# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FELISHATAY ALVARADO    :
   Plaintiff      :  Civil Action No. 22-3763
            :
   v.         :
            :
CITY OF PHILADELPHIA, *et al.*  :

# ORDER

   AND NOW, on this _____ day of _____, 2023, upon consideration of the Defendants' Motion for Summary Judgment, *Doc. No. 28*, and the Plaintiff's response in opposition thereto, it is hereby **ORDERED** that the Defendants' Motion is **DENIED**.

         **BY THE COURT:**

         _____
         **John F. Murphy, District Judge**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FELISHATAY ALVARADO | : | |
| Plaintiff | : | Civil Action No. 22-3763 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, *et al.* | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Felishatay Alvarado ("Ms. Alvarado"), by and through her undersigned counsel, hereby responds in opposition to the Defendants' Motion for Summary Judgement.  Ms. Alvarado hereby incorporates by reference her attached Memorandum of Law, and respectfully requests for the Court to **deny** the Defendants' Motion for Summary Judgement, for the reasons set forth therein.

Respectfully submitted,

/s/ Keith West
**Keith West, Esquire**
**VICTIMS' RECOVERY LAW CENTER**
**PA Attorney ID No. 317426**
**121 South Broad Street, 18th Floor**
**Philadelphia, PA 19107**
**keith@victimrecoverylaw.com**
*Attorneys for the Plaintiff*

# TABLE OF CONTENTS

Table of Contents ..................................................... **i**

Table of Authorities ................................................ **ii**

List of Exhibits ...................................................... **v**

I. Introduction ...................................................... **1**

II. Relevant Factual and Procedural Background ........... **2**

III. Applicable Law and Legal Argument ..................... **15**

   A. Summary Judgment Standard .......................... **16**

   B. The Individual SWAT Unit Officers Violated Ms. Alvarado's "Clearly Established" Fourth Amendment Rights When They Invaded Her Home with a Ram Without First Knocking and Announcing Their Presence ........................................ **17**

   C. The Individual SWAT Unit Officers Violated Ms. Alvarado's "Clearly Established" Fourth Amendment Rights by Entering Her Home Without a Valid Warrant, and By Their Subsequent Search and Seizure of Her Person And Property ........................................ **25**

   D. The City of Philadelphia May Be Held Liable for Failing to Train its SWAT Unit Officers vis-à-vis How to Handle Dog Encounters, About the Knock and Announce Rule, or How to Conduct Reconnaissance in Relation to Enforcing a Search Warrant ........................................ **28**

    IV. Conclusion ..................................................... **32**

# TABLE OF AUTHORITIES

Allen v. District Attorney's Officer of Philadelphia, 644 F. Supp. 2d 600 (E.D. Pa. 2009) **25**

Anderson v. Liberty Lobby Inc., 477 U.S. 242 (1986) **17**

Arroyo v. City of Buffalo, 2020 U.S. Dist. LEXIS 72674 (W.D. N.Y., Apr. 23, 2020) **29**

Berg v. County of Allegheny, 219 F.3d 261 (3d Cir. 2000) **2, 15, 25**

Bellotte v. Edwards, 2011 U.S. Dist. LEXIS 168377 (N.D. W. Va., Mar. 30, 2011) **4, 18**

Brown v. Grabowski, 922 F.2d 1097 (3d Cir. 1990) **17**

Brown v. Muhlenberg Township, 269 F.3d 205 (3d Cir. 2001) **15**

Burton v. Teleflex Inc., 707 F.3d 417 (3d Cir. 2013) **17**

Carroll v. County of Monroe, 712 F.3d 649 (2d Cir. 2013) **29**

Castro v. United States, 34 F.3d 106 (2d Cir. 1994) **27**

City of Canton v. Harris, 489 U.S. 378 (1989) **16**

City of Los Angeles v. Mendez, 581 U.S. 420 (2017) **2**

Coolidge v. New Hampshire, 403 U.S. 443 (1971) **15**

Estate of Singletary v. City of Philadelphia, 2021 WL 5235232, 2021 U.S. Dist. LEXIS 217607 (E.D. Pa., Nov. 10, 2021) **5, 21, 25, 28**

Fullerton v. Tinton Falls, 2020 U.S. Dist. LEXIS 180333 (D. N.J., Sep. 30, 2020) **29**

Hammond v. Acerno, 2021 U.S. Dist. LEXIS 213243 (E.D. Pa. 2021)   **31**

Hudson v. Michigan, 547 U.S. 586 (2006)   **19**

Hunter v. Bryant, 112 S. Ct. 534 (1991)   **27**

Klein v. Madison, 374 F. Supp. 3d 389 (E.D. Pa. 2019)   **15**

Kornegay v. Cottingham, 120 F.3d 392 (3d Cir. 1997)   **15, 19**

Malley v. Briggs, 475 U.S. 335 (1986)   **27**

Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986)   **17**

Mendez v. City of Los Angeles, 897 F.3d 1067 (9th Cir. 2018)   **20, 27**

Miller v. United States, 357 U.S. 301 (1958)   **24**

Murphy v. Grochowski, 2022 U.S. Dist. LEXIS 141591 (M.D. Pa., Aug. 9, 2022)   **19**

Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265 (3d Cir. 2010)   **17**

San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962, (9th Cir. 2005)   **29**

Sears v. Philadelphia, 2022 U.S. Dist. LEXIS 168313 (E.D. Pa., Sep. 19, 2022)   **19**

Sledd v. Lindsay, 102 F.3d 282 (7th Cir. 1996)   **18, 20**

Thomas v. Cumberland County, 749 F.3d 217 (3d Cir. 2014)   **16**

United States v. Andrews, 2023 U.S App. LEXIS 19397, 2023 WL 4824700 (3d Cir., July 27, 2023)   **26, 27**

United States v. Banks, 540 U.S. 31 (2003) **18, 24**

United States v. Gallegos, 314 F.3d 456 (10th Cir. 2002) **4**

United States v. Lucht, 18 F.3d 541 (8th Cir. 1994) **17**

United States v. Nolan, 718 F.2d 589 (3d Cir. 1983) **19**

United States v. Weaver, 808 F.3d 26 (D.C. Cir. 2015) **24**

Welsh v. Wisconsin, 466 U.S. 740 (1984) **18**

Wilson v. Arkansas, 514 U.S. 927 (1995) **17, 19**

Wu v. Arouh, 2016 U.S. Dist. LEXIS 30483 (E.D. Pa., Mar. 8, 2016) **5**

**LIST OF EXHIBITS**

A.  Transcript of the Deposition of Plaintiff, Felishatay Alvarado

B.  Report of Glenn Garrels

C.  Transcript of the Deposition of Defendant, Brian Murray

D.  Transcript of the Deposition of Defendant, James Ashford

E.  Transcript of the Deposition of Dana Shannon

F.  Transcript of the Deposition of Jaclyn Matteo-Hand

G.  Transcript of the Deposition of Defendant, Patrick Saba

H.  Transcript of the Deposition of Defendant, Heriberto Quintana

I.  Report of Dr. Veronique Valliere

J.  Transcript of the Deposition of Defendant, Eric Clark

K.  OISI Statement of Defendant, Brian Murray

L.  OISI Statement of Defendant, Eric Clark

M.  OISI Statement of Defendant, Demetrius Monk

N.  Transcript of the Deposition of Defendant, Demetrius Monk

O.  Transcript of the Deposition of Defendant, Kevin Mellody

P.  Transcript of the Deposition of Defendant, Edward Song

Q.  Transcript of the Deposition of Defendant, Joshua Burkitt

R.  Transcript of the Deposition of Defendant, Jose Hamoy

S.  Search Warrant and Affidavit

T.  Transcript of the Deposition of Detective, Francis Graf

U.  Transcript of the Deposition of Defendant, Kevin Mellody

V.  PPD Directive 5.7

W.  PPD Directive "Dog Encounters"

X.  Transcript of the Deposition of Detective, Timothy Scally

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FELISHATAY ALVARADO | : | |
| Plaintiff | : | Civil Action No. 22-3763 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, *et al.* | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.   Introduction

