**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FELISHATAY ALVARADO** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-3763** |
| | : | |
| **CITY OF PHILADELPHIA,** *et al.* | : | |

**MEMORANDUM**

**MURPHY, J.**                                          **February 27, 2024**

The Fourth Amendment protects people from unreasonable searches and seizures.  That's why the police usually need a warrant to enter your home, and need to announce their presence before breaking down your door.  But the law does not — and cannot — demand perfection.  Courts often consider whether the mistakes of police officers fall within the margin of error seen as reasonable.

In this case, police officers aimed to execute a valid warrant to arrest someone and search their apartment, which was on the second floor of a two-unit building.  The door to the second-floor apartment was in the rear.  The officers broke down the front door of the building, expecting it to lead to some sort of interior common area with stairs leading up.  But the door actually opened directly into Felishatay Alvarado's first-floor apartment.  Wrong apartment, wrong person.  The officers confronted the mostly undressed Ms. Alvarado and her startled pets, including her service dog, Akuma.  Akuma acted aggressively, and one officer shot and killed him.  After clearing the apartment and moving on to execute the warrant through the rear building entrance, at least one officer held Ms. Alvarado at gunpoint for as long as thirty

minutes.  This is her lawsuit against the officers[1] and the City of Philadelphia for damages under the Fourth Amendment.

Defendants move for summary judgment, arguing that the officers' actions were appropriate, and even if not, were protected by qualified immunity.  We grant the motion in part and deny it in part.  Ms. Alvarado's Fourth Amendment claim against individual defendants may proceed to trial based on three theories: (1) that they unlawfully breached and entered her apartment by unreasonable mistake, (2) that they unlawfully failed to knock and announce before doing so, and (3) that they unlawfully detained her after realizing they were in the wrong unit.  Her claim against the City may also proceed to trial.  But her theory that individual defendants violated the Fourth Amendment by killing her dog is not viable on the record here, because the Officer was entitled to defend himself against an admittedly aggressive dog.

## I.   **Factual Background**[2]

On June 3, 2021, two detectives[3] from the Philadelphia Police Department obtained arrest

---

[1] The individual defendants named in Ms. Alvarado's suit are Officers Ashford, Burkitt, Cerruti, Clark, Fitzpatrick, Hamoy, Sergeant Mellody, Lieutenant Monk, Murray, Quintana, Riotto, Rivera, Saba, Scott, Song, and certain John Does.  Defendant officers Ashford, Scott, Fitzpatrik, Rivera, Quintana, Riotto, and Cerutti seek dismissal because they were not personally involved in the relevant events.  DI 28 at 17.  Ms. Alvarado concedes, so we dismiss them on that basis.  DI 29 at 1 n.1.  We refer to the balance — Burkitt, Clark, Hamoy, Mellody, Monk, Murray, Saba, and Song — collectively as "individual defendants."

[2] We draw these facts from (1) defendants' statement of material facts admitted or undisputed in Ms. Alvarado's opposition to defendants' summary judgment motion, (2) Ms. Alvarado's counterstatement of material facts, and (3) exhibits and record items accompanying the parties' briefs.

[3] The two detectives, the magistrate judge who issued the warrant, and the probation officer are not parties.  Further, the dispute here concerns the warrant's execution, not its validity.

and search warrants for a homicide suspect.[4]  DI 28-1 ¶ 12; DI 29-1 ¶ 12.  The search warrant

defined the premises to be searched as "4664 Torresdale Ave. Phila. Pa. 19123, 2nd floor rear."

*Id.*  The suspect's probation officer gave the detectives this address.  DI 28-1 ¶¶ 13, 14; DI 29-1

¶ 14.  Probation staff were in possession of notes explaining how to access the "2nd floor rear"

apartment from outside the building, but nobody asked them for that information.  DI 29-2 at

187-94, 218-19, 221 (ECF).  Next, the detectives provided the warrant to the individual

defendants (members of a "SWAT unit") for execution.[5]  And then two members of the unit,

defendants Sergeant Mellody and Officer Clark, conducted reconnaissance.[6]

Early the next morning, the individual defendants arrived at 4664 Torresdale Ave. to

execute the search warrant.  DI 28-1 ¶ 18; DI 29-1 ¶ 18.  4664 Torresdale Ave. is a two-story

apartment building.  DI 28-1 ¶ 4; DI 29-1 ¶ 4.  The building has two doors — one at the front of

the building and one at the back.  DI 28-1 ¶ 5; DI 29-1 ¶ 5.  The front of the building faces

Torresdale Ave., while the back faces an unnamed "cul-de-sac-type alley" accessible via

Margaret Street.  DI 28-1 ¶¶ 5, 10; DI 29-1 ¶¶ 5, 10.  The front door bears the building's street

number ("4664"), while two mailboxes labeled "1" and "2" respectively hang several inches to

the left of the door on the building's front wall.  DI 28-4 at 1 (ECF); DI 28-1 ¶¶ 6-7; DI 29-1

---

[4] To protect an ongoing criminal investigation, the parties agreed to keep the homicide suspect's identity confidential.  DI 17.  The suspect's identity is not material to our decision, and the parties have redacted it from their filings.  DI 28 at 2 n.2.

[5] DI 28-1 ¶ 15; DI 29-1 ¶ 15.  A SWAT unit executes search warrants under circumstances that present "increased risk," like where a named suspect may be armed.  DI 28-1 ¶¶ 15-16; DI 29-1 ¶¶ 15-16.

