# THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FELISHATAY ALVARADO,** | : | |
| *Plaintiff*, | : | |
| | : | Civil Action |
| v. | : | No. 22-3763 |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| *Defendants*. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE DR. VERONIQUE VALLIERE AS AN EXPERT

Plaintiff Felishatay Alvarado (hereinafter "Ms. Alvarado" or "the Plaintiff") alleges that Defendants City of Philadelphia; Police Officers Joshua Burkitt, Eric Clark, Jose Hamoy, Brian Murray, Patrick Saba, Edward Song; Sgt. Kevin Mellody; and Lt. Demetrius Monk (collectively "the Defendants"), violated her constitutional rights when they entered her apartment on June 3, 2021. *See generally*, Complaint.

In support of her claims for emotional distress, Plaintiff retained Veronique N. Valliere (hereinafter "Dr. Valliere"), an expert in Sexual Offenders, Domestic Violence, and Victims of Interpersonal violence such as sexual assault and physical abuse. *See* Exhibit 1 (Dr. Valliere's CV). In her report, Dr. Valliere opines that: (1) Ms. Alvarado suffers from Post-traumatic Stress Disorder (hereinafter "PTSD") and Major Depressive Disorder (hereinafter "MDD"); (2) Ms. Alvarado requires therapeutic interventions such as exposure therapy, EMDR, or biofeedback; (3) Ms. Alvarado's current treatment is inadequate; (4) if her symptoms increase, Ms. Alvarado may require inpatient or intensive outpatient care; (5) Ms. Alvarado needs to strengthen her coping skills; (6) Ms. Alvarado will struggle with her trauma for a significant period in the future, and

possibly the rest of her life; and (7) Ms. Alvarado may benefit from a service animal. *See* Exhibit 2 (Dr. Valliere's Expert Report).

The Defendants now move to preclude Dr. Valliere's opinion testimony on the basis that: (1) Dr. Valliere's opinions exceed her qualifications; (2) Dr. Valliere's methodology is not reliable; and (3) Dr. Valliere's opinion does not "fit" the facts at issue in this case.

**I. STANDARD OF REVIEW**

The Supreme Court decision in *Daubert*, and its subsequent codification in Federal Rule of Evidence (hereinafter "Rule') 702, governs the admissibility of expert testimony. *See generally* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Under the framework established by Rule 702 and *Daubert*, a court must determine: (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) whether the expert's reasoning or methodology underlying the testimony is reliable; and (3) whether the testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. *Elcock v. Kmart Corp*, 233 F.3d 734, 741 (3d Cir. 2000). This analysis applies to scientific and nonscientific, technical or specialized knowledge alike. *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137 (1999). Ultimately, the proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10.

**II. ARGUMENT**

**A. Dr. Valliere Is Not Qualified to Opine on Institutional Trauma.**

When district courts exercise their gatekeeping responsibility under *Daubert*, the first question is "whether the expert has sufficient qualifications to testify." *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp.2d 167, 174 (E.D.N.Y. 2008). This threshold inquiry involves the court's comparison of "the area in which the witness has superior knowledge, education, experience, or

skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2nd Cir. 2004). Notably, the Third Circuit does "not pursue[] a policy of qualifying *any* proffered witness as an expert." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (collecting cases). Even doctors, who may be experts in one area, must be qualified to opine on the topic at hand. *See id.* (citing to *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 373 (D.N.J. 1995)).

For example, in *Diaz v. Johnson Matthey*, the plaintiff alleged that working conditions at his job caused him to develop platinum salt allergies. 893 F. Supp. at 362. In support of his position, the plaintiff proffered the expert opinion of Dr. Donald Auerbach, a pulmonologist who served as the Medical Directory of the Respiratory Therapy Department and the Pulmonary Function Laboratory at Cooper University Medical Center in Camden, New Jersey, and operated a private practice in Cherry Hill, New Jersey. *See id.* at 362-63. Despite Dr. Auerbach's qualifications as a pulmonologist, the district court noted that Dr. Auerbach "knew little" about the etiology of platinum salt allergies. *See id.* at 372. He was not an expert in epidemiology or toxicology; he did not specialize in occupational medicine; nor had he ever treated a patient, aside from the plaintiff, that suffered from a platinum allergy. *See id.* at 372-73. On that basis, the district court found that Dr. Auerbach was unqualified to testify as an expert on plaintiff's platinum salt allergy. *See id.* at 373.

