# THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FELISHATAY ALVARADO,** : | |
| *Plaintiff*, : | |
| : | Civil Action |
| v. : | No. 22-3763 |
| : | |
| **CITY OF PHILADELPHIA, et al.,** : | |
| : | |
| *Defendants*. : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY AND REPORT OF GLENN GARRELS**

Plaintiff Felishatay Alvarado (hereinafter "Ms. Alvarado" or "the Plaintiff") alleges that Defendants City of Philadelphia; Police Officers Joshua Burkitt, Eric Clark, Jose Hamoy, Brian Murray, Patrick Saba, Edward Song; Sgt. Kevin Mellody; and Lt. Demetrius Monk (collectively "the Defendants"), violated her constitutional rights when they entered her apartment on June 3, 2021. *See generally*, Complaint.

In support of her claims, Plaintiff retained Glenn Garrels (hereinafter "Mr. Garrels"), an expert in use of force encounters and police best practices. *See* Exhibit 1 (Mr. Garrels' CV). In his report, Mr. Garrels opines that: (1) SWAT officers violated Ms. Alvarado's rights under the Fourth Amendment and Philadelphia Police Department (hereinafter "PPD") procedures when they entered her home; (2) SWAT officers violated Ms. Alvarado's rights under the Fourth Amendment and PPD procedures by not providing a reasonable amount of time for her to voluntarily surrender; (3) Lt. Monk and Sgt. Mellody failed to properly supervise the warrant execution; (4) PPD improperly investigated this incident; (5) PPD violated Ms. Alvarado's Fourth Amendment rights by shooting her dog without allowing her time to secure her dog; (6) PPD failed to follow national

standards in their execution of the warrant; and (7) PPD failed to train its officers on how to deal with dog encounters. *See* Exhibit 2 (Mr. Garrels' Expert Report).

The Defendants now move to strike any portions of Mr. Garrels' opinion testimony that: (1) expresses a legal conclusion; (2) expresses an opinion on the layout of Ms. Alvarado's apartment building; (3) expresses an opinion on cell phone tracking data; and (4) expresses any opinion on Ms. Alvarado's dog, Akuma.

## I. STANDARD OF REVIEW

The Supreme Court decision in *Daubert*, and its subsequent codification in Federal Rule of Evidence (hereinafter "Rule') 702, governs the admissibility of expert testimony. *See generally* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Under the framework established by Rule 702 and *Daubert*, a court must determine: (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) whether the expert's reasoning or methodology underlying the testimony is reliable; and (3) whether the testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. *Elcock v. Kmart Corp*, 233 F.3d 734, 741 (3d Cir. 2000). This analysis applies to scientific and nonscientific, technical or specialized knowledge alike. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Ultimately, the proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592, n.10.

When district courts exercise their gatekeeping responsibility under *Daubert*, the first question is "whether the expert has sufficient qualifications to testify." *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp.2d 167, 174 (E.D.N.Y. 2008). This threshold inquiry involves the court's comparison of "the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d

31, 40 (2nd Cir. 2004). Notably, the Third Circuit does "not pursue[] a policy of qualifying *any* proffered witness as an expert." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (collecting cases). Even witnesses, who may be experts in one area, must be qualified to opine on the topic at hand. *See id.* (citing to *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 373 (D.N.J. 1995).

Once a district court determines that a witness qualifies as an expert, it moves to the second part of the inquiry – determining whether the expert's testimony is reliable. To determine whether an expert's testimony is reliable, the Third Circuit has put forth the following facts: (1) whether a method consist of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Crowley v. Chait*, 322 F.Supp.2d 530, 535 (D.N.J. 2004) (citing to *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994)).

However, because "the *Daubert* factors do not always fit neatly into or easily translate in the context of nonscientific testimony. . . the inquiry into an expert's reliability may focus instead upon personal knowledge or experience." *Crowley*, 322 F.Supp.2d at 535 (*citing to Voilas v. Gen. Motors Corp.*, 73 F. Supp.2d 452, 461 (D.N.J. 1999)); *see also On Track Innovations Ltd. V. T-Mobile USA, Inc.,* 106 F. Supp.3d 369, 411 (S.D.N.Y. 2015) (quoting *WeddingChannel.Com, Inc. v. The Knot, Inc.*, 03-cv-7369 (RWS), 2005 WL 165286, at 6 (S.D.N.Y. Jan. 26, 2005) ("[I]n some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods")).

If a court determines that an expert witness is qualified and that her methodology is reliable, the court should last turn to the question of whether the expert's testimony "fits" the facts and issues presented in the case. *See Elcock*, 233 F.3d at 741. An expert's testimony "fits" the needs of the case if the testimony "will help the trier of fact to [1] understand the evidence or [2] to determine a fact in issue." Fed. R. Evid. 702. To determine whether an expert's testimony "fits" the needs of the case, courts often look to arguments usually reserved for a Rule 403 analysis. *In re Paoli II*, 35 F.3d at 746 ("We explained in *Downing* that Rule 702 analysis partly incorporates Rule 403 analysis but leaves room for Rule 403 to operate independently."). However, because "expert evidence is often more misleading than other evidence, [the] Rule 403 [analysis] gives a judge more power over experts than over lay witnesses." *Id.* at 747.