On June 4, 2021, Plaintiff, Felishatay Alvarado ("Ms. Alvarado"), was the victim of an unreasonable search and seizure of her home, person, and property (including the summary execution of her service dog, Akuma), by the SWAT Unit of the Philadelphia Police Department, in clear violation of long-established Fourth Amendment law. Accordingly, this civil action is brought under 42 U.S.C. § 1983.  The Individual SWAT Unit Officers, who conducted and supervised the illegal raid of Ms. Alvarado's home,[1] should be held liable for the injuries suffered by Ms. Alvarado that were proximately

---

[1]    In paragraph 28 of the Defendants' Statement of Undisputed Material Facts, the Defendants say that no evidence has been adduced that Defendants, James Ashford, Cyprian Scott, Matthew Fitzpatrick, Migeul Rivera, Heriberto Quintana, Phillip Riotto, or Michael Cerruti, "entered Plaintiff's first-floor unit."  This is true; Ms. Alvarado does not oppose the dismissal of *these defendants only*.  By contrast, Defendants, Joshua Burkitt, Eric Clark, Jose Hamoy, Kevin Mellody, Demetrius Monk, Brian Murray, Patrick Saba, and Edward Song (collectively may be referred to herein as "the Individual SWAT Unit Officers") *did* conduct and/or supervise the illegal raid, and for that reason the instant Motion should be *denied* with regards to the Individual SWAT Unit Officers.  Accord Defendants' Statement of Undisputed Facts at ¶ 19.

caused by the Individual SWAT Unit Officers' illegal and wrongful conduct.  See City of

Los Angeles v. Mendez, 581 U.S. 420, 431 (2017) (holding that a § 1983 plaintiff may

recover for *all* damages "proximately caused *by the warrantless entry*") (emphasis in

original). Additionally, the City of Philadelphia should be held subject to Monell liability

for failing to train the Individual SWAT Unit Officers regarding the "knock and

announce" rule, conducting reconnaissance before enforcing a search warrant, or how to

handle dog encounters in a non-lethal manner.  Compare Berg v. County of Allegheny,

219 F.3d 261, 276-277 (3d Cir. 2000) (valid Monell claim asserted against municipal

government that implemented computer system that issued arrest warrants with "no

'double check' to ensure that warrants were issued in the correct name"). Hence, the

instant Motion should be denied.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On the morning of June 4, 2021, Ms. Alvarado resided by herself with two dogs

and some other pets in Apartment #1, which was located on the ground floor / Torresdale

Avenue side of the apartment building that has a mailing address of 4664 Torresdale

Avenue, Philadelpha, PA 19124.  See Ms. Alvarado's Deposition at 11:12-11:24, 24:7-

24:23, a copy of which is attached hereto at Exhibit "A." As stated in the expert report

prepared for this case by Dr. Veronique Valliere, Ms. Alvarado was 31 years old at the time

and had woken up at around 5:00 AM to get ready for work.  See Dr. Valliere's report at 3,

a copy of which is attached hereto at Exhibit "I." Although Ms. Alvarado was on disability

due to the lingering effects of a childhood illness, and an anxiety condition that was

precipitated by the death of her mother, she had recently taken steps to obtain more

independence by taking a job sorting items at a local warehouse.  See Ms. Alvarado's Deposition at 11:12-11:24, 24:7-24:23, a copy of which is attached hereto at Exhibit "A;" see also Dr. Valliere's report at 4, a copy of which is attached hereto at Exhibit "I." She had also obtained her beloved dog, Akuma, which was a registered service animal, to help treat her anxiety condition.  See Ms. Alvarado's Deposition at 30:1-30:9, a copy of which is attached hereto at Exhibit "A." Ms. Alvarado has never had any legal trouble of any kind in her life and was "a peace-loving, introverted, simple individual who had made a life for herself with a chronic disorder and difficulties with learning."  See Dr. Valliere's report at 10, a copy of which is attached hereto at Exhibit "I."

Suddenly, Ms. Alvarado's life came crashing down at approximately 6:00 AM, when the Individual SWAT Unit Officers rammed down Ms. Alvarado's front door, summarily executed Akuma, ransacked her home, and held her hostage at gunpoint for approximately 30 minutes. Getting ready for her new job, Ms. Alvarado had recently gotten out of the shower and was nude except for a towel.  See Ms. Alvarado's Deposition at 38:3-38:11, 87:8-87:24, a copy of which is attached hereto at Exhibit "A."  Ms. Alvarado testified that the Individual SWAT Unit Officers did not knock before breaking open her door with a ram.  Id. at 34:2-34:17.

Ms. Alvarado's testimony is consistent with the evidence — *the Individual SWAT Unit Officers did not knock and announce themselves before breaking down Ms. Alvarado's front door.*  The video, captured by a neighboring deli (the Defendants were not wearing bodycams), shows that the Individual SWAT Unit Officers began ramming Ms. Alvarado's front door almost immediately after arriving on the scene.  Officer Clark was the SWAT

Unit Officer who rammed Ms. Alvarado's front door open.  See Officer Clark's Deposition at 83:10-84:13, a copy of which is attached hereto at Exhibit "J."  When Officer Clark was deposed and viewed the video, he claimed that it looked to him like Officer Murray knocked on the door with a Halligan tool "at most [ . . .] about seven seconds" before Officer Clark rammed Ms. Alvarado's door open, which he said "complie[d] with the knock and announce rule [ . . .] pursuant to [the] training [he had] received from the Philadelphia Police Department."  Id. at 79:5-80:19.  Even if Officer Clark's interpretation of the video was accurate, a mere seven second pause in a case such as this, with absolutely no exigent circumstances, would not comply with the knock and announce rule, as developed more fully in the legal argument section below.  See e.g., Bellotte v. Edwards, 2011 U.S. Dist. LEXIS 168377, at *15-32 (N.D. W. Va., Mar. 30, 2011) (holding that, absent exigent circumstances, a mere seven second wait does not satisfy the knock and announce rule; *granting summary judgment in favor of the § 1983 plaintiff*, because "under the totality of the circumstances [. . .] the Police Defendants' seven-second wait was unreasonable as a matter of law"); and United States v. Gallegos, 314 F.3d 456, 459-460 (10th Cir. 2002) (holding that "an interval of less than ten seconds in the absence of exigent circumstances" is never permissible under the knock and announce rule).