[6] DI 28-1 ¶ 17.  Ms. Alvarado's response to defendants' statement of facts does not explicitly dispute that the officers conducted reconnaissance, but instead characterizes "any 'reconnaissance' that was actually performed" as "incompetent and inadequate."  DI 29-1 ¶ 17.

¶¶ 6-7.  Neither the front door nor the back door has a unit number on it.  DI 28-1 ¶¶ 6, 9; DI 29-1 ¶¶ 6, 9.

The building's shape is unusual.  The front façade of the building consists of two vertically stacked sections.  The lower section is tan in color, juts out to the sidewalk, and is only one story tall.  DI 28-4 at 1 (ECF); DI 29-2 at 53 (ECF).  Behind the tan section is a taller, two-story brick section that is set back considerably from the sidewalk.  *Id.*  Both sections have windows facing Torresdale Ave.  *Id.*  The front door is in the lower tan section.  *Id.*  The rear side of the building — not visible from Torresdale Ave. — is tan in color, stands two stories tall, and features a small room (like a covered service porch) extending off the back wall, about half the width of the building.  DI 29-2 at 59 (ECF).  The back door is on this extension.  *Id.*  Photographs of the building's front and back appear below:





DI 28-4 at 1 (ECF) (front); DI 29-2 at 53 (ECF) (front); *id.* at 59 (back).  As can be appreciated, the building's exterior does not indicate where either door leads, nor does it identify an entrance to the "2nd floor rear" apartment covered by the warrant.

Nevertheless, Lieutenant Monk directed the other individual defendants to gather near and forcibly breach the building's front door because he expected that door to lead to an interior common area housing doors to both apartment units.[7]  They did not knock or announce their

---

[7] DI 28-1 ¶¶ 22-24.  Ms. Alvarado purports to dispute Lieutenant Monk's alleged expectation that the front door led to a common area by arguing that she is in "no position to admit or deny what Lieutenant Monk 'expected'" to be behind the building's front door.  DI 29-1 ¶ 23.  Lieutenant Monk's subjective expectation is thus undisputed.

presence before breaching the front door.[8]  They heard the sounds of at least one dog barking

behind the door.[9]  After breaching, the individual defendants entered and found themselves in

Ms. Alvarado's first floor apartment.  DI 28-1 ¶¶ 25-26; DI 29-1 ¶¶ 25-26.

At that moment, the individual defendants encountered Ms. Alvarado and her pets,

including her service dog — a pitbull named Akuma.  DI 28-1 ¶¶ 29-34; DI 29-1 ¶¶ 29-34, 38.

Ms. Alvarado wore little more than a bath towel and her pets were alarmed.  DI 29-2 at 11-12

(ECF).   The individual defendants ordered her to "get on the floor" at gunpoint.  *Id.* at 14 (ECF).

They asked Ms. Alvarado how to access the second-floor apartment.  *Id.* at 15 (ECF).  She told

them that they would need to exit her apartment, because the building's back door was the

second-floor apartment's only entrance.  *Id.*  The individual defendants did not respond to Ms.

Alvarado's directions.  *Id.*  Instead, they moved through her apartment, appearing to her to be in

search of a person.  *Id.*  They "ripped the curtain down from [her] laundry room," entered her

bedroom and bathroom, and moved items around.  *Id.* at 15-16 (ECF).  At least one officer

checked her apartment for weapons.  *Id.* at 15-16, 346 (ECF).

Meanwhile, Akuma barked, growled, and bared his teeth at defendant Officer Song,

biting his ankle several times.[10]  Officer Song tried to shake Akuma off his foot, but the dog

---

[8] The parties dispute whether individual defendants knocked and announced their presence before breaching Ms. Alvarado's door.  *Compare* DI 28-1 ¶¶ 21-24, *with* DI 29-1 ¶¶ 21-24.  Because Ms. Alvarado is the non-movant, we take her account as true here.

[9] DI 29 at 23 (citing DI 29-2 at 362-63 (ECF)); *see also* DI 29-2 at 326, 346, 373-76, 381 (ECF).

[10] DI 28-1 ¶¶ 29-32.  For reasons explained in more detail below, Ms. Alvarado was not able to materially dispute defendants' description of Akuma's level of aggression.

turned back towards him, refusing to "back[] down." DI 28-1 ¶¶ 30, 32. As Akuma "lunged" towards Officer Song, Officer Song shot and killed him. *Id.* ¶ 32.

After Officer Song shot Akuma, most of the individual defendants left in search of the building's rear entrance. DI 28-1 ¶ 35; DI 29-2 at 15 (ECF). But at least one stayed behind — he kept Ms. Alvarado on the ground at gunpoint for about thirty minutes. DI 29-1 ¶ 35; DI 29-2 at 15-16 (ECF). Eventually, Ms. Alvarado was permitted to stand up, get dressed, and give her statement to an officer processing the scene. DI 29-2 at 16 (ECF).

Video footage is scant. The individual defendants did not wear body cameras. DI 29-2 at 147 (ECF). But a nearby surveillance camera captured video footage (the "video") of them arriving in front of 4664 Torresdale Avenue in SWAT gear, gathering near the front door, swinging a battering ram towards the door, and entering and exiting Ms. Alvarado's apartment.[11] The video does not have sound or closed captions, and Ms. Alvarado's front door itself is out of frame, as is the inside of her apartment. This lawsuit followed.