Here, the Plaintiff seeks to introduce the testimony of Dr. Valliere, a Doctor of Psychology whose CV lists her areas of expertise as "Sexual offenders", "Victims of interpersonal violence (sexual assault and physical abuse)", and "Domestic violence." Dr. Valliere's CV lists extensive training, experience, and achievements in these three topics. In contrast, Dr. Valliere does not identify herself as an expert in institutional violence, she does not list any training on this specific topic, she does not list any experience assisting those with institutional trauma – aside from the

plaintiff, and she does not list any achievements or awards in the area of institutional trauma. While Dr. Valliere may qualify as an expert in other areas, she is not qualified to opine as an expert on institutional trauma, the very topic on which Plaintiff proffers her testimony. Accordingly, the Defendants respectfully request that this Court find that Dr. Valliere does not possess sufficient qualifications to testify on the subject matter at hand.

### B. Dr. Valliere's Qualifications Are So Thin That They Render Her Opinion Unreliable.

Once a district court determines that a witness qualifies as an expert, it moves to the second part of the inquiry – determining whether the expert's testimony is reliable. To determine whether an expert's testimony is reliable, the Third Circuit has put forth the following facts: (1) whether a method consist of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Crowley v. Chait*, 322 F.Supp.2d 530, 535 (D.N.J. 2004) (citing to *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994).

However, because "the *Daubert* factors do not always fit neatly into or easily translate in the context of nonscientific testimony. . . the inquiry into an expert's reliability may focus instead upon personal knowledge or experience." *Id*. (*citing to Voilas v. Gen. Motors Corp.*, 73 F. Supp.2d 452, 461 (D.N.J. 1999)); *see also On Track Innovations Ltd. V. T-Mobile USA, Inc.,* 106 F. Supp.3d 369, 411 (S.D.N.Y. 2015) (quoting *WeddingChannel.Com, Inc. v. The Knot, Inc.*, 03-cv-7369 (RWS), 2005 WL 165286, at 6 (S.D.N.Y. Jan. 26, 2005) ("[I]n some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods")).

When determining the reliability of non-scientific expert testimony, "[t]he relevant reliability concerns [will] focus upon the personal knowledge [and] experience of the witness and the methodology used will be applying that experience to the facts of the case." *Walsh/Granite, JV v. HDR Engineering, Inc.*, Case No. 17-cv-558, 2020WL13876908, at *6 (E.D. Pa. June 15, 2020) (quoting *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 286 F.R.D. 266, 269 (W.D.Pa. 2012)). Since, "in the nonscientific world, theories are often not subject to testing or experimentation[,]" the amount of experience and training that an expert has determines the reliability of his or her testimony. *Voilas*, 73 F.Supp.2d at 461; *see also Elcock*, 233 F.3d at 749 ("As we made clear in *Paoli II*, an expert's 'level of expertise may affect the reliability of the expert's opinion.'")

Once again, Dr. Valliere's credentials weigh against qualifying her as an expert. As a non-scientific expert, this Court does not have the benefit of looking towards Dr. Valliere's hypothesis, whether her methods were subject to peer review, the known or potential rate of error, or the existence and maintenance of standards controlling her technique's operation. Instead, the analysis focuses almost exclusively on the seventh reliability factor – Dr. Valliere's qualifications as an expert. As already detailed above, and incorporated by reference herein, Dr. Valliere does not possess sufficient qualifications to opine on institutional trauma.