Finally, while the court has the discretion to determine whether expert testimony will help the trier of fact, expert testimony that renders a legal opinion does not help the trier of fact, and instead usurps the court's pivotal role in explaining the law to the jury. *See Berckeley Inv. Grp, Ltd. v. Colkitt*, 455 F.3d 195, 217 (2d Cir. 2006) (*citing to First Nat'l State Bank v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981)). For example, a use of force expert may testify as to whether an officer's actions fell within the scope of standard police procedures, but he cannot testify that an officer's actions were "unreasonable." *See Jackson v. Pittsburg*, No. 07-111, 2010WL 3222137, at *15 (W.D. Pa Aug. 13th, 2010) (*citing to Burger v. Mays*, 176 F.R.D. 153, 157 (E.D. Pa. 1997)). Thus, even though Rule 704 permits expert witness testimony that "embraces an ultimate issue[,]" the court "shall 'exclude opinions phrased in terms of inadequately explored legal criteria.'" *FedEx Ground Package Syt. v. Applications Intern. Corp.*, 695 F. Supp.2d 216, 221 (W.D. Pa 2010) (*citing to* Fed. R. Evid. 702(a) (Advisory Committee Note)).

## II. ARGUMENT

### A. Mr. Garrels Cannot Testify to Legal Conclusions.

Mr. Garrels' expert report is littered with impermissible legal conclusions. For example, his first opinion states, "SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by illegally entering into her 1st floor, front apartment without having the legal authority to do so while executing a search warrant for a defendant believed to be located inside the 2nd floor, rear apartment which was a violation of policies and procedures of the Philadelphia Police Department." *See* Ex. 2 at 2. Likewise, his second opinion states, "SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by executing the search warrant by forcibly ramming the door and not allowing her a reasonable amount of time to voluntarily surrender her residence which was also a violation of policies and procedures of the Philadelphia Police Department." *See id.* While Mr. Garrels may testify that Defendants' actions did not comply with PPD policy, he cannot conclude that Defendants violated Ms. Alvarado's constitutional rights, that they illegally entered into her apartment, or that they did not have the legal authority to do so. Those are all legal conclusions, that would clearly usurp the jury's roles as a final finder of fact.

Accordingly, Defendants respectfully request that this Court preclude Mr. Garrels from testifying to any legal conclusions at trial.

### B. Mr. Garrels should not be allowed to testify to the layout of Ms. Alvarado's apartment building.

Mr. Garrels opines, on page fourteen of his report, that "Google Earth photographs[] clearly shows that there could not be a 2nd floor front as the 2nd floor is set back from the front of the building." Likewise, on page nineteen of his report, he opines that, "[a] stairway would have to be located by the kitchen entrance toward the rear of the residence to gain access to the 2nd floor

because it is set back from the front of the building." These opinion fails to satisfy all three prongs of a *Daubert* analysis. First, Mr. Garrels does not possess the requisite expertise to testify to the layout of a building. Mr. Garrels' own CV identifies him as an expert on "use of force encounters" and "police best practices." *See* Ex. 1. His CV does not list any qualifications that would render him an expert on architecture or building codes. Thus, he does not possess the qualifications to render this opinion.

Furthermore, Mr. Garrels does not employ a reliable methodology to reach this conclusion. According to his report, he reached this conclusion by merely looking at a photograph on Google Earth and a snippet from a photograph in discovery. However, there is no information about whether it is possible for a house to have both a setback and an antechamber or whether the houses constructed in this neighborhood were all designed with a similar layout that did not include an antechamber. It should go without saying, but an individual, with no training, cannot look at a photograph of a house and simply guess the layout. Thus, this Court should find that Mr. Garrels did not employ a reliable methodology.

Last, Mr. Garrels' testimony on the layout of Ms. Alvarado's house would not assist the trier of fact. Even assuming that Mr. Garrels possess the requisite qualifications and employed a reliable methodology to determine the layout of Ms. Alvarado's apartment building, his opinion would be irrelevant. The question before the jury will be whether it was reasonable for the officers to believe that the apartment building possessed a common area. Mr. Garrels' opinions does not make this answer either more or less likely. Thus, this Court should find that Mr. Garrels' opinion does not "fit" the needs of this case.

Accordingly, the Defendants respectfully request that this Court preclude Mr. Garrels from testifying on any areas outside of expertise, and strike any opinions related to the layout of Ms. Alvarado's house.