*But we know that Officer Murray did not knock on Ms. Alvarado's door either, because he said that he did not do it.*  The video — which has no sound and is not shot at a direct angle — is somewhat ambiguous on this point, it is simply not clear what Officer Murray was doing with the Halligan tool in the seconds preceding the breach.  However,

in the statement that Officer Murray gave to the Philadelphia Police Department Officer Involved Shooting Unit a mere two hours after the incident giving rise to this case, a copy of which is attached hereto at Exhibit "K," Officer Murray claimed that "Officer Clark conducted the knock and announce." When Officer Murray was deposed in this case, he again claimed that Officer Clark was the one who knocked and announced before Ms. Alvarado's door was breached. See Officer Murray's Deposition at 12:21-13:6, a copy of which is attached hereto at Exhibit "C." Indeed, even Officer Clark — in the statement he gave to the Philadelphia Police Department Officer Involved Shooting Unit right after the incident, a copy of which is attached hereto at Exhibit "L" — claimed that *he* performed the knock and announce. And the lead supervisor of the operation, Lt. Monk, claimed in his Officer Involved Shooting Unit Statement, a copy of which is attached hereto at Exhibit "M," that "[u]pon arrival, Officer Clark approached the door, knocked and announced 'Police, with a warrant, open the door.'" Simply stated, Officer Murray, Officer Clark, and Lt. Monk did not tell the truth in their Officer Involved Shooting Unit Statements; the video, which they did not know was being recorded, shows plainly that Officer Clark could not possibly have performed a knock and announce before ramming Ms. Alvarado's door open. That Officer Murray, Officer Clark, and Lt. Monk may have lied about this issue invites the natural inference that they *knew that no one performed any sort of knock and announce* before Ms. Alvarado's door was breached. Wu v. Arouh, 2016 U.S. Dist. LEXIS 30483, at *25 (E.D. Pa., Mar. 8, 2016) ("false or contradictory testimony permits an inference of guilt") (citation omitted); Estate of Singletary v. City of Philadelphia, 2021 WL 5235232, 2021 U.S. Dist. LEXIS 217607, at *37-40 (E.D. Pa.,

Nov. 10, 2021), <u>appeal dismissed by</u> 2023 U.S. App. LEXIS 20933 (3d Cir. Pa., Aug. 10, 2023) (inconsistencies in the testimony of Philadelphia Police Officers "calls into question whether the Defendant Officers may have coordinated or fabricated their accounts," thus questions of material fact precluded summary judgement). Moreover, even if Officer Murray did knock on the door (which, again, would be contrary to every Officer Involved Shooting Unit Statement and his own testimony), the video shows that only two seconds would have elapsed from the knock until Lt. Monk ordered for the door to be breached. <u>See</u> Mr. Garrels' report at 32-33, a copy of which is attached hereto at Exhibit "B."

Not only did the Individual SWAT Unit Officers fail to knock and announce before breaking and entering into Ms. Alvarado's apartment, *but every single one of them admitted when deposed in this case that no exigent circumstances existed to excuse their conduct*. <u>See</u> Lt. Monk's Deposition at 44:20-44:24, a copy of which is attached hereto at Exhibit "N;" Sgt. Mellody Deposition at 74:8-74:15, a copy of which is attached hereto at Exhibit "O;" Officer Clark Deposition at 66:19-67:10, a copy of which is attached at Exhibit "J;" Officer Murray Deposition at 20:5-20:9, a copy of which is attached hereto at Exhibit "C;" Officer Saba Deposition at 55:11-56:1, a copy of which is attached hereto at Exhibit "G;" Officer Song Deposition at 67:8-67:14, a copy of which is attached hereto at Exhibit "P;" Officer Song Burkitt at 53:1-53:6, a copy of which is attached hereto at Exhibit "Q;" Officer Hamoy Deposition at 56:20-57:5, a copy of which is attached hereto at Exhibit "R." Rather, this is a situation where the Individual SWAT

Unit Officers had no excuse for taking shortcuts and trampling over Ms. Alvarado's basic

protected freedoms.

> Q. Okay. Prior to the door being breached in this situation, were there any exigent circumstances whatsoever that you're aware of?
>
> [The Defendants' Counsel]: Object to form. But Officer, you can answer if you can.
>
> Q. Just to give some clarification to the question. When I use the term exigent circumstances, you know what that means, right?
>
> A. Sure. Yes.
>
> Q. Were there an exigent circumstances that required any sort of emergency?
>
>         ***
>
> A. No.
>
> Q. Okay. Philadelphia Police Department prior to breaching the door had total control of the situation, correct?
>
>         ***
>
> A. Yes.
>
>         ***
>
> Q. And this was a preplanned warrant enforcement operation, correct?
>
> A. Yes.
>
> Q. Did Ms. Alvarado do anything that day that you can recall that any officer would have reasonably believed created a danger that they had to react to?
>
> A. No.

See Officer Saba Deposition at 55:11-56:17, a copy of which is attached hereto at Exhibit "G."

The Individual SWAT Unit Officers did not even have a warrant to enter Ms. Alvarado's residence. Rather, they had obtained a search warrant for the "2nd floor rear" apartment of the apartment building, a copy of which is attached hereto at Exhibit "S." The affidavit affixed to the search warrant stated that the "2nd floor rear" apartment address for the Arrestee was obtained from the Arrestee's probation officer. Id. However, if the Defendants had simply asked the Arrestee's probation officer how the "2nd floor rear" apartment was entered, she would easily have been able to inform them that the only entrance to the Arrestee's apartment was through the "rear" door on the *cul-de-sac* off Margaret Street, as was memorialized in multiple places within the Arrestee's probation records. See Dana Shannon's Deposition at 22:22-23:22, 25:22-29:3, a copy of which is attached hereto at Exhibit "E;" and Jaclyn Matteo-Hand's Deposition at 7:16-8:24, 18:21-21:5, a copy of which is attached hereto at Exhibit "F."

In theory, Sgt. Mellody and Officer Clark conducted "reconnaissance" before the SWAT Unit attempted to enforce the search warrant for the "2nd floor rear" apartment by breaking down the front door to Ms. Alvarado's first-floor apartment. See Sgt. Mellody Deposition at 13:18-16:6, a copy of which is attached hereto at Exhibit "O." But Sgt. Mellody did not even include learning whether the Arrestee was on probation as part of this "reconnaissance," which he said was consistent with his training. Id. at 30:5-30:14. Of course, as part of the probation process, the probation office had conducted a physical

examination of the Arrestee's residence and therefore knew how to physically enter the "second floor rear" apartment; this should have been especially obvious to the Defendants since the Arrestee had, until recently, been *on house arrest*:

> Q.  So this case involves someone named
>     [ . .] . Was he put on house arrest?
>
> A.  Yes.
>
> Q.  And for every person who's placed under house arrest,
>     would there need to be some people [ . .] who go out
>     and inspect their house?
>
> ***
>
> A.  Yes.
>
> Q.  So not to beat a dead horse, but in the City of
>     Philadelphia, every time somebody is placed under
>     house arrest, that would mean somebody from the
>     [probation] office would have actually gone to that
>     person's house and inspected the premises, right?
>
> A.  Yes.

See Jaclyn Matteo-Hand's Deposition at 6:13-7:8, a copy of which is attached hereto at Exhibit "F."