## II.   **Defendants' Motion for Summary Judgment**

On summary judgment, the individual defendants argue that they did not violate the Fourth Amendment because their conduct was reasonable as a matter of law before, during, and after they mistakenly entered her apartment. DI 28 at 8. Further, individual defendants argue that even if they did violate the Fourth Amendment, qualified immunity excuses their conduct. *Id.* at 8-9, 15-16. For its part, the City argues that Ms. Alvarado's *Monell*[12] claim should be

---

[11] Ms. Alvarado sent the video to us and to counsel of record via Dropbox link. The video is unavailable on this case's docket but appears to have been relied upon by Ms. Alvarado's expert, is referenced in Ms. Alvarado's brief, and is labeled "A10_2021-6-4053500_002.mp4." *See* DI 29 at 3; DI 29-2 at 45 (ECF). We refer to the video as if it were an exhibit to Ms. Alvarado's opposition to defendants' motion.

[12] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

dismissed because the record does not establish a predicate Fourth Amendment violation, and even if it did, Ms. Alvarado has not shown causation.  DI 28 at 18-19.

Ms. Alvarado responds that on this record, a reasonable juror could conclude that individual defendants violated the Fourth Amendment because they acted unreasonably in four ways: (1) by targeting and entering her apartment by mistake; (2) by failing to knock and announce their presence; (3) by remaining in her apartment and restricting her movement for about thirty minutes after discovering their mistake; and (4) by fatally shooting her service dog. DI 29 at 15-16.  Ms. Alvarado further argues that individual defendants are not entitled to qualified immunity because caselaw had clearly established their conduct as unlawful under the Fourth Amendment.  *Id.* at 16.  Finally, Ms. Alvarado argues that the City is liable for individual defendants' conduct because of the obvious need to train officers on dog encounters, the knock-and-announce requirement, and reconnaissance for search warrants, and because causation is a fair — if not likely — inference from this record.  *Id.* at 28-31.

### III.    <u>Standard of Review</u>

The Federal Rules of Civil Procedure require summary judgment movants to "show[] that there is no genuine dispute as to any material fact."    Fed. R. Civ. P. 56(a).  A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022) ("[F]or a factual dispute to be material, its resolution must have the potential to affect the outcome of the suit.").  And a "genuine dispute" over a material fact means "a reasonable jury could return a verdict for" the party not moving for summary judgment.  *Anderson*, 477 U.S. at 248.  In deciding whether a genuine dispute of material fact exists, we must view "the evidence in the light most

favorable to the nonmovant." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010); *see Young v. Martin*, 801 F.3d 172, 174 n.2 (3d Cir. 2015).  In qualified immunity cases, that "'usually means adopting . . . the plaintiff's version of the facts,' unless 'no reasonable jury could believe it.'" *Jacobs v. Cumberland County*, 8 F.4th 187, 192 (3d Cir. 2021) (citation omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).  But we may not "weigh the evidence [or] assess its veracity." *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021).  Further, as an "added wrinkle" to our analysis here, "where there is reliable video depicting the events in question, courts must not adopt a version of the facts that is blatantly contradicted by video footage." *Jacobs*, 8 F.4th at 192 (cleaned up).

IV.   **Analysis**

    a.  **A jury will determine whether the individual defendants violated a clearly established right under the Fourth Amendment by mistakenly entering Ms. Alvarado's apartment unit.**

We first consider whether the individual defendants violated the Fourth Amendment by mistakenly entering Ms. Alvarado's home without a warrant.  "The Fourth Amendment to the United States Constitution, applicable to the states by way of the Fourteenth Amendment, guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020) (alteration in original).  Entering the wrong house on a valid warrant violates the Fourth Amendment if the circumstances would alert a reasonable officer to "the risk that they might be" in the wrong place. *Maryland v. Garrison*, 480 U.S. 79, 87 (1987); *see also Allen v. Dist. Att'y's Off.*, 644 F. Supp. 2d 600, 608 (E.D. Pa. 2009); *Fullard v. City of Philadelphia*, 1996 WL 195388, at *10 (E.D. Pa. Apr. 22, 1996).  In other words, a mistaken search does not violate the

Fourth Amendment if the mistake was "objectively understandable and reasonable" in light of facts known to officers at the time. *Garrison*, 480 U.S. at 88.

Garrison and *Allen* are instructive here.  In *Garrison*, police officers obtained a warrant to search a suspect and a certain apartment.  480 U.S. at 80.  The apartment sat on the third floor of an apartment building.  *Id.*  The warrant covered the entire third floor because officers believed there to be only one apartment on that floor.  *Id.*  In fact, the third floor consisted of two apartments — one the suspect's and the other a neighbor's.  *Id.*  The officers searched the wrong apartment before realizing their mistake and terminating the search.  *Id.*  The Supreme Court held that the mistaken search did not violate the Fourth Amendment because there were no "objective facts" suggesting a "risk" that the officers might be in the wrong apartment.  *Id.* at 87-88.

In *Allen*, detectives who were concerned about illegal drug activity obtained a valid warrant to seal a forfeited house.  644 F. Supp. 2d at 603.  On his way to execute the warrant, an officer walked down the house's block.  *Id.*  He saw people entering and exiting a particular house carrying bottles of beer.  *Id.*  On that information alone, he figured that house was the one specified by the warrant, so he knocked on the door and gained entry.  *Id.*  More officers arrived and ordered the occupants out of the house.  *Id.*  Eventually, a neighbor asked to see the warrant and then informed officers that they were in the wrong house; the house specified by the warrant was actually across the street (with its street number clearly marked).  *Id.*  Applying *Garrison*, the *Allen* court held that it was unreasonable for the officer to "random[ly]" enter and evict a home's occupants without verification based solely on his deduction that it was the house specified by the warrant.  *Id.* at 608-09.