It is also worth noting that the Court applies a different standard when evaluating an expert's qualifications and an expert's reliability. While the Third Circuit maintains "a generally liberal standard of qualifying experts[,]" the standards for reliability are more rigorous. *Elcock*, 233 F.3d at 742. For example, in *Elcock*, the Third Circuit noted that Dr. Chester Copemann's "qualifications as a vocational rehabilitationist are thin[,]" but nevertheless, affirmed the lower court's decision to qualify Copemann as an expert. 233 F.3d at 741, 744. In contrast, when the

Third Circuit analyzed the reliability of Dr. Copemann's methodology, it noted that "Copemann's qualifications are marginal at best, and mindful of the District Court's statement that the question of Copemann's qualifications was a 'close call,' we believe that this factor also weighs in favor of excluding Copemman's testimony." *Id.* at 749.

Thus, even if this Court finds that Dr. Valliere possesses sufficient qualifications, it would be consistent with Third Circuit case law for this Court to still find that her lack of expertise on the area of institutional trauma, weighs against the reliability of her opinion. Accordingly, Defendants respectfully request that this Court hold that Dr. Valliere does not possess sufficient qualifications to render her testimony reliable.

### C. Dr. Valliere's Testimony Does Not "Fit" With the Issues At Hand.

If a court determines that an expert witness is qualified and that her methodology is reliable, the court should last turn to the question of whether the expert's testimony "fits" the facts and issues presented in the case. *See Elcock*, 233 F.3d at 741. An expert's testimony "fits" the needs of the case if the testimony "will help the trier of fact to [1] understand the evidence or [2] to determine a fact in issue." Fed. R. Evid. 702. To determine whether an expert's testimony "fits" the needs of the case, courts often look to arguments usually reserved for a Rule 403 analysis. *In re Paoli II*, 35 F.3d at 746 ("We explained in *Downing* that Rule 702 analysis partly incorporates Rule 403 analysis but leaves room for Rule 403 to operate independently."). However, because "expert evidence is often more misleading than other evidence, [the] Rule 403 [analysis] gives a judge more power over experts than over lay witnesses." *Id.* at 747.

Here, Dr. Valliere's testimony does not fit with the issues at hand. Dr. Valliere's report starts by noting that Akuma was certified as an emotional support animal to assist Plaintiff with her high stress levels and to make her feel safe and protected. *See* Ex. 2. Dr. Valliere also notes that Ms. Alvarado describes Akuma as "the love of [her] life" and claims, "[m]y animals were the

6

only thing I got out of bed for[.]" *Id.* at 3. When asked about her losses as a result of this incident, Ms. Alvarado noted that after Akuma was shot, "[t]hey didn't even say sorry." *Id.* at 5. Unsurprisingly, Ms. Alvarado's repeated mentions of Akuma's passing find their way into Dr. Valliere opinions. In the "Conclusions and recommendations" section of the report, Dr. Valliere notes, "Ms. Alvarado was managing her pre-existing mental health issues with the assistance of Akuma prior to the police killing him." Ex. 2 at 11. Likewise, Dr. Valliere opines that the Plaintiff "experienced an episode of Major Depressive Disorder, triggered by the loss of her dog[.]"*Id.*

This Court should exclude Dr. Valliere's testimony because it is inappropriate for the jury to hear testimony about Akuma's death. This Court has already ruled that Akuma's death did not violate Ms. Alvarado's rights under the Fourth Amendment. *See* Dkt. No. 39. As such, testimony on Akuma's death would not make any facts in dispute more likely. In fact, the only conceivable purpose for such testimony would be to convince the jury that someone who would shoot a dog, would also violate someone's rights. A purpose that is clearly improper. *See, e.g. Brown v. Eberly*, No. CIV.A. 99-1076, 2002WL31528675, at *2 (E.D. Pa. Nov. 14th, 2002) ("[E]vidence that defendant has shot and killed four dogs in the past is evidence of another crime or wrong and cannot be used to show that defendant is more likely to have committed the violations of law cited by plaintiffs."). Nor would such testimony help the jury understand the evidence. To the contrary, there is a significant danger that such evidence would likely mislead or confuse the jury. Thus, there is no probative value to introducing testimony on Akuma's death.