### C. Mr. Garrels Should Not Be Allowed to Testify on Cellphone Location Data.

Mr. Garrels' inexpert opinions are not confined to the layout of Ms. Alvarado's home. Despite listing no qualifications or expertise on the issue of geo-location tracking or IP address tracking, Mr. Garrel notes that, "[t]he 'File Notes' provided a cell phone number for the defendant where suspects can be tracked to their location. He also provided an email address where IP addresses can be tracked to a location. . . I found no documentation that Detective Graf followed any of these steps for the cell phone or IP addresses" *See* Ex. 2 at 26-27. Mr. Garrels seems to imply that if Detective Graf sought a search warrant for the homicide suspect's cell phone or IP address then it would have helped determine the layout of the apartment building. However, Mr. Garrels lists neither qualifications nor any methodology that would justify this conclusion. Despite this lack, Mr. Garrels uses his uninformed conclusion as evidence that Defendants violated Ms. Alvarado's rights.

If Mr. Garrels was actually familiar with this technology, then he would know that cell phone data and IP addresses can only approximate location data. This information is not exact and it is absolutely not able to determine what surrounds the location data set. Thus, even if Defendants obtained this information, it would not be able to provide them with the layout of Ms. Alvarado's residence. Accordingly, the decision not to seek the homicide suspect's location data is not probative of any of the issues present in this case, including whether PPD reasonably believed that they could obtain access to the homicide suspect's home by entering the door to Ms. Alvarado's

apartment. Thus, Defendants respectfully request that this Court strike any opinion testimony related to location data and preclude Mr. Garrels from opining on the absence of such data.

### D. Mr. Garrels Should Not Be Allowed to Testify on Akuma's Death Or PPD's Training On Dog Encounters.

Mr. Garrels' fifth and sixth opinions support Plaintiff's claim for the death of Akuma. However, this Court has already ruled that Akuma's death did not violate Ms. Alvarado's rights under the Fourth Amendment. *See* Dkt. No. 39. Thus, Mr. Garrels' expert opinion on Akuma's death and PPD dog encounter training would not aid the trier of fact and does not "fit" the needs of this case. The only conceivable purpose for introducing testimony on Akuma's death would be to convince the jury that someone who would shoot a dog, would also violate someone's rights. A purpose that is clearly improper. *See, e.g. Brown v. Eberly*, No. CIV.A. 99-1076, 2002WL31528675, at *2 (E.D. Pa. Nov. 14th, 2002) ("[E]vidence that defendant has shot and killed four dogs in the past is evidence of another crime or wrong and cannot be used to show that defendant is more likely to have committed the violations of law cited by plaintiffs."). Thus, there is no probative value to introducing testimony on Akuma's death.

In contrast, the prejudicial value of this testimony is extraordinarily high. As the Fourth Circuit has noted, "[d]ogs have aptly been labeled 'Man's Best Friend,' and certainly the bond between a dog owner and his pet can be strong and enduring. Many consider dogs to be their most prized personal possessions, and still others think of dogs solely in terms of an emotional relationship, rather than a property relationship." *Altman v. City of High Point, N.C.*, 330 F.3d 194, 205 (4th Cir. 2003). There is a strong likelihood that jurors will likely relate to these sentiments and testimony on Akuma's death will only serve to inflame the passions of the jury.

The inflammatory nature of such evidence is well-settled. Courts have precluded testimony that seeks to attribute human qualities or attributes to dogs. *See Brown*, 2002WL31528675 at *1

("Evidence that would seek to attribute human characteristics to the dog is not relevant and will be excluded . . . [For example] The picture of the dog and the child on a couch with the child thinking 'we're best buddies' is excluded under Rule 403."). As well as testimony that refers to a dog as a "comfort" animal. *See Commonwealth v. Purnell*, 259 A.3d 974, 986 (2021) (The lower court appropriately mitigated against potential prejudice by requiring that the parties refer "to the animal as a 'service dog' to lessen the likelihood that the dog's presence would engender sympathy from the jury.").

Accordingly, Defendants respectfully request that this Court strike Mr. Garrels' fifth and sixth opinions as they will not aid the trier of fact and do not "fit" the issues at hand.

### III. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant Defendants' motion *in limine* and strike any portion of Mr. Garrels' testimony that (1) expresses a legal conclusion; (2) expresses an opinion on the layout of Ms. Alvarado's apartment building; (3) expresses an opinion on cell phone tracking data; and (4) expresses any opinion on Ms. Alvarado's dog, Akuma.

Date: <u>August 29, 2024</u>                                    Respectfully submitted,

/s/ *Emily Hoff*
**EMILY HOFF, ESQUIRE**
Assistant City Solicitor
Attorney Identification No. 330859

/s/ *Jonah Santiago-Pagán*
**JONAH SANTIAGO-PAGÁN, ESQUIRE**
Deputy City Solicitor
Attorney Identification No. 326442
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA  19102-1595