Amazingly, Det. Graf — the person who completed the affidavit for the search warrant and who spoke with the Arrestee's probation officer (without asking how the Arrestee's apartment could be physically entered) — a man who has been employed by the Philadelphia Police Department since 1995, the last 11 and a half years as a homicide detective — claimed to have no idea how the probation system works in the City of Philadelphia:

> Q.  In your experience if a suspect had been placed on
>     house arrest, would that mean that someone from the

> Probation [and] Parole Office had, by necessity, made a
> physical inspection of the house?
>
> ***
>
> A.  I don't know. I don't know their procedures.
>
> Q.  Okay.  So in your many years of experience with the
> Philadelphia Police Department, you have never been
> educated as far as what the procedures of the
> Philadelphia Probation and Parole Office are?
>
> ***
>
> A.  I don't know what their procedures — I can only
> assume. I don't know what their actual procedures are.

See Det. Graf's Deposition at 15:3-15:22, a copy of which is attached hereto at Exhibit

"T."

The "reconnaissance" was also so bad in this case that the Defendants did not

even know that the apartment building had a rear door.  Id. at 20:16-21:12, 27:8-31:24

(Det. Graf testifying that he had no idea that the building had a rear door, and that the

SWAT Unit supervisors gave no indication of knowing that either); Lt. Monk's

Deposition at 53:16-56:19 (testifying that he was not "aware of the existence of a rear

door prior to breaching Ms. Alvarado's apartment"), a copy of which is attached hereto at

Exhibit "N;" Officer Song's Deposition at 44:9-45:7 (testifying that the reconnaissance

done on the property determined that there was no rear door), a copy of which is attached

hereto at Exhibit "N."  Even so, it should have been obvious from a basic visual

examination of the building that Ms. Alvarado's front door — which led into a portion of

the building that was obviously only one-story tall — did not lead to a "rear second floor"

apartment.  As Officer Saba admitted when he was deposed in this case, even a cursory,

visual review of the subject building would have shown that the front door to Ms.

Alvarado's apartment was not the entrance to the "2nd floor rear" apartment to which

the warrant applied:

> Q.      All right, sir.  Do you recognize what this is a picture
>         of?
>
> A.      Uh-huh.  Yes, I do.
>
> Q.      What is this picture of?
>
> A.      [. . .] [I]t depict[s] the tan colored property [that] was
>         the location that we went into.
>
> Q.      Right.  And is it your testimony then, the tan colored
>         house pictured here, was the residence where Ms.
>         Alvarado lived?
>
> A.      Yes.
>                                 ***
>
> Q.      Is that the door that got breached?
>
> A.      Yes.
>
> Q.      Do you see any second floor above that door?
>
>                                 ***
> A.      No.
>
> Q.      So do you think it would be reasonable for someone to
>         believe that this [. . .] door led to the second floor of a
>         building?
>                                 ***
> A.      No.  It wouldn't be reasonable.

See Officer Saba Deposition at 41:4-42:14, a copy of which is attached hereto at Exhibit

"C."

Besides these unreasonable oversights — such as failing to ask the parole officer how to access the unit, failing to look for a rear door when the word "rear" was in the warrant, and failing to notice that Ms. Alvarado's front door obviously led directly into a first-floor apartment — Plaintiff's well-qualified expert, Glenn Garrels, documented in his report a seemingly-endless list of obviously incompetent decisions or oversights by the Defendants, and even more damagingly a complete lack of training by the Philadelphia Police Department.  As Mr. Garrels — a retired Lieutenant with the New Jersey State Police — notes, a simple Google Earth search would have revealed that from the overhead view, it was obvious that the Torresdale Avenue door led directly into a portion of the building that was only one-story tall, whereas the door on the *cul-de-sac* off Margaret Street led to the second-floor area.  See Mr. Garrels' report at 16, 22, a copy of which is attached hereto at Exhibit "B."  Further, a directive of the Philadelphia Police Department required that "the executing officer have no doubt as to who or what can be seized and where they may be found," which was plainly violated in this case because all of the Individual SWAT Unit Officers admitted that they did not know where Ms. Alvarado's front door led to.  Id. at 31.  Faced with uncertainty, Sgt. Mellody admitted that he could have contacted the property manager or reviewed property records, but he simply declined to do so.  Id. at 33-34.  The Defendants have offered no excuse for taking these reckless shortcuts, when they knew there was at least *uncertainty* whether breaching Ms. Alvarado's front door was permissible.  While the Individual SWAT Unit Officers should be held individually liable for their unreasonable conduct, their gross

incompetence also resulted from an almost complete failure by the City to train them. <u>Id.</u> at 48-56.

After illegally bursting into Ms. Alvarado's apartment without knocking and announcing themselves, the Individual SWAT Unit Officers then set about terrorizing Ms. Alvarado and destroying her property. "Less than eight seconds" after Ms. Alvarado's front door was breached, Officer Song shot Ms. Alvarado's service dog, Akuna, in the head. <u>See</u> Officer Ashford's Deposition at 81:4-82:20, 84:3-84:17, a copy of which is attached hereto at Exhibit "D." Officer Song's conduct blatantly violated a directive of the Philadelphia Police Department pertaining to dog encounters. <u>See</u> Mr. Garrels' report at 46-48. But the City's training was so lacking that Officer Song did not even know the directive existed. <u>See</u> Officer Song's Deposition at 88:1-89:19, a copy of which is attached hereto at Exhibit "P." Officer Song has been a SWAT Officer for 15 years and an Officer with the Philadelphia Police Department for 23 years. <u>Id.</u> at 9:18-9:23. In all that time, Officer Song never received any training from the City pertaining to how to handle dog encounters in the line of duty. <u>Id.</u> at 16:14-17:12.

Although Officer Song claimed that he shot Akuna because the dog bit him, he admitted that *there was "no physical evidence of a dog bite."* <u>Id.</u> at 60:4-61:10. Officer Song's claim of having been bitten by Akuna is simply not credible. Moreover, Officer Song admitted that Akuna was "about two feet away" when he killed the dog. <u>Id.</u> at 69:12-69:14. Ms. Alvarado testified that when the Individual SWAT Unit Officers suddenly burst through the front door, Akuna was in his kennel. <u>See</u> Ms. Alvarado's Deposition at 41:4-41:13, a copy of which is attached hereto at Exhibit "A." Akuna and

the other animals naturally became agitated when the Individual SWAT Unit Officers suddenly burst through the front door, and Ms. Alvarado was denied an opportunity to defuse the situation:

> A. They came through the front door. And I told my dogs to calm down. They was okay. [Akuna] calmed down. And then I told him, let me put him in the cage, let me put him in the cage a few times. And they said, no. And they shot [Akuna].
>
> And they were just asking how do you get to the second floor. And when they had shot him, they shot him. They had me on the floor. They didn't let me move. They didn't want to show me the search warrant. They told me don't talk and just sit there on the floor.
>
> ***
>
> Q. When the officers came through the door, did they come right up to you or did any of them come right up to you?
>
> A. They had the gun to my face and told me to get on the ground.

Id. at 44:1-44:20, 46:4-46:11.