Here, there is a genuine dispute of material fact as to whether individual defendants acted reasonably under the Fourth Amendment.  Although Lieutenant Monk expected the door to lead to a common area because it bore the building's street number and because both apartment's mailboxes were next to it, our inquiry concerns whether a juror could find this mistaken belief unreasonable in light of the circumstances known to the officers.  *See Allen*, 644 F. Supp. 2d at 609.  For several reasons, we think a reasonable juror could find in Ms. Alvarado's favor.  First, the individual defendants knew the warrant specified the building's "2nd floor rear" apartment but chose to breach the building's front door instead of the back door.  DI 28-1 ¶¶ 12-13, 21-26.  Second, it is readily apparent from the exterior of the building that the front door leads directly into a portion of the building that is only one story tall.[13]  Third, officers heard dogs barking behind Ms. Alvarado's front door but did not pause to verify that it did not lead to a residence.[14]  Coupled with the reality that the officers did not know for sure where the front door led, the facts call into dispute whether reasonable officers would have appreciated some risk that the door could lead to a first-floor residence not covered by their warrant.

Before sending this theory of liability to the jury, we must consider whether, even if the individual defendants violated the Fourth Amendment by mistakenly entering Ms. Alvarado's apartment, they are protected by qualified immunity.  "Qualified immunity shields government officials from personal liability for civil damages" unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known" at

---

[13] *See supra* Part I (photograph of 4664 Torresdale Ave., taken from DI 29-2 at 53 (ECF)).

[14] DI 29 at 23 (citing DI 29-2 at 362-63 (ECF)).  *See also* DI 29-2 at 326, 346, 373-76, 381 (ECF).

the time of the violation.  *George v. Rehiel*, 738 F.3d 562, 571-72 (3d Cir. 2013) (cleaned up).

To decide whether a right was clearly established, we must first define it "in light of specific

context of the case, not as a broad general proposition."  *Id.* at 572 (quoting *Brosseau v. Haugen*,

543 U.S. 194, 198 (2004)).  Once defined, a right can be considered clearly established at the

time of the violation if at that time, caselaw put the matter "beyond debate."  *Id.* (quoting

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  But a prior case establishing the right need not

be "directly on point."  *Ashcroft*, 563 U.S. at 741.

Here, as of the date of the incident — June 4, 2021 — caselaw clearly put beyond debate

that police officers violate the Fourth Amendment if they mistakenly enter the wrong home

pursuant to a search a warrant unless that mistake was "objectively understandable and

reasonable."  *Garrison*, 480 U.S. at 88.  That principle dates back at least to *Garrison*, which in

1987 held that a mistaken entry is reasonable if made absent facts that would otherwise suggest

to police officers that they might be searching the wrong premises.  *Id.* at 87.

*Fullard* and *Allen* bolster our view that *Garrison* does enough to pass this issue to the

jury.  In 1996, *Fullard* observed that "there are many cases in which courts have denied claims

of qualified immunity by police personnel . . . .  [Where] the defendant officers were aware of

factual discrepancies which would have placed reasonable officers on notice that they were

searching the wrong premises or seizing the wrong person."  1996 WL 195388, at *7.  And in

2009, *Allen* instructed that a mistaken entry into a residence violates the Fourth Amendment

when officers assume, without verification, that the residence is the one specified by a warrant

based only on limited observations of the home's exterior.  644 F. Supp. 2d at 609.

Here, a jury could conclude that the individual defendants ignored facts that should have

alerted them to some risk that they were about to breach the front door to a private home not

covered by the warrant.  Caselaw had established such conduct — so viewed by a jury — as a

Fourth Amendment violation long before June 4, 2021.  Therefore, we deny summary judgment

on qualified immunity and as to this theory of liability generally.

> **b.  A jury will determine whether the individual defendants violated a clearly established right under the Fourth Amendment by failing to knock and announce their presence before breaching Ms. Alvarado's door.**

Ms. Alvarado next argues that the individual defendants violated the Fourth Amendment

by breaching her front door without knocking and announcing.  A reasonable residence search

pursuant to a warrant generally requires police officers to announce their presence and intent to

conduct the search — for example, by knocking and announcing.  *Wilson v. Arkansas*, 514 U.S.

927 (1995); *United States v. Banks*, 540 U.S. 31, 36 (2003).  Officers may forego a knock and

announce only if they encounter certain exigent circumstances, including where "(1) the

individual inside [is] aware of the officers' identity and thus announcement would [be] a useless

gesture; (2) announcement might lead to the sought individual's escape; (3) announcement might

place the officers in physical peril; [or] (4) announcement might lead to the destruction of

evidence."  *Kornegay v. Cottingham*, 120 F.3d 392, 397 (3d Cir. 1997).

Here, there is a genuine dispute over whether individual defendants conducted a knock

and announce.  Defendants state that "officers of the SWAT Unit" conducted a knock and

announce on the front door of 4664 Torresdale Ave., waited about fifteen to twenty seconds,

received no answer, then breached the door.  DI 28-1 ¶¶ 21-22.  But the record could support a

reasonable juror's conclusion to the contrary.  First, Ms. Alvarado testified that she never heard a

knock and announce, even though she was awake and walking towards "the front" of her one

floor apartment — i.e., near the door.  DI 29-2 at 11-13 (ECF).  Second, the record reflects

inconsistent accounts of the alleged knock and announce, including which defendant conducted

it.[15]  Third, Ms. Alvarado's account does not conflict with the available video evidence.  The

video, recorded by an outdoor security camera, sheds little light on what exactly happened

outside the door.  *See* A10_2021-6-4053500_002.mp4.  It has no sound, no closed captions, and

does not show whether any officer knocked or otherwise contacted the door before breaching it.