In contrast, the prejudicial value of this testimony is extraordinarily high. Plaintiff is not the only person who has developed a strong attachment to their dog. As the Fourth Circuit has noted, "Dogs have aptly been labeled 'Man's Best Friend,' and certainly the bond between a dog owner and his pet can be strong and enduring. Many consider dogs to be their most prized personal

possessions, and still others think of dogs solely in terms of an emotional relationship, rather than a property relationship." *Altman v. City of High Point, N.C.*, 330 F.3d 194, 205 (4th Cir. 2003). There is a strong likelihood that jurors will likely relate to these sentiments and empathize with Ms. Alvarado's loss.

The inflammatory nature of such evidence is well-settled. Courts have precluded testimony that seeks to attribute human qualities or attributes to dogs. *See Brown*, 2002WL31528675 at *1 ("Evidence that would seek to attribute human characteristics to the dog is not relevant and will be excluded . . . [For example] The picture of the dog and the child on a couch with the child thinking 'we're best buddies' is excluded under Rule 403."). As well as testimony that refers to a dog as a "comfort" animal. *See Commonwealth v. Purnell*, 259 A.3d 974, 986 (2021) (The lower court appropriately mitigated against potential prejudice by requiring that the parties refer "to the animal as a 'service dog' to lessen the likelihood that the dog's presence would engender sympathy from the jury.").

In sum, Dr. Valliere's testimony does not "fit" the facts at issue in this case. Dr. Valliere's report repeatedly mentions Akuma's death, and she diagnoses Ms. Alvarado with Major Depressive Disorder due to Akuma's death. Dr. Valliere's report attributes human characteristics to Akuma, such as when Plaintiff referred to Akuma as the "love of her life," and makes reference to Akuma's status as a certified emotional support animal. This information, combined with testimony on Akuma's death, is highly prejudicial and inflammatory. The only conceivable purpose of such evidence is to inflame the passion of the jury. Accordingly, Defendants respectfully request that this Court find that Dr. Valliere's testimony does not "fit" the issues at hand and exclude her expert opinion.

### D. Dr. Valliere's Opinion Is Inextricably Intertwined with Akuma's Death.

There are repeated references to Akuma's death throughout Dr. Valliere's report. Thus, Dr. Valliere's opinions are inextricably intertwined with Plaintiff's sadness over Akuma's death, and this Court should preclude Dr. Valliere's report in its entirety. However, if this Court is inclined to strike portions of Dr. Valliere's report, Defendants would respectfully request to set for hearing on this issue, at which Defendants would seek to question Dr. Valliere under oath about the basis for her opinions.

### III. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant Defendants' motion *in limine* in its entirety and preclude Dr. Valliere from testifying as an expert. In the alternative, Defendants respectfully request that this Court schedule a *Daubert* hearing to further address Dr. Valliere's testimony, along with any other relief that this Court deems just and proper.

Date: <u>August 29, 2024</u>　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　/s/ *Emily Hoff*
　　　　　　　　　　　　　　　　　　　　　　　**EMILY HOFF, ESQUIRE**
　　　　　　　　　　　　　　　　　　　　　　　Assistant City Solicitor
　　　　　　　　　　　　　　　　　　　　　　　Attorney Identification No. 330859

　　　　　　　　　　　　　　　　　　　　　　　/s/ *Jonah Santiago-Pagán*
　　　　　　　　　　　　　　　　　　　　　　　**JONAH SANTIAGO-PAGÁN, ESQUIRE**
　　　　　　　　　　　　　　　　　　　　　　　Deputy City Solicitor
　　　　　　　　　　　　　　　　　　　　　　　Attorney Identification No. 326442
　　　　　　　　　　　　　　　　　　　　　　　City of Philadelphia Law Department
　　　　　　　　　　　　　　　　　　　　　　　1515 Arch Street, 14th Floor
　　　　　　　　　　　　　　　　　　　　　　　Philadelphia, PA  19102-1595