The Individual SWAT Unit Officers then proceeded to tear Ms. Alvarado's apartment apart, "ripping the curtains" and generally turning her property over. Id. at 50:1-51:9. *Then, for about "half an hour," Ms. Alvarado's was held prisoner in her apartment, forced at gunpoint to lie face-down on her floor virtually nude.* Id. at 53:4-54:3. This illegal search and seizure of Ms. Alvarado's person, home, and property continued despite the fact that the Individual SWAT Unit Officers realized that they were in the wrong apartment almost immediately after breaking Ms. Alvardo's front door, and knew that they were not legally allowed to be in Ms. Alavarado's first-floor

apartment.  <u>See</u> Officer Saba's Deposition at 16:11-20:3, a copy of which is attached

hereto at Exhibit "G."  Nevertheless, the Individual SWAT Unit Officers readily admit

that Ms. Alvarado conducted herself in a proper manner at all times.  <u>Id.</u> at 56:13-56:17.

## III.  APPLICABLE LAW AND LEGAL ARGUMENT

The Individual SWAT Unit Officers and the City of Philadelphia clearly violated

Ms. Alvarado's Fourth Amendment right to be secure "against unreasonable searches

and seizures."  The Individual SWAT Unit Officers violated several of Ms. Alvarado's

"clearly established rights," as that term is used in § 1983 jurisprudence.  The Third

Circuit Court of Appeals established over 26 years ago that, absent exigent

circumstances, law enforcement officers violate a citizen's "clearly established" rights

under the Fourth Amendment when they fail to "knock and announce their presence"

prior to conducting a search of the citizen's home.  <u>Kornegay v. Cottingham</u>, 120 F.3d

392, 396-397 (3d Cir. 1997).  "The right to be free of warrantless searches of one's

residence unless exigent circumstances apply" is also "clearly established."  <u>Klein v.

Madison</u>, 374 F. Supp. 3d 389, 416 (E.D. Pa. 2019), <u>citing</u> <u>Coolidge v. New Hampshire</u>,

403 U.S. 443, 474-475 (1971).  It is also "clearly established" that "[t]he Fourth

Amendment prohibits arrests without probable cause."  <u>Berg</u>, 219 F.3d at 269.  And it

has long been "clearly established" that law enforcement officers commit an

unreasonable seizure of property in violation of the Fourth Amendment when they kill a

person's dog "in the absence of a substantial public interest that would be served by the

destruction."  <u>Brown v. Muhlenberg Township</u>, 269 F.3d 205, 209-210 (3d Cir. 2001).

Accordingly, the Individual SWAT Unit Officers violated Ms. Alvarado's "clearly

established" Fourth Amendment rights, for independent and separate reasons, when they (1) broke and entered into her home without first knocking and announcing and giving her a reasonable opportunity to voluntarily surrender the premises and secure her pets from harm; (2) recklessly entered her residence without a warrant or any reasonable basis to claim an innocent mistake; (3) arrested her even though they knew she was not a suspect; and (4) killed her service dog. Moreover, the need for SWAT Unit Officers to receive training regarding these "clearly established" Fourth Amendment rights was "plainly obvious," and therefore the City of Philadelphia may also be held directly liable for its apparent deliberate indifference to the constitutional rights of its citizens in that it failed to ensure that the Individual SWAT Unit Officers received training pertaining to these "clearly established" rights. See e.g., Thomas v. Cumberland County, 749 F.3d 217, 223-224 (3d Cir. 2014); City of Canton v. Harris, 489 U.S. 378, 388 (1989).z

## A.  SUMMARY JUDGMENT STANDARD

Summary judgment may only be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). When applying this standard, the court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013).

When considering a motion for summary judgment, the Court is not permitted to weigh the evidence or to make credibility determinations and is limited to deciding

whether there are any genuine and material issues in dispute. <u>Anderson v. Liberty Lobby</u> <u>Inc.</u>, 477 U.S. 242, 255 (1986). The inquiry, then, involves determining "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Brown v. Grabowski</u>, 922 F.2d 1097, 1111 (3d Cir. 1990), <u>quoting</u> <u>Anderson</u>, 477 U.S. at 251–252. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." <u>Pignataro v. Port</u> <u>Auth. of N.Y. & N.J.</u>, 593 F.3d 265, 268 (3d Cir. 2010).

### B. THE INDIVIDUAL SWAT UNIT OFFICERS VIOLATED MS. ALVARADO'S "CLEARLY ESTABLISHED" FOURTH AMENDMENT RIGHTS WHEN THEY INVADED HER HOME WITH A RAM WITHOUT FIRST KNOCKING AND ANNOUNCING THEIR PRESENCE

The Defendants in their Motion for Summary Judgment cite the Eighth Circuit Court of Appeals' decision in <u>United States v. Lucht</u> for the supposed proposition "that a mere 6-8 seconds [is] sufficient" to satisfy the knock and announce rule. <u>See</u> the Defendants' Memorandum of Law at 14. But this case is easily distinguishable from <u>Lucht</u>, because the <u>Lucht</u> court specifically held that there were exigent circumstances present in that case, and that the suspect actually opened the door during that period. 18 F.3d 541, 549-550 (1994). By contrast, in this case there were no exigent circumstances, and Ms. Alvarado certainly did not open the door. Further, the Defendants did not even wait "6-8 seconds" before ramming open Ms. Alvarado's door; the video supports, at most, a 7 second period of time between Officer Murray possibly striking Ms. Alvarado's front door with a Halligan tool and Officer Clark ramming the door open; but a reasonable

juror could easily conclude that there was no knock, in light of Ms. Alvarado's testimony

that there was none at all, the ambiguity of the video evidence, and the fact that in

numerous statements and depositions *none of the Defendants have ever claimed that a*

*knock and announce was performed by Officer Murray*; rather, a knock and announce was

supposedly performed by Officer Clark, and the video evidence clearly shows that the

many Defendants who repeated that narrative in numerous statements and depositions

simply were making up a story.[2]  Compare Sledd v. Lindsay, 102 F.3d 282, 286 (7th Cir.

1996) (holding that conflicting testimony of plaintiff and defendant police officers as to

whether the police had knocked and announced themselves before entering the home

meant that there were material questions of fact and that summary judgment was

inappropriate).

---

[2]     The Defendants also cite United States v. Banks, holding a police knock-and-
announce time of 20 seconds permissible, but the Banks case rationale, too, was rooted in
exigent circumstances.  540 U.S. 31, 40 (2003) ("In this case [. . .] the police claim
exigent need to enter, and the crucial fact in examining their actions is not time to reach
the door but the particular exigency claimed"). In the case *sub judice*, the video clearly
shows that the Individual SWAT Unit Officers did not wait anywhere near 20 seconds
before breaking down Ms. Alvarado's front door; but, even more fundamentally, the
Defendants simply concede the total absence of any exigent circumstances. See Bellotte,
2011 U.S. Dist. LEXIS 168377, at *16 (observing that Banks involved a fact scenario
where the police were permitted to disregard the knock and announce rule because of
exigent circumstances, and holding that "[u]nlike in Banks, the Police Defendants cannot
claim that exigent circumstances justified their, at maximum, seven-second-wait between
announcing their presence and entering the [plaintiff's] residence").  The Defendants bear
the burden of demonstrating that exigent circumstances justified a departure from the
rights normally protected under the Fourth Amendment, and that burden is "heavy."
Welsh v. Wisconsin, 466 U.S. 740, 749-750 (1984).  That burden is not met here, and so
the Defendants cannot rely upon case law relaxing the knock and announce rule in the
context of exigent circumstances.