*Id.*  Only a jury can resolve this dispute.  *ADA Anglemeyer v. Ammons*, 2024 U.S. App. LEXIS

2828 at *12, 92 F.4th 184 (3d Cir. 2024) ("competing evidence" constitutes a "classic factual

dispute" appropriate for resolution at trial (quoting *Smith v. Mensinger*, 293 F.3d 641, 650 (3d

Cir. 2002))).

      As for qualified immunity on this theory, "[i]t is well established in the Third Circuit that

a failure to knock and announce in serving an ordinary warrant, absent certain exigent

circumstances, works a deprivation of the Fourth Amendment rights of the residents, then

present, of the dwelling entered."  *Hammond v. Acerno*, 2021 WL 5176299, at *4 (E.D. Pa. Nov.

4, 2021) (discussing *Kornegay*, 120 F.3d at 397).  The knock and announce principle is an

"ancient" and "traditional" protection.  *Hudson v. Michigan*, 547 U.S. 586, 589 (2006).  Indeed,

as of June 4, 2021, it was clearly established that a police officer violates the Fourth Amendment

by breaching a dwelling without first knocking and announcing unless they reasonably suspect

certain exigent circumstances as described above.  *Kornegay*, 120 F.3d at 397 (collecting cases).

---

[15] In statements made to the Philadelphia Police Department Officer Involved Shooting Unit hours after the incident, individual defendants Officer Murray, Officer Clark, and Lieutenant Monk claimed that Officer Clark conducted the knock and announce.  DI 29-2 at 342, 346, 349 (ECF).  Similarly, defendant Officer Murray testified in his deposition that he believed that Officer Clark conducted the knock and announce.  *Id.* at 100 (ECF).  But when Officer Clark testified in his deposition, he had no recollection of knocking on the door and seemed to imply that Officer Murray conducted the knock and announce.  *Id.* at 316-20 (ECF).

The individual defendants do not seriously suggest the presence of exigent circumstances here.[16]  And taking the facts and their reasonable inferences in favor of Ms. Alvarado, a jury could conclude that the individual defendants breached her front door without knocking and announcing their presence and purpose.  Such conduct was clearly established as a violation of the Fourth Amendment before June 4, 2021, so individual defendants are not entitled to qualified immunity.  This theory, too, survives summary judgment.

### c.  A jury will determine whether the individual defendants violated a clearly established right under the Fourth Amendment by detaining Ms. Alvarado after realizing their mistake.

Ms. Alvarado next claims that the individual defendants violated the Fourth Amendment by detaining her on the floor at gunpoint for about thirty minutes after realizing their mistaken entry into her home.  DI 29 at 27-28.  Defendants disagree with this characterization, arguing that they were merely securing the scene with Ms. Alvarado's consent.  DI 30 at 5.  As an initial matter, there is a genuine dispute of material fact as to the length and nature of Ms. Alvarado's post-search detention.  Relying on Ms. Alvarado's account, as we must, a juror could reasonably conclude that defendant officers detained Ms. Alvarado against her will for about thirty minutes.[17]  And a jury could find that the seizure violated the Fourth Amendment.

---

[16] Relevant to this point, the individual defendants state that before the breach, they were "bunched at the front door, poised to execute a search warrant for a [homicide] suspect."  DI 28 at 14-15.  They call this a "tactically unsound position," presumably implying that it imperiled their safety.  *Id.* at 14.  But the individual defendants simultaneously insist that they *did* conduct a knock and announce and that they expected Ms. Alvarado's door to lead to a common area (not a residence housing a homicide suspect), which undermines any suggestion of exigent circumstances.  DI 28-1 ¶¶ 21-23.

[17] Ms. Alvarado testified as much.  DI 29-1 ¶ 35; DI 29-2 at 15-16 (ECF).  Her testimony does not support any inference of consent; she recounts being held on the floor at gunpoint in a state of undress.  DI 29-2 at 15-16 (ECF).  Further, the video reflects eight officers in SWAT gear entering Ms. Alvarado's apartment at the 2:44 minute mark.  *See* A10_2021-6-

Several legal principles provide guidance here.  First, Ms. Alvarado's forcible detention was a seizure under the Fourth Amendment.  *Gomez v. Feissner*, 474 F. App'x 53, 57 (3d Cir. 2012) (a police officer makes a seizure under the Fourth Amendment when they restrain a person's liberty "by means of physical force or show of authority" (cleaned up)).  Second, and to defendants' point, officers searching a home pursuant to a warrant may make reasonable seizures "to secure the premises and to ensure their own safety and the efficacy of the search."  *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007).  This is true even if the initial search is made by mistake.  *Id.* at 615-16.  Further, officers with a warrant for one apartment in a multi-unit building may make protective sweeps and short detentions in other apartments as part of efforts to secure the entire building.  *Gomez*, 474 F. App'x at 57.  But even in these circumstances, officers must end a seizure after completing the search or when they know (or should know) that they are without authority to search or seize.  *Id.* (citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *Garrison*, 480 U.S. at 79.  Finally, "restraints and detention for a 'prolonged and unnecessary period of time' [are] unreasonable."  *Poindexter v. Carroll*, 2013 WL 2351360, at *13 (M.D. Pa. May 23, 2013) (quoting *Rettele*, 550 U.S. at 614).