In Wilson v. Arkansas, a unanimous opinion authored by Justice Clarence Thomas, the United States Supreme Court held that the English common law requirement that a law enforcement officer must, absent exigent circumstances, knock and announce his presence before breaking into a home, was incorporated into the Fourth Amendment's reasonableness requirement. 514 U.S. 927 (1995). It is well-established in the Third Circuit that when law enforcement violates a person's Fourth Amendment rights by breaking and entering into the person's home without first "announc[ing] their presence and provid[ing] residents an opportunity to open the door," they are liable for damages in a subsequent § 1983 action. Sears v. Philadelphia, 2022 U.S. Dist. LEXIS 168313, at *8-9 (E.D. Pa., Sep. 19, 2022) (collecting authorities); accord Murphy v. Grochowski, 2022 U.S. Dist. LEXIS 141591, at *15-19, 23-32 (M.D. Pa., Aug. 9, 2022). *Indeed, the Supreme Court specifically held that § 1983 lawsuits for damages are the appropriate means for the important societal interests embodied in the knock and announce rule to be preserved and protected.* Hudson v. Michigan, 547 U.S. 586, 597-598 (2006).

The Third Circuit Court of Appeals has summarized the important societal interests embodied in the knock and announce rule as follows:

> First, it reduces the likelihood of injury to police officers, who might be mistaken, upon an unannounced intrusion into a home, for someone with no right to be there. Second, it seeks to prevent needless damage to private property. Finally, it embodies respect for the individual's right of privacy, which is to be imposed upon as little as possible in making an entry to search or arrest.

Kornegay, 120 F.3d at 396, quoting United States v. Nolan, 718 F.2d 589, 596 (3d Cir. 1983). The Wilson Court described the knock and announce rule as rooted in English

common cases holding that law enforcement must "first signify to those in the house the cause of [their] coming, and request them to give admittance," and embracing the "view that the breaking of the door of a dwelling was permitted" only after "admittance was refused." 514 U.S. at 932-933 (citations omitted). Needless tragedies caused by armed law enforcement bursting unannounced into private residences — which here, *inter alia*, resulted in the foreseeable and preventable death of Ms. Alvarado's service animal — are precisely the sort of harm that the knock and announce rule is intended to prevent.

Accord Mendez v. City of Los Angeles, 897 F.3d 1067, 1077 (9th Cir. 2018) ("the risk of injury posed by the entry of an armed stranger into a residence is one of the reasons the Fourth Amendment prohibits entry except under defined specific conditions"); Sledd, 102 F.3d at 287-288 (holding that police officers' failure to follow the knock and announce rule "unreasonably created the encounter that led to the use of force," where the plaintiff's decedent pulled a gun on intruding police officers in evident self-defense and was then shot to death).

The Philadelphia Police Department had in effect at the time of the incident Directive 5.7, titled "Search Warrants," which under a subpart titled, "Knock and Announce Rule," reads:

> The courts have not precisely and uniformly determined the exact period of time that can be considered "reasonable." However, recent court decisions have shown that ***30 seconds should be the minimum time police personnel should delay their entry into a property after announcing their presence and purpose.***

See Philadelphia Police Department Directive 5.7 at § 6B, a copy of which is attached hereto at Exhibit "V" (emphasis added).  The fact that the Individual SWAT Unit Officers plainly made no effort to comply with Directive 5.7 *vis-à-vis* the warrant enforcement action that resulted in Ms. Alvarado's catastrophic injuries is itself significant evidence that their actions were not "reasonable."  Singletary, 2021 U.S. Dist. LEXIS 217607, at *32-33 (collecting cases).

Again, the Individual SWAT Unit Officers concede that there were no exigent circumstances, therefore as a corollary they have not provided any valid explanation as to why they did not follow Directive 5.7 and announce their presence at Ms. Alvarado's home and then provide her "at minimum" thirty seconds to voluntarily surrender the premises and secure her dogs. Thirty seconds that would have turned a life-altering tragedy into a mere inconvenience, because Ms. Alvarado certainly would have voluntarily surrendered and secured Akuna in his cage, *if given an opportunity*.   Lt. Monk, who gave the order for Ms. Alvarado's door to be breached, admitted that he did not provide Ms. Alvarado as much time as he should have to surrender the premises, but his explanation for doing this simply made no sense:

> Q. So am I correct to understand your testimony as saying that you knew, prior to entering Ms. Alvarado's apartment, that under the policies and procedures of the Philadelphia Police Department, you were required to knock on the door before entering and give the occupant sufficient time to voluntarily surrender the premises?
>
> ***
>
> A. That's correct.

***

Q.      How long — how much time passed between that
        knock and the front door being breached?

A.      If I was to guess, 15, 20 seconds perhaps.

***

Q.      Did you use any techniques to try to figure out how
        much time passed [. . .]?

***

A.      No.

Q.      What is your basis for saying that you believe at least
        15 to 20 seconds passed?

***

A.      Because my state of mind at the time, typically with a
        multi-unit property, you knock on the exterior door and
        often times the occupants do not hear.  So you give a
        brief knock on that exterior door, breach that, and then
        you give an extended knock on the door leading into
        whatever premises we were going into.

Q.      So you intentionally gave less time than you thought
        was required for Ms. Alvarado to respond when you
        breached her door; is that your testimony?

***

A.      We're knocking on the door to allow the second
        floor occupant to come down.

Q.      But when you breached the first floor door, you knew
        that you had allowed enough time for someone on the
        first floor to voluntarily answer the door.  Is that
        correct?

***

A.      When we're knocking on the main exterior door, it's
        unknown to us that is actually the first floor door.

Q.      But regardless, the point being that you knew that you were giving less time than you would have if it had been a front door that you knew was occupied, correct?

                                    ***

A.      Yes.

                                    ***

Q.      Was that consistent with the training you received from the Philadelphia Police Department?

                                    ***

A.      I would go by experience that I've had on this job.

Q.      Okay.  Is that a way of saying that it was not consistent with the training that you received?

                                    ***

A.      It was consistent. Again, we did a knock and announce. It might have been shortened, but we did a knock and announce and there were dogs barking inside as well.

Q.      Did the training that you received from the Philadelphia Police Department give you any sort of guidance as to how much time you should let pass between knocking on someone's front door and smashing it open?

                                    ***

A.      Typically it's about 30 seconds.

Q.      Okay.  So the training you received was you should wait at least 30 seconds, correct?

                                    ***

A.      Not should wait, but typically about 30 seconds is appropriate, yes.

> Q.    And so you will admit now that you did not follow your training because you did not allow at least 30 seconds to pass, correct?
>
> ***
>
> A.    I followed my training, but no, I did not allow the 30 seconds.

See Lt. Monk's Deposition at 37:20-44:6, a copy of which is attached hereto at Exhibit "N."