---

4053500_002.mp4.  It then shows seven officers in SWAT gear exiting at 4:23 minute mark.  *Id.* Then at the 14:37 minute mark, two more officers in SWAT gear enter.  *Id.*  Then two officers in SWAT gear exit at the 15:37 minute mark.  *Id.*  Then another officer in uniform enters at the 23:23 minute mark.  *Id.*  Then another officer in uniform enters at the 24:03 minute mark.  *Id.* Then an officer in uniform exits at the 24:13 minute mark.  *Id.*  Then an officer in SWAT gear exits at the 24:22 minute mark.  *Id.*  The video ends at the 35-minute mark before the final uniformed officer exits.  *Id.*  This sequence suggests that at least one member of the SWAT unit remained in Ms. Alvarado's apartment for about twenty-two minutes, while at least one officer remained in her apartment for about thirty minutes or more after the SWAT unit's initial breach. *Id.*  At oral argument, defendants argued, without citing to the record, that it does not reflect that Ms. Alvarado was forcibly detained for about thirty minutes.  But she testified that she was, and the video does not clearly contradict that testimony.

*Rettele* describes a reasonable detention pursuant to a mistaken search.  550 U.S. 609.  In that case, officers obtained a valid search warrant for a house but did not know that the subjects of the warrant had moved out of the house while new unrelated occupants had moved in.  *Id.* at 610-11.  When officers entered the house, they briefly detained the new occupants at gunpoint, allowed the occupants to get dressed, realized their mistake, and departed the premises within a span of several minutes.  *Id.* at 611-12.  The Supreme Court held that the officers' brief seizure of the occupants at gunpoint, even in their undressed state and even though they were not subject to a warrant, was nevertheless reasonable under the Fourth Amendment because the officers "needed a moment to secure the room and ensure that other persons were not close by or did not present a danger."  *Id.* at 615.  But the Court cautioned that the officers "were [not] free to force [the occupants] to remain motionless and standing for any longer than necessary" to protect their safety.  *Id.*

In contrast, *Gomez* describes a "protective sweep" that was reasonable at first but became an unreasonable seizure.  474 F. App'x at 53.  In that case, a police officer did not violate the Fourth Amendment by making a five to fifteen minute "protective sweep" of an apartment unit in a building as part of efforts to secure the whole building, even though the warrant covered a different unit.  *Id.* at 57.  But his colleague did make an unreasonable seizure by involuntarily detaining the residents of the non-warrant apartment for several hours after the protective sweep. *Id.*

Ms. Alvarado's detention is similar to *Gomez*.  She was forced to remain motionless on the floor, at gunpoint, for about thirty minutes while clad in a towel even after most individual defendants had left her apartment in search of the right unit and suspect.  By that point, individual defendants had already cleared her small apartment and checked for weapons.  DI 29-

1 ¶ 35; DI 29-2 at 15-16, 346 (ECF).  They knew — in short order — that her apartment did not connect to the unit they sought.  DI 28-1 ¶ 35.  And no facts indicate that concerns for officer safety or search efficacy motivated Ms. Alvarado's detention.  *Rettele*, 550 U.S. 609 at 614.  Such a seizure violates the Fourth Amendment's prohibition on prolonged and unnecessary detentions.

Turning to qualified immunity, officers who have conducted a wrongful seizure "are entitled to qualified immunity unless they knew information which would have alerted a reasonable officer of the possibility of a Fourth Amendment violation."  *Fullard*, 1996 WL 195388, at *9.  As of June 4, 2021, it was clearly established that police officers violate the Fourth Amendment if they make unnecessary or prolonged detentions incident to a residential search without a warrant.  To wit, in 2007, *Rettele* instructed that officers violate the Fourth Amendment by forcing people to remain "motionless" in their own home for "any longer than necessary" to protect officer safety.  550 U.S. at 615.  Similarly, *Gomez* instructed in 2011 that while officers may conduct brief protective sweeps of apartments not subject to warrants in order to secure a building, they violate a clearly established right under the Fourth Amendment if they detain residents of those apartments for a prolonged time.  474 F. App'x at 57.

Here, the individual defendants had already cleared Ms. Alvarado's apartment, knew that it did not connect to the apartment for which they had a warrant, and have not raised a dispute about officer safety or scene security.  They detained Ms. Alvarado for a prolonged time at gunpoint while she remained in a state of undress — a Fourth Amendment violation clearly established under the law by 2021.  We thus deny summary judgment as to this theory of liability.

**d. Akuma's killing did not Violate the Fourth Amendment.**

Ms. Alvarado's fourth theory is that the individual defendants violated the Fourth Amendment by killing her dog, Akuma. That is a seizure under the Fourth Amendment. *Bletz*, 974 F.3d at 308 (people have a possessory interest in their pets). But police officers may make reasonable seizures under the Fourth Amendment, and it is reasonable for an officer to use fatal force against a dog behaving aggressively or threatening an imminent attack. *Compare Bletz*, 974 F.3d at 310-11 (granting summary judgment for defendant officer who fatally shot dog because the dog was charging, growling, and baring its teeth at the officer), *with Brown v. Muhlenberg Township*, 269 F.3d 205, 209 (3d Cir. 2001) (denying summary judgment for defendant officer who fatally shot dog because the dog was not barking, growling, or behaving aggressively).