It should be remembered that Lt. Monk *objectively* did not wait 15 to 20 seconds before ordering the SWAT Unit to smash through Ms. Alvarado's front door; he waited either zero seconds or, at maximum, two seconds. His obliviousness to the fact that he smashed open somebody's front door is simply unreasonable and his description of an "exterior door" makes no sense whatsoever in the context of this building. Even more troubling, Lt. Monk seems to be saying that he intentionally "shortened" the knock and announce period *because* "often times the occupants do not hear." "The knock-and-announce rule requires officers to announce their presence and purpose and give an arrestee an opportunity to open the door of his home." United States v. Weaver, 808 F.3d 26, 39 (D.C. Cir. 2015), citing Miller v. United States, 357 U.S. 301, 308 (1958); and Banks, 540 U.S. at 38-39. Here, Lt. Monk effectively concedes that he had no intention of giving the occupant of Ms. Alvarado's home "an opportunity to open the door" before he sent Officer Clark to ram the door open.

**C. THE INDIVIDUAL SWAT UNIT OFFICERS VIOLATED MS. ALVARADO'S "CLEARLY ESTABLISHED" FOURTH AMENDMENT RIGHTS BY ENTERING HER HOME WITHOUT A VALID WARRANT, AND BY THEIR SUBSEQUENT SEARCH AND SEIZURE OF HER PERSON AND PROPERTY**

Even when a law enforcement officer has a valid warrant, if the law enforcement officer enforces the warrant at the wrong address as the result of failing to make a reasonable investigation in connection with the proper location described in the warrant, the law enforcement officer's action may be considered to be so unreasonable as to violate the Fourth Amendment's reasonableness requirement and to give rise to protentional § 1983 liability. Allen v. District Attorney's Officer of Philadelphia, 644 F. Supp. 2d 600, 607-610 (E.D. Pa. 2009). As the Third Circuit Court of Appeals held in Berg, a government official may not claim reliance upon a facially valid warrant as an excuse to commit unreasonable actions that violate a citizen's Fourth Amendment protection against unreasonable searches and seizures. 219 F.3d at 269-273.

Here, genuine questions of material fact exist as to whether the Individual SWAT Unit Officers conducted a reasonable investigation before smashing Ms. Alvarado's front door in a supposedly mistaken effort to enforce a warrant to enter the "2nd floor rear" apartment. As recounted in Mr. Garrels' report, the Individual SWAT Unit Officers failed to comply with numerous Philadelphia Police Department Directives in relation to the reconnaissance conducted prior to this operation. The Individual SWAT Unit Officers' failure to comply with the relevant Police Department Directives is itself significant evidence that their actions were not "reasonable." Singletary, 2021 U.S. Dist. LEXIS 217607, at *32-33 (collecting cases). But even more fundamentally — as Officer Saba

admitted — it should have been obvious from simply looking at the building from the sidewalk that Ms. Alvarado's front door led into a first-floor apartment, and "[i]t wouldn't be reasonable" to believe that her front door led to the second floor.  See Officer Saba Deposition at 41:4-42:14, a copy of which is attached hereto at Exhibit "C." At minimum, the uncertainty, combined with the absence of any exigent circumstances, should have caused the Individual SWAT Unit Officers to have sought out more information.  United States v. Andrews, 2023 U.S App. LEXIS 19397, at *2-4, 2023 WL 4824700 (3d Cir., July 27, 2023) (police officers cannot claim "honest mistake" in connection with enforcing a search warrant at the wrong address "when the agents arrived at the front door of the property and [ . . .] saw or chose to ignore several things that should have put them on notice" of their error); see also e.g. Lt. Monk's Deposition at 91:19-94:9, a copy of which is attached hereto at Exhibit "N" (testifying that he and the other Individual SWAT Unit Officers did not know where the door that they rammed open led and had made no effort to determine how the first-floor apartment was entered). For example, as the Individual SWAT Unit Officers readily admitted, had they simply asked the Arrestee's probation officer how to enter his apartment, they would have known to have entered through the door on the *cul-de-sac* off Margaret Street.  See Sgt. Mellody Deposition at 48:2-50:9, a copy of which is attached hereto at Exhibit "O;" Officer Clark Deposition at 53:11-57:3, a copy of which is attached hereto at Exhibit "J."  Because the Individual SWAT Unit Officers knew they were entering a multi-unit apartment building, their reckless indifference for the rights of other persons who lived in the building, and their inadequate investigation beforehand, were simply not reasonable and therefore

violated their duty under the Fourth Amendment to act reasonably. "Though a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, that doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." Castro v. United States, 34 F.3d 106, 112 (2d Cir. 1994), citing Hunter v. Bryant, 112 S. Ct. 534, 537 (1991) and Malley v. Briggs, 475 U.S. 335, 341 (1986). Here, a reasonable juror could conclude that the Individual SWAT Unit Officers' conduct was reckless and plainly incompetent.

Moreover, any searches and seizures committed by the Individual SWAT Unit Officers *within* Ms. Alvarado's apartment were plainly unconstitutional. The moment that Officer Clark broke open Ms. Alvarado's front door, the Individual SWAT Unit Officers understood immediately that an occupied first-floor apartment was behind that door, which could not possibly have been considered the "2nd floor rear" apartment. See Officer Murray Deposition at 64:16-66:6, a copy of which is attached hereto at Exhibit "C." Therefore, the Individual SWAT Unit Officers had an absolute obligation to immediately discontinue the search and they simply never even should have set foot *inside* of Ms. Alavardo's home. Andrews, 2023 U.S App. LEXIS 19397, at *2-4. The Fourth Amendment means "that absent a warrant, consent, or exigent circumstances" law enforcement has "a duty *not* to enter" a person's home. Mendez, 897 F.3d at 1074 (emphasis in original). But-for the Individual SWAT Unit Officers' clear violation of this well-established "duty *not* to enter" none of the significant damages suffered by Ms. Alavardo would have occurred: her service dog would not have been killed, her other property would not have been rummaged, she would not have been held prisoner at

gunpoint in her home for half an hour.  Hence, the Individual SWAT Unit Officers may be

held liable in this action for all of the serious harm caused by their violation of Ms.

Alvarado's Fourth Amendment rights.  <u>Singletary</u>, 2021 U.S. Dist. LEXIS 217607, at

*29-33.

### D. The City of Philadelphia May Be Held Liable for Failing to Train its SWAT Unit Officers *vis-à-vis* How to Handle Dog Encounters, About the Knock and Announce Rule, or How to Conduct Reconnaissance in Relation to Enforcing a Search Warrant

As held by the Honorable Nitza I. Quiñones Alejandro in her the opinion attached

to her Order denying the Defendants' Motion to Dismiss Plaintiff's Claim, *Doc No.* 9,

failing to adequately train SWAT Unit Officers how to lawfully execute search warrants in

the context of multi-resident properties or residences with pets would constitute a failure

to train that is "so obvious" as to subject the City of Philadelphia to <u>Monell</u> liability even

if the failure to train results in only a "single incident."  Based on the Court's ruling and

the straightforward testimony of the Individual SWAT Unit Officers that they simply

received no training with regards to the relevant issues in this case, the parties did not

engage in discovery whether there was a pattern of incidents; the City's liability is clear

simply based upon the facts of this case alone.

Officer Song is the person who killed Akuma. Despite being on SWAT for 15 years,

he never received *any* training regarding how to handle dog encounters.  <u>See</u> Officer Song

Deposition at 16:14-17:19, a copy of which is attached hereto at Exhibit "P;" <u>accord</u> Sgt.