Here, the undisputed record shows that Officer Song shot Akuma because he was behaving aggressively and threatening an imminent attack. Specifically, Akuma barked, growled, bit Officer Song's ankle several times, and lunged towards Officer Song even after Officer Song shook the dog off his ankle. DI 28-1 ¶¶ 30-32. Ms. Alvarado does not genuinely dispute the nature of Akuma's conduct. Rather, she argues that "a reasonable juror could conclude that Akuma never posed any threat to Officer Song" because Akuma's bites left no physical evidence on Officer Song's leg; Officer Song's testimony was partially inconsistent as to which leg and how many bites; and Officer Song shot Akuma from several feet away. DI 29-1 ¶¶ 30-32; DI 35 at 5. But those arguments do not call Officer Song's version of the story into serious dispute.

A lack of bite marks alone does not contradict Officer Song's account that Akuma lunged at him and bit him. And the individual defendants were clad in tactical gear including high

boots.  *See* A10_2021-6-4053500_002.mp4.  Similarly, Officer Song's lack of recall as to where exactly and how many times Akuma bit his lower extremities does little to show that Akuma never bit him.  These observations might carry some weight along with, e.g., testimony from Ms. Alvarado that Akuma did not in fact bite Officer Song.  But it is undisputed that Akuma was barking, growling, baring his teeth, and lunging toward Officer Song.[18]  Those undisputed facts sufficiently establish Akuma's conduct as aggressive and predictive of an imminent attack.  *See Bletz*, 974 F.3d at 310.  Therefore, we grant summary judgment for individual defendants as to Akuma's killing.[19]  And because Akuma's killing did not violate the Fourth Amendment, we need not decide whether individual defendants are entitled to qualified immunity regarding the same.  *Rettele*, 550 U.S. at 616 ("As respondents' constitutional rights were not violated, 'there is no necessity for further inquiries concerning qualified immunity.'") (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### e.  Ms. Alvarado shows adequate *Monell* causation to survive summary judgment.

Under 42 U.S.C. § 1983, plaintiffs may bring claims against municipalities for constitutional violations by police officers if a failure by the municipality caused the violation.

---

[18] *Compare* DI 28-1 ¶¶ 30-32, *with* DI 29-1 ¶¶ 30-32.

[19] Ms. Alvarado also argues that even if Akuma did behave aggressively towards Officer Song, the dog's death was the proximate cause of an unlawful entry into Ms. Alvarado's home and was therefore de facto unreasonable.  DI 35 at 3-4 (first citing *Est. of Singletary v. City of Philadelphia*, 2021 WL 5235232, at *1 (E.D. Pa. Nov. 10, 2021); then citing *Mendez v. City of Los Angeles*, 897 F.3d 1067 (9th Cir. 2018); and then citing *Sledd v. Lindsay*, 102 F.3d 282 (7th Cir. 1996)).  We decline to adopt Ms. Alvarado's argument.  The authorities she cites are non-binding and distinguishable because they pertain to excessive use of force against individuals, not unreasonable seizures of property.  Absent binding authority to the contrary, we follow *Bletz* and *Brown* as described above.  That said, this opinion should not be read to exclude any reference to Akuma's killing at trial, given the potential connection to other issues such as damages.

*Monell*, 436 U.S. at 694; *Forrest v. Parry*, 930 F.3d 93, 105 (2019).  The failure must reflect a conscious choice amounting to deliberate indifference.  *Forrest*, 930 F.3d at 106.  Further, the alleged deficiency must be "closely related" to the constitutional violation; attenuated links will not suffice.  *Id.* at 109.  "[I]n other words, 'the deficiency in training [must have] actually caused' the constitutional violation."  *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (second alteration in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)).  While a plaintiff must adduce "proof from which to infer that implementing the changes to the training program that [they] suggest[] would have made any difference," *Forrest*, 930 F.3d at 109, causation should be left to the jury if "the causal link is not too tenuous" at summary judgment, *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).

Ms. Alvarado argues that the City failed to adequately train its officers regarding dog encounters, knock-and-announce requirements, and search warrant reconnaissance.  DI 29 at 28. Defendants first counter that Ms. Alvarado has not established a constitutional violation.  DI 28 at 18.  We disagree.  As we explained, Ms. Alvarado established triable disputes over whether the individual defendants violated the Fourth Amendment by mistakenly entering Ms. Alvarado's apartment without knocking and announcing and then meaningfully detaining her. *See supra.*  But defendants are right that because individual defendants' encounter with Akuma did not amount to a constitutional injury, the City cannot be liable on that theory.  *See Marable v. West Pottsgrove Township*, 176 F. App'x 275, 283 (3d Cir. 2006) ("[A] municipality may not incur *Monell* liability as a result of the actions of its officers when its officers have inflicted no constitutional injury."); *Persico v. City of Jersey City*, 67 F. App'x 669, 676 (3d Cir. 2003) ("Proof of a constitutional injury is a threshold requirement for a *Monell* claim.").  Similarly, Ms. Alvarado does not argue that the City failed to train individual defendants about post-search

21

detentions.  So our inquiry here focuses on the City's potential liability for the individual defendants' mistaken entry into Ms. Alvarado's apartment and their failure to knock and announce first.