Mellody Deposition at 87:14-88:9, a copy of which is attached hereto at Exhibit "O"

(testifying that the Philadelphia Police Department provides SWAT Officers with

absolutely no training pertaining to dog encounters). Officer Song was also completely

unaware of the fact that the City had a Directive pertaining to how dog encounters should

be handled.  See Officer Song Deposition at 88:7-89:19.  The City's Directive, a copy of

which is attached hereto at Exhibit "W,"  is actually quite detailed and consistent with

constitutional requirements; if followed, the Directive would have provided Officer Song

with a range of non-lethal options that would have prevented the death of Akuma.  See Mr.

Garrels' report at 46-48, a copy of which is attached hereto at Exhibit "B."  A very clear

instance of *failing to train* is when the City knows that it needs to implement a policy to

meet constitutional requirements and then completely fails to communicate the policy to

its frontline SWAT Officers.  Further, the need to provide training regarding dog

encounters was "obvious."  It is clearly established in the Third Circuit that "the killing

of a person's dog by a law enforcement officer constitutes a seizure under the Fourth

Amendment" and that qualified immunity will *only* protect an officer who kills a citizen's

dog *out of necessity*.  Fullerton v. Tinton Falls, 2020 U.S. Dist. LEXIS 180333, at *10-12

(D. N.J., Sep. 30, 2020) (collecting authorities and denying summary judgment because

"there are two different versions of the facts" whether it was necessary for the officer to

kill the dog).[3]  Accordingly, the City's complete failure to train Officer Song with regards

---

[3]      The need to avoid killing dogs if possible is obvious and well established. San Jose
Charter of the Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962, 975 (9th
Cir. 2005) ("Here, the intrusion was severe.  The officers shot and killed one of [the
plaintiff's] dogs [. . .] dogs are more than just a personal effect.  The emotional attachment
to a family's dog is not comparable to a possessory interest in furniture [. . .] the effect of
[plaintiff] being handcuffed just yards from where her dog [. . .] lay dead and bleeding was
extremely traumatic") (citation omitted); Arroyo v. City of Buffalo, 2020 U.S. Dist.
LEXIS 72674, at *45 (W.D. N.Y., Apr. 23, 2020) citing Carroll v. County of Monroe, 712

to how to handle dog encounters — which resulted in the foreseeable and preventable death of Akuma — creates a material question of fact as to whether the City should be held directly liable.

Lt. Monk is the person who ordered for Ms. Alvarado's front door to be breached even though there was no knock and announce and no exigent circumstances. Lt. Monk, a senior supervisor of the City's ultra-sensitive SWAT Unit, claimed that he had never received any training from the City regarding how long to wait when performing a knock and announce. <u>See</u> Lt. Monk's Deposition at 39:14-40:5, a copy of which is attached hereto at Exhibit "N." Sgt. Mellody said that "back in the 1990s" he "[p]robably in the Academy" received some training about the knock and announce rule, but that he could not recall any training that he had ever received when deposed in this case. <u>See</u> Sgt. Mellody Deposition at 56:10-58:6, a copy of which is attached hereto at Exhibit "O." Officer Clark, the person who rammed open Ms. Alvarado's door, testified that he had been trained to wait "seven seconds" when performing a knock and announce. <u>See</u> Officer Clark Deposition at 81:20-84:13, a copy of which is attached hereto at Exhibit "J." Both Det. Scally and Sgt. Mellody testified that the knock and announce in this case was performed consistent with their training and was typical of their experience with how the Philadelphia SWAT Unit enforces search warrants. <u>See</u> Det. Scally Deposition at 52:8-53:2, a copy of which is attached hereto at Exhibit "X;" Sgt. Mellody Deposition at 8:15-

---

F.3d 649, 651 (2d Cir. 2013) ("a law enforcement officer's shooting of a pet dog constitutes 'a severe intrusion given the emotional attachment between a dog and owner'").

10:17, a copy of which is attached hereto at Exhibit "O." This record presents a material question of fact as to whether the City adequately trained the SWAT Unit *vis-à-vis* the knock and announce rule. In turn, the need to provide training about the knock and announce rule was obvious, because "[i]t is well established in the Third Circuit that a failure to knock and announce in serving an ordinary warrant, absent certain exigent circumstances, works a deprivation of the Fourth Amendment rights of the residents, then present, of the dwelling entered." Hammond v. Acerno, 2021 U.S. Dist. LEXIS 213243, at *10 (E.D. Pa. 2021) (citation omitted).

Finally, the City's training with regards to conducting reconnaissance was also plainly inadequate. The single most glaring oversight in this case is the fact that the City did not train its officers to obtain easily accessible information from the Probation and Parole Office when available; it has been clearly established in discovery that any confusion as to how to access the Arrestee's home could easily have been removed by simply asking his parole officer how to get there. Although the City, again, has written numerous relevant and compelling Directives — as Mr. Garrels shows in his report, none of them were followed in this case. See Mr. Garrels' report at 48-52, a copy of which is attached hereto at Exhibit "B." Unsurprisingly, Sgt. Mellody, who oversaw reconnaissance for the subject operation, had never received any "written" training materials and so was not aware of the relevant Directives. See Sgt. Mellody Deposition at 91:14-92:10, a copy of which is attached hereto at Exhibit "O." As noted *infra*, there is evidence that Sgt. Mellody did not even know to look for a rear door when serving a warrant on the "rear apartment" of an apartment house, and so a material question exists

as to whether he received adequate training.  As Judge Nitza I. Quiñones Alejandro previously held in this matter, the need for such training was "obvious."

## IV.  Conclusion

WHEREFORE, Plaintiff respectfully requests for the Court to *deny* the Defendants' Motion for Summary Judgment, in the form of the attached proposed Order.

Respectfully submitted,

/s/ Keith West
Keith West, Esquire
VICTIMS' RECOVERY LAW CENTER
PA Attorney ID No. 317426
121 South Broad Street, 18th Floor
Philadelphia, PA 19107
keith@victimrecoverylaw.com
*Attorneys for the Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FELISHATAY ALVARADO              :
    Plaintiff                  :       Civil Action No. 22-3763
                               :
    v.                         :
                               :
CITY OF PHILADELPHIA, *et al.*   :

## CERTIFICATE OF SERVICE

I, Keith West, Esquire, on this date, by electronic filing, caused a true and correct copy of Plaintiff's above response to the Defendants' Motion for Summary Judgement to be served on the Defendants.

**Respectfully submitted,**

**/s/ Keith West**
**Keith West, Esquire**
**VICTIMS' RECOVERY LAW CENTER**
**PA Attorney ID No. 317426**
**121 South Broad Street, 18th Floor**
**Philadelphia, PA 19107**
**keith@victimrecoverylaw.com**
*Attorneys for the Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FELISHATAY ALVARADO | : | |
| Plaintiff | : | Civil Action No. 22-3763 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, *et al.* | : | |

**CERTIFICATE OF WORD COUNT**

I, Keith West, Esquire, by using the word count feature on Microsoft Word, determined that the above Memorandum of Law was no more than 8750 words.

**Respectfully submitted,**

**/s/ Keith West**
**Keith West, Esquire**
**VICTIMS' RECOVERY LAW CENTER**
**PA Attorney ID No. 317426**
**121 South Broad Street, 18th Floor**
**Philadelphia, PA 19107**
**keith@victimrecoverylaw.com**
*Attorneys for the Plaintiff*