Defendants also argue that Ms. Alvarado cannot establish that the City caused her constitutional injuries.  DI 28 at 18; DI 30 at 7; DI 37 at 5.  Ms. Alvarado responds that the City's need to train officers on reconnaissance and knocking and was "'so obvious' as to subject the City [] to *Monell* liability."  DI 29 at 28.  We note here that the obviousness of a need to train officers on a particular topic generally speaks to a municipality's deliberate indifference.[20]  Here, defendants primarily attack Ms. Alvarado's claim for lack of causation; they do not seriously argue a lack of deliberate indifference.[21]  But while the two are separate elements of a *Monell* failure to train claim, if a constitutional violation is a highly predictable consequence of a failure to train, that predictability may also support an inference of causation.  *See, e.g.*, *Thomas*, 749 F.3d at 226 (stating "[c]ausation is a requirement for failure-to-train liability that is separate from deliberate indifference; however, '[t]he high degree of predictability . . . may also support an inference of causation — that the municipality's indifference led directly to the very consequence

---

[20] *See Thomas*, 749 F.3d at 223 (stating "in certain situations, the need for training can be said to be so obvious that failure to do so could properly be characterized as deliberate indifference to constitutional rights" (cleaned up)).

[21] Defendants' limited references to the deliberate indifference standard cannot sustain their motion.  For instance, in their opening brief, defendants state, without elaboration, that Mrs. Alvarado has "adduced no evidence of similar incidents . . . that would indicate that the City . . . was deliberately indifferent."  DI 28 at 19.  In their reply brief, defendants argue that Ms. Alvarado cannot show causation but do not argue deliberate indifference.  DI 30 at 7.  In their sur-sur reply brief, defendants state that Ms. Alvarado "has adduced no evidence that any specific lack of training was indicative of deliberate indifference" but then go on to discuss causation only.  DI 37 at 5.  A movant cannot merely invoke an argument — it must make it.  Even if defendants had adequately advanced a deliberate indifference argument, predictability and obviousness, as explored below, can speak to both deliberate indifference and causation.  *Thomas*, 749 F.3d at 223-24, 26.

that was so predictable.'" (second alteration in original) (quoting *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997))).  In such a case, a plaintiff can preclude summary judgment by putting forth evidence that a jury could rely on with "judgment and common sense" to find a causal relationship between the alleged lack of training and the constitutional injuries at bar.  *Id.* at 227.  Sufficient evidence could be expert opinion or witness testimony.  *Id.* at 226-27.

 We see sufficient evidence of causation here to forestall summary judgment.  Consider Ms. Alvarado's theory that the City did not adequately train individual defendants on warrant reconnaissance.  Ms. Alvarado advances evidence that the City maintained written directives instructing officers to eliminate any "doubt" about subject location and warrant premises, including by checking with a known suspect's parole or probation officer.  DI 29 at 12; DI 29-2 at 67, 71-73 (ECF).  Ms. Alvarado also advances evidence that defendant Sergeant Mellody, who oversaw pre-execution reconnaissance at 4664 Torresdale Ave., was not trained on those written directives.  DI 29-2 at 409-10, 422-23 (ECF) (testimony by Sergeant Mellody that he did not recall training on the City's written directives and thought that it was not his responsibility to communicate with parole or probation staff about warrant premises).  Instead, he chose to breach 4664 Torresdale Ave.'s front door based on his observations of the building's exterior.  *Id.* at 407-08 (ECF).  He testified that had he known what probation staff knew (that the entrance to the suspect's apartment was through the rear door), he would not have chosen Ms. Alvarado's door as the breach point.  *Id.* at 410-11 (ECF).  Further, Ms. Alvarado cites unrebutted expert opinion that individual defendants failed to follow "national standards" in planning and executing the warrant here, which mandate, among other things, that officers verify floor plans and entrances before executing a warrant.  *Id.* at 85-88 (ECF).

A reasonable juror could infer a causal relationship here because Ms. Alvarado has adduced proof that better training would have "made a difference." *Forrest*, 930 F.3d at 109. Sergeant Mellody testified that he was not trained to confirm points of entry with probation staff when executing a warrant for a known suspect and that he would have planned the warrant execution at 4664 Torresdale Ave. differently had he taken that step here. The connection between that missing step and Ms. Alvarado's injuries is surely not "too tenuous." *Bielecki*, 915 F.2d at 851.

Similarly, a reasonable juror could infer that had individual defendants received adequate training on par with the "national standards" Ms. Alvarado cites, they could have avoided their mistaken entry into her apartment. *See Thomas*, 749 F.3d at 221, 226 (denying summary judgment on *Monell* failure to train claim based on expert evidence, including expert's comparison to national training standards). Finally, we think unconstitutional intrusions into private residences a highly predictable consequence — if not the most predictable consequence — of failing to train police officers to verify that a breach point does not lead to someone else's home before executing a warrant. That level of predictability entitles a jury to find a causal relationship between the alleged inadequate training here and Ms. Alvarado's injuries. *See, e.g.*, *id.* at 226. For all these reasons, we deny summary judgment on Ms. Alvarado's *Monell* claim.

## V.   <u>Conclusion</u>

For the reasons discussed above, we grant defendants' motion for summary in part and deny it in part. Ms. Alvarado's Fourth Amendment claim against individual defendants may proceed to trial based on their mistaken entry into her home, their failure to knock and announce their presence, and her extended detention. Her claim against the City may proceed to trial as

well.  But her claim may not proceed against individual defendants or the City on the theory that

Akuma's killing violated the Fourth Amendment.  And finally, defendant Officers Ashford,

Scott, Fitzpatrik, Rivera, Quintana, Riotto, and Cerutti are dismissed by agreement of the parties.

25