# EXHIBIT "A"

# Transcript of the Testimony of:
# **FELISHATAY ALVARADO**

**Date:** August 11, 2023

**Case:** FELISHATAY ALVARADO v. CITY OF PHILADELPHIA

DIAMOND COURT REPORTING
406 REDBUD LANE
MANTUA, NEW JERSEY 08051
856-589-1107
dcr.diamond@comcast.net

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------

FELISHATAY ALVARADO,　　　: CIVIL ACTION
　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
　　vs.　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
CITY OF PHILADELPHIA, et.　:
al.　　　　　　　: NO. 22-3763

------------------------

- - -

August 11, 2023

- - -

Oral Deposition of FELISHATAY ALVARADO, taken at the Law Offices of Victims' Recovery Law Center, The North American Building, 121 South Broad Street, Suite 1800, Philadelphia, Pennsylvania 19107, on the above date, beginning at approximately 12:54 a.m., before Douglas S. Diamond, Certified Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania and the State of New Jersey, there being present.

- - -

DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 589-1107
e-mail: dcr.diamond@comcast.net

## Page 2

1　APPEARANCES:
2　　VICTIMS' RECOVERY LAW CENTER
　　　BY: KEITH T. WEST, ESQUIRE
3　　THE NORTH AMERICAN BUILDING
　　　121 SOUTH BROAD STREET
4　　SUITE 1800
　　　PHILADELPHIA, PENNSYLVANIA 19107
5　　Counsel for the Plaintiff
　　　Tel. (215) 546-1433
6　　E-mail: keith@victimrecoverylaw.com
7　　　* * * * *
8　　CITY OF PHILADELPHIA LAW DEPARTMENT
　　　BY: ADAM R. ZURBRIGGEN, ESQUIRE
9　　ONE PARKWAY BUILDING
　　　1515 ARCH STREET
10　PHILADELPHIA, PENNSYLVANIA 19102
　　　Counsel for the Defendants
11　Tel. (215) 683-5114
　　　E-mail: adam.zurbriggen@phila.gov
12
　　　　　* * * * *
13
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1　　　　　　I N D E X
2　WITNESS　　　　　　　　　　PAGE
3　FELISHATAY ALVARADO
4　Examination by Mr. Zurbriggen:　4, 88
5　Examination by Mr. West:　　86
6
7
8
9
10
11
12　　　　　　EXHIBITS
　　　NO.　　　DESCRIPTION　　　PAGE
13
　　　Plaintiff-1　Color Photocopy of Photograph　92
14
　　　Plaintiff-2　Responses to Interrogatories　92
15
　　　Plaintiff-3　Color Photocopy of Photograph　92
16
　　　Plaintiff-4　Color Photocopy of Photograph　92
17
18
19
20
21
22
23
24

## Page 4

1　　　　　- - -
2　　　(It was stipulated by and between
3　counsel that signing, sealing,
4　certification and filing be waived; and
5　that all objections, except as to the
6　form of the question, be reserved until
7　the time of trial.)
8　　　　　- - -
9　　　MR. WEST:　We have a mutual
10　agreement, but we'll reserve all
11　objections other than objections to the
12　form of the question until the time of
13　trial.　Great.
14　　　MR. ZURBRIGGEN:　That's good to
15　hear.
16　　　　　- - -
17　　. . . FELISHATAY ALVARADO, having been
18　duly sworn, as a witness, was examined
19　and testified as follows . . .
20　　　　　- - -
21　　　　　EXAMINATION
22　　　　　- - -
23　BY MR. ZURBRIGGEN:
24　　　Q.　Good afternoon, Ms. Alvarado.　We

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 5

1    were introduced off the record, but I'll just say
2    again my name is Adam Zurbriggen.  I represent the
3    City of Philadelphia and the other defendant
4    individual police officers in this case.
5              Have you ever given a civil
6    deposition before?
7        A.   No.
8        Q.   Okay.  I'm going to go over just a
9    few ground rules just to let you know how things
10   are going to go.  First of all, because there's a
11   court reporter here taking down everything that we
12   say, even though in a normal conversation we might
13   not verbalize our answers, we might respond uh-huh
14   or un-unh or shake the head, I need you here, if
15   you would, please to verbalize all of your answers
16   yes or no.
17             Is that okay?
18       A.   Yes.
19       Q.   And often times I will ask a
20   question that may be very long and not
21   comprehensible.  I do that all the time.  So,
22   please, if you don't understand anything I ask,
23   feel free, 100 percent free, to say I don't
24   understand, could you please restate the question.

Page 6

1              Is that understood and okay?
2        A.   Yes.
3        Q.   Okay.  Also, because the court
4    reporter is taking down everything that we say
5    today, it's very important that we not speak over
6    each other.  So I might be asking a question and
7    you kind of know where I'm starting to go, but,
8    please, if you would, just let me get my entire
9    question out before you start your answer.  And
10   I'll try to do the same for you to make sure even
11   if I think I know what your answer is, not to
12   interrupt your answer and let you give your full
13   answer.
14             In addition, your counsel may have
15   an objection.  So if you wouldn't mind, just
16   slightly pause after I finish my question so that
17   your counsel can object.
18             Is that okay?
19       A.   Yes.
20       Q.   Okay.  And I'm going to try and not
21   go very long today and get you out of here as
22   quick as possible.  But if you need a break at any
23   time, please don't hesitate to say can we take a
24   break.  The only thing I'd ask is if I have a

Page 7

1    question to you already pending, if you would just
2    answer before we take any break.
3              Is that all right?
4        A.   Yes.
5        Q.   And then, also, I know a lot of the
6    issues you and I talk about today are sensitive
7    and can be upsetting.  I apologize about that in
8    advance.  I really promise I don't want to make
9    you uncomfortable in any way.  So if you need to
10   take a break or pause, that's completely fine.  I
11   want you to be comfortable.  Okay?
12       A.   Yes.
13       Q.   And, finally, and I don't mean to
14   imply anything by this, but it's just something I
15   have to ask.
16             Are you under the influence of any
17   medication or is there any other reason why you
18   can't testify truthfully today?
19       A.   No.
20       Q.   All right.  Ms. Alvarado, what's
21   your current date of birth?
22             I'm sorry, not your current.
23             What is your date of birth?
24       A.   12-1-89.

Page 8

1        Q.   12-1-89.
2              Your sister's name is Yara
3    Alvarado?
4        A.   Yes.
5        Q.   And she's your legal guardian; if
6    you know?
7        A.   No.
8        Q.   To your knowledge, do you have a
9    legal guardian?
10       A.   No.
11       Q.   And you have not ever been
12   employed; is that correct?
13       A.   No.
14       Q.   You have been employed before.
15             What was the last time you were
16   employed?
17       A.   I currently have a job now.
18       Q.   Okay.  What's your current job?
19       A.   Home health aide.
20       Q.   You're a home health aide?
21       A.   Yes.
22       Q.   Do you work for a specific company?
23       A.   Yes.
24       Q.   What's the name of that company?

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 9

1    A.    Fox Chase.
2    Q.    Fox Chase.
3          And how long have you been employed
4    as a home health aide at Fox Chase?
5    A.    Three months.
6    Q.    Prior to that, had you ever been
7    employed?
8    A.    Yes.
9    Q.    What was the last employment that
10   you had prior to Fox Chase?
11   A.    The day of the accident.
12   Q.    Where were you working the day of
13   the -- sorry, let me clarify.
14         By accident you're referring to the
15   date in June 2021 when your dog was shot?
16   A.    Yes.
17   Q.    Thank you.
18         And where were you employed that
19   day?
20   A.    CRC.
21   Q.    And do you know what is CRC?
22   A.    A warehouse.
23   Q.    And is that in Philadelphia?
24   A.    It's like Pennsylvania.

Page 10

1    Q.    But you're not sure what --
2    A.    I'm not too -- I know it's in
3    Philadelphia, but it's like, yeah, Philadelphia.
4    Q.    Okay.  And what did you do at CRC?
5    A.    Picker.
6    Q.    I'm sorry, a picker?
7    A.    A picker.
8    Q.    And what is a picker?
9    A.    Where an item will come in and then
10   I would have to go get it.
11   Q.    Okay.  How long were you employed
12   at CRC?
13   A.    I think maybe a month.
14   Q.    And you said that you were employed
15   there on the date of the incident?
16   A.    I was, yeah, but from the whole --
17   like, yes, I was.
18   Q.    Do you recall when you stopped, was
19   it a month after the incident?
20   A.    I got fired.
21   Q.    Okay.  And that was about how long,
22   if you know, after the incident was that?
23   A.    Two weeks.
24   Q.    Okay.  Prior to your working with

Page 11

1    CRC, had you been employed before that?
2    A.    No.
3    Q.    Okay.  Before that, Ms. Alvarado,
4    were you on disability?
5    A.    Yes.
6    Q.    Have you been on disability at all
7    since the incident?
8    A.    Yes.
9    Q.    Are you still currently on
10   disability?
11   A.    Yes.
12   Q.    Okay.  I'll come back to that a
13   little bit later.  I want to ask you first about
14   the apartment, 4664 Torresdale Avenue.
15         You were living there on the date
16   of the incident, June 4th of 2021; correct?
17   A.    Yes.
18   Q.    And, specifically, you were living
19   in a first-floor apartment in that -- at that
20   building?
21   A.    Yes.
22   Q.    And you first moved into that
23   apartment in March of 2021; is that right?
24   A.    Yes.

Page 12

1    Q.    Okay.  Where were you living
2    immediately prior to moving into that building?
3    A.    With my sister.
4    Q.    And do you know your sister's
5    address at that time?
6    A.    Yes.
7    Q.    What was that address?
8    A.    4723 Torresdale Avenue.
9    Q.    And that's nearby the building at
10   4664 Torresdale; correct?
11   A.    Yes.
12   Q.    About how far?
13   A.    Diagonally, if I'm standing in
14   front of the door I can see her house.
15   Q.    Okay.  One other instruction, I
16   guess, I should have given before we started.  But
17   just to remind, you know, there may be questions I
18   ask that might not know or might not know the
19   answer to.  It's perfectly okay to say I don't
20   know the answer.  The one kind of exception to
21   that is I might ask you to estimate sometimes in
22   terms of time, minutes, hours, days or in terms of
23   distances, feet.  If you can give a reasonable
24   estimate, please do, but I don't want you to guess

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 13

1  or speculate.  So feel free to say I really don't
2  know.
3          But going back to the distance
4  between your -- and your sister is Yara; right?
5          A.    Yes.
6          Q.    So going back in terms of the
7  distance between Yara's residence and 4664
8  Torresdale, it was about a few minutes walk; is
9  that right?
10         A.    Yes.
11         Q.    Okay.  How long had you been living
12 with Yara before you moved into the apartment at
13 4664 Torresdale?
14         A.    Two months.
15         Q.    And where were you living prior to
16 Yara's apartment before the incident?
17         A.    In my own apartment.
18         Q.    And where was that apartment, do
19 you remember the address?
20         A.    Roosevelt Boulevard.  It was 4021
21 Roosevelt Boulevard.
22         Q.    And was that an apartment or a
23 house?
24         A.    An apartment.

Page 14

1          Q.    And how long had you been living
2  there, how long did you live there total; if you
3  can estimate?
4          A.    A year.
5          Q.    Okay.  Going back to 4664
6  Torresdale, when you moved in there in March of
7  2021, did you have a lease agreement with -- for
8  that apartment?
9          And if you don't know, that's okay.
10         A.    No.
11         Q.    And let me ask you.  I think I read
12 in your Responses to Interrogatories that you had
13 assumed a lease from your cousin.
14         Does that sound right?
15         A.    Yes, but it was the same landlord
16 that I had in my other apartment.
17         Q.    So the landlord for 4664 Torresdale
18 was the same as your previous apartment.
19         Was that the one at 4021 Roosevelt?
20         A.    Yes.
21         Q.    But it's correct that you assumed a
22 lease from -- that your cousin had at that
23 address?
24         A.    Yes.

Page 15

1          Q.    What's your cousin's name?
2          A.    Lucy Ortiz.
3          Q.    And where does Lucy live now, is
4  Lucy still in Philadelphia?
5          A.    Yes.
6          Q.    Do you know Lucy's address?
7          A.    No.
8          Q.    But just to confirm, you don't have
9  a copy of your lease agreement when you were at
10 4664 Torresdale anymore; correct?
11         A.    Yes.
12         Q.    Okay.  You mentioned the landlord
13 at -- your landlord at 4664 Torresdale.
14         Do you recall the landlord's name?
15         A.    There was -- yes.
16         Q.    What was -- who was the landlord?
17         A.    Leo.
18         Q.    And is that Leo Pajo that you
19 identified in the Interrogatory Responses?
20         A.    Yes.
21         Q.    And then you also identified, I
22 believe, a Mirela Pajo.
23         Do you know Mirela Pajo?
24         A.    His wife.

Page 16

1          Q.    Leo's wife.
2          Before moving into the apartment at
3  4664 Torresdale, did you know Leo and Mirela,
4  personally?
5          A.    No.
6          Q.    You just knew them as the landlord
7  for your previous property?
8          A.    Yes.
9          Q.    When you were at your previous
10 property, did you interact with Leo or Mirela at
11 all?
12         A.    No.
13         Q.    If you needed things at your
14 previous property like maintenance or anything,
15 did you contact anyone else specifically at that
16 previous property?
17         A.    Yes.
18         Q.    Who was that; if you remember?
19         A.    Arvin.
20         Q.    And is that Arvin Marroli, the
21 person identified in the --
22         A.    Yes.
23         Q.    And Arvin Marroli was also the
24 property manager at 4664 Torresdale; correct?

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 17

1    A.   Yes.
2    Q.   Did you know Arvin Marroli
3 personally other than through being a property
4 manager for those two properties?
5    A.   Yes.
6    Q.   How did you know Arvin?
7    A.   He was my landlord for the
8 apartment on Roosevelt.
9    Q.   Okay.  And so if you needed
10 maintenance or anything else with regards to your
11 apartment at 4664 Torresdale, would you contact
12 Arvin for that?
13    A.   Yes.
14    Q.   And was that true until you left
15 4664 Torresdale or was there anyone else who was
16 ever a property manager at that address?
17    A.   No.
18    Q.   Okay.
19    A.   You're asking if Arvin was the
20 property manager at that address at 4664?
21    Q.   I am asking is there any other
22 person other than Arvin who was ever your property
23 manager at 4664 Torresdale, any other property
24 managers at that address?

Page 18

1    A.   No.
2    Q.   Okay.  Ms. Alvarado, I want to ask
3 you about how the property, specifically, the
4 front door of 4664 Torresdale, was marked
5 specifically at the time that you moved in.
6         Do you recall what was on the front
7 door when you first moved into 4664 Torresdale
8 Avenue in terms of writing?
9    A.   Yes.
10    Q.   What was that?
11    A.   The address.
12    Q.   I'm going to show you, and I'm
13 going to mark -- I'm going to mark this photograph
14 Plaintiff's Exhibit-1.
15         MR. ZURBRIGGEN:  And, for the
16    record, this is a document Bates Stamped
17    D-80.  And I've got a copy for you.
18 BY MR. ZURBRIGGEN:
19    Q.   And, Ms. Alvarado, is this the way
20 -- first of all, can you see the writing on the
21 front door from this picture of your apartment at
22 4664 Torresdale?
23    A.   Yes.
24    Q.   Okay.  And do you see that it's

Page 19

1 marked 4664; do you see that?
2    A.   Yes.
3    Q.   Is that the way that it was marked
4 when you first moved into 4664 Torresdale in March
5 of 2021?
6    A.   No.
7    Q.   How was it different?
8    A.   I put the numbers because it didn't
9 have an address.
10    Q.   So when you first moved in to 4664
11 Torresdale in March 2021 those four numbers did
12 not appear there?
13    A.   Not as bold.  They were like
14 fading, so I --
15    Q.   I understand.
16         So there was the numbers 4664
17 there, but they were fading?
18    A.   Uh-huh, yes.
19    Q.   And then I want to direct your
20 attention to the two white mailboxes just to the
21 left of the front door.
22         Do you see those, Ms. Alvarado?
23    A.   Yes.
24    Q.   Do you recall whether these

Page 20

1 mailboxes had markings when you first moved into
2 that apartment?
3    A.   Yes.
4    Q.   How were they marked?
5    A.   The way they are now.
6    Q.   And that looks like from this
7 picture a little one on one of the mailboxes and a
8 little two?
9    A.   Yes.
10    Q.   And so you didn't modify any of the
11 markings on those mailboxes when you moved in?
12    A.   No.
13    Q.   And you didn't modify those until
14 you left, or you didn't modify those at any time,
15 I should say?
16    A.   No.
17    Q.   Okay.  Ms. Alvarado, at any time
18 before the incident in June of 2021, did you ever
19 interact with the people that lived on the
20 second-floor apartment at 4664 Torresdale?
21    A.   No.
22    Q.   Before the date of the incident in
23 June 2021, did you ever get anyone knocking on the
24 door looking for the people in the second-floor

Page 21

1  apartment that you can recall?
2      A.   No.
3      Q.   Okay.  Ms. Alvarado, I think you
4  respond in your Interrogatory Responses that you
5  moved out in August of 2021; is that right?
6           And if you're not sure, that's
7  okay, you can estimate, if you can.
8      A.   Yes.
9      Q.   That sounds right?
10     A.   Yes.
11     Q.   Why did you move out of that
12  apartment in August of 2021?
13     A.   Because I couldn't deal with being
14  in there.
15     Q.   I know it's tough, but can you tell
16  me a little bit more about what was it about
17  living there that you couldn't deal with?
18     A.   The blood that was on the floor,
19  the smell, the fact that I wasn't able to sleep.
20  I was paranoid.  I was always crying.
21     Q.   Okay.  Thank you.
22           MR. WEST:  Are you finished
23       answering?
24           It's okay if you are.  I just

Page 22

1           didn't want you to get cut off.
2  BY MR. ZURBRIGGEN:
3      Q.   Feel free, please, if there's any
4  other thing you wanted to add in terms of why you
5  moved out?
6      A.   That was then of me being there of
7  reliving what happened.
8      Q.   And so in August of 2021, where did
9  you move after 4664 Torresdale?
10     A.   Across the street because that was
11  the only apartment that the landlord was able to
12  get.
13     Q.   And what was the address of the
14  apartment that you moved into?
15     A.   4713 Torresdale Avenue.
16     Q.   And is that immediately next to
17  your sister, Yara's, apartment?
18     A.   No.
19     Q.   Or is it like how far is it
20  approximately of a walk from your sister's
21  apartment?
22     A.   Three houses down.
23     Q.   And who is your -- do you still
24  live at 4713 Torresdale Avenue?

Page 23

1      A.   Yes.
2      Q.   And who is your landlord at 4713
3  Torresdale Avenue?
4      A.   Leo.
5      Q.   And is your property manager also
6  still Arvin?
7      A.   Yes.
8      Q.   Turning you back to that
9  photograph, Ms. Alvarado, at any time after the
10  incident, do you know did either yourself or Leo
11  or Arvin or anyone else change the way the front
12  door or the mailboxes were marked that you know
13  of?
14     A.   Can you repeat that question?
15     Q.   Sure, absolutely.
16           Do you recall whether between the
17  time of the incident and the time you left 4664
18  Torresdale whether the front door was changed in
19  any way in terms of markings?
20     A.   No.
21     Q.   It was not?
22     A.   Un-unh, no.
23     Q.   Did you ever have a conversation
24  with Leo or Arvin about changing the way that the

Page 24

1  front door was marked?
2      A.   No.
3      Q.   Ms. Alvarado, I want to shift gears
4  a little bit and ask you about the animals that
5  you had, specifically, on June 4, 2021, the date
6  of the incident.
7           I understand from your
8  Interrogatory Responses you had two dogs and one
9  was Akuma, the dog that was shot, and one was
10  Penelope; is that right?
11     A.   Yes.
12     Q.   And Akuma is a pitbull mix;
13  correct.
14     A.   Yes.
15     Q.   And Penelope was a Jack Russell,
16  Shih Tzu mix; correct?
17     A.   Yes.
18     Q.   Okay.  And you also had two cats
19  and a bird; is that right?
20     A.   Yes.
21     Q.   And all of those pets were inside
22  your apartment that day of that incident; right?
23     A.   Yes.
24     Q.   Okay.  I want to ask specifically

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 25

1  about Akuma. So you said in, I think, in response
2  to your Interrogatories that you got Akuma about
3  three years before the incident; is that right?
4      A.   Yes.
5      Q.   And you got Akuma from a shelter?
6      A.   Yes.
7      Q.   When you adopted Akuma from the
8  shelter, did you have to pay any fees to get
9  Akuma?
10     A.   No.
11     Q.   And when you adopted Akuma, did you
12 intend for Akuma to be a service dog or an
13 emotional support animal at that time when you
14 adopted Akuma?
15     A.   No.
16     Q.   Why did you get Akuma?
17     A.   I wanted a companion. I had a dog
18 of 13 years who was dying. And I needed --
19 because the dog that I had of 13 years belonged to
20 my mom who died, so it was a lot because she was
21 like having seizures and heart problems. So then
22 I knew she was going to pass. So then I got Akuma
23 to like -- to be like with me and also like help
24 her.

Page 26

1      Q.   I understand.
2           Did you -- was -- in addition to
3  the reasons that you just gave, was one reason
4  that you picked Akuma specifically to be a guard
5  dog for your property where you were living?
6      A.   Not a guard dog because I had small
7  dogs. So just so I can have a bigger dog so I can
8  feel safe. It wasn't a guard dog.
9      Q.   I understand.
10          So before you got Akuma, did you
11 speak with anyone in terms of like a doctor or
12 medical professional about getting Akuma?
13     A.   No.
14     Q.   When you got Akuma, do you know if
15 Akuma had any specific training to serve as a
16 service dog or emotional support dog?
17     A.   Can you ask that question again?
18     Q.   Sure, absolutely. I want to take
19 you back to the time that you adopted Akuma when
20 you went to the shelter to get Akuma.
21          At that time when you picked Akuma
22 out at the shelter, did you know that Akuma had
23 any special training to serve as a service dog or
24 emotional support dog?

Page 27

1      A.   No.
2      Q.   Do you know if Akuma had any
3  specific training to serve as a guard dog?
4      A.   No.
5      Q.   I want to ask about like when you
6  left the house. And I'm taking you back to the
7  time right around 4664 Torresdale, the incident
8  there in June of 2021.
9           Did you, when you would leave the
10 house, would you take Akuma with you ever?
11     A.   Yes.
12     Q.   What kind of places and what
13 situations, if you could, would you take Akuma
14 with you?
15     A.   I would take him with me to my
16 friend's house. When I went to go to the parks I
17 would take him because I really don't have any
18 friends or anyone. So I would go everywhere with
19 my dog.
20     Q.   Did you ever take Akuma on any kind
21 of transportation, public transportation, like
22 subway or bus?
23     A.   No.
24     Q.   Did you ever take him into movie

Page 28

1  theatres or any kind of places where you would go
2  shopping or any other place would you take Akuma?
3      A.   Can you repeat the question?
4      Q.   Absolutely. So you mentioned
5  bringing Akuma to your friend's house and to the
6  park.
7           Did you ever take him into any kind
8  of businesses when you would go shopping, any
9  other kind of places?
10     A.   If he was allowed to go in.
11     Q.   Did you ever try to take Akuma in a
12 place and not be allowed to?
13     A.   No.
14     Q.   Prior to the incident in June of
15 2021, did you ever have any problem with Leo or
16 Mirela or Arvin about having Akuma at 4664
17 Torresdale, did you ever get any pushback or
18 concern from them about that?
19     A.   No.
20          MR. ZURBRIGGEN: I'm going to mark
21          another document. And, Keith, I hope
22          you don't mind, I've just got Ms.
23          Alvarado's Interrogatory Responses and
24          RP Responses with the documents all as

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 29

1        one document.  There's not a whole lot
2    there.
3            MR. WEST:  Yes, I don't think
4    there's any problem.
5            MR. ZURBRIGGEN:  I'm going to mark
6    that whole packet as Plaintiff's-1, for
7    the record.
8    BY MR. ZURBRIGGEN:
9        Q.    I've got a copy here, Ms. Alvarado.
10   I've got one.  You should have a third one,
11   actually.
12           MR. ZURBRIGGEN:  I'm just going to
13   give you the marked one, Keith.
14           MR. WEST:  Sure.  I'll just switch.
15   BY MR. ZURBRIGGEN:
16       Q.    Ms. Alvarado, I want to turn your
17   attention, it's the not the last page, not the
18   second-to-last page, but the third-to-last page.
19   It's got on the top a Dr. Frank J. Welch, M.D.
20           Can you turn to that page, if you
21   would, and let me know when you find it?
22       A.    (Witness complies.)
23       Q.    That's perfect.  That's the one,
24   yes.

Page 30

1            Ms. Alvarado, have you seen this
2    document before?
3        A.    Yes.
4        Q.    Okay.  Can you tell me, you know,
5    what your understanding of what this document is?
6        A.    It's the paperwork stating that my
7    dogs were registered as emotional support.
8        Q.    Do you recall -- and the date on
9    this you see at the top is April 25th of 2021.
10           Do you remember the process of
11   applying to Dr. Welch for this letter?
12       A.    Yes.
13       Q.    Can you tell me what that process
14   entailed?
15       A.    They asked me questions to see if I
16   qualified for an emotional support pet.
17       Q.    Did you have to provide Dr. Welch's
18   office with any documents or just responses to
19   questions; if you remember?
20       A.    I don't remember.
21       Q.    Okay.  Do you remember meeting with
22   Dr. Welch about this?
23       A.    No.
24       Q.    Are you sure that you didn't or do

Page 31

1    you just not remember?
2        A.    Did I meet face to face?
3        Q.    Yes.
4        A.    No.
5        Q.    Do you remember why you applied to
6    Dr. Welch, if there was any specific reason you
7    applied to Dr. Welch to get this certification?
8        A.    Yes.
9        Q.    What was the reason?
10       A.    So I can take my animals with me.
11   And I was suffering from depression, anxiety.  And
12   they were a comfort to me.  So in order for me to
13   be able to have them with me at all times and take
14   them into stores, then I had to get them
15   registered.
16       Q.    I understand.
17           Is there any specific incident
18   before you applied for this that prompted you to
19   reach out; if you can recall?
20       A.    No.
21       Q.    I know you said you didn't meet
22   face to face with Dr. Welch.
23           Do you know if Dr. Welch saw your
24   pets in any way, if you had to bring your pets to

Page 32

1    see Dr. Welch?
2        A.    No.
3        Q.    Before the incident that occurred
4    in June 2021, was there ever any time or incident
5    that you can recall where Akuma was either
6    growling or barking at another individual, another
7    person, did you ever have an issue with that?
8        A.    No.
9        Q.    And so I want to ask you about
10   Penelope.
11           Penelope is your Jack Russell Shih
12   Tsu mix; right?
13       A.    Yes.
14       Q.    And do you still have Penelope?
15       A.    Yes.
16       Q.    And then did you obtain Penelope
17   around the same time as Akuma or was it later?
18       A.    No.
19       Q.    When did you acquire Penelope?
20       A.    2018.
21       Q.    Do you remember if that was after
22   Akuma?
23       A.    Before.
24       Q.    Before.  And did you adopt Penelope

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 33

1   for the same reasons that you adopted Akuma?
2       A.   No.
3       Q.   Why did you adopt Penelope?
4       A.   She was a gift.
5       Q.   From whom was she a gift?
6       A.   From my ex.
7       Q.   Was that an ex-boyfriend?
8       A.   Fiance.
9       Q.   Fiance, okay.
10          When you got Penelope as a gift, do
11  you know if Penelope had any special training to
12  serve as a service dog or emotional support dog?
13      A.   No.
14      Q.   Okay.  Ms. Alvarado, I want to
15  switch gears and talk about what occurred in June
16  2021, June 4th of 2021, the incident.
17          And that occurred in the early
18  morning of the day of this incident; is that
19  right?
20      A.   Yes.
21      Q.   Where were you in the house when
22  you first noticed that someone was at your
23  property, at your residence?
24      A.   Can you --

Page 34

1       Q.   Sure.  Let me clarify.
2          How did you first learn on that
3   day, the day of the incident, that someone was at
4   the property, did you hear something?
5       A.   My door was kicked down.
6          MR. WEST:  I apologize.  What did
7   you say, your dog was what?
8          THE WITNESS:  No.  I said my door
9   was kicked down.
10         MR. WEST:  Door was kicked down.  I
11  only asked because I didn't hear it.
12         Sorry.
13         MR. ZURBRIGGEN:  That's fine.
14  BY MR. ZURBRIGGEN:
15      Q.   So did you hear any knocking at the
16  door before your door was kicked down?
17      A.   No.
18      Q.   Where were you when you first
19  learned -- you heard the door knocked down, where
20  were you in the apartment?
21      A.   I saw -- I was walking towards the
22  door.
23      Q.   So you were walking towards the
24  front door of your apartment?

Page 35

1       A.   Yes.
2       Q.   Where were you coming from in the
3   apartment when you were walking towards the door?
4       A.   The bathroom.
5       Q.   And when you were walking towards
6   the front door, was there anything that you were
7   heading for in the apartment at that time?
8       A.   No.
9       Q.   And I know this is personal.  I'm
10  sorry to ask.  I just have to.
11          In terms of your state of dress at
12  that time --
13      A.   Can you go back to that question?
14      Q.   Yes.  And you look like you want to
15  clarify something.  Go ahead.
16      A.   You asked me if I was heading
17  towards something?
18      Q.   Yes.
19      A.   Not towards something, but towards
20  like my bird because he was screaming.  So I was
21  like not like towards the door, but towards the
22  bird.
23      Q.   I understand.
24          So you had heard before that your

Page 36

1   bird was screaming, I think you said, or
2   squeaking?
3       A.   Yes, yes.
4       Q.   Okay.  Where were you when you
5   first heard the bird squeaking?
6       A.   In the bathroom.
7       Q.   And did you hear anything else when
8   you were in the bathroom or just the bird?
9       A.   Just the bird.
10      Q.   So you didn't hear the dog barking
11  at that point?
12      A.   I heard the bird.
13      Q.   Before you left the bathroom, did
14  you hear the dog bark or did you hear the dog bark
15  after you left the bathroom?
16      A.   It was after.
17      Q.   And, just to be clear, you were
18  alone in the apartment at this time; correct?
19      A.   Yes.
20      Q.   Were the lights off in the
21  apartment?
22      A.   Yes.
23      Q.   All of them or was the bathroom
24  light on?

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 37

1      A.    The bathroom light.
2      Q.    Okay.  So you mentioned that you
3  were walking toward the bird when the door was
4  kicked in; is that right?
5      A.    I was walking towards the front
6  because it's like one open space, so everything is
7  together.  So I was walking towards the front,
8  like the front of the apartment where the door was
9  and because the bird was next to the door, so
10  everything is together.
11     Q.    And that's when you heard the door
12  being breached?
13     A.    When I saw them standing, yes.
14     Q.    So they --
15     A.    They kicked the door down.  And
16  that's when I noticed what was -- that someone was
17  trying to get in.
18     Q.    Were you looking at the door when
19  the door was breached?
20     A.    Yes.
21     Q.    And so you saw the first officers
22  come through the door after that?
23     A.    Yes.
24     Q.    And let me go back to this point

Page 38

1  because I think I was going to ask it before we
2  went back.  And I hate to ask it.
3         But in terms of how you were
4  dressed at that point when you left the bathroom
5  and headed toward the front door where the bird
6  was, you said you were not dressed from the waist
7  down?
8      A.    Yes.
9      Q.    But did you have a towel wrapped
10  around you at that point in time?
11     A.    Yes.
12     Q.    And from the top up you had a bra
13  on, but you did not have a top; is that right?
14     A.    No.  I had a shirt, but no bra.
15     Q.    I understand.  Okay.
16         So after you saw the door being
17  breached, did you see all of the officers enter?
18     A.    Yes.
19     Q.    And where were you standing when
20  they entered, were you standing -- where were you
21  situated in the apartment?
22     A.    I was where the kitchen and the
23  living room start, like where they meet, but since
24  it was all open space it was like in the middle of

Page 39

1  the doorway.
2      Q.    So is it, I'm sorry, I don't want
3  to cut you off, is it fair to say that you were
4  standing about at the boundary line between the
5  kitchen and the living room?
6      A.    Yes.
7         MR. ZURBRIGGEN:  And I'm going to
8     just mark another document.  This is
9     Plaintiff's Exhibit-3 or Plaintiff's-3.
10        MR. WEST:  Do you mean defense?
11        MR. ZURBRIGGEN:  I'm sorry, I'm
12     just going to call it Plaintiff-3.
13        MR. WEST:  Okay.  Because your
14     plaintiff.
15        MR. ZURBRIGGEN:  And this is her
16     deposition.
17        MR. WEST:  I understand.
18        MR. ZURBRIGGEN:  And it's a
19     document with the Bates Stamp 94.
20        Here's a copy.
21  BY MR. ZURBRIGGEN:
22     Q.    All right.  Ma'am, is this a
23  picture of how your apartment looked on the day of
24  the incident?

Page 40

1      A.    Yes.
2      Q.    Okay.  And so when we said -- we
3  were talking earlier about where you were standing
4  when the officers entered.
5         Is that at the point where the wood
6  there becomes the tile that you see on this
7  photograph, is that about where you were standing
8  or was it further back or forward?
9      A.    Yes, further, the wood and the tile
10  come together.
11     Q.    And were you standing to the --
12  were you standing behind that little barrier there
13  or were you standing -- were you standing where
14  that barrier between the living room and kitchen
15  is, there's a gap?
16     A.    I was standing in the gap.
17     Q.    You were standing in the gap
18  between the wall and that little divider?
19     A.    Not behind the divider, but on the
20  side, so right there.
21     Q.    And, if you could, just so we have
22  a record, I'm going to give you my pen, and if you
23  could mark with an X where you were standing?
24     A.    (Witness complies.)

Page 41

1        Q.    Thank you.  So, just to be clear,
2   you were standing on the tile; is that right?
3        A.    Yes.
4        Q.    And you could see the front door at
5   that point in time?
6        A.    Yes.
7        Q.    Do you know at that point in time
8   where the officers came through the front door
9   where Akuma was?
10       A.    Yes.
11       Q.    Where was Akuma in this -- in the
12  apartment?
13       A.    In his cage.
14       Q.    And is that the cage that's on
15  Plaintiff-3 to the far left of the photograph?
16       A.    Yes.
17       Q.    And could you see Akuma at that
18  point inside the cage or do you just know that he
19  was there some other way?
20       A.    He was -- could I see?
21       Q.    Sure.  If you'd like to on the
22  photograph where Akuma was, that's fine as well,
23  and you can mark that with a D for dog or A for
24  Akuma.

Page 42

1        A.    (Witness complies.)
2        Q.    I'm sorry, I'm struggling to see.
3            Was that right where --
4        A.    Where the --
5        Q.    Oh, right, I see now.  Thank you.
6            So when the officers came through
7   the front door where that toy is where Akuma was,
8   could you see Akuma there at that time?
9        A.    No.
10       Q.    But did you know Akuma was there
11  some other way?
12       A.    Yes.
13       Q.    How did you know Akuma was there at
14  that time?
15       A.    Because I heard him.  And that's
16  where he usually sleeps.
17       Q.    You said you heard Akuma at that
18  point.
19           Did Akuma start to bark as soon as
20  the officers came in the door or was it before?
21       A.    When they kicked it down.
22       Q.    So, to the best of your
23  recollection, Akuma was not barking before the
24  door was kicked down?

Page 43

1        A.    Before he barked and then after
2   because when the bird was screaming, that's when
3   he barked.
4        Q.    I see.  So Akuma --
5        A.    Because the bird was screaming and
6   he barked.  So I guess he saw what the bird saw.
7        Q.    I understand.
8            So you heard the bird start
9   squeaking first?
10       A.    Yes.
11       Q.    And then you heard Akuma start
12  barking after that?
13       A.    Yes.
14       Q.    But it was before the officers came
15  through the door?
16       A.    Yes.
17       Q.    And it was before the door was
18  breached?
19       A.    Yes.
20       Q.    So can you describe it?
21           I know this isn't pleasant.
22           Would you describe for me what
23  happened after the officers came through the front
24  door?

Page 44

1        A.    They came through the front door.
2   And I told my dogs to calm down.  They was okay.
3   He calmed down.
4            And then I told him, let me put him
5   in the cage, let me put him in the cage a few
6   times.
7            And they said, no.
8            And they shot him.  And they were
9   just asking how do you get to the second floor.
10  And when they had shot him, they shot him.  They
11  had me on the floor.  They didn't let me move.
12  They didn't want to show me the search warrant.
13  They told me don't talk and just sit there on the
14  floor.  And I called the little dog.  Well, when
15  they kicked the front door the little dog ran
16  towards me.
17           And I asked them, let me put him in
18  the cage.
19           And they said, no.
20           And they just shot him.
21       Q.    When you refer to the little dog
22  you're referring to Penelope; correct?
23       A.    Yes.
24       Q.    So when the officers came through

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 45

1    the front door you said Penelope ran toward you?
2         A.    Yes.
3         Q.    Where was Penelope before that; if
4    you know?
5         A.    They sleep together.
6         Q.    So did you see Penelope before the
7    officers came through the front door?
8         A.    Yes.
9         Q.    And Penelope was you said where
10   Akuma was?
11        A.    Yes.
12        Q.    By that toy?
13        A.    Yes, because when I was in the
14   bathroom they came to me.  And I told him them to
15   lay down.  They went back to their bed.
16        Q.    So I just want to be completely
17   clear.
18              You said Penelope came to you
19   before the officers came through the door?
20        A.    Because every morning is the same
21   routine, yes, so yes.
22        Q.    But when the officers came through
23   the door Penelope was not -- you could not see
24   Penelope?

Page 46

1         A.    Correct.
2         Q.    Was Penelope barking?
3         A.    I don't remember.
4         Q.    When the officers came through the
5    door, did they come right up to you or did any of
6    them come right up to you?
7         A.    They had the gun to my face and
8    told me to get on the ground.
9         Q.    How many officers came up to you?
10        A.    So there was one officer that came
11   up to me that made me get on the floor.
12        Q.    Do you recall what that officer's
13   -- do you recall the officer's name?
14              If you don't, that's okay.
15        A.    No.  They didn't give any names.
16        Q.    What -- can you describe that
17   officer who came up to you in terms of a
18   description; tall, short?
19        A.    Tall.
20        Q.    Could you tell the officer's race
21   or ethnicity?
22        A.    I know he was light skinned.
23   Because of what they had on you couldn't see.
24        Q.    I understand.

Page 47

1              When that officer came up to you,
2    were you standing where you had marked here when
3    they came in and just in the kitchen?
4         A.    He pushed me back.
5         Q.    How far back did you go at that
6    point in time?
7         A.    Just like --
8         Q.    You can mark on here, if you want.
9    And you can mark that with like a B for back, if
10   that's easiest.
11        A.    (Witness complies.)
12        Q.    So you moved back about a few feet
13   from where you were?
14        A.    Maybe like two.
15        Q.    About two feet?
16        A.    Yeah.
17        Q.    And how close to you was that
18   officer?
19        A.    In my face.
20        Q.    At that point in time when the
21   officer was in your face, could you see where
22   Akuma was?
23        A.    No.
24        Q.    And at that point in time, did you

Page 48

1    get on the ground as you were instructed by the
2    officer?
3         A.    Yes.  I was forced.  I had a gun to
4    my face.
5         Q.    And you said you told that officer
6    to let me put my dog away?
7         A.    Yes.
8         Q.    You said the officer told you, no?
9         A.    Correct, yes.
10        Q.    Were you -- I want to ask you about
11   when, and you heard a single gunshot; is that
12   right?
13        A.    Yes.
14        Q.    Were you on the ground at the time
15   that you heard that shot?
16        A.    Yes.
17        Q.    And at the time that you heard that
18   shot, could you see Akuma?
19        A.    I heard him scream.
20        Q.    But you couldn't see him?
21        A.    Yes.
22        Q.    Could you hear Akuma barking right
23   before the shot?
24        A.    Can you repeat the question?

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 49

1    Q.    Sure.  Was Akuma barking right
2  before the gunshot?
3    A.    No.
4    Q.    Did you see Akuma at any point in
5  time go toward the officers?
6    A.    No.
7    Q.    You didn't see Akuma at any point
8  before the shot, you said; correct?
9    A.    Yes.
10   Q.    Now, Ms. Alvarado, at some point in
11  time did the officers ask you or did any of the
12  officers ask you how to access the second-floor
13  apartment?
14   A.    Yes.
15   Q.    When was that, was that after the
16  shot or before the shot?
17   A.    As soon as they kicked the door
18  down that's all they were saying.
19   Q.    And did you respond to that?
20   A.    I told them that -- yes.
21   Q.    What did you say in response?
22   A.    They had to get out because there
23  was only one way in and one way out, the second
24  floor was around the back.

Page 50

1    Q.    Did any of the officers say
2  anything in response to that?
3    A.    No.  They started ripping the
4  curtains and started looking and they started
5  searching the apartment.
6    Q.    You said that you were on the floor
7  in the kitchen; is that right?
8    A.    When they first kicked the door
9  down.
10   Q.    Did the officers go past you in the
11  kitchen?
12   A.    Yes.
13   Q.    And they went further back into the
14  apartment?
15   A.    Yes.
16   Q.    You saw them go further back into
17  the apartment?
18   A.    Yes.
19   Q.    Did you see them search through
20  anything in terms of not going -- let me ask it
21  this way.
22        Just to be clear, you saw them go
23  back into the rest of the apartment; correct?
24   A.    Yes.

Page 51

1    Q.    But did you see them search through
2  any of your belongings?
3    A.    Yes.
4    Q.    What did you see?
5    A.    They ripped the curtain down from
6  my laundry room.  And then they went into my room.
7  And they were just moving the stuff around.  They
8  were searching for, I guess, a person.  They were
9  just looking.  They went into the bathroom.
10   Q.    And then what happened after they
11  went back into the bathroom?
12   A.    They saw -- they came out.
13   Q.    About how long was it between the
14  time that the shot was fired and the time that
15  they came back out?
16   A.    I don't recall.
17   Q.    Was it a matter of minutes,
18  seconds; if you can say?
19        MR. WEST:  Object to the form of
20   the question.
21        You can answer.  If you're able to
22   answer, you can answer.
23        MR. ZURBRIGGEN:  And I can rephrase
24   the question, if it's easier.

Page 52

1  BY MR. ZURBRIGGEN:
2    Q.    Was it more than five minutes that
3  they were inside the apartment before they left
4  outside the apartment?
5    A.    Yes.
6    Q.    It was more than five minutes?
7    A.    Yes.
8    Q.    Before that five minutes was up,
9  did any of the officers leave the apartment?
10   A.    No.
11   Q.    So they all stayed in the
12  apartment?
13   A.    No.  There were some that were in
14  my bedroom searching.  And then there was some
15  that were making sure that I didn't move.
16   Q.    How many officers were with you
17  watching you at this time?
18   A.    There was three.
19   Q.    And so while those three officers
20  were watching you, did you see any leave the
21  apartment?
22   A.    They -- yes.
23   Q.    About how long after the shot,
24  again, if you can estimate?  If you can't --

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 53

1   A.   I can't.
2       Q.   At some point -- I'm sorry, you
3   look like you want to clarify.  Go ahead.
4       A.   Yes.  Once they went and saw that
5   they moved the curtains and realized that there
6   was a wall and a window, they just left.
7       Q.   At that point when that occurred,
8   did any officers stay behind with you?
9       A.   Yes.
10      Q.   How many?
11      A.   Two.
12      Q.   And, if you can estimate, about how
13  long were you on the ground until you got off the
14  ground?
15      A.   A half an hour.
16      Q.   And so what happened that prompted
17  you to get up?
18      A.   I want -- I asked to put on clothes
19  because my boobs were hanging out.  The towel was
20  showing my -- because the towel wasn't a big
21  towel, so it barely covered me.
22  (Witness indicating.)
23      Q.   And so you asked one of the
24  officers if you could go put on clothing?

Page 54

1       A.   Yes.
2       Q.   And what did the officer say?
3       A.   He said it was okay.
4       Q.   And then did you go and put
5   clothing on?
6       A.   I went to the bathroom.
7       Q.   And you put clothing on in the
8   bathroom?
9       A.   Yes.
10      Q.   When you came out of the bathroom,
11  where did you go at that point?
12      A.   To the chair.
13      Q.   And just referring you back to
14  Plaintiff's-3, is that one of the chairs at the
15  table in the kitchen or -- I'm sorry, did I take
16  your -- I'm sorry.
17           Was that one of the chairs in the
18  kitchen or one in the living room?
19      A.   Yes, it was.
20      Q.   Just, for the record, you're
21  indicating the chair in the kitchen?
22      A.   Yes.
23      Q.   And when you came and sat at the
24  chair in the kitchen, were any officers still

Page 55

1   there with you?
2       A.   Yes.
3       Q.   How many?
4       A.   They were coming in and out.  There
5   was like three.
6       Q.   Did any of these officers say
7   anything to you at that point in time?
8       A.   No.
9       Q.   Did you say anything to the
10  officers at that point after you came out to
11  change?
12      A.   Yes.
13      Q.   What did you say?
14      A.   I asked them what was going on.
15  And they said that they couldn't tell me anything.
16      Q.   About how long were you sitting in
17  that chair, if you can say?
18      A.   Until they left.  Until they told
19  me to go outside and take my statement.  Because
20  he was standing there watching me.  So then once I
21  was able to move to go outside and for them to
22  take my statement, that's when he left.
23      Q.   At some point in time that day, did
24  your sister, Yara, come over?

Page 56

1       A.   Yes.
2       Q.   When was that, was that when you
3   were still inside or was that after you were
4   outside giving a statement?
5       A.   When I was inside.
6       Q.   And so Yara came inside with you?
7       A.   No.  They didn't allow her to.
8       Q.   Could you see Yara outside while
9   you were still sitting inside?
10      A.   Yes.
11      Q.   You could see her through the door?
12      A.   Yes.  She came at one point to get
13  Penelope because she had pissed all over me and
14  she was shaking.
15      Q.   Do you know -- did you -- before
16  that point in time, did you contact Yara to have
17  her come over or did she just come over?
18      A.   No.  She came.  She saw everything
19  through her house, I guess her front door, saw the
20  cops that were outside.
21      Q.   So your first interaction with Yara
22  was when you were outside giving a statement?
23      A.   Yes.
24      Q.   At some point in time that day, did

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 57

1    you notice officers taking photographs inside the
2    apartment?
3        A.    No.
4        Q.    Do you remember giving your
5    statement when you went outside?
6        A.    Yes.
7        Q.    Do you remember how many officers
8    it was that took your statement?
9        A.    One.
10       Q.    Do you remember if that officer --
11   do you remember that officer's name?
12            If you don't, that's okay.
13       A.    No.
14       Q.    Okay.  Do you remember if that
15   officer was recording it by video?
16       A.    Yes.
17       Q.    And, Miss, I'm sorry, I mean to
18   imply nothing by this, but I just have to ask.
19            When you gave a statement to that
20   officer you were fully honest and truthful with
21   that officer; correct?
22       A.    Yes.
23       Q.    At some point that day, did you
24   learn that the officers were looking for a

Page 58

1    homicide or a murder suspect?
2        A.    After everything happened.
3        Q.    Do you remember if that was when
4    you were giving a statement?
5        A.    No.
6        Q.    Do you remember if it was after you
7    left and you went outside?
8        A.    That was when everything was done
9    and over with that I heard from people speaking
10   that that was why they were there, but the officer
11   had never told me why they were there.  They just
12   said that they were looking for someone.
13       Q.    But they didn't tell you they were
14   looking specifically for a homicide or a murder --
15       A.    They didn't say.  They just said
16   that they were looking for someone.
17       Q.    Did you learn at any point after
18   that that the person they were looking for was a
19   murder suspect?
20       A.    No.
21       Q.    So you did not know that before
22   today?
23       A.    Well, I figured that out after
24   everything took place, because I wanted to know

Page 59

1    what was going on, why they went into my house.
2    So then I went to the person who lives upstairs
3    because that's where they said -- she came to me
4    and she apologized because of what happened to my
5    dog.
6        Q.    How long was it that the person
7    from upstairs came to you to apologize, how long
8    after the incident; if you remember?
9        A.    Right once everything -- everybody
10   left.
11       Q.    So it was the same day as the
12   event?
13       A.    The same day.
14       Q.    And you said you never interacted
15   with that person before; correct?
16       A.    No, correct.
17       Q.    And you said she just apologized
18   about what had happened with your dog?
19       A.    Correct.
20       Q.    Did she say anything else to you
21   about what happened?
22       A.    No.
23       Q.    Did you say anything to her that
24   you can remember?

Page 60

1        A.    No.
2        Q.    Did you ever interact with that
3    woman again after that?
4        A.    Yes.
5        Q.    What was the nature of that
6    interaction?
7        A.    She was -- she lived upstairs from
8    me.  So every time I see her she'll always
9    apologize.  And she felt bad for what happened.
10       Q.    Did she say anything other than
11   apologizing about what happened?
12       A.    She said that her -- that they were
13   looking, I guess, for her son.
14       Q.    Did she say anything else about
15   that that you can remember?
16       A.    No.
17       Q.    Ms. Alvarado, did you ever go
18   around to the back of 4664 Torresdale while you
19   were living there?
20       A.    No.
21       Q.    So you never saw how the back
22   looked of the property?
23       A.    I can see it through my bedroom
24   window.

Page 61

```
 1        Q.     Can you see the door that's in the
 2   back of the property from your bedroom window?
 3        A.     Yes.
 4        Q.     What does that door look like?
 5        A.     It's a white screen door.
 6        Q.     Is there anything written on it?
 7        A.     No.  I wasn't able to see that much
 8   because it's on an angle.  So I can only see a
 9   certain point.
10        Q.     And you've never been -- you said
11   you've never been back there, so you've never been
12   through it; correct?
13        A.     Correct.
14        Q.     Ms. Alvarado, and again, I
15   apologize in advance.  I know this is not an easy
16   thing to talk about.
17               But at some point the day of the
18   incident, did the officers tell you that you could
19   pick up the remains for Akuma?
20        A.     They -- no.
21        Q.     Not that you can remember or do you
22   know that they did not tell you that you could
23   pick up the remains for Akuma?
24        A.     Can you repeat that?
```

Page 62

```
 1        Q.     Sure.  Did anybody at any time from
 2   the police that day talk to you about what you
 3   could do to pick up Akuma's body?
 4        A.     No.
 5        Q.     Do you recall how you learned how
 6   to pick up Akuma?
 7        A.     They said that they were going to
 8   take his body to Act -- well, to Act Philly.
 9        Q.     Is that Act, A-c-t, like Act
10   Philly?
11        A.     Yes.
12        Q.     Did they say what for?
13        A.     No.  They just -- that's where they
14   took him.  That's where he was going to be, I
15   guess, cremated, so that's where they took him.
16   And I would have to go from there.
17        Q.     So did you personally pick up
18   Akuma's body at any time?
19        A.     Yes.
20        Q.     Did you pick up his body to take to
21   be cremated or did you pick up his cremated
22   remains?
23        A.     I picked up his body to be cremated
24   because they don't do it there.
```

Page 63

```
 1        Q.     And you took it somewhere else to
 2   be cremated?
 3        A.     Yes.
 4        Q.     And you did that yourself?
 5        A.     Yes.
 6        Q.     About how long after the incident
 7   was that; if you can remember?
 8        A.     As soon like -- after everybody
 9   left or?
10        Q.     Was it the same day that you went
11   to pick up Akuma?
12        A.     Yes.
13        Q.     It was the same day.
14               And did you take Akuma to the place
15   to be cremated the same day?
16        A.     Yes.
17        Q.     And did you pay to have Akuma
18   cremated that day?
19        A.     Yes.
20        Q.     Was that $143.50 that you paid?
21        A.     Yes.
22        Q.     And I believe you said in your
23   Interrogatory Responses that Akuma's blood was
24   still on the floor.
```

Page 64

```
 1               Did you clean that up yourself?
 2        A.     No.
 3        Q.     Who did?
 4        A.     My sister.
 5        Q.     Is that Yara?
 6        A.     Yes.
 7        Q.     Were any of your pets, Penelope or
 8   your bird or cats, hurt that day, physically, I
 9   should clarify?
10        A.     No.
11        Q.     Now, your front door was damaged as
12   a result of the officers coming through; is that
13   correct?
14        A.     Yes.
15        Q.     But you did not pay for that
16   yourself; correct?
17        A.     I called the landlord.
18        Q.     Okay.  Was that you spoke to Arvin
19   or did you speak to Leo or do you recall?
20        A.     Both.
21        Q.     You spoke to Arvin and Leo?
22        A.     Yes.
23        Q.     Do you remember how long after the
24   incident, was it the same day as the incident that
```

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 65

1    you spoke with them?
2        A.    Yes.
3        Q.    And you remember speaking to both
4    of them?
5        A.    I spoke to Leo because his office
6    is not far from the apartment.
7        Q.    Where -- do you know the address of
8    Leo's office?
9        A.    No.
10       Q.    But you said it's close by.
11            Do you know about how many minutes
12   walk, say?
13       A.    Around the corner from -- it's like
14   his office is behind my sister's house.
15       Q.    And did you go over there in person
16   that day?
17       A.    No.  He came.
18       Q.    Do you know how he learned about
19   what had happened, did you contact him?
20       A.    No.
21       Q.    So you're not sure how he learned?
22       A.    I'm not sure.
23       Q.    But you said he came to the
24   property that day.

Page 66

1            Were the officers still there when
2    he arrived?
3        A.    I don't remember.  I know I had to
4    tell him about the door because I needed a new
5    door and a frame to the door.
6        Q.    And so when Leo came you told him
7    you needed a new door and a new frame?
8        A.    Yes.
9        Q.    Do you remember anything else from
10   that conversation that Leo told you about what had
11   happened?
12       A.    He asked me what happened.  And I
13   told him.
14       Q.    And did Leo say anything else in
15   response that you can remember?
16       A.    Not that I can remember.
17       Q.    Do you know about how long it took
18   for Leo or anyone to replace your door that day?
19       A.    I don't remember the exact timing
20   of how long from the incident.  I can't give you a
21   specific time period.
22       Q.    But it was not the same day?
23       A.    It was the same day.
24       Q.    It was the same day, okay.

Page 67

1            Do you recall any discussion with
2    Arvin?  I think you said you spoke with Arvin that
3    day as well.  Do you remember what you talked
4    about with Arvin?
5        A.    What happened since he was the
6    property manager.
7        Q.    Do you remember whether Arvin came
8    out or if you spoke to him on the phone?
9        A.    He didn't come out.  I just spoke
10   to him on the phone.
11       Q.    Can you remember anything else he
12   said about -- in response to you telling him what
13   happened?
14       A.    I don't remember.
15       Q.    Do you remember any conversations
16   with Arvin, Leo or even Mirela after that about
17   the markings on the property or the front door?
18       A.    No, I don't remember.
19       Q.    Ms. Alvarado, I'm going to shift
20   gears a little bit and talk about some of your
21   mental health conditions.  And I don't mean to
22   pry.  It's just I have to ask these questions.
23   Now, you mentioned that you were on disability at
24   some point in your life.

Page 68

1            Do you know the condition for which
2    the reason that you're on disability?
3        A.    I have a bleeding disorder that is
4    hereditary.  So I had it since I was a child.
5        Q.    Is that Von Willebrand Disease?
6        A.    Yes.
7        Q.    Do you know if there are any other
8    conditions that are the basis of your disability,
9    if you know, other than Von Willebrand Disease?
10       A.    Can you --
11       Q.    Sure.  Let me rephrase that
12   question because it's poorly worded.
13            Do you know if there are any other
14   reasons that you're on disability other than
15   having the Von Willebrand Disease?
16       A.    Yes.
17       Q.    What are those?
18       A.    I had it since I was a child
19   because of when I was baby I caught the German
20   measles.  So ever since I was a child I always
21   struggled.  I've always been a sick child.
22       Q.    Anything other than that and the
23   Von Willebrand disease that you know of in terms
24   of reasons for your disability?

1      A.    Not that I know of.
2      Q.    So, as far as you're aware, you're
3  not on disability due to any mental health
4  conditions; is that right?
5      A.    Well, as far as a learning
6  disability when I was a child.
7      Q.    Do you, and if you don't know, this
8  is okay.
9          Do you know anything more specific
10  about what the learning disability is, attention
11  deficit disorder or anything more specific?
12      A.    I don't remember.  So I don't
13  recall.
14      Q.    Prior to the June 2021 incident
15  we've been talking about, were you seeing any
16  mental health professionals, any social workers or
17  psychiatrists or anyone to mental health for any
18  mental health condition?
19      A.    No.
20      Q.    So after the incident, did you
21  start to see someone for mental health issues?
22      A.    Yes, I would because of the
23  pandemic.  So I couldn't -- well, when I was
24  before that.

1      Q.    So you started to see someone after
2  the pandemic?
3      A.    Like prior to -- well, since I had
4  it since I was a child and I've always struggled
5  with depression and anxiety.  I have always had to
6  see a psychiatrist.
7      Q.    So, if you know, what is the name
8  of the individual that you see or the individuals
9  that you see for depression and anxiety?
10      A.    I don't remember.
11          MR. WEST:  Could you clarify the
12          timeframe you're asking about?
13          MR. ZURBRIGGEN:  Sure, absolutely.
14  BY MR. ZURBRIGGEN:
15      Q.    Do you recall -- you said you do
16  recall seeing someone about depression and anxiety
17  at some in point time; right?
18      A.    Yes.
19      Q.    To your recollection, how long ago,
20  when's the first time you saw someone for
21  depression and anxiety, was it what time, about
22  what year, if you can say?
23      A.    The first time?
24      Q.    Yes.

1      A.    I was a child, the first time I
2  ever saw a therapist for depression and anxiety.
3      Q.    Have you since that time seen
4  someone regularly or is it sporadic?
5          And I can try and clarify it.
6          Have you ever had a regular
7  appointment, like a monthly appointment or a
8  weekly appointment with a mental health
9  professional about depression or anxiety?
10      A.    Yes, when I was -- yes.
11      Q.    Was that when you were a child?
12      A.    And as an adult.
13      Q.    So as an adult, when's the first
14  time that you had a regular appointment with a
15  mental health professional?
16      A.    I don't remember.
17      Q.    Do you remember the name or the
18  place where you could go as an adult for mental
19  health treatment?
20      A.    It's the building is no longer.
21  Like right after my mom died, but the building,
22  they closed, so they're no longer there.
23      Q.    Do you remember was it in
24  Philadelphia?

1      A.    Yes.
2      Q.    Do you remember where in
3  Philadelphia that was?
4      A.    It was on 5th and Allegheny.
5      Q.    And you said it was right after
6  your mom died.
7          What year was that; if you can
8  remember?
9      A.    2013.
10      Q.    And did you have a regular -- you
11  said you had a regular appointment at the place at
12  5th and Allegheny; is that right?
13      A.    I went there.  Can you --
14      Q.    Sure.  So you went to the place at
15  5th and Allegheny for treatment for depression and
16  anxiety; right?
17      A.    Yes.
18      Q.    Do you remember how often you would
19  go to that place?
20      A.    No.
21      Q.    I mean, can you say whether it was
22  monthly, yearly, would you go more than once a
23  year, twice a year?
24      A.    It would be monthly depending on

Page 73

1    how like -- first it would be weekly.  And then it
2    would be monthly.
3        Q.    Do you remember when you stopped
4    going to 5th and Allegheny, how many years ago
5    that was?
6        A.    No.
7        Q.    Can you remember any other places
8    that you would go other than 5th and Allegheny for
9    treatment for depression and anxiety?
10       A.    No.
11             MR. WEST:  I'll ask for
12         clarification.
13         Is your question any other place
14         after ever?
15             MR. ZURBRIGGEN:  Yes, absolutely.
16   BY MR. ZURBRIGGEN:
17       Q.    Any other place ever?
18       A.    Ever.  I've been to a lot of
19   different places.  But as far as the exact timing,
20   I went to one on 5th Street on -- I think it's 5th
21   and Cayuga.  And then I went to one on Allegheny,
22   C, I think it's C and Allegheny.
23             MR. WEST:  Do you need the
24         spelling?

Page 74

1              MR. ZURBRIGGEN:  I do, if you know.
2    BY MR. ZURBRIGGEN:
3        Q.    C like the letter C?
4        A.    The letter.
5        Q.    Any other places other than 5th and
6    Cayuga and C and Allegheny that you can remember?
7        A.    That I can remember at the moment,
8    yeah.  Those are the only ones that I remember.
9        Q.    Do you remember when the last time
10   you would have gone to 5th and Cayuga was, how
11   many years ago?
12       A.    No, I don't remember.
13       Q.    Do you remember whether it was
14   before this incident that you stopped going, I
15   should say?
16       A.    It was before this incident.
17       Q.    Okay.  And then how about the place
18   at C and Allegheny, do you remember the last time
19   you visited there was?
20       A.    No, I don't remember.
21       Q.    Do you remember if it was before
22   the incident that you stopped going there?
23       A.    Before the incident.
24       Q.    Do you remember the names of any of

Page 75

1    the individuals you saw at either of those?
2        A.    No.
3        Q.    And so you said you would go to
4    those places about depression and anxiety?
5        A.    Yes.
6        Q.    Did you also go to those places to
7    deal with any learning conditions that you had?
8        A.    No.
9        Q.    Just depression and anxiety?
10       A.    Just depression and anxiety.
11       Q.    All right.  Ms. Alvarado, I want to
12   direct your attention back to the Interrogatory
13   Responses.  And, in fact, I can just ask you.  I
14   don't think you need to take a look right yet.
15   Hold on.  I think in one of your Interrogatory
16   Responses you noted treating with a Robert Willis
17   at the LCC Health Clinic in Philadelphia.
18             Do you recall Mr. Willis?
19       A.    I'm actually still with Mr. Willis.
20   I'm still going to the office.
21       Q.    Do you remember when the first time
22   you visited with Mr. Willis?
23       A.    That was after because of the
24   pandemic, everything was so you couldn't really

Page 76

1    find a therapist or anything like that.  So I was
2    able to find one in July.
3        Q.    You mentioned the pandemic.
4        That was July of 2020; right?
5        A.    No.  When I was able to get an
6    appointment with a therapist.
7        Q.    And that was in July of 2020?
8        A.    July --
9              MR. WEST:  Do you know what year?
10             THE WITNESS:  No, I don't remember.
11   BY MR. ZURBRIGGEN:
12       Q.    Do you remember if you first met
13   with Mr. Willis before the incident with Akuma in
14   June 2021?
15       A.    No.
16       Q.    So it was after the incident that
17   you first saw Mr. Willis?
18       A.    Yes.
19       Q.    How long -- I'm sorry.
20             How frequently did you meet with
21   Mr. Willis?
22       A.    Every two weeks.
23       Q.    And that's been every two weeks
24   since you've started?

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 77

1      A.    In telehealth.
2      Q.    So you meet with Mr. Willis by
3  telehealth?
4      A.    Yes.
5      Q.    Did you ever meet with Mr. Willis
6  in person?
7      A.    Yes.
8      Q.    And is it every two weeks that you
9  do the telehealth or any appointments?
10     A.    Any appointments.
11     Q.    And how do you determine whether
12  it's telehealth or not, is it just a scheduling
13  thing?
14     A.    It's on their end because of, once
15  again, the pandemic.
16     Q.    And you still see Mr. Willis now?
17     A.    Yes.
18     Q.    And if you don't know, that's okay.
19         But, as far as you know, have you
20  seen Mr. Willis every two weeks approximately
21  since the incident?  Have you ever had -- let me
22  ask it this way.
23         Has there ever been any time that
24  you stopped seeing Mr. Willis from the time of the

Page 78

1  incident until now?
2      A.    No.
3      Q.    Is there any other individual other
4  than Mr. Willis and the places we talked about
5  earlier at 5th and Cayuga and C and Allegheny
6  where you've seen a mental health professional
7  that you can recall?
8      A.    That I can recall, no.
9      Q.    And so --
10     A.    Please.
11     Q.    Please, go ahead.
12     A.    Before you ask me the next
13  question, could I go to the bathroom?
14     Q.    One hundred percent.  Let's take a
15  break.
16         MR. WEST:  Sure.
17             - - -
18         (Whereupon, a discussion took place
19         off the stenographic record.)
20             - - -
21         MR. ZURBRIGGEN:  Back on the
22         record.  Actually, I do need my last
23         question.  I'm so sorry.
24             - - -

Page 79

1         (Whereupon, a pertinent portion of
2         the record was read back by the court
3         reporter.)
4             - - -
5  BY MR. ZURBRIGGEN:
6      Q.    Ms. Alvarado, I want to ask have
7  you ever taken any medication for the depression
8  and anxiety you have?
9      A.    When I was feel bad.
10     Q.    Do you recall what the medication
11  was?
12     A.    No.  The medication used to work
13  the opposite on me.  So we tried to -- I want
14  through a lot of medications.
15     Q.    As an adult, can you remember
16  taking medication as an adult for depression or
17  anxiety?
18     A.    No.  They prescribed it to me.
19     Q.    What was prescribed to you?
20     A.    I don't remember the name of it.
21  It was the one that they prescribed to me
22  recently.  I don't have it.  I don't know the name
23  of it.
24     Q.    I saw in your Interrogatory

Page 80

1  Responses I think at some point you were
2  prescribed Duloxetine.
3         Does that sound correct?
4      A.    Yes.
5      Q.    Do you remember whether that was
6  Mr. Willis that -- do you know who -- I'm sorry,
7  let me just ask it this way.
8         Do you know who prescribed you the
9  Duloxetine?
10     A.    Yes.
11     Q.    Who was that?
12     A.    My primary doctor.
13     Q.    What's the name of your primary
14  doctor?
15     A.    It was -- because they -- he's no
16  longer there.  So then the doctor switched.  So
17  then I -- I forget the new doctor who prescribed
18  me the medication, her name.  Thomas Lubin was my
19  primary doctor.  And then he switched me to -- I
20  can't believe I forgot the name.  Thomas Lubin was
21  my -- from Einstein.
22     Q.    And that's Einstein Hospital or
23  Medical Center?
24     A.    Medical Center.

Page 81

1    Q.    Do you know where's that's located?
2    A.    Mayfair.
3    Q.    How often would you go see -- I'm
4  sorry.  Is Lubin L-u-b-i-n; if you know?
5    A.    Yes.
6    Q.    How often would you go see Dr.
7  Lubin at the time -- around the time you were
8  prescribed Duloxetine?
9    A.    Often because I had a -- I have
10 health problems.  So I would go because of pain
11 and just on regular visits, checkups.
12   Q.    So Dr. Lubin treated you not just
13 for anxiety and depression, but for other issues
14 not related to mental health?
15   A.    Correct.
16   Q.    And you said Dr. Lubin has since
17 left and you have a new primary care doctor?
18   A.    Yes.
19   Q.    But you don't remember that
20 person's name?
21   A.    No.
22   Q.    How often do you go in now to see
23 that person?
24   A.    Now, I haven't went in -- the last

Page 82

1  time I went was when she prescribed me the
2  medication.
3    Q.    The medication being the
4  Duloxetine?
5    A.    Yes.
6    Q.    And so it was this other person and
7  not Dr. Lubin that prescribed you the Duloxetine
8  or you're not sure?
9    A.    It was she prescribed it to me
10 because he was in the process of leaving.
11   Q.    I understand.
12         Do you recall approximately when
13 that was, was it 2021, 2022?
14   A.    It was 2022.
15   Q.    And you've never taken the
16 Duloxetine even though it's been prescribed to
17 you; right?
18   A.    I took it.  I took it.
19   Q.    How long did you take it?
20   A.    For -- I didn't like the side
21 effects of it.  So I took it for a month.  And
22 then I got natural herbs where it would help
23 regulate me.  It would help with my mood.  So I
24 would try to do like natural herbs instead of

Page 83

1  medication because of the side effects.
2    Q.    And what were the side effects that
3  you experienced from the drug?
4    A.    It was headaches and it upset my
5  stomach.
6    Q.    Did you tell that to the doctor,
7  the doctor that replaced Dr. Lubin?
8    A.    Yes, yes.
9    Q.    Did that doctor provide any
10 alternative recommendations?
11   A.    No.
12   Q.    The natural herbs that you
13 described, was that the doctor's recommendation or
14 did you get that from someone else?
15   A.    I did the research.
16   Q.    Just online on the Internet?
17   A.    Online.
18   Q.    Do you know what the herbs are that
19 you take?
20   A.    Reishi mushrooms, mood enhancers.
21 It's supposed to help with your mood.
22   Q.    Any others?
23   A.    Just that one, yeah, just that one.
24   Q.    How often do you take the Reishi

Page 84

1  mushrooms?
2    A.    Every day in a smoothie.
3    Q.    Is there anything else that you
4  take other than the Reishi mushrooms for your
5  anxiety and depression right now?
6    A.    No.
7    Q.    And putting aside the herbs that
8  you mentioned for purposes of anxiety and
9  depression, do you take other medication regularly
10 for your non-mental health issues?
11   A.    No.
12   Q.    So you don't take any medication
13 besides the herbs currently; correct?
14   A.    Correct.
15   Q.    I'm just going to very briefly
16 shift gears, Ms. Alvarado, and then I'll be done,
17 I promise.
18         I want to ask you, going back to
19 Plaintiff's-1, that's this photograph of your
20 front door, you never posted any sign in terms of
21 like beware of dog or anything on your door
22 about having a dog; correct?
23   A.    I had a sign, but it's -- I had
24 written a sign and placed it.

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 85

1        But the question is, yes.
2        Q.    Yes.  So do you know when you put
3   up that sign, was it when you first moved in?
4        A.    Yes, unless the cats knocked it
5   down, but I had the sign up.
6        Q.    To your recollection, was that sign
7   up on the date of the incident?
8        A.    I thought it was.
9        Q.    But and then I just want to a last
10  exhibit on this.
11        Well, before I do that, do you
12  recall at any point taking that sign down?
13        A.    I don't recall, no.
14        Q.    And then I'm just going to mark one
15  final exhibit.  I think I'm up to Plaintiff-4.
16  Okay.
17        MR. ZURBRIGGEN:  I'm going to show
18        this to Ms. Alvarado.  And here's a copy
19        for you, Keith.  But, just for the
20        record, this is a printout from Google
21        Maps.  The date of the view is April
22        2022.
23  BY MR. ZURBRIGGEN:
24        Q.    Now, Ms. Alvarado, you moved out of

Page 86

1   the building, you said, in August of 2021;
2   correct?
3        A.    Yes.
4        Q.    And this is the front door of what
5   was before August 2021 your apartment; correct, or
6   it appears to be?
7        A.    It appears to be.
8        Q.    There's you'll will notice a beware
9   of dog sign in the window there.
10        I just wanted to ask is that the
11  sign you put up at any point?
12        A.    That was, yes.
13        Q.    But you don't -- you can't recall
14  if that sign came down at any point in time after
15  you had put it up?
16        A.    Correct.
17        MR. ZURBRIGGEN:  I think that's all
18        I have.
19        MR. WEST:  I'll ask like two
20        follow-ups, if you're done.
21        MR. ZURBRIGGEN:  Yes, I'm done.
22        - - -
23        EXAMINATION
24        - - -

Page 87

1   BY MR. WEST:
2        Q.    Just to clarify, the beware of dog
3   sign, do you believe that that sign was still
4   posted on the date of the incident?
5        A.    Yes.
6        Q.    And then there's one other thing I
7   was confused about.  All right.
8        So correct me if I'm wrong, but I
9   believe you testified that on the date of the
10  incident you had a job at CRC Warehouse; is that
11  right?
12        A.    Yes.
13        Q.    Did you go to work on the day of
14  the incident?
15        A.    No.
16        Q.    Why not?
17        A.    Because of the incident.
18        Q.    Okay.  I think you testified that
19  you were up and taking a shower at the time the
20  police officers entered your home; correct?
21        A.    Yes.
22        Q.    Were you getting ready for work at
23  that time?
24        A.    Yes.

Page 88

1        Q.    And then I think you testified that
2   you got fired two weeks after the incident?
3        A.    Yes, correct.
4        Q.    Do you know why you got fired?
5        A.    Because of -- yes.
6        Q.    What?
7        A.    Because of calling out due to the
8   emotions that I was going through, not being able
9   to go to go to work.  I would wake up sad and crying.
10  And I couldn't get myself together to make it to
11  work.  So they had to let me go.
12        MR. WEST:  Okay.  I don't have any
13        questions.
14        MR. ZURBRIGGEN:  I'll just have a
15        real brief follow-up about that point.
16        - - -
17        EXAMINATION
18        - - -
19  BY MR. ZURBRIGGEN:
20        Q.    Ms. Alvarado, were you fired, to
21  your knowledge, as a result of missing a single
22  day of work on this date of the incident?
23        A.    Can you --
24        Q.    Sure.  Let me clarify that.  It

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 89

1    wasn't really clear.
2            So is it your understanding from
3    your employer, CRC, that you were fired because
4    you missed work on the date of this incident, June
5    4, 2021?
6        A.    No.
7        Q.    What was your understanding of why
8    you were fired?
9        A.    Because I was missing too many
10   days.
11       Q.    How many days did they say that you
12   had missed?
13       A.    I kept calling -- it was like I
14   missed -- because after more than three days they
15   give you a write-up.
16       Q.    Before the date of this incident,
17   had you been written up?
18       A.    No.  I explained to them what was
19   going on.  So they were aware of the situation.
20   But they still had to let me go because I missed
21   too many days.
22       Q.    What was the situation that you
23   described to them?
24       A.    How my dog got shot and how I was

Page 90

1    going through a lot of emotions and I was
2    depressed.  And I was sad.  And it was hard for me
3    to get myself together to be able to focus to do
4    the job correctly.
5        Q.    I understand.
6            And so you missed days after the
7    date of the incident at CRC?
8        A.    Yes.
9        Q.    How many days after the incident
10   did you miss?
11       A.    I missed like five and then a
12   callout.
13       Q.    And so when you say you missed five
14   days, does that mean you missed five days without
15   alerting them?
16       A.    No.  Like within the timeframe.
17       Q.    So on those days that you missed
18   you alerted your employer that you wouldn't be
19   there?
20       A.    Yes, yes.
21       Q.    And I believe you said that you
22   were fired, it was about a week after the
23   incident?
24            MR. WEST:  She said two weeks.

Page 91

1            MR. ZURBRIGGEN:  Two weeks, okay.
2    BY MR. ZURBRIGGEN:
3        Q.    And what's the name of your manager
4    or supervisor at CRC?
5        A.    Jason.  There was three of them.
6        Q.    Do you know Jason's last name?
7        A.    No.
8        Q.    Do you know the other two
9    supervisors?
10       A.    Chris Gumphrey.
11       Q.    Gumphrey with a G?
12       A.    Yes.
13       Q.    And do you know the other?
14       A.    Jason, did I say Jason?
15       Q.    You said Jason and you said two
16   others, I think, Chris.
17            And was there another individual?
18       A.    I don't remember, but the ones that
19   I used to call out to was Jason and Chris.
20       Q.    Were they the --
21       A.    They were the floor managers.
22       Q.    I understand.
23            When you were fired, was it Jason
24   or Chris that talked to you?

Page 92

1        A.    Jason.
2        Q.    Jason, okay.
3            MR. ZURBRIGGEN:  I think that's all
4    I have unless he has any further
5    follow-ups.
6            MR. WEST:  No, I'm not going to
7    keep us here any longer.
8            - - -
9            (Whereupon, Exhibits Plaintiff-1
10   through Plaintiff-4 were marked for
11   identification.)
12           - - -
13           (Whereupon, the deposition
14   concluded at 2:50 p.m.)
15           - - -
16
17
18
19
20
21
22
23
24

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

Page 93

```
 1
 2
 3              CERTIFICATION
 4
 5          I, DOUGLAS S. DIAMOND, hereby
 6   certify that the foregoing is a true and correct
 7   transcript transcribed from the stenographic notes
 8   taken by me on Friday, August 11, 2023.
 9
10
11
              DOUGLAS S. DIAMOND
12            Court Reporter - Notary Public
13              (This certification does not apply
14   to any reproduction of this transcript, unless
15   under the direct supervision of the certifying
16   reporter.)
17
18
19
20
21
22
23
24
```

3dfa0b24-83ed-4098-8079-cc6e600e6b8e

**A**

**A-c-t** 62:9
**a.m** 1:17
**able** 21:19 22:11
  31:13 51:21
  55:21 61:7
  76:2,5 88:8
  90:3
**absolutely** 23:15
  26:18 28:4
  70:13 73:15
**access** 49:12
**accident** 9:11,14
**acquire** 32:19
**Act** 62:8,8,9,9
**ACTION** 1:4
**Adam** 2:8 5:2
**adam.zurbrig...**
  2:11
**add** 22:4
**addition** 6:14
  26:2
**address** 12:5,7
  13:19 14:23
  15:6 17:16,20
  17:24 18:11
  19:9 22:13
  65:7
**adopt** 32:24
  33:3
**adopted** 25:7,11
  25:14 26:19
  33:1
**adult** 71:12,13
  71:18 79:15,16
**advance** 7:8
  61:15
**afternoon** 4:24
**ago** 70:19 73:4
  74:11
**agreement** 4:10
  14:7 15:9
**ahead** 35:15
  53:3 78:11
**aide** 8:19,20 9:4
**Akuma** 24:9,12
  25:1,2,5,7,9,11
  25:12,14,16,22
  26:4,10,12,14

26:15,19,20,21
26:22 27:2,10
27:13,20 28:2
28:5,11,16
32:5,17,22
33:1 41:9,11
41:17,22,24
42:7,8,10,13
42:17,19,23
43:4,11 45:10
47:22 48:18,22
49:1,4,7 61:19
61:23 62:6
63:11,14,17
76:13
**Akuma's** 62:3
  62:18 63:23
**al** 1:7
**alerted** 90:18
**alerting** 90:15
**Allegheny** 72:4
  72:12,15 73:4
  73:8,21,22
  74:6,18 78:5
**allow** 56:7
**allowed** 28:10
  28:12
**alternative**
  83:10
**Alvarado** 1:4,12
  3:3 4:17,24
  7:20 8:3 11:3
  18:2,19 19:22
  20:17 21:3
  23:9 24:3 29:9
  29:16 30:1
  33:14 49:10
  60:17 61:14
  67:19 75:11
  79:6 84:16
  85:18,24 88:20
**Alvarado's**
  28:23
**American** 1:14
  2:3
**angle** 61:8
**animal** 25:13
**animals** 24:4
  31:10

**answer** 6:9,11
  6:12,13 7:2
  12:19,20 51:21
  51:22,22
**answering** 21:23
**answers** 5:13,15
**anxiety** 31:11
  70:5,9,16,21
  71:2,9 72:16
  73:9 75:4,9,10
  79:8,17 81:13
  84:5,8
**anybody** 62:1
**anymore** 15:10
**apartment**
  11:14,19,23
  13:12,16,17,18
  13:22,24 14:8
  14:16,18 16:2
  17:8,11 18:21
  20:2,20 21:1
  21:12 22:11,14
  22:17,21 24:22
  34:20,24 35:3
  35:7 36:18,21
  37:8 38:21
  39:23 41:12
  49:13 50:5,14
  50:17,23 52:3
  52:4,9,12,21
  57:2 65:6 86:5
**apologize** 7:7
  34:6 59:7 60:9
  61:15
**apologized** 59:4
  59:17
**apologizing**
  60:11
**appear** 19:12
**appears** 86:6,7
**applied** 31:5,7
  31:18
**apply** 93:13
**applying** 30:11
**appointment**
  71:7,7,8,14
  72:11 76:6
**appointments**
  77:9,10

**approximately**
  1:17 22:20
  77:20 82:12
**April** 30:9 85:21
**ARCH** 2:9
**arrived** 66:2
**Arvin** 16:19,20
  16:23 17:2,6
  17:12,19,22
  23:6,11,24
  28:16 64:18,21
  67:2,2,4,7,16
**aside** 84:7
**asked** 30:15
  34:11 35:16
  44:17 53:18,23
  55:14 66:12
**asking** 6:6 17:19
  17:21 44:9
  70:12
**assumed** 14:13
  14:21
**attention** 19:20
  29:17 69:10
  75:12
**August** 1:10
  21:5,12 22:8
  86:1,5 93:8
**Avenue** 11:14
  12:8 18:8
  22:15,24 23:3
**aware** 69:2
  89:19

**B**

**B** 47:9
**baby** 68:19
**back** 11:12 13:3
  13:6 14:5 23:8
  26:19 27:6
  35:13 37:24
  38:2 40:8
  45:15 47:4,5,9
  47:12 49:24
  50:13,16,23
  51:11,15 54:13
  60:18,21 61:2
  61:11 75:12
  78:21 79:2

84:18
**bad** 60:9 79:9
**barely** 53:21
**bark** 36:14,14
  42:19
**barked** 43:1,3,6
**barking** 32:6
  36:10 42:23
  43:12 46:2
  48:22 49:1
**barrier** 40:12,14
**basis** 68:8
**Bates** 18:16
  39:19
**bathroom** 35:4
  36:6,8,13,15
  36:23 37:1
  38:4 45:14
  51:9,11 54:6,8
  54:10 78:13
**bed** 45:15
**bedroom** 52:14
  60:23 61:2
**beginning** 1:16
**believe** 15:22
  63:22 80:20
  87:3,9 90:21
**belonged** 25:19
**belongings** 51:2
**best** 42:22
**beware** 84:21
  86:8 87:2
**big** 53:20
**bigger** 26:7
**bird** 24:19 35:20
  35:22 36:1,5,8
  36:9,12 37:3,9
  38:5 43:2,5,6,8
  64:8
**birth** 7:21,23
**bit** 11:13 21:16
  24:4 67:20
**bleeding** 68:3
**blood** 21:18
  62:3
**body** 62:3,8,18
  62:20,23
**bold** 19:13
**boobs** 53:19

**Boulevard** 13:20 13:21
**boundary** 39:4
**bra** 38:12,14
**breached** 37:12 37:19 38:17 43:18
**break** 6:22,24 7:2,10 78:15
**brief** 88:15
**briefly** 84:15
**bring** 31:24
**bringing** 28:5
**Broad** 1:15 2:3
**building** 1:14 2:3,9 11:20 12:2,9 71:20 71:21 86:1
**bus** 27:22
**businesses** 28:8

**C**

**C** 2:1 73:22,22 74:3,3,6,18 78:5
**cage** 41:13,14,18 44:5,5,18
**call** 39:12 91:19
**called** 44:14 64:17
**calling** 88:7 89:13
**callout** 90:12
**calm** 44:2
**calmed** 44:3
**care** 81:17
**case** 5:4
**cats** 24:18 64:8 85:4
**caught** 68:19
**Cayuga** 73:21 74:6,10 78:5
**Center** 1:14 2:2 80:23,24
**certain** 61:9
**certification** 4:4 31:7 93:3,13
**Certified** 1:18
**certify** 93:6

**certifying** 93:15
**chair** 54:12,21 54:24 55:17
**chairs** 54:14,17
**change** 23:11 55:11
**changed** 23:18
**changing** 23:24
**Chase** 9:1,2,4,10
**checkups** 81:11
**child** 68:4,18,20 68:21 69:6 70:4 71:1,11
**Chris** 91:10,16 91:19,24
**City** 1:7 2:8 5:3
**civil** 1:4 5:5
**clarification** 73:12
**clarify** 9:13 34:1 35:15 53:3 64:9 70:11 71:5 87:2 88:24
**clean** 64:1
**clear** 36:17 41:1 45:17 50:22 89:1
**Clinic** 75:17
**close** 47:17 65:10
**closed** 71:22
**clothes** 53:18
**clothing** 53:24 54:5,7
**Color** 3:13,15,16
**come** 9:10 11:12 37:22 40:10 46:5,6 55:24 56:17,17 67:9
**comfort** 31:12
**comfortable** 7:11
**coming** 35:2 55:4 64:12
**Commonwealth** 1:19
**companion** 25:17

**company** 8:22 8:24
**completely** 7:10 45:16
**complies** 29:22 40:24 42:1 47:11
**comprehensible** 5:21
**concern** 28:18
**concluded** 92:14
**condition** 68:1 69:18
**conditions** 67:21 68:8 69:4 75:7
**confirm** 15:8
**confused** 87:7
**contact** 16:15 17:11 56:16 65:19
**conversation** 5:12 23:23 66:10
**conversations** 67:15
**cops** 56:20
**copy** 15:9 18:17 29:9 39:20 85:18
**corner** 65:13
**correct** 8:12 11:16 12:10 14:21 15:10 16:24 24:13,16 36:18 44:22 46:1 48:9 49:8 50:23 57:21 59:15,16,19 61:12,13 64:13 64:16 80:3 81:15 84:13,14 84:22 86:2,5 86:16 87:8,20 88:3 93:6
**correctly** 90:4
**counsel** 2:5,10 4:3 6:14,17
**court** 1:1,18,21 5:11 6:3 79:2

93:12
**cousin** 14:13,22
**cousin's** 15:1
**covered** 53:21
**CRC** 9:20,21 10:4,12 11:1 87:10 89:3 90:7 91:4
**cremated** 62:15 62:21,21,23 63:2,15,18
**crying** 21:20 88:9
**current** 7:21,22 8:18
**currently** 8:17 11:9 84:13
**curtain** 51:5
**curtains** 50:4 53:5
**cut** 22:1 39:3

**D**

**D** 3:1 41:23
**D-80** 18:17
**damaged** 64:11
**date** 1:16 7:21 7:23 9:15 10:15 11:15 20:22 24:5 30:8 85:7,21 87:4,9 88:22 89:4,16 90:7
**day** 9:11,12,19 24:22 33:18 34:3,3 39:23 55:23 56:24 57:23 59:11,13 61:17 62:2 63:10,13,15,18 64:8,24 65:16 65:24 66:18,22 66:23,24 67:3 84:2 87:13 88:22
**days** 12:22 89:10,11,14,21 90:6,9,14,14 90:17

**dcr.diamond...** 1:23
**deal** 21:13,17 75:7
**defendant** 5:3
**Defendants** 2:10
**defense** 39:10
**deficit** 69:11
**DEPARTME...** 2:8
**depending** 72:24
**deposition** 1:12 5:6 39:16 92:13
**depressed** 90:2
**depression** 31:11 70:5,9 70:16,21 71:2 71:9 72:15 73:9 75:4,9,10 79:7,16 81:13 84:5,9
**describe** 43:20 43:22 46:16
**described** 83:13 89:23
**description** 3:12 46:18
**determine** 77:11
**Diagonally** 12:13
**Diamond** 1:18 1:21 93:5,11
**died** 25:20 71:21 72:6
**different** 19:7 73:19
**direct** 19:19 75:12 93:15
**disability** 11:4,6 11:10 67:23 68:2,8,14,24 69:3,6,10
**discussion** 67:1 78:18
**disease** 68:5,9 68:15,23
**disorder** 68:3 69:11

**distance** 13:3,7
**distances** 12:23
**DISTRICT** 1:1
  1:2
**divider** 40:18,19
**doctor** 26:11
  80:12,14,16,17
  80:19 81:17
  83:6,7,9
**doctor's** 83:13
**document** 18:16
  28:21 29:1
  30:2,5 39:8,19
**documents**
  28:24 30:18
**dog** 9:15 24:9
  25:12,17,19
  26:5,6,7,8,16
  26:16,23,24
  27:3,19 33:12
  33:12 34:7
  36:10,14,14
  41:23 44:14,15
  44:21 48:6
  59:5,18 84:21
  84:22 86:9
  87:2 89:24
**dogs** 24:8 26:7
  30:7 44:2
**door** 12:14 18:4
  18:7,21 19:21
  20:24 23:12,18
  24:1 34:5,8,10
  34:16,16,19,22
  34:24 35:3,6
  35:21 37:3,8,9
  37:11,15,18,19
  37:22 38:5,16
  41:4,8 42:7,20
  42:24 43:15,17
  43:24 44:1,15
  45:1,7,19,23
  46:5 49:17
  50:8 56:11,19
  61:1,4,5 64:11
  66:4,5,5,7,18
  67:17 84:20,21
  86:4
**doorway** 39:1

**Douglas** 1:17
  93:5,11
**Dr** 29:19 30:11
  30:17,22 31:6
  31:7,22,23
  32:1 81:6,12
  81:16 82:7
  83:7
**dress** 35:11
**dressed** 38:4,6
**drug** 83:3
**due** 69:3 88:7
**Duloxetine** 80:2
  80:9 81:8 82:4
  82:7,16
**duly** 4:18
**dying** 25:18

——————
**E**
**E** 2:1,1 3:1
**e-mail** 1:23 2:6
  2:11
**earlier** 40:3 78:5
**early** 33:17
**easier** 51:24
**easiest** 47:10
**EASTERN** 1:2
**easy** 61:15
**effects** 82:21
  83:1,2
**Einstein** 80:21
  80:22
**either** 23:10
  32:5 75:1
**emotional** 25:13
  26:16,24 30:7
  30:16 33:12
**emotions** 88:8
  90:1
**employed** 8:12
  8:14,16 9:3,7
  9:18 10:11,14
  11:1
**employer** 89:3
  90:18
**employment** 9:9
**enhancers** 83:20
**entailed** 30:14
**enter** 38:17

**entered** 38:20
  40:4 87:20
**entire** 6:8
**ESQUIRE** 2:2,8
**estimate** 12:21
  12:24 14:3
  21:7 52:24
  53:12
**et** 1:7
**ethnicity** 46:21
**event** 59:12
**everybody** 59:9
  63:8
**ex** 33:6
**ex-boyfriend**
  33:7
**exact** 66:19
  73:19
**Examination**
  3:4,5 4:21
  86:23 88:17
**examined** 4:18
**exception** 12:20
**exhibit** 85:10,15
**Exhibit-1** 18:14
**Exhibit-3** 39:9
**Exhibits** 3:12
  92:9
**experienced**
  83:3
**explained** 89:18

——————
**F**
**face** 31:2,2,22
  31:22 46:7
  47:19,21 48:4
**fact** 21:19 75:13
**fading** 19:14,17
**fair** 39:3
**far** 12:12 22:19
  41:15 47:5
  65:6 69:2,5
  73:19 77:19
**feel** 5:23 13:1
  22:3 26:8 79:9
**fees** 25:8
**feet** 12:23 47:12
  47:15
**FELISHATAY**

1:4,12 3:3 4:17
**felt** 60:9
**Fiance** 33:8,9
**figured** 58:23
**filing** 4:4
**final** 85:15
**finally** 7:13
**find** 29:21 76:1
  76:2
**fine** 7:10 34:13
  41:22
**finish** 6:16
**finished** 21:22
**fired** 10:20
  51:14 88:2,4
  88:20 89:3,8
  90:22 91:23
**first** 5:10 11:13
  11:22 18:7,20
  19:4,10 20:1
  33:22 34:2,18
  36:5 37:21
  43:9 50:8
  56:21 70:20,23
  71:1,13 73:1
  75:21 76:12,17
  85:3
**first-floor** 11:19
**five** 52:2,6,8
  90:11,13,14
**floor** 21:18 44:9
  44:11,14 46:11
  49:24 50:6
  63:24 91:21
**focus** 90:3
**follow-up** 88:15
**follow-ups** 86:20
  92:5
**follows** 4:19
**forced** 48:3
**foregoing** 93:6
**forget** 80:17
**forgot** 80:20
**form** 4:6,12
  51:19
**forward** 40:8
**four** 19:11
**Fox** 9:1,2,4,10
**frame** 66:5,7

**Frank** 29:19
**free** 5:23,23 13:1
  22:3
**frequently** 76:20
**Friday** 93:8
**friend's** 27:16
  28:5
**friends** 27:18
**front** 12:14 18:4
  18:6,21 19:21
  23:11,18 24:1
  34:24 35:6
  37:5,7,8 38:5
  41:4,8 42:7
  43:23 44:1,15
  45:1,7 56:19
  64:11 67:17
  84:20 86:4
**full** 6:12
**fully** 57:20
**further** 40:8,9
  50:13,16 92:4

——————
**G**
**G** 91:11
**gap** 40:15,16,17
**gears** 24:3 33:15
  67:20 84:16
**German** 68:19
**getting** 26:12
  87:22
**gift** 33:4,5,10
**give** 6:12 12:23
  29:13 40:22
  46:15 66:20
  89:15
**given** 5:5 12:16
**giving** 56:4,22
  57:4 58:4
**go** 5:8,10 6:7,21
  10:10 27:16,18
  28:1,8,10
  35:13,15 37:24
  47:5 49:5
  50:10,16,22
  53:3,24 54:4
  54:11 55:19,21
  60:17 62:16
  65:15 71:18

72:19,22 73:8
75:3,6 78:11
78:13 81:3,6
81:10,22 87:13
88:9,11 89:20
**going** 5:8,10
6:20 13:3,6
14:5 18:12,13
18:13 25:22
28:20 29:5,12
38:1 39:7,12
40:22 50:20
55:14 59:1
62:7,14 67:19
73:4 74:14,22
75:20 84:15,18
85:14,17 88:8
89:19 90:1
92:6
**good** 4:14,24
**Google** 85:20
**Great** 4:13
**ground** 5:9 46:8
48:1,14 53:13
53:14
**growling** 32:6
**guard** 26:4,6,8
27:3
**guardian** 8:5,9
**guess** 12:16,24
43:6 51:8
56:19 60:13
62:15
**Gumphrey**
91:10,11
**gun** 46:7 48:3
**gunshot** 48:11
49:2

**H**

**half** 53:15
**hanging** 53:19
**happened** 22:7
43:23 51:10
53:16 58:2
59:4,18,21
60:9,11 65:19
66:11,12 67:5
67:13

**hard** 90:2
**hate** 38:2
**head** 5:14
**headaches** 83:4
**headed** 38:5
**heading** 35:7,16
**health** 8:19,20
9:4 67:21 69:3
69:16,17,18,21
71:8,15,19
75:17 78:6
81:10,14 84:10
**hear** 4:15 34:4
34:11,15 36:7
36:10,14,14
48:22
**heard** 34:19
35:24 36:5,12
37:11 42:15,17
43:8,11 48:11
48:15,17,19
58:9
**heart** 25:21
**help** 25:23 82:22
82:23 83:21
**herbs** 82:22,24
83:12,18 84:7
84:13
**hereditary** 68:4
**hesitate** 6:23
**Hold** 75:15
**home** 8:19,20
9:4 87:20
**homicide** 58:1
58:14
**honest** 57:20
**hope** 28:21
**Hospital** 80:22
**hour** 53:15
**hours** 12:22
**house** 12:14
13:23 27:6,10
27:16 28:5
33:21 56:19
59:1 65:14
**houses** 22:22
**hundred** 78:14
**hurt** 64:8

**I**

**identification**
92:11
**identified** 15:19
15:21 16:21
**immediately**
12:2 22:16
**imply** 7:14 57:18
**important** 6:5
**incident** 10:15
10:19,22 11:7
11:16 13:16
20:18,22 23:10
23:17 24:6,22
25:3 27:7
28:14 31:17
32:3,4 33:16
33:18 34:3
39:24 59:8
61:18 63:6
64:24,24 66:20
69:14,20 74:14
74:16,22,23
76:13,16 77:21
78:1 85:7 87:4
87:10,14,17
88:2,22 89:4
89:16 90:7,9
90:23
**indicating** 53:22
54:21
**individual** 5:4
32:6 70:8 78:3
91:17
**individuals** 70:8
75:1
**influence** 7:16
**inside** 24:21
41:18 52:3
56:3,5,6,9 57:1
**instructed** 48:1
**instruction**
12:15
**intend** 25:12
**interact** 16:10
20:19 60:2
**interacted** 59:14
**interaction**
56:21 60:6

**Internet** 83:16
**Interrogatories**
3:14 14:12
25:2
**Interrogatory**
15:19 21:4
24:8 28:23
63:23 75:12,15
79:24
**interrupt** 6:12
**introduced** 5:1
**issue** 32:7
**issues** 7:6 69:21
81:13 84:10
**item** 10:9

**J**

**J** 29:19
**Jack** 24:15
32:11
**Jason** 91:5,14,14
91:15,19,23
92:1,2
**Jason's** 91:6
**Jersey** 1:20,22
**job** 8:17,18
87:10 90:4
**July** 76:2,4,7,8
**June** 9:15 11:16
20:18,23 24:5
27:8 28:14
32:4 33:15,16
69:14 76:14
89:4

**K**

**keep** 92:7
**Keith** 2:2 28:21
29:13 85:19
**keith@victim...**
2:6
**kept** 89:13
**kicked** 34:5,9,10
34:16 37:4,15
42:21,24 44:15
49:17 50:8
**kind** 6:7 12:20
27:12,20 28:1
28:7,9
**kitchen** 38:22

39:5 40:14
47:3 50:7,11
54:15,18,21,24
**knew** 16:6 25:22
**knocked** 34:19
85:4
**knocking** 20:23
34:15
**know** 5:9 6:7,11
7:5 8:6 9:21
10:2,22 12:4
12:17,18,18,20
13:2 14:9 15:6
15:23 16:3
17:2,6 21:15
23:10,12 26:14
26:22 27:2
29:21 30:4
31:21,23 33:11
35:9 41:7,18
42:10,13 43:21
45:4 46:22
56:15 58:21,24
61:15,22 65:7
65:11,18 66:3
66:17 68:1,7,9
68:13,23 69:1
69:7,9 70:7
74:1 76:9
77:18,19 79:22
80:6,8 81:1,4
83:18 85:2
88:4 91:6,8,13
**knowledge** 8:8
88:21

**L**

**L-u-b-i-n** 81:4
**landlord** 14:15
14:17 15:12,13
15:16 16:6
17:7 22:11
23:2 64:17
**landlord's** 15:14
**Lane** 1:22
**laundry** 51:6
**Law** 1:13,13 2:2
2:8
**lay** 45:15

**LCC** 75:17
**learn** 34:2 57:24
  58:17
**learned** 34:19
  62:5 65:18,21
**learning** 69:5,10
  75:7
**lease** 14:7,13,22
  15:9
**leave** 27:9 52:9
  52:20
**leaving** 82:10
**left** 17:14 19:21
  20:14 23:17
  27:6 36:13,15
  38:4 41:15
  52:3 53:6
  55:18,22 58:7
  59:10 63:9
  81:17
**legal** 8:5,9
**Leo** 15:17,18
  16:3,10 23:4
  23:10,24 28:15
  64:19,21 65:5
  66:6,10,14,18
  67:16
**Leo's** 16:1 65:8
**Let's** 78:14
**letter** 30:11 74:3
  74:4
**life** 67:24
**light** 36:24 37:1
  46:22
**lights** 36:20
**line** 39:4
**little** 11:13 20:7
  20:8 21:16
  24:4 40:12,18
  44:14,15,21
  67:20
**live** 14:2 15:3
  22:24
**lived** 20:19 60:7
**lives** 59:2
**living** 11:15,18
  12:1 13:11,15
  14:1 21:17
  26:5 38:23

39:5 40:14
  54:18 60:19
**located** 81:1
**long** 5:20 6:21
  9:3 10:11,21
  13:11 14:1,2
  51:13 52:23
  53:13 55:16
  59:6,7 63:6
  64:23 66:17,20
  70:19 76:19
  82:19
**longer** 71:20,22
  80:16 92:7
**look** 35:14 53:3
  61:4 75:14
**looked** 39:23
  60:22
**looking** 20:24
  37:18 50:4
  51:9 57:24
  58:12,14,16,18
  60:13
**looks** 20:6
**lot** 7:5 25:20
  29:1 73:18
  79:14 90:1
**Lubin** 80:18,20
  81:4,7,12,16
  82:7 83:7
**Lucy** 15:2,3,4
**Lucy's** 15:6

———————
           **M**
**M.D** 29:19
**Ma'am** 39:22
**mailboxes** 19:20
  20:1,7,11
  23:12
**maintenance**
  16:14 17:10
**making** 52:15
**manager** 16:24
  17:4,16,20,23
  23:5 67:6 91:3
**managers** 17:24
  91:21
**Mantua** 1:22
**Maps** 85:21

**March** 11:23
  14:6 19:4,11
**mark** 18:13,13
  28:20 29:5
  39:8 40:23
  41:23 47:8,9
  85:14
**marked** 18:4
  19:1,3 20:4
  23:12 24:1
  29:13 47:2
  92:10
**markings** 20:1
  20:11 23:19
  67:17
**Marroli** 16:20
  16:23 17:2
**matter** 51:17
**Mayfair** 81:2
**mean** 7:13 39:10
  57:17 67:21
  72:21 90:14
**measles** 68:20
**medical** 26:12
  80:23,24
**medication** 7:17
  79:7,10,12,16
  80:18 82:2,3
  83:1 84:9,12
**medications**
  79:14
**meet** 31:2,21
  38:23 76:20
  77:2,5
**meeting** 30:21
**mental** 67:21
  69:3,16,17,18
  69:21 71:8,15
  71:18 78:6
  81:14
**mentioned**
  15:12 28:4
  37:2 67:23
  76:3 84:8
**met** 76:12
**middle** 38:24
**mind** 6:15 28:22
**minutes** 12:22
  13:8 51:17

52:2,6,8 65:11
**Mirela** 15:22,23
  16:3,10 28:16
  67:16
**missed** 89:4,12
  89:14,20 90:6
  90:11,13,14,17
**missing** 88:21
  89:9
**mix** 24:12,16
  32:12
**modify** 20:10,13
  20:14
**mom** 25:20
  71:21 72:6
**moment** 74:7
**month** 10:13,19
  82:21
**monthly** 71:7
  72:22,24 73:2
**months** 9:5
  13:14
**mood** 82:23
  83:20,21
**morning** 33:18
  45:20
**move** 21:11 22:9
  44:11 52:15
  55:21
**moved** 11:22
  13:12 14:6
  18:5,7 19:4,10
  20:1,11 21:5
  22:5,14 47:12
  53:5 85:3,24
**movie** 27:24
**moving** 12:2
  16:2 51:7
**murder** 58:1,14
  58:19
**mushrooms**
  83:20 84:1,4
**mutual** 4:9

———————
           **N**
**N** 2:1 3:1
**name** 5:2 8:2,24
  15:1,14 46:13
  57:11 70:7

71:17 79:20,22
  80:13,18,20
  81:20 91:3,6
**names** 46:15
  74:24
**natural** 82:22,24
  83:12
**nature** 60:5
**nearby** 12:9
**need** 5:14 6:22
  7:9 73:23
  75:14 78:22
**needed** 16:13
  17:9 25:18
  66:4,7
**never** 58:11
  59:14 60:21
  61:10,11,11
  82:15 84:20
**new** 1:20,22
  66:4,7,7 80:17
  81:17
**non-mental**
  84:10
**normal** 5:12
**North** 1:14 2:3
**Notary** 1:18
  93:12
**noted** 75:16
**notes** 93:7
**notice** 57:1 86:8
**noticed** 33:22
  37:16
**numbers** 19:8
  19:11,16

———————
           **O**
**object** 6:17
  51:19
**objection** 6:15
**objections** 4:5
  4:11,11
**obtain** 32:16
**occurred** 32:3
  33:15,17 53:7
**office** 30:18 65:5
  65:8,14 75:20
**officer** 46:10,17
  47:1,18,21

48:2,5,8 54:2
57:10,15,20,21
58:10
**officer's** 46:12
46:13,20 57:11
**officers** 5:4
37:21 38:17
40:4 41:8 42:6
42:20 43:14,23
44:24 45:7,19
45:22 46:4,9
49:5,11,12
50:1,10 52:9
52:16,19 53:8
53:24 54:24
55:6,10 57:1,7
57:24 61:18
64:12 66:1
87:20
**Offices** 1:13
**Oh** 42:5
**okay** 5:8,17 6:1
6:3,18,20 7:11
8:18 10:4,11
10:21,24 11:3
11:12 12:1,15
12:19 13:11
14:5,9 15:12
17:9,18 18:2
18:24 20:17
21:3,7,21,24
24:18,24 30:4
30:21 33:9,14
36:4 37:2
38:15 39:13
40:2 44:2
46:14 54:3
57:12,14 64:18
66:24 69:8
74:17 77:18
85:16 87:18
88:12 91:1
92:2
**once** 53:4 55:20
59:9 72:22
77:14
**ones** 74:8 91:18
**online** 83:16,17
**open** 37:6 38:24

**opposite** 79:13
**Oral** 1:12
**order** 31:12
**Ortiz** 15:2
**outside** 52:4
55:19,21 56:4
56:8,20,22
57:5 58:7

---

**P**

**P** 2:1,1
**p.m** 92:14
**packet** 29:6
**page** 3:2,12
29:17,18,20
**paid** 63:20
**pain** 81:10
**Pajo** 15:18,22,23
**pandemic** 69:23
70:2 75:24
76:3 77:15
**paperwork** 30:6
**paranoid** 21:20
**park** 28:6
**parks** 27:16
**PARKWAY** 2:9
**pass** 25:22
**pause** 6:16 7:10
**pay** 25:8 63:17
64:15
**pen** 40:22
**pending** 7:1
**Penelope** 24:10
24:15 32:10,11
32:14,16,19,24
33:3,10,11
44:22 45:1,3,6
45:9,18,23,24
46:2 56:13
64:7
**Pennsylvania**
1:2,16,19 2:4
2:10 9:24
**people** 20:19,24
58:9
**percent** 5:23
78:14
**perfect** 29:23
**perfectly** 12:19

**period** 66:21
**person** 16:21
17:22 32:7
51:8 58:18
59:2,6,15
65:15 77:6
81:23 82:6
**person's** 81:20
**personal** 35:9
**personally** 16:4
17:3 62:17
**pertinent** 79:1
**pet** 30:16
**pets** 24:21 31:24
31:24 64:7
**Philadelphia** 1:7
1:15 2:4,8,10
5:3 9:23 10:3,3
15:4 71:24
72:3 75:17
**Philly** 62:8,10
**phone** 67:8,10
**Photocopy** 3:13
3:15,16
**photograph**
3:13,15,16
18:13 23:9
40:7 41:15,22
84:19
**photographs**
57:1
**physically** 64:8
**pick** 61:19,23
62:3,6,17,20
62:21 63:11
**picked** 26:4,21
62:23
**picker** 10:5,6,7,8
**picture** 18:21
20:7 39:23
**pissed** 56:13
**pitbull** 24:12
**place** 28:2,12
58:24 63:14
71:18 72:11,14
72:19 73:13,17
74:17 78:18
**placed** 84:24
**places** 27:12

28:1,9 73:7,19
74:5 75:4,6
78:4
**plaintiff** 2:5
39:14
**Plaintiff's** 18:14
39:9
**Plaintiff's-1** 29:6
84:19
**Plaintiff's-3** 39:9
54:14
**Plaintiff-1** 3:13
92:9
**Plaintiff-2** 3:14
**Plaintiff-3** 3:15
39:12 41:15
**Plaintiff-4** 3:16
85:15 92:10
**pleasant** 43:21
**please** 5:15,22
5:24 6:8,23
12:24 22:3
78:10,11
**point** 36:11
37:24 38:4,10
40:5 41:5,7,18
42:18 47:6,20
47:24 49:4,7
49:10 53:2,7
54:11 55:7,10
55:23 56:12,16
56:24 57:23
58:17 61:9,17
67:24 70:17
80:1 85:12
86:11,14 88:15
**police** 5:4 62:2
87:20
**poorly** 68:12
**portion** 79:1
**possible** 6:22
**posted** 84:20
87:4
**prescribed**
79:18,19,21
80:2,8,17 81:8
82:1,7,9,16
**present** 1:20
**previous** 14:18

16:7,9,14,16
**primary** 80:12
80:13,19 81:17
**printout** 85:20
**prior** 9:6,10
10:24 12:2
13:15 28:14
69:14 70:3
**problem** 28:15
29:4
**problems** 25:21
81:10
**process** 30:10,13
82:10
**professional**
26:12 71:9,15
78:6
**professionals**
69:16
**promise** 7:8
84:17
**prompted** 31:18
53:16
**properties** 17:4
**property** 16:7
16:10,14,16,24
17:3,16,20,22
17:23 18:3
23:5 26:5
33:23 34:4
60:22 61:2
65:24 67:6,17
**provide** 30:17
83:9
**pry** 67:22
**psychiatrist**
70:6
**psychiatrists**
69:17
**public** 1:19
27:21 93:12
**purposes** 84:8
**pushback** 28:17
**pushed** 47:4
**put** 19:8 44:4,5
44:17 48:6
53:18,24 54:4
54:7 85:2
86:11,15

**putting** 84:7

## Q

**qualified** 30:16
**question** 4:6,12
  5:20,24 6:6,9
  6:16 7:1 23:14
  26:17 28:3
  35:13 48:24
  51:20,24 68:12
  73:13 78:13,23
  85:1
**questions** 12:17
  30:15,19 67:22
  88:13
**quick** 6:22

## R

**R** 2:1,8
**race** 46:20
**ran** 44:15 45:1
**reach** 31:19
**read** 14:11 79:2
**ready** 87:22
**real** 88:15
**realized** 53:5
**really** 7:8 13:1
  27:17 75:24
  89:1
**reason** 7:17 26:3
  31:6,9 68:2
**reasonable**
  12:23
**reasons** 26:3
  33:1 68:14,24
**recall** 10:18
  15:14 18:6
  19:24 21:1
  23:16 30:8
  31:19 32:5
  46:12,13 51:16
  62:5 64:19
  67:1 69:13
  70:15,16 75:18
  78:7,8 79:10
  82:12 85:12,13
  86:13
**recollection**
  42:23 70:19
  85:6

**recommendati...**
  83:13
**recommendati...**
  83:10
**record** 5:1 18:16
  29:7 40:22
  54:20 78:19,22
  79:2 85:20
**recording** 57:15
**Recovery** 1:13
  2:2
**Redbud** 1:22
**refer** 44:21
**referring** 9:14
  44:22 54:13
**regards** 17:10
**registered** 30:7
  31:15
**regular** 71:6,14
  72:10,11 81:11
**regularly** 71:4
  84:9
**regulate** 82:23
**Reishi** 83:20,24
  84:4
**related** 81:14
**reliving** 22:7
**remains** 61:19
  61:23 62:22
**remember** 13:19
  16:18 30:10,19
  30:20,21 31:1
  31:5 32:21
  46:3 57:4,7,10
  57:11,14 58:3
  58:6 59:8,24
  60:15 61:21
  63:7 64:23
  65:3 66:3,9,15
  66:16,19 67:3
  67:7,11,14,15
  67:18 69:12
  70:10 71:16,17
  71:23 72:2,8
  72:18 73:3,7
  74:6,7,8,9,12
  74:13,18,20,21
  74:24 75:21
  76:10,12 79:15

  79:20 80:5
  81:19 91:18
**remind** 12:17
**repeat** 23:14
  28:3 48:24
  61:24
**rephrase** 51:23
  68:11
**replace** 66:18
**replaced** 83:7
**reporter** 1:18
  5:11 6:4 79:3
  93:12,16
**REPORTING**
  1:21
**represent** 5:2
**reproduction**
  93:14
**research** 83:15
**reserve** 4:10
**reserved** 4:6
**residence** 13:7
  33:23
**respond** 5:13
  21:4 49:19
**response** 25:1
  49:21 50:2
  66:15 67:12
**responses** 3:14
  14:12 15:19
  21:4 24:8
  28:23,24 30:18
  63:23 75:13,16
  80:1
**rest** 50:23
**restate** 5:24
**result** 64:12
  88:21
**right** 7:3,20
  11:23 13:4,9
  14:14 21:5,9
  24:10,19,22
  25:3 27:7
  32:12 33:19
  37:4 38:13
  39:22 40:20
  41:2 42:3,5
  46:5,6 48:12
  48:22 49:1

  50:7 59:9 69:4
  70:17 71:21
  72:5,12,16
  75:11,14 76:4
  82:17 84:5
  87:7,11
**ripped** 51:5
**ripping** 50:3
**Robert** 75:16
**room** 38:23 39:5
  40:14 51:6,6
  54:18
**Roosevelt** 13:20
  13:21 14:19
  17:8
**routine** 45:21
**RP** 28:24
**rules** 5:9
**Russell** 24:15
  32:11

## S

**S** 1:17 2:1 93:5
  93:11
**sad** 88:9 90:2
**safe** 26:8
**sat** 54:23
**saw** 31:23 34:21
  37:13,21 38:16
  43:6,6 50:16
  50:22 51:12
  53:4 56:18,19
  60:21 70:20
  71:2 75:1
  76:17 79:24
**saying** 49:18
**scheduling**
  77:12
**scream** 48:19
**screaming** 35:20
  36:1 43:2,5
**screen** 61:5
**sealing** 4:3
**search** 44:12
  50:19 51:1
**searching** 50:5
  51:8 52:14
**second** 44:9
  49:23

**second-floor**
  20:20,24 49:12
**second-to-last**
  29:18
**seconds** 51:18
**see** 12:14 18:20
  18:24 19:1,22
  30:9,15 32:1
  38:17 40:6
  41:4,17,20
  42:2,5,8 43:4
  45:6,23 46:23
  47:21 48:18,20
  49:4,7 50:19
  51:1,4 52:20
  56:8,11 60:8
  60:23 61:1,7,8
  69:21 70:1,6,8
  70:9 77:16
  81:3,6,22
**seeing** 69:15
  70:16 77:24
**seen** 30:1 71:3
  77:20 78:6
**seizures** 25:21
**sensitive** 7:6
**serve** 26:15,23
  27:3 33:12
**service** 25:12
  26:16,23 33:12
**shake** 5:14
**shaking** 56:14
**she'll** 60:8
**shelter** 25:5,8
  26:20,22
**shift** 24:3 67:19
  84:16
**Shih** 24:16
  32:11
**shirt** 38:14
**shopping** 28:2,8
**short** 46:18
**shot** 9:15 24:9
  44:8,10,10,20
  48:15,18,23
  49:8,16,16
  51:14 52:23
  89:24
**show** 18:12

**shower** 87:19
**showing** 53:20
**sick** 68:21
**side** 40:20 82:20
83:1,2
**sign** 84:20,23,24
85:3,5,6,12
86:9,11,14
87:3,3
**signing** 4:3
**single** 48:11
88:21
**sister** 12:3 13:4
22:17 55:24
64:4
**sister's** 8:2 12:4
22:20 65:14
**sit** 44:13
**sitting** 55:16
56:9
**situated** 38:21
**situation** 89:19
89:22
**situations** 27:13
**skinned** 46:22
**sleep** 21:19 45:5
**sleeps** 42:16
**slightly** 6:16
**small** 26:6
**smell** 21:19
**smoothie** 84:2
**social** 69:16
**son** 60:13
**soon** 42:19
49:17 63:8
**sorry** 7:22 9:13
10:6 34:12
35:10 39:2,11
42:2 53:2
54:15,16 57:17
76:19 78:23
80:6 81:4
**sound** 14:14
80:3
**sounds** 21:9
**South** 1:14 2:3
**space** 37:6 38:24
**speak** 6:5 26:11

64:19
**speaking** 58:9
65:3
**special** 26:23
33:11
**specific** 8:22
26:15 27:3
31:6,17 66:21
69:9,11
**specifically**
11:18 16:15
18:3,5 24:5,24
26:4 58:14
**speculate** 13:1
**spelling** 73:24
**spoke** 64:18,21
65:1,5 67:2,8,9
**sporadic** 71:4
**squeaking** 36:2
36:5 43:9
**Stamp** 39:19
**Stamped** 18:16
**standing** 12:13
37:13 38:19,20
39:4 40:3,7,11
40:12,13,16,16
40:17,23 41:2
47:2 55:20
**start** 6:9 38:23
42:19 43:8,11
69:21
**started** 12:16
50:3,4,4 70:1
76:24
**starting** 6:7
**state** 1:20 35:11
**statement** 55:19
55:22 56:4,22
57:5,8,19 58:4
**STATES** 1:1
**stating** 30:6
**stay** 53:8
**stayed** 52:11
**stenographic**
78:19 93:7
**stipulated** 4:2
**stomach** 83:5
**stopped** 10:18
73:3 74:14,22

77:24
**stores** 31:14
**street** 1:15 2:3,9
22:10 73:20
**struggled** 68:21
70:4
**struggling** 42:2
**stuff** 51:7
**subway** 27:22
**suffering** 31:11
**Suite** 1:15 2:4
**supervision**
93:15
**supervisor** 91:4
**supervisors** 91:9
**support** 25:13
26:16,24 30:7
30:16 33:12
**supposed** 83:21
**sure** 6:10 10:1
21:6 23:15
26:18 29:14
30:24 34:1
41:21 49:1
52:15 62:1
65:21,22 68:11
70:13 72:14
78:16 82:8
88:24
**suspect** 58:1,19
**switch** 29:14
33:15
**switched** 80:16
80:19
**sworn** 4:18

**T**

**T** 2:2
**table** 54:15
**take** 6:23 7:2,10
26:18 27:10,13
27:15,17,20,24
28:2,7,11
31:10,13 54:15
55:19,22 62:20
62:20 63:14
75:14 78:14
82:19 83:19,24
84:4,9,12

**taken** 1:13 79:7
82:15 93:8
**talk** 7:6 33:15
44:13 61:16
62:2 67:20
**talked** 67:3 78:4
91:24
**talking** 40:3
69:15
**tall** 46:18,19
**Tel** 2:5,11
**telehealth** 77:1,3
77:9,12
**tell** 21:15 30:4
30:13 46:20
55:15 58:13
61:18,22 66:4
83:6
**telling** 67:12
**terms** 12:22,22
13:6 18:8 22:4
23:19 26:11
35:11 38:3
46:17 50:20
68:23 84:20
**testified** 4:19
87:9,18 88:1
**testify** 7:18
**Thank** 9:17
21:21 41:1
42:5
**theatres** 28:1
**therapist** 71:2
76:1,6
**thing** 6:24 22:4
61:16 77:13
87:6
**things** 5:9 16:13
**think** 6:11 10:13
14:11 21:3
25:1 29:3 36:1
38:1 67:2
73:20,22 75:14
75:15 80:1
85:15 86:17
87:18 88:1
91:16 92:3
**third** 29:10
**third-to-last**

29:18
**Thomas** 80:18
80:20
**thought** 85:8
**three** 9:5 22:22
25:3 52:18,19
55:5 89:14
91:5
**tile** 40:6,9 41:2
**time** 4:7,12 5:21
6:23 8:15 12:5
12:22 18:5
20:14,17 23:9
23:17,17 25:13
26:19,21 27:7
32:4,17 35:7
35:12 36:18
38:10 41:5,7
42:8,14 47:6
47:20,24 48:14
48:17 49:5,11
51:14,14 52:17
55:7,23 56:16
56:24 60:8
62:1,18 66:21
70:17,20,21,23
71:1,3,14 74:9
74:18 75:21
77:23,24 81:7
81:7 82:1
86:14 87:19,23
**timeframe** 70:12
90:16
**times** 5:19 31:13
44:6
**timing** 66:19
73:19
**today** 6:5,21 7:6
7:18 58:22
**told** 44:2,4,13
45:14 46:8
48:5,8 49:20
55:18 58:11
66:6,10,13
**top** 19:22 30:9
38:12,13
**Torresdale**
11:14 12:8,10
13:8,13 14:6

14:17 15:10,13
16:3,24 17:11
17:15,23 18:4
18:7,22 19:4
19:11 20:20
22:9,15,24
23:3,18 27:7
28:17 60:18
**total** 14:2
**tough** 21:15
**towel** 38:9 53:19
53:20,21
**toy** 42:7 45:12
**training** 26:15
26:23 27:3
33:11
**transcribed** 93:7
**transcript** 93:7
93:14
**transportation**
27:21,21
**treated** 81:12
**treating** 75:16
**treatment** 71:19
72:15 73:9
**trial** 4:7,13
**tried** 79:13
**true** 17:14 93:6
**truthful** 57:20
**truthfully** 7:18
**try** 6:10,20
28:11 71:5
82:24
**trying** 37:17
**Tsu** 32:12
**turn** 29:16,20
**Turning** 23:8
**twice** 72:23
**two** 10:23 13:14
17:4 19:20
20:8 24:8,18
47:14,15 53:11
76:22,23 77:8
77:20 86:19
88:2 90:24
91:1,8,15
**Tzu** 24:16

**U**

**uh-huh** 5:13
19:18
**un-unh** 5:14
23:22
**uncomfortable**
7:9
**understand** 5:22
5:24 19:15
24:7 26:1,9
31:16 35:23
38:15 39:17
43:7 46:24
82:11 90:5
91:22
**understanding**
30:5 89:2,7
**understood** 6:1
**UNITED** 1:1
**upset** 83:4
**upsetting** 7:7
**upstairs** 59:2,7
60:7
**usually** 42:16

**V**

**verbalize** 5:13
5:15
**Victims'** 1:13
2:2
**video** 57:15
**view** 85:21
**visited** 74:19
75:22
**visits** 81:11
**Von** 68:5,9,15
68:23
**vs** 1:5

**W**

**waist** 38:6
**waived** 4:4
**wake** 88:9
**walk** 13:8 22:20
65:12
**walking** 34:21
34:23 35:3,5
37:3,5,7
**wall** 40:18 53:6
**want** 7:8,11
11:13 12:24

18:2 19:19
22:1 24:3,24
26:18 27:5
29:16 32:9
33:14 35:14
39:2 44:12
45:16 47:8
48:10 53:3,18
75:11 79:6,13
84:18 85:9
**wanted** 22:4
25:17 58:24
86:10
**warehouse** 9:22
87:10
**warrant** 44:12
**wasn't** 21:19
26:8 53:20
61:7 89:1
**watching** 52:17
52:20 55:20
**way** 7:9 18:19
19:3 20:5
23:11,19,24
31:24 41:19
42:11 49:23,23
50:21 77:22
80:7
**we'll** 4:10
**we've** 69:15
**week** 90:22
**weekly** 71:8 73:1
**weeks** 10:23
76:22,23 77:8
77:20 88:2
90:24 91:1
**Welch** 29:19
30:11,22 31:6
31:7,22,23
32:1
**Welch's** 30:17
**went** 26:20
27:16 38:2
45:15 50:13
51:6,9,11 53:4
54:6 57:5 58:7
59:1,2 63:10
72:13,14 73:20
73:21 81:24

82:1
**West** 2:2 3:5 4:9
21:22 29:3,14
34:6,10 39:10
39:13,17 51:19
70:11 73:11,23
76:9 78:16
86:19 87:1
88:12 90:24
92:6
**when's** 70:20
71:13
**white** 19:20 61:5
**wife** 15:24 16:1
**Willebrand** 68:5
68:9,15,23
**Willis** 75:16,18
75:19,22 76:13
76:17,21 77:2
77:5,16,20,24
78:4 80:6
**window** 53:6
60:24 61:2
86:9
**witness** 3:2 4:18
29:22 34:8
40:24 42:1
47:11 53:22
76:10
**woman** 60:3
**wood** 40:5,9
**worded** 68:12
**work** 8:22 79:12
87:13,22 88:9
88:11,22 89:4
**workers** 69:16
**working** 9:12
10:24
**wouldn't** 6:15
90:18
**wrapped** 38:9
**write-up** 89:15
**writing** 18:8,20
**written** 61:6
84:24 89:17
**wrong** 87:8

**X**

**X** 3:1 40:23

**Y**

**Yara** 8:2 13:4,12
55:24 56:6,8
56:16,21 64:5
**Yara's** 13:7,16
22:17
**yeah** 10:3,16
47:16 74:8
83:23
**year** 14:4 70:22
72:7,23,23
76:9
**yearly** 72:22
**years** 25:3,18,19
73:4 74:11

**Z**

**Zurbriggen** 2:8
3:4 4:14,23 5:2
18:15,18 22:2
28:20 29:5,8
29:12,15 34:13
34:14 39:7,11
39:15,18,21
51:23 52:1
70:13,14 73:15
73:16 74:1,2
76:11 78:21
79:5 85:17,23
86:17,21 88:14
88:19 91:1,2
92:3

**0**

**08051** 1:22

**1**

**100** 5:23
**11** 1:10 93:8
**12-1-89** 7:24 8:1
**12:54** 1:17
**121** 1:14 2:3
**13** 25:18,19
**143.50** 63:20
**1515** 2:9
**1800** 1:15 2:4
**19102** 2:10
**19107** 1:16 2:4

**2**

**2:50** 92:14
**2013** 72:9
**2018** 32:20
**2020** 76:4,7
**2021** 9:15 11:16
   11:23 14:7
   19:5,11 20:18
   20:23 21:5,12
   22:8 24:5 27:8
   28:15 30:9
   32:4 33:16,16
   69:14 76:14
   82:13 86:1,5
   89:5
**2022** 82:13,14
   85:22
**2023** 1:10 93:8
**215** 2:5,11
**22-3763** 1:7
**25th** 30:9

---
**3**
---

---
**4**
---
**4** 3:4 24:5 89:5
**4021** 13:20
   14:19
**406** 1:22
**4664** 11:14
   12:10 13:7,13
   14:5,17 15:10
   15:13 16:3,24
   17:11,15,20,23
   18:4,7,22 19:1
   19:4,10,16
   20:20 22:9
   23:17 27:7
   28:16 60:18
**4713** 22:15,24
   23:2
**4723** 12:8
**4th** 11:16 33:16

---
**5**
---
**546-1433** 2:5
**589-1107** 1:23
**5th** 72:4,12,15
   73:4,8,20,20
   74:5,10 78:5

---
**6**
---
**683-5114** 2:11

---
**7**
---

---
**8**
---
**856** 1:23
**86** 3:5
**88** 3:4

---
**9**
---
**92** 3:13,14,15,16
**94** 39:19

# EXHIBIT "B"

*Force Analysis LLC*

*PO Box 128*

*Linwood, New Jersey 08221*

*Glenn Garrels – Use of Force / Police Practices Consultant*

_____

| | | |
|---|---|---|
| FELISHATAY ALVARADO | : | Civil Action |
| Plaintiff, | : | No. 22-3763 |
| v. | : | |
| City of Philadelphia, et al., | : | |
| Defendants | : | |

*Expert Report of Glenn Garrels of Force Analysis LLC pertaining to the incident that occurred on June 4, 2021.*

**Force Analysis LLC**
Excellence in Use of Force Encounters                                        Page **2** of **57**

October 27, 2023

Mr. David Keith

The Victim's Recovery Loss Center

121 South Broad Street

Philadelphia, Pennsylvania

Dear Mr. Keith,

I have reviewed the documents and submitted material provided to me concerning the incident that occurred on June 4, 2021.  I have formulated seven opinions that I hold to a reasonable degree of probability and certainty in the field of police practices upon my training and experience:

1. **SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by illegally entering into her 1st floor, front apartment without having the legal authority to do so while executing a search warrant for a defendant believed to be located inside the 2nd floor, rear apartment which was also a violation of policies and procedures of the Philadelphia Police Department.**

2. **SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by executing the search warrant by forcibly ramming the door and not allowing her a reasonable amount of time to voluntarily surrender her residence which was also a violation of policies and procedures of the Philadelphia Police Department.**

3. **Lieutenant Monk and Sergeant Mellody failed to supervise the operation properly from the "recon" of the residence to the execution of the search warrant.**

4. **The Philadelphia Police Department improperly investigated this incident and provided inconsistent information about what had occurred pertaining to the execution of the search warrant and breach of the residence of Felishatay Alvarado.**

5. **The Philadelphia Police Department violated Felishatay Alvarado's 4th Amendment rights when Officer Song discharged his firearm mortally wounding the dog that was considered property**

PO Box 128, Linwood, NJ  08221             Email: glenn@forceanalysisllc.com             Phone:  609-214-6449

of Felishatay Alvarado by not allowing her time to secure her dog which was also a violation of policies and procedures of the Philadelphia Police Department.

6. **The Philadelphia Police Department failed to follow nation standards in the planning and execution of this search warrant.**

7. **The Philadelphia Police Department failed to train its officers on policies and how to deal with dog encounters.**

I expand and support my opinions in the attached report. If more materials are provided regarding this incident, I reserve the right to add, change, and delete any of my opinions based on any provision of additional information not reviewed at the time this report was completed.

Sincerely,

Glenn Garrels
Force Analysis LLC

**Force Analysis LLC**
Excellence in Use of Force Encounters                                    Page **4** of **57**

## Table of Contents

Introduction                                    5

Legal Guiding Principles                        7

Incident Summary                                8

Document Listing                                8

Method of Analysis                              12

Incident Analysis                               13

Opinions and Review                             13

    Opinion 1                               13

    Opinion 2                               32

    Opinion 3                               42

    Opinion 4                               44

    Opinion 5                               46

    Opinion 6                               48

    Opinion 7                               52

Conclusion                                      56

# Introduction

I was a member of the New Jersey State Police for twenty-two years as a member of the 121St State Police Class which graduated on April 24, 2001.  I last held the rank of Lieutenant and was assigned as the Unit Head of the Special Investigations Unit at the Casino Gaming Bureau.  My experience included 4 years as a Road Duty Trooper assigned to the Field Operations Section in Troop "A" which encompassed southern New Jersey from 2001 through 2005.  During that time, I was assigned to the Bellmawr, Port Norris, and Woodbine Stations before being transferred to the Tactical Patrol Unit.  As a road duty Trooper, my duties and responsibilities included conducting motor vehicle accident investigations and enforcing motor vehicle laws under Title 39.  I also conducted criminal investigations concerning property thefts, burglaries, sex assaults, assaults, robberies, weapon offenses, and narcotics under the New Jersey Criminal Code Title 2C.  I prepared several narcotic search warrants that led to the recovery of narcotics and U.S. currency.  I have a vast knowledge of identifying confidential informants and utilizing them to solve open criminal investigations.

While assigned to the Field Operations Section, I had temporary tenures in the Alcohol Beverage Control Unit where I investigated alcohol related crimes under Title 33 and licensed premise investigations under Title 13. These investigations also involved working in an undercover capacity concerning alcohol, narcotics, and gambling investigations.  I also worked temporarily as a station detective in the Criminal Investigation Office in Troop "A" where I conducted extensive and complex criminal investigations.

In January of 2006, I was transferred to the Digital Technology Investigations Unit where I conducted criminal investigations into the possession and distribution of child pornography and other crimes against children.  I received training in the recovery and analyzation of digital evidence.

In September of 2006, I was then transferred to the Major Crime South Unit where I was responsible for investigating suspicious deaths, homicides, in-custody deaths, and deadly force incidents which mainly consisted of officer involved shootings.  It was here I honed my skills and expertise in force encounters.  I was a member of the Major Crime South Unit for fourteen years and was a Detective, Detective Sergeant, Detective Sergeant First Class, and Lieutenant all within the unit.  I was a case detective, case manager, and incident commander during these complex and high-profile investigations. During this time, I was also assigned to the New Jersey Attorney General's Shooting Response Team.  I was involved in nearly one hundred Deadly Force / In-Custody Death Investigations.  I have testified in Grand Juries, Motions, and Trials pertaining to these investigations.

I was temporarily assigned to the New Jersey State Police Academy for the 158th State Police Class in 2018. I instructed recruits on the New Jersey Criminal Code, Constitutional Law pertaining to search and seizure, and conducting criminal investigations.  During my tenure as a detective over approximately eighteen years, I had extensive knowledge in preparing search warrants affidavits and their constitutional requirement pertaining to residences, vehicles, cell phone call detail records, clothing, and other evidence vital to investigations.  I have also supervised countless search warrant preparations and executions during that time. I attended yearly training in search and seizure issues as part as being a New Jersey State Trooper.

I have attended training from around the country in the areas of how to conduct officer involved shooting investigations and deadly force incidents, and the different disciplines in those areas.  I also became a use of force instructor through the Federal Law Enforcement Training Center (FLETC) and currently instruct Police and Correction recruits in the standard of force at the Atlantic County Police Academy.  I have also instructed on how to conduct officer involved shooting investigations to different law enforcement agencies around the State of New Jersey.  I have also attended several different trainings and certifications in the human performance in force encounters.  Understanding these principles can greatly affect how an individual can perceive and respond to a force encounter.

Prior to becoming a New Jersey State Trooper, I was a Campus Police Officer with the Commonwealth of Massachusetts, Department of Mental Health.  I was assigned to an out-patient Mental Health Facility where I provided police and security for the employees, visitors, and patients.  This included interacting with patients daily and providing restraints on patients who were in crisis.  I have attended training on dealing with mentally ill individuals by the Massachusetts Police Training Commission as well as training in non-violent self-defense by the Department of Mental Health. I have completed annual training for the New Jersey State Police that pertains to dealing with mentally ill.  As a Road Duty Trooper, I assisted and handled dozens of cases dealing with individuals who were in crisis and needed a psychiatric evaluation.

## Instruction:

| | |
|---|---|
| Supervisor's Review of Use of Force – JA Mongomery Consulting - | 2023 - Present |
| Use of Force Instructor – Atlantic County Police Academy - | 2019 - Present |
| Investigating Officer Involved Shootings/Deadly Force - | 2014 - Present |

## Education:

**Master of Science Degree**, Criminal Justice Administration - Western New England College, 1998
**Bachelors of Art Degree**, Criminal Justice – Curry College, 1997
**Associate in Science Degree**, Massasoit Community College, 1995

## Commendations/Awards:

| | |
|---|---|
| New Jersey State Police / Letter of Recognition | March 2018 |
| 200 Club of Burlington County / Meritorious Service Award | February 2018 |
| New Jersey State Police / Unit Certificate of Commendation | September 2017 |
| New Jersey State Police / Letter of Commendation | July 2017 |
| New Jersey State Police / Unit Certificate of Commendation | March 2017 |
| New Jersey State Police / Unit Certificate of Commendation | March 2016 |
| **New Jersey State Police / Trooper of the Year** | **December 2015** |
| Burlington County / Pro Cops Award | August 2015 |
| New Jersey State Police / Unit Certificate of Commendation | April 2014 |
| New Jersey State Police / Unit Certificate of Commendation | October 2008 |

New Jersey Attorney General's Award                                      December 2008

**Association Membership**

New Jersey Homicide Investigator's Association
Association of Force Investigators
Human Factor & Ergonomics Society
International Association of Chiefs of Police
New Jersey Licensed Private Investigator's Association

**Legal Guiding Principles - This section contains foundational information for the basis of my opinions.**

**Fourth Amendment:**   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[1]

**Pennsylvania Constitution; Article 1, Section 8: Security from Searches & Seizures:**   The people shall be secure in their person, houses, papers, and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath of affirmation subscribed to by the affiant.[2]

**Pennsylvania Rules of Criminal Code, Rule 207 which states;**

"*Rule 207 - Manner of Entry into Premises*

*(A) A law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of the officer's identity, authority, and purpose to any occupant of the premises specified in the warrant, **unless exigent circumstances require the officer's immediate forcible entry**.*

*(B) Such officer shall await a response for a **reasonable period of time** after this announcement of identity, authority, and purpose, unless exigent circumstances require the officer's immediate forcible entry.*

*(C) If the officer is not admitted after such reasonable period, the officer may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search.[3]*

See generally *Commonwealth v. DeMichel*, 277 A.2d 159 (Pa. 1971) with regard to paragraphs (A) and (B). Concerning paragraph (C), see *Commonwealth v. Newman*, 240 A.2d 795 (Pa. 1968)."

---

[1] Fourth Amendment, United States Constitution
[2] Pennsylvania Constitution; Article 1, Section 8:
[3] Pennsylvania Rules of Criminal Code, Rule 207

**Force Analysis LLC**
Excellence in Use of Force Encounters                                    Page **8** of 57

## Pennsylvania Rules of Criminal Code, Rule 205, which states:

*"Rule 205, Contents of Search Warrant*

*(A)  Each search warrant shall be signed by the issuing authority and shall:*

*(1)  specify the date and time of issuance;*

*(2)  identify specifically the property to be seized;*

*(3)  **name or describe with particularity the person or place to be searched;***

*(4)  direct that the search be executed either;*

*(a)  within a specified period of time, not to exceed 2 days from the time of issuance, or;*

*(b)  when the warrant is issued for a prospective event, only after the specified event has occurred.*[4]

## Incident Summary

On June 4, 2021, officers from the Philadelphia Police Department executed a search warrant at the residence of Felishatay Alvarado located on the front, 1st floor apartment of 4664 Torresdale Street in Philadelphia, Pennsylvania.  This search warrant was a continuing investigation into an arrest warrant for a suspect in a homicide case that did not include Felishatay Alvarado or her residence.  The search warrant was authorized for the rear, 2nd floor apartment of 4664 Torresdale Avenue.  When officers breached the front door of her apartment with a knock and announce search warrant after only a brief period, they encountered Felishatay Alvarado and her service door.  One officer discharged his firearm at the service dog mortally wounding it while other officers cleared the remainder of the residence.  When officers realized they had made a mistake, they exited the apartment and walked to the rear of the building and entered into the rear door which led to the 2nd floor, rear apartment.  The suspect was not located at that time.

## Document Listing

The following were the documents I reviewed pertaining to this incident:

1.  Axon_Capture_Video_2021-06-04_070917
2.  Axon_Capture_Video_2021-06-04_071356
3.  Axon_Capture_Video_2021-06-04_072135
4.  Surveillance video A09_20210604053500_001.mp4
     (rear of building)
5.  Surveillance video A10_20210604053500_002.mp4
       (Deli at front of building)
6.  Use of Force / Hospital Case Summary                                    D000001
7.  Warrant of Arrest                                                                    D000002
8.  Philadelphia Police Department Officer Involved Shooting Investigation    D000003-D000010

---

[4] Pennsylvania Rules of Criminal Code, Rule 205

**Force Analysis LLC**
Excellence in Use of Force Encounters                                          Page **9** of **57**

Unit Final Report prepared by Detective Horn, Report OIS# PS21-05

| | |
|---|---|
| 9.  Officer Involved Shooting Investigation Unit Summary | D000011 |
| 10. Complaint of Incident Report dated 6/4/21 | D000012 |
| 11. Complaint or Incident Report prepared by Officer Hamoy dated 6/4/21 | D000013 |
| 12. Warrant of Arrest / Affidavit | D000014-D000018 |
| 13. Philadelphia Police Department Consent to Search dated 6/4/21 | D000019 |
| 14. Crime Scene Log | D000020-D000021 |
| 15. Statement of Officer Burkitt | D000022-D000023 |
| 16. Statement of Officer Ashford | D000024-D000025 |
| 17. Statement of Officer Scott | D000026-D000028 |
| 18. Statement of Officer Murray | D000029-D000031 |
| 19. Statement of Officer Riotto | D000032-D000034 |
| 20. Statement of Sergeant Mellody | D000035-D000038 |
| 21. Statement of Officer Smith | D000039-D000040 |
| 22. Statement of Officer Clark | D000041-D000042 |
| 23. Statement of Lieutenant Monk | D000043-D000045 |
| 24. Civilian Interview Sheet OIS | D000046 |
| 25. Statement of Officer Rivera | D000047-D000048 |
| 26. Statement of Officer Saba | D000049-D000050 |
| 27. Statement of Officer Hamoy | D000051 |
| 28. Statement of Officer Fitzpatrick | D000052-D00054 |
| 29. Statement of Officer Quintana | D000055 |
| 30. Property Receipt | D000056-D000057 |
| 31. Search Warrant | D000058-D000060 |
| 32. Internal Affairs Statement of Sergeant Mellody | D000061-D000064 |
| 33. Internal Affairs Statement of Detective Scully | D000065-D000067 |
| 34. Internal Affairs Statement of Detective Graf | D000068-D000071 |
| 35. SWAT Unit Recon Sheet | D000072-D000075 |
| 36. PPD Mugshot Profile | D000076 |
| 37. Firearms Identification Unit Lab Report | D000077-D000078 |
| 38. Scene Photographs | D000079-D000100 |
| 39. Complaint or Incident Report dated 6/4/21 prepared by Officer Vega | D000101 |
| 40. Stray Contact Sheet from Animal Control | D000102-D000104 |
| 41. Officer Involved Shooting Contact Sheet | D000105-D000109 |
| 42. Memorandum from Commanding Officer of Internal Affairs | D000110-D000120 |
| 43. OIS Investigation Unit Report prepared by Detective Horn | D000121-D000122 |
| 44. PPD Case Report | D000123-D000124 |
| 45. Internal Affairs Statement of Officer Song with Diagram | D000125-D000131 |
| 46. Firearms Identification Unit Lab Report | D000132-D000133 |

**Force Analysis LLC**
Excellence in Use of Force Encounters                                    Page **10** of **57**

47. Property Report                                                          D000134
48. Crime Scene Report                                                       D000135-D000138
49. Complaint of Incident Report dated 6/4/21 prepared by SGT Williams       D000139
50. Incident History Report                                                  D000140-D000143
51. Email from LT Hendershot dated 6/4/21                                    D000144
52. Memo dated 6/11/21 Commanding Officer, Firearms Unit                     D000145
53. Defendant City of Philadelphia's Answers and Objections to Plaintiff Interrogatories and Requests for Production of Documents                                       17 pages
54. Defendant Police Officer Edward Song's Answers and Objections to Plaintiff's Interrogatories and Requests for Production of Documents                                        16 pages
55. Civil Complaint                                                          25 pages
56. PPD Wanted Person Directive 5.17 dated 11/20/00
57. PPD Body Worn Camera (BWC) Directive 4.21 dated 5/20/19
58. PPD Arrest Warrant Directive 5.22 dated 9/1/20
59. PPD Use of Force Review Board Directive 10.4 dated 2/5/21
60. PPD Use of Force - Involving the Discharge of a Firearm Directive 10.1
       dated 5/13/21
61. PPD Search Warrant Directive 5.7 dated 4/29/16                           D000154-D000193
62. PPD Disciplinary Procedures Directive 8.6 dated 5/1/10                   D000194-D000208
63. PPD Firearms Training Sheet for Officer Song dated 6/9/21                D000209
64. PPD Officer Involved Shooting Invest Unit (Repeated)                     D000210-D000211
65. PPD Training Bureau Firearms Training Unit                               D000212
66. Memo from Commanding Officer Firearms Training                           D000213
       dated 6/11/21
67. Memo from Corporal Francis Rogalski dated 6/10/21                        D000214
68. Firearms Training Unit Policy #8                                         D000215-D000216
       PPD Directive 10.1                                                    D000217-D000219
69. PPD SOP #18 (Revised 2/24/20) SWAT Unit                                  D000220-D000222
       Room Clearing Techniques
70. PPD SOP #26 SWAT Unit Operational Planning                              D000223-D000225
71. PPD SOP #28 SWAT Unit Reconnaissance & Intelligence                     D000226-D000228
       (Revised 4/11/19)
72. PPD SOP #30 SWAT Unit Warrant Threat Level Guidelines                   D000229
73. PPD SOP #31 SWAT Unit Warrant Service                                   D000230-D000232
       (Revised 10-20-22)
74. PPD SOP #36 SWAT Unit Dog Neutralization Policy                         D000233-D000234
75. City of Philadelphia Response Letter dated 5/5/23
76. PPD Directive 8.2 Civil Suits dated 1/6/05
77. Dog Encounters Training                                                 D000235-D000241

**Force Analysis LLC**

Excellence in Use of Force Encounters                              Page **11** of **57**

78. Pennsylvania Law Enforcement Accreditation Commission          D000242-D000243
      Date October 28, 2021
79. Transcript deposition of Officer James Ashford dated 5/22/23
80. Transcript deposition of Officer Matthew Fitzpatrick dated 5/17/23
81. Transcript deposition of Lieutenant Demetrius Monk dated 5/19/23
82. Transcript deposition of Officer Heriberto Quintana dated 5/23/23
83. Transcript deposition of Officer Phillip Riotto dated 5/22/23
84. Transcript deposition of Officer Patrick Saba dated 5/16/23
85. Transcript deposition of Officer Edward Song dated 5/15/23
86. Ashford Exhibit 1 & Riotto Exhibit 1
87. SWAT Unit Recon Sheet                                           D000244-000249
      (Different than D000072-D000075 as 246-249 were added)
88. Police Internal Affairs Files                                  D000250-000336
89. Video PS 21-05 4664 Torresdale Avenue (Inside Bing)
90. Riotto Exhibit 1
91. Saba Exhibits 1 (D000137), 2, 3 (D000172-173)
92. Songs Exhibits 1, 2                                            D000235-240
93. Training Records of officers involved                          D000337-644
94. Alvarado Exhibit 1 – Photograph of apartment front door
95. Alvarado Exhibit 1
96. Internal Affairs files for officers involved (unredacted)      D000645-731
97. Shannon Exhibit 1
98. Exhibits for Scott
99. Exhibits for Graff
100.    Hamoy Exhibits
101.    Home Investigation Interview Report
102.    Matteo Exhibits
103.    Rivera Exhibits
104.    Murray Exhibits 1
105.    Photo 1
106.    Photo 2
107.    Photo 3
108.    Photo 4
109.    Photo 5
110.    Plaintiff Photos 1-4
111.    Burkett Exhibits 1-7
112.    Scally Exhibits 1-3
113.    Sergeant Mellody Exhibits

**Force Analysis LLC**

Excellence in Use of Force Encounters                                    Page **12** of 57

114.   Transcript Deposition of Felishatay Alvarado dated 8/11/23
115.   Transcript Deposition of Yara Alvarado dated 8/28/23
116.   Transcript Deposition of Officer Joshua Burkitt dated 9/20/23
117.   Transcript Deposition of Officer Eric Clark dated 9/21/23
118.   Transcript Deposition of Detective Francis Graf dated 9/28/23
119.   Transcript Deposition of Officer Jose Hamoy dated 8/17/23
120.   Transcript Deposition of Jaclyn Matteo-Hand dated 9/27/23
121.   Transcript Deposition of Sergeant Kevin Mellody dated 10/11/23
122.   Transcript Deposition of Officer Brian Murray dated 8/11/23
123.   Transcript Deposition of Officer Miguel Rivera dated 8/18/23
124.   Transcript Deposition of Detective Timothy Scally dated 9/28/23
125.   Transcript Deposition of Officer Cypian Scott dated 9/21/23
126.   Transcript Deposition of Dana Shannon dated 9/15/23
127.   Transcript Deposition of Sergeant Michael Cerruti dated 10/16/23
128.   Cerruti exhibit 1
129.   Defendant Motion for Summary Judgement dated 10/17/23

## Method of Analysis

In March of 2023 I was contacted by Attorney Keith West of the Victim Loss Recovery Center.  He requested I review an incident that occurred in Philadelphia, Pennsylvania on June 4, 2021 when SWAT Officers from the Philadelphia Police Department executed a search warrant at 4664 Torresdale Avenue.  I requested he send me all the documents/video pertaining to this incident.  After I received all the pertinent information, I reviewed it in its entirety. I then formulated my opinions based on the totality of circumstances from the information provided in an impartial and objective manner.  In reviewing the evidence in this case and forming my opinions, I have relied upon the education, experience, and training that I have obtained in over two decades in law enforcement.  That methodology that I employed in this case was consistent with how I would have reviewed any similar use of force incident based on my training and experience as a supervisor in the field of law enforcement.

## Officers Involved

Officer James Ashford                    Badge Number 3802

Officer Joshua Burkitt                   Badge Number 2091

Officer Eric Clark                       Badge Number 4453

Officer Matthew Fitzpatrick              Badge Number 148

Officer Jose Hamoy                       Badge Number 2987

Officer Brian Murray                     Badge Number 6068

Officer Heriberto Quintana          Badge Number 2721

Officer Phillip Riotto              Badge Number 3984

Officer Rivera                      Badge Number 6797

Officer Patrick Saba               Badge Number 9823

Officer Cyprian Scott              Badge Number 3936

Officer Edward Song               Badge Number 3936

Detective Francis Graf            Badge Number 9066

Detective Timothy Scully          Badge Number 791

Sergeant Kevin Mellody           Badge Number 285

Sergeant Michael Cerruti          Badge Number 8649

Lieutenant Demetrius Monk        Badge Number 279

**Involved Person**

Felishatay Alvarado

**Incident Analysis**

**Opinion 1:  SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by illegally entering into her 1st floor, front apartment without having the legal authority to do so while executing a search warrant for a defendant believed to be located inside the 2nd floor, rear apartment which was also a violation of policies and procedures of the Philadelphia Police Department.**

The following fact patterns support my above opinion;

I reviewed the search warrant for 4664 Torresdale Avenue, Philadelphia, Pennsylvania which was signed and approved on June 3, 2021 where Detective Scally was listed as the affiant.  It clearly states on the first page that the search warrant was for the **2nd floor, rear** apartment. (D000058).  On the third page it again, clearly states on two occasions that the search warrant was for the **2nd floor, rear** apartment. (D000060)

I reviewed the typed statement of Detective Scally dated 6/17/21.  When asked, "Why did you list that the 2nd floor rear of 4664 Torresdale Avenue was the specific description of the premises that was to searched on the search warrant?"  He replied, "The information that was received from the probation officer was the most recent information.  Since the address was for the second floor, we wanted to be specific.  There could

have been a second-floor front that we did not know about." (D000066).  (As I will demonstrate from Google Earth photographs, it clearly shows that there could not be a 2nd floor front as the 2nd floor is set back from the front of the building.)  When Detective Scally was asked, "Did you have information on how the 2nd floor rear was to be accessed?"  He replied, "No. I assumed it would be from the front."  (D00066)  Again, Google Earth photographs clearly show that no possible access could have been made to the 2nd floor rear from the 1st floor, front as the 2nd floor was set back from the front of the building.

I also reviewed the arrest warrant for the defendant whom the SWAT officers were attempting to locate which listed Detective Graf as the affiant.  On page 1 the address listed was for the **2nd floor** of the building (D000002), and listed again as the 2nd floor on page 1 of the arrest affidavit (D000016).

I reviewed the typed statement provided by Detective Graf dated 6/17/21.  Detective Graf advised database checks of BMV and prison release for the defendant involved in the murder both listed 4664 Torresdale Ave, **2nd floor** as an address (D000069).  He also spoke with Probation Officer Shannon who advised the defendant's address as **2nd floor, rear** (D000069).  She last spoke with the defendant on May 5, 2021, a month prior to the execution of the search warrant.  Detective Graf advised he conducted no surveillance on the address (D000069) which would have confirmed the defendant was present at that location.  He then advised he drove by the front of the property (D000069).  He was asked if he "had any prior information that the 2nd floor apartment was in the rear of the property" which he answered, "I did not." (D000069).  Prior to that question, Detective Graf provided the information above which came from database checks he conducted prior to obtaining the arrest warrant which clearly indicated the address as **2nd floor, rear.**  He stated he looked at the property on Google maps which listed the property in 2019. He also advised he did not know there was a rear door until after the warrant service (D000070).

I reviewed the typed statement of Sergeant Mellody dated 7/12/21.  When asked, "Did you have any information that the 2nd floor apartment was in the rear of the property?" He replied, "Yes." (D000062).  When asked, "Was there any discussion about how to access the 2 floor, rear apartment of 4664 Torresdale Avenue at any time?"  He replied, "Yes. I did a recon on the property and I observed a rear door at the location. When I reconed the property there was no signs of that door going to the second floor. There was a bump out on the left side. The door was on the right of the bump out when looking towards the rear of the property. I discussed this with the homicide personnel.  The Homicide Unit personnel did not know where the rear door led to." (D000062).

Sergeant Mellody had first-hand information that the search warrant was for the 2nd floor rear.  He had personally "reconed" the apartment.  His observation that day provided him with access to the front and rear of the property.  The photograph that was provided on the "SWAT Unit RECON Sheet" which showed a clear view of the front of the building (D000075).  His observation should have informed him that the second floor was set back from the front of the building which would provide no access to the 2nd floor from the front of the 1st floor.  He confirmed the search warrant and arrest warrant were for the 2nd floor rear (D000062).  He confirmed he did not know where the rear door on the first floor led to (D000062).  He then advised that he has obtained floor plans in the past for large apartment buildings through the internet

(D000063).  He was then asked, "Were there any signs or indication on the front of the property leading you to believe the 2nd floor could be accessed from the front of the property?  He replied, "No." (D000063).  He indicated that he and Lieutenant Monk were the supervisors on scene (D000037).  Even though there was no indication that the 2nd floor rear could not be accessed through the 1st floor front of the building, he still allowed the SWAT team to make entry into the front of the building.  Because he had the knowledge and ability to obtain building plans, there was a possibility that he could of obtain them for this incident.  D000073 showed the recon was conducted by "Clark/Sgt. Melody."

I reviewed PPD SOP 28 for SWAT Reconnaissance & Intelligence dated 4/11/19.  It states;

> *"Purpose*
>
> *B. Intelligence is critical when planning a tactical operation and the first step to planning an operation."*
>
> *"Policy*
>
> *B. The reconnaissance will be performed by members of the SWAT Unit and a second separate reconnaissance will be performed by the Unit Supervisor unless there is an exigent circumstance why a supervisor cannot perform the operation or members of the SWAT Unit cannot be used."*
>
> "*3. Survey Examples*
>
> *A. There can never be too much tactical information available. Listed in this document are __minimum examples of necessary information__.*
>
> *1. Location or Site Intelligence - Address - __Number of floors - How constructed__ - Exits, how many, how constructed, where at on the property. - Number of windows, where at, size, fortifications.*
>
> *2 - Dogs, other deterrents to Police - Possible escape points, porch roofs, etc. - Overview of property in relationship to entire block. - Overview of block in relationship to neighborhood - Street types and direction in relationship to location."*

It appeared that Officer Clark and Sergeant Mellody conducted an incomplete "recon" of the property.  Both officers, one being a supervisor, clearly observed the front of the residence prior to the execution of the search warrant.  They did not take into consideration how the floors were constructed in relation to one another. SOP 28 also states;

> "*5. Method of Reconnaissance.*
>
> *a. Marked Vehicle, Uniformed personnel*
>
> *b. Unmarked vehicle, plainclothes personnel*
>
> *c. Police Helicopter*
>
> *d. Assistance from other members of the Police Department, accompanied by a SWAT Unit member*

**Force Analysis LLC**
Excellence in Use of Force Encounters                                    Page **16** of 57

    <u>***e. Any ruse or disguise that will enhance the accuracy of the reconnaissance***</u>*."*

No methods were documented to ensure they were accurate on how and where they executed the search warrant.

I reviewed the typed statement of LT Monk dated 6/4/21.  When asked to describe 4664 Torresdale Avenue, he replied, "It was a two-story row home with two mailboxes on the front. One for the 1st floor and one for the 2nd floor. There was no access to the second-floor apartment from inside of the first floor. The warrant was for the second floor. **We had no information on how to access the 2nd floor then through the main door**." LT Monk acknowledged the warrant was for the second floor, but had no information on how to access the 2nd floor.

I reviewed PPD SOP 31 "SWAT Unit Warrant Service" revised 10/20/22 which states:

    *"A thorough recon and brief will be conducted before warrant service is attempted…Both SWAT supervisors will obtain a copy of the warrant from the investigators and check it for accuracy and be guided by procedures outlined in SOP 28"*

The following photograph is a picture taken from Google Earth with an imagery date of 6/6/22.  I then utilized the "snipping tool" to take a photograph of the image and saved it as a "PNG" file.



As the viewer can see, the 2nd floor is set back from the front of the building a considerable distance.  If someone enters through the front door, it clearly shows there would be no entrance way to access the 2nd floor as the 2nd floor is set back.  This photograph shows there could be no common foyer where a doorway

PO Box 128, Linwood, NJ  08221                 Email: glenn@forceanalysisllc.com                 Phone:  609-214-6449

would exist to access the 1st and 2nd floor apartments from the front of the apartment.  Sergeant Mellody conducted what he described as "recon" the morning the search warrant was executed.  His observation of the front of the residence showed there would be no access to the 2nd floor from the front 1st floor.

I utilized the "snipping tool" and photographed the picture as provided in discovery of D000080 which depicts the front of the residence on the day of the incident.  I then saved it as a "PNG" file.  It clearly shows the 2nd floor is set back from the 1st floor front of the residence.  Sergeant Mellody conducted "recon" on the day of the incident and this depicts his viewpoint.



**Force Analysis LLC**

Excellence in Use of Force Encounters                                          Page **18** of **57**

I utilized the "snipping tool" and photographed the picture as provided in discovery of D000084 which depicts the front door of the residence that was struck with a ram by Officer Clark on the day of the incident. I then saved it as a "PNG" file.



I utilized the "snipping tool" and photographed the picture as provided in discovery of D000085 which depicts the front door frame of the residence that was struck with a ram by Officer Clark on the day of the incident.  I then saved it as a "PNG" file.



**Force Analysis LLC**
Excellence in Use of Force Encounters                                                    Page **19** of **57**

I utilized "snipping tool" to take a photograph of the picture provided in discovery of D000087.  This photograph depicts the view point from the front of the 1st floor apartment as entrance is made inside.  I saved it as a "PNG" file.  A stairway would have to be located by the kitchen entrance toward the rear of the residence to gain access to the 2nd floor because it is set back from the front of the building.



**Force Analysis LLC**
Excellence in Use of Force Encounters                                              Page **20** of **57**

I utilized "snipping tool" to take a photograph of the picture provided in discovery of D000089.   This photograph depicts the view point from the front of the 1st floor apartment to the left front corner of the living room inward.  I saved it as a "PNG" file.



**Force Analysis LLC**

Excellence in Use of Force Encounters                                    Page **21** of **57**

I utilized "snipping tool" to take a photograph of the picture provided in discovery of D000098.   This photograph depicts the rear of the residence and rear door into the 2nd floor apartment.  I saved it as a "PNG" file.



**Force Analysis LLC**
Excellence in Use of Force Encounters                                         Page **22** of 57

I also utilized Google Earth to take a photograph of the rear of the residence with "snipping tool." I then saved it as a "PNG" file.



I reviewed the typed stated of Sergeant Mellody to Internal Affairs dated 7/12/21. He was asked, "Was there any indication that a dog was present **before** the SWAT Unit entered 4664 Torresdale Avenue while you were outside the property?" He answered, "**Yes. A dog was barking**." I also reviewed the typed statement of Lieutenant Monk dated 6/4/21. He was asked, "Upon your arrival at 4664 Torresdale Avenue, what did you see and do?" He replied, "Upon arrival, Officer Clark approached the door, knocked and announced "Police, with a warrant, open the door". **At that point, I could hear a dog barking and I gave the order to breach**. Upon entry, we were met by a light brown colored pit-bull mix in the living room area. The dog immediately went after Officer Song biting his lower right leg. I continued past Officer Song where I encountered a white female in the kitchen area. She was on the floor behind a fence that separated the living from the kitchen. I proceeded past her and cleared the property. Once I encountered the female, I heard a single shot from behind me."

I reviewed the transcript deposition of Sergeant Brian Mellody dated October 11, 2023. At the beginning of the deposition, he stated he believed all policies and procedures were followed (Page 9). He advised there was nothing inconsistent from his training (Page 10). Sergeant Mellody confirmed he and Officer Clark did the "recon" (Page 15). He stated he inspected the front by riding past the residence then exited his vehicle and walked to the rear to observe that (Page 18). Sergeant Mellody confirmed he heard the

knock then Officer Clark and Murry performed the breach (Page 24).  He advised LT Monk made the decision to breach the door (Page 33), but he (Mellody) was the one who had made the decision to go to the front door to execute the warrant (Page 34).  He stated the search warrant stated rear while the "recon" sheet stated 2nd floor rear (Page 36).  When asked if he knew about the suspect being on parole, he stated he did not (Page 38).  He stated if he knew of the parole information it could have changed the plans (Page 44).  Sergeant Mellody advised the front of the residence is one story (Page 68).  He explained he heard LT Monk give the command to breach the door (Page 74).

I reviewed the deposition of Lieutenant Demetrius Monk dated 5/19/2023.  He was asked, "If you're attempting to enter an apartment for which you do have a valid warrant, as a member of the Philadelphia Police Department, pursuant to the policies and procedures of the Philadelphia Police Department, as you understand them based on your training, are you allowed to go into someone else's apartment that is not subject to the warrant?"  He replied, "Let me back up. At the time it was unknown whether the entrance was within the first-floor apartment or not. So, I would go with we were legally -- we had legal bounds to be in that apartment." (Page 20).  He confirmed he knew the search warrant was for the second floor (Page 19).  (Again, PPD Directive 5.7 pertaining to search warrant states, "***the executing officer have no doubt as to who or what can be seized and where they may be found.)***  He was also asked, "So you believe that you were legally allowed to be in apartment one, first floor" which he responded, "Yes." (Page 20).

Lieutenant Monk was asked, "So prior to entering Ms. Alvarado's apartment, you understood that legally you are not allowed to go anywhere on the property, other than the second-floor rear apartment, correct?" He replied, "That's correct." (Page 25).  He was asked, "And did you believe that the breached private residence was the second-floor rear apartment?"  He replied, "At the time, we did not know the second floor was in the rear." (Page 27**) (As previously shown photographs of the residence, it clearly indicates that the 2nd floor could not be located at the front as the 2nd floor was set back from the front of the residence.**  When the door to the residence was breached, officers knew then as they entered into a residence and not a common hallway or foyer.  Yet, they continued through the 1st floor apartment clearing all rooms including the rear of the residence.)  Lieutenant Monk was asked, "However, assuming that it was true, if it was possible to access the second-floor rear apartment through Ms. Alvarado's first floor apartment, would you legally have been allowed to go through the first-floor apartment, in order to get there, without a warrant?"  He replied, "No." (Page 34).  Lieutenant Monk was asked, "Sir, what is the point of doing reconnaissance prior to a warrant enforcement job?"  He replied, "To identify the properties, the specific property, any difficulties we may have on approach, to get a layout of what the rear may look like and the general neighborhood." (Page 36).  (It was already established the Sergeant Mellody and Officer Clark conducted the "Recon" of the residence.  If done properly, a rear door would have been observed that could show how to access the 2nd floor rear, and also that the 2nd floor rear was set back from the front of the residence.)  Lieutenant Monk also confirmed he ordered the breach. (Page 37).

I again reviewed the search warrant which was approved on June 3, 2021.  It stated the warrant shall be served only between the hours of 6AM and 6PM (D000058).  I also reviewed the video surveillance (A10_20210604053500_002, Camera 10) provided from the corner Deli store which shows the SWAT Unit approaching the residence at 5:36:21 AM.  (The time of the video surveillance was not confirmed with the actual time, but the video clearly shows it was daylight outside.)  If "recon" by Sergeant Mellody was conducted when it was dark, it clearly now shows that any reasonable person could determine that the 2nd floor was set back from the front first floor of the building, therefore, no access could be made into a common foyer or area that would provide immediate access to the 2nd floor rear.

I reviewed the "Defendant Officer Edward Song's answers and objections to plaintiff's interrogatories and requests for production of documents." On page 8 he was asked, "If you believe that it was lawful for you to enter Plaintiff's home and/or kill her dog, please specify: A. Why you believe it was lawful for you to enter Plaintiff's home, and/or B. Why you believe it was lawful for you to kill Plaintiff's dog?"  The answer provided was *Notwithstanding these objections, and without waiving the same, Defendant responds that he entered the front door to 4664 Torresdale Avenue in good faith and under the belief that it was the common entrance to both the first- and second-floor apartments; that this belief was reasonable given the appearance of the front door facing Torresdale Avenue, which read "4664," was situated immediately to the right of two mailboxes, and lacked any other markings on the door indicating it to be the entrance to the first floor apartment only.*

I reviewed the transcript deposition of Detective Timothy Scally dated 9/28/23.  Detective Scally advised he conducted the probation check (Page 20) and did not know the defendant had been on house arrest (Page 21).  He indicated he did not know the entrance to the apartment was on Margaret Street (Page 30).  He advised if he had the information from probation, he would have known the entrance was at the rear (Page 31).  Detective Scally stated there was no specific policy for preparing a warrant and obtaining all available information (Page 35).   ** ***PPD has Directive 5.22 for preparing arrest warrants and Directive 5.7 for preparing search warrants.*** ** He advised he knew the search warrant was for the 2nd floor-rear (Page 37).  Detective Scally explained that if he had the probation information and google maps view, the proper way to enter the residence would be through the rear.

Detective Scally stated the only way they determined the location of the apartment was they drove past the building (Page 40).  He indicated he would not have contacted the property owner for safety reasons.  He confirmed the area of the front door to the building is one story (Page 45).  He believed the front door led to a vestibule area through his experience.  He advised the SWAT Unit's knock and announce was consistent with what he observed from his experience (Page 51).  He stated he obtained no search warrant for the suspect's cell phone or IP addresses (57).  He believed that 5-7 seconds was a reasonable opportunity to surrender the premises (Page 75).

I reviewed the deposition of Officer Patrick Saba dated 5/16/23.  He had been identified as a member of the PPD SWAT Unit since 2018.  He was shown a photograph of the front of the residence located at 4664 Torresdale Avenue (Saba Exhibit 2).  He was asked, "So do you think it would be reasonable for someone

to believe that this second -- that this door led to the second floor of a building?"  He replied, "No. It wouldn't be reasonable." (Page 42).  He also confirmed there were no exigent circumstances that required any sort of emergency. (Page 55 & 56).

I reviewed the deposition of Officer Matthew Fitzpatrick dated 5/17/23.  He was asked, "When you have done reconnaissance at multi-residence properties as part of that, would you try to determine what apartment the warrant was valid for?"  He replied, "So we do it on apartments, you have to make sure when you're doing reconnaissance you have to know the specific apartment. If it's unclear, then we will contact the detectives back and we will ask them, you know, if it's not in the warrant they will have to redo the warrant. And if it's not clear then we end up not doing it."  (Page 29 & 30).  He was then asked, "So if you did have a warrant and did specify a specific floor and apartment number, as part of your reconnaissance would you make sure that you understood how to get to that specific floor and apartment before you sent a team in there?  He replied, "Yes. So, if it's a specific apartment, we will have to make sure when we are doing the reconnaissance that we are going to that specific apartment that the warrant is for.  (Page 30).  Officer Fitzpatrick was then asked, "And what kind of steps have you personally taken to try to figure that out in multi-residence properties?"  He replied, "Usually it's unclear. So, if it's like, you know, apartment one and there's a one and a two and it's not marked, usually I will tell my supervisor usually that is -- I will tell them like hey, this isn't clear. He will end up contacting the detectives back. If it's unclear which house it is, then we usually will work with the detectives. But if they can't give us a specific answer, then we will just not do the warrant and we will say you didn't give us more information."  (Page 31).  He was then asked, "But what I want to ask you actually is if you were part of a reconnaissance team and you knew you had a warrant that was for a second-floor rear apartment and you knew that the apartment building had a rear door, would you investigate whether or not if the rear door was the proper access to the rear apartment?"  He replied, "Yes. So, if I was on a reconnaissance and I saw that it said second floor rear door, then I would definitely tell my supervisor and say, hey, listen, there's a door in the rear that leads to the second floor. He would end up talking to the detectives and they would have to hash it out from there." (Page 32).

I reviewed the deposition of Officer Heriberto Quintana dated 5/23/23.  He was asked, "Prior to arriving at the property, did you know whether or not there was a rear door?"  He replied, "Yes." He was asked, "What were you told about the -- how did you know there was a rear door?" He replied, "Based on the description given during the reconnaissance and on the reconnaissance sheet."  He was also asked, "And what were you told about the rear door prior to the operation?"  He responded, "Not much. Just that it was accessible from the rear driveway, the view of the rear, including the rear door. Nothing else in particular about it."  (Page 16).   Officer Quintana was asked, "And during that briefing, did you learn one way or another whether or not the warrant specified a specific apartment number?"  He replied, "It did not specify a specific apartment."  (Page 27).  (***This information is inconsistent with the signed search warrant for the residence.***  It states on at least three occasions that the search warrant specified the "2nd floor rear.)

Officer Quintana was asked, "So with that background in mind and the personal experience you've already referred to, if you were tasked with doing a reconnaissance on a multi residence apartment building, where

the warrant specified that it only applied to the apartment number two, second floor rear, and you knew that there was a rear door and you knew that there was a front door to the building, would you at least consider the possibility that the front door did not provide entrance to the second floor rear apartment?"  He replied, "Yes, I would consider that." (Page 32).  He was also asked, "So would you try to get additional information, in that situation, prior to sending out the SWAT Unit to do a warrant enforcement operation?" He replied, "Yes." (Page 33).  When he was asked what additional steps he would take, Officer Quintana replied, "If I have access to that information, I'd probably look up like a city database and find out exactly what type of dwelling it is. Ask the detectives to possibly set up a surveillance to see if they make a determination, based on the surveillance, what entrance to use specifically for something like that." (Page 33).  When he was asked if reconnaissance was to sort out issues ahead of time, he agreed to that statement. (Page 37).  When Officer Quintana was asked about what type of guidance he had received on training when it came to conducting reconnaissance, he replied, "In regards to recon, just basically what kind of things to look for when it came to that, how to access any particular, I guess you could say, additional entryways. For example, if we use -- if we were to serve a warrant in a multi-story dwelling, then we have to make a determination of how to get into the first door, how to get into a second door, if needed, and then how to access that particular floor that the apartment is on. That's something that all has to get taken into consideration." (Page 53).

I reviewed the deposition of Probation Officer Dana Shannon dated 9/15/23.  She confirmed the "File Notes" pertaining to the suspect in this case stated that the field team went to the residence of the defendant on April 25, 2019.  The location stated 2nd floor apartment (rear entrance off Margaret St.) (Page 18).  She advised she never went to the residence (Page 20) and told Detective Graf she had never been to the residence (Page 22).  She also told Detective Graf she personally never verified the address.  Officer Shannon advised Detective Graf never requested the records (Page 25), but if asked, she would have told Detective Graf it was confirmed at that time (Page 26).

I then reviewed the "File Notes" pertaining to the suspect in this case.  The following were notations of importance to this case and are summarized below:

1. 6/2/21    PP is suspect in a murder.  PO told him we have only had contact with PP by phone.  We could not confirm his address by a field visit.
2. 5/5/21    PP stated his address and phone number are the same.
3. 4/27/21    PP gave phone number 267-770-2861.
4. 7/31/20    PP gave email of blockzombie215@gmail.com.
5. 6/22/20    PP gave address 4664 Torresdale Ave, rear
6. 4/25/19    Field Team provided location of 2nd floor apartment (rear entrance off Margaret St.)

The "File Notes" provided a cell phone number for the defendant where suspects can be tracked to their location.  He also provided an email address where IP addresses can be tracked to a location.  Notations also provided information that the apartment was at the 2nd floor apartment (rear entrance off Margaret

**Force Analysis LLC**
Excellence in Use of Force Encounters                                                    Page **27** of 57

Street.)  I found no documentation that Detective Graf followed any of these steps for the cell phone or IP addresses.

I reviewed the deposition of Felishatay Alvarado dated 8/11/23.  She advised she moved into the apartment in March of 2021.  She advised she added different numbers on the address that were bolder as the previous numbers were faded (Page 19).  Alvarado indicated the numbers on the mailboxes were the same (Page 20).  When asked if she ever had anyone knock on her door looking for people on the 2nd floor, she answered, "No." (Page 21).  She advised she was in her bathroom when she heard her bird scream (Page 43).  She advised here dog barked prior to the police officers breaching her door (Page 44).  She stated the "Beware of Dog" sign was up on the date of this incident (Page 87).

I reviewed the deposition of Officer Eric Clark dated 9/21/23.  He confirmed he and Sergeant Mellody conducted the reconnaissance for the execution of this search warrant (Page 38).   Officer Clark stated he knew there was a rear door to the residence (Page 46) and that they inspected the property (Page 47).  He also confirmed he knew the search warrant was for the rear of the residence (Page 49).  He advised he did not know about the Parole Office having records about the entrance in the rear (Page 53).  He advised if he knew Parole had information about the entrance being in the rear, it would have affected how they did the entry.  When asked, "Did you, as part of your reconnaissance, investigate whether there might be a door to enter the property off Margaret Street?"  He responded, "So I would say since I believe that in front of the property there's two mailboxes, so the properties, numerous properties that we had apartments set up like that and we see two mailboxes, you wouldn't think that, okay, that the entrance to the second-floor apartment is in the rear because the mailbox is not there, it's on the front of the property. So, we were expecting -- well, what I was expecting when I breached the door, that we go in, there was going to be probably a door to the right where there's the first-floor apartment and then a set of steps we had to go up to get to the second floor." (Page 58).  He was then asked, "Given that you knew that the 4664 Torresdale Avenue property had a front door and a rear door and had multiple apartments in it and that your warrant was only for the rear apartment, didn't it show reckless disregard for the residents of the apartments in that building that you did not investigate whether or not the proper entrance point was through the front door or the rear door."  He responded, "Because like I said, there's two mailboxes on the front of the property. Who gets their mail from the front of the property and has to walk all the way back to the rear of the property, like, I mean, that doesn't make sense. So, a reasonable person would believe, okay, to get to apartment 1, it's probably going to say Apartment 1 and 2 Apartment 2, they're going to go through the front door and go up some steps or go to the right, whatever the case may be, whatever the case may be. A reasonable person that sees two mailboxes -- like I'm pretty sure the mailman is not walking to the back of the property, he's putting the mail in the front mailbox."

Officer Clark was later asked, "Okay. So, under your understanding of the United States Constitution, would the warrant that was issued to enter ████████ residence, were you legally allowed to enter Ms. Alvarado's first floor apartment?"  He responded, "No. The warrant wasn't for the first floor, it was for the second floor." (Page 96)  He also confirmed he heard the dog barking prior to breaching the door (Page 98).

He advised he was not aware of any PPD SOP on dog encounters and has not received any training on dog encounters (99).

I reviewed the deposition of Officer Joshua Burkitt dated 9/20/23. He confirmed the search warrant indicated 2nd floor rear apartment (Page 23). He agreed if he had all the information that was available now, he would have assumed that the entrance to the apartment would be in the rear (Page 31). He advised there were no exigent circumstances to enter the apartment on the first floor and they had no legal grounds to enter (Page 53).

I reviewed the deposition of Jaclyn Matteo Hand, Probation/Parole Officer, dated 9/27/23. She indicated she would conduct the investigation of the defendant and provide the information to the field team (Page 5). She also stated the field team would inspect the residence (Page 6). Officer Matteo Hand advised she spoke with the mother of the defendant who advised the entrance to their apartment was in the alleyway (Page 8). She stated she completed the "Home Investigation Interview" with the mother in April of 2019. She advised the information would have been available to probation (Page 13). She indicated if someone asked where the defendant lived, they could have pulled the document and provided the information of the entrance off Margaret Street (Page 21).

I reviewed the "Home Investigation Interview" document which Officer Matteo Hand advised she completed for the field team. It stated the interview was completed with Shiela Washington who was the mother (Page 1). It also listed the address as:   **4664 Torresdale Ave. Rear apartment (2 floors) Phila PA 19124 (go up alleyway to knock on door).**   It also provided the legal owner of the property as: NAME: Mirela Pajo, Contact #: 267-303-2120 (Page 2). It also lists under household structure:  rear apartment – 2 floors (Page 4). Where it asks where the defendant would sleep, it states:  2nd floor back bedroom (Page 4).

I reviewed the deposition of Officer Cyprian Scott dated 9/21/23. He stated he was informed of the search warrant the night prior when he came to work at 11pm (Page 12). He was aware they were going to a 2-story residence (Page 14). He believed the residence only had one door and he had no other information about another door (Page 21). He admitted the front portion of the residence was only one story (Page 26). When told that probation and inspection records specifically said that entry to this apartment was to the rear of the building on Margaret Street, he stated he was not aware of it (Page 31). Officer Scott stated he would have gone to the rear door if they had the information (Page 32). He indicated that the PPD has provided him with training on enforcing warrants on multi-residence properties (Page 35). He was asked, "And based on the training you've received from the Philadelphia Police Department in the SWAT Unit, would it be important for you and the rest of the SWAT team to avoid if at all possible, entering the wrong apartment number?" He replied, "Yes." (Page 39) Officer Scott also indicated it would be unconstitutional to go into another apartment (Page 39). He indicated that he has executed thousands of warrants and never has been to the rear of the residence to enter (Page 40). He advised he would not breach a door if it led into another apartment (Page 50).

I reviewed the deposition of Detective Francis Graf dated 9/28/03.  He explained he had no prior knowledge of the rear door to the residence (Page 20).  He advised he doesn't ever recall going through the rear entrance of a property like that (Page 21).  He indicated the warrant was for the 2nd-floor rear (Page 23).  When asked, "Were officers allowed to enter other apartments that happened to be in the same building?  He responded, "No." (Page 24)  He specifically stated that the SWAT Unit plans the entries (Page 25).  He did not recall if the suspect had a cell phone, but did not complete a phone warrant (Page 33).  Detective Graf indicated he did not recall any social media sites for the suspect (Page 33).  (If he did, it was not documented).  He advised he did not check IP addresses for the suspect and no one conducted physical surveillance (Page 33).  Detective Graf stated he did not contact the property owner.  He stated if he had the information from parole that the access was through the alleyway, it would have led to believe the entrance was off Margaret Street (Page 46).  He explained the "knock and announce rule" meant a reasonable amount of time (Page 67).

I reviewed the deposition of Officer Miguel Rivera dated 8/18/23.  Officer Rivera advised he was assigned to the rear of the apartment when he heard a single gunshot (Page 13).  He stated the entry team then came around the back of the residence (Page 13).  He stated the "recon" is to figure out what doors lead to which apartments (Page 25).  Officer Rivera stated at times they had contacted the property owners (Page 26).  When he was asked, "Can you enter any -- any portion of the building, even if the warrant applied only to Apartment 2, second floor rear?"  He responded, "No." (Page 30)  He confirmed that there was no 2nd-floor directly above the front door (Page 35).  Officer Rivera stated sometimes they monitor residences for when people are coming and going (Page 37).  When Officer Rivera was asked, "If it's not possible ahead of time to determine whether a front door leads into an occupied apartment or a common area, should you, if possible, delay the operation until reconnaissance is able to make that determination in order to avoid entering the apartment of someone who is not subject to a warrant?"  He responded, "Yes." (Page 43).  He indicated he has had no training on dog encounters.

I reviewed the deposition of Officer Jose Hamoy dated 8/17/23.  When asked if he knew whether or not the Philadelphia Police Department has ever issued any directives pertaining to how Philadelphia Police Department officers should handle encounters with dogs?"  He responded, "Yes, I believe so" and advised he has other tools to deal with dogs (Page 16).  He indicated he has received training from the PPD on how to enforce warrants on multi-residence buildings (Page 21).  He stated that sometimes the detective or supervisor would contact the property owner (Page 37).  He stated he knew there was a rear door (Page 43).  Officer Hamoy advised if he saw the warrant and knew there was a rear door, he would have gone to the rear door (Page 51).  When he was asked, "What is the knock-and-announce rule in your experience?"  He responded, "We always knock and announce at least three times before we wait for an order from a supervisor to breach."  **(That is not consistent what happened in this incident according to the video.)**  When asked, **"**And did you ever receive any training as to how much time you should allow to pass between, pursuant to the knock-and-announce rule, between knocking on someone's front door and breaching their property?  He responded, "To the best of my recollection, reasonable time."  (Page 54)  He was asked, "Okay. Can you recall at this time how much time passed between, if any, between Ms.

Alvarado's front door being knocked on and her door being knocked down with the SWAT unit ram?"  He responded, "I cannot recall it specifically, sir."  Then he was asked, "Do you recall whether or not it was a reasonable amount of time?"  He responded, "Yeah. It would be reasonable, sir, to the best of my recollection." (Page 56)  He explained that other than serving a warrant for a warrant for a homicide there was no exigent circumstances (Page 57).   Officer Hamoy agreed that the 2nd-floor was pushed back from the front door (Page 67).  He again advised on this warrant he would have gone to the rear of the residence (Page 68).

I reviewed the deposition of Officer Brian Murray dated 8/11/23.  He identified himself as one of the breachers (page 9).  He later stated that Officer Clark conducted the knock and announce and the breach of the door (Page 13).  He advised he knew the search warrant was for the 2nd floor (Page 9).  Officer Murray stated he was expecting to enter into a common entry point (Page).  He indicated he was the last one to enter the residence (Page 10).  He advised when he did enter into the residence, he knew it was not a common entry (10).  He stated that he believed that LT Monk gave the order to breach the door (Page 15).

When Officer Murray was asked, "And why was that, why would you allow a period of time before the breach?"  He responded, "We give enough time to try and get someone to comply and open the door. Ideally someone will open the door as opposed to us having to breach the door." (Page 18)  He could not recall any exigent circumstances (Page 20) and indicated that a reasonable amount of time would be 30 seconds (Page 20).  He stated he had no knowledge of a video of the incident (Page 20).  He explained a dog was barking prior to breaching the door (Page 24).  He advised he is trained to utilize OC spray on dogs to avoid a lethal encounter and they keep a dog noose in the truck (Page 27).  Officer Murray advised he had no knowledge of the dog policy (Page 34).  He explained he has never contacted a property owner and was unaware the suspect was on parole (Page 55).  When he was asked, "Based on your experience and training with the Philadelphia Police Department, if you heard a dog barking inside of a property, would that be any reason to cut short the amount of time under the knock and announce rule between knocking on the property and breaching the door?"  He responded, "No." (Page 60).

I reviewed the PPD Directive 5.7 pertaining to "search warrants" which states:

> "B.   All search warrants will be obtained and executed by police personnel in accordance with the procedures established in this directive and the applicable **rules of Pennsylvania Criminal Procedure (Pa. R. Crim. P. 2001 to 2010)** which can be found in the Pennsylvania Crimes Code. (D000155).

4.    *Particularity of the Search Warrant*

> B.    *The premises or person to be seized and the items to be seized must be specifically described in the warrant so that the judge if bail commissioner and the* ==*executing officer have no doubt as to who or what can be seized and where they may be found.*==

> 1.    *Descriptions of buildings should include:*

> a.    street name and number of (no intersections.)  When possible, where search will take place (vehicle/building), use exact numerical location.
>
> b.    number of stories – apartment number
>
> C.    type of construction (brick, wood, etc.)
>
> d.    type of property (single home, apartments, twin structure, etc.)
>
> e.    particular markings, color, or any additional information which serve to identify the particular premise.

I reviewed the Pennsylvania Rules of Criminal Code, Rule 205, Contents of Search Warrant which states:

> (A)  Each search warrant shall be signed by the issuing authority and shall:
>
> (1)  specify the date and time of issuance;
>
> (2)  identify specifically the property to be seized;
>
> **(3)  name or describe with particularity the person or place to be searched;**
>
> (4)  direct that the search be executed either;
>
> (a)  ==within a specified period of time, **not to exceed 2 days from the time of issuance**==, or;
>
> (b)  when the warrant is issued for a prospective event, only after the specified event has occurred.[5]

The search warrant described the exact place to be searched which was described in the search warrant on three occasions listed as 4664 Torresdale Ave, **2nd floor, rear**.  It was unreasonable for the officers to believe that they could obtained entry into the 2nd floor rear from the 1st floor front of the building as the photos of the front of the residence indicate.  As stated in Directive 5.7, "*the executing officer **have no doubt as to who or what can be seized and where they may be found.**"*

From reviewing the statements of the officers involved, specifically LT Monk, who advised, "==At the time it was unknown whether the entrance was within the first-floor apartment or not==," there was at least ambiguity on the part of the officers of how to gain access to the 2nd floor, rear.  This is not consistent with the policy of PPD which states:

"*the executing officer **have no doubt as to who or what can be seized and where they may be found.**"*

As part of their policy, the officers had the ability to obtain more background information prior to executing the search warrant.  There appeared to be ambiguity on their part, but still executed the search warrant.  No physical surveillance was conducted as Sergeant Mellody and Officer Clark only drove by the front of the residence and Detective Graf also only drove past the front of the residence.  No officers

---

[5] Pennsylvania Rules of Criminal Code, Rule 205, Contents of Search Warrants

advised they conducted surveillance.  It is understandable that they did not want to contact the property owner the night prior and risk notifying the suspect of the warrant, but also attempted no other "***ruse or disguise that will enhance the accuracy of the reconnaissance***" as stated in the policy.

As specified in Rule 205, the search warrant was valid for 2 days.  The detectives who obtained the warrants, the officers who conducted the reconnaissance, and the officers who executed the search warrant, specifically LT Monk and Sergeant Mellody, had ample time to further their investigation and obtain more thorough and complete information.

A reasonable and thorough investigation by Detective Scally would have included asking the parole officer how to enter into the residence.  His own statement confirmed if he had the now known information, he would have known entry was in the rear of the residence.  By not doing to was a violation of the PPD policy which also led to an unconstitutional entry into the residence of Ms. Alvarado.


**Opinion #2   SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by executing the search warrant by forcibly ramming the door and not allowing her a reasonable amount of time to voluntarily surrender her residence which was also a violation of policies and procedures of the Philadelphia Police Department.**

The following is a timing sequence of the events as captured by the video surveillance, A10_20210604053500_002, Camera 10.  All times are approximations.

**TIMING SEQUENCE**

| Camera Time | Time Counter | Description |
|---|---|---|
| 5:36:19 | 1:18 | Philadelphia SWAT arrive at residence |
| 5:37:13 | 2:12 | SWAT is in a stack in front of residence |
| 5:37:19 | 2:18 | Officer knocks and announces |
| 5:37:21 | 2:20 | Officer Clark begins to move toward the front door to utilize the ram after order given to breach by LT Monk |
| 5:37:27 | 2:26 | 1st ram of the door |
| 5:37:29 | 2:28 | 2nd ram of the door |
| 5:37:33 | 2:32 | Officers begin to enter residence |
| 5:39:11 | 4:10 | Officers begin to exit residence |
| | | |


Although I did not observe it written on the search warrant, SWAT officers were conducting a "knock and announce" search warrant for 4664 Torresdale Ave, 2nd floor, rear as stated in the Officer Involved Shooting Investigation Report. (D000003).  Officers knocked and announced at 5:37:19AM.  Officer Clark began to walk toward the front door with the ram after the order was given to breach it.  He then rammed

the door the first time at 5:37:27AM.  They only gave the resident 2 seconds before the order was given to breach the door and 8 seconds before they began to strike the door with the ram.  It is unreasonable to think the resident could answer the door that quickly, specifically that time of the morning, and more importantly, no exigent circumstances existed.

In a review of the typed statement of LT Monk (D000044), he advised, "At that point, I could hear a dog barking and I gave the order to breach."  A review of the typed statement of Sergeant Mellody (D000063), he advised he knew a dog was present when he was outside the property when he heard it barking.  Due to the fact that this was a "knock and announce" search warrant, the resident must be given a reasonable amount of time to answer the door.  The dog barking did not give away any tactical disadvantage and jeopardize the lives of the officers as they were already knocking and announcing their presence.  Although attempting to apprehend a murder suspect is in itself dangerous, the situation did not become more dangerous by the dog barking whereby no exigent circumstances existed.

I again reviewed the transcript deposition of Sergeant Mellody.  He confirmed from his previous interview to the shoot team that when they conducted the knock and announce there was no response (Page 20).  When he was asked to explain the knock and announce rule, he stated, "Well, knock and announce rule is like a reasonable amount of time to take a door in a search warrant." (Page 51)  Sergeant Mellody explained he obtained that information from training with the PPD.  He explained he received training about knock and announce warrants while at SWAT school (Page 56).  He stated knock and announce is no specific time just reasonable time to answer the door (Page 59).  When he was asked, "Under the knock and announce rule, are you obligated to give the occupant of the property a reasonable opportunity to voluntarily surrender the property before you break down the door?"  He responded, "Yes." (Page 59).  Sergeant Mellody also stated, "When we do knock and announce, we give them a reasonable amount of time to answer the door to surrender to us." (Page 59).  He advised he never saw SWAT not follow the knock and announce rule (61) and believed it was followed that day (Page 62).  **(He had not observed the video at that time).**  He advised there were no exigent circumstances (Page 74).  He explained he has had no dog encounter training and does not remember the dog policy (Page 88).  He stated he had no other tools like a dog noose or OC spray to utilize (Page 90).  He confirmed the SWAT SOP for knock and announce stated 30 seconds to wait (Page 95).  Sergeant Mellody did not remember if 30 seconds was utilized before the breach (Page 96).   He was asked, "In your experience, the door would be knocked on at least three times before you break someone's door down; right?"  He responded, "Three or more." (Page 98)

Sergeant Mellody explained he did not know about the video of the search warrant until the deposition (Page 106).  When he was shown the video, he expressed "Little quick from what I would do." (Page 110)  When asked, "Assuming there were no exigent circumstances, was this consistent with the knock and announce rule policies from the Philadelphia Police Department?"  He responded, "No." (Page 115).  He was asked, "Was this consistent with your experience, as a member of the SWAT unit, as far as how a warrant enforcement action would normally be done?" He responded, "No." (Page 115)  Sergeant Mellody was asked, "So you believe that what you saw was a knock and announce consistent with the policies and procedures of the Philadelphia Police Department?" He responded, "So I'm going to say visually looking at

that video, no, but I don't know what the circumstances were and what the Lieutenant was thinking at that time." (Page 115)

A review of the memorandum prepared by Lieutenant Kevin Hall (Commanding Officer of Internal Affairs) dated 1/3/23, he advised Lieutenant Jason Hendershot of the OISI contacted the property owner, identified as Armin Maroli, (D000117).  Maroli stated he purchased the property 2-3 years ago (2018-2019) as a duplex and no modifications had been made indicating that there was never any access between the two (2) apartments.  As stated by Sergeant Mellody, he has obtained building plans in the past for apartment buildings.  If plans were obtained for this residence or contact made with the property owner, information would have been obtained that showed no access to the 2nd floor rear could have been obtained from the 1st floor front.

I reviewed the PPD Directive 5.17 related to "Wanted Persons."  It clearly states, "Make every effort to determine the location of the wanted subject, **prior to obtaining the warrant**."[6]  Although Detective Graf stated in the arrest warrant that he conducted database checks with BMV, prison release records, and a conversation with probation officer, he did not make every effort to determine the fugitive's location as outlined in the directive.  Being a former homicide detective for 14 years, it is common knowledge that suspects are often apprehended utilizing the cellphone records to provide their locations with cell site tower information, cell phone "pings", and call detail records which was not documented by detectives.  The search warrant specifically stated the officers were attempting to locate a **"cellular phone"** along with other evidence.  This insinuates they were aware that the suspect had a cell phone and may be utilized to track his location.  It is often common knowledge that suspects are often tracked utilizing their social media accounts that provide who they are communicating with and IP addresses utilized by their accounts that can be tracked to an address.  A neighborhood canvass was not documented to determine of any persons observed the suspect at that 2nd floor, rear apartment.  Certainly, no physical surveillance was conducted to determine if the suspect was seen entering or exiting the 2nd floor rear apartment.  Further, any reasonable investigation of the suspect's whereabouts would have included, at bare minimum, obtaining all information from the Probation / Parole Office with regards to how the suspect's apartment could be entered.  It is blatantly indifferent to the 4th Amendment for the City of Philadelphia to have failed to have required its detectives to obtain such basic information in conducting reconnaissance under the circumstances presented here.

I reviewed the PPD Directive 5.22 related to "Arrest Warrants."  It clearly reads, "Regarding omissions, investigators shall include in all warrant applications highly relevant facts within his or her knowledge that any reasonable officer knows that a magistrate would need to make an independent determination of probable cause. **This included all culpable information as well as exculpable information**."[7]  Again, it is not known whether the suspect had a cellphone, social media accounts, neighbors who saw him at the

---

[6] Philadelphia Police Department Directive, 5.17, Wanted Persons dated 11/20/00
[7] Philadelphia Police Department Directive 5.22, Arrest Warrants dated 9/1/20

residence, or physical surveillance that was conducted to place the suspect at the 2nd floor rear apartment.  I am merely stating that these procedures, if done, were not documented.

Also in the Directive 5.22, it states;

*"PRIOR TO OBTAINING THE ARREST WARRANT*

*A. Sworn personnel will ensure that a complete and timely investigation has taken place. The information concerning the suspect and his/her location, as well as any information noted on the 75-572 and 75-51 must be accurate, reliable and contemporary.*

*B. Areas of investigation should **include but are not limited to:***

*1. Motor vehicle checks*

*2. Voter registration checks*

*3. Welfare files*

*4. School records*

*5. Employment records*

*6. Utility bills*

*7. **Interviews with family, friends, co-workers, etc.***

*8. **Informants***

*9. **Surveillance***

*10. Jailtrak system*

*11. Coles Directory*

*12. Fiche File*

*13. **Intelligence check (associates, areas frequented)***

*14. Criminal record check - photos, extracts*

*15. Driver's license*

*16. Firearms checks*

*17. **Probation/Parole***

*NOTE:  These types of investigations should also be used to supplement an officer's efforts concerning "due diligence" requirements after the warrant has been obtained."*

Although some of these steps were taken, many others were not such as interviews with family, friends, and co-workers, surveillance, informants, intelligence checks, and probation/parole notes which goes toward "make every effort to determine the location of the wanted subject, <u>**prior to obtaining the warrant.**</u>"[8]

I reviewed PPD Directive 5.7 related to "Search Warrants" dated 4/29/16.  The directive states;

"*B.  Knock and Announce*

**1.** *The purpose of the Knock and announce" rule is to prevent the violence and physical injury to police and occupants, <u>**to protect the occupant's expectation of privacy, to prevent property damage resulting from a forced entry and to give the occupants an opportunity to surrender the premises.**</u>*

2. *The manner of the entry is provided from in Rule 207 of the Pennsylvania Rules of Criminal Procedure and is as follows:*

    a.  *A law enforcement officer executing a search warrant shall, before entry give or make reasonable effort to give, notice of their identity, authority and purpose to any occupant of the premises specified in the arrant, <u>**UNLESS exigent circumstances require immediate forcible entry.**</u>*

    b.  <u>***Such officer shall wait a response for a reasonable period of time after their announcement before gaining entry into the property.***</u>

    c.  *If the officer is not admitted after such a reasonable period of time, they may forcibly enter the premises and may use such physical force to effect entry therein as is necessary to execute the search warrant.*

**NOTE:  The courts have not precisely and uniformly determined the exact period of time that can be considered "reasonable."**

I reviewed the Pennsylvania Rules of Criminal Code, Rule 207 which states;

"*Rule 207 - Manner of Entry into Premises*

*(A) A law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of the officer's identity, authority, and purpose to any occupant of the premises specified in the warrant, unless exigent circumstances require the officer's immediate forcible entry.*

*(B) Such officer shall await a response for* <u>*a reasonable period of time*</u> *after this announcement of identity, authority, and purpose,* <u>***unless exigent circumstances require the officer's immediate forcible entry.***</u>

---

[8] Philadelphia Police Department Directive 5.17, Wanted Persons dated 11/20/00

*(C) If the officer is not admitted after such reasonable period, the officer may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search.[9]*

 See generally *Commonwealth v. DeMichel*, 277 A.2d 159 (Pa. 1971) with regard to paragraphs (A) and (B). Concerning paragraph (C), see *Commonwealth v. Newman*, 240 A.2d 795 (Pa. 1968)."

** Although these court cases are older cases, these are the ones noted under the Pennsylvania Criminal Code for Rule 207 **

I reviewed PPD SOP 31 "SWAT UNIT WARRANT SERVICE" which states:

*Knock and Announce Rule Directive 5.7 6 B*

*1. The purpose of the "knock and announce" rule is to prevent violence and physical injury to police and occupants, **to protect an occupant's expectation of privacy**, **to prevent property damage resulting from forced entry and to give the occupants an opportunity to surrender the premises**.*

*2. The manner of entry is provided for in Rule 207 of the Pennsylvania Rules of Criminal Procedure and is as follows:*

*a. A law enforcement officer executing a search warrant shall, before entry, give or make reasonable effort to give, notice of their identity, authority and purpose to any occupant of the premises specified in the warrant, **UNLESS exigent circumstances require immediate forcible entry**.*

*b. **Such officer shall await a response for a** **reasonable period of time after their announcement before gaining entry into the property.***

*c. If the officer is not admitted after such a reasonable period of time, they may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search warrant.*

*NOTE: **The courts have not precisely and uniformly determined the exact period of time that can be considered "reasonable". However, recent court decisions have shown that 30 seconds should be the minimum time police personnel should delay their entry into a property after announcing their presence and purpose.***

A review of the Lieutenant Monk's deposition revealed he was asked, "What is the knock and announce rule?"  He replied, "the knock and announce rule is when you knock on the door to give the occupant sufficient time to open the door." (Page 37).  He was also asked, "Based on the training that you've received with regards to the policies and procedures of the Philadelphia Police Department, what is the purpose of the knock and announce rule?" He responded, "Again, we perform a knock and announce,

---

[9] Pennsylvania Rules of Criminal Code, Rule 207

again, to make the occupant aware that the police are on their -- at their door and allow them time, sufficient time, typically 25, 30 seconds, to open the door." (Page 38)  He was asked, "How long -- how much time passed between that knock and the front door being breached?"  He replied, "If I was to guess, 15, 20 seconds perhaps" (Page 39) **(This information is inconsistent with the timing sequence I conducted utilizing the video obtained.)**  Lieutenant Monk was asked, "But regardless, the point being that you knew that you were giving less time than you would have if it had been a front door that you knew was occupied, correct?"  He replied, "Yes." (Page 42).  He also stated, "I followed my training, but no, I did not allow the 30 seconds."  (Page 44)  This clearly shows that Lieutenant Monk was aware of providing sufficient time to surrender the residence, but purposely did not allow that time.  He later revealed that there were no exigent circumstances to breach the door earlier. (Page 44).

Lieutenant Monk also agreed that Sergeant Mellody could have figured out whether or not it was necessary to go through the first-floor apartment to get to the second floor (Page 51) and could have called the property management (Page 52).  He indicated he was not aware of a rear door prior to breaching Ms. Alvarado's door.  (Page 53).  Later, Lieutenant Monk was asked, "That door that was breached, prior to breaching that door, you were not concerned with allowing enough time for anyone who might be behind that door an opportunity to voluntarily surrender the premises, correct?"  He replied, "Incorrect, because again, we performed a knock and announce. Though it may have been shorter, we did perform a knock and announce." (Page 83).  When asked, "So is it your testimony that you ordered the breach of Ms. Alvarado's front door sooner than you might have otherwise because you heard dogs barking?"  He replied, "That combined with the fact that ==typically== it's an exterior door and there are apartment doors behind it." (Page 86).  **(This again shows that there were no exigent circumstances in this situation.  Also, he is suggesting that he has not reached the "No doubt" threshold as per PPD policy.)**  Also, if the exterior opened into a common hallway or foyer, the allotted time must still be given to answer and surrender the residence.  It was also to his knowledge that no one under his command made any effort to ascertain who resided on the first floor. (Page 93).  He was later asked, "Was there any higher requirement implemented by the Philadelphia Police Department, to your knowledge, for breaching someone's front door, other than mere possibility that that door might lead to a residence where you were legally allowed to be?"  He replied, "Not that I am aware of."  Again, PPD directive 5.7 related to search warrants states the "executing officer have ***no doubt*** as to who or what can be seized and where they may be found."

I reviewed the deposition of Officer Edward Song dated 5/15/23.  Officer Song was identified as the individual who discharged his firearm mortally wounding Ms. Alvarado's dog during this incident.  He was also the first individual who entered the residence to execute the search warrant. He was asked, "Please tell me to the best of your understanding what the knock and announce rule is?"  He replied, "You knock and announce the warrant charges, you give ample amount of time for the person to come answer the door, and if they don't answer then the order is given to breach the door." (Page 18)  He also indicated that between knocking and breaching, you should allow at least 30-40 seconds. (Page 21).  When asked, "When you executed the warrant at Ms. Alvarado's house, did you have any information provided to you as to who lived on the first floor of that building?"  He replied, "We were given information -- no. We were just given

**Force Analysis LLC**
Excellence in Use of Force Encounters                                                                Page **39** of **57**

information that it was -homicide gave us a warrant to serve on this gentleman that was wanted for homicide, he was supposed to be in the second-floor rear and that's who we were going after."  Officer Song later confirmed the area they entered into the residence by looking at the picture (Song Exhibit 1) that there was no second floor above it. (Page 32) and also "that there is no second floor in that front room." (Page 33)



When Officer Song was asked, "When you walked through the door that had been breached, did it occur to you that you might be entering the residence of someone other than the person named on the warrant?" He replied, "Ninety percent or even more than that, if there's a two-story apartment you can enter the front door and it's like a foyer area and it's a separation from going straight and going up to the second floor and another door that goes into the first floor." (Page 40).  As previously stated, Officer Song acknowledged there was no second floor at the front of the residence, therefore, it would have been unreasonable to gain access to the 2nd floor from the front first floor.  Officer Song advised the residence had a rear door and the warrant actually stated "rear" on it.  (Page 43).  He was asked, "Based on your training from the Philadelphia Police Department, do you believe that enough ample time was provided to Ms. Alvarado between the door being knocked on, for her to answer the door before the door was breached?"  He replied, "I believe there was" and "Like I said before, 30 to 40 seconds at the least. (Page 65 & 66).  Officer Song later stated there were no exigent circumstances during the execution of the warrant. (Page 67 & 76).  He later advised when shown PPD Directive 5.7 related to search warrants, that he could not recall seeing that document prior.  (Page 92).  When asked, "In your opinion, having, you know, whatever training you've received from the Philadelphia Police Department and the fact that you were there, do you believe that Ms. Alvarado was given an opportunity to surrender the premises before her front door was breached?"  He replied, "Yes." (Page 93).   Officer Song was then asked, "Right. So, if only two seconds passed between

the knock and the door being breached, would it be fair to say that she was not given an opportunity to surrender the premises?"  He replied, "Yes." (Page 95).

I reviewed the deposition of Officer Ashford dated 5/22/23.  He was asked, "So based on the training that you've received as a member of the Philadelphia Police Department, how much time should you let pass between knocking on someone's front door to -- to enforce a warrant and before you actually breach the front door? He replied, "I would say 20 to 30 seconds." (Page 40).  He was also asked, "My question is do you personally know -- just a yes or no question. Do you personally know what the policies and procedures are of the Philadelphia Police Department with regards to the knock-and-announce rule?"  He replied, "No." (Page 44).

I again reviewed the deposition of Detective Scally.  Detective Scally advised he had a lot of experience with search and arrests warrants (Page 11) and is familiar with the policies and procedures of them (Page 12).  He advised he heard the knocks on the door then heard the door rammed (Page 14).  He believed officers waited 15-30 seconds after the knock and announce prior to entry (Page 14).  **(That was inconsistent with what was viewed in the video.)**  When asked to explain the meaning of knock and announce, he stated, "That is what I basically described, a knock and announce what they are here for. Usually, it's a search warrant or arrest warrant. And then they wait a certain amount of minutes or not minutes, but time. And then they breach the door." (Page 15)

I reviewed the deposition of Officer Quintana dated 5/23/23.  He was asked, "Are you familiar with something called the knock and announce rule?  He replied, "Yes."  He was asked, "What is the knock and announce rule?  He replied, "When you announce that you're serving a warrant, you're supposed to give about 30 seconds to a minute before you breach the property." (Page 17).   When asked about training for the "knock and announce rule," he was asked, "So it's your testimony that at least once a year you and the other members of the SWAT Unit are informed that there's something called the knock and announce rule that requires you to allow at least 30 to 60 seconds between knocking on a front door and attempting to breach the property, correct?"  He replied, "Yes." (Page 19).  He was also asked, "So from your position in the rear of the building, you could actually hear someone yell breach?"  He replied, "No. I could hear when they knock and announce and then I could hear the actual breach, like a ram hitting a door."  (Page 16). Officer Quintana was asked, "So when the ram hit the door, that was loud enough that you could actually hear it hit the door from the rear of the building?"  He replied, "Yes."  (Page 16).  He was asked, "How much time passed between the knock and the door being breached?" He replied, "I don't recall. Anywhere from 30 seconds to a minute."  (Page 16).  "When you say anywhere between 30 seconds and a minute, what's your basis for that?"  He replied, "Based on what I remember between the knock and announce, the screams, you know, the officer screaming they were serving a warrant, and then based on the time that I could hear the door get breached and then more or less the time between that and the one gunshot, that was maybe a minute, minute and a half."  (Page 16).  He was asked, "Do you think it's possible that your experience that officers should allow at least 30 to 60 seconds under the knock and announce rule has been so routine in your experience, something you've experienced so many times, that you may remember this incident as a time where that rule was followed because you've seen it followed so many times?"  He

replied, "I was going by my memory from being in the rear and listening to radio communication as to when they arrived. It's just based on my memory." (Page 21).

I reviewed the deposition of Officer Eric Clark dated 9/21/23.  He confirmed he has received training on the "knock and announce rule" as being a member of the PPD.  When asked, "Is your only knowledge as to what the knock and announce rule training that you've received from the Philadelphia Police Department?" He responded, "Yes. I would say that's basically we're told to knock and announce, give a reasonable amount of time depending on the circumstances and breach the door." (Page 19).  He indicated when the SWAT Unit is executing a search warrant, the supervisor says when to breach the door (Page 24).  He was asked if he could wait as little as 10 seconds, he advised, "Yeah, if exigent circumstances or something to that nature, yeah, possibly." (Page 26)  He later indicated he was not aware of any exigent circumstances (Page 67).  Officer Clark was asked, "Under the knock and announce rule, when you knock and announce your presence, are you required to give the occupants of the structure enough time to voluntarily surrender the structure?"  He responded, "Yes." (Page 33)  When asked, "And you definitely never received any training from the Philadelphia Police Department about providing a certain amount of time or anything like that, correct?"  He responded, "Like I said, not that I'm aware of." (Page 34)  Officer Clark confirmed he had the ram and breached the door because he was told to by the supervisor (Page 64).  He also advised there was only a few seconds before the door was breached after the knock (Page 70).  After being shown the video and confirming it was only approximately seven seconds until the door was breached after the knock, he was asked, "So at most we've got about seven seconds. Does that comply with the requirements of the knock and announce rule under your understanding pursuant to whatever training you've received from the Philadelphia Police Department, including the SWAT unit?"  He responded, "Yea, I guess." (Page 80)  Officer Clark later advised it was a reasonable amount of time (Page 82).

I reviewed the deposition of Officer Cyprian Scott dated 9/21/23.  When he was asked why was the building breached, he responded, "There was no answer at the door after numerous times knocking and announcing police." (Page 16)  When he was asked how much time passed between the first knock until the door was breached, he responded, "I would say a good minute to a minute -- about a minute, minute 15 seconds maybe." (Page 16) ***These two answers are inconsistent with what is seen on the video of the breach as my timing sequence indicates. ***  He indicated he heard the officer knocking on the door (Page 16).  When asked if he had ever heard of something called the knock and announce rule, he advised, "I believe you knock and announce and you wait at least 45 seconds, if I'm not mistaken, before a door has to be breached." (Page 16)  Officer Scott stated that is how he was trained by the PPD. (Page 17).  He advised it was a violation of the constitution to enter a private citizen's residence without knocking and announcing first (Page 19)  When asked as of June 4, 2021 that if you hadn't waited at least 45 seconds before entering Ms. Alvarado's property, that was a violation of the constitution, correct?"  He responded, "Yes." (Page 19).

I believe the officers did not wait a **<u>reasonable amount of time</u>** prior to entering into the residence.  The only explanation Lieutenant Monk and Sergeant Mellody provided was a dog began barking.  This was not a "no knock" search warrant.  It was a "knock and announce" warrant, therefore, the dog barking did not

**Force Analysis LLC**
Excellence in Use of Force Encounters                                        Page **42** of 57

provide exigent circumstances for the officers to enter almost immediately after announcing themselves and did not place the officers at a tactical disadvantage or increase safety issues. ***"The dignity and privacy protected by the fourth amendment demand a certain propriety on the part of policemen even after they have been authorized to invade an individual's privacy. Regardless of how great the probable cause to believe a man guilty of a crime, he must be given a reasonable opportunity to surrender his privacy voluntarily."[10]***

Again, the timing sequence depicts a very short amount of time the officers allowed for Ms. Alvarado to answer the door, just because a dog began to bark. ***"Accordingly, even where the police duly announce their identity and purpose, forcible entry is still unreasonable and hence violative of the Fourth Amendment if the occupants of the premises sought to be entered and searched are not first given an opportunity to surrender the premises voluntarily."[11]*** In the search warrant it states the following items of evidence that the police were looking for:

> *"Any and all firearms, ammunition, or other ballistic evidence, clothing including dark colored pants, dark belt, black, white, and orange or red Puma sneakers, cellular phone, and any and all other items deemed to be of evidentiary value to this investigation."* (D000058)

I don't believe the officers were in fear of the suspect escaping as officers were in the front and rear of the residence, and they were attempting to locate the suspect on the 2nd floor rear. I also don't believe officers were in fear of the suspect destroying evidence.

According to Rule 207, I don't believe there were any **exigent circumstances** that would allow the forcible entry into the residence without allowing reasonable amount of time to surrender the premises. As previously stated, there was no added safety issue from the barking dog or tactical disadvantage to enter for safety reasons. No officers provided an exigent circumstance during their depositions.

Both Officer Clark and Officer Murray gave conflicting information in their depositions of who performed the knock and announce on the date of this incident. It is clear one person conducted the knock and announce while a separate person conducted the breach of the door with the ram. The video has no audio and the person who conducted the knock and announce goes out of view for a few seconds when they approach the door. Regardless of who conducted the knock and announce, there was insufficient time between that and when the door was breached to allow a person reasonable amount of time to voluntarily surrender their residence, and in this case, also secure the dog who was mortally wounded.

**Opinion 3:  Lieutenant Monk and Sergeant Mellody failed to supervise the operation properly from the "recon" of the residence to the execution of the search warrant.**

From the documentation provided for this case, it appeared that Lieutenant Monk was the highest-ranking officer for this operation. According to SOP, he would be the individual who approved this operation. He

---

[10] Commonwealth v. Demichel 442 Pa. 553 (Pa. 1971) • 277 A.2d 159
[11] Abid

ordered the execution of the search warrant at the wrong address as listed in the search warrant, and also ordered officers to execute the search warrant prior to allowing a reasonable amount of time for the resident to allow SWAT entry into the building to voluntarily surrender the residence.

A review of PPD Directive 5.7 Search Warrants also states;

    *C.*    *Exceptions to the Knock and Announce Rule*

      *1.  The only exceptions to the "knock and announce" rule which will permit an officer to disregard its provisions are:*

        *a. When occupants remain silence after repeated knocking and identification by officers and continued compliance with the Rule would be fruitless;*

        *b. When the police are virtually certain that the occupants of the premises already know their purpose;*

        *c. When the police have reason to believe that an announcement prior to their entry would imperil their safety; and*

        *d. The police have reason to believe that evidence is about to be destroyed.*

      ***2.  Sworn personnel should be prepared to clearly articulate to the courts why the "knock and announce" rule was violated and produce any evidence to support their decision to do so.***

      *3.  In addition, where exigent circumstances have occurred during the servicer of the warrant, they will be noted on the Complaint or Incident Report (75-48).  The assigned investigator will also describe on the Investigation Report (75-49), in detail, the exigent circumstances and explain why the "knock and announce" rule was violated."*

I have received no documentation that explains why the officers violated the "knock and announce" rule by not providing a reasonable amount of time for the occupant to answer the door and voluntarily surrender her residence.  Lieutenant Monk stated in his typed statement (D000044) that he gave the order to breach after hearing the dog bark.  As stated in the timing sequence, Officer Clark began to walk to the door to utilize the ram approximately 2 seconds after the knock and announce and 8 seconds before the first time the ram was utilized.  This was not only a clear violation of the Pennsylvania Rules of Criminal Code 207, but also PPD Directive 5.7.

I reviewed PPD SOP 26 SWAT Unit Operational Planning.  It states:

    *"2. Responsibility*

    *A. The supervisor, who will brief the Operation, will be responsible to establish the Operational Plan unless exigent circumstances exist.*

*B. The Operational Plan will be approved by the* **highest-ranking SWAT Supervisor** *available, through the chain of Command."*

During the deposition of Lieutenant Monk, he was asked, "the warrant specifically says second floor rear, does it not?" He replied, "I have not seen the warrant." (Page 27).

Sergeant Mellody was the supervisor who was responsible for the reconnaissance of the residence. He conducted no surveillance and did not take into account of how the second-story was set back from the first floor. In his deposition he advised he was responsible for where they would make entry into the residence. He stated he was notified of the warrant when he arrived at work the night before. He had 2 days to execute the warrant. More time was available to do a more though and complete reconnaissance in order for the correct apartment to be searched.

I reviewed the discipline history of Lt Monk. If I am reading it properly, it states that LT Monk was found guilty of an administrative charge of "Neglect of Duty" for failing to supervise on 5/2/03. He again, was found guilty on a separate administrative charge for "Neglect of Duty" for failing to supervise on 7/17/09.

**Opinion 4: The Philadelphia Police Department improperly investigated this incident and provided inconsistent information about what had occurred pertaining to the execution of the search warrant and breach of the residence of Felishatay Alvarado**.

I reviewed the following three documents:

1. Officer Involved Shooting (OIS) Investigation Unit Preliminary Report (D000121-D000122) prepared by Detective Horn dated 6/4/21. The OIS investigation Unit Preliminary Report states on page 1 (D000121);

   *"Sergeant Mellody was a part of the entry team with additional officers; the SWAT Unit was positioned (in a stack formation) at the front door: <u>they knocked and announced their presence with no response from inside of the home. At that point, members of the SWAT Unit heard a dog barking from inside. A second knock and announce was performed with negative results and the dog continued to bark. Lieutenant Monk ordered the front door entry team to breach the front door, utilizing a ram</u>."*

2. Officer Involved Shooting Investigation Unit Final Report (D000003-D000010) prepared by Detective Horn. The Final Report states on page 1 (D00003);

   <u>*"The SWAT Unit was stacked at the front door residence and knocked and announced their presence with no response from inside of the home.*</u> *SWAT subsequently used a ram to take down the front door and entered the residence."*

3. Memorandum to the Police Commissioner from the Commanding Officer of Internal Affairs Division prepared by Lieutenant Mark Bugieda dated 1/3/23. The memorandum states on page 1;

*"Upon their arrival, the SWAT officers positioned themselves in a stacked formation at the front door of the residence, knowed and announced their presence. The officers received no response from inside the residence. SWAT officers then heard a dog barking inside the residence. Lieutenant Monk gave an order to breach the front door, utilizing a ram. Officer Clark then struck the entrance door with a ram, breaching the door".* (D000110)

On page 10 the memorandum states;

*"Upon their arrival, the SWAT officers positioned themselves in a stacked formation at the front door of the residence. Officer Clark knocked and announced their presence. The officers received no response from inside the residence, but the officers could hear a dog barking from inside the residence. Lieutenant Monk gave an order to breach the front door, utilizing a ram."* (D000119)

As I showed with the timing sequence, I obtained from viewing the video surveillance from the Deli three doors down (Surveillance video A10_20210604053500_002.mp4), the video clearly shows the officers provided approximately 2 seconds before giving the order to breach the door after they "knocked and announced," and approximately 8 seconds when the door was first struck with the ram. The OIS Preliminary Report states a second knock and announce was performed which clearly did not happen. It is understandable that the Preliminary Report may have inaccurate information as all the facts of the case may not have been collected when the report was prepared. The Final Report also states that "no response" was obtained. In the Final Report Detective Horn wrote that the video surveillance was collected from the front and rear of the residence, therefore, he must have viewed it as he wrote, "Exterior cameras from both the front and rear were recovered and show SWAT lining up and entering the property." (D000009). The video and timing sequence shows that statement to be inaccurate as no reasonable amount of time was allowed for Ms. Alvarado to answer the door.

The report prepared by Lieutenant Bugieda also states that "no response" was obtained when officers "knocked and announced." He wrote in his report on page 8 the timed events as they occurred on video (D000117) as shown below:

*"Title: A10_20210604053500.MP4, Camera 10*

*Length: Thirty-four (34) minutes and fifty-nine (59) seconds.*

*• At 5:37:04 AM, SWAT officers line up on the sidewalk, while front containment and breach officers are positioned in front of 4664 Torresdale Avenue.*

*• At 5:37:27 AM, a SWAT officer strikes the front door of 4664 Torresdale A venue with a ram. SWAT officers in a stacked position enter 4664 Torresdale Avenue. Approximately two (2) minutes later, the*

*SWAT officers exit the property through the front door, and walk around the block to the rear of the property."*

I agree with his time that the SWAT officer strikes the door at 5:37:27 which is indicated on my timing sequence, but Lieutenant Bugieda failed to document when the officer "knocked and announced" and when the officer began to approach the door to strike it with the ram, therefore, he did not understand that no reasonable amount of time was provided to Ms. Alvarado to surrender her residence to officers. These investigation reports failed to indicate that officers violated Directive 5.7 pertaining to "Search Warrants" as well as the Pennsylvania Rules of Criminal Code, Rule 207, and SOP 31 "SWAT Unit Warrant Service."


**Opinion 5:  The Philadelphia Police Department violated Felishatay Alvarado's 4ᵗʰ Amendment rights when Officer Song discharged his firearm mortally wounding the dog that was considered property of Felishatay Alvarado by not allowing her time to secure her dog which was also a violation of policies and procedures of the Philadelphia Police Department.**

As previously stated in this report, the PPD did not wait a reasonable amount of time before breaching the 1ˢᵗ floor front apartment of Felishatay Alvarado.  Again, this was a "knock and announce" search warrant where Pennsylvania Rule 207 and PPD Directive 5.7 clearly indicate that police must wait a "reasonable amount of time" prior to entering into a premises to execute a search warrant.  As shown by the video surveillance and timing sequence I constructed, Officer Clark began walking to the front door with the breaching tool approximately 2 seconds after the "knock and announce" was conducted.  Lieutenant Monk advised "I could hear a dog barking and I gave the order to breach." (Monk typed statement Page 2, D000044). Due to the fact that a reasonable amount of time was not provided for Felishatay Alvarado to voluntarily surrender her residence prior to the breach of the front door, it also did not allow for her to secure her dog.  "A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property."[12]  The dog was clearly property of Felishatay Alvarado while she was inside her home.  Again, there was no exigent circumstances to immediately enter the residence while executing a "knock and announce" search warrant.  Officer Song later discharged his firearm one time mortally wounding the dog in the living room of the residence.  "Destroying property meaningfully interferes with an individual's possessory interest in that property."[13] In Pennsylvania, by statute, "All dogs are declared to be personal property and subjects of theft."[14]  I understand that this search warrant was pertaining to a homicide investigation where an individual was shot, but again, this was a "knock and announce" search warrant.

I reviewed PPD Directive 10.1 "Use of Force-Involving the Discharge of Firearms."  It states:

   B.    *Discharging Involving Other Animals*

---

[12] United States v. Jacobsen, 466 U.S. 109, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984).
[13] Abid
[14] 3 Pa. Stat. Ann. § 459-601(a).

> *1.    Police Officers shall not discharge their firearm at a dog or other animal except to protect themselves or another person from physical injury **and there is no other reasonable means to eliminate the threat,** or when acting consistently with existing Department guidelines authorizing the human destruction of a deer."*

As previously stated, there was no exigent circumstances to enter the residence to violate the "knock and announce" rule.  The officers heard the dog barking when they were outside the front 1st floor residence and attempt no other means to control or secure the dog prior to breaching the door.

I also reviewed the "Dog Encounters" training block that was provided to Officer Song after the incident occurred (D000235-D000241).  It states on page 1:

> *B.    Training Objectives*
>
> - *Identify and respond to indicators that a dog is present in a location.*
> 1. *Failing to anticipate a dog on the premises is a frequent mistake that officers make.*
> 2. *Food/water bowls, leashed/chains, worn paths in lawn usually mean the presence of a dog.*
> 3. ==*Notify owner that you are there and tell them to contain their dog.*==
> 4. *Make noise, shake fence, call to dog to avoid surprises for you or the dog.*
>
> - *Identify tools and methods of avoiding or warding off a dog attack.*
>
> 1. *Officers' body position, tone of voice, and other "tricks" can avoid their being perceived as a threat by the dog.*
> 2. *Baton, night stick, ASP. Pepper spray – tools readily at hand-can be used to counter a dog attack.*
> 3. *When all other means fail to stop the threat, lethal force is justified."*

Officer Songs and all the other officers on scene including Lieutenant Monk clearly knew a dog was present and failed to have a contingency plan to deal with it or utilize any other reasonable means to secure the dog.  Officer Song or any other officer on scene made no attempt to utilize other tools at their disposal.  According to Officer Song's Internal Affairs Typed Statement (D000125-000131), he turned to the left as he entered the residence to clear the corner of the room (D000126).   He then advised "the rest of the team was heading back toward the back of the first floor" (D000127).  This clearly shows that while Officer Song was dealing with the dog, it did not stop the remainder of the SWAT Unit from performing their job, therefore, no further danger or exigent circumstances existed.

I reviewed the deposition of Lieutenant Monk.  When asked, "As of June 2021, to your knowledge, did the Philadelphia Police Department have any sort of policy or procedure in place as to how members of the

SWAT Unit should deal with dogs at private residences, if they encounter them?" He replied, "I can't state that there is a policy in regards to that, no." (Page 78).

**OPINION 6:  The Philadelphia Police Department failed to follow nation standards in the planning and execution of this search warrant.**

I reviewed the letter from the Pennsylvania Law Enforcement Accreditation Commission (P.L.E.A.C.) dated October 28, 2021.  It stated that the Commission unanimously voted to ***re-accredit*** the Philadelphia Police Department.  This insinuates that the PPD was accredited prior to this and would predate the date of this incident which was June 4, 2021.  The PPD Directive 5.7 pertaining to search warrants dated 4/29/16 lists PLEAC standards 1.2.3, 2.7.1, 2.7.2 a,b,c,d,e as referred to in their directive.  These standards only state that the police department should have a directive on how legal processes (such as search warrants) should be documented for records purposes.  The standards are listed below are updated from 4/22:

*LEGAL PROCESS*

***Records***

***2.7.1*** *– A written directive that includes information regarding each item of legal process, civil and/or criminal, shall be recorded and include, at minimum, the following elements:* ***(04/19)***
    *a. date received;*
    *b. type of legal process, civil or criminal;*
    *c. nature of document;*
    *d. source of document;*
    *e. name of plaintiff/complainant or name of defendant/respondent;*
    *f. officer assigned for service;*
    *g. date of assignment;*
    *h. court docket number, warrant number, or other identifying number; and*
    *i. date service is due or date of service.*

***Narrative:*** *This system of records should allow entries to be retrieved by docket number, name or unique number assigned to allow cross-reference.*

***2.7.2*** *– A written directive that provides ~~for~~ procedures for and documenting of a record of the execution or attempted service of legal process documents shall be maintained and include at minimum, the following elements:* ***~~(04/19)~~ (04/22)***
    *a. date and time service was executed/attempted;*
    *b. name of sworn law enforcement officer(s) executing/attempting service;* ***(04/22)***
    *c. name of person on whom legal process was served/executed;*
    *d. method of service/reason for non-service; ~~and~~* ***(04/22)***
    *e. address of service/attempt~~.~~; and* ***(04/22)***

    *f.  execution of criminal arrest warrants, civil arrest warrants, or writs requiring the seizure of real or personal property are to be performed by a sworn law enforcement officer. **(04/22)***

**Narrative:** *Basic information must be maintained for each execution or attempted execution of legal process documents.*

I located the International Association of Chiefs of Police (IACP) Model Policy pertaining to executing search warrants dated February 2005.  The IACP is the world's largest and most influential professional association for police leaders. With more than 33,000 members in over 170 countries, the IACP is a recognized leader in global policing, committed to advancing safer communities through thoughtful, progressive police leadership. Since 1893, the association has been serving communities by speaking out on behalf of law enforcement and advancing leadership and professionalism in policing worldwide.  The policy states:

    *B. Preparation for Executing the Warrant*

        *1. The case agent and tactical coordinator, where required, work cooperatively to ensure proper preparation, planning, and service of the warrant. They shall detail procedures for executing the warrant to all team members in a warrant service briefing. The plan briefing shall be conducted by both the case agent and tactical coordinator and will include but not necessarily be limited to the following:*

            *a. The specific items subject to the search as defined in the warrant and any available information on their location.*

            *b. Information concerning the structure to be search and surroundings, **to include floor plans where available**, mockups, photos, and diagrams of the location identifying entrances, exits, obstructions, fortifications, garages, outlying buildings, suspect vehicles, and all other points of concern.*

            *c. Suspects and other occupants who may be present at the location—incorporating photos or sketches whenever possible—with emphasis on suspect threat potential, as well as the presence of children, the elderly or others who may not be involved with suspects.*

            *d. A complete review of the tactical plan to include the staging area, route of approach; individual assignments for entry, search, management of evidence, custody and handling of seized vehicles, custody of prisoners, and post-execution duties such as securing the location and conducting surveillance on the site for additional suspects.*

            *e. Personnel, resources, or armament necessary for gaining entry, safety and security of officers, or for conducting the search.*

*f. If a joint agency task force operation, all officers participating in the warrant service shall be present and identified as members of the warrant service team.*

*g. Contingency plans for encountering hazardous materials, __canines__, booby traps, fortifications or related hazards; measures to take in case of injury or accident, to include the nearest location of trauma or emergency care facilities*

*h. Procedures for exiting the location under emergency conditions.*

*C. Entry Procedures*

*1. If an advance surveillance team is at the target site, radio contact shall be made to ensure that the warrant can be served according to plan.*

*2. The search personnel shall position themselves in accordance with the execution plan.*

*3. Notification*

*a. An easily identifiable police officer shall knock and notify persons inside the search site, in a voice loud enough to be heard inside the premises, that he/she is a police officer and has a warrant to search the premises, and that he/she demands entry to the premises at once.*

*b. Following the knock and announce, officers shall delay entry for an appropriate period of time based on the size and nature of the target site and time of day to provide a reasonable opportunity for an occupant to respond __(normally between 15 and 20 seconds).__ If there is reasonable suspicion to believe that the delay would create unreasonable risks to the officers or others, inhibit the effectiveness of the investigation, or would permit the destruction of evidence, entry may be made as soon as practicable.*

*APPENDIX A: PRE-SEARCH PLANNING CHECKLIST*

*A. Target Location Considerations*

*1. Can the site be penetrated by gunfire?*

*2. Does the target site pose a fire hazard?*

*3. Are there underground parking facilities, attached garages, or additional buildings on the curtilage?*

*4. Where are the access points, on upper and lower levels, approach issues related to access points, and points of cover at approach point(s)?*

*5. Which way do doors and windows open?*

*6. Does the target site have an alarm system or warning device?*

7. *Is there evidence of reinforced entrances or fortifications?*

8. *Barred windows or doors*

9. *Backing mesh*

10. *Appearance of double locks on doors?*

11. *Are there any lookouts, and if so, where, how many, warning devices used, signals?*

12. *Evidence of children, such as bicycles or swings?*

13. *Evidence of elderly, disabled, handicapped or other uninvolved persons?*

14. *Unusual obstacles to entrance?*

15. *Can a reasonably accurate floor plan be obtained or constructed?*

16. *Attitude of neighbors: hostile or friendly?*

17. *Evidence of dogs? If so, how can they best be controlled?*

18. *Where is the electrical box and is it accessible?*


I also reviewed the IACP "Concepts and Issues" pertaining to the execution of search warrants dated February 2006 which states:

> *Whenever possible, photographs should be taken of the location and the immediate surroundings. If available, a helicopter is ideal for taking photographs. Photographs can identify safe approach routes and provide views of areas obstructed by vegetation, fencing, walls, or other natural or manmade obstacles that could affect the approach or entry. Other useful photographs can be easily obtained from a surveillance location, or stationary or moving vehicle. For example, if it is a detached home, the officer should note the proximity of adjoining homes and should attempt to determine who occupies these locations. If occupants of those locations are sympathetic to or in conspiracy with suspects at the target site, they may serve to alert the suspects to either police surveillance or their approach to the location. On the other hand, if neighbors or others occupying locations in the immediate area are cooperative and trustworthy, they may allow authorities to utilize their locations briefly for purposes of surveillance. Video cameras are also very useful in this regard as they may cover more area in a shorter time frame and add greater continuity to photographic coverage.*

> *The same type of information should be established for multiple family units with added emphasis on safety should it be necessary to use firearms. The volume and nature of pedestrian and vehicular traffic in the immediate area should be established at the time of day in which the warrant will be executed. This information will have obvious safety implications for the operation, dictate whether*

*special consideration should be given to traffic control, and will also help to establish whether there is a need to deal with lookouts or other accomplices that may be operating in the area.*

I reviewed the PPD Directive 10.4; Use of Force Review Board (UFRB).  It states that "all police involved shootings shall be reviewed." (Page 1)  Although this incident did not involve deadly force toward a citizen, it did involve the discharge of an officer's duty weapon during the course of their duties.  The directive also states, "No Use of Force Violations, but Other Departmental Violation Discovered: The actions of the officer were in accordance with Departmental Use of Force policy or objectively reasonable under extraordinary circumstances, <mark>but other Departmental violations not related to the use of force are discovered</mark>. The review will be marked "Justified - Use of Force within Departmental Policy – Other Departmental Violations Discovered - Not within Departmental Policy."

NOTE: The Chairperson will notify the Police Commissioner in writing and forward the case to the charging unit for the appropriate disciplinary charges to be filed against the officer." (Page 3)

I opine that several departmental violations occurred during the course of this incident as previously stated which include the executing the search warrant at the wrong location, and not following the knock and announce rule which also led to the shooting of the dog.  I requested, but did not receive, the complete IAB investigation which would have documented any department violations if they occurred.  I also requested the Use of Force Review Board documentation and recordings which were not provided to me.  The UFRB would also have department violations documented if they occurred.  On Page 11 of Lt Bugieda's memorandum to the Police Commissioner, it states:

"This investigation Report should be forwarded to the Use of Force Review Board (UFRB) to review the totality of the circumstances and issue a final determination regarding the Philadelphia Police Department's policy Directive #10.1, pertaining to the use of deadly force."

**Opinion 7:  The Philadelphia Police Department failed to train its officers on policies and how to deal with dog encounters.**

A review of the officers' depositions showed that a large majority of the them stated they have had no training on dog encounters, specifically Lt Monk and Sergeant Mellody (Supervisors on scene) as well as Officer Song (Officer who mortally wounded the dog belonging to Ms. Alvarado.)  A review of PPD SOP #36 – SWAT Unit Dog Neutralization Policy states:

1. Policy.

   **A. SWAT personnel will use every means available to have vicious animals secured.**

      **1. Have owner secure the animal**.

      **2. Ensnare the animal.**

3. Remove or confine the animal.

4. Request the assistance of the PACCA.

**B. SWAT personnel will not place themselves or allow others to place themselves in unnecessary or unreasonable danger of serious bodily injury by vicious animals.**

C. When there are no reasonable means of securing the animal, deadly force is justifiable against viscous animals. All guidelines of PD # 10 shall apply.

D. If the animal is secured or contained and no one is claiming ownership PACCA will be notified

2. SWAT Unit Supervisor Responsibility

**A. Ensure alternative methods are _considered_ when viscous animals may be present.**

1. High volume OC spray

2. Dog Noose

A review of the "Dog Encounters" training states the following:

*B.   Training Objectives*

- *Identify and respond to indicators that a dog is present in a location.*
  1. *Failing to anticipate a dog on the premises is a frequent mistake that officers make.*
  2. *Food/water bowls, leashed/chains, worn paths in lawn usually mean the presence of a dog.*
  3. *Notify owner that you are there and tell them to contain their dog.*
  4. *Make noise, shake fence, call to dog to avoid surprises for you or the dog.*

- *Identify tools and methods of avoiding or warding off a dog attack.*

  1. *Officers' body position, tone of voice, and other "tricks" can avoid their being perceived as a threat by the dog.*
  2. *Baton, night stick, ASP. Pepper spray – tools readily at hand-can be used to counter a dog attack.*
  3. *When all other means fail to stop the threat, lethal force is justified."*

I opine that the officers were not prepared to handle a dog encounter during this incident and did not even consider other alternatives prior to entering the residence.  I have seen conflicting photographs regarding the "Beware of Dog" sign that was placed in the left front window of the Ms. Alvarado's residence.  The

**Force Analysis LLC**

Excellence in Use of Force Encounters                                      Page **54** of **57**

following is a Crime Scene photograph of taken after the incident occurred by Crime Scene detectives on the day of the incident.  It shows no "Beware of Dog" sign in the window (D000080).



The following photograph was exhibited and shown as plaintiff 4 which clearly shows the "Beware of Dog" sign in the left window:



If the sign was present in the hours leading up to the execution of the search warrant, it would have been displayed when Detectives drove past the residence and when officers conducted their reconnaissance.

Again, referring to the timing sequence I conducted, Officer Clark began to move toward the door within approximately 2 seconds of the knock and announce after LT Monk gave the order to breach the door after hearing the dog barking.  No consideration for other alternatives were considered to handle the dog.  Also, by not allowing Ms. Alvarado reasonable time to voluntarily surrender the residence and secure her dog,

**Force Analysis LLC**
Excellence in Use of Force Encounters                                      Page **56** of 57

offices placed themselves in a situation to have to use deadly force on the
dog.

<u>**Conclusion:**</u>

As previously stated, I have formulated ??? opinions that I hold to a reasonable degree of probability and
certainty in the field of use of force based upon my training and experience:

1. **SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by illegally entering into her 1st floor, front apartment without having the legal authority to do so while executing a search warrant for a defendant believed to be located inside the 2nd floor, rear apartment which was also a violation of policies and procedures of the Philadelphia Police Department.**

2. **SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by executing the search warrant by forcibly ramming the door and not allowing her a reasonable amount of time to voluntarily surrender her residence which was also a violation of policies and procedures of the Philadelphia Police Department.**

3. **Lieutenant Monk and Sergeant Mellody failed to supervise the operation properly from the "recon" of the residence to the execution of the search warrant.**

4. **The Philadelphia Police Department improperly investigated this incident and provided inconsistent information about what had occurred pertaining to the execution of the search warrant and breach of the residence of Felishatay Alvarado.**

5. **The Philadelphia Police Department violated Felishatay Alvarado's 4th Amendment rights when Officer Song discharged his firearm mortally wounding the dog that was considered property of Felishatay Alvarado by not allowing her time to secure her dog which was also a violation of policies and procedures of the Philadelphia Police Department.**

6. **The Philadelphia Police Department failed to follow nation standards in the planning and execution of this search warrant.**

7.  **The Philadelphia Police Department failed to train its officers on policies and how to deal with dog encounters.**

I expand and support my opinions in the attached report.  If more materials are provided regarding this incident, I reserve the right to add, change, and delete any of my opinions based on any provision of additional information not reviewed at the time this report was completed.

Sincerely,

*Glenn Garrels*

Glenn Garrels

Force Analysis LLC

# EXHIBIT "C"

# Transcript of the Testimony of:
# **OFFICER BRIAN MURRAY**

**Date:** August 11, 2023

**Case:** FELISHATAY ALVARADO v. CITY OF PHILADELPHIA

DIAMOND COURT REPORTING
406 REDBUD LANE
MANTUA, NEW JERSEY 08051
856-589-1107
dcr.diamond@comcast.net

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------
FELISHATAY ALVARADO,      : CIVIL ACTION
                          :
                          :
      vs.                 :
                          :
                          :
CITY OF PHILADELPHIA, et. :
al.            : NO. 22-3763
------------------------
- - -
August 11, 2023
- - -

Videotape Deposition of OFFICER BRIAN
MURRAY, taken at the Law Offices of Victims'
Recovery Law Center, The North American Building,
121 South Broad Street, Suite 1800, Philadelphia,
Pennsylvania 19107, on the above date, beginning
at approximately 10:03 a.m., before Douglas S.
Diamond, Certified Court Reporter and Notary
Public in and for the Commonwealth of Pennsylvania
and the State of New Jersey, there being present.
- - -

DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 589-1107
e-mail: dcr.diamond@comcast.net

Page 2

1   A P P E A R A N C E S :
2   VICTIMS' RECOVERY LAW CENTER
      BY: KEITH T. WEST, ESQUIRE
3   THE NORTH AMERICAN BUILDING
      121 SOUTH BROAD STREET
4   SUITE 1800
      PHILADELPHIA, PENNSYLVANIA 19107
5   Counsel for the Plaintiff
      Tel. (215) 546-1433
6   E-mail: keith@victimrecoverylaw.com
7          * * * * *
8   CITY OF PHILADELPHIA LAW DEPARTMENT
      BY: ADAM R. ZURBRIGGEN, ESQUIRE
9   ONE PARKWAY BUILDING
      1515 ARCH STREET
10  14th FLOOR
      PHILADELPHIA, PENNSYLVANIA 19102
11  Counsel for the Defendants
      Tel. (215) 683-5114
12  E-mail: adam.zurbriggen@phila.gov
13         * * * * *
14
15
16
17
18  A L S O   P R E S E N T :
19     COURTNEY KITCHERMAN - THE VIDEOTAPE OPERATOR
20
21
22
23
24

Page 3

1              I N D E X
2   WITNESS                        PAGE
3   OFFICER BRIAN MURRAY
4   Examination by Mr. West:       4, 64
5   Examination by Mr. Zurbriggen:    62
6
7
8
9
10
11
12           EXHIBITS
    NO.        DESCRIPTION        PAGE
13
    Murray-1  Color Photocopy of Photograph   72
14
15
16
17
18
19
20
21
22
23
24

Page 4

1              - - -
2          (It was stipulated by and between
3      counsel that signing, sealing,
4      certification and filing be waived; and
5      that all objections, except as to the
6      form of the question, be reserved until
7      the time of trial.)
8              - - -
9          THE VIDEOTAPE OPERATOR:  This is
10     the deposition of Officer Brian Murray,
11     Badge Number 6068.  This is the
12     audio/video deposition for use at trial
13     in the matter of the Alvarado versus the
14     City of Philadelphia, Case Number 22
15     dash 3763.
16         I am the video operator.  My name
17     is Courtney Kitcherman.  And I'm
18     employed by Victims Recovery Law Center.
19         My address is 121 South Broad
20     Street, 18th Floor, Philadelphia,
21     Pennsylvania 19107.
22         Today's date is August 11th of
23     2023.  The time is 9:59 a.m.
24         This deposition is being performed

80ef9dad-d257-49c4-a9d1-b955b1b8559b

Page 5

1          in person.  The caption of this case is
2     Alvarado versus City of Philadelphia,
3     Case Number 22 dash 3763.
4          The witness being deposed today is
5     Officer Brian Murray, Badge Number 6068.
6          This deposition is being taken on
7     behalf of the plaintiff, Felishatay
8     Alvarado.
9          The officer taking this deposition
10    is Douglas Diamond.  And he shall swear
11    the witness in at this time:
12              - - -
13     . . . OFFICER BRIAN MURRAY, having been
14         duly sworn, as a witness, was examined
15         and testified as follows . . .
16              - - -
17          EXAMINATION
18              - - -
19    BY MR. WEST:
20         Q.    Good morning, Officer.  Thanks for
21    coming in today.
22         A.    Good morning.
23         Q.    And we already talked.  You've had
24    a chance to confer with your attorney and you're

Page 6

1     prepared to proceed; correct?
2          A.    Correct.
3          Q.    My name is Keith West.  I'm one of
4     the attorneys representing the plaintiff in this
5     case, Ms. Alvarado.
6          Have you ever been in a deposition
7     before?
8          A.    I have not.
9          Q.    All right.  Just it's not overly
10    complicated, but just some ground rules so you
11    understand how everything works.  One of the major
12    things is that we have the court reporter here.
13    So we have to make sure that we don't speak at the
14    same time.  And all of our responses have to be
15    verbal.  The court reporter can't write down nods
16    of the head, that kind of thing.  Okay?
17         A.    Understood.
18         Q.    So everything has got to be spoken.
19    And at the same time your attorney may
20    occasionally have objections to questions I ask.
21    Again, just make sure that we don't speak at the
22    same time.  So I might ask a question, pause.  If
23    he interjects, let him state whatever he wants,
24    for the record.  And then unless he specifically

Page 7

1     instructs you not to, please continue.  Okay?
2          A.    Very good.
3          Q.    If you need a break at any point,
4     if you'd like some water, anything like that, just
5     let us know.  We're not trying to make you
6     uncomfortable.  Okay?
7          A.    Not a problem.  Thank you.
8          Q.    And, likewise, if I ask you a
9     question and you answer it the assumption will be
10    that you understood it.  So if you have any
11    trouble understanding a question, please just let
12    us know.  I'll be glad to rephrase the question,
13    if I can, speak louder or speak slower, anything
14    like that.  Just let us know if you have trouble
15    understanding the question.  Okay?
16         A.    Okay.
17         Q.    Your only obligation today is to
18    give truthful testimony based on what you
19    personally know.  So at no point am I going to ask
20    you to guess or speculate.  Okay?
21         A.    Yes.
22         Q.    Just if you know the answer, let us
23    know what you know.  The kind of partial exception
24    to that is that we do want to know everything you

Page 8

1     know.  So if you don't have an exact answer to a
2     question, but you feel that you could give a
3     meaningful estimate or an approximation, we do ask
4     for you to give us your estimate or approximation.
5     Just let us know that's what you're doing.  Okay?
6          A.    Not a problem.
7          Q.    The example I always give is if I
8     asked you how many feet it is to the wall, you
9     probably can't just eyeball it and say exactly.
10         You would have to give kind of an
11    estimate based on your experience; right?
12         A.    Right.
13         Q.    But you might have a witness who
14    grew up in France and only uses the metric system
15    and you ask them how many feet something is, they
16    have no idea.  That person, we're not going to ask
17    that person to guess.  Just say I don't know.
18         You get the difference; right?
19         A.    Correct.
20         Q.    All right.  So, sir, this case
21    arises from an incident that occurred at Ms.
22    Alvarado's apartment, which was in the building
23    located at 4664 Torresdale Avenue in the City of
24    Philadelphia.  And the date of the incident was

80ef9dad-d257-49c4-a9d1-b955b1b8559b

Page 9

1    June 4th of 2021.
2        A.    Okay.
3        Q.    Do you remember this incident, do
4    you remember anything about it?
5        A.    I do.
6        Q.    All right.  I'll just ask you
7    generally, can you tell me what you remember about
8    that day?
9        A.    That day we were serving a homicide
10    warrant at that location for the second-floor
11    floor apartment.
12            Do you want me to go through the
13    whole --
14        Q.    Yes, what you remember, sure.
15        A.    That day I was working as a
16    breacher slash hospital car, one of the breachers,
17    I should say.  We approached the property, the
18    expectation being that we knew it was a
19    second-floor apartment.  There was markings, I
20    believe, of the number one and two both on that
21    door or possibly next to it.  So the expectation
22    was that that was a common entry point at which
23    point we would -- we knocked and announced.  After
24    no response one of the supervisors gave us the

Page 10

1    command to breach.  The door had been -- was then
2    breached.  Being a breacher, that means I'm one of
3    the last few people to enter into the property.
4    As we entered in, by the time I got in there, I
5    knew at that point it was a -- it was no longer a
6    common point entry, but there was a dog that had
7    been aggressively coming towards Officer Song.
8    And through the course of that confrontation the
9    dog ended up being dispatched by Officer Song.
10    Once the property was secured and they realized
11    that there was no access to the second floor from
12    the first-floor apartment I stayed and held the
13    scene, itself.  And the entry teams made their way
14    to the back of the property and executed the
15    second-floor warrant, I believe, through a fire
16    escape.  I'm not 100 percent sure on how that
17    layout was because I never made it to the second
18    floor.
19        Q.    Okay.  Have you had a chance to
20    review any documents in preparation for today's
21    deposition?
22        A.    Yeah, my statement to Internal
23    Affairs for the shooting team.
24        Q.    All right.  Did you review anything

Page 11

1    else?
2        A.    No.
3        Q.    All right.  So you knew that the
4    warrant only applied to the second-floor
5    apartment; correct?
6            MR. ZURBRIGGEN:  Object to the
7        form.
8            But, Officer, you can answer.
9            THE WITNESS:  Correct.
10    BY MR. WEST:
11        Q.    Okay.  And did you know that the
12    warrant actually specified second floor rear?
13        A.    I did not.
14        Q.    Okay.  Do you know whether or not
15    the -- strike the question.
16            Let me just kind of lay a rule for
17    the deposition, if everyone agrees.  The building
18    is the building at 4664 Torresdale Avenue, just so
19    I'm not reading the address all the time.  Moving
20    forward if I say the building, that's the one I'm
21    referring to, everyone's fine with that on here.
22            Okay?
23        A.    I'm good with it.
24        Q.    Do you know whether or not the

Page 12

1    building, I'll call it the building in question
2    because it makes more sense for the future, do you
3    know whether or not the building in question had
4    another door besides the one that you breached?
5        A.    I mean, I personally did not see
6    it.  I wasn't the one who did the -- we do recons
7    on the jobs.  I wasn't the one who put eyes on the
8    property prior to our serving the warrant.  I know
9    that they gained access to the second floor, so
10    the assumption would be, yes, there's a door
11    somewhere else leading to the second floor.
12        Q.    Okay.
13        A.    But in the front of the property,
14    which is the only path I took, there was no other
15    door.
16        Q.    Prior to breaching the door that
17    you did breach at the building in question --
18        A.    I didn't personally breach it, I
19    don't believe.
20        Q.    Oh, I thought you were --
21        A.    I was part of the breaching team.
22    So you typically have according to my statement
23    just because I don't recall specifically, it had
24    me as using a Halligan, which is a prying tool.

80ef9dad-d257-49c4-a9d1-b955b1b8559b

Page 13

1    Typically when you breach a door you're using a
2    ram. So it stated that, I believe, Officer Clark,
3    again, I'd have to refer to my notes, I believe it
4    was Officer Clark did the knocking and announcing.
5    And I'm assuming he probably breached as well, but
6    I could be wrong.
7        Q.    Okay. So your understanding of
8    what happened the day in question is that you and
9    Officer Clark were both --
10       A.    I believe Clark was. I didn't -- I
11   know that he knocked and announced. I don't know
12   if he was the first one of the -- for whatever
13   reason I didn't see in my notes who my partner
14   was. So I'm not sure if he was one of the first
15   guys on the door or if he was one of the
16   breachers. Typically the breacher, one of the
17   breachers, knocks and announces.
18       Q.    All right. As of today you have no
19   specific recollection?
20       A.    I don't. We've served so many
21   warrants it kind of blends together,
22   unfortunately.
23       Q.    Okay. And, sir, I don't want you
24   to feel like I'm criticizing you.

Page 14

1        A.    No.
2        Q.    It's just that a deposition is an
3    unusual thing. Make sure that you allow a little
4    space between the question gets asked and before
5    you answer it because we don't want to talk over
6    each other, for the record. Okay?
7        A.    Not a problem.
8        Q.    All right. So prior to being part
9    of the team that breached the door of the building
10   in question, did you know whether or not the
11   building in question had another door?
12       A.    I did not.
13       Q.    Okay. Was there a meeting before
14   this warrant execution occurred where one or more
15   people gave instructions to the rest of the SWAT
16   unit and described how the warrant should be
17   enforced?
18       A.    Yes, we do have a briefing prior to
19   us serving warrants. You typically have a, I
20   believe, one of the supervisors takes the lead.
21   And they will go over the pertinent information.
22   Unfortunately, with the recons we don't always
23   have -- because these are exigent circumstances
24   that you're going out for homicide warrants you

Page 15

1    can't always go in the back of these properties
2    without basically alerting because we go in and do
3    it either the night before, the day before, maybe
4    two days before, your team is going out there and
5    putting eyes. Unfortunately. It would look
6    suspicious if a bunch of cops are walking through
7    the alleyway and you don't want to alert the
8    target you're going after. So I don't know if
9    anyone had access to seeing what the back of that
10   property looked like prior to our actual serving
11   of that warrant. So if we didn't have that
12   information it wouldn't have been relayed in the
13   briefing. They would have only based it on the
14   knowledge they could have had at that point.
15       Q.    In any case, Officer Murray, at the
16   briefing for this warrant execution no one
17   mentioned that there was another door at the
18   property; correct?
19       A.    Not to my recollection, no.
20       Q.    To your recollection, why -- who
21   ordered the door to be breached?
22       A.    I don't know that I gave -- have
23   that. Lieutenant Monk is what comes to mind, but
24   I can't say certainly.

Page 16

1        Q.    Yes. Again, Officer Murray, as I
2    instructed you at the beginning, I'm not -- it's a
3    question of what you do personally know. So
4    please don't feel compelled to answer every
5    question. If you don't have the answer, please
6    don't guess or speculate. Okay?
7        A.    Not a problem.
8        Q.    So is it fair to say at this time
9    you do not recall who ordered for the door to be
10   breached?
11       A.    That's fair to say.
12       Q.    Okay. And do you have any memory
13   today of why the order was given when it was given
14   to breach the door?
15           MR. ZURBRIGGEN: Object to form.
16           But, Officer, you can answer; if
17       you can.
18           THE WITNESS: No. I don't know
19       what the -- if there was -- we typically
20       give it a certain amount of time just
21       making multiple knocks and announce.
22       And I don't know anything specific.
23       This doesn't stand out as anything
24       different than any other job.

4 (Pages 13 to 16)

Page 17

1    BY MR. WEST:
2        Q.    Okay.  So you said typically
3    there's a knock and announce before the door would
4    be breached; correct?
5        A.    We always do a knock and announce.
6    I've never been since I've been in the SWAT unit
7    done a no-knock warrant.
8        Q.    Okay.  And you're not actually
9    allowed to do no-knock warrants; correct?
10       A.    Any --
11            MR. ZURBRIGGEN:  Go ahead, Officer.
12            Object to form.
13            THE WITNESS:  When I got on the job
14        I believe it was an option.  Anymore I
15        don't believe it is.  We don't do them.
16   BY MR. WEST:
17       Q.    As of June 2021, was the SWAT unit
18   that you were a part of allowed to perform
19   no-knock warrants?
20            MR. ZURBRIGGEN:  Same objection.
21        But, Officer, you can answer.
22            THE WITNESS:  As of '21, again, we
23        never did.  I don't recall when that was
24        no longer an option for us.

Page 18

1    BY MR. WEST:
2        Q.    Okay.  In any case, this warrant
3    execution involving Ms. Alvarado, was that
4    supposed to be a no-knock warrant or a knock and
5    announce warrant?
6        A.    A knock and announce.
7        Q.    So I think you mentioned that
8    typically the door would be knocked on a number of
9    times before the door would be breached; correct?
10       A.    Correct.
11       Q.    And a period of time would be
12   allowed to elapse; correct?
13       A.    Correct.
14       Q.    And why was that, why would you
15   allow a period of time before the breach?
16            MR. ZURBRIGGEN:  Object to form.
17        But, Officer, you can answer.
18            THE WITNESS:  We give enough time
19        to try and get someone to comply and
20        open the door.  Ideally someone will
21        open the door as opposed to us having to
22        breach the door.
23   BY MR. WEST:
24       Q.    And isn't that to allow the

Page 19

1    occupant of the property a reasonable opportunity
2    to voluntarily surrender the property before the
3    door is breached?
4            MR. ZURBRIGGEN:  Same objection.
5        Officer, you can answer.
6            THE WITNESS:  That's correct.
7    BY MR. WEST:
8        Q.    How much time passed, in your
9    recollection, from when Ms. Alvarado's front door
10   was knocked on until her door was breached?
11       A.    I don't recall this job.  As I
12   said, we serve a lot of warrants.  So nothing
13   stands out about this particular warrant.
14       Q.    Can you give an estimation or
15   approximation?
16       A.    I can't.
17       Q.    Based on your experience and
18   training with the SWAT unit, what should have been
19   the minimum amount of time that should have been
20   given before the door was breached?
21            MR. ZURBRIGGEN:  Object to form.
22        Officer, you can answer.
23            THE WITNESS:  We don't have
24        minimums.  If something happens that

Page 20

1            causes us to have exigent circumstances,
2            we will speed up the process.  There's
3            no set time.
4    BY MR. WEST:
5        Q.    Okay.  Where there any exigent
6    circumstances on the morning of June 4th of 2021?
7        A.    I don't recall any, but, again, I
8    don't remember the timeframe.  So I can't say
9    specifically anything happening.
10       Q.    Okay.  So assuming that there are
11   no exigent circumstances, how much time should be
12   allowed as of the policies that were in effect in
13   June 2021 between someone's front door being
14   knocked on and their door being knocked down?
15            MR. ZURBRIGGEN:  Object to form.
16        Officer, you can answer.
17            THE WITNESS:  We just say a
18        reasonable amount of time, which is
19        typically like 30 seconds.
20   BY MR. WEST:
21       Q.    At least 30 seconds; correct?
22            MR. ZURBRIGGEN:  Object to form.
23        Officer, you can answer.
24   BY MR. WEST:

Page 21

1    Q.    Or could it be less than that?
2    A.    Without exigent circumstances I'm
3  saying roughly 30 seconds.
4    Q.    Okay.  Would it be at least 30
5  seconds or can it be less than that?
6        MR. ZURBRIGGEN:  Object to form.
7        Officer, you can answer.
8        THE WITNESS:  As I stated before,
9        it's roughly 30 seconds.
10  BY MR. WEST:
11    Q.    Okay.  Have you seen -- are you
12  aware of whether or not there was any surveillance
13  footage taken of this incident?
14    A.    I'm not aware of any either way.
15    Q.    Was anyone wearing any body
16  cameras, to your knowledge?
17    A.    Not to my knowledge.
18    Q.    All right.  Are you aware of the
19  fact there was a neighboring business on the block
20  that actually did record this incident?
21        MR. ZURBRIGGEN:  Object to form.
22        But, Officer, you can answer.
23        THE WITNESS:  I'm not aware of it.
24  BY MR. WEST:

Page 22

1    Q.    So you've never seen that footage;
2  correct?
3    A.    Correct.
4    Q.    Would you be surprised to learn
5  that surveillance footage shows that at most only
6  a few seconds passed between the officers arriving
7  on Ms. Alvarado's front door step and her door
8  being breached?
9        MR. ZURBRIGGEN:  Object to form.
10        Officer, you can answer.
11        THE WITNESS:  Unless there was
12        exigent circumstances, as I stated, I
13        don't recall this exact breach.  So
14        without something causing the breach to
15        be sped up, yeah, I mean, that would be
16        surprising, but if there was something
17        that caused one of the supervisors to
18        place the order to breach faster than
19        that, then that's not surprising.
20  BY MR. WEST:
21    Q.    Okay.  And, again, related to this
22  warrant enforcement, do you recall any exigent
23  circumstances or any special circumstances that
24  would have caused the officer to order for the

Page 23

1  door to be breached in less than the normal amount
2  of time?
3        MR. ZURBRIGGEN:  Object to form.
4        Officer, you can answer.
5        THE WITNESS:  I don't recall this,
6        that specific part of this incident, so
7        I can't say.
8  BY MR. WEST:
9    Q.    Okay.  When the door to Ms.
10  Alvarado's apartment was breached, what did you
11  believe was going to be on the other side of that
12  door?
13        MR. ZURBRIGGEN:  Object to form.
14        Officer, you can answer.
15        THE WITNESS:  A common hallway
16        where it leads you into typically a
17        two-door situation where you have a door
18        to the side and typically you have a
19        door in front.  The door to the side
20        typically goes to the first floor.  The
21        door in front typically leads to a set
22        of steps, which would get you to the
23        second floor.
24  BY MR. WEST:

Page 24

1    Q.    Did you believe that there was
2  going to be at least one dog on the other side of
3  that door?
4    A.    At which point?
5    Q.    Before the door was breached.
6    A.    Before it was breached, I do
7  believe I stated there was a dog barking.  So, I
8  mean, there was no knowledge -- like sometimes if
9  we see a dog leash or beware of dog sign,
10  something indicating on the property, we will note
11  it in our recon sheets.  Again, based on my prior
12  statement there was nothing leading us to believe
13  up until we got to that door there was a dog.  I
14  believe I said there was a dog barking.  So there
15  was no -- that was in the moment though, you know
16  what I mean.
17    Q.    Okay.  So if you walk up to
18  someone's front door and you can hear a dog
19  barking on the other side, would you assume that
20  there's a dog inside of the property?
21        MR. ZURBRIGGEN:  Object to form.
22        But, Officer, you can answer.
23        THE WITNESS:  Yes, once you hear
24        the dog barking.

Page 25

1    BY MR. WEST:
2        Q.   So prior to breaching Ms.
3    Alvarado's front door you're aware of the fact
4    that there was a dog on the other side of the
5    door; correct?
6            MR. ZURBRIGGEN:  Same objection.
7        Officer, you can answer.
8            THE WITNESS:  Once the knock and
9        announce began that's when we were aware
10       of the dog being on the other side in
11       the property somewhere.  Again, we
12       didn't know that that was leading into
13       her property.  So knowing it was her
14       property or his property of where the
15       dog was barking from with our
16       expectation of not going into her
17       property, it's kind of a non-issue as
18       such.
19   BY MR. WEST:
20       Q.   So what, if any, measures were put
21   in place prior to the door being breached to
22   handle the dog in a non-lethal manner?
23           MR. ZURBRIGGEN:  Object to form.
24           But, Officer you can answer.

Page 26

1            THE WITNESS:  I personally carry
2        OC.  But, as I said, I was further back
3        in the line.  And the dog wasn't on me
4        at that point.  So it depends if you
5        have the time to deploy it.  And every
6        circumstance is different.
7    BY MR. WEST:
8        Q.   What's OC?
9        A.   Pepper spray in layman's terms.
10       Q.   Okay.  At some point were you
11   trained that pepper spray is something that should
12   be used on a dog in order to avoid a lethal
13   encounter?
14           MR. ZURBRIGGEN:  Object to form.
15           But, Officer, you can answer.
16           THE WITNESS:  Yes.
17   BY MR. WEST:
18       Q.   Okay.  And when were you trained
19   that?
20       A.   When I went through SWAT basic
21   school.
22       Q.   Okay.  So SWAT basic gave you
23   training on how to handle dogs in a non-lethal
24   manner?

Page 27

1        A.   It's limited training.  It's more
2    just given the knowledge that sometimes it works.
3    It doesn't always work.  So it's a tool in the
4    toolbox just like everything else, unfortunately.
5    There's no definite means to controlling a vicious
6    dog.
7        Q.   All right.  Besides OC, were you
8    given any training on any other tools that you
9    could use in a dog encounter to avoid a lethal
10   outcome?
11           MR. ZURBRIGGEN:  Same objection.
12           But, Officer, you can answer.
13           THE WITNESS:  There is a dog noose
14       that is typically retrieved from the
15       truck that is typically kept in the
16       truck rear containment drives, but
17       unfortunately, again, without having
18       prior knowledge of a dog or signs or
19       signage posted of any evidence of a dog,
20       it wouldn't be something we typically
21       carry along with all of the door gear
22       that we're bringing into a property
23       without prior knowledge.
24   BY MR. WEST:

Page 28

1        Q.   All right.  Besides the dog noose,
2    were there any other tools?
3        A.   Not that I can think of, offhand.
4        Q.   Okay.  So prior to breaching Ms.
5    Alvarado's front door, I think you mentioned that
6    you had some OC on you, but you were standing in
7    the rear and were not planning -- you were
8    planning on being like the last person to go in;
9    right?
10       A.   I was one of the last people to go
11   in.
12       Q.   All right.  And there was no dog
13   noose.
14           Did any of the officers that were
15   -- that actually encountered the dog have any
16   tools deployed that they could use in the dog
17   encounter to prevent a lethal outcome?
18           MR. ZURBRIGGEN:  Object to form.
19           But, Officer, you can answer.
20           THE WITNESS:  I don't know what
21       each officer was carrying that day.
22   BY MR. WEST:
23       Q.   So as part of the protocol before
24   the SWAT unit breached down someone's door and

1    goes into their house, wouldn't there normally be
2    some coordination between the various SWAT
3    officers to make sure that everybody has the
4    proper tools and a plan to handle the encounter in
5    a professional manner.
6           MR. ZURBRIGGEN: Object to form.
7           Officer, you can answer.
8           THE WITNESS: Again, if there's a
9           known dog then you can have -- put a
10          plan into place. But, unfortunately,
11          the way we work is there's a lot of
12          flexibility. So you never -- all plans
13          go out the door. So I may plan on being
14          the third person and things -- I may be
15          the last person in line and end up being
16          the first person on the second floor at
17          some point. So there's not -- depending
18          on what you encounter when you walk into
19          that room there's no saying, hey, you're
20          going to deal with this person or this
21          dog or that. You don't know where the
22          dog is. You don't know who's going to
23          -- you can attempt to have a plan if you
24          know ahead of time. But, unfortunately,

1    these houses that we go into and the
2    situations that we're put in you never
3    know who's going to encounter what. So,
4    unfortunately, when you're going after
5    someone for a homicide your biggest
6    concern is someone with lethal force
7    that's going to use that against you.
8    BY MR. WEST:
9           Q.    Okay. So, Officer Murray, prior to
10   entering a property where it's known that there's
11   a dog inside, would the SWAT unit normally make
12   some sort of plan on how to handle the dog
13   encounter in a non-lethal manner?
14          MR. ZURBRIGGEN: Object to form.
15          Officer, you can answer.
16          THE WITNESS: We may bring more OC
17          canisters and larger ones versus just
18          the small personal ones. As far as a
19          noose team it depends on the situation
20          because, again, we don't -- you can't go
21          into a property with a noose first when
22          you're encountering lethal force. So I
23          don't think a noose would have
24          appropriate in that situation,

1    unfortunately.
2    BY MR. WEST:
3           Q.    And normally wouldn't you have to
4    have the OC spray available to at least one of the
5    officers who would be one of the first ones to
6    enter the property so it could actually be used on
7    the dog, if need be?
8           MR. ZURBRIGGEN: Object to form.
9           Officer, you can answer.
10          THE WITNESS: It would help to have
11          multiple because you never know, again,
12          when you're going to encounter the dog
13          or where the dog will be. So it's just
14          typically you're the first person in the
15          door, that door, it doesn't mean you're
16          going to be the first person to
17          encounter the dog.
18   BY MR. WEST:
19          Q.    Okay. So even if it wouldn't only
20   be the first person it would be good that it would
21   be at least the first person; correct?
22          MR. ZURBRIGGEN: Same objection.
23          Officer, you can answer.
24          THE WITNESS: Yes, if they have the

1    time and the right situation to use it,
2    yes.
3    BY MR. WEST:
4           Q.    Okay. Was anything like that done
5    in this situation involving Ms. Alvarado?
6           MR. ZURBRIGGEN: Same objection.
7           Officer, you can answer.
8           THE WITNESS: I don't know if
9           anyone did or did not have OC on them
10          aside from their personal.
11   BY MR. WEST:
12          Q.    Did anyone discuss the likelihood
13   of a dog encounter whatsoever prior to breaching
14   Ms. Alvarado's door?
15          A.    Not to my recollection.
16          Q.    To your knowledge, does the
17   Philadelphia Police --
18          MR. WEST: I'm sorry. Can we go
19          off the record for just a moment?
20          MR. ZURBRIGGEN: Sure.
21          THE VIDEOTAPE OPERATOR: Going off
22          the record at 10:26 a.m.
23          - - -
24          (Whereupon, a discussion took place

8 (Pages 29 to 32)

Page 33

1        off the video and stenographic records.)
2                      - - -
3            (Whereupon, a pertinent portion of
4        the record was read back by the court
5        reporter.)
6                      - - -
7            THE VIDEOTAPE OPERATOR:  Back on
8        the record at 10:28 a.m.
9    BY MR. WEST:
10       Q.    Officer Murray, to your knowledge,
11   as of June 2021, did the Philadelphia Police
12   Department have any policies or procedures in
13   place regarding dog encounters in the line of
14   duty?
15           MR. ZURBRIGGEN:  Object to form.
16           Officer, you can answer again.
17           THE WITNESS:  As far as what?
18           I'm sorry.  What was the -- I don't
19           really grasp what you're looking for in
20           the question.
21   BY MR. WEST:
22       Q.    Okay.  So, in your experience, does
23   the City of Philadelphia Police Department have
24   various directives that tell police officers how

Page 34

1    they should act in different situations?
2        A.    There are directives in place.  As
3    far as one handling dogs in this nature, I don't
4    know of it, offhand, specifically.
5        Q.    Not -- if there is one you've never
6    heard of it; correct?
7            MR. ZURBRIGGEN:  Object to form.
8            Officer, you can answer.
9            THE WITNESS:  Yeah, not to my
10           knowledge.
11   BY MR. WEST:
12       Q.    Okay.  So I think you testified
13   earlier that you believed that if Ms. Alvarado's
14   front door was breached that would lead into a
15   common area; correct?
16       A.    Correct.
17       Q.    What was the basis of that belief,
18   if any?
19           MR. ZURBRIGGEN:  Object to form.
20           Officer, you can answer.
21           THE WITNESS:  The basis was we
22           didn't see any other doors on the
23           property, itself, in the front.  And I
24           believe I stated there was a number one

Page 35

1    and two next to that door, based on my
2        prior statement.  I don't recall at the
3        moment, but, again, I'm going off of my
4        prior statement to Internal Affairs.
5    BY MR. WEST:
6        Q.    To your knowledge, did anyone speak
7    with the property manager or property owner or
8    anyone like that?
9        A.    Not that I'm aware of.
10       Q.    Okay.  And you were completely
11   unaware of the fact that the property sat on a
12   cul-de-sac and had a very prominent door on the
13   rear; correct?
14           MR. ZURBRIGGEN:  Object to form.
15           But, Officer, you can answer.
16           THE WITNESS:  Yeah, I'm unaware of
17           that.
18   BY MR. WEST:
19       Q.    And you're unaware of the fact that
20   the warrant specified that it was only valid for
21   the rear of the building; correct?
22           MR. ZURBRIGGEN:  Object to form.
23           Officer, you can answer.
24           THE WITNESS:  Yes, I was unaware of

Page 36

1        that.
2    BY MR. WEST:
3        Q.    All right.  Sir, I'd like to show
4    you a photograph, which was previously marked as
5    Exhibit-2 to Officer Saba's deposition.
6        A.    Okay.
7            MR. WEST:  I have an extra copy for
8            defense counsel.
9    BY MR. WEST:
10       Q.    By the way, have you discussed this
11   incident with Officer Saba or any other member of
12   the SWAT unit that was there that day?
13           MR. ZURBRIGGEN:  Object to the
14           form.
15           Officer, you can answer.
16           THE WITNESS:  No, aside from that
17           day, no.
18   BY MR. WEST:
19       Q.    So what I'd ask you to do, sir, is
20   please look at the photograph that I've given you.
21       A.    Right.
22       Q.    And which you've had a chance to
23   review.  Let me know if you recognize what that
24   is.

80ef9dad-d257-49c4-a9d1-b955b1b8559b

Page 37

1      A.    I mean, based on if is this an
2  accurate photo, my best recollection is I believe
3  this is the property, the tan one that juts out.
4      Q.    Okay. Could you sort of like put a
5  square around the property you're referring to
6  with this green highlighter?
7      A.    Again, this is just to the best of
8  my recollection, but -- (Witness complies.)
9      Q.    I see. So you believe that the
10 building, the building in question, was this tan
11 building; correct?
12     A.    Correct.
13     Q.    All right. And you've put a green
14 highlighted box around that building; correct?
15     A.    Correct.
16     Q.    And I'm going to hand this back to
17 you, but I'm going to say, first, do you recognize
18 that there is a front door inside of that green
19 square that you've created; right?
20     A.    I do see that.
21     Q.    Is that the front door that you
22 breached or you and your SWAT unit breached?
23     A.    If this is accurate, yes, I
24 believe.

Page 38

1      Q.    Okay. Is there a second floor
2  above that door?
3           MR. ZURBRIGGEN: Object to form.
4           Officer, you can answer.
5           THE WITNESS: Yes.
6  BY MR. WEST:
7      Q.    So you're looking at that picture
8  and you see a second floor above that door?
9           MR. ZURBRIGGEN: Same objection.
10          Officer, you can answer.
11          THE WITNESS: I do.
12 BY MR. WEST:
13     Q.    Okay. You don't see that that door
14 enters into an area that is only one floor?
15          MR. ZURBRIGGEN: Same objection.
16          Officer, you can answer.
17          THE WITNESS: You can clearly see
18          there's three windows above it there on
19          the second floor.
20 BY MR. WEST:
21     Q.    So at some point in the building
22 it's two floors; right?
23          MR. ZURBRIGGEN: Object to form.
24 BY MR. WEST:

Page 39

1      Q.    But the door leads into an area
2  that's only one floor; right?
3           MR. ZURBRIGGEN: Object to form.
4           Officer, you can answer.
5           THE WITNESS: It appears it's an
6           enclosed porch based on the other
7           properties there to the left. So it
8           appears that they enclosed the porch,
9           extended and enclosed the porch. As far
10          as the layout to a house prior to -- I
11          know now being inside the property how
12          the layout is. But prior to that you're
13          just looking at what appears to be an
14          enclosed porch and the door and the
15          second floor above it.
16 BY MR. WEST:
17     Q.    So you would look at this and you
18 would say -- you would assume that that's an
19 enclosed porch?
20          MR. ZURBRIGGEN: Object to form.
21          Officer, you can answer.
22          THE WITNESS: Based on other
23          properties I've been in, yes.
24 BY MR. WEST:

Page 40

1      Q.    Did you make any effort to
2  ascertain if anyone was living in the occupied
3  area behind these windows within the green square?
4           MR. ZURBRIGGEN: Object to form.
5           Officer, you can answer.
6           THE WITNESS: Again, we're serving
7           a high-risk homicide warrant. So for us
8           to give people a heads up that, hey,
9           we're going to try and get the layout of
10          the property where we're trying to
11          ascertain -- get someone who's killed
12          other people or believed to have killed
13          other people, then, no. We don't -- we
14          do as much as we can without scaring away
15          the person who we're to target.
16 BY MR. WEST:
17     Q.    Could you answer the question I
18 asked you?
19          It can be read back to you, if
20 you'd like.
21          Would you like the last question
22 read back to you?
23     A.    I was just giving why we don't
24 ascertain -- we can't go and get all of that

10 (Pages 37 to 40)

80ef9dad-d257-49c4-a9d1-b955b1b8559b

Page 41

1   information.
2       Q.    So let me have the last question
3   read back to you.  Please answer the question that
4   you're actually asked.
5       A.    Certainly.
6           MR. ZURBRIGGEN:  And an objection
7       for the record for him as his answer
8       being responsive.
9               - - -
10          (Whereupon, a pertinent portion of
11      the record was read back by the court
12      reporter.)
13              - - -
14          MR. ZURBRIGGEN:  And the same
15      objection to form, for the record.
16          But, Officer, if you want to answer
17      again, you can answer again.
18  BY MR. WEST:
19      Q.    Yes.  So regardless of whether or
20  not you think it should have been made, was any
21  effort made to ascertain that?
22          MR. ZURBRIGGEN:  Objection.
23      I'm sorry.  Go ahead, Officer.
24          THE WITNESS:  I personally did not.

Page 42

1   BY MR. WEST:
2       Q.    Okay.  And do you know if anyone
3   else did?
4       A.    Not to my knowledge.
5       Q.    Okay.  And isn't it fair to say
6   that you can look at that picture today and you
7   can clearly see that that door leads into the same
8   area that's on the other side of those windows?
9           MR. ZURBRIGGEN:  Object to form.
10          Officer, you can answer; if you
11      can.
12          THE WITNESS:  Yes, with hindsight I
13      can tell you where that leads to.
14  BY MR. WEST:
15      Q.    So in hindsight in looking at that
16  picture you can clearly see that you're entering
17  an occupied area on the first floor; correct?
18          MR. ZURBRIGGEN:  Object to form.
19      Officer, you can answer.
20          THE WITNESS:  With hindsight, yes,
21      I know exactly what's on the other side
22      of the door.
23  BY MR. WEST:
24      Q.    Okay.  And since the warrant only

Page 43

1   covered Apartment Number 2 on the second floor
2   rear, just looking at that property, isn't it
3   clear that you were entering an occupied area that
4   was not Apartment Number 2 on the second floor
5   rear?
6           MR. ZURBRIGGEN:  Object to form.
7       Officer, you can answer.
8           THE WITNESS:  As I stated before, I
9       didn't know it was the rear of the
10      property.  I knew it was the second
11      floor.  So based on now knowing the
12      layout, yes, I know now that it's not to
13      the second floor and that it's not to
14      the rear.  And that's based on what you
15      said, if the warrant did say that it was
16      the rear property.  But, again, that was
17      never shown to me.
18  BY MR. WEST:
19      Q.    Okay.  So if you're breaching the
20  front door of an occupied area on the first floor,
21  would that have been violating the warrant or did
22  you believe that was allowed under the
23  circumstances?
24          MR. ZURBRIGGEN:  Object to form.

Page 44

1       Officer, you can answer.
2           THE WITNESS:  Based on the
3       information I had prior to us entering
4       that property, I believe that we were
5       entering into an area that would lead us
6       to the second floor and not into an
7       occupied space of solely the first
8       floor.
9   BY MR. WEST:
10      Q.    Right.  So even though this wasn't
11  the case, I think you'll agree, if it had been
12  true that the second-floor apartment was
13  accessible by going through the first-floor
14  apartment, did you believe that that would have
15  been permissible if the warrant only applied to
16  the second-floor apartment?
17          MR. ZURBRIGGEN:  Object to form.
18      Officer, you can answer.
19  BY MR. WEST:
20      Q.    Do you understand the question?
21      A.    You're stating it as if we only had
22  access to the second floor, but we're also going
23  through an occupied first floor.
24      Q.    Yes.

80ef9dad-d257-49c4-a9d1-b955b1b8559b

Page 45

1      A.    Yes, you would have to have a
2  warrant covering the entire property had that been
3  the case.  But with our expectation of it being a
4  common shared area that was why we entered that
5  door.  But, yes, if we had to have -- if it was a
6  situation where we believe that the only way to
7  get to the second floor was through the first
8  occupied floor and not through a shared area,
9  then, yes, we would have to have a warrant that
10  would allow us to enter that way.
11      Q.    So prior to breaching Ms.
12  Alvarado's front door, you knew that you were not
13  allowed to enter any occupied area other than the
14  second-floor rear apartment described in the
15  warrant; correct?
16          MR. ZURBRIGGEN:  Object to form.
17          Officer, you can answer.
18          THE WITNESS:  Correct, we were
19      attempting to get to the second floor
20      only, not Ms. Alvarado's property.
21  BY MR. WEST:
22      Q.    Okay.  Prior to breaching Ms.
23  Alvarado's front door, did you know -- I'm not
24  asking if you had an assumption or a speculation

Page 46

1  -- did you know what was on the other side of that
2  door?
3          MR. ZURBRIGGEN:  Object to form.
4          Officer, you can answer.
5          THE WITNESS:  I have never known
6      what's on the other side of another door
7      until I've gone through it.
8  BY MR. WEST:
9      Q.    What, if any, efforts did you make
10  to determine whether or not someone was living on
11  the other side of that door?
12          MR. ZURBRIGGEN:  Object to form.
13          Officer, you can answer.
14          THE WITNESS:  As I stated before,
15      we have a team that does our recon and
16      gets the information that we base it off
17      of.  So I personally did nothing being
18      that it was not my personal
19      responsibility to get that information.
20      So we're all team members.  We all have
21      our own job sets.  Granted, a lot of
22      them are -- we may do different -- you
23      know, that may be my responsibility
24      today, but on this job it was not.  So I

Page 47

1      had to base it off of the other recon
2      team's information.  So I personally did
3      not do anything for this property's
4      recon.
5  BY MR. WEST:
6      Q.    Have you ever been part of a recon
7  team?
8      A.    Again, yes.
9      Q.    I'm sorry, what?
10      A.    Yes.
11      Q.    Okay.  And did you receive any
12  training from the Philadelphia Police Department
13  as to how to conduct recognizance in this kind of
14  situation?
15          MR. ZURBRIGGEN:  Object to form.
16          But, Officer, you can answer.
17          THE WITNESS:  Yes, I've been
18      trained how to do recons.
19  BY MR. WEST:
20      Q.    All right.  So what training, if
21  any, did you receive from the Philadelphia Police
22  Department as to what you could do to determine
23  whether or not a door led to a common area or an
24  occupied area?

Page 48

1          MR. ZURBRIGGEN:  Object to form.
2          Officer, you can answer.
3          THE WITNESS:  I don't have any
4      training as far as having a building
5      layout and even blueprints that may have
6      been printed when they built the
7      structure.  We've been in many houses
8      that have been converted and changed and
9      knowing what could possibly be inside
10      somebody else's house legally or
11      illegally you don't know until you're
12      inside that house.  So there's nothing
13      other than what I can see from the
14      street view that would let me know the
15      information of what's inside the
16      property.
17  BY MR. WEST:
18      Q.    Okay.  Did the Philadelphia Police
19  Department ever provide any specific training on
20  how to conduct recognizance at multi-residence
21  buildings?
22          MR. ZURBRIGGEN:  Object to form.
23          Officer, you can answer.
24          THE WITNESS:  No.  There was a --

Page 49

1     the training I received was simply
2     hands-on training while in SWAT basic
3     school. When we go to our basic
4     training that's you spend time going out
5     and putting eyes on properties and
6     getting ways that, you know, you're
7     basically sizing up a property and
8     seeing what information can be feasible.
9     But as far as a specific one for a
10    multi-dwelling it would just have been
11    whatever is incorporated in that initial
12    training.
13   BY MR. WEST:
14        Q.    Okay. The City of Philadelphia is
15   more densely populated than most areas in the
16   United States; correct?
17              MR. ZURBRIGGEN: Object to form.
18              Officer, you can answer; if you
19        can.
20              THE WITNESS: I mean, we're a major
21        city.
22   BY MR. WEST:
23        Q.    Is it your experience that many
24   people in the City of Philadelphia live in

Page 50

1     multi-residence dwellings; apartment buildings,
2     houses, that might have multiple units within them
3     of various forms of multi-residence properties?
4          A.    Yes, we see them both legal and
5     illegal multi-residence properties.
6          Q.    Okay. Are you implying that the
7     building in question was illegal in any way?
8              MR. ZURBRIGGEN: Object to form.
9              Officer, you can answer.
10             THE WITNESS: No. What I'm saying
11       is that we come across many types. So
12       just because it appears to be a single
13       dwelling, once you get inside you never
14       know exactly how it's going to be.
15   BY MR. WEST:
16        Q.    Okay. Well, as you already said,
17   this warrant specifically referred to an apartment
18   number, Apartment Number 2; correct?
19        A.    Correct.
20        Q.    Okay. So not worrying about
21   illegal properties, you were aware of the fact
22   that there's certain properties that have
23   apartments within a single building in the City of
24   Philadelphia; correct?

Page 51

1              MR. ZURBRIGGEN: Object to form.
2              Officer, you can answer.
3              THE WITNESS: Correct.
4     BY MR. WEST:
5          Q.    Okay. And when you're attempting
6     to execute a warrant at a multi-residence
7     building, that does present special issues so that
8     you are sure to only enter the property that
9     you're allowed to enter with a warrant without
10    violating the Constitutional Rights of any other
11    people in the building; correct?
12             MR. ZURBRIGGEN: Objection to form.
13             Officer, you can answer.
14             THE WITNESS: Can you just -- I'm
15       sorry, can you run that back one more
16       time?
17       I apologize.
18    BY MR. WEST:
19        Q.    Sure. If you are executing a
20   warrant --
21        A.    Right.
22        Q.    -- at a multi-residence building,
23   doesn't that present a special consideration in
24   that you want to make sure that you only enter the

Page 52

1     apartment identified in the warrant so that you
2     don't enter anyone else's private home and violate
3     their Constitutional Rights?
4              MR. ZURBRIGGEN: Object to form.
5              Officer, you can answer; if you
6        can.
7              THE WITNESS: Yes, we attempt based
8        on the information that's available to
9        us to always only enter the property
10       that we believe -- or we always attempt
11       to go directly to the property and not
12       to disrupt any other properties, if at
13       all possible.
14    BY MR. WEST:
15        Q.    Based on your training in the
16   policies and procedures of the Philadelphia Police
17   Department, do people who live in apartments have
18   the same Constitutional Right not to have police
19   officers break down their door and break into
20   their house add shoot their dog as people who live
21   in private homes?
22             MR. ZURBRIGGEN: Object to form.
23             Officer, if you can answer; you can
24       answer.

80ef9dad-d257-49c4-a9d1-b955b1b8559b

1          THE WITNESS:  Yes, everyone has the
2      same Constitutional Rights regardless of
3      their property or whatever.
4   BY MR. WEST:
5          Q.    Given that, when you entered the
6   building in question, how did you make sure that
7   you weren't entering the apartment belonging to
8   someone who is not subject to the warrant?
9          MR. ZURBRIGGEN:  Object to form.
10      Particularly, Officer, you can
11      answer again.
12          THE WITNESS:  As I answered before,
13      I was given the information based on the
14      other officers, what the other officers
15      recovered when they went out and did
16      their recon.  And based on that
17      information that's how we served this
18      warrant attempting not to enter any
19      other property.  So I personally did not
20      do a recon on it because that wasn't my
21      job set that day.  But I just took the
22      information that was presented to me,
23      and our your team executed the warrant
24      based on that information.

1   BY MR. WEST:
2          Q.    When you personally have done
3   recognizance, as a member of the SWAT unit, have
4   you ever contacted a property owner or property
5   manager to ask about the layout of the property?
6          A.    I have not, no.
7          Q.    When you've done recognizance at --
8   have you ever done recognizance at an apartment
9   building?
10          A.    Yes.
11          Q.    So when you've done recognizance at
12   an apartment building, how have you determined
13   which -- how to get to the apartment in question?
14          MR. ZURBRIGGEN:  Object to form.
15   BY MR. WEST:
16          Q.    Do you understand the question?  I
17   can rephrase that.
18          A.    I understand what you're saying.
19   Again, there's a lot of different types of
20   apartments.  So depending on the type of
21   apartment, if it is a large multi-floored, you
22   know, complex, that's one thing.  Everything gets
23   handled as best as we can while also not trying to
24   tip off the target that we're, you know, trying to

1   apprehend.  So we use as much information that's
2   at hand.
3          Q.    Do you know whether or not the
4   suspect in this situation was on parole or
5   probation?
6          MR. ZURBRIGGEN:  Object to form.
7          But, Officer, you can answer.
8          THE WITNESS:  I'm unaware either
9      way.
10   BY MR. WEST:
11          Q.    Have you ever contacted a parole or
12   probation officer to ask how to get to the
13   person's house?
14          A.    I personally have not, no.
15          Q.    Okay.  Did you receive any training
16   besides what we've discussed before from the
17   Philadelphia Police Department as to how you could
18   conduct recognizance on a multi-residence
19   dwelling?
20          MR. ZURBRIGGEN:  Object to form,
21      asked and answered.
22          Officer, you can answer again.
23          THE WITNESS:  Ask that again.
24          MR. WEST:  Yes.

1          THE WITNESS:  I have a feeling we
2      already did answer this question; right?
3      Am I incorrect?
4   BY MR. WEST:
5          Q.    Well, I'm just trying to make sure
6   I'm not missing anything, because so far I don't
7   recall you stating any specific checklist of items
8   or techniques or anything you would do to figure
9   out if you're going to the right apartment at a
10   multi-residence dwelling.
11          So I'm just wondering is there
12   anything that you would do to try to check?
13          MR. ZURBRIGGEN:  Same objection,
14      Officer.
15          THE WITNESS:  Again, we do not have
16      a checklist.  I was trained how to
17      conduct a recognizance.  Without giving
18      out everything that we use as a unit
19      that is not privy to the public as far
20      as tipping off how we do these, but we
21      do not have a checklist as far as
22      checking each little box.  We take the
23      information that's presented to us with
24      as much information as possible without

Page 57

1      -- we try to gain as much information as
2      possible while not tipping off the
3      offender again.
4  BY MR. WEST:
5      Q.    Okay.  Is there anything you would
6  do beyond what you've already described?
7           MR. ZURBRIGGEN:  Object to form.
8           Officer, you can answer.
9           THE WITNESS:  No.
10 BY MR. WEST:
11     Q.    Okay.  So I think you said that you
12 believe that the front door would lead to a common
13 area.
14           Was that something that you've been
15 trained or was that just some guess that you had
16 or where did that come from?
17           MR. ZURBRIGGEN:  Object to form,
18           and asked and answered.
19           Officer, you can answer again.
20           THE WITNESS:  That is based on the
21           numerous warrants we've done in the City
22           of Philadelphia and the information that
23           was presented on this recon paperwork.
24 BY MR. WEST:

Page 58

1      Q.    Okay.  If you had known that there
2  was a rear door, in every sense a front door as
3  much as the one that you breached with a gate on a
4  cul-de-sac, and if you had known that the warrant
5  specified the rear, would that possibly have
6  changed your thinking about whether or not you
7  needed to figure out which door led to the
8  second-floor rear apartment?
9           MR. ZURBRIGGEN:  Object to form.
10           Officer, you can answer.
11           THE WITNESS:  Yes, based on the
12           information you just said, had I known
13           that this was solely a rear property, we
14           still would have had people in the
15           front, but our entry point would have
16           been through the rear.
17 BY MR. WEST:
18     Q.    Okay.  As part of your
19 recognizance, have you ever attempted to obtain
20 blueprints to properties?
21           MR. ZURBRIGGEN:  Object to form.
22           Officer, you can answer.
23           THE WITNESS:  No.
24 BY MR. WEST:

Page 59

1      Q.    So did you see Ms. Alvarado on the
2  date of the incident at any point?
3      A.    I did.
4      Q.    And just tell me everything you can
5  remember about that.
6      A.    I believe they were -- the property
7  was being secured at that point.  By the time I
8  encountered her she was in her kitchen area,
9  kitchen, dining room area.  I believe she was
10 seated when I encountered her.
11     Q.    Did you hear her ask for an
12 opportunity to put her dog in its cage?
13     A.    I did not hear any of that, no.
14     Q.    Do you specifically recall whether
15 or not she said that?
16     A.    I never heard it, no.
17     Q.    Did you see Officer Song fire his
18 gun?
19     A.    I did.
20     Q.    Where was the dog physically
21 located in relation to Officer Song at the time
22 that the gun was fired?
23     A.    He was directly in front of him
24 facing him with his head, you know, pointed

Page 60

1  towards him.
2      Q.    Okay.  And how far apart was the
3  dog's head and Officer Song's body at that time?
4      A.    Six inches to a foot, something
5  like that.
6      Q.    Based on your experience and
7  training with the Philadelphia Police Department,
8  if you heard a dog barking inside of a property,
9  would that be any reason to cut short the amount
10 of time under the knock and announce rule between
11 knocking on the property and breaching the door?
12           MR. ZURBRIGGEN:  Object to form.
13           Officer, you can answer; if you
14           can.
15           THE WITNESS:  No.
16 BY MR. WEST:
17     Q.    Do you know whether or not Officer
18 Clark played any role in the recognizance for the
19 warrant we're discussing?
20     A.    I don't recall.
21     Q.    Have you ever been interviewed by
22 Internal Affairs before?
23     A.    Based on this job?
24     Q.    Or any other job?

Page 61

1          MR. ZURBRIGGEN: Object to form.
2      But, Officer, you can answer.
3          THE WITNESS: Yes.
4  BY MR. WEST:
5      Q.   How many times?
6          MR. ZURBRIGGEN: Same objection.
7      Officer, you can answer.
8          THE WITNESS: I don't have a
9      number, offhand.
10 BY MR. WEST:
11     Q.   Can you give an estimate or an
12 approximation?
13         MR. ZURBRIGGEN: Same objection.
14     Officer, you can answer.
15         THE WITNESS: In my career I have
16     probably, I guess, 20 times.
17 BY MR. WEST:
18     Q.   Okay.  And what were those
19 incidents about?
20         MR. ZURBRIGGEN: Object to form.
21     Officer, you can answer.
22         THE WITNESS: Everything, you name
23     it, police complaints, police-involved
24     shootings, anything.

Page 62

1  BY MR. WEST:
2      Q.   Have you ever been involved in any
3  situation where there was an allegation that a
4  property was entered without a warrant?
5          MR. ZURBRIGGEN: Object to form.
6      But, Officer, you can answer.
7          THE WITNESS: I don't believe so.
8  BY MR. WEST:
9      Q.   Other than this incident; correct?
10     A.   Correct.  To clarify, I was never
11 interviewed for the purpose of the property being
12 entered, you know, unintentionally.  It was
13 interviewed in regards to the shooting, not in
14 reference to the property.
15     Q.   Have you ever been involved in any
16 incident involving the shooting of an animal?
17     A.   I have not aside from this one.
18         MR. WEST: All right.  That's
19     pretty much all the questions I have for
20     you today.
21         MR. ZURBRIGGEN: All right.
22     Officer, I just have a few very brief.
23         - - -
24         EXAMINATION

Page 63

1          - - -
2  BY MR. ZURBRIGGEN:
3      Q.   Officer, you had answered a few
4  questions from plaintiff's counsel about OC or
5  pepper spray.
6          Do you recall those questions?
7      A.   I recall answering questions.  This
8  particular question, I don't recall.
9      Q.   If you can, can you take me through
10 any factors you might consider when you use pepper
11 spray, just briefly describe what you might
12 consider when you use pepper spray?
13     A.   As far as, I mean, you basically
14 have to -- for humans or for dogs or for
15 everything?
16     Q.   Any situation.
17     A.   Any situation.  I mean, there's
18 obviously a list of rules for when we can use OC
19 such as on people.  There's distances involved.
20 Also, you have to worry about cross-contamination
21 to the other operators in the property or other
22 officers depending on the job, itself, you know.
23 Being pepper sprayed myself, it takes away from
24 your focus.  It's obviously once you spray it in

Page 64

1  the house everyone that's in the house gets
2  contaminated by it.
3      Q.   So the size of any closed space is
4  one factor you consider?
5      A.   Absolutely.
6          MR. ZURBRIGGEN: That's all I have.
7      I don't know if Keith has any
8      follow-up on that.
9          MR. WEST: Yes, just a quick
10     follow-up.
11         MR. ZURBRIGGEN: Sure.
12         - - -
13         EXAMINATION
14         - - -
15 BY MR. WEST:
16     Q.   So, Officer Murray, I'm trying to
17 just visualize how all of this went down.
18         So your belief is that the reason
19 why Ms. Alvarado's front door was breached was
20 because there was an expectation that once that
21 door was forced open there would be some sort of
22 porch or common area on the other side; correct?
23         MR. ZURBRIGGEN: Object to form,
24     beyond the scope, asked and answered.

80ef9dad-d257-49c4-a9d1-b955b1b8559b

Page 65

1           Go ahead, Officer.
2           THE WITNESS:  Again, yes.
3      BY MR. WEST:
4           Q.    Okay.  When that door was breached,
5      however, anybody who looked inside would have seen
6      a normal looking apartment; right?
7                MR. ZURBRIGGEN:  Same objection and
8           object to form.
9           Officer?
10               THE WITNESS:  You would have seen
11          the apartment, yes.
12     BY MR. WEST:
13          Q.    Okay.  And you did eventually enter
14     an apartment, it looked like a normal apartment,
15     couch, TV, kitchen; right?
16               MR. ZURBRIGGEN:  Same objection.
17          Officer?
18               THE WITNESS:  Yeah.  I mean, I was
19          in the living and the kitchen was the
20          extent of how far I went in, but, yes.
21     BY MR. WEST:
22          Q.    Okay.  But anybody who looked
23     inside that dwelling could immediately recognize
24     that was an occupied area; correct?

Page 66

1                MR. ZURBRIGGEN:  Same objection.
2           Officer?
3                THE WITNESS:  Yeah, it appeared
4           that it was at least a single.  Whether
5           it also extended to the second floor,
6           that you couldn't say.
7      BY MR. WEST:
8           Q.    See, here's what I don't
9      understand.  Even if the SWAT unit for some reason
10     believed ahead of time that if they knocked down
11     that door it would lead into some sort of common
12     area, once that door was knocked in and people
13     looked ahead, shouldn't they have recognized
14     immediately that they were entering an occupied
15     area and then withdrawn?
16               MR. ZURBRIGGEN:  Same objections.
17          Officer?
18               THE WITNESS:  Again, we were going
19          after a homicide.  Just to put it in
20          perspective, you're going after a
21          homicide suspect.  So if -- now we have
22          a duty to contain the property.  We're
23          not necessarily searching and doing all
24          of that.  But you -- we don't know that

Page 67

1      there isn't a second-floor access from
2      there.  So if it very -- like I said
3      before, when you have these properties,
4      people rehabilitate them, they change
5      them.  There's nothing saying that this
6      -- now this defendant can't go freely
7      from the first and second floor.  So
8      just in the matter of for the purpose of
9      securing the property it was secured,
10     but you're not actively searching this
11     house and tearing it, you know, tearing
12     it and looking for evidence and that
13     aspect.  Once you have that access
14     you're going to gain control and then
15     move.  Once they realized it was the
16     second floor they exited while I
17     maintained the security of the first
18     floor.  And then they were able to
19     execute a second floor and get that, you
20     know, under control.
21     BY MR. WEST:
22          Q.    So in executing this warrant for
23     the second-floor Apartment Number 2 rear, once the
24     members of the SWAT unit knew that they were

Page 68

1      entering an occupied first-floor apartment, were
2      they allowed to continue and go into that
3      apartment or should they have understood that they
4      were not allowed to be there?
5                MR. ZURBRIGGEN:  Same objections
6           and objection to form.
7           Officer?
8                THE WITNESS:  As I stated before,
9           you're securing it.  We entered there
10          with the basis of -- with the
11          expectation of it being a common area.
12          Again, it has the concern and safety
13          issue, even for Ms. Alvarado's -- that
14          is her name; correct?
15     BY MR. WEST:
16          Q.    Alvarado.
17          A.    Alvarado, excuse me, Alvarado's.
18     If we now -- if there is flow back and forth and
19     this male is coming down, he could harm her.  So
20     we have to secure the property and ensure that
21     she's safe.  Nobody in any -- had any intention of
22     going in her property with the expectation of
23     encountering her or violating Constitutional
24     Rights.  It is -- but now that we're here we have

17 (Pages 65 to 68)

Page 69

1  to secure and make sure that she is still safe
2  from the suspected murderer who's on the second
3  floor of the property and that she doesn't have --
4  he doesn't have access and he can put her in
5  harm's way.  So as much as it is a shame that
6  we're in the property and that mistake was made
7  it's now our job to make sure that she is safe
8  until we actually secure her property and go from
9  there.
10        Q.    Do you believe that the SWAT unit
11  was protecting Ms. Alvarado from her dog?
12              MR. ZURBRIGGEN:  Object to form.
13        Officer, you can answer; if you
14        can.
15              THE WITNESS:  That was not the
16        intention at any point.
17  BY MR. WEST:
18        Q.    Do you believe that anyone from the
19  SWAT unit attempted to gain Ms. Alvarado's consent
20  to enter her private home?
21              MR. ZURBRIGGEN:  Same objection.
22        Officer, you can answer.
23              THE WITNESS:  When we knocked and
24        announced it was attempting to gain the

Page 70

1        second floor, not her floor, not her
2        property.
3  BY MR. WEST:
4        Q.    Okay.  Once the door was breached,
5  isn't it true that Ms. Alvarado asked for the
6  officers to leave?
7              MR. ZURBRIGGEN:  Same objection,
8        all of the previous objections.
9              THE WITNESS:  I never heard her ask
10        for anyone to leave, no.
11  BY MR. WEST:
12        Q.    Okay.  Last question.
13              So you -- once the officers knew
14  that they had entered the wrong apartment, you
15  don't believe that they were obligated to leave as
16  soon as possible?
17              MR. ZURBRIGGEN:  Same set of
18        objections.
19              Officer?
20              THE WITNESS:  Again, our obligation
21        at that point is to make sure that she's
22        safe and the property is secure.  And
23        unfor -- had it not been a dog shooting
24        we would have backed out once he was --

Page 71

1        we knew there was no issues and then it
2        would have just been handed down to the
3        supervisor obviously to deal with the
4        issue as far as the City Solicitor would
5        handle it as far as the fact that we
6        entered her property incorrectly.
7              MR. WEST:  All right.  That's all I
8        have for today.  Thanks.
9              MR. ZURBRIGGEN:  No follow-up here.
10        Thank you.
11              THE WITNESS:  Not a problem, not a
12        problem.
13              THE VIDEOTAPE OPERATOR:  Going off
14        the record at 11:03 a.m.
15              ---
16              (Whereupon, a discussion took place
17        off the video record only.)
18              ---
19              MR. WEST:  I think the only thing
20        is we should quickly put on the record
21        that we will mark this as Murray
22        Exhibit-1.  By mutual agreement that's
23        marked Murray-1.
24              MR. ZURBRIGGEN:  We'll mark it on

Page 72

1        our end and agreed.
2              ---
3              (Whereupon, Exhibit Murray-1 was
4        marked for identification.)
5              ---
6              (Whereupon, the deposition
7        concluded at 11:03 p.m.)
8              ---

80ef9dad-d257-49c4-a9d1-b955b1b8559b

Page 73

```
 1
 2
 3                 CERTIFICATION
 4
 5         I, DOUGLAS S. DIAMOND, hereby
 6   certify that the foregoing is a true and correct
 7   transcript transcribed from the stenographic notes
 8   taken by me on Friday, August 11, 2023.
 9
10
11
                 DOUGLAS S. DIAMOND
12           Court Reporter - Notary Public
13              (This certification does not apply
14   to any reproduction of this transcript, unless
15   under the direct supervision of the certifying
16   reporter.)
17
18
19
20
21
22
23
24
```

80ef9dad-d257-49c4-a9d1-b955b1b8559b

**A**

**a.m** 1:17 4:23
32:22 33:8
71:14
**able** 67:18
**Absolutely** 64:5
**access** 10:11
12:9 15:9
44:22 67:1,13
69:4
**accessible** 44:13
**accurate** 37:2,23
**act** 34:1
**ACTION** 1:4
**actively** 67:10
**actual** 15:10
**ADAM** 2:8
**adam.zurbrig...**
2:12
**add** 52:20
**address** 4:19
11:19
**Affairs** 10:23
35:4 60:22
**aggressively**
10:7
**agree** 44:11
**agreed** 72:1
**agreement** 71:22
**agrees** 11:17
**ahead** 17:11
29:24 41:23
65:1 66:10,13
**al** 1:7
**alert** 15:7
**alerting** 15:2
**allegation** 62:3
**alleyway** 15:7
**allow** 14:3 18:15
18:24 45:10
**allowed** 17:9,18
18:12 20:12
43:22 45:13
51:9 68:2,4
**Alvarado** 1:4
4:13 5:2,8 6:5
18:3 32:5 59:1
68:16,17 69:11
70:5

**Alvarado's** 8:22
19:9 22:7
23:10 25:3
28:5 32:14
34:13 45:12,20
45:23 64:19
68:13,17 69:19
**American** 1:14
2:3
**amount** 16:20
19:19 20:18
23:1 60:9
**animal** 62:16
**announce** 16:21
17:3,5 18:5,6
25:9 60:10
**announced** 9:23
13:11 69:24
**announces**
13:17
**announcing**
13:4
**answer** 7:9,22
8:1 11:8 14:5
16:4,5,16
17:21 18:17
19:5,22 20:16
20:23 21:7,22
22:10 23:4,14
24:22 25:7,24
26:15 27:12
28:19 29:7
30:15 31:9,23
32:7 33:16
34:8,20 35:15
35:23 36:15
38:4,10,16
39:4,21 40:5
40:17 41:3,7
41:16,17 42:10
42:19 43:7
44:1,18 45:17
46:4,13 47:16
48:2,23 49:18
50:9 51:2,13
52:5,23,24
53:11 55:7,22
56:2 57:8,19
58:10,22 60:13

61:2,7,14,21
62:6 69:13,22
**answered** 53:12
55:21 57:18
63:3 64:24
**answering** 63:7
**anybody** 65:5,22
**Anymore** 17:14
**apart** 60:2
**apartment** 8:22
9:11,19 10:12
11:5 23:10
43:1,4 44:12
44:14,16 45:14
50:1,17,18
52:1 53:7 54:8
54:12,13,21
56:9 58:8 65:6
65:11,14,14
67:23 68:1,3
70:14
**apartments**
50:23 52:17
54:20
**apologize** 51:17
**appeared** 66:3
**appears** 39:5,8
39:13 50:12
**applied** 11:4
44:15
**apply** 73:13
**apprehend** 55:1
**approached**
9:17
**appropriate**
30:24
**approximately**
1:17
**approximation**
8:3,4 19:15
61:12
**ARCH** 2:9
**area** 34:15 38:14
39:1 40:3 42:8
42:17 43:3,20
44:5 45:4,8,13
47:23,24 57:13
59:8,9 64:22
65:24 66:12,15

68:11
**areas** 49:15
**arises** 8:21
**arriving** 22:6
**ascertain** 40:2
40:11,24 41:21
**aside** 32:10
36:16 62:17
**asked** 8:8 14:4
40:18 41:4
55:21 57:18
64:24 70:5
**asking** 45:24
**aspect** 67:13
**assume** 24:19
39:18
**assuming** 13:5
20:10
**assumption** 7:9
12:10 45:24
**attempt** 29:23
52:7,10
**attempted** 58:19
69:19
**attempting**
45:19 51:5
53:18 69:24
**attorney** 5:24
6:19
**attorneys** 6:4
**audio/video** 4:12
**August** 1:10
4:22 73:8
**available** 31:4
52:8
**Avenue** 8:23
11:18
**avoid** 26:12 27:9
**aware** 21:12,14
21:18,23 25:3
25:9 35:9
50:21

**B**

**back** 10:14 15:1
15:9 26:2 33:4
33:7 37:16
40:19,22 41:3
41:11 51:15

68:18
**backed** 70:24
**Badge** 4:11 5:5
**barking** 24:7,14
24:19,24 25:15
60:8
**base** 46:16 47:1
**based** 7:18 8:11
15:13 19:17
24:11 35:1
37:1 39:6,22
43:11,14 44:2
52:7,15 53:13
53:16,24 57:20
58:11 60:6,23
**basic** 26:20,22
49:2,3
**basically** 15:2
49:7 63:13
**basis** 34:17,21
68:10
**began** 25:9
**beginning** 1:16
16:2
**behalf** 5:7
**belief** 34:17
64:18
**believe** 9:20
10:15 12:19
13:2,3,10
14:20 17:14,15
23:11 24:1,7
24:12,14 34:24
37:2,9,24
43:22 44:4,14
45:6 52:10
57:12 59:6,9
62:7 69:10,18
70:15
**believed** 34:13
40:12 66:10
**belonging** 53:7
**best** 37:2,7
54:23
**beware** 24:9
**beyond** 57:6
64:24
**biggest** 30:5
**blends** 13:21

**block** 21:19
**blueprints** 48:5
  58:20
**body** 21:15 60:3
**box** 37:14 56:22
**breach** 10:1
  12:17,18 13:1
  16:14 18:15,22
  22:13,14,18
**breached** 10:2
  12:4 13:5 14:9
  15:21 16:10
  17:4 18:9 19:3
  19:10,20 22:8
  23:1,10 24:5,6
  25:21 28:24
  34:14 37:22,22
  58:3 64:19
  65:4 70:4
**breacher** 9:16
  10:2 13:16
**breachers** 9:16
  13:16,17
**breaching** 12:16
  12:21 25:2
  28:4 32:13
  43:19 45:11,22
  60:11
**break** 7:3 52:19
  52:19
**Brian** 1:12 3:3
  4:10 5:5,13
**brief** 62:22
**briefing** 14:18
  15:13,16
**briefly** 63:11
**bring** 30:16
**bringing** 27:22
**Broad** 1:15 2:3
  4:19
**building** 1:14
  2:3,9 8:22
  11:17,18,20
  12:1,1,3,17
  14:9,11 35:21
  37:10,10,11,14
  38:21 48:4
  50:7,23 51:7
  51:11,22 53:6

  54:9,12
**buildings** 48:21
  50:1
**built** 48:6
**bunch** 15:6
**business** 21:19

———— **C** ————

**C** 2:1
**cage** 59:12
**call** 12:1
**cameras** 21:16
**canisters** 30:17
**caption** 5:1
**car** 9:16
**career** 61:15
**carry** 26:1 27:21
**carrying** 28:21
**case** 4:14 5:1,3
  6:5 8:20 15:15
  18:2 44:11
  45:3
**caused** 22:17,24
**causes** 20:1
**causing** 22:14
**Center** 1:14 2:2
  4:18
**certain** 16:20
  50:22
**certainly** 15:24
  41:5
**certification** 4:4
  73:3,13
**Certified** 1:18
**certify** 73:6
**certifying** 73:15
**chance** 5:24
  10:19 36:22
**change** 67:4
**changed** 48:8
  58:6
**check** 56:12
**checking** 56:22
**checklist** 56:7,16
  56:21
**circumstance**
  26:6
**circumstances**
  14:23 20:1,6

  20:11 21:2
  22:12,23,23
  43:23
**city** 1:7 2:8 4:14
  5:2 8:23 33:23
  49:14,21,24
  50:23 57:21
  71:4
**CIVIL** 1:4
**clarify** 62:10
**Clark** 13:2,4,9
  13:10 60:18
**clear** 43:3
**clearly** 38:17
  42:7,16
**closed** 64:3
**Color** 3:13
**come** 50:11
  57:16
**comes** 15:23
**coming** 5:21
  10:7 68:19
**command** 10:1
**common** 9:22
  10:6 23:15
  34:15 45:4
  47:23 57:12
  64:22 66:11
  68:11
**Commonwealth**
  1:19
**compelled** 16:4
**complaints**
  61:23
**completely**
  35:10
**complex** 54:22
**complicated**
  6:10
**complies** 37:8
**comply** 18:19
**concern** 30:6
  68:12
**concluded** 72:7
**conduct** 47:13
  48:20 55:18
  56:17
**confer** 5:24
**confrontation**

  10:8
**consent** 69:19
**consider** 63:10
  63:12 64:4
**consideration**
  51:23
**Constitutional**
  51:10 52:3,18
  53:2 68:23
**contacted** 54:4
  55:11
**contain** 66:22
**containment**
  27:16
**contaminated**
  64:2
**continue** 7:1
  68:2
**control** 67:14,20
**controlling** 27:5
**converted** 48:8
**coordination**
  29:2
**cops** 15:6
**copy** 36:7
**correct** 6:1,2
  8:19 11:5,9
  15:18 17:4,9
  18:9,10,12,13
  19:6 20:21
  22:2,3 25:5
  31:21 34:6,15
  34:16 35:13,21
  37:11,12,14,15
  42:17 45:15,18
  49:16 50:18,19
  50:24 51:3,11
  62:9,10 64:22
  65:24 68:14
  73:6
**couch** 65:15
**counsel** 2:5,11
  4:3 36:8 63:4
**course** 10:8
**court** 1:1,18,21
  6:12,15 33:4
  41:11 73:12
**Courtney** 2:19
  4:17

**covered** 43:1
**covering** 45:2
**created** 37:19
**criticizing** 13:24
**cross-contami...**
  63:20
**cul-de-sac** 35:12
  58:4
**cut** 60:9

———— **D** ————

**D** 3:1
**dash** 4:15 5:3
**date** 1:16 4:22
  8:24 59:2
**day** 9:8,9,15
  13:8 15:3
  28:21 36:12,17
  53:21
**days** 15:4
**dcr.diamond...**
  1:23
**deal** 29:20 71:3
**defendant** 67:6
**Defendants** 2:11
**defense** 36:8
**definite** 27:5
**densely** 49:15
**Department** 2:8
  33:12,23 47:12
  47:22 48:19
  52:17 55:17
  60:7
**depending** 29:17
  54:20 63:22
**depends** 26:4
  30:19
**deploy** 26:5
**deployed** 28:16
**deposed** 5:4
**deposition** 1:12
  4:10,12,24 5:6
  5:9 6:6 10:21
  11:17 14:2
  36:5 72:6
**describe** 63:11
**described** 14:16
  45:14 57:6
**DESCRIPTION**

3:12
**determine** 46:10
    47:22
**determined**
    54:12
**Diamond** 1:18
    1:21 5:10 73:5
    73:11
**difference** 8:18
**different** 16:24
    26:6 34:1
    46:22 54:19
**dining** 59:9
**direct** 73:15
**directives** 33:24
    34:2
**directly** 52:11
    59:23
**discuss** 32:12
**discussed** 36:10
    55:16
**discussing** 60:19
**discussion** 32:24
    71:16
**dispatched** 10:9
**disrupt** 52:12
**distances** 63:19
**DISTRICT** 1:1
    1:2
**documents**
    10:20
**dog** 10:6,9 24:2
    24:7,9,9,13,14
    24:18,20,24
    25:4,10,15,22
    26:3,12 27:6,9
    27:13,18,19
    28:1,12,15,16
    29:9,21,22
    30:11,12 31:7
    31:12,13,17
    32:13 33:13
    52:20 59:12,20
    60:8 69:11
    70:23
**dog's** 60:3
**dogs** 26:23 34:3
    63:14
**doing** 8:5 66:23

**door** 9:21 10:1
    12:4,10,15,16
    13:1,15 14:9
    14:11 15:17,21
    16:9,14 17:3
    18:8,9,20,21
    18:22 19:3,9
    19:10,20 20:13
    20:14 22:7,7
    23:1,9,12,17
    23:19,19,21
    24:3,5,13,18
    25:3,5,21 28:5
    28:24 29:13
    31:15,15 32:14
    34:14 35:1,12
    37:18,21 38:2
    38:8,13 39:1
    39:14 42:7,22
    43:20 45:5,12
    45:23 46:2,6
    46:11 47:23
    52:19 57:12
    58:2,2,7 60:11
    64:19,21 65:4
    66:11,12 70:4
**doors** 34:22
**Douglas** 1:17
    5:10 73:5,11
**drives** 27:16
**duly** 5:14
**duty** 33:14
    66:22
**dwelling** 50:13
    55:19 56:10
    65:23
**dwellings** 50:1

——————
        **E**
——————
**E** 2:1,1,18,18
    3:1
**e-mail** 1:23 2:6
    2:12
**earlier** 34:13
**EASTERN** 1:2
**effect** 20:12
**effort** 40:1 41:21
**efforts** 46:9
**either** 15:3

    21:14 55:8
**elapse** 18:12
**else's** 48:10 52:2
**employed** 4:18
**enclosed** 39:6,8
    39:9,14,19
**encounter** 26:13
    27:9 28:17
    29:4,18 30:3
    30:13 31:12,17
    32:13
**encountered**
    28:15 59:8,10
**encountering**
    30:22 68:23
**encounters**
    33:13
**ended** 10:9
**enforced** 14:17
**enforcement**
    22:22
**ensure** 68:20
**enter** 10:3 31:6
    45:10,13 51:8
    51:9,24 52:2,9
    53:18 65:13
    69:20
**entered** 10:4
    45:4 53:5 62:4
    62:12 68:9
    70:14 71:6
**entering** 30:10
    42:16 43:3
    44:3,5 53:7
    66:14 68:1
**enters** 38:14
**entire** 45:2
**entry** 9:22 10:6
    10:13 58:15
**escape** 10:16
**ESQUIRE** 2:2,8
**estimate** 8:3,4
    8:11 61:11
**estimation** 19:14
**et** 1:7
**eventually** 65:13
**everybody** 29:3
**everyone's** 11:21
**evidence** 27:19

    67:12
**exact** 8:1 22:13
**exactly** 8:9
    42:21 50:14
**Examination**
    3:4,5 5:17
    62:24 64:13
**examined** 5:14
**example** 8:7
**exception** 7:23
**excuse** 68:17
**execute** 51:6
    67:19
**executed** 10:14
    53:23
**executing** 51:19
    67:22
**execution** 14:14
    15:16 18:3
**Exhibit** 72:3
**Exhibit-1** 71:22
**Exhibit-2** 36:5
**EXHIBITS** 3:12
**exigent** 14:23
    20:1,5,11 21:2
    22:12,22
**exited** 67:16
**expectation** 9:18
    9:21 25:16
    45:3 64:20
    68:11,22
**experience** 8:11
    19:17 33:22
    49:23 60:6
**extended** 39:9
    66:5
**extent** 65:20
**extra** 36:7
**eyeball** 8:9
**eyes** 12:7 15:5
    49:5

——————
        **F**
——————
**facing** 59:24
**fact** 21:19 25:3
    35:11,19 50:21
    71:5
**factor** 64:4
**factors** 63:10

**fair** 16:8,11 42:5
**far** 30:18 33:17
    34:3 39:9 48:4
    49:9 56:6,19
    56:21 60:2
    63:13 65:20
    71:4,5
**faster** 22:18
**feasible** 49:8
**feel** 8:2 13:24
    16:4
**feeling** 56:1
**feet** 8:8,15
**Felishatay** 1:4
    5:7
**figure** 56:8 58:7
**filing** 4:4
**fine** 11:21
**fire** 10:15 59:17
**fired** 59:22
**first** 13:12,14
    23:20 29:16
    30:21 31:5,14
    31:16,20,21
    37:17 42:17
    43:20 44:7,23
    45:7 67:7,17
**first-floor** 10:12
    44:13 68:1
**flexibility** 29:12
**floor** 2:10 4:20
    9:11 10:11,18
    11:12 12:9,11
    23:20,23 29:16
    38:1,8,14,19
    39:2,15 42:17
    43:1,4,11,13
    43:20 44:6,8
    44:22,23 45:7
    45:8,19 66:5
    67:7,16,18,19
    69:3 70:1,1
**floors** 38:22
**flow** 68:18
**focus** 63:24
**follow-up** 64:8
    64:10 71:9
**follows** 5:15
**foot** 60:4

22:1,5
**force** 30:6,22
**forced** 64:21
**foregoing** 73:6
**form** 4:6 11:7
16:15 17:12
18:16 19:21
20:15,22 21:6
21:21 22:9
23:3,13 24:21
25:23 26:14
28:18 29:6
30:14 31:8
33:15 34:7,19
35:14,22 36:14
38:3,23 39:3
39:20 40:4
41:15 42:9,18
43:6,24 44:17
45:16 46:3,12
47:15 48:1,22
49:17 50:8
51:1,12 52:4
52:22 53:9
54:14 55:6,20
57:7,17 58:9
58:21 60:12
61:1,20 62:5
64:23 65:8
68:6 69:12
**forms** 50:3
**forth** 68:18
**forward** 11:20
**France** 8:14
**freely** 67:6
**Friday** 73:8
**front** 12:13 19:9
20:13 22:7
23:19,21 24:18
25:3 28:5
34:14,23 37:18
37:21 43:20
45:12,23 57:12
58:2,15 59:23
64:19
**further** 26:2
**future** 12:2

**G**

**gain** 57:1 67:14
69:19,24
**gained** 12:9
**gate** 58:3
**gear** 27:21
**generally** 9:7
**getting** 49:6
**give** 7:18 8:2,4,7
8:10 16:20
18:18 19:14
40:8 61:11
**given** 16:13,13
19:20 27:2,8
36:20 53:5,13
**giving** 40:23
56:17
**glad** 7:12
**go** 9:12 14:21
15:1,2 17:11
28:8,10 29:13
30:1,20 32:18
40:24 41:23
49:3 52:11
65:1 67:6 68:2
69:8
**goes** 23:20 29:1
**going** 7:19 8:16
14:24 15:4,8
23:11 24:2
25:16 29:20,22
30:3,4,7 31:12
31:16 32:21
35:3 37:16,17
40:9 44:13,22
49:4 50:14
56:9 66:18,20
67:14 68:22
71:13
**good** 5:20,22 7:2
11:23 31:20
**Granted** 46:21
**grasp** 33:19
**green** 37:6,13,18
40:3
**grew** 8:14
**ground** 6:10
**guess** 7:20 8:17
16:6 57:15
61:16

**H**

**Halligan** 12:24
**hallway** 23:15
**hand** 37:16 55:2
**handed** 71:2
**handle** 25:22
26:23 29:4
30:12 71:5
**handled** 54:23
**handling** 34:3
**hands-on** 49:2
**happened** 13:8
**happening** 20:9
**happens** 19:24
**harm** 68:19
**harm's** 69:5
**head** 6:16 59:24
60:3
**heads** 40:8
**hear** 24:18,23
59:11,13
**heard** 34:6
59:16 60:8
70:9
**held** 10:12
**help** 31:10
**hey** 29:19 40:8
**high-risk** 40:7
**highlighted**
37:14
**highlighter** 37:6
**hindsight** 42:12
42:15,20
**home** 52:2 69:20
**homes** 52:21
**homicide** 9:9
14:24 30:5
40:7 66:19,21
**hospital** 9:16
**house** 29:1
39:10 48:10,12
52:20 55:13
64:1,1 67:11
**houses** 30:1 48:7
50:2
**humans** 63:14

**I**

**idea** 8:16
**Ideally** 18:20
**identification**
72:4
**identified** 52:1
**illegal** 50:5,7,21
**illegally** 48:11
**immediately**
65:23 66:14
**implying** 50:6
**inches** 60:4
**incident** 8:21,24
9:3 21:13,20
23:6 36:11
59:2 62:9,16
**incidents** 61:19
**incorporated**
49:11
**incorrect** 56:3
**incorrectly** 71:6
**indicating** 24:10
**information**
14:21 15:12
41:1 44:3
46:16,19 47:2
48:15 49:8
52:8 53:13,17
53:22,24 55:1
56:23,24 57:1
57:22 58:12
**initial** 49:11
**inside** 24:20
30:11 37:18
39:11 48:9,12
48:15 50:13
60:8 65:5,23
**instructed** 16:2
**instructions**
14:15
**instructs** 7:1
**intention** 68:21
69:16
**interjects** 6:23
**Internal** 10:22
35:4 60:22
**interviewed**
60:21 62:11,13
**involved** 62:2,15

63:19
**involving** 18:3
32:5 62:16
**issue** 68:13 71:4
**issues** 51:7 71:1
**items** 56:7

**J**

**Jersey** 1:20,22
**job** 16:24 17:13
19:11 46:21,24
53:21 60:23,24
63:22 69:7
**jobs** 12:7
**June** 9:1 17:17
20:6,13 33:11
**juts** 37:3

**K**

**Keith** 2:2 6:3
64:7
**keith@victim...**
2:6
**kept** 27:15
**killed** 40:11,12
**kind** 6:16 7:23
8:10 11:16
13:21 25:17
47:13
**kitchen** 59:8,9
65:15,19
**Kitcherman**
2:19 4:17
**knew** 9:18 10:5
11:3 43:10
45:12 67:24
70:13 71:1
**knock** 17:3,5
18:4,6 25:8
60:10
**knocked** 9:23
13:11 18:8
19:10 20:14,14
66:10,12 69:23
**knocking** 13:4
60:11
**knocks** 13:17
16:21
**know** 7:5,12,14
7:19,22,23,23

7:24 8:1,5,17
11:11,14,24
12:3,8 13:11
13:11 14:10
15:8,22 16:3
16:18,22 24:15
25:12 28:20
29:21,22,24
30:3 31:11
32:8 34:4
36:23 39:11
42:2,21 43:9
43:12 45:23
46:1,23 48:11
48:14 49:6
50:14 54:22,24
55:3 59:24
60:17 62:12
63:22 64:7
66:24 67:11,20
**knowing** 25:13
43:11 48:9
**knowledge**
15:14 21:16,17
24:8 27:2,18
27:23 32:16
33:10 34:10
35:6 42:4
**known** 29:9
30:10 46:5
58:1,4,12

**L**

**L** 2:18
**Lane** 1:22
**large** 54:21
**larger** 30:17
**Law** 1:13,14 2:2
2:8 4:18
**lay** 11:16
**layman's** 26:9
**layout** 10:17
39:10,12 40:9
43:12 48:5
54:5
**lead** 14:20 34:14
44:5 57:12
66:11
**leading** 12:11

24:12 25:12
**leads** 23:16,21
39:1 42:7,13
**learn** 22:4
**leash** 24:9
**leave** 70:6,10,15
**led** 47:23 58:7
**left** 55:7
**legal** 50:4
**legally** 48:10
**lethal** 26:12 27:9
28:17 30:6,22
**Lieutenant**
15:23
**likelihood** 32:12
**likewise** 7:8
**limited** 27:1
**line** 26:3 29:15
33:13
**list** 63:18
**little** 14:3 56:22
**live** 49:24 52:17
52:20
**living** 40:2 46:10
65:19
**located** 8:23
59:21
**location** 9:10
**longer** 10:5
17:24
**look** 15:5 36:20
39:17 42:6
**looked** 15:10
65:5,14,22
66:13
**looking** 33:19
38:7 39:13
42:15 43:2
65:6 67:12
**lot** 19:12 29:11
46:21 54:19
**louder** 7:13

**M**

**maintained**
67:17
**major** 6:11
49:20
**making** 16:21

**male** 68:19
**manager** 35:7
54:5
**manner** 25:22
26:24 29:5
30:13
**Mantua** 1:22
**mark** 71:21,24
**marked** 36:4
71:23 72:4
**markings** 9:19
**matter** 4:13 67:8
**mean** 12:5 22:15
24:8,16 31:15
37:1 49:20
63:13,17 65:18
**meaningful** 8:3
**means** 10:2 27:5
**measures** 25:20
**meeting** 14:13
**member** 36:11
54:3
**members** 46:20
67:24
**memory** 16:12
**mentioned**
15:17 18:7
28:5
**metric** 8:14
**mind** 15:23
**minimum** 19:19
**minimums**
19:24
**missing** 56:6
**mistake** 69:6
**moment** 24:15
32:19 35:3
**Monk** 15:23
**morning** 5:20,22
20:6
**move** 67:15
**Moving** 11:19
**multi-dwelling**
49:10
**multi-floored**
54:21
**multi-residence**
48:20 50:1,3,5
51:6,22 55:18

56:10
**multiple** 16:21
31:11 50:2
**murderer** 69:2
**Murray** 1:13 3:3
4:10 5:5,13
15:15 16:1
30:9 33:10
64:16 71:21
**Murray-1** 3:13
71:23 72:3
**mutual** 71:22

**N**

**N** 2:1,18 3:1
**name** 4:16 6:3
61:22 68:14
**nature** 34:3
**necessarily**
66:23
**need** 7:3 31:7
**needed** 58:7
**neighboring**
21:19
**never** 10:17 17:6
17:23 22:1
29:12 30:2
31:11 34:5
43:17 46:5
50:13 59:16
62:10 70:9
**New** 1:20,22
**night** 15:3
**no-knock** 17:7,9
17:19 18:4
**nods** 6:15
**non-issue** 25:17
**non-lethal** 25:22
26:23 30:13
**noose** 27:13 28:1
28:13 30:19,21
30:23
**normal** 23:1
65:6,14
**normally** 29:1
30:11 31:3
**North** 1:14 2:3
**Notary** 1:18
73:12

**note** 24:10
**notes** 13:3,13
73:7
**number** 4:11,14
5:3,5 9:20 18:8
34:24 43:1,4
50:18,18 61:9
67:23
**numerous** 57:21

**O**

**O** 2:18
**object** 11:6
16:15 17:12
18:16 19:21
20:15,22 21:6
21:21 22:9
23:3,13 24:21
25:23 26:14
28:18 29:6
30:14 31:8
33:15 34:7,19
35:14,22 36:13
38:3,23 39:3
39:20 40:4
42:9,18 43:6
43:24 44:17
45:16 46:3,12
47:15 48:1,22
49:17 50:8
51:1 52:4,22
53:9 54:14
55:6,20 57:7
57:17 58:9,21
60:12 61:1,20
62:5 64:23
65:8 69:12
**objection** 17:20
19:4 25:6
27:11 31:22
32:6 38:9,15
41:6,15,22
51:12 56:13
61:6,13 65:7
65:16 66:1
68:6 69:21
70:7
**objections** 4:5
6:20 66:16

68:5 70:8,18
**obligated** 70:15
**obligation** 7:17
70:20
**obtain** 58:19
**obviously** 63:18
63:24 71:3
**OC** 26:2,8 27:7
28:6 30:16
31:4 32:9 63:4
63:18
**occasionally**
6:20
**occupant** 19:1
**occupied** 40:2
42:17 43:3,20
44:7,23 45:8
45:13 47:24
65:24 66:14
68:1
**occurred** 8:21
14:14
**offender** 57:3
**offhand** 28:3
34:4 61:9
**officer** 1:12 3:3
4:10 5:5,9,13
5:20 10:7,9
11:8 13:2,4,9
15:15 16:1,16
17:11,21 18:17
19:5,22 20:16
20:23 21:7,22
22:10,24 23:4
23:14 24:22
25:7,24 26:15
27:12 28:19,21
29:7 30:9,15
31:9,23 32:7
33:10,16 34:8
34:20 35:15,23
36:5,11,15
38:4,10,16
39:4,21 40:5
41:16,23 42:10
42:19 43:7
44:1,18 45:17
46:4,13 47:16
48:2,23 49:18

50:9 51:2,13
52:5,23 53:10
55:7,12,22
56:14 57:8,19
58:10,22 59:17
59:21 60:3,13
60:17 61:2,7
61:14,21 62:6
62:22 63:3
64:16 65:1,9
65:17 66:2,17
68:7 69:13,22
70:19
**officers** 22:6
28:14 29:3
31:5 33:24
52:19 53:14,14
63:22 70:6,13
**Offices** 1:13
**Oh** 12:20
**Okay** 6:16 7:1,6
7:15,16,20 8:5
9:2 10:19
11:11,14,22
12:12 13:7,23
14:6,13 16:6
16:12 17:2,8
18:2 20:5,10
21:4,11 22:21
23:9 24:17
26:10,18,22
28:4 30:9
31:19 32:4
33:22 34:12
35:10 36:6
37:4 38:1,13
42:2,5,24
43:19 45:22
47:11 48:18
49:14 50:6,16
50:20 51:5
55:15 57:5,11
58:1,18 60:2
61:18 65:4,13
65:22 70:4,12
**once** 10:10
24:23 25:8
50:13 63:24
64:20 66:12

67:13,15,23
70:4,13,24
**ones** 30:17,18
31:5
**open** 18:20,21
64:21
**operator** 2:19
4:9,16 32:21
33:7 71:13
**operators** 63:21
**opportunity**
19:1 59:12
**opposed** 18:21
**option** 17:14,24
**order** 16:13
22:18,24 26:12
**ordered** 15:21
16:9
**outcome** 27:10
28:17
**overly** 6:9
**owner** 35:7 54:4

**P**
**P** 2:1,1,18
**p.m** 72:7
**PAGE** 3:2,12
**paperwork**
57:23
**PARKWAY** 2:9
**parole** 55:4,11
**part** 12:21 14:8
17:18 23:6
28:23 47:6
58:18
**partial** 7:23
**particular** 19:13
63:8
**Particularly**
53:10
**partner** 13:13
**passed** 19:8 22:6
**path** 12:14
**pause** 6:22
**Pennsylvania**
1:2,16,19 2:4
2:10 4:21
**people** 10:3
14:15 28:10

40:8,12,13
49:24 51:11
52:17,20 58:14
63:19 66:12
67:4
**pepper** 26:9,11
63:5,10,12,23
**percent** 10:16
**perform** 17:18
**performed** 4:24
**period** 18:11,15
**permissible**
44:15
**person** 5:1 8:16
8:17 28:8
29:14,15,16,20
31:14,16,20,21
40:15
**person's** 55:13
**personal** 30:18
32:10 46:18
**personally** 7:19
12:5,18 16:3
26:1 41:24
46:17 47:2
53:19 54:2
55:14
**perspective**
66:20
**pertinent** 14:21
33:3 41:10
**Philadelphia** 1:7
1:15 2:4,8,10
4:14,20 5:2
8:24 32:17
33:11,23 47:12
47:21 48:18
49:14,24 50:24
52:16 55:17
57:22 60:7
**photo** 37:2
**Photocopy** 3:13
**photograph**
3:13 36:4,20
**physically** 59:20
**picture** 38:7
42:6,16
**place** 22:18
25:21 29:10

32:24 33:13
34:2 71:16
**plaintiff** 2:5 5:7
6:4
**plaintiff's** 63:4
**plan** 29:4,10,13
29:23 30:12
**planning** 28:7,8
**plans** 29:12
**played** 60:18
**please** 7:1,11
16:4,5 36:20
41:3
**point** 7:3,19
9:22,23 10:5,6
15:14 24:4
26:4,10 29:17
38:21 58:15
59:2,7 69:16
70:21
**pointed** 59:24
**police** 32:17
33:11,23,24
47:12,21 48:18
52:16,18 55:17
60:7 61:23
**police-involved**
61:23
**policies** 20:12
33:12 52:16
**populated** 49:15
**porch** 39:6,8,9
39:14,19 64:22
**portion** 33:3
41:10
**possible** 52:13
56:24 57:2
70:16
**possibly** 9:21
48:9 58:5
**posted** 27:19
**preparation**
10:20
**prepared** 6:1
**present** 1:20
51:7,23
**presented** 53:22
56:23 57:23
**pretty** 62:19

**prevent** 28:17
**previous** 70:8
**previously** 36:4
**printed** 48:6
**prior** 12:8,16
  14:8,18 15:10
  24:11 25:2,21
  27:18,23 28:4
  30:9 32:13
  35:2,4 39:10
  39:12 44:3
  45:11,22
**private** 52:2,21
  69:20
**privy** 56:19
**probably** 8:9
  13:5 61:16
**probation** 55:5
  55:12
**problem** 7:7 8:6
  14:7 16:7
  71:11,12
**procedures**
  33:12 52:16
**proceed** 6:1
**process** 20:2
**professional**
  29:5
**prominent**
  35:12
**proper** 29:4
**properties** 15:1
  39:7,23 49:5
  50:3,5,21,22
  52:12 58:20
  67:3
**property** 9:17
  10:3,10,14
  12:8,13 15:10
  15:18 19:1,2
  24:10,20 25:11
  25:13,14,14,17
  27:22 30:10,21
  31:6 34:23
  35:7,7,11 37:3
  37:5 39:11
  40:10 43:2,10
  43:16 44:4
  45:2,20 48:16

49:7 51:8 52:9
  52:11 53:3,19
  54:4,4,5 58:13
  59:6 60:8,11
  62:4,11,14
  63:21 66:22
  67:9 68:20,22
  69:3,6,8 70:2
  70:22 71:6
**property's** 47:3
**protecting** 69:11
**protocol** 28:23
**provide** 48:19
**prying** 12:24
**public** 1:19
  56:19 73:12
**purpose** 62:11
  67:8
**put** 12:7 25:20
  29:9 30:2 37:4
  37:13 59:12
  66:19 69:4
  71:20
**putting** 15:5
  49:5

---
**Q**

**question** 4:6
  6:22 7:9,11,12
  7:15 8:2 11:15
  12:1,3,17 13:8
  14:4,10,11
  16:3,5 33:20
  37:10 40:17,21
  41:2,3 44:20
  50:7 53:6
  54:13,16 56:2
  63:8 70:12
**questions** 6:20
  62:19 63:4,6,7
**quick** 64:9
**quickly** 71:20

---
**R**

**R** 2:1,8,18
**ram** 13:2
**read** 33:4 40:19
  40:22 41:3,11
**reading** 11:19
**realized** 10:10

67:15
**really** 33:19
**rear** 11:12 27:16
  28:7 35:13,21
  43:2,5,9,14,16
  45:14 58:2,5,8
  58:13,16 67:23
**reason** 13:13
  60:9 64:18
  66:9
**reasonable** 19:1
  20:18
**recall** 12:23 16:9
  17:23 19:11
  20:7 22:13,22
  23:5 35:2 56:7
  59:14 60:20
  63:6,7,8
**receive** 47:11,21
  55:15
**received** 49:1
**recognizance**
  47:13 48:20
  54:3,7,8,11
  55:18 56:17
  58:19 60:18
**recognize** 36:23
  37:17 65:23
**recognized**
  66:13
**recollection**
  13:19 15:19,20
  19:9 32:15
  37:2,8
**recon** 24:11
  46:15 47:1,4,6
  53:16,20 57:23
**recons** 12:6
  14:22 47:18
**record** 6:24 14:6
  21:20 32:19,22
  33:4,8 41:7,11
  41:15 71:14,17
  71:20
**records** 33:1
**recovered** 53:15
**Recovery** 1:14
  2:2 4:18
**Redbud** 1:22

**refer** 13:3
**reference** 62:14
**referred** 50:17
**referring** 11:21
  37:5
**regarding** 33:13
**regardless** 41:19
  53:2
**regards** 62:13
**rehabilitate** 67:4
**related** 22:21
**relation** 59:21
**relayed** 15:12
**remember** 9:3,4
  9:7,14 20:8
  59:5
**rephrase** 7:12
  54:17
**reporter** 1:18
  6:12,15 33:5
  41:12 73:12,16
**REPORTING**
  1:21
**representing** 6:4
**reproduction**
  73:14
**reserved** 4:6
**response** 9:24
**responses** 6:14
**responsibility**
  46:19,23
**responsive** 41:8
**rest** 14:15
**retrieved** 27:14
**review** 10:20,24
  36:23
**right** 6:9 8:11,12
  8:18,20 9:6
  10:24 11:3
  13:18 14:8
  21:18 27:7
  28:1,9,12 32:1
  36:3,21 37:13
  37:19 38:22
  39:2 44:10
  47:20 51:21
  52:18 56:2,9
  62:18,21 65:6
  65:15 71:7

**Rights** 51:10
  52:3 53:2
  68:24
**role** 60:18
**room** 29:19 59:9
**roughly** 21:3,9
**rule** 11:16 60:10
**rules** 6:10 63:18
**run** 51:15

---
**S**

**S** 1:17 2:1,18,18
  73:5,11
**Saba** 36:11
**Saba's** 36:5
**safe** 68:21 69:1,7
  70:22
**safety** 68:12
**sat** 35:11
**saying** 21:3
  29:19 50:10
  54:18 67:5
**scaring** 40:14
**scene** 10:13
**school** 26:21
  49:3
**scope** 64:24
**sealing** 4:3
**searching** 66:23
  67:10
**seated** 59:10
**second** 10:11,17
  11:12 12:9,11
  23:23 29:16
  38:1,8,19
  39:15 43:1,4
  43:10,13 44:6
  44:22 45:7,19
  66:5 67:7,16
  67:19 69:2
  70:1
**second-floor**
  9:10,19 10:15
  11:4 44:12,16
  45:14 58:8
  67:1,23
**seconds** 20:19
  20:21 21:3,5,9
  22:6

**secure** 68:20
69:1,8 70:22
**secured** 10:10
59:7 67:9
**securing** 67:9
68:9
**security** 67:17
**see** 12:5 13:13
24:9 34:22
37:9,20 38:8
38:13,17 42:7
42:16 48:13
50:4 59:1,17
66:8
**seeing** 15:9 49:8
**seen** 21:11 22:1
65:5,10
**sense** 12:2 58:2
**serve** 19:12
**served** 13:20
53:17
**serving** 9:9 12:8
14:19 15:10
40:6
**set** 20:3 23:21
53:21 70:17
**sets** 46:21
**shame** 69:5
**shared** 45:4,8
**sheets** 24:11
**shoot** 52:20
**shooting** 10:23
62:13,16 70:23
**shootings** 61:24
**short** 60:9
**show** 36:3
**shown** 43:17
**shows** 22:5
**side** 23:11,18,19
24:2,19 25:4
25:10 42:8,21
46:1,6,11
64:22
**sign** 24:9
**signage** 27:19
**signing** 4:3
**signs** 27:18
**simply** 49:1
**single** 50:12,23

66:4
**sir** 8:20 13:23
36:3,19
**situation** 23:17
30:19,24 32:1
32:5 45:6
47:14 55:4
62:3 63:16,17
**situations** 30:2
34:1
**Six** 60:4
**size** 64:3
**sizing** 49:7
**slash** 9:16
**slower** 7:13
**small** 30:18
**solely** 44:7 58:13
**Solicitor** 71:4
**somebody** 48:10
**someone's** 20:13
24:18 28:24
**Song** 10:7,9
59:17,21
**Song's** 60:3
**soon** 70:16
**sorry** 32:18
33:18 41:23
47:9 51:15
**sort** 30:12 37:4
64:21 66:11
**South** 1:15 2:3
4:19
**space** 14:4 44:7
64:3
**speak** 6:13,21
7:13,13 35:6
**special** 22:23
51:7,23
**specific** 13:19
16:22 23:6
48:19 49:9
56:7
**specifically** 6:24
12:23 20:9
34:4 50:17
59:14
**specified** 11:12
35:20 58:5
**speculate** 7:20

16:6
**speculation**
45:24
**sped** 22:15
**speed** 20:2
**spend** 49:4
**spoken** 6:18
**spray** 26:9,11
31:4 63:5,11
63:12,24
**sprayed** 63:23
**square** 37:5,19
40:3
**stand** 16:23
**standing** 28:6
**stands** 19:13
**state** 1:20 6:23
**stated** 13:2 21:8
22:12 24:7
34:24 43:8
46:14 68:8
**statement** 10:22
12:22 24:12
35:2,4
**States** 1:1 49:16
**stating** 44:21
56:7
**stayed** 10:12
**stenographic**
33:1 73:7
**step** 22:7
**steps** 23:22
**stipulated** 4:2
**street** 1:15 2:3,9
4:20 48:14
**strike** 11:15
**structure** 48:7
**subject** 53:8
**Suite** 1:15 2:4
**supervision**
73:15
**supervisor** 71:3
**supervisors** 9:24
14:20 22:17
**supposed** 18:4
**sure** 6:13,21
9:14 10:16
13:14 14:3
29:3 32:20

51:8,19,24
53:6 56:5
64:11 69:1,7
70:21
**surprised** 22:4
**surprising** 22:16
22:19
**surrender** 19:2
**surveillance**
21:12 22:5
**suspect** 55:4
66:21
**suspected** 69:2
**suspicious** 15:6
**SWAT** 14:15
17:6,17 19:18
26:20,22 28:24
29:2 30:11
36:12 37:22
49:2 54:3 66:9
67:24 69:10,19
**swear** 5:10
**sworn** 5:14
**system** 8:14

**T**

**T** 2:2,18
**take** 56:22 63:9
**taken** 1:13 5:6
21:13 73:8
**takes** 14:20
63:23
**talk** 14:5
**talked** 5:23
**tan** 37:3,10
**target** 15:8
40:15 54:24
**team** 10:23
12:21 14:9
15:4 30:19
46:15,20 47:7
53:23
**team's** 47:2
**teams** 10:13
**tearing** 67:11,11
**techniques** 56:8
**Tel** 2:5,11
**tell** 9:7 33:24
42:13 59:4

**terms** 26:9
**testified** 5:15
34:12
**testimony** 7:18
**Thank** 7:7 71:10
**Thanks** 5:20
71:8
**thing** 6:16 14:3
54:22 71:19
**things** 6:12
29:14
**think** 18:7 28:3
28:5 30:23
34:12 41:20
44:11 57:11
71:19
**thinking** 58:6
**third** 29:14
**thought** 12:20
**three** 38:18
**time** 4:7,23 5:11
6:14,19,22
10:4 11:19
16:8,20 18:11
18:15,18 19:8
19:19 20:3,11
20:18 23:2
26:5 29:24
32:1 49:4
51:16 59:7,21
60:3,10 66:10
**timeframe** 20:8
**times** 18:9 61:5
61:16
**tip** 54:24
**tipping** 56:20
57:2
**today** 5:4,21
7:17 13:18
16:13 42:6
46:24 62:20
71:8
**today's** 4:22
10:20
**tool** 12:24 27:3
**toolbox** 27:4
**tools** 27:8 28:2
28:16 29:4
**Torresdale** 8:23

11:18
**trained** 26:11,18
  47:18 56:16
  57:15
**training** 19:18
  26:23 27:1,8
  47:12,20 48:4
  48:19 49:1,2,4
  49:12 52:15
  55:15 60:7
**transcribed** 73:7
**transcript** 73:7
  73:14
**trial** 4:7,12
**trouble** 7:11,14
**truck** 27:15,16
**true** 44:12 70:5
  73:6
**truthful** 7:18
**try** 18:19 40:9
  56:12 57:1
**trying** 7:5 40:10
  54:23,24 56:5
  64:16
**TV** 65:15
**two** 9:20 15:4
  35:1 38:22
**two-door** 23:17
**type** 54:20
**types** 50:11
  54:19
**typically** 12:22
  13:1,16 14:19
  16:19 17:2
  18:8 20:19
  23:16,18,20,21
  27:14,15,20
  31:14

———————
**U**
**unaware** 35:11
  35:16,19,24
  55:8
**uncomfortable**
  7:6
**understand** 6:11
  44:20 54:16,18
  66:9
**understanding**

7:11,15 13:7
**understood** 6:17
  7:10 68:3
**unfor** 70:23
**unfortunately**
  13:22 14:22
  15:5 27:4,17
  29:10,24 30:4
  31:1
**unintentionally**
  62:12
**unit** 14:16 17:6
  17:17 19:18
  28:24 30:11
  36:12 37:22
  54:3 56:18
  66:9 67:24
  69:10,19
**United** 1:1 49:16
**units** 50:2
**unusual** 14:3
**use** 4:12 27:9
  28:16 30:7
  32:1 55:1
  56:18 63:10,12
  63:18
**uses** 8:14

———————
**V**
**valid** 35:20
**various** 29:2
  33:24 50:3
**verbal** 6:15
**versus** 4:13 5:2
  30:17
**vicious** 27:5
**Victims** 4:18
**Victims'** 1:13
  2:2
**video** 4:16 33:1
  71:17
**Videotape** 1:12
  2:19 4:9 32:21
  33:7 71:13
**view** 48:14
**violate** 52:2
**violating** 43:21
  51:10 68:23
**visualize** 64:17

**voluntarily** 19:2
**vs** 1:5

———————
**W**
**waived** 4:4
**walk** 24:17
  29:18
**walking** 15:6
**wall** 8:8
**want** 7:24 9:12
  13:23 14:5
  15:7 41:16
  51:24
**wants** 6:23
**warrant** 9:10
  10:15 11:4,12
  12:8 14:14,16
  15:11,16 17:7
  18:2,4,5 19:13
  22:22 35:20
  40:7 42:24
  43:15,21 44:15
  45:2,9,15
  50:17 51:6,9
  51:20 52:1
  53:8,18,23
  58:4 60:19
  62:4 67:22
**warrants** 13:21
  14:19,24 17:9
  17:19 19:12
  57:21
**wasn't** 12:6,7
  26:3 44:10
  53:20
**water** 7:4
**way** 10:13 21:14
  29:11 36:10
  45:6,10 50:7
  55:9 69:5
**ways** 49:6
**We'll** 71:24
**we're** 7:5 8:16
  27:22 30:2
  40:6,9,10,15
  44:22 46:20
  49:20 54:24
  60:19 66:22
  68:24 69:6

**we've** 13:20 48:7
  55:16 57:21
**wearing** 21:15
**went** 26:20
  53:15 64:17
  65:20
**weren't** 53:7
**West** 2:2 3:4
  5:19 6:3 11:10
  17:1,16 18:1
  18:23 19:7
  20:4,20,24
  21:10,24 22:20
  23:8,24 25:1
  25:19 26:7,17
  27:24 28:22
  30:8 31:2,18
  32:3,11,18
  33:9,21 34:11
  35:5,18 36:2,7
  36:9,18 38:6
  38:12,20,24
  39:16,24 40:16
  41:18 42:1,14
  42:23 43:18
  44:9,19 45:21
  46:8 47:5,19
  48:17 49:13,22
  50:15 51:4,18
  52:14 53:4
  54:1,15 55:10
  55:24 56:4
  57:4,10,24
  58:17,24 60:16
  61:4,10,17
  62:1,8,18 64:9
  64:15 65:3,12
  65:21 66:7
  67:21 68:15
  69:17 70:3,11
  71:7,19
**whatsoever**
  32:13
**windows** 38:18
  40:3 42:8
**withdrawn**
  66:15
**witness** 3:2 5:4
  5:11,14 8:13

11:9 16:18
  17:13,22 18:18
  19:6,23 20:17
  21:8,23 22:11
  23:5,15 24:23
  25:8 26:1,16
  27:13 28:20
  29:8 30:16
  31:10,24 32:8
  33:17 34:9,21
  35:16,24 36:16
  37:8 38:5,11
  38:17 39:5,22
  40:6 41:24
  42:12,20 43:8
  44:2 45:18
  46:5,14 47:17
  48:3,24 49:20
  50:10 51:3,14
  52:7 53:1,12
  55:8,23 56:1
  56:15 57:9,20
  58:11,23 60:15
  61:3,8,15,22
  62:7 65:2,10
  65:18 66:3,18
  68:8 69:15,23
  70:9,20 71:11
**wondering**
  56:11
**work** 27:3 29:11
**working** 9:15
**works** 6:11 27:2
**worry** 63:20
**worrying** 50:20
**wouldn't** 15:12
  27:20 29:1
  31:3,19
**write** 6:15
**wrong** 13:6
  70:14

———————
**X**
**X** 3:1

———————
**Y**
**yeah** 10:22
  22:15 34:9
  35:16 65:18
  66:3

**Z**

**Zurbriggen** 2:8
3:5 11:6 16:15
17:11,20 18:16
19:4,21 20:15
20:22 21:6,21
22:9 23:3,13
24:21 25:6,23
26:14 27:11
28:18 29:6
30:14 31:8,22
32:6,20 33:15
34:7,19 35:14
35:22 36:13
38:3,9,15,23
39:3,20 40:4
41:6,14,22
42:9,18 43:6
43:24 44:17
45:16 46:3,12
47:15 48:1,22
49:17 50:8
51:1,12 52:4
52:22 53:9
54:14 55:6,20
56:13 57:7,17
58:9,21 60:12
61:1,6,13,20
62:5,21 63:2
64:6,11,23
65:7,16 66:1
66:16 68:5
69:12,21 70:7
70:17 71:9,24

**0**

**08051** 1:22

**1**

**10:03** 1:17
**10:26** 32:22
**10:28** 33:8
**100** 10:16
**11** 1:10 73:8
**11:03** 71:14 72:7
**11th** 4:22
**121** 1:15 2:3
4:19
**14th** 2:10

**1515** 2:9
**1800** 1:15 2:4
**18th** 4:20
**19102** 2:10
**19107** 1:16 2:4
4:21

**2**

**2** 43:1,4 50:18
67:23
**20** 61:16
**2021** 9:1 17:17
20:6,13 33:11
**2023** 1:10 4:23
73:8
**21** 17:22
**215** 2:5,11
**22** 4:14 5:3
**22-3763** 1:7

**3**

**30** 20:19,21 21:3
21:4,9
**3763** 4:15 5:3

**4**

**4** 3:4
**406** 1:22
**4664** 8:23 11:18
**4th** 9:1 20:6

**5**

**546-1433** 2:5
**589-1107** 1:23

**6**

**6068** 4:11 5:5
**62** 3:5
**64** 3:4
**683-5114** 2:11

**7**

**72** 3:13

**8**

**856** 1:23

**9**

**9:59** 4:23

# EXHIBIT "D"

Transcript of the Testimony of:
# Officer James Ashford

**Date:** May 22, 2023

**Case:** Felishatay Alvarado v. City of Philadelphia, et al.

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

## Page 1

IN THE COURT OF COMMON PLEAS
FOR PHILADELPHIA COUNTY, PENNSYLVANIA

- - -

FELISHATAY ALVARADO,   :   JUNE TERM, 2022
                       :
      Plaintiff,   :   NO. 01633
                       :
   vs.                 :
                       :
CITY OF PHILADELPHIA,  :
et al.,            :
                       :
      Defendants.  :

- - -

May 22, 2023

- - -

Videotape deposition of OFFICER
JAMES ASHFORD, taken pursuant to Notice at
VICTIMS' RECOVERY LAW CENTER, 121 South
Broad Street, 18th Floor, Philadelphia, PA
19107, beginning at 9:08 a.m., before
Candace Weindel, a Professional Reporter and
a Notary Public in and for the Commonwealth
of Pennsylvania.

- - -

DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 589-1107

## Page 2

1  APPEARANCES:
2
3  VICTIMS' RECOVERY LAW CENTER
   BY:  KEITH WEST, ESQUIRE
4  121 South Broad Street
   18th Floor
5  Philadelphia, PA 19107
   (215) 546-1433
6  Keith@victimrecoverylaw.com
   Representing the Plaintiff
7
8
9  CITY OF PHILADELPHIA LAW DEPARTMENT
   BY:  ADAM R. ZURBRIGGEN, ESQUIRE AND ALTHEA
10 UDO-INYANG, ESQUIRE
   1515 Arch Street
11 14th Floor
   Philadelphia, PA 19102
12 (352) 214-0377
   Adam.Zurbriggen@phila.gov
13 Representing the Defendants
14
15       - - -
16 ALSO PRESENT:
17 Courtney Kitcherman, Videotape Operator
18       - - -
19
20
21
22
23
24

## Page 3

1                   I N D E X
2  WITNESS                          PAGE
3  OFFICER JAMES ASHFORD
4  Examination By Mr. West           6
5  Examination By Mr. Zurbriggen    87
6
7
8              E X H I B I T S
9  NO.        DESCRIPTION          PAGE
10
11 Ashford-1    Google Maps Image   47
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1      (It is agreed by and between
2  counsel for the respective parties that
3  reading, signing, sealing, certification
4  and filing are waived; and that all
5  objections, except as to the form of the
6  question, are reserved until the time of
7  trial.)
8       - - -
9      OFFICER JAMES ASHFORD, after having
10 been first duly sworn, was examined and
11 testified as follows:
12       - - -
13     THE VIDEOTAPE OPERATOR:  Okay.
14 Deposition of Officer James Ashford.
15 This is the audio and video deposition
16 for use at trial in the matter of
17 Alvarado versus City of Philadelphia, et
18 al., Case Number 220601633.
19     I am the video operator.  My name
20 is Courtney Kitcherman, and I am
21 employed by Victims' Recovery Law
22 Center.  My address is 121 South Broad
23 Street, 18th Floor, Philadelphia,
24 Pennsylvania 19107.

1 (Pages 1 to 4)

Page 5

1        Today's date is May 22nd at 9:00
2    a.m. -- 9:08.  This is -- deposition is
3    being performed in person.  The case
4    caption is Alvarado versus City of
5    Philadelphia, et al., 220601633.
6        The witness being deposed today is
7    Officer James Bradford[sic], Badge
8    Number 3802.  This deposition is being
9    taken on behalf of plaintiff, Felishatay
10   Alvarado.
11       The officer taking this deposition
12   is Candace Weindel, and she shall swear
13   the witness in at this time.
14       MR. WEST:  I think you may have
15   misspoke.
16       It's Ashford; correct?
17       THE WITNESS:  Ashford.
18       THE VIDEOTAPE OPERATOR:  What did I
19   say?
20       THE WITNESS:  Bradford.
21       MR. WEST:  Officer Ashford.
22       THE VIDEOTAPE OPERATOR:  Officer
23   Ashford.
24       THE WITNESS:  Ashford.

Page 6

1            - - -
2        OFFICER JAMES ASHFORD, after having
3    been first duly sworn, was examined and
4    testified as follows:
5            - - -
6            EXAMINATION
7            - - -
8    BY MR. WEST:
9        Q.    Good morning, sir.  My name is
10   Keith West.  I'm one of the attorneys representing
11   the plaintiff in this case, Ms. Alvarado.  Just a
12   few preliminary questions we have to ask
13   everybody, so don't -- please don't think anything
14   into it.
15       Have you had an opportunity to
16   confer with your attorney, the attorney from the
17   City here today, and are you prepared to testify?
18       A.    Yes, I am.
19       Q.    Okay.  Are you under the influence
20   of any sort of medication, substance, illness,
21   anything that would impair your ability to testify
22   truthfully today?
23       A.    No.
24       Q.    Okay.  Just to let you know, you

Page 7

1    know, this isn't intended to be an -- any more
2    uncomfortable than necessary.  So if you need to
3    take a break at any time, if you'd like some more
4    water, coffee, anything like that, just let us
5    know.  We're going to try to be as accommodating
6    as possible.  Okay?
7        A.    Okay.
8        Q.    Similarly, one of our instructions
9    will be please don't answer any questions unless
10   you feel that you understand them.  If you need me
11   to rephrase a question, restate it, speak louder,
12   slower, anything like that, if you let me know,
13   I'm going to try to rephrase or restate the
14   question.  Okay?
15       A.    Okay.
16       Q.    But if you -- if you answer it,
17   we'll assume that you understood.  Okay?
18       A.    Yes.
19       Q.    As I'm sure your attorney already
20   advised you, your only obligation today is to give
21   truthful testimony based on what you personally
22   know.  So don't feel that you have to answer every
23   question like a multiple choice, no need to guess
24   or speculate.  Okay?  Just let us know what you

Page 8

1    know if you know it.  Okay?
2        A.    Yes.
3        Q.    On the other hand, it -- it may be
4    that you have partial knowledge or some knowledge.
5    Whatever you know, we'd like to know.  So if
6    you're able to give an estimate or an
7    approximation, please give us your estimate or
8    approximation and just let us know that's what you
9    are doing.  Okay?
10       A.    Yes.
11       Q.    The -- I guess one other thing,
12   too, is in many ways this is similar to a normal
13   conversation.  But we do have a court reporter
14   here.  She has to write down everything we say.
15   So please be sure that all of your responses are
16   spoken and -- because like nods of the head, that
17   kind of thing, won't get on the record.  Okay?
18       A.    Yes.
19       Q.    All right.  Officer Ashford, have
20   you ever been in a deposition before?
21       A.    No.
22       Q.    Okay.  Have you ever been in an
23   internal affairs investigation before other than
24   the incident involving Ms. Alvarado?

2 (Pages 5 to 8)

Page 9

1    A.    Yes.
2         MR. ZURBRIGGEN:  Object to form.
3    But Officer, you can answer.
4         THE WITNESS:  Yes.
5    BY MR. WEST:
6         Q.    Okay.  And how often has that
7    happened?
8         MR. ZURBRIGGEN:  Same objection.
9    But Officer, you can answer.
10        THE WITNESS:  Not many.
11   BY MR. WEST:
12        Q.    Okay.  Could you give me an
13   estimate or approximation?
14        MR. ZURBRIGGEN:  Same objection.
15        Officer, you can answer.
16        THE WITNESS:  With internal
17        affairs?
18        MR. WEST:  Internal affairs.
19        THE WITNESS:  Three times.
20        MR. WEST:  Three times.
21   BY MR. WEST:
22        Q.    Okay.  And just briefly, what were
23   each of those incidents related to?
24        MR. ZURBRIGGEN:  Same objection.

Page 10

1    But Officer, you can answer.
2         THE WITNESS:  I don't recall.
3    BY MR. WEST:
4         Q.    You don't recall any details about
5    these incidents whatsoever?
6         MR. ZURBRIGGEN:  Same objection.
7         Officer, you can answer.
8         THE WITNESS:  I don't re -- recall.
9    BY MR. WEST:
10        Q.    I'm sorry.  Could you repeat your
11   answer?
12        A.    I don't recall.
13        Q.    You don't recall any -- any facts
14   about any of these incidents whatsoever; correct?
15        A.    What --
16        MR. ZURBRIGGEN:  Same objection.
17        Officer, you can answer.
18        THE WITNESS:  What incidents are
19        you referring to?
20   BY MR. WEST:
21        Q.    So, sir, your testimony was that
22   you have been involved in three other internal
23   affairs investigations; correct?
24        A.    Yes.

Page 11

1         Q.    Do you recall any facts about any
2    of those incidents whatsoever?
3         MR. ZURBRIGGEN:  Same objection.
4         Officer, you can answer.
5         THE WITNESS:  Most recent one was
6         the barricade we had recently and the
7         dog shooting one and the last one was --
8         the last one was Corporal O'Connor's
9         shooting.
10   BY MR. WEST:
11        Q.    Okay.  So what was the barricade
12   incident about?
13        MR. ZURBRIGGEN:  Same objection.
14        But Officer, you can answer.
15        THE WITNESS:  Male shooting at
16        police.
17   BY MR. WEST:
18        Q.    There was a man who was shooting at
19   police?
20        A.    Yes, man with a gun.
21        Q.    Okay.  What was -- what was the
22   man's name?
23        A.    I don't recall.
24        Q.    Okay.  When did this take place?

Page 12

1         A.    About three, four weeks ago.
2         Q.    Okay.  All right.
3         And then the -- the dog shooting
4    incident, what's that about?
5         A.    That was back in 2021.
6         Q.    Okay.  And what happened?
7         A.    We served a warrant on, I believe,
8    Torresdale Avenue -- I don't know the exact
9    address -- and I was front containment.
10        Q.    Okay.  Is this the incident
11   involving Ms. Alvarado?
12        A.    Repeat.
13        Q.    Are you referring right now to the
14   incident involving Ms. Alvarado?
15        A.    Yes.
16        Q.    Okay.  What was the Corporal
17   O'Connor incident about?
18        MR. ZURBRIGGEN:  Same objection.
19        But Officer, you can answer.
20        THE WITNESS:  We served a -- a
21        warrant for a person wanted for -- for
22        homicide.
23   BY MR. WEST:
24        Q.    And then what happened?

3 (Pages 9 to 12)

Page 13

1    MR. ZURBRIGGEN:  Same objection.
2    But Officer, you can answer.
3    THE WITNESS:  My corporal got shot
4    in the line of duty and he died.
5    BY MR. WEST:
6    Q.    Okay.  When did that happen?
7    A.    2020.
8    Q.    Okay.  The barricade incident that
9    you referred to, did that have anything to do with
10   a warrant enforcement action?
11   MR. ZURBRIGGEN:  Same objection.
12   But Officer, you can answer.
13   THE WITNESS:  Repeat that.
14   BY MR. WEST:
15   Q.    The -- so of the three incidents
16   you referred to, the first one you said that
17   involved a barricade --
18   A.    Yes.
19   Q.    -- did that incident involve a
20   warrant enforcement?
21   MR. ZURBRIGGEN:  Objection.
22   But Officer, you can answer.
23   THE WITNESS:  No.
24   BY MR. WEST:

Page 14

1    Q.    Okay.  All right, sir.
2    So you are a member of the SWAT
3    unit of the Philadelphia Police Department; is
4    that correct?
5    A.    Yes.
6    Q.    When did you first join the SWAT
7    unit?
8    A.    2022.
9    Q.    So you were not --
10   A.    I mean, 20 -- correction, 2002.
11   Q.    2002?
12   A.    Yes.
13   Q.    Okay.  So coming up on like 21
14   years now; right?
15   A.    Yes.
16   Q.    Prior to joining the SWAT unit,
17   what was your job?
18   A.    Patrol officer in the 19th
19   District.
20   Q.    Okay.  So you were a patrol officer
21   with the Philadelphia Police Department?
22   A.    That's correct.
23   Q.    How -- how long did you have that
24   job?

Page 15

1    A.    As a patrol officer in the 19th
2    District?
3    Q.    Yeah.
4    A.    About four years.
5    Q.    Okay.  And then what job did you
6    have prior to that, if any?
7    A.    You mean before I became a police
8    officer?
9    Q.    So you said you were a patrol
10   officer for four years; right?
11   A.    Yes.
12   Q.    What job did you have before
13   becoming a patrol officer?
14   A.    I was a patrol officer.
15   Q.    Okay.  Before you --
16   A.    I don't understand the question.
17   Q.    Right.  For four years you were a
18   patrol officer; correct?
19   A.    Yes.
20   Q.    Okay.  Did you have any form of
21   employment or a job title before becoming a patrol
22   officer?
23   A.    Outside of the scope of being a
24   police officer, is that what you are asking me?

Page 16

1    Q.    I'm just asking you what was your
2    job before you became a patrol officer?
3    A.    I was a student.
4    Q.    Okay.  So if I am doing my math
5    right, have you been a member of the Philadelphia
6    Police Department now for on about -- on about 25
7    years; is that right?
8    A.    That's correct, sir.
9    Q.    Okay.  And you are still employed;
10   correct?
11   A.    Yes.
12   Q.    You're wearing a uniform, so you're
13   still a member of the SWAT unit; is that correct?
14   A.    Yes.
15   Q.    Okay.  All right, sir.
16   I believe that you testified that
17   -- with regards to the June 2021 incident at Ms.
18   Alvarado's house, you were a member of the front
19   containment; is that correct?
20   A.    Yes.
21   Q.    What was front containment?
22   A.    Front containment is that you
23   contain the property and you cover down on the
24   location that you want to serve the warrant on so

4 (Pages 13 to 16)

Page 17

1  that our entry team can arrive safely.
2      Q.    Okay.  So there's an entry team
3  that -- that actually enters the property;
4  correct?
5      A.    That's correct.
6      Q.    Okay.  And so does the front
7  containment unit stand behind those -- those
8  officers?
9      A.    Stand behind or be in front.  It
10 depends on the line of march.  It depends on the
11 approach of the house.
12     Q.    And is part of the -- the front
13 containment's job duties to make sure that nobody
14 either goes in or out of the property from the
15 street?
16     A.    Yes.
17     Q.    You're kind of patrolling the --
18 the Torresdale Avenue in this situation; correct?
19     A.    Just making sure -- just making
20 sure everyone is safe, so --
21     Q.    On Torresdale Avenue; correct?
22     A.    Yes.
23     Q.    And could you hear -- like with --
24 with your own ears, could you hear if anybody

Page 18

1  knocked on the door before -- before the door was
2  breached in this operation?
3      A.    Yes.
4      Q.    You're sure you could?
5      A.    Yes.
6      Q.    Okay.  How many officers were
7  closer to the door than you on that operation?
8      A.    I would say approximately maybe
9  eight.
10     Q.    Okay.  So there were at least eight
11 officers who were in closer proximity if the door
12 was knocked on or not; correct?
13     A.    Yes.
14     Q.    Did you have any sort of equipment
15 available to you that would have made it where you
16 could hear the door being knocked on if these
17 other eight officers couldn't hear it?
18         MR. ZURBRIGGEN:  Object to form.
19         But Officer, you can answer.
20         THE WITNESS:  No.
21 BY MR. WEST:
22     Q.    Okay.  Could you physically see
23 whether or not anyone knocked on the door?
24     A.    No.

Page 19

1      Q.    All right.  Do you know whether or
2  not at some point the front door to Ms. Alvarado's
3  apartment was breached?
4      A.    I wasn't in like -- approximately
5  in front of the door, but yes.  I -- I wasn't able
6  to tell because I'm focusing on the second floor
7  covering down.
8      Q.    Okay.  So you couldn't physically
9  see whether or not her door was breached?
10         MR. ZURBRIGGEN:  Object to form.
11         THE WITNESS:  No, I could not.
12 BY MR. WEST:
13     Q.    Okay.  And you said you were
14 focused on the second floor?
15     A.    Yes.
16     Q.    Okay.  Can you tell me why you were
17 focused on the second floor?
18     A.    Because I'm the -- I'm the cover
19 guy.  I'm containment.
20     Q.    Okay.  Was it your understanding
21 that the person who the warrant was for was on the
22 second floor of the building?
23     A.    Yes.
24     Q.    Okay.  And where did you gain that

Page 20

1  -- that understanding?
2      A.    On the brief.  We had a brief.
3      Q.    Who led the brief?
4      A.    I don't recall.
5      Q.    Do you think that might have been
6  either Lieutenant Monk or Sergeant Mellody?
7          MR. ZURBRIGGEN:  Object to form.
8          Officer, you can answer if you can.
9          THE WITNESS:  Sergeant
10         Melanie[sic].
11 BY MR. WEST:
12     Q.    You believe it was Sergeant -- is
13 it Melanie or Mellody?
14     A.    Melanie.
15     Q.    Melanie.  Okay.  Sorry for
16 mispronouncing it.  Sorry if -- I'm a little hard
17 of hearing.  I apologize for that, if I
18 mispronounce things every so often.
19         All right.  So Sergeant Melanie
20 gave a briefing prior to the -- the incident where
21 the front door to Ms. Alvarado's apartment was
22 breached; correct?
23         MR. ZURBRIGGEN:  Object to form.
24         But Officer, you can answer.

Electronically signed by Candace Weindel (601-298-573-1229)                                    f247d9b5-f354-4ef7-b091-b3c2080f2069

Page 21

1    THE WITNESS: I would say yes.
2  BY MR. WEST:
3    Q.    Are -- are you saying yes because
4  that seems correct, or do you actually have a
5  memory of it?
6    A.    If he is leading the -- the
7  operation, then it would be him.
8    Q.    Sir, but is it -- is it correct
9  then that, sitting here today, you have no actual
10  recollection of this?
11    A.    I do --
12    MR. ZURBRIGGEN: Object to form.
13    Officer, you can answer.
14    THE WITNESS: I do have a recollect
15    of the job.
16  BY MR. WEST:
17    Q.    All right, sir. But just to make
18  sure you understand the question I'm asking, do
19  you, sitting here today, have any specific
20  recollection whatsoever of Sergeant Melanie giving
21  a briefing related to this operation?
22    MR. ZURBRIGGEN: Object to form.
23    Officer, you can answer.
24    THE WITNESS: Repeat that again.

Page 22

1  BY MR. WEST:
2    Q.    Sitting here today, do you have any
3  specific recollection, like an actual memory, not
4  just an assumption or an inference -- do you have
5  any actual memory of Sergeant Melanie leading a
6  briefing related to this operation?
7    MR. ZURBRIGGEN: Object to form.
8    THE WITNESS: Yes.
9  BY MR. WEST:
10    Q.    Okay. All right.
11    So please tell me everything that
12  you can remember that Sergeant Melanie said.
13    A.    I can't recall that, exactly
14  everything that he said.
15    Q.    Okay. But my question was
16  everything you can remember that he said. So
17  please tell me everything that you remember him
18  saying.
19    MR. ZURBRIGGEN: Object to form.
20    Officer, you can answer.
21    THE WITNESS: Basically we have a
22    warrant -- I don't know the exact
23    location -- on Torresdale Avenue. He
24    gave the lineup, gave the -- the people

Page 23

1    who were serving the warrant and
2    basically it was for homicide.
3  BY MR. WEST:
4    Q.    Okay. Can you recall anything
5  else?
6    A.    No.
7    Q.    All right. But he told you
8  specifically, as part of the front containment,
9  that you should focus on the second floor;
10  correct?
11    MR. ZURBRIGGEN: Object to form.
12    Officer, you can answer.
13    THE WITNESS: No, that's not -- I'm
14    front containment. My duties is to
15    cover down on the whole property of that
16    location or that address, not --
17  BY MR. WEST:
18    Q.    Sir -- did I interrupt you?
19    A.    Not just the second floor, the
20  whole property.
21    Q.    All right. I -- sir, I don't have
22  the transcript in front of me, but didn't you
23  previously say that you were focused on the second
24  floor?

Page 24

1    A.    Well --
2    Q.    That's why you couldn't tell what
3  was going on at the front door?
4    MR. ZURBRIGGEN: Object to form.
5    Officer, you can answer.
6    THE WITNESS: Reason being because
7    the entry team is already at the front
8    door. I'm not focusing on the first
9    floor because we already have SWAT
10    officers at that location. Now I am
11    focusing on the second floor.
12    MR. WEST: Okay.
13    THE WITNESS: That's what we do.
14  BY MR. WEST:
15    Q.    Okay. Did Sergeant Melanie give
16  any instructions during the briefing as to whether
17  or not the warrant was valid for the entire
18  building or only a portion of the building?
19    MR. ZURBRIGGEN: Object to form.
20    Officer, you can answer.
21    THE WITNESS: I don't recall.
22  BY MR. WEST:
23    Q.    Okay. Did Sergeant Melanie --
24  strike the question.

Electronically signed by Candace Weindel (601-298-573-1229)                    f247d9b5-f354-4ef7-b091-b3c2080f2069

Page 25

1    Have you ever, as a member of the
2  SWAT unit of the Philadelphia Police Department,
3  enforced a search warrant at a multi-residence
4  property?
5         MR. ZURBRIGGEN:  Object to form.
6    Officer, you can answer.
7         THE WITNESS:  Yes.
8  BY MR. WEST:
9    Q.    And in your experience, have you
10 ever had a search warrant which only applied to
11 one apartment within a multi-residence property?
12        MR. ZURBRIGGEN:  Same objection.
13   Officer, you can answer.
14        THE WITNESS:  Yes.
15 BY MR. WEST:
16   Q.    Pursuant to the policies and
17 procedures of the Philadelphia -- Philadelphia
18 Police Department, as you understand them based on
19 your experience and training as a member of the
20 SWAT unit for many years, when you enforce a
21 warrant at a multi-residence property, if the
22 warrant specifies only a certain apartment within
23 that property, are you allowed to go anywhere with
24 -- on the property or only to that specific

Page 26

1  apartment?
2         MR. ZURBRIGGEN:  Object to form.
3    Officer, you can answer if you can.
4         THE WITNESS:  Can you repeat that
5    question, please?
6         MR. WEST:  Can you repeat it,
7    Candace?
8         THE COURT REPORTER:  Yes.
9         MR. WEST:  We're going to read back
10   the same question.  Okay?
11            - - -
12        (Whereupon, the court reporter read
13   back the pertinent testimony.)
14            - - -
15        MR. ZURBRIGGEN:  Same objection.
16   Officer...
17        THE WITNESS:  Yes.
18 BY MR. WEST:
19   Q.    Yes what?
20   A.    To that property.
21   Q.    Anywhere on the property?
22   A.    No, to that location, that address
23 to that apartment, only to that apartment.
24   Q.    Okay.  So if you have a warrant

Page 27

1  that's specific to a certain apartment, then when
2  you go to the multi-residence property where that
3  apartment is located, you understand that legally
4  you're only allowed to go into that one apartment;
5  correct?
6         MR. ZURBRIGGEN:  Same objection.
7    Officer, you can answer.
8         THE WITNESS:  Yes.
9  BY MR. WEST:
10   Q.    Okay.  And where did you gain that
11 understanding?
12   A.    What do you mean by that?
13   Q.    So, sir, you just testified as to
14 your understanding of the law in this area;
15 correct?
16   A.    Yes.
17   Q.    Okay.  Where did you get that
18 understanding?
19        MR. ZURBRIGGEN:  Same objection.
20   You can answer, Officer.
21        THE WITNESS:  Where you get that
22   understanding is that during the brief,
23   we have a location of the actual
24   address.  So prior to going to that

Page 28

1    property, we have information.
2  BY MR. WEST:
3    Q.    Okay.  As a member of the
4  Philadelphia Police Department, has anybody from
5  the Philadelphia Police Department ever given you
6  any training with regards to how to enforce a
7  warrant at a multi-residence property?
8         MR. ZURBRIGGEN:  Object to form.
9    Officer, you can answer.
10        THE WITNESS:  Yes.
11 BY MR. WEST:
12   Q.    Okay.  When did you receive that
13 training?
14        MR. ZURBRIGGEN:  Same objection.
15   Officer, you can answer.
16        THE WITNESS:  Back in 2002, when I
17   first started with the SWAT unit.
18 BY MR. WEST:
19   Q.    Okay.  Did you ever receive similar
20 training again or was it just the first time back
21 in 2002?
22        MR. ZURBRIGGEN:  Same objection.
23   Officer, you can answer.
24        THE WITNESS:  I don't understand

7 (Pages 25 to 28)

Page 29

1    the question.
2    BY MR. WEST:
3        Q.   Okay.  So you -- you said that you
4    received certain specific training on this issue
5    back in 2002; is that --
6        A.   Yes.
7        Q.   -- true?  Did you receive that
8    training?
9        A.   Yes.
10       Q.   Okay.  So did you only receive
11   training on this issue once back in 2002 or have
12   you received it subsequently as well?
13           MR. ZURBRIGGEN:  Object to form.
14           Officer, you can answer if you can.
15           THE WITNESS:  When you say
16           training, I don't understand what you're
17           saying as far as training concern --
18           like what do you mean?
19   BY MR. WEST:
20       Q.   Sir, do you have a general
21   understanding of the meaning of the word training?
22           MR. ZURBRIGGEN:  Object to form.
23           Officer, you can answer.
24           THE WITNESS:  Yes.

Page 30

1    BY MR. WEST:
2        Q.   Okay.  Could you tell me what your
3    understanding of the meaning of that word is?
4            THE WITNESS:  When someone teaches
5            or show you something.
6    BY MR. WEST:
7        Q.   Okay.  So did anyone from the
8    Philadelphia Police Department ever teach you or
9    show you how to enforce an arrest warrant or a
10   search warrant at a multi-residence property?
11           MR. ZURBRIGGEN:  Object to form.
12           Officer, you can answer.
13           THE WITNESS:  Yes.
14   BY MR. WEST:
15       Q.   Okay.  When did that take place?
16       A.   Back in '02 when I start the SWAT
17   unit.  We get information to serve a warrant and
18   we go do a recon at the property or the location
19   that the SWAT officers are going to hit.
20       Q.   Okay.  So back in 2002, who
21   specifically gave you the training you're
22   referring to?
23           MR. ZURBRIGGEN:  Object to form.
24           Officer, you can answer.

Page 31

1            THE WITNESS:  I don't recall.
2    BY MR. WEST:
3        Q.   Do you recall the job title of this
4    person or the location at which the training took
5    place?
6            MR. ZURBRIGGEN:  Same objection.
7            Officer, you can answer.
8            THE WITNESS:  Training officer.
9    BY MR. WEST:
10       Q.   Training officer with the
11   Philadelphia Police Department?
12       A.   With the SWAT unit.
13       Q.   Okay.  So training officer for the
14   SWAT unit; is that correct?
15       A.   Yes.
16       Q.   As a training officer, is there
17   only one training officer or is there more than
18   one?
19       A.   It could be more than one.
20       Q.   Okay.  Is there currently a
21   training officer of the SWAT unit of the
22   Philadelphia Police Department?
23       A.   Yes.
24       Q.   Who is that person?

Page 32

1        A.   We have a lot of them.  I mean,
2    it's -- training officer -- like I don't
3    understand the question.  I mean, what are you
4    asking me?
5        Q.   Okay.  So you said that you know
6    who the training officer is; correct?
7            MR. ZURBRIGGEN:  Object to form.
8            Officer, you can answer.
9            THE WITNESS:  Yes.
10   BY MR. WEST:
11       Q.   And then I asked you who it is; do
12   you remember me asking you that?
13       A.   Yes, I do.
14       Q.   Okay.  So since you said you know,
15   could you please tell me?
16       A.   Training officer Sergeant Binns.
17       Q.   Could you spell that last name?
18       A.   B-I-N-N-S.
19       Q.   Okay.
20       A.   We have Officer Buck, Officer
21   Sharamtew.
22       Q.   Could you spell his last name --
23       A.   S --
24       Q.   -- his or her?  Sorry.

Electronically signed by Candace Weindel (601-298-573-1229)                    f247d9b5-f354-4ef7-b091-b3c2080f2069

Page 33

1    A.    S-H-A-R-A-M-T-E-W.
2    Q.    Okay.
3    A.    That's it.
4    Q.    Is that it?
5    A.    Yeah.
6    Q.    Okay.  And the three people that
7  you just named, would they have been the training
8  officers for the SWAT unit back in June 2021?
9          MR. ZURBRIGGEN:  Object to form.
10         But Officer, you can answer if you
11   can.
12         THE WITNESS:  Yes.
13 BY MR. WEST:
14   Q.    Okay.  Have you yourself ever been
15 a training officer?
16   A.    No.
17   Q.    All right.  So what specific
18 instructions did you receive from the training
19 officer as far as how you should enforce a warrant
20 at a multi-residence property if the warrant only
21 applied to one apartment therein?
22         MR. ZURBRIGGEN:  Object to form.
23         Officer, you can answer if you can.
24         THE WITNESS:  I don't understand

Page 34

1        the question.
2  BY MR. WEST:
3    Q.    All right.  I can try to repeat it.
4  Let me know if you understand it this time.
5    A.    Okay.
6    Q.    What specific instruction did you
7  receive from the training officer as far as to how
8  you should enforce a warrant at a multi-residence
9  property if that warrant only applied to one
10 apartment therein?
11         MR. ZURBRIGGEN:  Object to form.
12         Officer, you can answer if you can.
13         THE WITNESS:  When you do a recon,
14         you go out and you look at the property.
15         You look at the front and see how the
16         structure is built.  You look at the
17         rear and see if there's -- you know, the
18         structure of the rear.  Also, you look
19         at if the property is marked or not.
20 BY MR. WEST:
21   Q.    Okay.  Have you yourself ever done
22 recon as part of the SWAT unit?
23   A.    Yes.
24   Q.    Okay.  So you have all the training

Page 35

1  that somebody would need to do recon as part of
2  the SWAT unit; correct?
3          MR. ZURBRIGGEN:  Object to form.
4          Officer, you can answer.
5          THE WITNESS:  Yes.
6  BY MR. WEST:
7    Q.    When you say marked or not, what
8  does that mean?
9    A.    When I say marked, it means it has
10 an address.
11   Q.    Oh, okay.  So you mean like just an
12 address marker on the building; correct?
13   A.    Numbers, with numbers.
14   Q.    Okay.  And you would review the
15 front of the property; correct?
16         MR. ZURBRIGGEN:  Object to form.
17         Officer, you can answer.
18         THE WITNESS:  That's the training,
19         yes.
20 BY MR. WEST:
21   Q.    All right.  And you would review
22 the rear of the property; correct?
23   A.    Yes.
24         MR. ZURBRIGGEN:  Same objection.

Page 36

1        Officer...
2          THE WITNESS:  If you do a recon,
3          yes.
4  BY MR. WEST:
5    Q.    Okay.  Besides that, what, if any,
6  steps would you make -- would you take as part of
7  the reconnaissance for the SWAT unit to determine
8  where the various apartments were located inside
9  of a multi-residence property before breaching the
10 property?
11         MR. ZURBRIGGEN:  Object to form.
12         Officer, you can answer.
13         THE WITNESS:  I don't quite
14         understand the question.
15 BY MR. WEST:
16   Q.    Would that be it; it wouldn't take
17 any more steps than that?
18         MR. ZURBRIGGEN:  Same objection.
19         THE WITNESS:  Yes.
20 BY MR. WEST:
21   Q.    Okay.  All right.
22         Prior to the -- Ms. Alvarado's
23 front door being breached, did you know whether or
24 not that building had a rear door?

9 (Pages 33 to 36)

Page 37

1    A.    No.
2    Q.    You did not know there was a rear
3  door; correct?
4    A.    Yes.
5    Q.    It is correct or not correct?
6    A.    No, I did not know.
7    Q.    Okay.  Did you know what apartment
8  the warrant was valid for?
9          MR. ZURBRIGGEN:  Object to form.
10         Officer, you can answer if you can.
11         THE WITNESS:  Second floor rear.
12  BY MR. WEST:
13   Q.    Did you know how to access
14  the second floor rear apartment of that building?
15   A.    No.
16   Q.    Did anybody, as part of the SWAT
17  unit, to your knowledge, know how to get to the
18  second floor rear apartment before Ms. Alvarado's
19  front door was breached?
20         MR. ZURBRIGGEN:  Object to form.
21         Officer, you can answer.
22         THE WITNESS:  I can't answer that.
23  BY MR. WEST:
24   Q.    To your knowledge, did anyone know?

Page 38

1          MR. ZURBRIGGEN:  Same objection.
2          Officer...
3          THE WITNESS:  I can't answer that.
4  BY MR. WEST:
5    Q.    Why can't you answer that?
6          MR. ZURBRIGGEN:  Same objection.
7          THE WITNESS:  Because I don't know
8      what anyone else would think.  I don't
9      know.
10  BY MR. WEST:
11   Q.    Okay.  When -- when Sergeant
12  Melanie gave the briefing, did he say anything
13  about how to get to the second floor rear
14  apartment?
15   A.    No.
16   Q.    And -- and Sergeant Melanie just
17  gave one briefing for all of the members of the
18  SWAT unit; correct?
19         MR. ZURBRIGGEN:  Same objection.
20         Officer...
21         THE WITNESS:  Yes.
22  BY MR. WEST:
23   Q.    Did you hear anyone order for Ms.
24  Alvarado's front door to be breached?

Page 39

1    A.    No, I did not hear.
2    Q.    Okay.  Do you know what the
3  knock-and-announce rule is?
4    A.    Yes.
5    Q.    What is the knock-and-announce
6  rule?
7    A.    Basically, you knock on the door.
8  You announce that you're a police officer for any
9  occupants inside the property to notify -- to let
10  them know that the police are here to serve a
11  warrant to give them enough time to, I guess, wake
12  up, don't startle them or alarm them.
13   Q.    And do you also understand that
14  part of the knock-and-announce rule is you're
15  supposed to give people enough time that they can
16  voluntarily surrender the property if they're
17  inclined to do so?
18         MR. ZURBRIGGEN:  Object to form.
19         Officer, you can answer.
20         THE WITNESS:  Yes.
21  BY MR. WEST:
22   Q.    Okay.  So based on the training
23  that you've received as a member of the
24  Philadelphia Police Department, how much time

Page 40

1  should you let pass between knocking on someone's
2  front door to -- to enforce a warrant and before
3  you actually breach the front door?
4          MR. ZURBRIGGEN:  Object to form.
5          Officer, you can answer.
6          THE WITNESS:  I would say 20 to 30
7      seconds.
8  BY MR. WEST:
9    Q.    Twenty to 30 seconds is -- is all
10  the time somebody would get before you'd kick in
11  their door?
12         MR. ZURBRIGGEN:  Object to form.
13         Officer...
14  BY MR. WEST:
15   Q.    Is that correct?
16   A.    Yes, approximately.
17   Q.    Okay.  So how much time actually
18  passed between someone knocking on Ms. Alvarado's
19  door and her door getting breached?
20         MR. ZURBRIGGEN:  Object to form.
21         Officer...
22         THE WITNESS:  I don't know.
23  BY MR. WEST:
24   Q.    Okay.  Have you seen the video?

10 (Pages 37 to 40)

Page 41

1  A.   No.
2  Q.   Did you even know there was video?
3  A.   No.
4  Q.   Okay.  I can represent to you the
5  video shows there was about two seconds.
6  Do you have any -- any personal
7  knowledge to contradict that?
8  MR. ZURBRIGGEN:  Object to form.
9  Officer...
10  THE WITNESS:  No.
11  BY MR. WEST:
12  Q.   Would that be reasonable based on
13  your understanding of the knock-and-announce rule
14  -- strike.  I got tongue-tied.  Strike the
15  question.
16  Would a two-second warning before
17  breaching the front door be compatible with the
18  knock-and-announce rule as you understand that
19  rule based on the training you have received?
20  MR. ZURBRIGGEN:  Object to form.
21  Officer...
22  THE WITNESS:  I don't know what you
23  are asking.
24  BY MR. WEST:

Page 42

1  Q.   Sure.  So you've received training
2  from the Philadelphia Police Department about the
3  knock-and-announce rule; correct?
4  MR. ZURBRIGGEN:  Object to form.
5  Officer...
6  THE WITNESS:  Training, what do you
7  mean of like training as far as the
8  knock-and-announce rule?
9  BY MR. WEST:
10  Q.   Okay.  You know, yeah, I shouldn't
11  assume facts that are not in evidence.
12  How did you come to ever hear of
13  the knock-and-announce rule?
14  A.   Being in the SWAT unit.
15  Q.   Okay.  So did you ever receive any
16  actual specific training from the Philadelphia
17  Police Department where you were told what the
18  policies and procedures of the Philadelphia Police
19  Department are with regards to the
20  knock-and-announce rule?
21  MR. ZURBRIGGEN:  Object to form.
22  Officer, you can answer.
23  THE WITNESS:  I don't recall.
24  BY MR. WEST:

Page 43

1  Q.   Okay.  So fair to say that you
2  don't actually know what the specific policies and
3  procedures of the Philadelphia Police Department
4  are with regards to the knock-and-announce rule?
5  MR. ZURBRIGGEN:  Object to form.
6  Officer...
7  THE WITNESS:  That's not -- that's
8  not what I am saying.
9  BY MR. WEST:
10  Q.   Okay.  Do you know what the
11  specific policies and procedures of Philadelphia
12  Police Department are with regards to the
13  knock-and-announce rule?
14  MR. ZURBRIGGEN:  Object to form.
15  Officer, you can answer.
16  THE WITNESS:  Basically, like I
17  just got finished saying, if there's an
18  occupant --
19  BY MR. WEST:
20  Q.   Sir, sir, if you can just answer
21  the question that I am asking you.  The question I
22  am asking you is not what those policies are.
23  My question is do you personally
24  know -- just a yes or no question.  Do you

Page 44

1  personally know what the policies and procedures
2  are of the Philadelphia Police Department with
3  regards to the knock-and-announce rule?
4  MR. ZURBRIGGEN:  And same
5  objection.
6  Officer, you can answer if you can.
7  THE WITNESS:  No.
8  BY MR. WEST:
9  Q.   Okay.  Sir, I'll represent to you
10  that the building in which Ms. Alvarado's
11  apartment was located had two doors.
12  Do you have any personal knowledge
13  as to why the door was breached -- that was
14  breached that day as opposed to the other door on
15  the property?
16  MR. ZURBRIGGEN:  Object to form.
17  Officer, you can answer if you can.
18  THE WITNESS:  I cannot answer that.
19  BY MR. WEST:
20  Q.   Okay.  And is there any particular
21  reason you can't answer that?
22  MR. ZURBRIGGEN:  Same objection.
23  Officer...
24  THE WITNESS:  Because I was for

Electronically signed by Candace Weindel (601-298-573-1229)          f247d9b5-f354-4ef7-b091-b3c2080f2069

Page 45

1       front containment.
2    BY MR. WEST:
3       Q.    Okay.  But as part of the briefing
4    given my Sergeant Melanie, did he give any
5    indication as to why one door was being breached
6    and not another door or anything along those
7    lines?
8          MR. ZURBRIGGEN:  Same objection.
9          Officer...
10         THE WITNESS:  You would have to ask
11         Sergeant Melanie.
12   BY MR. WEST:
13      Q.    Okay.  But you, sitting today, have
14   no specific recollection of him giving any sort of
15   guidance as part of the briefing; correct?
16         MR. ZURBRIGGEN:  Same objection.
17         Officer...
18         THE WITNESS:  Yes.
19   BY MR. WEST:
20      Q.    Okay.  Did Sergeant Melanie try to
21   give any sort of floor plan of the property to
22   advise the members of the SWAT unit where they
23   were supposed to go once they got inside the
24   building?

Page 46

1          MR. ZURBRIGGEN:  Object to form.
2          Officer, you can answer if you can.
3          THE WITNESS:  Floor plan, what do
4          you mean floor plan?
5    BY MR. WEST:
6       Q.    Do you know what a floor plan is?
7       A.    What is a floor plan?  No.
8       Q.    Okay.  Have you ever seen anything
9    that looks like -- a little bit like a map that
10   shows where different rooms are located within a
11   building?
12         MR. ZURBRIGGEN:  Object to form.
13         Officer...
14         THE WITNESS:  No.
15   BY MR. WEST:
16      Q.    You've never seen anything like
17   that in your life?
18         MR. ZURBRIGGEN:  Same objection.
19         Officer...
20         THE WITNESS:  In my life, yes, I
21         have, but --
22   BY MR. WEST:
23      Q.    Okay.  So that's a floor plan.
24      A.    Right.

Page 47

1       Q.    Did you see any sort of floor plan
2    with regards to the building that Ms. Alvarado
3    lived in before the door was breached?
4       A.    No.
5       Q.    Sir, I have a photograph here.  I
6    think I only have one copy on hand.  I'll get more
7    copies before the other deposition.  You have your
8    copy, so --
9          MR. ZURBRIGGEN:  Yeah.
10   BY MR. WEST:
11      Q.    Just to put this on the record real
12   quick, I'll represent to you, sir, this is a
13   photograph that has been used at, I think, every
14   prior deposition so far.  It's printed from Google
15   Maps.  It's dated Monday, May 15 at 9:30 a.m.
16         MR. WEST:  We are going to mark
17         this as Ashford-1.
18              - - -
19         (Whereupon, the document was
20         marked, for identification purposes, as
21         Exhibit Number Ashford-1.)
22              - - -
23         MR. WEST:  Are you ready, Candace?
24         THE COURT REPORTER:  Yup.

Page 48

1    BY MR. WEST:
2       Q.    All right, sir.  So please take a
3    moment to look at that photograph and let me know
4    if you recognize what that is.
5       A.    Yes.
6       Q.    All right.  What is it?
7       A.    It's row homes.
8       Q.    All right, sir.  Do you -- do you
9    recognize any specific property in that picture?
10      A.    Yes.
11      Q.    Which one?
12      A.    The target location.
13   (Witness indicating)
14      Q.    Okay.  When you say target
15   location, what do you mean by that?
16      A.    I don't know the address on
17   Torresdale.  What is -- what is the address number
18   on Torresdale?
19      Q.    Do you mean, sir, that you
20   recognize the door that got breached the -- the
21   morning Ms. Alvarado's apartment was breached in
22   that picture?
23         MR. ZURBRIGGEN:  Object to form.
24         Officer...

Page 49

1    THE WITNESS:  Yes.
2  BY MR. WEST:
3    Q.    Okay.  Could you use the orange
4  highlighter to highlight the door that you believe
5  was breached?  Thanks.  I'm just going to leave
6  this here so it's not so awkward.
7    A.    (Witness complies)
8    Q.    Okay.  Can I see it?
9    All right.  That's the door that
10  got breached, right, sir, that you have circled as
11  -- with an orange circle?
12    A.    Yes.
13    MR. ZURBRIGGEN:  Object to form.
14    Officer...
15    MR. WEST:  Okay.
16    THE WITNESS:  Yes.
17  BY MR. WEST:
18    Q.    And what was on the other side of
19  this door?
20    MR. ZURBRIGGEN:  Object to form.
21    Officer, you can answer.
22    THE WITNESS:  I don't know because
23    I never went inside.  I'm front
24    containment.

Page 50

1  BY MR. WEST:
2    Q.    So sitting here today, you don't
3  know what was on the other side of that door?
4    MR. ZURBRIGGEN:  Same objection.
5    Officer...
6    THE WITNESS:  No.
7  BY MR. WEST:
8    Q.    You -- sorry.  Just to make sure,
9  you do know or do not know?
10    A.    I do not know what was on the other
11  side of that door.
12    Q.    All right, sir.  I can represent to
13  you that that was Ms. Alvarado's apartment.
14    A.    Okay.
15    Q.    And you didn't know that before
16  now; is that correct?
17    MR. ZURBRIGGEN:  Same objection.
18    Officer...
19    THE WITNESS:  No.
20  BY MR. WEST:
21    Q.    It is correct or is not correct?
22    A.    I did not know that.
23    Q.    Okay.  Did you get any instruction
24  from Sergeant Mellody, prior to the breaching

Page 51

1  action, as to what was on the other side of that
2  door?
3    MR. ZURBRIGGEN:  Object to form.
4    But Officer, you can answer if you
5    can.
6    THE WITNESS:  No.
7  BY MR. WEST:
8    Q.    Okay.  Sir, I think you testified
9  earlier that the warrant was valid for the second
10  floor rear apartment; correct?
11    MR. ZURBRIGGEN:  Object to form.
12    Officer, you can answer.
13    THE WITNESS:  Yes.
14  BY MR. WEST:
15    Q.    Okay.  If you look at the area that
16  you have circled with an orange, is there any
17  second floor there?
18    MR. ZURBRIGGEN:  And object to
19    form.
20    But Officer, you can answer if you
21    can.
22    THE WITNESS:  Second floor, yes.
23    (Witness indicating)
24  BY MR. WEST:

Page 52

1    Q.    Where the doors are located, is
2  there any second floor to the structure in which
3  the door leads directly?
4    MR. ZURBRIGGEN:  Object to form.
5    Officer, you can answer if you can.
6    THE WITNESS:  I don't know that.
7  BY MR. WEST:
8    Q.    Do you see a second floor?
9    A.    Yes.
10    Q.    So you see the --
11    UNIDENTIFIED SPEAKER:  Someone to
12  observe from the City, Keith.  Is it
13  okay?
14    MR. ZURBRIGGEN:  Keith, you want to
15  go off the record?  I have someone from
16  the City to come and observe.
17    MR. WEST:  Oh, you do.  Okay.
18    MR. ZURBRIGGEN:  Yes, I do.  This
19  is me.  I'm sorry to interrupt.
20    MR. WEST:  No, no.  It's totally
21  fine.  I just thought Tony was bringing
22  in friends.
23    UNIDENTIFIED SPEAKER:  No, no.
24  (Unintelligible) other day to do the

13 (Pages 49 to 52)

Page 53

1   same thing.  We all have interns.
2         MR. WEST:  No, no.  It's totally
3   fine.
4         THE VIDEOTAPE OPERATOR:  We're
5   going off the record at 9:48 a.m.
6              - - -
7         (Whereupon, a discussion took place
8   off the video and stenographic record.)
9              - - -
10        THE VIDEOTAPE OPERATOR:  We are on
11   the record at 9:49 a.m.
12  BY MR. WEST:
13        Q.    All right, sir.  So just to get
14   back where we left off, the area that you've
15   circled with an orange highlighter, all right, you
16   circled the front door; correct?
17        A.    Yes.
18        Q.    And that front door leads into a
19   room; correct?
20        MR. ZURBRIGGEN:  Object to form.
21        Officer...
22        THE WITNESS:  It leads in front of
23   the building and it leads into the
24   property.

Page 54

1   BY MR. WEST:
2         Q.    Okay.  You don't know where that
3   door leads; correct?
4         MR. ZURBRIGGEN:  Object to form.
5         Officer...
6         THE WITNESS:  That's correct.
7   BY MR. WEST:
8         Q.    Okay.  But the -- the room or area
9   immediately behind that door, is that a one-floor
10   area or a two-floor area?
11        MR. ZURBRIGGEN:  Object to form.
12        Officer, you can answer.
13        THE WITNESS:  I don't know.  I
14   never went inside.
15  BY MR. WEST:
16        Q.    But you -- you can't tell, just
17   looking at that picture, whether or not there's
18   one floor or two floors there?
19        MR. ZURBRIGGEN:  Same objection.
20        Officer...
21        THE WITNESS:  There's two floors.
22  BY MR. WEST:
23        Q.    So your testimony, even seeing the
24   picture, is that the room behind that door has two

Page 55

1   floors?
2         MR. ZURBRIGGEN:  Same objection.
3         Officer...
4         THE WITNESS:  Seeing that picture,
5   I can see that it's a second floor.
6   BY MR. WEST:
7         Q.    What?
8         A.    Looking at this picture, there is a
9   second floor.
10        Q.    Okay.  But does that door lead
11   directly to the second floor, yes or no?
12        MR. ZURBRIGGEN:  Object to form.
13        Officer...
14        THE WITNESS:  I never went inside.
15  BY MR. WEST:
16        Q.    Based on what you can see in the
17   picture, can you tell that that door leads to a
18   room that is only one floor?
19        MR. ZURBRIGGEN:  Object to form.
20        THE WITNESS:  I can't say that.
21  BY MR. WEST:
22        Q.    Okay.  That's fine.
23        Can I have that back?
24        A.    Sure.

Page 56

1         Q.    And your inability to tell whether
2   or not this is a one or two-floor structure is
3   consistent with the training that you've received
4   as a member of the Philadelphia SWAT unit for all
5   of the other times that you've done
6   reconnaissance?
7         MR. ZURBRIGGEN:  Object to form.
8         Officer...
9         THE WITNESS:  I did not say that.
10        That is a two -- second floor, so it is
11        a two-story.
12  BY MR. WEST:
13        Q.    Sir, my question is as you look at
14   this picture and try to figure out whether or not
15   this door leads to the second floor, you're using
16   whatever training that you've received as a member
17   of the Philadelphia SWAT unit in conducting
18   reconnaissance; correct?
19        MR. ZURBRIGGEN:  Object to form.
20        Officer...
21        THE WITNESS:  Yes.
22  BY MR. WEST:
23        Q.    Okay.  And if someone who had
24   received basic training in this area would be able

14 (Pages 53 to 56)

Electronically signed by Candace Weindel (601-298-573-1229)                    f247d9b5-f354-4ef7-b091-b3c2080f2069

Page 57

1  to tell that there's no second floor here, that
2  would be training that you had not received as a
3  member of the Philadelphia SWAT unit; correct?
4          MR. ZURBRIGGEN:  Object to form.
5          Officer, you can answer.
6          THE WITNESS:  Well, they would --
7          they would see there is a second floor
8          there.  You can see it yourself.
9  BY MR. WEST:
10     Q.     All right, sir.  Have you ever
11  received any training from the Philadelphia Police
12  Department with regards to how to conduct
13  reconnaissance specifically at multi-residence
14  properties?
15          MR. ZURBRIGGEN:  Object to form.
16          Officer, you can answer.
17          THE WITNESS:  What's the question?
18  BY MR. WEST:
19     Q.     Sir, did you ever receive any
20  training with regards to reconnaissance at all?
21          MR. ZURBRIGGEN:  Same objection.
22          Officer...
23          THE WITNESS:  I told you that in
24          the beginning.

Page 58

1  BY MR. WEST:
2     Q.     So what was your answer?
3     A.     Yes.
4          MR. ZURBRIGGEN:  Same objection.
5  BY MR. WEST:
6     Q.     Okay.  So did you ever receive any
7  training as to how to conduct reconnaissance
8  specifically at multi-residence properties?
9          MR. ZURBRIGGEN:  Same objection.
10          THE WITNESS:  It's the same that
11          you would do with one property.
12  BY MR. WEST:
13     Q.     Okay.  So if you had a search
14  warrant that was valid for an entire house, you
15  could enter any portion of that house to execute
16  that warrant; correct?
17          MR. ZURBRIGGEN:  Object to form.
18          Officer, you can answer.
19          THE WITNESS:  What do you mean?
20  BY MR. WEST:
21     Q.     Sir, if you have a warrant that's
22  for a house, are you allowed to enter any portion
23  of that house in order to execute the warrant?
24          MR. ZURBRIGGEN:  Object to form.

Page 59

1          Officer, you can answer.
2          THE WITNESS:  Yes.
3  BY MR. WEST:
4     Q.     Okay.  But if you have a warrant
5  for an apartment, are you allowed to enter any
6  portion of the building in which that apartment is
7  located in order to execute the warrant?
8          MR. ZURBRIGGEN:  Same objection.
9          Officer, you can answer.
10          THE WITNESS:  Yes.
11  BY MR. WEST:
12     Q.     Okay.  And that's based on your
13  understanding of the law that you received as
14  someone who does reconnaissance for the SWAT unit;
15  correct?
16          MR. ZURBRIGGEN:  Same objection.
17          Officer, you can answer.
18          THE WITNESS:  Yes.
19  BY MR. WEST:
20     Q.     Okay.  Besides what we discussed
21  today, did you ever receive any training from the
22  Philadelphia Police as to any other steps you
23  could take in the reconnaissance process to
24  determine where different apartments were located

Page 60

1  within a multi-residence structure?
2          MR. ZURBRIGGEN:  Object to form.
3          Officer, you can answer.
4          THE WITNESS:  No.
5  BY MR. WEST:
6     Q.     So for example, you never received
7  any training that if you're not sure how to get to
8  the apartment, you could contact the property
9  owner or property manager?
10          MR. ZURBRIGGEN:  Same objection.
11          Officer, you can answer.
12          THE WITNESS:  Not me.  Well, you
13          probably can do that, but I've never
14          done it.
15  BY MR. WEST:
16     Q.     And you never received any training
17  from the Philadelphia Police Department that
18  that's something you should do as part of
19  reconnaissance; correct?
20          MR. ZURBRIGGEN:  Same objection.
21          Officer, you can answer.
22          THE WITNESS:  I'm guessing you may
23          have that option.
24  BY MR. WEST:

15 (Pages 57 to 60)

Page 61

1    Q.    Sir, my question is training that
2  you specifically received as someone who goes out
3  and does reconnaissance as part of the SWAT unit,
4  that's nothing that you specifically learned in
5  training; correct?
6         MR. ZURBRIGGEN:  Same objection.
7    Officer...
8         THE WITNESS:  Yes.
9  BY MR. WEST:
10   Q.    All right.  And you never received
11 any training that you could go get floor plans or
12 blueprints of property prior to executing a
13 warrant; correct?
14        MR. ZURBRIGGEN:  Same objection.
15        Officer, you can answer.
16        THE WITNESS:  No.
17 BY MR. WEST:
18   Q.    Okay.  You never learned any of the
19 other many surveillance techniques available to
20 ascertain the locations of various apartments
21 within a building; correct?
22        MR. ZURBRIGGEN:  Object to form.
23        Officer, you can answer.
24        THE WITNESS:  No.

Page 62

1  BY MR. WEST:
2    Q.    That is correct or is not correct?
3    A.    No.
4         MR. ZURBRIGGEN:  Same objection.
5  BY MR. WEST:
6    Q.    When you say no, are you saying I
7  am correct or I'm not correct?
8    A.    I --
9         MR. ZURBRIGGEN:  Same objection.
10        Officer...
11        THE WITNESS:  I have not received
12    any training.
13 BY MR. WEST:
14   Q.    Okay.  Sir, as I rep -- I -- I know
15 you said you didn't know this, but as I
16 represented to you before, this building has a
17 front door and a rear door.
18        Do you have any idea why the front
19 door was breached to gain access to the rear
20 apartment --
21        MR. ZURBRIGGEN:  Object to form.
22        MR. WEST:  -- and not the rear
23    door?
24        MR. ZURBRIGGEN:  Object to form.

Page 63

1         THE WITNESS:  Because that is the
2    front -- the front of the property.
3  BY MR. WEST:
4    Q.    Okay.  But as you have
5  acknowledged, you knew that the warrant was valid
6  for the rear apartment; correct?
7         MR. ZURBRIGGEN:  Object to form.
8    Officer...
9         THE WITNESS:  Second floor rear.
10 BY MR. WEST:
11   Q.    Right.  And there is no second
12 floor here; correct?
13        MR. ZURBRIGGEN:  Object to form.
14        Officer...
15        THE WITNESS:  That's the front of
16    the property.
17 BY MR. WEST:
18   Q.    Okay.  So if you -- if you are
19 trying to gain access to the second floor rear
20 apartment, why choose this door as opposed to the
21 rear door?
22        MR. ZURBRIGGEN:  Object to form.
23        Officer...
24 BY MR. WEST:

Page 64

1    Q.    To your knowledge.  I'm not asking
2  you to guess.
3         Do you have any idea why they
4  thought they could get there through this door as
5  opposed to the rear door on the cul-de-sac in the
6  back?
7         MR. ZURBRIGGEN:  Object to form.
8    Officer, you can answer.
9         THE WITNESS:  Because of my years
10    of experience serving warrants, most of
11    the time you go through the front door
12    and you have access to the second floor
13    through the front door.
14 BY MR. WEST:
15   Q.    Okay.  But what about the rear
16 door?  Is -- is there any reason to think you
17 couldn't get to the second floor rear apartment
18 through the rear door?
19        MR. ZURBRIGGEN:  Same objection.
20        Officer, you can answer.
21        THE WITNESS:  I don't know.  I
22    wasn't in the rear.
23 BY MR. WEST:
24   Q.    Okay.  And as of today, you do have

16 (Pages 61 to 64)

Electronically signed by Candace Weindel (601-298-573-1229)          f247d9b5-f354-4ef7-b091-b3c2080f2069

Page 65

1  knowledge that the only entrance to that apartment
2  was through the rear door; correct?
3       MR. ZURBRIGGEN: Object to form.
4       Officer...
5       THE WITNESS: I just found out. I
6       mean, I didn't know about the rear door.
7       Like I said, I was in front containment.
8  BY MR. WEST:
9       Q.   Okay.  As part of the
10  reconnaissance before you execute a warrant at
11  someone's house, shouldn't you figure out what
12  door leads to their house or their apartment?
13       MR. ZURBRIGGEN: Object to form.
14       Officer, you can answer.
15       THE WITNESS: No.
16  BY MR. WEST:
17       Q.   Okay.  That's not important?
18       MR. ZURBRIGGEN: Object to form.
19       Officer, you can answer.
20       THE WITNESS: I mean, it is
21       important because you want to, you know,
22       you want to go at the -- the right
23       location.
24  BY MR. WEST:

Page 66

1       Q.   So why shouldn't you figure that
2  out before you bust down their door and kill their
3  dog?
4       MR. ZURBRIGGEN: Object to form.
5       THE WITNESS: I mean, that was the
6       front door thinking it would lead to the
7       second floor apartment.
8  BY MR. WEST:
9       Q.   Okay.  But if you go to a
10  multi-resident structure and it has multiple
11  doors, before you start breaking down the doors,
12  shouldn't you figure out which door leads to the
13  proper apartment?
14       MR. ZURBRIGGEN: Object to form.
15       Officer, you can answer.
16       THE WITNESS: Yes.
17  BY MR. WEST:
18       Q.   Okay.  And if you don't know which
19  door leads to the -- the apartment for which you
20  have a warrant, should you wait until you learn
21  that or should you just kick down the door?
22       MR. ZURBRIGGEN: Object to form.
23       Officer, you can answer.
24       THE WITNESS: Wait until you learn

Page 67

1       that?  I don't understand the question.
2       Like what do you mean wait?
3  BY MR. WEST:
4       Q.   Okay.  If there is a door to a
5  multi-residence property and you have a warrant
6  for only one apartment therein and you do not know
7  where that door leads, should you breach that door
8  or should you do more reconnaissance until you
9  figure out what the door actually leads to?
10       MR. ZURBRIGGEN: Object to form.
11       Officer, you can answer.
12       THE WITNESS: You should -- you
13       should get intel or information on what
14       property and what door you should hit.
15  BY MR. WEST:
16       Q.   Okay.  So the fact that Ms.
17  Alvarado's front door was breached means that a
18  mistake was made; correct?
19       MR. ZURBRIGGEN: Object to form.
20       Officer...
21       THE WITNESS: I cannot answer that.
22  BY MR. WEST:
23       Q.   Okay.  Based on the training you've
24  received as far as the policies and procedures of

Page 68

1  the Philadelphia Police Department, is it okay to
2  bust down the front door of an Apartment Number 1
3  in a multi-residence property where the warrant is
4  valid only for the second floor rear apartment?
5       MR. ZURBRIGGEN: Object to form.
6       Officer, you can answer.
7       THE WITNESS: Like I said, in my
8       years of experience the front door
9       normally leads up to the second floor
10       apartment.
11  BY MR. WEST:
12       Q.   Okay.  Now, if the first floor
13  apartment is right behind that door, but you can
14  walk across that apartment and it will eventually
15  lead you to a staircase up to the second floor,
16  are you allowed to -- to breach that door in order
17  to execute the warrant on the second floor
18  apartment?
19       MR. ZURBRIGGEN: Object to form.
20       Officer, you can answer.
21       THE WITNESS: I would say yes, but
22       you wouldn't know that until you go to
23       the front door where there are two
24       mailbox at that location and you would,

17 (Pages 65 to 68)

Page 69

1      you know, assume that that is -- leads
2      up to the second floor.
3   BY MR. WEST:
4      Q.    Right.  But it's okay to go through
5   the Apartment Number 1 to get to some other
6   apartment; correct?
7          MR. ZURBRIGGEN:  Object to form.
8          Officer, you can answer.
9          THE WITNESS:  I'm not saying that
10         it's okay, but most front doors will
11         lead to the second floor.
12  BY MR. WEST:
13     Q.    Sir, I -- please answer the
14  question I'm asking you.
15         Are you allowed to enter the first
16  floor apartment at all if you only have a warrant
17  for the second floor rear apartment?
18         MR. ZURBRIGGEN:  Object to form.
19         THE WITNESS:  Like I said, the
20         front door was breached --
21  BY MR. WEST:
22     Q.    Sir, please answer the question I'm
23  actually asking you.
24         The question I'm asking you if you

Page 70

1   have a warrant for the second floor rear
2   apartment, are you allowed to enter even one foot
3   in the first floor apartment?
4          MR. ZURBRIGGEN:  Object to form.
5          And Officer, you can answer.
6          THE WITNESS:  I would say yes
7          because the front door may lead to the
8          second floor.  That's the front door to
9          the whole building.
10  BY MR. WEST:
11     Q.    All right.  And your understanding
12  is based on what you've learned from the training
13  you've received from the Philadelphia Police
14  Department; correct?
15         MR. ZURBRIGGEN:  Object to form.
16         And Officer, you can answer.
17         THE WITNESS:  Yes.
18  BY MR. WEST:
19     Q.    Did you ever receive any training
20  on how to deal with dogs at residences when
21  executing a warrant?
22         MR. ZURBRIGGEN:  Object to form.
23         Officer, you can answer.
24         THE WITNESS:  Can you rephrase that

Page 71

1   question?
2   BY MR. WEST:
3      Q.    Okay.  So if you are executing a
4   warrant at a residence, do those residences
5   sometimes have dogs?
6          MR. ZURBRIGGEN:  Object to form.
7          Officer, you can answer.
8          THE WITNESS:  You mean like any
9          residence?  I mean, yes.  I mean --
10  BY MR. WEST:
11     Q.    You're aware that -- of the fact
12  that sometimes people have dogs in their houses;
13  correct?
14     A.    Yes.
15     Q.    Okay.  Now, did you ever receive
16  any training from the Philadelphia Police
17  Department as far as how to handle an encounter
18  with a dog at a residence while executing a
19  warrant?
20         MR. ZURBRIGGEN:  Object to form.
21         Officer, you can answer.
22         THE WITNESS:  If a dog is
23         aggressive --
24         MR. WEST:  Sir --

Page 72

1          MR. ZURBRIGGEN:  Please let him --
2   BY MR. WEST:
3      Q.    Please answer the question I'm
4   asking you.  I'm not asking you what you should do
5   or what you think you should do.
6          Just a basic question, have you
7   received specific training from the Philadelphia
8   Police Department as far as how to handle a dog
9   encounter while executing a warrant?
10         MR. ZURBRIGGEN:  Object to form.
11         Officer, please answer your
12         question.
13         And please let him finish the
14         answer.
15         THE WITNESS:  I would say no.
16  BY MR. WEST:
17     Q.    Okay.  Have you ever been trained
18  on what sorts of tools you should bring with you
19  if you are going to breach a residence where you
20  believe a dog is located in order to handle the
21  encounter with a dog in a non-lethal manner?
22         MR. ZURBRIGGEN:  Object to form.
23         Officer...
24         THE WITNESS:  I mean, why should we

18 (Pages 69 to 72)

Page 73

1      bring tools on -- to handle a dog
2      whereas far as we're going to serve a
3      warrant for someone that's, you know,
4      wanted for homicide.
5  BY MR. WEST:
6      Q.    Right.  So you've -- you've never
7  actually received any training from the
8  Philadelphia Police Department as far as what
9  non-lethal tools you're supposed to bring with you
10 when entering a residence where you know there's a
11 dog; correct?
12        MR. ZURBRIGGEN:  Object to form.
13     Officer...
14        THE WITNESS:  OC or pepper spray.
15 BY MR. WEST:
16     Q.    Okay.  Did you ever receive any
17 specific training from the Philadelphia Police
18 Department that told you to bring pepper spray
19 with you when entering a residence if you know
20 there's a dog there?
21        MR. ZURBRIGGEN:  Object to form.
22     Officer, you can answer.
23        THE WITNESS:  I'm guessing that --
24     I mean, it's your choice to bring pepper

Page 74

1      spray, but you don't know if there's a
2      dog in there.
3  BY MR. WEST:
4      Q.    All right.  Sir, please answer the
5  question I'm asking you.
6         The question is have you ever
7  received any specific training from the
8  Philadelphia Police Department that told you what
9  tools you should bring with you when entering a
10 residence where you know there's a dog in order to
11 avoid a fatal encounter, yes or no?
12        MR. ZURBRIGGEN:  Object to form.
13     Officer...
14        THE WITNESS:  Yes.
15 BY MR. WEST:
16     Q.    Okay.  You received that specific
17 training?
18     A.    Yes.
19     Q.    When and where?
20        MR. ZURBRIGGEN:  Object to form.
21     Officer, you can answer.
22        THE WITNESS:  On-the-job training.
23 BY MR. WEST:
24     Q.    When and where?

Page 75

1         MR. ZURBRIGGEN:  Object to form.
2      Officer, you can answer.
3         THE WITNESS:  Being a Philadelphia
4      police officer.
5  BY MR. WEST:
6      Q.    Okay.  When did you receive this
7  training?
8         MR. ZURBRIGGEN:  Object to form.
9      Officer, you can answer.
10        THE WITNESS:  I don't recall.
11 BY MR. WEST:
12     Q.    Okay.  And who gave you this
13 training?
14        MR. ZURBRIGGEN:  Same objection.
15        THE WITNESS:  I don't recall.
16 BY MR. WEST:
17     Q.    Okay.  And what specific tools were
18 you instructed that you should bring with you when
19 entering a residence where you think there's a dog
20 in order to avoid a fatal encounter with a dog?
21        MR. ZURBRIGGEN:  Object to form.
22     Officer, you can answer.
23        THE WITNESS:  Pepper spray, a
24     baton, a baton.

Page 76

1  BY MR. WEST:
2      Q.    A baton?
3      A.    Or yeah, baton.  And that's the
4  only thing I can -- I can think of.
5      Q.    Okay.  You can't recall anything
6  else at this time; correct?
7         MR. ZURBRIGGEN:  Object to form.
8      Officer...
9         THE WITNESS:  Yes.
10 BY MR. WEST:
11     Q.    Sir, is it therefore correct that,
12 based on the training that you received, if you or
13 another member of the SWAT team were about to
14 breach a private residence where you believe there
15 was a dog inside, you should have pepper spray and
16 a baton ready to use in order to avoid a fatal
17 encounter with a dog?
18        MR. ZURBRIGGEN:  Object to form.
19     Officer, you can answer if you can.
20        THE WITNESS:  I'm not saying that.
21 BY MR. WEST:
22     Q.    Okay.  What are you saying?
23     A.    I'm not saying that -- that you
24 bring a baton round or pepper spray with you.

19 (Pages 73 to 76)

Page 77

1     You're asking me if that's what we have as far as
2 being a police officer, one of the things that we
3 can use for dogs.
4     Q.   Okay.  Did you ever receive any
5 specific training from the Philadelphia Police
6 Department as far as what tools you're supposed to
7 use, if any, if you are going to encounter a dog
8 on a -- in a residence while executing a warrant
9 in order to avoid a fatal encounter with a dog?
10     MR. ZURBRIGGEN:  Object to form;
11     particularly it's asked and answered.
12     THE WITNESS:  You would not know
13     until you go inside the property.
14 BY MR. WEST:
15     Q.   Okay.  So you never received any
16 training that -- that you should have certain
17 tools that you should have at-hand in order to be
18 prepared for this situation; correct?
19     MR. ZURBRIGGEN:  Object to form.
20     THE WITNESS:  No.
21 BY MR. WEST:
22     Q.   That is correct or not correct?
23     A.   I have not received training.
24     Q.   Okay.  Do you have any personal

Page 78

1 knowledge as far as what the policies and
2 procedures of the Philadelphia Police Department
3 are as far as the list of tools that you're
4 supposed to have ready before encountering a dog?
5     MR. ZURBRIGGEN:  Object to form;
6     particularly asked and answered several
7     times.
8     THE WITNESS:  I do not know.
9 BY MR. WEST:
10     Q.   Okay.  Were you wearing a body cam
11 on the date of this encounter?
12     A.   No.
13     Q.   Was any member of the operation
14 wearing a body cam?
15     MR. ZURBRIGGEN:  Object to form.
16     Officer, you can answer.
17     THE WITNESS:  No.
18 BY MR. WEST:
19     Q.   It's my understanding that, even
20 today, members of the SWAT unit are not wearing
21 body cams; is that correct?
22     MR. ZURBRIGGEN:  Object to form.
23     Officer...
24     THE WITNESS:  That's correct.

Page 79

1 BY MR. WEST:
2     Q.   All right.  And I think you're
3 probably aware of the fact that most of the
4 Philadelphia police officers began wearing body
5 cams years ago.
6     Do you know why members of the SWAT
7 unit continue not to wear body cams?
8     MR. ZURBRIGGEN:  Object to form.
9     Officer, you can answer.
10     THE WITNESS:  No.
11 BY MR. WEST:
12     Q.   Do you have any personal knowledge
13 as to why you're not assigned to wear a body cam?
14     MR. ZURBRIGGEN:  Object to form.
15     Officer, you can answer if you can.
16     THE WITNESS:  No.
17 BY MR. WEST:
18     Q.   Okay.  Have you ever, in any
19 capacity as a Philadelphia Police Department
20 member, worn a body cam?
21     MR. ZURBRIGGEN:  Same objection.
22     Officer...
23     THE WITNESS:  No.
24 BY MR. WEST:

Page 80

1     Q.   Have you ever received any training
2 from the Philadelphia Police Department as far as
3 how to review different types of structures in
4 order to make a plan on entering the structure
5 when executing a warrant?
6     MR. ZURBRIGGEN:  Object to form;
7     particularly as asked and answered
8     several times.
9     THE WITNESS:  No.
10 BY MR. WEST:
11     Q.   Now, sir, what is the SWAT unit?
12 Like specifically what -- what is the functions of
13 the SWAT unit, to your knowledge?
14     A.   Special weapons and tactics.
15     Q.   How much time passed between Ms.
16 Alvarado's front door being breached and gunfire?
17     A.   Repeat the question.
18     Q.   How much time passed between her
19 front door being breached and you hearing gunfire?
20     A.   I don't know.  I wasn't inside.
21     Q.   Okay.  Sir, do you recall giving an
22 interview to the internal affairs department --
23 division?
24     MR. ZURBRIGGEN:  Object to form.

Electronically signed by Candace Weindel (601-298-573-1229)    f247d9b5-f354-4ef7-b091-b3c2080f2069

| Page 81 | Page 83 |
|---|---|

**Page 81**

1    Officer...
2         THE WITNESS:  Yes.
3    BY MR. WEST:
4         Q.    Okay.  So this page is Bates
5    stamped as D000024.  I'm just going to read from
6    it.  So you were -- this is Question Number 5 when
7    you were interviewed by internal affairs.
8         Can you provide me details of the
9    incident?  Answer, at approximately 5:50 a.m., we
10   arrived at the above location to execute the
11   arrest and search warrant.
12        Let me stop there and ask you.  Is
13   that consistent with your memory today, that the
14   warrant in question was enforced about 5:50 a.m.?
15        MR. ZURBRIGGEN:  Object to form
16       officer, answer if you can.
17        THE WITNESS:  Yes.
18   BY MR. WEST:
19        Q.    Okay.  To continue from your
20   answer, I was front containment along with Police
21   Officer Scott and Police Officer Fitzpatrick.
22   Once on location, I established front containment
23   until the entry team made their approach.  Once
24   they made their approach, the breacher knocked and

**Page 82**

1    announced.  After the second knock-and-announce,
2    the supervisor gave the command to breach the
3    front of the property, door open.  You could hear
4    dogs in the property.  Entry was made by SWAT
5    officers.  Less than eight seconds later, I heard
6    one discharge.
7         I'll stop reading there.  Sir, did
8    you give truthful testimony when you were
9    interviewed by the internal affairs?
10        MR. ZURBRIGGEN:  Object to form.
11       But Officer, you can answer.
12        THE WITNESS:  Yes.
13   BY MR. WEST:
14        Q.    So when you testified that there
15   was less than eight seconds that passed between
16   entering into the property and you hearing
17   gunfire, was that truthful testimony?
18        MR. ZURBRIGGEN:  Object to form.
19       But Officer, you can answer.
20        THE WITNESS:  Yes.
21   BY MR. WEST:
22        Q.    Does this recollect your
23   recollection as far as how much time passed
24   between the door being breached and the dog

**Page 83**

1    getting shot?
2         A.    Yes.
3         Q.    Okay.  So it was eight seconds or
4    less?
5         A.    It was about eight seconds
6    approximately.
7         Q.    All right.
8         MR. ZURBRIGGEN:  Objection, just
9       for the record.
10   BY MR. WEST:
11        Q.    And just to quote, your -- what you
12   said here is less than eight seconds.
13        Was that true?
14        MR. ZURBRIGGEN:  Object to form.
15       And Keith, I'm going to show the --
16       I'm going to show -- unless you have a
17       copy, paper copy, I can show him the
18       actual statement.
19        MR. WEST:  Oh.  That's fine.  I can
20       just hand it to him.
21        MR. ZURBRIGGEN:  Just so that he
22       can see what you're talking about.
23   BY MR. WEST:
24        Q.    And just to -- I'm not going to go

**Page 84**

1    on this more, sir.  I just designate -- it's the
2    last line of text here.
3         The words are less than eight
4    seconds later; right?
5         A.    Less than eight seconds, than ten
6    seconds.
7         Q.    So is -- is the phrase less than
8    eight seconds on that page?
9         A.    It's about approximately eight --
10   eight to ten seconds.
11        Q.    Sir, if you can just answer the
12   question.
13        Is the phrase less than eight
14   seconds later on the -- on the page?
15        MR. ZURBRIGGEN:  Object to form.
16       Officer, you can answer.
17        THE WITNESS:  Yes.
18   BY MR. WEST:
19        Q.    Okay.  If I can have the piece of
20   paper back.
21        A.    (Witness complies)
22        Q.    Did you have any motivation to lie
23   when you gave this internal affairs statement?
24        MR. ZURBRIGGEN:  Object to form.

21 (Pages 81 to 84)

Page 85

1    Officer, you can answer.
2    THE WITNESS: Repeat the question.
3  BY MR. WEST:
4    Q.    Did you have any motivation to lie
5  when you gave that statement to internal affairs?
6    MR. ZURBRIGGEN: Same objection.
7    THE WITNESS: No.
8  BY MR. WEST:
9    Q.    So there's no reason, when you gave
10 this statement, that you would have exaggerated
11 that it was a shorter time than it really was;
12 right?
13    MR. ZURBRIGGEN: Same objection.
14    Officer...
15    THE WITNESS: No.
16 BY MR. WEST:
17    Q.    Okay. Do you know why the dog was
18 killed?
19    MR. ZURBRIGGEN: Object to form.
20    Officer, you can answer.
21    THE WITNESS: No.
22 BY MR. WEST:
23    Q.    Did you ever see Ms. Alvarado?
24    A.    No.

Page 86

1    Q.    Did you ever speak with Ms.
2  Alvarado?
3    A.    No.
4    Q.    After the dog was shot, what
5  happened after that, to your recollection?
6    MR. ZURBRIGGEN: Object to form.
7    Officer, you can answer.
8    THE WITNESS: I continued to
9    maintain my position as front
10    containment.
11 BY MR. WEST:
12    Q.    Okay. Do you recall at some point
13 the SWAT officers went to the rear door on the
14 cul-de-sac and then that's how they got to the
15 apartment second floor rear?
16    MR. ZURBRIGGEN: Object to form.
17    Officer, you can answer.
18    THE WITNESS: Yes, because they
19    came out and they walked around. I
20    didn't know -- didn't understand why.
21    I'm just covering the front containment.
22 BY MR. WEST:
23    Q.    Okay. Were you a part of going
24 over to the rear or did you stay in the front?

Page 87

1    A.    I maintained my position as front
2  containment.
3    Q.    Okay. At any point prior to Ms.
4  Alvarado's front door being breached, were there
5  any ex -- ex -- exigent circumstances at all
6  related to this operation of which you're aware?
7    MR. ZURBRIGGEN: Object to form.
8    Officer, you can answer.
9    MR. WEST: Let me re -- re-ask the
10    question just because I stuttered.
11 BY MR. WEST:
12    Q.    Are you aware of any exigent
13 circumstances whatsoever related to this operation
14 prior to Ms. Alvarado's front door being breached?
15    MR. ZURBRIGGEN: Object to form.
16    Officer, you can answer.
17    THE WITNESS: No.
18 BY MR. WEST:
19    Q.    Okay. And then just as a
20 foundational question, member of the Philadelphia
21 Police Department, you have received training.
22 You know what the phrase exigent circumstances
23 means; correct?
24    MR. ZURBRIGGEN: Object to form.

Page 88

1    Officer, you can answer.
2    THE WITNESS: Yes.
3    MR. WEST: Okay. All right, sir.
4  I think that's all the questions I have.
5  Thank you.
6    MR. ZURBRIGGEN: I'll just have a
7  very brief follow-up question for you.
8    - - -
9    EXAMINATION
10    - - -
11 BY MR. ZURBRIGGEN:
12    Q.    Officer, I'm just going to show you
13 again what's been marked as Ashford-1. This is
14 the picture.
15    Do you recall -- I believe you
16 identified it's the third door -- third building,
17 I'm sorry, from the right that was Ms. Alvarado's
18 building; is that correct, sir?
19    A.    That's correct.
20    Q.    Okay. Can you see what's written
21 on the front door from that picture, sir?
22    A.    I can't really see it from here.
23    Q.    Okay. Do you recall what was
24 written on the front door?

22 (Pages 85 to 88)

Page 89

1    A.   Numbers.

2    Q.   Do you recall which specific

3    numbers?

4    A.   I don't know the exact address.

5    Q.   Do you recall whether there was any

6    indication on the front door that it was the

7    entrance only to the first floor apartment?

8    A.   No.

9    Q.   Okay.

10        MR. ZURBRIGGEN:  That's the only

11   question I have, Keith, unless you have

12   any follow-up.

13        MR. WEST:  No.  That's everything.

14   Thank you for your time, sir.

15        MR. ZURBRIGGEN:  Officer, thank

16   you.

17        THE VIDEOTAPE OPERATOR:  We are

18   going off the record at 10:18 a.m.

19                - - -

20        (Whereupon, the videotape

21   deposition concluded at 10:18 a.m.)

22                - - -

23

24


Page 90

1

2

3        CERTIFICATION

4

5        I, CANDACE WEINDEL, hereby

6    certify that the foregoing is a true and

7    correct transcript transcribed from the

8    stenographic notes taken by me on Monday,

9    May 22, 2023.

10

11

12        _Candace C Weindel_

13              Candace Weindel,

              Court Reporter

              Notary Public

14

15

16

17        (This certification does not apply

   to any reproduction of this transcript,

18   unless under the direct supervision of

   the certifying reporter.)

19

20

21

22

23

24

**A**

**a.m** 1:17 5:2
   47:15 53:5,11
   81:9,14 89:18
   89:21
**ability** 6:21
**able** 8:6 19:5
   56:24
**access** 37:13
   62:19 63:19
   64:12
**accommodating**
   7:5
**acknowledged**
   63:5
**action** 13:10
   51:1
**actual** 21:9 22:3
   22:5 27:23
   42:16 83:18
**ADAM** 2:9
**Adam.Zurbri...**
   2:12
**address** 4:22
   12:9 23:16
   26:22 27:24
   35:10,12 48:16
   48:17 89:4
**advise** 45:22
**advised** 7:20
**affairs** 8:23 9:17
   9:18 10:23
   80:22 81:7
   82:9 84:23
   85:5
**aggressive** 71:23
**ago** 12:1 79:5
**agreed** 4:1
**al** 1:8 4:18 5:5
**alarm** 39:12
**allowed** 25:23
   27:4 58:22
   59:5 68:16
   69:15 70:2
**ALTHEA** 2:9
**Alvarado** 1:5
   4:17 5:4,10
   6:11 8:24
   12:11,14 47:2

85:23 86:2
**Alvarado's**
   16:18 19:2
   20:21 36:22
   37:18 38:24
   40:18 44:10
   48:21 50:13
   67:17 80:16
   87:4,14 88:17
**announce** 39:8
**announced** 82:1
**answer** 7:9,16
   7:22 9:3,9,15
   10:1,7,11,17
   11:4,14 12:19
   13:2,12,22
   18:19 20:8,24
   21:13,23 22:20
   23:12 24:5,20
   25:6,13 26:3
   27:7,20 28:9
   28:15,23 29:14
   29:23 30:12,24
   31:7 32:8
   33:10,23 34:12
   35:4,17 36:12
   37:10,21,22
   38:3,5 39:19
   40:5 42:22
   43:15,20 44:6
   44:17,18,21
   46:2 49:21
   51:4,12,20
   52:5 54:12
   57:5,16 58:2
   58:18 59:1,9
   59:17 60:3,11
   60:21 61:15,23
   64:8,20 65:14
   65:19 66:15,23
   67:11,21 68:6
   68:20 69:8,13
   69:22 70:5,16
   70:23 71:7,21
   72:3,11,14
   73:22 74:4,21
   75:2,9,22
   76:19 78:16
   79:9,15 81:9

81:16,20 82:11
   82:19 84:11,16
   85:1,20 86:7
   86:17 87:8,16
   88:1
**answered** 77:11
   78:6 80:7
**anybody** 17:24
   28:4 37:16
**apartment** 19:3
   20:21 25:11,22
   26:1,23,23
   27:1,3,4 33:21
   34:10 37:7,14
   37:18 38:14
   44:11 48:21
   50:13 51:10
   59:5,6 60:8
   62:20 63:6,20
   64:17 65:1,12
   66:7,13,19
   67:6 68:2,4,10
   68:13,14,18
   69:5,6,16,17
   70:2,3 86:15
   89:7
**apartments** 36:8
   59:24 61:20
**apologize** 20:17
**applied** 25:10
   33:21 34:9
**apply** 90:16
**approach** 17:11
   81:23,24
**approximately**
   18:8 19:4
   40:16 81:9
   83:6 84:9
**approximation**
   8:7,8 9:13
**Arch** 2:10
**area** 27:14 51:15
   53:14 54:8,10
   54:10 56:24
**arrest** 30:9
   81:11
**arrive** 17:1
**arrived** 81:10
**ascertain** 61:20

**Ashford** 1:14
   3:3 4:9,14 5:16
   5:17,21,23,24
   6:2 8:19
**Ashford-1** 3:11
   47:17,21 88:13
**asked** 32:11
   77:11 78:6
   80:7
**asking** 15:24
   16:1 21:18
   32:4,12 41:23
   43:21,22 64:1
   69:14,23,24
   72:4,4 74:5
   77:1
**assigned** 79:13
**assume** 7:17
   42:11 69:1
**assumption** 22:4
**at-hand** 77:17
**attorney** 6:16,16
   7:19
**attorneys** 6:10
**audio** 4:15
**available** 18:15
   61:19
**Avenue** 12:8
   17:18,21 22:23
**avoid** 74:11
   75:20 76:16
   77:9
**aware** 71:11
   79:3 87:6,12
**awkward** 49:6

**B**

**B** 3:8
**B-I-N-N-S** 32:18
**back** 12:5 26:9
   26:13 28:16,20
   29:5,11 30:16
   30:20 33:8
   53:14 55:23
   64:6 84:20
**Badge** 5:7
**barricade** 11:6
   11:11 13:8,17
**based** 7:21

25:18 39:22
   41:12,19 55:16
   59:12 67:23
   70:12 76:12
**basic** 56:24 72:6
**basically** 22:21
   23:2 39:7
   43:16
**Bates** 81:4
**baton** 75:24,24
   76:2,3,16,24
**becoming** 15:13
   15:21
**began** 79:4
**beginning** 1:17
   57:24
**behalf** 5:9
**believe** 12:7
   16:16 20:12
   49:4 72:20
   76:14 88:15
**Binns** 32:16
**bit** 46:9
**blueprints** 61:12
**body** 78:10,14
   78:21 79:4,7
   79:13,20
**Bradford** 5:20
**Bradford[sic** 5:7
**breach** 40:3 67:7
   68:16 72:19
   76:14 82:2
**breached** 18:2
   19:3,9 20:22
   36:23 37:19
   38:24 40:19
   44:13,14 45:5
   47:3 48:20,21
   49:5,10 62:19
   67:17 69:20
   80:16,19 82:24
   87:4,14
**breacher** 81:24
**breaching** 36:9
   41:17 50:24
**break** 7:3
**breaking** 66:11
**brief** 20:2,2,3
   27:22 88:7

**briefing** 20:20
21:21 22:6
24:16 38:12,17
45:3,15
**briefly** 9:22
**bring** 72:18 73:1
73:9,18,24
74:9 75:18
76:24
**bringing** 52:21
**Broad** 1:16 2:4
4:22
**Buck** 32:20
**building** 19:22
24:18,18 35:12
36:24 37:14
44:10 45:24
46:11 47:2
53:23 59:6
61:21 62:16
70:9 88:16,18
**built** 34:16
**bust** 66:2 68:2

———————
C
———————

**C** 2:1
**cam** 78:10,14
79:13,20
**cams** 78:21 79:5
79:7
**Candace** 1:18
5:12 26:7
47:23 90:3,13
**capacity** 79:19
**caption** 5:4
**case** 4:18 5:3
6:11
**Center** 1:15 2:3
4:22
**certain** 25:22
27:1 29:4
77:16
**certification** 4:3
90:1,16
**certify** 90:4
**certifying** 90:18
**choice** 7:23
73:24
**choose** 63:20

**circle** 49:11
**circled** 49:10
51:16 53:15,16
**circumstances**
87:5,13,22
**City** 1:8 2:9 4:17
5:4 6:17 52:12
52:16
**closer** 18:7,11
**coffee** 7:4
**come** 42:12
52:16
**coming** 14:13
**command** 82:2
**COMMON** 1:1
**Commonwealth**
1:19
**compatible**
41:17
**complies** 49:7
84:21
**concern** 29:17
**concluded** 89:21
**conduct** 57:12
58:7
**conducting**
56:17
**confer** 6:16
**consistent** 56:3
81:13
**contact** 60:8
**contain** 16:23
**containment**
12:9 16:19,21
16:22 17:7
19:19 23:8,14
45:1 49:24
65:7 81:20,22
86:10,21 87:2
**containment's**
17:13
**continue** 79:7
81:19
**continued** 86:8
**contradict** 41:7
**conversation**
8:13
**copies** 47:7
**copy** 47:6,8

83:17,17
**corporal** 11:8
12:16 13:3
**correct** 5:16
10:14,23 14:4
14:22 15:18
16:8,10,13,19
17:4,5,18,21
18:12 20:22
21:4,8 23:10
27:5,15 31:14
32:6 35:2,12
35:15,22 37:3
37:5,5 38:18
40:15 42:3
45:15 50:16,21
50:21 51:10
53:16,19 54:3
54:6 56:18
57:3 58:16
59:15 60:19
61:5,13,21
62:2,2,7,7 63:6
63:12 65:2
67:18 69:6
70:14 71:13
73:11 76:6,11
77:18,22,22
78:21,24 87:23
88:18,19 90:5
**correction** 14:10
**counsel** 4:2
**COUNTY** 1:2
**court** 1:1,22
8:13 26:8,12
47:24 90:13
**Courtney** 2:17
4:20
**cover** 16:23
19:18 23:15
**covering** 19:7
86:21
**cul-de-sac** 64:5
86:14
**currently** 31:20

———————
D
———————

**D** 3:1
**D000024** 81:5

**date** 5:1 78:11
**dated** 47:15
**day** 44:14 52:24
**deal** 70:20
**Defendants** 1:9
2:13
**department** 2:9
14:3,21 16:6
25:2,18 28:4,5
30:8 31:11,22
39:24 42:2,17
42:19 43:3,12
44:2 57:12
60:17 68:1
70:14 71:17
72:8 73:8,18
74:8 77:6 78:2
79:19 80:2,22
87:21
**depends** 17:10
17:10
**deposed** 5:6
**deposition** 1:13
4:14,15 5:2,8
5:11 8:20 47:7
47:14 89:21
**DESCRIPTION**
3:9
**designate** 84:1
**details** 10:4 81:8
**determine** 36:7
59:24
**DIAMOND**
1:22
**died** 13:4
**different** 46:10
59:24 80:3
**direct** 90:17
**directly** 52:3
55:11
**discharge** 82:6
**discussed** 59:20
**discussion** 53:7
**District** 14:19
15:2
**division** 80:23
**document** 47:19
**dog** 11:7 12:3
66:3 71:18,22

72:8,20,21
73:1,11,20
74:2,10 75:19
75:20 76:15,17
77:7,9 78:4
82:24 85:17
86:4
**dogs** 70:20 71:5
71:12 77:3
82:4
**doing** 8:9 16:4
**door** 18:1,1,7,11
18:16,23 19:2
19:5,9 20:21
24:3,8 36:23
36:24 37:3,19
38:24 39:7
40:2,3,11,19
40:19 41:17
44:13,14 45:5
45:6 47:3
48:20 49:4,9
49:19 50:3,11
51:2 52:3
53:16,18 54:3
54:9,24 55:10
55:17 56:15
62:17,17,19,23
63:20,21 64:4
64:5,11,13,16
64:18 65:2,6
65:12 66:2,6
66:12,19,21
67:4,7,7,9,14
67:17 68:2,8
68:13,16,23
69:20 70:7,8
80:16,19 82:3
82:24 86:13
87:4,14 88:16
88:21,24 89:6
**doors** 44:11 52:1
66:11,11 69:10
**duly** 4:10 6:3
**duties** 17:13
23:14
**duty** 13:4

———————
E
———————

**E** 2:1,1,16,16
    3:1,8
**earlier** 51:9
**ears** 17:24
**eight** 18:9,10,17
    82:5,15 83:3,5
    83:12 84:3,5,8
    84:9,10,13
**either** 17:14
    20:6
**employed** 4:21
    16:9
**employment**
    15:21
**encounter** 71:17
    72:9,21 74:11
    75:20 76:17
    77:7,9 78:11
**encountering**
    78:4
**enforce** 25:20
    28:6 30:9
    33:19 34:8
    40:2
**enforced** 25:3
    81:14
**enforcement**
    13:10,20
**enter** 58:15,22
    59:5 69:15
    70:2
**entering** 73:10
    73:19 74:9
    75:19 80:4
    82:16
**enters** 17:3
**entire** 24:17
    58:14
**entrance** 65:1
    89:7
**entry** 17:1,2
    24:7 81:23
    82:4
**equipment**
    18:14
**ESQUIRE** 2:3,9
    2:10
**established**
    81:22

**estimate** 8:6,7
    9:13
**et** 1:8 4:17 5:5
**eventually** 68:14
**everybody** 6:13
**evidence** 42:11
**ex** 87:5,5
**exact** 12:8 22:22
    89:4
**exactly** 22:13
**exaggerated**
    85:10
**Examination**
    3:4,5 6:6 88:9
**examined** 4:10
    6:3
**example** 60:6
**execute** 58:15,23
    59:7 65:10
    68:17 81:10
**executing** 61:12
    70:21 71:3,18
    72:9 77:8 80:5
**Exhibit** 47:21
**exigent** 87:5,12
    87:22
**experience** 25:9
    25:19 64:10
    68:8

**F**
**fact** 67:16 71:11
    79:3
**facts** 10:13 11:1
    42:11
**fair** 43:1
**far** 29:17 33:19
    34:7 42:7
    47:14 67:24
    71:17 72:8
    73:2,8 77:1,6
    78:1,3 80:2
    82:23
**fatal** 74:11 75:20
    76:16 77:9
**feel** 7:10,22
**Felishatay** 1:5
    5:9
**figure** 56:14

65:11 66:1,12
    67:9
**filing** 4:4
**fine** 52:21 53:3
    55:22 83:19
**finish** 72:13
**finished** 43:17
**first** 4:10 6:3
    13:16 14:6
    24:8 28:17,20
    68:12 69:15
    70:3 89:7
**Fitzpatrick**
    81:21
**floor** 1:16 2:4,11
    4:23 19:6,14
    19:17,22 23:9
    23:19,24 24:9
    24:11 37:11,14
    37:18 38:13
    45:21 46:3,4,6
    46:7,23 47:1
    51:10,17,22
    52:2,8 54:18
    55:5,9,11,18
    56:10,15 57:1
    57:7 61:11
    63:9,12,19
    64:12,17 66:7
    68:4,9,12,15
    68:17 69:2,11
    69:16,17 70:1
    70:3,8 86:15
    89:7
**floors** 54:18,21
    55:1
**focus** 23:9
**focused** 19:14,17
    23:23
**focusing** 19:6
    24:8,11
**follow-up** 88:7
    89:12
**follows** 4:11 6:4
**foot** 70:2
**foregoing** 90:4
**form** 4:5 9:2
    15:20 18:18
    19:10 20:7,23

21:12,22 22:7
    22:19 23:11
    24:4,19 25:5
    26:2 28:8
    29:13,22 30:11
    30:23 32:7
    33:9,22 34:11
    35:3,16 36:11
    37:9,20 39:18
    40:4,12,20
    41:8,20 42:4
    42:21 43:5,14
    44:16 46:1,12
    48:23 49:13,20
    51:3,11,19
    52:4 53:20
    54:4,11 55:12
    55:19 56:7,19
    57:4,15 58:17
    58:24 60:2
    61:22 62:21,24
    63:7,13,22
    64:7 65:3,13
    65:18 66:4,14
    66:22 67:10,19
    68:5,19 69:7
    69:18 70:4,15
    70:22 71:6,20
    72:10,22 73:12
    73:21 74:12,20
    75:1,8,21 76:7
    76:18 77:10,19
    78:5,15,22
    79:8,14 80:6
    80:24 81:15
    82:10,18 83:14
    84:15,24 85:19
    86:6,16 87:7
    87:15,24
**found** 65:5
**foundational**
    87:20
**four** 12:1 15:4
    15:10,17
**friends** 52:22
**front** 12:9 16:18
    16:21,22 17:6
    17:9,12 19:2,5
    20:21 23:8,14

23:22 24:3,7
    34:15 35:15
    36:23 37:19
    38:24 40:2,3
    41:17 45:1
    49:23 53:16,18
    53:22 62:17,18
    63:2,2,15
    64:11,13 65:7
    66:6 67:17
    68:2,8,23
    69:10,20 70:7
    70:8 80:16,19
    81:20,22 82:3
    86:9,21,24
    87:1,4,14
    88:21,24 89:6
**functions** 80:12

**G**
**gain** 19:24 27:10
    62:19 63:19
**general** 29:20
**getting** 40:19
    83:1
**give** 7:20 8:6,7
    9:12 24:15
    39:11,15 45:4
    45:21 82:8
**given** 28:5 45:4
**giving** 21:20
    45:14 80:21
**go** 25:23 27:2,4
    30:18 34:14
    45:23 52:15
    61:11 64:11
    65:22 66:9
    68:22 69:4
    77:13 83:24
**goes** 17:14 61:2
**going** 7:5,13
    24:3 26:9
    27:24 30:19
    47:16 49:5
    53:5 72:19
    73:2 77:7 81:5
    83:15,16,24
    86:23 88:12
    89:18

**Good** 6:9
**Google** 3:11
47:14
**guess** 7:23 8:11
39:11 64:2
**guessing** 60:22
73:23
**guidance** 45:15
**gun** 11:20
**gunfire** 80:16,19
82:17
**guy** 19:19

**H**

**H** 3:8
**hand** 8:3 47:6
83:20
**handle** 71:17
72:8,20 73:1
**happen** 13:6
**happened** 9:7
12:6,24 86:5
**hard** 20:16
**head** 8:16
**hear** 17:23,24
18:16,17 38:23
39:1 42:12
82:3
**heard** 82:5
**hearing** 20:17
80:19 82:16
**highlight** 49:4
**highlighter** 49:4
53:15
**hit** 30:19 67:14
**homes** 48:7
**homicide** 12:22
23:2 73:4
**house** 16:18
17:11 58:14,15
58:22,23 65:11
65:12
**houses** 71:12

**I**

**idea** 62:18 64:3
**identification**
47:20
**identified** 88:16
**illness** 6:20

**Image** 3:11
**immediately**
54:9
**impair** 6:21
**important** 65:17
65:21
**inability** 56:1
**incident** 8:24
11:12 12:4,10
12:14,17 13:8
13:19 16:17
20:20 81:9
**incidents** 9:23
10:5,14,18
11:2 13:15
**inclined** 39:17
**indicating** 48:13
51:23
**indication** 45:5
89:6
**inference** 22:4
**influence** 6:19
**information**
28:1 30:17
67:13
**inside** 36:8 39:9
45:23 49:23
54:14 55:14
76:15 77:13
80:20
**instructed** 75:18
**instruction** 34:6
50:23
**instructions** 7:8
24:16 33:18
**intel** 67:13
**intended** 7:1
**internal** 8:23
9:16,18 10:22
80:22 81:7
82:9 84:23
85:5
**interns** 53:1
**interrupt** 23:18
52:19
**interview** 80:22
**interviewed**
81:7 82:9
**investigation**

8:23
**investigations**
10:23
**involve** 13:19
**involved** 10:22
13:17
**involving** 8:24
12:11,14
**issue** 29:4,11

**J**

**James** 1:14 3:3
4:9,14 5:7 6:2
**Jersey** 1:23
**job** 14:17,24
15:5,12,21
16:2 17:13
21:15 31:3
**join** 14:6
**joining** 14:16
**June** 1:5 16:17
33:8

**K**

**Keith** 2:3 6:10
52:12,14 83:15
89:11
**Keith@victim...**
2:6
**kick** 40:10 66:21
**kill** 66:2
**killed** 85:18
**kind** 8:17 17:17
**Kitcherman**
2:17 4:20
**knew** 63:5
**knock** 39:7
**knock-and-an...**
39:3,5,14
41:13,18 42:3
42:8,13,20
43:4,13 44:3
82:1
**knocked** 18:1,12
18:16,23 81:24
**knocking** 40:1
40:18
**know** 6:24 7:1,5
7:12,22,24 8:1
8:1,5,5,8 12:8

19:1 22:22
32:5,14 34:4
34:17 36:23
37:2,6,7,13,17
37:24 38:7,9
39:2,10 40:22
41:2,22 42:10
43:2,10,24
44:1 46:6 48:3
48:16 49:22
50:3,9,9,10,15
50:22 52:6
54:2,13 62:14
62:15 64:21
65:6,21 66:18
67:6 68:22
69:1 73:3,10
73:19 74:1,10
77:12 78:8
79:6 80:20
85:17 86:20
87:22 89:4
**knowledge** 8:4,4
37:17,24 41:7
44:12 64:1
65:1 78:1
79:12 80:13

**L**

**L** 2:16
**Lane** 1:23
**law** 1:15 2:3,9
4:21 27:14
59:13
**lead** 55:10 66:6
68:15 69:11
70:7
**leading** 21:6
22:5
**leads** 52:3 53:18
53:22,23 54:3
55:17 56:15
65:12 66:12,19
67:7,9 68:9
69:1
**learn** 66:20,24
**learned** 61:4,18
70:12
**leave** 49:5

**led** 20:3
**left** 53:14
**legally** 27:3
**lie** 84:22 85:4
**Lieutenant** 20:6
**life** 46:17,20
**line** 13:4 17:10
84:2
**lines** 45:7
**lineup** 22:24
**list** 78:3
**little** 20:16 46:9
**lived** 47:3
**located** 27:3
36:8 44:11
46:10 52:1
59:7,24 72:20
**location** 16:24
22:23 23:16
24:10 26:22
27:23 30:18
31:4 48:12,15
65:23 68:24
81:10,22
**locations** 61:20
**long** 14:23
**look** 34:14,15,16
34:18 48:3
51:15 56:13
**looking** 54:17
55:8
**looks** 46:9
**lot** 32:1
**louder** 7:11

**M**

**mailbox** 68:24
**maintain** 86:9
**maintained** 87:1
**making** 17:19,19
**Male** 11:15
**man** 11:18,20
**man's** 11:22
**manager** 60:9
**manner** 72:21
**Mantua** 1:23
**map** 46:9
**Maps** 3:11 47:15
**march** 17:10

**mark** 47:16
**marked** 34:19
  35:7,9 47:20
  88:13
**marker** 35:12
**math** 16:4
**matter** 4:16
**mean** 14:10 15:7
  27:12 29:18
  32:1,3 35:8,11
  42:7 46:4
  48:15,19 58:19
  65:6,20 66:5
  67:2 71:8,9,9
  72:24 73:24
**meaning** 29:21
  30:3
**means** 35:9
  67:17 87:23
**medication** 6:20
**Melanie** 20:13
  20:14,15,19
  21:20 22:5,12
  24:15,23 38:12
  38:16 45:4,11
  45:20
**Melanie[sic**
  20:10
**Mellody** 20:6,13
  50:24
**member** 14:2
  16:5,13,18
  25:1,19 28:3
  39:23 56:4,16
  57:3 76:13
  78:13 79:20
  87:20
**members** 38:17
  45:22 78:20
  79:6
**memory** 21:5
  22:3,5 81:13
**mispronounce**
  20:18
**mispronouncing**
  20:16
**misspoke** 5:15
**mistake** 67:18
**moment** 48:3

**Monday** 47:15
  90:6
**Monk** 20:6
**morning** 6:9
  48:21
**motivation**
  84:22 85:4
**multi-residence**
  25:3,11,21
  27:2 28:7
  30:10 33:20
  34:8 36:9
  57:13 58:8
  60:1 67:5 68:3
**multi-resident**
  66:10
**multiple** 7:23
  66:10

---

**N**

**N** 2:1,16 3:1
**name** 4:19 6:9
  11:22 32:17,22
**named** 33:7
**necessary** 7:2
**need** 7:2,10,23
  35:1
**never** 46:16
  49:23 54:14
  55:14 60:6,13
  60:16 61:10,18
  73:6 77:15
**New** 1:23
**nods** 8:16
**non-lethal** 72:21
  73:9
**normal** 8:12
**normally** 68:9
**Notary** 1:19
  90:14
**notes** 90:6
**Notice** 1:14
**notify** 39:9
**number** 4:18 5:8
  47:21 48:17
  68:2 69:5 81:6
**numbers** 35:13
  35:13 89:1,3

---

**O**

**O** 2:16
**O'Connor** 12:17
**O'Connor's**
  11:8
**object** 9:2 18:18
  19:10 20:7,23
  21:12,22 22:7
  22:19 23:11
  24:4,19 25:5
  26:2 28:8
  29:13,22 30:11
  30:23 32:7
  33:9,22 34:11
  35:3,16 36:11
  37:9,20 39:18
  40:4,12,20
  41:8,20 42:4
  42:21 43:5,14
  44:16 46:1,12
  48:23 49:13,20
  51:3,11,18
  52:4 53:20
  54:4,11 55:12
  55:19 56:7,19
  57:4,15 58:17
  58:24 60:2
  61:22 62:21,24
  63:7,13,22
  64:7 65:3,13
  65:18 66:4,14
  66:22 67:10,19
  68:5,19 69:7
  69:18 70:4,15
  70:22 71:6,20
  72:10,22 73:12
  73:21 74:12,20
  75:1,8,21 76:7
  76:18 77:10,19
  78:5,15,22
  79:8,14 80:6
  80:24 81:15
  82:10,18 83:14
  84:15,24 85:19
  86:6,16 87:7
  87:15,24
**objection** 9:8,14
  9:24 10:6,16
  11:3,13 12:18
  13:1,11,21

25:12 26:15
27:6,19 28:14
28:22 31:6
35:24 36:18
38:1,6,19 44:5
44:22 45:8,16
46:18 50:4,17
54:19 55:2
57:21 58:4,9
59:8,16 60:10
60:20 61:6,14
62:4,9 64:19
75:14 79:21
83:8 85:6,13
**objections** 4:5
**obligation** 7:20
**observe** 52:12
  52:16
**OC** 73:14
**occupant** 43:18
**occupants** 39:9
**officer** 1:13 3:3
  4:9,14 5:7,11
  5:21,22 6:2
  8:19 9:3,9,15
  10:1,7,17 11:4
  11:14 12:19
  13:2,12,22
  14:18,20 15:1
  15:8,10,13,14
  15:18,22,24
  16:2 18:19
  20:8,24 21:13
  21:23 22:20
  23:12 24:5,20
  25:6,13 26:3
  26:16 27:7,20
  28:9,15,23
  29:14,23 30:12
  30:24 31:7,8
  31:10,13,16,17
  31:21 32:2,6,8
  32:16,20,20
  33:10,15,19,23
  34:7,12 35:4
  35:17 36:1,12
  37:10,21 38:2
  38:20 39:8,19
  40:5,13,21

41:9,21 42:5
42:22 43:6,15
44:6,17,23
45:9,17 46:2
46:13,19 48:24
49:14,21 50:5
50:18 51:4,12
51:20 52:5
53:21 54:5,12
54:20 55:3,13
56:8,20 57:5
57:16,22 58:18
59:1,9,17 60:3
60:11,21 61:7
61:15,23 62:10
63:8,14,23
64:8,20 65:4
65:14,19 66:15
66:23 67:11,20
68:6,20 69:8
70:5,16,23
71:7,21 72:11
72:23 73:13,22
74:13,21 75:2
75:4,9,22 76:8
76:19 77:2
78:16,23 79:9
79:15,22 81:1
81:16,21,21
82:11,19 84:16
85:1,14,20
86:7,17 87:8
87:16 88:1,12
89:15
**officers** 17:8
  18:6,11,17
  24:10 30:19
  33:8 79:4 82:5
  86:13
**Oh** 35:11 52:17
  83:19
**okay** 4:13 6:19
  6:24 7:6,7,14
  7:15,17,24 8:1
  8:9,17,22 9:6
  9:12,22 11:11
  11:21,24 12:2
  12:6,10,16
  13:6,8 14:1,13

14:20 15:5,15
15:20 16:4,9
16:15 17:2,6
18:6,10,22
19:8,13,16,20
19:24 20:15
22:10,15 23:4
24:12,15,23
26:10,24 27:10
27:17 28:3,12
28:19 29:3,10
30:2,7,15,20
31:13,20 32:5
32:14,19 33:2
33:6,14 34:5
34:21,24 35:11
35:14 36:5,21
37:7,13 38:11
39:2,22 40:17
40:24 41:4
42:10,15 43:1
43:10 44:9,20
45:3,13,20
46:8,23 48:14
49:3,8,15
50:14,23 51:8
51:15 52:13,17
54:2,8 55:10
55:22 56:23
58:6,13 59:4
59:12,20 61:18
62:14 63:4,18
64:15,24 65:9
65:17 66:9,18
67:4,16,23
68:1,12 69:4
69:10 71:3,15
72:17 73:16
74:16 75:6,12
75:17 76:5,22
77:4,15,24
78:10 79:18
80:21 81:4,19
83:3 84:19
85:17 86:12,23
87:3,19 88:3
88:20,23 89:9
**On-the-job**
74:22

**once** 29:11
45:23 81:22,23
**one-floor** 54:9
**open** 82:3
**operation** 18:2,7
21:7,21 22:6
78:13 87:6,13
**operator** 2:17
4:13,19 5:18
5:22 53:4,10
89:17
**opportunity**
6:15
**opposed** 44:14
63:20 64:5
**option** 60:23
**orange** 49:3,11
51:16 53:15
**order** 38:23
58:23 59:7
68:16 72:20
74:10 75:20
76:16 77:9,17
80:4
**Outside** 15:23
**owner** 60:9

———————
**P**
**P** 2:1,1,16
**PA** 1:16 2:5,11
**page** 3:2,9 81:4
84:8,14
**paper** 83:17
84:20
**part** 17:12 23:8
34:22 35:1
36:6 37:16
39:14 45:3,15
60:18 61:3
65:9 86:23
**partial** 8:4
**particular** 44:20
**particularly**
77:11 78:6
80:7
**parties** 4:2
**pass** 40:1
**passed** 40:18
80:15,18 82:15

82:23
**patrol** 14:18,20
15:1,9,13,14
15:18,21 16:2
**patrolling** 17:17
**Pennsylvania**
1:2,20 4:24
**people** 22:24
33:6 39:15
71:12
**pepper** 73:14,18
73:24 75:23
76:15,24
**performed** 5:3
**person** 5:3 12:21
19:21 31:4,24
**personal** 41:6
44:12 77:24
79:12
**personally** 7:21
43:23 44:1
**pertinent** 26:13
**Philadelphia** 1:2
1:8,16 2:5,9,11
4:17,23 5:5
14:3,21 16:5
25:2,17,17
28:4,5 30:8
31:11,22 39:24
42:2,16,18
43:3,11 44:2
56:4,17 57:3
57:11 59:22
60:17 68:1
70:13 71:16
72:7 73:8,17
74:8 75:17 77:2
78:2 79:4,19
80:2 87:20
**photograph**
47:5,13 48:3
**phrase** 84:7,13
87:22
**physically** 18:22
19:8
**picture** 48:9,22
54:17,24 55:4
55:8,17 56:14
88:14,21

**piece** 84:19
**place** 11:24
30:15 31:5
53:7
**plaintiff** 1:6 2:6
5:9 6:11
**plan** 45:21 46:3
46:4,6,7,23
47:1 80:4
**plans** 61:11
**PLEAS** 1:1
**please** 6:13 7:9
8:7,15 22:11
22:17 26:5
32:15 48:2
69:13,22 72:1
72:3,11,13
74:4
**point** 19:2 86:12
87:3
**police** 11:16,19
14:3,21 15:7
15:24 16:6
25:2,18 28:4,5
30:8 31:11,22
39:8,10,24
42:2,17,18
43:3,12 44:2
57:11 59:22
60:17 68:1
70:13 71:16
72:8 73:8,17
74:8 75:4 77:2
77:5 78:2 79:4
79:19 80:2
81:20,21 87:21
**policies** 25:16
42:18 43:2,11
43:22 44:1
67:24 78:1
**portion** 24:18
58:15,22 59:6
**position** 86:9
87:1
**possible** 7:6
**preliminary**
6:12
**prepared** 6:17
77:18

**previously** 23:23
**printed** 47:14
**prior** 14:16 15:6
20:20 27:24
36:22 47:14
50:24 61:12
87:3,14
**private** 76:14
**probably** 60:13
79:3
**procedures**
25:17 42:18
43:3,11 44:1
67:24 78:2
**process** 59:23
**Professional**
1:18
**proper** 66:13
**properties** 57:14
58:8
**property** 16:23
17:3,14 23:15
23:20 25:4,11
25:21,23,24
26:20,21 27:2
28:1,7 30:10
30:18 33:20
34:9,14,19
35:15,22 36:9
36:10 39:9,16
44:15 45:21
48:9 53:24
58:11 60:8,9
61:12 63:2,16
67:5,14 68:3
77:13 82:3,4
82:16
**provide** 81:8
**proximity** 18:11
**Public** 1:19
90:14
**purposes** 47:20
**pursuant** 1:14
25:16
**put** 47:11

———————
**Q**
**question** 4:6
7:11,14,23

15:16 21:18
22:15 24:24
26:5,10 29:1
32:3 34:1
36:14 41:15
43:21,21,23,24
56:13 57:17
61:1 67:1
69:14,22,24
71:1 72:3,6,12
74:5,6 80:17
81:6,14 84:12
85:2 87:10,20
88:7 89:11
**questions** 6:12
7:9 88:4
**quick** 47:12
**quite** 36:13
**quote** 83:11

_____
**R**

**R** 2:1,9,16
**re-ask** 87:9
**read** 26:9,12
81:5
**reading** 4:3 82:7
**ready** 47:23
76:16 78:4
**real** 47:11
**really** 85:11
88:22
**rear** 34:17,18
35:22 36:24
37:2,11,14,18
38:13 51:10
62:17,19,22
63:6,9,19,21
64:5,15,17,18
64:22 65:2,6
68:4 69:17
70:1 86:13,15
86:24
**reason** 24:6
44:21 64:16
85:9
**reasonable**
41:12
**recall** 10:2,4,8
10:12,13 11:1

11:23 20:4
22:13 23:4
24:21 31:1,3
42:23 75:10,15
76:5 80:21
86:12 88:15,23
89:2,5
**receive** 28:12,19
29:7,10 33:18
34:7 42:15
57:19 58:6
59:21 70:19
71:15 73:16
75:6 77:4
**received** 29:4,12
39:23 41:19
42:1 56:3,16
56:24 57:2,11
59:13 60:6,16
61:2,10 62:11
67:24 70:13
72:7 73:7 74:7
74:16 76:12
77:15,23 80:1
87:21
**recognize** 48:4,9
48:20
**recollect** 21:14
82:22
**recollection**
21:10,20 22:3
45:14 82:23
86:5
**recon** 30:18
34:13,22 35:1
36:2
**reconnaissance**
36:7 56:6,18
57:13,20 58:7
59:14,23 60:19
61:3 65:10
67:8
**record** 8:17
47:11 52:15
53:5,8,11 83:9
89:18
**Recovery** 1:15
2:3 4:21
**Redbud** 1:23

**referred** 13:9,16
**referring** 10:19
12:13 30:22
**regards** 16:17
28:6 42:19
43:4,12 44:3
47:2 57:12,20
**related** 9:23
21:21 22:6
87:6,13
**remember** 22:12
22:16,17 32:12
**rep** 62:14
**repeat** 10:10
12:12 13:13
21:24 26:4,6
34:3 80:17
85:2
**rephrase** 7:11
7:13 70:24
**reporter** 1:18
8:13 26:8,12
47:24 90:13,18
**REPORTING**
1:22
**represent** 41:4
44:9 47:12
50:12
**represented**
62:16
**representing** 2:6
2:13 6:10
**reproduction**
90:17
**reserved** 4:6
**residence** 71:4,9
71:18 72:19
73:10,19 74:10
75:19 76:14
77:8
**residences** 70:20
71:4
**respective** 4:2
**responses** 8:15
**restate** 7:11,13
**review** 35:14,21
80:3
**right** 8:19 12:2
12:13 14:1,14

15:10,17 16:5
16:7,15 19:1
20:19 21:17
22:10 23:7,21
33:17 34:3
35:21 36:21
46:24 48:2,6,8
49:9,10 50:12
53:13,15 57:10
61:10 63:11
65:22 68:13
69:4 70:11
73:6 74:4 79:2
83:7 84:4
85:12 88:3,17
**room** 53:19 54:8
54:24 55:18
**rooms** 46:10
**round** 76:24
**row** 48:7
**rule** 39:3,6,14
41:13,18,19
42:3,8,13,20
43:4,13 44:3

_____
**S**

**S** 2:1,16,16 3:8
32:23
**S-H-A-R-A-...**
33:1
**safe** 17:20
**safely** 17:1
**saying** 21:3
22:18 29:17
43:8,17 62:6
69:9 76:20,22
76:23
**scope** 15:23
**Scott** 81:21
**sealing** 4:3
**search** 25:3,10
30:10 58:13
81:11
**second** 19:6,14
19:17,22 23:9
23:19,23 24:11
37:11,14,18
38:13 51:9,17
51:22 52:2,8

55:5,9,11
56:10,15 57:1
57:7 63:9,11
63:19 64:12,17
66:7 68:4,9,15
68:17 69:2,11
69:17 70:1,8
82:1 86:15
**seconds** 40:7,9
41:5 82:5,15
83:3,5,12 84:4
84:5,6,8,10,14
**see** 18:22 19:9
34:15,17 47:1
49:8 52:8,10
55:5,16 57:7,8
83:22 85:23
88:20,22
**seeing** 54:23
55:4
**seen** 40:24 46:8
46:16
**Sergeant** 20:6,9
20:12,19 21:20
22:5,12 24:15
24:23 32:16
38:11,16 45:4
45:11,20 50:24
**serve** 16:24
30:17 39:10
73:2
**served** 12:7,20
**serving** 23:1
64:10
**Sharamtew**
32:21
**shooting** 11:7,9
11:15,18 12:3
**shorter** 85:11
**shot** 13:3 83:1
86:4
**show** 30:5,9
83:15,16,17
88:12
**shows** 41:5
46:10
**side** 49:18 50:3
50:11 51:1
**signing** 4:3

**similar** 8:12
  28:19
**Similarly** 7:8
**sir** 6:9 10:21
  14:1 16:8,15
  21:8,17 23:18
  23:21 27:13
  29:20 43:20,20
  44:9 47:5,12
  48:2,8,19
  49:10 50:12
  51:8 53:13
  56:13 57:10,19
  58:21 61:1
  62:14 69:13,22
  71:24 74:4
  76:11 80:11,21
  82:7 84:1,11
  88:3,18,21
  89:14
**sitting** 21:9,19
  22:2 45:13
  50:2
**situation** 17:18
  77:18
**slower** 7:12
**somebody** 35:1
  40:10
**someone's** 40:1
  65:11
**sorry** 10:10
  20:15,16 32:24
  50:8 52:19
  88:17
**sort** 6:20 18:14
  45:14,21 47:1
**sorts** 72:18
**South** 1:15 2:4
  4:22
**speak** 7:11 86:1
**SPEAKER**
  52:11,23
**Special** 80:14
**specific** 21:19
  22:3 25:24
  27:1 29:4
  33:17 34:6
  42:16 43:2,11
  45:14 48:9

72:7 73:17
  74:7,16 75:17
  77:5 89:2
**specifically** 23:8
  30:21 57:13
  58:8 61:2,4
  80:12
**specifies** 25:22
**speculate** 7:24
**spell** 32:17,22
**spoken** 8:16
**spray** 73:14,18
  74:1 75:23
  76:15,24
**staircase** 68:15
**stamped** 81:5
**stand** 17:7,9
**start** 30:16
  66:11
**started** 28:17
**startle** 39:12
**statement** 83:18
  84:23 85:5,10
**stay** 86:24
**stenographic**
  53:8 90:6
**steps** 36:6,17
  59:22
**stop** 81:12 82:7
**street** 1:16 2:4
  2:10 4:23
  17:15
**strike** 24:24
  41:14,14
**structure** 34:16
  34:18 52:2
  56:2 60:1
  66:10 80:4
**structures** 80:3
**student** 16:3
**stuttered** 87:10
**subsequently**
  29:12
**substance** 6:20
**supervision**
  90:17
**supervisor** 82:2
**supposed** 39:15
  45:23 73:9

77:6 78:4
**sure** 7:19 8:15
  17:13,19,20
  18:4 21:18
  42:1 50:8
  55:24 60:7
**surrender** 39:16
**surveillance**
  61:19
**SWAT** 14:2,6,16
  16:13 24:9
  25:2,20 28:17
  30:16,19 31:12
  31:14,21 33:8
  34:22 35:2
  36:7 37:16
  38:18 42:14
  45:22 56:4,17
  57:3 59:14
  61:3 76:13
  78:20 79:6
  80:11,13 82:4
  86:13
**swear** 5:12
**sworn** 4:10 6:3

— — — — — — —
          **T**
**T** 2:16 3:8
**tactics** 80:14
**take** 7:3 11:24
  30:15 36:6,16
  48:2 59:23
**taken** 1:14 5:9
  90:6
**talking** 83:22
**target** 48:12,14
**teach** 30:8
**teaches** 30:4
**team** 17:1,2 24:7
  76:13 81:23
**techniques**
  61:19
**tell** 19:6,16
  22:11,17 24:2
  30:2 32:15
  54:16 55:17
  56:1 57:1
**ten** 84:5,10
**TERM** 1:5

**testified** 4:11 6:4
  16:16 27:13
  51:8 82:14
**testify** 6:17,21
**testimony** 7:21
  10:21 26:13
  54:23 82:8,17
**text** 84:2
**thank** 88:5
  89:14,15
**Thanks** 49:5
**thing** 8:11,17
  53:1 76:4
**things** 20:18
  77:2
**think** 5:14 6:13
  20:5 38:8 47:6
  47:13 51:8
  64:16 72:5
  75:19 76:4
  79:2 88:4
**thinking** 66:6
**third** 88:16,16
**thought** 52:21
  64:4
**three** 9:19,20
  10:22 12:1
  13:15 33:6
**time** 4:6 5:13 7:3
  28:20 34:4
  39:11,15,24
  40:10,17 64:11
  76:6 80:15,18
  82:23 85:11
  89:14
**times** 9:19,20
  56:5 78:7 80:8
**title** 15:21 31:3
**today** 5:6 6:17
  6:22 7:20 21:9
  21:19 22:2
  45:13 50:2
  59:21 64:24
  78:20 81:13
**Today's** 5:1
**told** 23:7 42:17
  57:23 73:18
  74:8
**tongue-tied**

41:14
**Tony** 52:21
**tools** 72:18 73:1
  73:9 74:9
  75:17 77:6,17
  78:3
**Torresdale** 12:8
  17:18,21 22:23
  48:17,18
**totally** 52:20
  53:2
**trained** 72:17
**training** 25:19
  28:6,13,20
  29:4,8,11,16
  29:17,21 30:21
  31:4,8,10,13
  31:16,17,21
  32:2,6,16 33:7
  33:15,18 34:7
  34:24 35:18
  39:22 41:19
  42:1,6,7,16
  56:3,16,24
  57:2,11,20
  58:7 59:21
  60:7,16 61:1,5
  61:11 62:12
  67:23 70:12,19
  71:16 72:7
  73:7,17 74:7
  74:17,22 75:7
  75:13 76:12
  77:5,16,23
  80:1 87:21
**transcribed** 90:5
**transcript** 23:22
  90:5,17
**trial** 4:7,16
**true** 29:7 83:13
  90:4
**truthful** 7:21
  82:8,17
**truthfully** 6:22
**try** 7:5,13 34:3
  45:20 56:14
**trying** 63:19
**Twenty** 40:9
**two** 41:5 44:11

54:18,21,24
56:10 68:23
**two-floor** 54:10
56:2
**two-second**
41:16
**two-story** 56:11
**types** 80:3

---

**U**

**UDO-INYANG**
2:10
**uncomfortable**
7:2
**understand** 7:10
15:16 21:18
25:18 27:3
28:24 29:16
32:3 33:24
34:4 36:14
39:13 41:18
67:1 86:20
**understanding**
19:20 20:1
27:11,14,18,22
29:21 30:3
41:13 59:13
70:11 78:19
**understood** 7:17
**UNIDENTIFI...**
52:11,23
**uniform** 16:12
**Unintelligible**
52:24
**unit** 14:3,7,16
16:13 17:7
25:2,20 28:17
30:17 31:12,14
31:21 33:8
34:22 35:2
36:7 37:17
38:18 42:14
45:22 56:4,17
57:3 59:14
61:3 78:20
79:7 80:11,13
**use** 4:16 49:3
76:16 77:3,7

---

**V**

**valid** 24:17 37:8
51:9 58:14
63:5 68:4
**various** 36:8
61:20
**versus** 4:17 5:4
**VICTIMS** 2:3
**Victims'** 1:15
4:21
**video** 4:15,19
40:24 41:2,5
53:8
**videotape** 1:13
2:17 4:13 5:18
5:22 53:4,10
89:17,20
**voluntarily**
39:16
**vs** 1:7

---

**W**

**wait** 66:20,24
67:2
**waived** 4:4
**wake** 39:11
**walk** 68:14
**walked** 86:19
**want** 16:24
52:14 65:21,22
**wanted** 12:21
73:4
**warning** 41:16
**warrant** 12:7,21
13:10,20 16:24
19:21 22:22
23:1 24:17
25:3,10,21,22
26:24 28:7
30:9,10,17
33:19,20 34:8
34:9 37:8
39:11 40:2
51:9 58:14,16
58:21,23 59:4
59:7 61:13
63:5 65:10
66:20 67:5
68:3,17 69:16
70:1,21 71:4

---

71:19 72:9
73:3 77:8 80:5
81:11,14
**warrants** 64:10
**wasn't** 19:4,5
64:22 80:20
**water** 7:4
**ways** 8:12
**we'll** 7:17
**we're** 7:5 26:9
53:4 73:2
**weapons** 80:14
**wear** 79:7,13
**wearing** 16:12
78:10,14,20
79:4
**weeks** 12:1
**Weindel** 1:18
5:12 90:3,13
**went** 49:23
54:14 55:14
86:13
**West** 2:3 3:4
5:14,21 6:8,10
9:5,11,18,20
9:21 10:3,9,20
11:10,17 12:23
13:5,14,24
18:21 19:12
20:11 21:2,16
22:1,9 23:3,17
24:12,14,22
25:8,15 26:6,9
26:18 27:9
28:2,11,18
29:2,19 30:1,6
30:14 31:2,9
32:10 33:13
34:2,20 35:6
35:20 36:4,15
36:20 37:12,23
38:4,10,22
39:21 40:8,14
40:23 41:11,24
42:9,24 43:9
43:19 44:8,19
45:2,12,19
46:5,15,22
47:10,16,23

---

48:1 49:2,15
49:17 50:1,7
50:20 51:7,14
51:24 52:7,17
52:20 53:2,12
54:1,7,15,22
55:6,15,21
56:12,22 57:9
57:18 58:1,5
58:12,20 59:3
59:11,19 60:5
60:15,24 61:9
61:17 62:1,5
62:13,22 63:3
63:10,17,24
64:14,23 65:8
65:16,24 66:8
66:17 67:3,15
67:22 68:11
69:3,12,21
70:10,18 71:2
71:10,24 72:2
72:16 73:5,15
74:3,15,23
75:5,11,16
76:1,10,21
77:14,21 78:9
78:18 79:1,11
79:17,24 80:10
81:3,18 82:13
82:21 83:10,19
83:23 84:18
85:3,8,16,22
86:11,22 87:9
87:11,18 88:3
89:13
**whatsoever** 10:5
10:14 11:2
21:20 87:13
**witness** 3:2 5:6
5:13,17,20,24
9:4,10,16,19
10:2,8,18 11:5
11:15 12:20
13:3,13,23
18:20 19:11
20:9 21:1,14
21:24 22:8,21
23:13 24:6,13

---

24:21 25:7,14
26:4,17 27:8
27:21 28:10,16
28:24 29:15,24
30:4,13 31:1,8
32:9 33:12,24
34:13 35:5,18
36:2,13,19
37:11,22 38:3
38:7,21 39:20
40:6,22 41:10
41:22 42:6,23
43:7,16 44:7
44:18,24 45:10
45:18 46:3,14
46:20 48:13
49:1,7,16,22
50:6,19 51:6
51:13,22,23
52:6 53:22
54:6,13,21
55:4,14,20
56:9,21 57:6
57:17,23 58:10
58:19 59:2,10
59:18 60:4,12
60:22 61:8,16
61:24 62:11
63:1,9,15 64:9
64:21 65:5,15
65:20 66:5,16
66:24 67:12,21
68:7,21 69:9
69:19 70:6,17
70:24 71:8,22
72:15,24 73:14
73:23 74:14,22
75:3,10,15,23
76:9,20 77:12
77:20 78:8,17
78:24 79:10,16
79:23 80:9
81:2,17 82:12
82:20 84:17,21
85:2,7,15,21
86:8,18 87:17
88:2
**word** 29:21 30:3
**words** 84:3

worn 79:20
wouldn't 36:16
  68:22
write 8:14
written 88:20,24

**X**

X 3:1,8

**Y**

yeah 15:3 33:5
  42:10 47:9
  76:3
years 14:14 15:4
  15:10,17 16:7
  25:20 64:9
  68:8 79:5
Yup 47:24

**Z**

Zurbriggen 2:9
  3:5 9:2,8,14,24
  10:6,16 11:3
  11:13 12:18
  13:1,11,21
  18:18 19:10
  20:7,23 21:12
  21:22 22:7,19
  23:11 24:4,19
  25:5,12 26:2
  26:15 27:6,19
  28:8,14,22
  29:13,22 30:11
  30:23 31:6
  32:7 33:9,22
  34:11 35:3,16
  35:24 36:11,18
  37:9,20 38:1,6
  38:19 39:18
  40:4,12,20
  41:8,20 42:4
  42:21 43:5,14
  44:4,16,22
  45:8,16 46:1
  46:12,18 47:9
  48:23 49:13,20
  50:4,17 51:3
  51:11,18 52:4
  52:14,18 53:20
  54:4,11,19

55:2,12,19
56:7,19 57:4
57:15,21 58:4
58:9,17,24
59:8,16 60:2
60:10,20 61:6
61:14,22 62:4
62:9,21,24
63:7,13,22
64:7,19 65:3
65:13,18 66:4
66:14,22 67:10
67:19 68:5,19
69:7,18 70:4
70:15,22 71:6
71:20 72:1,10
72:22 73:12,21
74:12,20 75:1
75:8,14,21
76:7,18 77:10
77:19 78:5,15
78:22 79:8,14
79:21 80:6,24
81:15 82:10,18
83:8,14,21
84:15,24 85:6
85:13,19 86:6
86:16 87:7,15
87:24 88:6,11
89:10,15

**0**

01633 1:6
02 30:16
08051 1:23

**1**

1 68:2 69:5
10:18 89:18,21
121 1:15 2:4
  4:22
14th 2:11
15 47:15
1515 2:10
18th 1:16 2:4
  4:23
19102 2:11
19107 1:17 2:5
  4:24
19th 14:18 15:1

**2**

20 14:10 40:6
2002 14:10,11
  28:16,21 29:5
  29:11 30:20
2020 13:7
2021 12:5 16:17
  33:8
2022 1:5 14:8
2023 1:11 90:7
21 14:13
214-0377 2:12
215 2:5
22 1:11 90:7
220601633 4:18
  5:5
22nd 5:1
25 16:6

**3**

30 40:6,9
352 2:12
3802 5:8

**4**

406 1:23
47 3:11

**5**

5 81:6
5:50 81:9,14
546-1433 2:5
589-1107 1:24

**6**

6 3:4

**7**

**8**

856 1:24
87 3:5

**9**

9:00 5:1
9:08 1:17 5:2
9:30 47:15
9:48 53:5
9:49 53:11

# EXHIBIT "E"

# Transcript of the Testimony of:
# **Dana Shannon**

**Date:** September 15, 2023

**Case:** Felishatay Alvarado v. City of Philadelphia, et al.

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

Page 1

IN THE COURT OF COMMON PLEAS

FOR PHILADELPHIA COUNTY, PENNSYLVANIA

- - -

FELISHATAY ALVARADO,    :  JUNE TERM, 2022
                   :
      Plaintiff,    :  NO. 01633
                   :
    vs.          :
                   :
CITY OF PHILADELPHIA,    :
et al.,           :
                   :
      Defendants.   :
              - - -

September 15, 2023

- - -

Oral deposition of DANA SHANNON,

taken pursuant to Notice at VICTIMS'

RECOVERY LAW CENTER, 121 South Broad Street,

18th Floor, Philadelphia, PA 19107,

beginning at 10:00 a.m., before Candace

Weindel, a Professional Reporter and a

Notary Public in and for the Commonwealth of

Pennsylvania.

- - -

DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 589-1107

Page 2

```
 1    A P P E A R A N C E S :

 2

 3    VICTIMS' RECOVERY LAW CENTER
      BY:  KEITH WEST, ESQUIRE
 4    121 South Broad Street
      18th Floor
 5    Philadelphia, PA 19107
      (215) 546-1433
 6    Keith@victimrecoverylaw.com
      Representing the Plaintiff
 7

 8

 9    FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
      BY:  ERIC J. ASSINI, ESQUIRE
10    Room 369 City Hall
      Philadelphia, PA 19107
11    (215) 686-3745
      Eric.assini@courts.phila.gov
12    Representing the Witness

13

14
      CITY OF PHILADELPHIA LAW DEPARTMENT
15    BY:  JONAH SANTIAGO-PAGAN, ESQUIRE
      1515 Arch Street
16    14th Floor
      Philadelphia, PA 19102
17    (352) 214-0377
      Jonah.santiago-pagan@phila.gov
18    Adam.Zurbriggen@phila.gov
      Representing the Defendants
19

20

21

22

23

24
```

Page 3

1                     I N D E X

2    WITNESS                              PAGE

3    DANA SHANNON

4    Examination By Mr. West              4, 37

5    Examination By Mr. Santiago-Pagan    32, 39

6

7

8                   E X H I B I T S

9    NO.              DESCRIPTION         PAGE

10

11   Shannon-1    Client File Notes          4

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

```
 1                    (It is agreed by and between

 2            counsel for the respective parties that

 3            sealing, certification and filing are

 4            waived; and that all objections, except

 5            as to the form of the question, are

 6            reserved until the time of trial.)

 7                           - - -

 8                    DANA SHANNON, after having been

 9            first duly sworn, was examined and

10            testified as follows:

11                           - - -

12                        EXAMINATION

13                           - - -

14   BY MR. WEST:

15        Q.     All right, Ms. Shannon.  My name is

16   Keith West.  I'm one of the attorneys for the

17   plaintiff in this case, Ms. Alvarado.  I'm going

18   to mark as Shannon-1 -- this is a pile of

19   documents that you brought with you today as part

20   of your appearance for today's subpoenaed

21   deposition; correct?

22        A.     Yes.

23                        - - -

24                    (Whereupon, the document was
```

Page 5

```
 1              marked, for identification purposes, as

 2              Exhibit Number Shannon-1.)

 3                         -   -   -

 4   BY MR. WEST:

 5        Q.     Okay.  And let me just go through

 6   some quick kind of preemptory things.

 7                Have you ever been in a deposition

 8   before?

 9        A.     Yes.

10        Q.     How many times have you been

11   deposed?

12        A.     Once.

13        Q.     And can you tell me, just

14   generally, what that case was about?

15        A.     A car accident.

16        Q.     Okay.  So unrelated to your

17   employment for the City of Philadelphia; correct?

18        A.     Yes.

19        Q.     And you are in fact an employee of

20   the City of Philadelphia; right?

21        A.     Yes.

22                MR. ASSINI:  Well, just to clarify,

23           she is an employee of the First Judicial

24           District, which is not -- it's not the
```

Page 6

1            same as the City of Philadelphia;

2            however, it is -- it is the judicial

3            branch of the City of Philadelphia.

4            Like her -- it's separate, but the same,

5            you know --

6                 MR. WEST:  Well, no.  That's what I

7            am trying to figure out because I

8            actually don't know the answer to that.

9            Like the police department is like an

10           entity of the City.  Is --

11                MR. ASSINI:  More independent than

12           that --

13                MR. WEST:  That's what I'm trying

14           --

15                MR. ASSINI:  -- because we're the

16           judicial branch, so that's --

17                MR. SANTIAGO-PAGAN:  Right.

18                MR. WEST:  Okay.  I honestly didn't

19           know the answer to that.

20  BY MR. WEST:

21           Q.    I'm sorry.  So you are an employee

22  of the First Judicial District of Pennsylvania;

23  right?

24           A.    Yes.

1          Q.      Okay.  But your prior deposition

2    appearance was unrelated to that; right?

3          A.      Yes.

4          Q.      How long have you worked as a

5    parole officer?

6          A.      Twenty-two years.

7                  MR. WEST:  Off the record.

8                        -  -  -

9                  (Whereupon, a discussion took place

10           off the stenographic record.)

11                       -  -  -

12                 MR. SANTIAGO-PAGAN:  I just want to

13           state for the record that she is a

14           probation officer, not a parole officer.

15                 MR. ASSINI:  Yes, probation.

16           Right.

17                 MR. WEST:  Okay.

18   BY MR. WEST:

19         Q.      Can you just tell me quickly what

20   is the difference between probation and parole as

21   far as the Commonwealth of Pennsylvania goes?

22                 MR. ASSINI:  If you know.

23                 THE WITNESS:  I'm trying to figure

24           out how to answer that because we do

Page 8

1              supervise people that's on parole as

2              well.

3                  So, I mean, parole is if a person

4              that has been sentenced to a jail

5              sentence and if the judge says like

6              immediate parole, then they can serve

7              their sentence out on the street.

8              Probation is just if the judge sentences

9              a person to a period of probation and we

10             also supervise them on the street.

11   BY MR. WEST:

12        Q.     Right.  Probation is a probationary

13   release from prison.  If the person doesn't meet

14   the terms, they go back to prison; correct?

15        A.     It depends on the judge and if it's

16   like a technical violation or a direct violation.

17        Q.     Okay.  And you, in your capacity,

18   you would supervise people who are released both

19   under probation and under parole; correct?

20        A.     Yes.

21        Q.     What is your actual job title?

22        A.     I'm an Armed Probation Officer II,

23   so I carry a firearm.

24        Q.     And how long have you had that

1   particular job title?

2          A.      I've been doing the job for almost

3   14 years, but technically didn't get classified

4   until last July.

5          Q.      The incident giving rise to this

6   case occurred a little over two years ago.  Do you

7   know what your job title would have been back

8   then?

9          A.      Still a probation and parole

10  officer and I was still armed, but I wasn't

11  classified as that.

12                 MR. ASSINI:  Can I --

13                 MR. WEST:  Yes, please.

14                 MR. ASSINI:  So our probation

15            officers are part of a union, and as

16            part of the collective bargaining

17            agreement that was most recent, part of

18            that was creating a new classification

19            for armed officers and giving them a

20            different salary scale because it

21            requires extra things to --

22                 MR. WEST:  Training.

23                 MR. ASSINI:  -- you know, be armed,

24            training and certifications and renewal.

1              So it didn't exist until it was

2              collectively bargained.

3    BY MR. WEST:

4         Q.      Okay.  So have you always been an

5    armed officer?

6         A.      No.

7         Q.      When did you first become an armed

8    officer?

9         A.      I want to say 2011-ish.  I can't

10   remember the exact date.

11        Q.      But long before this incident;

12   right?

13        A.      Yes.

14        Q.      So do you remember supervising

15   someone who was on probation by the name of

16              ?

17        A.      Yes.

18        Q.      Can you just -- for brevity's sake,

19   I'm going to try to ask you a very general

20   question.

21              Can you tell me everything you

22   remember about your interactions with              ?

23        A.      Just we had contact by phone.  It

24   was during the pandemic, so at that time no one

Page 11

1    was coming into the office.

2          Q.     Okay.  What was              on

3    probation for?

4                    MR. ASSINI:  Objection to form.

5                    But you can answer if you

6           understand.

7    BY MR. WEST:

8          Q.     I should have given you a few more

9    instructions.  You are only being -- all of my

10   questions are just intended to ask what you

11   personally know, so I am not going to ask you to

12   guess or speculate at any time.  If you are not in

13   possession of complete understanding, but you can

14   give us an estimate or an approximation, we would

15   ask for you to let us know that you are giving us

16   an estimate.

17                    This isn't intended to be an

18   unnecessarily uncomfortable -- it's hard to hear

19   me with this, isn't it?  This isn't intended to be

20   an unnecessarily uncomfortable process, so if at

21   any point you would like a break or anything, just

22   let me know.  If you have any trouble

23   understanding any of the questions, please don't

24   answer them.  I'll be more than glad to speak

Page 12

1   louder, slower, faster, rephrase questions if at

2   all possible, anything like that.  Okay?

3        A.      Yes.

4        Q.      With that said, do you know why

5             was on probation, if he was?

6        A.      I believe it was for firearm

7   charges, but I didn't write it down, so I can't

8   remember offhand.

9        Q.      And how long did you supervise him?

10       A.      His case was transferred to me --

11   his case was transferred to me on 7/24/2020.

12       Q.      And before that date in July of

13   2020, was           already under some form of

14   supervision?

15       A.      Yes.

16       Q.      And are you able to remember or

17   just by reviewing your notes able to determine

18   when           first went under -- on

19   supervision?

20             MR. ASSINI:  Objection to form.

21             But you can answer if you

22        understand the question.

23             THE WITNESS:  I believe it was

24             April 9, 2019.

Electronically signed by Candace Weindel (601-298-573-1229)

Page 13

1    BY MR. WEST:

2         Q.      So well before the COVID pandemic;

3    correct?

4         A.      Yes.

5         Q.      Okay.  And who would have been his

6    probation supervisor back then?

7               MR. ASSINI:  Objection to form.

8               You can answer.

9               MR. WEST:  If you know.

10              THE WITNESS:  His supervisor or

11         officer?

12              MR. ASSINI:  So I objected to form,

13         but you can -- if you want to clarify

14         that or ask -- go ahead.

15   BY MR. WEST:

16        Q.      And if I am misstating things --

17   I'm very fortunate that, either as a civilian or a

18   lawyer, I have had almost no interaction with this

19   system, so I'm going to be misstating terms.

20              So if officer is the right --

21   probation officer --

22              MR. ASSINI:  Can we go off the

23         record?

24              MR. WEST:  Yes.

Page 14

```
 1                      -  -  -

 2              (Whereupon, a discussion took place

 3          off the stenographic record.)

 4                      -  -  -

 5              MR. WEST:  Let me ask the question

 6          more generally.

 7  BY MR. WEST:

 8          Q.      Do you know the name and title of

 9  the person who would have been supervising

10      back when his case initiated in 2019?

11          A.      Michael Anderson.

12          Q.      Okay.

13          A.      And he was under monitored

14  supervision, which is house arrest.

15          Q.      Okay.  House arrest.

16                  And that date was, again, what in

17  2019?

18              MR. ASSINI:  I think you said

19          April.

20              THE WITNESS:  It says April 26,

21          2019 that they received notification of

22          house arrest.

23  BY MR. WEST:

24          Q.      What is Michael Anderson's job
```

Page 15

1    title?  At least what would it have been at that

2    time?

3            A.      A probation parole officer.

4            Q.      So generally the same as yourself?

5            A.      Yes.

6            Q.      In your experience, especially in

7    the pre-COVID days back in 2019, if someone was

8    placed on house arrest, would the probation

9    officer normally inspect the home?

10                   MR. ASSINI:  Objection to form.

11                   You can answer.

12                   THE WITNESS:  Yes.  They actually

13              go out and, I guess, investigate the

14              house and see if the person is eligible

15              to be on house arrest and see if the

16              equipment can fit in the house and, I

17              guess, the range.

18   BY MR. WEST:

19           Q.      Okay.  And don't you guys normally

20   inspect the house as well to see who the person is

21   living with because there's usually restrictions

22   limiting who people placed on probation are

23   allowed to live with?

24                   MR. ASSINI:  Objection to form.

Page 16

1                   You can answer.

2                   THE WITNESS:  Am I speaking for

3          house arrest or speaking for what I do

4          in my unit?

5   BY MR. WEST:

6          Q.      I guess house arrest.

7                   But to ask a different question

8   then, do you never handle people with house

9   arrest?

10         A.      I usually get people once they

11  complete house arrest and transfer them to our

12  unit.

13         Q.      Okay.  But are you still familiar

14  with what the procedures for house arrest are?

15         A.      Not a hundred percent.

16         Q.      Okay.  Is it your general

17  understanding that in order for someone to be

18  placed on house arrest, a probation officer needs

19  to go to the house in question and inspect it?

20         A.      Yes.

21         Q.      And are you able -- thank you for

22  bringing these records with you.  I'm only getting

23  a chance to quickly scan them for the first time

24  now.

Page 17

1                     Are you able to look on these and

2     actually find if it's recorded anywhere that

3     someone actually did physically go to the house

4     where              was living?

5          A.       Give me a second.

6          Q.       While you are looking for that, can

7     I quickly ask you another question?  I can see on

8     the notation for April 29, 2019 that an NCIC check

9     was performed.

10                    Do you know what NCIC would stand

11    for in this case?

12         A.       It's like a GNET search.  You have

13    access to a federal database that you can look up

14    offenders' information as far as their criminal

15    history.

16         Q.       Okay.

17         A.       Only thing that I could see in the

18    notes was that --

19         Q.       Yes, actually --

20         A.       -- on 4/25/2019 that a field team

21    went out.

22         Q.       Yes.  So if we go to April -- I'm

23    sorry.  I'm asking this question a little bit

24    inappropriately, but I'm trying not to take up

Page 18

1    extra of your time.

2              It specifically says right on here

3    April 26, 2019 and somebody went to the house, and

4    the location is specifically specified as a second

5    floor apartment with the rear entrance off

6    Margaret Street; right?

7         A.    Yes.  But it stated that they went

8    out on 4/25/2019.

9         Q.    Right.  So these records indicate

10   that somebody went out there and they knew at that

11   time that the entrance to the property was through

12   the rear door; correct?

13             MR. ASSINI:  Objection to form.

14             MR. WEST:  Well, actually, strike

15        the question.  It's a little bit of an

16        inappropriate question.

17   BY MR. WEST:

18        Q.    And you didn't write these records;

19   right?

20        A.    Yes.

21        Q.    So looking at the notation on 4/26,

22   it looks like the author's name is MatteoJ.

23             Do you think that's the person who

24   would have done the actual physical inspection of

Page 19

1    the home or do you think, from these records, it

2    would have been someone else?

3                 MR. ASSINI:  If you know.

4                 THE WITNESS:  Basically -- her name

5            is Jaclyn Matteo.  I think she gets the

6            order and then she connects everybody to

7            process and send people out.  I don't

8            know if she physically goes out, but I

9            know she is like the handler of the

10           house arrest applications that come

11           through or the orders.  She verifies it

12           and then sends the team out to verify

13           the address.  Then once they come back,

14           they will assign it to the officer who

15           is going to be supervising the house

16           arrest.

17   BY MR. WEST:

18       Q.    All right.  If we wanted to ask the

19   person most likely to have more information about

20   how this inspection occurred back in April of

21   2019, do you think Jaclyn Matteo would be probably

22   our best bet as far as to ask more questions?

23                 MR. ASSINI:  If you know.

24                 Objection to form.

Page 20

1              THE WITNESS:  I would say yes.  And

2         she probably could tell you who the

3         officer's name and stuff were when they

4         went out at that time.

5   BY MR. WEST:

6         Q.      Okay.  And is she still, as far as

7   you are aware, currently employed with the First

8   Judicial District?

9         A.      Yes.

10        Q.      Did you ever personally go to the

11  home in which            was allegedly staying?

12        A.      No.

13        Q.      Did you ever speak with anyone from

14  the Philadelphia Police Department about executing

15  a warrant at           's home?

16        A.      I spoke with a homicide detective.

17        Q.      Is that Detective Graf?

18        A.      Yes.

19              MR. WEST:  And Graf is spelled

20         G-R-A-F.

21  BY MR. WEST:

22        Q.      Did you speak with anyone else from

23  the Philadelphia Police Department regarding this

24  or only Detective Graf?

Page 21

1         A.       Only Detective Graf.

2         Q.       Can you -- today, can you remember

3    that conversation with Detective Graf?

4         A.       Yes.

5         Q.       Okay.  So please tell me everything

6    you can remember about that conversation.

7         A.       Do you want me to read the note or

8    just like summarize?

9         Q.       Well, that's what I am trying to

10   distinguish.  I am trying to distinguish between

11   if you are just reading a note that, you know, is

12   something that you know is written down or

13   actually what you can remember independent from

14   the notes.

15            So right now I'm asking you -- if

16   you wouldn't mind even kind of just setting the

17   paper aside for a moment and just let me know what

18   you can remember from your independent

19   recollection, if anything.

20       A.       I just remember him calling me and

21   stating how dangerous Mr.     was and that he was

22   wanted for murder and they were looking at him

23   because he's been kind of terrorizing the

24   neighborhood or the surrounding neighborhood that

Page 22

1    he lived in.  And then, at the time, they said

2    they were going to execute a warrant at the house

3    and they asked me have I been out.

4                     And I said, no, because of the

5    pandemic we are not allowed to do any home visits.

6                     So then he said, can you verify or

7    just tell me if the address I have is correct or

8    do you have any alternative addresses?

9                     So at that time, I asked my

10   supervisor -- because more recently we are not

11   allowed to speak to certain people about releasing

12   information.  So my supervisor said it was okay to

13   talk with him, and the address that he said was

14   the same address that we had, that was in our

15   notes.  So I told him that was the same address,

16   but I haven't personally been out to verify

17   through a field visit like we would normally do.

18   So they said they would just let me know if they

19   pick him up.

20        Q.      Did Detective Graf -- strike the

21   question.

22                     Just to lay a foundation, I can

23   represent to you that the warrant in this case

24   does specify that          was on the second

Page 23

1    floor rear apartment.  With that foundation, did

2    Detective Graf ask you any questions about how to

3    physically get access to that particular apartment

4    number?

5                  MR. SANTIAGO-PAGAN:  Objection to

6           form.

7                  MR. ASSINI:  You can answer to the

8           extent you can.

9                  THE WITNESS:  No.

10   BY MR. WEST:

11       Q.    Did detective Graf ask you if you

12   had access to any records that would have provided

13   any sort of guidance as to how to physically

14   access the apartment in which          was

15   believed to occupy?

16                  MR. ASSINI:  Objection to form.

17                  But you can answer.

18                  THE WITNESS:  No.

19   BY MR. WEST:

20       Q.    Did Detective Graf ask to see these

21   records that you have provided to us today?

22       A.    No.

23       Q.    If Detective Graf had asked to see

24   these records, would you have provided him a copy?

Page 24

1          A.       I would have had --

2                   MR. SANTIAGO-PAGAN:  Object to

3          form.

4                   MR. ASSINI:  Go ahead.  You can

5          answer.

6                   THE WITNESS:  I would have had to

7          get permission from our department and

8          then if they said yes, then I could give

9          it to him, but if not, then no.

10    BY MR. WEST:

11         Q.    Can you think of any reason why the

12    First Judicial District would be unwilling to

13    cooperate on an issue like this with the

14    Philadelphia Police Department?

15                 MR. ASSINI:  Objection to form.

16                 MR. WEST:  In your personal

17         experience.

18                 THE WITNESS:  We're just restricted

19         on a lot of stuff, so right now, it's

20         just you have to ask permission and if

21         they say yes, you go with it, if they

22         say no, then you don't.

23    BY MR. WEST:

24         Q.    Do you have any personal knowledge

Page 25

1   or understanding of why information would be

2   restricted as to what's provided to the

3   Philadelphia Police Department out trying to catch

4   a murder suspect?

5           MR. ASSINI:  You can answer to the

6       extent you know.  I mean --

7           THE WITNESS:  No.  We just follow

8       orders.  That's all I can say.

9   BY MR. WEST:

10      Q.      But in any case, if Detective Graf

11  had asked the question as to if an inspection had

12  been made of the address where          was

13  believed to reside, you could have looked at your

14  records and answered the question in the

15  affirmative; correct?

16          MR. ASSINI:  Objection to form.

17          MR. SANTIAGO-PAGAN:  Objection to

18      form.

19          THE WITNESS:  Can you repeat the

20      question?

21  BY MR. WEST:

22      Q.      Yes.  If Detective Graf had asked

23  the question whether your records indicated that

24  an inspection had been made of the home where

Page 26

1        was believed to reside, you could have

2    answered that in the affirmative; correct?

3            MR. ASSINI:  Same objection to the

4        form.

5            But go ahead.  You can answer.

6            THE WITNESS:  I could have just

7        told him it was confirmed while he was

8        on house arrest, but I couldn't tell him

9        or confirm it at that time.

10   BY MR. WEST:

11       Q.    Right.  And you could have told him

12   what's indicated in these records, that the

13   entrance to the property was through the rear;

14   correct?

15            MR. ASSINI:  Objection to form.

16            MR. SANTIAGO-PAGAN:  Objection to

17       the form.

18            THE WITNESS:  I guess, yes.

19   BY MR. WEST:

20       Q.    And also, you know, our deposition

21   here has only been a few minutes.  In the same

22   amount of time or less, you also could have told

23   him that if he wanted more information, he could

24   reach out to Jaclyn Matteo; correct?

Page 27

1                    MR. ASSINI:  Objection to the form.

2                    THE WITNESS:  I guess, yes.

3    BY MR. WEST:

4         Q.      And I apologize.  I'm going to ask

5    the question differently just because that

6    probably is objectionable.

7                    If Detective Graf had asked you if

8    there was anyone in your office who had more

9    information about the home inspection, you could

10   have encouraged Detective Graf to get in touch

11   with Jaclyn Matteo; correct?

12                   MR. SANTIAGO-PAGAN:  Objection to

13              the form.

14                   MR. ASSINI:  Objection to the form.

15              But go ahead.

16                   THE WITNESS:  Yes or, I guess, his

17              officer at the time, supervisor, Michael

18              Anderson.

19   BY MR. WEST:

20        Q.      Okay.  And the only reason that you

21   didn't provide this information to Detective Graf

22   is because he didn't ask the question; correct?

23                   MR. SANTIAGO-PAGAN:  Objection to

24              form.

Page 28

1                    THE WITNESS:  I guess.  I don't

2          remember.

3    BY MR. WEST:

4          Q.     Is there any other reason why you

5    wouldn't -- strike the question.

6                    Did you want to cooperate with

7    Detective Graf to give him any information that

8    might help him to capture this murder suspect?

9                    MR. SANTIAGO-PAGAN:  Objection to

10         form.

11                   THE WITNESS:  Yes.

12   BY MR. WEST:

13         Q.     And would you have provided

14   Detective Graf with any question that he -- with

15   any -- strike the question.

16                   Would you have willingly provided

17   Detective Graf with any information available to

18   you that would have assisted in the Philadelphia

19   Police Department executing this warrant in a way

20   that was likely to lead to the capture of

21      without infringing on the constitutional

22   rights of others?

23                   MR. SANTIAGO-PAGAN:  Objection to

24         form.

Page 29

1                    MR. ASSINI:  Objection to the form.

2                    You can try to answer.

3                    THE WITNESS:  Oh.  Yes.

4      BY MR. WEST:

5          Q.     And when Detective Graf called you,

6      you were cooperative and willing to provide any

7      information available to you?

8                    MR. ASSINI:  Objection to form.

9                    You can answer.

10                    THE WITNESS:  Yeah, as long as it

11               was in the rights that my supervisor was

12               okay with it, yes.

13      BY MR. WEST:

14          Q.     Okay.  And probably the last

15      question, all of the information that you have

16      provided us today, this printout from your

17      records, this would have been available to you

18      back a couple of years ago as well; correct?

19                    MR. ASSINI:  Objection to form.

20                    But go ahead.

21                    THE WITNESS:  Yes, but sometimes

22               house arrest notes aren't imported to

23               us, so we might not have been able to

24               see it.  But usually if it's just a

1          regular officer transferring paperwork,

2          we would be able to see all of the

3          notes.

4    BY MR. WEST:

5        Q.    All right.  And the records

6    indicating the home inspection, that would have

7    been available to you back at the time you spoke

8    to Detective Graf; correct?

9              MR. SANTIAGO-PAGAN:  Objection to

10         form.

11             THE WITNESS:  It was available, but

12         not always -- it's not always

13         accessible.  Like usually house arrest

14         notes are separate from the notes that

15         we see.

16   BY MR. WEST:

17       Q.    Is that something that you could --

18   if Detective Graf had asked you to find if the

19   home had ever been inspected, could you have

20   provided him an accurate answer to that question

21   even back at the time Detective Graf spoke with

22   you?

23             MR. ASSINI:  Objection to form.

24             But go ahead.

1                    THE WITNESS:  Based on the notes, I

2          could have.  But if I didn't have access

3          to the notes, then I would have to go to

4          house arrest directly and ask for access

5          to the notes.

6    BY MR. WEST:

7          Q.     And is that something you would

8    have been willing to do if Detective Graf had

9    asked you to do it?

10         A.     If I was able to get permission to

11   do so, yes.

12         Q.     Do you have any reason to believe

13   your supervisor wouldn't have allowed you to do

14   that?

15                    MR. SANTIAGO-PAGAN:  Objection to

16         the form.

17                    MR. ASSINI:  Objection to the form.

18                    THE WITNESS:  I guess it depends on

19         what the director says to him.  A lot of

20         things we have to get permission to do,

21         so it depends on that.

22   BY MR. WEST:

23         Q.     Okay.  And you also could have

24   encouraged Detective Graf to speak with your

Page 32

1    supervisor directly; correct?

2              MR. SANTIAGO-PAGAN:  Objection to

3         the form.

4              MR. ASSINI:  Objection to the form.

5              THE WITNESS:  Yes.

6    BY MR. WEST:

7         Q.    But none of that happened because

8    Detective Graf didn't ask the question; correct?

9              MR. SANTIAGO-PAGAN:  Objection to

10        form.

11             THE WITNESS:  Right.

12             MR. WEST:  I have nothing further

13        for you today.  I hope you do have a

14        wonderful Friday.  I hope that they are

15        going to let you have the whole day off.

16             THE WITNESS:  That would be nice.

17             MR. ASSINI:  That's not my call.

18             MR. SANTIAGO-PAGAN:  Do you have

19        anything to follow up?

20             MR. ASSINI:  Well, no.  Go ahead.

21                  -  -  -

22                  EXAMINATION

23                  -  -  -

24    BY MR. SANTIAGO-PAGAN:

1          Q.      Ms. Shannon, these documents that

2     you provided today were not provided to Mr. Graf

3     when you spoke to him related to the conversation

4     that you had with him on, it looks like, June 2,

5     2021, is that right, these documents themselves?

6          A.      Yes.

7          Q.      Okay.  You would have needed to get

8     permission from a supervisor to give him any of

9     the information contained in these records; right?

10         A.      Yes.

11         Q.      In fact, you did get permission

12    even just to confirm the address that Mr. Graf

13    provided to you; right?

14         A.      Yes.

15         Q.      And similarly to how you needed to

16    get permission to just provide confirmation of the

17    address, you would have needed to get permission

18    to provide any other information in these

19    documents; correct?

20                 MR. ASSINI:  Objection to the form.

21                 THE WITNESS:  Yes.

22    BY MR. SANTIAGO-PAGAN:

23         Q.      And you don't know because you are

24    unaware as of today what the parameters are for

Page 34

1    giving information and not --

2                    MR. ASSINI:  Objection to form.

3                    Sorry.

4    BY MR. SANTIAGO-PAGAN:

5         Q.      -- what -- whether your supervisor

6    would have allowed you to provide this information

7    or not; correct?

8         A.      Yes.

9         Q.      And then I just want to go to the

10   June 2, 2021 note itself.

11                   MR. SANTIAGO-PAGAN:  Is that

12          Shannon-1?

13                   MR. WEST:  Yes.

14   BY MR. SANTIAGO-PAGAN:

15        Q.      On the exhibit marked Shannon-1,

16   where it says 12:30, phone, Homicide Detective

17   Fran Graf -- do you agree that it says that there?

18        A.      Yes.

19        Q.      And can you read through that note

20   where it says -- maybe in the middle of the

21   paragraph it says he wanted to know if we verified

22   -- do you see where I am reading?

23        A.      Yes.

24                   MR. WEST:  What's the page number?

1          MR. SANTIAGO-PAGAN:  Page --

2          THE WITNESS:  2 of 21.

3          MR. SANTIAGO-PAGAN:  -- 2 of 21.

4     Thank you.

5  BY MR. SANTIAGO-PAGAN:

6     Q.     Where it says he wanted to know if

7  we verified his address or had any alternative

8  addresses to one they had on file which is the

9  address we had, do you agree that that's what it

10 said?

11    A.     Yes.

12    Q.     And that's what you were referring

13 to with you had to get confirmation from your

14 supervisor to confirm that -- verify that that was

15 the address; correct?

16    A.     Yes.

17    Q.     And then later on it says PO told

18 him we only had contact with PP by phone.

19         Do you agree that that's what it

20 said?

21    A.     Yes.

22    Q.     And that's what you were referring

23 to earlier when you said you didn't actually go

24 out to the home, you only were supervising him by

1    phone; correct?

2         A.    Yes.

3         Q.    And where it says we could not

4    confirm his address by a field visit, do you agree

5    that that's what it says?

6         A.    Yes.

7         Q.    And that's because you hadn't gone

8    out and confirmed it via field visit?

9         A.    Yes.

10        Q.    Were you asked whether you could

11   have confirmed the address of Mr.              by

12   field visit?

13              MR. ASSINI:  Objection to the form.

14              You can answer.

15              THE WITNESS:  He asked me have you

16          been out to the house and I said no.

17   BY MR. SANTIAGO-PAGAN:

18        Q.    When you write a note like we could

19   not confirm his address by field visit, in your

20   experience, in your personal experience, is that

21   because you are being asked whether -- strike

22   that.

23              MR. SANTIAGO-PAGAN:  I have nothing

24          further.

Page 37

1            MR. WEST:  Just real quick

2        follow-up.

3                  -  -  -

4                EXAMINATION

5                  -  -  -

6   BY MR. WEST:

7        Q.    Did Detective Graf request any

8   information from you that you told him, for any

9   reason, you couldn't give him?

10           MR. SANTIAGO-PAGAN:  Objection to

11        form.

12           MR. WEST:  I can rephrase the

13        question.

14   BY MR. WEST:

15        Q.    Is there any question that

16   Detective Graf asked you that you replied by

17   telling him that you couldn't give him the

18   information for any reason?

19           MR. SANTIAGO-PAGAN:  Objection to

20        form.

21           THE WITNESS:  No.

22   BY MR. WEST:

23        Q.    Okay.  So any question that

24   Detective Graf actually asked you, you gave him an

Page 38

1   accurate answer to the best of your ability;

2   correct?

3                  MR. SANTIAGO-PAGAN:  Objection to

4          form.

5                  MR. ASSINI:  Objection to the form.

6                  Go ahead.

7                  THE WITNESS:  Yes.

8                  MR. WEST:  Okay.  No further

9          questions.

10                 MR. ASSINI:  I have nothing.

11                 MR. SANTIAGO-PAGAN:  Just give me

12         one second.

13                 MR. WEST:  While you look that up,

14         I have one last.

15  BY MR. WEST:

16         Q.     This says ISTPD, what's that stand

17  for?

18                 MR. ASSINI:  Do you know where we

19         are looking?

20                 MR. WEST:  Yes, just the first

21         line.

22                 THE WITNESS:  Say that question

23         again.

24  BY MR. WEST:

Page 39

1          Q.        ISTPD.  So the first entry on here,

2     it says this Sequence 3 automated appointment has

3     been scheduled by ISTPD.

4                    Do you know what ISTPD stands for

5     on Page 1?

6          A.        Oh.  That's -- so back when it was

7     a pandemic, we only had contact with people by

8     phone.  And then after a certain amount of time,

9     they automatically scheduled people to come in on

10    certain dates, and so they were allowed -- the

11    people were allowed or the probationers were

12    allowed to come back into the building on that

13    date and time.

14                    So the ISTPD is the author of the

15    note.  So they imported the notes into our system

16    to notify us when we can tell people to start

17    reporting in person.

18         Q.        Okay.

19                    MR. SANTIAGO-PAGAN:  You good?

20                    MR. WEST:  Yes.

21                         -  -  -

22                    EXAMINATION

23                         -  -  -

24    BY MR. SANTIAGO-PAGAN:

1          Q.      So Ms. Shannon, you willingly gave

2    information to Officer Graf when he called you;

3    correct?

4          A.      Yes.

5          Q.      But you did that after you got

6    permission from your supervisor; correct?

7          A.      Yes.

8          Q.      And then where -- we are looking

9    back at the same Page 2 of 21 where it says --

10   right above the 12:30 p.m. note, there's a 1:00

11   p.m. note.  It says PO left a voicemail stating

12   she is looking for PP to call her back at

13   215-683-1097.

14               Do you agree that it says that?

15         A.      Yes.

16         Q.      As you sit here today, do you

17   recall why you were calling, what information you

18   were trying to gather?

19         A.      I was just trying to get in contact

20   with him to report.  At the time, I haven't had a

21   phone call from him, so I just reached out to him.

22         Q.      Was the conversation that you had

23   with Homicide Detective Fran Graf, did that lead

24   you to try to make a phone call?

Page 41

1        A.      Yes.

2        Q.      And was there anything that you can

3   recall that you were trying to confirm through

4   that phone call?

5        A.      Just to establish contact with him

6   because we gave him certain dates and times to

7   call and report in and just verify to his address

8   one more time just to be sure.

9        Q.      Do you recall whether you were

10  verifying his address for any specific reason?

11       A.      Just like to verify it again.

12  Usually when they call we ask if their address,

13  phone number is the same and if they're employed

14  or not or if anything new happened by the time --

15  from the last time we spoke with him.

16       Q.      Okay.

17              MR. SANTIAGO-PAGAN:  I have nothing

18          further.

19                      -   -   -

20              (Whereupon, a discussion took place

21          off the stenographic record.)

22                      -   -   -

23              MR. SANTIAGO-PAGAN:  I just want to

24          move to designate the portions of this

Page 42

1           deposition that refer to Mr.

2           by his name to be designated as

3           confidential pursuant to the

4           confidentiality order with regard to the

5           suspect's name that's in place for this

6           case.

7                MR. WEST:  No objection.

8                MR. ASSINI:  That's fine.

9                MR. SANTIAGO-PAGAN:  That's all.

10                    -  -  -

11                (Whereupon, the deposition

12           concluded at 10:39 a.m.)

13                    -  -  -

14

15

16

17

18

19

20

21

22

23

24

Page 43

1                          CERTIFICATION

2

3                    I, CANDACE WEINDEL, hereby

4       certify that the foregoing is a true and

5       correct transcript transcribed from the

6       stenographic notes taken by me on Friday,

7       September 15, 2023.

8

9

10

11

12       _____

13                          Candace Weindel,
                           Court Reporter
14                          Notary Public

15

16

17                    (This certification does not apply
         to any reproduction of this transcript,
         unless under the direct supervision of
18       the certifying reporter.)

19

20

21

22

23

24

Page 44

1                    INSTRUCTIONS TO WITNESS.

2

3           Please read your deposition over

4      carefully and make any necessary

5      corrections.  You should state the reason in

6      the appropriate space on the errata sheet

7      for any corrections that are made.

8                After doing so, please sign the

9      errata sheet and date it.

10               You are signing same subject to the

11      changes you have noted on the errata sheet,

12      which will be attached to your deposition.

13               It is imperative that you return the

14      original errata sheet to the deposing

15      attorney within thirty (30) days of receipt

16      of the deposition transcript by you.  If you

17      fail to do so, the deposition transcript may

18      be deemed to be accurate and may be used in

19      court.

20

21

22

23

24

```
 1                      E R R A T A
                         - - - - -
 2
        PAGE   LINE    CHANGE
 3      _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 4      Reason for
        Change:_____
 5
        _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
 6
        Reason for
 7      Change:_____

 8      _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 9      Reason for
        Change:_____
10
        _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
11
        Reason for Change:
12      _____

13      _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

14      Reason for Change:
        _____
15
        _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
16
        Reason for Change:
17      _____

18      _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19      Reason for Change:
        _____
20
        _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
21
        Reason for Change:
22      _____

23      _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

24
```

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2          I, _____, do hereby

 3      certify that I have read the foregoing pages

 4      __ to ___ and that the same is a correct

 5      transcription of the answers given by me to

 6      the questions therein propounded, except for

 7      the corrections or changes in form or

 8      substance, if any, noted in the attached

 9      Errata Sheet.

10

11      _____          _____

12      DATE                 SIGNATURE

13

14                   Subscribed and sworn to before
        me this
15
        _____ day of _____, 2023.
16

17
                     My commission expires:
18
                     _____
19

20
                     _____
21
                     Notary Public
22

23

24
```

**A**

**a.m** 1:17 42:12
**ability** 38:1
**able** 12:16,17
  16:21 17:1
  29:23 30:2
  31:10
**access** 17:13
  23:3,12,14
  31:2,4
**accessible** 30:13
**accident** 5:15
**accurate** 30:20
  38:1 44:18
**ACKNOWLE...**
  46:1
**actual** 8:21
  18:24
**Adam.Zurbri...**
  2:18
**address** 19:13
  22:7,13,14,15
  25:12 33:12,17
  35:7,9,15 36:4
  36:11,19 41:7
  41:10,12
**addresses** 22:8
  35:8
**affirmative**
  25:15 26:2
**ago** 9:6 29:18
**agree** 34:17 35:9
  35:19 36:4
  40:14
**agreed** 4:1
**agreement** 9:17
**ahead** 13:14
  24:4 26:5
  27:15 29:20
  30:24 32:20
  38:6
**al** 1:8
**allegedly** 20:11
**allowed** 15:23
  22:5,11 31:13
  34:6 39:10,11
  39:12
**alternative** 22:8
  35:7

**Alvarado** 1:5
  4:17
**amount** 26:22
  39:8
**Anderson** 14:11
  27:18
**Anderson's**
  14:24
**answer** 6:8,19
  7:24 11:5,24
  12:21 13:8
  15:11 16:1
  23:7,17 24:5
  25:5 26:5 29:2
  29:9 30:20
  36:14 38:1
**answered** 25:14
  26:2
**answers** 46:5
**apartment** 18:5
  23:1,3,14
**apologize** 27:4
**appearance** 4:20
  7:2
**applications**
  19:10
**apply** 43:16
**appointment**
  39:2
**appropriate**
  44:6
**approximation**
  11:14
**April** 12:24
  14:19,20 17:8
  17:22 18:3
  19:20
**Arch** 2:15
**armed** 8:22 9:10
  9:19,23 10:5,7
**arrest** 14:14,15
  14:22 15:8,15
  16:3,6,9,11,14
  16:18 19:10,16
  26:8 29:22
  30:13 31:4
**aside** 21:17
**asked** 22:3,9
  23:23 25:11,22

27:7 30:18
31:9 36:10,15
36:21 37:16,24
**asking** 17:23
  21:15
**assign** 19:14
**ASSINI** 2:9 5:22
  6:11,15 7:15
  7:22 9:12,14
  9:23 11:4
  12:20 13:7,12
  13:22 14:18
  15:10,24 18:13
  19:3,23 23:7
  23:16 24:4,15
  25:5,16 26:3
  26:15 27:1,14
  29:1,8,19
  30:23 31:17
  32:4,17,20
  33:20 34:2
  36:13 38:5,10
  38:18 42:8
**assisted** 28:18
**attached** 44:12
  46:8
**attorney** 44:15
**attorneys** 4:16
**author** 39:14
**author's** 18:22
**automated** 39:2
**automatically**
  39:9
**available** 28:17
  29:7,17 30:7
  30:11
**aware** 20:7

**B**

**B** 3:8
**back** 8:14 9:7
  13:6 14:10
  15:7 19:13,20
  29:18 30:7,21
  39:6,12 40:9
  40:12
**bargained** 10:2
**bargaining** 9:16
**Based** 31:1

**Basically** 19:4
**beginning** 1:17
**believe** 12:6,23
  31:12
**believed** 23:15
  25:13 26:1
**best** 19:22 38:1
**bet** 19:22
**bit** 17:23 18:15
**branch** 6:3,16
**break** 11:21
**brevity's** 10:18
**bringing** 16:22
**Broad** 1:15 2:4
**brought** 4:19
**building** 39:12

**C**

**C** 2:1
**call** 32:17 40:12
  40:21,24 41:4
  41:7,12
**called** 29:5 40:2
**calling** 21:20
  40:17
**Candace** 1:17
  43:3,13
**capacity** 8:17
**capture** 28:8,20
**car** 5:15
**carefully** 44:4
**carry** 8:23
**case** 4:17 5:14
  9:6 12:10,11
  14:10 17:11
  22:23 25:10
  42:6
**catch** 25:3
**CENTER** 1:15
  2:3
**certain** 22:11
  39:8,10 41:6
**certification** 4:3
  43:1,16
**certifications**
  9:24
**certify** 43:4 46:3
**certifying** 43:18
**chance** 16:23

**Change** 45:2,4,7
  45:9,11,14,16
  45:19,21
**changes** 44:11
  46:7
**charges** 12:7
**check** 17:8
**City** 2:8 2:10,14
  5:17,20 6:1,3
  6:10
**civilian** 13:17
**clarify** 5:22
  13:13
**classification**
  9:18
**classified** 9:3,11
**Client** 3:11
**collective** 9:16
**collectively** 10:2
**come** 19:10,13
  39:9,12
**coming** 11:1
**commission**
  46:17
**COMMON** 1:1
**Commonwealth**
  1:19 7:21
**complete** 11:13
  16:11
**concluded** 42:12
**confidential**
  42:3
**confidentiality**
  42:4
**confirm** 26:9
  33:12 35:14
  36:4,19 41:3
**confirmation**
  33:16 35:13
**confirmed** 26:7
  36:8,11
**connects** 19:6
**constitutional**
  28:21
**contact** 10:23
  35:18 39:7
  40:19 41:5
**contained** 33:9
**conversation**

21:3,6 33:3
40:22
**cooperate** 24:13
28:6
**cooperative** 29:6
**copy** 23:24
**correct** 4:21
5:17 8:14,19
13:3 18:12
22:7 25:15
26:2,14,24
27:11,22 29:18
30:8 32:1,8
33:19 34:7
35:15 36:1
38:2 40:3,6
43:5 46:4
**corrections** 44:5
44:7 46:7
**counsel** 4:2
**COUNTY** 1:2
**couple** 29:18
**court** 1:1,22
43:13 44:19
**COVID** 13:2
**creating** 9:18
**criminal** 17:14
**currently** 20:7

**D**

**D** 3:1
**DANA** 1:13 3:3
4:8
**dangerous** 21:21
**database** 17:13
**date** 10:10 12:12
14:16 39:13
44:9 46:12
**dates** 39:10 41:6
**day** 32:15 46:15
**days** 15:7 44:15
**deemed** 44:18
**Defendants** 1:9
2:18
**department**
2:14 6:9 20:14
20:23 24:7,14
25:3 28:19
**depends** 8:15

31:18,21
**DEPONENT**
46:1
**deposed** 5:11
**deposing** 44:14
**deposition** 1:13
4:21 5:7 7:1
26:20 42:1,11
44:3,12,16,17
**DESCRIPTION**
3:9
**designate** 41:24
**designated** 42:2
**detective** 20:16
20:17,24 21:1
21:3 22:20
23:2,11,20,23
25:10,22 27:7
27:10,21 28:7
28:14,17 29:5
30:8,18,21
31:8,24 32:8
34:16 37:7,16
37:24 40:23
**determine** 12:17
**DIAMOND**
1:22
**difference** 7:20
**different** 9:20
16:7
**differently** 27:5
**direct** 8:16
43:17
**directly** 31:4
32:1
**director** 31:19
**discussion** 7:9
14:2 41:20
**distinguish**
21:10,10
**District** 2:9 5:24
6:22 20:8
24:12
**document** 4:24
**documents** 4:19
33:1,5,19
**doing** 9:2 44:8
**door** 18:12
**duly** 4:9

**E**

**E** 2:1,1 3:1,8
45:1
**earlier** 35:23
**either** 13:17
**eligible** 15:14
**employed** 20:7
41:13
**employee** 5:19
5:23 6:21
**employment**
5:17
**encouraged**
27:10 31:24
**entity** 6:10
**entrance** 18:5,11
26:13
**entry** 39:1
**equipment**
15:16
**ERIC** 2:9
Eric.assini@c...
2:11
**errata** 44:6,9,11
44:14 46:9
**especially** 15:6
**ESQUIRE** 2:3,9
2:15
**establish** 41:5
**estimate** 11:14
11:16
**et** 1:8
**everybody** 19:6
**exact** 10:10
**Examination**
3:4,5 4:12
32:22 37:4
39:22
**examined** 4:9
**execute** 22:2
**executing** 20:14
28:19
**exhibit** 5:2
34:15
**exist** 10:1
**experience** 15:6
24:17 36:20,20
**expires** 46:17
**extent** 23:8 25:6

**extra** 9:21 18:1

**F**

**fact** 5:19 33:11
**fail** 44:17
**familiar** 16:13
**far** 7:21 17:14
19:22 20:6
**faster** 12:1
**federal** 17:13
**FELISHATAY**
1:5
**field** 17:20 22:17
36:4,8,12,19
**figure** 6:7 7:23
**file** 3:11 35:8
**filing** 4:3
**find** 17:2 30:18
**fine** 42:8
**firearm** 8:23
12:6
**first** 2:9 4:9 5:23
6:22 10:7
12:18 16:23
20:7 24:12
38:20 39:1
**fit** 15:16
**floor** 1:16 2:4,16
18:5 23:1
**follow** 25:7
32:19
**follow-up** 37:2
**follows** 4:10
**foregoing** 43:4
46:3
**form** 4:5 11:4
12:13,20 13:7
13:12 15:10,24
18:13 19:24
23:6,16 24:3
24:15 25:16,18
26:4,15,17
27:1,13,14,24
28:10,24 29:1
29:8,19 30:10
30:23 31:16,17
32:3,4,10
33:20 34:2
36:13 37:11,20

38:4,5 46:7
**fortunate** 13:17
**foundation**
22:22 23:1
**Fran** 34:17
40:23
**Friday** 32:14
43:6
**further** 32:12
36:24 38:8
41:18

**G**

**G-R-A-F** 20:20
**gather** 40:18
**general** 10:19
16:16
**generally** 5:14
14:6 15:4
**getting** 16:22
**give** 11:14 17:5
24:8 28:7 33:8
37:9,17 38:11
**given** 11:8 46:5
**giving** 9:5,19
11:15 34:1
**glad** 11:24
**GNET** 17:12
**go** 5:5 8:14
13:14,22 15:13
16:19 17:3,22
20:10 24:4,21
26:5 27:15
29:20 30:24
31:3 32:20
34:9 35:23
38:6
**goes** 7:21 19:8
**going** 4:17 10:19
11:11 13:19
19:15 22:2
27:4 32:15
**good** 39:19
**Graf** 20:17,19
20:24 21:1,3
22:20 23:2,11
23:20,23 25:10
25:22 27:7,10
27:21 28:7,14

28:17 29:5
30:8,18,21
31:8,24 32:8
33:2,12 34:17
37:7,16,24
40:2,23
**guess** 11:12
15:13,17 16:6
26:18 27:2,16
28:1 31:18
**guidance** 23:13
**guys** 15:19

**H**

**H** 3:8
**Hall** 2:10
**handle** 16:8
**handler** 19:9
**happened** 32:7
41:14
**hard** 11:18
**hear** 11:18
**help** 28:8
**history** 17:15
**home** 15:9 19:1
20:11,15 22:5
25:24 27:9
30:6,19 35:24
**homicide** 20:16
34:16 40:23
**honestly** 6:18
**hope** 32:13,14
**house** 14:14,15
14:22 15:8,14
15:15,16,20
16:3,6,8,11,14
16:18,19 17:3
18:3 19:10,15
22:2 26:8
29:22 30:13
31:4 36:16
**hundred** 16:15

**I**

**identification**
5:1
**II** 8:22
**immediate** 8:6
**imperative**
44:13

**imported** 29:22
39:15
**inappropriate**
18:16
**inappropriately**
17:24
**incident** 9:5
10:11
**independent**
6:11 21:13,18
**indicate** 18:9
**indicated** 25:23
26:12
**indicating** 30:6
**information**
17:14 19:19
22:12 25:1
26:23 27:9,21
28:7,17 29:7
29:15 33:9,18
34:1,6 37:8,18
40:2,17
**infringing** 28:21
**initiated** 14:10
**inspect** 15:9,20
16:19
**inspected** 30:19
**inspection** 18:24
19:20 25:11,24
27:9 30:6
**instructions**
11:9 44:1
**intended** 11:10
11:17,19
**interaction**
13:18
**interactions**
10:22
**investigate**
15:13
**issue** 24:13
**ISTPD** 38:16
39:1,3,4,14

**J**

**J** 2:9
**Jaclyn** 19:5,21
26:24 27:11
**jail** 8:4

**Jersey** 1:23
**job** 8:21 9:1,2,7
14:24
**JONAH** 2:15
**Jonah.santiag...**
2:17
**judge** 8:5,8,15
**judicial** 2:9 5:23
6:2,16,22 20:8
24:12
**July** 9:4 12:12
**June** 1:5 33:4
34:10

**K**

**Keith** 2:3 4:16
**Keith@victim...**
2:6
**kind** 5:6 21:16
21:23
**knew** 18:10
**know** 6:5,8,19
7:22 9:7,23
11:11,15,22
12:4 13:9 14:8
17:10 19:3,8,9
19:23 21:11,12
21:17 22:18
25:6 26:20
33:23 34:21
35:6 38:18
39:4
**knowledge**
24:24

**L**

**Lane** 1:23
**LAW** 1:15 2:3
2:14
**lawyer** 13:18
**lay** 22:22
**lead** 28:20 40:23
**left** 40:11
**limiting** 15:22
**line** 38:21 45:2
**little** 9:6 17:23
18:15
**live** 15:23
**lived** 22:1
**living** 15:21 17:4

**location** 18:4
**long** 7:4 8:24
10:11 12:9
29:10
**look** 17:1,13
38:13
**looked** 25:13
**looking** 17:6
18:21 21:22
38:19 40:8,12
**looks** 18:22 33:4
**lot** 24:19 31:19
**louder** 12:1

**M**

**Mantua** 1:23
**Margaret** 18:6
**mark** 4:18
**marked** 5:1
34:15
**Matteo** 19:5,21
26:24 27:11
**MatteoJ** 18:22
**mean** 8:3 25:6
**meet** 8:13
**Michael** 14:11
14:24 27:17
**middle** 34:20
**mind** 21:16
**minutes** 26:21
**misstating** 13:16
13:19
**moment** 21:17
**monitored** 14:13
**move** 41:24
**murder** 21:22
25:4 28:8

**N**

**N** 2:1 3:1
**name** 4:15 10:15
14:8 18:22
19:4 20:3 42:2
42:5
**NCIC** 17:8,10
**necessary** 44:4
**needed** 33:7,15
33:17
**needs** 16:18
**neighborhood**

21:24,24
**never** 16:8
**new** 1:23 9:18
41:14
**nice** 32:16
**normally** 15:9
15:19 22:17
**Notary** 1:19
43:14 46:21
**notation** 17:8
18:21
**note** 21:7,11
34:10,19 36:18
39:15 40:10,11
**noted** 44:11 46:8
**notes** 3:11 12:17
17:18 21:14
22:15 29:22
30:3,14,14
31:1,3,5 39:15
43:6
**Notice** 1:14
**notification**
14:21
**notify** 39:16
**number** 5:2 23:4
34:24 41:13

**O**

**Object** 24:2
**objected** 13:12
**objection** 11:4
12:20 13:7
15:10,24 18:13
19:24 23:5,16
24:15 25:16,17
26:3,15,16
27:1,12,14,23
28:9,23 29:1,8
29:19 30:9,23
31:15,17 32:2
32:4,9 33:20
34:2 36:13
37:10,19 38:3
38:5 42:7
**objectionable**
27:6
**objections** 4:4
**occupy** 23:15

**occurred** 9:6
  19:20
**offenders'** 17:14
**offhand** 12:8
**office** 11:1 27:8
**officer** 7:5,14,14
  8:22 9:10 10:5
  10:8 13:11,20
  13:21 15:3,9
  16:18 19:14
  27:17 30:1
  40:2
**officer's** 20:3
**officers** 9:15,19
**Oh** 29:3 39:6
**okay** 5:5,16 6:18
  7:1,17 8:17
  10:4 11:2 12:2
  13:5 14:12,15
  15:19 16:13,16
  17:16 20:6
  21:5 22:12
  27:20 29:12,14
  31:23 33:7
  37:23 38:8
  39:18 41:16
**once** 5:12 16:10
  19:13
**Oral** 1:13
**order** 16:17 19:6
  42:4
**orders** 19:11
  25:8
**original** 44:14

**P**
**P** 2:1,1
**p.m** 40:10,11
**PA** 1:16 2:5,10
  2:16
**page** 3:2,9 34:24
  35:1 39:5 40:9
  45:2
**pages** 46:3
**pandemic** 10:24
  13:2 22:5 39:7
**paper** 21:17
**paperwork** 30:1
**paragraph**

34:21
**parameters**
  33:24
**parole** 7:5,14,20
  8:1,3,6,19 9:9
  15:3
**part** 4:19 9:15
  9:16,17
**particular** 9:1
  23:3
**parties** 4:2
**Pennsylvania**
  1:2,20 2:9 6:22
  7:21
**people** 8:1,18
  15:22 16:8,10
  19:7 22:11
  39:7,9,11,16
**percent** 16:15
**performed** 17:9
**period** 8:9
**permission** 24:7
  24:20 31:10,20
  33:8,11,16,17
  40:6
**person** 8:3,9,13
  14:9 15:14,20
  18:23 19:19
  39:17
**personal** 24:16
  24:24 36:20
**personally** 11:11
  20:10 22:16
**Philadelphia** 1:2
  1:8,16 2:5,10
  2:14,16 5:17
  5:20 6:1,3
  20:14,23 24:14
  25:3 28:18
**phone** 10:23
  34:16 35:18
  36:1 39:8
  40:21,24 41:4
  41:13
**physical** 18:24
**physically** 17:3
  19:8 23:3,13
**pick** 22:19
**pile** 4:18

**place** 7:9 14:2
  41:20 42:5
**placed** 15:8,22
  16:18
**plaintiff** 1:6 2:6
  4:17
**PLEAS** 1:1
**please** 9:13
  11:23 21:5
  44:3,8
**PO** 35:17 40:11
**point** 11:21
**police** 6:9 20:14
  20:23 24:14
  25:3 28:19
**portions** 41:24
**possession** 11:13
**possible** 12:2
**PP** 35:18 40:12
**pre-COVID**
  15:7
**preemptory** 5:6
**printout** 29:16
**prior** 7:1
**prison** 8:13,14
**probably** 19:21
  20:2 27:6
  29:14
**probation** 7:14
  7:15,20 8:8,9
  8:12,19,22 9:9
  9:14 10:15
  11:3 12:5 13:6
  13:21 15:3,8
  15:22 16:18
**probationary**
  8:12
**probationers**
  39:11
**procedures**
  16:14
**process** 11:20
  19:7
**Professional**
  1:18
**property** 18:11
  26:13
**propounded**
  46:6

**provide** 27:21
  29:6 33:16,18
  34:6
**provided** 23:12
  23:21,24 25:2
  28:13,16 29:16
  30:20 33:2,2
  33:13
**Public** 1:19
  43:14 46:21
**purposes** 5:1
**pursuant** 1:14
  42:3

**Q**
**question** 4:5
  10:20 12:22
  14:5 16:7,19
  17:7,23 18:15
  18:16 22:21
  25:11,14,20,23
  27:5,22 28:5
  28:14,15 29:15
  30:20 32:8
  37:13,15,23
  38:22
**questions** 11:10
  11:23 12:1
  19:22 23:2
  38:9 46:6
**quick** 5:6 37:1
**quickly** 7:19
  16:23 17:7

**R**
**R** 2:1 45:1,1
**range** 15:17
**reach** 26:24
**reached** 40:21
**read** 21:7 34:19
  44:3 46:3
**reading** 21:11
  34:22
**real** 37:1
**rear** 18:5,12
  23:1 26:13
**reason** 24:11
  27:20 28:4
  31:12 37:9,18
  41:10 44:5

45:4,6,9,11,14
  45:16,19,21
**recall** 40:17 41:3
  41:9
**receipt** 44:15
**received** 14:21
**recollection**
  21:19
**record** 7:7,10,13
  13:23 14:3
  41:21
**recorded** 17:2
**records** 16:22
  18:9,18 19:1
  23:12,21,24
  25:14,23 26:12
  29:17 30:5
  33:9
**RECOVERY**
  1:15 2:3
**Redbud** 1:23
**refer** 42:1
**referring** 35:12
  35:22
**regard** 42:4
**regarding** 20:23
**regular** 30:1
**related** 33:3
**release** 8:13
**released** 8:18
**releasing** 22:11
**remember** 10:10
  10:14,22 12:8
  12:16 21:2,6
  21:13,18,20
  28:2
**renewal** 9:24
**repeat** 25:19
**rephrase** 12:1
  37:12
**replied** 37:16
**report** 40:20
  41:7
**reporter** 1:18
  43:13,18
**reporting** 1:22
  39:17
**represent** 22:23
**Representing**

2:6,12,18
**reproduction** 43:17
**request** 37:7
**requires** 9:21
**reserved** 4:6
**reside** 25:13 26:1
**respective** 4:2
**restricted** 24:18 25:2
**restrictions** 15:21
**return** 44:13
**reviewing** 12:17
**right** 4:15 5:20 6:17,23 7:2,16 8:12 10:12 13:20 18:2,6,9 18:19 19:18 21:15 24:19 26:11 30:5 32:11 33:5,9 33:13 40:10
**rights** 28:22 29:11
**rise** 9:5
**Room** 2:10

**S**
**s** 2:1 3:8 20:15
**sake** 10:18
**salary** 9:20
**Santiago-Pagan** 2:15 3:5 6:17 7:12 23:5 24:2 25:17 26:16 27:12,23 28:9 28:23 30:9 31:15 32:2,9 32:18,24 33:22 34:4,11,14 35:1,3,5 36:17 36:23 37:10,19 38:3,11 39:19 39:24 41:17,23 42:9
**says** 8:5 14:20 18:2 31:19

34:16,17,20,21 35:6,17 36:3,5 38:16 39:2 40:9,11,14
**scale** 9:20
**scan** 16:23
**scheduled** 39:3,9
**sealing** 4:3
**search** 17:12
**second** 17:5 18:4 22:24 38:12
**see** 15:14,15,20 17:7,17 23:20 23:23 29:24 30:2,15 34:22
**send** 19:7
**sends** 19:12
**sentence** 8:5,7
**sentenced** 8:4
**sentences** 8:8
**separate** 6:4 30:14
**September** 1:11 43:7
**Sequence** 39:2
**serve** 8:6
**setting** 21:16
**Shannon** 1:13 3:3 4:8,15 33:1 40:1
**Shannon-1** 3:11 4:18 5:2 34:12 34:15
**sheet** 44:6,9,11 44:14 46:9
**sign** 44:8
**SIGNATURE** 46:12
**signing** 44:10
**similarly** 33:15
**sit** 40:16
**slower** 12:1
**somebody** 18:3 18:10
**sorry** 6:21 17:23 34:3
**sort** 23:13
**South** 1:15 2:4
**space** 44:6

**speak** 11:24 20:13,22 22:11 31:24
**speaking** 16:2,3
**specific** 41:10
**specifically** 18:2 18:4
**specified** 18:4
**specify** 22:24
**speculate** 11:12
**spelled** 20:19
**spoke** 20:16 30:7 30:21 33:3 41:15
**stand** 17:10 38:16
**stands** 39:4
**start** 39:16
**state** 7:13 44:5
**stated** 18:7
**stating** 21:21 40:11
**staying** 20:11
**stenographic** 7:10 14:3 41:21 43:6
**street** 1:15 2:4 2:15 8:7,10 18:6
**strike** 18:14 22:20 28:5,15 36:21
**stuff** 20:3 24:19
**subject** 44:10
**subpoenaed** 4:20
**Subscribed** 46:14
**substance** 46:8
**summarize** 21:8
**supervise** 8:1,10 8:18 12:9
**supervising** 10:14 14:9 19:15 35:24
**supervision** 12:14,19 14:14 43:17
**supervisor** 13:6

13:10 22:10,12 27:17 29:11 31:13 32:1 33:8 34:5 35:14 40:6
**sure** 41:8
**surrounding** 21:24
**suspect** 25:4 28:8
**suspect's** 42:5
**sworn** 4:9 46:14
**system** 13:19 39:15

**T**
**T** 3:8 45:1
**take** 17:24
**taken** 1:14 43:6
**talk** 22:13
**team** 17:20 19:12
**technical** 8:16
**technically** 9:3
**tell** 5:13 7:19 10:21 20:2 21:5 22:7 26:8 39:16
**telling** 37:17
**TERM** 1:5
**terms** 8:14 13:19
**terrorizing** 21:23
**testified** 4:10
**thank** 16:21 35:4
**thing** 17:17
**things** 5:6 9:21 13:16 31:20
**think** 14:18 18:23 19:1,5 19:21 24:11
**thirty** 44:15
**time** 4:6 10:24 11:12 15:2 16:23 18:1,11 20:4 22:1,9 26:9,22 27:17 30:7,21 39:8

39:13 40:20 41:8,14,15
**times** 5:10 41:6
**title** 8:21 9:1,7 14:8 15:1
**today** 4:19 21:2 23:21 29:16 32:13 33:2,24 40:16
**today's** 4:20
**told** 22:15 26:7 26:11,22 35:17 37:8
**touch** 27:10
**training** 9:22,24
**transcribed** 43:5
**transcript** 43:5 43:17 44:16,17
**transcription** 46:5
**transfer** 16:11
**transferred** 12:10,11
**transferring** 30:1
**trial** 4:6
**trouble** 11:22
**true** 43:4
**try** 10:19 29:2 40:24
**trying** 6:7,13 7:23 17:24 21:9,10 25:3 40:18,19 41:3
**Twenty-two** 7:6
**two** 9:6

**U**
**unaware** 33:24
**uncomfortable** 11:18,20
**understand** 11:6 12:22
**understanding** 11:13,23 16:17 25:1
**union** 9:15
**unit** 16:4,12
**unnecessarily**

**unrelated** 5:16
  7:2
**unwilling** 24:12
**usually** 15:21
  16:10 29:24
  30:13 41:12

**V**

**verified** 34:21
  35:7
**verifies** 19:11
**verify** 19:12
  22:6,16 35:14
  41:7,11
**verifying** 41:10
**VICTIMS** 2:3
**VICTIMS'** 1:14
**violation** 8:16
  8:16
**visit** 22:17 36:4
  36:8,12,19
**visits** 22:5
**voicemail** 40:11
**vs** 1:7

**W**

**waived** 4:4
**want** 7:12 10:9
  13:13 21:7
  28:6 34:9
  41:23
**wanted** 19:18
  21:22 26:23
  34:21 35:6
**warrant** 20:15
  22:2,23 28:19
**wasn't** 9:10
**way** 28:19
**we're** 6:15 24:18
**Weindel** 1:18
  43:3,13
**went** 12:18
  17:21 18:3,7
  18:10 20:4
**West** 2:3 3:4
  4:14,16 5:4 6:6
  6:13,18,20 7:7
  7:17,18 8:11
  9:13,22 10:3
  11:7 13:1,9,15

13:24 14:5,7
14:23 15:18
16:5 18:14,17
19:17 20:5,19
20:21 23:10,19
24:10,16,23
25:9,21 26:10
26:19 27:3,19
28:3,12 29:4
29:13 30:4,16
31:6,22 32:6
32:12 34:13,24
37:1,6,12,14
37:22 38:8,13
38:15,20,24
39:20 42:7
**willing** 29:6 31:8
**willingly** 28:16
  40:1
**Witness** 2:12 3:2
  7:23 12:23
  13:10 14:20
  15:12 16:2
  19:4 20:1 23:9
  23:18 24:6,18
  25:7,19 26:6
  26:18 27:2,16
  28:1,11 29:3
  29:10,21 30:11
  31:1,18 32:5
  32:11,16 33:21
  35:2 36:15
  37:21 38:7,22
  44:1
**wonderful** 32:14
**worked** 7:4
**wouldn't** 21:16
  28:5 31:13
**write** 12:7 18:18
  36:18
**written** 21:12

**X**

**X** 3:1,8

**Y**

**Yeah** 29:10
**years** 7:6 9:3,6
  29:18

**Z**

**0**

**01633** 1:6
**08051** 1:23

**1**

**1** 39:5
**1:00** 40:10
**10:00** 1:17
**10:39** 42:12
**12:30** 34:16
  40:10
**121** 1:15 2:4
**14** 9:3
**14th** 2:16
**15** 1:11 43:7
**1515** 2:15
**18th** 1:16 2:4
**19102** 2:16
**19107** 1:16 2:5
  2:10

**2**

**2** 33:4 34:10
  35:2,3 40:9
**2011-ish** 10:9
**2019** 12:24
  14:10,17,21
  15:7 17:8 18:3
  19:21
**2020** 12:13
**2021** 33:5 34:10
**2022** 1:5
**2023** 1:11 43:7
  46:15
**21** 35:2,3 40:9
**214-0377** 2:17
**215** 2:5,11
**215-683-1097**
  40:13
**26** 14:20 18:3
**29** 17:8

**3**

**3** 39:2
**30** 44:15
**32** 3:5
**352** 2:17
**369** 2:10

**37** 3:4
**39** 3:5

**4**

**4** 3:4,11
**4/25/2019** 17:20
  18:8
**4/26** 18:21
**406** 1:23

**5**

**546-1433** 2:5
**589-1107** 1:24

**6**

**686-3745** 2:11

**7**

**7/24/2020** 12:11

**8**

**856** 1:24

**9**

**9** 12:24

# EXHIBIT "F"

Transcript of the Testimony of:
# Jaclyn Matteo-Hand

**Date:** September 27, 2023

**Case:** Alvarado v. City of Philadelphia, et al

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

Page 1

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

-------------------------- :
FELISHATAY ALVARADO,          :
                              :
     Plaintiff   : June Term,
                 : 2022
     vs.         :
                 : No. 01633
CITY OF PHILADELPHIA,        :
ET AL,                       :
                              :
     Defendants  :
-------------------------- :

- - -
September 27, 2023
- - -

Remote Oral Deposition of JACLYN MATTEO-HAND,
taken via Zoom conference technology, on the above
date, beginning at approximately 1:00 p.m., before
Dawn M. Burr, a Professional Court Reporter and
Notary Public, there being present.

- - -

DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 589-1107
dcr.diamond@comcast.net

---

Page 2

1     A P P E A R A N C E S:
2     VICTIMS' RECOVERY LAW CENTER
      BY: KEITH THOMAS WEST, ESQUIRE
3     The North American Building
      121 South Broad Street, 18th Floor
4     Philadelphia, PA 19107
      Counsel for the Plaintiff
5     Tel. 215-546-1433
      E-mail: keith@victimrecoverylaw.com
6          * * * * *
7     CITY OF PHILADELPHIA - LAW
      DEPARTMENT
8     BY: ADAM R. ZURBRIGGEN, ESQUIRE
      One Parkway Building
9     1515 Arch Street
      Philadelphia, PA 19102
10    Counsel for the Defendants
      Tel. 215-683-5114
11    E-mail: adam.zurbriggen@phila.gov
           * * * * *
12
      FIRST JUDICIAL DISTRICT OF
13    PENNSYLVANIA
      DEPUTY COURT ADMINISTRATOR CHIEF -
14    LEGAL SERVICES
      BY: ERIC J. ASSINI, ESQUIRE
15    369 City Hall
      Philadelphia, PA 19107
16    Counsel for the Witness,
      Jaclyn Matteo-Hand
17    Tel. 215-686-3745
      E-mail: eric.assini@courts.phila.gov
18         * * * * *
19
20
21
22
23
24

---

Page 3

1              I N D E X
2     WITNESS                     PAGE
3     JACLYN MATTEO-HAND
4     Examination by Mr. West          4
5     Examination by Mr. Assini       28
6
7
8              EXHIBITS
      NO.         DESCRIPTION        PAGE
9
      Matteo-Hand-1   Home Investigation      28
10                    Interview
                                     28
11    Matteo-Hand-2   Client File Notes
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 4

1              - - -
2          (It was stipulated by and between
3     counsel that all objections, except as
4     to the form of the question, be reserved
5     until the time of trial.)
6              - - -
7          . . . JACLYN MATTEO-HAND, having
8     been duly sworn as a witness, was
9     examined and testified as follows. . .
10             - - -
11         EXAMINATION
12             - - -
13    BY MR. WEST:
14         Q.   Ms. Matteo-Hand, my name is Keith
15    West.  I'm one of the attorneys who represents the
16    plaintiff in this action, a woman by the name of
17    Ms. Alvarado.  My understanding is that you are
18    with the Probation and Parole Office; is that
19    right?
20         A.   Yes.
21         Q.   Could you tell us what is your
22    current job position and employer?
23         A.   I work for the FJD, First Judicial
24    District.  I am a Probation Parole Officer II, and

1 (Pages 1 to 4)

1   I am working as house arrest release coordinator

2   at this point.

3       Q.    So as part of the house release

4   coordinator, do you actually go to the house of

5   people who are put on probation and inspect the

6   house trying to make sure that it fits any sort of

7   criteria for release?

8           MR. ASSINI:  Objection to the form,

9       but you can answer.

10          THE WITNESS:  No, I do not.

11  BY MR. WEST:

12      Q.    Could you tell me what do you do as

13  the home coordinator?

14      A.    I would get a contact sheet and

15  court order from the attorney and the judge.  I

16  would call them on the phone.  We complete an

17  investigation.  I complete an investigation on the

18  computer.  I hand it into our pretrial field team.

19  They would go out and install the equipment at the

20  residence.

21      Q.    So I think you referred to the

22  people who would actually go out to the home

23  as -- it cut out a little bit.  Something team?

24      A.    Pretrial field team.

1       Q.    Could you tell me a bit more about

2   the pretrial field team; what is that?

3       A.    They install house arrest equipment

4   in the residence.

5       Q.    Now, is that something that needs

6   to be done for all probations or some probations?

7           MR. ASSINI:  Objection to the form,

8       but you can answer.

9           THE WITNESS:  Just house arrest

10      cases, that are sentenced to house

11      arrest.

12  BY MR. WEST:

13      Q.    So this case involves someone named

14  ████████  Was he put on house arrest?

15      A.    Yes.

16      Q.    And for every person who's placed

17  under house arrest, would there need to be some

18  people from the pretrial field team who go out and

19  inspect their house?

20          MR. ASSINI:  Objection to form.

21      You can answer.

22          THE WITNESS:  Yes.

23  BY MR. WEST:

24      Q.    So not to beat a dead horse, but in

1   the City of Philadelphia, every time somebody is

2   placed under house arrest, that would mean

3   somebody from the office would have actually gone

4   to that person's house and inspected the premises,

5   right?

6           MR. ASSINI:  Objection to form, but

7       you can answer to the extent --

8           THE WITNESS:  Yes.

9   BY MR. WEST:

10      Q.    So let's -- I'm going to pull up

11  here a document.  I can represent this was

12  e-mailed to us earlier today.  Then I'll ask you

13  if you know what it is.  Can you guys see my

14  screen here?

15      A.    Yes.

16      Q.    So we're gonna mark this as

17  Matteo-Hand Exhibit-1.  And could you tell me what

18  this is?

19      A.    This is a home investigation

20  interview, which I complete over the phone.

21      Q.    Okay.  So you personally did this

22  interview?

23      A.    Yes.

24      Q.    I tried to use TrialPad and it

1   wouldn't work.  So I gotta do something else here.

2   I think this might be the same thing.

3           So I'm circling part of it in

4   yellow and this says interview completed with

5   Sheila Washington - mother.  Is that the person

6   that you spoke with?

7       A.    According to my notes, yes.

8       Q.    I'm just going down here.  The

9   address, I'm gonna mark that in yellow as well.

10  That says 4664 Torresdale Avenue, rear apartment,

11  two floors, and then it says go up alleyway to

12  knock on door, right?

13      A.    Yes.

14      Q.    Did you write that?

15      A.    I did.

16      Q.    How would you have gotten the

17  information on what the address was?

18      A.    When I spoke to his mother.

19      Q.    So your understanding, based on

20  your notes, is that you spoke with his mother who

21  represented that she lived in the same apartment

22  and she told you that the entrance to their

23  apartment was in the alleyway, correct?

24      A.    Yes.

Page 9

1   Q.   Is there anything else in
2   particular that you recall about that
3   conversation?
4   A.   No.
5   Q.   Okay.  Do you know approximately
6   when this conversation would have happened?  I see
7   also it's dated September 25th, this year, but I
8   assume that's just when you printed it out, right?
9   A.   Correct.  It was completed on April
10  25th, 2019.
11  Q.   Okay, in April 2019.  Now, our
12  lawsuit, that this case is about, is an incident
13  that occurred in 2021.  Did anyone from the
14  Philadelphia Police Department ever contact you
15  asking for information about how to get to ██████
16  ██████ homes?
17  A.   No.
18  Q.   If anybody from the Philadelphia
19  Police Department had contacted you asking for
20  advice on how to get to ████████ home, would
21  you have referred to these notes and let them know
22  that your records indicated that the entrance was
23  through the alleyway?
24  MR. ASSINI:  Objection to form.

Page 10

1   You can answer.
2   THE WITNESS:  I'm not sure.  I
3   wasn't in that position and I would
4   most likely need to ask my supervisor if
5   we're able to give that information.
6   BY MR. WEST:
7   Q.   Who's your supervisor?
8   A.   My supervisor?
9   Q.   Yeah.
10  A.   Right now is Zakia Balon.
11  Q.   Who would have been your supervisor
12  back in June of 2021?
13  A.   I didn't have the case in June
14  2021.
15  Q.   You did not have any supervisor in
16  June 2021?
17  A.   No.
18  MR. ASSINI:  Hold on.  No, you
19  didn't have a supervisor, or no --
20  THE WITNESS:  No.  I had a
21  supervisor, but I was not supervising
22  this case.
23  BY MR. WEST:
24  Q.   Okay.  Are you currently

Page 11

1   supervising this case?
2   A.   No.
3   Q.   Who was your supervisor back in
4   June 2021?
5   A.   Duane Archie, D-U-A-N-E, Archie,
6   A-R-C-H-I-E.
7   Q.   In your experience working for the
8   First Judicial District, have you ever been
9   contacted by anybody from the police department
10  asking for advice as far as how someone on
11  probation or parole could be located?
12  MR. ASSINI:  Objection to form.
13  You can answer.
14  THE WITNESS:  No, not that I
15  recall.
16  BY MR. WEST:
17  Q.   Okay.  Would the police normally
18  contact somebody in a different position in your
19  experience?
20  MR. ASSINI:  Objection to form.
21  You can answer.
22  MR. ZURBRIGGEN:  Joining in the
23  objection.
24  THE WITNESS:  I'm not sure.

Page 12

1   BY MR. WEST:
2   Q.   Could you tell me a bit more about
3   your -- like what were your job duties and
4   responsibilities back in June 2021?
5   A.   I was doing the same thing with the
6   house arrest release coordinations.  So I was
7   placing -- getting people ready to be placed on
8   house arrest.
9   Q.   So who would you create these
10  records for?
11  A.   Repeat the question.
12  Q.   The record that you've given us,
13  that we've marked Matteo-Hand-1, is a written
14  record of a conversation you had with Sheila
15  Washington, right?
16  MR. ASSINI:  Object to the form.
17  You can answer.
18  THE WITNESS:  Basically, yes.
19  BY MR. WEST:
20  Q.   Why did you create this?
21  A.   It's my job to create that.
22  Q.   What is your understanding as to
23  why your employer asked you to make these?
24  MR. ASSISI:  Objection to form.

Electronically signed by Dawn Burr (101-019-021-7097)                                    68da893f-dd31-4841-b103-f3ba3e290bd9

Page 13

1    You can answer.
2         THE WITNESS:  To get all the
3    information to get defendants placed on
4    house arrest.
5    BY MR. WEST:
6         Q.    Who would use that information, in
7    your experience?
8         MR. ASSINI:  Objection to form.
9    You can answer.
10        THE WITNESS:  The pretrial field
11   team uses it, probation officers use
12   it.
13   BY MR. WEST:
14        Q.    So would the information that
15   you've written down in this exhibit be available
16   to the probation officer?
17        A.    Yes.
18        Q.    So in theory, if someone at the --
19   strike the question.
20        In your experience, the way that
21   the probation parole office is set up in the First
22   Judicial District, if somebody were to ask the
23   probation officer what records there where as far
24   as where ███████ lived, is it your experience

Page 14

1    that the probation officer could have looked at
2    documents like this if they wanted to find an
3    answer to that question?
4         MR. ASSINI:  Objection to the form.
5    You can answer.
6         THE WITNESS:  I'm not sure if this
7    document was available in 2021 for
8    someone to look at.
9    BY MR. WEST:
10        Q.    Do you have any reason to believe
11   -- I'm sorry.  Did I interrupt you?
12        A.    In 2019 it was available, but he
13   was no longer on house arrest in 2021.
14        Q.    So in 2019 it was available because
15   that's when it was created, right?
16        A.    Right.
17        Q.    And it must be available now
18   because you just obtained it a couple days ago,
19   right?
20        A.    Yes, on my computer.
21        Q.    And besides saving it on your
22   computer, did you save it somewhere else?
23        A.    I personally -- no, I did not.
24        Q.    Did you submit this paperwork to

Page 15

1    someone?
2         A.    Yes.
3         Q.    Who did you submit it to?
4         A.    The pretrial field team.
5         Q.    Okay.  And they also would have
6    passed that along to the probation officer, right?
7         MR. ASSINI:  Objection to the form.
8    You can answer, if you know.
9         MR. ZURBRIGGEN:  Joining in the
10   objection.
11        THE WITNESS:  I passed it along to
12   the house arrest officer.
13   BY MR. WEST:
14        Q.    I can represent that, as of June
15   2021, ███████ still had a probation officer.
16   Would it be your understanding or expectation that
17   the probation officer would have had documents
18   like this in her possession, or access to it?
19        A.    I'm not sure.
20        Q.    In your experience, has there ever
21   been a situation where the Philadelphia Police
22   Department contacted the office that you work for
23   asking for information about a wanted suspect and
24   a supervisor at your office said don't talk to the

Page 16

1    police?
2         MR. ASSINI:  Objection to the form.
3    You can answer to what you know.
4         THE WITNESS:  I've never spoken to
5    a police office about a suspect.
6    BY MR. WEST:
7         Q.    I'm just asking because you said
8    that before you spoke to a police officer you'd
9    have to ask for a supervisor to approve that?  I'm
10   just wondering is there anything in your
11   experience, or anything you've ever heard, that
12   would lead you to believe that a supervisor would
13   ever even consider saying, hey, don't tell the
14   police where that guy is?
15        A.    I have no idea.
16        Q.    But is it fair to say that you've
17   never had any experience that would lead you to
18   believe that a supervisor would ever deny a
19   request like that?
20        MR. ASSINI:  Objection to form, but
21   you can answer.
22        MR. ZURBRIGGEN:  Join.
23        THE WITNESS:  I have no idea.  I'm
24   not a supervisor.

4 (Pages 13 to 16)

Page 17

```
 1    BY MR. WEST:
 2       Q.    Okay.  Do you know if this document
 3    was saved in ▮▮▮▮▮▮ probation folder?
 4             MR. ASSINI:  Objection to the form,
 5          but you can answer to the extent you
 6          understand the question.
 7             THE WITNESS:  It may have been.  I
 8          can't say for sure.
 9    BY MR. WEST:
10       Q.    Is that -- could you look up that
11    folder now and check if it's in there?
12       A.    Can I?
13       Q.    Yeah.
14             MR. ASSINI:  Not from here.  We're
15          in my office and I don't have access
16          to that.
17    BY MR. WEST:
18       Q.    Okay.  But is that something you
19    would normally have access to?
20       A.    Yes, if I was at my office, sure.
21       Q.    Based on your understanding of the
22    policies and practices of your employer, would
23    there be any reason why this document wouldn't be
24    in his probation folder?
```

Page 18

```
 1             MR. ASSINI:  Objection to the form,
 2          but you can answer to the extent you
 3          know.
 4             THE WITNESS:  I guess it should
 5          have been.  I don't really know.  I
 6          didn't have the file.
 7             MR. WEST:  All right.  Let me --
 8          I'm gonna stop sharing for just a moment
 9          to pull up another document.  Can you
10          guys see the document I'm sharing?
11             MR. ASSINI:  Yes.
12    BY MR. WEST:
13       Q.    So this document has been
14    previously marked as Shannon Exhibit-1.  We're
15    also gonna mark the same document as Matteo-Hand
16    Exhibit-2.  Just for the record, it says Client
17    File Notes at the top.  Do you recognize what this
18    is generally?  Is this the kind of document you've
19    seen before?
20       A.    Yes.
21       Q.    Can you tell me, in your
22    experience, generally what are documents like this
23    used for?
24       A.    That's our monitor.  That's where
```

Page 19

```
 1    we put all of our notes in.
 2       Q.    Is this something that the
 3    probation officer would normally have access to?
 4       A.    Yes.
 5       Q.    I can represent to you this is for
 6    ▮▮▮▮▮▮ I don't know if you can see that,
 7    but it says ▮▮▮▮▮ on it, okay.  This was
 8    produced to us by Ms. Shannon, the probation
 9    officer, when she was deposed earlier.  I'll just
10    scroll down here to -- I highlighted something.  I
11    don't know why the highlighting is not showing up.
12    So I'll just do it again.  I apologize.  I
13    premarked this, but it didn't come through for
14    some reason.  So I will use a highlighting tool.
15             Can you see that I've highlighted
16    part of this page?
17       A.    Yes.
18       Q.    It says April 26th, 2019,
19    completed, and it says Matteo J.  Is that you?
20       A.    Yes.
21       Q.    And it says author.  Does that mean
22    that you wrote this?
23       A.    Yes.
24       Q.    And it says field team installed
```

Page 20

```
 1    PHMU.  Can you tell us what PHMU would stand for
 2    in this context?
 3       A.    Sure.  It's the house arrest box.
 4       Q.    And it says location: second floor
 5    apartment, rear entrance off Margaret Street,
 6    right?
 7       A.    Yes.
 8       Q.    So is this you memorializing that
 9    -- so that everyone in your office would know that
10    the entrance to Mr. ▮▮▮ apartment was off
11    Margaret Street?
12             MR. ASSINI:  Objection to form.
13          You can answer.
14             THE WITNESS:  Yes.  This was copied
15          from pretrial field team notes and put
16          into our notes so everyone would know.
17    BY MR. WEST:
18       Q.    So any of the people involved with
19    ▮▮▮▮▮▮ case at the probation office, if
20    they were contacted and asked hey, do you have any
21    information on how to get into ▮▮▮▮▮▮
22    apartment, they could have pulled this up and
23    said, yeah, you gotta go in the rear entrance off
24    Margaret Street, right?
```

Electronically signed by Dawn Burr (101-019-021-7097)                                    68da893f-dd31-4841-b103-f3ba3e290bd9

Page 21

1      MR. ASSINI:  Objection to the form.
2  You can answer.
3      MR. ZURBRIGGEN:  I'm joining in the
4  objection.
5      THE WITNESS:  Yes.
6  BY MR. WEST:
7      Q.    I understand that you personally
8  haven't had the experience of speaking with
9  anybody from the police department about how to
10 find a suspect who's on probation, but I'm just
11 asking generally, in your experience, do you know
12 if the police contact other people in your office
13 to ask for that kind of information?
14     A.    They could, I guess.  I don't know
15 of any.
16     Q.    I don't know what kind of briefing
17 you might get from you're employer.  So you're not
18 really aware if the probation officers are asked
19 that sort of question or not?
20     MR. ASSINI:  Objection.
21     THE WITNESS:  No.  Sorry.
22     MR. WEST:  That's fine.
23 BY MR. WEST:
24     Q.    Is there any policy in your office,

Page 22

1  that you're aware of, that would give anyone any
2  reason to believe that supervisors in your office
3  would ever instruct anybody in your office, you
4  know, hey, don't tell the police where these guys
5  are?
6      MR. ASSINI:  Objection to the form.
7  You can answer.
8      THE WITNESS:  Not in my
9  recollection.  I would need to review
10 policy.
11     MR. ZURBRIGGEN:  I'm joining in the
12 objection, just for the record.
13 BY MR. WEST:
14     Q.    All right.  In any case, if
15 somebody did contact your office and the records
16 were pulled, your office's records clearly showed
17 that the entrance to ████████ apartment was
18 the rear entrance off Margaret Street, correct?
19     MR. ASSINI:  Objection to the form.
20 You can answer.
21     MR. ZURBRIGGEN:  I'm joining in the
22 objection.
23     THE WITNESS:  Correct.
24 BY MR. WEST:

Page 23

1      Q.    Is there anything else at this time
2  that you recall about the ████████ case?  Did
3  you ever have any unusual interactions with him,
4  maybe not the police, but anyone else?  Is there
5  anything else that you recall at this time about
6  the ████ case?
7      A.    No.
8      Q.    I think you indicated he was off
9  house arrest at some point.  Do you know when he
10 would have been off house arrest?
11     A.    He actually absconded in July of
12 2019.
13     Q.    Can you tell me more about that?
14     A.    He absconded.  So he left.  I'm not
15 sure if he cut off his bracelet or whatever, but
16 he was no longer reporting.  We didn't know where
17 he was.  There was a warrant out for him.
18     Q.    So between July of 2019 and up
19 until at least June of 2021, from your office's
20 point of view, was ████████ whereabouts
21 unknown?
22     MR. ASSINI:  October to the form,
23 but you can answer to the extent you
24 can.

Page 24

1      THE WITNESS:  To my knowledge,
2  eventually he was found, yes.
3  BY MR. WEST:
4      Q.    Can you tell me about when he was
5  found?
6      A.    May of 2020.
7      Q.    And where was he found?
8      A.    That I do not know.
9      Q.    Once he was found, was he taken
10 back to prison, jail, was he put back on house
11 arrest?
12     A.    He was taken to prison.
13     Q.    Do you know how long he was taken
14 back to prison for?
15     A.    I think his detainer was lifted in
16 June of 2020.
17     Q.    Okay.  So only a month?
18     A.    Yeah, with no house arrest.
19     Q.    All right.  I've definitely heard
20 of worst fates for absconding, but okay.
21     So then between June of 2020 and
22 June of 2021, do you know what his status was; was
23 he on house arrest, something else?
24     A.    This is all according to the

Electronically signed by Dawn Burr (101-019-021-7097)                                    68da893f-dd31-4841-b103-f3ba3e290bd9

Page  25

1   notes.
2       Q.    Okay.
3       A.    He was not on house arrest.  He was
4   -- I assume he was reporting to a probation
5   officer.
6           MR. ASSINI:  Do you know that for
7       sure?
8           THE WITNESS:  No, I don't know that
9       for sure.  I didn't read every note.  I
10      just read my part of the notes.
11  BY MR. WEST:
12      Q.    So as of June 2021, is it your
13  understanding that ▮▮▮▮▮▮ was under probation
14  and was supposed to be reporting to a probation
15  officer?
16      A.    June of -- I believe so, yes.
17      Q.    I don't want to take up more of
18  your time and this is a little bit outside, but I
19  think I have to ask the question in case I'm
20  missing something.
21          To me it seems a little strange
22  that he would be on house arrest, abscond, and
23  then be released to what seems like a lower level
24  of supervision.  Do you have any insight in the

Page  26

1   records of why that might have been?
2           MR. ASSINI:  Objection to form, but
3       you can -- if you have any insight.
4           THE WITNESS:  I'm gonna say it was
5       COVID.
6   BY MR. WEST:
7       Q.    Okay.  They just didn't have a lot
8   of room in jail, right, probably?  I mean we're
9   guessing.
10          MR. ASSINI:  I just want to -- for
11      the record, it's not the PO's
12      determination in any way.  It's up to a
13      judge.
14  BY MR. WEST:
15      Q.    I'm just saying you don't see
16  anything in the record that like says they
17  pardoned him of some crime or something.  There's
18  nothing in there to explain why he would be lower
19  level, right, other than possible just scarcity?
20          MR. ASSINI:  Objection to the form,
21      but you --
22          MR. WEST:  Okay.  I don't need her
23      to go into that.
24  BY MR. WEST:

Page  27

1       Q.    Just the last question.  So the two
2   exhibits that we've looked at, these are things
3   that, in your experience, would have been
4   available back in June 2020, correct?
5       A.    Yes.
6           MR. WEST:  I have no further
7       questions for you.  Thank you for taking
8       a little bit of your time.
9           THE WITNESS:  Thank you.
10          MR. ZURBRIGGEN:  I have no
11      questions for you.  I just need to
12      designate on the record those portions
13      of this deposition mentioning ▮▮▮▮▮
14      ▮▮▮ name be designated confidential
15      pursuant to the protective order.
16          MR. WEST:  I have no objection to
17      that.
18          MR. ZURBRIGGEN:  Thank you very
19      much for your time.
20          MR. ASSINI:  I just have brief
21      questions.
22              - - -
23          EXAMINATION
24              - - -

Page  28

1   BY MR. ASSINI:
2       Q.    Do you have any independent memory
3   of ▮▮▮▮▮▮
4       A.    No.
5       Q.    So your memory is based off of your
6   review of the file notes that are offered as an
7   exhibit and the report also offered as an exhibit
8   today?
9       A.    Absolutely.
10          MR. ASSINI:  No further questions.
11              - - -
12          (Whereupon, Exhibits Matteo-Hand-1
13      and Matteo-Hand-2 were marked for
14      identification.)
15              - - -
16          (Whereupon, the deposition
17      concluded at 1:30 p.m.)
18              - - -
19
20
21
22
23
24

7 (Pages 25 to 28)

Page 29

2      CERTIFICATION

4          I, DAWN M. BURR, hereby certify
5   that the foregoing is a true and correct
6   transcript transcribed from the stenographic notes
7   taken by me on Wednesday, September 27, 2023.

11      DAWN M. BURR
12      Shorthand Reporter

14          (This certification does not apply
15   to any reproduction of this transcript, unless
16   under the direct supervision of the certifying
17   reporter.)

---

Page 30

1       ACKNOWLEDGEMENT OF DEPONENT
2           I, JACLYN MATTEO-HAND, do hereby
3   certify that I have read the foregoing pages,
4   _____, and that the same is a correct
5   transcript of the answers given by me to the
6   questions therein propounded, except for the
7   corrections or changes in form or substance, if
8   any, noted in the attached Errata Sheet.
9   _____      _____
    DATE                 SIGNATURE

11          E R R A T A
12          - - - - - - - -
13   PAGE   LINE       CHANGE

20   SUBSCRIBED AND SWORN TO BEFORE ME THIS
21   _____DAY OF _____, 2023.
22   My Commission expires: _____
                Notary Public

8 (Pages 29 to 30)

**A**

**A-R-C-H-I-E**
11:6
**able** 10:5
**abscond** 25:22
**absconded**
23:11,14
**absconding**
24:20
**Absolutely** 28:9
**access** 15:18
17:15,19 19:3
**ACKNOWLE...**
30:1
**action** 4:16
**ADAM** 2:8
**adam.zurbrig...**
2:11
**address** 8:9,17
**ADMINISTR...**
2:13
**advice** 9:20
11:10
**ago** 14:18
**AL** 1:7
**alleyway** 8:11,23
9:23
**Alvarado** 1:4
4:17
**American** 2:3
**answer** 5:9 6:8
6:21 7:7 10:1
11:13,21 12:17
13:1,9 14:3,5
15:8 16:3,21
17:5 18:2
20:13 21:2
22:7,20 23:23
**answers** 30:5
**anybody** 9:18
11:9 21:9 22:3
**apartment** 8:10
8:21,23 20:5
20:10,22 22:17
**apologize** 19:12
**apply** 29:14
**approve** 16:9
**approximately**
1:17 9:5

**April** 9:9,11
19:18
**Arch** 2:9
**Archie** 11:5,5
**arrest** 5:1 6:3,9
6:11,14,17 7:2
12:6,8 13:4
14:13 15:12
20:3 23:9,10
24:11,18,23
25:3,22
**asked** 12:23
20:20 21:18
**asking** 9:15,19
11:10 15:23
16:7 21:11
**Assini** 2:14 3:5
5:8 6:7,20 7:6
9:24 10:18
11:12,20 12:16
13:8 14:4 15:7
16:2,20 17:4
17:14 18:1,11
20:12 21:1,20
22:6,19 23:22
25:6 26:2,10
26:20 27:20
28:1,10
**ASSISI** 12:24
**assume** 9:8 25:4
**attached** 30:8
**attorney** 5:15
**attorneys** 4:15
**author** 19:21
**available** 13:15
14:7,12,14,17
27:4
**Avenue** 8:10
**aware** 21:18
22:1

**B**

**back** 10:12 11:3
12:4 24:10,10
24:14 27:4
**Balon** 10:10
**based** 8:19
17:21 28:5
**Basically** 12:18

**beat** 6:24
**beginning** 1:17
**believe** 14:10
16:12,18 22:2
25:16
█████ 6:14
9:15,20 13:24
15:15 17:3
19:6,7 20:19
20:21 22:17
23:2,6,20
25:13 27:13
28:3
**bit** 5:23 6:1 12:2
25:18 27:8
**box** 20:3
**bracelet** 23:15
**brief** 27:20
**briefing** 21:16
**Broad** 2:3
**Building** 2:3,8
**Burr** 1:18 29:4
29:11

**C**

**C** 2:1
**call** 5:16
**case** 6:13 9:12
10:13,22 11:1
20:19 22:14
23:2,6 25:19
**cases** 6:10
**CENTER** 2:2
**certification**
29:2,14
**certify** 29:4 30:3
**certifying** 29:16
**CHANGE** 30:13
**changes** 30:7
**check** 17:11
**CHIEF** 2:13
**circling** 8:3
**City** 1:7 2:7,15
7:1
**clearly** 22:16
**Client** 3:11
18:16
**come** 19:13
**Commission**

30:22
**COMMON** 1:1
**complete** 5:16
5:17 7:20
**completed** 8:4
9:9 19:19
**computer** 5:18
14:20,22
**concluded** 28:17
**conference** 1:16
**confidential**
27:14
**consider** 16:13
**contact** 5:14
9:14 11:18
21:12 22:15
**contacted** 9:19
11:9 15:22
20:20
**context** 20:2
**conversation** 9:3
9:6 12:14
**coordinations**
12:6
**coordinator** 5:1
5:4,13
**copied** 20:14
**correct** 8:23 9:9
22:18,23 27:4
29:5 30:4
**corrections** 30:7
**counsel** 2:4,10
2:16 4:3
**COUNTY** 1:2
**couple** 14:18
**court** 1:1,18,21
2:13 5:15
**COVID** 26:5
**create** 12:9,20
12:21
**created** 14:15
**crime** 26:17
**criteria** 5:7
**current** 4:22
**currently** 10:24
**cut** 5:23 23:15

**D**

**D** 3:1

**D-U-A-N-E** 11:5
**date** 1:17 30:9
**dated** 9:7
**Dawn** 1:18 29:4
29:11
**DAY** 30:21
**days** 14:18
**dcr.diamond...**
1:23
**dead** 6:24
**defendants** 1:8
2:10 13:3
**definitely** 24:19
**deny** 16:18
**department** 2:7
9:14,19 11:9
15:22 21:9
**DEPONENT**
30:1
**deposed** 19:9
**deposition** 1:15
27:13 28:16
**DEPUTY** 2:13
**DESCRIPTION**
3:8
**designate** 27:12
**designated**
27:14
**detainer** 24:15
**determination**
26:12
**DIAMOND**
1:21
**different** 11:18
**direct** 29:16
**District** 2:12
4:24 11:8
13:22
**document** 7:11
14:7 17:2,23
18:9,10,13,15
18:18
**documents** 14:2
15:17 18:22
**doing** 12:5
**door** 8:12
**Duane** 11:5
**duly** 4:8
**duties** 12:3

**E**

**E** 2:1,1 3:1
  30:11
**E-mail** 2:5,11,17
**e-mailed** 7:12
**earlier** 7:12 19:9
**employer** 4:22
  12:23 17:22
  21:17
**entrance** 8:22
  9:22 20:5,10
  20:23 22:17,18
**equipment** 5:19
  6:3
**ERIC** 2:14
**eric.assini@co...**
  2:17
**Errata** 30:8
**ESQUIRE** 2:2,8
  2:14
**ET** 1:7
**eventually** 24:2
**Examination**
  3:4,5 4:11
  27:23
**examined** 4:9
**exhibit** 13:15
  28:7,7
**Exhibit-1** 7:17
  18:14
**Exhibit-2** 18:16
**exhibits** 3:8 27:2
  28:12
**expectation**
  15:16
**experience** 11:7
  11:19 13:7,20
  13:24 15:20
  16:11,17 18:22
  21:8,11 27:3
**expires** 30:22
**explain** 26:18
**extent** 7:7 17:5
  18:2 23:23

**F**

**fair** 16:16
**far** 11:10 13:23
**fates** 24:20

**FELISHATAY**
  1:4
**field** 5:18,24 6:2
  6:18 13:10
  15:4 19:24
  20:15
**file** 3:11 18:6,17
  28:6
**find** 14:2 21:10
**fine** 21:22
**First** 2:12 4:23
  13:18 13:21
**fits** 5:6
**FJD** 4:23
**floor** 2:3 20:4
**floors** 8:11
**folder** 17:3,11
  17:24
**follows** 4:9
**foregoing** 29:5
  30:3
**form** 4:4 5:8 6:7
  6:20 7:6 9:24
  11:12,20 12:16
  12:24 13:8
  14:4 15:7 16:2
  16:20 17:4
  18:1 20:12
  21:1 22:6,19
  23:22 26:2,20
  30:7
**found** 24:2,5,7,9
**further** 27:6
  28:10

**G**

**generally** 18:18
  18:22 21:11
**getting** 12:7
**give** 10:5 22:1
**given** 12:12 30:5
**go** 5:4,19,22
  6:18 8:11
  20:23 26:23
**going** 7:10 8:8
**gonna** 7:16 8:9
  18:8,15 26:4
**gotta** 8:1 20:23
**gotten** 8:16

**guess** 18:4 21:14
**guessing** 26:9
**guy** 16:14
**guys** 7:13 18:10
  22:4

**H**

**Hall** 2:15
**hand** 5:18
**happened** 9:6
**heard** 16:11
  24:19
**hey** 16:13 20:20
  22:4
**highlighted**
  19:10,15
**highlighting**
  19:11,14
**Hold** 10:18
**home** 3:9 5:13
  5:22 7:19 9:20
**homes** 9:16
**horse** 6:24
**house** 5:1,3,4,6
  6:3,9,10,14,17
  6:19 7:2,4 12:6
  12:8 13:4
  14:13 15:12
  20:3 23:9,10
  24:10,18,23
  25:3,22

**I**

**idea** 16:15,23
**identification**
  28:14
**II** 4:24
**incident** 9:12
**independent**
  28:2
**indicated** 9:22
  23:8
**information**
  8:17 9:15 10:5
  13:3,6,14
  15:23 20:21
  21:13
**insight** 25:24
  26:3
**inspect** 5:5 6:19

**inspected** 7:4
**install** 5:19 6:3
**installed** 19:24
**instruct** 22:3
**interactions**
  23:3
**interrupt** 14:11
**interview** 3:10
  7:20,22 8:4
**investigation** 3:9
  5:17,17 7:19
**involved** 20:18
**involves** 6:13

**J**

**J** 2:14 19:19
**Jaclyn** 1:15 2:16
  3:3 4:7 30:2
**jail** 24:10 26:8
**Jersey** 1:22
**job** 4:22 12:3,21
**Join** 16:22
**joining** 11:22
  15:9 21:3
  22:11,21
**judge** 5:15 26:13
**Judicial** 2:12
  4:23 11:8
  13:22
**July** 23:11,18
**June** 1:5 10:12
  10:13,16 11:4
  12:4 15:14
  23:19 24:16,21
  24:22 25:12,16
  27:4

**K**

**Keith** 2:2 4:14
**keith@victim...**
  2:5
**kind** 18:18
  21:13,16
**knock** 8:12
**know** 7:13 9:5
  9:21 15:8 16:3
  17:2 18:3,5
  19:6,11 20:9
  20:16 21:11,14
  21:16 22:4

  23:9,16 24:8
  24:13,22 25:6
  25:8
**knowledge** 24:1

**L**

**Lane** 1:22
**LAW** 2:2,7
**lawsuit** 9:12
**lead** 16:12,17
  ▉ 6:14 13:24
  15:15 19:6,7
  23:2,6 25:13
  28:3
  ▉ 9:16,20
  17:3 20:10,19
  20:21 22:17
  23:20 27:14
**left** 23:14
**LEGAL** 2:14
**let's** 7:10
**level** 25:23 26:19
**lifted** 24:15
**LINE** 30:13
**little** 5:23 25:18
  25:21 27:8
**lived** 8:21 13:24
**located** 11:11
**location** 20:4
**long** 24:13
**longer** 14:13
  23:16
**look** 14:8 17:10
**looked** 14:1 27:2
**lot** 26:7
**lower** 25:23
  26:18

**M**

**M** 1:18 29:4,11
**Mantua** 1:22
**Margaret** 20:5
  20:11,24 22:18
**mark** 7:16 8:9
  18:15
**marked** 12:13
  18:14 28:13
**Matteo** 19:19
**Matteo-Hand**
  1:15 2:16 3:3

4:7,14 7:17
18:15 30:2
**Matteo-Hand-1**
3:9 12:13
28:12
**Matteo-Hand-2**
3:11 28:13
**mean** 7:2 19:21
26:8
**memorializing**
20:8
**memory** 28:2,5
**mentioning**
27:13
**missing** 25:20
**moment** 8:8
**monitor** 18:24
**month** 24:17
**mother** 8:5,18
8:20

**N**
**N** 2:1 3:1
**name** 4:14,16
27:14
**named** 6:13
**need** 6:17 10:4
22:9 26:22
27:11
**needs** 6:5
**never** 16:4,17
**New** 1:22
**normally** 11:17
17:19 19:3
**North** 2:3
**Notary** 1:19
30:22
**note** 25:9
**noted** 30:8
**notes** 3:11 8:7
8:20 9:21
18:17 19:1
20:15,16 25:1
25:10 28:6
29:6

**O**
**Object** 12:16
**objection** 5:8
6:7,20 7:6 9:24

11:12,20,23
12:24 13:8
14:4 15:7,10
16:2,20 17:4
18:1 20:12
21:1,4,20 22:6
22:12,19,22
26:2,20 27:16
**objections** 4:3
**obtained** 14:18
**occurred** 9:13
**October** 23:22
**offered** 28:6,7
**office** 4:18 7:3
13:21 15:22,24
16:5 17:15,20
20:9,19 21:12
21:24 22:2,3
22:15
**office's** 22:16
23:19
**officer** 4:24
13:16,23 14:1
15:6,12,15,17
16:8 19:3,9
25:5,15
**officers** 13:11
21:18
**okay** 7:21 9:5,11
10:24 11:17
15:5 17:2,18
19:7 24:17,20
25:2 26:7,22
**Once** 24:9
**Oral** 1:15
**order** 5:15 27:15
**outside** 25:18

**P**
**P** 2:1,1
**p.m** 1:17 28:17
**PA** 2:4,9,15
**page** 3:2,8 19:16
30:13
**pages** 30:3
**paperwork**
14:24
**pardoned** 26:17
**Parkway** 2:8

**parole** 4:18,24
11:11 13:21
**part** 5:3 8:3
19:16 25:10
**particular** 9:2
**passed** 15:6,11
**PENNSYLVA...**
1:2 2:13
**people** 5:5,22
6:18 12:7
20:18 21:12
**person** 6:16 8:5
**person's** 7:4
**personally** 7:21
14:23 21:7
**Philadelphia** 1:2
1:7 2:4,7,9,15
7:1 9:14,18
15:21
**PHMU** 20:1,1
**phone** 5:16 7:20
**placed** 6:16 7:2
12:7 13:3
**placing** 12:7
**plaintiff** 1:5 2:4
4:16
**PLEAS** 1:1
**PO's** 26:11
**point** 5:2 23:9
23:20
**police** 9:14,19
11:9,17 15:21
16:1,5,8,14
21:9,12 22:4
23:4
**policies** 17:22
**policy** 21:24
22:10
**portions** 27:12
**position** 4:22
10:3 11:18
**possession** 15:18
**possible** 26:19
**practices** 17:22
**premarked**
19:13
**premises** 7:4
**present** 1:19
**pretrial** 5:18,24

6:2,18 13:10
15:4 20:15
**previously** 18:14
**printed** 9:8
**prison** 24:10,12
24:14
**probably** 26:8
**probation** 4:18
4:24 5:5 11:11
13:11,16,21,23
14:1 15:6,15
15:17 17:3,24
19:3,8 20:19
21:10,18 25:4
25:13,14
**probations** 6:6,6
**produced** 19:8
**Professional**
1:18
**propounded**
30:6
**protective** 27:15
**Public** 1:19
30:22
**pull** 7:10 18:9
**pulled** 20:22
22:16
**pursuant** 27:15
**put** 5:5 6:14
19:1 20:15
24:10

**Q**
**question** 4:4
12:11 13:19
14:3 17:6
21:19 25:19
27:1
**questions** 27:7
27:11,21 28:10
30:6

**R**
**R** 2:1,8 30:11,11
**read** 25:9,10
30:3
**ready** 12:7
**really** 18:5 21:18
**rear** 8:10 20:5
20:23 22:18

**reason** 14:10
17:23 19:14
22:2
**recall** 9:2 11:15
23:2,5
**recognize** 18:17
**recollection** 22:9
**record** 12:12,14
18:16 22:12
26:11,16 27:12
**records** 9:22
12:10 13:23
22:15,16 26:1
**RECOVERY**
2:2
**Redbud** 1:22
**referred** 5:21
9:21
**release** 5:1,3,7
12:6
**released** 25:23
**Remote** 1:15
**Repeat** 12:11
**report** 28:7
**reporter** 1:18
29:12,17
**reporting** 1:21
23:16 25:4,14
**represent** 7:11
15:14 19:5
**represented**
8:21
**represents** 4:15
**reproduction**
29:15
**request** 16:19
**reserved** 4:4
**residence** 5:20
6:4
**responsibilities**
12:4
**review** 22:9 28:6
**right** 4:19 7:5
8:12 9:8 10:10
12:15 14:15,16
14:19 15:6
18:7 20:6,24
22:14 24:19
26:8,19

room 26:8

**S**

S 2:1
save 14:22
saved 17:3
saving 14:21
saying 16:13
  26:15
says 8:4,10,11
  18:16 19:7,18
  19:19,21,24
  20:4 26:16
scarcity 26:19
screen 7:14
scroll 19:10
second 20:4
see 7:13 9:6
  18:10 19:6,15
  26:15
seen 18:19
sentenced 6:10
September 1:12
  9:7 29:7
SERVICES
  2:14
set 13:21
Shannon 18:14
  19:8
sharing 18:8,10
sheet 5:14 30:8
Sheila 8:5 12:14
Shorthand
  29:12
showed 22:16
showing 19:11
SIGNATURE
  30:9
situation 15:21
somebody 7:1,3
  11:18 13:22
  22:15
sorry 14:11
  21:21
sort 5:6 21:19
South 2:3
speaking 21:8
spoke 8:6,18,20
  16:8

spoken 16:4
stand 20:1
status 24:22
stenographic
  29:6
stipulated 4:2
stop 18:8
strange 25:21
Street 2:3,9 20:5
  20:11,24 22:18
strike 13:19
submit 14:24
  15:3
SUBSCRIBED
  30:20
substance 30:7
supervising
  10:21 11:1
supervision
  25:24 29:16
supervisor 10:4
  10:7,8,11,15
  10:19,21 11:3
  15:24 16:9,12
  16:18,24
supervisors 22:2
supposed 25:14
sure 5:6 10:2
  11:24 14:6
  15:19 17:8,20
  20:3 23:15
  25:7,9
suspect 15:23
  16:5 21:10
sworn 4:8 30:20

**T**

T 30:11
take 25:17
taken 1:16 24:9
  24:12,13 29:7
talk 15:24
team 5:18,23,24
  6:2,18 13:11
  15:4 19:24
  20:15
technology 1:16
Tel 2:5,10,17
tell 4:21 5:12 6:1

7:17 12:2
  16:13 18:21
  20:1 22:4
  23:13 24:4
Term 1:5
testified 4:9
Thank 27:7,9,18
theory 13:18
thing 8:2 12:5
things 27:2
think 5:21 8:2
  23:8 24:15
  25:19
THOMAS 2:2
time 4:5 7:1 23:1
  23:5 25:18
  27:8,19
today 7:12 28:8
told 8:22
tool 19:14
top 18:17
Torresdale 8:10
transcribed 29:6
transcript 29:6
  29:15 30:5
trial 4:5
TrialPad 7:24
tried 7:24
true 29:5
trying 5:6
two 8:11 27:1

**U**

understand 17:6
  21:7
understanding
  4:17 8:19
  12:22 15:16
  17:21 25:13
unknown 23:21
unusual 23:3
use 7:24 13:6,11
  19:14
uses 13:11

**V**

VICTIMS' 2:2
view 23:20
vs 1:6

**W**

want 25:17
  26:10
wanted 14:2
  15:23
warrant 23:17
Washington 8:5
  12:15
wasn't 10:3
way 13:20 26:12
we're 7:16 10:5
  17:14 18:14
  26:8
we've 12:13 27:2
Wednesday 29:7
West 2:2 3:4
  4:13,15 5:11
  6:12,23 7:9
  10:6,23 11:16
  12:1,19 13:5
  13:13 14:9
  15:13 16:6
  17:1,9,17 18:7
  18:12 20:17
  21:6,22,23
  22:13,24 24:3
  25:11 26:6,14
  26:22,24 27:6
  27:16
whereabouts
  23:20
witness 2:16 3:2
  4:8 5:10 6:9,22
  7:8 10:2,20
  11:14,24 12:18
  13:2,10 14:6
  15:11 16:4,23
  17:7 18:4
  20:14 21:5,21
  22:8,23 24:1
  25:8 26:4 27:9
woman 4:16
wondering
  16:10
work 4:23 8:1
  15:22
working 5:1
  11:7
worst 24:20

wouldn't 8:1
  17:23
write 8:14
written 12:13
  13:15
wrote 19:22

**X**

X 3:1

**Y**

yeah 10:9 17:13
  20:23 24:18
year 9:7
yellow 8:4,9

**Z**

Zakia 10:10
Zoom 1:16
ZURBRIGGEN
  2:8 11:22 15:9
  16:22 21:3
  22:11,21 27:10
  27:18

**0**

01633 1:6
08051 1:22

**1**

1:00 1:17
1:30 28:17
121 2:3
1515 2:9
18th 2:3
19102 2:9
19107 2:4,15

**2**

2019 9:10,11
  14:12,14 19:18
  23:12,18
2020 24:6,16,21
  27:4
2021 9:13 10:12
  10:14,16 11:4
  12:4 14:7,13
  15:15 23:19
  24:22 25:12
2022 1:5

**2023** 1:12 29:7
  30:21
**215-546-1433**
  2:5
**215-683-5114**
  2:10
**215-686-3745**
  2:17
**25th** 9:7,10
**26th** 19:18
**27** 1:12 29:7
**28** 3:5,9,10

**3**

**369** 2:15

**4**

**4** 3:4
**406** 1:22
**4664** 8:10

**5**

**589-1107** 1:23

**6**

**7**

**8**

**856** 1:23

# EXHIBIT "G"

# Transcript of the Testimony of:
# **Patrick Officer Saba**

**Date:** May 16, 2023

**Case:** Alvarado v. City of Philadelphia Police Dept., et al

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

IN THE COURT OF COMMON PLEAS

PHILADELPHIA COUNTY, PENNSYLVANIA

- - -

```
FELISHATAY ALVARADO            :   JUNE TERM, 2022
                               :
       vs.                     :
                               :
CITY OF PHILADELPHIA POLICE    :
DEPARTMENT, et al.             :   NO. 1633
```
- - -

TUESDAY, MAY 16, 2023

- - -


Videotaped Oral Deposition of

OFFICER PATRICK SABA, taken at Victims' Recovery

Law Center, 121 South Broad Street, 17th Floor,

Philadelphia, Pennsylvania, 19107, commencing at

10:00 a.m., before Denise Weller, a Professional

Shorthand Reporter and Notary Public in and for

the Commonwealth of Pennsylvania.


- - -


DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 589-1107
dcr.diamond@comcast.net

Page 2

```
1    A P P E A R A N C E S :
2
3        VICTIMS' RECOVERY LAW CENTER
         BY:  KEITH THOMAS WEST, ESQUIRE
4        121 South Broad Street
         18th Floor
5        Philadelphia, PA  19107
         (215) 546-1433
6        Keith@victimrecoverylaw.com
         Attorney for the Plaintiff
7
8        CITY OF PHILADELPHIA
         BY:  ADAM ZURBRIGGEN, ESQUIRE
9        Law Department
         1515 Arch Street
10       14th Floor
         Philadelphia, PA  19102
11       (215) 683-5114
         Adam.zurbriggen@phila.gov
12       Attorney for the Defendants
13
     A L S O  P R E S E N T :
14       Samantha DiBona, Video Operator
             - - -
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1                 I N D E X
2
3    WITNESS                    PAGE
4    OFFICER PATRICK SABA
5        By Mr. West            5, 65
6        By Mr. Zurbriggen       62
7
8
9                 - - -
10
11            EXHIBITS
12   NO.        DESCRIPTION      PAGE
13
14   1          Diagram          11
15   2          Photograph       41
16   3          Recon Sheet      48
17
18
19
20
21
22
23
24
```

Page 4

```
1                 - - -
2               PROCEEDINGS
3                 - - -
4        (It is hereby stipulated and agreed
5    by and among counsel that signing, sealing,
6    filing and certification are waived; and
7    that all objections, except as to the form
8    of the questions, are reserved until the
9    time of trial.)
10                - - -
11       MR. WEST:  We agree that what we
12   usually call the stipulations that you can
13   reserve all objections except as to the form
14   until the time of trial.
15       MR. ZURBRIGGEN:  Okay.  That's fine.
16       MR. WEST:  That's what you
17   understand is the usual stipulations, right?
18       MR. ZURBRIGGEN:  Yes.  I'm happy to
19   waive the reading and signing.
20       THE VIDEO OPERATOR:  This is the
21   audio/video deposition for use at trial in
22   the matter of Felishatay Alvarado v. The
23   City of Philadelphia, et al, GD number
24   22-3763.  And I'm the video operator.  My
```

Page 5

```
1    name is Samantha DiBona and I am employed by
2    the Victims' Recovery Law Center.  My
3    address is 121 South Broad Street, 18th
4    Floor, Philadelphia, Pennsylvania, 19107.
5    Today's date is May 16th, 2023 at 10:02 a.m.
6        This deposition is being performed
7    in person.  The caption in this case is
8    Alvarado v. City of Philadelphia, et al, GD
9    number 22-3763.  The witness being deposed
10   today is Officer Patrick Saba.  This
11   deposition is being taken on behalf of the
12   Plaintiff Felishatay Alvarado.  The officer
13   taking this deposition is Denise Weller and
14   she shall swear in the witness at this time.
15                - - -
16       OFFICER PATRICK SABA, after having
17   been first duly sworn, was examined and
18   testified as follows:
19                - - -
20              EXAMINATION
21                - - -
22   BY MR. WEST:
23       Q.  Officer Saba, my name is Keith West.  I
24   am one of the attorneys representing Ms. Alvarado
```

Page 6

1   in this case.  And you're here represented by
2   Counsel.  You have had a chance to confer with him
3   and you're prepared to testify today, correct?
4       A.  Yes.
5       Q.  All right.  Just a couple of preliminary
6   questions we always have to ask.  Don't read
7   anything into it.  Are you under the influence of
8   any sort of medication, substance, illness,
9   anything that would impair your ability to testify
10  truthfully today?
11      A.  No.
12      Q.  And have you ever actually been in a
13  deposition before?
14      A.  Yes, it's been a while.
15      Q.  Okay.  How many times have you been
16  deposed previously?
17      A.  I believe it was only twice.  But I can
18  be off with the numbers.
19      Q.  Okay.  Could you just generally tell me
20  what the prior depositions were about and give me
21  an approximation of when they occurred, if that's
22  possible?
23      A.  They were for auto accidents.  And
24  probably 10 plus years ago.

Page 7

1       Q.  Okay.  And were these auto accidents that
2   you were somehow a witness to in your private
3   capacity or were these related to being a member
4   of the Philadelphia Police Department?
5       A.  Just a member of the department.
6       Q.  Okay.  They were both auto accidents?
7       A.  Yes.
8       Q.  Were you the victim in these auto
9   accidents or --
10      A.  No.  I would have been the officer taking
11  the report.
12      Q.  Okay.  So you're there as a witness?
13      A.  Yes.
14      Q.  All right.  Well, your attorney probably
15  explained how the format is.  Just to give a
16  general over ground, this in many ways may feel
17  like a normal conversation, which is good.  We
18  just have to remember that the court reporter
19  needs to write down what we are saying all of the
20  time.
21      A.  Sure.
22      Q.  So you're already doing it.  Just make
23  sure we don't speak at the same time.  Say your
24  attorney wants to put something on the record, we

Page 8

1   all pause and don't speak at the same time, okay?
2       A.  Okay.
3       Q.  Likewise, all of our responses have to be
4   spoken.  So nods of the head, things we normally
5   do in a conversation won't get on the record.
6       A.  Of course.
7       Q.  So you have to make sure everything is
8   spoken out loud, okay?
9       A.  Sure.
10      Q.  As your attorney, I am sure has advised
11  you, your only obligation is to just give truthful
12  testimony based on your personal information.  So
13  I am not going to ask you to guess or speculate.
14      A.  Okay.
15      Q.  Just tell me what you know, okay?
16      A.  Okay.
17      Q.  Now, one area that we usually advise
18  people is that if you are able to give an estimate
19  or approximation, that is something that we would
20  like to hear from you.  Just let us know what
21  you're giving an estimate or approximation.
22      A.  Okay.
23      Q.  Example, it's a boring example, but we
24  always say if I was to ask you how many feet it is

Page 9

1   to the wall, you're not a robot.  I don't think
2   you can eyeball it and tell me to the inch exactly
3   how far it is, right?
4       A.  Gotcha.  Okay.
5       Q.  But in your job, I bet you normally give
6   estimates like that, right?  However, say somebody
7   grows up in France, only knows the metric system,
8   I am not asking them to guess how long a foot or
9   an inch is if they don't know.
10      A.  Yes.
11      Q.  You understand the difference, right?
12      A.  Yeah.  Definitely, yes.
13      Q.  Beyond that, this is not intended to be
14  an unnecessarily uncomfortable thing, this isn't
15  an interrogation.  So if you need a break at any
16  time, you want a cup of coffee or something, just
17  let us know.  We will try to be as accommodating
18  as possible.  Any questions I ask you, the
19  assumption is that you understand it before you
20  answer it.
21      A.  Okay.
22      Q.  So if you need me to rephrase a question,
23  speak louder, anything like that, just let us know
24  and we will, if possible, try to restate or

3 (Pages 6 to 9)

Page 10

1  rephrase the question, okay?
2      A.  Okay.
3      Q.  All right, sir.  Do you recall an
4  incident -- basically, do you recall the incident
5  that this case is about, where some members of the
6  SWAT team went into Ms. Alvarado's house and I
7  guess her dog was killed.
8      Do you recall this incident?
9      A.  It's pretty vague, because it's been
10 quite some time.  But I know that it was just
11 based off of the information that I saw, it was
12 June of 2021.
13     Q.  Okay.  But sitting here today, do you
14 actually recall the incident in June 2021 at all?
15     A.  Some of it, yes.
16     Q.  All right.  So what do you recall?  Tell
17 me whatever you can remember about it.
18     A.  I do remember Officer Song discharging at
19 a dog.
20     Q.  Okay.
21     A.  It would be -- I guess it would have been
22 the living room area of the property.
23     Q.  Okay.  Did you actually see Officer Song
24 shoot the dog or do you just remember that it

Page 11

1  happened?
2      A.  No, I didn't see him shoot the dog.
3      Q.  Okay.  And could you see what Officer
4  Song was doing immediately before he discharged
5  his firearm?
6      A.  No.  Immediately before Officer Song
7  discharged, I had already passed Officer Song.  So
8  he was -- he would have been off behind me and to
9  my left.
10     Q.  Sure.  Actually, I have -- I have a
11 diagram that I will put on the record was provided
12 to me by the Defendant's in this case.  It's Bates
13 stamped as D000137.
14     MR. WEST:  And if there's no
15     objection from Defense Counsel, we will mark
16     this as Exhibit 1 for today's deposition.
17     MR. ZURBRIGGEN:  No objection.
18     MR. WEST:  So I will give you a
19     copy.
20         - - -
21     (Whereupon, Exhibit 1 was marked for
22     identification.)
23         - - -
24 BY MR. WEST:

Page 12

1      Q.  Sir, I would ask you to take a moment to
2  look that over, review it.  And let me know when
3  you're prepared to continue.
4      A.  Okay.
5      Q.  All right, sir.  Do you recognize what
6  this is a diagram of?
7      A.  Yes.
8      Q.  Okay.  Tell me what this is a diagram of.
9      A.  This would be a diagram of the living
10 quarters for Torresdale Avenue.
11     Q.  Okay.  Is it fair to state that this is a
12 diagram of Ms. Alvarado's apartment?
13     A.  I don't -- I don't exactly remember the
14 placement of everything that is on this diagram.
15 But it would be fair to say that this is pretty
16 close.
17     Q.  Okay.  To the best of your understanding,
18 is this consistent with Ms. Alvarado's apartment?
19     MR. ZURBRIGGEN:  Object to form.
20     Officer, you can answer.
21     THE WITNESS:  To my knowledge, yes,
22     it would be fair to say.  Yes.
23 BY MR. WEST:
24     Q.  Okay.  Let me ask you the question this

Page 13

1  way.  Do you recall at any point back in the
2  incident in June 2021 entering Ms. Alvarado's
3  apartment?
4      A.  Yes.
5      Q.  Okay.  And is there anything that you can
6  recall about the layout of her apartment, whatever
7  you found inside of her apartment that is
8  inconsistent with this diagram?
9      A.  I don't remember this table being in the
10 center of the room.  But again, I don't remember
11 if everything on this was exactly placed out.
12 But I wouldn't be able to say that it wasn't there
13 either.
14     Q.  So is it your recollection today that you
15 don't remember there being a table?  Is it your
16 sense --
17     A.  I don't remember there being a table, no.
18     Q.  Right.  So is it your sense that this
19 area was kind of --
20     A.  Yes.
21     Q.  It seems obvious to us now, but when
22 someone is reading the record in a year it might
23 be more complicated.  Would you mind just
24 highlighting with this pink highlighter the table?

Electronically signed by Denise Weller (401-411-238-5399)                                    abe389dd-bbdf-49c6-b3e0-aefa518f2f9e

Page 14

1    A.  Sure.  (Witness complies.)
2    Q.  All right.  And do you recall there being
3  a dog crate?
4    A.  I don't recall a dog crate.
5    Q.  Okay.  All right.  So could you -- I will
6  give you a blue pen.  Could you mark here -- let's
7  see.  You and Officer Song have the same last
8  initial.  So what is the best way to put it?
9  Maybe if you could just do an M for me.
10   A.  Okay.
11   Q.  Could you mark to the best of memory an M
12  for where you believe that you were located and
13  where -- and an S for where you believe Officer
14  Song was located at the time that Officer Song's
15  firearm was discharged?
16   A.  Okay.  So S for where Officer Song was at
17  when he discharged and an M for me where I was at
18  when he discharged?
19   Q.  Yes.
20   A.  Okay.  So I -- I believe I was right
21  here.  And Officer Song was somewhere
22  approximately within this area right here.
23   Q.  All right.  And then could you point an
24  arrow pointing in the direction of where your

Page 15

1  eyesight was focused?
2    A.  You want me to indicate an arrow like
3  which way I was looking?
4    Q.  Right.  So basically you were looking
5  away from the direction of Officer Song at the
6  time, correct?
7    A.  Yes.
8    Q.  Okay.
9      MR. ZURBRIGGEN:  Keith, just for
10   clarification, is this the point at which he
11   fired?
12     MR. WEST:  Yes.
13     MR. ZURBRIGGEN:  Okay.  Thank you.
14  BY MR. WEST:
15   Q.  And -- okay.  All right.  That takes care
16  of that.
17     Do you -- do you know why Officer Song
18  discharged his firearm?
19   A.  Do I know why Officer Song discharged his
20  firearm?
21   Q.  Yes.
22     MR. ZURBRIGGEN:  Object to form.
23   But Officer, you can answer.
24     THE WITNESS:  It would have been

Page 16

1  because the dog was biting at him.
2  BY MR. WEST:
3    Q.  Did you actually see a dog bite Officer
4  Song?
5    A.  The dog -- when I initially saw the dog
6  attacking Officer Song's legs.
7  of Officer Song's legs.
8    Q.  Okay.  But did you actually see the
9  dog -- the dog bite Officer Song?
10   A.  No.
11   Q.  Okay.  All right.  How did you end up in
12  Ms. Alvarado's apartment that day?
13   A.  We were serving a warrant for homicide.
14  It was an arrest and search warrant for homicide
15  at this location.
16   Q.  Okay.  Now, is it your understanding
17  today that the warrant that you were executing
18  actually authorized you to be inside of Ms.
19  Alvarado's apartment?
20     MR. ZURBRIGGEN:  Object to form.
21   But Officer, you can answer.
22     THE WITNESS:  To the best of my
23   knowledge, this warrant was for a male that
24   was in the second floor rear apartment of

Page 17

1  this -- of this property.  I believe it was
2  6446 Torresdale.
3  BY MR. WEST:
4    Q.  Uh-huh.
5    A.  Yes.
6    Q.  Okay.  So on the date of the incident,
7  you were attempting -- you and the other officers
8  were attempting to execute a warrant that you
9  understood authorized you to be in the second
10  floor rear apartment?
11   A.  Uh-huh.
12   Q.  Of the building, correct?
13   A.  Yes.
14   Q.  Okay.  And to your knowledge, did Ms.
15  Alvarado live in the second floor rear apartment?
16   A.  No.
17   Q.  All right.  Is it fair to say that she
18  lived in apartment number one on the first floor,
19  correct?
20   A.  Yes.
21   Q.  Okay.  Did you believe prior to entering
22  Ms. Alvarado's home that the warrant for the
23  second floor rear apartment legally entitled you
24  to enter apartment number one on the first floor?

5  (Pages 14 to 17)

Page 18

1    MR. ZURBRIGGEN: Object to form.
2  Officer, you can answer.
3    THE WITNESS: So there was no
4  indication on the front door that this was
5  apartment one only.
6  BY MR. WEST:
7    Q.  I understand.  That is a separate issue.
8  I'm just asking -- if you can just answer the
9  question I am asking.
10    Did you -- was it your understanding that
11  the warrant for the second floor rear apartment
12  gave you a legal right to enter apartment number
13  one on the first floor where Ms. Alvarado lived?
14    MR. ZURBRIGGEN: Object to form.
15  But Officer, you can answer.
16    THE WITNESS: I will answer the
17  same.  There was no indication that this
18  front door was apartment one only.  It would
19  lead any reasonable person to believe that
20  this front door may have led to or more than
21  likely led to two different doors which
22  would have been your client's door and the
23  second floor door.
24  BY MR. WEST:

Page 19

1    Q.  Sure.  So if you had known that the door
2  on the first floor led directly into apartment
3  number one, would you believe that the warrant
4  legally authorized you to open that door?
5    A.  No.
6    MR. ZURBRIGGEN: Object to form.
7  But Officer, you can answer.
8    THE WITNESS: No.  I will answer no.
9  BY MR. WEST:
10    Q.  Okay.  And could you clarify when you say
11  no, what do you mean?
12    A.  If there was an indication on this front
13  door that this was apartment one only, we would
14  not be able to legally enter the property without
15  further information indicating where the entry
16  would be or where the stairwell would be to get to
17  the second floor.
18    Q.  Okay.  But you understood even back in
19  June 2021 that if that door led directly into Ms.
20  Alvarado's apartment, it was illegal for you to
21  walk through that door, correct?
22    MR. ZURBRIGGEN: Object to form.
23  Officer, you can answer.
24    THE WITNESS: If there was

Page 20

1  information saying that this door led only
2  to the first floor apartment, then we would
3  not have been legally able to enter.
4  BY MR. WEST:
5    Q.  Okay.
6    A.  But I will also indicate that on the
7  front of the property there were two mailboxes.
8    Q.  Uh-huh.  All right, sir.  Did you hear
9  the dog barking before the door was breached?
10    A.  I did not.
11    Q.  Do you know if the dog was barking before
12  the door was breached?
13    MR. ZURBRIGGEN: Object to form.
14  Officer, you can answer.
15    THE WITNESS: I don't recall, no.
16  BY MR. WEST:
17    Q.  Okay.  So could you explain to me at the
18  time that the door was breached, where were you
19  physically standing?
20    A.  I would have been -- I would have been
21  six officers back from the front door.  So I
22  was -- I would say I was approximately 20 to 25
23  feet away from the front door.
24    Q.  Okay.  All right.  I will try to make --

Page 21

1  just from my notes I have written down here one
2  through six.
3    A.  Uh-huh.
4    Q.  So I will put -- I will put you for six.
5    A.  Uh-huh.
6    Q.  And who do you believe was the nearest to
7  the door at the time that this -- make sure we are
8  on the same page, at the time the door was
9  breached?
10    A.  Sure.  It would have been our two
11  breachers were the first -- were the first two at
12  the door.
13    Q.  Uh-huh.
14    A.  So that would have been I believe it was
15  Officer Murray and Officer Clark.
16    Q.  Okay.  And who do you believe was number
17  three?
18    A.  Number three would have been Officer
19  Song.
20    Q.  Okay.
21    A.  Then it would have been Officer Hamoy,
22  H-A-M-O-Y.  And then Lieutenant Monk, M-O-N-K.
23    Q.  Okay.  All right.  And of these six
24  people, did anyone have any like command or

6 (Pages 18 to 21)

Page  22

1  supervision over the other officers?
2      A.  Lieutenant Monk.
3      Q.  Lieutenant Monk did, correct?
4      A.  Yes.
5      Q.  Okay.  All right.  Did you see anyone
6  knock on the front door before the door was
7  breached?
8      A.  I didn't see anyone.  But you know, we
9  knock and announce with, you know, a loud
10 boisterous, you know, just to let somebody know
11 that we are there for a warrant.
12     Q.  I understand that it's your understanding
13 that under the policies and procedures there's
14 supposed to be a knock before the door is
15 breached, correct?
16     A.  Sure.
17     Q.  But is it your testimony that you have no
18 specific recollection of seeing anyone knock that
19 day?
20     A.  I wouldn't have been able to see the
21 front door, because it was set back off of the
22 property.  There was -- it was kind of like -- I
23 guess surrounded by the foundation of the
24 property.  So the door is actually set back a

Page  23

1  little bit.
2      Q.  Okay.  Prior to the door being breached,
3  did you personally know whether or not there was a
4  rear entrance to the building?
5      A.  Any property would have a rear
6  exit/entry.  All properties have a rear
7  exit/entry.
8      Q.  My question is, did you personally know
9  whether or not the property had a rear entrance at
10 the time before the door was breached?
11     A.  No.
12     Q.  You did not know that?
13     A.  No.
14     Q.  Okay.  You were aware that the warrant
15 was only valid for the rear apartment, correct?
16         MR. ZURBRIGGEN:  Object to form.
17     Officer, you can answer.
18         THE WITNESS:  Second floor rear.
19 BY MR. WEST:
20     Q.  Right.  So do you think it may have
21 affected your understanding of what the proper
22 door was if you had known that there was a rear
23 entrance?
24         MR. ZURBRIGGEN:  Object to form.

Page  24

1      Officer, you can answer.
2          THE WITNESS:  Repeat the question.
3  BY MR. WEST:
4      Q.  If you had known that there was a rear
5  entrance, do you think that may have affected your
6  understanding of what door was the way to get into
7  the rear apartment?
8          MR. ZURBRIGGEN:  Object to form.
9      Officer, you can answer.
10         THE WITNESS:  All properties have
11     rear entrances.  So it would be hard to know
12     whether that rear entrance went straight up
13     to second floor, unless you were actually
14     inside the property.
15 BY MR. WEST:
16     Q.  Okay.  How long -- you're on the SWAT
17 team, right?
18     A.  Yes.
19     Q.  So when did you first join the
20 Philadelphia Police Department?
21     A.  2006; November 2006.
22     Q.  And when you first joined the
23 Philadelphia Police Department, what was your
24 title?

Page  25

1      A.  Patrol officer.
2      Q.  Patrol officer.  Had you ever been in law
3  enforcement prior to joining the Philadelphia
4  Police Department?
5      A.  No.
6      Q.  At some point you joined the SWAT team?
7      A.  Yes.
8      Q.  When was that?
9      A.  December 2018.
10     Q.  All right.  And when you joined the SWAT
11 team, did you receive any additional SWAT team
12 training?
13     A.  Yes.
14     Q.  As far as you're aware, you received all
15 SWAT team training offered by the Philadelphia
16 Police Department in order to be a member of the
17 SWAT team as of June 2021?
18         MR. ZURBRIGGEN:  Object to form.
19     Officer, you can answer.
20         THE WITNESS:  You're asking if all
21     of my training was through the department?
22 BY MR. WEST:
23     Q.  Right.  I am trying to figure out in June
24 2021 if you were like maybe a provisional member

7 (Pages 22 to 25)

Page 26

1  of the SWAT team or --
2      A.  Oh, no.  I was officially part of the
3  SWAT.
4      Q.  Right.  So was it your understanding as
5  of June 2021 that you received all of the training
6  provided by the Philadelphia Police Department
7  that prepared SWAT team members to do their job?
8      A.  Yes.
9          MR. ZURBRIGGEN:  Object to form.
10         THE WITNESS:  Yes.
11  BY MR. WEST:
12     Q.  Okay.  Now, had you received any training
13  prior to June 2021 about how to execute a search
14  warrant or an arrest warrant at a home?
15     A.  Have I received training on how to -- I'm
16  not -- I'm not really understanding your question.
17     Q.  That's fine.  I can repeat the question.
18     A.  Yes.
19     Q.  As of June 2021, so I am not really
20  asking about anything that may have happened after
21  the incident, but prior to the incident at Ms.
22  Alvarado's house --
23     A.  Uh-huh.
24     Q.  -- had you received any training from the

Page 27

1  Philadelphia Police Department as far as what you
2  should do when you were executing a warrant at a
3  person's private residence?
4      A.  Yes.
5          MR. ZURBRIGGEN:  Object to form.
6          THE WITNESS:  Yes.
7  BY MR. WEST:
8      Q.  Okay.  So how did that -- according to
9  the training that you received, how were you told
10  that you should execute a warrant at a private
11  residence?
12         MR. ZURBRIGGEN:  Object to form.
13         But Officer, you can answer if you can.
14         THE WITNESS:  So when we -- when we
15     go to serve a warrant, you knock -- you
16     knock and announce your presence that
17     there's a warrant to be served at the
18     property.
19  BY MR. WEST:
20     Q.  Okay.  And how were you told that you
21  should knock and announce?
22     A.  Loud, boisterous so that not only the
23  occupants can hear you, but that, you know,
24  neighbors, anybody in the area can hear that a

Page 28

1  warrant is being served.
2      Q.  Okay.  And according to the training that
3  you received when you knocked and announced, how
4  much time should you normally give the occupant of
5  the home to answer the door before breaching the
6  door?
7          MR. ZURBRIGGEN:  Object to form.
8          Officer, you can answer if you can.
9          THE WITNESS:  The order is always
10     given to breach the property by a
11     supervisor.  So that one would -- it would
12     have been Lieutenant Monk would have ordered
13     the breach of that property.
14  BY MR. WEST:
15     Q.  Okay.  But were you ever given any
16  training whatsoever as to how much time you should
17  normally allow to pass before breaching a door?
18     A.  A reasonable amount of time.
19     Q.  Sure.  When you say reasonable amount of
20  time, what do you mean by that?
21     A.  I guess it could be approximately 30
22  seconds.
23     Q.  Okay.  So at least 30 seconds?
24         MR. ZURBRIGGEN:  Object to form.

Page 29

1  But Officer --
2          THE WITNESS:  Approximately, yeah.
3     Approximately 30 seconds before the order is
4     given.
5  BY MR. WEST:
6      Q.  Do you have any personal knowledge as to
7  whether at least 30 seconds were provided to Ms.
8  Alvarado between when the door was knocked and her
9  front door was breached?
10         MR. ZURBRIGGEN:  Objection to form.
11     Officer, you can answer.
12         THE WITNESS:  Personal knowledge,
13     no.  But I heard Lieutenant Monk say breach.
14     So yes, I wasn't, you know, paying attention
15     to like the time clock to when the
16     announcement was made to when the door was
17     breached.
18  BY MR. WEST:
19     Q.  Okay.  That is what I am asking.  So I
20  understand.  You're saying that the door was
21  breached because Lieutenant Monk ordered the door
22  to be breached, correct?
23     A.  Yes.
24     Q.  But you personally did not observe that

Electronically signed by Denise Weller (401-411-238-5399)          abe389dd-bbdf-49c6-b3e0-aefa518f2f9e

| Page 30 | Page 32 |
|---|---|

**Page 30**

1   at least 30 seconds passed between the door being
2   knocked and the door being breached, correct?
3           MR. ZURBRIGGEN:  Object to form.
4       Officer, you can answer.
5           THE WITNESS:  Okay.  Yeah, I wasn't
6       watching the time clock.  So I mean, no, I
7       don't have personal knowledge of whether it
8       was actually 30 seconds.
9   BY MR. WEST:
10      Q.  Okay.  Have you ever seen the video?
11      A.  I haven't seen anything.
12      Q.  Did you review any documents,
13  photographs, video, anything to prepare for
14  today's testimony?
15      A.  No.
16      Q.  All right.  On the day that the front
17  door on Ms. Alvarado's home was breached, were you
18  wearing a body camera?
19      A.  No.
20      Q.  Were any of the officers wearing a body
21  camera?
22      A.  Nobody from SWAT was wearing body
23  cameras.
24      Q.  Do you know why no one was wearing body

**Page 32**

1           MR. ZURBRIGGEN:  Object to form.
2       But Officer, you can answer.
3           THE WITNESS:  If the City provides
4       it, you're supposed to wear it.
5   BY MR. WEST:
6       Q.  Okay.  Do you have any personal knowledge
7   as to why the SWAT team had not been provided body
8   cams that day?
9           MR. ZURBRIGGEN:  Object to form.
10      Officer, you can answer.
11          THE WITNESS:  No.  I am not in
12      charge of buying the body cameras for the
13      City.
14  BY MR. WEST:
15      Q.  Right.  So Officer Saba, I just want to
16  remind you of the instruction at the beginning of
17  the deposition.  I promise it will go faster.
18      A.  Yeah.
19      Q.  All questions are based on what you
20  personally know.  So I am not asking you what
21  you're responsible for or anything like that.  If
22  I ask you a question have you heard this, I am
23  asking have you heard it.  I am not asking
24  anything beyond that, okay?

**Page 31**

1   cams that day?
2           MR. ZURBRIGGEN:  Object to form.
3       But Officer, you can answer if you can.
4           THE WITNESS:  We have -- we haven't
5       received any body cameras from the
6       department.
7   BY MR. WEST:
8       Q.  Is that true even today?
9       A.  Yes.
10      Q.  All right.  Have you ever -- have you
11  ever heard anything about their being a
12  Philadelphia Police Department directive that
13  officers are supposed to wear body cams?
14          MR. ZURBRIGGEN:  Object to form.
15      But Officer, you can answer if you can.
16          THE WITNESS:  I don't make up the
17      directives.  I just go to work and --
18  BY MR. WEST:
19      Q.  I understand, sir.  I am not asking that
20  you make up the directives.  I am just wondering
21  if you heard -- I am just -- have you personally
22  heard that there might be a directive in place
23  from the commissioner that officers are supposed
24  to wear body cams?

**Page 33**

1       A.  Okay.
2       Q.  All right.  So just to make sure that you
3   understand.  Have you ever heard anything as to
4   why the SWAT team had not been provided body cams
5   as of June 2021?
6       A.  No.
7           MR. ZURBRIGGEN:  Object to form.
8           THE WITNESS:  No.
9           MR. ZURBRIGGEN:  Officer, you can
10      answer.
11          THE WITNESS:  No.  No, I haven't
12      heard why.
13  BY MR. WEST:
14      Q.  Were you aware that other officers within
15  the Philadelphia Police Department were wearing
16  body cams as of that time?
17          MR. ZURBRIGGEN:  Object to form.
18      Officer, you can answer.
19          THE WITNESS:  At that location or
20      just City wide?
21  BY MR. WEST:
22      Q.  Other members of the Philadelphia Police
23  Department in general?
24      A.  Just in general -- yeah, in general there

Page 34

1  are a lot of officers that wear body cameras.  I
2  had a body camera when I was in patrol.
3      Q.  And that was back when?
4      A.  That would have been -- so I was in 22nd
5  at the time.  So it would have been prior to
6  February of 2017.
7      Q.  All right.  And again, this is based on
8  your personal information.
9      A.  Sure.
10      Q.  Do you have any personal information as
11  to why all the way back in February 2017, normal
12  patrol officers in the City of Philadelphia were
13  wearing body cams, but all the way back into the
14  summer of 2019 the SWAT team wasn't wearing them?
15          MR. ZURBRIGGEN:  Object to form.
16      Officer, you can answer.
17          THE WITNESS:  It would have been the
18      summer of 2021.
19  BY MR. WEST:
20      Q.  I'm sorry.  I misspoke.  2021.
21      A.  That's fine.  I don't have knowledge of
22  why we didn't have body cameras at the time, nor
23  do I know why we still don't have body cameras.
24      Q.  All right.  To your knowledge, was there

Page 35

1  any recording devices whatsoever being used at the
2  time when Ms. Alvarado's front door was breached?
3          MR. ZURBRIGGEN:  Object to form.
4      Officer, you can answer.
5          THE WITNESS:  There would have been
6      no recording devices used by the SWAT Unit.
7  BY MR. WEST:
8      Q.  Okay.  Was that normal practice in your
9  experience for the SWAT Unit and the Philadelphia
10  Police Department as of June 2021?
11          MR. ZURBRIGGEN:  Object to form.
12      Officer, you can answer if you can.
13          THE WITNESS:  From the time that I
14      was assigned to SWAT to the time of the
15      incident, yes, that was normal procedure.
16  BY MR. WEST:
17      Q.  Okay.  Do you know why Lieutenant Monk
18  ordered the door to be breached at the time he
19  ordered the door to be breached?
20          MR. ZURBRIGGEN:  Object to form.
21      Officer, you can answer.
22          THE WITNESS:  No.
23  BY MR. WEST:
24      Q.  Have you ever had any conversation with

Page 36

1  Lieutenant Monk about this incident?
2      A.  I mean, not recent.  But you know, we
3  normally talk about all warrants.
4      Q.  All right.  And when you did speak to
5  Lieutenant Monk about this incident, what did he
6  say?
7          MR. ZURBRIGGEN:  Object to form.
8      But Officer, you can answer if you can.
9          THE WITNESS:  I don't recall.
10  BY MR. WEST:
11      Q.  Can you recall anything he said?
12      A.  No.
13      Q.  Sir, based on your training from the
14  Philadelphia Police Department as of June 2021, if
15  the only entrance to the second floor rear
16  apartment was through apartment number one, and
17  you only had a warrant for the second floor rear
18  apartment, could you as a member of the SWAT Unit
19  have gone through the first floor apartment in
20  order to get to the second floor rear apartment?
21          MR. ZURBRIGGEN:  Object to form.
22      Officer, you can answer if you can.
23          THE WITNESS:  Based on my
24      experience, I have never encountered

Page 37

1      entryways to the second floor through
2      someone else's apartment.
3  BY MR. WEST:
4      Q.  Okay.  But could you answer the question
5  I asked you?  Would you like it read back to you?
6      A.  Yes.
7              - - -
8          (Whereupon, the pertinent portion of
9      the record was read.)
10              - - -
11          MR. ZURBRIGGEN:  Object to form.
12      Officer, you can answer if you can.
13          THE WITNESS:  Yes.  If that is the
14      only way to get to the second floor, yes, we
15      can serve that warrant.
16  BY MR. WEST:
17      Q.  Okay.  And was that consistent with the
18  policies and procedures of the Philadelphia Police
19  Department as you understood them from the
20  training you had received as of June 2021?
21          MR. ZURBRIGGEN:  Same objection.
22      Officer, you can answer.
23          THE WITNESS:  Yes.
24  BY MR. WEST:

Electronically signed by Denise Weller (401-411-238-5399)                                    abe389dd-bbdf-49c6-b3e0-aefa518f2f9e

Page 38

1    Q.  Okay.  Could you tell me where did you
2  gain that understanding that was the policies and
3  procedures of the Philadelphia Police Department?
4        MR. ZURBRIGGEN:  Same objection.
5    Officer, you can answer.
6        THE WITNESS:  I mean, that is just
7  pretty -- to me, that is pretty much common
8  sense.  If there is only one entryway to the
9  second floor through someone else's
10 apartment, it would be -- it would lead any
11 common person to believe that that occupant
12 of the second floor also has some form of
13 legal entry into the first apartment as
14 well.
15 BY MR. WEST:
16   Q.  Um-hum.  Okay.  Now, the front door that
17 was breached, prior to that door being breached,
18 had anyone told you what was behind that door?
19   A.  No.
20   Q.  All right.  So, for example, Lieutenant
21 Monk -- Lieutenant Monk was the commanding officer
22 on the scene, correct?
23   A.  Yes.
24   Q.  Did he give you and the other SWAT Unit

Page 39

1  members any sort of briefing about what you guys
2  were doing?
3    A.  We brief every warrant.  And that
4  briefing consists of the location that we are
5  going to, the suspect or defendant that we are
6  going to get, what they are wanted for.  And then
7  there's usually other information like where we
8  are staging at, how we are driving from the
9  staging area to the property.  And then God forbid
10 there's an emergency or one of us are shot,
11 there's also information of how to get to the
12 nearest trauma center from the location.
13   Q.  Right.  So did he give you guys any sort
14 of briefing about -- that you were going to go
15 through the front door?
16        MR. ZURBRIGGEN:  Object to form.
17   Officer, you can answer if you can.
18        THE WITNESS:  I don't recall that
19 particular -- no.
20 BY MR. WEST:
21   Q.  Okay.  You don't recall him saying
22 anything about the front door that you were
23 knocking on that you breached?
24        MR. ZURBRIGGEN:  Object to form.

Page 40

1    Officer, you can answer.
2        THE WITNESS:  Other than the type of
3  door.  It was just a metal magna steel door.
4  BY MR. WEST:
5    Q.  Did he say anything about what you guys
6  anticipated was on the other side of that door?
7    A.  I don't recall.
8    Q.  Did he tell you where the door led?
9    A.  There would be no way for us to know.  No
10 one was ever inside the property.
11   Q.  Do you know if anyone from the SWAT Unit
12 had contacted property management, property owner
13 or anybody like that?
14        MR. ZURBRIGGEN:  Object to form.
15   Officer, you can answer.
16        THE WITNESS:  I don't know.
17 BY MR. WEST:
18   Q.  Did you have any knowledge as to who
19 lived on the first floor of the property before
20 the door was breached?
21   A.  No.
22   Q.  All right, sir.  I have a photograph
23 here.  This is taken from Google Maps.  It's
24 actually time stamped 9:39 a.m. Monday, May 15th.

Page 41

1  It's from yesterday.  And the same photograph I
2  will just represent for the record was used as an
3  exhibit at yesterday's deposition of Officer Song.
4  I will give you -- so we will mark this as Exhibit
5  2.  If you can take a moment to look at it, once
6  you had a chance to review it, let me know when
7  you're ready to proceed.
8    A.  Sure.
9           - - -
10       (Whereupon, Exhibit 2 was marked for
11 identification.)
12          - - -
13 BY MR. WEST:
14   Q.  All right, sir.  Do you recognize what
15 this is a picture of?
16   A.  Uh-huh.  Yes, I do.
17   Q.  What is this picture of?
18   A.  Other than the houses to the left, it
19 would depict the tan colored property was the
20 location that we went into.
21   Q.  Right.  And is it your testimony then,
22 the tan colored house pictured here, was the
23 residence where Ms. Alvarado lived?
24   A.  Yes.

Page 42

1    Q.  And the front door of this tan colored
2  property, is that the front door that got
3  breached?
4    A.  The door would be to the right of the
5  windows, yes.
6    Q.  So there's windows.  There's a couple
7  things that look like mailboxes.  And then there's
8  a door right next to that, right?
9    A.  Yes.
10    Q.  Is that the door that got breached?
11    A.  Yes.
12    Q.  Do you see any second floor above that
13  door?
14       MR. ZURBRIGGEN:  Object to form.
15    Officer, you can answer if you can.
16       THE WITNESS:  No.
17  BY MR. WEST:
18    Q.  So do you think it would be reasonable
19  for someone to believe that this second -- that
20  this door led to the second floor of a building?
21       MR. ZURBRIGGEN:  Object to form.
22    Officer, you can answer.
23       THE WITNESS:  No.  It wouldn't be
24    reasonable.

Page 43

1  BY MR. WEST:
2    Q.  Okay.  So tell me what you recall
3  happened after the dog was shot.
4    A.  I remember -- after the dog was shot, I
5  remember continuing to walk through the property.
6  I remember Mrs. -- I am going to indicate on
7  the -- on your --
8    Q.  Oh, sure.  I will tell you what, let me
9  give you a black pen.  And you can write anything
10  you want.  Just let us know what you're doing.
11    A.  I am just going to write on here I
12  remember Mrs. Alvarado being right here, at like
13  the kitchen wall.  There was a wall in between the
14  living area and the kitchen.  I remember Mrs.
15  Alvarado being right here.  She was -- if I
16  remember, she was down on her knees.
17    Q.  Was she naked at the time?
18    A.  I don't recall.
19    Q.  Okay.
20    A.  Yeah, I don't recall.  I remember her
21  being -- was like this and she was crying.
22    Q.  Her hands up to show she was no threat
23  and she was crying, correct?
24    A.  Yes.

Page 44

1       MR. ZURBRIGGEN:  Object to form.
2    Officer, you can answer.
3       THE WITNESS:  Yes.  Hands up that
4    she was of no threat to us.  I went -- I
5    went directly to Ms. Alvarado and I asked
6    her where the steps were to the second
7    floor.  And she said they're out back.
8  BY MR. WEST:
9    Q.  Okay.  And so what did you do after that?
10    A.  I informed Lieutenant Monk what Mrs.
11  Alvarado had told me.
12    Q.  Yes.  What did he say to that?
13    A.  And it was almost simultaneously at the
14  same time our rear containment had communicated
15  through our radio system that there were people
16  coming out of the back door.  So with that
17  information from our rear containment and with
18  information from Ms. Alvarado, Lieutenant Monk
19  told us to exit the property, form up and go
20  around to the back of the property.
21    Q.  Okay.  And then what happened?
22    A.  We went around to the back of the
23  property.  Between that time, the occupants that
24  had come out the back door, they had told our rear

Page 45

1  containment that they lived on the second floor.
2  And then it was to my knowledge it was
3  communicated to them who we were looking for.  And
4  I believe the male that came out said that it was
5  his son.
6    Q.  Okay.  So when you referred to the rear
7  containment officers, was it -- does that mean
8  that there were some officers from the SWAT unit
9  who were actually stationed at the rear door?
10    A.  They wouldn't be at the rear door.  They
11  would be like positioned off of the property.
12  Like, you know, you're not -- you wouldn't be
13  standing directly up against the door.  You would
14  have some distance between the property and the
15  property line.
16    Q.  Okay.  Do you know how many people were
17  in the rear containment?
18    A.  It would always be two.
19    Q.  So the standard would be to have two
20  officers?
21    A.  Two officers, yes.
22    Q.  Do you recall that there's a cul-de-sac
23  area in front of the rear door?
24       MR. ZURBRIGGEN:  Object to form.

Electronically signed by Denise Weller (401-411-238-5399)                                    abe389dd-bbdf-49c6-b3e0-aefa518f2f9e

Page 46

1 But Officer, you can answer if you know.
2       THE WITNESS: I don't recall exactly
3   how the rear of the property looked. No, I
4   don't.
5 BY MR. WEST:
6   Q.   Okay. Do you have any personal knowledge
7   why there wasn't an effort to execute the warrant
8   through the rear door?
9       MR. ZURBRIGGEN: Object to form.
10   Officer, you can answer if you can.
11       THE WITNESS: There was no
12   information. We had no information that
13   entry to the second floor was through the
14   rear door.
15 BY MR. WEST:
16   Q.   Okay. Do you have any personal knowledge
17   as to whether or not there was any effort by
18   anybody associated with the Philadelphia Police
19   Department to learn whether the front door or the
20   rear door lead to the second floor rear apartment
21   prior to Ms. Alvarado's front door being breached?
22       MR. ZURBRIGGEN: Object to form.
23   Officer, you can answer.
24       THE WITNESS: I don't know. Yes, I

Page 47

1   don't know if there was any other.
2 BY MR. WEST:
3   Q.   Okay. Is that something you would
4   normally know prior to executing a warrant? Would
5   you know like what reconnaissance had occurred?
6       MR. ZURBRIGGEN: Object to form.
7   Officer, you can answer.
8       THE WITNESS: The SWAT Unit always
9   recons -- does reconnaissance on every
10   property that we serve warrants on. And our
11   main objective for that is number one, to
12   make sure that the property itself does
13   exist. To see whether the property is
14   marked by saying, you know, that the address
15   is on the property. We always make sure
16   that there's some form of access or access
17   to the rear of the property so that we can
18   set up rear containment.
19       But yes, the SWAT Unit always does
20   recon -- reconnaissance on every property.
21 BY MR. WEST:
22   Q.   All right. I will mark as Exhibit 3 a
23   document produced to us in discovery from the
24   defendants Bates stamped 72. I won't add in all

Page 48

1   of the zeros, 73 defense. And we will mark this
2   as 3.
3       - - -
4       (Whereupon, Exhibit 3 was marked for
5   identification.)
6       - - -
7 BY MR. WEST:
8   Q.   Sir, take a moment to review that
9   document. And once you have had a chance to
10   review it, let me know if you know what that is.
11   A.   Yes.
12   Q.   What is this?
13   A.   This is a recon sheet that we always fill
14   out on every warrant that we serve.
15   Q.   All right. And actually, I will add two
16   pages. It will still be Exhibit 3, but there's
17   two additional pages that I think I should have
18   included. But before we do, will you look at
19   those and let me know, are those two pages all
20   part of the same thing?
21   A.   So these two would be just like front and
22   back. So it would be one document.
23   Q.   Okay. But you're not sure if that third
24   page is part of it?

Page 49

1   A.   No. This is --
2   Q.   All right. Let me have that back then.
3   So the two pages there are usually front and back.
4   A.   Yes.
5   Q.   And that -- and that is the document we
6   are referring to. Just let us know what this is.
7   A.   This is our recon sheet. We fill this
8   out on every warrant that we serve.
9   Q.   Okay. Who actually is responsible for
10   completing this document?
11   A.   We -- we preliminarily put all of this
12   information in. All of the boxes are filled out
13   by one of the officers. And then everything is
14   looked over and approved by a supervisor. He will
15   ultimately make changes or, you know, if there is
16   something that he doesn't want, you know, on there
17   or something he wants added, he will make that
18   determination.
19   Q.   All right. And for this particular
20   document, who would have been the person
21   responsible?
22   A.   Sergeant Mellody.
23   Q.   Not Lieutenant Monk?
24   A.   No.

13 (Pages 46 to 49)

Page 50

1    Q.  All right.  Do you see anything on this
2  document that indicates the existence of a rear
3  door?
4        MR. ZURBRIGGEN:  Object to form.
5    Officer, you can answer.
6        THE WITNESS:  No.
7  BY MR. WEST:
8    Q.  Do you see anything on this document that
9  indicates that the building in question may have
10  contained multiple residences?
11        MR. ZURBRIGGEN:  Object to form.
12    Officer, you can answer.
13        THE WITNESS:  Other than the
14    location 4664 Torresdale Avenue (Apartment
15    second floor rear).
16  BY MR. WEST:
17    Q.  Right.  So you can see that it's an
18  apartment building, because there's apartment
19  numbers, right?
20    A.  Other than second floor rear.
21    Q.  But what I'm saying is you see that
22  there's an apartment number, so that indicates to
23  you that the building contained multiple
24  residences, correct?

Page 51

1    A.  Yes.  It would be safe to say that, yes.
2    Q.  Okay.  Did you ever receive any training
3  from the Philadelphia Police Department specific
4  to if you're executing a warrant at a multi
5  residence building what should be done ahead of
6  time to determine which portions of the building
7  were the residences of certain people as opposed
8  to maybe the suspect that you're going after?
9        MR. ZURBRIGGEN:  Object to form.
10  But Officer, you can answer if you can.
11        THE WITNESS:  No.
12        MR. WEST:  This is going to be super
13    annoying, but I think that your attorney is
14    probably right, that I misworded that
15    question.  I will try to -- I will ask the
16    same question, but I will ask it in a way
17    that makes more sense.
18        THE WITNESS:  Okay.
19  BY MR. WEST:
20    Q.  Okay.  So from all of the training that
21  you received from the Philadelphia Police
22  Department, did you ever receive any training that
23  specifically told you how to determine what
24  portions of a building belong to various

Page 52

1  residences in buildings that were multi residence?
2        MR. ZURBRIGGEN:  Object to form.
3  But Officer, you can answer.
4        THE WITNESS:  Just based off of my
5    16 plus experience of working in
6    Philadelphia and not only being assigned to
7    the SWAT Unit, but in various sections of
8    the City, a lot of buildings are altered
9    into different apartments.  And then
10    sometimes those are even altered into
11    rooming houses.
12      So a lot of times in -- based off of
13    my experience, I have gone into properties
14    where you may have a second floor apartment,
15    but they're sub-rented out to other people.
16    So you have second floor front, second floor
17    middle, second floor rear.  Where it's,
18    you know, not legally allowed to be like that.
19    But that's -- based on my experience, that
20    is what I have seen in my time, you know, in
21    policing.
22  BY MR. WEST:
23    Q.  Right.  So in fairness, I think you
24  testified as to what your personal experience was.

Page 53

1    A.  Yes.
2    Q.  But my question was, the training that
3  you have received from the Philadelphia Police
4  Department, did you ever receive any specific
5  training from the Philadelphia Police Department
6  on this topic?
7        MR. ZURBRIGGEN:  Same objection.
8    Officer, you can answer.
9        THE WITNESS:  No.
10  BY MR. WEST:
11    Q.  Okay.  Do you know whether or not anyone
12  reviewed the property records for this property
13  before the breach?
14        MR. ZURBRIGGEN:  Object to form.
15    But Officer, you can answer.
16        THE WITNESS:  I don't know.
17  BY MR. WEST:
18    Q.  Okay.  For example, I can represent to
19  you that there is at least some indication in the
20  records that they knew from the property records
21  that there was an apartment upstairs and an
22  apartment downstairs.  Did you ever hear anything
23  about that prior to the door being breached?
24        MR. ZURBRIGGEN:  Object to form.

14 (Pages 50 to 53)

Page 54

1    But Officer, you can answer.
2         THE WITNESS:  No.
3    BY MR. WEST:
4         Q.   Okay.  In your experience with the
5    Philadelphia Police Department prior to executing
6    a warrant at a multi residence building, would
7    there normally be an effort to review the property
8    records to determine where the various residences
9    were located within the building?
10        MR. ZURBRIGGEN:  Object to form.
11   But Officer, you can answer.
12        THE WITNESS:  I think that the
13        responsibility would be on the detective
14        division and where they obtain their warrant
15        for.
16   BY MR. WEST:
17        Q.   Right.  So the detective should do that,
18   in your experience?
19        MR. ZURBRIGGEN:  Object to form.
20   But Officer, you can answer.
21        THE WITNESS:  Yes.  Yes, they should
22        do that.
23   BY MR. WEST:
24        Q.   In your experience with the Philadelphia

Page 55

1    Police Department, is that something that a
2    detective normally would do in this situation?
3         MR. ZURBRIGGEN:  Object to form.
4    But Officer, you can answer.
5         THE WITNESS:  I'm not a detective.
6         So I don't know if that is standard protocol
7         or procedure that they do.  But it would be
8         reasonable to believe that that is what they
9         should do.
10   BY MR. WEST:
11        Q.   Okay.  Prior to the door being breached
12   in this situation, were there any exigent
13   circumstances whatsoever that you're aware of?
14        MR. ZURBRIGGEN:  Object to form.
15   But Officer, you can answer if you can.
16   BY MR. WEST:
17        Q.   Just to give some clarification to the
18   question.  When I use the term exigent
19   circumstances, you know what that means, right?
20        A.   Sure.  Yes.
21        Q.   Were there an exigent circumstances that
22   required any sort of emergency?
23        MR. ZURBRIGGEN:  Same objection.
24   But Officer, you can answer.

Page 56

1         THE WITNESS:  No.
2    BY MR. WEST:
3         Q.   Okay.  Philadelphia Police Department
4    prior to breaching the door had total control of
5    the situation, correct?
6         MR. ZURBRIGGEN:  Object to form.
7    But Officer, you can answer.
8         THE WITNESS:  Yes.
9    BY MR. WEST:
10        Q.   And this was a preplanned warrant
11   enforcement operation, correct?
12        A.   Yes.
13        Q.   Did Ms. Alvarado do anything that day
14   that you can recall that any officer would have
15   reasonably believed created a danger that they had
16   to react to?
17        A.   No.
18        Q.   Did you hear Ms. Alvarado ask for the
19   opportunity to put her dog in its cage prior it
20   being shot?
21        A.   I did not, no.
22        Q.   Okay.  Did you speak with Ms. Alvarado at
23   any point?
24        A.   Yes.

Page 57

1         Q.   And please tell me everything that you
2    can recall that she said.
3         A.   I just asked Ms. Alvarado where the entry
4    was -- where the steps were.  I'm sorry.  Where
5    the steps were for the second floor.  She was
6    where I indicated on the map right by the door
7    between the living area and -- right by the
8    entryway to the kitchen.  That is when she told me
9    that the entry to the second floor was out back.
10        Q.   Okay.  Other than that conversation, did
11   you have any other conversation with Ms. Alvarado
12   at any time?
13        A.   No.
14        Q.   Okay.  I kind of covered this before.  I
15   want to make sure I am not missing anything.  In
16   all of the preparation that you received for this
17   warrant execution, all of the planning instruction
18   you got, did anyone at any point say anything
19   about the fact that there were other people who
20   lived on the first floor of this building?
21        MR. ZURBRIGGEN:  Object to form.
22   Officer, you can answer.
23        THE WITNESS:  No.
24   BY MR. WEST:

15 (Pages 54 to 57)

Page 58

1    Q.  Did you have any knowledge one way or
2  another whether or not there was a dog in the
3  property prior to the door being breached?
4    A.  No.
5    Q.  All right.  I think I might actually be
6  pretty much done.  I guess I was asking --
7  normally in your experience with the Philadelphia
8  Police Department, if you're executing a warrant
9  at a multi resident building, is there normally
10  any sort of conversation that addresses the fact
11  that there are people who lived in the building
12  that are not subject to the warrant?
13    MR. ZURBRIGGEN:  Object to form.
14  But Officer, you can answer.
15    THE WITNESS:  Yes.  Definitely.
16  Sure.  Yes.
17  BY MR. WEST:
18    Q.  Okay.  Do you have any knowledge as to
19  why a conversation of that type didn't take place
20  this time?
21    MR. ZURBRIGGEN:  Same objection.
22  But Officer, you can answer.
23    THE WITNESS:  No, I don't.
24    MR. WEST:  Okay.

Page 59

1  BY MR. WEST:
2    Q.  In your experience -- strike the
3  question.
4    So in your time with the SWAT Unit in the
5  Philadelphia Police Department, have you ever been
6  in a situation where you have to execute a warrant
7  in a building where you know that there's a dog
8  inside?
9    A.  Yes.
10    Q.  Like a dog that's barking before you
11  enter the property.  You have been in that
12  situation before?
13    A.  Yes.
14    Q.  All right.  In that situation, did you
15  ever receive any training of any kind as a member
16  of the Philadelphia Police Department as to what
17  you should do with regards to the dog?
18    MR. ZURBRIGGEN:  Object to form.
19  Officer, you can answer.
20    THE WITNESS:  No.
21  BY MR. WEST:
22    Q.  You have never received any -- have you
23  ever received any training of any kind as to how
24  to deal with dogs while executing warrants?

Page 60

1    MR. ZURBRIGGEN:  Same objection.
2    THE WITNESS:  All dogs are
3  different.  So some dogs are going to bark.
4  And some dogs are going to attack.  And some
5  dogs are going to sit there and you know,
6  just kind of look at you.  So I think to
7  answer your question, it's kind of -- it
8  varies, you know.  But our tactics never
9  change.
10  BY MR. WEST:
11    Q.  Sir, I understand that dogs are
12  different.  But my question -- I want to make sure
13  you understand it -- was did you receive any
14  specific training from the Philadelphia Police
15  Department on that topic?
16    A.  No.
17    MR. ZURBRIGGEN:  Object to form.
18  But Officer, you can answer.
19    THE WITNESS:  No.
20  BY MR. WEST:
21    Q.  For example, if you were planning on
22  executing a warrant on a door that you thought
23  maybe led to a common area but you weren't sure
24  and you could hear that there was dog barking on

Page 61

1  the other side of the door, would your training
2  tell you that you should take any sort of
3  precaution so that the dog isn't frightened
4  because someone is smashing in the front door and
5  that might lead to an incident?  Any kind of
6  training like that?
7    MR. ZURBRIGGEN:  Object to form.
8  Officer, you can answer.
9    THE WITNESS:  There's no way of
10  knowing how the dog is going to react.  If
11  it's barking, it's barking.  We don't have
12  dog treats or anything to try and you know,
13  make the dog go to a different area or try
14  and lead the dog away from the entry team on
15  the property, so no.
16  BY MR. WEST:
17    Q.  So based on your training and years of
18  experience with the Philadelphia SWAT Unit, it's
19  your understanding that if there is a dog barking
20  at a front door and a bunch of people smash in the
21  door and come running in, the reaction of that dog
22  is entirely unforeseeable?
23    MR. ZURBRIGGEN:  Object to form.
24    THE WITNESS:  Correct.

16 (Pages 58 to 61)

Page 62

1    MR. WEST: Okay. I have no further
2  questions. Thank you very much for your
3  time.
4    THE WITNESS: Yeah, thank you.
5    MR. WEST: I wish we met on other --
6  on another occasion, but thank you for
7  coming in.
8    THE WITNESS: Yes, no problem.
9    MR. ZURBRIGGEN: Officer, I have
10  just a few follow-up questions for you and
11  then we can wrap up.
12    MR. WEST: Oh, I'm sorry.
13    MR. ZURBRIGGEN: It's okay. It will
14  be very brief.
15    MR. WEST: Sometimes Defense Counsel
16  won't ask questions. He is certainly
17  entitled.
18    MR. ZURBRIGGEN: It will be very
19  brief, I promise.
20      - - -
21    EXAMINATION
22      - - -
23  BY MR. ZURBRIGGEN:
24    Q.  Officer, I just want to clarify.

Page 63

1  Plaintiff's Counsel asked you during your
2  deposition whether you saw the knocking on the
3  front door. And I believe your testimony was that
4  you did not see the knocking on the front door
5  before breach to Ms. Alvarado's apartment; is that
6  correct?
7    A.  Correct.
8    Q.  I just want to clarify, did you hear a
9  knock and announce?
10    A.  Yes.
11    Q.  I want to direct your attention, Officer,
12  to what was marked I believe Exhibit 2. That is
13  the photograph. Can you take a look at that
14  again, Officer?
15    A.  Sure.
16    Q.  And I believe you testified that it's the
17  tan house that is the third from the right side
18  that is Ms. Alvarado's property, is that correct,
19  sir?
20    A.  Correct.
21    Q.  And can you see -- when you look at this
22  picture, can you see anything on the front door
23  from this picture?
24    A.  From this picture I can't see the front

Page 64

1  door.
2    Q.  Do you recall, sir, what was -- what the
3  front door looked like?
4    A.  If I recall, it was just a basic metal
5  front door. If there were anything on the actual
6  door, I don't recall.
7    Q.  Okay. And you testified earlier that you
8  recall seeing the two mailboxes that are just to
9  the left of the door; is that correct, sir?
10    A.  Yes.
11    Q.  Okay. Is there anything else that
12  indicated to you that this front door entry was an
13  exclusive entry to a first floor property?
14    A.  No.
15    Q.  Okay. And then, sir, I just want to ask
16  you with regards to dog encounters. What is your
17  understanding of when you can use force against a
18  dog?
19    A.  If the dog poses serious bodily injury.
20    Q.  So it's your understanding that you
21  cannot use force on a dog that poses no threat?
22    A.  Correct.
23    Q.  Okay. That's the only questions I have.
24    MR. WEST: I just have a follow-up.

Page 65

1    THE WITNESS: Sure.
2      - - -
3    EXAMINATION
4      - - -
5  BY MR. WEST:
6    Q.  Sir, I believe when Defense Counsel asked
7  you questions, you said you heard the knock and
8  announce?
9    A.  Yes.
10    Q.  Okay. How long was it between when you
11  heard the knock and announce and when the door was
12  breached?
13    A.  I think I had answered this before. I
14  don't recall. Because I wasn't watching a time
15  watch or anything. So I don't really recall the
16  time from the knock to the breach. It would have
17  just been under Lieutenant Monk's order to breach
18  the door. So I don't really remember the
19  timeframe.
20    Q.  Do you believe it may have been less than
21  30 seconds?
22    MR. ZURBRIGGEN: Object to form.
23  Officer, you can answer if you can.
24    THE WITNESS: It could have been,

Electronically signed by Denise Weller (401-411-238-5399)                                    abe389dd-bbdf-49c6-b3e0-aefa518f2f9e

Page 66

1      yes.
2  BY MR. WEST:
3      Q.  Okay.  Who did the knock and announce?
4      A.  It would have been Officer Murray and
5  Officer Clark.  They were our breachers.
6      Q.  Do you specifically recall them doing it
7  or do you think that is what they normally would
8  have done?
9      A.  No.  We knock and announce on every
10  property.
11      Q.  I understand.  What I am saying is, do
12  you actually specifically recall them doing it?
13      A.  Yes.
14      Q.  Okay.  And what exactly did they say?
15      A.  We always knock.  At the same time we are
16  knocking we say police with a warrant.
17      Q.  I want to make sure you understand my
18  question, sir.  I am not asking what you normally
19  do.  I am saying do you actually specifically
20  recall?  And if so, what do you specifically
21  recall?
22      A.  Police with a warrant.
23          MR. ZURBRIGGEN:  Object to form.
24      Officer, you can answer.

Page 67

1  BY MR. WEST:
2      Q.  What was it?
3      A.  Police with a warrant.
4      Q.  Okay.  Police with a warrant.  Did you
5  hear anything else said before the door got
6  breached?
7      A.  Other than Lieutenant Monk saying breach,
8  no.
9      Q.  Okay.  Sir, I will represent to you that
10  there actually is surveillance footage of this
11  incident.  It seems to indicate there's maybe two
12  seconds that pass.
13      A.  Okay.
14      Q.  Do you have any personal knowledge to
15  contradict that?
16          MR. ZURBRIGGEN:  Object to form.
17      But Officer, you can answer if you can.
18          THE WITNESS:  No.
19          MR. WEST:  All right, sir.  Thank
20  you very much for your time.
21          MR. ZURBRIGGEN:  All right.  Thank
22  you, sir.
23          THE WITNESS:  Thank you.
24          VIDEO OPERATOR:  Ending the

Page 68

1  recording at 11:01 a.m.
2          - - -
3          (Whereupon, the deposition concluded
4  at 11:01 a.m.)
5          - - -

Page 69

1          C E R T I F I C A T I O N
          _ _ _ _ _ _ _ _ _ _ _ _ _

2
3
4      I hereby certify that the
5  proceedings and evidence noted are contained
6  fully and accurately in the notes taken by
7  me on the deposition of the above matter,
8  and that this is a correct transcript of the
9  same.
10
11
12
13      DENISE WELLER
      Shorthand Reporter
14
15          - - -
16
17
18      (The foregoing certification of this
19  transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24          - - -

Page 70

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Electronically signed by Denise Weller (401-411-238-5399)                    abe389dd-bbdf-49c6-b3e0-aefa518f2f9e

**A**

**a.m** 1:15 5:5
    40:24 68:1,4
**ability** 6:9
**able** 8:18 13:12
    19:14 20:3
    22:20
**access** 47:16,16
**accidents** 6:23
    7:1,6,9
**accommodating**
    9:17
**accurately** 69:6
**actual** 64:5
**ADAM** 2:8
**Adam.zurbrig...**
    2:11
**add** 47:24 48:15
**added** 49:17
**additional** 25:11
    48:17
**address** 5:3
    47:14
**addresses** 58:10
**advise** 8:17
**advised** 8:10
**ago** 6:24
**agree** 4:11
**agreed** 4:4
**ahead** 51:5
**al** 1:6 4:23 5:8
**allow** 28:17
**allowed** 52:18
**altered** 52:8,10
**Alvarado** 1:4
    4:22 5:8,12,24
    17:15 18:13
    29:8 41:23
    43:12,15 44:5
    44:11,18 56:13
    56:18,22 57:3
    57:11
**Alvarado's** 10:6
    12:12,18 13:2
    16:12,19 17:22
    19:20 26:22
    30:17 35:2
    46:21 63:5,18
**amount** 28:18

28:19
**and/or** 69:21
**announce** 22:9
    27:16,21 63:9
    65:8,11 66:3,9
**announced** 28:3
**announcement**
    29:16
**annoying** 51:13
**answer** 9:20
    12:20 15:23
    16:21 18:2,8
    18:15,16 19:7
    19:8,23 20:14
    23:17 24:1,9
    25:19 27:13
    28:5,8 29:11
    30:4 31:3,15
    32:2,10 33:10
    33:18 34:16
    35:4,12,21
    36:8,22 37:4
    37:12,22 38:5
    39:17 40:1,15
    42:15,22 44:2
    46:1,10,23
    47:7 50:5,12
    51:10 52:3
    53:8,15 54:1
    54:11,20 55:4
    55:15,24 56:7
    57:22 58:14,22
    59:19 60:7,18
    61:8 65:23
    66:24 67:17
**answered** 65:13
**anticipated** 40:6
**anybody** 27:24
    40:13 46:18
**apartment**
    12:12,18 13:3
    13:6,7 16:12
    16:19,24 17:10
    17:15,18,23,24
    18:5,11,12,18
    19:2,13,20
    20:2 23:15
    24:7 36:16,16
    36:18,19,20

37:2 38:10,13
    46:20 50:14,18
    50:18,22 52:14
    53:21,22 63:5
**apartments** 52:9
**apply** 69:19
**approved** 49:14
**approximately**
    14:22 20:22
    28:21 29:2,3
**approximation**
    6:21 8:19,21
**Arch** 2:9
**area** 8:17 10:22
    13:19 14:22
    27:24 39:9
    43:14 45:23
    57:7 60:23
    61:13
**arrest** 16:14
    26:14
**arrow** 14:24
    15:2
**asked** 37:5 44:5
    57:3 63:1 65:6
**asking** 9:8 18:8
    18:9 25:20
    26:20 29:19
    31:19 32:20,23
    32:23 58:6
    66:18
**assigned** 35:14
    52:6
**associated** 46:18
**assumption** 9:19
**attack** 60:4
**attacking** 16:6,6
**attempting** 17:7
    17:8
**attention** 29:14
    63:11
**attorney** 2:6,12
    7:14,24 8:10
    51:13
**attorneys** 5:24
**audio/video** 4:21
**authorized**
    16:18 17:9
    19:4

**auto** 6:23 7:1,6,8
**Avenue** 12:10
    50:14
**aware** 23:14
    25:14 33:14
    55:13

**B**

**back** 13:1 16:6
    19:18 20:21
    22:21,24 34:3
    34:11,13 37:5
    44:7,16,20,22
    44:24 48:22
    49:2,3 57:9
**bark** 60:3
**barking** 20:9,11
    59:10 60:24
    61:11,11,19
**based** 8:12
    10:11 32:19
    34:7 36:13,23
    52:4,12,19
    61:17
**basic** 64:4
**basically** 10:4
    15:4
**Bates** 11:12
    47:24
**beginning** 32:16
**behalf** 5:11
**believe** 6:17
    14:12,13,20
    17:1,21 18:19
    19:3 21:6,14
    21:16 38:11
    42:19 45:4
    55:8 63:3,12
    63:16 65:6,20
**believed** 56:15
**belong** 51:24
**best** 12:17 14:8
    14:11 16:22
**bet** 9:5
**beyond** 9:13
    32:24
**bit** 23:1
**bite** 16:3,9
**biting** 16:1

**black** 43:9
**blue** 14:6
**bodily** 64:19
**body** 30:18,20
    30:22,24 31:5
    31:13,24 32:7
    32:12 33:4,16
    34:1,2,13,22
    34:23
**boisterous** 22:10
    27:22
**boring** 8:23
**boxes** 49:12
**breach** 28:10,13
    29:13 53:13
    63:5 65:16,17
    67:7
**breached** 20:9
    20:12,18 21:9
    22:7,15 23:2
    23:10 29:9,17
    29:21,22 30:2
    30:17 35:2,18
    35:19 38:17,17
    39:23 40:20
    42:3,10 46:21
    53:23 55:11
    58:3 65:12
    67:6
**breachers** 21:11
    66:5
**breaching** 28:5
    28:17 56:4
**break** 9:15
**brief** 39:3 62:14
    62:19
**briefing** 39:1,4
    39:14
**Broad** 1:13 2:4
    5:3
**building** 17:12
    23:4 42:20
    50:9,18,23
    51:5,6,24 54:6
    54:9 57:20
    58:9,11 59:7
**buildings** 52:1,8
**bunch** 61:20
**buying** 32:12

**C**

**C** 2:1 69:1,1
**cage** 56:19
**call** 4:12
**camera** 30:18,21
  34:2
**cameras** 30:23
  31:5 32:12
  34:1,22,23
**cams** 31:1,13,24
  32:8 33:4,16
  34:13
**capacity** 7:3
**caption** 5:7
**care** 15:15
**case** 5:7 6:1 10:5
  11:12
**center** 1:13 2:3
  5:2 13:10
  39:12
**certain** 51:7
**certainly** 62:16
**certification** 4:6
  69:18
**certify** 69:4
**certifying** 69:22
**chance** 6:2 41:6
  48:9
**change** 60:9
**changes** 49:15
**charge** 32:12
**circumstances**
  55:13,19,21
**City** 1:6 2:8 4:23
  5:8 32:3,13
  33:20 34:12
  52:8
**clarification**
  15:10 55:17
**clarify** 19:10
  62:24 63:8
**Clark** 21:15
  66:5
**client's** 18:22
**clock** 29:15 30:6
**close** 12:16
**coffee** 9:16
**colored** 41:19,22
  42:1

**come** 44:24
  61:21
**coming** 44:16
  62:7
**command** 21:24
**commanding**
  38:21
**commencing**
  1:14
**commissioner**
  31:23
**common** 1:1
  38:7,11 60:23
**Commonwealth**
  1:17
**communicated**
  44:14 45:3
**completing**
  49:10
**complicated**
  13:23
**complies** 14:1
**concluded** 68:3
**confer** 6:2
**consistent** 12:18
  37:17
**consists** 39:4
**contacted** 40:12
**contained** 50:10
  50:23 69:5
**containment**
  44:14,17 45:1
  45:7,17 47:18
**continue** 12:3
**continuing** 43:5
**contradict** 67:15
**control** 56:4
  69:21
**conversation**
  7:17 8:5 35:24
  57:10,11 58:10
  58:19
**copy** 11:19
**correct** 6:3 15:6
  17:12,19 19:21
  22:3,15 23:15
  29:22 30:2
  38:22 43:23
  50:24 56:5,11

61:24 63:6,7
  63:18,20 64:9
  64:22 69:8
**counsel** 4:5 6:2
  11:15 62:15
  63:1 65:6
**COUNTY** 1:2
**couple** 6:5 42:6
**course** 8:6
**court** 1:1,22
  7:18
**covered** 57:14
**crate** 14:3,4
**created** 56:15
**crying** 43:21,23
**cul-de-sac** 45:22
**cup** 9:16

**D**

**D** 3:1
**D000137** 11:13
**danger** 56:15
**date** 5:5 17:6
**day** 16:12 22:19
  30:16 31:1
  32:8 56:13
**dcr.diamond...**
  1:24
**deal** 59:24
**December** 25:9
**defendant** 39:5
**Defendant's**
  11:12
**defendants** 2:12
  47:24
**defense** 11:15
  48:1 62:15
  65:6
**Definitely** 9:12
  58:15
**Denise** 1:15 5:13
  69:12
**department** 1:6
  2:9 7:4,5 24:20
  24:23 25:4,16
  25:21 26:6
  27:1 31:6,12
  33:15,23 35:10
  36:14 37:19

38:3 46:19
  51:3,22 53:4,5
  54:5 55:1 56:3
  58:8 59:5,16
  60:15
**depict** 41:19
**deposed** 5:9
  6:16
**deposition** 1:11
  4:21 5:6,11,13
  6:13 11:16
  32:17 41:3
  63:2 68:3 69:7
**depositions** 6:20
**DESCRIPTION**
  3:12
**detective** 54:13
  54:17 55:2,5
**determination**
  49:18
**determine** 51:6
  51:23 54:8
**devices** 35:1,6
**diagram** 3:14
  11:11 12:6,8,9
  12:12,14 13:8
**DIAMOND**
  1:22
**DiBona** 2:14 5:1
**difference** 9:11
**different** 18:21
  52:9 60:3,12
  61:13
**direct** 63:11
  69:21
**direction** 14:24
  15:5
**directive** 31:12
  31:22
**directives** 31:17
  31:20
**directly** 19:2,19
  44:5 45:13
**discharged** 11:4
  11:7 14:15,17
  14:18 15:18,19
**discharging**
  10:18
**discovery** 47:23

**distance** 45:14
**division** 54:14
**document** 47:23
  48:9,22 49:5
  49:10,20 50:2
  50:8
**documents**
  30:12
**dog** 10:7,19,24
  11:2 14:3,4
  16:1,3,5,5,9,9
  20:9,11 43:3,4
  56:19 58:2
  59:7,10,17
  60:24 61:3,10
  61:12,13,14,19
  61:21 64:16,18
  64:19,21
**dogs** 59:24 60:2
  60:3,4,5,11
**doing** 7:22 11:4
  39:2 43:10
  66:6,12
**door** 18:4,18,20
  18:22,23 19:1
  19:4,13,19,21
  20:1,9,12,18
  20:21,23 21:7
  21:8,12 22:6,6
  22:14,21,24
  23:2,10,22
  24:6 28:5,6,17
  29:8,9,16,20
  29:21 30:1,2
  30:17 35:2,18
  35:19 38:16,17
  38:18 39:15,22
  40:3,3,6,8,20
  42:1,2,4,8,10
  42:13,20 44:16
  44:24 45:9,10
  45:13,23 46:8
  46:14,19,20,21
  50:3 53:23
  55:11 56:4
  57:6 58:3
  60:22 61:1,4
  61:20,21 63:3
  63:4,22 64:1,3

64:5,6,9,12
65:11,18 67:5
**doors** 18:21
**downstairs**
53:22
**driving** 39:8
**duly** 5:17

**E**

**E** 2:1,1,13,13
3:1 69:1
**earlier** 64:7
**effort** 46:7,17
54:7
**either** 13:13
**else's** 37:2 38:9
**emergency**
39:10 55:22
**employed** 5:1
**encountered**
36:24
**encounters**
64:16
**enforcement**
25:3 56:11
**enter** 17:24
18:12 19:14
20:3 59:11
**entering** 13:2
17:21
**entirely** 61:22
**entitled** 17:23
62:17
**entrance** 23:4,9
23:23 24:5,12
36:15
**entrances** 24:11
**entry** 19:15
38:13 46:13
57:3,9 61:14
64:12,13
**entryway** 38:8
57:8
**entryways** 37:1
**ESQUIRE** 2:3,8
**estimate** 8:18,21
**estimates** 9:6
**et** 1:6 4:23 5:8
**evidence** 69:5

**exactly** 9:2
12:13 13:11
46:2 66:14
**EXAMINATI...**
5:20 62:21
65:3
**examined** 5:17
**example** 8:23,23
38:20 53:18
60:21
**exclusive** 64:13
**execute** 17:8
26:13 27:10
46:7 59:6
**executing** 16:17
27:2 47:4 51:4
54:5 58:8
59:24 60:22
**execution** 57:17
**exhibit** 11:16,21
41:3,4,10
47:22 48:4,16
63:12
**EXHIBITS** 3:11
**exigent** 55:12,18
55:21
**exist** 47:13
**existence** 50:2
**exit** 44:19
**exit/entry** 23:6,7
**experience** 35:9
36:24 52:5,13
52:19,24 54:4
54:18,24 58:7
59:2 61:18
**explain** 20:17
**explained** 7:15
**eyeball** 9:2
**eyesight** 15:1

**F**

**F** 69:1
**fact** 57:19 58:10
**fair** 12:11,15,22
17:17
**fairness** 52:23
**far** 9:3 25:14
27:1
**faster** 32:17

**February** 34:6
34:11
**feel** 7:16
**feet** 8:24 20:23
**Felishatay** 1:4
4:22 5:12
**figure** 25:23
**filing** 4:6
**fill** 48:13 49:7
**filled** 49:12
**fine** 4:15 26:17
34:21
**firearm** 11:5
14:15 15:18,20
**fired** 15:11
**first** 5:17 17:18
17:24 18:13
19:2 20:2
21:11,11 24:19
24:22 36:19
38:13 40:19
57:20 64:13
**floor** 1:13 2:4,10
5:4 16:24
17:10,15,18,23
17:24 18:11,13
18:23 19:2,17
20:2 23:18
24:13 36:15,17
36:19,20 37:1
37:14 38:9,12
40:19 42:12,20
44:7 45:1
46:13,20 50:15
50:20 52:14,16
52:16,17 57:5
57:9,20 64:13
**focused** 15:1
**follow-up** 62:10
64:24
**follows** 5:18
**foot** 9:8
**footage** 67:10
**forbid** 39:9
**force** 64:17,21
**foregoing** 69:18
**form** 4:7,13
12:19 15:22
16:20 18:1,14

19:6,22 20:13
23:16,24 24:8
25:18 26:9
27:5,12 28:7
28:24 29:10
30:3 31:2,14
32:1,9 33:7,17
34:15 35:3,11
35:20 36:7,21
37:11 38:12
39:16,24 40:14
42:14,21 44:1
44:19 45:24
46:9,22 47:6
47:16 50:4,11
51:9 52:2
53:14,24 54:10
54:19 55:3,14
56:6 57:21
58:13 59:18
60:17 61:7,23
65:22 66:23
67:16
**format** 7:15
**found** 13:7
**foundation**
22:23
**France** 9:7
**frightened** 61:3
**front** 18:4,18,20
19:12 20:7,21
20:23 22:6,21
29:9 30:16
35:2 38:16
39:15,22 42:1
42:2 45:23
46:19,21 48:21
49:3 52:16
61:4,20 63:3,4
63:22,24 64:3
64:5,12
**fully** 69:6
**further** 19:15
62:1

**G**

**gain** 38:2
**GD** 4:23 5:8
**general** 7:16

33:23,24,24
**generally** 6:19
**give** 6:20 7:15
8:11,18 9:5
11:18 14:6
28:4 38:24
39:13 41:4
43:9 55:17
**given** 28:10,15
29:4
**giving** 8:21
**go** 27:15 31:17
32:17 39:14
44:19 61:13
**God** 39:9
**going** 8:13 39:5
39:6,14 43:6
43:11 51:8,12
60:3,4,5 61:10
**good** 7:17
**Google** 40:23
**Gotcha** 9:4
**ground** 7:16
**grows** 9:7
**guess** 8:13 9:8
10:7,21 22:23
28:21 58:6
**guys** 39:1,13
40:5

**H**

**H-A-M-O-Y**
21:22
**Hamoy** 21:21
**hands** 43:22
44:3
**happened** 11:1
26:20 43:3
44:21
**happy** 4:18
**hard** 24:11
**head** 8:4
**hear** 8:20 20:8
27:23,24 53:22
56:18 60:24
63:8 67:5
**heard** 29:13
31:11,21,22
32:22,23 33:3

**highlighter**
13:24
**highlighting**
13:24
**home** 17:22
26:14 28:5
30:17
**homicide** 16:13
16:14
**house** 10:6
26:22 41:22
63:17
**houses** 41:18
52:11

**I**

**identification**
11:22 41:11
48:5
**illegal** 19:20
**illness** 6:8
**immediately**
11:4,6
**impair** 6:9
**inch** 9:2,9
**incident** 10:4,4
10:8,14 13:2
17:6 26:21,21
35:15 36:1,5
61:5 67:11
**included** 48:18
**inconsistent**
13:8
**indicate** 15:2
20:6 43:6
67:11
**indicated** 57:6
64:12
**indicates** 50:2,9
50:22
**indicating** 19:15
**indication** 18:4
18:17 19:12
53:19
**influence** 6:7
**information**
8:12 10:11
19:15 20:1

33:12 65:7,11

34:8,10 39:7
39:11 44:17,18
46:12,12 49:12
**informed** 44:10
**initial** 14:8
**initially** 16:5
**injury** 64:19
**inside** 13:7
16:18 24:14
40:10 59:8
**instruction**
32:16 57:17
**intended** 9:13
**interrogation**
9:15
**issue** 18:7

**J**

**Jersey** 1:23
**job** 9:5 26:7
**join** 24:19
**joined** 24:22
25:6,10
**joining** 25:3
**June** 1:4 10:12
10:14 13:2
19:19 25:17,23
26:5,13,19
33:5 35:10
36:14 37:20

**K**

**Keith** 2:3 5:23
15:9
**Keith@victim...**
2:6
**killed** 10:7
**kind** 13:19
22:22 57:14
59:15,23 60:6
60:7 61:5
**kitchen** 43:13,14
57:8
**knees** 43:16
**knew** 53:20
**knock** 22:6,9,14
22:18 27:15,16
27:21 63:9
65:7,11,16
66:3,9,15

**knocked** 28:3
29:8 30:2
**knocking** 39:23
63:2,4 66:16
**know** 8:15,20
9:9,17,23
10:10 12:2
15:17,19 20:11
22:8,9,10,10
23:3,8,12
24:11 27:23
29:14 30:24
32:20 34:23
35:17 36:2
40:9,11,16
41:6 43:10
45:12,16 46:1
46:24 47:1,4,5
47:14 48:10,10
48:19 49:6,15
49:16 52:18,20
53:11,16 55:6
55:19 59:7
60:5,8 61:12
**knowing** 61:10
**knowledge**
12:21 16:23
17:14 29:6,12
30:7 32:6
34:21,24 40:18
45:2 46:6,16
58:1,18 67:14
**known** 19:1
23:22 24:4
**knows** 9:7

**L**

**L** 2:13
**Lane** 1:22
**law** 1:13 2:3,9
5:2 25:2
**layout** 13:6
**lead** 18:19 38:10
46:20 61:5,14
**learn** 46:19
**led** 18:20,21
19:2,19 20:1
40:8 42:20
60:23

**left** 11:9 41:18
64:9
**legal** 18:12
38:13
**legally** 17:23
19:4,14 20:3
52:18
**legs** 16:7
**let's** 14:6
**Lieutenant**
21:22 22:2,3
28:12 29:13,21
35:17 36:1,5
38:20,21 44:10
44:18 49:23
65:17 67:7
**Likewise** 8:3
**line** 45:15
**little** 23:1
**live** 17:15
**lived** 17:18
18:13 40:19
41:23 45:1
57:20 58:11
**living** 10:22 12:9
43:14 57:7
**located** 14:12,14
54:9
**location** 16:15
33:19 39:4,12
41:20 50:14
**long** 9:8 24:16
65:10
**look** 12:2 41:5
42:7 48:18
60:6 63:13,21
**looked** 46:3
49:14 64:3
**looking** 15:3,4
45:3
**lot** 34:1 52:8,12
**loud** 8:8 22:9
27:22
**louder** 9:23

**M**

**M** 14:9,11,17
**M-O-N-K** 21:22
**magna** 40:3

**mailboxes** 20:7
42:7 64:8
**main** 47:11
**male** 16:23 45:4
**management**
40:12
**Mantua** 1:23
**map** 57:6
**Maps** 40:23
**mark** 11:15 14:6
14:11 41:4
47:22 48:1
**marked** 11:21
41:10 47:14
48:4 63:12
**matter** 4:22 69:7
**mean** 19:11
28:20 30:6
36:2 38:6 45:7
**means** 55:19
69:20
**medication** 6:8
**Mellody** 49:22
**member** 7:3,5
25:16,24 36:18
59:15
**members** 10:5
26:7 33:22
39:1
**memory** 14:11
**met** 62:5
**metal** 40:3 64:4
**metric** 9:7
**middle** 52:17
**mind** 13:23
**missing** 57:15
**misspoke** 34:20
**misworded**
51:14
**moment** 12:1
41:5 48:8
**Monday** 40:24
**Monk** 21:22
22:2,3 28:12
29:13,21 35:17
36:1,5 38:21
38:21 44:10,18
49:23 67:7
**Monk's** 65:17

**multi** 51:4 52:1
54:6 58:9
**multiple** 50:10
50:23
**Murray** 21:15
66:4

### N

**N** 2:1,13 3:1
69:1
**naked** 43:17
**name** 5:1,23
**nearest** 21:6
39:12
**need** 9:15,22
**needs** 7:19
**neighbors** 27:24
**never** 36:24
59:22 60:8
**New** 1:23
**nods** 8:4
**normal** 7:17
34:11 35:8,15
**normally** 8:4 9:5
28:4,17 36:3
47:4 54:7 55:2
58:7,9 66:7,18
**Notary** 1:16
**noted** 69:5
**notes** 21:1 69:6
**November** 24:21
**number** 4:23 5:9
17:18,24 18:12
19:3 21:16,18
36:16 47:11
50:22
**numbers** 6:18
50:19

### O

**O** 2:13 69:1
**Object** 12:19
15:22 16:20
18:1,14 19:6
19:22 20:13
23:16,24 24:8
25:18 26:9
27:5,12 28:7
28:24 30:3
31:2,14 32:1,9

33:7,17 34:15
35:3,11,20
36:7,21 37:11
39:16,24 40:14
42:14,21 44:1
45:24 46:9,22
47:6 50:4,11
51:9 52:2
53:14,24 54:10
54:19 55:3,14
56:6 57:21
58:13 59:18
60:17 61:7,23
65:22 66:23
67:16
**objection** 11:15
11:17 29:10
37:21 38:4
53:7 55:23
58:21 60:1
**objections** 4:7
4:13
**objective** 47:11
**obligation** 8:11
**observe** 29:24
**obtain** 54:14
**obvious** 13:21
**occasion** 62:6
**occupant** 28:4
38:11
**occupants** 27:23
44:23
**occurred** 6:21
47:5
**offered** 25:15
**officer** 1:12 3:4
5:10,12,16,23
7:10 10:18,23
11:3,6,7 12:20
14:7,13,14,16
14:21 15:5,17
15:19,23 16:3
16:6,7,9,21
18:2,15 19:7
19:23 20:14
21:15,15,18,21
23:17 24:1,9
25:1,2,19
27:13 28:8

29:1,11 30:4
31:3,15 32:2
32:10,15 33:9
33:18 34:16
35:4,12,21
36:8,22 37:12
37:22 38:5,21
39:17 40:1,15
41:3 42:15,22
44:2 46:1,10
46:23 47:7
50:5,12 51:10
52:3 53:8,15
54:1,11,20
55:4,15,24
56:7,14 57:22
58:14,22 59:19
60:18 61:8
62:9,24 63:11
63:14 65:23
66:4,5,24
67:17
**officers** 17:7
20:21 22:1
30:20 31:13,23
33:14 34:1,12
45:7,8,20,21
49:13
**officially** 26:2
**Oh** 26:2 43:8
62:12
**okay** 4:15 6:15
6:19 7:1,6,12
8:1,2,8,14,15
8:16,22 9:4,21
10:1,2,13,20
10:23 11:3
12:4,8,11,17
12:24 13:5
14:5,10,16,20
15:8,13,15
16:8,11,16
17:6,14,21
19:10,18 20:5
20:17,24 21:16
21:20,23 22:5
23:2,14 24:16
26:12 27:8,20
28:2,15,23

29:19 30:5,10
32:6,24 33:1
35:8,17 37:4
37:17 38:1,16
39:21 43:2,19
44:9,21 45:6
45:16 46:6,16
47:3 48:23
49:9 51:2,18
51:20 53:11,18
54:4 55:11
56:3,22 57:10
57:14 58:18,24
62:1,13 64:7
64:11,15,23
65:10 66:3,14
67:4,9,13
**once** 41:5 48:9
**open** 19:4
**operation** 56:11
**operator** 2:14
4:20,24 67:24
**opportunity**
56:19
**opposed** 51:7
**Oral** 1:11
**order** 25:16 28:9
29:3 36:20
65:17
**ordered** 28:12
29:21 35:18,19
**owner** 40:12

### P

**P** 2:1,1,13
**PA** 2:5,10
**page** 3:3,12 21:8
48:24
**pages** 48:16,17
48:19 49:3
**part** 26:2 48:20
48:24
**particular** 39:19
49:19
**pass** 28:17 67:12
**passed** 11:7 30:1
**Patrick** 1:12 3:4
5:10,16
**patrol** 25:1,2

34:2,12
**pause** 8:1
**paying** 29:14
**pen** 14:6 43:9
**Pennsylvania**
1:2,14,17 5:4
**people** 8:18
21:24 44:15
45:16 51:7
52:15 57:19
58:11 61:20
**performed** 5:6
**person** 5:7 18:19
38:11 49:20
**person's** 27:3
**personal** 8:12
29:6,12 30:7
32:6 34:8,10
46:6,16 52:24
67:14
**personally** 23:3
23:8 29:24
31:21 32:20
**pertinent** 37:8
**Philadelphia** 1:2
1:6,14 2:5,8,10
4:23 5:4,8 7:4
24:20,23 25:3
25:15 26:6
27:1 31:12
33:15,22 34:12
35:9 36:14
37:18 38:3
46:18 51:3,21
52:6 53:3,5
54:5,24 56:3
58:7 59:5,16
60:14 61:18
**photograph**
3:15 40:22
41:1 63:13
**photographs**
30:13
**physically** 20:19
**picture** 41:15,17
63:22,23,24
**pictured** 41:22
**pink** 13:24
**place** 31:22

58:19
**placed** 13:11
**placement** 12:14
**Plaintiff** 2:6
  5:12
**Plaintiff's** 63:1
**planning** 57:17
  60:21
**PLEAS** 1:1
**please** 57:1
**plus** 6:24 52:5
**point** 13:1 14:23
  15:10 25:6
  56:23 57:18
**pointing** 14:24
**police** 1:6 7:4
  24:20,23 25:4
  25:16 26:6
  27:1 31:12
  33:15,22 35:10
  36:14 37:18
  38:3 46:18
  51:3,21 53:3,5
  54:5 55:1 56:3
  58:8 59:5,16
  60:14 66:16,22
  67:3,4
**policies** 22:13
  37:18 38:2
**policing** 52:21
**portion** 37:8
**portions** 51:6,24
**poses** 64:19,21
**positioned** 45:11
**possible** 6:22
  9:18,24
**practice** 35:8
**precaution** 61:3
**preliminarily**
  49:11
**preliminary** 6:5
**preparation**
  57:16
**prepare** 30:13
**prepared** 6:3
  12:3 26:7
**preplanned**
  56:10
**presence** 27:16

**pretty** 10:9
  12:15 38:7,7
  58:6
**previously** 6:16
**prior** 6:20 17:21
  23:2 25:3
  26:13,21 34:5
  38:17 46:21
  47:4 53:23
  54:5 55:11
  56:4,19 58:3
**private** 7:2 27:3
  27:10
**probably** 6:24
  7:14 51:14
**problem** 62:8
**procedure** 35:15
  55:7
**procedures**
  22:13 37:18
  38:3
**proceed** 41:7
**proceedings** 4:2
  69:5
**produced** 47:23
**Professional**
  1:15
**promise** 32:17
  62:19
**proper** 23:21
**properties** 23:6
  24:10 52:13
**property** 10:22
  17:1 19:14
  20:7 22:22,24
  23:5,9 24:14
  27:18 28:10,13
  39:9 40:10,12
  40:12,19 41:19
  42:2 43:5
  44:19,20,23
  45:11,14,15
  46:3 47:10,12
  47:13,15,17,20
  53:12,12,20
  54:7 58:3
  59:11 61:15
  63:18 64:13
  66:10

**protocol** 55:6
**provided** 11:11
  26:6 29:7 32:7
  33:4
**provides** 32:3
**provisional**
  25:24
**Public** 1:16
**put** 7:24 11:11
  14:8 21:4,4
  49:11 56:19

———————

**Q**

**quarters** 12:10
**question** 9:22
  10:1 12:24
  18:9 23:8 24:2
  26:16,17 32:22
  37:4 50:9
  51:15,16 53:2
  55:18 59:3
  60:7,12 66:18
**questions** 4:8
  6:6 9:18 32:19
  62:2,10,16
  64:23 65:7
**quite** 10:10

———————

**R**

**R** 2:1,13 69:1
**radio** 44:15
**react** 56:16
  61:10
**reaction** 61:21
**read** 6:6 37:5,9
**reading** 4:19
  13:22
**ready** 41:7
**really** 26:16,19
  65:15,18
**rear** 16:24 17:10
  17:15,23 18:11
  23:4,5,6,9,15
  23:18,22 24:4
  24:7,11,12
  36:15,17,20
  44:14,17,24
  45:6,9,10,17
  45:23 46:3,8
  46:14,20,20

47:17,18 50:2
  50:15,20 52:17
**reasonable**
  18:19 28:18,19
  42:18,24 55:8
**reasonably**
  56:15
**recall** 10:3,4,8
  10:14,16 13:1
  13:6 14:2,4
  20:15 36:9,11
  39:18,21 40:7
  43:2,18,20
  45:22 46:2
  56:14 57:2
  64:2,4,6,8
  65:14,15 66:6
  66:12,20,21
**receive** 25:11
  51:2,22 53:4
  59:15 60:13
**received** 25:14
  26:5,12,15,24
  27:9 28:3 31:5
  37:20 51:21
  53:3 57:16
  59:22,23
**recognize** 12:5
  41:14
**recollection**
  13:14 22:18
**recon** 3:16 47:20
  48:13 49:7
**reconnaissance**
  47:5,9,20
**recons** 47:9
**record** 7:24 8:5
  11:11 13:22
  37:9 41:2
**recording** 35:1,6
  68:1
**records** 53:12,20
  53:20 54:8
**Recovery** 1:12
  2:3 5:2
**Redbud** 1:22
**referred** 45:6
**referring** 49:6
**regards** 59:17

64:16
**related** 7:3
**remember** 7:18
  10:17,18,24
  12:13 13:9,10
  13:15,17 43:4
  43:5,6,12,14
  43:16,20 65:18
**remind** 32:16
**repeat** 24:2
  26:17
**rephrase** 9:22
  10:1
**report** 7:11
**reporter** 1:16
  7:18 69:13,22
**REPORTING**
  1:22
**represent** 41:2
  53:18 67:9
**represented** 6:1
**representing**
  5:24
**reproduction**
  69:20
**required** 55:22
**reserve** 4:13
**reserved** 4:8
**residence** 27:3
  27:11 41:23
  51:5 52:1 54:6
**residences** 50:10
  50:24 51:7
  52:1 54:8
**resident** 58:9
**responses** 8:3
**responsibility**
  54:13
**responsible**
  32:21 49:9,21
**restate** 9:24
**review** 12:2
  30:12 41:6
  48:8,10 54:7
**reviewed** 53:12
**right** 4:17 6:5
  7:14 9:3,6,11
  10:3,16 12:5
  13:18 14:2,5

14:20,22,23
15:4,15 16:11
17:17 18:12
20:8,24 21:23
22:5 23:20
24:17 25:10,23
26:4 30:16
31:10 32:15
33:2 34:7,24
36:4 38:20
39:13 40:22
41:14,21 42:4
42:8,8 43:12
43:15 47:22
48:15 49:2,19
50:1,17,19
51:14 52:23
54:17 55:19
57:6,7 58:5
59:14 63:17
67:19,21
**robot** 9:1
**room** 10:22
13:10
**rooming** 52:11
**running** 61:21

**S**

**S** 2:1,13,13
14:13,16
**Saba** 1:12 3:4
5:10,16,23
32:15
**safe** 51:1
**Samantha** 2:14
5:1
**saw** 10:11 16:5
63:2
**saying** 7:19 20:1
29:20 39:21
47:14 50:21
66:11,19 67:7
**scene** 38:22
**sealing** 4:5
**search** 16:14
26:13
**second** 16:24
17:9,15,23
18:11,23 19:17

23:18 24:13
36:15,17,20
37:1,14 38:9
38:12 42:12,19
42:20 44:6
45:1 46:13,20
50:15,20 52:14
52:16,16,17
57:5,9
**seconds** 28:22
28:23 29:3,7
30:1,8 65:21
67:12
**sections** 52:7
**see** 10:23 11:2,3
14:7 16:3,8
22:5,8,20
42:12 47:13
50:1,8,17,21
63:4,21,22,24
**seeing** 22:18
64:8
**seen** 30:10,11
52:20
**sense** 13:16,18
38:8 51:17
**separate** 18:7
**Sergeant** 49:22
**serious** 64:19
**serve** 27:15
37:15 47:10
48:14 49:8
**served** 27:17
28:1
**serving** 16:13
**set** 22:21,24
47:18
**sheet** 3:16 48:13
49:7
**shoot** 10:24 11:2
**Shorthand** 1:16
69:13
**shot** 39:10 43:3
43:4 56:20
**show** 43:22
**side** 40:6 61:1
63:17
**signing** 4:5,19
**simultaneously**

44:13
**sir** 10:3 12:1,5
20:8 31:19
36:13 40:22
41:14 48:8
60:11 63:19
64:2,9,15 65:6
66:18 67:9,19
67:22
**sit** 60:5
**sitting** 10:13
**situation** 55:2
55:12 56:5
59:6,12,14
**six** 20:21 21:2,4
21:23
**smash** 61:20
**smashing** 61:4
**somebody** 9:6
22:10
**son** 45:5
**Song** 10:18,23
11:4,6,7 14:7
14:14,16,21
15:5,17,19
16:4,6,9 21:19
41:3
**Song's** 14:14
16:7
**sorry** 34:20 57:4
62:12
**sort** 6:8 39:1,13
55:22 58:10
61:2
**South** 1:13 2:4
5:3
**speak** 7:23 8:1
9:23 36:4
56:22
**specific** 22:18
51:3 53:4
60:14
**specifically**
51:23 66:6,12
66:19,20
**speculate** 8:13
**spoken** 8:4,8
**staging** 39:8,9
**stairwell** 19:16

**stamped** 11:13
40:24 47:24
**standard** 45:19
55:6
**standing** 20:19
45:13
**state** 12:11
**stationed** 45:9
**steel** 40:3
**steps** 44:6 57:4,5
**stipulated** 4:4
**stipulations** 4:12
4:17
**straight** 24:12
**Street** 1:13 2:4,9
5:3
**strike** 59:2
**sub-rented**
52:15
**subject** 58:12
**substance** 6:8
**summer** 34:14
34:18
**super** 51:12
**supervision** 22:1
69:22
**supervisor** 28:11
49:14
**supposed** 22:14
31:13,23 32:4
**sure** 7:21,23 8:7
8:9,10 11:10
14:1 19:1 21:7
21:10 22:16
28:19 33:2
34:9 41:8 43:8
47:12,15 48:23
55:20 57:15
58:16 60:12,23
63:15 65:1
66:17
**surrounded**
22:23
**surveillance**
67:10
**suspect** 39:5
51:8
**SWAT** 10:6
24:16 25:6,10

25:11,15,17
26:1,3,7 30:22
32:7 33:4
34:14 35:6,9
35:14 36:18
38:24 40:11
45:8 47:8,19
52:7 59:4
61:18
**swear** 5:14
**sworn** 5:17
**system** 9:7 44:15

**T**

**T** 2:13 69:1,1
**table** 13:9,15,17
13:24
**tactics** 60:8
**take** 12:1 41:5
48:8 58:19
61:2 63:13
**taken** 1:12 5:11
40:23 69:6
**takes** 15:15
**talk** 36:3
**tan** 41:19,22
42:1 63:17
**team** 10:6 24:17
25:6,11,11,15
25:17 26:1,7
32:7 33:4
34:14 61:14
**tell** 6:19 8:15 9:2
10:16 12:8
38:1 40:8 43:2
43:8 57:1 61:2
**term** 1:4 55:18
**testified** 5:18
52:24 63:16
64:7
**testify** 6:3,9
**testimony** 8:12
22:17 30:14
41:21 63:3
**thank** 15:13
62:2,4,6 67:19
67:21,23
**thing** 9:14 48:20
**things** 8:4 42:7

**think** 9:1 23:20
24:5 42:18
48:17 51:13
52:23 54:12
58:5 60:6
65:13 66:7
**third** 48:23
63:17
**THOMAS** 2:3
**thought** 60:22
**threat** 43:22
44:4 64:21
**three** 21:17,18
**time** 4:9,14 5:14
7:20,23 8:1
9:16 10:10
14:14 15:6
20:18 21:7,8
23:10 28:4,16
28:18,20 29:15
30:6 33:16
34:5,22 35:2
35:13,14,18
40:24 43:17
44:14,23 51:6
52:20 57:12
58:20 59:4
62:3 65:14,16
66:15 67:20
**timeframe** 65:19
**times** 6:15 52:12
**title** 24:24
**today** 5:10 6:3
6:10 10:13
13:14 16:17
31:8
**today's** 5:5
11:16 30:14
**told** 27:9,20
38:18 44:11,19
44:24 51:23
57:8
**topic** 53:6 60:15
**Torresdale**
12:17 17:2
50:14
**total** 56:4
**training** 25:12
25:15,21 26:5

26:12,15,24
27:9 28:2,16
36:13 37:20
51:2,20,22
53:2,5 59:15
59:23 60:14
61:1,6,17
**transcript** 69:8
69:19
**trauma** 39:12
**treats** 61:12
**trial** 4:9,14,21
**true** 31:8
**truthful** 8:11
**truthfully** 6:10
**try** 9:17,24
20:24 51:15
61:12,13
**trying** 25:23
**TUESDAY** 1:8
**twice** 6:17
**two** 18:21 20:7
21:10,11 45:18
45:19,21 48:15
48:17,19,21
49:3 64:8
67:11
**type** 40:2 58:19

**U**

**Uh-huh** 17:4,11
20:8 21:3,5,13
26:23 41:16
**ultimately** 49:15
**Um-hum** 38:16
**uncomfortable**
9:14
**understand** 4:17
9:11,19 18:7
22:12 29:20
31:19 33:3
60:11,13 66:11
66:17
**understanding**
12:17 16:16
18:10 22:12
23:21 24:6
26:4,16 38:2
61:19 64:17,20

**understood** 17:9
19:18 37:19
**unforeseeable**
61:22
**unit** 35:6,9
36:18 38:24
40:11 45:8
47:8,19 52:7
59:4 61:18
**unnecessarily**
9:14
**upstairs** 53:21
**use** 4:21 55:18
64:17,21
**usual** 4:17
**usually** 4:12
8:17 39:7 49:3

**V**

**v** 4:22 5:8
**vague** 10:9
**valid** 23:15
**varies** 60:8
**various** 51:24
52:7 54:8
**victim** 7:8
**Victims'** 1:12
2:3 5:2
**video** 2:14 4:20
4:24 30:10,13
67:24
**Videotaped** 1:11
**vs** 1:5

**W**

**waive** 4:19
**waived** 4:6
**walk** 19:21 43:5
**wall** 9:1 43:13
43:13
**want** 9:16 15:2
32:15 43:10
49:16 57:15
60:12 62:24
63:8,11 64:15
66:17
**wanted** 39:6
**wants** 7:24
49:17
**warrant** 16:13

16:14,17,23
17:8,22 18:11
19:3 22:11
23:14 26:14,14
27:2,10,15,17
28:1 36:17
37:15 39:3
46:7 47:4
48:14 49:8
51:4 54:6,14
56:10 57:17
58:8,12 59:6
60:22 66:16,22
67:3,4
**warrants** 36:3
47:10 59:24
**wasn't** 13:12
29:14 30:5
34:14 46:7
65:14
**watch** 65:15
**watching** 30:6
65:14
**way** 13:1 14:8
15:3 24:6
34:11,13 37:14
40:9 51:16
58:1 61:9
**ways** 7:16
**wear** 31:13,24
32:4 34:1
**wearing** 30:18
30:20,22,24
33:15 34:13,14
**Weller** 1:15 5:13
69:12
**went** 10:6 24:12
41:20 44:4,5
44:22
**weren't** 60:23
**West** 2:3 3:5
4:11,16 5:22
5:23 11:14,18
11:24 12:23
15:12,14 16:2
17:3 18:6,24
19:9 20:4,16
23:19 24:3,15
25:22 26:11

27:7,19 28:14
29:5,18 30:9
31:7,18 32:5
32:14 33:13,21
34:19 35:7,16
35:23 36:10
37:3,16,24
38:15 39:20
40:4,17 41:13
42:17 43:1
44:8 46:5,15
47:2,21 48:7
50:7,16 51:12
51:19 52:22
53:10,17 54:3
54:16,23 55:10
55:16 56:2,9
57:24 58:17,24
59:1,21 60:10
60:20 61:16
62:1,5,12,15
64:24 65:5
66:2 67:1,19
**whatsoever**
28:16 35:1
55:13
**wide** 33:20
**windows** 42:5,6
**wish** 62:5
**witness** 3:3 5:9
5:14 7:2,12
12:21 14:1
15:24 16:22
18:3,16 19:8
19:24 20:15
23:18 24:2,10
25:20 26:10
27:6,14 28:9
29:2,12 30:5
31:4,16 32:3
32:11 33:8,11
33:19 34:17
35:5,13,22
36:9,23 37:13
37:23 38:6
39:18 40:2,16
42:16,23 44:3
46:2,11,24
47:8 50:6,13

51:11,18 52:4
53:9,16 54:2
54:12,21 55:5
56:1,8 57:23
58:15,23 59:20
60:2,19 61:9
61:24 62:4,8
65:1,24 67:18
67:23
**wondering**
31:20
**work** 31:17
**working** 52:5
**wouldn't** 13:12
22:20 42:23
45:10,12
**wrap** 62:11
**write** 7:19 43:9
43:11
**written** 21:1

**X**

**X** 3:1

**Y**

**yeah** 9:12 29:2
30:5 32:18
33:24 43:20
62:4
**year** 13:22
**years** 6:24 61:17
**yesterday** 41:1
**yesterday's** 41:3

**Z**

**zeros** 48:1
**Zurbriggen** 2:8
3:6 4:15,18
11:17 12:19
15:9,13,22
16:20 18:1,14
19:6,22 20:13
23:16,24 24:8
25:18 26:9
27:5,12 28:7
28:24 29:10
30:3 31:2,14
32:1,9 33:7,9
33:17 34:15
35:3,11,20

36:7,21 37:11
37:21 38:4
39:16,24 40:14
42:14,21 44:1
45:24 46:9,22
47:6 50:4,11
51:9 52:2 53:7
53:14,24 54:10
54:19 55:3,14
55:23 56:6
57:21 58:13,21
59:18 60:1,17
61:7,23 62:9
62:13,18,23
65:22 66:23
67:16,21

**0**

**08051** 1:23

**1**

**1** 3:14 11:16,21
**10** 6:24
**10:00** 1:15
**10:02** 5:5
**11** 3:14
**11:01** 68:1,4
**121** 1:13 2:4 5:3
**14th** 2:10
**1515** 2:9
**15th** 40:24
**16** 1:8 52:5
**1633** 1:6
**16th** 5:5
**17th** 1:13
**18th** 2:4 5:3
**19102** 2:10
**19107** 1:14 2:5
5:4

**2**

**2** 3:15 41:5,10
63:12
**20** 20:22
**2006** 24:21,21
**2017** 34:6,11
**2018** 25:9
**2019** 34:14
**2021** 10:12,14
13:2 19:19

25:17,24 26:5
26:13,19 33:5
34:18,20 35:10
36:14 37:20
**2022** 1:4
**2023** 1:8 5:5
**215** 2:5,11
**22-3763** 4:24 5:9
**22nd** 34:4
**25** 20:22

**3**

**3** 3:16 47:22
48:2,4,16
**30** 28:21,23 29:3
29:7 30:1,8
65:21

**4**

**406** 1:22
**41** 3:15
**4664** 50:14
**48** 3:16

**5**

**5** 3:5
**546-1433** 2:5
**589-1107** 1:23

**6**

**62** 3:6
**6446** 17:2
**65** 3:5
**683-5114** 2:11

**7**

**72** 47:24
**73** 48:1

**8**

**856** 1:23

**9**

**9:39** 40:24

# EXHIBIT "H"

# Transcript of the Testimony of:
## Heriberto Quintana

**Date:** May 23, 2023

**Case:** Alvarado v. City of Philadelphia, et al

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

## Page 1

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

-------------------------- :
FELISHATAY ALVARADO,      :
                          :
          Plaintiff   : June Term,
                      : 2022
     vs.              :
                      : No. 01633
CITY OF PHILADELPHIA,     :
ET AL,                    :
                          :
          Defendants  :
-------------------------- :

- - -
May 23, 2023
- - -

Remote Oral Deposition of HERIBERTO QUINTANA,
taken via Zoom conference technology, on the above
date, beginning at approximately 10:00 a.m.,
before Dawn M. Burr, a Professional Court Reporter
and Notary Public, there being present.

- - -
DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 589-1107
dcr.diamond@comcast.net

## Page 2

1    A P P E A R A N C E S:
2    VICTIMS' RECOVERY LAW CENTER
3    BY: KEITH THOMAS WEST, ESQUIRE
     The North American Building
4    121 South Broad Street, 18th Floor
     Philadelphia, PA 19107
5    Counsel for the Plaintiff
     Tel. 215-546-1433
6    E-mail: keith@victimrecoverylaw.com
          * * * * *
7    CITY OF PHILADELPHIA - LAW
     DEPARTMENT
8    BY: ADAM R. ZURBRIGGEN, ESQUIRE
     One Parkway Building
9    1515 Arch Street
     Philadelphia, PA 19102
10   Counsel for the Defendants
     Tel. 215-683-5114
11   E-mail: adam.zurbriggen@phila.gov
          * * * * *
12
13
14   ALSO PRESENT FROM THE CITY OF
     PHILADELPHIA LAW DEPARTMENT:
15
     JONAH SANTIAGO-PAGAN
16   BEN JACKAL
     ALTHEA UDO-INYANG
17
18
19
20
21
22
23
24

## Page 3

1              I N D E X
2    WITNESS                    PAGE
3    HERIBERTO QUINTANA
4    Examination by Mr. West      4, 56
5    Examination by Mr. Zurbriggen   54
6
7
8              EXHIBITS
     NO.        DESCRIPTION       PAGE
9
     None
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1              - - -
2         (It was stipulated by and between
3    counsel that signing, sealing,
4    certification and filing be waived; and
5    that all objections, except as to the
6    form of the question, be reserved until
7    the time of trial.)
8              - - -
9         MR. WEST:  I'll just put on the
10   record by usual stipulations we mean
11   that all objections are reserved at the
12   time of trial, other than objections to
13   the form of the question.
14             - - -
15         . . . HERIBERTO QUINTANA, having
16   been duly sworn as a witness, was
17   examined and testified as follows. . .
18             - - -
19         EXAMINATION
20             - - -
21   BY MR. WEST:
22        Q.    Do you pronounce your last name
23   Quintana, sir?
24        A.    I'm sorry?

1 (Pages 1 to 4)

Page 5

1  Q.   Do you pronounce your last name
2  Quintana?
3  A.   Quintana, yes.
4  Q.   Officer Quintana, thanks for coming
5  in this morning.  My name is Keith West and I'm
6  one of the attorneys who represents the plaintiff
7  in this case.  It's Ms. Alvarado.  Okay?
8  A.   Okay.
9  Q.   I think you've been through a
10 deposition before; is that correct?
11 A.   Yes.
12 Q.   How many times have you been
13 deposed?
14 A.   Maybe three times in like 20 years.
15 Q.   In 20 years?
16 A.   Yes.
17 Q.   So I'm sure you're already pretty
18 much familiar with the process.  I just have a
19 couple of preliminary questions we have to ask
20 everybody and I'll just lay out a few things, so
21 you understand how this will work and we won't
22 take took much of your time, I don't think.
23 A.   Okay.
24 Q.   In many ways this is similar to a

Page 6

1  normal conversation.  The difference of course is
2  that our court reporter needs to write everything
3  down.  So we have to be careful that we never
4  speak at the same time and all of our responses
5  have to be verbal.  She can't write down nods of
6  the head and that kind of thing.  So all our
7  responses have to be spoken clearly and we're not
8  gonna speak at the same time.  Okay, sir?
9  A.   Okay.
10 Q.   Also this is not intended to be an
11 unnecessarily uncomfortable or inconvenient
12 process.  If you need to take a break at any
13 point, you want to grab a glass of water or
14 something like that, just let us know.  Okay?
15 A.   Okay.
16 Q.   Are you under the influence of any
17 sort of medication, substance, illness, anything
18 that would impair your ability to testify
19 truthfully today?
20 A.   I am not.
21 Q.   You've had a chance to confer with
22 your attorney and you're prepared to go forward
23 with today's deposition, correct?
24 A.   Yes.

Page 7

1  Q.   I'm sure your attorney has already
2  let you know your only obligation today is to give
3  truthful testimony based on your personal
4  knowledge.  So just to be clear, as an
5  introductory instruction, I'm not gonna ask you to
6  guess or speculate at any time.  Okay, sir?
7  A.   Okay.
8  Q.   On the other hand, if you have
9  partial information, we would like to know that
10 because we want to know everything that you know.
11 If you can give us an estimate or an
12 approximation, please do so.  Just let us know
13 that you are in fact giving an estimate or an
14 approximation.  Okay, sir?
15 A.   Okay.
16 Q.   So Officer Quintana, are you a
17 member of the SWAT Unit of the City of
18 Philadelphia Police Department?
19 A.   Yes, I am.
20 Q.   How long have you been a member of
21 the SWAT unit?
22 A.   Since January of 2002.
23 Q.   So you're at over 20 years at this
24 point, correct?

Page 8

1  A.   Correct.
2  Q.   Now, our case involves an incident
3  that happened back in June 2021 at Ms. Alvarado's
4  house.  Do you recall this incident?
5  A.   I do.
6  Q.   I'm gonna ask you a broad general
7  question, you know, and maybe we'll save some
8  time.  Can you tell me everything you can remember
9  about that incident?
10 A.   I remember that I was working with
11 Officer Miguel Rivera, R-I-V-E-R-A.  For some
12 reason, I can't remember his badge number off the
13 top of my head, but we were assigned to rear
14 containment for a warrant we were serving at the
15 -- at your client's address.  And we arrived and
16 Officer Rivera and I went to the rear of the
17 property, which was -- it had a common driveway
18 and it had a small yard that was fenced in with a
19 four-foot fence and the rear door was facing to
20 our right.  In other words, it didn't -- we
21 couldn't see directly into the rear door because
22 it had steps that came in on the side.
23     So at that point, we let the team
24 know that we were on location and after a few

Page 9

1   seconds, at some point the -- we could hear the
2   door was breached and after a few seconds, we
3   heard -- well, I heard one gunshot and I remember
4   as they were knocking, just as they were knocking,
5   or just after, an older black male and black
6   female came to the second floor rear window and
7   were -- it looked like they were trying to get my
8   attention. So I told them -- I kind of gave them
9   the signal to hold on and I let the team know that
10  there was a black female and older black male at
11  the second floor rear window.
12          At that point, I think -- I forget
13  the timeline, if it was just after or just before
14  the discharge. At that point, I signaled them to
15  come down. I let the team know that they were
16  there and I signaled them to come downstairs and
17  they exited from the rear door and I had them
18  standby inside the fenced in yard until the team
19  at some point came around and made entry into the
20  rear of the property from that back door.
21      Q.    Okay, sir. So the back door that
22  you've described, there was like a cul-de-sac --
23  it was like on a cul-de-sac, correct?
24      A.    The back door, it was a common

Page 10

1   driveway.
2       Q.    Right. Could you describe the
3   driveway?
4       A.    So we came in from -- it would be
5   to my left. We entered the driveway from there
6   and then kind of like parked our truck -- I think
7   we were on the street actually at the entrance to
8   that driveway and it was just a large opening and
9   you could see pretty much -- I would say, from our
10  vantage point, maybe the rear of about eight or
11  nine of these houses.
12      Q.    Right. So there's I think a large
13  driveway that encompassed an area of at least
14  eight buildings, correct?
15      A.    Yes, the rear of these houses.
16      Q.    And you were able to park your
17  truck back there?
18          MR. ZURBRIGGEN: Object to form.
19      Officer, you can answer.
20          THE WITNESS: I don't remember if
21      we parked our truck. I want to say we
22      were on the -- we left our truck on the
23      street. I can't remember exactly.
24  BY MR. WEST:

Page 11

1       Q.    I apologize, sir. I'm not trying
2   to put words in your mouth. I misunderstood. I
3   thought you said that you did park back there. So
4   just to be clear, I'm not trying to put words in
5   your mouth.
6           All right, sir. So this driveway
7   area where you were in the rear of the building,
8   would that have been, in your experience, enough
9   room for a SWAT Unit to have stationed an entry
10  team?
11          MR. ZURBRIGGEN: Object to form,
12      but Officer, you can answer.
13          THE WITNESS: There's plenty of
14      room back there.
15  BY MR. WEST:
16      Q.    There's plenty of room. If the
17  SWAT Unit had wanted to enter through the rear
18  door, there was plenty of room in that rear
19  driveway area, correct?
20          MR. ZURBRIGGEN: Object to the
21      form. Sir, you can answer.
22  BY MR. WEST:
23      Q.    What was your answer to the last
24  question, sir?

Page 12

1       A.    That was correct.
2       Q.    Now, before you got to the
3   property, had you gotten any instructions as to
4   what kind of property you were going to that day?
5       A.    That would have been on like a
6   reconnaissance sheet. So I can give you my
7   experience as to what kind of a description that
8   would have had, but I don't remember off the top
9   of my head, without seeing the reconnaissance
10  sheet, exactly what was written on that date.
11      Q.    Right. Sir, just to remind you of
12  an instruction we gave at the beginning. We're
13  just asking based on what you personally know. So
14  I'm not gonna ask you to guess or speculate or
15  tell me what you think would normally happen, just
16  what you specifically can recall now.
17          In addition to the reconnaissance
18  sheet that you referred to, would you have
19  received any sort of verbal instruction or
20  guidance prior to the operation as to what to
21  expect?
22          MR. ZURBRIGGEN: Object to form,
23      but Officer, you can answer.
24          THE WITNESS: Only if -- that would

3 (Pages 9 to 12)

Page 13

1 only happen if we had additional
2 information besides what would be on
3 that sheet. It would be something more
4 in the sense that what kind of
5 difficulties we would have getting to
6 that rear.
7 BY MR. WEST:
8 Q. For example, was there any sort of
9 briefing done prior to you getting to the site?
10 A. Yes. We had briefed at our
11 headquarters prior to that.
12 Q. And who did the briefing for this
13 operation?
14 A. I can't recall. I think it was --
15 that would be the sergeant. I don't know why I'm
16 drawing a blank on his name. I haven't been at
17 work for a few months, so bear with me.
18 Q. Do you think it might have been
19 Sergeant Mellody?
20 A. That's it, Sergeant Kevin Mellody.
21 Q. Just a follow-up. You mentioned
22 you haven't been at work for a few months. May I
23 ask why that is?
24 A. I was shot through my leg in

Page 14

1 October.
2 Q. Okay. I'm sorry to hear that, sir.
3 So do you recall anything that Sergeant Mellody,
4 or anyone else who did the briefing, said prior to
5 this operation about what to expect?
6 A. Nothing in particular stands out,
7 no.
8 Q. Were you informed that this warrant
9 was going to be executed at an apartment building?
10 A. No. There was no discussion about
11 it being an apartment.
12 Q. Was there any explanation as to
13 what kind of building it was?
14 A. A two-story property with a rear
15 driveway. Nothing else in particular. Just a
16 description of how we would get to the rear.
17 Q. Did you know what the warrant
18 specifically was for, what area specifically the
19 warrant applied to?
20 MR. ZURBRIGGEN: Object to form.
21 Officer, you can answer, if you can.
22 THE WITNESS: What area in what
23 sense? What do you mean?
24 BY MR. WEST:

Page 15

1 Q. So for example, is it your
2 understanding that the warrant applied to the
3 entire building?
4 A. Yes.
5 MR. ZURBRIGGEN: Same objection.
6 BY MR. WEST:
7 Q. Based on the briefing that you
8 received, your understanding was the warrant was a
9 search warrant that applied to the entire
10 building, correct?
11 MR. ZURBRIGGEN: Same objection,
12 but Officer, you can answer.
13 THE WITNESS: Yes. It was a
14 warrant for the house.
15 BY MR. WEST:
16 Q. I think you testified earlier that
17 you could hear over the radio that at some point
18 an order was given to breach the property; is that
19 correct?
20 A. Not over the radio. I could hear
21 it from the rear.
22 Q. So from your position in the rear
23 of the building, you could actually hear someone
24 yell breach?

Page 16

1 A. No. I could hear when they knock
2 and announce and then I could hear the actual
3 breach, like a ram hitting a door.
4 Q. So when the ramp hit the door, that
5 was loud enough that you could actually hear it
6 hit the door from the rear of the building?
7 A. Yes.
8 Q. And you said you could hear the
9 knock and announce?
10 A. Yes.
11 Q. How much time passed between the
12 knock and the door being breached?
13 A. I don't recall. Anywhere from 30
14 seconds to a minute.
15 Q. When you say anywhere between 30
16 seconds and a minute, what's your basis for that?
17 MR. ZURBRIGGEN: Object to form.
18 Officer, you can answer.
19 THE WITNESS: Based on what I
20 remember between the knock and announce,
21 the screams, you know, the officer
22 screaming they were serving a warrant,
23 and then based on the time that I could
24 hear the door get breached and then

4 (Pages 13 to 16)

Page 17

1    more or less the time between that and
2    the one gunshot, that was maybe a
3    minute, minute and a half.
4    BY MR. WEST:
5        Q.   I'm sorry.  What was a minute to a
6    minute and a half?
7        A.   Between the initial knock and
8    announce and the gunshot.
9        Q.   Are you familiar with something
10   called the knock and announce rule?
11       A.   Yes.
12       Q.   What is the knock and announce
13   rule?
14       A.   When you announce that you're
15   serving a warrant, you're supposed to give about
16   30 seconds to a minute before you breach the
17   property.
18       Q.   Is that the training that you
19   received from the Philadelphia Police Department
20   that, pursuant to the knock and announce rule, you
21   should allow at least 30 to 60 seconds between
22   knocking on a property prior to attempting to
23   breach the property?
24       MR. ZURBRIGGEN:  Object to form,

Page 18

1    but Officer, you can answer.
2        THE WITNESS:  Yes.
3    BY MR. WEST:
4        Q.   And where did you receive that
5    training?
6        A.   Every year, pretty much whenever
7    anything changes, MPO, legal updates, and any time
8    there's new case law released, we're given that
9    information.
10       Q.   What does MPO?
11       A.   Municipal police officers
12   training.
13       Q.   And who does the municipal police
14   officer training?
15       A.   That is state mandated and it's
16   given by instructors at the police academy.
17       Q.   And is this training that you're
18   required to receive on a yearly basis?
19       A.   Yes, or more frequent than that.
20       Q.   At least a yearly basis, correct?
21       A.   Yes.
22       Q.   So it's your testimony that at
23   least once a year you and the other members of the
24   SWAT Unit are informed that there's something

Page 19

1    called the knock and announce rule that requires
2    you to allow at least 30 to 60 seconds between
3    knocking on a front door and attempting to breach
4    the property, correct?
5        MR. ZURBRIGGEN:  Object to form.
6        Sir, you can answer.
7        THE WITNESS:  Yes.
8    BY MR. WEST:
9        Q.   Now, when you say that there was 30
10   to 60 seconds that passed in this case between the
11   knock and announce and the breach, is that based
12   on your specific memory of this incident, or just
13   what you assume would have happened because that's
14   what normally would happen?
15       MR. ZURBRIGGEN:  Object to form,
16       but Officer, you can answer.
17       THE WITNESS:  It's based on my
18       memory.
19   BY MR. WEST:
20       Q.   Sir, have you had a chance to view
21   the surveillance footage of the breach in this
22   incident?
23       A.   No, I have not.
24       Q.   Would you be surprised to learn

Page 20

1    that the surveillance footage would indicate there
2    was about two seconds?
3        MR. ZURBRIGGEN:  Object to form.
4        Officer, you can answer.
5        THE WITNESS:  I'm sorry.  Between
6        the knock and announce and the breach?
7    BY MR. WEST:
8        Q.   Actually really between officers
9    arriving at the front door and the door being
10   breached.  I also can represent to you that
11   Lieutenant Monk has testified in this case already
12   that he did not follow the knock and announce
13   rule.  Would that surprise you?
14       MR. ZURBRIGGEN:  Object to form.
15       Misstating testimony, but Officer
16       Quintana, you can answer.
17       THE WITNESS:  That would surprise
18       me, yes.
19   BY MR. WEST:
20       Q.   Do you think that possibly the rule
21   that people should allow at least -- strike the
22   question.  I apologize.  I mis-worded it.
23       Do you think it's possible that
24   your experience that officers should allow at

Electronically signed by Dawn Burr (101-019-021-7097)     b7ca7be0-b16f-4511-ad4e-469556885 7d7

Page 21

1    least 30 to 60 seconds under the knock and
2    announce rule has be so routine in your
3    experience, something you've experienced so many
4    times, that you may remember this incident as a
5    time where that rule was followed because you've
6    seen it followed so many times?
7              MR. ZURBRIGGEN:  Object to form.
8         Officer, you can answer.
9              THE WITNESS:  I was going by my
10        memory from being in the rear and
11        listening to radio communication as to
12        when they arrived.  It's just based on
13        my memory.
14   BY MR. WEST:
15        Q.    Okay.  Did you keep any sort of
16   contemporaneous notes?
17        A.    I did not.
18        Q.    Did you create any sort of audio or
19   visual recording?
20        A.    I did not.
21        Q.    Are you aware of -- did you wear a
22   body cam?
23        A.    I did not.
24        Q.    Do you believe that any of the

Page 22

1    officers on the scene were wearing body cams?
2              MR. ZURBRIGGEN:  Object to form.
3         Officer, you can answer.
4              THE WITNESS:  In our SWAT Unit
5         officers, no.  Maybe the 15th District
6         officers that were there.
7    BY MR. WEST:
8         Q.    But do you personally have any
9    knowledge if they were?
10        A.    No, I don't.
11        Q.    Sir, I can represent to you that
12   the surveillance footage I referred to before was
13   from a neighboring property.  Other than that, are
14   you aware of any audio or video recording that was
15   made of this incident?
16        A.    I do not know.
17        Q.    Did you review any documents or
18   anything else to prepare for today's testimony?
19        A.    I reviewed one document sent to me
20   from I guess it would be Mr. Zurbriggen.
21        Q.    Sir, just to be clear, I'm not
22   gonna ask you any questions about what your
23   attorney said to you or what you said to your
24   attorney.  I am allowed to just know what you've

Page 23

1    done to prepare for today's testimony.  So could
2    you just tell me what document you reviewed, but
3    again, don't -- I'm not asking you to volunteer
4    any information about what you were told from the
5    attorney or what you told the attorney?
6              MR. ZURBRIGGEN:  Do you understand
7         that question that he's asking you,
8         Officer?
9              THE WITNESS:  I believe so.
10             MR. WEST:  I'm gonna just ask a
11        clean question so we create a better
12        record.
13   BY MR. WEST:
14        Q.    Could you just tell me what
15   document you did review in anticipation for
16   today's testimony?
17        A.    It was a document with a very brief
18   description of the incident and there was a
19   statement that I had made to the Officer Involved
20   Shooting Investigation Team.
21        Q.    So did you review the statement
22   that you gave to Internal Affairs prior to today's
23   testimony?
24        A.    No.  That was the -- what I looked

Page 24

1    at was the interview at the Officer Involved
2    Shooting Investigation Unit.
3         Q.    And you reviewed some sort of
4    written description of the incident, correct?
5         A.    Yes.
6         Q.    Did the written description that
7    you read, did that read that the knock and
8    announce rule had been followed?
9              MR. ZURBRIGGEN:  Object to form,
10        but Officer, you can answer, if you can.
11             THE WITNESS:  I did not see that,
12        no.
13   BY MR. WEST:
14        Q.    Did the written description that
15   you saw make any reference to the knock and
16   announce rule?
17             MR. ZURBRIGGEN:  Same objection,
18        but Officer, you can answer.
19             MR. WEST:  And to be clear, if it's
20        a privileged document -- are you
21        asserting that privilege or is it just
22        something -- I just want to be clear.
23             MR. ZURBRIGGEN:  I'm not asserting
24        any privilege.  I'm just objecting to

Electronically signed by Dawn Burr (101-019-021-7097)                                          b7ca7be0-b16f-4511-ad4e-469556885 7d7

Page 25

1      the form of the question.
2           MR. WEST:  That's fine.
3  BY MR. WEST:
4      Q.    So the document that you reviewed,
5  did it make any reference to the knock and
6  announce rule?
7      A.    It did not.
8      Q.    Prior to arriving at the property,
9  did you know whether or not there was a rear door?
10     A.    Yes.
11     Q.    What were you told about the -- how
12  did you know there was a rear door?
13     A.    Based on the description given
14  during the reconnaissance and on the
15  reconnaissance sheet.
16     Q.    And what were you told about the
17  rear door prior to the operation?
18          MR. ZURBRIGGEN:  Object to form.
19      Officer, you can answer.
20          THE WITNESS:  Not much.  Just that
21      it was accessible from the rear
22      driveway, the view of the rear,
23      including the rear door.  Nothing else
24      in particular about it.

Page 26

1  BY MR. WEST:
2      Q.    Do you know why the entry team
3  attempted to enter the property through the front
4  door, rather than the rear door?
5          MR. ZURBRIGGEN:  Object to form,
6      but Officer, you can answer, if you can.
7          THE WITNESS:  Based on the way it
8      looks and based on the way the rear
9      looks, it looks like a regular row home.
10      So normally on a regular home, we would
11      enter through the front door.
12  BY MR. WEST:
13     Q.    Why?
14     A.    Why?  I'm sorry.  You said Why?
15     Q.    Yeah.
16     A.    Just based on that, because the
17  easiest access point is through the front door.
18     Q.    Sir, have you ever received any
19  training from the Philadelphia Police Department
20  about how to enforce a warrant at a multi
21  residence building?
22          MR. ZURBRIGGEN:  Object to form,
23      but Officer, you can answer, if you can.
24          THE WITNESS:  How to enforce a

Page 27

1  warrant in multi -- based on my
2  experience, if there is knowledge that
3  it is an apartment building, then the
4  warrant should and normally would
5  specify that there is an apartment
6  number and what the apartment number
7  would be.
8  BY MR. WEST:
9      Q.    Okay.  And in this incident, did
10  the warrant specify -- strike the question.
11          In this incident, did the warrant
12  specify a specific apartment number?
13          MR. ZURBRIGGEN:  Object to form.
14      You can answer, if you can.
15          THE WITNESS:  I'm sorry.  I did
16      not see the warrant.
17  BY MR. WEST:
18     Q.    Okay.  But you did get a briefing
19  prior to the operation?
20     A.    Correct.
21     Q.    And during that briefing, did you
22  learn one way or another whether or not the
23  warrant specified a specific apartment number?
24     A.    It did not specify a specific

Page 28

1  apartment.
2      Q.    The suspect for whom the warrant
3  applied -- strike the question.
4          The suspect for whom the warrant
5  was valid, did you have any knowledge whether or
6  not that person's residence was accessible through
7  the front door or the rear door?
8          MR. ZURBRIGGEN:  Objection to form.
9      Officer, you can answer, if you can.
10          THE WITNESS:  I can only state what
11      the reconnaissance sheet stated and it
12      stated it was a row home.
13  BY MR. WEST:
14     Q.    Do you actually recall if the
15  reconnaissance sheet specifically said row home on
16  it?
17          MR. ZURBRIGGEN:  Object to form.
18      Officer, you can answer, if you can.
19          THE WITNESS:  Based on the actual
20      word, the phrase, row home, off the top
21      of my head, no.
22  BY MR. WEST:
23     Q.    Have you ever heard of a row home
24  where the building might be divided into different

7 (Pages 25 to 28)

Page 29

1  apartments accessible through different doors;
2  have you ever heard of anything like that?
3       MR. ZURBRIGGEN:  Object to form.
4       Officer, you can answer.
5       THE WITNESS:  Yes.
6  BY MR. WEST:
7       Q.    So prior to June 2021, you knew,
8  even in a row home, all of the apartments in that
9  building might not be accessible through the front
10 door, correct?
11      MR. ZURBRIGGEN:  Object to form.
12      Officer, you can answer.
13      THE WITNESS:  Correct.
14 BY MR. WEST:
15      Q.    And how did you know that?
16      MR. ZURBRIGGEN:  Same objection.
17      Officer, you can answer.
18      THE WITNESS:  You're asking how do
19      I know that row homes can be divided
20      into apartments?
21 BY MR. WEST:
22      Q.    Right.  I'm just saying -- you've
23 testified a moment ago that even before June 2021,
24 you were perfectly aware that in a multi residence

Page 30

1  row home type building, the front door might not
2  provide access to all of the apartments in the
3  building.  I'm just wondering how did you gain
4  that information?
5       MR. ZURBRIGGEN:  Object to form.
6       Officer, you can answer.
7       THE WITNESS:  That's based on my
8       experience with other recons, other
9       warrants that we've served in the past.
10 BY MR. WEST:
11      Q.    So based on this experience that
12 you're referring to, if the warrant in question
13 actually referred specifically and exclusively to
14 apartment two on the second floor rear, would you
15 have at least considered the possibility that the
16 front door might not lead to the second floor rear
17 apartment?
18      MR. ZURBRIGGEN:  Object to form.
19      Officer, you can answer.
20      THE WITNESS:  You're asking me to
21      speculate whether or not I would know
22      that in an apartment a door may not lead
23      to it?
24 BY MR. WEST:

Page 31

1       Q.    Sir, to be clear, I'm not asking
2  you to speculate.  I'm asking based on the
3  training that you've received as a member of the
4  SWAT Unit.  Let me lay a foundation.  I think
5  you've already alluded to this, but just to lay a
6  foundation.
7       As part of your role with the SWAT
8  Unit for the Philadelphia Police Department, have
9  you personally been responsible for conducting
10 reconnaissance prior to warrant enforcement
11 operations?
12      A.    Yes.
13      Q.    As far as you're aware, have you
14 received all of the training available to a member
15 of the SWAT Unit to prepare them to do
16 reconnaissance on a warrant enforcement operation?
17      MR. ZURBRIGGEN:  Object to form.
18      Officer, you can answer.
19      THE WITNESS:  Yes.
20 BY MR. WEST:
21      Q.    So far as you're aware, have you
22 been informed of all of the policies and
23 procedures of the Philadelphia Police Department
24 that apply to the SWAT Unit?

Page 32

1       MR. ZURBRIGGEN:  Same objection.
2       Officer, you can answer.
3       THE WITNESS:  Yes.
4  BY MR. WEST:
5       Q.    So with that background in mind and
6  the personal experience you've already referred
7  to, if you were tasked with doing a reconnaissance
8  on a multi residence apartment building, where the
9  warrant specified that it only applied to the
10 apartment number two, second floor rear, and you
11 knew that there was a rear door and you knew that
12 there was a front door to the building, would you
13 at least consider the possibility that the front
14 door did not provide entrance to the second floor
15 rear apartment?
16      MR. ZURBRIGGEN:  Object to form.
17      Officer, you can answer.
18      THE WITNESS:  Yes, I would consider
19      that.
20 BY MR. WEST:
21      Q.    So would you try to get additional
22 information, in that situation, prior to sending
23 out the SWAT Unit to do a warrant enforcement
24 operation?

8 (Pages 29 to 32)

Page 33

1    MR. ZURBRIGGEN: Same objection.
2    Officer, you can answer.
3    THE WITNESS: Yes.
4    BY MR. WEST:
5    Q.    And what steps would you take to
6    try to gain additional information?
7    MR. ZURBRIGGEN: Same objection.
8    Officer, you can answer.
9    THE WITNESS: If I have access to
10   that information, I'd probably look up
11   like a city database and find out
12   exactly what type of dwelling it is.
13   Ask the detectives to possibly set up a
14   surveillance to see if they make a
15   determination, based on the
16   surveillance, what entrance to use
17   specifically for something like that.
18   BY MR. WEST:
19   Q.    How about would you consider
20   contacting the property manager or the property
21   owner?
22   MR. ZURBRIGGEN: Same objection.
23   Officer, you can answer.
24   THE WITNESS: Usually that's not a

Page 34

1    good idea based on the sensitivity of
2    the information.
3    BY MR. WEST:
4    Q.    Okay. If you had conducted a
5    surveillance operation or actually ordered a
6    surveillance operation to be conducted, or asked
7    for one to be conducted, and that had revealed
8    that the door to the first floor led directly into
9    a first floor apartment, would that be enough
10   information for you to understand that the first
11   floor apartment provided direct entry to an
12   apartment or a residence that was not the second
13   floor rear apartment?
14   MR. ZURBRIGGEN: Object to form.
15   Officer, you can answer, if you can.
16   THE WITNESS: If I knew in fact
17   that very detailed information, yes.
18   BY MR. WEST:
19   Q.    Now, if you know that, if you knew
20   that the front door, if you open that door, you're
21   walking directly into an apartment or a residence
22   which is not the second floor rear apartment,
23   based on your understanding of the policies and
24   procedures of the Philadelphia Police Department,

Page 35

1    could you have sent in an entry team of SWAT Unit
2    officers to breach that front door in order to
3    gain access to apartment two on second floor rear?
4    MR. ZURBRIGGEN: Object to form.
5    Officer, you can answer, if you can.
6    THE WITNESS: Based on what makes
7    sense, if you're given the information
8    that that front door leads directly into
9    the actual apartment, as opposed to,
10   also in our experience, that front door
11   may lead to a set of stairs that go to a
12   second floor apartment, but if the
13   information that you're given says that
14   that front door leads directly into say
15   the living room of that first floor
16   apartment, then it makes sense that the
17   entrance to the second apartment is
18   somewhere else.
19   BY MR. WEST:
20   Q.    Okay. Thanks for you testimony,
21   sir. I just want to bring you back though to the
22   exact question that I asked. Really this is a
23   question of your understanding of the policies and
24   procedures of the Philadelphia Police Department.

Page 36

1    If you knew that that first floor
2    door led directly into the living room of
3    apartment one on the first floor, would it have
4    been permissible under the Philadelphia policies
5    and procedures to have breached that front door in
6    an effort to gain access to apartment two rear on
7    the second floor?
8    MR. ZURBRIGGEN: Object to form.
9    Officer, you can answer, if you can.
10   THE WITNESS: No, I would not
11   breach that front door based on that
12   information.
13   BY MR. WEST:
14   Q.    Based on your training with the
15   Philadelphia Police Department, did you understand
16   that it actually would have been illegal to have
17   entered the other residence, the apartment number
18   one, without a warrant that applied to apartment
19   number one?
20   MR. ZURBRIGGEN: Same objection.
21   Officer, you can answer.
22   THE WITNESS: Correct.
23   BY MR. WEST:
24   Q.    So based on the training that you

Electronically signed by Dawn Burr (101-019-021-7097)                          b7ca7be0-b16f-4511-ad4e-469556885 7d7

Page 37

1  received, are these the sort of things that the
2  Reconnaissance Unit should try to figure out
3  before they do a warrant enforcement, what doors
4  lead where?
5          MR. ZURBRIGGEN:  Object to form.
6      Officer, you can answer.
7          THE WITNESS:  If the information
8      based on the recon is clear, then yes,
9      you definitely give that information.
10 BY MR. WEST:
11     Q.    Right, but I'm asking is this the
12 sort of thing that the reconnaissance is for, to
13 try to figure out these sort of issues ahead of
14 time?
15         MR. ZURBRIGGEN:  Same objection.
16         THE WITNESS:  Yes.
17 BY MR. WEST:
18     Q.    Just because we're speaking at the
19 same time, your answer was yes, correct, sir?
20     A.    Correct, yes.
21     Q.    In your time with the Philadelphia
22 Police Department, have you ever received any
23 training as to how to handle an encounter with a
24 dog if you are entering a residence?

Page 38

1          MR. ZURBRIGGEN:  Object to form.
2      Officer, you can answer.
3          THE WITNESS:  Yes, I have.
4  BY MR. WEST:
5      Q.    And where did you receive that
6  training?
7      A.    Part of it is SWAT training, part
8  of it is experience, and the other part is based
9  on directives, use of force.
10     Q.    So your recollection is that as
11 part of being a member of the SWAT Unit, you
12 received specific training with regards to how to
13 handle interactions with dogs, correct?
14         MR. ZURBRIGGEN:  Object to form.
15     Officer, you can answer.
16         THE WITNESS:  Correct.
17 BY MR. WEST:
18     Q.    And is it your testimony that as of
19 June 2021, you were aware of the existence of a
20 directive from the Philadelphia Police Department
21 which addressed dog interactions?
22         MR. ZURBRIGGEN:  Object to form.
23     Officer, you can answer.
24         THE WITNESS:  I'm sorry.  Which

Page 39

1      direct what?
2  BY MR. WEST:
3      Q.    This is a new question.  Prior to
4  June 2021, were there any directives from the
5  Philadelphia Police Department pertaining to dog
6  encounters, to your knowledge?
7      A.    Yes.
8      Q.    And how did you gain that
9  knowledge?
10         MR. ZURBRIGGEN:  Object to form.
11     Officer, you can answer.
12         THE WITNESS:  In regards to the
13     directive, from reading the directive.
14 BY MR. WEST:
15     Q.    Right.  How did you do that?  How
16 did the existence of this directive come to your
17 attention?
18         MR. ZURBRIGGEN:  Object to form.
19     Officer, you can answer.
20         THE WITNESS:  Whenever there's any
21     changes, we're updated on changes, and
22     also just from reading it on my own.
23 BY MR. WEST:
24     Q.    Okay.  I know this question might

Page 40

1  seem really obvious because it's your world and
2  you're dealing with it all the time, but could you
3  just explain to us mechanically how do you
4  physically became aware of an update in the
5  directives?
6          MR. ZURBRIGGEN:  Object to form.
7      Officer, you can answer.
8          THE WITNESS:  Every time there are
9      changes to directives, for whatever
10     reason, we're physically handed a new
11     copy of it and also we've actually gone
12     over it, if it specifically pertains to
13     us.
14 BY MR. WEST:
15     Q.    So it's your experience, as a
16 member of the SWAT Unit now for over 20 years,
17 that every time the Philadelphia Police Department
18 implements a new directive, at least one relevant
19 to what you guys are doing, a copy of that
20 directive is physically handed to every member of
21 the SWAT Unit and everybody on the SWAT Unit is
22 supposed to go over the contents thereof together,
23 correct?
24         MR. ZURBRIGGEN:  Object to form.

10 (Pages 37 to 40)

Page 41

1    Officer, you can answer.
2         THE WITNESS: Yes.
3    BY MR. WEST:
4    Q.    Your answer was yes, right?
5    A.    Yes.
6    Q.    If we have deposed a bunch of
7    officers in this case who deny being aware of the
8    existence of a relevant directive, do you have any
9    personal knowledge of how they might not have
10   known that?
11        MR. ZURBRIGGEN: Object to form.
12        It was misstating testimony. Officer,
13        you can answer, if you can.
14        THE WITNESS: If they're not aware
15        of it, there may have been a delay from
16        the time that directed was issued to the
17        time that they were given that
18        information.
19   BY MR. WEST:
20   Q.    Now, to your recollection, does the
21   directive from the Philadelphia Police Department,
22   pertaining to dog encounters, give any sort of
23   guidance as to what an officer can do to avoid a
24   lethal encounter if they believe that they're

Page 42

1    gonna have an interaction with the dog?
2         MR. ZURBRIGGEN: Object to form.
3         Officer, you can answer.
4         THE WITNESS: You're asking based
5         on the directive?
6    BY MR. WEST:
7    Q.    Right. Does the directive say
8    anything about certain tools that officers should
9    use to avoid having a lethal encounter with the
10   dog?
11        MR. ZURBRIGGEN: Same objection.
12        THE WITNESS: Recently the
13        directive stated that you can actually
14        taser, use a taser, to prevent a dog
15        attack. You can also use your pepper
16        spray to deter a dog from attacking.
17   BY MR. WEST:
18   Q.    And isn't it also true that the
19   directive refers to muzzles as a tool that could
20   be used?
21        MR. ZURBRIGGEN: Object to form.
22        Officer, you can answer.
23        THE WITNESS: I've never seen that.
24        I've seen dog nooses on that, but I've

Page 43

1    never seen a police officer use a
2    muzzle. We don't have equipment such as
3    a muzzle for a dog.
4    BY MR. WEST:
5    Q.    Do you recall if muzzles are
6    referred to in the directive?
7         MR. ZURBRIGGEN: Same objection.
8         THE WITNESS: I don't recall that.
9    BY MR. WEST:
10   Q.    Do you recall if batons are
11   referred to in the directive?
12        MR. ZURBRIGGEN: Same objection.
13        Officer.
14        THE WITNESS: Against a dog attack,
15        I don't recall that.
16   BY MR. WEST:
17   Q.    In any case, prior to June 2021,
18   you were aware of the fact that the Philadelphia
19   Police Department had provided guidance that if a
20   member of the SWAT Unit knew they were likely to
21   encounter a dog, they should consider having tools
22   ready that could be used to avoid a fatal
23   encounter, correct?
24        MR. ZURBRIGGEN: Object to form.

Page 44

1    Officer, you can answer.
2         THE WITNESS: If it is immediately
3         known prior to, then yes.
4    BY MR. WEST:
5    Q.    Prior to Ms. Alvarado's front door
6    being breached, did you know whether or not there
7    was a dog inside that house?
8    A.    I did not know.
9    Q.    Do you know if anybody knew?
10        MR. ZURBRIGGEN: Object to form.
11        Officer, you can answer.
12        THE WITNESS: I don't.
13   BY MR. WEST:
14   Q.    In your experience, if the SWAT
15   Unit is enforcing a warrant and they hear a dog
16   barking inside the property, would that create an
17   exception to the knock and announce rule, where
18   the police officer would no longer be required to
19   wait 30 to 60 seconds after knocking because
20   there's a dog barking?
21        MR. ZURBRIGGEN: Object to form.
22        Officer, you can answer, if you can.
23        THE WITNESS: At some point it goes
24        into officer's safety and how much time

11 (Pages 41 to 44)

Page 45

1   you're gonna give the person inside, you
2   know, the suspect on the warrant.  You
3   have to, at some point, take officer
4   safety into consideration as to how much
5   time you're gonna take.
6   BY MR. WEST:
7       Q.    Right, I understand that.  I'm
8   trying to figure out whether or not, in your
9   experience, the existence of a dog barking inside
10  the property would create some sort of exception
11  to the knock and announce rule?
12          MR. ZURBRIGGEN:  Same objection.
13      Officer, you can answer.
14          THE WITNESS:  No, it doesn't change
15      that.
16  BY MR. WEST:
17      Q.    You've never heard anything about
18  that in your training, correct?
19          MR. ZURBRIGGEN:  Same objection.
20  BY MR. WEST:
21      Q.    That you don't have to wait after
22  knocking because there's a dog barking?
23          MR. ZURBRIGGEN:  Same objection.
24          THE WITNESS:  I've never heard

Page 46

1       that.
2   BY MR. WEST:
3       Q.    Actually, in your experience, if
4   you're planning to do a warrant enforcement
5   operation and there are no exigent circumstances,
6   if you can hear that there's a dog barking inside
7   the property, that would slow you down a little
8   bit, so that you can get out non-lethal tools and
9   try to have some sort of plan for handling the
10  dog, correct?
11          MR. ZURBRIGGEN:  Object to form.
12      Officer, you can answer.
13          THE WITNESS:  The issue with that
14      is that our warrant basically is not for
15      the dog.  It's for the dangerous person
16      inside that property.  So a dog takes a
17      second seat, I guess you could say, to
18      the danger that that person inside can
19      pose to our team.
20  BY MR. WEST:
21      Q.    In your experience with the
22  Philadelphia Police Department, if you're planning
23  on enforcing a warrant at a residence and you know
24  that there's a barking dog inside the residence,

Page 47

1   should you create some sort of plan to try to
2   handle the dog in a non-lethal manner?
3           MR. ZURBRIGGEN:  Object to form.
4       Officer, you can answer.
5           THE WITNESS:  Yes, it could be
6       brought up that someone should keep
7       maybe an MK9 pepper spray, which is a
8       larger canister of pepper spray, and if
9       they can, in that situation, when the
10      property is breached, get to that dog in
11      some way without creating a dangerous
12      situation for the team entering, then
13      yes.
14  BY MR. WEST:
15      Q.    Sir, in a situation in which there
16  are no exigent circumstances, if you were planning
17  on entering a residence and you know that there
18  was a barking dog near the door, would you
19  consider contacting Animal Control prior to
20  entering the property?
21          MR. ZURBRIGGEN:  Object to form.
22      Officer, you can answer.
23          THE WITNESS:  In a high risk
24      warrant, the exigent circumstances are

Page 48

1       already there.  It's understood based on
2       that because we're serving a high risk
3       warrant.
4   BY MR. WEST:
5       Q.    Could you elaborate what you mean
6   by that?
7       A.    Sure.  The reason why the SWAT Unit
8   is used is because it's a high risk warrant.
9   That means that the person that the warrant is for
10  is armed and dangerous, has committed a violent
11  crime, and poses a danger to a person who would be
12  let's say non SWAT, such as uniform personnel.
13  That person inside the property would pose an
14  immediate danger to anyone else that does not have
15  the kind of equipment that we do.
16      Q.    All right, sir.  So in your
17  experience, if the SWAT Unit is enforcing a
18  warrant at someone's residence, there's already a
19  built in presumption that the person inside of
20  that residence poses an immediate danger, correct?
21          MR. ZURBRIGGEN:  Object to form.
22          THE WITNESS:  Correct.
23  BY MR. WEST:
24      Q.    So doesn't that make it all the

12 (Pages 45 to 48)

Page 49

1 more important for the reconnaissance team to make
2 sure that they're sending the SWAT unit into the
3 right person's house before there's a breaching
4 action?
5         MR. ZURBRIGGEN: Object to form.
6     Officer, you can answer.
7         THE WITNESS: Yes.
8 BY MR. WEST:
9     Q.    Did you ever have any encounter
10 with Ms. Alvarado at any point?
11     A.    I did not.
12     Q.    Did you at any point enter her
13 residence?
14     A.    I did not.
15     Q.    Did you ever hear Lieutenant Monk
16 say anything about this incident at any time, in
17 any capacity?
18         MR. ZURBRIGGEN: Object to form,
19     but Officer, you can answer.
20         THE WITNESS: I don't recall. Not
21     to me directly.
22 BY MR. WEST:
23     Q.    Did you ever hear Sergeant Mellody
24 say anything about this incident in any capacity?

Page 50

1         MR. ZURBRIGGEN: Same objection.
2     Officer, you can answer.
3         THE WITNESS: Yes.
4 BY MR. WEST:
5     Q.    What did Sergeant Mellody say?
6     A.    After the warrant was served, he
7 directed us, myself and Officer Rivera, back
8 around to the rear of the property to get another
9 really good look at it and we noticed that there
10 was no specific markings and we discussed how
11 there was no specific markings as to whether or
12 not this was a different property.
13     Q.    Could you elaborate what you mean
14 by that?
15     A.    Yes. We basically walked around to
16 the rear and he looked at us and asked if there's
17 anything in particular that we saw that would
18 indicate that this was a second apartment, or a
19 second entryway.
20     Q.    Sergeant Mellody had been
21 responsible for doing the reconnaissance in the
22 first place on this operation, correct?
23         MR. ZURBRIGGEN: Object to form.
24     Officer, you can answer.

Page 51

1         THE WITNESS: I don't recall.
2 BY MR. WEST:
3     Q.    If Sergeant Mellody had been the
4 person responsible for reconnaissance, did it
5 appear to you that he was trying to find a
6 justification for having botched the job by
7 pointing out these issues?
8         MR. ZURBRIGGEN: Object to form.
9     Officer.
10         THE WITNESS: I can't say what his
11     state of mind was.
12 BY MR. WEST:
13     Q.    Sir, is it your testimony that
14 after Ms. Alvarado's dog had been killed, Sergeant
15 Mellody discussed with you the markings on the
16 property?
17         MR. ZURBRIGGEN: Object to form.
18     Officer, you can answer.
19         THE WITNESS: He basically just
20     asked us to look at it and to kind of
21     like let's say get a second look at it,
22     just to double check to make sure there
23     was nothing in particular that we saw in
24     regards to any particular markings on

Page 52

1 this property on the rear.
2 BY MR. WEST:
3     Q.    Did Sergeant Mellody ever tell you
4 about any effort he had made whatsoever to
5 ascertain where the rear door to this property
6 led?
7         MR. ZURBRIGGEN: Object to form.
8     Officer, you can answer.
9         THE WITNESS: Not that I recall.
10 BY MR. WEST:
11     Q.    Okay. Sir, as part of the training
12 you received with regards to doing reconnaissance
13 for these kind of missions, did you get any sort
14 of special or specific guidance as to how to do
15 reconnaissance at multi residence properties?
16         MR. ZURBRIGGEN: Object to form,
17     specifically as asked and answered, but
18     Officer, you can answer.
19         THE WITNESS: Yes.
20 BY MR. WEST:
21     Q.    What guidance did you receive?
22     A.    In regards to recon, just basically
23 what kind of things to look for when it came to
24 that, how to access any particular, I guess you

13 (Pages 49 to 52)

Page 53

1  could say, additional entryways.  For example, if
2  we use -- if we were to serve a warrant in a
3  multi story dwelling, then we have to make a
4  determination of how to get into the first door,
5  how to get into a second door, if needed, and then
6  how to access that particular floor that the
7  apartment is on.  That's something that all has to
8  get taken into consideration.
9      Q.    Right, sir.  If you were to plan an
10 operation to enforce a warrant for an apartment
11 that was on the third floor of an apartment
12 building, wouldn't you have to do reconnaissance
13 to figure out how the officers could gain entry to
14 the apartment on the third floor without entering
15 any of the other apartments in the building, so
16 long as the warrant only applied to the apartment
17 on the third floor?
18         MR. ZURBRIGGEN:  Object to form.
19     Officer, you can answer.
20         THE WITNESS:  Yes.
21 BY MR. WEST:
22     Q.    And that's the kind of thing that
23 you were specifically trained how to do as part of
24 the reconnaissance, correct?

Page 54

1          MR. ZURBRIGGEN:  Same objection.
2          THE WITNESS:  Yes.
3          MR. WEST:  Sir, your attorney might
4      have some questions for you, but I think
5      those are all the questions I have for
6      you today.  Thank you very much time for
7      your time.
8                  - - -
9              EXAMINATION
10                 - - -
11 BY MR. ZURBRIGGEN:
12     Q.    Officer, I'll just have a few very,
13 very briefly and few questions to ask.
14     I want to ask you first --
15 Plaintiff's Counsel asked you a few questions
16 regarding what you and Sergeant Mellody discussed
17 regarding the back door.  I wanted to ask you, do
18 you recall seeing the back door before the front
19 door was breached?
20     A.    I could not see the back door
21 because it was facing to the right.
22     Q.    Do you recall seeing, prior to the
23 breaching of the front door, anything that
24 indicated to you what that back door led to?

Page 55

1      A.    No.  It looked exactly like the
2  other properties at the back of that.
3      Q.    Did the other properties on that
4  driveway have any kind of markings on the back
5  door?
6      A.    No.
7      Q.    Officer, I want to ask you just
8  generally, you mentioned that your understanding
9  is that pepper spray can be used on dogs; is that
10 correct?
11     A.    Yes.
12     Q.    When considering whether to use
13 pepper spray, do you consider whether it's inside
14 or outside of a property?
15     A.    Whether the dog is outside the
16 property?
17     Q.    Yes, whether the pepper spray
18 would be used inside or outside of the property.
19     A.    Yes.
20     Q.    What do you consider?  Can you
21 just explain what you would consider in that
22 situation?
23     A.    Yes.  Based on the volume of pepper
24 spray that comes out of that cannister, if it's

Page 56

1  done in a closed or a tight area, the residual
2  spray will effect the rest of the team.  So it has
3  to be considered -- you have to take into
4  consideration how much you can use on a particular
5  dog.
6      Q.    Then I want to clarify too, did you
7  understand when you and the remainder of the SWAT
8  Team were executing the warrant on that day that
9  this was a homicide suspect that you were
10 executing a warrant for?
11     A.    If the -- normally that information
12 would be on the reconnaissance sheet, yes.
13         MR. ZURBRIGGEN:  Officer, that's
14     all I have, unless Keith has any
15     follow-up from that.
16         MR. WEST:  I just have a follow-up
17     on one issue.
18                 - - -
19             EXAMINATION
20                 - - -
21 BY MR. WEST:
22     Q.    Sir, the defense attorney asked you
23 if you could see the rear door prior to the
24 breach.  Do you recall that?

14 (Pages 53 to 56)

Electronically signed by Dawn Burr (101-019-021-7097)   b7ca7be0-b16f-4511-ad4e-469556885 7d7

Page 57

1      A.    Yes.
2      Q.    I don't have a copy of the
3  transcript in front of me.  Was your answer that
4  you could not see the door at all?
5      A.    I could see that it was facing to
6  the right and I could see it partially based on
7  the angle that I was on.
8      Q.    Could you elaborate what you mean
9  by that?
10     A.    I might have been on the left side
11 of that property and Officer Rivera would have
12 been on the right side facing the rear.  So he
13 would have had a better angle on it.
14     Q.    Prior to Ms. Alvarado's door being
15 breached, did you know that there was a rear door
16 that you could see?
17     A.    I don't recall.
18     Q.    Okay.  So you think it's possible
19 that you were in the rear of the property, but
20 you didn't know there was a door back there?
21         MR. ZURBRIGGEN:  Object to form,
22     but Officer, you can answer.
23         THE WITNESS:  I knew there was a
24     door back there.

Page 58

1  BY MR. WEST:
2      Q.    Okay.  Are you saying that you were
3  placed physically in some location other than
4  behind the house?
5          MR. ZURBRIGGEN:  Object to form.
6      Officer, you can answer.
7          THE WITNESS:  No.  I was directly
8      behind the house.
9  BY MR. WEST:
10     Q.    Not to go on, but I'm just
11 struggling to understand physically how you
12 couldn't have seen the door in the back of the
13 house if you were behind there?
14         MR. ZURBRIGGEN:  Object to form.
15         THE WITNESS:  If you're looking
16     directly at that house, standing
17     directly behind it, that door faces to
18     the right.  It doesn't face the back.
19     So there's a wall that stands out,
20     kind of like a bump out and the door is
21     on the right side of that wall.
22 BY MR. WEST:
23     Q.    But just to make sure everything is
24 clear, even if you had decided to stand at a

Page 59

1  certain angle, where you didn't have a direct view
2  of the door at a particular time, you were
3  perfectly aware of the existence of the door in
4  the rear of the house, prior to the breach,
5  correct?
6          MR. ZURBRIGGEN:  Object to form.
7      Officer, you can answer.
8          THE WITNESS:  Yes.
9  BY MR. WEST:
10     Q.    And was part of the purpose of the
11 rear containment part of the operation to have a
12 couple of officers behind the building who could
13 intercept anyone who might coming running out the
14 rear door?
15         MR. ZURBRIGGEN:  Object to form.
16     Officer, you can answer.
17         THE WITNESS:  Yes, that's part of
18     the assignment.
19 BY MR. WEST:
20     Q.    So regardless of whether or not you
21 could physically see the rear door at any time,
22 you actually were where you were, at least in
23 part, to monitor that door, correct?
24         MR. ZURBRIGGEN:  Object to form.

Page 60

1          THE WITNESS:  Correct.
2          MR. WEST:  Thank you very much,
3  sir.
4          MR. ZURBRIGGEN:  No follow-up here.
5      Officer, thank you very much for your
6      time.
7              - - -
8          (Whereupon, the deposition
9  concluded at 11:05 a.m.)
10             - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Electronically signed by Dawn Burr (101-019-021-7097)                                    b7ca7be0-b16f-4511-ad4e-469556885 7d7

Page 61

1
2                    CERTIFICATION
3
4          I, DAWN M. BURR, hereby certify
5    that the foregoing is a true and correct
6    transcript transcribed from the stenographic notes
7    taken by me on Tuesday, May 23, 2023.
8
9
10                   _Dawn M. B_
11          DAWN M. BURR
12          Shorthand Reporter
13
14          (This certification does not apply
15   to any reproduction of this transcript, unless
16   under the direct supervision of the certifying
17   reporter.)
18
19
20
21
22
23
24

16 (Page 61)

Electronically signed by Dawn Burr (101-019-021-7097)                          b7ca7be0-b16f-4511-ad4e-4695568857d7

**A**

**a.m** 1:17 60:9
**ability** 6:18
**able** 10:16
**academy** 18:16
**access** 26:17
    30:2 33:9 35:3
    36:6 52:24
    53:6
**accessible** 25:21
    28:6 29:1,9
**action** 49:4
**actual** 16:2
    28:19 35:9
**ADAM** 2:8
**adam.zurbrig...**
    2:11
**addition** 12:17
**additional** 13:1
    32:21 33:6
    53:1
**address** 8:15
**addressed** 38:21
**Affairs** 23:22
**ago** 29:23
**ahead** 37:13
**AL** 1:7
**allow** 17:21 19:2
    20:21,24
**allowed** 22:24
**alluded** 31:5
**ALTHEA** 2:16
**Alvarado** 1:4
    5:7 49:10
**Alvarado's** 8:3
    44:5 51:14
    57:14
**American** 2:3
**angle** 57:7,13
    59:1
**Animal** 47:19
**announce** 16:2,9
    16:20 17:8,10
    17:12,14,20
    19:1,11 20:6
    20:12 21:2
    24:8,16 25:6
    44:17 45:11
**answer** 10:19

11:12,21,23
12:23 14:21
15:12 16:18
18:1 19:6,16
20:4,16 21:8
22:3 24:10,18
25:19 26:6,23
27:14 28:9,18
29:4,12,17
30:6,19 31:18
32:2,17 33:2,8
33:23 34:15
35:5 36:9,21
37:6,19 38:2
38:15,23 39:11
39:19 40:7
41:1,4,13 42:3
42:22 44:1,11
44:22 45:13
46:12 47:4,22
49:6,19 50:2
50:24 51:18
52:8,18 53:19
57:3,22 58:6
59:7,16
**answered** 52:17
**anticipation**
    23:15
**anybody** 44:9
**apartment** 14:9
    14:11 27:3,5,6
    27:12,23 28:1
    30:14,17,22
    32:8,10,15
    34:9,11,12,13
    34:21,22 35:3
    35:9,12,16,17
    36:3,6,17,18
    50:18 53:7,10
    53:11,14,16
**apartments** 29:1
    29:8,20 30:2
    53:15
**apologize** 11:1
    20:22
**appear** 51:5
**applied** 14:19
    15:2,9 28:3
    32:9 36:18

53:16
**apply** 31:24
    61:14
**approximately**
    1:17
**approximation**
    7:12,14
**Arch** 2:9
**area** 10:13 11:7
    11:19 14:18,22
    56:1
**armed** 48:10
**arrived** 8:15
    21:12
**arriving** 20:9
    25:8
**ascertain** 52:5
**asked** 34:6 35:22
    50:16 51:20
    52:17 54:15
    56:22
**asking** 12:13
    23:3,7 29:18
    30:20 31:1,2
    37:11 42:4
**asserting** 24:21
    24:23
**assigned** 8:13
**assignment**
    59:18
**assume** 19:13
**attack** 42:15
    43:14
**attacking** 42:16
**attempted** 26:3
**attempting**
    17:22 19:3
**attention** 9:8
    39:17
**attorney** 6:22
    7:1 22:23,24
    23:5,5 54:3
    56:22
**attorneys** 5:6
**audio** 21:18
    22:14
**available** 31:14
**avoid** 41:23 42:9
    43:22

**aware** 21:21
    22:14 29:24
    31:13,21 38:19
    40:4 41:7,14
    43:18 59:3

**B**

**back** 8:3 9:20,21
    9:24 10:17
    11:3,14 35:21
    50:7 54:17,18
    54:20,24 55:2
    55:4 57:20,24
    58:12,18
**background**
    32:5
**badge** 8:12
**barking** 44:16
    44:20 45:9,22
    46:6,24 47:18
**based** 7:3 12:13
    15:7 16:19,23
    19:11,17 21:12
    25:13 26:7,8
    26:16 27:1
    28:19 30:7,11
    31:2 33:15
    34:1,23 35:6
    36:11,14,24
    37:8 38:8 42:4
    48:1 55:23
    57:6
**basically** 46:14
    50:15 51:19
    52:22
**basis** 16:16
    18:18,20
**batons** 43:10
**bear** 13:17
**beginning** 1:17
    12:12
**believe** 21:24
    23:9 41:24
**BEN** 2:16
**better** 23:11
    57:13
**bit** 46:8
**black** 9:5,5,10
    9:10

**blank** 13:16
**body** 21:22 22:1
**botched** 51:6
**breach** 15:18,24
    16:3 17:16,23
    19:3,11,21
    20:6 35:2
    36:11 56:24
    59:4
**breached** 9:2
    16:12,24 20:10
    36:5 44:6
    47:10 54:19
    57:15
**breaching** 49:3
    54:23
**break** 6:12
**brief** 23:17
**briefed** 13:10
**briefing** 13:9,12
    14:4 15:7
    27:18,21
**briefly** 54:13
**bring** 35:21
**broad** 2:3 8:6
**brought** 47:6
**building** 2:3,8
    11:7 14:9,13
    15:3,10,23
    16:6 26:21
    27:3 28:24
    29:9 30:1,3
    32:8,12 53:12
    53:15 59:12
**buildings** 10:14
**built** 48:19
**bump** 58:20
**bunch** 41:6
**Burr** 1:18 61:4
    61:11

**C**

**C** 2:1
**called** 17:10
    19:1
**cam** 21:22
**cams** 22:1
**canister** 47:8
**cannister** 55:24

**capacity** 49:17
49:24
**careful** 6:3
**case** 5:7 8:2 18:8
19:10 20:11
41:7 43:17
**CENTER** 2:2
**certain** 42:8
59:1
**certification** 4:4
61:2,14
**certify** 61:4
**certifying** 61:16
**chance** 6:21
19:20
**change** 45:14
**changes** 18:7
39:21,21 40:9
**check** 51:22
**circumstances**
46:5 47:16,24
**city** 1:7 2:7,14
7:17 33:11
**clarify** 56:6
**clean** 23:11
**clear** 7:4 11:4
22:21 24:19,22
31:1 37:8
58:24
**clearly** 6:7
**client's** 8:15
**closed** 56:1
**come** 9:15,16
39:16
**comes** 55:24
**coming** 5:4
59:13
**committed**
48:10
**common** 1:1
8:17 9:24
**communication**
21:11
**concluded** 60:9
**conducted** 34:4
34:6,7
**conducting** 31:9
**confer** 6:21
**conference** 1:16

**consider** 32:13
32:18 33:19
43:21 47:19
55:13,20,21
**consideration**
45:4 53:8 56:4
**considered**
30:15 56:3
**considering**
55:12
**contacting** 33:20
47:19
**containment**
8:14 59:11
**contemporane...**
21:16
**contents** 40:22
**Control** 47:19
**conversation** 6:1
**copy** 40:11,19
57:2
**correct** 5:10
6:23 7:24 8:1
9:23 10:14
11:19 12:1
15:10,19 18:20
19:4 24:4
27:20 29:10,13
36:22 37:19,20
38:13,16 40:23
43:23 45:18
46:10 48:20,22
50:22 53:24
55:10 59:5,23
60:1 61:5
**counsel** 2:4,10
4:3 54:15
**COUNTY** 1:2
**couple** 5:19
59:12
**course** 6:1
**court** 1:1,18,21
6:2
**create** 21:18
23:11 44:16
45:10 47:1
**creating** 47:11
**crime** 48:11
**cul-de-sac** 9:22

9:23
―――――――
**D**
**D** 3:1
**danger** 46:18
48:11,14,20
**dangerous** 46:15
47:11 48:10
**database** 33:11
**date** 1:17 12:10
**Dawn** 1:18 61:4
61:11
**day** 12:4 56:8
**dcr.diamond...**
1:23
**dealing** 40:2
**decided** 58:24
**Defendants** 1:8
2:10
**defense** 56:22
**definitely** 37:9
**delay** 41:15
**deny** 41:7
**Department** 2:7
2:14 7:18
17:19 26:19
31:8,23 34:24
35:24 36:15
37:22 38:20
39:5 40:17
41:21 43:19
46:22
**deposed** 5:13
41:6
**deposition** 1:15
5:10 6:23 60:8
**describe** 10:2
**described** 9:22
**description** 3:8
12:7 14:16
23:18 24:4,6
24:14 25:13
**detailed** 34:17
**detectives** 33:13
**deter** 42:16
**determination**
33:15 53:4
**DIAMOND**
1:21

**difference** 6:1
**different** 28:24
29:1 50:12
**difficulties** 13:5
**direct** 34:11
39:1 59:1
61:16
**directed** 41:16
50:7
**directive** 38:20
39:13,13,16
40:18,20 41:8
41:21 42:5,7
42:13,19 43:6
43:11
**directives** 38:9
39:4 40:5,9
**directly** 8:21
34:8,21 35:8
35:14 36:2
49:21 58:7,16
58:17
**discharge** 9:14
**discussed** 50:10
51:15 54:16
**discussion** 14:10
**District** 22:5
**divided** 28:24
29:19
**document** 22:19
23:2,15,17
24:20 25:4
**documents**
22:17
**dog** 37:24 38:21
39:5 41:22
42:1,10,14,16
42:24 43:3,14
43:21 44:7,15
44:20 45:9,22
46:6,10,15,16
46:24 47:2,10
47:18 51:14
55:15 56:5
**dogs** 38:13 55:9
**doing** 32:7 40:19
50:21 52:12
**door** 8:19,21 9:2
9:17,20,21,24

11:18 16:3,4,6
16:12,24 19:3
20:9,9 25:9,12
25:17,23 26:4
26:4,11,17
28:7,7 29:10
30:1,16,22
32:11,12,14
34:8,20,20
35:2,8,10,14
36:2,5,11 44:5
47:18 52:5
53:4,5 54:17
54:18,19,20,23
54:24 55:5
56:23 57:4,14
57:15,20,24
58:12,17,20
59:2,3,14,21
59:23
**doors** 29:1 37:3
**double** 51:22
**downstairs** 9:16
**drawing** 13:16
**driveway** 8:17
10:1,3,5,8,13
11:6,19 14:15
25:22 55:4
**duly** 4:16
**dwelling** 33:12
53:3
―――――――
**E**
**E** 2:1,1 3:1
**E-mail** 2:5,11
**earlier** 15:16
**easiest** 26:17
**effect** 56:2
**effort** 36:6 52:4
**eight** 10:10,14
**elaborate** 48:5
50:13 57:8
**encompassed**
10:13
**encounter** 37:23
41:24 42:9
43:21,23 49:9
**encounters** 39:6
41:22

**enforce** 26:20,24
  53:10
**enforcement**
  31:10,16 32:23
  37:3 46:4
**enforcing** 44:15
  46:23 48:17
**enter** 11:17 26:3
  26:11 49:12
**entered** 10:5
  36:17
**entering** 37:24
  47:12,17,20
  53:14
**entire** 15:3,9
**entrance** 10:7
  32:14 33:16
  35:17
**entry** 9:19 11:9
  26:2 34:11
  35:1 53:13
**entryway** 50:19
**entryways** 53:1
**equipment** 43:2
  48:15
**ESQUIRE** 2:2,8
**estimate** 7:11,13
**ET** 1:7
**everybody** 5:20
  40:21
**exact** 35:22
**exactly** 10:23
  12:10 33:12
  55:1
**Examination**
  3:4,5 4:19 54:9
  56:19
**examined** 4:17
**example** 13:8
  15:1 53:1
**exception** 44:17
  45:10
**exclusively**
  30:13
**executed** 14:9
**executing** 56:8
  56:10
**EXHIBITS** 3:8
**exigent** 46:5

47:16,24
**existence** 38:19
  39:16 41:8
  45:9 59:3
**exited** 9:17
**expect** 12:21
  14:5
**experience** 11:8
  12:7 20:24
  21:3 27:2 30:8
  30:11 32:6
  35:10 38:8
  40:15 44:14
  45:9 46:3,21
  48:17
**experienced**
  21:3
**explain** 40:3
  55:21
**explanation**
  14:12

__F__
**face** 58:18
**faces** 58:17
**facing** 8:19
  54:21 57:5,12
**fact** 7:13 34:16
  43:18
**familiar** 5:18
  17:9
**far** 31:13,21
**fatal** 43:22
**FELISHATAY**
  1:4
**female** 9:6,10
**fence** 8:19
**fenced** 8:18 9:18
**figure** 37:2,13
  45:8 53:13
**filing** 4:4
**find** 33:11 51:5
**fine** 25:2
**first** 34:8,9,10
  35:15 36:1,3
  50:22 53:4
  54:14
**floor** 2:3 9:6,11
  30:14,16 32:10

32:14 34:8,9
  34:11,13,22
  35:3,12,15
  36:1,3,7 53:6
  53:11,14,17
**follow** 20:12
**follow-up** 13:21
  56:15,16 60:4
**followed** 21:5,6
  24:8
**follows** 4:17
**footage** 19:21
  20:1 22:12
**force** 38:9
**foregoing** 61:5
**forget** 9:12
**form** 4:6,13
  10:18 11:11,21
  12:22 14:20
  16:17 17:24
  19:5,15 20:3
  20:14 21:7
  22:2 24:9 25:1
  25:18 26:5,22
  27:13 28:8,17
  29:3,11 30:5
  30:18 31:17
  32:16 34:14
  35:4 36:8 37:5
  38:1,14,22
  39:10,18 40:6
  40:24 41:11
  42:2,21 43:24
  44:10,21 46:11
  47:3,21 48:21
  49:5,18 50:23
  51:8,17 52:7
  52:16 53:18
  57:21 58:5,14
  59:6,15,24
**forward** 6:22
**foundation** 31:4
  31:6
**four-foot** 8:19
**frequent** 18:19
**front** 19:3 20:9
  26:3,11,17
  28:7 29:9 30:1
  30:16 32:12,13

34:20 35:2,8
  35:10,14 36:5
  36:11 44:5
  54:18,23 57:3

__G__
**gain** 30:3 33:6
  35:3 36:6 39:8
  53:13
**general** 8:6
**generally** 55:8
**getting** 13:5,9
**give** 7:2,11 12:6
  17:15 37:9
  41:22 45:1
**given** 15:18 18:8
  18:16 25:13
  35:7,13 41:17
**giving** 7:13
**glass** 6:13
**go** 6:22 35:11
  40:22 58:10
**goes** 44:23
**going** 12:4 14:9
  21:9
**gonna** 6:8 7:5
  8:6 12:14
  22:22 23:10
  42:1 45:1,5
**good** 34:1 50:9
**gotten** 12:3
**grab** 6:13
**guess** 7:6 12:14
  22:20 46:17
  52:24
**guidance** 12:20
  41:23 43:19
  52:14,21
**gunshot** 9:3 17:2
  17:8
**guys** 40:19

__H__
**half** 17:3,6
**hand** 7:8
**handed** 40:10,20
**handle** 37:23
  38:13 47:2
**handling** 46:9
**happen** 12:15

13:1 19:14
**happened** 8:3
  19:13
**head** 6:6 8:13
  12:9 28:21
**headquarters**
  13:11
**hear** 9:1 14:2
  15:17,20,23
  16:1,2,5,8,24
  44:15 46:6
  49:15,23
**heard** 9:3,3
  28:23 29:2
  45:17,24
**HERIBERTO**
  1:15 3:3 4:15
  4:15
**high** 47:23 48:2
  48:8
**hit** 16:4,6
**hitting** 16:3
**hold** 9:9
**home** 26:9,10
  28:12,15,20,23
  29:8 30:1
**homes** 29:19
**homicide** 56:9
**house** 8:4 15:14
  44:7 49:3 58:4
  58:8,13,16
  59:4
**houses** 10:11,15

__I__
**idea** 34:1
**illegal** 36:16
**illness** 6:17
**immediate**
  48:14,20
**immediately**
  44:2
**impair** 6:18
**implements**
  40:18
**important** 49:1
**incident** 8:2,4,9
  19:12,22 21:4
  22:15 23:18
  24:4 27:9,11

49:16,24
**including** 25:23
**inconvenient**
  6:11
**indicate** 20:1
  50:18
**indicated** 54:24
**influence** 6:16
**information** 7:9
  13:2 18:9 23:4
  30:4 32:22
  33:6,10 34:2
  34:10,17 35:7
  35:13 36:12
  37:7,9 41:18
  56:11
**informed** 14:8
  18:24 31:22
**initial** 17:7
**inside** 9:18 44:7
  44:16 45:1,9
  46:6,16,18,24
  48:13,19 55:13
  55:18
**instruction** 7:5
  12:12,19
**instructions**
  12:3
**instructors**
  18:16
**intended** 6:10
**interaction** 42:1
**interactions**
  38:13,21
**intercept** 59:13
**Internal** 23:22
**interview** 24:1
**introductory** 7:5
**Investigation**
  23:20 24:2
**Involved** 23:19
  24:1
**involves** 8:2
**issue** 46:13
  56:17
**issued** 41:16
**issues** 37:13 51:7

**J**

**JACKAL** 2:16
**January** 7:22
**Jersey** 1:22
**job** 51:6
**JONAH** 2:15
**June** 1:5 8:3
  29:7,23 38:19
  39:4 43:17
**justification**
  51:6

**K**

**keep** 21:15 47:6
**Keith** 2:2 5:5
  56:14
**keith@victim...**
  2:5
**Kevin** 13:20
**killed** 51:14
**kind** 6:6 9:8
  10:6 12:4,7
  13:4 14:13
  48:15 51:20
  52:13,23 53:22
  55:4 58:20
**knew** 29:7 32:11
  32:11 34:16,19
  36:1 43:20
  44:9 57:23
**knock** 16:1,9,12
  16:20 17:7,10
  17:12,20 19:1
  19:11 20:6,12
  21:1 24:7,15
  25:5 44:17
  45:11
**knocking** 9:4,4
  17:22 19:3
  44:19 45:22
**know** 6:14 7:2,9
  7:10,10,12 8:7
  8:24 9:9,15
  12:13 13:15
  14:17 16:21
  22:16,24 25:9
  25:12 26:2
  29:15,19 30:21
  34:19 39:24
  44:6,8,9 45:2

46:23 47:17
  57:15,20
**knowledge** 7:4
  22:9 27:2 28:5
  39:6,9 41:9
**known** 41:10
  44:3

**L**

**Lane** 1:22
**large** 10:8,12
**larger** 47:8
**law** 2:2,7,14
  18:8
**lay** 5:20 31:4,5
**lead** 30:16,22
  35:11 37:4
**leads** 35:8,14
**learn** 19:24
  27:22
**led** 34:8 36:2
  52:6 54:24
**left** 10:5,22
  57:10
**leg** 13:24
**legal** 18:7
**let's** 48:12 51:21
**lethal** 41:24 42:9
**Lieutenant**
  20:11 49:15
**listening** 21:11
**little** 46:7
**living** 35:15 36:2
**location** 8:24
  58:3
**long** 7:20 53:16
**longer** 44:18
**look** 33:10 50:9
  51:20,21 52:23
**looked** 9:7 23:24
  50:16 55:1
**looking** 58:15
**looks** 26:8,9,9
**loud** 16:5

**M**

**M** 1:18 61:4,11
**male** 9:5,10
**manager** 33:20
**mandated** 18:15

**manner** 47:2
**Mantua** 1:22
**markings** 50:10
  50:11 51:15,24
  55:4
**mean** 4:10 14:23
  48:5 50:13
  57:8
**means** 48:9
**mechanically**
  40:3
**medication** 6:17
**Mellody** 13:19
  13:20 14:3
  49:23 50:5,20
  51:3,15 52:3
  54:16
**member** 7:17,20
  31:3,14 38:11
  40:16,20 43:20
**members** 18:23
**memory** 19:12
  19:18 21:10,13
**mentioned**
  13:21 55:8
**Miguel** 8:11
**mind** 32:5 51:11
**minute** 16:14,16
  17:3,3,5,6,16
**mis-worded**
  20:22
**missions** 52:13
**misstating** 20:15
  41:12
**misunderstood**
  11:2
**MK9** 47:7
**moment** 29:23
**monitor** 59:23
**Monk** 20:11
  49:15
**months** 13:17,22
**morning** 5:5
**mouth** 11:2,5
**MPO** 18:7,10
**multi** 26:20 27:1
  29:24 32:8
  52:15 53:3
**municipal** 18:11

18:13
**muzzle** 43:2,3
**muzzles** 42:19
  43:5

**N**

**N** 2:1 3:1
**name** 4:22 5:1,5
  13:16
**near** 47:18
**need** 6:12
**needed** 53:5
**needs** 6:2
**neighboring**
  22:13
**never** 6:3 42:23
  43:1 45:17,24
**new** 1:22 18:8
  39:3 40:10,18
**nine** 10:11
**nods** 6:5
**non** 48:12
**non-lethal** 46:8
  47:2
**nooses** 42:24
**normal** 6:1
**normally** 12:15
  19:14 26:10
  27:4 56:11
**North** 2:3
**Notary** 1:19
**notes** 21:16 61:6
**noticed** 50:9
**number** 8:12
  27:6,6,12,23
  32:10 36:17,19

**O**

**Object** 10:18
  11:11,20 12:22
  14:20 16:17
  17:24 19:5,15
  20:3,14 21:7
  22:2 24:9
  25:18 26:5,22
  27:13 28:17
  29:3,11 30:5
  30:18 31:17
  32:16 34:14
  35:4 36:8 37:5

38:1,14,22
39:10,18 40:6
40:24 41:11
42:2,21 43:24
44:10,21 46:11
47:3,21 48:21
49:5,18 50:23
51:8,17 52:7
52:16 53:18
57:21 58:5,14
59:6,15,24
**objecting** 24:24
**objection** 15:5
15:11 24:17
28:8 29:16
32:1 33:1,7,22
36:20 37:15
42:11 43:7,12
45:12,19,23
50:1 54:1
**objections** 4:5
4:11,12
**obligation** 7:2
**obvious** 40:1
**October** 14:1
**officer** 5:4 7:16
8:11,16 10:19
11:12 12:23
14:21 15:12
16:18,21 18:1
18:14 19:16
20:4,15 21:8
22:3 23:8,19
24:1,10,18
25:19 26:6,23
28:9,18 29:4
29:12,17 30:6
30:19 31:18
32:2,17 33:2,8
33:23 34:15
35:5 36:9,21
37:6 38:2,15
38:23 39:11,19
40:7 41:1,12
41:23 42:3,22
43:1,13 44:1
44:11,18,22
45:3,13 46:12
47:4,22 49:6

49:19 50:2,7
50:24 51:9,18
52:8,18 53:19
54:12 55:7
56:13 57:11,22
58:6 59:7,16
60:5
**officer's** 44:24
**officers** 18:11
20:8,24 22:1,5
22:6 35:2 41:7
42:8 53:13
59:12
**Okay** 5:7,8,23
6:8,9,14,15 7:6
7:7,14,15 9:21
14:2 21:15
27:9,18 34:4
35:20 39:24
52:11 57:18
58:2
**older** 9:5,10
**once** 18:23
**open** 34:20
**opening** 10:8
**operation** 12:20
13:13 14:5
25:17 27:19
31:16 32:24
34:5,6 46:5
50:22 53:10
59:11
**operations**
31:11
**opposed** 35:9
**Oral** 1:15
**order** 15:18 35:2
**ordered** 34:5
**outside** 55:14,15
55:18
**owner** 33:21

————————

**P**

**P** 2:1,1
**PA** 2:4,9
**PAGE** 3:2,8
**park** 10:16 11:3
**parked** 10:6,21
**Parkway** 2:8

**part** 31:7 38:7,7
38:8,11 52:11
53:23 59:10,11
59:17,23
**partial** 7:9
**partially** 57:6
**particular** 14:6
14:15 25:24
50:17 51:23,24
52:24 53:6
56:4 59:2
**passed** 16:11
19:10
**PENNSYLVA...**
1:2
**people** 20:21
**pepper** 42:15
47:7,8 55:9,13
55:17,23
**perfectly** 29:24
59:3
**permissible** 36:4
**person** 45:1
46:15,18 48:9
48:11,13,19
51:4
**person's** 28:6
49:3
**personal** 7:3
32:6 41:9
**personally** 12:13
22:8 31:9
**personnel** 48:12
**pertaining** 39:5
41:22
**pertains** 40:12
**Philadelphia** 1:2
1:7 2:4,7,9,14
7:18 17:19
26:19 31:8,23
34:24 35:24
36:4,15 37:21
38:20 39:5
40:17 41:21
43:18 46:22
**phrase** 28:20
**physically** 40:4
40:10,20 58:3
58:11 59:21

**place** 50:22
**placed** 58:3
**plaintiff** 1:5 2:4
5:6
**Plaintiff's** 54:15
**plan** 46:9 47:1
53:9
**planning** 46:4
46:22 47:16
**PLEAS** 1:1
**please** 7:12
**plenty** 11:13,16
11:18
**point** 6:13 7:24
8:23 9:1,12,14
9:19 10:10
15:17 26:17
44:23 45:3
49:10,12
**pointing** 51:7
**police** 7:18
17:19 18:11,13
18:16 26:19
31:8,23 34:24
35:24 36:15
37:22 38:20
39:5 40:17
41:21 43:1,19
44:18 46:22
**policies** 31:22
34:23 35:23
36:4
**pose** 46:19 48:13
**poses** 48:11,20
**position** 15:22
**possibility** 30:15
32:13
**possible** 20:23
57:18
**possibly** 20:20
33:13
**preliminary**
5:19
**prepare** 22:18
23:1 31:15
**prepared** 6:22
**present** 1:19
2:14
**presumption**

48:19
**pretty** 5:17 10:9
18:6
**prevent** 42:14
**prior** 12:20 13:9
13:11 14:4
17:22 23:22
25:8,17 27:19
29:7 31:10
32:22 39:3
43:17 44:3,5
47:19 54:22
56:23 57:14
59:4
**privilege** 24:21
24:24
**privileged** 24:20
**probably** 33:10
**procedures**
31:23 34:24
35:24 36:5
**process** 5:18
6:12
**Professional**
1:18
**pronounce** 4:22
5:1
**properties** 52:15
55:2,3
**property** 8:17
9:20 12:3,4
14:14 15:18
17:17,22,23
19:4 22:13
25:8 26:3
33:20,20 44:16
45:10 46:7,16
47:10,20 48:13
50:8,12 51:16
52:1,5 55:14
55:16,18 57:11
57:19
**provide** 30:2
32:14
**provided** 34:11
43:19
**Public** 1:19
**purpose** 59:10
**pursuant** 17:20

**put** 4:9 11:2,4

**Q**

**question** 4:6,13
  8:7 11:24
  20:22 23:7,11
  25:1 27:10
  28:3 30:12
  35:22,23 39:3
  39:24
**questions** 5:19
  22:22 54:4,5
  54:13,15
**Quintana** 1:15
  3:3 4:15,23 5:2
  5:3,4 7:16
  20:16

**R**

**R** 2:1,8
**R-I-V-E-R-A**
  8:11
**radio** 15:17,20
  21:11
**ram** 16:3
**ramp** 16:4
**read** 24:7,7
**reading** 39:13
  39:22
**ready** 43:22
**really** 20:8 35:22
  40:1 50:9
**rear** 8:13,16,19
  8:21 9:6,11,17
  9:20 10:10,15
  11:7,17,18
  13:6 14:14,16
  15:21,22 16:6
  21:10 25:9,12
  25:17,21,22,23
  26:4,8 28:7
  30:14,16 32:10
  32:11,15 34:13
  34:22 35:3
  36:6 50:8,16
  52:1,5 56:23
  57:12,15,19
  59:4,11,14,21
**reason** 8:12
  40:10 48:7

**recall** 8:4 12:16
  13:14 14:3
  16:13 28:14
  43:5,8,10,15
  49:20 51:1
  52:9 54:18,22
  56:24 57:17
**receive** 18:4,18
  38:5 52:21
**received** 12:19
  15:8 17:19
  26:18 31:3,14
  37:1,22 38:12
  52:12
**recollection**
  38:10 41:20
**recon** 37:8 52:22
**reconnaissance**
  12:6,9,17
  25:14,15 28:11
  28:15 31:10,16
  32:7 37:2,12
  49:1 50:21
  51:4 52:12,15
  53:12,24 56:12
**recons** 30:8
**record** 4:10
  23:12
**recording** 21:19
  22:14
**RECOVERY**
  2:2
**Redbud** 1:22
**reference** 24:15
  25:5
**referred** 12:18
  22:12 30:13
  32:6 43:6,11
**referring** 30:12
**refers** 42:19
**regarding** 54:16
  54:17
**regardless** 59:20
**regards** 38:12
  39:12 51:24
  52:12,22
**regular** 26:9,10
**released** 18:8
**relevant** 40:18

  41:8
**remainder** 56:7
**remember** 8:8
  8:10,12 9:3
  10:20,23 12:8
  16:20 21:4
**remind** 12:11
**Remote** 1:15
**reporter** 1:18
  6:2 61:12,17
**REPORTING**
  1:21
**represent** 20:10
  22:11
**represents** 5:6
**reproduction**
  61:15
**required** 18:18
  44:18
**requires** 19:1
**reserved** 4:6,11
**residence** 26:21
  28:6 29:24
  32:8 34:12,21
  36:17 37:24
  46:23,24 47:17
  48:18,20 49:13
  52:15
**residual** 56:1
**responses** 6:4,7
**responsible** 31:9
  50:21 51:4
**rest** 56:2
**revealed** 34:7
**review** 22:17
  23:15,21
**reviewed** 22:19
  23:2 24:3 25:4
**right** 8:20 10:2
  10:12 11:6
  12:11 29:22
  37:11 39:15
  41:4 42:7 45:7
  48:16 49:3
  53:9 54:21
  57:6,12 58:18
  58:21
**risk** 47:23 48:2,8
**Rivera** 8:11,16

  50:7 57:11
**role** 31:7
**room** 11:9,14,16
  11:18 35:15
  36:2
**routine** 21:2
**row** 26:9 28:12
  28:15,20,23
  29:8,19 30:1
**rule** 17:10,13,20
  19:1 20:13,20
  21:2,5 24:8,16
  25:6 44:17
  45:11
**running** 59:13

**S**

**S** 2:1
**safety** 44:24
  45:4
**SANTIAGO-...**
  2:15
**save** 8:7
**saw** 24:15 50:17
  51:23
**saying** 29:22
  58:2
**says** 35:13
**scene** 22:1
**screaming** 16:22
**screams** 16:21
**sealing** 4:3
**search** 15:9
**seat** 46:17
**second** 9:6,11
  30:14,16 32:10
  32:14 34:12,22
  35:3,12,17
  36:7 46:17
  50:18,19 51:21
  53:5
**seconds** 9:1,2
  16:14,16 17:16
  17:21 19:2,10
  20:2 21:1
  44:19
**see** 8:21 10:9
  24:11 27:16
  33:14 54:20

  56:23 57:4,5,6
  57:16 59:21
**seeing** 12:9
  54:18,22
**seen** 21:6 42:23
  42:24 43:1
  58:12
**sending** 32:22
  49:2
**sense** 13:4 14:23
  35:7,16
**sensitivity** 34:1
**sent** 22:19 35:1
**sergeant** 13:15
  13:19,20 14:3
  49:23 50:5,20
  51:3,14 52:3
  54:16
**serve** 53:2
**served** 30:9 50:6
**serving** 8:14
  16:22 17:15
  48:2
**set** 33:13 35:11
**sheet** 12:6,10,18
  13:3 25:15
  28:11,15 56:12
**Shooting** 23:20
  24:2
**Shorthand**
  61:12
**shot** 13:24
**side** 8:22 57:10
  57:12 58:21
**signal** 9:9
**signaled** 9:14,16
**signing** 4:3
**similar** 5:24
**sir** 4:23 6:8 7:6
  7:14 9:21 11:1
  11:6,21,24
  12:11 14:2
  19:6,20 22:11
  22:21 26:18
  31:1 35:21
  37:19 47:15
  48:16 51:13
  52:11 53:9
  54:3 56:22

60:3
**site** 13:9
**situation** 32:22
47:9,12,15
55:22
**slow** 46:7
**small** 8:18
**someone's** 48:18
**sorry** 4:24 14:2
17:5 20:5
26:14 27:15
38:24
**sort** 6:17 12:19
13:8 21:15,18
24:3 37:1,12
37:13 41:22
45:10 46:9
47:1 52:13
**South** 2:3
**speak** 6:4,8
**speaking** 37:18
**special** 52:14
**specific** 19:12
27:12,23,24
38:12 50:10,11
52:14
**specifically**
12:16 14:18,18
28:15 30:13
33:17 40:12
52:17 53:23
**specified** 27:23
32:9
**specify** 27:5,10
27:12,24
**speculate** 7:6
12:14 30:21
31:2
**spoken** 6:7
**spray** 42:16 47:7
47:8 55:9,13
55:17,24 56:2
**stairs** 35:11
**stand** 58:24
**standby** 9:18
**standing** 58:16
**stands** 14:6
58:19
**state** 18:15

28:10 51:11
**stated** 28:11,12
42:13
**statement** 23:19
23:21
**stationed** 11:9
**stenographic**
61:6
**steps** 8:22 33:5
**stipulated** 4:2
**stipulations** 4:10
**story** 53:3
**street** 2:3,9 10:7
10:23
**strike** 20:21
27:10 28:3
**struggling** 58:11
**substance** 6:17
**supervision**
61:16
**supposed** 17:15
40:22
**sure** 5:17 7:1
48:7 49:2
51:22 58:23
**surprise** 20:13
20:17
**surprised** 19:24
**surveillance**
19:21 20:1
22:12 33:14,16
34:5,6
**suspect** 28:2,4
45:2 56:9
**SWAT** 7:17,21
11:9,17 18:24
22:4 31:4,7,15
31:24 32:23
35:1 38:7,11
40:16,21,21
43:20 44:14
48:7,12,17
49:2 56:7
**sworn** 4:16

_____
**T**
_____
**take** 5:22 6:12
33:5 45:3,5
56:3

**taken** 1:16 53:8
61:7
**takes** 46:16
**taser** 42:14,14
**tasked** 32:7
**team** 8:23 9:9,15
9:18 11:10
23:20 26:2
35:1 46:19
47:12 49:1
56:2,8
**technology** 1:16
**Tel** 2:5,10
**tell** 8:8 12:15
23:2,14 52:3
**Term** 1:5
**testified** 4:17
15:16 20:11
29:23
**testify** 6:18
**testimony** 7:3
18:22 20:15
22:18 23:1,16
23:23 35:20
38:18 41:12
51:13
**thank** 54:6 60:2
60:5
**thanks** 5:4 35:20
**thereof** 40:22
**thing** 6:6 37:12
53:22
**things** 5:20 37:1
52:23
**think** 5:9,22
9:12 10:6,12
12:15 13:14,18
15:16 20:20,23
31:4 54:4
57:18
**third** 53:11,14
53:17
**THOMAS** 2:2
**thought** 11:3
**three** 5:14
**tight** 56:1
**time** 4:7,12 5:22
6:4,8 7:6 8:8
16:11,23 17:1

18:7 21:5
37:14,19,21
40:2,8,17
41:16,17 44:24
45:5 49:16
54:6,7 59:2,21
60:6
**timeline** 9:13
**times** 5:12,14
21:4,6
**today** 6:19 7:2
54:6
**today's** 6:23
22:18 23:1,16
23:22
**told** 9:8 23:4,5
25:11,16
**tool** 42:19
**tools** 42:8 43:21
46:8
**top** 8:13 12:8
28:20
**trained** 53:23
**training** 17:18
18:5,12,14,17
26:19 31:3,14
36:14,24 37:23
38:6,7,12
45:18 52:11
**transcribed** 61:6
**transcript** 57:3
61:6,15
**trial** 4:7,12
**truck** 10:6,17,21
10:22
**true** 42:18 61:5
**truthful** 7:3
**truthfully** 6:19
**try** 32:21 33:6
37:2,13 46:9
47:1
**trying** 9:7 11:1,4
45:8 51:5
**Tuesday** 61:7
**two** 20:2 30:14
32:10 35:3
36:6
**two-story** 14:14
**type** 30:1 33:12

_____
**U**
_____
**UDO-INYANG**
2:16
**uncomfortable**
6:11
**understand** 5:21
23:6 34:10
36:15 45:7
56:7 58:11
**understanding**
15:2,8 34:23
35:23 55:8
**understood** 48:1
**uniform** 48:12
**unit** 7:17,21
11:9,17 18:24
22:4 24:2 31:4
31:8,15,24
32:23 35:1
37:2 38:11
40:16,21,21
43:20 44:15
48:7,17 49:2
**unnecessarily**
6:11
**update** 40:4
**updated** 39:21
**updates** 18:7
**use** 33:16 38:9
42:9,14,15
43:1 53:2
55:12 56:4
**usual** 4:10
**Usually** 33:24

_____
**V**
_____
**valid** 28:5
**vantage** 10:10
**verbal** 6:5 12:19
**VICTIMS'** 2:2
**video** 22:14
**view** 19:20
25:22 59:1
**violent** 48:10
**visual** 21:19
**volume** 55:23
**volunteer** 23:3
**vs** 1:6

| W | | | | |
|---|---|---|---|---|
| **wait** 44:19 45:21 | 24:19 25:2,3 | 50:3 51:1,10 | 39:18 40:6,24 | **4** 3:4 |
| **waived** 4:4 | 26:1,12 27:8 | 51:19 52:9,19 | 41:11 42:2,11 | **406** 1:22 |
| **walked** 50:15 | 27:17 28:13,22 | 53:20 54:2 | 42:21 43:7,12 | |
| **walking** 34:21 | 29:6,14,21 | 57:23 58:7,15 | 43:24 44:10,21 | **5** |
| **wall** 58:19,21 | 30:10,24 31:20 | 59:8,17 60:1 | 45:12,19,23 | **54** 3:5 |
| **want** 6:13 7:10 | 32:4,20 33:4 | **wondering** 30:3 | 46:11 47:3,21 | **56** 3:4 |
| 10:21 24:22 | 33:18 34:3,18 | **word** 28:20 | 48:21 49:5,18 | **589-1107** 1:23 |
| 35:21 54:14 | 35:19 36:13,23 | **words** 8:20 11:2 | 50:1,23 51:8 | |
| 55:7 56:6 | 37:10,17 38:4 | 11:4 | 51:17 52:7,16 | **6** |
| **wanted** 11:17 | 38:17 39:2,14 | **work** 5:21 13:17 | 53:18 54:1,11 | **60** 17:21 19:2,10 |
| 54:17 | 39:23 40:14 | 13:22 | 56:13 57:21 | 21:1 44:19 |
| **warrant** 8:14 | 41:3,19 42:6 | **working** 8:10 | 58:5,14 59:6 | |
| 14:8,17,19 | 42:17 43:4,9 | **world** 40:1 | 59:15,24 60:4 | **7** |
| 15:2,8,9,14 | 43:16 44:4,13 | **wouldn't** 53:12 | | |
| 16:22 17:15 | 45:6,16,20 | **write** 6:2,5 | **0** | **8** |
| 26:20 27:1,4 | 46:2,20 47:14 | **written** 12:10 | **01633** 1:6 | **856** 1:23 |
| 27:10,11,16,23 | 48:4,23 49:8 | 24:4,6,14 | **08051** 1:22 | |
| 28:2,4 30:12 | 49:22 50:4 | | | |
| 31:10,16 32:9 | 51:2,12 52:2 | **X** | **1** | |
| 32:23 36:18 | 52:10,20 53:21 | **X** 3:1 | **10:00** 1:17 | |
| 37:3 44:15 | 54:3 56:16,21 | | **11:05** 60:9 | |
| 45:2 46:4,14 | 58:1,9,22 59:9 | **Y** | **121** 2:3 | |
| 46:23 47:24 | 59:19 60:2 | **yard** 8:18 9:18 | **1515** 2:9 | |
| 48:3,8,9,18 | **whatsoever** 52:4 | **Yeah** 26:15 | **15th** 22:5 | |
| 50:6 53:2,10 | **window** 9:6,11 | **year** 18:6,23 | **18th** 2:3 | |
| 53:16 56:8,10 | **witness** 3:2 4:16 | **yearly** 18:18,20 | **19102** 2:9 | |
| **warrants** 30:9 | 10:20 11:13 | **years** 5:14,15 | **19107** 2:4 | |
| **water** 6:13 | 12:24 14:22 | 7:23 40:16 | | |
| **way** 26:7,8 | 15:13 16:19 | **yell** 15:24 | **2** | |
| 27:22 47:11 | 18:2 19:7,17 | | **20** 5:14,15 7:23 | |
| **ways** 5:24 | 20:5,17 21:9 | **Z** | 40:16 | |
| **we'll** 8:7 | 22:4 23:9 | **Zoom** 1:16 | **2002** 7:22 | |
| **we're** 6:7 12:12 | 24:11 25:20 | **Zurbriggen** 2:8 | **2021** 8:3 29:7,23 | |
| 18:8 37:18 | 26:7,24 27:15 | 3:5 10:18 | 38:19 39:4 | |
| 39:21 40:10 | 28:10,19 29:5 | 11:11,20 12:22 | 43:17 | |
| 48:2 | 29:13,18 30:7 | 14:20 15:5,11 | **2022** 1:5 | |
| **we've** 30:9 40:11 | 30:20 31:19 | 16:17 17:24 | **2023** 1:12 61:7 | |
| **wear** 21:21 | 32:3,18 33:3,9 | 19:5,15 20:3 | **215-546-1433** | |
| **wearing** 22:1 | 33:24 34:16 | 20:14 21:7 | 2:5 | |
| **went** 8:16 | 35:6 36:10,22 | 22:2,20 23:6 | **215-683-5114** | |
| **West** 2:2 3:4 4:9 | 37:7,16 38:3 | 24:9,17,23 | 2:10 | |
| 4:21 5:5 10:24 | 38:16,24 39:12 | 25:18 26:5,22 | **23** 1:12 61:7 | |
| 11:15,22 13:7 | 39:20 40:8 | 27:13 28:8,17 | | |
| 14:24 15:6,15 | 41:2,14 42:4 | 29:3,11,16 | **3** | |
| 17:4 18:3 19:8 | 42:12,23 43:8 | 30:5,18 31:17 | **30** 16:13,15 | |
| 19:19 20:7,19 | 43:14 44:2,12 | 32:1,16 33:1,7 | 17:16,21 19:2 | |
| 21:14 22:7 | 44:23 45:14,24 | 33:22 34:14 | 19:9 21:1 | |
| 23:10,13 24:13 | 46:13 47:5,23 | 35:4 36:8,20 | 44:19 | |
| | 48:22 49:7,20 | 37:5,15 38:1 | | |
| | | 38:14,22 39:10 | **4** | |

# EXHIBIT "I"

# VERONIQUE N. VALLIERE, PSY.D.
# VALLIERE & COUNSELING ASSOCIATES, Inc.

Forensic Treatment Services

P.O. Box 864
Fogelsville, PA 18051
Telephone: (610) 530-8392
Fax: (610) 530-8940

## Clinical Evaluation

**Client:** Alvarado, Felishatay  **Clinician:** Veronique N. Valliere, Psy.D.
**DOB:** 12/1/89  **Date of Report:** 10/24/23
**Referral Source:** Victims' Recovery Law Center  **Dates of Interviews:** 7/12/23; 8/4/23
==============================================================

## Reason for Referral

Ms. Alvarado was referred for an evaluation to assess the psychological, emotional, and social impact of an incident involving police officers who entered her home and shot her dog. Officers were attempted to execute a warrant and entered Ms. Alvarado's home, the wrong address. During the breach of Ms. Alvarado's apartment, officers killed Ms. Alvarado's dog and terrified Ms. Alvarado. Ms. Alvarado is involved in a lawsuit against the City of Philadelphia and multiple co-defendants for their "collective gross negligence, careless, reckless, willful and wanton disregard for the rights and safety of" Ms. Alvarado. The referral questions include:

- The nature of any psychological harm caused to the victim as a result of the alleged abuse;
- Whether the victim has recovered from the harm or continues to suffer from the harm;
- Her prognosis with respect to recovery, and how and for how long the harm will impact her life; and,
- Treatment recommendations if necessary, and if required, the nature, extent, and expected duration of the treatment.

Ms. Alvarado appeared as scheduled for her evaluation, which was performed on a secure video platform for a total of 3.0 hours, including testing. Testing was administered via secure link. Ms. Alvarado was coherent and oriented throughout her interview. She demonstrated no overt signs of confusion, incoherence, or psychosis during the interview. The purpose of the interview and the limits to confidentiality were explained. Ms. Alvarado understood that the disclosures she made, and the results of testing would be written into an evaluation for her attorney. It appeared that her competence to participate in the interview was not compromised in any way. There was nothing to suggest that her ability to consent to the interview was significantly compromised.

This evaluation is limited to the information attained by history, records, interview, collateral contacts, and test results. New or supplemental information potentially could impact the opinions offered in this report. If new or contradictory information is obtained, this examiner would require review of the information to incorporate that information into the formulation of this report. Any self-report can be impacted by bias. However, Ms. Alvarado's reported history was entirely consistent with the provided information. There is no reason to question the legitimacy of her self-report.

## Test & Techniques
Clinical Interview (total 3 hours)
Collateral Interviews
        Ms. Yara Alvarado – sister (25 minutes)

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA. This information cannot be copied or re-distributed without specific consent. Violators of these requirements may be subject to reporting and penalties under the law.

Alvarado, Felishatay                                                                                                        page 2
## Confidential Evaluation

Review of Records:
    Body Cam Videos of Interviews of F. & Y. Alvarado on 6/4/21
    Deposition of F. Alvarado dated 8/11/23
    Deposition of Y. Alvarado dated 8/28/23
    Encounter Note – Greater Philadelphia Health Action, Inc. (GPHA) dated 3/8/23
    ESA Verification #ESA3691099894 by F. Welch, MD dated 4/24/21
    Ledger from Greater Philadelphia Health Action, Inc. (GPHA)
    Plaintiff's Amended Complaint with Exhibit
    Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production
Testing:
    Personality Assessment Inventory (PAI)
    Trauma Symptom Inventory – 2nd Edition (TSI-2)

## Qualifications of Examiner

I am a licensed clinical psychologist and have worked in the field of interpersonal violence for 30 years.  I received my doctorate in Clinical Psychology from the Graduate School of Applied and Professional Psychology of Rutgers University in January 1993.  I became licensed as a Psychologist in May 1995.  I have gained my knowledge through my own studies and clinical work treating hundreds of victims of assault.  Additionally, having evaluated, interviewed, and/or treated thousands of offenders, I have learned about the methods employed by sexual offenders and the dynamics of sexual abuse, along with the ways in which victims have responded to their assaults and the traumatic impact of sexual assault.

I am the owner/operator of two outpatient treatment centers, one for victims of violence and the other for offenders of violence.  I provide treatment, evaluations, and consultation, as well as supervise the work of numerous other clinicians.  I have served as an expert in courts across the country and internationally and with all branches of the military.  I have served as a consultant and/or expert witness in over 150 courts martials and in many other trials as an expert in clinical psychology, forensic psychology, victim dynamics and response to violence/abuse, trauma, and offender risk, dynamics, and rehabilitation potential.  I have also served as an evaluator in civil court in cases involving damages to victims related to abuse or assaults they have experienced at the hands of an individual or involving the neglect or failure to act by an agency or organization.  I have served on the Pennsylvania Sexual Offender Assessment Board since 1997, performing thousands of offender evaluations.

I act as a consultant and trainer for many agencies and organizations.  I have provided training nationally and internationally for such agencies as the Federal Bureau of Investigations, the Department of Defense, the Department of Justice, the Bureau of Indian Affairs, all branches of the military, and for agencies and institutions in other countries.  I have testified regarding sexual assault in the military to the U.S. Congress and to the Pennsylvania General Assembly regarding a number of laws and issues involving sexual assault and violence.  I have consulted with the Department of Defense and the U.S. Department of Justice in policy creation regarding sexual assault and understanding sexual offenders.  I contributed to the Prison Rape Elimination Act (PREA).  I have been consulted as an expert on sexual assault and domestic violence in media articles, and I have appeared on television and radio shows.

I have written three books published by Routledge Press, Understanding Victims of Interpersonal Violence (2019), Unmasking the Sexual Offender (2023), and Successful Prosecution of Intimate Violence (2023), regarding topics related to the substance of my Expert Report.  The former is a guide for investigators and prosecutors designed to provide accessible information for personnel "in the trenches" with victims of violence to aid in understanding and explaining their behavior.  The second provides information about the motivations, techniques, and dynamics of sexual offenders and their behaviors and outlines ways in which offenders manipulate and exploit others.

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

Alvarado, Felishatay                                                                                    page 3
**Confidential Evaluation**

## Compensation

Valliere & Counseling Associates, Inc. is being compensated for its time at hourly rates and, for its out-of-pocket expenses, at cost.  My hourly rate is $350.00, up to $3500.00 per day.  The compensation paid to Valliere & Counseling Associates, Inc. is not contingent upon the nature or substance of my findings or on the outcome of this matter.

## Offense/Incident Information

Ms. Alvarado lived alone in Philadelphia, renting a first-floor apartment with her two dogs, three cats, and bird.  Ms. Alvarado was living a quiet life, where she supported herself on Social Security Disability and occasional jobs she could hold when she felt well enough.  Ms. Alvarado suffers from Von Willebrand disease, a bleeding disorder that prevents the individual's blood from clotting properly.  She often felt poorly, with fatigue and pain from the disorder.  Ms. Alvarado also suffered from anxiety and depression, lifelong issues that began in her early teen years, but worsening significantly since her mother's death in 2013.

After a period of depression and grief when her mother died, Ms. Alvarado adopted her Akuma, who provided emotional support and protection for her.  He, along with Ms. Alvarado's smaller dog Penelope, became certified as emotional support animals in April 2021, to assist Ms. Alvarado with her "high stress levels."  Her dog and other pets were her primary sources of solace and companionship.  "My animals were the only thing I got out of bed for," she said, describing how her pets kept her going when she was severely depressed.  Akuma, a pit bull, also helped Ms. Alvarado feel safe and protected as a single woman living alone in Philadelphia.  She trained him well and he was "the love of [her] life."

On June 4, 2021, at approximately 5:00 in the morning, Ms. Alvarado was getting up and getting ready for work, preparing to get in the shower.  She had on a tank top, wrapping her naked lower half with a towel.  On the way to the shower, Ms. Alvarado heard her small parrot screaming "an alert," so went to her living room went to see what was happening.  Suddenly, her door was smashed in, followed by numerous police officers.  As Ms. Alvarado used multiple deadbolts on her door, the crash was significant.  The officers began shouting and Ms. Alvarado's dogs began barking.  She was ordered to sit on the floor, half-naked.  Ms. Alvarado immediately called to her pit bull Akuma, telling him to "calm."  He sat beside her and stopped barking.  Ms. Alvarado asked the police to allow her to put the dogs in their kennel.  However, the police "just shot Akuma."  She said the dog was not barking or growling when he was shot.

Ms. Alvarado was immediately grief stricken when she heard the gunshot.  Penelope, her small dog, ran to her, screaming and yelping loudly.  Penelope was shaking and urinated on Ms. Alvarado, as Ms. Alvarado was sitting on the floor trying to calm the little dog.  The police would not let her get up and would not tell Ms. Alvarado what had happened, simply commanding her to "be quiet, don't move."  Ms. Alvarado felt panicky.  She could not see Akuma but knew that he screamed when he was shot.  Ms. Alvarado remained sitting on the floor for "a half hour."  She saw one officer "kick" at the dog.  After, Ms. Alvarado said that the police did not want to give her the dog's body.  She had to advocate to get Akuma's body for cremation.  When Ms. Alvarado did get her dog's body, she saw that he had been shot in the face.

The investigation revealed that officers falsely believed that Ms. Alvarado's apartment gave them access to a second-floor apartment where they were trying to serve the warrant.  They ignored Ms. Alvarado when she tried to inform them that they could not reach the other apartment from her and had entered her home under problematic expectations.  Ms. Alvarado had to remain on the floor on her knees, half-naked, without information and terrified, smelling her dog's blood for about a half hour.  During the incident, Ms. Alvarado's sister came over, screaming for Ms. Alvarado because she heard the gunshot and did not know if Ms. Alvarado had been shot.

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

Alvarado, Felishatay                                                                              page 4
### Confidential Evaluation

Ms. Alvarado's apartment was left in chaos and the floor covered in blood.  Ms. Alvarado could not bear to return nor to clean up the blood.  Her sister Yara had to clean the mess.  Ms. Alvarado moved to another apartment as soon as she could, staying with her sister for about a month until they could find another place.  Ms. ** had difficulty retrieving Akuma's body and then had to pay for his cremation.

### Relevant Historical Information

Ms. Alvarado is a 33-year-old, single Hispanic female.  She has an olive complexion, with brown eyes and black hair.  She wore glasses during her interview.  Ms. Alvarado is slender.

Ms. Alvarado was born and raised in North Philadelphia where she has lived her entire life.  She was raised by a single mother of seven.  Ms. Alvarado is the youngest.  Her mother had her later in life, when her mother was 40.  Ms. Alvarado has two siblings, a brother and a sister, with the same biological parents.  She has numerous half-siblings.  She grew up with her sister and two of her brothers.  Some of her siblings are much older than her.  Ms. Alvarado reported that her father "didn't want anything to do with" his children.  She looked for him at some point, but her father was never in her life, leaving when she was six months old.

Ms. Alvarado described her childhood as having its "ups and downs," especially financially.  Ms. Alvarado's mother is deceased, dying in 2013.  Ms. Alvarado was serving as her primary caretaker as her mother had COPD, arthritis, and diabetes.  Ms. Alvarado moved to Georgia after high school but returned after three years to care for her mother.  Her mother's death "hit" Ms. Alvarado "hard."  She became very depressed and withdrawn after her mother died, only "getting out of bed" to care for her mother's elderly dog.  Ms. Alvarado adopted Akuma after her mother's dog died within the same year or so.

Ms. Alvarado denied ever having been abused as child, physically, sexually, or emotionally.  She described school as "okay," but reported that she struggled with reading.  She "never got help," not receiving an IEP or special education.  She did not graduate high school and did not attain her GED.

Ms. Alvarado reported that she was "always sick" as a child.  She was on disability beginning as a child, which she supports herself now with, supplementing her SSD with part-time work.  She had German measles and has Von Willebrand's disease, a bleeding disorder characterized by blood-clotting issues that can lead to bleeding.  She can feel tired and ill at times.  Ms. Alvarado does work when she "feels okay," holding lower skilled retail and factory jobs.  Ms. Alvarado did not work since the "incident," dealing with depression, anxiety, and fatigue.  Ms. Alvarado may have recently gotten a part-time job as a companion for the elderly, which her sister pushed her to do to "get her out of the house."

Ms. Alvarado has never been married.  She has no children.  Ms. Alvarado has never been in a long-term relationship.  "I like to be by myself," she said.

Treatment History/Substance Abuse History:  As a child Ms. Alvarado suffered from depression.  Her mother put her into therapy, but "it didn't work."  Ms. Alvarado described herself as "quiet," saying she did not like to talk.  It was hard for her to open up about her feelings.  The therapists were unable to encourage her participation in treatment.  Ms. Alvarado is currently in treatment to learn to cope with her trauma.

Ms. Alvarado has no history of substance abuse.  She has never received substance abuse treatment.

Criminal/Legal History:  Ms. Alvarado has never had contact with the law prior to this incident.  She has no criminal history.

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

**Confidential Evaluation**

**Interview/Behavioral Observations**

Ms. Alvarado appeared as scheduled for her interview.  She was appropriately dressed and groomed.  Ms. Alvarado understood the purpose of the evaluation.  She was coherent and oriented.  Ms. Alvarado displayed not overt signs of severe depression, dysregulation, or difficulties with reality testing.  Ms. Alvarado was able to participate effectively in the interview.

Interpersonally, Ms. Alvarado was very pleasant and cooperative.  She spoke sadly much of the time, presenting with some depressed affect, though she tried very hard to be upbeat and optimistic.  When we discussed difficult topics, Ms. Alvarado became sad, though she tended to brush off the feelings so as not to trouble me or concern me with her well-being.  This was consistent with how Ms. Alvarado described herself and how her sister later described Ms. Alvarado, as not wanting to be a bother, not asking for help, and being reluctant to open up and be vulnerable about her feelings.

Ms. Alvarado was very simplistic and concrete.  She was not able to describe her thoughts and feelings well, using unsophisticated language and terms to express herself.  For example, when describing a severe level of depression that entailed not being able to get out of bed, not bathing, and not eating, she simply said she was "really sad."  When describing symptoms of panic attacks and terror, she used the simple terms of "nervous" and "anxious."  Ms. Alvarado does not have the language or insight to give a complex description of her inner life.  This is at least partially due to Ms. Alvarado's limitations and history of learning disabilities.  Her difficulties with reading and comprehension were recognizable and impacted her testing as well.  Ms. Alvarado seems to maintain simplistic ideas of herself and the world, living a quiet, peaceful, and uncomplicated life.  She was introverted and self-protective prior to this event, something that she has become even more so since she was violated.

Ms. Alvarado was cooperative.  She did not try to evade questions or intimidate the examiner.  She was not dramatic or exaggerating.  She spoke softly and clearly.  She did not display any problematic interpersonal behavior that would impact the interview.  Ms. Alvarado did not seem angry, hostile, or retaliatory.  She was very sad about her losses and conveyed a sense of fear and vulnerability.  Ms. Alvarado seemed to be struggling with disappointment over basic expectations of how she was treated.  For example, Ms. Alvarado said sadly when describing the officers shooting her dog, "They didn't even say sorry."

**Interview Information**

When Ms. Alvarado thinks about the raid she is "sad."  "It makes me want to cry," she said, "I relive it over and over again."  Ms. Alvarado is living across the street from her current apartment.  After the incident, she could not return to her home, living with her sister until they could find Ms. Alvarado a new apartment.  She "still smelled the blood" in her apartment, which triggered her and caused her to "relive" the killing of her dog and her fear.  She did not want to go home anymore.  Now, living across the street from her old home still reminds her and produces bad memories, but it is "not as bad."  Ms. Alvarado cried "all the time" after Akuma was killed.  She could not eat or sleep.  She became fearful of police. She was "paranoid" all the time.

Ms. Alvarado suffers from significant fear and anxiety now.  "My sense of safety is gone," Ms. Alvarado said, explaining that she always feels on guard and vigilant, even in her new home.  "Every time someone knocks on the door," she said, "I am afraid.  Every noise startles me.  I am paranoid and afraid."  This was not a problem before, even when she struggled with depression.  "I feel unsafe all the time," Ms. Alvarado said sadly.

Ms. Alvarado has had severe sleeping issues since the raid.  The police entered her home when it was dark, very early in the morning.  Ms. Alvarado was vulnerable and unprepared.  Now, she feels very vulnerable when she sleeps.  She "always wakes up" during the night, "scared someone is coming in" her

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

Alvarado, Felishatay                                                                                          page 6
### Confidential Evaluation

home repeatedly during the night.  Ms. Alvarado also has difficulties falling asleep.  Often, she stays up to three or four in the morning.  Ms. Alvarado stated that she does not dream anymore.  She had frequent nightmares that were terrifying.  She would then wake up and "think about it" (the incident).  Then she cannot sleep.  Typically, Ms. Alvarado sleeps four hours, a disrupted sleep.  At times she sleeps during the day.  On good days, Ms. Alvarado will get "seven hours at the most" of sleep, but it is disrupted.  Overall, Ms. Alvarado reported she has "never really slept after the incident."  Ms. Alvarado eats less due to her anxiety.  Her weight has fluctuated.

Ms. Alvarado has flashbacks and intrusive thoughts.  She said she will be driving and "all of the sudden" she will begin to relive the event.  When she hears someone knock on the door, "it triggers and [she] will go back to that day."  "If I see a cop car parked near where I live," Ms. Alvarado immediately gets anxious.  "It is improving," Ms. Alvarado said, "but I try to avoid them."  Dogs that look like Akuma trigger sadness, anxiety, and grief for Ms. Alvarado.

The event has changed Ms. Alvarado's perception of police.  She does not feel safe.  This is a regrettable change for Ms. Alvarado.  Her older brother is a police officer.  She "used to have respect for" police.  Now she does not trust them.

Ms. Alvarado has struggled with a number of practical changes in her life.  Ms. Alvarado moved to another apartment about a month after the event.  Her new apartment is smaller.  It is also on the second floor.  Ms. Alvarado has to carry all her groceries and goods up a fire escape.  She must use the fire escape regardless of the weather to leave or enter her apartment.  She also has to use it to walk her dogs.  Penelope is fearful of the stairs, so Ms. Alvarado must carry her up and down.  Ms. Alvarado used to be on the first floor.  The move has caused some "inconvenience."  She has fallen on the fire escape twice, as it is slippery in the winter and rain.  It is also hot in the summer, as it is metal.

Ms. Alvarado has lived alone since her mother's death.  She was not afraid to live alone, especially because of Akuma.  Now, she feels afraid to live by herself.  She is aware of men on her "corner" who see her go in and out of her apartment without her big dog.  "I lost my sense of protection without my dog," she said.  Her new apartment is "more in the open" as well, more visible to strangers being close to a bus stop.  She does not walk the dogs as she used to because she does not feel safe.

Ms. Alvarado has a history of major depression, repeatedly triggered by loss and grief.  Ms. Alvarado said that her depression began when she was 13, after her grandmother, that she was close with, died of cancer.  Ms. Alvarado helped care for her grandmother.  After her grandmother died, it "left [Ms. Alvarado] feeling empty and sad."  She began having trouble sleeping.  She would not eat.  This became an issue quickly as Ms. Alvarado said she was "not a big eater ever – never really ate a lot."  She lost weight.  Her mother put her in treatment.  Ms. Alvarado described being seriously depressed after her mother died.  Ms. Alvarado was her caretaker for years and was devastated by her mother's death.

After Ms. Alvarado's mother's death, Ms. Alvarado got Akuma, the dog that was killed by police.  Akuma served as her emotional support dog, helping her with her depression and anxiety.  He was very well-trained.  He was nine years old when he was killed, spending almost all his life with Ms. Alvarado.  Ms. Alvarado said that she and Akuma had a "very deep bond."  He helped her begin to function again after she lost her mother.  "My animals were the only reason I got up in the morning," she explained, saying her depression and grief were severe at the time.  She was having trouble getting out of bed, caring for herself, and leaving her house.  Her pets' needs were her motivation.  Ms. Alvarado got another small dog, Penelope, after she got Akuma.  They kept each other company as well.

Penelope has been traumatized by being present for the raid and killing of Akuma.  Ms. Alvarado stated that Penelope is now anxious, scared of loud noises, and afraid of strangers.  Ms. Alvarado also has a small parrot, a conure, that has been impacted by the raid.  Ms. Alvarado described how her bird was "screaming" throughout the event, adding to Ms. Alvarado's fear and the chaos that ensued.  The bird

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

Alvarado, Felishatay                                                                                          page 7
**Confidential Evaluation**

now screams at loud noises, is more anxious, and reacts with fear if Ms. Alvarado picks up her broom or a stick.  The bird is a bit more aggressive as well, prone to bite if it is nervous.

Ms. Alvarado is currently in therapy to address her trauma symptoms.  She reported that this is "sometimes in zoom, sometimes in person."  She said that her therapist gave her useful "breathing exercises."  She attends every two weeks.  Ms. Alvarado will not take medication for her anxiety and depression.  She is fearful of becoming "addicted," so relies on prayer, natural remedies, and herbs.  Ms. Alvarado is exerting effort in to feeling better and dealing with her symptoms.  "I try to control the way I feel," she said, "I use treatment and coping.  I try to clear my mind when I am overwhelmed."

Ms. Alvarado's primary coping is to rely on God.  "I leave it up to God," she said, "It helps me a lot – prayer."  Ms. Alvarado has returned to church after the incident.  She said her mother always "talked about God," so Ms. Alvarado finds solace in leaning on God.

_Collateral Interviews – Yara Alvarado (sister)_

This examiner interviewed Ms. Yara Alvarado over the phone for approximately 25 minutes.  Ms. Alvarado identified her sister as someone she was close to and who had observed the impact of the incident on Ms. Alvarado.  Ms. Yara Alvarado speaks to her sister on an almost daily basis.  They were close before the incident.  Ms. Alvarado lived with Yara for about a month after the incident, until she was able to help Ms. Alvarado get another apartment.  Ms. Alvarado did not feel safe in the apartment that was breached.

Directly after the incident, Yara was fearful for Ms. Alvarado's mental health.  For instance, she explained what Ms. Alvarado did in her new apartment, which concerned Yara.  "It was like the movie _A Beautiful Mind,"_ she said, "There were papers pasted all over the walls."  These "papers" were inspirational and coping quotes that Ms. Alvarado had put up all over to help her deal with her anxiety and grief.  According to her sister, Ms. Alvarado has a "very hard time expressing herself" and sharing her feelings.  "She is trying to prove she is so strong," Yara explained.  Yara encourages Ms. Alvarado to go to therapy.  Yara added, "Going to Church helps her."  Yara explained that Ms. Alvarado has gotten more involved in church, which has been the "most helpful."  "the Church is pulling her out of depression some," Yara stated.

Yara has noticed numerous changes in her sister.  Ms. Alvarado has gone into a "very bad depression" since Akuma was killed, according to Yara.  She also has become reactive and hypervigilant.  "If someone knocks, she is paranoid," Yara explained.  Yara must give Ms. Alvarado plenty of notice when she is coming to visit, something that was not previously necessary.  When she hears sirens, Ms. Alvarado "tenses up and looks around."  Ms. Alvarado's "nerves are really bad."  "She is very jumpy," said Yara.  The most upsetting thing for Yara to witness is that Ms. Alvarado "has lost her sense of safety – she doesn't feel safe."

Ms. Alvarado has withdrawn from relationships with friends and family.  The only family Ms. Alvarado associates with is Yara.  She is not engaged with nephews she was once close to since the incident.  Ms. Alvarado cannot have children, so her "animals are her children."

Ms. Alvarado has changed in other ways.  "She was always dolled up all the time," Yara said, "Now, she doesn't wear makeup.  She wears pajama bottoms, baggy clothes.  She doesn't comb or do up her hair."  Ms. Alvarado has "dropped a lot of weight."  Ms. Alvarado has always been vegan, but now only eats "rice and potatoes."  "I have to get on her to eat properly," Yara said.  For a while after the incident, Ms. Alvarado was not leaving the house "for days and days."  Yara recently helped get Ms. Alvarado a part-time job being a companion for the elderly.  Ms. Alvarado will now go out, and enjoys her job, but takes two of her dogs "everywhere she goes."

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

Alvarado, Felishatay                                                                                          page 8
**Confidential Evaluation**

Another new and compulsive behavior Yara has noticed is that Ms. Alvarado has been "collecting pets" ever since Akuma was killed.  She said Ms. Alvarado has adopted two more dogs since she was interviewed for her evaluation.  Ms. Alvarado now has four dogs, four cats, and a bird.  Yara had to force Ms. Alvarado to give up an opossum baby she found on the street and was trying to raise.  "She is trying to fill the void," Yara explained.  Ms. Alvarado is now demonstrating what Yara described as "attachment issues."  "She wants to rescue everything she sees," Yara said.  Ms. Alvarado allowed a strange homeless man into her shared basement and almost inviting a homeless couple to stay with her.  "She tries to be everyone's superman because she can't be her own," Yara said.

Yara tries to offer Ms. Alvarado as much support and encouragement as she can.  She helped Ms. Alvarado get a job, encourages her to go to church, and supports her involvement in therapy.  However, she remains worried about Ms. Alvarado, especially because it is difficult for Ms. Alvarado to ask for help. "I just want her to feel safe again," Yara said.

## Review of Records

*Encounter Note – GPHA (3/8/23)*

Ms. Alvarado appeared at the clinic to seek a letter to excuse her from jury duty.  At the time she presented for care, she had the diagnoses of Anxiety Disorder, unspecified, Major Depressive Disorder, recurrent, and Post-traumatic Stress Disorder, chronic.

*Ledger – GPHA*

A ledger sheet from GPHA indicated that Ms. Alvarado had a psychiatric evaluation performed in July 2022.  She participated in three mental health telehealth visits for a total of one hour and 15 minutes.

## Testing Summary

Ms. Alvarado took the testing through a link to her cell phone.  She was monitored via video and instructed to let this examiner know if she had trouble reading or comprehending any item.  Ms. Alvarado did not report any specific difficulties during her testing.  However, she informed this examiner that she had a history of reading difficulties and learning disabilities, something I told her might affect her comprehension, reiterating that she needed to inform me if she had problems.  While Ms. Alvarado did not identify any problems while taking her tests, the test results both indicate some random and atypical response patterns.

*Trauma Symptom Inventory – 2nd ed. (TSI-2)* - The TSI is a self-report instrument measuring symptoms of Post-Traumatic Stress Disorder and other symptoms of trauma.  It was designed as a broad-spectrum assessment of trauma related symptoms and behaviors.  The scale assesses a wide array of psychological arenas including:  anger/irritability; depression; intrusive experiences; anxious arousal; avoidance; dissociation; suicidality; somatic preoccupation; impaired self-reference; insecure attachment; and other trauma related symptoms and behaviors.  There are two validity scales – one assessing defensiveness or avoidance, the other assessing atypical responding.

Ms. Alvarado produced a valid profile.  Her score on atypical responding was elevated.  This scale can assess over-reporting of symptoms, a cry for help, or the presence of symptoms that not all individuals with trauma experience.  In elevated scales, the manual advises examining the individual items to see if the items are consistent with observations and self-report.  In Ms. Alvarado's case, her score was elevated by an item regarding frequent flashbacks for several weeks and loss of memory for traumatic events.  Ms. Alvarado did report intense, frequent flashbacks for weeks after the event, corroborated by her sister.

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

### Confidential Evaluation

Ms. Alvarado showed elevations on scales consistent with her self-report.  Her scores involving anxiety were clinically significant.  The scales represent the experiences of hyperarousal, "jumpiness," fear, and panic associated with trauma.  Ms. Alvarado continues to have clinically significant levels of intrusive experiences – unwanted and sudden memories, thoughts, or feelings associated with the traumatic event.  Testing reiterates that Ms. Alvarado way of coping is to avoid thoughts, feelings, reminders, and triggers of the trauma, something she readily described.  Ms. Alvarado's test scores also reflect her somatic or physical concerns, indicating that she worries about her health and symptoms that may be related to the depression and anxiety she had, but also likely reflects her chronic health issues.  Finally, Ms. Alvarado indicated that she avoids intimacy and attachment.  While Ms. Alvarado and her sister reported she has further withdrawn for social interactions, Ms. Alvarado described this as a pre-existing issue for her.  Overall, Ms. Alvarado's score on the Posttraumatic Stress scale was clinically significant.

*Personality Assessment Inventory* (PAI) – The PAI is a 344 item, self-administered personality inventory that assesses numerous domains in the individual's personality functioning, including self-concept, clinical syndromes and symptoms, and interpersonal issues.  It has four validity scales, including measurements of inconsistent responding, positive and negative impression management, and unusual responding.  It is also useful in assessing exaggeration and potential malingering, important areas for examination in a forensic evaluation.

Ms. Alvarado produced a valid profile.  However, she demonstrated some elevation on the scale for unusual responses, potentially related to confusion, reading difficulties, or unique interpretations of items.  Given this score, her profile should be interpreted with caution.  Ms. Alvarado's profile indicated some level of defensiveness as well, a reluctance to admit even common issues.  Ms. Alvarado's score indicate that she may attempt to present as functioning better than she actually is, something she demonstrated in her interview and corroborated by her sister.

Ms. Alvarado's testing did not reveal any serious clinical pathology indicative of a severe mental illness or personality pathology.  However, her scale scores reveal her suspiciousness, anxiety, depression, fears, and unhappiness.  Ms. Alvarado's results reflect her distrust in her environment, hypervigilance to harm, and distrust of other people's motives.  Ms. Alvarado has somatic complaints, consistent with her chronic illness and the somatic symptoms of her anxiety and depression.  Ms. Alvarado reported ineffective efforts in coping with her fears and anxieties at times, choosing to avoid reminders or situations that evoke her fear versus being able to cope with those fears.  She may struggle with agoraphobia.  Ms. Alvarado's profile indicates that she experiences the physiological symptoms associated with depression, like sleep disturbances, fatigue, and eating issues, as well as symptoms related to anxiety, like pounding heart, trembling, and sweaty hands.

Ms. Alvarado's profile reiterated her social isolation.  She maintains detachment from others; intimacy may be uncomfortable or threatening.  Others may perceive her as aloof and unemotional.  She tends to keep her environment predictable but has few reliable social supports.  She is unlikely to be willing to be vulnerable and open to discussing her problems.  Ms. Alvarado's strength lies in her stable sense of self.  She believes she is goal-driven and has a sense of purpose.

Ms. Alvarado's profile is consistent with her interview presentation, self-report, and history.  She has limited supports, has lived an introverted life with few relationships, and has a chronic disease that worries her.  She is fearful of leaving her home, hypervigilant about her environment, and mistrustful of others.  She has described losing any sense of safety, something that has magnified her shy and introverted behavior.  Ms. Alvarado is fearful of leaving the home and struggles with anxiety about the unknown and unpredictable since the event.

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

Alvarado, Felishatay                                                                        page 10
**Confidential Evaluation**

**Diagnostic Summary/Offense Impact Analysis**

Ms. Alvarado is a peace-loving, introverted, simple individual who made a life for herself with a chronic disorder and difficulties with learning.  Ms. Alvarado has a history of depression and anxiety beginning in her early adolescence that was triggered by loss and death.  An episode of Major Depression recurred following the death of her mother.  She found a means to cope with her issues and rise out of her depression with the love and companionship of her pets, especially Akuma, who she used for protection and emotional support.

Ms. Alvarado suffered a tragedy, in both the violation of her home and sanctuary and the killing of her dog Akuma.  This event triggered a recurrence of her Major Depression because she suffered a significant loss and experienced the related grief.  Historically, loss has been a serious challenge for Ms. Alvarado.  It was again, resulting in daily crying, loss of eating, sleep disturbances, dysphoria, and loss of self-care.  Ms. Alvarado experienced a Major Depressive episode following the death of her dog, characterized by depressed mood, loss of interest, sleep disturbances, fatigue, problems concentrating and coping, and appetite problems.  Ms. Alvarado reported a history of Major Depressive Disorder.  However, she was managing her depression and the related anxiety prior to the event with police.

Additionally, since the raid and killing of her dog, Ms. Alvarado has developed a trauma-related disorder, suffering symptoms related specifically to the traumatic event, in addition to the depression.  Ms. Alvarado can be diagnosed with Posttraumatic Stress Disorder.  In diagnosis of trauma disorders, the traumatic experience has to be experienced or witnessed and must involve an actual or serious threat of death or significant injury to the physical integrity of oneself or others.  Subsequent to the event(s), the individual must develop symptoms characteristic of trauma that persist for more than 30 days.

It is evident that Ms. Alvarado meets the diagnostic criteria of Posttraumatic Stress Disorder and developed symptoms specifically following and related to the raid of her apartment. Ms. Alvarado demonstrates the following symptoms, meeting the full diagnostic criteria for PTSD:

- Intrusive Symptoms
  - Recurrent and intrusive thoughts and memories of the assault;
  - Recurrent distressing dreams/nightmares;
  - Flashbacks, or a sense of reliving the event;
  - Intense distress at exposure to stimuli evoking or triggering recall of the event;
  - Physiological reactivity to stimuli evoking the event;
- Avoidance of Stimuli Associated with the Trauma
  - Efforts to avoid any thoughts or feelings of the event;
  - Efforts to avoid situations, reminders, or triggers of the event;
- Negative Alterations in Cognitions and Mood related to the trauma
  - Persistent negative beliefs and expectations (lack of trust, fear of recurrence);
  - Persistent negative emotional state (chronic anxiety, fear);
  - Feelings of detachment and estrangement from others (betrayal, "paranoid," isolated);
  - Marked diminishment of pleasure or interest in significant activities;
- Marked Alterations in Arousal and Reactivity
  - Difficulty falling asleep and/or staying asleep;
  - Difficulty concentrating;
  - Hypervigilance and exaggerated startle response.

Ms. Alvarado described the symptoms above throughout her interview.  Her reports were confirmed by collateral contacts, records, and testing results.

Ms. Alvarado is attending therapy, despite her pre-existing issues with describing and sharing her issues with others.  She is using the skills she is learning to cope with her anxiety.  Additionally, Ms. Alvarado is

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

**Confidential Evaluation**

seeking solace and comfort in her faith and her optimism.  She is challenging herself by working and broadening her range of activities, like walking her dogs.  Ms. Alvarado continues to rely on avoidance as a major part of her survival with her symptoms.  It is clear that Ms. Alvarado is not invested in suffering and is making efforts to improve.

One of the more momentous changes in Ms. Alvarado's life as a result of this traumatic event, is her loss of a sense of safety.  Ms. Alvarado lived a protected and relatively modest, uncomplicated life prior to the assault on her home.  She was comfortable and felt protected, where she lived and with her dog.  Now, she fears that people will know she lives alone.  She does not trust police.  Ms. Alvarado has had to adjust to a new apartment with all the factors involved, like being closer to a bus stop.  She did not leave her home for a time.  Ms. Alvarado has a distorted and disrupted sense of trust, something that a traumatic event can create.  Ms. Alvarado does not know what to trust so she vacillates between distrust and no regard for trust, like taking in a stranger.  Individuals who are traumatized in situations presumed safe and protected, by people they were supposed to trust (like parents or police), can become ineffective and inaccurate at assessing risk and evaluating trustworthiness.  She has withdrawn from some relationships in the course of her trauma.

## Conclusions and Recommendations

It is my opinion, to a reasonable degree of psychological certainty, that Ms. Alvarado has suffered from a diagnosable condition, namely **Post-traumatic Stress Disorder**, in the past and currently that has profoundly altered her life.  This condition is a direct result of the violations she experienced during the raid on June 4, 2021.  Ms. Alvarado also experienced an episode of **Major Depressive Disorder**, triggered by the loss of her dog and safety, creating additional psychological hurdles for her to navigate.  Ms. Alvarado has a history of Major Depressive Disorder and Generalized Anxiety Disorder, which were exacerbated by the traumatic event.  Ms. Alvarado was managing her pre-existing mental health issues with the assistance of Akuma prior to police killing him.  She suffers impairment in all arenas of her life: psychological; interpersonal/social; and functional.

My conclusions are as follows:

1.     Ms. Alvarado can be diagnosed with Post-traumatic Stress Disorder, which has persisted and is still very prominent in her experience.  She is engaged in efforts to cope with her trauma the best she can with limited skills, primarily relying on avoidance as a means to cope.

2.     Ms. Alvarado requires therapeutic interventions.  Her treatment needs to be specialized to address her trauma and related depressive and anxiety symptoms.  Treatment of trauma is a specialized treatment that may require a variety of techniques and interventions, including exposure therapy, EMDR, biofeedback, or other avenues to improvement.  Alternative interventions may be particularly necessary for Ms. Alvarado, who is reluctant to or less adept at sharing and introspecting than other clients.  Ms. Alvarado requires strategies and skills that a concrete and accessible to her, presented at a level she can best utilize.  Her learning issues may make reading, journaling, or other more typical interventions less useful.

3.     Ms. Alvarado's current treatment is inadequate.  She is unable to have regular appointments, dictated by insurance and clinic scheduling issues.  She should be afforded private therapy that is regular, available, and preferably in person.  Effective therapeutic interventions as described above are not easy or doable via telehealth.  Therapy sessions with a specialized therapist can cost between $150 - $250 per session.  A year of therapy will cost between $7500 - $12,500 per year.  Ms. Alvarado will likely require at least two

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

Alvarado, Felishatay                                                    page 12
                          **Confidential Evaluation**

years of therapy with decreasing sessions if she progresses.  She may require a course of
EMDR or exposure therapy, which may require more fees.

4.      Adequate treatment of trauma can take years and require consistent participation by the
        client.  If her symptoms increase, she might require a higher level of care, like inpatient
        or intensive outpatient care.  As Ms. Alvarado is involved in her faith and uses her
        relationship with God as source of her strength, faith-based therapy may be useful for
        Ms. Alvarado.

5.      Ms. Alvarado's treatment should also address her coping skills.  She has few if any skills
        to process and manage her anxiety, fear, and depression, as well as her intrusive
        thoughts and memories related to the abuse.

6.      Ms. Alvarado will struggle with her trauma for a significant period in the future, if not for
        the remainder of her life.  She will experience permanent harm in the form of recurrent
        intrusive memories, fear and hypervigilance, grief, and anxiety.  While she might learn to
        better manage these issues, it is unlikely they will fully resolve, especially given her pre-
        existing vulnerabilities.

7.      As Ms. Alvarado finds solace and relief from animals, she may benefit from a service
        animal for her trauma and anxiety to assist her in becoming more independent.  A
        service animal differs from an emotional support animal in that a service animal is
        specially trained to detect and intervene in mental health symptoms, like those that
        accompany serious PTSD.  A trained service dog that can accompany her in public may
        assist in broadening her circle and allow her to seek new and different opportunities for
        socialization and education.  An animal that additionally offers her a feeling of protection,
        like a larger trained dog, will be beneficial.

*All the opinions contained in this report are given with a reasonable degree of psychological certainty.*


Veronique N. Valliere, Psy.D.
Licensed Psychologist

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This
information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

# EXHIBIT "J"

# Transcript of the Testimony of:
# **Officer Eric Clark**

**Date:** September 21, 2023

**Case:** Alvarado v. City of Philadelphia

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FELISHATAY ALVARADO,  : CIVIL ACTION
                       :
     Plaintiff (s)  :
                       :
     -vs-        : NO.: 22-3763
                       :
CITY OF PHILADELPHIA,  :
et al.,          :
                       :
     Defendant (s)  :

- - -
Thursday, September 21, 2023
- - -

VIDEOTAPE DEPOSITION of OFFICER ERIC
CLARK, was taken, pursuant to notice, held at
the Victims' Recovery Law Center, 121 South
Broad Street, 18th Floor, Philadelphia,
Pennsylvania 19107, commencing at 12:05 a.m.,
before LISA HUGHES, Court Reporter and Notary
Public, there being present:

DIAMOND COURT REPORTING
406 REDBUD LANE
MANTUA, NEW JERSEY  08051
856-589-1107

## Page 2

1  APPEARANCES:
2
3  VICTIMS' RECOVERY LAW CENTER
     BY:  KEITH WEST, ESQUIRE
4        121 South Broad Street
         18th Floor
5        Philadelphia, Pennsylvania 19107
         Phone: (215) 546-1433
6        keith@victimrecoverylaw.com
         Representing the Plaintiff
7
8  CITY OF PHILADELPHIA LAW DEPARTMENT
     BY:  ADAM R. ZURBRIGGEN, ESQUIRE
9        1515 Arch Street, 16th Floor
         Philadelphia, Pennsylvania 19102
10       Phone: (215) 683-5114
         adam.zurbriggen@phila.gov
11       Representing the City of
         Philadelphia as the Defendant
12
13
     ALSO PRESENT:
14
15  IRENE LU, ESQUIRE
16  COURTNEY KITCHERMAN, VIDEOGRAPHER
17
18
19
20
21
22
23
24

## Page 3

1        - - -
2        I N D E X
3        - - -
4
5   WITNESS          PAGE
6   OFFICER ERIC CLARK
7
8
9   EXAMINATION:
10  BY MR. WEST          6
11
12
13
14        - - -
15      E X H I B I T S
16        - - -
17
18  EXHIBIT NO.   DESCRIPTION     PAGE MARKED
19   (Whereupon, no exhibits were marked.)
20
21
22
23
24

## Page 4

1        - - -
2        (It is hereby stipulated and
3   agreed by and between counsel for
4   respective parties that reading,
5   signing, sealing, certification and
6   filing are waived and that all
7   objections, except as to the form of
8   questions, be reserved until the
9   time of trial and that any objection
10  by one defense counsel will inure to
11  the benefit of all other defense
12  counsel present.)
13        - - -
14        THE VIDEOGRAPHER:  This is
15  the audio/video deposition for use
16  at trial in the matter of Alvarado
17  versus The City of Philadelphia, et
18  al.  Philadelphia Court of Common
19  Pleas.  Docket #220601633.  And I am
20  the video operator.  My name is
21  Courtney Kitcherman, I am employed
22  by the Victim's Recovery Law Center.
23  My address is 212 South Broad
24  Street, 18th Floor, Philadelphia,

Page 5

1    Pennsylvania, 19107.
2         Today's date is
3    September 21, 2023 at 12:08 p.m.,
4    this deposition is being performed
5    in person.  The caption of this case
6    is Alvarado versus The City of
7    Philadelphia, et al.  Philadelphia
8    Court of Common Pleas.  Docket
9    #220601633.
10        The witness being deposed
11   today is Officer Eric Clark.  This
12   deposition is being taken on behalf
13   of the plaintiff, Felishatay
14   Alvarado.  The officer taking this
15   deposition is Lisa Hughes and she
16   shall swear the witness in at this
17   time.
18        - - -
19        OFFICER ERIC CLARK, having
20   been first duly sworn, was examined
21   and testified as follows:
22        - - -
23        EXAMINATION
24        - - -

Page 6

1    BY MR. WEST:
2    Q. Good afternoon, Officer Clark.  My name
3    is Keith West, I'm one of the attorneys
4    representing the plaintiff in this case, Ms.
5    Alvarado.  Thank you very much for coming in
6    today.  And just a few preliminary things we
7    always put on the record.
8         You've had a chance to confer with your
9    attorneys and you're prepared to testify
10   today, correct?
11   A. Yes.
12   Q. Okay.  Are you under the influence of
13   any sort of illness, medication, substance,
14   or anything that would impair your ability to
15   testify truthfully today?
16   A. No.
17   Q. We don't intend this to be an
18   unnecessarily uncomfortable process so if at
19   any time you need a break, normally I'd offer
20   you a cup of coffee, I think we actually just
21   ran out of coffee.
22   A. No.  I am dying walking over here.
23   Q. But if you'd like a glass of water,
24   whatever, you need to use the restroom at

Page 7

1    some point, just let us know, we'll be
2    accommodating.  Okay?
3    A. Not a problem.
4    Q. Please don't answer any questions
5    unless you believe that you understand them.
6    A. Okay.
7    Q. So if at any point if you have trouble
8    understanding a question I'm asking you, just
9    let us know, I'll be glad to rephrase any
10   question if I can, try to speak louder, less
11   loud, faster, slower, whatever.  Okay?
12   A. Uh-huh.
13   Q. Or rephrase the question.  As I'm sure
14   your attorney advised you, your only
15   obligation today is to give truthful
16   testimony based on your personal knowledge.
17   A. Right.
18   Q. So please do that.  I'm not at any
19   point going to ask you to guess or speculate.
20   It's not like a multiple option test where
21   you have to answer every question.  Okay?
22   A. I understand.
23   Q. But we would like to know everything
24   that you do know.  So if you're asked any

Page 8

1    question and you have partial memory, partial
2    knowledge, just let us know that that's the
3    case, and if you're able to give any
4    estimates or approximations, we want your
5    estimates or approximations, just let us know
6    that you are, in fact, giving an estimate or
7    approximation.  Okay?
8    A. Got you.
9    Q. Yeah, I think that's all the
10   preliminary stuff.  So, Officer Clark, our
11   incident giving rise to this lawsuit occurred
12   on June 4, 2021.  At that time, you were a
13   member of the Philadelphia SWAT unit; is that
14   correct?
15   A. That's correct.
16   Q. All right.  It looks like a different
17   uniform.  Are you still a member of the SWAT
18   team?
19   A. No.  I'm in and out of patrol.  I ride
20   horses now.
21   Q. Sure.  So when did you stop being a
22   part of the SWAT unit?
23   A. February of this year I was detailed
24   and I was officially transferred to mounted

Electronically signed by Lisa Hughes (601-318-489-3416)                    1eafd3c4-c374-4f6d-9bda-8318b0a3eb96

1 [phonetic] maybe two weeks ago.
2 Q. So that's a new thing, right?
3 A. Yes.
4 Q. And you stopped being a member of the
5 SWAT unit in February of 2023?
6 A. Yes, correct.
7 Q. Why did you stop being a member of the
8 SWAT unit?
9 A. Just a life-style change.
10 Q. Was that a decision that you made, were
11 you transferred?
12 A. No, it's a decision that I made.
13 Q. Okay. And why did you decide you'd
14 like to make that change?
15 A. I just had a newborn baby.
16 Q. Okay.
17 A. And it was taking a toll on the family,
18 the hours, the on-call and everything like
19 that, so...
20 Q. Yeah. My latest son was born late
21 January of 2023. All right. When did you
22 first become a member of the Philadelphia
23 Police Department?
24 A. I joined the academy at 12/12/2011.

1 Q. So as of June, 2021 you've been a
2 member of the Philadelphia Police Department
3 for a little over nine years, right?
4 A. Yes.
5 Q. Okay. When did you first join the SWAT
6 unit?
7 A. December, 2020 if I'm not mistaken.
8 I'm not exactly sure.
9 Q. Okay. So you think it was about a half
10 of year before our incident?
11 A. Yes.
12 Q. Okay. You were interviewed by Internal
13 Affairs as part of this incident, correct?
14 A. OISI, Officer Involved Shooting Team.
15 Q. Is that part of Internal Affairs or a
16 separate unit?
17 MR. ZURBRIGGEN: Object to
18 form, but, Officer, if you know.
19 THE WITNESS: I'm not sure.
20 I know they do their separate
21 things. OISI does the shooting
22 interview and then IAB does the
23 other thing so I'm not completely a
24 hundred percent sure.

1 BY MR. WEST:
2 Q. Were you interviewed by one or both?
3 A. Just one.
4 Q. Okay. Besides this incident, have you
5 ever been involved in an officer involved
6 shooting?
7 MR. ZURBRIGGEN: Object to
8 form, but, Officer, if you know you
9 can answer.
10 MR. WEST: Okay. I'll lay a
11 foundation.
12 BY MR. WEST:
13 Q. Was this incident an officer involved
14 shooting?
15 A. Meaning?
16 Q. Sure. You were involved in a warrant
17 informant action on June 4, 2021, correct?
18 A. Correct, uh-huh.
19 Q. Did that action involve an officer
20 involved shooting?
21 A. Discharging his firearm, is that what
22 you're asking?
23 Q. So you used the phrase officer involved
24 shooting just a moment ago, correct?

1 A. Uh-huh.
2 Q. Would you use that same phrase in
3 relation to the incidents that occurred on
4 June 4, 2021?
5 MR. ZURBRIGGEN: Object to
6 form, but, Officer, if you know.
7 THE WITNESS: You're kind of
8 confusing me with what you're
9 asking.
10 BY MR. WEST:
11 Q. That's fine. Was there an officer
12 involved shooting investigation done with
13 regards to the SWAT unit activities on
14 June 4, 2021?
15 MR. ZURBRIGGEN: Same
16 objection, but, Officer, if you
17 know.
18 THE WITNESS: Yes.
19 BY MR. WEST:
20 Q. Okay. And you were interviewed by the
21 officer involved shooting team, correct?
22 A. Uh-huh.
23 Q. Okay. Besides that occasion, have you
24 ever been involved by the officer involved

Electronically signed by Lisa Hughes (601-318-489-3416)                    1eafd3c4-c374-4f6d-9bda-8318b0a3eb96

Page 13

1 shooting team?
2        MR. ZURBRIGGEN: Same
3    objection, but, Officer, if you
4    know.
5        THE WITNESS: Are you asking
6    me have I been interviewed by OISI
7    previous to this or after this, like
8    have I --
9 BY MR. WEST:
10    Q. On any occasion.
11    A. Yes, I have.
12    Q. All right. How many times?
13    A. Twice.
14    Q. Okay. Please describe in general terms
15 what those two other instances were?
16        MR. ZURBRIGGEN: Object to
17    form.
18        THE WITNESS: Well, one is
19    this one and the other one would be
20    we were serving a warrant and
21    basically while conducting the
22    warrant for a homicide suspect he
23    started shooting through the door
24    and my colleagues returned fire.

Page 14

1 BY MR. WEST:
2    Q. Okay. So you've been involved by the
3 officer involved shooting team a total of two
4 times?
5        MR. ZURBRIGGEN: Object to
6    form, but, Officer.
7 BY MR. WEST:
8    Q. Or is it a total of three times?
9    A. Just two. I've been interviewed down
10 there twice.
11    Q. Okay. The other incident, was that
12 before or after the shooting that we're --
13    A. That was after.
14    Q. Have you ever been interviewed by
15 Internal Affairs?
16    A. In reference to this job?
17    Q. This or any other incident.
18    A. Through my career, yes.
19    Q. Okay. Have you ever received any
20 public complaints?
21        MR. ZURBRIGGEN: Object to
22    form, but, Officer, if you know.
23        THE WITNESS: I don't know.
24    I can't --

Page 15

1 BY MR. WEST:
2    Q. You do understand what I'm saying, that
3 there's a grievance process where if a member
4 of the public feels there's been an incident
5 they can make a complaint. Have you ever had
6 such a complaint?
7        MR. ZURBRIGGEN: Same
8    objection, but, Officer, if you
9    know.
10        THE WITNESS: Not that I'm
11    aware of. I don't know.
12 BY MR. WEST:
13    Q. Okay. Do you have any recollection
14 today of the June 4, 2021 warrant enforcement
15 action at 4664 Torresdale Avenue?
16    A. I have some.
17    Q. Okay. And did you have a chance to
18 review any documents, photographs, or videos
19 in preparation for today's testimony?
20    A. Just my statement.
21    Q. Okay. And that's the investigation
22 interview record provided to OISI, right?
23    A. Yes.
24    Q. So you read that statement to prepare

Page 16

1 yourself for today's deposition?
2    A. Yes.
3    Q. And is that the only material that you
4 reviewed?
5    A. That's the only thing that I reviewed.
6    Q. Okay. Have you ever heard of anything
7 known as the knock and announce rule?
8        MR. ZURBRIGGEN: Object to
9    form, but, Officer, if you know.
10        THE WITNESS: Yes, I have
11    heard.
12 BY MR. WEST:
13    Q. Okay. And in your experience, what is
14 the knock and announce rule?
15    A. In my experience in being a SWAT,
16 before we breached the door or anything we'll
17 knock and announce, let the occupants know
18 that it's the police. Not only just the
19 occupants, we like to be as loud as possible
20 to like wake the neighborhood up so there is
21 no misrepresentation that the police are at
22 the door.
23    Q. Okay. Is it your understanding that
24 one of the purposes of the knock and announce

Page 17

1  rule is to provide any occupants of the
2  building an opportunity to voluntarily
3  surrender?
4          MR. ZURBRIGGEN:  Object to
5      form.  Officer, you can answer if
6      you can.
7          THE WITNESS:  I'm sorry,
8      repeat that question again?
9  BY MR. WEST:
10     Q. Okay.  So when would you use the knock
11 and announce rule?
12     A. Every time we're serving a warrant.
13     Q. And that's at a residence, correct?
14         MR. ZURBRIGGEN:  Object to
15     form, but, Officer if you know.
16         THE WITNESS:  Yeah.  At a
17     residence or if -- yeah, exactly,
18     at a residence.
19 BY MR. WEST:
20     Q. And you received training from the
21 Philadelphia Police Department as far as what
22 the knock and announce rule is?
23     A. Yes.
24     Q. Okay.  And did you receive additional

Page 18

1  training with regards to what the knock and
2  announce rule is from the SWAT unit?
3          MR. ZURBRIGGEN:  Object to
4      form, but, Officer, if you know.
5          THE WITNESS:  When you say
6      rule, like is it -- so basically
7      we're taught to knock and announce
8      before we go inside any residence,
9      that's basically our training, we
10     knock and announce, we give them --
11     it comes down to the supervisor, the
12     supervisor a reasonable amount of
13     time and then, boom, we breach the
14     door, so...
15 BY MR. WEST:
16     Q. Do you know why there's a knock and
17 announce rule?
18         MR. ZURBRIGGEN:  Object to
19     form, but, Officer, you can answer
20     if you know.
21         THE WITNESS:  No.
22 BY MR. WEST:
23     Q. Okay.  To your knowledge, is the knock
24 and announce rule a legal obligation or is it

Page 19

1  just something that the Philadelphia Police
2  Department likes to do?
3          MR. ZURBRIGGEN:  Same
4      objection.
5          THE WITNESS:  I don't know.
6  BY MR. WEST:
7      Q. Okay.  Do you have any personal
8  knowledge if the knock and announce rule is a
9  constitutional requirement?
10         MR. ZURBRIGGEN:  Same
11     objection.
12         THE WITNESS:  I don't know.
13 BY MR. WEST:
14     Q. Okay.  Is your only knowledge as to
15 what the knock and announce rule training
16 that you've received from the Philadelphia
17 Police Department?
18         MR. ZURBRIGGEN:  Objection
19     to form, but, Officer, if you know.
20         THE WITNESS:  Yes.  I would
21     say that's basically we're told to
22     knock and announce, give a
23     reasonable amount of time depending
24     on the circumstances and breach the

Page 20

1      door.
2  BY MR. WEST:
3      Q. Okay.  And then let me try to clarify
4  this next question.  So I take it that you
5  received training from the police academy
6  and --
7      A. No.
8      Q. You never received any training from
9  the police academy?
10     A. From knock and announcing?
11     Q. Yes.
12     A. No, that's a totally different thing.
13     Q. Okay.  Fine.  So you received no
14 training with regards to knock and announce
15 from the police academy, correct?
16     A. No.  Not that I'm aware of, no.
17     Q. Okay.  Where did you receive training
18 about the knock and announce rule?
19     A. When you join SWAT you have to go
20 through a whole different training that lasts
21 for a couple months.
22     Q. Okay.
23     A. That's where, most of the times where
24 knock and announce is used and SWAT, we were

Electronically signed by Lisa Hughes (601-318-489-3416)                                          1eafd3c4-c374-4f6d-9bda-8318b0a3eb96

Page 21

1    the guys serving the warrant so that's where
2    we receive the training from knock and
3    announce, how to properly breach doors, our
4    tactics and things like that.
5        Q. So was that the first time you'd ever
6    heard of the knock and announce rule, when
7    you went through the SWAT unit training?
8            MR. ZURBRIGGEN: Object to
9        form, but, Officer, if you know.
10           THE WITNESS: I don't know.
11       I'm not going to guess.
12   BY MR. WEST:
13       Q. Okay. Do you have any recollection
14   today of having ever heard of the knock and
15   announce rule prior to SWAT unit training?
16           MR. ZURBRIGGEN: Same
17       objection, but, Officer, if you
18       know.
19           THE WITNESS: I don't know.
20   BY MR. WEST:
21       Q. Not that you can recall today, correct?
22       A. Not that I can recall.
23       Q. Okay. So when you did get to the SWAT
24   unit and you did get SWAT unit training, what

Page 22

1    were you told specifically about the knock
2    and announce rule?
3            MR. ZURBRIGGEN: Object to
4        form, but, Officer, you can answer.
5            THE WITNESS: A reasonable
6        amount of time depending on the
7        circumstances.
8    BY MR. WEST:
9        Q. And how much time were you told was
10   considered a reasonable amount of time?
11       A. That's debatable. I don't know. It
12   depends on the situation and what's going on.
13       Q. Were you given any guidance,
14   whatsoever, as far as what was considered a
15   reasonable amount of time?
16           MR. ZURBRIGGEN: Object to
17       form.
18           THE WITNESS: That would
19       have to fall back on the supervisor.
20   BY MR. WEST:
21       Q. Okay. For reference, you know an
22   Officer Scott who's been with the SWAT unit
23   since about 1994, right?
24       A. Yes.

Page 23

1        Q. Okay. He's sort of a senior guy,
2    right?
3        A. Yes.
4        Q. And he was part of this warrant
5    enforcement operation back on June 4, 2020,
6    right?
7        A. Was he? Do you have like -- I don't
8    want to say yeah and he wasn't.
9            MR. ZURBRIGGEN: Just if you
10       recall.
11           THE WITNESS: I don't know.
12   BY MR. WEST:
13       Q. You don't remember. Okay. But in any
14   case, he was a member of the SWAT unit and
15   that was true back in June, 2021, as well,
16   right?
17       A. Yes.
18       Q. Okay. Sir, I can represent to you that
19   he was, just as a point of reference, he was
20   deposed earlier today and he said that under
21   the knock and announce rule you should wait
22   at least 45 seconds after knocking before
23   entering a property. Is that consistent with
24   your training?

Page 24

1            MR. ZURBRIGGEN: Object to
2        form, but, Officer, if you know.
3            THE WITNESS: I don't know.
4        I mean, like I said, it all goes
5        back to the supervisor. If the
6        supervisor gives me the go ahead to
7        breach then I'm breaching. As the
8        breacher you just don't walk up and
9        breach the door, the supervisor will
10       tell you, hey, look, start the knock
11       and announce, start the knock and
12       announce, and then when it comes
13       down to it he'll give the go ahead
14       to breach and take it from there.
15   BY MR. WEST:
16       Q. Okay. So would it be accurate then to
17   say that testifying today you have no idea
18   what would be considered a reasonable time
19   under the knock and announce rule?
20           MR. ZURBRIGGEN: Objection
21       to form. Go ahead, Officer.
22           THE WITNESS: It depends on
23       the circumstances. Like, I mean,
24       yeah, it depends. Like if, let's

6 (Pages 21 to 24)

Page 25

1	say for instance, you knock on the
2	door one time and you see through
3	the window and the guy's loading up
4	a gun, are you going to continue to
5	knock? Every situation is
6	different.
7	BY MR. WEST:
8	Q. Okay. What if you were executing a
9	warrant and there were no exigent
10	circumstances and you knocked on the door and
11	you didn't hear anything, how long should you
12	wait before breaching?
13	MR. ZURBRIGGEN: Object to
14	form.
15	THE WITNESS: Again, it
16	depends on the supervisor. I mean,
17	it depends. Like I can't give you
18	an exact second countdown because it
19	could be 20 seconds, it could be
20	45 seconds, it could be ten seconds.
21	It varies.
22	BY MR. WEST:
23	Q. Okay. Would hearing a dog bark inside
24	of a home change the amount of time you

Page 26

1	should wait under the knock and announce
2	rule?
3	MR. ZURBRIGGEN: Object to
4	form, but, Officer.
5	THE WITNESS: I don't know.
6	I don't know.
7	BY MR. WEST:
8	Q. Okay. You said you could wait as
9	little as ten seconds?
10	MR. ZURBRIGGEN: Object to
11	form. Officer.
12	THE WITNESS: Yeah, if
13	exigent circumstances or something
14	to that nature, yeah, possibly.
15	BY MR. WEST:
16	Q. What would you consider to be exigent
17	circumstances that would allow you to breach
18	a door only ten seconds after knocking?
19	MR. ZURBRIGGEN: Object to
20	form. Officer, you can answer if
21	you can.
22	THE WITNESS: If we get
23	entail that the guy is wanted for
24	murder, possibly armed, stuff like

Page 27

1	that.
2	BY MR. WEST:
3	Q. So if you were told that you were
4	executing a warrant at the residence of a
5	person suspected of murder, then would that
6	automatically cause you to wait less time
7	under the knock and announce rule?
8	MR. ZURBRIGGEN: Object to
9	form. Officer.
10	THE WITNESS: It depends.
11	It depends on the supervisor. All
12	this goes back to, not to sound
13	like, but it goes back to when the
14	supervisor feels as though we should
15	go into the house.
16	BY MR. WEST:
17	Q. Okay. Sir, you've been a police
18	officer now with the Philadelphia Police
19	Department for almost 12 years, right?
20	A. Correct.
21	Q. Okay. Every single time that you've
22	knocked on someone's door, has a supervisor
23	been standing over your shoulder telling you
24	what to do?

Page 28

1	A. Yes. In SWAT, yes.
2	Q. So you haven't been provided enough
3	training to know how to carry out the knock
4	and announce rule on your own without a
5	supervisor directly telling you what to do at
6	all times, correct?
7	MR. ZURBRIGGEN: Object to
8	the form, particularly the
9	characterization. Officer.
10	BY MR. WEST:
11	Q. Is that correct or is it not correct?
12	MR. ZURBRIGGEN: And same
13	objection, but, Officer, you can
14	answer.
15	THE WITNESS: No, that's not
16	correct. Normal patrol and SWAT has
17	different tactics. Like it's two
18	different animals. When it's in
19	SWAT a supervisor is right there
20	with you all the time. Patrol, when
21	it comes to knock and announcing,
22	you're not really serving warrants
23	in patrol really for the most part.
24	BY MR. WEST:

7 (Pages 25 to 28)

Page 29

1   Q. Did you receive any training as to what
2 the knock and announce rule was while you
3 were a patrol officer before you joined SWAT?
4           MR. ZURBRIGGEN: Object to
5       form, particularly as asked and
6       answered. Go ahead, Officer.
7           THE WITNESS: I don't
8       recall. I don't.
9 BY MR. WEST:
10   Q. Okay. Because I think you just
11 testified as to what a patrol officer would
12 do under the knock and announce rule and I'm
13 just wondering what your basis for that
14 testimony was.
15           MR. ZURBRIGGEN: Object to
16       form. Officer, you can answer
17       again.
18           THE WITNESS: As a patrol
19       officer, when it comes to warrants,
20       they really don't serve warrants for
21       the most part, they usually call
22       SWAT. So most of my knock and
23       announce, breaching tactics, all
24       that came from SWAT.

Page 30

1 BY MR. WEST:
2   Q. Okay. But patrol officers still do
3 need to serve warrants on occasion, correct?
4           MR. ZURBRIGGEN: Object to
5       form, but, Officer, if you know.
6           THE WITNESS: I guess so. I
7       guess.
8 BY MR. WEST:
9   Q. When you were a patrol officer prior to
10 joining the SWAT, didn't you have to serve
11 warrants on occasion?
12   A. Yeah, I assisted SWAT. Like actual
13 homicide warrants and stuff like that, yeah.
14   Q. Okay. And in order to do your job,
15 didn't you have to know what the knock and
16 announce rule was?
17           MR. ZURBRIGGEN: Object to
18       form.
19           THE WITNESS: So when patrol
20       officers are assisting SWAT, you're
21       nowhere around SWAT, they leave you
22       down the block and then once they
23       secure the house, then they bring
24       you up. So when it comes to patrol

Page 31

1       officers assisting SWAT and serving
2       warrants, you don't even come in
3       front of the house until we're done.
4 BY MR. WEST:
5   Q. Is it your experience having been both
6 a patrol officer with the Philadelphia Police
7 Department and a member of the SWAT unit with
8 the Philadelphia Police Department that the
9 SWAT unit waits a less amount of time before
10 breaching a property under the knock and
11 announce rule?
12           MR. ZURBRIGGEN: Object to
13       the form of the question. Officer,
14       if you understand you can answer.
15           THE WITNESS: I don't
16       understand the question.
17 BY MR. WEST:
18   Q. Okay. So you saw the knock and
19 announce rule used while you were a patrol
20 officer, right?
21   A. I don't -- like I don't understand what
22 you're asking.
23   Q. Okay. So you previously testified that
24 while you were a patrol officer you were

Page 32

1 involved in some warrant enforcement actions,
2 correct?
3   A. To assist SWAT, yes.
4   Q. Okay. And in those operations, was the
5 knock and announce rule followed?
6           MR. ZURBRIGGEN: Object to
7       form, but, Officer, if you know.
8           THE WITNESS: I don't know,
9       I wasn't in SWAT at the time. Like
10       I said, when patrol works with SWAT
11       we tell them to wait down the
12       street. What SWAT does is what SWAT
13       does. Now, when I joined SWAT and
14       got the training on how to breach
15       and everything like that, that's
16       when the whole you got to knock and
17       announce your presence, that's when
18       all that came into play.
19 BY MR. WEST:
20   Q. Okay. Under the knock and announce
21 rule, when you knock and announce your
22 presence, are you required to give the
23 occupants of the structure enough time to
24 voluntarily surrender the structure?

8 (Pages 29 to 32)

Page 33

1      MR. ZURBRIGGEN:  Object to
2  form, but, Officer, if you know.
3      THE WITNESS:  Yes.
4  BY MR. WEST:
5    Q. So how would you do that?
6      MR. ZURBRIGGEN:  Object to
7  form.  Officer, you can answer.
8      THE WITNESS:  How would I
9  give him enough time to come to the
10  door and open the door?
11  BY MR. WEST:
12    Q. Yes.
13    A. You knock and announce, keep knocking
14  to announce, and like I said, a reasonable
15  amount of time, if they don't come to the
16  door then we go in.
17    Q. So how would you determine if you had
18  waited long enough that the person had a
19  reasonable opportunity to come to the door?
20      MR. ZURBRIGGEN:  Object to
21  form.  Officer, you can answer.
22      THE WITNESS:  I don't know.
23  BY MR. WEST:
24    Q. You didn't have any sort of general

Page 34

1  time that you would try to follow or anything
2  like that?
3    A. Not that I'm aware of.
4      MR. ZURBRIGGEN:  And
5  objection for the record.
6  BY MR. WEST:
7    Q. And you definitely never received any
8  training from the Philadelphia Police
9  Department about providing a certain amount
10  of time or anything like that, correct?
11      MR. ZURBRIGGEN:  And
12  objection to form.
13      THE WITNESS:  Like I said,
14  not that I'm aware of.
15  BY MR. WEST:
16    Q. Okay.  Have you ever been involved in
17  reconnaissance as part of the SWAT unit?
18    A. Yes.
19    Q. Okay.  And were you involved in the
20  reconnaissance of the Torresdale Avenue
21  property?
22    A. Yes.
23    Q. You were?
24    A. Uh-huh.

Page 35

1    Q. Okay.  Who did it with you?
2    A. Do you have paperwork?  I don't --
3      MR. ZURBRIGGEN:  It's just
4  if you recall.
5      THE WITNESS:  Oh, I don't
6  recall.  I know I did go out there
7  and put eyes on it.
8  BY MR. WEST:
9    Q. Okay.  Is there any sort of paperwork
10  that would record who you did that with?
11    A. Yes.  Our recon sheets.
12    Q. Okay.
13    A. Oh, you got one there.
14    Q. All right, sir, so I'm going to show
15  you a document which was marked earlier today
16  as Scott-5.  These documents are Bates
17  stamped from defense 72 to 76.  And what I'd
18  ask you to do is take a moment to review
19  these documents and let me know when you've
20  had a chance to do that?
21    A. Yeah.  Good.
22    Q. Okay.  What is this?
23    A. What is this?
24    Q. Yes.

Page 36

1    A. Oh, our recon sheet.  Basically, it's a
2  packet of information on the target, the
3  location, who has what assignment that we
4  give out during our briefing.
5    Q. Were you involved in the briefing for
6  this operation?
7    A. Yes.
8    Q. Who did the briefing, you and who else?
9    A. No, I didn't do the briefing.
10    Q. I'm sorry, when you said involved, you
11  mean that you were present?
12    A. I was there present during the
13  briefing, yes.
14    Q. Okay.  So who did the briefing for this
15  operation?
16    A. It had to be one of the supervisors,
17  I'm not sure which one.
18    Q. All right.  Do you have any specific
19  recollection of the briefing at this time?
20    A. No.
21    Q. Okay.  All right.  So my understanding
22  is that the first two pages, defense 72 and
23  73, are normally a one-page of a two-sided
24  document; is that correct?

Page 37

1          MR. ZURBRIGGEN: Object to
2      form, but, Officer, if you know.
3          THE WITNESS: Yes.
4   BY MR. WEST:
5      Q. I'm going to reask the question just in
6   case the objection is correct. Are the first
7   two pages of this packet normally a single
8   two-sided page?
9          MR. ZURBRIGGEN: Same
10     objection, but, Officer, you can
11     answer if you know.
12         THE WITNESS: Yes.
13  BY MR. WEST:
14     Q. Okay. Now, the other pages in this
15  packet, it's three additional pages, are they
16  normally part of the reconnaissance packet?
17         MR. ZURBRIGGEN: Objection
18     for the record, but go ahead,
19     Officer.
20         THE WITNESS: Yes. We
21     always have a map, you know, a
22     picture of our target and a picture
23     of the property.
24  BY MR. WEST:

Page 38

1      Q. Besides these pages that we have
2   stapled together as Scott-5, were there any
3   additional documents as part of the
4   reconnaissance package for the warrant
5   enforcement action at 4664 Torresdale Avenue?
6          MR. ZURBRIGGEN: Object to
7      form, but, Officer, if you know.
8          THE WITNESS: This is
9      usually the packet that we get. It
10     contains like I said, the recon
11     sheet, the map, the target, and the
12     picture of the property.
13  BY MR. WEST:
14     Q. So as far as you're aware, this was the
15  complete packet, correct?
16     A. Yes.
17     Q. Okay. And if we look to the bottom of
18  the second page in this packet, page 73, this
19  memorializes that the reconnaissance was done
20  by yourself and Sergeant Mellody; is that
21  correct?
22     A. That's correct.
23     Q. Was it just the two of you who did it?
24     A. Yes.

Page 39

1      Q. So this map is not very good quality,
2   but I believe it's the same quality that was
3   provided to us. Do you know where this map
4   came from?
5      A. Yeah. We make the map.
6      Q. How?
7      A. Well, first we choose a staging area
8   where we're going to stage and then we go to
9   Google Maps or some type of map program and
10  we actually draw the route from our staging
11  area to the location.
12     Q. Okay. But the underlying map, I'm not
13  really asking about the drawing, I'm just
14  asking about the underlying map, itself, do
15  you know where this came from? Did it come
16  from Google Maps or something else?
17     A. I'll say Google Maps.
18     Q. Is that what you usually use, Google
19  Maps?
20     A. Yeah, we use Google Maps.
21     Q. And is this the only Google Maps image
22  that you used as part of the reconnaissance?
23         MR. ZURBRIGGEN: Object to
24     form, but, Officer, if you know.

Page 40

1          THE WITNESS: Yes. It's in
2      the packet, it's the only one.
3   BY MR. WEST:
4      Q. Okay. Now, from this Google Map, this
5   is kind of a birds-eye view, it's far enough
6   away that you can't really see the specific
7   property; is that correct
8          MR. ZURBRIGGEN: Object to
9      form. Officer.
10         THE WITNESS: It is a
11     birds-eye view, yes. Top down.
12  BY MR. WEST:
13     Q. As part of the reconnaissance, would
14  you ever look at Google Maps of the specific
15  target property?
16     A. Yes.
17     Q. Is there any reason you didn't do that
18  for this operation?
19         MR. ZURBRIGGEN: Object to
20     form, but, Officer.
21         THE WITNESS: We did. It's
22     right here.
23  BY MR. WEST:
24     Q. Okay. It's not a very good quality,

10 (Pages 37 to 40)

Page 41

1   but this target photo, you think that's from
2   Google Maps?
3       A. Yes. I believe that's from Google
4   Maps. And then, that's why we also go out
5   and put eyes on it. So sometimes you'll have
6   Google Maps won't be updated for the most
7   part, so sometimes the property could be
8   different, whatever the case may be, so
9   that's why we also go out and put eyes on it
10  to make sure what we're seeing matches what
11  Google Maps has.
12      Q. Is there anywhere in this recon sheet
13  that memorializes that any sort of in-person
14  inspection of the property was done?
15          MR. ZURBRIGGEN: Object to
16      form, but, Officer, if you know.
17          THE WITNESS: I don't
18      understand.
19  BY MR. WEST:
20      Q. Well, you said you put eyes on it,
21  correct?
22      A. Yes.
23      Q. That means that you go out in person or
24  not?

Page 42

1       A. Yeah. We go out in person, yes.
2       Q. Is there anywhere on this document that
3   records that anyone actually went out there
4   in person?
5       A. Yes.
6       Q. Where?
7       A. Right at the bottom where it says recon
8   conducted by Clark and Sergeant Mellody.
9       Q. Okay. And reconnaissance is the whole
10  thing, by looking at the Google Maps, as
11  well, right?
12          MR. ZURBRIGGEN: Object to
13      form, but, Officer.
14          THE WITNESS: Yes.
15  BY MR. WEST:
16      Q. So besides that notation recon, is
17  there anything in here that specifically
18  shows that you and/or Sergeant Mellody
19  actually went to the property?
20          MR. ZURBRIGGEN: Same
21      objection, but, Officer, if you can.
22          THE WITNESS: So you're
23      asking if it's anything recorded
24      that basically says that we went out

Page 43

1   there?
2   BY MR. WEST:
3       Q. Uh-huh.
4       A. I mean, our names is enough. I mean, I
5   guess so. I mean, our names are at the
6   bottom so we went out and reconned it.
7       Q. Did you take any pictures while you
8   were out there in person?
9       A. I don't recall.
10      Q. Do you have any written recollections
11  that are from being there in person?
12          MR. ZURBRIGGEN: Object to
13      form, but, Officer, if you
14      understand.
15          THE WITNESS: Not that I'm
16      aware of.
17  BY MR. WEST:
18      Q. Okay. Do you specifically have any
19  recollection today of actually having been
20  there in person?
21      A. Yes.
22      Q. How did you get there?
23      A. What do you mean how did I get there?
24      Q. How did you get there? If you were

Page 44

1   there in person, how did you get there?
2       A. We drove there.
3       Q. Where did you drive from?
4       A. Our headquarters.
5       Q. What road did you take?
6       A. We just drove from our headquarters to
7   put eyes on it to recon it.
8       Q. What road did you take to get there?
9          MR. ZURBRIGGEN: Object to
10      the form as asked and answered.
11      Officer.
12          THE WITNESS: I don't
13      remember. We drove from
14      headquarters.
15  BY MR. WEST:
16      Q. All right. Based on your
17  reconnaissance, how many outside doors were
18  there to 4664 Torresdale Avenue?
19          MR. ZURBRIGGEN: Object to
20      the form of the question. Officer,
21      you can answer.
22          THE WITNESS: If this
23      picture was clearer I could tell
24      you, but I don't remember.

11 (Pages 41 to 44)

Page 45

1  BY MR. WEST:
2      Q. Okay. But so far as you are aware,
3  based on your memory and review of these
4  documents, the only doors to the outside of
5  the property would be recorded in the
6  photograph at defense 75, right?
7          MR. ZURBRIGGEN: Object to
8  form. Officer, if you know.
9          THE WITNESS: Yes.
10 BY MR. WEST:
11     Q. Okay. And no other doors were
12 discovered during the reconnaissance of this
13 property, correct?
14         MR. ZURBRIGGEN: Object to
15 form. Officer, you can answer.
16         THE WITNESS: On the front
17 or the rear location, is that what
18 you're asking?
19 BY MR. WEST:
20     Q. I'm asking any outside doors to this
21 building.
22     A. Yeah. Eventually we found one in the
23 rear.
24     Q. But not as part of reconnaissance,

Page 46

1  correct?
2      A. Yeah.
3      Q. That is correct, right?
4      A. That is correct. We went out, you have
5  to look at the rear of the house and you have
6  to look at the front of the house.
7      Q. Okay. As part of the reconnaissance,
8  did you know that there was a rear door?
9          MR. ZURBRIGGEN: Object to
10 form. Officer, if you recall.
11         THE WITNESS: Yes.
12 BY MR. WEST:
13     Q. Okay. Where is that written down on
14 this recon sheet?
15         MR. ZURBRIGGEN: Object to
16 form. Officer, if you know.
17         THE WITNESS: It's not going
18 to be written down here. We're
19 going to tell our rear containment
20 where the rear door is. Actually,
21 if you look, this map is kind of
22 unclear, but basically, this map
23 tells us where -- it tells everybody
24 where the positions are. If you

Page 47

1  look and see where that R is, if you
2  can see it on the map. You probably
3  can't see. I can point it out to
4  you if you want me to.
5          MR. ZURBRIGGEN: You can
6  just describe it for now, Officer.
7          THE WITNESS: Yeah. So if
8  you see where it says R, basically
9  that tells our rear containment
10 where to go because there's a door
11 back there. Now, if there wasn't a
12 door back there, like they can't get
13 out, then we wouldn't put our rear
14 containment back there.
15 BY MR. WEST:
16     Q. When you went out and inspected the
17 property in person, did you look at the rear
18 door?
19     A. Yes.
20     Q. You did?
21     A. Yes.
22     Q. Did you take a photograph of the rear
23 door?
24     A. No.

Page 48

1      Q. Why not?
2      A. Why should I?
3      Q. Well, you knew that the warrant
4  specified that it was for the rear, right?
5          MR. ZURBRIGGEN: Object to
6  form. Officer, if you know.
7          THE WITNESS: Well, so the
8  way this property was set up, the
9  way the property was set up, there
10 was two mailboxes on the front of
11 the house, so what I can recall is,
12 okay, this must be one of those
13 properties, because we seen it all
14 before, there's going to be stairs
15 that shoot up and then there's going
16 to be a first-floor apartment.
17 BY MR. WEST:
18     Q. You knew that there was a rear door to
19 the building, correct?
20         MR. ZURBRIGGEN: Object to
21 form and as asked and answered.
22 Officer.
23         THE WITNESS: Yes.
24 BY MR. WEST:

Electronically signed by Lisa Hughes (601-318-489-3416)                                    1eafd3c4-c374-4f6d-9bda-8318b0a3eb96

Page 49

1　　　Q. And you knew that the warrant specified
2　that it was to the rear apartment, correct?
3　　　　　MR. ZURBRIGGEN: Object to
4　　　form. Officer, if you know.
5　BY MR. WEST:
6　　　Q. You can just answer the question I'm
7　asking. You knew that, correct?
8　　　A. Yes. But --
9　　　Q. Okay. There's no pending question.
10　Since you knew that the warrant was
11　specifically for the rear apartment and you
12　knew that there was a rear door, did it occur
13　to you that the entrance for the rear
14　apartment might be the rear door?
15　　　　　MR. ZURBRIGGEN: Object to
16　　　form.
17　　　　　THE WITNESS: No. Because
18　　　there were two mailboxes on the
19　　　front of the property and no mailbox
20　　　on the back of the property, so we
21　　　just assumed that that was just,
22　　　okay, a rear door that somebody can
23　　　get out of.
24　BY MR. WEST:

Page 50

1　　　Q. Okay. The suspect in this case is
2　named ▮▮▮▮▮▮▮, correct?
3　　　A. Uh, let me look at that.
4　　　Q. I can just represent to you his name is
5　▮▮▮▮▮▮▮ Okay?
6　　　A. Okay.
7　　　Q. Do you know whether or not he was on
8　probation or parole at the time?
9　　　A. I don't know.
10　　　Q. Is that something you would normally
11　know?
12　　　　　MR. ZURBRIGGEN: Object to
13　　　form, but, Officer, you can answer.
14　　　　　THE WITNESS: I don't know.
15　　　I just know that he's wanted and we
16　　　got to go get him, that's it.
17　BY MR. WEST:
18　　　Q. Okay. Would it be important to know if
19　somebody is on probation or parole as part of
20　reconnaissance for a warrant enforcement
21　operation?
22　　　　　MR. ZURBRIGGEN: Object to
23　　　form, Officer, if you know.
24　　　　　THE WITNESS: I don't know.

Page 51

1　BY MR. WEST:
2　　　Q. In your experience, that's not
3　considered important; is that correct?
4　　　　　MR. ZURBRIGGEN: Same
5　　　objection. Officer.
6　　　　　THE WITNESS: I don't know.
7　BY MR. WEST:
8　　　Q. All right. So you're aware of the fact
9　that if somebody is on probation, that means
10　that somebody from the probation parole
11　office has inspected the residence of the
12　probation person, right?
13　　　　　MR. ZURBRIGGEN: Object to
14　　　form. Officer, if you know.
15　　　　　THE WITNESS: I don't know,
16　　　that's just an assumption.
17　BY MR. WEST:
18　　　Q. You never received any training about
19　that?
20　　　　　MR. ZURBRIGGEN: Same
21　　　objection.
22　　　　　THE WITNESS: That probation
23　　　parole goes out and checks the
24　　　location of where the person on

Page 52

1　　　probation lives?
2　BY MR. WEST:
3　　　Q. Yes.
4　　　A. Yeah. I heard they did, it don't mean
5　that they done it. They should go out and do
6　it, it doesn't mean that they go out and
7　actually do it.
8　　　Q. So if you're conducting reconnaissance
9　on how to enforce a warrant at the home of
10　somebody who is on probation or patrol,
11　wouldn't it be a good idea to call the
12　probation officer and ask the probation
13　officer if they know how to enter the
14　person's residence?
15　　　　　MR. ZURBRIGGEN: Object to
16　　　form. Officer.
17　　　　　THE WITNESS: That's above
18　　　my pay grade. I don't do all that.
19　BY MR. WEST:
20　　　Q. That's not part of reconnaissance?
21　　　A. That's not me. I'm just the officer,
22　that falls back on the supervisor.
23　　　Q. Okay. Are you aware of the fact that
24　we deposed the probation officer in this case

Electronically signed by Lisa Hughes (601-318-489-3416)                    1eafd3c4-c374-4f6d-9bda-8318b0a3eb96



Page 53

1   and the probation office had records showing
2   that the only entrance to Mr. ███ apartment
3   was through Margaret Street.  Did you know
4   that?
5           MR. ZURBRIGGEN:  Object to
6       the form of the question and the
7       characterization, but, Officer.
8           THE WITNESS:  I did not know
9       that.
10  BY MR. WEST:
11      Q. If someone had told you that the
12  probation officer had been to the property
13  and recorded that the only entrance was
14  through Margaret Street, would that
15  information have affected your reconnaissance
16  in any way, whatsoever?
17          MR. ZURBRIGGEN:  Same set of
18      objections, but Officer.
19          THE WITNESS:   Absolutely.
20  BY MR. WEST:
21      Q. How would it have affected your
22  reconnaissance?
23          MR. ZURBRIGGEN:  Same set of
24      objections.

Page 54

1           THE WITNESS:  If you got
2       information from the parole officer
3       saying that oh, this is how you get
4       into his property, then we would
5       know that okay, instead of stacking
6       up on the front of the property
7       where we thought that was the
8       entrance we would have just stacked
9       up in the rear where the apartment
10      was.
11  BY MR. WEST:
12      Q. Okay.  I will provide you with a copy
13  of a document previously marked as Scott-3.
14  So this is the Exhibit-3 from the deposition
15  of Officer Scott earlier today.  So I mean,
16  it says Google Maps at the top of this
17  document.  Do you recognize what this is a
18  Google Map image of?
19      A. Yep.  This is a top down view of the
20  property.  It shows where you can get to the
21  rear of the property and it shows the front
22  of the property.
23      Q. Okay.  Sir, I can represent to you that
24  I asked Officer Scott if he was doing

Page 55

1   reconnaissance and he knew that the probation
2   office had learned that the entrance to Mr.
3   ███ property was off Margaret Street, he
4   would have recommended entering the
5   property -- this is his handwriting, the
6   yellow arrow.
7       A. Right.
8       Q. Would you have done the same thing?
9       A. Absolutely.
10          MR. ZURBRIGGEN:  And same
11      set of objections for the record.
12  BY MR. WEST:
13      Q. All right.  So is it accurate to say
14  that if you had learned that the probation
15  office had determined that the entry to
16  ███████ apartment was off Margaret
17  Street, you would have recommended entering
18  the property, in order to enforce the warrant
19  to capture Mr. ███ in the same manner as
20  indicated on Scott-3, through the area
21  indicated by his pink marking?
22          MR. ZURBRIGGEN:  Same set of
23      objections.
24          THE WITNESS:  Yes, I would

Page 56

1       have done the same thing.  That is
2       because we know, we have
3       information that, okay, this is
4       where our target is so we wouldn't
5       even have went through the front if
6       he would have had that information.
7   BY MR. WEST:
8       Q. All right.  I know this is annoying,
9   but let me reask that question just because I
10  think I misstated it.  So looking at Scott-3,
11  is this the same path of entry that you would
12  have recommended as the reconnaissance for
13  the 4664 Torresdale Avenue property had you
14  known that the deposition parole office had
15  determined that the entry to Mr. ███
16  apartment was off Margaret Street?
17          MR. ZURBRIGGEN:  Same set of
18      objections.  Officer.
19          THE WITNESS:  Yes.  When we
20      do a recon of any property we look
21      at the front and we look at the
22      rear, so if we would have had
23      information that his apartment is in
24      the rear, that you get through

Electronically signed by Lisa Hughes (601-318-489-3416)                    1eafd3c4-c374-4f6d-9bda-8318b0a3eb96

Page 57

1    through Margaret Street, then that's
2    how we would have entered the
3    property.
4  BY MR. WEST:
5    Q. Okay. Did you look at this Google Map
6  image or a similar one as part of your
7  reconnaissance?
8          MR. ZURBRIGGEN: Object to
9      the form, but, Officer, if you know.
10          THE WITNESS: Yes.
11  BY MR. WEST:
12    Q. And so you knew that there was a rear
13  entrance to the property off Margaret Street,
14  correct?
15          MR. ZURBRIGGEN: Object to
16      the form and asked and answered.
17          THE WITNESS: Yes.
18  BY MR. WEST:
19    Q. Did you, as part of your
20  reconnaissance, investigate whether there
21  might be a door to enter the property off
22  Margaret Street?
23          MR. ZURBRIGGEN: Same set of
24      objections. Officer.

Page 58

1          THE WITNESS: So what I
2      recall, we reconned it, we went back
3      there and we had to count how many
4      houses down off the corner of the
5      property so we could set up our rear
6      containment just in case somebody
7      bails out.
8          So I would say since I
9      believe that in front of the
10      property there's two mailboxes, so
11      the properties, numerous properties
12      that we had apartments set up like
13      that and we see two mailboxes, you
14      wouldn't think that, okay, that the
15      entrance to the second floor
16      apartment is in the rear because the
17      mailbox is not there, it's on the
18      front of the property.
19          So we were expecting --
20      well, what I was expecting when I
21      breached the door, that we go in,
22      there was going to be probably a
23      door to the right where there's the
24      first-floor apartment and then a set

Page 59

1    of steps we had to go up to get to
2    the second floor.
3  BY MR. WEST:
4    Q. But did you at least consider the
5  possibility that the rear apartment entrance
6  was through the rear door?
7          MR. ZURBRIGGEN: Object to
8      form and asked and answered. Go
9      ahead, Officer.
10          THE WITNESS: No. Because
11      like I said, the way the property
12      was set up the two front mailboxes
13      that were on the front of the
14      property, I mean, that would make
15      anybody assume that okay, this is
16      the front door to get to both
17      apartments and the back door was
18      just the back door.
19          MR. WEST: Okay. I don't
20      really mean to just only reuse Scott
21      exhibits.
22          THE WITNESS: That's fine.
23  BY MR. WEST:
24    Q. Well, I was speaking to your attorney

Page 60

1  really, but they're just at hand.
2    A. Oh.
3    Q. But I'm going to use here Scott
4  Exhibit-2, another exhibit from earlier
5  today.
6    A. Thank you.
7    Q. If you can just look at this document
8  and tell me what it is if you know?
9    A. It looks like a rear of a property.
10  It's not a very good picture.
11    Q. Is this the rear of the 4664 Torresdale
12  Avenue property?
13    A. You know what, I don't recall.
14    Q. Are you sure you ever actually saw it?
15          MR. ZURBRIGGEN: Object to
16      form.
17          THE WITNESS: Yeah.
18  BY MR. WEST:
19    Q. Okay. But you don't remember if this
20  is what it looks like?
21    A. Right.
22    Q. Did the rear of the property look like
23  this or different or you don't recall?
24    A. I don't recall.

15 (Pages 57 to 60)

Page 61

1   Q. So when the door to Ms. Alvarado's
2   apartment was ultimately breached, you're the
3   one who was using the ram, correct?  Well,
4   let me ask.  So without looking at the
5   records, I'm really just asking based on your
6   personal memory.  Do you even remember if he
7   did that?
8   A. I don't recall, that's why I was trying
9   to see if he detailed it on the recon.
10   Q. And that's fine, but just to be clear,
11   my question was based on your personal
12   memory.  So just to make sure I understand,
13   today you don't have any personal
14   recollection of having breached the 4664
15   Torresdale Avenue door, correct?
16   A. I know I was part of the breaching
17   team, I don't know if I had the ram or the
18   halligan because we usually bring multiple
19   tools.
20   Q. Okay.  At some point a dog was shot as
21   part of this operation, correct?
22   A. Yes.
23   Q. And you, personally, did not view the
24   dog at the time of the shooting; is that

Page 62

1   correct?
2   A. No.
3   Q. You didn't see it when the dog got
4   shot, right?
5   A. No.
6   Q. So you wouldn't know personally if
7   Officer Song was bitten or anything like
8   that, correct?
9   MR. ZURBRIGGEN:  Object to
10   form.
11   THE WITNESS:  No.
12   BY MR. WEST:
13   Q. It is correct or not correct?
14   MR. ZURBRIGGEN:  Same
15   objection.  Officer, if you know.
16   THE WITNESS:  I didn't see
17   it, no.
18   BY MR. WEST:
19   Q. Had you ever done reconnaissance with
20   Sergeant Mellody prior to this incident?
21   A. Yes.
22   Q. How many times?  Can you give an
23   estimate or an approximation?
24   A. I'd say more than ten times.

Page 63

1   Q. Okay.  So was it a pretty normal thing
2   then that you and Sergeant Mellody would do
3   reconnaissance together?
4   MR. ZURBRIGGEN:  Object to
5   form.
6   THE WITNESS:  It depends.
7   Other guys would go out.  It
8   depends.  It depends on the night.
9   It could be other officers that go
10   out, it could be other supervisors
11   that go out, it just depends.
12   BY MR. WEST:
13   Q. I can represent to you that in Sergeant
14   Mellody's investigation interview record he
15   said that Police Officer Eric Clark, you took
16   the door with a ram.  Does that refresh your
17   recollection if you had the ram or the
18   halligan tool?
19   MR. ZURBRIGGEN:  Object to
20   form but, Officer, if you can.
21   THE WITNESS:  Yes.  Then,
22   yeah, if I took the door I had the
23   ram, yes.
24   BY MR. WEST:

Page 64

1   Q. Okay.  And I'm just asking if it
2   refreshes your recollection.  Do you now
3   remember doing it or you're not sure?
4   A. Yeah.  Well, actually, I was going to
5   point out, in one of the questions it says
6   the dog was barking, I announced and yelled
7   dog as I breached the front door, so I'm
8   assuming I had the -- not assuming, I had the
9   ram.
10   Q. Okay.  Why did you breach the door?
11   A. I got the go ahead from the supervisor
12   to breach the door.
13   Q. Did you knock on the door?
14   A. I don't know.  I don't know if I did
15   both or I had my partner knock on the door
16   while I stood on standby with the ram.
17   Q. All right.  Is it fair to say that you
18   have no specific recollection of the door
19   being knocked on at this time, correct?
20   A. No.
21   Q. It is correct or no?
22   A. Or who knocked on the door, rather I
23   did or my partner did.
24   Q. Do you have any specific recollection

Page 65

1   of anyone knocking on the door at this time?
2           MR. ZURBRIGGEN: Object to
3       form. Officer.
4           WITNESS: I don't know.
5       Like I said, I don't know if I did
6       or my partner did, but the door was
7       knocked on. I don't know who did
8       it, if I did it or my partner did
9       it.
10  BY MR. WEST:
11      Q. Okay. Do you actually remember someone
12  knocking on the door at this time or are you
13  just assuming it happened?
14          MR. ZURBRIGGEN: Same
15      objection.
16          THE WITNESS: No. We
17      knocked on the door, I'm just not
18      sure who did it.
19  BY MR. WEST:
20      Q. How much time passed between the door
21  being knocked on and you breaching it with
22  the ram?
23      A. I don't know. Maybe a couple seconds,
24  maybe. I'm not sure.

Page 66

1       Q. A couple seconds?
2       A. I would say maybe ten seconds. I don't
3   know.
4       Q. So ten or less seconds, correct?
5           MR. ZURBRIGGEN: Object to
6       the form. Officer, if you know and
7       do not guess.
8           THE WITNESS: I'm not going
9       to guess so I don't know.
10  BY MR. WEST:
11      Q. Why was the door breached at that time?
12          MR. ZURBRIGGEN: Object to
13      form. Asked and answered. Officer,
14      you can answer.
15          THE WITNESS: The door was
16      breached because the supervisor gave
17      me the go ahead to breach the door.
18  BY MR. WEST:
19      Q. Were there any sort of exigent
20  circumstances at that time or any particular
21  reason why the door would be breached at the
22  time it was?
23          MR. ZURBRIGGEN: Same
24      objection. Officer, you can answer.

Page 67

1           THE WITNESS: You gotta ask
2       the supervisor that. Like he gives
3       the go ahead.
4   BY MR. WEST:
5       Q. Okay. But you're not personally aware
6   of any exigent circumstances, correct?
7           MR. ZURBRIGGEN: Same
8       objection.
9           THE WITNESS: Not that I can
10      recall.
11  BY MR. WEST:
12      Q. All right. I would like to show you
13  the video. We don't have the advanced
14  technology to record that I'm showing you the
15  video, but whatever, it will be fine for the
16  written record. All right. Have you ever
17  seen the video of this incident?
18      A. No.
19      Q. Do you have any idea how a video of
20  this incident was recorded?
21      A. No.
22      Q. Did you even know that a video of this
23  incident was recorded until I just said it?
24          MR. ZURBRIGGEN: Object to

Page 68

1       form. Officer.
2           THE WITNESS: No.
3   BY MR. WEST:
4       Q. All right, sir, so I can represent to
5   you that this video was provided to us by the
6   City of Philadelphia as part of the discovery
7   responses. For the sake of the record, this
8   has been -- the title of this video is
9   A10_20210604053500_001 and it's a video.
10  I'll leave it at that. So I'm going to
11  forward the video to the two minute and 10
12  second mark. So for the record, the video is
13  frozen at this time, it's at the 2 minute 10
14  second mark. And Officer Clark, can you see
15  that there are members of the SWAT unit
16  assembled in front of the 4664 Torresdale
17  Avenue property in this screen shot?
18      A. Yes.
19      Q. Okay. So I'm going to play the video
20  from the 2 minute 10 second mark and I'm
21  going to ask you to tell me to pause if at
22  any point you can see that anyone knocks on
23  the door. Okay?
24          MR. ZURBRIGGEN: And

17 (Pages 65 to 68)

Page 69

1      objection to form, but, Officer, if
2   you can observe.
3          THE WITNESS:  Sure.
4   BY MR. WEST:
5      Q. Okay.  So I paused the video at two
6   minutes and twenty-two seconds.  Can you see
7   that there's a figure kind of hunched in
8   front of the door?
9      A. Yes.
10     Q. And does that appear to be somebody
11  with a ram?
12     A. Yes.
13     Q. Is that you?
14     A. So that is me with the ram and it looks
15  like Brian Murray went up to the door first
16  so I don't know, I don't recall, he probably
17  could have knocked with the halligan, I'm not
18  sure, but you could continue playing.
19     Q. And you can clearly see that you're
20  attempting to breach the door?
21     A. Uh-huh.
22     Q. All right.  And you didn't stop me at
23  any point to say that you saw someone knock
24  on the door, correct?

Page 70

1          MR. ZURBRIGGEN:  And
2   objection to form, but, Officer, you
3   can answer again.
4          THE WITNESS:  I said Brian
5      Murray walked up so he could have
6      knocked a few seconds with the
7      halligan and then that's when I
8      probably got told to breach the
9      door so...
10  BY MR. WEST:
11     Q. Okay.  At most, that would have been a
12  single round of knocking, correct?
13         MR. ZURBRIGGEN:  Object to
14     the form, but, Officer.
15         THE WITNESS:  Yes.
16  BY MR. WEST:
17     Q. Okay.  And at most, that would have
18  been just a few seconds before the door was
19  breached, correct?
20         MR. ZURBRIGGEN:  Same
21     objection, but, Officer.
22         THE WITNESS:  Yes.
23  BY MR. WEST:
24     Q. Based on your training with the

Page 71

1   Philadelphia Police Department, was this
2   sufficient as a knock and announce under the
3   knock and announce rule?
4          MR. ZURBRIGGEN:  Object to
5      form and as asked and answered.
6      Officer, you can answer again.
7          THE WITNESS:  I will say
8      based on the layout of the property
9      where you see two mailboxes in front
10     of the property, like I explained
11     earlier, you assume that the
12     property is going to have another
13     door that you got to breach,
14     actually, two other doors that you
15     got to breach.
16         So we've encountered
17     properties where you have to go
18     through that door and then there's a
19     little vestibule, you got to break
20     that door down and then you finally
21     get into the first floor apartment
22     and then another door at the top of
23     the steps.
24         So I would say based on the

Page 72

1      layout of the property and what we
2      saw on the reconnaissance and the
3      way the mailboxes were set up out
4      front, we, you know, did a quick one
5      and went in, based on what I'm
6      seeing here.
7   BY MR. WEST:
8      Q. Okay.  When you were a member of the
9   SWAT unit, were there any other situations
10  where you did a quick one on what you thought
11  was the outside door?
12     A. And we went inside and there was a
13  bunch of other doors, yes.
14     Q. Okay.
15     A. Like I said, for instance, when we hit
16  apartment complexes or, you know, we have to
17  get through the glass door, there's no point
18  in knocking and announcing on that, you got
19  to get through the glass door and you have to
20  get through the other glass door and then we
21  got to go up the elevators and then that's
22  when we do our, you know, knock on like the
23  apartment complex, whatever the case may be,
24  and then we go in.  So like I said, every

18 (Pages 69 to 72)

Page 73

1   situation is different.
2       Q. Sure. So what you're seeing on this
3   video is consistent with the training you
4   received from the Philadelphia Police
5   Department as far as to how you should do a
6   knock and announce, correct?
7           MR. ZURBRIGGEN: Same set of
8       objections, but, Officer.
9           THE WITNESS: I would say --
10      it's like a reloaded question. It
11      depends on the circumstances. I
12      don't know. I don't know. This is
13      like -- I don't know. Like this job
14      is different from any other job.
15      Every other job is not the same. So
16      this job, like I said, we assumed
17      that, you know, we were going to
18      encounter another door, but we
19      didn't, it was just an apartment.
20  BY MR. WEST:
21      Q. The way that you conducted yourself
22  with regards to the warrant at the 4664
23  Torresdale Avenue property, was that
24  consistent with the knock and announce rule

Page 74

1   as you understood it from your training with
2   the Philadelphia Police Department?
3           MR. ZURBRIGGEN: Same set of
4       objections. This was asked and
5       answered and to the form. Officer.
6           THE WITNESS: I don't know
7       because like I said -- I don't know.
8       Like you're asking me -- like I'm
9       not sure what you're asking me.
10  BY MR. WEST:
11      Q. Okay. When you were a member of the
12  SWAT unit, have you ever done this before,
13  you saw a door to a building where you're
14  enforcing a warrant and you breached the door
15  after waiting at most a couple seconds?
16          MR. ZURBRIGGEN: Object to
17      the form. Object as asked and
18      answered. Officer, you can answer
19      again.
20          THE WITNESS: Yes.
21  BY MR. WEST:
22      Q. Okay. And did you do that because you
23  were following the training you received from
24  the Philadelphia Police Department or were

Page 75

1   you doing that for some other reason?
2           MR. ZURBRIGGEN: Object to
3       the form. Officer.
4           THE WITNESS: Yeah, the form
5       is -- so when you say training from
6       the Philadelphia Police Department,
7       it's training from SWAT, like it's a
8       whole different -- like we don't get
9       breaching training in the academy,
10      like that comes when you go to SWAT
11      and things like that. So when you
12      say the Philadelphia Police
13      Department, I'm thinking in my head
14      like meaning the academy. No, not
15      the academy. SWAT. That's where I
16      learned to breach and everything,
17      from SWAT.
18  BY MR. WEST:
19      Q. Is the SWAT unit part of the
20  Philadelphia Police Department?
21      A. Yes.
22          MR. ZURBRIGGEN: Object to
23      form.
24          MR. WEST: I'm sorry, can

Page 76

1       you read back the last question I
2       asked, the second to last question.
3           - - -
4           (Whereupon, the reporter
5       read back the second to the last
6       question posed.)
7           - - -
8   BY MR. WEST:
9       Q. So, Officer Clark, when you breached
10  Ms. Alvarado's front door, at most a couple
11  of seconds after -- how many seconds do you
12  think it was from -- if you want me to show
13  the video again I will.
14      A. Okay. You can show the video.
15      Q. Do you have a stopwatch on your watch?
16      A. Well, you can start and stop it.
17      Q. The thing is, you can record this with
18  a stopwatch if you want. But tell me, how
19  many seconds is it between somebody knocking
20  on this door and then you going up and
21  knocking in Ms. Alvarado's front door with
22  the ram?
23          MR. ZURBRIGGEN: Objection
24      to the form. Objection as asked and

Electronically signed by Lisa Hughes (601-318-489-3416)                    1eafd3c4-c374-4f6d-9bda-8318b0a3eb96

Page 77

1      answered again.  Officer, again, you
2   can observe and answer when there's
3   a question pending.
4   BY MR. WEST:
5      Q. So again, I'm going to start playing
6   the video from the 2 minute and 10 second
7   mark.
8      A. Stop.
9      Q. So we're stopped at 02:30.0.
10     A. So that took 20 seconds?  You said you
11  started it at what, 02:10.0?
12     Q. Okay.  Well, you're clearly not
13  beginning go breach the property at the
14  02:30.0 mark, correct?
15         MR. ZURBRIGGEN:  Objection
16     to form.  Objection as asked and
17     answered.  Go ahead, Officer.
18         THE WITNESS:  So I would go
19     back to where you actually see my
20     partner go up to the door and that's
21     where you can start the timer.
22  BY MR. WEST:
23     Q. So Officer Murray walked up to the
24  property with a halligan tool, correct?

Page 78

1      A. Uh-huh.
2      Q. So how do you use a halligan tool?
3      A. We actually use it to knock on the door
4   or we can use it to pry a screen door off or
5   things like that.
6      Q. Wouldn't Officer Murray have used the
7   halligan tool to pry the door open prior to
8   using the ram?
9          MR. ZURBRIGGEN:  Object to
10     form.  But, Officer, if you
11     understand.
12         THE WITNESS:  Repeat that.
13     You're saying would he pry the door
14     open?
15  BY MR. WEST:
16     Q. Yes.
17         MR. ZURBRIGGEN:  Same
18     objection.
19         THE WITNESS:  If it's like a
20     screen door on there.
21  BY MR. WEST:
22     Q. Okay.
23     A. But we also use the tool to knock on
24  doors.

Page 79

1      Q. Okay.
2          MR. ZURBRIGGEN:  And the
3      same objection for the record.
4   BY MR. WEST:
5      Q. So tell me -- we'll go back to 02:10.0.
6   All right.  Playing at 02:10.0.
7      A. Okay.  So Brian goes up to the door.
8      Q. Tell me when to stop when you think he
9   knocks.
10         MR. ZURBRIGGEN:  Object to
11     the form.
12         THE WITNESS:  So he's up
13     there.
14  BY MR. WEST:
15     Q. So you think he's knocking at this
16  point?
17         MR. ZURBRIGGEN:  And
18     objection for the record, but,
19     Officer, if you can observe.
20         THE WITNESS:  Well, yeah,
21     he's up there for a reason so I'm
22     assuming he's knocking.
23  BY MR. WEST:
24     Q. Okay.  And this is 02:16.0, right?

Page 80

1      A. Uh-huh.
2      Q. Push play.  Pause.  So now it's 02:23.0
3   and you are ramming the door open, correct?
4          MR. ZURBRIGGEN:  Same
5      objection and asked and answered.
6      Go ahead, Officer, if you can.
7          THE WITNESS:  Yeah, about
8      to, once I start swinging.
9   BY MR. WEST:
10     Q. Okay.  So at most we've got about seven
11  seconds.  Does that comply with the
12  requirements of the knock and announce rule
13  under your understanding pursuant to whatever
14  training you've received from the
15  Philadelphia Police Department, including the
16  SWAT unit?
17         MR. ZURBRIGGEN:  Same set of
18     objections.  Officer.
19         THE WITNESS:  Yes, I guess.
20  BY MR. WEST:
21     Q. So the policies and procedures of the
22  Philadelphia Police Department told you that
23  you could breach Ms. Alvarado's apartment
24  seven seconds after Officer Murray knocked on

Page 81

1   the door, correct?
2          MR. ZURBRIGGEN:  I'm going
3   to object to the form and as asked
4   and answered.  Officer, you can
5   answer again, please.
6          THE WITNESS:  So like I
7   said, every situation is different.
8   The way the property was laid out
9   we assumed that, like I said, it was
10  going to be another door behind it.
11  Obviously, it wasn't another door.
12         Now, if we had information
13  where, like earlier you said oh, he
14  lives in the back, in the rear, then
15  it probably would be different
16  because the way the property is laid
17  out, it's like, all right, it's
18  going to be one door.
19  BY MR. WEST:
20     Q. All right.  Sir, if you can please just
21  answer the question you're asked and I think
22  you should be able to answer this question
23  with a yes or no answer.  Did the policies
24  and procedures of the Philadelphia Police

Page 82

1   Department tell you that you could ram this
2   door open seven seconds after Officer Murray
3   first knocked on the door?
4          MR. ZURBRIGGEN:  Object to
5   form.  Object to asked and answered.
6   Go ahead, Officer.
7          THE WITNESS:  I would say
8   the way that you're asking the
9   question -- no.  It's a reasonable
10  amount of time.
11  BY MR. WEST:
12     Q. Is seven seconds a reasonable amount of
13  time?
14         MR. ZURBRIGGEN:  Same
15  objections.
16         THE WITNESS:  Well,
17  depending on what the supervisor
18  felt and the layout of the property
19  that we assumed was going to happen,
20  that was a reasonable amount of
21  time.
22  BY MR. WEST:
23     Q. So, sir, I'm not really asking you to
24  answer the question over because I don't

Page 83

1   think the question I'm actually trying to get
2   to has been answered, so let me lay a
3   foundation.  What I'm trying to figure out is
4   if what you did on that day was in violation
5   of the policies and procedures of the
6   Philadelphia Police Department as you
7   understood them or did you act in compliance
8   with the policies and procedures of the
9   Philadelphia Police Department?
10         So with that foundation laid, when you
11  rammed the front door of the 4664 Torresdale
12  Avenue property on June 4, 2021, seven
13  seconds approximately after Officer Murray
14  first knocked on the door, were you complying
15  with the policies and procedures of the
16  Philadelphia Police Department as you
17  understood them or were you defying those
18  policies and procedures?
19     MR. ZURBRIGGEN:  Object to         the
20  form.  Object as asked and
21  answered.  Go ahead and answer.
22         THE WITNESS:  I was
23  complying.              BY MR.
24  WEST:

Page 84

1      Q. Was that based on the training that
2   you'd received as a member of the
3   Philadelphia Police Department?
4          MR. ZURBRIGGEN:  Same set of
5   objections.  Officer.
6          THE WITNESS:  Yes.
7   BY MR. WEST:
8      Q. Was that consistent with the training
9   that you had received as a member of the
10  Philadelphia SWAT unit?
11         MR. ZURBRIGGEN:  Same set of
12  objections.  Officer.
13         THE WITNESS:  Yes.
14  BY MR. WEST:
15     Q. Was that consistent with the experience
16  that you personally had as to how a SWAT unit
17  of the Philadelphia Police Department
18  regularly conducted warrant enforcement
19  actions?
20         MR. ZURBRIGGEN:  Same set of
21  objections.
22         THE WITNESS:  Like I said,
23  it depends on the circumstances.
24  That's not how every job that we do

21 (Pages 81 to 84)

Page 85

1  is handled.
2  BY MR. WEST:
3  Q. Are you aware of any other member of
4  the SWAT unit who was with you that day who
5  suggested that anything had been done that
6  was in any way inconsistent with the standard
7  practice in the Philadelphia Police
8  Department?
9       MR. ZURBRIGGEN:  Object to
10      the form of the question.  Officer,
11      if you know.
12      THE WITNESS:  No, I don't
13      know.
14  BY MR. WEST:
15  Q. Was there anything that happened in
16  relation to the warrant enforcement operation
17  at 4664 Torresdale Avenue that was in any way
18  irregular or inconsistent with the normal
19  practices of the Philadelphia SWAT unit in
20  your experience?
21      MR. ZURBRIGGEN:  Same set of
22      objections.  Officer.
23      THE WITNESS:  No.
24  BY MR. WEST:

Page 86

1  Q. Given that you knew that the 4664
2  Torresdale Avenue property had a front door
3  and a rear door and had multiple apartments
4  in it and that your warrant was only for the
5  rear apartment, didn't it show reckless
6  disregard for the residents of the apartments
7  in that building that you did not investigate
8  whether or not the proper entrance point was
9  through the front door or the rear door?
10      MR. ZURBRIGGEN:  Object to
11      the form, object to the
12      characterization, and object as
13      asked and answered.  Go ahead,
14      Officer.
15      THE WITNESS:  No.
16  BY MR. WEST:
17  Q. Why not?
18  A. Because like I said, there's two
19  mailboxes on the front of the property.  Who
20  gets their mail from the front of the
21  property and has to walk all the way back to
22  the rear of the property, like, I mean, that
23  doesn't make sense.  So a reasonable person
24  would believe, okay, to get to apartment 1,

Page 87

1  it's probably going to say Apartment 1 and
2  Apartment 2, they're going to go through the
3  front door and go up some steps or go to the
4  right, whatever the case may be, whatever the
5  case may be.  A reasonable person that sees
6  two mailboxes -- like I'm pretty sure the
7  mailman is not walking to the back of the
8  property, he's putting the mail in the front
9  mailbox.
10  Q. Don't you think it would have been
11  reasonable to call the property manager?
12      MR. ZURBRIGGEN:  Object.
13      Officer, you can answer if you can.
14      THE WITNESS:  No.  No.
15  BY MR. WEST:
16  Q. Don't you think it would have been
17  reasonable to have asked the probation
18  officer for the inspection records?
19      MR. ZURBRIGGEN:  Object to
20      the form.  Officer.
21      THE WITNESS:  Yes.  But like
22      I said, that's not my -- that all
23      falls back on the supervisor.
24  BY MR. WEST:

Page 88

1  Q. Did you review the property records
2  available to the City of Philadelphia for the
3  property?
4  A. No.
5       MR. ZURBRIGGEN:  Object to
6       the form.
7  BY MR. WEST:
8  Q. Are you even aware if the City of
9  Philadelphia has a publically available
10  website where you can see all of these
11  property records?
12  A. Yes.
13      MR. ZURBRIGGEN:  Object to
14      the form of the question with the
15      property records.
16  BY MR. WEST:
17  Q. You know that that website exists,
18  correct?
19  A. Yes.  But like I said, that falls back
20  on the supervisor.
21      MR. ZURBRIGGEN:  Same
22      objection.
23  BY MR. WEST:
24  Q. As part of your reconnaissance, would

22 (Pages 85 to 88)

Page 89

1  you ever view the City of Philadelphia
2  property records website?
3      A. Yes. The supervisor would.
4      Q. But as part of the reconnaissance that
5  you would do, would you review those records?
6      A. No. Unless it was brought up by a
7  supervisor saying, hey, there's something
8  fishy with this property, then we would.
9      Q. Again, I have a document, this also was
10  premarked as Scott Exhibit-4. Please look at
11  that and let me know if you can identify what
12  this is?
13     A. That's who owns the property.
14     Q. Are you assuming that that's what that
15  is just based on reading the words and
16  putting in context or do you actually
17  recognize what this is?
18     A. Yes. It's the City of Philadelphia
19  property -- who owns the property.
20     Q. Okay. So you're aware of the existence
21  of this website, correct?
22         MR. ZURBRIGGEN: Object to
23     the form. Officer.
24         THE WITNESS: Yes.

Page 90

1  BY MR. WEST:
2      Q. Where did you learn about the existence
3  of this website?
4          MR. ZURBRIGGEN: Same
5      objection. Officer.
6          THE WITNESS: I learned
7      about it -- I mean, it's common
8      knowledge I guess. Is that the
9      answer you're looking for?
10  BY MR. WEST:
11     Q. Okay. And it didn't come out very well
12  in this printout, but on the right side of
13  this page -- and normally on the property
14  website there's even a map of the property,
15  correct?
16         MR. ZURBRIGGEN: Object to
17     the form. Officer, if you can tell.
18         THE WITNESS: Yeah, I can't.
19  BY MR. WEST:
20     Q. In your experience, is there normally a
21  map of property there?
22         MR. ZURBRIGGEN: Same
23     objection. Officer, if you know.
24         THE WITNESS: I don't know.

Page 91

1  BY MR. WEST:
2      Q. Is there any reason why you don't use
3  this information as part of your
4  reconnaissance when you were in the SWAT
5  unit?
6          MR. ZURBRIGGEN: Object to
7      the form. Officer.
8          THE WITNESS: We do use it.
9      But in prime example, let's say for
10     instance, if Google Maps isn't
11     updated and it says, let's say, for
12     instance, this address is a vacant
13     lot, our supervisor will go to the
14     City of Philadelphia property thing
15     and say okay, this is a property
16     here and then we'll go out and sure
17     enough they'll be a property there.
18  BY MR. WEST:
19     Q. Let's use Scott-6. Let me know if you
20  recognize what this is a photograph of?
21     A. Yep. The front of the property.
22     Q. This is the front of the 4664
23  Torresdale Avenue property, correct?
24     A. Uh-huh.

Page 92

1      Q. And on the front of the building
2  there's a window, right?
3      A. Uh-huh.
4      Q. Was the area behind that window
5  occupied?
6          MR. ZURBRIGGEN: Object to
7      the form. Officer, if you
8      understand.
9          THE WITNESS: Like are you
10     asking is that an apartment?
11  BY MR. WEST:
12     Q. Yeah. I'm asking like this window that
13  we see in the front of the property, on the
14  other side of these windows is there a
15  dwelling area where people lived?
16         MR. ZURBRIGGEN: Same
17     objection. Officer, if you know.
18         THE WITNESS: Yes.
19  BY MR. WEST:
20     Q. Okay. Was that dwelling area where
21  people lived behind these windows fairly
22  described as Apartment 2, second floor rear?
23         MR. ZURBRIGGEN: Object to
24     the form of the question. Officer,

23 (Pages 89 to 92)

Page 93

1  if you understand it.
2      THE WITNESS:  I understand
3  it.  No.  But the way like as you
4  can look at the property there's
5  this window and then you got an
6  upstairs window.  So in numerous
7  properties that I've been in, this
8  front door, it will be a door to the
9  left that goes into Apartment 1 and
10  then it should have been a flight of
11  steps that go up to Apartment 2
12  rear.  You can like just look at the
13  property and any reasonable person
14  would believe that.
15  BY MR. WEST:
16      Q. So you knew prior to breaching Ms.
17  Alvarado's front door that there was an
18  occupied first floor apartment, correct?
19      MR. ZURBRIGGEN:  Object to
20  the characterization.  Officer, you
21  can answer.
22      THE WITNESS:  I wouldn't say
23  I knew it was occupied until we went
24  in.

Page 94

1  BY MR. WEST:
2      Q. You knew there was a first floor
3  apartment, correct?
4      A. Yes.
5      Q. Did you at least consider the
6  possibility that the door you were breaching
7  led to the first floor apartment?
8      MR. ZURBRIGGEN:  Object to
9  the form of the question and as
10  asked and answered.  Officer, go
11  ahead.
12      THE WITNESS:  No.
13  BY MR. WEST:
14      Q. So all the training that you received
15  from the Philadelphia Police Department and
16  the SWAT unit, including reconnaissance
17  training, hadn't prepared you for the
18  possibility that that door might lead to the
19  first floor apartment right next to it?
20      MR. ZURBRIGGEN:  Same set of
21  objections.  Officer, you can answer
22  again.
23      THE WITNESS:  No. Because I
24  mean, the numerous amount of

Page 95

1  apartments that we went in it
2  wouldn't be set up like that.  And
3  also, if that second mailbox wasn't
4  up there, that would have made it a
5  game changer because all right,
6  there's only one mailbox, so where
7  is the other mailbox.
8  BY MR. WEST:
9      Q. Under your understanding of the United
10  States Constitution -- let me lay a
11  foundation.  Do you have to have some
12  understanding of the United States
13  Constitution in order to be a Philadelphia
14  police officer in your experience?
15      MR. ZURBRIGGEN:  Object to
16  the form.  Officer, you can answer
17  if you can.
18      THE WITNESS:  I guess very
19  basic, yes.
20  BY MR. WEST:
21      Q. Okay.  So under your understanding of
22  the United States Constitution, would the
23  warrant that was issued to enter ███████
24  ███  residence, were you legally allowed to

Page 96

1  enter Ms. Alvarado's first floor apartment?
2      MR. ZURBRIGGEN:  Object to
3  the form of the question.  Officer,
4  you can answer.
5      THE WITNESS:  No.  The
6  warrant wasn't for the first floor,
7  it was for the second floor.
8  BY MR. WEST:
9      Q. Okay.  Did you use any precautions in
10  connection with the 4664 Torresdale Avenue
11  enforcement action in order to ensure that
12  you did not enter Ms. Alvarado's apartment?
13      MR. ZURBRIGGEN:  Object to
14  the form of the question.  Officer,
15  if you understand, you can answer.
16      THE WITNESS:  Can you repeat
17  the question?
18  BY MR. WEST:
19      Q. Did you use any precautions in
20  connection with the 4664 Torresdale Avenue
21  warrant enforcement action in order to ensure
22  that you did not illegally enter Ms.
23  Alvarado's apartment?
24      MR. ZURBRIGGEN:  Same

Electronically signed by Lisa Hughes (601-318-489-3416)                    1eafd3c4-c374-4f6d-9bda-8318b0a3eb96

Page 97

1    objection. Officer, you can answer.
2         THE WITNESS: I would say
3    yeah when we went out there and
4    reconned it. We went out there and
5    looked at the property, made sure
6    -- like the two mailboxes were like
7    the biggest thing because you would
8    think that it will be a first floor
9    and a second floor and we would have
10   to go through the first floor to get
11   to the second floor.
12   BY MR. WEST:
13   Q. Were there any other precautions that
14   you used in order to avoid entering Ms.
15   Alvarado's apartment?
16        MR. ZURBRIGGEN: Same
17   objection. Officer.
18        THE WITNESS: I would say
19   just the reconnaissance.
20   BY MR. WEST:
21   Q. Why weren't you wearing a body cam?
22        MR. ZURBRIGGEN: Object to
23   the form. Officer, if you know.
24        THE WITNESS: SWATs not

Page 98

1    issued body cams.
2    BY MR. WEST:
3    Q. Do you have any personal knowledge as
4    to why the SWAT unit is not issued body cams?
5         MR. ZURBRIGGEN: Same
6    objection, but, Officer, if you
7    know.
8         THE WITNESS: I don't know.
9    BY MR. WEST:
10   Q. I think you testified earlier that you
11   could hear the dog barking before the
12   property was breached, correct?
13   A. Yes.
14   Q. What, if any, precautions did you or
15   any other members of the SWAT unit use to
16   prepare yourself for a possible dog
17   encounter?
18        MR. ZURBRIGGEN: Object to
19   the form, but, Officer, if you know
20   you can answer.
21        THE WITNESS: There's no
22   precautions. I mean, if the
23   property's got a dog in it we still
24   got to go in there.

Page 99

1    BY MR. WEST:
2    Q. Okay. Have you ever heard of the
3    Philadelphia Police Department having any
4    sort of standard operating procedure for dog
5    encounters?
6         MR. ZURBRIGGEN: Object to
7    the form, but, Officer, if you know.
8         THE WITNESS: No.
9    BY MR. WEST:
10   Q. Did you ever receive any guidance or
11   training as a member of the SWAT unit with
12   regards to dog encounters?
13        MR. ZURBRIGGEN: Same
14   objection. Officer.
15        THE WITNESS: No.
16   BY MR. WEST:
17   Q. Were any tools made available to you or
18   any of the other members of the SWAT unit for
19   the dog encounter that would prevent a lethal
20   encounter?
21        MR. ZURBRIGGEN: Object to
22   the form. Officer, if you
23   understand, you can answer.
24        THE WITNESS: Were any

Page 100

1    tools?
2    BY MR. WEST:
3    Q. Let me clarify. Have you ever received
4    any training from the Philadelphia Police
5    Department, including the SWAT unit, with
6    regards to certain tools that have been
7    identified as available to be used in dog
8    encounters in order to avoid a lethal
9    encounter?
10        MR. ZURBRIGGEN: Object to
11   the form. Officer, if you know.
12        THE WITNESS: Yes.
13   BY MR. WEST:
14   Q. What are those tools?
15   A. It depends. You can use OC, you can
16   use a taser, you can use -- you can use those
17   things, but it wasn't used.
18   Q. Okay. So you were aware of the fact
19   that tools were available for dog encounters,
20   but none of these were ready to be used in
21   connection with the 4664 Torresdale Avenue
22   operation, correct?
23        MR. ZURBRIGGEN: Object to
24   the form, particularly

25 (Pages 97 to 100)

Page 101

1   characterization, but, Officer, go
2   ahead.
3        THE WITNESS:  I'm going to
4   say no.  I mean, we're already
5   stacked up on the door and ready to
6   go in, we're not going to stop and
7   say -- we can't stop, this dude is
8   wanted for what, I believe it was
9   murder, right?
10  BY MR. WEST:
11  Q. But none of the dog encounter tools
12  were used for this operation, correct?
13       MR. ZURBRIGGEN:  Same
14   objection.  Officer, if you know.
15       THE WITNESS:  I mean --
16  BY MR. WEST:
17  Q. It is correct, isn't it?
18       MR. ZURBRIGGEN:  Same
19   objection.
20       THE WITNESS:  I mean, you
21   could use your gun, too.  I mean,
22   so...
23  BY MR. WEST:
24  Q. Okay.  So you can hear the dog barking

Page 102

1   on the first floor, right?
2   A. Uh-huh.
3   Q. Didn't that lead you to understand that
4   the first floor apartment was occupied?
5        MR. ZURBRIGGEN:  Object to
6    the form.  Object as asked and
7    answered.  Officer, go ahead and
8    answer again.
9        THE WITNESS:  No. Just
10   because you hear a dog barking, I've
11   been in houses where a dog is
12   barking and there's nobody home.
13  BY MR. WEST:
14  Q. Occupied as far as it was a place where
15  people lived, right?
16       MR. ZURBRIGGEN:  Same set of
17   objections.  Officer, you can answer
18   again.
19       THE WITNESS:  I guess, yes.
20  BY MR. WEST:
21  Q. Okay.  And the dog was on the other
22  side of the door, right?
23  A. Uh-huh.
24  Q. That didn't lead you to understand that

Page 103

1   the door led to an apartment?
2        MR. ZURBRIGGEN:  Same set of
3    objections.
4        THE WITNESS:  No.  Like --
5    no.
6   BY MR. WEST:
7   Q. Really?
8   A. Yes.
9        MR. ZURBRIGGEN:  Same set of
10   objections.
11       MR. WEST:  I have no further
12   question.
13       MR. ZURBRIGGEN:  And I have
14   none, but I will designate on the
15   record that please, for purses of
16   ████████, the name of the
17   homicide suspect, we designate those
18   portions of the record as
19   confidential.
20       MR. WEST:  Thank you.
21       THE VIDEOGRAPHER:  1:34.  We
22   are going off the record.
23       - - -
24       (Whereupon, the videographer

Page 104

1   went off the video record.)
2        - - -
3        (Whereupon, the deposition
4   concluded at 1:34 p.m.
5        - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Electronically signed by Lisa Hughes (601-318-489-3416)                    1eafd3c4-c374-4f6d-9bda-8318b0a3eb96

Page 105

\- \- \-

CERTIFICATE

\- \- \-

1  I, hereby certify that the proceedings
2  and evidence noted are contained fully and
3  accurately in the stenographic notes taken by
4  me in the foregoing matter, and that this is
5  a correct transcript of the same.



Court Reporter - Notary Public

(The foregoing certification of this
transcript does not apply to any reproduction
of the same by any means, unless under the
direct control and/or supervision of the
certifying reporter.)

Electronically signed by Lisa Hughes (601-318-489-3416)

1eafd3c4-c374-4f6d-9bda-8318b0a3eb96

**A**

**a.m** 1:16
**A10_2021060...**
68:9
**ability** 6:14
**able** 8:3 81:22
**Absolutely**
53:19 55:9
**academy** 9:24
20:5,9,15 75:9
75:14,15
**accommodating**
7:2
**accurate** 24:16
55:13
**accurately** 105:7
**act** 83:7
**action** 1:3 11:17
11:19 15:15
38:5 96:11,21
**actions** 32:1
84:19
**activities** 12:13
**actual** 30:12
**ADAM** 2:8
**adam.zurbrig...**
2:10
**additional** 17:24
37:15 38:3
**address** 4:23
91:12
**advanced** 67:13
**advised** 7:14
**Affairs** 10:13,15
14:15
**afternoon** 6:2
**ago** 9:1 11:24
**agreed** 4:3
**ahead** 24:6,13
24:21 29:6
37:18 59:9
64:11 66:17
67:3 77:17
80:6 82:6
83:21 86:13
94:11 101:2
102:7
**al** 1:6 4:18 5:7
**allow** 26:17

**allowed** 95:24
**Alvarado** 1:3
4:16 5:6,14 6:5
**Alvarado's** 61:1
76:10,21 80:23
93:17 96:1,12
96:23 97:15
**amount** 18:12
19:23 22:6,10
22:15 25:24
31:9 33:15
34:9 82:10,12
82:20 94:24
**and/or** 42:18
105:17
**animals** 28:18
**announce** 16:7
16:14,17,24
17:11,22 18:2
18:7,10,17,24
19:8,15,22
20:14,18,24
21:3,6,15 22:2
23:21 24:11,12
24:19 26:1
27:7 28:4 29:2
29:12,23 30:16
31:11,19 32:5
32:17,20,21
33:13,14 71:2
71:3 73:6,24
80:12
**announced** 64:6
**announcing**
20:10 28:21
72:18
**annoying** 56:8
**answer** 7:4,21
11:9 17:5
18:19 22:4
26:20 28:14
29:16 31:14
33:7,21 37:11
44:21 45:15
49:6 50:13
66:14,24 70:3
71:6 74:18
77:2 81:5,21
81:22,23 82:24

83:21 87:13
90:9 93:21
94:21 95:16
96:4,15 97:1
98:20 99:23
102:8,17
**answered** 29:6
44:10 48:21
57:16 59:8
66:13 71:5
74:5,18 77:1
77:17 80:5
81:4 82:5 83:2
83:21 86:13
94:10 102:7
**anybody** 59:15
**apartment**
48:16 49:2,11
49:14 53:2
54:9 55:16
56:16,23 58:16
58:24 59:5
61:2 71:21
72:16,23 73:19
80:23 86:5,24
87:1,2 92:10
92:22 93:9,11
93:18 94:3,7
94:19 96:1,12
96:23 97:15
102:4 103:1
**apartments**
58:12 59:17
86:3,6 95:1
**appear** 69:10
**APPEARAN...**
2:1
**apply** 105:15
**approximately**
83:13
**approximation**
8:7 62:23
**approximations**
8:4,5
**Arch** 2:9
**area** 39:7,11
55:20 92:4,15
92:20
**armed** 26:24

**arrow** 55:6
**asked** 7:24 29:5
44:10 48:21
54:24 57:16
59:8 66:13
71:5 74:4,17
76:2,24 77:16
80:5 81:3,21
82:5 83:20
86:13 87:17
94:10 102:6
**asking** 7:8 11:22
12:9 13:5
31:22 39:13,14
42:23 45:18,20
49:7 61:5 64:1
74:8,9 82:8,23
92:10,12
**assembled** 68:16
**assignment** 36:3
**assist** 32:3
**assisted** 30:12
**assisting** 30:20
31:1
**assume** 59:15
71:11
**assumed** 49:21
73:16 81:9
82:19
**assuming** 64:8,8
65:13 79:22
89:14
**assumption**
51:16
**attempting**
69:20
**attorney** 7:14
59:24
**attorneys** 6:3,9
**audio/video** 4:15
**automatically**
27:6
**available** 88:2,9
99:17 100:7,19
**Avenue** 15:15
34:20 38:5
44:18 56:13
60:12 61:15
68:17 73:23

83:12 85:17
86:2 91:23
96:10,20
100:21
**avoid** 97:14
100:8
**aware** 15:11
20:16 34:3,14
38:14 43:16
45:2 51:8
52:23 67:5
85:3 88:8
89:20 100:18

**B**

**B** 3:15
**baby** 9:15
**back** 22:19 23:5
23:15 24:5
27:12,13 47:11
47:12,14 49:20
52:22 58:2
59:17,18 76:1
76:5 77:19
79:5 81:14
86:21 87:7,23
88:19
**bails** 58:7
**bark** 25:23
**barking** 64:6
98:11 101:24
102:10,12
**based** 7:16
44:16 45:3
61:5,11 70:24
71:8,24 72:5
84:1 89:15
**basic** 95:19
**basically** 13:21
18:6,9 19:21
36:1 42:24
46:22 47:8
**basis** 29:13
**Bates** 35:16
**beginning** 77:13
**behalf** 5:12
**believe** 7:5 39:2
41:3 58:9
86:24 93:14

101:8
**benefit** 4:11
███ 50:2,5
55:16 95:23
103:16
**biggest** 97:7
**birds-eye** 40:5
40:11
**bitten** 62:7
**block** 30:22
**body** 97:21 98:1
98:4
**boom** 18:13
**born** 9:20
**bottom** 38:17
42:7 43:6
**breach** 18:13
19:24 21:3
24:7,9,14
26:17 32:14
64:10,12 66:17
69:20 70:8
71:13,15 75:16
77:13 80:23
**breached** 16:16
58:21 61:2,14
64:7 66:11,16
66:21 70:19
74:14 76:9
98:12
**breacher** 24:8
**breaching** 24:7
25:12 29:23
31:10 61:16
65:21 75:9
93:16 94:6
**break** 6:19
71:19
**Brian** 69:15
70:4 79:7
**briefing** 36:4,5,8
36:9,13,14,19
**bring** 30:23
61:18
**Broad** 1:15 2:3
4:23
**brought** 89:6
**building** 17:2
45:21 48:19

74:13 86:7
92:1
**bunch** 72:13
_____
**C**
**C** 105:2,2
**call** 29:21 52:11
87:11
**cam** 97:21
**cams** 98:1,4
**caption** 5:5
**capture** 55:19
**career** 14:18
**carry** 28:3
**case** 5:5 6:4 8:3
23:14 37:6
41:8 50:1
52:24 58:6
72:23 87:4,5
**cause** 27:6
**Center** 1:14 2:2
4:22
**certain** 34:9
100:6
**certification** 4:5
105:14
**certify** 105:5
**certifying**
105:18
**chance** 6:8
15:17 35:20
**change** 9:9,14
25:24
**changer** 95:5
**characterizati...**
28:9 53:7
86:12 93:20
101:1
**checks** 51:23
**choose** 39:7
**circumstances**
19:24 22:7
24:23 25:10
26:13,17 66:20
67:6 73:11
84:23
**City** 1:6 2:8,11
4:17 5:6 68:6
88:2,8 89:1,18

91:14
**CIVIL** 1:3
**clarify** 20:3
100:3
**Clark** 1:13 3:6
5:11,19 6:2
8:10 42:8
63:15 68:14
76:9
**clear** 61:10
**clearer** 44:23
**clearly** 69:19
77:12
**coffee** 6:20,21
**colleagues** 13:24
**come** 31:2 33:9
33:15,19 39:15
90:11
**comes** 18:11
24:12 28:21
29:19 30:24
75:10
**coming** 6:5
**commencing**
1:16
**common** 4:18
5:8 90:7
**complaint** 15:5
15:6
**complaints**
14:20
**complete** 38:15
**completely**
10:23
**complex** 72:23
**complexes** 72:16
**compliance** 83:7
**comply** 80:11
**complying** 83:14
83:23
**concluded** 104:4
**conducted** 42:8
73:21 84:18
**conducting**
13:21 52:8
**confer** 6:8
**confidential**
103:19
**confusing** 12:8

**connection**
96:10,20
100:21
**consider** 26:16
59:4 94:5
**considered**
22:10,14 24:18
51:3
**consistent** 23:23
73:3,24 84:8
84:15
**Constitution**
95:10,13,22
**constitutional**
19:9
**contained** 105:6
**containment**
46:19 47:9,14
58:6
**contains** 38:10
**context** 89:16
**continue** 25:4
69:18
**control** 105:17
**copy** 54:12
**corner** 58:4
**correct** 6:10
8:14,15 9:6
10:13 11:17,18
11:24 12:21
17:13 20:15
21:21 27:20
28:6,11,11,16
30:3 32:2
34:10 36:24
37:6 38:15,21
38:22 40:7
41:21 45:13
46:1,3,4 48:19
49:2,7 50:2
51:3 57:14
61:3,15,21
62:1,8,13,13
64:19,21 66:4
67:6 69:24
70:12,19 73:6
77:14,24 80:3
81:1 88:18
89:21 90:15

91:23 93:18
94:3 98:12
100:22 101:12
101:17 105:9
**counsel** 4:3,10
4:12
**count** 58:3
**countdown**
25:18
**couple** 20:21
65:23 66:1
74:15 76:10
**Court** 1:1,17,22
4:18 5:8
105:12
**Courtney** 2:16
4:21
**cup** 6:20
_____
**D**
**D** 3:2
**date** 5:2
**day** 83:4 85:4
**debatable** 22:11
**December** 10:7
**decide** 9:13
**decision** 9:10,12
**Defendant** 1:7
2:11
**defense** 4:10,11
35:17 36:22
45:6
**definitely** 34:7
**defying** 83:17
**Department** 2:8
9:23 10:2
17:21 19:2,17
27:19 31:7,8
34:9 71:1 73:5
74:2,24 75:6
75:13,20 80:15
80:22 82:1
83:6,9,16 84:3
84:17 85:8
94:15 99:3
100:5
**depending** 19:23
22:6 82:17
**depends** 22:12

24:22,24 25:16
25:17 27:10,11
63:6,8,8,11
73:11 84:23
100:15
**deposed** 5:10
23:20 52:24
**deposition** 1:12
4:15 5:4,12,15
16:1 54:14
104:3
**describe** 13:14
47:6
**described** 92:22
**DESCRIPTION**
3:18
**designate**
103:14,17
**detailed** 8:23
61:9
**determine** 33:17
**determined**
55:15 56:15
**DIAMOND**
1:22
**different** 8:16
20:12,20 25:6
28:17,18 41:8
60:23 73:1,14
75:8 81:7,15
**direct** 105:17
**directly** 28:5
**Discharging**
11:21
**discovered**
45:12
**discovery** 68:6
**disregard** 86:6
**DISTRICT** 1:1
1:1
**Docket** 4:19 5:8
**document** 35:15
36:24 42:2
54:13,17 60:7
89:9
**documents**
15:18 35:16,19
38:3 45:4
**dog** 25:23 61:20

61:24 62:3
64:6,7 98:11
98:16,23 99:4
99:12,19 100:7
100:19 101:11
101:24 102:10
102:11,21
**doing** 54:24 64:3
75:1
**door** 13:23
16:16,22 18:14
20:1 24:9 25:2
25:10 26:18
27:22 33:10,10
33:16,19 46:8
46:20 47:10,12
47:18,23 48:18
49:12,14,22
57:21 58:21,23
59:6,16,17,18
61:1,15 63:16
63:22 64:7,10
64:12,13,15,18
64:22 65:1,6
65:12,17,20
66:11,15,17,21
68:23 69:8,15
69:20,24 70:9
70:18 71:13,18
71:20,22 72:11
72:17,19,20
73:18 74:13,14
76:10,20,21
77:20 78:3,4,7
78:13,20 79:7
80:3 81:1,10
81:11,18 82:2
82:3 83:11,14
86:2,3,9,9 87:3
93:8,8,17 94:6
94:18 101:5
102:22 103:1
**doors** 21:3 44:17
45:4,11,20
71:14 72:13
78:24
**draw** 39:10
**drawing** 39:13
**drive** 44:3

**drove** 44:2,6,13
**dude** 101:7
**duly** 5:20
**dwelling** 92:15
92:20
**dying** 6:22

_____

### E

**E** 3:2,15 105:2,2
**earlier** 23:20
35:15 54:15
60:4 71:11
81:13 98:10
**EASTERN** 1:1
**elevators** 72:21
**employed** 4:21
**encounter** 73:18
98:17 99:19,20
100:9 101:11
**encountered**
71:16
**encounters** 99:5
99:12 100:8,19
**enforce** 52:9
55:18
**enforcement**
15:14 23:5
32:1 38:5
50:20 84:18
85:16 96:11,21
**enforcing** 74:14
**ensure** 96:11,21
**entail** 26:23
**enter** 52:13
57:21 95:23
96:1,12,22
**entered** 57:2
**entering** 23:23
55:4,17 97:14
**entrance** 49:13
53:2,13 54:8
55:2 57:13
58:15 59:5
86:8
**entry** 55:15
56:11,15
**Eric** 1:12 3:6
5:11,19 63:15
**ESQUIRE** 2:3,8

2:15
**estimate** 8:6
62:23
**estimates** 8:4,5
**et** 1:6 4:17 5:7
**Eventually**
45:22
**everybody** 46:23
**evidence** 105:6
**exact** 25:18
**exactly** 10:8
17:17
**EXAMINATI...**
3:9 5:23
**examined** 5:20
**example** 91:9
**executing** 25:8
27:4
**exhibit** 3:18
60:4
**Exhibit-2** 60:4
**Exhibit-3** 54:14
**Exhibit-4** 89:10
**exhibits** 3:19
59:21
**exigent** 25:9
26:13,16 66:19
67:6
**existence** 89:20
90:2
**exists** 88:17
**expecting** 58:19
58:20
**experience**
16:13,15 31:5
51:2 84:15
85:20 90:20
95:14
**explained** 71:10
**eyes** 35:7 41:5,9
41:20 44:7

_____

### F

**F** 105:2
**fact** 8:6 51:8
52:23 100:18
**fair** 64:17
**fairly** 92:21
**fall** 22:19

**falls** 52:22 87:23
88:19
**family** 9:17
**far** 17:21 22:14
38:14 40:5
45:2 73:5
102:14
**faster** 7:11
**February** 8:23
9:5
**feels** 15:4 27:14
**Felishatay** 1:3
5:13
**felt** 82:18
**figure** 69:7 83:3
**filing** 4:6
**finally** 71:20
**fine** 12:11 20:13
59:22 61:10
67:15
**fire** 13:24
**firearm** 11:21
**first** 5:20 9:22
10:5 21:5
36:22 37:6
39:7 69:15
71:21 82:3
83:14 93:18
94:2,7,19 96:1
96:6 97:8,10
102:1,4
**first-floor** 48:16
58:24
**fishy** 89:8
**flight** 93:10
**floor** 1:15 2:4,9
4:24 58:15
59:2 71:21
92:22 93:18
94:2,7,19 96:1
96:6,7 97:8,9
97:10,11 102:1
102:4
**follow** 34:1
**followed** 32:5
**following** 74:23
**follows** 5:21
**foregoing** 105:8
105:14

**form** 4:7 10:18
11:8 12:6
13:17 14:6,22
16:9 17:5,15
18:4,19 19:19
21:9 22:4,17
24:2,21 25:14
26:4,11,20
27:9 28:8 29:5
29:16 30:5,18
31:13 32:7
33:2,7,21
34:12 37:2
38:7 39:24
40:9,20 41:16
42:13 43:13
44:10,20 45:8
45:15 46:10,16
48:6,21 49:4
49:16 50:13,23
51:14 52:16
53:6 57:9,16
59:8 60:16
62:10 63:5,20
65:3 66:6,13
68:1 69:1 70:2
70:14 71:5
74:5,17 75:3,4
75:23 76:24
77:16 78:10
79:11 81:3
82:5 83:20
85:10 86:11
87:20 88:6,14
89:23 90:17
91:7 92:7,24
94:9 95:16
96:3,14 97:23
98:19 99:7,22
100:11,24
102:6
**forward** 68:11
**found** 45:22
**foundation**
11:11 83:3,10
95:11
**front** 31:3 45:16
46:6 48:10
49:19 54:6,21

56:5,21 58:9
58:18 59:12,13
59:16 64:7
68:16 69:8
71:9 72:4
76:10,21 83:11
86:2,9,19,20
87:3,8 91:21
91:22 92:1,13
93:8,17
**frozen** 68:13
**fully** 105:6
**further** 103:11

_____

**G**
**game** 95:5
**general** 13:14
33:24
**give** 7:15 8:3
18:10 19:22
24:13 25:17
32:22 33:9
36:4 62:22
**given** 22:13 86:1
**gives** 24:6 67:2
**giving** 8:6,11
**glad** 7:9
**glass** 6:23 72:17
72:19,20
**go** 18:8 20:19
24:6,13,21
27:15 29:6
33:16 35:6
37:18 39:8
41:4,9,23 42:1
47:10 50:16
52:5,6 58:21
59:1,8 63:7,9
63:11 64:11
66:17 67:3
71:17 72:21,24
75:10 77:13,17
77:18,20 79:5
80:6 82:6
83:21 86:13
87:2,3,3 91:13
91:16 93:11
94:10 97:10
98:24 101:1,6

102:7
**goes** 24:4 27:12
27:13 51:23
79:7 93:9
**going** 7:19 21:11
22:12 25:4
35:14 37:5
39:8 46:17,19
48:14,15 58:22
60:3 64:4 66:8
68:10,19,21
71:12 73:17
76:20 77:5
81:2,10,18
82:19 87:1,2
101:3,6 103:22
**good** 6:2 35:21
39:1 40:24
52:11 60:10
**Google** 39:9,16
39:17,18,20,21
40:4,14 41:2,3
41:6,11 42:10
54:16,18 57:5
91:10
**gotta** 67:1
**grade** 52:18
**grievance** 15:3
**guess** 7:19 21:11
30:6,7 43:5
66:7,9 80:19
90:8 95:18
102:19
**guidance** 22:13
99:10
**gun** 25:4 101:21
**guy** 23:1 26:23
**guy's** 25:3
**guys** 21:1 63:7

_____

**H**
**H** 3:15
**half** 10:9
**halligan** 61:18
63:18 69:17
70:7 77:24
78:2,7
**hand** 60:1
**handled** 85:1

**handwriting**
55:5
**happen** 82:19
**happened** 65:13
85:15
**he'll** 24:13
**head** 75:13
**headquarters**
44:4,6,14
**hear** 25:11 98:11
101:24 102:10
**heard** 16:6,11
21:6,14 52:4
99:2
**hearing** 25:23
**held** 1:13
**hey** 24:10 89:7
**hit** 72:15
**home** 25:24 52:9
102:12
**homicide** 13:22
30:13 103:17
**horses** 8:20
**hours** 9:18
**house** 27:15
30:23 31:3
46:5,6 48:11
**houses** 58:4
102:11
**Hughes** 1:17
5:15
**hunched** 69:7
**hundred** 10:24

_____

**I**
**IAB** 10:22
**idea** 24:17 52:11
67:19
**identified** 100:7
**identify** 89:11
**illegally** 96:22
**illness** 6:13
**image** 39:21
54:18 57:6
**impair** 6:14
**important** 50:18
51:3
**in-person** 41:13
**incident** 8:11

10:10,13 11:4
11:13 14:11,17
15:4 62:20
67:17,20,23
**incidents** 12:3
**including** 80:15
94:16 100:5
**inconsistent**
85:6,18
**indicated** 55:20
55:21
**influence** 6:12
**informant** 11:17
**information**
36:2 53:15
54:2 56:3,6,23
81:12 91:3
**inside** 18:8
25:23 72:12
**inspected** 47:16
51:11
**inspection** 41:14
87:18
**instance** 25:1
72:15 91:10,12
**instances** 13:15
**intend** 6:17
**Internal** 10:12
10:15 14:15
**interview** 10:22
15:22 63:14
**interviewed**
10:12 11:2
12:20 13:6
14:9,14
**inure** 4:10
**investigate**
57:20 86:7
**investigation**
12:12 15:21
63:14
**involve** 11:19
**involved** 10:14
11:5,5,13,16
11:20,23 12:12
12:21,24,24
14:2,3 32:1
34:16,19 36:5
36:10

**IRENE** 2:15
**irregular** 85:18
**issued** 95:23
98:1,4

**J**

**January** 9:21
**JERSEY** 1:23
**job** 14:16 30:14
73:13,14,15,16
84:24
**join** 10:5 20:19
**joined** 9:24 29:3
32:13
**joining** 30:10
**June** 8:12 10:1
11:17 12:4,14
15:14 23:5,15
83:12

**K**

**keep** 33:13
**Keith** 2:3 6:3
**keith@victim...**
2:5
**kind** 12:7 40:5
46:21 69:7
**Kitcherman**
2:16 4:21
**knew** 48:3,18
49:1,7,10,12
55:1 57:12
86:1 93:16,23
94:2
**knock** 16:7,14
16:17,24 17:10
17:22 18:1,7
18:10,16,23
19:8,15,22
20:10,14,18,24
21:2,6,14 22:1
23:21 24:10,11
24:19 25:1,5
26:1 27:7 28:3
28:21 29:2,12
29:22 30:15
31:10,18 32:5
32:16,20,21
33:13 64:13,15
69:23 71:2,3

72:22 73:6,24
78:3,23 80:12
**knocked** 25:10
27:22 64:19,22
65:7,17,21
69:17 70:6
80:24 82:3
83:14
**knocking** 23:22
26:18 33:13
65:1,12 70:12
72:18 76:19,21
79:15,22
**knocks** 68:22
79:9
**know** 7:1,9,23
7:24 8:2,5
10:18,20 11:8
12:6,17 13:4
14:22,23 15:9
15:11 16:9,17
17:15 18:4,16
18:20 19:5,12
19:19 21:9,10
21:18,19 22:11
22:21 23:11
24:2,3 26:5,6
28:3 30:5,15
32:7,8 33:2,22
35:6,19 37:2
37:11,21 38:7
39:3,15,24
41:16 45:8
46:8,16 48:6
49:4 50:7,9,11
50:14,15,18,23
50:24 51:6,14
51:15 52:13
53:3,8 54:5
56:2,8 57:9
60:8,13 61:16
61:17 62:6,15
64:14,14 65:4
65:5,7,23 66:3
66:6,9 67:22
69:16 72:4,16
72:22 73:12,12
73:13,17 74:6
74:7 85:11,13

88:17 89:11
90:23,24 91:19
92:17 97:23
98:7,8,19 99:7
100:11 101:14
**knowledge** 7:16
8:2 18:23 19:8
19:14 90:8
98:3
**known** 16:7
56:14

**L**

**laid** 81:8,16
83:10
**LANE** 1:23
**lasts** 20:20
**late** 9:20
**latest** 9:20
**Law** 1:14 2:2,8
4:22
**lawsuit** 8:11
**lay** 11:10 83:2
95:10
**layout** 71:8 72:1
82:18
**lead** 94:18 102:3
102:24
**learn** 90:2
**learned** 55:2,14
75:16 90:6
**leave** 30:21
68:10
**led** 94:7 103:1
■ 50:2,5 55:19
103:16
■ 53:2 55:3
55:16 56:15
95:24
**left** 93:9
**legal** 18:24
**legally** 95:24
**let's** 24:24 91:9
91:11,19
**lethal** 99:19
100:8
**life-style** 9:9
**likes** 19:2
**Lisa** 1:17 5:15

**little** 10:3 26:9
71:19
**lived** 92:15,21
102:15
**lives** 52:1 81:14
**loading** 25:3
**location** 36:3
39:11 45:17
51:24
**long** 25:11 33:18
**look** 24:10 38:17
40:14 46:5,6
46:21 47:1,17
50:3 56:20,21
57:5 60:7,22
89:10 93:4,12
**looked** 97:5
**looking** 42:10
56:10 61:4
90:9
**looks** 8:16 60:9
60:20 69:14
**lot** 91:13
**loud** 7:11 16:19
**louder** 7:10
**LU** 2:15

**M**

**mail** 86:20 87:8
**mailbox** 49:19
58:17 87:9
95:3,6,7
**mailboxes** 48:10
49:18 58:10,13
59:12 71:9
72:3 86:19
87:6 97:6
**mailman** 87:7
**manager** 87:11
**manner** 55:19
**MANTUA** 1:23
**map** 37:21 38:11
39:1,3,5,9,12
39:14 40:4
46:21,22 47:2
54:18 57:5
90:14,21
**Maps** 39:9,16,17
39:19,20,21

40:14 41:2,4,6
41:11 42:10
54:16 91:10
**Margaret** 53:3
53:14 55:3,16
56:16 57:1,13
57:22
**mark** 68:12,14
68:20 77:7,14
**marked** 3:18,19
35:15 54:13
**marking** 55:21
**matches** 41:10
**material** 16:3
**matter** 4:16
105:8
**mean** 24:4,23
25:16 36:11
43:4,4,5,23
52:4,6 54:15
59:14,20 86:22
90:7 94:24
98:22 101:4,15
101:20,21
**meaning** 11:15
75:14
**means** 41:23
51:9 105:16
**medication** 6:13
**Mellody** 38:20
42:8,18 62:20
63:2
**Mellody's** 63:14
**member** 8:13,17
9:4,7,22 10:2
15:3 23:14
31:7 72:8
74:11 84:2,9
85:3 99:11
**members** 68:15
98:15 99:18
**memorializes**
38:19 41:13
**memory** 8:1
45:3 61:6,12
**minute** 68:11,13
68:20 77:6
**minutes** 69:6
**misrepresenta...**

16:21
**misstated** 56:10
**mistaken** 10:7
**moment** 11:24
  35:18
**months** 20:21
**mounted** 8:24
**multiple** 7:20
  61:18 86:3
**murder** 26:24
  27:5 101:9
**Murray** 69:15
  70:5 77:23
  78:6 80:24
  82:2 83:13

**N**

**N** 3:2
**name** 4:20 6:2
  50:4 103:16
**named** 50:2
**names** 43:4,5
**nature** 26:14
**need** 6:19,24
  30:3
**neighborhood**
  16:20
**never** 20:8 34:7
  51:18
**new** 1:23 9:2
**newborn** 9:15
**night** 63:8
**nine** 10:3
**normal** 28:16
  63:1 85:18
**normally** 6:19
  36:23 37:7,16
  50:10 90:13,20
**Notary** 1:17
  105:12
**notation** 42:16
**noted** 105:6
**notes** 105:7
**notice** 1:13
**numerous** 58:11
  93:6 94:24

**O**

**object** 10:17
  11:7 12:5

13:16 14:5,21
16:8 17:4,14
18:3,18 21:8
22:3,16 24:1
25:13 26:3,10
26:19 27:8
28:7 29:4,15
30:4,17 31:12
32:6 33:1,6,20
37:1 38:6
39:23 40:8,19
41:15 42:12
43:12 44:9,19
45:7,14 46:9
46:15 48:5,20
49:3,15 50:12
50:22 51:13
52:15 53:5
57:8,15 59:7
60:15 62:9
63:4,19 65:2
66:5,12 67:24
70:13 71:4
74:16,17 75:2
75:22 78:9
79:10 81:3
82:4,5 83:19
83:20 85:9
86:10,11,12
87:12,19 88:5
88:13 89:22
90:16 91:6
92:6,23 93:19
94:8 95:15
96:2,13 97:22
98:18 99:6,21
100:10,23
102:5,6
**objection** 4:9
12:16 13:3
15:8 19:4,11
19:18 21:17
24:20 28:13
34:5,12 37:6
37:10,17 42:21
51:5,21 62:15
65:15 66:24
67:8 69:1 70:2
70:21 76:23,24

77:15,16 78:18
79:3,18 80:5
88:22 90:5,23
92:17 97:1,17
98:6 99:14
101:14,19
**objections** 4:7
53:18,24 55:11
55:23 56:18
57:24 73:8
74:4 80:18
82:15 84:5,12
84:21 85:22
94:21 102:17
103:3,10
**obligation** 7:15
18:24
**observe** 69:2
77:2 79:19
**Obviously** 81:11
**OC** 100:15
**occasion** 12:23
13:10 30:3,11
**occupants** 16:17
16:19 17:1
32:23
**occupied** 92:5
93:18,23 102:4
102:14
**occur** 49:12
**occurred** 8:11
12:3
**offer** 6:19
**office** 51:11 53:1
55:2,15 56:14
**officer** 1:12 3:6
5:11,14,19 6:2
8:10 10:14,18
11:5,8,13,19
11:23 12:6,11
12:16,21,24
13:3 14:3,6,22
15:8 16:9 17:5
17:15 18:4,19
19:19 21:9,17
22:4,22 24:2
24:21 26:4,11
26:20 27:9,18
28:9,13 29:3,6

29:11,16,19
30:5,9 31:6,13
31:20,24 32:7
33:2,7,21 37:2
37:10,19 38:7
39:24 40:9,20
41:16 42:13,21
43:13 44:11,20
45:8,15 46:10
46:16 47:6
48:6,22 49:4
50:13,23 51:5
51:14 52:12,13
52:16,21,24
53:7,12,18
54:2,15,24
56:18 57:9,24
59:9 62:7,15
63:15,20 65:3
66:6,13,24
68:1,14 69:1
70:2,14,21
71:6 73:8 74:5
74:18 75:3
76:9 77:1,17
77:23 78:6,10
79:19 80:6,18
80:24 81:4
82:2,6 83:13
84:5,12 85:10
85:22 86:14
87:13,18,20
89:23 90:5,17
90:23 91:7
92:7,17,24
93:20 94:10,21
95:14,16 96:3
96:14 97:1,17
97:23 98:6,19
99:7,14,22
100:11 101:1
101:14 102:7
102:17
**officers** 30:2,20
31:1 63:9
**officially** 8:24
**oh** 35:5,13 36:1
54:3 60:2
81:13

**OISI** 10:14,21
13:6 15:22
**okay** 6:12 7:2,6
7:11,21 8:7
9:13,16 10:5,9
10:12 11:4,10
12:20,23 13:14
14:2,11,19
15:13,17,21
16:6,13,23
17:10,24 18:23
19:7,14 20:3
20:13,17,22
21:13,23 22:21
23:1,13,18
24:16 25:8,23
26:8 27:17,21
29:10 30:2,14
31:18,23 32:4
32:20 34:16,19
35:1,9,12,22
36:14,21 37:14
38:17 39:12
40:4,24 42:9
43:18 45:2,11
46:7,13 48:12
49:9,22 50:1,5
50:6,18 52:23
54:5,12,23
56:3 57:5
58:14 59:15,19
60:19 61:20
63:1 64:1,10
65:11 67:5
68:19,23 69:5
70:11,17 72:8
72:14 74:11,22
76:14 77:12
78:22 79:1,7
79:24 80:10
86:24 89:20
90:11 91:15
92:20 95:21
96:9 99:2
100:18 101:24
102:21
**on-call** 9:18
**once** 30:22 80:8
**one-page** 36:23

**open** 33:10 78:7
78:14 80:3
82:2
**operating** 99:4
**operation** 23:5
36:6,15 40:18
50:21 61:21
85:16 100:22
101:12
**operations** 32:4
**operator** 4:20
**opportunity**
17:2 33:19
**option** 7:20
**order** 30:14
55:18 95:13
96:11,21 97:14
100:8
**outside** 44:17
45:4,20 72:11
**owns** 89:13,19

**P**

**p.m** 5:3 104:4
**package** 38:4
**packet** 36:2 37:7
37:15,16 38:9
38:15,18 40:2
**page** 3:5,18 37:8
38:18,18 90:13
**pages** 36:22 37:7
37:14,15 38:1
**paperwork** 35:2
35:9
**parole** 50:8,19
51:10,23 54:2
56:14
**part** 8:22 10:13
10:15 23:4
28:23 29:21
34:17 37:16
38:3 39:22
40:13 41:7
45:24 46:7
50:19 52:20
57:6,19 61:16
61:21 68:6
75:19 88:24
89:4 91:3

**partial** 8:1,1
**particular** 66:20
**particularly**
28:8 29:5
100:24
**parties** 4:4
**partner** 64:15
64:23 65:6,8
77:20
**passed** 65:20
**path** 56:11
**patrol** 8:19
28:16,20,23
29:3,11,18
30:2,9,19,24
31:6,19,24
32:10 52:10
**pause** 68:21
80:2
**paused** 69:5
**pay** 52:18
**pending** 49:9
77:3
**Pennsylvania**
1:1,16 2:4,9
5:1
**people** 92:15,21
102:15
**percent** 10:24
**performed** 5:4
**person** 5:5 27:5
33:18 41:23
42:1,4 43:8,11
43:20 44:1
47:17 51:12,24
86:23 87:5
93:13
**person's** 52:14
**personal** 7:16
19:7 61:6,11
61:13 98:3
**personally** 61:23
62:6 67:5
84:16
**Philadelphia** 1:6
1:15 2:4,8,9,11
4:17,18,24 5:7
5:7 8:13 9:22
10:2 17:21

19:1,16 27:18
31:6,8 34:8
68:6 71:1 73:4
74:2,24 75:6
75:12,20 80:15
80:22 81:24
83:6,9,16 84:3
84:10,17 85:7
85:19 88:2,9
89:1,18 91:14
94:15 95:13
99:3 100:4
**Phone** 2:5,10
**phonetic** 9:1
**photo** 41:1
**photograph**
45:6 47:22
91:20
**photographs**
15:18
**phrase** 11:23
12:2
**picture** 37:22,22
38:12 44:23
60:10
**pictures** 43:7
**pink** 55:21
**place** 102:14
**plaintiff** 1:4 2:6
5:13 6:4
**play** 32:18 68:19
80:2
**playing** 69:18
77:5 79:6
**Pleas** 4:19 5:8
**please** 7:4,18
13:14 81:5,20
89:10 103:15
**point** 7:1,7,19
23:19 47:3
61:20 64:5
68:22 69:23
72:17 79:16
86:8
**police** 9:23 10:2
16:18,21 17:21
19:1,17 20:5,9
20:15 27:17,18
31:6,8 34:8

63:15 71:1
73:4 74:2,24
75:6,12,20
80:15,22 81:24
83:6,9,16 84:3
84:17 85:7
94:15 95:14
99:3 100:4
**policies** 80:21
81:23 83:5,8
83:15,18
**portions** 103:18
**posed** 76:6
**positions** 46:24
**possibility** 59:5
94:6,18
**possible** 16:19
98:16
**possibly** 26:14
26:24
**practice** 85:7
**practices** 85:19
**precautions**
96:9,19 97:13
98:14,22
**preliminary** 6:6
8:10
**premarked**
89:10
**preparation**
15:19
**prepare** 15:24
98:16
**prepared** 6:9
94:17
**presence** 32:17
32:22
**present** 1:18
2:13 4:12
36:11,12
**pretty** 63:1 87:6
**prevent** 99:19
**previous** 13:7
**previously** 31:23
54:13
**prime** 91:9
**printout** 90:12
**prior** 21:15 30:9
62:20 78:7

93:16
**probably** 47:2
58:22 69:16
70:8 81:15
87:1
**probation** 50:8
50:19 51:9,10
51:12,22 52:1
52:10,12,12,24
53:1,12 55:1
55:14 56:14
87:17
**problem** 7:3
**procedure** 99:4
**procedures**
80:21 81:24
83:5,8,15,18
**proceedings**
105:5
**process** 6:18
15:3
**program** 39:9
**proper** 86:8
**properly** 21:3
**properties** 48:13
58:11,11 71:17
93:7
**property** 23:23
31:10 34:21
37:23 38:12
40:7,15 41:7
41:14 42:19
45:5,13 47:17
48:8,9 49:19
49:20 53:12
54:4,6,20,21
54:22 55:3,5
55:18 56:13,20
57:3,13,21
58:5,10,18
59:11,14 60:9
60:12,22 68:17
71:8,10,12
72:1 73:23
77:13,24 81:8
81:16 82:18
83:12 86:2,19
86:21,22 87:8
87:11 88:1,3

88:11,15 89:2
89:8,13,19,19
90:13,14,21
91:14,15,17,21
91:23 92:13
93:4,13 97:5
98:12
**property's** 98:23
**provide** 17:1
54:12
**provided** 15:22
28:2 39:3 68:5
**providing** 34:9
**pry** 78:4,7,13
**public** 1:18
14:20 15:4
105:12
**publically** 88:9
**purposes** 16:24
**purses** 103:15
**pursuant** 1:13
80:13
**Push** 80:2
**put** 6:7 35:7
41:5,9,20 44:7
47:13
**putting** 87:8
89:16

**Q**

**quality** 39:1,2
40:24
**question** 7:8,10
7:13,21 8:1
17:8 20:4
31:13,16 37:5
44:20 49:6,9
53:6 56:9
61:11 73:10
76:1,2,6 77:3
81:21,22 82:9
82:24 83:1
85:10 88:14
92:24 94:9
96:3,14,17
103:12
**questions** 4:8
7:4 64:5
**quick** 72:4,10

**R**

**R** 2:8 47:1,8
105:2
**ram** 61:3,17
63:16,17,23
64:9,16 65:22
69:11,14 76:22
78:8 82:1
**rammed** 83:11
**ramming** 80:3
**ran** 6:21
**read** 15:24 76:1
76:5
**reading** 4:4
89:15
**ready** 100:20
101:5
**really** 28:22,23
29:20 39:13
40:6 59:20
60:1 61:5
82:23 103:7
**rear** 45:17,23
46:5,8,19,20
47:9,13,17,22
48:4,18 49:2
49:11,12,13,14
49:22 54:9,21
56:22,24 57:12
58:5,16 59:5,6
60:9,11,22
81:14 86:3,5,9
86:22 92:22
93:12
**reask** 37:5 56:9
**reason** 40:17
66:21 75:1
79:21 91:2
**reasonable**
18:12 19:23
22:5,10,15
24:18 33:14,19
82:9,12,20
86:23 87:5,11
87:17 93:13
**recall** 21:21,22
23:10 29:8
35:4,6 43:9
46:10 48:11

58:2 60:13,23
60:24 61:8
67:10 69:16
**receive** 17:24
20:17 21:2
29:1 99:10
**received** 14:19
17:20 19:16
20:5,8,13 34:7
51:18 73:4
74:23 80:14
84:2,9 94:14
100:3
**reckless** 86:5
**recognize** 54:17
89:17 91:20
**recollection**
15:13 21:13
36:19 43:19
61:14 63:17
64:2,18,24
**recollections**
43:10
**recommended**
55:4,17 56:12
**recon** 35:11 36:1
38:10 41:12
42:7,16 44:7
46:14 56:20
61:9
**reconnaissance**
34:17,20 37:16
38:4,19 39:22
40:13 42:9
44:17 45:12,24
46:7 50:20
52:8,20 53:15
53:22 55:1
56:12 57:7,20
62:19 63:3
72:2 88:24
89:4 91:4
94:16 97:19
**reconned** 43:6
58:2 97:4
**record** 6:7 15:22
34:5 35:10
37:18 55:11
63:14 67:14,16

68:7,12 76:17
79:3,18 103:15
103:18,22
104:1
**recorded** 42:23
45:5 53:13
67:20,23
**records** 42:3
53:1 61:5
87:18 88:1,11
88:15 89:2,5
**Recovery** 1:14
2:2 4:22
**REDBUD** 1:23
**reference** 14:16
22:21 23:19
**refresh** 63:16
**refreshes** 64:2
**regards** 12:13
18:1 20:14
73:22 99:12
100:6
**regularly** 84:18
**relation** 12:3
85:16
**reloaded** 73:10
**remember** 23:13
44:13,24 60:19
61:6 64:3
65:11
**repeat** 17:8
78:12 96:16
**rephrase** 7:9,13
**reporter** 1:17
76:4 105:12,18
**REPORTING**
1:22
**represent** 23:18
50:4 54:23
63:13 68:4
**representing** 2:6
2:11 6:4
**reproduction**
105:15
**required** 32:22
**requirement**
19:9
**requirements**
80:12

**reserved** 4:8
**residence** 17:13
17:17,18 18:8
27:4 51:11
52:14 95:24
**residents** 86:6
**respective** 4:4
**responses** 68:7
**restroom** 6:24
**returned** 13:24
**reuse** 59:20
**review** 15:18
35:18 45:3
88:1 89:5
**reviewed** 16:4,5
**ride** 8:19
**right** 7:17 8:16
9:2,21 10:3
13:12 15:22
22:23 23:2,6
23:16 27:19
28:19 31:20
35:14 36:18,21
40:22 42:7,11
44:16 45:6
46:3 48:4 51:8
51:12 55:7,13
56:8 58:23
60:21 62:4
64:17 67:12,16
68:4 69:22
79:6,24 81:17
81:20 87:4
90:12 92:2
94:19 95:5
101:9 102:1,15
102:22
**rise** 8:11
**road** 44:5,8
**round** 70:12
**route** 39:10
**rule** 16:7,14
17:1,11,22
18:2,6,17,24
19:8,15 20:18
21:6,15 22:2
23:21 24:19
26:2 27:7 28:4
29:2,12 30:16

31:11,19 32:5
32:21 71:3
73:24 80:12

**S**

**s** 1:4,7 3:15
**sake** 68:7
**saw** 31:18 60:14
69:23 72:2
74:13
**saying** 15:2 54:3
78:13 89:7
**says** 42:7,24
47:8 54:16
64:5 91:11
**Scott** 22:22
54:15,24 59:20
60:3 89:10
**Scott-3** 54:13
55:20 56:10
**Scott-5** 35:16
38:2
**Scott-6** 91:19
**screen** 68:17
78:4,20
**sealing** 4:5
**second** 25:18
38:18 58:15
59:2 68:12,14
68:20 76:2,5
77:6 92:22
95:3 96:7 97:9
97:11
**seconds** 23:22
25:19,20,20
26:9,18 65:23
66:1,2,4 69:6
70:6,18 74:15
76:11,11,19
77:10 80:11,24
82:2,12 83:13
**secure** 30:23
**see** 25:2 40:6
47:1,2,3,8
58:13 61:9
62:3,16 68:14
68:22 69:6,19
71:9 77:19
88:10 92:13

**seeing** 41:10
72:6 73:2
**seen** 48:13 67:17
**sees** 87:5
**senior** 23:1
**sense** 86:23
**separate** 10:16
10:20
**September** 1:9
5:3
**Sergeant** 38:20
42:8,18 62:20
63:2,13
**serve** 29:20 30:3
30:10
**serving** 13:20
17:12 21:1
28:22 31:1
**set** 48:8,9 53:17
53:23 55:11,22
56:17 57:23
58:5,12,24
59:12 72:3
73:7 74:3
80:17 84:4,11
84:20 85:21
94:20 95:2
102:16 103:2,9
**seven** 80:10,24
82:2,12 83:12
**sheet** 36:1 38:11
41:12 46:14
**sheets** 35:11
**shoot** 48:15
**shooting** 10:14
10:21 11:6,14
11:20,24 12:12
12:21 13:1,23
14:3,12 61:24
**shot** 61:20 62:4
68:17
**shoulder** 27:23
**show** 35:14
67:12 76:12,14
86:5
**showing** 53:1
67:14
**shows** 42:18
54:20,21

**side** 90:12 92:14
102:22
**signing** 4:5
**similar** 57:6
**single** 27:21 37:7
70:12
**sir** 23:18 27:17
35:14 54:23
68:4 81:20
82:23
**situation** 22:12
25:5 73:1 81:7
**situations** 72:9
**slower** 7:11
**somebody** 49:22
50:19 51:9,10
52:10 58:6
69:10 76:19
**someone's** 27:22
**son** 9:20
**Song** 62:7
**sorry** 17:7 36:10
75:24
**sort** 6:13 23:1
33:24 35:9
41:13 66:19
99:4
**sound** 27:12
**South** 1:14 2:3
4:23
**speak** 7:10
**speaking** 59:24
**specific** 36:18
40:6,14 64:18
64:24
**specifically** 22:1
42:17 43:18
49:11
**specified** 48:4
49:1
**speculate** 7:19
**stacked** 54:8
101:5
**stacking** 54:5
**stage** 39:8
**staging** 39:7,10
**stairs** 48:14
**stamped** 35:17
**standard** 85:6

99:4
**standby** 64:16
**standing** 27:23
**stapled** 38:2
**start** 24:10,11
76:16 77:5,21
80:8
**started** 13:23
77:11
**statement** 15:20
15:24
**States** 1:1 95:10
95:12,22
**stenographic**
105:7
**steps** 59:1 71:23
87:3 93:11
**stipulated** 4:2
**stood** 64:16
**stop** 8:21 9:7
69:22 76:16
77:8 79:8
101:6,7
**stopped** 9:4 77:9
**stopwatch** 76:15
76:18
**street** 1:15 2:3,9
4:24 32:12
53:3,14 55:3
55:17 56:16
57:1,13,22
**structure** 32:23
32:24
**stuff** 8:10 26:24
30:13
**substance** 6:13
**sufficient** 71:2
**suggested** 85:5
**supervision**
105:17
**supervisor** 18:11
18:12 22:19
24:5,6,9 25:16
27:11,14,22
28:5,19 52:22
64:11 66:16
67:2 82:17
87:23 88:20
89:3,7 91:13

**supervisors**
36:16 63:10
**sure** 7:13 8:21
10:8,19,24
11:16 36:17
41:10 60:14
61:12 64:3
65:18,24 69:3
69:18 73:2
74:9 87:6
91:16 97:5
**surrender** 17:3
32:24
**suspect** 13:22
50:1 103:17
**suspected** 27:5
**SWAT** 8:13,17
8:22 9:5,8 10:5
12:13 16:15
18:2 20:19,24
21:7,15,23,24
22:22 23:14
28:1,16,19
29:3,22,24
30:10,12,20,21
31:1,7,9 32:3,9
32:10,12,12,13
34:17 68:15
72:9 74:12
75:7,10,15,17
75:19 80:16
84:10,16 85:4
85:19 91:4
94:16 98:4,15
99:11,18 100:5
**SWATs** 97:24
**swear** 5:16
**swinging** 80:8
**sworn** 5:20

**T**

**T** 3:15 105:2,2
**tactics** 21:4
28:17 29:23
**take** 20:4 24:14
35:18 43:7
44:5,8 47:22
**taken** 1:13 5:12
105:7

**target** 36:2
37:22 38:11
40:15 41:1
56:4
**taser** 100:16
**taught** 18:7
**team** 8:18 10:14
12:21 13:1
14:3 61:17
**technology**
67:14
**tell** 24:10 32:11
44:23 46:19
60:8 68:21
76:18 79:5,8
82:1 90:17
**telling** 27:23
28:5
**tells** 46:23,23
47:9
**ten** 25:20 26:9
26:18 62:24
66:2,4
**terms** 13:14
**test** 7:20
**testified** 5:21
29:11 31:23
98:10
**testify** 6:9,15
**testifying** 24:17
**testimony** 7:16
15:19 29:14
**Thank** 6:5 60:6
103:20
**thing** 9:2 10:23
16:5 20:12
42:10 55:8
56:1 63:1
76:17 91:14
97:7
**things** 6:6 10:21
21:4 75:11
78:5 100:17
**think** 6:20 8:9
10:9 29:10
41:1 56:10
58:14 76:12
79:8,15 81:21
83:1 87:10,16

97:8 98:10
**thinking** 75:13
**thought** 54:7
72:10
**three** 14:8 37:15
**Thursday** 1:9
**time** 4:9 5:17
6:19 8:12
17:12 18:13
19:23 21:5
22:6,9,10,15
24:18 25:2,24
27:6,21 28:20
31:9 32:9,23
33:9,15 34:1
34:10 36:19
50:8 61:24
64:19 65:1,12
65:20 66:11,20
66:22 68:13
82:10,13,21
**timer** 77:21
**times** 13:12 14:4
14:8 20:23
28:6 62:22,24
**title** 68:8
**today** 5:11 6:6
6:10,15 7:15
15:14 21:14,21
23:20 24:17
35:15 43:19
54:15 60:5
61:13
**today's** 5:2
15:19 16:1
**told** 19:21 22:1,9
27:3 53:11
70:8 80:22
**toll** 9:17
**tool** 63:18 77:24
78:2,7,23
**tools** 61:19
99:17 100:1,6
100:14,19
101:11
**top** 40:11 54:16
54:19 71:22
**Torresdale**
15:15 34:20

38:5 44:18
56:13 60:11
61:15 68:16
73:23 83:11
85:17 86:2
91:23 96:10,20
100:21
**total** 14:3,8
**totally** 20:12
**training** 17:20
18:1,9 19:15
20:5,8,14,17
20:20 21:2,7
21:15,24 23:24
28:3 29:1
32:14 34:8
51:18 70:24
73:3 74:1,23
75:5,7,9 80:14
84:1,8 94:14
94:17 99:11
100:4
**transcript** 105:9
105:15
**transferred** 8:24
9:11
**trial** 4:9,16
**trouble** 7:7
**true** 23:15
**truthful** 7:15
**truthfully** 6:15
**try** 7:10 20:3
34:1
**trying** 61:8 83:1
83:3
**twenty-two** 69:6
**twice** 13:13
14:10
**two** 9:1 13:15
14:3,9 28:17
36:22 37:7
38:23 48:10
49:18 58:10,13
59:12 68:11
69:5 71:9,14
86:18 87:6
97:6
**two-sided** 36:23
37:8

**type** 39:9

**U**

**Uh** 50:3
**uh-huh** 7:12
11:18 12:1,22
34:24 43:3
69:21 78:1
80:1 91:24
92:3 102:2,23
**ultimately** 61:2
**unclear** 46:22
**uncomfortable**
6:18
**underlying**
39:12,14
**understand** 7:5
7:22 15:2
31:14,16,21
41:18 43:14
61:12 78:11
92:8 93:1,2
96:15 99:23
102:3,24
**understanding**
7:8 16:23
36:21 80:13
95:9,12,21
**understood** 74:1
83:7,17
**uniform** 8:17
**unit** 8:13,22 9:5
9:8 10:6,16
12:13 18:2
21:7,15,24,24
22:22 23:14
31:7,9 34:17
68:15 72:9
74:12 75:19
80:16 84:10,16
85:4,19 91:5
94:16 98:4,15
99:11,18 100:5
**United** 1:1 95:9
95:12,22
**unnecessarily**
6:18
**updated** 41:6
91:11

**upstairs** 93:6
**use** 4:15 6:24
12:2 17:10
39:18,20 60:3
78:2,3,4,23
91:2,8,19 96:9
96:19 98:15
100:15,16,16
100:16 101:21
**usually** 29:21
38:9 39:18
61:18

**V**

**vacant** 91:12
**varies** 25:21
**versus** 4:17 5:6
**vestibule** 71:19
**Victim's** 4:22
**Victims'** 1:14
2:2
**video** 4:20 67:13
67:15,17,19,22
68:5,8,9,11,12
68:19 69:5
73:3 76:13,14
77:6 104:1
**videographer**
2:16 4:14
103:21,24
**videos** 15:18
**VIDEOTAPE**
1:12
**view** 40:5,11
54:19 61:23
89:1
**violation** 83:4
**voluntarily** 17:2
32:24
**vs-** 1:5

**W**

**wait** 23:21 25:12
26:1,8 27:6
32:11
**waited** 33:18
**waiting** 74:15
**waits** 31:9
**waived** 4:6
**wake** 16:20

**walk** 24:8 86:21
**walked** 70:5
　77:23
**walking** 6:22
　87:7
**want** 8:4 23:8
　47:4 76:12,18
**wanted** 26:23
　50:15 101:8
**warrant** 11:16
　13:20,22 15:14
　17:12 21:1
　23:4 25:9 27:4
　32:1 38:4 48:3
　49:1,10 50:20
　52:9 55:18
　73:22 74:14
　84:18 85:16
　86:4 95:23
　96:6,21
**warrants** 28:22
　29:19,20 30:3
　30:11,13 31:2
**wasn't** 23:8 32:9
　47:11 81:11
　95:3 96:6
　100:17
**watch** 76:15
**water** 6:23
**way** 48:8,9
　53:16 59:11
　72:3 73:21
　81:8,16 82:8
　85:6,17 86:21
　93:3
**we'll** 7:1 16:16
　79:5 91:16
**we're** 14:12
　17:12 18:7
　19:21 31:3
　39:8 41:10
　46:18 77:9
　101:4,6
**we've** 71:16
　80:10
**wearing** 97:21
**website** 88:10,17
　89:2,21 90:3
　90:14

**weeks** 9:1
**went** 21:7 42:3
　42:19,24 43:6
　46:4 47:16
　56:5 58:2
　69:15 72:5,12
　93:23 95:1
　97:3,4 104:1
**weren't** 97:21
**West** 2:3 3:10
　6:1,3 11:1,10
　11:12 12:10,19
　13:9 14:1,7
　15:1,12 16:12
　17:9,19 18:15
　18:22 19:6,13
　20:2 21:12,20
　22:8,20 23:12
　24:15 25:7,22
　26:7,15 27:2
　27:16 28:10,24
　29:9 30:1,8
　31:4,17 32:19
　33:4,11,23
　34:6,15 35:8
　37:4,13,24
　38:13 40:3,12
　40:23 41:19
　42:15 43:2,17
　44:15 45:1,10
　45:19 46:12
　47:15 48:17,24
　49:5,24 50:17
　51:1,7,17 52:2
　52:19 53:10,20
　54:11 55:12
　56:7 57:4,11
　57:18 59:3,19
　59:23 60:18
　62:12,18 63:12
　63:24 65:10,19
　66:10,18 67:4
　67:11 68:3
　69:4 70:10,16
　70:23 72:7
　73:20 74:10,21
　75:18,24 76:8
　77:4,22 78:15
　78:21 79:4,14

　79:23 80:9,20
　81:19 82:11,22
　83:24 84:7,14
　85:2,14,24
　86:16 87:15,24
　88:7,16,23
　90:1,10,19
　91:1,18 92:11
　92:19 93:15
　94:1,13 95:8
　95:20 96:8,18
　97:12,20 98:2
　98:9 99:1,9,16
　100:2,13
　101:10,16,23
　102:13,20
　103:6,11,20
**whatsoever**
　22:14 53:16
**window** 25:3
　92:2,4,12 93:5
　93:6
**windows** 92:14
　92:21
**witness** 3:5 5:10
　5:16 10:19
　12:7,18 13:5
　13:18 14:23
　15:10 16:10
　17:7,16 18:5
　18:21 19:5,12
　19:20 21:10,19
　22:5,18 23:11
　24:3,22 25:15
　26:5,12,22
　27:10 28:15
　29:7,18 30:6
　30:19 31:15
　32:8 33:3,8,22
　34:13 35:5
　37:3,12,20
　38:8 40:1,10
　40:21 41:17
　42:14,22 43:15
　44:12,22 45:9
　45:16 46:11,17
　47:7 48:7,23
　49:17 50:14,24
　51:6,15,22

　52:17 53:8,19
　54:1 55:24
　56:19 57:10,17
　58:1 59:10,22
　60:17 62:11,16
　63:6,21 65:4
　65:16 66:8,15
　67:1,9 68:2
　69:3 70:4,15
　70:22 71:7
　73:9 74:6,20
　75:4 77:18
　78:12,19 79:12
　79:20 80:7,19
　81:6 82:7,16
　83:22 84:6,13
　84:22 85:12,23
　86:15 87:14,21
　89:24 90:6,18
　92:9,18 93:2
　93:22 94:12,23
　95:18 96:5,16
　97:2,18,24
　98:8,21 99:8
　99:15,24
　100:12 101:3
　101:15,20
　102:9,19 103:4
**wondering**
　29:13
**words** 89:15
**works** 32:10
**wouldn't** 47:13
　52:11 56:4
　58:14 62:6
　78:6 93:22
　95:2
**written** 43:10
　46:13,18 67:16

　　　　**X**

**X** 3:2,15

　　　　**Y**

**yeah** 8:9 9:20
　17:16,17 23:8
　24:24 26:12,14
　30:12,13 35:21
　39:5,20 42:1

　45:22 46:2
　47:7 52:4
　60:17 63:22
　64:4 75:4
　79:20 80:7
　90:18 92:12
　97:3
**year** 8:23 10:10
**years** 10:3 27:19
**yelled** 64:6
**yellow** 55:6
**Yep** 54:19 91:21

　　　　**Z**

**ZURBRIGGEN**
　2:8 10:17 11:7
　12:5,15 13:2
　13:16 14:5,21
　15:7 16:8 17:4
　17:14 18:3,18
　19:3,10,18
　21:8,16 22:3
　22:16 23:9
　24:1,20 25:13
　26:3,10,19
　27:8 28:7,12
　29:4,15 30:4
　30:17 31:12
　32:6 33:1,6,20
　34:4,11 35:3
　37:1,9,17 38:6
　39:23 40:8,19
　41:15 42:12,20
　43:12 44:9,19
　45:7,14 46:9
　46:15 47:5
　48:5,20 49:3
　49:15 50:12,22
　51:4,13,20
　52:15 53:5,17
　53:23 55:10,22
　56:17 57:8,15
　57:23 59:7
　60:15 62:9,14
　63:4,19 65:2
　65:14 66:5,12
　66:23 67:7,24
　68:24 70:1,13
　70:20 71:4

73:7 74:3,16
75:2,22 76:23
77:15 78:9,17
79:2,10,17
80:4,17 81:2
82:4,14 83:19
84:4,11,20
85:9,21 86:10
87:12,19 88:5
88:13,21 89:22
90:4,16,22
91:6 92:6,16
92:23 93:19
94:8,20 95:15
96:2,13,24
97:16,22 98:5
98:18 99:6,13
99:21 100:10
100:23 101:13
101:18 102:5
102:16 103:2,9
103:13

**0**

**02:10.0** 77:11
79:5,6
**02:16.0** 79:24
**02:23.0** 80:2
**02:30.0** 77:9,14
**08051** 1:23

**1**

**1** 86:24 87:1
93:9
**1:34** 103:21
104:4
**10** 68:11,13,20
77:6
**12** 27:19
**12/12/2011** 9:24
**12:05** 1:16
**12:08** 5:3
**121** 1:14 2:3
**1515** 2:9
**16th** 2:9
**18th** 1:15 2:4
4:24
**19102** 2:9
**19107** 1:16 2:4
5:1

**1994** 22:23

**2**

**2** 68:13,20 77:6
87:2 92:22
93:11
**20** 25:19 77:10
**2020** 10:7 23:5
**2021** 8:12 10:1
11:17 12:4,14
15:14 23:15
83:12
**2023** 1:9 5:3 9:5
9:21
**21** 1:9 5:3
**212** 4:23
**215** 2:5,10
**22-3763** 1:5
**220601633** 4:19
5:9

**3**

**4**

**4** 8:12 11:17
12:4,14 15:14
23:5 83:12
**406** 1:23
**45** 23:22 25:20
**4664** 15:15 38:5
44:18 56:13
60:11 61:14
68:16 73:22
83:11 85:17
86:1 91:22
96:10,20
100:21

**5**

**546-1433** 2:5

**6**

**6** 3:10
**683-5114** 2:10

**7**

**72** 35:17 36:22
**73** 36:23 38:18
**75** 45:6
**76** 35:17

**8**

**856-589-1107**
1:24

# EXHIBIT "K"

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT OISI PS# 21-05 | | CASE NUMBER: 21-05 |
|---|---|---|---|
| | | | INTERVIEWER: Lt. Hendershot #148 |

| NAME: Officer Brian Murray #6068, PR# | AGE: | RACE: W | SEX: MALE | DOB: |
|---|---|---|---|---|
| ADDRESS: SWAT HQ | APARTMENT #: | HOME TELEPHONE# | | OTHER CONTACT# |
| NAME OF EMPLOYMENT / SCHOOL: Philadelphia Police Department | | | | SOCIAL SECURITY # |
| ADDRESS OF EMPLOYMENT / SCHOOL: | | DEPARTMENT: | | WORK TELEPHONE# |

| DATES OF PLANNED VACATIONS: | | |
|---|---|---|
| DATES OF PLANNED BUSINESS TRIPS: | | |
| NAME OF CLOSE RELATIVE OR ALTERNATE CONTACT PERSON: | | RELATIONSHIP: |
| ADDRESS: | | TELEPHONE# |

| PLACE OF INTERVIEW: POSI Unit Hqs, 2301 South 24th Street | DATE: 6/4/21 | TIME: 8:45 AM |
|---|---|---|
| BROUGHT IN BY: SELF | DATE: | TIME: |

WE ARE QUESTIONING YOU CONCERNING:
The Officer Involved Shooting Incident at 4664 Torresdale Avenue on 6-04-2021

| WARNINGS GIVEN BY: | | | | | DATE: | TIME: |
|---|---|---|---|---|---|---|
| ANSWERS: | | | | | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

Police Officer Murray, I am Lieutenant Hendershot #148, with the Officer-Involved Shooting Investigation (OISI) Unit. I will be interviewing you in reference to your involvement during the Officer Involved Shooting incident that took place on 6-04-2021, at 4664 Torresdale Avenue.

Q. What was your assignment and tour of duty on 6-04-2021?
A. I was 11PM to 7AM and I was assigned to S123.

Q. What was your assignment in regards to for today?
A. My tour of duty I was assigned to S112 and for the warrant service, I was assigned to S123.

Q. What was your responsibility for the warrant service?
A. I was assigned as the breacher/hospital car.

Q. Was you assignment in a marked unit and in full uniform?
A. Yes, in full SWAT gear.

Q. During your tour, did you respond to the area of 4664 Torresdale Avenue to serve a warrant?
A. Correct.

| INVESTIGATION INTERVIEW RECORD | | CITY OF PHILADELPHIA | |
| CONTINUATION SHEET | | POLICE DEPARTMENT | |
| NAME: | | PAGE# | CASE# |
| Officer Brian Murray #6068, PR# ███ | | 2 | 21-05 |

Q. What was the warrant in reference to?
A. We were serving an arrest/search warrant for a homicide at that location.

Q. Did the warrant specify that there was a dog in the property?
A. It did not and there were no signs that there was a dog in the residence prior to our arrival.

Q. Can you tell me everything you know about the incident?
A. I was the breacher, using the Halligan tool. I was with Officer Eric Clark #4453, who was using the ram. Officer Clark conducted the knock and announce during which time a dog was heard barking. After the breach, I entered the property. I observed a brown Pit-bull dog that was aggressively barking and lunging towards Officer Song. The dog continued to bark and aggressively approaching Officer Song. I observed Officer Song discharge his weapon one time, dispatching the dog. At that point, I continued to secure the front room. Once the team realized there was no entrance to the second floor from the first floor, they proceeded to the rear. I heard over SWAT band that there was a male coming out of the rear door. I remained in the first floor with a female and secured the scene until a patrol officer relieved me.

Q. Can you elaborate on the dog's aggressive actions?
A. He was showing his teeth, growling, was a very short distance from Officer Song, and was not backing down. I also had my weapon fixed on the dog but Officer Song had discharged already.

Q. Did the female say anything to you?
A. She was upset that her dog had been shot. She was wearing a towel around her body and asked that she be allowed to get dressed, which she did in her bathroom I believe.

Q. Did you hear the female saying anything at the time you were knocking and announcing?
A. No, just the dog.

Q. Where in the property did this discharge occur?
A. Front room, which was the living room.

Q. Did you apprehend the suspect wanted on the warrant?
A. No.

Q. Was there anyone else in the property at the time of the warrant service?
A. I only made it to the first floor and the female was the only one home.

P/O ___ #6068

D000030

75-123 (Rev. 7/82)

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA | |
|---|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT | |

| NAME: Officer Brian Murray #6068, PR# ▮▮▮▮ | PAGE# 3 | CASE# 21-05 |
|---|---|---|

Q. Is there a way to get upstairs from the first floor?
A. We discovered that there was not.

Q. Did the warrant specify whether the location of 4664 Torresdale Avenue was for the first or second floor?
A. It was for the second floor.

Q. Were you aware that the front door was for the first floor?
A. No. There were two mailboxes; I believe labeled one and two on the front door, which led us to believe that the front door led to both floors inside the property.

Q. Can you describe the property at 4664 Torresdale Ave?
A. Two story row home, with a tan first floor, white Magna Seal door.

Q. Did you speak with Officer Song about the discharge?
A. No, but I did overhear him saying that he was bit by the dog, so I understood why he discharged. In addition to the dog's actions/behavior.

Q. Did you observe any physical evidence at the scene?
A. I saw the FCC and dead dog.

Q. Did you prepare any paperwork in reference to this incident?
A. No.

Q. Were you wearing a Body Worn Camera (BWC)?
A. No.

Q. Were you injured during this incident?
A. No.

Q. Do you have any additional information that we have not covered?
A. No.

P/O ▮▮▮▮ #6068

D000031

# EXHIBIT "L"

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT Officer Involved Shooting Investigation Unit PS #21-5 | | | CASE NUMBER: 21-5 | |
|---|---|---|---|---|---|
| | | | | INTERVIEWER: Detective Brian Newell #662 | |

| NAME: Officer Eric Clark #4453, PR████, 3B | AGE: | RACE: | SEX: MALE | DOB: |
|---|---|---|---|---|
| ADDRESS: SWAT | APARTMENT #: | HOME TELEPHONE# | OTHER CONTACT# 215-685-9862 | |
| NAME OF EMPLOYMENT / SCHOOL: | | | SOCIAL SECURITY # | |
| ADDRESS OF EMPLOYMENT / SCHOOL: | | DEPARTMENT: | WORK TELEPHONE# | |
| DATES OF PLANNED VACATIONS: | | | | |
| DATES OF PLANNED BUSINESS TRIPS: | | | | |

| NAME OF CLOSE RELATIVE OR ALTERNATE CONTACT PERSON: | RELATIONSHIP: | |
|---|---|---|
| ADDRESS: | TELEPHONE# | |
| PLACE OF INTERVIEW: O.I.S.I. | DATE: 6/4/21 | TIME: 9:06AM |
| BROUGHT IN BY: Self | DATE: | TIME: |

| WE ARE QUESTIONING YOU CONCERNING: Officer Involved Shooting at 4664 Torresdale Avenue (Dog) | | |
|---|---|---|
| WARNINGS GIVEN BY: | DATE: | TIME: |

| ANSWERS: | | | | | | |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

**I am Detective Brian Newell #662, with the Officer-Involved Shooting Investigation (OISI) Unit. I will be interviewing you in reference to your involvement during the Officer Involved Shooting that took place on 6/4/21 inside 4664 Torresdale Avenue.**

**Q. Officer, what was your assignment and tour of duty on 6/4/21?**
A. I was assigned to Sam112, working 11Pm to 7:15Am.

**Q. During your tour, did you respond to the area 4664 Torresdale Avenue?**
A. Yes.

**Q. What was the nature of the assignment that prompted you to respond to that location?**
A. We were requested by Homicide Division to execute a Search/Arrest Warrant for ████ ████ B/M, PPN #████. Search Warrant #24513 and Arrest Warrant #28312021.

**Q. What was your responsibilities pertaining to responding to 4664 Torresdale Avenue?**
A. I was assigned to breach the front door.



D000041

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA | |
|---|---|---|
| *CONTINUATION SHEET* | POLICE DEPARTMENT | |

| NAME: | PAGE# | CASE# |
|---|---|---|
| Officer Eric Clark #4453, PR ████, 3B | 2 | 21-5 |

**Q. Upon your arrival at 4664 Toressdale Avenue, what did you see and do?**
A. Upon arrival, I got the go ahead to "knock and announce" from Lt Monk. A dog was barking as I announced and yelled "Dog" as I breached the front door. I moved to the side allowing the entry teams to enter. When I entered, I began searching the couches looking for weapons. I heard and saw a dog barking at Officer Long, I continued to search the couches and heard a single gunshot.

**Q. Describe the gunshot you heard.**
A. It was a rifle shot.

**Q. After hearing the shot, what did you do?**
A. Looked and continued to search the couches.

**Q. Was the target of the warrant located inside of 4664 Torresdale Avenue?**
A. No.

**Q. Describe 4664 Torresdale Avenue.**
A. It was a stucco, two story row home with two mailboxes indicating 1 and 2.

**Q. What direction does the front of 4664 Torresdale Avenue face?**
A. South.

**Q. Was anyone located inside of the property?**
A. A Spanish female was located inside of the property. I saw her briefly.

**Q. Did you speak with Officer Long as to what caused him to discharge his firearm?**
A. No.

**Q. Did you observe the dog after it was shot by Officer Long?**
A. Yes, it was dead in the living room.

**Q. Was Officer Long injured?**
A. I don't know.

**Q. Was the female that was encountered identified?**
A. Not by me.

**Q. Did you prepare any paperwork regarding this incident?**
A. No.

*P/o  Enc clac*
*4453*

**Q. Is there anything else that you would like to add to your statement that I did not cover?**
A. No.

D000042

# EXHIBIT "M"

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT Officer Involved Shooting Investigation Unit PS #21-5 | | | CASE NUMBER: 21-5 | |
|---|---|---|---|---|---|
| | | | | INTERVIEWER: Detective Brian Newell #662 | |

| NAME: Lieutenant Demetrius Monk #279, PR ███, 3B | AGE: | RACE: | SEX: MALE | DOB: | |
|---|---|---|---|---|---|
| ADDRESS: SWAT | APARTMENT #: | HOME TELEPHONE# | | OTHER CONTACT# 215-685-9862 | |
| NAME OF EMPLOYMENT / SCHOOL: | | | | SOCIAL SECURITY # | |
| ADDRESS OF EMPLOYMENT / SCHOOL: | | | DEPARTMENT: | WORK TELEPHONE# | |
| DATES OF PLANNED VACATIONS: | | | | | |
| DATES OF PLANNED BUSINESS TRIPS: | | | | | |
| NAME OF CLOSE RELATIVE OR ALTERNATE CONTACT PERSON: | | | | RELATIONSHIP: | |
| ADDRESS: | | | | TELEPHONE# | |
| PLACE OF INTERVIEW: O.I.S.I. | | | | DATE: 6/4/21 | TIME: 8:20AM |
| BROUGHT IN BY: Self | | | | DATE: | TIME: |
| WE ARE QUESTIONING YOU CONCERNING: Officer Involved Shooting at 4664 Torresdale Avenue (Dog) | | | | | |
| WARNINGS GIVEN BY: | | | | DATE: | TIME: |
| ANSWERS: (1)        (2)        (3)        (4)        (5)        (6)        (7) | | | | | |

**I am Detective Brian Newell #662, with the Officer-Involved Shooting Investigation (OISI) Unit. I will be interviewing you in reference to your involvement during the Officer Involved Shooting that took place on 6/4/21 inside 4664 Torresdale Avenue.**

**Q. Lieutenant, what was your assignment and tour of duty on 6/4/21?**
A. I was assigned to Sam 3X, working 11P to 7:15am.

**Q. During your tour, did you respond to the area 4664 Torresdale Avenue?**
A. Yes.

**Q. What was the nature of the assignment that prompted you to respond to that location?**
A. We were requested by Homicide Division to execute a Search/Arrest Warrant for ███ ███ B/M, PPN #███. Search Warrant #24513 and Arrest Warrant #28312021.

**Q. Do you know the name of the officer who discharged?**
A. Yes, Officer Edward Song #3936.

**Q. Where is Officer Song assigned?**
A. SWAT.



| INVESTIGATION INTERVIEW RECORD | | CITY OF PHILADELPHIA | |
|---|---|---|---|
| *CONTINUATION SHEET* | | POLICE DEPARTMENT | |
| NAME: Lieutenant Demetrius Monk #279, PR ▮▮▮, 3B | | PAGE# 2 | CASE# 21-5 |

**Q. What was Officer Song responsibilities pertaining to him responding to 4664 Torresdale Avenue?**

A. He was assigned to Sam 101. Officer Song was part of the front entry team. The entry team comprised of Officer Hamoy #2984, myself, Officer Saba #9823, Officer Burkett #2091, Sergeant Melody #285, Officer Murray #6068 and Officer Clark #4453.

**Q. Upon your arrival at 4664 Toressdale Avenue, what did you see and do?**

A. Upon arrival, Officer Clark approached the door, knocked and announced "Police, with a warrant, open the door". At that point, I could hear a dog barking and I gave the order to breach. Upon entry, we were met by a light brown colored pit-bull mix in the living room area. The dog immediately went after Officer Song biting his lower right leg. I continued past Officer Song where I encountered a white female in the kitchen area. She was on the floor behind a fence that separated the living from the kitchen. I proceeded past her and cleared the property. Once I encountered the female, I heard a single shot from behind me.

**Q. Describe the gunshot you heard.**

A. It was a rifle shot.

**Q. Please continue.**

A. I cleared the remaining part of the property. There was a bathroom to the left of the kitchen and a bedroom past the kitchen.

**Q. Was the target of the warrant located inside of 4664 Torresdale Avenue?**

A. No.

**Q. Describe 4664 Torresdale Avenue.**

A. It was a two story row home with two mailboxes on the front. One for the 1st floor and one for the 2nd floor. There was no access to the second floor apartment from inside of the first floor. The warrant was for the second floor. We had no information on how to access the 2nd floor then through the main door.

**Q. What direction does the front of 4664 Torresdale Avenue face?**

A. South.

**Q. Upon entry, was the interior of the property lit or dark?**

A. I don't remember any lights on upon entry. There was light on just outside of the bathroom.

**Q. Who was assigned to rear containment?**

A. Officers Quintana #2721 and Rivera #6797.

D000044

| INVESTIGATION INTERVIEW RECORD | | CITY OF PHILADELPHIA | |
|---|---|---|---|
| **CONTINUATION SHEET** | | **POLICE DEPARTMENT** | |
| NAME: | | PAGE# | CASE# |
| Lieutenant Demetrius Monk #279, PR▮▮▮, 3B | | 3 | 21-5 |

**Q. Did you speak with Officer Song as to what caused him to discharge his firearm?**
A. No. H just offered the information. He told me that after the dog bit him, it regrouped itself and appeared that it was going to jump at him and he took the shot killing the dog.

**Q. Did you observe the dog after it was shot by Officer Song?**
A. Yes, it was in the living room.

**Q. Was Officer Song injured from the dog bite?**
A. No. I checked his leg, there were red marks but didn't penetrate his skin.

**Q. Was the female that was encountered inside of the kitchen identified?**
A. No, not by me.

**Q. Did you prepare any paperwork regarding this incident?**
A. No.

**Q. Is there anything else that you would like to add to your statement that I did not cover?**
A. No.

D000045

# EXHIBIT "N"

# Transcript of the Testimony of:
# **Demetrius Monk**

**Date:** May 19, 2023

**Case:** Alvarado v. City of Philadelphia, et al

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

## Page 1

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

-------------------------- :
FELISHATAY ALVARADO,      :
                          :
        Plaintiff   : June Term,
                    : 2022
        vs.         :
                    : No. 01633
CITY OF PHILADELPHIA,     :
ET AL,                    :
                          :
        Defendants  :
-------------------------- :

- - -
May 19, 2023
- - -

Videotaped Deposition of DEMETRIUS MONK, taken at
VICTIMS' RECOVERY LAW CENTER, The North American
Building, 121 South Broad Street, 18th Floor,
Philadelphia, PA, on the above date, beginning at
approximately 11:00 a.m., before Dawn M. Burr, a
Professional Court Reporter and Notary Public,
there being present.

- - -

DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 589-1107

## Page 2

APPEARANCES:

VICTIMS' RECOVERY LAW CENTER
BY: KEITH THOMAS WEST, ESQUIRE
The North American Building
121 South Broad Street, 18th Floor
Philadelphia, PA 19107
Counsel for the Plaintiff
Tel. 215-546-1433
E-mail: keith@victimrecoverylaw.com
    * * * * *

CITY OF PHILADELPHIA - LAW
DEPARTMENT
BY: ADAM R. ZURBRIGGEN, ESQUIRE
One Parkway Building
1515 Arch Street
Philadelphia, PA  19102
Counsel for the Defendants
Tel. 215-683-5114
E-mail: adam.zurbriggen@phila.gov
    * * * * *

VIDEOGRAPHER: SAMANTHA DIBONA

## Page 3

I N D E X
WITNESS                          PAGE
DEMETRIUS MONK
Examination by Mr. West          5, 118
Examination by Mr. Zurbriggen    115

EXHIBITS
NO.          DESCRIPTION          PAGE

Monk-1     Assorted Documents        9

Monk-1A    Photo                    61

Monk-2     Search Warrant           29

Monk-3     Photo                    64

Monk-4     Dog Encounter Directive  100

## Page 4

- - -
(It was stipulated by and between
counsel that signing, sealing,
certification and filing be waived; and
that all objections, except as to the
form of the question, be reserved until
the time of trial.)
- - -
MR. WEST:  By usual stipulations we
mean we can reserve all objections other
than as to the form of questions until
the time of trial.
VIDEOGRAPHER:  This is the audio
video deposition for use at trial in
the matter of Alvarado v. City of
Philadelphia, et al, GD number 22-3763,
and I am the video operator.  My name is
Samantha DiBona and I'm employed by
Victims' Recovery Law Center.  My
address is 121 South Broad Street, 18th
Floor, Philadelphia, Pennsylvania 19107.
Today's date is May 19th, 2023 at
11:02 a.m.  This deposition is being
performed in person.  The caption in

1 (Pages 1 to 4)

Page 5

1    this case is Alvarado v. City of
2    Philadelphia, et al, GD number 22-3763.
3    The witness being deposed today is
4    Demetrius Monk.  This deposition is
5    being taken on behalf of the Plaintiff,
6    Felishatay Alvarado.  The officer taking
7    this deposition is Dawn Burr and she
8    shall swear in the witness at this time.
9                   - - -
10           . . . DEMETRIUS MONK, having been
11        duly sworn as a witness, was examined
12        and testified as follows. . .
13                   - - -
14             EXAMINATION
15                   - - -
16   BY MR. WEST:
17        Q.    Good morning, Lieutenant Monk.  We
18   introduced ourselves before off the record, but
19   I'm Keith West.  I'm one of the attorneys
20   representing the plaintiff, Ms. Alvarado, in this
21   lawsuit.
22           Just a few formalities to get on
23   the record.  You're here represented by Counsel
24   from the city.  You've had a chance to confer with

Page 6

1    your attorney and you feel prepared to proceed
2    with your deposition at this time?
3        A.    Yes.
4        Q.    Have you ever been in a deposition
5    before?
6        A.    Yes.
7        Q.    Do you have an estimate or
8    approximation of how many depositions you've been
9    in before?
10       A.    About a handful.  Less than five.
11       Q.    Less than five?
12       A.    Yes.
13       Q.    And have those all been with
14   testifying as a member of the Philadelphia Police
15   Department?
16       A.    That's correct, yes.
17       Q.    So you're probably familiar with
18   the process, but I'm just gonna go over quick
19   background.
20           The first couple questions, I'm
21   sure you get to ask these all the time, don't take
22   anything into it.  Are you under the influence of
23   any sort of illness, medication, substance,
24   anything that would impair your ability to testify

Page 7

1    truthfully today?
2        A.    No.
3        Q.    As I'm sure your attorney has
4    advised you, your only obligation today is to give
5    truthful testimony based on personal knowledge, to
6    the best of your ability.  So to be clear, I'm not
7    gonna ask for you to guess or speculate at any
8    time.  Okay?
9        A.    Yes.
10       Q.    If you don't know the answer to a
11   question, that's perfectly fine.  If that's the
12   truth, we just need to know what you do and don't
13   know.  Okay?
14       A.    Yes.
15       Q.    On the other hand, we would like to
16   know everything you know.  So if you believe that
17   you have partial knowledge, are able to give an
18   intelligent, reasonable, estimate or
19   approximation, we would like to know what your
20   estimates or approximations are, just let us know
21   that you're giving an estimate or an
22   approximation.  Okay?
23       A.    Yes.
24       Q.    This is not intended to be an

Page 8

1    unnecessarily uncomfortable process.  If you want
2    to take a break at any time, you want us to grab
3    you some coffee, you need to use the restroom, you
4    want some water, anything like that, just let us
5    know and we'll try to be as accommodating as we
6    can be.  Okay?
7        A.    Okay.  Thank you.
8        Q.    Likewise, another instruction would
9    be don't answer any question if you don't
10   understand it.  If you're asked a question and you
11   need it to be rephrased, you need me to speak
12   louder, slower, anything like that, just let us
13   know.  I'm gonna try to be as accommodating as I
14   can and, if possible, I'll rephrase or restate the
15   question.  Okay?
16       A.    Yes.
17       Q.    So with that, I guess we can get
18   into the substance of our deposition.  I'll just
19   state for the record that prior to us going on the
20   record, through your attorney, you gave us a
21   small packet of documents.
22           MR. WEST:  Why don't we mark this
23        whole packet as Monk-1?
24                   - - -

Electronically signed by Dawn Burr (101-019-021-7097)                                     f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 9

1       (Whereupon, Exhibit Monk-1 was
2      marked for identification.)
3      - - -
4  BY MR. WEST:
5     Q.   I've given you a document that's
6  marked Monk-1.
7     A.   Yes.
8     Q.   And the back of this packet is a
9  photograph and the front says SWAT Unit Recon
10  Sheet, right?
11     A.   Yes.
12     Q.   So I would like to just go through
13  this packet.  If you could identify -- first of
14  all, why did you bring this with you?
15     A.   To refresh my memory of what took
16  place.
17     Q.   This will help refresh your
18  recollection of the incident involved
19  Ms. Alvarado?
20     A.   Yes.
21     Q.   So the first document, if I'm
22  looking at it correctly, is a two-sided piece of
23  paper and it says SWAT Recon Sheet, right?
24     A.   Yes.

Page 10

1     Q.   Could you identify this document
2  for us?  Tell us what it is.
3     A.   It is our recon sheet.  It is used
4  when our individuals go out and look at a property
5  and get the specifics of the property and come
6  back and put it on paper.  That includes the route
7  to the property from our station area and the
8  route to a hospital, if an officer happens to get
9  injured.
10     Q.   And this document it says location
11  4664 Torresdale Avenue, Apartment 2nd floor rear,
12  correct?
13     A.   Yes.
14     Q.   And in the bottom right corner, I
15  see L-O-M-R-B-F-E-E.  Do you see that?
16     A.   Yes.
17     Q.   What does that mean?
18     A.   L-O-M is line of march and
19  R-B-F-E-E is the line of march of our vehicles,
20  which is rear, breacher, front, entry, entry.
21  Rear containment are breachers, the ones that
22  breach the door, our front containment in the
23  front of the property, and our two entry teams.
24  That designates how we approach the property, in

Page 11

1  that order.
2     Q.   When you say in that order, could
3  you explain the context of in what sense is that
4  in order?
5     A.   Well, rear is the lead vehicle that
6  leads out to the property, breacher is right
7  behind him, then front, and then the two entry
8  teams thereafter.
9     Q.   Is this in the sense of like a
10  caravan of vehicles approaching the property?
11     A.   That's correct.
12     Q.   Tools, what does that refer to?
13     A.   The tools needed for the particular
14  operation.  In this case, the ram, the Halligan,
15  and the water based fire extinguisher, in case
16  there's a fire, if we have to deploy a flash
17  suppression device.
18     Q.   Do you know what the purpose of the
19  mission was that the SWAT Unit recon sheet refers
20  to?
21     A.   We were executing a warrant on
22  behalf of the homicide unit, Philadelphia Homicide
23  Unit, an arrest warrant for ███████
24     Q.   And what specifically -- strike the

Page 12

1  question.  Strike the question for right now.
2  Let's just go to the second page.  What is the
3  second page, SWAT Unit Service Report?
4     A.   Yes.  This is a synopsis of what
5  took place during that warrant execution.
6     Q.   How did this come into your
7  possession?
8     MR. ZURBRIGGEN:  Object to form,
9    but Officer, you can answer, if you can.
10     THE WITNESS:  I had my operation
11    room assistant pull it up and make me a
12    copy of it.
13  BY MR. WEST:
14     Q.   Was that in anticipation for
15  today's deposition?
16     A.   That's correct.
17     Q.   Besides the documents that we've
18  collectively marked Monk-1, are there any other
19  documents that you reviewed in anticipation for
20  today's deposition?
21     A.   No.  Just these three here.
22     Q.   Did you review any recordings or
23  video in preparation for today's deposition?
24     A.   No.

Electronically signed by Dawn Burr (101-019-021-7097)

f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 13

1  Q.   Do you know whether or not there's
2  any recording of this warrant enforcement action?
3        MR. ZURBRIGGEN:  Objection to form,
4     but Officer, you can answer, if you can.
5        THE WITNESS:  State the question
6     again, please.
7  BY MR. WEST:
8     Q.   For example, did any of the
9  officers wear body cams?
10    A.   No.  We don't wear body cams, not
11 yet anyway.
12    Q.   And by we, who are you referring
13 to?
14    A.   The SWAT Unit.
15    Q.   Most Philadelphia Police Department
16 officers do wear body cams when they're out
17 performing their jobs, correct?
18    A.   Yes.
19       MR. ZURBRIGGEN:  Objection to form,
20    but Officer, you can answer.
21       THE WITNESS:  I'm sorry.  Yes.
22 BY MR. WEST:
23    Q.   But the SWAT Unit does not,
24 correct?

Page 14

1     A.   Not yet, no.  It's coming, but we
2  don't have them yet.
3        MR. ZURBRIGGEN:  Same objection,
4     for the record.
5  BY MR. WEST:
6     Q.   When you say it's coming, when is
7  that gonna happen?
8        MR. ZURBRIGGEN:  Same objection for
9     the record.  Officer, you can answer.
10       THE WITNESS:  We haven't been given
11    a timeline.  From what I understand,
12    the rest of the department with be
13    furnished with body cams.  We will be
14    the last to receive them.
15 BY MR. WEST:
16    Q.   Do you know why the SWAT Team is
17 the last to receive the body cams?
18       MR. ZURBRIGGEN:  Same objection.
19    Officer, you can answer.
20       THE WITNESS:  No, I do not.
21 BY MR. WEST:
22    Q.   Have you, yourself, as a member of
23 the Philadelphia Police Department ever worn a
24 body cam?

Page 15

1     A.   No.
2     Q.   How long have you been a member of
3  the SWAT Unit?
4     A.   13 years.
5     Q.   Then after that document, I think I
6  see two photographs.
7     A.   Well, the one photograph does not
8  pertain to the job.  It just happened to be a
9  two-sided copy.  It's a paper that was in the copy
10 machine.
11    Q.   So am I correct, in interpreting
12 what you said, that the last page in our packet,
13 the back side of the photograph, two-sided page,
14 is a photograph of a building that is not relevant
15 to this case?
16    A.   That's correct.
17    Q.   So the picture before that, what's
18 this a picture of?
19    A.   A picture of the property, whatever
20 the address was, 4664 Torresdale.
21    Q.   I see the word Google on here.  Is
22 this a Google Maps picture?
23    A.   That's correct.
24    Q.   Do you know when this picture was

Page 16

1  taken?
2     A.   No, I do not.
3     Q.   Was this picture taken prior to the
4  warrant enforcement action that this case is
5  about?
6        MR. ZURBRIGGEN:  Objection to form,
7     but Officer, you can answer.
8        THE WITNESS:  Yes.
9  BY MR. WEST:
10    Q.   How do you know that?
11    A.   It's a picture that we pulled off
12 the computer doing our recon.
13    Q.   So you believe that this picture
14 was part of the reconnaissance for this mission?
15    A.   Yes.
16       MR. ZURBRIGGEN:  Same objection.
17 BY MR. WEST:
18    Q.   Do you know that for certainty, or
19 is that your assumption?
20    A.   No.  I know that for certainty.
21    Q.   How do you know that?
22    A.   Because the operation room
23 assistant pulled this out of the packet for the
24 job.

Electronically signed by Dawn Burr (101-019-021-7097)                    f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 17

1   Q.   So you believe that this was stored
2   in the system with other reconnaissance documents?
3   A.   Yes.
4        MR. ZURBRIGGEN:  Same objection for
5        the record.
6   BY MR. WEST:
7   Q.   Sir, I'll represent to you this
8   incident occurred in June 2021.  Do you have any
9   recollection today of this incident from June 2021
10  where members of the Philadelphia SWAT Unit
11  entered Ms. Alvarado's home?
12  A.   Yes.
13  Q.   Just tell me generally, what can
14  you remember about that incident today?
15  A.   What I remember is that we arrived
16  on location.  My containment team setup their
17  perimeter.  Entry teams went up to the door.  A
18  knock was executed by our breaching team and I
19  gave the order to breach.  Often times when you
20  knock on the main door, occupants don't hear it.
21  So we gave a brief knock, then we entered.  Once
22  the door was breached, we entered and it went
23  right into the property itself.  There was no
24  first or second floor.

Page 18

1   Q.   Okay.
2   A.   We entered the property.  Officer
3   Song was the lead officer, then Officer Hamoy
4   after him, then myself.  Then the rest of the team
5   behind me.  There were dogs barking, one dog I
6   remember in particular.  We proceeded past the
7   dog.  Then I hear a discharge and that's when
8   Officer Song had discharged his weapon.  We
9   continued forward into the property to clear the
10  property.  There was woman occupant in the
11  property.  I believe she was in the kitchen area,
12  kitchen or living room area, I'm not completely
13  sure.  We were looking for the second floor.  She
14  indicated the second floor entrance was in the
15  rear of the property.
16  Q.   Okay.  When you entered this
17  property, were you attempting to execute some sort
18  of warrant?
19  A.   Yes.  I'm sorry.  I'll refer to the
20  document.  Yes, an arrest warrant and search
21  warrant, on behalf of the Homicide Unit.
22  Q.   Pursuant to warrants that you are
23  attempting to enforce at that time, were you
24  legally allowed to be in the first floor

Page 19

1   apartment?
2        MR. ZURBRIGGEN:  Objection to form,
3        but Officer, you can answer.
4        THE WITNESS:  The warrant
5        stipulated second floor, but again, once
6        we breached the door, there was no first
7        or second floor.
8   BY MR. WEST:
9   Q.   Okay, sir.  I want to make sure you
10  understand the question I'm asking you.
11       Pursuant to the warrant that you
12  were enforcing, were you legally allowed to be in
13  the first floor apartment?
14       MR. ZURBRIGGEN:  Object to form.
15       Officer, you can answer.
16       THE WITNESS:  No.
17  BY MR. WEST:
18  Q.   Okay.  Did you enter the first
19  floor apartment?
20  A.   Yes.
21  Q.   Why?
22  A.   Not knowing -- again, the warrant
23  indicated second floor.  So it was my belief that
24  perhaps there's an entrance within the apartment

Page 20

1   itself, leading up to the second floor.
2   Q.   You said you thought that perhaps
3   there was an entrance to the second floor?
4   A.   Yes.
5   Q.   If you're attempting to enter an
6   apartment for which you do have a valid warrant,
7   as a member of the Philadelphia Police Department,
8   pursuant to the policies and procedures of the
9   Philadelphia Police Department, as you understand
10  them based on your training, are you allowed to go
11  into someone else's apartment that is not subject
12  to the warrant?
13       MR. ZURBRIGGEN:  Objection to form.
14       Officer, you can answer, if you can.
15       THE WITNESS:  Let me back up.  At
16       the time it was unknown whether the
17       entrance was within the first floor
18       apartment or not.  So I would go with we
19       were legally -- we had legal bounds to
20       be in that apartment.
21  BY MR. WEST:
22  Q.   So you believe that you were
23  legally allowed to be in apartment one, first
24  floor?

5 (Pages 17 to 20)

## Page 21

1    MR. ZURBRIGGEN: Object to form.
2  Lieutenant, you can answer.
3    THE WITNESS: Yes.
4  BY MR. WEST:
5    Q.   And legally why were you allowed to
6  be in apartment one, first floor?
7    MR. ZURBRIGGEN: Objection to form.
8  Lieutenant, you can answer.
9    THE WITNESS: Because again, I'll
10    stipulate that there was no entrance.
11    When we breached the door, there was no
12    entrance to a second floor apartment
13    from the exterior. So therefore, in my
14    mind, the second floor entrance was
15    within that first floor apartment.
16  BY MR. WEST:
17    Q.   I'm sorry. Could you just repeat
18  that? I don't think I'm understanding what you're
19  saying.
20    MR. ZURBRIGGEN: Same objection for
21  the record. Lieutenant.
22    THE WITNESS: Once we breached the
23    exterior door to the property, there was
24    no door that led to a second floor. So

## Page 22

1    in my mind, it must be within the
2    apartment itself perhaps.
3  BY MR. WEST:
4    Q.   So you're saying that because the
5  door to Ms. Alvarado's apartment did not lead to
6  the second floor, you were legally allowed to be
7  in her apartment?
8    MR. ZURBRIGGEN: Objection to form.
9  Lieutenant, you can answer.
10    THE WITNESS: Yes, because again,
11    once we breached the exterior door, it
12    opened right up to her -- to the
13    property. It wasn't like it was
14    identified as an apartment. It was just
15    the exterior door, like you're opening a
16    door to a house.
17  BY MR. WEST:
18    Q.   So is it your understanding that if
19  you can cross someone's apartment and enter
20  someone else's apartment by going through the
21  apartment, if your warrant is only applicable to
22  the second apartment, you're allowed to cross the
23  first one?
24    MR. ZURBRIGGEN: Object to form.

## Page 23

1  Lieutenant, you can answer.
2    THE WITNESS: Well, again, once
3  we --
4    MR. WEST: If you could just answer
5  the question I'm asking.
6    MR. ZURBRIGGEN: Same objection.
7  Lieutenant.
8    THE WITNESS: State the question
9  again. I'm sorry.
10  BY MR. WEST:
11    Q.   Yeah. I think this might be a yes
12  or no answer, if you can.
13    So if you're executing a warrant
14  for an apartment number two, say a multi residence
15  apartment and your warrant says apartment number
16  two, if you believe that you can cross through
17  apartment number one to get to apartment number
18  two, are you legally allowed to cross through
19  apartment one to get to number two, based on your
20  understanding?
21    MR. ZURBRIGGEN: Objection to form.
22  Lieutenant, you can answer.
23    THE WITNESS: It's not a simple yes
24    or no question, because again, once we

## Page 24

1    breach the door, we're already in what
2    we now know is apartment number one.
3  BY MR. WEST:
4    Q.   So I'm not asking about what
5  specifically happened in this situation. I'm just
6  asking your understanding of the law.
7    Is it your understanding that
8  legally, if you have a warrant for one apartment,
9  that warrant gives you the legal right to enter
10  someone else's apartment?
11    A.   No, it does not.
12    MR. ZURBRIGGEN: And objection to
13    form.
14    THE WITNESS: No, it does not.
15  BY MR. WEST:
16    Q.   It does not?
17    A.   No, it does not.
18    MR. ZURBRIGGEN: Same objection for
19  the record.
20  BY MR. WEST:
21    Q.   But what if the other apartment
22  leads to the apartment where you have a warrant,
23  can you go through the other apartment?
24    MR. ZURBRIGGEN: Same objection for

6 (Pages 21 to 24)

Page 25

1  the record.  Lieutenant, you can answer.
2      THE WITNESS:  In that case, you
3      would need a warrant for the whole
4      property.
5  BY MR. WEST:
6      Q.   So prior to entering Ms. Alvarado's
7  apartment, you understood that legally you are not
8  allowed to go anywhere on the property, other than
9  the second floor rear apartment, correct?
10     A.   That's correct.
11         MR. ZURBRIGGEN:  Object to form.
12 BY MR. WEST:
13     Q.   So when you opened Ms. Alvarado's
14 front door, if that door led anywhere other than
15 the second floor rear apartment, you understood
16 that you were breaking the law by walking through
17 that door, correct?
18         MR. ZURBRIGGEN:  Object to form.
19         Lieutenant, you can answer, if you can.
20         THE WITNESS:  State the question
21         again, please.
22 BY MR. WEST:
23     Q.   Prior to entering Ms. Alvarado's
24 apartment, you knew that if you walked through her

Page 26

1  door and her door led to any residence other than
2  the second floor rear apartment, if you walk
3  through that door, you're breaking the law, you
4  already knew that, correct?
5          MR. ZURBRIGGEN:  Object to form.
6          Lieutenant, you can answer.
7          THE WITNESS:  No, I did not.
8  BY MR. WEST:
9      Q.   Okay.
10     A.   Because again, once the exterior
11 door was breached, it opened right to the
12 apartment.  The property was open.  There was no
13 division as to a first floor or second floor.
14 It's just like opening a door to a house.
15     Q.   But what I'm saying -- okay.  So
16 once you open that door, what was on the other
17 side?
18     A.   Wide open property.
19     Q.   Wide open property, or property
20 that you had opened?
21         MR. ZURBRIGGEN:  Object to form,
22         but Lieutenant, you can answer, if you
23         can.
24         THE WITNESS:  A property that was

Page 27

1  breached, yes.
2  BY MR. WEST:
3      Q.   So a person's private residence had
4  been breached, correct?
5          MR. ZURBRIGGEN:  Object to form.
6          Lieutenant, you can answer.
7          THE WITNESS:  Yes.
8  BY MR. WEST:
9      Q.   And did you believe that that
10 breached private residency was the second floor
11 rear apartment?
12         MR. ZURBRIGGEN:  Object to form.
13         Lieutenant, you can answer.
14         THE WITNESS:  At the time, we did
15         not know the second floor was in the
16         rear.
17 BY MR. WEST:
18     Q.   Well, the warrant specifically says
19 second floor rear, does it not?
20         MR. ZURBRIGGEN:  Object to form.
21         Lieutenant, you can answer.
22         THE WITNESS:  I have not seen the
23         warrant.
24 BY MR. WEST:

Page 28

1      Q.   All right, sir.  If you look at the
2  SWAT recon sheet, doesn't it say on it, location,
3  apartment second floor rear?
4      A.   The recon sheet was updated after
5  the warrant service was conducted.
6      Q.   So you're saying that this has been
7  changed after the incident?
8      A.   Yes.
9      Q.   How do you know that?
10     A.   Whatever transpires during the
11 incident of any job, we always update our sheets
12 in accordance to what we encounter during the
13 warrant service.
14     Q.   So what is your understanding as
15 far as what the warrant said?
16         MR. ZURBRIGGEN:  Object to form.
17         Lieutenant, you can answer, if you can.
18         THE WITNESS:  To my recollection,
19         the address and stipulating that it was
20         a second floor apartment, but there was
21         no delineation as to whether it was
22         front or rear.
23         MR. WEST:  All right, sir.  So
24         let's mark this as Monk-2.

7 (Pages 25 to 28)

## Page 29

1           - - -
2           (Whereupon, Exhibit Monk-2 was
3       marked for identification.)
4           - - -
5   BY MR. WEST:
6       Q.    Please identify for me what that
7   document is?
8       A.    The search warrant, warrant number
9   242513.
10      Q.    That's the search warrant, correct?
11      A.    Yes.
12      Q.    You were enforcing that search
13  warrant when you entered Ms. Alvarado's apartment,
14  did you not?
15      A.    That's correct.
16      Q.    Please highlight for me where it
17  says second floor rear?
18      A.    (Witness complies.)
19      Q.    It says second floor rear, correct?
20      A.    That's correct.
21      Q.    Just a moment ago I believe your
22  testimony was that no such words were on that
23  warrant; is that correct?
24          MR. ZURBRIGGEN:  Objection to form.

## Page 30

1       Officer, you can answer.
2           THE WITNESS:  I said to my
3       recollection.  I had not seen the
4       warrant.
5   BY MR. WEST:
6       Q.    Well, you now acknowledge it says
7   second floor read, correct?
8       A.    Yes.
9           MR. ZURBRIGGEN:  Object to form.
10  BY MR. WEST:
11      Q.    So does that change your
12  understanding as to whether or not you were
13  legally allowed to walk through the door after you
14  breached Ms. Alvarado's front door?
15          MR. ZURBRIGGEN:  Object to form.
16      Lieutenant, you can answer.
17          THE WITNESS:  Second floor rear
18      typically means rear within the -- when
19      you enter the front of the property, go
20      up to the second floor, it's a rear
21      apartment, not that the entrance would
22      be in the rear of the property.
23  BY MR. WEST:
24      Q.    When you breached Ms. Alvarado's

## Page 31

1   front door, had you breached the second floor
2   apartment?
3           MR. ZURBRIGGEN:  Object to form.
4       Lieutenant, you can answer, if you can.
5           THE WITNESS:  No.
6   BY MR. WEST:
7       Q.    Once you breached the door, could
8   you see that you had breached a door entering into
9   an occupied area, a residence?
10      A.    Yes.
11      Q.    Did you believe the residence was
12  the second floor rear apartment?
13      A.    I didn't know what we had at the
14  time.
15          MR. ZURBRIGGEN:  Object to form
16      just for the record.
17  BY MR. WEST:
18      Q.    Did you think it was reasonable to
19  assume that that was a second floor rear
20  apartment?
21          MR. ZURBRIGGEN:  Object to form.
22      Lieutenant, you can answer.
23          THE WITNESS:  I didn't think -- how
24      can I state this?  Obviously it was on

## Page 32

1       the first floor, but again, it was a
2       surprise to all of us, myself included,
3       once we reached the doors, it was an
4       open property.
5   BY MR. WEST:
6       Q.    Sir, so after you had breached
7   Ms. Alvarado's front door, you knew that you were
8   obviously on the first floor, as you just said,
9   correct?
10          MR. ZURBRIGGEN:  Object to form.
11      Lieutenant, you can answer.
12          THE WITNESS:  Yes.
13  BY MR. WEST:
14      Q.    Did you walk through her front
15  door?
16      A.    Yes.
17      Q.    Did you knowingly enter property
18  that was not described on the search warrant as
19  second floor rear apartment?
20          MR. ZURBRIGGEN:  Object to form.
21      Lieutenant, you can answer.
22          THE WITNESS:  Again, not knowing
23      where access to the second floor was.
24  BY MR. WEST:

8 (Pages 29 to 32)

Page 33

1    Q.    So --
2         MR. ZURBRIGGEN:  Lieutenant, were
3    you finished with your answer?
4         THE WITNESS:  Yes.
5         MR. ZURBRIGGEN:  Okay.
6    BY MR. WEST:
7         Q.    Sir, did you believe that it was
8    possible that you could access the second floor
9    rear apartment through Ms. Alvarado's first floor
10   apartment?
11        MR. ZURBRIGGEN:  Object to form.
12   Lieutenant, you can answer.
13        THE WITNESS:  I thought it was
14   possible, yes.
15   BY MR. WEST:
16        Q.    Did you know whether or not that
17   was possible?
18        A.    I did not know it was possible.
19        Q.    However, assuming that it was true,
20   if it was possible to access the second floor rear
21   apartment through Ms. Alvarado's first floor
22   apartment, would you legally have been allowed to
23   go through the first floor apartment, in order to
24   get there, without a warrant?

Page 34

1         MR. ZURBRIGGEN:  Object to form.
2    Lieutenant, you can answer.
3         THE WITNESS:  No.
4    BY MR. WEST:
5         Q.    So again, when you entered
6    Ms. Alvarado's apartment, which you knew was an
7    occupied residence, which you knew was on the
8    first floor, did you knowingly enter her apartment
9    illegally?
10        MR. ZURBRIGGEN:  Object to form.
11   Lieutenant, you can answer.
12        THE WITNESS:  After the fact, no.
13   BY MR. WEST:
14        Q.    What do you mean by after the fact?
15        A.    Because again --
16        MR. ZURBRIGGEN:  Same objection for
17   the record, but Lieutenant, you can
18   answer.
19        THE WITNESS:  Because again, once
20   we breached the exterior door, the
21   property was wide open.  So it could
22   have been a whole house.  We did not
23   know.  We never encountered anything
24   like that before.

Page 35

1    BY MR. WEST:
2         Q.    Sir, did you believe that you were
3    entering the second floor rear apartment when you
4    walked through that door?
5         MR. ZURBRIGGEN:  Same objection.
6    Lieutenant, you can answer.
7         THE WITNESS:  When we breached the
8    exterior door, I'm expecting there to be
9    two doors, one for one apartment, one
10   for the second apartment.
11   BY MR. WEST:
12        Q.    Sir, the door was breached.  You
13   walked through the door.  Did you believe that you
14   were walking into an occupied residence?
15        MR. ZURBRIGGEN:  Object to form.
16   Lieutenant, you can answer.
17        THE WITNESS:  We were walking into
18   an occupied residence, yes.
19   BY MR. WEST:
20        Q.    Did you believe that occupied
21   residence was the second floor rear apartment?
22        MR. ZURBRIGGEN:  Object to form.
23   Lieutenant, you can answer.
24        THE WITNESS:  Again, I did not know

Page 36

1    what we were walking into.  We just had
2    an open property.
3    BY MR. WEST:
4         Q.    Okay.  Sir --
5         A.    After the fact, we can say it was
6    an apartment, but at the time, we did not know.
7         Q.    Did you answer the question yes or
8    no?  Did you believe that that occupied residence
9    was the second floor rear apartment?
10        MR. ZURBRIGGEN:  Object to form.
11   Lieutenant, you can answer.
12        THE WITNESS:  I cannot say it was
13   not, until we walked in.
14   BY MR. WEST:
15        Q.    Sir, what is the point of doing
16   reconnaissance prior to a warrant enforcement job?
17        MR. ZURBRIGGEN:  Object to form.
18   Lieutenant, you can answer.
19        MR. WEST:  In your experience.
20        THE WITNESS:  To identify the
21   properties, the specific property, any
22   difficulties we may have on approach, to
23   get a layout of what the rear may look
24   like and the general neighborhood.

Electronically signed by Dawn Burr (101-019-021-7097)                                        f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 37

1    BY MR. WEST:
2        Q.    Sir, did you personally order
3    Ms. Alvarado's front door to be breached?
4        A.    Yes.
5        Q.    Are you aware of something known as
6    the knock and announce rule?
7        A.    Yes.
8        Q.    What is the knock and announce
9    rule?
10       A.    Knock and announce rule is when you
11   knock on the door to give the occupant sufficient
12   time to open the door.
13       Q.    You've received training with
14   regards to the policies and procedures of the
15   Philadelphia Police Department, correct?
16           MR. ZURBRIGGEN:  Object to form.
17       Lieutenant, you can answer.
18           THE WITNESS:  Yes.
19   BY MR. WEST:
20       Q.    Based on the training that you've
21   received with regards to the policies and
22   procedures of the Philadelphia Police Department,
23   what is the purpose of the knock and announce
24   rule?

Page 38

1            MR. ZURBRIGGEN:  Object to form.
2        Lieutenant, you can answer.
3            THE WITNESS:  Again, we perform a
4        knock and announce, again, to make the
5        occupant aware that the police are on
6        their -- at their door and allow them
7        time, sufficient time, typically 25, 30
8        seconds, to open the door.
9    BY MR. WEST:
10       Q.    So am I correct to understand your
11   testimony as saying that you knew, prior to
12   entering Ms. Alvarado's apartment, that under the
13   policies and procedures of the Philadelphia Police
14   Department, you were required to knock on the door
15   before entering and give the occupant sufficient
16   time to voluntarily surrender the premises?
17           MR. ZURBRIGGEN:  Object to form.
18       Lieutenant, you can answer.
19           THE WITNESS:  That's correct.
20   BY MR. WEST:
21       Q.    Did you knock on Ms. Alvarado's
22   apartment prior to breaching the door?
23       A.    I did not, but the breaching team
24   did, yes.

Page 39

1        Q.    How long -- how much time passed
2    between that knock and the front door being
3    breached?
4        A.    If I was to guess, 15, 20 seconds
5    perhaps.
6        Q.    You used the word guess.  Why are
7    you guessing?
8            MR. ZURBRIGGEN:  Object to form.
9        Lieutenant, you can answer.
10           THE WITNESS:  Because again, I was
11       not timing it.  It was a short period of
12       time.
13   BY MR. WEST:
14       Q.    Have you received training from the
15   Philadelphia Police Department as to techniques
16   you can use to try to figure out how much time is
17   passing between a knock and breaking in someone's
18   door?
19           MR. ZURBRIGGEN:  Object to form.
20       Lieutenant, you can answer.
21           THE WITNESS:  Restate that again.
22   BY MR. WEST:
23       Q.    Have you received any sort of
24   training about how you can gauge how much time has

Page 40

1    passed from knocking on a door and breaking it
2    open?
3            MR. ZURBRIGGEN:  Same objection.
4        Lieutenant, you can answer.
5            THE WITNESS:  No.
6    BY MR. WEST:
7        Q.    Did you use any techniques to try
8    to figure out how much time passed as of June
9    2021?
10           MR. ZURBRIGGEN:  Same objection.
11       Lieutenant, you can answer.
12           THE WITNESS:  No.
13   BY MR. WEST:
14       Q.    What is your basis for saying that
15   you believe at least 15 to 20 seconds passed?
16           MR. ZURBRIGGEN:  Object to form.
17       Lieutenant, you can answer.
18           THE WITNESS:  Because my state of
19       mind at the time, typically with a multi
20       unit property, you knock on the exterior
21       door and often times the occupants do
22       not hear.  So you give a brief knock on
23       that exterior door, breach that, and
24       then you give an extended knock on the

10 (Pages 37 to 40)

Page 41

1      door leading into whatever premises we
2      were going into.
3 BY MR. WEST:
4     Q.   So you intentionally gave less time
5 than you thought was required for Ms. Alvarado to
6 respond when you breached her door; is that your
7 testimony?
8       MR. ZURBRIGGEN:  Object to form,
9      but Lieutenant, you can answer, if you
10      can.
11       THE WITNESS:  We're knocking on the
12      door to allow the second floor occupant
13      to come down.
14 BY MR. WEST:
15     Q.   But when you breached the first
16 floor door, you knew that you had allowed enough
17 time for someone on the first floor to voluntarily
18 answer the door.  Is that correct?
19       MR. ZURBRIGGEN:  Object to form.
20      Lieutenant, you can answer.
21       THE WITNESS:  When we're knocking
22      on the main exterior door, it's unknown
23      to us that is actually the first floor
24      door.

Page 42

1 BY MR. WEST:
2     Q.   But regardless, the point being
3 that you knew that you were giving less time than
4 you would have if it had been a front door that
5 you knew was occupied, correct?
6       MR. ZURBRIGGEN:  Object to form.
7      Lieutenant, you can answer.
8       THE WITNESS:  Yes.
9 BY MR. WEST:
10     Q.   Was that consistent with the
11 training you received from the Philadelphia Police
12 Department?
13       MR. ZURBRIGGEN:  Same objection.
14      Lieutenant, you can answer.
15       THE WITNESS:  I would go by
16      experience that I've had on this job.
17 BY MR. WEST:
18     Q.   Okay.  Is that a way of saying that
19 it was not consistent with the training that you
20 received?
21       MR. ZURBRIGGEN:  Object to form.
22      Lieutenant, you can answer.
23       THE WITNESS:  It was consistent.
24      Again, we did a knock and announce.  It

Page 43

1      might have been shortened, but we did a
2      knock and announce and there were dogs
3      barking inside as well.
4 BY MR. WEST:
5     Q.   Did the training that you received
6 from the Philadelphia Police Department give you
7 any sort of guidance as to how much time you
8 should let pass between knocking on someone's
9 front door and smashing it open?
10       MR. ZURBRIGGEN:  Object to form.
11      Lieutenant, you can answer.
12       THE WITNESS:  Typically it's about
13      30 seconds.
14 BY MR. WEST:
15     Q.   Okay.  So the training you received
16 was you should wait at least 30 seconds, correct?
17       MR. ZURBRIGGEN:  Object to form.
18      Lieutenant, you can answer.
19       THE WITNESS:  Not should wait, but
20      typically about 30 seconds is
21      appropriate, yes.
22 BY MR. WEST:
23     Q.   And so you will admit now that you
24 did not follow your training because you did not

Page 44

1 allow at least 30 seconds to pass, correct?
2       MR. ZURBRIGGEN:  Object to form.
3      Lieutenant, you can answer.
4       THE WITNESS:  I followed my
5      training, but no, I did not allow the 30
6      seconds.
7 BY MR. WEST:
8     Q.   Okay.  And had you ever been
9 trained by any official member of the -- strike
10 the question.
11      Had you ever been trained by the
12 Philadelphia Police Department that you were
13 sometimes allowed to let less than about 30
14 seconds pass before entering someone's property?
15       MR. ZURBRIGGEN:  Object to form.
16      Lieutenant, you can answer.
17       THE WITNESS:  Exigent
18      circumstances, yes.
19 BY MR. WEST:
20     Q.   Were there any exigent
21 circumstances here?
22       MR. ZURBRIGGEN:  Same objection.
23      Lieutenant, you can answer.
24       THE WITNESS:  No.

Electronically signed by Dawn Burr (101-019-021-7097)          f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 45

1    BY MR. WEST:
2         Q.    So had you ever received any
3    training from the Philadelphia Police Department
4    that sometimes you didn't need to let about 30
5    seconds pass in a situation in which there were no
6    exigent circumstance?
7              MR. ZURBRIGGEN:  Same objection.
8         Lieutenant, you can answer.
9              THE WITNESS:  I'm sorry.  Repeat
10        the question again, please.
11   BY MR. WEST:
12        Q.    So had you ever received any
13   training from the Philadelphia Police Department
14   that when you were doing a knock warrant
15   enforcement, you could let less than 30 seconds
16   pass between a knock and breaching the door in a
17   situation that did not involve exigent
18   circumstances?
19             MR. ZURBRIGGEN:  Object to form.
20        Lieutenant, you can answer.
21             THE WITNESS:  I'm sorry.  Repeat
22        that question one more time.  I'm sorry.
23   BY MR. WEST:
24        Q.    Had you ever received any training

Page 46

1    from the Philadelphia Police Department that when
2    enforcing a warrant and implementing the knock and
3    announce rule you could ignore the rule that
4    required you to wait approximately 30 seconds
5    between knocking and breaching the property in a
6    situation that did not involve exigent
7    circumstances?
8              MR. ZURBRIGGEN:  Object to form.
9         Lieutenant, you can answer.
10             THE WITNESS:  Not that I recall,
11        no.
12   BY MR. WEST:
13        Q.    Was it your understanding, as of
14   June 2021, that the policies and procedures of the
15   Philadelphia Police Department relating to the
16   knock and announce rule required you to wait at
17   least 30 seconds between knocking on someone's
18   front door and breaching the premises if there
19   were no exigent circumstances?
20             MR. ZURBRIGGEN:  Object to form.
21        Lieutenant, you can answer.
22             THE WITNESS:  Yes.
23   BY MR. WEST:
24        Q.    Do you have any explanation today

Page 47

1    as to why you did not follow that policy and
2    procedure with regards to Ms. Alvarado's front
3    door?
4              MR. ZURBRIGGEN:  Same objection.
5         Lieutenant, you can answer.
6              THE WITNESS:  Yes.  For one, the
7         exterior door typically to a multi
8         occupant structure, when you're knocking
9         on the door, they typically do not hear
10        the occupants inside.  So we give a
11        brief knock, we breach, and then we give
12        an extended knock on the actual door
13        itself leading to the premises.
14   BY MR. WEST:
15        Q.    Sir, had you ever received any
16   specific training from the Philadelphia Police
17   Department as to how to enforce warrants at multi
18   occupant structures?
19             MR. ZURBRIGGEN:  Object to form.
20        Lieutenant, you can answer.
21             THE WITNESS:  No.
22   BY MR. WEST:
23        Q.    To your knowledge, did the
24   Philadelphia Police Department have any policies

Page 48

1    or procedures with regards to enforcing warrants
2    that were specific to multi occupant structures?
3              MR. ZURBRIGGEN:  Same objection.
4         Lieutenant, you can answer.
5              THE WITNESS:  No.
6    BY MR. WEST:
7         Q.    There was a reconnaissance done
8    related to this enforcement action, correct?
9         A.    Yes.
10        Q.    Now, as the Lieutenant, you were in
11   charge of this operation, correct?
12             MR. ZURBRIGGEN:  Object to form,
13        but Lieutenant, you can answer.
14             THE WITNESS:  Actually my Sergeant
15        ran the job, Sergeant Mellody.
16   BY MR. WEST:
17        Q.    In the kind of ranking order, does
18   a Lieutenant outrank a Sergeant in the
19   Philadelphia Police Department, just overall?
20        A.    Yes.
21             MR. ZURBRIGGEN:  Objection just for
22        the record.
23   BY MR. WEST:
24        Q.    But is it your testimony that

12 (Pages 45 to 48)

Page 49

1   Sergeant Mellody had more responsibility related
2   to this job than you did?
3        MR. ZURBRIGGEN: Object to form.
4   Lieutenant, you can answer.
5        THE WITNESS: No. What I will say
6        is that he was in charge of running the
7        job. He had the job.
8   BY MR. WEST:
9        Q.    Was he the one responsible for
10  doing the reconnaissance?
11       A.    Yes.
12       Q.    Was he the one responsible for
13  figuring out if there was a first floor apartment?
14       MR. ZURBRIGGEN: Object to form.
15  Lieutenant, you can answer.
16       THE WITNESS: If there is a first
17       floor apartment?
18       MR. WEST: Uh-huh.
19       THE WITNESS: Meaning?
20  BY MR. WEST:
21       Q.    So the warrant, as you've now
22  highlighted, specifically refers to a second floor
23  rear apartment, correct?
24       A.    Yes.

Page 50

1        Q.    Doesn't that imply that there's
2   probably a first floor apartment?
3        MR. ZURBRIGGEN: Object to form.
4   Lieutenant, you can answer.
5        THE WITNESS: Yes.
6   BY MR. WEST:
7        Q.    So wouldn't part of the
8   reconnaissance process be to figure out if the
9   first floor apartment is occupied?
10       MR. ZURBRIGGEN: Object to form.
11  Lieutenant, you can answer.
12       THE WITNESS: Not whether it's
13       occupied, but whether it actually
14       exists.
15  BY MR. WEST:
16       Q.    Whether it exists and when you're
17  going around figuring out if it exists, should you
18  also try to figure out what door leads into it?
19       MR. ZURBRIGGEN: Object to form.
20  Lieutenant, you can answer.
21       THE WITNESS: Yes.
22  BY MR. WEST:
23       Q.    And should you try to figure out
24  what door leads to the second floor rear

Page 51

1   apartment?
2        MR. ZURBRIGGEN: Same objection.
3   Lieutenant, you can answer.
4        THE WITNESS: Yes.
5   BY MR. WEST:
6        Q.    Should you try to figure out
7   whether or not it's required to go through one
8   residence to get to another?
9        MR. ZURBRIGGEN: Same objection.
10  Lieutenant, you can answer.
11       THE WITNESS: Repeat the question,
12       please.
13  BY MR. WEST:
14       Q.    As part of the reconnaissance,
15  should Sergeant Mellody have tried to figure out
16  whether or not it was necessary to go through the
17  first floor apartment to get to the second floor
18  apartment?
19       MR. ZURBRIGGEN: Same objection.
20  Lieutenant, you can answer.
21       THE WITNESS: There would have been
22       no way to determine that.
23  BY MR. WEST:
24       Q.    But is that something he should

Page 52

1   have tried to figure out, if he could, as part of
2   his reconnaissance?
3        MR. ZURBRIGGEN: Same objection.
4        THE WITNESS: If he could, yes.
5   BY MR. WEST:
6        Q.    For example, he could call the
7   property manager potentially, correct?
8        MR. ZURBRIGGEN: Object.
9        Lieutenant.
10       THE WITNESS: Yes.
11  BY MR. WEST:
12       Q.    Do you know if Sergeant Mellody
13  did that?
14       A.    I'm not aware that he did.
15       Q.    He could potentially have checked
16  property records, correct?
17       MR. ZURBRIGGEN: Object to form.
18  Lieutenant, you can answer.
19       THE WITNESS: He could check
20       property records, but I don't think
21       property records would have gave an
22       indication of the layout of the
23       property.
24  BY MR. WEST:

13 (Pages 49 to 52)

Electronically signed by Dawn Burr (101-019-021-7097)                                    f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 53

1    Q.    Were you aware of the fact that
2  property records actually were pulled prior to
3  this job, which clearly showed that they were
4  separate apartments?
5         MR. ZURBRIGGEN:  Object to form.
6  Lieutenant, you can answer.
7         THE WITNESS:  No, I'm not aware of
8  that.
9  BY MR. WEST:
10   Q.    That was not something you were
11 informed of prior to this operation, correct?
12        MR. ZURBRIGGEN:  Same objection.
13 Lieutenant, you can answer.
14        THE WITNESS:  That's correct.
15 BY MR. WEST:
16   Q.    Were you aware of the existence of
17 a rear door prior to breaching Ms. Alvarado's
18 apartment?
19   A.    No.
20   Q.    If you had known that there was a
21 rear entrance located on a cul-de-sac to this
22 property, do you think that you may have
23 considered the possibility that the rear entrance
24 led to the rear apartment?

Page 54

1         MR. ZURBRIGGEN:  Object to form.
2  Lieutenant, you can answer.
3         THE WITNESS:  No, because in our
4    minds, the rear entrance would have been
5    just that, just a rear exit, not an
6    entrance, unless we had other
7    information to verify that, validate
8    that.
9  BY MR. WEST:
10   Q.    Is it your testimony, as a member
11 of the SWAT Unit of the Philadelphia Police
12 Department, that your understanding that a small
13 amount of residences sometimes have doors that can
14 only be exited by not entered?
15        MR. ZURBRIGGEN:  Object to form.
16 Lieutenant, you can answer.
17        THE WITNESS:  Again, in this
18    particular property, you have two
19    mailboxes in the front.  So in my mind,
20    the entrance to the property is in the
21    front, not in the rear.
22 BY MR. WEST:
23   Q.    Okay.  And even if you had been
24 aware of the existence of a rear entrance located

Page 55

1  on a cul-de-sac, you still never would have even
2  considered the possibility that that door might
3  lead to the rear apartment?
4         MR. ZURBRIGGEN:  Object to form.
5  Lieutenant, you can answer.
6         THE WITNESS:  Unless we have
7    specific intel indicating that that is
8    an entrance.  Other than that, we treat
9    it as an exit and our rear containment
10   would cover it.
11 BY MR. WEST:
12   Q.    And when you say that, is that
13 consistent to some sort of training that you
14 received from the Philadelphia Police Department?
15        MR. ZURBRIGGEN:  Object to form.
16 Lieutenant, you can answer.
17        THE WITNESS:  That's consistent
18   with the number of jobs that we've done.
19 BY MR. WEST:
20   Q.    Sir, could you please answer the
21 question I asked you.  Is that consistent with
22 specific training that you received from the
23 Philadelphia Police Department?
24        MR. ZURBRIGGEN:  Same objection.

Page 56

1  Lieutenant, you can answer.
2         THE WITNESS:  Can you restate your
3    question?
4  BY MR. WEST:
5    Q.    Your testimony that you never would
6  have considered the possibility that the rear door
7  might lead to the rear apartment, is that
8  consistent with specific training that you
9  received at some point from the Philadelphia
10 Police Department?  Please answer the question yes
11 or no.
12        MR. ZURBRIGGEN:  Object to form.
13 Lieutenant, you can answer, if you can.
14        THE WITNESS:  First of all, I did
15   not say I would never considered that,
16   but I said unless we have specific intel
17   indicating that that door is actually
18   the entrance to the property.
19 BY MR. WEST:
20   Q.    Could you please answer the
21 question I asked?
22        MR. ZURBRIGGEN:  Same objection to
23   the question.
24 BY MR. WEST:

14 (Pages 53 to 56)

Page 57

1      Q.     Did you ever receive any specific
2  training from the Philadelphia Police Department
3  on that issue?
4           MR. ZURBRIGGEN:  Same objection.
5      Lieutenant, answer if you can.
6           THE WITNESS:  No.
7  BY MR. WEST:
8      Q.     To your knowledge, does the
9  Philadelphia Police Department have any policies
10  or procedures pertaining to whether or not you
11  should go through front doors or rear doors,
12  anything like that?
13           MR. ZURBRIGGEN:  Object to form.
14      Lieutenant, you can answer.
15           THE WITNESS:  Not to my
16      recollection.
17  BY MR. WEST:
18      Q.     So where did you get this idea?
19           MR. ZURBRIGGEN:  Same objection.
20      Lieutenant, you can answer, if you can.
21           THE WITNESS:  Idea referring to?
22  BY MR. WEST:
23      Q.     Your testimony I believe has been
24  that you wouldn't have considered that the rear

Page 58

1  door might be the entrance to the rear apartment,
2  even if you'd known it existed and you've
3  testified that that's not consistent with any
4  particular training you've received, that's not
5  consistent with any particular policy or
6  procedure.  So where do you get this idea?
7           MR. ZURBRIGGEN:  Object to form.
8      Lieutenant, you can answer.
9           THE WITNESS:  Dealing with this
10      specific property, again, there was two
11      mailboxes in the front.  There was no
12      other intel indicating that the entrance
13      to the rear apartment was from the rear.
14  BY MR. WEST:
15      Q.     If you have an apartment building
16  and it has two entrances, based on your
17  understanding of what sort of reconnaissance
18  should happen pursuant to the practices of the
19  SWAT Unit of the Philadelphia Police Department,
20  what efforts should be made to determine which
21  door leads where, if any?
22           MR. ZURBRIGGEN:  Object to form.
23      Lieutenant, you can answer.
24           THE WITNESS:  Again, confer with

Page 59

1  the detectives and see if they have any
2  intel.  We can confer with the property
3  manager, if we are able to contact one,
4  or property records in and of itself,
5  but outside of that, we will treat that
6  door as an exit.  Based upon two
7  mailboxes in the front, the entrance is
8  in the front.
9  BY MR. WEST:
10      Q.     Did anyone from the SWAT Unit ask
11  the detective to try to ascertain which door led
12  where related to this property?
13           MR. ZURBRIGGEN:  Object to form.
14      Lieutenant, you can answer.
15           THE WITNESS:  I'm unable to answer
16      that.  I do not know.
17  BY MR. WEST:
18      Q.     Not to your knowledge, correct?
19      A.     Not to my knowledge, no.
20      Q.     Did any member of the SWAT Unit ask
21  anyone else, besides the detective, to try to
22  ascertain which door led where prior to breaching
23  Ms. Alvarado's apartment?
24           MR. ZURBRIGGEN:  Object to form.

Page 60

1      Lieutenant, you can answer.
2           THE WITNESS:  Not to my knowledge.
3  BY MR. WEST:
4      Q.     Is that something that should have
5  been done?
6           MR. ZURBRIGGEN:  Object to form.
7      Lieutenant, you can answer.
8           THE WITNESS:  Going by what we
9      determined in the recon, two mailboxes
10      in the front, led us to believe the
11      entrance was from the front on
12      Torresdale Avenue.
13  BY MR. WEST:
14      Q.     Okay.  Had you ever received any
15  training from the Philadelphia Police Department
16  that reflected the mailbox rule that you're
17  referring to?
18           MR. ZURBRIGGEN:  Object to form.
19      Lieutenant, you can answer, if you can.
20           THE WITNESS:  No.
21  BY MR. WEST:
22      Q.     Were there any policies or
23  procedures of the Philadelphia Police Department
24  that you're aware of that made this reference to

Electronically signed by Dawn Burr (101-019-021-7097)                                    f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 61

1  mailboxes that you're referring to?
2       MR. ZURBRIGGEN:  Same objection.
3       Lieutenant, you can answer, if you can.
4       THE WITNESS:  No.
5  BY MR. WEST:
6       Q.    Sir, I'd ask you to look at the
7  photograph, the Google photograph, that we
8  discussed before.
9       MR. WEST:  I'm going to ask the
10      court reporter actually to mark this
11      document, this picture, as Monk-1A.  I
12      just want to be absolutely clear on the
13      record which photograph we're referring
14      to.
15           - - -
16      (Whereupon, Exhibit Monk-1A was
17      marked for identification.)
18           - - -
19  BY MR. WEST:
20      Q.    Sir, I'm gonna ask you to very
21  carefully look at this photograph now.
22      A.    Yes.
23      Q.    As you look at this photograph
24  today, do you think it's reasonable for anyone to

Page 62

1  believe that that door led to the second floor?
2       MR. ZURBRIGGEN:  Object to form.
3       Lieutenant, you can answer, if you can.
4       THE WITNESS:  Yes.
5  BY MR. WEST:
6       Q.    If you look at that door, sir, if
7  you look up, is there any second floor above that
8  door?
9       MR. ZURBRIGGEN:  Object to form.
10      Lieutenant, you can answer.
11      THE WITNESS:  No.
12  BY MR. WEST:
13      Q.    So you can plainly see that this
14  door doesn't lead to the second floor, correct?
15      MR. ZURBRIGGEN:  Object to form.
16  BY MR. WEST:
17      Q.    There's no second floor there?
18      MR. ZURBRIGGEN:  Object to form.
19      Lieutenant, you can answer.
20      THE WITNESS:  And there's no first
21      floor either identified, just two
22      mailboxes.
23  BY MR. WEST:
24      Q.    Sir, can we both agree that the

Page 63

1  apartment behind that door is on the first floor
2  of the property?
3       MR. ZURBRIGGEN:  Object to form.
4       Lieutenant, you can answer, if you can.
5       THE WITNESS:  Typically with a
6       multi occupied structure, this is just
7       the exterior door.  Once that is
8       breached, there's a vestibule and
9       however many units are in there, those
10      are the doors behind it.
11  BY MR. WEST:
12      Q.    Sir, please answer my question.
13  Can we both agree that the property that this
14  door is located is on the first floor?
15      MR. ZURBRIGGEN:  Object to form.
16      Lieutenant, you can answer.
17      THE WITNESS:  No, I cannot agree to
18      that.
19  BY MR. WEST:
20      Q.    So based on the training that you
21  received as a member of the SWAT Unit and the
22  Philadelphia Police Department, you're a
23  Lieutenant, and you're saying that based on that
24  training, you don't know whether or not this is

Page 64

1  the first floor?
2       MR. ZURBRIGGEN:  Object to form.
3       THE WITNESS:  That's correct.
4       MR. WEST:  I have another
5       photograph.  I'll state for record this
6       photograph has been used at I believe
7       every other deposition we've used so
8       far.  It's the same photograph.  It's
9       from Google Maps.  The date it was
10      printed out is on the photograph,
11      Monday, May 15, 9:30 a.m.  I'd like to
12      mark it as Monk-3.
13           - - -
14      (Whereupon, Exhibit Monk-3 was
15      marked for identification.)
16           - - -
17  BY MR. WEST:
18      Q.    Have you had a chance to review
19  this photograph, sir?
20      A.    Yes.
21      Q.    Do you recognize this is the same
22  structure, just from a different angle?
23      A.    Yes.
24      Q.    Do you think it's reasonable for

16 (Pages 61 to 64)

Electronically signed by Dawn Burr (101-019-021-7097)    f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 65

1  anyone to believe that that door led to the second
2  floor?
3          MR. ZURBRIGGEN: Object to form.
4      Lieutenant, you can answer.
5          THE WITNESS: I do.
6  BY MR. WEST:
7      Q.    Why?
8          MR. ZURBRIGGEN: Same objection.
9      Lieutenant.
10         THE WITNESS: Based upon the fact
11     that there's two mailboxes on the
12     exterior.
13  BY MR. WEST:
14     Q.    Can you see that there is a portion
15  of this property behind that door which could only
16  be described as being located on the first floor
17  because there is no second floor?
18         MR. ZURBRIGGEN: Object to form.
19     Lieutenant, you can answer.
20         THE WITNESS: We do not know it's
21     not a second floor entrance until we
22     breach that door.
23  BY MR. WEST:
24     Q.    So your testimony is that you never

Page 66

1  received any sort of training as to how properties
2  work that would give you the ability to understand
3  that there is no second floor on that property
4  behind the door?
5          MR. ZURBRIGGEN: Object to form.
6      Lieutenant, you can answer.
7          THE WITNESS: No.
8  BY MR. WEST:
9      Q.    You can't see that?
10         MR. ZURBRIGGEN: Same objection.
11         THE WITNESS: No, you cannot.
12  BY MR. WEST:
13     Q.    Okay. So approximately how many
14  times have you personally done reconnaissance for
15  SWAT Team enforcement actions?
16     A.    I have no idea. I've been in the
17  unit 13 years.
18     Q.    Hundreds of times?
19     A.    Yes, I would venture to say that.
20     Q.    So hundreds of times at least you
21  were responsible for figuring out if when you're
22  sending in a team of SWAT Unit officers into
23  someone's private residence, you were the person
24  designated by the Philadelphia Police Department

Page 67

1  to determine whether or not you were entering
2  someone's home lawfully, correct?
3          MR. ZURBRIGGEN: Objection to form.
4      Lieutenant, you can answer.
5          THE WITNESS: That's correct.
6  BY MR. WEST:
7      Q.    And am I correct to infer that
8  you've never received any training of any kind at
9  any time that would help you determine the
10  different structures that are used by multi
11  residence buildings?
12         MR. ZURBRIGGEN: Object to form.
13     Lieutenant, you can answer.
14         THE WITNESS: No.
15  BY MR. WEST:
16     Q.    I am correct or I'm not correct?
17     A.    No, we have not received training
18  as far as architecture of a structure.
19     Q.    Ever, of any kind, correct?
20     A.    That's correct.
21         MR. ZURBRIGGEN: Same objection.
22  BY MR. WEST:
23     Q.    In a city full of multi residence
24  properties, you have no idea what you're doing,

Page 68

1  correct?
2          MR. ZURBRIGGEN: Same objection.
3          THE WITNESS: That's incorrect,
4      because often times when you enter that
5      door, you don't know what you're gonna
6      encounter.
7  BY MR. WEST:
8      Q.    You don't know what you're gonna
9  encounter --
10     A.    That's correct.
11     Q.    -- correct, because you've never
12  received any training, correct?
13         MR. ZURBRIGGEN: Same objection and
14     please let him answer the question.
15         THE WITNESS: How can you receive
16     training on the architecture of a
17     property when often times owners modify
18     their properties? We have encountered
19     this hundreds of thousands of times, but
20     this is the one time.
21         MR. WEST: Sir --
22         MR. ZURBRIGGEN: Please let him
23     answer the question.
24         MR. WEST: Are you finished? I

17 (Pages 65 to 68)

Page 69

1       didn't mean to interrupt you.
2           THE WITNESS: Go ahead, sir.
3    BY MR. WEST:
4       Q.    Based on the policies and
5    procedures of the Philadelphia Police Department
6    as you understood them, based on your training as
7    of June 2021, if there was a door of a private
8    residence and you did not know if that door led to
9    a residence for which you had a warrant or to
10   someone else's private residence, were you allowed
11   to breach that door?
12          MR. ZURBRIGGEN: Object to form.
13   Lieutenant, you can answer.
14          THE WITNESS: State the question
15       again, please.
16   BY MR. WEST:
17      Q.    Based on the policies and
18   procedures of the Philadelphia Police Department,
19   as of June 2021, if you, as a member of the SWAT
20   Unit, went to someone's front door and you did not
21   know if that front door led to a residence for
22   which you had a warrant or to someone else's
23   residence, were you allowed to breach that door?
24          MR. ZURBRIGGEN: Object to form.

Page 70

1       Lieutenant, you can answer.
2           THE WITNESS: Yes.
3    BY MR. WEST:
4       Q.    And what is the basis for your
5    understanding of that?
6           MR. ZURBRIGGEN: Same objection.
7    Lieutenant, you can answer.
8           THE WITNESS: Because that door
9        that is being breached is the entrance
10       to that property.
11   BY MR. WEST:
12      Q.    Sir, did you understand the
13   question? My question is if you didn't know?
14          MR. ZURBRIGGEN: Same objection.
15       Lieutenant.
16   BY MR. WEST:
17      Q.    If you didn't know whether it led
18   to the property or not, are you still allowed to
19   breach the door?
20      A.    Yes. That's the only entrance into
21   the property.
22          MR. ZURBRIGGEN: Same objection for
23       the record.
24   BY MR. WEST:

Page 71

1       Q.    Okay. And the policies and
2    procedures of the Philadelphia Police Department,
3    as they've been communicated to you as of June
4    2021, were that you, as a member of the SWAT Unit,
5    could breach a front door to a private residence
6    whether that door led to a residence for which you
7    had a valid warrant or to some other person's
8    residence, if you didn't know which was true,
9    correct?
10          MR. ZURBRIGGEN: Same objection.
11   Lieutenant, you can answer.
12          THE WITNESS: State that question
13       again, please.
14          MR. WEST: Could you read it back?
15          - - -
16          (Whereupon, the last question was
17       read back by the court reporter.)
18          - - -
19          MR. ZURBRIGGEN: Same objection for
20   record.
21          THE WITNESS: If that is the door
22       into the residence, you can breach that
23       door, unless we have specific intel
24       indicating that there's another entrance

Page 72

1       to that specific area in which we are
2        executing a warrant.
3    BY MR. WEST:
4       Q.    When you say the residence, what do
5    you mean by the residence? Because I referred to
6    a residence for which you do have a warrant and a
7    residence for which you do not have warrant. So
8    what do you mean?
9           MR. ZURBRIGGEN: Object to form.
10   Lieutenant.
11   BY MR. WEST:
12      Q.    Both? Do you mean both residences?
13          MR. ZURBRIGGEN: Same objection.
14   Lieutenant.
15          THE WITNESS: A residence for -- if
16       we don't have a warrant for a residence,
17       we're not going in that residence unless
18       there is a warrant.
19   BY MR. WEST:
20      Q.    Right. So my question, sir -- I
21   wouldn't normally ask the same question over and
22   over, but I think you're making it clear that
23   you're either not answering the question or you're
24   not understanding the question. So I'm gonna ask

Electronically signed by Dawn Burr (101-019-021-7097)                              f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 73

1    the same question again.
2            According to the policies and
3    procedures of the Philadelphia Police Department,
4    as of June 2021, if there was a front door of a
5    private residence and you did not know if that
6    front door led to a residence for which you did
7    have a warrant, or to someone else's residence,
8    were you allowed to breach that door?
9            MR. ZURBRIGGEN: Object to form.
10       Lieutenant, you can answer.
11           THE WITNESS: Are you referring to
12       a multi occupant structure, multi units?
13   BY MR. WEST:
14       Q.   I'm asking about a front door and
15   you don't know who lives on the other side of that
16   door.  Can you breach it?
17           MR. ZURBRIGGEN: Object to form.
18       Lieutenant, you can answer, if you can.
19           THE WITNESS: If it's a multi unit
20       structure and that is the entrance into
21       the property, yes.
22   BY MR. WEST:
23       Q.   To the property for which you do
24   not have a warrant?

Page 74

1            MR. ZURBRIGGEN: Object to form.
2        Lieutenant, you can answer.
3            THE WITNESS: If it's a multi unit
4        structure, meaning multiple units within
5        that one property, yes.  That's the
6        common door to get into that property.
7    BY MR. WEST:
8        Q.    Right.  So is your understanding
9    then that if you have a search warrant that's
10   valid for one apartment within an apartment
11   building, you're legally allowed to enter any
12   residence within that building?
13           MR. ZURBRIGGEN: Object to form.
14       Lieutenant.
15           THE WITNESS: Not any residences.
16       Specific apartment.
17   BY MR. WEST:
18       Q.    Okay.  So before you open the front
19   door to anyone's apartment, are you required to
20   figure out if that leads the residence for which
21   you have a warrant, or someone else's residence?
22           MR. ZURBRIGGEN: Object to form.
23       Lieutenant, you can answer.
24           THE WITNESS: Again, the front door

Page 75

1            is typically the entrance into the
2        property itself for a multi unit
3        structure.  Once you get in, there's
4        multiple doors leading to whatever
5        apartment.
6    BY MR. WEST:
7        Q.    Sir, please answer the question
8    that you're being asked.
9            My question is if you have a
10   warrant that's specific to one apartment within an
11   apartment building, before you breach some private
12   resident's front door, were you required to figure
13   out if that front door led to the residence for
14   which you had the warrant, or to a different
15   residence?
16           MR. ZURBRIGGEN: Object to form.
17       Lieutenant, you can answer, if you can.
18           THE WITNESS: When you're saying --
19       when you refer to a different residence,
20       you're saying a residence other than the
21       apartment for which we are going to?
22       MR. WEST: Yes.
23       MR. ZURBRIGGEN: Same objection.
24       THE WITNESS: No.

Page 76

1    BY MR. WEST:
2        Q.    You're not required to make that
3    determination?
4        A.    No.
5        Q.    What, sir, is the SWAT Unit?
6        A.    Meaning?
7        Q.    You're wearing a vest that says
8    SWAT on it, correct?
9        A.    Yes.
10       Q.    And there is something within the
11   Philadelphia Police Department referred to as the
12   SWAT Unit, correct?
13       A.    Yes.
14       Q.    What is it?
15       A.    Special Weapons And Tactics.
16       Q.    And what does the SWAT Unit do?
17       A.    Anything over and beyond what
18   patrol is able to handle, they call upon us.
19       Q.    Now, this incident involves the
20   enforcement of a search warrant, correct?
21       A.    Yes.  We serve the most violent
22   warrants in the city.
23       Q.    Again, sir --
24       A.    I'm sorry.

19 (Pages 73 to 76)

Page 77

1    Q.    I don't want you to feel like I'm
2  being testy with you, but just so we have a record
3  that makes any sense, please only answer the
4  question asked.  Okay?
5    A.    Yes.
6    Q.    So this incident involves the
7  enforcement of a search and arrest warrant,
8  correct?
9    A.    Yes.
10   Q.    As of June 2021, was the SWAT Unit
11 generally tasked with enforcing search and arrest
12 warrants?
13       MR. ZURBRIGGEN: Object to form.
14       Lieutenant, you can answer, if you can.
15       THE WITNESS: Not all search and
16       arrest warrants.  Those are the most
17       violent individuals.
18 BY MR. WEST:
19   Q.    As of June 2021, to your knowledge,
20 did the Philadelphia Police Department have any
21 sort of policy or procedure in place as to how
22 members of the SWAT Unit should deal with dogs at
23 private residences, if they encounter them?
24       MR. ZURBRIGGEN: Object to form.

Page 78

1       Lieutenant, you can answer, if you can.
2       THE WITNESS: I can't state that
3       there is a policy in regards to that,
4       no.
5  BY MR. WEST:
6    Q.    Okay.  Not to your knowledge,
7  correct?
8    A.    That's correct.
9    Q.    Sir, if there's a -- if someone had
10 only knocked on Ms. Alvarado's apartment door ten
11 seconds before breaching it, to your
12 understanding, would that be consistent with the
13 knock and announce rule?
14       MR. ZURBRIGGEN: Object to form.
15       Lieutenant, you can answer, if you can.
16       THE WITNESS: I keep going over and
17       over it.  Again, not knowing that that
18       door is an apartment door.
19 BY MR. WEST:
20   Q.    Sir, if you could just answer the
21 question I asked.  If ten seconds had passed,
22 would that have been less than required under the
23 knock and announce rule?
24       MR. ZURBRIGGEN: Object to form.

Page 79

1       Lieutenant, you can answer.
2       THE WITNESS: The requirement isn't
3       30 seconds.  It's suggested 30 seconds.
4  BY MR. WEST:
5    Q.    Okay.  What about ten seconds,
6  would ten seconds have complied with the knock and
7  announce rule, or it would have been too little
8  time?
9       MR. ZURBRIGGEN: Object to form.
10      Lieutenant, you can answer.
11      THE WITNESS: If there's no other
12      variables, perhaps it would have been
13      too short.
14 BY MR. WEST:
15   Q.    Okay.  Why did you order the breach
16 of Ms. Alvarado's front door at the time that you
17 did?
18      MR. ZURBRIGGEN: Object to form,
19      but Lieutenant, you can answer, if you
20      can.
21      THE WITNESS: Again, not knowing it
22      was Ms. Alvarado's door, the door --
23      typically the exterior door is just
24      that, the door leading into the

Page 80

1       premises.  Once you enter the vestibule,
2       there's multiple doors, depending upon
3       how many units you have in there.  Each
4       one has an individual door.
5  BY MR. WEST:
6    Q.    Sir, you've already testified that
7  there were no exigent circumstances, correct?
8       MR. ZURBRIGGEN: Object to form.
9       Lieutenant, you can answer.
10      THE WITNESS: That's correct.
11 BY MR. WEST:
12   Q.    You had control over the situation,
13 you had control over the scene, correct?
14      MR. ZURBRIGGEN: Object to form.
15      Lieutenant, you can answer.
16      THE WITNESS: I'm sorry.  Say
17      that --
18 BY MR. WEST:
19   Q.    You had control over the situation,
20 correct?
21      MR. ZURBRIGGEN: Object to form.
22      Lieutenant, you can answer.
23      THE WITNESS: Control over the
24      situation, meaning?

20 (Pages 77 to 80)

Page 81

1    BY MR. WEST:
2         Q.    There were no -- well, strike that
3    question.
4              The SWAT Unit that day had the
5    ability to choose the time when they would breach
6    the door, if they were gonna breach the door,
7    correct?
8              MR. ZURBRIGGEN:  Object to form.
9         Lieutenant, you can answer.
10             THE WITNESS:  When you say time,
11        the time of the execution or --
12   BY MR. WEST:
13        Q.    Sure.  At some point the SWAT Unit
14   breached the door, correct?
15        A.    Yes.
16        Q.    And the SWAT Unit had the ability
17   that day to choose when they would do that, if
18   they would do it, correct?
19             MR. ZURBRIGGEN:  Object to form.
20        Lieutenant, you can answer.
21             THE WITNESS:  Yes.
22   BY MR. WEST:
23        Q.    So why did you choose the time that
24   you chose?

Page 82

1              MR. ZURBRIGGEN:  Same objection.
2         Lieutenant, you can answer.
3              THE WITNESS:  Are you talking about
4         6:00 a.m.?
5    BY MR. WEST:
6         Q.    The testimony of all the officers
7    we've deposed in this case is the only reason that
8    door was breached is because you told them to do
9    that.
10        A.    You're speaking of -- I'm sorry.
11        Q.    So why did you make that choice?
12   What was going through your mind when you say we
13   gotta do it right now?  Why did you do it?
14        A.    I thought you were referring to the
15   time of the execution.  Again, in my mind, the
16   exterior door is just that, a door leading into
17   the premises.  Once we enter the premises, there's
18   gonna be an individual door to the second floor.
19             MR. ZURBRIGGEN:  And an objection
20        to the question for the record.
21   BY MR. WEST:
22        Q.    So prior to breaching that
23   particular door, you were not concerned with
24   giving anybody who might be behind that door an

Page 83

1    opportunity to voluntarily surrender that door,
2    correct?
3              MR. ZURBRIGGEN:  Object to form.
4         Lieutenant, you can answer.
5              THE WITNESS:  Repeat the question,
6         please.
7    BY MR. WEST:
8         Q.    That door that was breached, prior
9    to breaching that door, you were not concerned
10   with allowing enough time for anyone who might be
11   behind that door an opportunity to voluntarily
12   surrender the premises, correct?
13             MR. ZURBRIGGEN:  Object to form.
14             THE WITNESS:  Incorrect, because
15        again, we performed a knock and
16        announce.  Though it may have been
17        shorter, we did perform a knock and
18        announce.
19   BY MR. WEST:
20        Q.    Why didn't you wait the full 30
21   seconds?
22             MR. ZURBRIGGEN:  Object to form.
23        Lieutenant, you can answer, if you can.
24             THE WITNESS:  Because most of the

Page 84

1    time the occupants do not hear that
2    knock because it's an exterior door.
3    BY MR. WEST:
4         Q.    But why didn't you allow the
5    possibility that someone might hear the door?
6              MR. ZURBRIGGEN:  Same objection.
7         Lieutenant, you can answer.
8              THE WITNESS:  The dogs were
9         barking.  When we knocked on the door,
10        the dogs were barking.  That should have
11        been added to the knock, awakening the
12        residents within.
13   BY MR. WEST:
14        Q.    So you heard dogs barking on the
15   other side of the door before you breached it,
16   correct?
17        A.    Yes.
18        Q.    Did that give you any sort of
19   indication that that might be an occupied area?
20             MR. ZURBRIGGEN:  Object to form.
21        Lieutenant, you can answer.
22             THE WITNESS:  Occupied within the
23        premises, yes, but not specifically
24        behind that door.

21 (Pages 81 to 84)

Electronically signed by Dawn Burr (101-019-021-7097)                    f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 85

1    BY MR. WEST:
2        Q.    It didn't occur to you that when
3    you have a front -- when you have a door and
4    there's dogs barking on the other side of that
5    door, you might be entering someone's private
6    residence?
7            MR. ZURBRIGGEN:  Object to form.
8        Lieutenant, you can answer.
9            THE WITNESS:  Dogs barking within
10       the premises, not necessarily behind
11       that door.  We're hearing dogs barking.
12       We hear dogs barking from inside the
13       property, but it's nothing indicating
14       that that door leads right into the
15       property.
16   BY MR. WEST:
17       Q.    So is it your testimony that you
18   ordered the breach of Ms. Alvarado's front door
19   sooner than you might have otherwise because you
20   heard dogs barking?
21           MR. ZURBRIGGEN:  Object to form.
22       Lieutenant, you can answer.
23           THE WITNESS:  That combined with
24       the fact that typically it's an exterior

Page 86

1        door and there are apartment doors
2        behind it.
3    BY MR. WEST:
4        Q.    Why did the dogs barking play any
5    role in your decisionmaking as to length required
6    for the knock and announce rule?
7            MR. ZURBRIGGEN:  Object to form.
8        Lieutenant, you can answer.
9            THE WITNESS:  Because you hear the
10       dogs barking, but you hear no humans.
11   BY MR. WEST:
12       Q.    I'm sorry.  Sir, did you ever
13   receive any training from the Philadelphia Police
14   Department that told you that under the knock and
15   announce rule, you should knock, allow the
16   occupants a reasonable opportunity to surrender
17   the premises, except if you hear dogs barking in
18   which case that's no longer required; is there any
19   sort of rule like that that you were ever informed
20   of?
21           MR. ZURBRIGGEN:  Object to form.
22       Lieutenant, you can answer.
23           THE WITNESS:  No.
24   BY MR. WEST:

Page 87

1        Q.    Is there any sort of policy or
2    procedure of the Philadelphia Police Department
3    that said there was an exception to the knock and
4    announce rule if people heard dogs barking?
5            MR. ZURBRIGGEN:  Same objection
6        Lieutenant, you can answer.
7            THE WITNESS:  Well, it depends on
8        the circumstance, but generally, no.
9    BY MR. WEST:
10       Q.    So your training didn't tell you
11   that dogs barking should lessen the period of time
12   that you allow someone to voluntarily surrender
13   the premises before you smash open the door?
14           MR. ZURBRIGGEN:  Same objection.
15       Lieutenant, you can answer.
16   BY MR. WEST:
17       Q.    There was no policy or procedure of
18   the Philadelphia Police Department, so why did you
19   do it?
20           MR. ZURBRIGGEN:  Same objection.
21       Lieutenant, you can answer.
22           THE WITNESS:  Again, typically an
23       exterior door to a multi unit structure
24       is just that, an exterior door.  Once

Page 88

1        you breach that, there's individual
2        apartment doors.
3    BY MR. WEST:
4        Q.    Sir, to be clear, right now I'm
5    just trying to focus in on the dogs barking.  You
6    heard the dogs barking.  You therefore said that
7    was a reason why you ordered the breach when you
8    did.  What about the dogs barking made you lessen
9    the amount of time that you gave Ms. Alvarado to
10   open her door?
11           MR. ZURBRIGGEN:  Object to form.
12       Lieutenant, you can answer.
13           THE WITNESS:  Because the dogs are
14       barking, but yet I'm not hearing any
15       humans say wait, I'm coming, or anything
16       of that nature.
17   BY MR. WEST:
18       Q.    How much time would you allow the
19   occupant of the property to hear the dogs barking
20   and speak up?
21           MR. ZURBRIGGEN:  Object to form.
22       Lieutenant, you can answer.
23           THE WITNESS:  I'm sorry.  Repeat
24       the question.

22 (Pages 85 to 88)

Page 89

1  BY MR. WEST:
2      Q.    How much time would you allow under
3  those circumstances?
4          MR. ZURBRIGGEN:  Same objection.
5      Lieutenant, you can answer, if you can.
6          THE WITNESS:  How much time would I
7      allow for what?
8  BY MR. WEST:
9      Q.    So you hear dogs barking, right?
10     A.    Yes.
11     Q.    How much time would you allow
12  people to hear their dogs barking and say
13  something in response?
14         MR. ZURBRIGGEN:  Same objection.
15     Lieutenant, you can answer.
16         THE WITNESS:  The situation -- it
17     depends, but generally when dogs are
18     barking people generally say wait a
19     minute, I'm coming, at least that's been
20     my experience.
21  BY MR. WEST:
22     Q.    And if you don't hear that
23  immediately, you're gonna smash open their door,
24  correct?

Page 90

1          MR. ZURBRIGGEN:  Object to form.
2      Lieutenant, you can answer.
3          THE WITNESS:  It wasn't immediate.
4      We gave a knock and announce.  The dogs
5      are barking during the time we were
6      knocking and announcing.
7  BY MR. WEST:
8      Q.    Sir, I can represent to you that we
9  have surveillance footage of this incident and it
10  was well less than ten seconds between someone
11  first even standing on that stoop and that door
12  being breached.
13         MR. ZURBRIGGEN:  Object to form.
14     Lieutenant, you can answer.
15  BY MR. WEST:
16     Q.    Does that sound reasonable to you?
17         MR. ZURBRIGGEN:  Same objection.
18         THE WITNESS:  When you combine that
19     with the fact that typically occupants
20     do not hear that knock in the --
21  BY MR. WEST:
22     Q.    Do you think that you should allow
23  someone at least ten seconds to respond before
24  breaking their front door?

Page 91

1          MR. ZURBRIGGEN:  Object to form.
2      Lieutenant, you can answer.
3  BY MR. WEST:
4      Q.    Especially when you don't know for
5  sure if you're even at the right house?
6          MR. ZURBRIGGEN:  Object to form.
7      Lieutenant, you can answer.
8          THE WITNESS:  Well, we know we're
9      at the right house.
10  BY MR. WEST:
11     Q.    Sir, you were not at the right
12  house, correct?
13         MR. ZURBRIGGEN:  Object to form.
14     Lieutenant, you can answer.
15         THE WITNESS:  Going by the address,
16     4664 Torresdale, we were at the right
17     premises.
18  BY MR. WEST:
19     Q.    But you did not enter the correct
20  apartment, correct?
21         MR. ZURBRIGGEN:  Object to form.
22     Lieutenant, you can answer.
23         THE WITNESS:  In retrospect, no, we
24     did not.

Page 92

1  BY MR. WEST:
2      Q.    And I believe you've already
3  testified that you didn't know for sure what was
4  behind that door, correct?
5          MR. ZURBRIGGEN:  Object to form.
6      Lieutenant, you can answer.
7          THE WITNESS:  No, we did not.
8  BY MR. WEST:
9      Q.    So you knew before you went through
10  the door that you weren't sure what was on the
11  other side and it might be someone else's
12  apartment, correct?
13         MR. ZURBRIGGEN:  Object to form.
14     Lieutenant, you can answer.
15  BY MR. WEST:
16     Q.    You were at least aware of the
17  possibility?  Strike the question.
18         You were at least aware of the
19  possibility that you were going in the wrong
20  apartment?
21         MR. ZURBRIGGEN:  Object to form.
22     Lieutenant, you can answer.
23         THE WITNESS:  No, I was not.
24  BY MR. WEST:

Electronically signed by Dawn Burr (101-019-021-7097)                                            f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 93

1    Q.    You didn't even consider the
2    possibility that that door might lead to the
3    first floor apartment?
4    A.    No.
5        MR. ZURBRIGGEN: Objection for the
6    record.
7    BY MR. WEST:
8    Q.    Did you make any effort whatsoever,
9    prior to executing this warrant, to ascertain who
10   lived in the first floor apartment?
11       MR. ZURBRIGGEN: Object.
12   Lieutenant, you can answer.
13       THE WITNESS: Did I personally?
14   BY MR. WEST:
15   Q.    You or anyone under your command,
16   to your knowledge?
17   A.    Not to my knowledge.
18       MR. ZURBRIGGEN: Same objection.
19       THE WITNESS: Not to my knowledge.
20   BY MR. WEST:
21   Q.    Did you ever ask anyone if they
22   had made any sort of reconnaissance to figure out
23   where the first floor apartment was located?
24       MR. ZURBRIGGEN: Same objection.

Page 94

1    Lieutenant, you can answer.
2        THE WITNESS: No.
3    BY MR. WEST:
4    Q.    Did you ask anyone, hey, did we try
5    to figure out where these different apartments are
6    located?
7        MR. ZURBRIGGEN: Same objection.
8    Lieutenant, you can answer.
9        THE WITNESS: No, I did not ask.
10   BY MR. WEST:
11   Q.    But you just assumed that this door
12   couldn't possibly lead to the first floor
13   apartment?
14       MR. ZURBRIGGEN: Same objection.
15   Lieutenant, you can answer.
16       THE WITNESS: The only thing I
17       assumed was that there was gonna be two
18       doors, at least two doors, behind this
19       exterior door.
20   BY MR. WEST:
21   Q.    Sir, you knew that there were dogs
22   inside before you breached the property?
23       MR. ZURBRIGGEN: Object to form.
24   Lieutenant, you can answer.

Page 95

1        THE WITNESS: Yes. I heard dogs
2    barking.
3    BY MR. WEST:
4    Q.    Had you considered the possibility
5    that once the property was breached the dogs
6    inside might react defensively?
7        MR. ZURBRIGGEN: Object to form.
8    Lieutenant, you can answer.
9        THE WITNESS: Depending upon which
10   apartment we're going to, yes.
11   BY MR. WEST:
12   Q.    So you were aware of the
13   possibility that once the door was breached the
14   dogs may make some effort to scare the intruders
15   away, correct?
16       MR. ZURBRIGGEN: Object to form.
17   Lieutenant, you can answer.
18       THE WITNESS: Depending upon which
19       apartment we're going into, yes. If
20       there's an apartment that there's no
21       dogs, there's no issue.
22   BY MR. WEST:
23   Q.    And to be clear, in this scenario,
24   you were the intruder, correct?

Page 96

1        MR. ZURBRIGGEN: Object to form.
2    Lieutenant, you can answer, if you can.
3        THE WITNESS: I wouldn't classify
4        myself as an intruder.
5    BY MR. WEST:
6    Q.    Were you intruding into the
7    property?
8        MR. ZURBRIGGEN: Object to form.
9    BY MR. ZURBRIGGEN:
10   Q.    Illegally?
11       MR. ZURBRIGGEN: Object to form.
12   Lieutenant, you can answer.
13       THE WITNESS: I'm sorry. Restate
14       the question.
15   BY MR. WEST:
16   Q.    Were you in fact intruding into the
17   property illegally?
18       MR. ZURBRIGGEN: Object to form.
19   Lieutenant, you can answer.
20       THE WITNESS: At that time, no, we
21       were not intruding illegally.
22   BY MR. WEST:
23   Q.    Did you have a warrant to enter
24   the first floor apartment?

Electronically signed by Dawn Burr (101-019-021-7097)                                    f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 97

1        MR. ZURBRIGGEN: Object to form.
2    Lieutenant, you can answer.
3        THE WITNESS: No.
4    BY MR. WEST:
5        Q.    Okay.  So you knew that when the
6    property was breached the dogs inside may react
7    defensively to try to scare away the intruders?
8        MR. ZURBRIGGEN: Object to form.
9    Lieutenant, you can answer.
10   BY MR. WEST:
11       Q.    What, based on your training, did
12   you expect the dogs to do?
13       MR. ZURBRIGGEN: Object to form.
14   Lieutenant, you can answer.
15       THE WITNESS: Dogs will protect
16       their premises.
17   BY MR. WEST:
18       Q.    How, in your experience or
19   training, are dogs likely to protect their home?
20       A.    How?
21       Q.    Yeah.
22       MR. ZURBRIGGEN: Object to form.
23       THE WITNESS: They attack whoever
24       is invading their home.

Page 98

1    BY MR. WEST:
2        Q.    So before you broke the door down,
3    you knew that there was a likelihood that the
4    dogs on the other side might try to attack
5    whoever came through the door, correct?
6        MR. ZURBRIGGEN: Object to form.
7    Lieutenant, you can answer.
8        THE WITNESS: Again, not knowing
9        that door is leading into a first floor
10       apartment -- there's supposed to be at
11       least two apartments in the building
12       from the exterior door.  So dogs could
13       be on the first floor or dogs could be
14       on the second floor.
15   BY MR. WEST:
16       Q.    Sir, could you answer the question
17   that was asked?
18       MR. ZURBRIGGEN: Same objection to
19       the question.  Lieutenant, you can
20       answer.
21       THE WITNESS: Please restate the
22       question.
23   BY MR. WEST:
24       Q.    Sure.  Before that door was

Page 99

1    breached, you knew that there was a possibility
2    that there were dogs on the other side of the
3    door, correct?
4        A.    Yes.
5        MR. ZURBRIGGEN: Object to form.
6    BY MR. WEST:
7        Q.    And you knew that there was a
8    possibility that those dogs would act as dogs
9    naturally do and try to defend their property,
10   correct?
11       MR. ZURBRIGGEN: Object to form.
12   Lieutenant, you can answer, if you can.
13       THE WITNESS: Yes.
14   BY MR. WEST:
15       Q.    And you knew that, from the point
16   of view of the dogs, people were intruding into
17   the property, correct?
18       MR. ZURBRIGGEN: Object to form.
19   Lieutenant, you can answer.
20       THE WITNESS: Yes.
21   BY MR. WEST:
22       Q.    And you knew that it would be
23   natural for the dogs to either try to scare away
24   the people coming through the door or defend the

Page 100

1    home, correct?
2        MR. ZURBRIGGEN: Object to form.
3    Lieutenant, you can answer.
4        THE WITNESS: Yes.
5    BY MR. WEST:
6        Q.    Did that in any way effect your
7    decision as to the timing of breaching the door?
8        MR. ZURBRIGGEN: Same objection.
9    Lieutenant, you can answer.
10       THE WITNESS: No, because again, in
11       my mind, it's a multi unit structure.
12       At least two doors are gonna be behind
13       this exterior door.  That's the only
14       thing that was in my mind.
15       MR. WEST: Let's mark Monk-4.
16       - - -
17       (Whereupon, Exhibit Monk-4 was
18       marked for identification.)
19       - - -
20   BY MR. WEST:
21       Q.    I want to put on the record that
22   the document I've handed you, that's marked as
23   Monk-4, is a document that was produced to us in
24   discovery by the defendants.  It's been Bates

25 (Pages 97 to 100)

Page 101

1  stamped Defendant 235 to 240.
2      Sir, I'm just gonna read from the
3  first page. So it's I, Introduction, Section B,
4  Training Objectives. First of all, have you ever
5  seen this document before?
6      A.  No.
7      Q.  So it says -- B1 says, "Failing to
8  anticipate a dog on the premises is a frequent
9  mistake that officers make." Had you ever
10  received any training about that from the
11  Philadelphia Police Department?
12      MR. ZURBRIGGEN: Object to form.
13      THE WITNESS: No.
14  BY MR. WEST:
15      Q.  Do you have any knowledge as to why
16  failing to anticipate a dog on the premises might
17  be a mistake?
18      MR. ZURBRIGGEN: Object to form.
19      Lieutenant, you can answer, if you can.
20      THE WITNESS: I don't know why that
21      would be a frequent mistake for
22      officers.
23  BY MR. WEST:
24      Q.  Okay. So will you go to page four

Page 102

1  of the document that's Bates stamped 238?
2      A.  Yes.
3      Q.  Is says tools, right, do you see
4  that there?
5      A.  Yes.
6      Q.  "Having the right tools or knowing
7  how to use ordinary objects can prevent an
8  attack." Pepper spray. Did you or the other
9  members of the SWAT Unit have any pepper spray
10  prior to entering Ms. Alvarado's home?
11      MR. ZURBRIGGEN: Object to form.
12      Lieutenant, you can answer.
13      THE WITNESS: I had pepper spray on
14      me. I cannot attest to whether my
15      officers had pepper spray.
16  BY MR. WEST:
17      Q.  Because you knew that there was a
18  chance there was a dog in the property, did anyone
19  pull out their pepper spray before breaching the
20  property?
21      MR. ZURBRIGGEN: Object to form.
22      MR. WEST: Strike the question.
23      I'm gonna rephrase it.
24  BY MR. WEST:

Page 103

1      Q.  Prior to breaching the property,
2  had any of your SWAT officers pulled out their
3  pepper spray in anticipation of anticipating --
4  strike the question. I apologize. I'm just
5  wording it wrong. I'm not trying to take up extra
6  of your time.
7      Prior to breaching Ms. Alvarado's
8  door, had you or any of the other SWAT officers
9  pulled out your pepper spray in anticipation that
10  you might be encountering a dog?
11      MR. ZURBRIGGEN: Object to form.
12      THE WITNESS: Not that I'm aware
13      of.
14  BY MR. WEST:
15      Q.  And you gave no such order,
16  correct?
17      MR. ZURBRIGGEN: Object to form.
18      THE WITNESS: That's correct.
19  BY MR. WEST:
20      Q.  And no such training had been
21  received by any of the SWAT Unit officers, to your
22  knowledge, correct?
23      MR. ZURBRIGGEN: Object to form.
24      Lieutenant, you can answer, if you can.

Page 104

1      THE WITNESS: Training as to?
2  BY MR. WEST:
3      Q.  That one of the things you'd want
4  to do before going into someone's property, if you
5  think they have a dog, is pull out your pepper
6  spray?
7      MR. ZURBRIGGEN: Object to form.
8      Lieutenant, you can answer.
9      THE WITNESS: We use pepper spray
10      as a last resort.
11  BY MR. WEST:
12      Q.  Before shooting the dog?
13      MR. ZURBRIGGEN: Object to form.
14      Lieutenant.
15      THE WITNESS: I'm not saying before
16      shooting a dog, but as a last resort
17      period, because it contaminates the
18      area, contaminates the officers,
19      contaminates the occupants.
20  BY MR. WEST:
21      Q.  Right. So given the choice between
22  shooting the dog or giving the dog pepper spray,
23  you would choose shooting the dog?
24      A.  No.

26 (Pages 101 to 104)

Page 105

1    Q.    So pepper spray is not exactly the
2  last resort, correct?
3              MR. ZURBRIGGEN:  Object to form.
4        Lieutenant.
5              THE WITNESS:  In that vein, no,
6        it's not the last resort.
7  BY MR. WEST:
8    Q.    If an officer has a choice between
9  using pepper spray against a dog or shooting the
10 dog in the head, which do you think they should
11 choose?
12             MR. ZURBRIGGEN:  Object to form.
13       Lieutenant, you can answer, if you can.
14             THE WITNESS:  That depends on the
15       circumstances.  If the dog is actively
16       attacking the officer, he has to do what
17       he has to.  That's his judgment call.
18 BY MR. WEST:
19   Q.    In any case, prior to breaching
20 Ms. Alvarado's door, nobody prepared pepper spray
21 in anticipation of maybe having to encounter a
22 dog, correct?
23   A.    That's correct.
24   Q.    And prior -- you also see that it

Page 106

1  says here that you should have the right tools for
2  dealing with the dog include a noose or a snare,
3  right?
4              MR. ZURBRIGGEN:  Object to form.
5              THE WITNESS:  Yes.
6  BY MR. WEST:
7    Q.    Did anyone in your group of
8  soldiers have either a noose or a snare prior to
9  entering Ms. Alvarado's property?
10             MR. ZURBRIGGEN:  Object to form.
11             THE WITNESS:  No.
12 BY MR. WEST:
13   Q.    It says baton A-S-P.  What does
14 A-S-P stand for in this context?
15   A.    The ASP.
16   Q.    Did either you or any of the other
17 officers who were entering Ms. Alvarado's
18 apartment have a baton or an ASP prior to
19 breaching the door?
20             MR. ZURBRIGGEN:  Object to form.
21       Lieutenant, you can answer, if you can.
22             THE WITNESS:  I do not recall.
23 BY MR. WEST:
24   Q.    Not to your knowledge, correct?

Page 107

1    A.    Right.
2    Q.    And certainly no one pulled out an
3  ASP or baton prior to breaching the door in
4  anticipation of encountering a dog, correct?
5              MR. ZURBRIGGEN:  Same objection.
6        Lieutenant, you can answer, if you can.
7              THE WITNESS:  I will say that we're
8        not gonna have an ASP in our hands going
9        in.  We have our weapons in our hand.
10 BY MR. WEST:
11   Q.    Sir, if you could just answer the
12 question you're being asked.
13       Prior to breaching Ms. Alvarado's
14 door, neither you, nor any of the other entry team
15 pulled out a baton or an ASP in an anticipation of
16 dealing with the dog?
17   A.    That's correct.
18             MR. ZURBRIGGEN:  And objection to
19       form for the record.
20 BY MR. WEST:
21   Q.    And the other tool listed here is a
22 CO2 fire extinguisher.  Did you or any other of
23 the SWAT Team members have a CO2 fire extinguisher
24 with them?

Page 108

1    A.    We have a water based fire
2  extinguisher.  Not a CO2.
3    Q.    Okay.
4    A.    No.  No, we did not.
5    Q.    And was it your understanding that
6  the water based fire extinguisher was something
7  that could be used with the dog?
8              MR. ZURBRIGGEN:  Object to form,
9        but Lieutenant, answer, if you can.
10             THE WITNESS:  No.  We typically use
11       that for fires.
12 BY MR. WEST:
13   Q.    Okay.  Prior to breaching
14 Ms. Alvarado's door, had any plan been made as to
15 what the officers should do when they encountered
16 the dog on the other side?
17             MR. ZURBRIGGEN:  Object to form.
18       Lieutenant, you can answer, if you can.
19             THE WITNESS:  No.
20 BY MR. WEST:
21   Q.    Based on your understanding of the
22 policies and procedures of the Philadelphia Police
23 Department, under what circumstances may an
24 officer shoot a dog?

27 (Pages 105 to 108)

Page 109

1    A.    If he's being attacked.  If he or
2  she is being attacked.
3    Q.    Okay.  And I believe, sir, your
4  testimony earlier today --
5    A.    Or if the dog is attacking someone
6  else.
7    Q.    Okay.  And I believe your testimony
8  earlier was that you entered the property and
9  walked past the dog and you saw the woman in the
10  kitchen area prior to the dog being shot, correct?
11        MR. ZURBRIGGEN:  Object to form.
12      Lieutenant.
13        THE WITNESS:  That's correct.
14  BY MR. WEST:
15    Q.    So is it fair to infer that you did
16  not actually see the shooting?
17    A.    No, I did not.
18    Q.    Do you know personally whether or
19  not the dog had attacked anyone before it got
20  shot?
21        MR. ZURBRIGGEN:  Objection.
22        THE WITNESS:  I did not see the
23      attack, no.
24  BY MR. WEST:

Page 110

1    Q.    Because you knew that there was a
2  likelihood the dog might naturally try to defend
3  the premises once the door was breached, did you
4  put any thought into putting any sort of measures
5  in place where the issue of the dog might be able
6  to be dealt with in such a way that didn't result
7  in the dog's death?
8        MR. ZURBRIGGEN:  Object to form.
9      Lieutenant, you can answer, if you can.
10        THE WITNESS:  No, because often
11      times when we go in, the owner is able
12      to secure the dog, the animal.
13  BY MR. WEST:
14    Q.    Did you at any point hear
15  Ms. Alvarado ask for an opportunity to put her
16  dog in its cage?
17    A.    No, I don't recall.
18    Q.    Do you recall anything that
19  Ms. Alvarado was saying at that time?
20    A.    No, I do not.
21    Q.    Do you recall anything that
22  Ms. Alvarado said that entire day?
23        MR. ZURBRIGGEN:  Object to form.
24      Lieutenant, you can answer.

Page 111

1        THE WITNESS:  To sit right here to
2      say I can -- no, I cannot recall.
3  BY MR. WEST:
4    Q.    At what point did you realize that
5  you were in the wrong apartment?
6    A.    Once we cleared, as we now know,
7  the first floor apartment, and there was no way to
8  get to the second floor.
9    Q.    How long did that take?
10        MR. ZURBRIGGEN:  Object to form.
11        THE WITNESS:  About four minutes,
12      three or four minutes.
13  BY MR. WEST:
14    Q.    And then what happened?
15        MR. ZURBRIGGEN:  Object to form.
16      Lieutenant, you can answer, if you can.
17        THE WITNESS:  In reference to the
18      unit service report, it indicates that
19      the occupant, I guess Ms. Alvarado,
20      stated that the entrance to the second
21      floor apartment is in the rear.
22  BY MR. WEST:
23    Q.    Do you recall that happening?
24    A.    Her saying that, I can't say I

Page 112

1  recalled that, but we reform back outside the
2  property and walk around to the rear.
3    Q.    Do you recall that the rear door is
4  located on a cul-de-sac?
5        MR. ZURBRIGGEN:  Object to form,
6      but Lieutenant, you can answer, if you
7      can.
8        THE WITNESS:  No, I don't remember
9      that.
10  BY MR. WEST:
11    Q.    Once you -- strike the question.
12  Am I correct to understand that your practice
13  would be that if you heard a dog barking that
14  would actually shorten the amount of time you
15  would wait between knocking and announcing at a
16  property and entering the property?
17        MR. ZURBRIGGEN:  Object to form.
18      Lieutenant, you can answer.
19        THE WITNESS:  No, that's incorrect.
20      I said for this particular property,
21      being that it was a multi unit
22      structure, typically when you knock on
23      that door, the occupants in either
24      apartment do not hear it.  So we breach

28 (Pages 109 to 112)

Electronically signed by Dawn Burr (101-019-021-7097)

f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 113

1      and we go in and give a good knock on
2      the individual apartment door.
3  BY MR. WEST:
4      Q.    Sir, you did say that hearing the
5  dogs barking was one of the factors as to why the
6  property was breached when it was breached,
7  correct?
8          MR. ZURBRIGGEN:  Object to form.
9      Lieutenant, you can answer.
10         THE WITNESS:  Yes, because again
11     that raises the awareness of the
12     occupants inside and I didn't hear any
13     humans.
14 BY MR. WEST:
15     Q.    Did it ever occur to you that you
16 should allow more time than normal before
17 breaching a property, if you hear that there are
18 dogs inside?
19         MR. ZURBRIGGEN:  Object to form.
20     Lieutenant, you can answer.
21         THE WITNESS:  With the structure,
22     no, I did not.
23 BY MR. WEST:
24     Q.    I don't mean just the specific

Page 114

1  structure.  I just mean generally as far as the
2  practices that you follow as a member of the SWAT
3  Unit.  Did it ever occur to you that if you hear a
4  dog inside you, for example, maybe need to make a
5  plan as to how you're gonna deal with the dog
6  before you breach the property, so that might
7  actually be a reason to take a little bit more
8  time before entering?
9          MR. ZURBRIGGEN:  Object to form.
10         THE WITNESS:  No, we do not do
11     that.
12 BY MR. WEST:
13     Q.    And certainly no training or a
14 policy or procedure coming down from the
15 Philadelphia Police Department about giving
16 yourself time to formulate a plan on how to deal
17 with the dog, if you hear that there's a dog on
18 the property, correct?
19         MR. ZURBRIGGEN:  Object to form.
20     Lieutenant, you can answer.
21         THE WITNESS:  I'm sorry.  Repeat
22     that again, please.
23 BY MR. WEST:
24     Q.    There's no policy, procedure or

Page 115

1  training, from the Philadelphia Police Department,
2  that would tell you that if you're planning to
3  breach a property and you can hear that there's a
4  dog inside the property, you should make a plan on
5  how to deal with the likelihood of a dog encounter
6  before breaching that property, correct?
7          MR. ZURBRIGGEN:  Object to form.
8      Lieutenant.
9          THE WITNESS:  That's correct.
10         MR. WEST:  I have no further
11     questions.  Thank you.
12             ---
13         EXAMINATION
14             ---
15 BY MR. ZURBRIGGEN:
16     Q.    Lieutenant, I'll just have some
17 very brief questions for you.  I want to ask you,
18 would you just describe, Lieutenant, for the
19 record, the firearms that the members in your unit
20 had on that date?
21     A.    Our primary firearm is the SIG
22 Sauer 400.  It's an AR15 type rifle.  That's our
23 primary weapon.  Our secondary weapon is our
24 handgun, a Glock 17.

Page 116

1      Q.    The rifle, how is that held?  Is
2  that held with two hands?
3      A.    Yes.
4      Q.    And all of the members of the entry
5  team are equipped with that weapon?
6      A.    Yes.
7      Q.    Now, Lieutenant, I think you had
8  said that you all were executing a warrant for a
9  homicide suspect, is that correct?
10     A.    Yes.
11     Q.    Were you -- strike that question.
12 Was it your understanding that this suspect was
13 dangerous?
14     A.    Yes.
15     Q.    Lieutenant, I just want to direct
16 your attention back to what's been marked
17 previously as Monk-1, I believe, and 1A as well.
18 This is the photograph of the front door, sir.  If
19 you could just take a look.  The markings on this
20 front door are 4664; is that correct?
21     A.    Yes.
22     Q.    Do you recall any markings on that
23 front door that would have led you to believe that
24 behind that front door there was not an entrance

Electronically signed by Dawn Burr (101-019-021-7097)                                    f2c9ef0a-fa93-4b60-8a54-1abff48e0487

Page 117

1  to the second floor apartment?
2      A.   No.
3      Q.   Is there anything there that
4  indicates to you that that is the entrance
5  exclusively to the first floor apartment?
6      A.   I'm sorry?
7      Q.   Let me rephrase that.  It was
8  poorly phrased.  Does anything on the entrance,
9  that you can see here in this picture, indicate to
10  you that that is an entrance only to the first
11  floor apartment and not to the second floor
12  apartment?
13      A.   No.
14      Q.   Now, I believe you testified
15  earlier that you did not know what was behind that
16  front door.  Is it possible that behind that front
17  door there could have been a hallway?
18          MR. WEST:  Object to the form of
19      the question.
20          THE WITNESS:  Yes.
21  BY MR. ZURBRIGGEN:
22      Q.   Is it possible that when you
23  entered into that front door, that you see there
24  in Monk-1, that you would have found a hallway

Page 118

1  leading up to the second floor apartment?
2      A.   Yes.
3      Q.   Is that what you believed when you
4  entered that front door?
5      A.   That's correct.
6          MR. ZURBRIGGEN:  That's all the
7      questions I have, unless Keith has any
8      follow-up questions.
9          MR. WEST:  I guess I do.
10              - - -
11          EXAMINATION
12              - - -
13  BY MR. WEST:
14      Q.   Is that the standard, as you
15  understand it, of reconnaissance that the
16  Philadelphia Police Department would follow as of
17  June 2021, that you could breach a door if it was
18  possible that the door led somewhere you were
19  allowed to go?
20          MR. ZURBRIGGEN:  Object to form.
21      Lieutenant, you can answer.
22          THE WITNESS:  I'm sorry.  Can you
23      repeat that question again, please?
24  BY MR. WEST:

Page 119

1      Q.   Right.  Based on your understanding
2  of what sort of reconnaissance was required prior
3  to executing a warrant, was it your understanding
4  that you were allowed to breach the front door
5  just based on the possibility that that door might
6  possibly lead to somewhere where you were legally
7  allowed to be?
8          MR. ZURBRIGGEN:  Object to form.
9      Lieutenant, you can answer.
10          THE WITNESS:  That's correct.
11  BY MR. WEST:
12      Q.   And there was no higher standard
13  required, to your knowledge, than mere
14  possibility, correct?
15          MR. ZURBRIGGEN:  Object to form.
16      Lieutenant, you can answer.
17          THE WITNESS:  Departmentally a
18      higher standard established?
19  BY MR. WEST:
20      Q.   Sure.  Was there any higher
21  requirement implemented by the Philadelphia Police
22  Department, to your knowledge, for breaching
23  someone's front door, other than mere possibility
24  that that door might lead to a residence where you

Page 120

1  were legally allowed to be?
2          MR. ZURBRIGGEN:  Object to form
3      Lieutenant, you can answer, if you can.
4          THE WITNESS:  Not that I am aware
5      of.
6          MR. WEST:  Okay.  Thank you, sir.
7          MR. ZURBRIGGEN:  No follow-ups.
8      Lieutenant, thank you very much for your
9      time.
10          VIDEOGRAPHER:  I am stopping our
11      recording at 12:38 p.m.
12              - - -
13          (Whereupon, the deposition
14      concluded at 12:38 p.m.)
15              - - -
16
17
18
19
20
21
22
23
24

30 (Pages 117 to 120)

Electronically signed by Dawn Burr (101-019-021-7097)

Page 121

1
2        CERTIFICATION
3
4            I, DAWN M. BURR, hereby certify
5    that the foregoing is a true and correct
6    transcript transcribed from the stenographic notes
7    taken by me on Friday, May 19, 2023.
8
9
10
11        DAWN M. BURR
12        Shorthand Reporter
13
14            (This certification does not apply
15    to any reproduction of this transcript, unless
16    under the direct supervision of the certifying
17    reporter.)
18
19
20
21
22
23
24

f2c9ef0a-fa93-4b60-8a54-1abff48e0487

**A**

**A-S-P** 106:13,14
**a.m** 1:18 4:23
  64:11 82:4
**ability** 6:24 7:6
  66:2 81:5,16
**able** 7:17 59:3
  76:18 110:5,11
**absolutely** 61:12
**access** 32:23
  33:8,20
**accommodating**
  8:5,13
**acknowledge**
  30:6
**act** 99:8
**action** 13:2 16:4
  48:8
**actions** 66:15
**actively** 105:15
**actual** 47:12
**ADAM** 2:8
**adam.zurbrig...**
  2:11
**added** 84:11
**address** 4:20
  15:20 28:19
  91:15
**admit** 43:23
**advised** 7:4
**ago** 29:21
**agree** 62:24
  63:13,17
**ahead** 69:2
**al** 1:7 4:16 5:2
**allow** 38:6 41:12
  44:1,5 84:4
  86:15 87:12
  88:18 89:2,7
  89:11 90:22
  113:16
**allowed** 18:24
  19:12 20:10,23
  21:5 22:6,22
  23:18 25:8
  30:13 33:22
  41:16 44:13
  69:10,23 70:18
  73:8 74:11

118:19 119:4,7
  120:1
**allowing** 83:10
**Alvarado** 1:4
  4:15 5:1,6,20
  9:19 41:5 88:9
  110:15,19,22
  111:19
**Alvarado's**
  17:11 22:5
  25:6,13,23
  29:13 30:14,24
  32:7 33:9,21
  34:6 37:3
  38:12,21 47:2
  53:17 59:23
  78:10 79:16,22
  85:18 102:10
  103:7 105:20
  106:9,17
  107:13 108:14
**American** 1:15
  2:3
**amount** 54:13
  88:9 112:14
**angle** 64:22
**animal** 110:12
**announce** 37:6,8
  37:10,23 38:4
  42:24 43:2
  46:3,16 78:13
  78:23 79:7
  83:16,18 86:6
  86:15 87:4
  90:4
**announcing**
  90:6 112:15
**answer** 7:10 8:9
  12:9 13:4,20
  14:9,19 16:7
  19:3,15 20:14
  21:2,8 22:9
  23:1,4,12,22
  25:1,19 26:6
  26:22 27:6,13
  27:21 28:17
  30:1,16 31:4
  31:22 32:11,21
  33:3,12 34:2

34:11,18 35:6
  35:16,23 36:7
  36:11,18 37:17
  38:2,18 39:9
  39:20 40:4,11
  40:17 41:9,18
  41:20 42:7,14
  42:22 43:11,18
  44:3,16,23
  45:8,20 46:9
  46:21 47:5,20
  48:4,13 49:4
  49:15 50:4,11
  50:20 51:3,10
  51:20 52:18
  53:6,13 54:2
  54:16 55:5,16
  55:20 56:1,10
  56:13,20 57:5
  57:14,20 58:8
  58:23 59:14,15
  60:1,7,19 61:3
  62:3,10,19
  63:4,12,16
  65:4,19 66:6
  67:4,13 68:14
  68:23 69:13
  70:1,7 71:11
  73:10,18 74:2
  74:23 75:7,17
  77:3,14 78:1
  78:15,20 79:1
  79:10,19 80:9
  80:15,22 81:9
  81:20 82:2
  83:4,23 84:7
  84:21 85:8,22
  86:8,22 87:6
  87:15,21 88:12
  88:22 89:5,15
  90:2,14 91:2,7
  91:14,22 92:6
  92:14,22 93:12
  94:1,8,15,24
  95:8,17 96:2
  96:12,19 97:2
  97:9,14 98:7
  98:16,20 99:12
  99:19 100:3,9

101:19 102:12
  103:24 104:8
  105:13 106:21
  107:6,11 108:9
  108:18 110:9
  110:24 111:16
  112:6,18 113:9
  113:20 114:20
  118:21 119:9
  119:16 120:3
**answering** 72:23
**anticipate** 101:8
  101:16
**anticipating**
  103:3
**anticipation**
  12:14,19 103:3
  103:9 105:21
  107:4,15
**anybody** 82:24
**anyone's** 74:19
**anyway** 13:11
**apartment**
  10:11 19:1,13
  19:19,24 20:6
  20:11,18,20,23
  21:6,12,15
  22:2,5,7,14,19
  22:20,21,22
  23:14,15,15,17
  23:17,19 24:2
  24:8,10,21,22
  24:23 25:7,9
  25:15,24 26:2
  26:12 27:11
  28:3,20 29:13
  30:21 31:2,12
  31:20 32:19
  33:9,10,21,22
  33:23 34:6,8
  35:3,9,10,21
  36:6,9 38:12
  38:22 49:13,17
  49:23 50:2,9
  51:1,17,18
  53:18,24 55:3
  56:7 58:1,13
  58:15 59:23
  63:1 74:10,10

74:16,19 75:5
  75:10,11,21
  78:10,18 86:1
  88:2 91:20
  92:12,20 93:3
  93:10,23 94:13
  95:10,19,20
  96:24 98:10
  106:18 111:5,7
  111:21 112:24
  113:2 117:1,5
  117:11,12
  118:1
**apartments** 53:4
  94:5 98:11
**apologize** 103:4
**applicable** 22:21
**apply** 121:14
**approach** 10:24
  36:22
**approaching**
  11:10
**appropriate**
  43:21
**approximately**
  1:18 46:4
  66:13
**approximation**
  6:8 7:19,22
**approximations**
  7:20
**AR15** 115:22
**Arch** 2:9
**architecture**
  67:18 68:16
**area** 10:7 18:11
  18:12 31:9
  72:1 84:19
  104:18 109:10
**arrest** 11:23
  18:20 77:7,11
  77:16
**arrived** 17:15
**ascertain** 59:11
  59:22 93:9
**asked** 8:10 55:21
  56:21 75:8
  77:4 78:21
  98:17 107:12

**asking** 19:10
  23:5 24:4,6
  73:14
**ASP** 106:15,18
  107:3,8,15
**assistant** 12:11
  16:23
**Assorted** 3:9
**assume** 31:19
**assumed** 94:11
  94:17
**assuming** 33:19
**assumption**
  16:19
**attack** 97:23
  98:4 102:8
  109:23
**attacked** 109:1,2
  109:19
**attacking**
  105:16 109:5
**attempting**
  18:17,23 20:5
**attention** 116:16
**attest** 102:14
**attorney** 6:1 7:3
  8:20
**attorneys** 5:19
**audio** 4:13
**Avenue** 10:11
  60:12
**awakening**
  84:11
**aware** 37:5 38:5
  52:14 53:1,7
  53:16 54:24
  60:24 92:16,18
  95:12 103:12
  120:4
**awareness**
  113:11

─────── **B** ───────

**B** 101:3
**B1** 101:7
**back** 9:8 10:6
  15:13 20:15
  71:14,17 112:1
  116:16

**background**
  6:19
**barking** 18:5
  43:3 84:9,10
  84:14 85:4,9
  85:11,12,20
  86:4,10,17
  87:4,11 88:5,6
  88:8,14,19
  89:9,12,18
  90:5 95:2
  112:13 113:5
**based** 7:5 11:15
  20:10 23:19
  37:20 58:16
  59:6 63:20,23
  65:10 69:4,6
  69:17 97:11
  108:1,6,21
  119:1,5
**basis** 40:14 70:4
**Bates** 100:24
  102:1
**baton** 106:13,18
  107:3,15
**beginning** 1:17
**behalf** 5:5 11:22
  18:21
**belief** 19:23
**believe** 7:16
  16:13 17:1
  18:11 20:22
  23:16 27:9
  29:21 31:11
  33:7 35:2,13
  35:20 36:8
  40:15 57:23
  60:10 62:1
  64:6 65:1 92:2
  109:3,7 116:17
  116:23 117:14
**believed** 118:3
  ■ 11:23
**best** 7:6
**beyond** 76:17
**bit** 114:7
**body** 13:9,10,16
  14:13,17,24
**bottom** 10:14

**bounds** 20:19
**breach** 10:22
  17:19 24:1
  40:23 47:11
  65:22 69:11,23
  70:19 71:5,22
  73:8,16 75:11
  79:15 81:5,6
  85:18 88:1,7
  112:24 114:6
  115:3 118:17
  119:4
**breached** 17:22
  19:6 21:11,22
  22:11 26:11
  27:1,4,10
  30:14,24 31:1
  31:7,8 32:6
  34:20 35:7,12
  37:3 39:3 41:6
  41:15 63:8
  70:9 81:14
  82:8 83:8
  84:15 90:12
  94:22 95:5,13
  97:6 99:1
  110:3 113:6,6
**breacher** 10:20
  11:6
**breachers** 10:21
**breaching** 17:18
  38:22,23 45:16
  46:5,18 53:17
  59:22 78:11
  82:22 83:9
  100:7 102:19
  103:1,7 105:19
  106:19 107:3
  107:13 108:13
  113:17 115:6
  119:22
**break** 8:2
**breaking** 25:16
  26:3 39:17
  40:1 90:24
**brief** 17:21
  40:22 47:11
  115:17
**bring** 9:14

**Broad** 1:16 2:4
  4:20
**broke** 98:2
**building** 1:16
  2:3,9 15:14
  58:15 74:11,12
  75:11 98:11
**buildings** 67:11
**Burr** 1:18 5:7
  121:4,11

─────── **C** ───────

**C** 2:1
**cage** 110:16
**call** 52:6 76:18
  105:17
**cam** 14:24
**cams** 13:9,10,16
  14:13,17
**caption** 4:24
**caravan** 11:10
**carefully** 61:21
**case** 5:1 11:14
  11:15 15:15
  16:4 25:2 82:7
  86:18 105:19
**Center** 1:15 2:2
  4:19
**certainly** 107:2
  114:13
**certainty** 16:18
  16:20
**certification** 4:4
  121:2,14
**certify** 121:4
**certifying**
  121:16
**chance** 5:24
  64:18 102:18
**change** 30:11
**changed** 28:7
**charge** 48:11
  49:6
**check** 52:19
**checked** 52:15
**choice** 82:11
  104:21 105:8
**choose** 81:5,17
  81:23 104:23

  105:11
**chose** 81:24
**circumstance**
  45:6 87:8
**circumstances**
  44:18,21 45:18
  46:7,19 80:7
  89:3 105:15
  108:23
**city** 1:7 2:7 4:15
  5:1,24 67:23
  76:22
**classify** 96:3
**clear** 7:6 18:9
  61:12 72:22
  88:4 95:23
**cleared** 111:6
**clearly** 53:3
**CO2** 107:22,23
  108:2
**coffee** 8:3
**collectively**
  12:18
**combine** 90:18
**combined** 85:23
**come** 10:5 12:6
  41:13
**coming** 14:1,6
  88:15 89:19
  99:24 114:14
**command** 93:15
**common** 1:1
  74:6
**communicated**
  71:3
**completely**
  18:12
**complied** 79:6
**complies** 29:18
**computer** 16:12
**concerned** 82:23
  83:9
**concluded**
  120:14
**conducted** 28:5
**confer** 5:24
  58:24 59:2
**consider** 93:1
**considered**

53:23 55:2
56:6,15 57:24
95:4
**consistent** 42:10
42:19,23 55:13
55:17,21 56:8
58:3,5 78:12
**contact** 59:3
**containment**
10:21,22 17:16
55:9
**contaminates**
104:17,18,19
**context** 11:3
106:14
**continued** 18:9
**control** 80:12,13
80:19,23
**copy** 12:12 15:9
15:9
**corner** 10:14
**correct** 6:16
10:12 11:11
12:16 13:17,24
15:11,16,23
25:9,10,17
26:4 27:4
29:10,15,19,20
29:23 30:7
32:9 37:15
38:10,19 41:18
42:5 43:16
44:1 48:8,11
49:23 52:7,16
53:11,14 59:18
62:14 64:3
67:2,5,7,16,16
67:19,20 68:1
68:10,11,12
71:9 76:8,12
76:20 77:8
78:7,8 80:7,10
80:13,20 81:7
81:14,18 83:2
83:12 84:16
89:24 91:12,19
91:20 92:4,12
95:15,24 98:5
99:3,10,17

100:1 103:16
103:18,22
105:2,22,23
106:24 107:4
107:17 109:10
109:13 112:12
113:7 114:18
115:6,9 116:9
116:20 118:5
119:10,14
121:5
**correctly** 9:22
**counsel** 2:5,10
4:3 5:23
**COUNTY** 1:2
**couple** 6:20
**court** 1:1,19,22
61:10 71:17
**cover** 55:10
**cross** 22:19,22
23:16,18
**cul-de-sac** 53:21
55:1 112:4

**D**

**D** 3:1
**dangerous**
116:13
**date** 1:17 4:22
64:9 115:20
**Dawn** 1:18 5:7
121:4,11
**day** 81:4,17
110:22
**deal** 77:22 114:5
114:16 115:5
**dealing** 58:9
106:2 107:16
**dealt** 110:6
**death** 110:7
**decision** 100:7
**decisionmaking**
86:5
**defend** 99:9,24
110:22
**Defendant** 101:1
**defendants** 1:8
2:10 100:24
**defensively** 95:6

97:7
**delineation**
28:21
**Demetrius** 1:14
3:3 5:4,10
**department** 2:8
6:15 13:15
14:12,23 20:7
20:9 37:15,22
38:14 39:15
42:12 43:6
44:12 45:3,13
46:1,15 47:17
47:24 48:19
54:12 55:14,23
56:10 57:2,9
58:19 60:15,23
63:22 66:24
69:5,18 71:2
73:3 76:11
77:20 86:14
87:2,18 101:11
108:23 114:15
115:1 118:16
119:22
**Departmentally**
119:17
**depending** 80:2
95:9,18
**depends** 87:7
89:17 105:14
**deploy** 11:16
**deposed** 5:3
82:7
**deposition** 1:14
4:14,23 5:4,7
6:2,4 8:18
12:15,20,23
64:7 120:13
**depositions** 6:8
**describe** 115:18
**described** 32:18
65:16
**DESCRIPTION**
3:8
**designated**
66:24
**designates** 10:24
**detective** 59:11

59:21
**detectives** 59:1
**determination**
76:3
**determine** 51:22
58:20 67:1,9
**determined** 60:9
**device** 11:17
**DIAMOND**
1:22
**DiBona** 2:15
4:18
**different** 64:22
67:10 75:14,19
94:5
**difficulties** 36:22
**direct** 116:15
121:16
**Directive** 3:13
**discharge** 18:7
**discharged** 18:8
**discovery**
100:24
**discussed** 61:8
**division** 26:13
**document** 9:5
9:21 10:1,10
15:5 18:20
29:7 61:11
100:22,23
101:5 102:1
**documents** 3:9
8:21 12:17,19
17:2
**dog** 3:13 18:5,7
101:8,16
102:18 103:10
104:5,12,16,22
104:22,23
105:9,10,15,22
106:2 107:4,16
108:7,16,24
109:5,9,10,19
110:2,5,12,16
112:13 114:4,5
114:17,17
115:4,5
**dog's** 110:7
**dogs** 18:5 43:2

77:22 84:8,10
84:14 85:4,9
85:11,12,20
86:4,10,17
87:4,11 88:5,6
88:8,13,19
89:9,12,17
90:4 94:21
95:1,5,14,21
97:6,12,15,19
98:4,12,13
99:2,8,8,16,23
113:5,18
**doing** 16:12
36:15 45:14
49:10 67:24
**door** 10:22
17:17,20,22
19:6 21:11,23
21:24 22:5,11
22:15,16 24:1
25:14,14,17
26:1,1,3,11,14
26:16 30:13,14
31:1,7,8 32:7
32:15 34:20
35:4,8,12,13
37:3,11,12
38:6,8,14,22
39:2,18 40:1
40:21,23 41:1
41:6,12,16,18
41:22,24 42:4
43:9 45:16
46:18 47:3,7,9
47:12 50:18,24
53:17 55:2
56:6,17 58:1
58:21 59:6,11
59:22 62:1,6,8
62:14 63:1,7
63:14 65:1,15
65:22 66:4
68:5 69:7,8,11
69:20,21,23
70:8,19 71:5,6
71:21,23 73:4
73:6,8,14,16
74:6,19,24

75:12,13 78:10
78:18,18 79:16
79:22,22,23,24
80:4 81:6,6,14
82:8,16,16,18
82:23,24 83:1
83:8,9,11 84:2
84:5,9,15,24
85:3,5,11,14
85:18 86:1
87:13,23,24
88:10 89:23
90:11,24 92:4
92:10 93:2
94:11,19 95:13
98:2,5,9,12,24
99:3,24 100:7
100:13 103:8
105:20 106:19
107:3,14
108:14 110:3
112:3,23 113:2
116:18,20,23
116:24 117:16
117:17,23
118:4,17,18
119:4,5,23,24
**doors** 32:3 35:9
54:13 57:11,11
63:10 75:4
80:2 86:1 88:2
94:18,18
100:12
**duly** 5:11

———————
E
———————
**E** 2:1,1 3:1
**E-mail** 2:6,11
**earlier** 109:4,8
117:15
**effect** 100:6
**effort** 93:8 95:14
**efforts** 58:20
**either** 62:21
72:23 99:23
106:8,16
112:23
**else's** 20:11
22:20 24:10

69:10,22 73:7
74:21 92:11
**employed** 4:18
**encounter** 3:13
28:12 68:6,9
77:23 105:21
115:5
**encountered**
34:23 68:18
108:15
**encountering**
103:10 107:4
**enforce** 18:23
47:17
**enforcement**
13:2 16:4
36:16 45:15
48:8 66:15
76:20 77:7
**enforcing** 19:12
29:12 46:2
48:1 77:11
**enter** 19:18 20:5
22:19 24:9
30:19 32:17
34:8 68:4
74:11 80:1
82:17 91:19
96:23
**entered** 17:11,21
17:22 18:2,16
29:13 34:5
54:14 109:8
117:23 118:4
**entering** 25:6,23
31:8 35:3
38:12,15 44:14
67:1 85:5
102:10 106:9
106:17 112:16
114:8
**entire** 110:22
**entrance** 18:14
19:24 20:3,17
21:10,12,14
30:21 53:21,23
54:4,6,20,24
55:8 56:18
58:1,12 59:7

60:11 65:21
70:9,20 71:24
73:20 75:1
111:20 116:24
117:4,8,10
**entrances** 58:16
**entry** 10:20,20
10:23 11:7
17:17 107:14
116:4
**equipped** 116:5
**Especially** 91:4
**ESQUIRE** 2:3,8
**established**
119:18
**estimate** 6:7
7:18,21
**estimates** 7:20
**et** 1:7 4:16 5:2
**exactly** 105:1
**Examination**
3:4,5 5:14
115:13 118:11
**examined** 5:11
**example** 13:8
52:6 114:4
**exception** 87:3
**exclusively**
117:5
**execute** 18:17
**executed** 17:18
**executing** 11:21
23:13 72:2
93:9 116:8
119:3
**execution** 12:5
81:11 82:15
**Exhibit** 9:1 29:2
61:16 64:14
100:17
**EXHIBITS** 3:8
**exigent** 44:17,20
45:6,17 46:6
46:19 80:7
**existed** 58:2
**existence** 53:16
54:24
**exists** 50:14,16
50:17

**exit** 54:5 55:9
59:6
**exited** 54:14
**expect** 97:12
**expecting** 35:8
**experience**
36:19 42:16
89:20 97:18
**explain** 11:3
**explanation**
46:24
**extended** 40:24
47:12
**exterior** 21:13
21:23 22:11,15
26:10 34:20
35:8 40:20,23
41:22 47:7
63:7 65:12
79:23 82:16
84:2 85:24
87:23,24 94:19
98:12 100:13
**extinguisher**
11:15 107:22
107:23 108:2,6
**extra** 103:5

———————
F
———————
**fact** 34:12,14
36:5 53:1
65:10 85:24
90:19 96:16
**factors** 113:5
**failing** 101:7,16
**fair** 109:15
**familiar** 6:17
**far** 28:15 64:8
67:18 114:1
**feel** 6:1 77:1
**Felishatay** 1:4
5:6
**figure** 39:16
40:8 50:8,18
50:23 51:6,15
52:1 74:20
75:12 93:22
94:5
**figuring** 49:13

50:17 66:21
**filing** 4:4
**fine** 7:11
**finished** 33:3
68:24
**fire** 11:15,16
107:22,23
108:1,6
**firearm** 115:21
**firearms** 115:19
**fires** 108:11
**first** 6:20 9:13
9:21 17:24
18:24 19:6,13
19:18 20:17,23
21:6,15 22:23
26:13 32:1,8
33:9,21,23
34:8 41:15,17
41:23 49:13,16
50:2,9 51:17
56:14 62:20
63:1,14 64:1
65:16 90:11
93:3,10,23
94:12 96:24
98:9,13 101:3
101:4 111:7
117:5,10
**five** 6:10,11
**flash** 11:16
**floor** 1:16 2:4
4:21 10:11
17:24 18:13,14
18:24 19:5,7
19:13,19,23
20:1,3,17,24
21:6,12,14,15
21:24 22:6
25:9,15 26:2
26:13,13 27:10
27:15,19 28:3
28:20 29:17,19
30:7,17,20
31:1,12,19
32:1,8,19,23
33:8,9,20,21
33:23 34:8
35:3,21 36:9

41:12,16,17,23
49:13,17,22
50:2,9,24
51:17,17 62:1
62:7,14,17,21
63:1,14 64:1
65:2,16,17,21
66:3 82:18
93:3,10,23
94:12 96:24
98:9,13,14
111:7,8,21
117:1,5,11,11
118:1
**focus** 88:5
**follow** 43:24
47:1 114:2
118:16
**follow-up** 118:8
**follow-ups** 120:7
**followed** 44:4
**follows** 5:12
**footage** 90:9
**foregoing** 121:5
**form** 4:6,11 12:8
13:3,19 16:6
19:2,14 20:13
21:1,7 22:8,24
23:21 24:13
25:11,18 26:5
26:21 27:5,12
27:20 28:16
29:24 30:9,15
31:3,15,21
32:10,20 33:11
34:1,10 35:15
35:22 36:10,17
37:16 38:1,17
39:8,19 40:16
41:8,19 42:6
42:21 43:10,17
44:2,15 45:19
46:8,20 47:19
48:12 49:3,14
50:3,10,19
52:17 53:5
54:1,15 55:4
55:15 56:12
57:13 58:7,22

59:13,24 60:6
60:18 62:2,9
62:15,18 63:3
63:15 64:2
65:3,18 66:5
67:3,12 69:12
69:24 72:9
73:9,17 74:1
74:13,22 75:16
77:13,24 78:14
78:24 79:9,18
80:8,14,21
81:8,19 83:3
83:13,22 84:20
85:7,21 86:7
86:21 88:11,21
90:1,13 91:1,6
91:13,21 92:5
92:13,21 94:23
95:7,16 96:1,8
96:11,18 97:1
97:8,13,22
98:6 99:5,11
99:18 100:2
101:12,18
102:11,21
103:11,17,23
104:7,13 105:3
105:12 106:4
106:10,20
107:19 108:8
108:17 109:11
110:8,23
111:10,15
112:5,17 113:8
113:19 114:9
114:19 115:7
117:18 118:20
119:8,15 120:2
**formalities** 5:22
**formulate**
114:16
**forward** 18:9
**found** 117:24
**four** 101:24
111:11,12
**frequent** 101:8
101:21
**Friday** 121:7

**front** 9:9 10:20
10:22,23 11:7
25:14 28:22
30:14,19 31:1
32:7,14 37:3
39:2 42:4 43:9
46:18 47:2
54:19,21 57:11
58:11 59:7,8
60:10,11 69:20
69:21 71:5
73:4,6,14
74:18,24 75:12
75:13 79:16
85:3,18 90:24
116:18,20,23
116:24 117:16
117:16,23
118:4 119:4,23
**full** 67:23 83:20
**furnished** 14:13
**further** 115:10

──────────
**G**
**gauge** 39:24
**GD** 4:16 5:2
**general** 36:24
**generally** 17:13
77:11 87:8
89:17,18 114:1
**give** 7:4,17
37:11 38:15
40:22,24 43:6
47:10,11 66:2
84:18 113:1
**given** 9:5 14:10
104:21
**gives** 24:9
**giving** 7:21 42:3
82:24 104:22
114:15
**Glock** 115:24
**go** 6:18 9:12
10:4 12:2
20:10,18 24:23
25:8 30:19
33:23 42:15
51:7,16 57:11
69:2 101:24

110:11 113:1
118:19
**going** 8:19 22:20
41:2 50:17
60:8 61:9
72:17 75:21
78:16 82:12
91:15 92:19
95:10,19 104:4
107:8
**gonna** 6:18 7:7
8:13 14:7
61:20 68:5,8
72:24 81:6
82:18 89:23
94:17 100:12
101:2 102:23
107:8 114:5
**good** 5:17 113:1
**Google** 15:21,22
61:7 64:9
**gotta** 82:13
**grab** 8:2
**group** 106:7
**guess** 7:7 8:17
39:4,6 111:19
118:9
**guessing** 39:7
**guidance** 43:7

──────────
**H**
**Halligan** 11:14
**hallway** 117:17
117:24
**Hamoy** 18:3
**hand** 7:15 107:9
**handed** 100:22
**handful** 6:10
**handgun** 115:24
**handle** 76:18
**hands** 107:8
116:2
**happen** 14:7
58:18
**happened** 15:8
24:5 111:14
**happening**
111:23
**happens** 10:8

**head** 105:10
**hear** 17:20 18:7
40:22 47:9
84:1,5 85:12
86:9,10,17
88:19 89:9,12
89:22 90:20
110:14 112:24
113:12,17
114:3,17 115:3
**heard** 84:14
85:20 87:4
88:6 95:1
112:13
**hearing** 85:11
88:14 113:4
**held** 116:1,2
**help** 9:17 67:9
**hey** 94:4
**higher** 119:12
119:18,20
**highlight** 29:16
**highlighted**
49:22
**home** 17:11 67:2
97:19,24 100:1
102:10
**homicide** 11:22
11:22 18:21
116:9
**hospital** 10:8
**house** 22:16
26:14 34:22
91:5,9,12
**humans** 86:10
88:15 113:13
**hundreds** 66:18
66:20 68:19

──────────
**I**
**idea** 57:18,21
58:6 66:16
67:24
**identification**
9:2 29:3 61:17
64:15 100:18
**identified** 22:14
62:21
**identify** 9:13

10:1 29:6
36:20
**ignore** 46:3
**illegally** 34:9
96:10,17,21
**illness** 6:23
**immediate** 90:3
**immediately**
89:23
**impair** 6:24
**implemented**
119:21
**implementing**
46:2
**imply** 50:1
**incident** 9:18
17:8,9,14 28:7
28:11 76:19
77:6 90:9
**include** 106:2
**included** 32:2
**includes** 10:6
**incorrect** 68:3
83:14 112:19
**indicate** 117:9
**indicated** 18:14
19:23
**indicates** 111:18
117:4
**indicating** 55:7
56:17 58:12
71:24 85:13
**indication** 52:22
84:19
**individual** 80:4
82:18 88:1
113:2
**individuals** 10:4
77:17
**infer** 67:7
109:15
**influence** 6:22
**information**
54:7
**informed** 53:11
86:19
**injured** 10:9
**inside** 43:3
47:10 85:12

94:22 95:6
97:6 113:12,18
114:4 115:4
**instruction** 8:8
**intel** 55:7 56:16
58:12 59:2
71:23
**intelligent** 7:18
**intended** 7:24
**intentionally**
41:4
**interpreting**
15:11
**interrupt** 69:1
**introduced** 5:18
**Introduction**
101:3
**intruder** 95:24
96:4
**intruders** 95:14
97:7
**intruding** 96:6
96:16,21 99:16
**invading** 97:24
**involve** 45:17
46:6
**involved** 9:18
**involves** 76:19
77:6
**issue** 57:3 95:21
110:5

J

**Jersey** 1:23
**job** 15:8 16:24
28:11 36:16
42:16 48:15
49:2,7,7 53:3
**jobs** 13:17 55:18
**judgment**
105:17
**June** 1:5 17:8,9
40:8 46:14
69:7,19 71:3
73:4 77:10,19
118:17

K

**keep** 78:16
**Keith** 2:3 5:19

118:7
**keith@victim...**
2:6
**kind** 48:17 67:8
67:19
**kitchen** 18:11,12
109:10
**knew** 25:24 26:4
32:7 34:6,7
38:11 41:16
42:3,5 92:9
94:21 97:5
98:3 99:1,7,15
99:22 102:17
110:1
**knock** 17:18,20
17:21 37:6,8
37:10,11,23
38:4,14,21
39:2,17 40:20
40:22,24 42:24
43:2 45:14,16
46:2,16 47:11
47:12 78:13,23
79:6 83:15,17
84:2,11 86:6
86:14,15 87:3
90:4,20 112:22
113:1
**knocked** 78:10
84:9
**knocking** 40:1
41:11,21 43:8
46:5,17 47:8
90:6 112:15
**know** 7:10,12,13
7:16,16,19,20
8:5,13 11:18
13:1 14:16
15:24 16:10,18
16:20,21 24:2
27:15 28:9
31:13 33:16,18
34:23 35:24
36:6 52:12
59:16 63:24
65:20 68:5,8
69:8,21 70:13
70:17 71:8

73:5,15 91:4,8
92:3 101:20
109:18 111:6
117:15
**knowing** 19:22
32:22 78:17
79:21 98:8
102:6
**knowingly** 32:17
34:8
**knowledge** 7:5
7:17 47:23
57:8 59:18,19
60:2 77:19
78:6 93:16,17
93:19 101:15
103:22 106:24
119:13,22
**known** 37:5
53:20 58:2

L

**L-O-M** 10:18
**L-O-M-R-B-F...**
10:15
**Lane** 1:23
**law** 1:15 2:2,7
4:19 24:6
25:16 26:3
**lawfully** 67:2
**lawsuit** 5:21
**layout** 36:23
52:22
**lead** 11:5 18:3
22:5 55:3 56:7
62:14 93:2
94:12 119:6,24
**leading** 20:1
41:1 47:13
75:4 79:24
82:16 98:9
118:1
**leads** 11:6 24:22
50:18,24 58:21
74:20 85:14
**led** 21:24 25:14
26:1 53:24
59:11,22 60:10
62:1 65:1 69:8

69:21 70:17
71:6 73:6
75:13 116:23
118:18
■ 11:23
**legal** 20:19 24:9
**legally** 18:24
19:12 20:19,23
21:5 22:6
23:18 24:8
25:7 30:13
33:22 74:11
119:6 120:1
**length** 86:5
**lessen** 87:11
88:8
**let's** 12:2 28:24
100:15
**Lieutenant** 5:17
21:2,8,21 22:9
23:1,7,22 25:1
25:19 26:6,22
27:6,13,21
28:17 30:16
31:4,22 32:11
32:21 33:2,12
34:2,11,17
35:6,16,23
36:11,18 37:17
38:2,18 39:9
39:20 40:4,11
40:17 41:9,20
42:7,14,22
43:11,18 44:3
44:16,23 45:8
45:20 46:9,21
47:5,20 48:4
48:10,13,18
49:4,15 50:4
50:11,20 51:3
51:10,20 52:9
52:18 53:6,13
54:2,16 55:5
55:16 56:1,13
57:5,14,20
58:8,23 59:14
60:1,7,19 61:3
62:3,10,19
63:4,16,23

65:4,9,19 66:6
67:4,13 69:13
70:1,7,15
71:11 72:10,14
73:10,18 74:2
74:14,23 75:17
77:14 78:1,15
79:1,10,19
80:9,15,22
81:9,20 82:2
83:4,23 84:7
84:21 85:8,22
86:8,22 87:6
87:15,21 88:12
88:22 89:5,15
90:2,14 91:2,7
91:14,22 92:6
92:14,22 93:12
94:1,8,15,24
95:8,17 96:2
96:12,19 97:2
97:9,14 98:7
98:19 99:12,19
100:3,9 101:19
102:12 103:24
104:8,14 105:4
105:13 106:21
107:6 108:9,18
109:12 110:9
110:24 111:16
112:6,18 113:9
113:20 114:20
115:8,16,18
116:7,15
118:21 119:9
119:16 120:3,8
**likelihood** 98:3
110:2 115:5
**Likewise** 8:8
**line** 10:18,19
**listed** 107:21
**little** 79:7 114:7
**lived** 93:10
**lives** 73:15
**living** 18:12
**located** 53:21
54:24 63:14
65:16 93:23
94:6 112:4

**location** 10:10
17:16 28:2
**long** 15:2 39:1
111:9
**longer** 86:18
**look** 10:4 28:1
36:23 61:6,21
61:23 62:6,7
116:19
**looking** 9:22
18:13
**louder** 8:12

_____

**M**

**M** 1:18 121:4,11
**machine** 15:10
**mailbox** 60:16
**mailboxes** 54:19
58:11 59:7
60:9 61:1
62:22 65:11
**main** 17:20
41:22
**making** 72:22
**manager** 52:7
59:3
**Mantua** 1:23
**Maps** 15:22 64:9
**march** 10:18,19
**mark** 8:22 28:24
61:10 64:12
100:15
**marked** 9:2,6
12:18 29:3
61:17 64:15
100:18,22
116:16
**markings**
116:19,22
**matter** 4:15
**mean** 4:10 10:17
34:14 69:1
72:5,8,12
113:24 114:1
**meaning** 49:19
74:4 76:6
80:24
**means** 30:18
**measures** 110:4

**medication** 6:23
**Mellody** 48:15
49:1 51:15
52:12
**member** 6:14
14:22 15:2
20:7 44:9
54:10 59:20
63:21 69:19
71:4 114:2
**members** 17:10
77:22 102:9
107:23 115:19
116:4
**memory** 9:15
**mere** 119:13,23
**mind** 21:14 22:1
40:19 54:19
82:12,15
100:11,14
**minds** 54:4
**minute** 89:19
**minutes** 111:11
111:12
**mission** 11:19
16:14
**mistake** 101:9
101:17,21
**modify** 68:17
**moment** 29:21
**Monday** 64:11
**Monk** 1:14 3:3
5:4,10,17
**Monk-1** 3:9 8:23
9:1,6 12:18
116:17 117:24
**Monk-1A** 3:10
61:11,16
**Monk-2** 3:11
28:24 29:2
**Monk-3** 3:12
64:12,14
**Monk-4** 3:13
100:15,17,23
**morning** 5:17
**multi** 23:14
40:19 47:7,17
48:2 63:6
67:10,23 73:12

73:12,19 74:3
75:2 87:23
100:11 112:21
**multiple** 74:4
75:4 80:2

_____

**N**

**N** 2:1 3:1
**name** 4:17
**natural** 99:23
**naturally** 99:9
110:2
**nature** 88:16
**necessarily**
85:10
**necessary** 51:16
**need** 7:12 8:3,11
8:11 25:3 45:4
114:4
**needed** 11:13
**neighborhood**
36:24
**neither** 107:14
**never** 34:23 55:1
56:5,15 65:24
67:8 68:11
**New** 1:23
**noose** 106:2,8
**normal** 113:16
**normally** 72:21
**North** 1:15 2:3
**Notary** 1:19
**notes** 121:6
**number** 4:16 5:2
23:14,15,17,17
23:19 24:2
29:8 55:18

_____

**O**

**Object** 12:8
19:14 21:1
22:24 25:11,18
26:5,21 27:5
27:12,20 28:16
30:9,15 31:3
31:15,21 32:10
32:20 33:11
34:1,10 35:15
35:22 36:10,17
37:16 38:1,17

39:8,19 40:16
41:8,19 42:6
42:21 43:10,17
44:2,15 45:19
46:8,20 47:19
48:12 49:3,14
50:3,10,19
52:8,17 53:5
54:1,15 55:4
55:15 56:12
57:13 58:7,22
59:13,24 60:6
60:18 62:2,9
62:15,18 63:3
63:15 64:2
65:3,18 66:5
67:12 69:12,24
72:9 73:9,17
74:1,13,22
75:16 77:13,24
78:14,24 79:9
79:18 80:8,14
80:21 81:8,19
83:3,13,22
84:20 85:7,21
86:7,21 88:11
88:21 90:1,13
91:1,6,13,21
92:5,13,21
93:11 94:23
95:7,16 96:1,8
96:11,18 97:1
97:8,13,22
98:6 99:5,11
99:18 100:2
101:12,18
102:11,21
103:11,17,23
104:7,13 105:3
105:12 106:4
106:10,20
108:8,17
109:11 110:8
110:23 111:10
111:15 112:5
112:17 113:8
113:19 114:9
114:19 115:7
117:18 118:20

119:8,15 120:2
**objection** 13:3
  13:19 14:3,8
  14:18 16:6,16
  17:4 19:2
  20:13 21:7,20
  22:8 23:6,21
  24:12,18,24
  29:24 34:16
  35:5 40:3,10
  42:13 44:22
  45:7 47:4 48:3
  48:21 51:2,9
  51:19 52:3
  53:12 55:24
  56:22 57:4,19
  61:2 65:8
  66:10 67:3,21
  68:2,13 70:6
  70:14,22 71:10
  71:19 72:13
  75:23 82:1,19
  84:6 87:5,14
  87:20 89:4,14
  90:17 93:5,18
  93:24 94:7,14
  98:18 100:8
  107:5,18
  109:21
**objections** 4:5
  4:10
**Objectives**
  101:4
**objects** 102:7
**obligation** 7:4
**obviously** 31:24
  32:8
**occupant** 18:10
  37:11 38:5,15
  41:12 47:8,18
  48:2 73:12
  88:19 111:19
**occupants** 17:20
  40:21 47:10
  84:1 86:16
  90:19 104:19
  112:23 113:12
**occupied** 31:9
  34:7 35:14,18

35:20 36:8
  42:5 50:9,13
  63:6 84:19,22
**occur** 85:2
  113:15 114:3
**occurred** 17:8
**officer** 5:6 10:8
  12:9 13:4,20
  14:9,19 16:7
  18:2,3,3,8 19:3
  19:15 20:14
  30:1 105:8,16
  108:24
**officers** 13:9,16
  66:22 82:6
  101:9,22
  102:15 103:2,8
  103:21 104:18
  106:17 108:15
**official** 44:9
**okay** 7:8,13,22
  8:6,7,15 18:1
  18:16 19:9,18
  26:9,15 33:5
  36:4 42:18
  43:15 44:8
  54:23 60:14
  66:13 71:1
  74:18 77:4
  78:6 79:5,15
  97:5 101:24
  108:3,13 109:3
  109:7 120:6
**once** 17:21 19:5
  21:22 22:11
  23:2,24 26:10
  26:16 31:7
  32:3 34:19
  63:7 75:3 80:1
  82:17 87:24
  95:5,13 110:3
  111:6 112:11
**ones** 10:21
**open** 26:12,16
  26:18,19 32:4
  34:21 36:2
  37:12 38:8
  40:2 43:9
  74:18 87:13

88:10 89:23
**opened** 22:12
  25:13 26:11,20
**opening** 22:15
  26:14
**operation** 11:14
  12:10 16:22
  48:11 53:11
**operator** 4:17
**opportunity**
  83:1,11 86:16
  110:15
**order** 11:1,2,4
  17:19 33:23
  37:2 48:17
  79:15 103:15
**ordered** 85:18
  88:7
**ordinary** 102:7
**outrank** 48:18
**outside** 59:5
  112:1
**overall** 48:19
**owner** 110:11
**owners** 68:17

―――――――――

**P**

**P** 2:1,1
**p.m** 120:11,14
**PA** 1:17 2:4,10
**packet** 8:21,23
  9:8,13 15:12
  16:23
**page** 3:2,8 12:2
  12:3 15:12,13
  101:3,24
**paper** 9:23 10:6
  15:9
**Parkway** 2:9
**part** 16:14 50:7
  51:14 52:1
**partial** 7:17
**particular** 11:13
  18:6 54:18
  58:4,5 82:23
  112:20
**pass** 43:8 44:1
  44:14 45:5,16
**passed** 39:1 40:1

40:8,15 78:21
**passing** 39:17
**patrol** 76:18
**Pennsylvania**
  1:2 4:21
**people** 87:4
  89:12,18 99:16
  99:24
**pepper** 102:8,9
  102:13,15,19
  103:3,9 104:5
  104:9,22 105:1
  105:9,20
**perfectly** 7:11
**perform** 38:3
  83:17
**performed** 4:24
  83:15
**performing**
  13:17
**perimeter** 17:17
**period** 39:11
  87:11 104:17
**person** 4:24
  66:23
**person's** 27:3
  71:7
**personal** 7:5
**personally** 37:2
  66:14 93:13
  109:18
**pertain** 15:8
**pertaining** 57:10
**Philadelphia** 1:2
  1:7,17 2:4,7,10
  4:16,21 5:2
  6:14 11:22
  13:15 14:23
  17:10 20:7,9
  37:15,22 38:13
  39:15 42:11
  43:6 44:12
  45:3,13 46:1
  46:15 47:16,24
  48:19 54:11
  55:14,23 56:9
  57:2,9 58:19
  60:15,23 63:22
  66:24 69:5,18

71:2 73:3
  76:11 77:20
  86:13 87:2,18
  101:11 108:22
  114:15 115:1
  118:16 119:21
**Photo** 3:10,12
**photograph** 9:9
  15:7,13,14
  61:7,7,13,21
  61:23 64:5,6,8
  64:10,19
  116:18
**photographs**
  15:6
**phrased** 117:8
**picture** 15:17,18
  15:19,22,24
  16:3,11,13
  61:11 117:9
**piece** 9:22
**place** 9:16 12:5
  77:21 110:5
**plainly** 62:13
**plaintiff** 1:5 2:5
  5:5,20
**plan** 108:14
  114:5,16 115:4
**planning** 115:2
**play** 86:4
**PLEAS** 1:1
**please** 13:6
  25:21 29:6,16
  45:10 51:12
  55:20 56:10,20
  63:12 68:14,22
  69:15 71:13
  75:7 77:3 83:6
  98:21 114:22
  118:23
**point** 36:15 42:2
  56:9 81:13
  99:15 110:14
  111:4
**police** 6:14
  13:15 14:23
  20:7,9 37:15
  37:22 38:5,13
  39:15 42:11

43:6 44:12
45:3,13 46:1
46:15 47:16,24
48:19 54:11
55:14,23 56:10
57:2,9 58:19
60:15,23 63:22
66:24 69:5,18
71:2 73:3
76:11 77:20
86:13 87:2,18
101:11 108:22
114:15 115:1
118:16 119:21
**policies** 20:8
37:14,21 38:13
46:14 47:24
57:9 60:22
69:4,17 71:1
73:2 108:22
**policy** 47:1 58:5
77:21 78:3
87:1,17 114:14
114:24
**poorly** 117:8
**portion** 65:14
**possession** 12:7
**possibility** 53:23
55:2 56:6 84:5
92:17,19 93:2
95:4,13 99:1,8
119:5,14,23
**possible** 8:14
33:8,14,17,18
33:20 117:16
117:22 118:18
**possibly** 94:12
119:6
**potentially** 52:7
52:15
**practice** 112:12
**practices** 58:18
114:2
**premises** 38:16
41:1 46:18
47:13 80:1
82:17,17 83:12
84:23 85:10
86:17 87:13

91:17 97:16
101:8,16 110:3
**preparation**
12:23
**prepared** 6:1
105:20
**present** 1:20
**prevent** 102:7
**previously**
116:17
**primary** 115:21
115:23
**printed** 64:10
**prior** 8:19 16:3
25:6,23 36:16
38:11,22 53:2
53:11,17 59:22
82:22 83:8
93:9 102:10
103:1,7 105:19
105:24 106:8
106:18 107:3
107:13 108:13
109:10 119:2
**private** 27:3,10
66:23 69:7,10
71:5 73:5
75:11 77:23
85:5
**probably** 6:17
50:2
**procedure** 47:2
58:6 77:21
87:2,17 114:14
114:24
**procedures** 20:8
37:14,22 38:13
46:14 48:1
57:10 60:23
69:5,18 71:2
73:3 108:22
**proceed** 6:1
**proceeded** 18:6
**process** 6:18 8:1
50:8
**produced**
100:23
**Professional**
1:19

**properties** 36:21
66:1 67:24
68:18
**property** 10:4,5
10:7,23,24
11:6,10 15:19
17:23 18:2,9
18:10,11,15,17
21:23 22:13
25:4,8 26:12
26:18,19,19,24
30:19,22 32:4
32:17 34:21
36:2,21 40:20
44:14 46:5
52:7,16,20,21
52:23 53:2,22
54:18,20 56:18
58:10 59:2,4
59:12 63:2,13
65:15 66:3
68:17 70:10,18
70:21 73:21,23
74:5,6 75:2
85:13,15 88:19
94:22 95:5
96:7,17 97:6
99:9,17 102:18
102:20 103:1
104:4 106:9
109:8 112:2,16
112:16,20
113:6,17 114:6
114:18 115:3,4
115:6
**protect** 97:15,19
**Public** 1:19
**pull** 12:11
102:19 104:5
**pulled** 16:11,23
53:2 103:2,9
107:2,15
**purpose** 11:18
37:23
**pursuant** 18:22
19:11 20:8
58:18
**put** 10:6 100:21
110:4,15

**putting** 110:4

**Q**
**question** 4:6
7:11 8:9,10,15
12:1,1 13:5
19:10 23:5,8
23:24 25:20
36:7 44:10
45:10,22 51:11
55:21 56:3,10
56:21,23 63:12
68:14,23 69:14
70:13,13 71:12
71:16 72:20,21
72:23,24 73:1
75:7,9 77:4
78:21 81:3
82:20 83:5
88:24 92:17
96:14 98:16,19
98:22 102:22
103:4 107:12
112:11 116:11
117:19 118:23
**questions** 4:11
6:20 115:11,17
118:7,8
**quick** 6:18

**R**
**R** 2:1,8
**R-B-F-E-E**
10:19
**raises** 113:11
**ram** 11:14
**ran** 48:15
**ranking** 48:17
**reached** 32:3
**react** 95:6 97:6
**read** 30:7 71:14
71:17 101:2
**realize** 111:4
**rear** 10:11,20,21
11:5 18:15
25:9,15 26:2
27:11,16,19
28:3,22 29:17
29:19 30:17,18
30:20,22 31:12

31:19 32:19
33:9,20 35:3
35:21 36:9,23
49:23 50:24
53:17,21,23,24
54:4,5,21,24
55:3,9 56:6,7
57:11,24 58:1
58:13,13
111:21 112:2,3
**reason** 82:7 88:7
114:7
**reasonable** 7:18
31:18 61:24
64:24 86:16
90:16
**recall** 46:10
106:22 110:17
110:18,21
111:2,23 112:3
116:22
**recalled** 112:1
**receive** 14:14,17
57:1 68:15
86:13
**received** 37:13
37:21 39:14,23
42:11,20 43:5
43:15 45:2,12
45:24 47:15
55:14,22 56:9
58:4 60:14
63:21 66:1
67:8,17 68:12
101:10 103:21
**recognize** 64:21
**recollection** 9:18
17:9 28:18
30:3 57:16
**recon** 9:9,23
10:3 11:19
16:12 28:2,4
60:9
**reconnaissance**
16:14 17:2
36:16 48:7
49:10 50:8
51:14 52:2
58:17 66:14

93:22 118:15
119:2
**record** 5:18,23
8:19,20 14:4,9
17:5 21:21
24:19 25:1
31:16 34:17
48:22 61:13
64:5 70:23
71:20 77:2
82:20 93:6
100:21 107:19
115:19
**recording** 13:2
120:11
**recordings**
12:22
**records** 52:16,20
52:21 53:2
59:4
**Recovery** 1:15
2:2 4:19
**Redbud** 1:23
**refer** 11:12
18:19 75:19
**reference** 60:24
111:17
**referred** 72:5
76:11
**referring** 13:12
57:21 60:17
61:1,13 73:11
82:14
**refers** 11:19
49:22
**reflected** 60:16
**reform** 112:1
**refresh** 9:15,17
**regardless** 42:2
**regards** 37:14
37:21 47:2
48:1 78:3
**related** 48:8
49:1 59:12
**relating** 46:15
**relevant** 15:14
**remember** 17:14
17:15 18:6
112:8

**repeat** 21:17
45:9,21 51:11
83:5 88:23
114:21 118:23
**rephrase** 8:14
102:23 117:7
**rephrased** 8:11
**report** 12:3
111:18
**reporter** 1:19
61:10 71:17
121:12,17
**REPORTING**
1:22
**represent** 17:7
90:8
**represented**
5:23
**representing**
5:20
**reproduction**
121:15
**required** 38:14
41:5 46:4,16
51:7 74:19
75:12 76:2
78:22 86:5,18
119:2,13
**requirement**
79:2 119:21
**reserve** 4:10
**reserved** 4:6
**residence** 23:14
26:1 27:3 31:9
31:11 34:7
35:14,18,21
36:8 51:8
66:23 67:11,23
69:8,9,10,21
69:23 71:5,6,8
71:22 72:4,5,6
72:7,15,16,17
73:5,6,7 74:12
74:20,21 75:13
75:15,19,20
85:6 119:24
**residences** 54:13
72:12 74:15
77:23

**residency** 27:10
**resident's** 75:12
**residents** 84:12
**resort** 104:10,16
105:2,6
**respond** 41:6
90:23
**response** 89:13
**responsibility**
49:1
**responsible** 49:9
49:12 66:21
**rest** 14:12 18:4
**restate** 8:14
39:21 56:2
96:13 98:21
**restroom** 8:3
**result** 110:6
**retrospect** 91:23
**review** 12:22
64:18
**reviewed** 12:19
**rifle** 115:22
116:1
**right** 9:10,23
10:14 11:6
12:1 17:23
22:12 24:9
26:11 28:1,23
72:20 74:8
82:13 85:14
88:4 89:9 91:5
91:9,11,16
102:3,6 104:21
106:1,3 107:1
111:1 119:1
**role** 86:5
**room** 12:11
16:22 18:12
**route** 10:6,8
**rule** 37:6,9,10,24
46:3,3,16
60:16 78:13,23
79:7 86:6,15
86:19 87:4
**running** 49:6

———————
**S**
———————
**S** 2:1

**Samantha** 2:15
4:18
**Sauer** 115:22
**saw** 109:9
**saying** 21:19
22:4 26:15
28:6 38:11
40:14 42:18
63:23 75:18,20
104:15 110:19
111:24
**says** 9:9,23
10:10 23:15
27:18 29:17,19
30:6 76:7
101:7,7 102:3
106:1,13
**scare** 95:14 97:7
99:23
**scenario** 95:23
**scene** 80:13
**sealing** 4:3
**search** 3:11
18:20 29:8,10
29:12 32:18
74:9 76:20
77:7,11,15
**second** 12:2,3
17:24 18:13,14
19:5,7,23 20:1
20:3 21:12,14
21:24 22:6,22
25:9,15 26:2
26:13 27:10,15
27:19 28:3,20
29:17,19 30:7
30:17,20 31:1
31:12,19 32:19
32:23 33:8,20
35:3,10,21
36:9 41:12
49:22 50:24
51:17 62:1,7
62:14,17 65:1
65:17,21 66:3
82:18 98:14
111:8,20 117:1
117:11 118:1
**secondary**

115:23
**seconds** 38:8
39:4 40:15
43:13,16,20
44:1,6,14 45:5
45:15 46:4,17
78:11,21 79:3
79:3,5,6 83:21
90:10,23
**Section** 101:3
**secure** 110:12
**see** 10:15,15
15:6,21 31:8
59:1 62:13
65:14 66:9
102:3 105:24
109:16,22
117:9,23
**seen** 27:22 30:3
101:5
**sending** 66:22
**sense** 11:3,9
77:3
**separate** 53:4
**Sergeant** 48:14
48:15,18 49:1
51:15 52:12
**serve** 76:21
**service** 12:3 28:5
28:13 111:18
**setup** 17:16
**sheet** 9:10,23
10:3 11:19
28:2,4
**sheets** 28:11
**shoot** 108:24
**shooting** 104:12
104:16,22,23
105:9 109:16
**short** 39:11
79:13
**shorten** 112:14
**shortened** 43:1
**shorter** 83:17
**Shorthand**
121:12
**shot** 109:10,20
**showed** 53:3
**side** 15:13 26:17

73:15 84:15
85:4 92:11
98:4 99:2
108:16
**SIG** 115:21
**signing** 4:3
**simple** 23:23
**sir** 17:7 19:9
28:1,23 32:6
33:7 35:2,12
36:4,15 37:2
47:15 55:20
61:6,20 62:6
62:24 63:12
64:19 68:21
69:2 70:12
72:20 75:7
76:5,23 78:9
78:20 80:6
86:12 88:4
90:8 91:11
94:21 98:16
101:2 107:11
109:3 113:4
116:18 120:6
**sit** 111:1
**situation** 24:5
45:5,17 46:6
80:12,19,24
89:16
**slower** 8:12
**small** 8:21 54:12
**smash** 87:13
89:23
**smashing** 43:9
**snare** 106:2,8
**soldiers** 106:8
**someone's** 22:19
39:17 43:8
44:14 46:17
66:23 67:2
69:20 85:5
104:4 119:23
**Song** 18:3,8
**sooner** 85:19
**sorry** 13:21
18:19 21:17
23:9 45:9,21
45:22 76:24

80:16 82:10
86:12 88:23
96:13 114:21
117:6 118:22
**sort** 6:23 18:17
39:23 43:7
55:13 58:17
66:1 77:21
84:18 86:19
87:1 93:22
110:4 119:2
**sound** 90:16
**South** 1:16 2:4
4:20
**speak** 8:11 88:20
**speaking** 82:10
**Special** 76:15
**specific** 36:21
47:16 48:2
55:7,22 56:8
56:16 57:1
58:10 71:23
72:1 74:16
75:10 113:24
**specifically**
11:24 24:5
27:18 49:22
84:23
**specifics** 10:5
**speculate** 7:7
**spray** 102:8,9,13
102:15,19
103:3,9 104:6
104:9,22 105:1
105:9,20
**stamped** 101:1
102:1
**stand** 106:14
**standard** 118:14
119:12,18
**standing** 90:11
**state** 8:19 13:5
23:8 25:20
31:24 40:18
64:5 69:14
71:12 78:2
**stated** 111:20
**station** 10:7
**stenographic**

121:6
**stipulate** 21:10
**stipulated** 4:2
19:5
**stipulating**
28:19
**stipulations** 4:9
**stoop** 90:11
**stopping** 120:10
**stored** 17:1
**Street** 1:16 2:4,9
4:20
**strike** 11:24 12:1
44:9 81:2
92:17 102:22
103:4 112:11
116:11
**structure** 47:8
63:6 64:22
67:18 73:12,20
74:4 75:3
87:23 100:11
112:22 113:21
114:1
**structures** 47:18
48:2 67:10
**subject** 20:11
**substance** 6:23
8:18
**sufficient** 37:11
38:7,15
**suggested** 79:3
**supervision**
121:16
**supposed** 98:10
**suppression**
11:17
**sure** 6:21 7:3
18:13 19:9
81:13 91:5
92:3,10 98:24
119:20
**surprise** 32:2
**surrender** 38:16
83:1,12 86:16
87:12
**surveillance**
90:9
**suspect** 116:9,12

**SWAT** 9:9,23
11:19 12:3
13:14,23 14:16
15:3 17:10
28:2 54:11
58:19 59:10,20
63:21 66:15,22
69:19 71:4
76:5,8,12,16
77:10,22 81:4
81:13,16 102:9
103:2,8,21
107:23 114:2
**swear** 5:8
**sworn** 5:11
**synopsis** 12:4
**system** 17:2

_____
**T**
**Tactics** 76:15
**take** 6:21 8:2
103:5 111:9
114:7 116:19
**taken** 1:14 5:5
16:1,3 121:7
**talking** 82:3
**tasked** 77:11
**team** 14:16
17:16,18 18:4
38:23 66:15,22
107:14,23
116:5
**teams** 10:23
11:8 17:17
**techniques**
39:15 40:7
**Tel** 2:5,11
**tell** 10:2 17:13
87:10 115:2
**ten** 78:10,21
79:5,6 90:10
90:23
**Term** 1:5
**testified** 5:12
58:3 80:6 92:3
117:14
**testify** 6:24
**testifying** 6:14
**testimony** 7:5

29:22 38:11
41:7 48:24
54:10 56:5
57:23 65:24
82:6 85:17
109:4,7
**testy** 77:2
**thank** 8:7
115:11 120:6,8
**thing** 94:16
100:14
**things** 104:3
**think** 15:5 21:18
23:11 31:18,23
52:20 53:22
61:24 64:24
72:22 90:22
104:5 105:10
116:7
**THOMAS** 2:3
**thought** 20:2
33:13 41:5
82:14 110:4
**thousands** 68:19
**three** 12:21
111:12
**time** 4:7,12 5:8
6:2,21 7:8 8:2
18:23 20:16
27:14 31:14
36:6 37:12
38:7,7,16 39:1
39:12,16,24
40:8,19 41:4
41:17 42:3
43:7 45:22
67:9 68:20
79:8,16 81:5
81:10,11,23
82:15 83:10
84:1 87:11
88:9,18 89:2,6
89:11 90:5
96:20 103:6
110:19 112:14
113:16 114:8
114:16 120:9
**timeline** 14:11
**times** 17:19

40:21 66:14,18
66:20 68:4,17
68:19 110:11
**timing** 39:11
100:7
**today** 5:3 7:1,4
17:9,14 46:24
61:24 109:4
**today's** 4:22
12:15,20,23
**told** 82:8 86:14
**tool** 107:21
**tools** 11:12,13
102:3,6 106:1
**Torresdale**
10:11 15:20
60:12 91:16
**trained** 44:9,11
**training** 20:10
37:13,20 39:14
39:24 42:11,19
43:5,15,24
44:5 45:3,13
45:24 47:16
55:13,22 56:8
57:2 58:4
60:15 63:20,24
66:1 67:8,17
68:12,16 69:6
86:13 87:10
97:11,19 101:4
101:10 103:20
104:1 114:13
115:1
**transcribed**
121:6
**transcript** 121:6
121:15
**transpires** 28:10
**treat** 55:8 59:5
**trial** 4:7,12,14
**tried** 51:15 52:1
**true** 33:19 71:8
121:5
**truth** 7:12
**truthful** 7:5
**truthfully** 7:1
**try** 8:5,13 39:16
40:7 50:18,23

51:6 59:11,21
94:4 97:7 98:4
99:9,23 110:2
**trying** 88:5
103:5
**two** 10:23 11:7
15:6 23:14,16
23:18,19 35:9
54:18 58:10,16
59:6 60:9
62:21 65:11
94:17,18 98:11
100:12 116:2
**two-sided** 9:22
15:9,13
**type** 115:22
**typically** 30:18
38:7 40:19
43:12,20 47:7
47:9 63:5 75:1
79:23 85:24
87:22 90:19
108:10 112:22

———————
**U**
**Uh-huh** 49:18
**unable** 59:15
**uncomfortable**
8:1
**understand** 8:10
14:11 19:10
20:9 38:10
66:2 70:12
112:12 118:15
**understanding**
21:18 22:18
23:20 24:6,7
28:14 30:12
46:13 54:12
58:17 70:5
72:24 74:8
78:12 108:5,21
116:12 119:1,3
**understood** 25:7
25:15 69:6
**unit** 9:9 11:19
11:22,23 12:3
13:14,23 15:3
17:10 18:21

40:20 54:11
58:19 59:10,20
63:21 66:17,22
69:20 71:4
73:19 74:3
75:2 76:5,12
76:16 77:10,22
81:4,13,16
87:23 100:11
102:9 103:21
111:18 112:21
114:3 115:19
**units** 63:9 73:12
74:4 80:3
**unknown** 20:16
41:22
**unnecessarily**
8:1
**update** 28:11
**updated** 28:4
**use** 4:14 8:3
39:16 40:7
102:7 104:9
108:10
**usual** 4:9

———————
**V**
**v** 4:15 5:1
**valid** 20:6 71:7
74:10
**validate** 54:7
**variables** 79:12
**vehicle** 11:5
**vehicles** 10:19
11:10
**vein** 105:5
**venture** 66:19
**verify** 54:7
**vest** 76:7
**vestibule** 63:8
80:1
**Victims'** 1:15
2:2 4:19
**video** 4:14,17
12:23
**VIDEOGRAP...**
2:15 4:13
120:10
**Videotaped** 1:14

**view** 99:16
**violent** 76:21
77:17
**voluntarily**
38:16 41:17
83:1,11 87:12
**vs** 1:6

———————
**W**
**wait** 43:16,19
46:4,16 83:20
88:15 89:18
112:15
**waived** 4:4
**walk** 26:2 30:13
32:14 112:2
**walked** 25:24
35:4,13 36:13
109:9
**walking** 25:16
35:14,17 36:1
**want** 8:1,2,4
19:9 61:12
77:1 100:21
104:3 115:17
116:15
**warrant** 3:11
11:21,23 12:5
13:2 16:4
18:18,20,21
19:4,11,22
20:6,12 22:21
23:13,15 24:8
24:9,22 25:3
27:18,23 28:5
28:13,15 29:8
29:8,10,13,23
30:4 32:18
33:24 36:16
45:14 46:2
49:21 69:9,22
71:7 72:2,6,7
72:16,18 73:7
73:24 74:9,21
75:10,14 76:20
77:7 93:9
96:23 116:8
119:3
**warrants** 18:22

47:17 48:1
76:22 77:12,16
**wasn't** 22:13
90:3
**water** 8:4 11:15
108:1,6
**way** 42:18 51:22
100:6 110:6
111:7
**we'll** 8:5
**we're** 24:1 41:11
41:21 61:13
72:17 85:11
91:8 95:10,19
107:7
**we've** 12:17
55:18 64:7
82:7
**weapon** 18:8
115:23,23
116:5
**weapons** 76:15
107:9
**wear** 13:9,10,16
**wearing** 76:7
**went** 17:17,22
69:20 92:9
**weren't** 92:10
**West** 2:3 3:4 4:9
5:16,19 8:22
9:4 12:13 13:7
13:22 14:5,15
14:21 16:9,17
17:6 19:8,17
20:21 21:4,16
22:3,17 23:4
23:10 24:3,15
24:20 25:5,12
25:22 26:8
27:2,8,17,24
28:23 29:5
30:5,10,23
31:6,17 32:5
32:13,24 33:6
33:15 34:4,13
35:1,11,19
36:3,14,19
37:1,19 38:9
38:20 39:13,22

40:6,13 41:3
41:14 42:1,9
42:17 43:4,14
43:22 44:7,19
45:1,11,23
46:12,23 47:14
47:22 48:6,16
48:23 49:8,18
49:20 50:6,15
50:22 51:5,13
51:23 52:5,11
52:24 53:9,15
54:9,22 55:11
55:19 56:4,19
56:24 57:7,17
57:22 58:14
59:9,17 60:3
60:13,21 61:5
61:9,19 62:5
62:12,16,23
63:11,19 64:4
64:17 65:6,13
65:23 66:8,12
67:6,15,22
68:7,21,24
69:3,16 70:3
70:11,16,24
71:14 72:3,11
72:19 73:13,22
74:7,17 75:6
75:22 76:1
77:18 78:5,19
79:4,14 80:5
80:11,18 81:1
81:12,22 82:5
82:21 83:7,19
84:3,13 85:1
85:16 86:3,11
86:24 87:9,16
88:3,17 89:1,8
89:21 90:7,15
90:21 91:3,10
91:18 92:1,8
92:15,24 93:7
93:14,20 94:3
94:10,20 95:3
95:11,22 96:5
96:15,22 97:4
97:10,17 98:1

98:15,23 99:6
99:14,21 100:5
100:15,20
101:14,23
102:16,22,24
103:14,19
104:2,11,20
105:7,18 106:6
106:12,23
107:10,20
108:12,20
109:14,24
110:13 111:3
111:13,22
112:10 113:3
113:14,23
114:12,23
115:10 117:18
118:9,13,24
119:11,19
120:6
**whatsoever** 93:8
**wide** 26:18,19
34:21
**witness** 3:2 5:3,8
5:11 12:10
13:5,21 14:10
14:20 16:8
19:4,16 20:15
21:3,9,22
22:10 23:2,8
23:23 24:14
25:2,20 26:7
26:24 27:7,14
27:22 28:18
29:18 30:2,17
31:5,23 32:12
32:22 33:4,13
34:3,12,19
35:7,17,24
36:12,20 37:18
38:3,19 39:10
39:21 40:5,12
40:18 41:11,21
42:8,15,23
43:12,19 44:4
44:17,24 45:9
45:21 46:10,22
47:6,21 48:5

48:14 49:5,16
49:19 50:5,12
50:21 51:4,11
51:21 52:4,10
52:19 53:7,14
54:3,17 55:6
55:17 56:2,14
57:6,15,21
58:9,24 59:15
60:2,8,20 61:4
62:4,11,20
63:5,17 64:3
65:5,10,20
66:7,11 67:5
67:14 68:3,15
69:2,14 70:2,8
71:12,21 72:15
73:11,19 74:3
74:15,24 75:18
75:24 77:15
78:2,16 79:2
79:11,21 80:10
80:16,23 81:10
81:21 82:3
83:5,14,24
84:8,22 85:9
85:23 86:9,23
87:7,22 88:13
88:23 89:6,16
90:3,18 91:8
91:15,23 92:7
92:23 93:13,19
94:2,9,16 95:1
95:9,18 96:3
96:13,20 97:3
97:15,23 98:8
98:21 99:13,20
100:4,10
101:13,20
102:13 103:12
103:18 104:1,9
104:15 105:5
105:14 106:5
106:11,22
107:7 108:10
108:19 109:13
109:22 110:10
111:1,11,17
112:8,19

113:10,21
114:10,21
115:9 117:20
118:22 119:10
119:17 120:4
**woman** 18:10
109:9
**word** 15:21 39:6
**wording** 103:5
**words** 29:22
**work** 66:2
**worn** 14:23
**wouldn't** 50:7
57:24 72:21
96:3
**wrong** 92:19
103:5 111:5

_____
**X**
_____
**X** 3:1
_____
**Y**
_____
**Yeah** 23:11
97:21
**years** 15:4 66:17
_____
**Z**
_____
**Zurbriggen** 2:8
3:5 12:8 13:3
13:19 14:3,8
14:18 16:6,16
17:4 19:2,14
20:13 21:1,7
21:20 22:8,24
23:6,21 24:12
24:18,24 25:11
25:18 26:5,21
27:5,12,20
28:16 29:24
30:9,15 31:3
31:15,21 32:10
32:20 33:2,5
33:11 34:1,10
34:16 35:5,15
35:22 36:10,17
37:16 38:1,17
39:8,19 40:3
40:10,16 41:8
41:19 42:6,13
42:21 43:10,17

44:2,15,22
45:7,19 46:8
46:20 47:4,19
48:3,12,21
49:3,14 50:3
50:10,19 51:2
51:9,19 52:3,8
52:17 53:5,12
54:1,15 55:4
55:15,24 56:12
56:22 57:4,13
57:19 58:7,22
59:13,24 60:6
60:18 61:2
62:2,9,15,18
63:3,15 64:2
65:3,8,18 66:5
66:10 67:3,12
67:21 68:2,13
68:22 69:12,24
70:6,14,22
71:10,19 72:9
72:13 73:9,17
74:1,13,22
75:16,23 77:13
77:24 78:14,24
79:9,18 80:8
80:14,21 81:8
81:19 82:1,19
83:3,13,22
84:6,20 85:7
85:21 86:7,21
87:5,14,20
88:11,21 89:4
89:14 90:1,13
90:17 91:1,6
91:13,21 92:5
92:13,21 93:5
93:11,18,24
94:7,14,23
95:7,16 96:1,8
96:9,11,18
97:1,8,13,22
98:6,18 99:5
99:11,18 100:2
100:8 101:12
101:18 102:11
102:21 103:11
103:17,23

104:7,13 105:3
105:12 106:4
106:10,20
107:5,18 108:8
108:17 109:11
109:21 110:8
110:23 111:10
111:15 112:5
112:17 113:8
113:19 114:9
114:19 115:7
115:15 117:21
118:6,20 119:8
119:15 120:2,7

**0**

**01633** 1:6
**08051** 1:23

**1**

**100** 3:13
**11:00** 1:18
**11:02** 4:23
**115** 3:5
**118** 3:4
**12:38** 120:11,14
**121** 1:16 2:4
 4:20
**13** 15:4 66:17
**15** 39:4 40:15
 64:11
**1515** 2:9
**17** 115:24
**18th** 1:16 2:4
 4:20
**19** 1:12 121:7
**19102** 2:10
**19107** 2:4 4:21
**19th** 4:22
**1A** 116:17

**2**

**20** 39:4 40:15
**2021** 17:8,9 40:9
 46:14 69:7,19
 71:4 73:4
 77:10,19
 118:17
**2022** 1:5
**2023** 1:12 4:22

121:7
**215-546-1433**
 2:5
**215-683-5114**
 2:11
**22-3763** 4:16 5:2
**235** 101:1
**238** 102:1
**240** 101:1
**242513** 29:9
**25** 38:7
**29** 3:11
**2nd** 10:11

**3**

**30** 38:7 43:13,16
 43:20 44:1,5
 44:13 45:4,15
 46:4,17 79:3,3
 83:20

**4**

**400** 115:22
**406** 1:23
**4664** 10:11
 15:20 91:16
 116:20

**5**

**5** 3:4
**589-1107** 1:24

**6**

**6:00** 82:4
**61** 3:10
**64** 3:12

**7**

**8**

**856** 1:24

**9**

**9** 3:9
**9:30** 64:11

# EXHIBIT "O"

# Transcript of the Testimony of:
# **SERGEANT KEVIN MELLODY**

**Date:** October 11, 2023

**Case:** Alvarado v. City of Philadelphia, et al

DIAMOND COURT REPORTING
406 REDBUD LANE
MANTUA, NEW JERSEY 08051
856-589-1107
dcr.diamond@comcast.net

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
-------------------------
FELISHATAY ALVARADO,        : CIVIL ACTION
                            :
                            :
    vs.                     :
                            :
                            :
CITY OF PHILADELPHIA, et.   :
al.              : NO. 22-3763
-------------------------
- - -
October 11, 2023
- - -
Confidential Videotape Deposition of
SERGEANT KEVIN MELLODY, taken at the Law Offices
of Victim Recovery Law Center, The North American
Building, 121 South Broad Street, Suite 1800,
Philadelphia, Pennsylvania 19107, on the above
date, beginning at approximately 11:05 a.m.,
before Douglas S. Diamond, Certified Court
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania and the State of New
Jersey, there being present.
- - -

DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 589-1107
e-mail: dcr.diamond@comcast.net

---

Page 2

```
 1   A P P E A R A N C E S :
 2       VICTIM RECOVERY LAW CENTER
         BY: KEITH T. WEST, ESQUIRE
 3       THE NORTH AMERICAN BUILDING
         121 SOUTH BROAD STREET
 4       SUITE 1800
         PHILADELPHIA, PENNSYLVANIA 19107
 5       Counsel for the Plaintiff
         Tel. (215) 546-1433
 6       E-mail: keith@victimrecoverylaw.com
 7           * * * * *
 8       CITY OF PHILADELPHIA LAW DEPARTMENT
         BY: ADAM R. ZURBRIGGEN, ESQUIRE
 9       ONE PARKWAY BUILDING
         1515 ARCH STREET
10       14TH FLOOR
         PHILADELPHIA, PENNSYLVANIA 19102
11       Counsel for the Defendants
         Tel. (215) 683-5114
12       E-mail: adam.zurbriggen@phila.gov
13           * * * * *
14
15
16
17
18   A L S O   P R E S E N T :
19       COURTNEY KITCHERMAN - THE VIDEOTAPE OPERATOR
20
21
22
23
24
```

---

Page 3

```
 1                    I N D E X
 2   WITNESS                         PAGE
 3   SERGEANT KEVIN MELLODY
 4   Examination by Mr. West:        4, 127
 5   Examination by Mr. Zurbriggen:     122
 6
 7
 8           EXHIBITS
     NO.        DESCRIPTION        PAGE
 9
     Mellody-1  Investigation Interview Record   11
10
     Mellody-2        Statement            12
11
     Mellody-3  Investigation Interview Record   22
12
     Mellody-4  SWAT Unit Reconnaissance Sheet   23
13
     Mellody-5  Investigation Interview Record   27
14
     Mellody-6  Home Investigation Interview     42
15
     Mellody-7  Color Photocopy of Photograph    45
16
     Mellody-8    Property Description         62
17
     Mellody-9  Color Photocopy of Photograph    63
18
     Mellody-10 Color Photocopy of Photograph    66
19
     Mellody-11 Dog Neutralization Policy        88
20
     Mellody-12 SWAT Unit Warrant Service        93
21
     Mellody-13 SWAT Unit Reconnaissance and     98
22                  Intelligence
     Mellody-14 Color Photocopy of Photograph   123
23
24
```

---

Page 4

```
 1                  - - -
 2           (It was stipulated by and between
 3       counsel that signing, sealing,
 4       certification and filing be waived; and
 5       that all objections, except as to the
 6       form of the question, be reserved until
 7       the time of trial.)
 8                  - - -
 9           THE VIDEOTAPE OPERATOR:  This is
10       the deposition of Sergeant Kevin
11       Mellody, Badge Number 285.  This is the
12       audio/video deposition for use at trial
13       in the matter of Felishatay Alvarado
14       versus the City of Philadelphia, et.
15       al., Philadelphia Court of Common Pleas,
16       Docket Number 220601633.
17           And I'm the video operator.  My
18       name is Courtney Kitcherman.  And I'm
19       employed by the Victims' Recovery Law
20       Center.  My address is 121 South Broad
21       Street, 18th Floor, Philadelphia,
22       Pennsylvania 19107.
23           Today's date is October 11th of
24       2023 at 11:06 a.m.
```

03a074f7-07e5-43ee-aa33-9a62d33706df

1        This deposition is being performed
2    in person.
3        The witness being deposed today is
4    Sergeant Kevin Mellody, Badge Number
5    285.
6        This deposition is being taken on
7    behalf of the plaintiff, Felishatay
8    Alvarado.
9        The officer taken in this
10   deposition is Douglas Diamond.  And he
11   will swear the witness in at this time:
12            - - -
13       . . . SERGEANT KEVIN MELLODY, having
14       been duly sworn, as a witness, was
15       examined and testified as follows . . .
16            - - -
17       EXAMINATION
18            - - -
19   BY MR. WEST:
20       Q.    All right.  Good morning, Sergeant
21   Mellody.  My name is Keith West.  And I'm one of
22   the attorneys representing the plaintiff in this
23   matter, Ms. Alvarado.  And just preliminary
24   questions we ask in every deposition.

1    works.
2        You've had a chance to confer with
3    your attorney and you're prepared to go forward at
4    this time; correct?
5        A.    Correct.
6        Q.    Are you under the influence of any
7    sort of medication, substance, illness, anything
8    that will impair your ability to testify
9    truthfully today?
10       A.    No.
11       Q.    All right.  So, as I'm sure your
12   attorney has advised you, your only obligation
13   today is to give truthful testimony based on your
14   personal knowledge.  So we're not going to ask for
15   you to guess or speculate.  Okay?
16       A.    Okay.
17       Q.    On the other hand, we would like to
18   know everything that you do know.  If you aren't
19   100 percent sure of the answer to any question
20   you've given, but you believe that you can give an
21   estimate or an approximation, that's perfectly
22   fine.  Just let us know that you are giving an
23   estimate or approximation.  Okay?
24       A.    Okay.

1        Have you ever been in a deposition
2    before?
3        A.    Yes.
4        Q.    Okay.  So how many times have you
5    been deposed prior to this?
6        A.    Probably like maybe one or two.
7        Q.    Okay.  And what were those cases
8    about?
9        A.    Last time it was probably like 20
10   years ago.  I probably couldn't even tell you.
11       Q.    Okay.  What was that case about?
12       A.    Just a car stop.  And somehow it
13   turned into a lawsuit.
14       Q.    Were you a defendant in that case?
15       A.    Probably.
16       Q.    Okay.  And where were you --
17       A.    That's the only one I remember, to
18   be honest with you.
19       Q.    And what were the allegations made
20   against you in that case?
21       A.    I don't recall the allegations.
22       Q.    Okay.  All right.  Well, it sounds
23   like you haven't been in a deposition recently.
24   So let me go over kind of the outline of how this

1        Q.    This is not intended to be an
2    unnecessarily uncomfortable process.  So if at any
3    time you need to take a break, you want to use the
4    rest room, you want a cup of coffee, something
5    like that, just let us know.  Okay?
6        A.    Okay.
7        Q.    Similarly, we're not trying to
8    confuse you with our questions.  So if I ask you
9    any questions that you have trouble understanding
10   and you need me to speak slower, louder, possibly
11   rephrase the question, just let us know and we'll
12   try to ask the question in a way you do understand
13   it.  Okay?
14       A.    Okay.
15       Q.    All right.  So this lawsuit
16   involves a warrant enforcement action which
17   occurred on June 4th of 2021 on Torresdale Avenue.
18       Do you have any recollection of
19   this incident at this time?
20       A.    I do.
21       Q.    All right.  Let me ask you as kind
22   of a preliminary question, in your memory, was
23   there anything unusual about the way that the SWAT
24   unit carried out this operation or was the conduct

Page 9

1    of the SWAT unit typical, in your experience?
2         MR. ZURBRIGGEN:  Objection to the
3    form.
4         But, Sergeant, you can answer.
5         THE WITNESS:  No, there was nothing
6    out of the ordinary.
7    BY MR. WEST:
8         Q.    Okay.  And, to the best of your
9    information, were all of the policies and
10   procedures of the Philadelphia Police Department
11   --
12        A.    What was that word, all of the?
13        Q.    Policies?
14        A.    Okay.
15        Q.    So, to the best of your
16   understanding, were all of the policies and
17   procedures of the Philadelphia Police Department
18   followed by the SWAT unit that day?
19        A.    I believe so.
20        MR. ZURBRIGGEN:  Same objection to
21   the form.
22   BY MR. WEST:
23        Q.    Okay.  Was there anything that you
24   saw or observed as part of the warrant enforcement

Page 10

1    action at 4664 Torresdale Avenue that in any way
2    was inconsistent with the training that you
3    received from the Philadelphia Police Department?
4         A.    No.
5         MR. ZURBRIGGEN:  Same objection,
6    Sergeant.
7         THE WITNESS:  No.
8    BY MR. WEST:
9         Q.    Was there anything that you saw or
10   observed with regards to the warrant enforcement
11   action at 4664 Torresdale Avenue that was in any
12   way inconsistent with your understanding of the
13   obligations of the SWAT unit pursuant to the
14   United States Constitution?
15        A.    No.
16        MR. ZURBRIGGEN:  Same objection.
17        THE WITNESS:  No, it was not.
18   BY MR. WEST:
19        Q.    All right.  Have you had a chance
20   to review any documents, materials or video or
21   pictures in preparation for today's deposition?
22        A.    I just read this two minutes ago.
23   (Witness indicating.)
24        Q.    Is that a statement?

Page 11

1         A.    It's my internal affairs interview.
2         Q.    Okay.  So you had a chance to read
3    your statement.
4         Did you see any video?
5         A.    No.
6         Q.    Did you see any photographs or any
7    other written materials?
8         A.    No.
9         Q.    All right.  Let's start with your
10   statement.  I'm sure I have it somewhere.
11        MR. WEST:  All right.  Doug, if we
12   can mark this document as Mellody-1?
13        - - -
14        (Whereupon, Exhibit Mellody-1 was
15   marked for identification.)
16        - - -
17        MR. WEST:  Adam, do you need a
18   copy?
19        MR. ZURBRIGGEN:  I don't.  Thank
20   you.
21   BY MR. WEST:
22        Q.    All right.  Sir, so if you could
23   take a moment to review that?
24        A.    (Witness complies.)

Page 12

1         Q.    And is this the statement that you
2    reviewed in anticipation for today's testimony?
3         A.    No.  This is from the shooting
4    investigation team.
5         Q.    Okay.  You have a copy of the
6    document, I think, there.
7         Could you show it to me?
8         A.    Show this one?
9         Q.    Let me see it.
10        A.    (Witness complies.)
11        Q.    Let me check.  I think they are the
12   same.  All right.  So let's begin with the
13   statement to internal affairs.
14        MR. WEST:  And we'll mark this as
15   Mellody-2.
16        - - -
17        (Whereupon, Exhibit Mellody-2 was
18   marked for identification.)
19        - - -
20   BY MR. WEST:
21        Q.    Sir, before we review the internal
22   affairs statement, which is marked as Mellody-2,
23   as you had a chance to review this document prior
24   to today's deposition, was there anything that you

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 13

1    recognized as being inaccurate or incomplete?
2        A.    No.
3        Q.    Okay.  Are the statements that you
4    gave, which are recorded in this document,
5    consistent with your recollection of the events
6    today?
7        A.    Yes.
8        Q.    All right.  Sir, so if you look at
9    the second page of this document, which is Bates
10   Stamped as 62, when you look at the second
11   question and answer, it says, what information
12   prior to executing the search warrant, search
13   arrest warrant, for a suspect at 4664 Torresdale
14   Avenue?
15         And the answer is just the arrest
16   and search warrant.
17         Do you see that?
18       A.    Yes.
19       Q.    Is that accurate?
20       A.    Yes.
21       Q.    Isn't it true that you conducted a
22   reconnaissance of the property prior to the
23   enforcement?
24       A.    Yes.

Page 14

1        Q.    Okay.  So wouldn't it be more
2    accurate to say that you had the search and arrest
3    warrant and the fruits of your reconnaissance?
4         MR. ZURBRIGGEN:  Objection to the
5         form of the question.
6         But, Sergeant, you can answer it
7         again.
8         THE WITNESS:  So when you say -- on
9         our end when you say and prior
10        information, the information we get is
11        the search and arrest warrant.  And then
12        we go out and recon that location.  So
13        how I look at it is the only information
14        that I have that was given to me is the
15        search and arrest warrant.  Everything
16        else was on my end.
17   BY MR. WEST:
18       Q.    All right.  But if someone asked
19   you what information you had prior to executing
20   the search and arrest warrant, that would include
21   the search and arrest warrant, itself, plus
22   whatever information you gained through your
23   reconnaissance; correct?
24         MR. ZURBRIGGEN:  Object to the

Page 15

1         form.
2         Sergeant, you can answer.
3         THE WITNESS:  You could say that.
4    BY MR. WEST:
5        Q.    Now, did the SWAT unit conduct
6    reconnaissance of the property prior to executing
7    the search and arrest warrant for 4664 Torresdale
8    Avenue?
9        A.    Yes.
10       Q.    Who did that; if you know?
11       A.    I did.
12       Q.    Did you do it with anyone else?
13       A.    Officer Clark.
14       Q.    Okay.  All right.
15         Well, what did you do,
16   specifically?
17       A.    Basically we go out and look at the
18   location.  We look at staging area locations, the
19   rest of the property.  We look at doors, windows,
20   floors, side windows, how the rear is, and then
21   hospital routes to hospitals.
22       Q.    Okay.  Did you do a personal
23   inspection of the property?
24       A.    As best as we can without getting

Page 16

1    -- tipping off the people at the location.
2        Q.    Did you do a personal inspection of
3    the property at 4664 Torresdale Avenue?
4        A.    You could say I did, yes.
5        Q.    Did you or did you not?
6        A.    Yes.
7        Q.    Okay.  Please describe to me, in as
8    much detail as possible, the physical inspection
9    of the property you did.
10         MR. ZURBRIGGEN:  Object to the
11         form.
12         But, Sergeant, to the best of your
13         ability.
14         THE WITNESS:  As far as in colors
15         and stuff like that, I probably couldn't
16         tell you at this moment, but it's
17         basically a rowhome with a door and
18         windows on the front.  And looked into
19         the rear and there was a door with
20         windows on the rear.
21   BY MR. WEST:
22       Q.    Okay.  Sir, you might have
23   misunderstood the question.  I wasn't asking you
24   to describe what the property looks like.  I was

4 (Pages 13 to 16)

Page 17

1   asking you to describe what you specifically did
2   with regards to a physical inspection of the
3   property.
4           MR. ZURBRIGGEN:  Object to the
5       form.
6           THE WITNESS:  Okay.  I've got you.
7       Basically, rode by the property.  You
8       physically look at it as inconspicuous
9       as you can.  Looked at the front.  And
10      then we go drive around the back or walk
11      around the back and look at the rear.
12  BY MR. WEST:
13      Q.   Okay.  When you drove by, what
14  street were you on?
15      A.   The front's Torresdale.
16      Q.   Okay.  So you drove by the property
17  on Torresdale Avenue; correct?
18      A.   Yes.
19      Q.   Okay.  Did you drive by on any
20  other street?
21      A.   Well, the property is on
22  Torresdale.
23      Q.   So you only drove by on Torresdale
24  Avenue; correct?

Page 18

1       A.   Correct.
2       Q.   Okay.  Did you get out and explore
3   the property by foot or only by passing it in a
4   car?
5       A.   The front, vehicle.  The rear, we
6   got out.
7       Q.   Okay.  So where --
8       A.   Like the rear is like an alleyway
9   with, I believe, there's a parking lot behind the
10  alleyway there.
11      Q.   Okay.  So you drove by on
12  Torresdale Avenue; correct?
13      A.   Correct.
14      Q.   And then you got out at some point?
15      A.   When we went to look at the rear,
16  whatever that cross street is, we were down the
17  cross street and there was like an alleyway or a
18  parking lot or something in the rear there.
19      Q.   Where did you park your car when
20  you got out to inspect the property by foot?
21      A.   Whatever that cross street is
22  somewhere in there.
23      Q.   Okay.  And explain to me as much as
24  you can remember about what you did when you

Page 19

1   physically inspected the property.
2           MR. ZURBRIGGEN:  Object to the
3       form.
4           But, Sergeant, go ahead.
5           THE WITNESS:  Basically, just got
6       out of the car, looked at the property,
7       see like how many windows, doors, stuff
8       like that.
9   BY MR. WEST:
10      Q.   Did you take any pictures?
11      A.   No.
12      Q.   Did you take any contemporaneous
13  notes?
14      A.   The notes we take is basically we
15  relay it back to the guys at the office and they
16  do our recon sheet.
17      Q.   Okay.  Sir, so if you look at the
18  statement, which is marked as Mellody-2, could you
19  switch to the second page, that's Bates Stamped
20  36, and just look to the second question and
21  answer section?
22      A.   Second page, Question Number 2?
23      Q.   Yes.  This is on Mellody -- sorry,
24  Mellody-1.

Page 20

1       A.   (Witness complies.)
2       Q.   So this is the interview statement
3   that you gave to who?
4       A.   This statement here to, I believe,
5   the shooting team.
6       Q.   Okay.  And you did not have a
7   chance to review this prior to today; correct?
8       A.   No.
9       Q.   Okay.  So if you look at the second
10  question and answer, it says, would you please go
11  in your own words and tell me everything you know
12  about this incident?
13          And the answer, I'm just going to
14  read the first two sentences.  It says, we did a
15  knock and announce in front of the property at
16  4664 Torresdale Avenue.  There was no response
17  from any occupants.
18          Is that accurate?
19          MR. ZURBRIGGEN:  Sergeant, take as
20      much as time as you need to review it.
21          THE WITNESS:  Yes.
22  BY MR. WEST:
23      Q.   Okay.  So there was a knock and
24  announce done at the property at 4664 Torresdale

## Page 21

1  Avenue?
2      A.    Correct.
3      Q.    And there was no response from any
4  occupants; is that correct?
5      A.    Correct.
6      Q.    Okay.  How do you know that?
7      A.    How do I know that there was no
8  response?
9      Q.    Well, actually, let me clarify.
10          How do you know that there was a
11  knock and announce at the property?
12     A.    I was the sixth person in line.
13     Q.    So you physically saw a knock and
14  announce; correct?
15     A.    Physically, no.  Heard, yes.
16     Q.    Okay.
17     A.    Because I'm -- I was the last guy
18  in the stack, which is probably from like the door
19  to the wall, and I'm sitting right here.
20  (Witness indicating.)
21     Q.    Who did the knock and announce?
22     A.    I don't know who the breachers
23  were.  I'd have to look that up.
24          MR. WEST:  All right.  Let's mark

## Page 22

1          as Mellody-3, this is the statement
2          given by Lieutenant Demetrius Monk to
3          the officer involved shooting
4          investigation unit Bates Stamped as
5          Defense 43 to 45.
6              - - -
7          (Whereupon, Exhibit Mellody-3 was
8          marked for identification.)
9              - - -
10  BY MR. WEST:
11     Q.    Sir, if you could turn to second
12  page?
13     A.    (Witness complies.)
14     Q.    And if you look at the second
15  question-and-answer exchange on this document it
16  reads, upon your arrival at 4664 Torresdale
17  Avenue, what did you see and do?
18          And I'll read the first sentence of
19  Lieutenant Monk's answer.
20          Upon arrival Officer Clark
21  approached the door, knocked and announced,
22  police, with a warrant, open the door.
23          Does this refresh your recollection
24  as to which officer did the knock and announce?

## Page 23

1      A.    If Clark is saying -- if it says
2  Clark, then it was probably Clark.  Like I
3  couldn't tell you exactly.  If I didn't have this
4  document I couldn't tell you who breached that
5  morning.
6          MR. WEST:  Doug, please mark this
7          as Mellody-4 and provide it to the
8          witness.  This is the recon.
9              - - -
10          (Whereupon, Exhibit Mellody-4 was
11          marked for identification.)
12              - - -
13  BY MR. WEST:
14     Q.    Sergeant Mellody, I believe that
15  you testified earlier today that when you
16  inspected the property what you inspected would be
17  written down subsequently in the reconnaissance
18  sheet.
19          Is that your testimony?
20     A.    Correct.
21     Q.    And when you referred to a
22  reconnaissance sheet for the property at 4664
23  Torresdale Avenue, is that the document in your
24  hand, which has been marked as Mellody-4?

## Page 24

1      A.    Yes.
2      Q.    Okay.  Are you able to determine
3  from this document who the officers were that
4  breached the door as part of that operation?
5      A.    Yes.
6      Q.    What are the names?
7      A.    Clark and Murray.
8      Q.    Okay.  So whoever did the knock and
9  announce, would that have been either Clark or
10  Murray?
11          MR. ZURBRIGGEN:  Objection to the
12          form.
13          But, Sergeant, to the extent you
14          know.
15          THE WITNESS:  Yes.
16  BY MR. WEST:
17     Q.    Okay.  Do you see any reference to
18  a rear door anywhere on this document?
19     A.    No.
20     Q.    Do you see any reference anywhere
21  on this document, which would suggest that a
22  physical inspection of the property was done by
23  foot?
24          MR. ZURBRIGGEN:  Objection to the

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 25

1        form.
2               But, Sergeant, to the extent you
3        can tell.
4               THE WITNESS:  Repeat that question
5        for me again?
6    BY MR. WEST:
7        Q.     Do you see any notation on this
8    reconnaissance sheet to a physical inspection of
9    the property being done by foot?
10              MR. ZURBRIGGEN:  Same objection.
11              But, Sergeant, to the extent you
12       know.
13              THE WITNESS:  You can see where it
14       says property, property marked, their
15       property on the right from the corner
16       store, Philly Deli Delight, at Margaret
17       Street and Torresdale.  So Margaret was
18       the cross street.  And that's a
19       two-story rowhome.
20   BY MR. WEST:
21       Q.     Okay.  That's all information that
22   could have been obtained by driving past the
23   property on Torresdale Avenue; correct?
24              MR. ZURBRIGGEN:  Object to the

Page 26

1        form.
2               But, Sergeant, you can answer.
3               THE WITNESS:  Yes.
4    BY MR. WEST:
5        Q.     Okay.  I don't see any reference to
6    an alleyway here.
7        Do you?
8               MR. ZURBRIGGEN:  Same objection.
9               Sergeant, to the extent you can
10       tell.
11              THE WITNESS:  Driveway, well,
12       driveway, alleyway.
13   BY MR. WEST:
14       Q.     Where is that?
15       A.     It says, rear, same on the right
16   street on Margaret Street and left on the first
17   driveway, the property on the left.
18       Q.     The photograph that's attached to
19   the property is a photograph of the front door
20   that was taken from Google Maps; right?
21       A.     If that's what you're saying.
22       Q.     Do you remember at this point?
23       A.     I don't recall.  I don't recall
24   that.

Page 27

1        Q.     Okay.
2        A.     I couldn't tell you where this was
3    from.  It's all like distorted.
4        Q.     Well, we're going off in a
5    different direction.
6        Back to who did the knock and
7    announce, would it have to have been either Clark
8    or Murray?
9               MR. ZURBRIGGEN:  Object to the
10       form.
11              Sergeant, again, to the extent you
12       know.
13              THE WITNESS:  According to this
14       sheet it would have been Clark or
15       Murray.
16              MR. WEST:  Okay.  So let's mark
17       this document as Mellody-5.
18              ---
19              (Whereupon, Exhibit Mellody-5 was
20       marked for identification.)
21              ---
22   BY MR. WEST:
23       Q.     Sir, if you can you take a moment
24   to review this, this is the OISI interview

Page 28

1    statement given by Officer Brian Murray.  And if
2    you look on the second page I actually highlighted
3    a portion of Officer Murray's answer.  Let me know
4    when you can see that.
5        A.     I see it.
6        Q.     And you can see on here that
7    according to Officer Murray, quote, "Officer Clark
8    conducted the knock and announce.
9        Do you see that?
10       A.     Uh-huh.
11       Q.     Does that refresh your recollection
12   as to who supposedly did the knock and announce?
13              MR. ZURBRIGGEN:  Object to the
14       form.
15              But, Sergeant, to the extent you
16       know.
17              THE WITNESS:  If it's in this
18       document then obviously Officer Clark
19       conducted the knock and announce.  But
20       if you want me physically remembering
21       it, no.
22   BY MR. WEST:
23       Q.     Okay.  It certainly wasn't Officer
24   Murray; correct?

Page 29

```
1              MR. ZURBRIGGEN: Objection.
2              THE WITNESS: If it says -- if
3         Murray's saying it was Clark, then it
4         was Officer Clark.
5    BY MR. WEST:
6         Q.    Did you have any communications
7    with Detective Graf or Detective Scally prior to
8    the execution of this warrant?
9         A.    At the stage, but the names you're
10   saying, I can't put the names to the faces.
11        Q.    Okay. So am I correct in
12   interpreting your answer as saying that you recall
13   speaking to some detectives at the staging area
14   prior to the discussion, but you can't remember
15   precisely who they were at this time?
16        A.    Correct, correct.
17        Q.    Okay. Prior to the staging area,
18   had you communicated with any detectives about the
19   execution of this warrant?
20        A.    No.
21        Q.    Did you receive any information
22   from any detectives about the suspect's home or
23   how to enter the home prior to getting to the
24   staging area?
```

Page 30

```
1         A.    No.
2              MR. ZURBRIGGEN: And object to the
3         form, just for the record.
4    BY MR. WEST:
5         Q.    Do you know whether or not the
6    suspect was on probation or parole at the time of
7    the warrant execution operation?
8         A.    I don't recall.
9         Q.    As part of your reconnaissance, is
10   that information that you normally would have
11   obtained?
12        A.    Normally, no. Sometimes, yes. It
13   all depends what the detectives tell our desk guy
14   when they call it in.
15        Q.    Okay. But your recollection with
16   regards to this specific operation, the detectives
17   didn't tell you anything; correct?
18              MR. ZURBRIGGEN: Object to the
19        form.
20              Sergeant, if you understand, you
21        can answer.
22              THE WITNESS: I don't recall what
23        they exactly told me at the staging area
24        about parole, no.
```

Page 31

```
1    BY MR. WEST:
2         Q.    Okay. But had you conducted your
3    reconnaissance prior to or after arriving at the
4    staging area?
5         A.    Before.
6         Q.    So any communications you had with
7    the detectives would not have informed your
8    reconnaissance; correct?
9         A.    Repeat that again for me?
10             MR. ZURBRIGGEN: Object to the
11        form.
12   BY MR. WEST:
13        Q.    Yes. Any information that you
14   obtained from the detectives would have come to
15   you after you were already done with your
16   reconnaissance?
17        A.    Correct.
18        Q.    Okay.
19        A.    Well, the information, how it works
20   is they call our desk guy and they give all of the
21   information, like address, all of the information,
22   warrant number and all of that stuff. And if
23   there's any additional like information they want
24   to give to our desk guy, they do. But as far as
```

Page 32

```
1    like me and other officers, we'll go to the stage
2    and they might tell us if there's something else
3    going on at the job at that location.
4         Q.    Okay. You and Officer Clark --
5    strike the question.
6              When you and Officer Clark
7    conducted the reconnaissance for this operation
8    you were the supervising officer over Clark;
9    correct?
10        A.    Correct, yeah.
11        Q.    Is part of the reconnaissance with
12   regards to how the SWAT unit operates determining
13   the route that the SWAT unit should follow when
14   attempting to enter a property?
15        A.    Route by vehicle or route by like
16   approaching the house?
17        Q.    Approaching the house.
18        A.    Yes, we do have something in place
19   where if there's windows and doors are, we come in
20   a certain direction.
21        Q.    For example, the 4664 Torresdale
22   Avenue property had a front door and a rear door;
23   correct?
24        A.    Correct.
```

8 (Pages 29 to 32)

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 33

1    Q.    Was it ultimately your decision to
2  enter the property through the front door rather
3  than the rear door?
4    A.    No.
5    Q.    Who made that decision?
6    A.    The decision to breach the door is
7  by Lieutenant Monk.
8    Q.    Who made the decision as far as --
9  strike the question.
10         When you say it was Lieutenant
11  Monk's decision to breach the door, the decision
12  to breach is made when the SWAT unit officers are
13  already in position outside the door; correct?
14    A.    Correct.
15    Q.    Who made the decision to send the
16  SWAT unit to the front door -- let me lay a
17  foundation.
18    A.    I know what you're getting at.
19    Q.    Yes, we know what we're talking
20  about, but let me just try to create a clear
21  record.
22         At some point prior to the warrant
23  being executed at the 4664 Torresdale Avenue,
24  wasn't an operational decision made to breach the

Page 34

1  property through the front door rather than the
2  rear door?
3    A.    Yes.
4    Q.    Who made that decision?
5    A.    You could say -- you could say me
6  because I reconned that job.  And the way was
7  that's the door we were going through.
8    Q.    Okay.  Why did you make the
9  decision to enter the property through the rear
10  door rather than the front door?
11         MR. ZURBRIGGEN:  I'm going to
12    object to the form of the question.
13         But, Sergeant, you can explain.
14         THE WITNESS:  You just said --
15    repeat that for me?
16  BY MR. WEST:
17    Q.    Yes.  Why did you make the decision
18  to enter the property through the front door --
19    A.    You said rear door.
20    Q.    -- and not the rear door?
21         MR. ZURBRIGGEN:  Same objection.
22    But go ahead, Sergeant.
23         THE WITNESS:  The front of the
24    location gave us all of the indications

Page 35

1    that the front door was the best
2    opportunity for us to go through and
3    that it was normally what the house gave
4    us is what we could go through the door
5    and there should have been some type of
6    stairwell or door to the left or
7    straight ahead.
8  BY MR. WEST:
9    Q.    What was the description of the
10  property in the search warrant?
11         MR. ZURBRIGGEN:  Objection to the
12    form.
13         But, Sergeant, if you know.
14  BY MR. WEST:
15    Q.    If you recall at this time?
16    A.    I don't recall at this time.  I
17  don't know word for word what the search warrant
18  said.
19    Q.    Do you recall if the search warrant
20  referred to the suspect living in the rear
21  apartment?
22    A.    Yes.
23         MR. ZURBRIGGEN:  Same objection.
24         THE WITNESS:  Yes.

Page 36

1  BY MR. WEST:
2    Q.    Okay.  And, actually, we've marked
3  the recon sheet as what, Mellody-4?
4    A.    Yep.
5    Q.    So the recon sheet specifically
6  states it's apartment second floor rear; right?
7    A.    Yep.
8    Q.    So did it even occur to you that
9  the entrance to the rear apartment might be
10  through the rear door?
11         MR. ZURBRIGGEN:  Object to the
12    form.
13         But, Sergeant, you can explain.
14         THE WITNESS:  So with most, the
15    majority of the times of these apartment
16    buildings we go into, it's always
17    through the front door.  If we're going
18    through a rear door the detectives
19    usually tell us this guy lives in -- the
20    door's in the rear.  Like 99.9 percent
21    we're going through the front door.
22    That .1 percent the detectives might say
23    their front door is in the rear.
24  BY MR. WEST:

9 (Pages 33 to 36)

Page 37

1      Q.     Okay.  By the information available
2  to you as part of your reconnaissance is that you
3  knew that there was a rear door on the property
4  and you knew that you had a search warrant that
5  specified that this was a rear apartment; correct?
6           MR. ZURBRIGGEN:  Object to the
7       form.
8           But, Sergeant, you can --
9           THE WITNESS:  Right.
10  BY MR. WEST:
11      Q.     So what, if anything, did you do to
12  try to review the situation to see if possibly the
13  rear door led to a rear apartment?
14           MR. ZURBRIGGEN:  I'm going to
15       object to the form.
16           But, Sergeant, you can explain.
17           THE WITNESS:  I did look at the
18       rear.  That rear of the property gave me
19       no indication that that was a front door
20       to a second-floor rear apartment.
21  BY MR. WEST:
22      Q.     Okay.
23      A.     Because usually to me it was a rear
24  kitchen door coming off the first floor.

Page 38

1      Q.     If you had known that the suspect
2  was on parole, that would have told you that --
3  sorry, strike the question.
4           If you had known that the suspect
5  was on probation or parole, that would have
6  informed you that the probation and parole office
7  had likely been to his property; correct?
8           MR. ZURBRIGGEN:  Object to the
9       form.
10           Sergeant, you can say; if you know.
11           THE WITNESS:  Would parole have
12       known of the layout of the apartment
13       you're saying?
14  BY MR. WEST:
15      Q.     If you had known that the
16  suspect -- strike.  Let me lay a foundation.
17           I think -- you know, my memory is
18  not perfect.
19           I think I asked earlier if the
20  suspect was on probation or parole and I think
21  that you testified that you didn't know; is that
22  right?
23      A.     Correct.
24      Q.     Is that information that you would

Page 39

1  normally know about a suspect prior to trying to
2  enforce a search warrant at the suspect's home?
3      A.     It all depends if the detectives
4  tell us.
5      Q.     Did you ask the detectives if they
6  had that information about this particular person?
7      A.     If he was on parole?
8      Q.     Probation or parole.
9      A.     No.
10      Q.     Is that a question that you
11  normally would ask?
12      A.     No.
13      Q.     And your recollection is that the
14  detectives didn't give you any information with
15  regards to that; correct?
16      A.     Correct.
17      Q.     Okay.  If you had known that he was
18  on probation or parole, wouldn't that have led you
19  to understand that somebody from probation and
20  parole had probably been to his apartment before?
21           MR. ZURBRIGGEN:  Object to form.
22           Sergeant; if you know.
23           THE WITNESS:  So we get these
24       warrants the night before.  Like I come

Page 40

1       in at 11:00 at night or whatever.  So we
2       get these warrants literally at
3       nighttime for 5:00 a.m.  So the odds of
4       me -- like I don't know if they're on
5       probation.  I have no one to call to
6       find out anybody is on probation at 3:00
7       in the morning.
8  BY MR. WEST:
9      Q.     All right.  Thank you, Sergeant.
10  But if you could just answer the question that I'm
11  asking you.
12           If you had known that the suspect
13  was on probation or parole, wouldn't that have led
14  you to understand that somebody from probation or
15  parole had probably been to his apartment?
16      A.     Probably, yes.
17           MR. ZURBRIGGEN:  And the same
18       objection, for the record.
19  BY MR. WEST:
20      Q.     All right.  And it just follows
21  logically that if somebody from probation or
22  parole had been to the property they knew how to
23  enter it; right?
24           MR. ZURBRIGGEN:  Same objection.

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 41

1          Sergeant, to the extent you know.
2          THE WITNESS:  If parole was there
3     before, yes.
4     BY MR. WEST:
5          Q.    Okay.  So when you're doing the
6     reconnaissance and trying to figure out how to get
7     into this apartment, why wouldn't you reach out to
8     a resource like probation or parole that would be
9     able to tell you how to get there?
10         A.    That's detectives, that's the
11    detectives' business.
12         Q.    Then did you assume that the
13    detectives would do that?
14         A.    Yes.
15         Q.    Okay.  And once you realized the
16    detectives hadn't done that in this case, why
17    didn't you ask them that why hadn't done it?
18         MR. ZURBRIGGEN:  Object to the
19    form.
20         Sergeant; if you know.
21         THE WITNESS:  Before or after?
22    BY MR. WEST:
23         Q.    Before you broke down Ms.
24    Alvarado's front door, why didn't you ask that

Page 42

1     question of the detectives?
2          A.    Because if the detectives knew,
3     they should have told us.  We don't do detective
4     work.
5          Q.    Okay.
6          A.    It's not why we're there for.
7          Q.    Did you call the property manager?
8          A.    No.
9          Q.    Would you ever call a property
10    manager?
11         A.    No.
12         Q.    Why not?
13         A.    That would be detectives' work.
14         Q.    Okay.  Did ask you any of the
15    detectives if they had called the property
16    manager?
17         A.    No.
18         Q.    I have a document, which is
19    entitled Adult Probation Pretrial Services.  Let's
20    mark this as Mellody-6.  I usually lose track by
21    now.  It is.  And I have highlighted certain
22    portions of this document.
23              - - -
24              (Whereupon, Exhibit Mellody-6 was

Page 43

1     marked for identification.)
2              - - -
3     BY MR. WEST:
4          Q.    Sir, I can represent to you that we
5     deposed someone from the probation and parole
6     office in this case and they provided us with this
7     document, which is for the suspect.  His name was
8     xxxxxxx xxx.  Okay?
9          A.    Okay.
10         Q.    And this document memorializes that
11    the probation and parole office had been to this
12    property.  And you can see on the highlighted
13    section of the first page they had learned that
14    the entrance to the rear apartment was through the
15    alleyway.
16              Do you see that?
17         A.    Yes.
18         Q.    And they also had obtained the name
19    Mirela Pajo and the contact information for the
20    property owner.
21              You can see that on the second
22    page; correct?
23         A.    Yes.
24         MR. ZURBRIGGEN:  Object to the

Page 44

1     characterization.
2          But, Sergeant, you can answer to
3     the extent you can tell from this
4     document.
5     BY MR. WEST:
6          Q.    Okay.  If you had had the
7     information on the first page of this document
8     that the entrance to Mr. ███ apartment was
9     through the alleyway, would that have changed the
10    plans that you would have made for how to enter
11    the property and enforce this warrant?
12         MR. ZURBRIGGEN:  I'm going to
13    object to form.
14         But, Sergeant, you can answer.
15         THE WITNESS:  Yeah, if we had this
16    information it would change, yes.
17    BY MR. WEST:
18         Q.    Okay.  So if you had been provided
19    with that one piece of information on the first
20    page, how would you have enforced the warrant?
21         MR. ZURBRIGGEN:  Object to the form
22    of the question.
23         But, Sergeant, you can explain; if
24    you can.

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 45

1          THE WITNESS:  If we knew this
2     information at the time we would enter
3     the door from the rear because it
4     clearly says go down the alleyways, rear
5     apartment, second floor.  If we had this
6     information it would have been
7     different.
8  BY MR. WEST:
9          Q.   All right.  I have a document
10 previously been marked as Scott-3.
11         MR. WEST:  Let's mark this as
12    Mellody-7.
13              ---
14         (Whereupon, Exhibit Mellody-7 was
15    marked for identification.)
16              ---
17 BY MR. WEST:
18         Q.   Do you recognize what that document
19 is?
20         A.   Nope.
21         Q.   Have you ever seen a document that
22 looks like that before?
23         MR. ZURBRIGGEN:  Object to the form
24    of the question.

Page 46

1          But, Sergeant, if you can.
2          THE WITNESS:  It's an aerial map of
3     probably a satellite image of Google
4     Maps.
5  BY MR. WEST:
6          Q.   When you would do reconnaissance
7  operations as part of the SWAT unit back in 2021,
8  would you normally obtain an aerial satellite
9  image of a property before executing a warrant?
10         A.   We do.
11         Q.   Do you always do it or just
12 sometimes?
13         A.   Personally I do not do it.  It's
14 the officers under me do all of that work.
15         Q.   Okay.
16         A.   They do aerial satellites to get
17 maps of directions.
18         Q.   So that would have Officer Clark in
19 this case; right?
20         A.   It could have been anybody.  No, I
21 couldn't tell you who had done that.
22         Q.   Well, the reconnaissance team was
23 just you and Officer Clark; right?
24         A.   So we go out on the street.

Page 47

1  There's other people inside on computers.  We call
2  them and tell them what we're going to do.  And
3  they put on it the recon sheet.
4          Q.   Okay.
5          A.   So you have two guys on the street
6  and possibly two guys inside doing this recon
7  stuff.
8          Q.   So if an aerial Google Maps view of
9  the property had been obtained prior to the
10 warrant execution operation in this case, that
11 would have been part of the recon sheet; right?
12         MR. ZURBRIGGEN:  Object to the
13    form.
14         But, Sergeant; if you know.
15         THE WITNESS:  Sometimes yes,
16    sometimes no.  Like sometimes if the
17    rear has like a weird entry level in our
18    jobs we'll throw in a rear photo like
19    that, but this is not a normal thing,
20    no, because the normal one would be the
21    front of the property when we roll up
22    everybody knows what we're looking at.
23    An aerial shot does nothing for us when
24    we walk up to a property.

Page 48

1  BY MR. WEST:
2          Q.   Did you, specifically, view an
3  aerial shot of the 4664 Torresdale Avenue property
4  prior to the warrant execution operation in this
5  case?
6          A.   I don't recall that.
7          MR. WEST:  Let me actually change
8     something real quick.  I want to -- the
9     document that we marked as Mellody-7, I
10    just think this is a better copy.  So I
11    want to switch it out.  It's the same
12    exhibit.  It's just a better copy.
13    Let's make this Mellody-7.
14 BY MR. WEST:
15         Q.   All right.  Sir, so you can see
16 this is a Google Map aerial view and that somebody
17 has come by and they marked with a like a pink
18 marker; right?
19         A.   Yes.
20         Q.   Does the pink marker show where you
21 would have pulled the SWAT unit to go in order to
22 execute the warrant of Mr. xxx's apartment if you
23 had that information from the probation and parole
24 office?

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 49

1    MR. ZURBRIGGEN: Object to the
2    form.
3    And, Sergeant, you --
4    THE WITNESS: Most likely.
5    MR. WEST: Adam, could you explain
6    that objection?
7    The reason being because I want to
8    make sure I ask that question.
9    MR. ZURBRIGGEN: Yes. Well, I'm
10   objecting just because of the nature of
11   the photograph. It's not one he's been
12   presented before and it's not one he's
13   viewed. So and he also didn't draw the
14   pink arrow. So to the extent I object
15   to the form of that question. But to
16   the extent that the Sergeant can explain
17   in his answer in a way that is
18   comprehensive.
19   MR. WEST: That's fine. I wanted
20   to make sure I hadn't misused a word or
21   something.
22   BY MR. WEST:
23   Q.    Okay. All right.
24   And so the only reason that you

Page 50

1    didn't follow the course of entry displayed by the
2    yellow marker here on this exhibit is just simply
3    because you didn't have that information from
4    probation and parole; right?
5    MR. ZURBRIGGEN: Do you mean the
6    pink, just for the record?
7    MR. WEST: Yes.
8    MR. ZURBRIGGEN: Okay.
9    THE WITNESS: Correct.
10   MR. ZURBRIGGEN: And objection to
11   the form, for the record.
12   THE WITNESS: Can I ask a question
13   real quick?
14   MR. ZURBRIGGEN: Not right now,
15   Sergeant.
16   THE WITNESS: Because I don't even
17   know what this is. (Witness indicating.)
18   BY MR. WEST:
19   Q.    That's fine, you can set that aside
20   for now.
21   A.    (Witness complies.)
22   Q.    To be clear, if I ask you any
23   question that you have trouble understanding or
24   you would like a clarification, please ask for

Page 51

1    that, but I can't answer your questions in
2    testimony.
3    A.    I've got you.
4    Q.    Have you ever had heard of
5    something called the knock and announce rule?
6    A.    The knock and announce rule?
7    Q.    Yes.
8    A.    Yes.
9    Q.    Okay. Where did you hear about
10   that?
11   A.    Well, knock and announce rule is
12   like a reasonable amount of time to take a door in
13   a search warrant.
14   Q.    Okay. Where did you hear about
15   that?
16   A.    Training.
17   Q.    From the Philadelphia Police
18   Department?
19   A.    You could say, yes.
20   Q.    Did you receive any separate
21   training specific to the SWAT unit?
22   A.    No.
23   Q.    Just from the Philadelphia Police
24   Department?

Page 52

1    A.    Yes.
2    Q.    Okay. By the way, so you're like
3    48 years old?
4    A.    Forty-nine.
5    Q.    Forty-nine, okay.
6    When did you join the Philadelphia
7    Police Department?
8    A.    1998.
9    Q.    Okay. And when you joined, were
10   you a patrol officer?
11   A.    Yes.
12   Q.    How long did you remain a patrol
13   officer?
14   A.    Fifteen years.
15   Q.    What district were you assigned to,
16   district or districts?
17   A.    Third district, second district as
18   parole.
19   Q.    Okay. And after you stopped being
20   a patrol officer, what was next?
21   A.    Sergeant.
22   Q.    And when you first became a
23   sergeant, what were your duties?
24   A.    I was assigned to the 26th

Page 53

1    District.
2        Q.    Okay.  So you oversaw patrol
3    officers; is that correct?
4        A.    Correct.
5        Q.    And how long did you remain a
6    supervisor of patrol officers?
7        A.    I think it was six years, seven
8    years.
9        Q.    Okay.  What was next?
10       A.    I got transferred to the SWAT unit
11   in December of 2019.
12       Q.    Why did you get transferred to the
13   SWAT unit?
14       A.    Why?
15       Q.    Yes.  Did you request it?
16       A.    Yeah, you put it in, put a transfer
17   in.
18       Q.    Why did you decide to request a
19   transfer to the SWAT unit?
20           MR. ZURBRIGGEN:  Object to the
21       form.
22           But, Sergeant, you can answer.
23           THE WITNESS:  Something I always
24       wanted to do.

Page 54

1    BY MR. WEST:
2        Q.    Okay.  So you -- and when you
3    transferred you kept your rank, so you became a
4    sergeant within the SWAT unit; is that correct?
5        A.    Correct.
6        Q.    So our operation happened early
7    June 2021.
8            So I take it at that point you had
9    been a sergeant with the SWAT unit for about a
10   year and a half.
11           Does that sound right?
12       A.    Correct.
13       Q.    Were you like a probationary member
14   of the SWAT unit?  Were you still receiving
15   training or, as far as you know, had you received
16   all of the training that was available to a SWAT
17   unit sergeant as of June 2021?
18       A.    So when we get transferred we do
19   it's called SWAT school.  So the first couple of
20   months is training.
21       Q.    And you had already completed all
22   of the SWAT school training prior to June 2021?
23       A.    Correct.
24       Q.    And your testimony is that SWAT

Page 55

1    school didn't make any reference to the knock and
2    announce rule; correct?
3            MR. ZURBRIGGEN:  Object to the
4        form.
5            Sergeant?
6            THE WITNESS:  That they didn't make
7        any reference?
8    BY MR. WEST:
9        Q.    Well, yes, I think I asked you
10   earlier if you received any training about the
11   knock and announce rule specific to the SWAT unit
12   and I believe your testimony was no; is that
13   correct?
14           MR. ZURBRIGGEN:  Objection to the
15       form.
16           But, Sergeant, you can explain.
17           THE WITNESS:  So I don't recall a
18       specific time that they talked about it
19       during training.
20   BY MR. WEST:
21       Q.    Okay.  So as of today you do not
22   recall there being any specific training with
23   regards to the knock and announce rule?
24       A.    No, that's not what I said.  I said

Page 56

1    we probably did, but I couldn't tell you when.
2        Q.    Okay.  So let me just ask the
3    question a little bit differently.
4            Did you receive any training
5    specifically about the knock and announce rule
6    when you were at SWAT school?
7        A.    Yes.
8        Q.    Okay.
9        A.    But I don't recall when.
10       Q.    What specific training did you
11   receive at the SWAT school with regards to the
12   knock and announce rule?
13           MR. ZURBRIGGEN:  Object to the
14       form.
15           But, Sergeant, if you can recall.
16           THE WITNESS:  I don't recall any --
17       I don't recall any specific training.
18       Like if you're asking for like a certain
19       class or something, is that what you're
20       asking?
21   BY MR. WEST:
22       Q.    I'm just asking anything that they
23   told you about the knock and announce rule.
24       A.    I don't recall that.  I don't

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 57

1   recall that.
2            MR. ZURBRIGGEN: Same objection,
3       for the record.
4   Y MR. WEST:
5       Q.    At this time you don't recall
6   anything specifically being said about the knock
7   and announce rule at SWAT school; correct?
8            MR. ZURBRIGGEN: Same objection.
9            THE WITNESS: Correct.
10  BY MR. WEST:
11      Q.    Do you recall if you ever received
12  any training specifically about the knock and
13  announce rule before you went to SWAT school?
14      A.    No.
15      Q.    You don't recall any specific
16  training?
17      A.    No.
18      Q.    Have you ever received any training
19  from the Philadelphia Police Department that
20  specifically explained to you what the knock and
21  announce rule was?
22           MR. ZURBRIGGEN: Object to the form
23      of the question.
24           Sergeant, you can answer.

Page 58

1            THE WITNESS: Probably in the
2       Academy.
3   BY MR. WEST:
4       Q.    Which would have been back in the
5   1990s; right?
6       A.    Yes.
7       Q.    Do you know what the knock and
8   announce rule is?
9            MR. ZURBRIGGEN: Object to the
10      form.
11           Sergeant, you can answer and
12      explain.
13           THE WITNESS: We knock on the door
14      for a search warrant or arrest warrant
15      and give a reasonable amount of time
16      before we can take the door.
17  BY MR. WEST:
18      Q.    Okay. What does reasonable amount
19  of time mean in that context?
20           MR. ZURBRIGGEN: Object to the
21      form.
22           Sergeant, to the extent you can
23      answer.
24           THE WITNESS: There's no time.

Page 59

1            Just a reasonable amount of time
2       somebody can get to the door to answer
3       it.
4   BY MR. WEST:
5       Q.    Okay. Under the knock and announce
6   rule, are you obligated to give the occupant of
7   the property a reasonable opportunity to
8   voluntarily surrender the property before you
9   break down the door?
10           MR. ZURBRIGGEN: Object to the
11      form.
12           Sergeant, you can answer.
13           THE WITNESS: Yes.
14  BY MR. WEST:
15      Q.    Okay. Are you guessing or do you
16  know that for sure?
17           MR. ZURBRIGGEN: Object, same
18      objection.
19           THE WITNESS: When we do knock and
20      announce we give them a reasonable
21      amount of time to answer the door to
22      surrender to us.
23  BY MR. WEST:
24      Q.    Okay. Did you receive any training

Page 60

1   from the Philadelphia Police Department with
2   regards to what would be considered a reasonable
3   amount of time?
4            MR. ZURBRIGGEN: Same objection.
5            THE WITNESS: Probably in the
6       Academy.
7   BY MR. WEST:
8       Q.    Not that you can recall today;
9   correct?
10      A.    Not that I can recall, no.
11      Q.    Okay. In your specific experience
12  since you've joined the SWAT unit, what amount of
13  time would normally be allowed -- strike the
14  question.
15           How much time would you consider to
16  be a reasonable amount of time pursuant to the
17  knock and announce rule?
18           MR. ZURBRIGGEN: Objection to the
19      form.
20           Sergeant, you can explain.
21           THE WITNESS: So I'm just going to
22      say a reasonable amount of time. If
23      you're asking for a time, there's no
24      time.

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 61

```
 1    BY MR. WEST:
 2        Q.    Would you say 45 seconds or more?
 3            MR. ZURBRIGGEN:  Same objection.
 4            Sergeant, you can answer.
 5            THE WITNESS:  You could say that.
 6        That's a little long, but --
 7    BY MR. WEST:
 8        Q.    Okay.  So if that's too long, how
 9    much time would you consider reasonable?
10            MR. ZURBRIGGEN:  Same objection.
11            Sergeant, go ahead and answer
12        again.
13            THE WITNESS:  There's no time.
14        It's a reasonable amount of time.  So
15        when you're at these locations you hear
16        movement, you see them coming to the
17        door.  We wait for them.  We're not
18        crushing doors.  People say I'm coming
19        to the door.  We give them that
20        opportunity to open the door for us.
21        What that time is, I don't know.
22    BY MR. WEST:
23        Q.    Okay.  Have you ever seen the SWAT
24    unit breach a property without following the knock
```

Page 62

```
 1    and announce rule?
 2        A.    No.
 3        Q.    Was the knock and announce rule
 4    followed with regards to the 4664 Torresdale
 5    Avenue property?
 6        A.    I believe so, yes.
 7            MR. WEST:  Okay.  Let's mark this
 8        document as Mellody-8.
 9            - - -
10            (Whereupon, Exhibit Mellody-8 was
11        marked for identification.)
12            - - -
13    BY MR. WEST:
14        Q.    Do you know what that is?
15        A.    Well, it has the City of
16    Philadelphia logo on it and it says property.  So
17    I'm guessing it's some kind of real estate thing
18    in the City.
19        Q.    That's not a website that you
20    normally would use as part of your reconnaissance;
21    correct?
22        A.    No.  I don't know what website it
23    is.
24        Q.    All right.  You can put that aside.
```

Page 63

```
 1        A.    (Witness complies.)
 2        Q.    I've got a document here.  This
 3    particular document has exhibit stickers on it
 4    from Scott-1 and Hamoy-2.
 5            MR. WEST:  And we'll mark this as
 6        Mellody-9.
 7            - - -
 8            (Whereupon, Exhibit Mellody-9 was
 9        marked for identification.)
10            - - -
11    BY MR. WEST:
12        Q.    Do you recognize what this is a
13    photograph of?
14        A.    That looks likes the property at
15    46 --
16        Q.    64?
17        A.    4664.
18        Q.    Okay.  And I can represent to you
19    that it's been circled with a yellow highlighter
20    and there's some green highlighter markings.
21    That's from the prior time that this document was
22    used in prior depositions.
23            The property that's been circled in
24    yellow and marked with green, does that appear to
```

Page 64

```
 1    you to be the property that was breached as part
 2    of the operation that this case is about?
 3            MR. ZURBRIGGEN:  Object to the
 4        form.
 5            Sergeant, to the extent you can
 6        tell him.
 7            THE WITNESS:  I believe so, yes.
 8    BY MR. WEST:
 9        Q.    Okay.  And you can see that there's
10    a front door inside of that yellow circle; right?
11            MR. ZURBRIGGEN:  Same objection.
12            Sergeant, you can answer to the
13        extent you can tell.
14            THE WITNESS:  There's a front door,
15        yeah, I guess.
16    BY MR. WEST:
17        Q.    Do you actually recognize it or
18    not?
19            MR. ZURBRIGGEN:  Same objection.
20            THE WITNESS:  Well, the door is
21        probably about this big.
22        (Witness indicating.)
23    BY MR. WEST:
24        Q.    How big?
```

16 (Pages 61 to 64)

Page 65

1     A.    I see two windows and, I guess, a
2  door to the right.
3     Q.    Okay.  Do you know if the door that
4  got breached that led into Ms. Alvarado's
5  apartment is the door inside of the yellow circle
6  or you're not sure?
7         MR. ZURBRIGGEN:  Objection to the
8         form.
9         But, Sergeant, to the extent you
10        can tell from that picture, go ahead.
11        THE WITNESS:  So you're asking me
12        from this picture do you want me to say
13        -- you're asking if me if that's the
14        door to her apartment?
15 BY MR. WEST:
16    Q.    I'm asking if you recall?
17    A.    If I had a better picture.
18    Q.    Okay.  Fair enough.  It looks to me
19 like our printer might be on the blink, actually.
20        MR. WEST:  Does anyone want a break
21        or should I just run over to my office
22        real quick?  Do you guys want to take
23        like a quick break or are you guys ready
24        to go?

Page 66

1         THE WITNESS:  I'm fine.
2         MR. ZURBRIGGEN:  We can continue.
3  I'm fine.  The Sergeant's fine.
4         Do you all need a break?
5         MR. WEST:  No, I don't need a
6  break.  I'm going to be 30 seconds.  I
7  want to grab a better picture.
8         - - -
9         (Whereupon, a discussion took place
10        off the stenographic record only.)
11        - - -
12        MR. WEST:  We'll mark this as
13        Mellody-10.
14        - - -
15        (Whereupon, Exhibit Mellody-10 was
16        marked for identification.)
17        - - -
18 BY MR. WEST:
19    Q.    As I mentioned, the picture I
20 showed you before I don't think came out very well
21 from the printer.
22        Is that a better picture?
23    A.    Yes.
24    Q.    Do you recognize that house?

Page 67

1     A.    I do.
2     Q.    What house was that?
3     A.    That is the 4664 Torresdale.
4     Q.    Okay.  And that's the front door
5  that got breached as part of that operation?
6     A.    Correct.
7     Q.    All right.  So if you -- looking at
8  that picture, now that you look back to Mellody-9,
9  which is that -- do you recognize that now as the
10 same house just from a different angle?
11    A.    Yes.
12    Q.    Okay.  And even though this one
13 didn't come out clearly, is this consistent --
14 Mellody-9, is this consistent with your memory of
15 what the 4664 Torresdale property looked like?
16        MR. ZURBRIGGEN:  Object to the
17        form.
18        Sergeant; if you know.
19        THE WITNESS:  I recognize it more
20        in Mellody-10.
21 BY MR. WEST:
22    Q.    So as you look at both of these
23 pictures together, do you see -- strike the
24 question.

Page 68

1         As you look at these pictures
2  together, looking at Mellody-9, the area where the
3  green marking is, do you see that there's a
4  portion of the property that's marked in green?
5     A.    Yes.
6     Q.    And do you remember that there was,
7  in fact, at the 4664 Torresdale Avenue property a
8  portion of the building which was only one floor
9  or one story tall?
10        MR. ZURBRIGGEN:  Object to the
11        form.
12        Sergeant, you can answer it again.
13        THE WITNESS:  So you're asking me
14        if the green marking on Mellody-9, is it
15        a one-floor structure?
16 BY MR. WEST:
17    Q.    Right.  That portion of the
18 structure, is that two stories tall or one story
19 tall, just that portion?
20    A.    The tan part?
21    Q.    Yes.
22    A.    Yeah, it's one story.
23    Q.    So you knew that you had a warrant
24 that only applied to the second-floor rear

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 69

1 apartment; right?
2       MR. ZURBRIGGEN:  Object to the
3    form.
4       Sergeant, you can answer.
5       THE WITNESS:  Yes.
6 BY MR. WEST:
7    Q.    Okay.  And you knew that the door
8 on Torresdale Avenue led into a portion of the
9 property that was only one floor story tall;
10 right?
11       MR. ZURBRIGGEN:  Object to the
12    form.
13       Sergeant, to the extent you can
14    tell.
15       THE WITNESS:  Yes.
16 BY MR. WEST:
17    Q.    And you also knew that the property
18 had a rear door which led into a portion of the
19 property that was two stories tall; correct?
20       MR. ZURBRIGGEN:  Objection to the
21    form of the question.
22       Sergeant, if you can -- if you
23    know, you can answer.
24       THE WITNESS:  I believe the door in

Page 70

1       the rear I think was a bump-out.  I'm
2       not recalling if it was two floor in the
3       rear.  I believe it was like some kind
4       of a bump-out for the door.
5 BY MR. WEST:
6    Q.    So looking at this property from
7 the angle displayed in Mellody-9, do you think
8 that you should have investigated whether or not
9 the front door led only into a property that led
10 to the first-story apartment on the first floor?
11       MR. ZURBRIGGEN:  Object to the form
12    of the question.
13       Sergeant, you can answer and
14    explain.
15       THE WITNESS:  No, because this is
16    not nothing unusual.
17 BY MR. WEST:
18    Q.    Okay.  Did you receive training
19 with regards to how to conduct reconnaissance for
20 the SWAT unit?
21    A.    Yes.
22    Q.    As part of that training, was
23 anything ever said about trying to obtain
24 information from the probation and parole office,

Page 71

1 if available?
2       MR. ZURBRIGGEN:  Objection to the
3    form.
4       Sergeant, you can answer; if you
5    recall.
6       THE WITNESS:  I don't recall that.
7 BY MR. WEST:
8    Q.    Okay.  Nothing specific was said
9 about that, to your recollection; correct?
10    A.    Not that I recall.
11    Q.    Sir, specific to this operation, I
12 think you testified earlier that a knock and
13 announce was done; right?
14    A.    Yes.
15    Q.    How much time passed between the
16 door being knocked on and the door being breached?
17    A.    I don't recall.
18    Q.    Can you give an estimate or
19 approximation?
20    A.    I don't recall that.  I couldn't
21 tell you that.
22    Q.    And I'm just referring to your
23 prior testimony.
24       I think you stated that you could

Page 72

1 hear a gunshot when Officer Song killed the dog,
2 but you didn't actually see the shooting; correct?
3    A.    It was behind me.
4    Q.    But you didn't actually see the
5 shooting; right?
6    A.    No.
7    Q.    You also didn't see any physical
8 evidence that Officer Song had been bitten;
9 correct?
10       MR. ZURBRIGGEN:  Object to the
11    form.
12       Sergeant, if you know or remember.
13       THE WITNESS:  I don't recall.
14 BY MR. WEST:
15    Q.    You don't -- there's no -- at this
16 time you don't recall seeing anything that would
17 indicate he had been bitten; correct?
18    A.    No.
19    Q.    That is correct or not correct?
20    A.    If you're asking me did I see any
21 evidence that he was bitten at that time, I'm
22 going to say, no, I don't know.
23    Q.    All right.  Referring to Mellody-1,
24 the statement, there's a -- you can review it, if

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 73

1    you want.  This would will be a quick question.
2    I'll pull it out.
3        A.    Okay.
4        Q.    You were asked, QUESTION: Were you
5    the first supervisor on the scene?
6            ANSWER:  Yes, me and Lieutenant
7    Monk.
8            Could you elaborate what that would
9    mean?
10       A.    So when we go walk up to the
11   property, it's called a stack.  I was the
12   second-floor team.  And Lieutenant Monk was
13   first-floor team.  And we walk in a single file
14   line.  You have the breachers, the team for the
15   first floor and the team for the second floor
16   walking in the line.
17       Q.    And you were on the second-floor
18   team; right?
19       A.    Correct.
20       Q.    Who was the overall supervisor of
21   the SWAT unit that day?
22       A.    Lieutenant Monk because he's higher
23   rank.
24       Q.    Okay.  Did you hear Lieutenant Monk

Page 74

1    order for the property to be breached?
2        A.    I did.
3        Q.    Do you know why he ordered the
4    property be breached at that time?
5        A.    Why?
6            I can't give you why.  That would
7    be on him.
8        Q.    Okay.  Were there any exigent
9    circumstances or anything that you saw that
10   required the property to be breached immediately?
11           MR. ZURBRIGGEN:  Object to the
12       form.
13           Sergeant, to the extent you know.
14           THE WITNESS:  I don't believe so,
15       no.
16   BY MR. WEST:
17       Q.    As of June 2021, can you give an
18   estimate or approximation of how many SWAT unit
19   operations you had done reconnaissance for?
20       A.    Recons or warrants?
21       Q.    Recons.
22       A.    Probably around 50 to 100.
23       Q.    Okay.  And can you give an estimate
24   or an approximation of how many times you had

Page 75

1    personally participated in a warrant action which
2    involved breaching a property?
3        A.    Six hundred to 1,000.
4        Q.    All right.  So I think you earlier
5    said that there was a conversation that happened
6    at the staging area; right?  Is that correct or
7    not?
8        A.    With detectives?
9        Q.    At some point was there a brief
10   given to the members of the SWAT unit about this
11   operation?
12       A.    What was -- the previous question,
13   what was that?
14       Q.    I'll strike that question.  Let me
15   ask you a new question.
16           At some point, was there a briefing
17   given to the other members of the SWAT unit as far
18   as how this operation was going to be conducted?
19       A.    Yes.
20       Q.    Who gave the briefing?
21       A.    I believe I did.
22       Q.    Okay.  So could you tell us
23   everything you can remember about what you
24   actually said?

Page 76

1            MR. ZURBRIGGEN:  Object to the
2        form.
3            THE WITNESS:  I don't recall what I
4        said at that particular warrant.
5            There's been probably six, 700 different
6        warrants after that.
7    BY MR. WEST:
8        Q.    Did you say anything about a rear
9    door?
10       A.    Most likely, yes.
11       Q.    But testifying today you have no
12   specific recollection of saying anything about the
13   rear door; correct?
14           MR. ZURBRIGGEN:  Object to the
15       form.
16           Sergeant, to the extent you can
17       recall.
18           THE WITNESS:  I can recall there
19       was a rear door.
20   BY MR. WEST:
21       Q.    Sir, why was there a first-floor
22   entry team?
23       A.    Because there's always a
24   first-floor entry team, no matter what the

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 77

```
 1    property is.
 2        Q.    Why?
 3        A.    Did you say why?
 4        Q.    Yes.
 5        A.    That's how we do it.  There's
 6    always -- because you never know what's inside the
 7    property.  There's always a first-floor entry
 8    team, a second-floor entry team if it's an
 9    apartment or a two-story building.  If there's a
10    third-story building there would be three teams
11    going in.
12        Q.    So when you gave a briefing, where
13    did you tell the first-floor entry team they were
14    going to be going in this operation?
15        A.    Second floor rear.
16        Q.    Okay.  So you had a second-floor
17    team and they were going to go to the second floor
18    rear; correct?
19        A.    No.
20        Q.    The second-floor team wasn't going
21    to go to the second floor rear?
22        A.    When we breached the door both
23    teams were going to go to the second-floor
24    apartment.  That was the initial plan.
```

Page 78

```
 1        Q.    Okay.  So what's the point of
 2    having two separate entry teams if you're going to
 3    the same place?
 4        A.    What's the point of two?
 5              That's just how it is because you
 6    never know what's behind the door.  These
 7    locations we go into we never know what's behind
 8    that door.  So you always have to be prepared.
 9        Q.    When you gave the brief, what did
10    you tell the other members of the SWAT unit as far
11    as what was going on on the first floor of the
12    property?
13              MR. ZURBRIGGEN:  Objection to the
14    form.
15              Sergeant, to the extent you recall.
16              THE WITNESS:  Repeat that for me,
17    please?
18    BY MR. WEST:
19        Q.    Sure.  So what did you say about
20    the first floor of the 4664 Torresdale Avenue
21    building when you gave the briefing?
22              MR. ZURBRIGGEN:  The same
23    objection.
24              Go ahead, Sergeant.
```

Page 79

```
 1              THE WITNESS:  So, again, behind
 2    these doors we don't know what we're
 3    walking into.  So normally 99.9 percent
 4    usually it's a hallway with a door to
 5    the left to the first-floor apartment.
 6    So we hit the door.  Both teams go up
 7    the stairs to the second floor.
 8    BY MR. WEST:
 9        Q.    Okay.
10        A.    And even then we don't know what
11    the second floor gives us.
12        Q.    But when you gave the briefing for
13    this operation, what specifically did you tell the
14    other members of the SWAT unit about the first
15    floor?
16              MR. ZURBRIGGEN:  Object as asked
17    and answered.
18              Go ahead, Sergeant, you can answer.
19              THE WITNESS:  We didn't know that
20    the door led to the first floor.
21    BY MR. ZURBRIGGEN:
22        Q.    Did you tell them anything about
23    the first floor?
24              MR. ZURBRIGGEN:  Same objection.
```

Page 80

```
 1              Sergeant?
 2              THE WITNESS:  No.
 3    BY MR. WEST:
 4        Q.    Okay.
 5        A.    There's no -- because when you hit
 6    the door you're thinking there's going to be a
 7    door left or stairs to the rear of the property
 8    that goes upstairs.  That first floor could be
 9    anything.  If we hit that door and there was
10    something else we just handle it, we do what we
11    do.  Like I said, we go in through these doors
12    blindly.  We don't know what's behind that door.
13        Q.    All right.  So you knew that the
14    first floor of the building was occupied; right?
15              MR. ZURBRIGGEN:  Objection to the
16    form.
17              Sergeant; if you know.
18              THE WITNESS:  No.
19    BY MR. WEST:
20        Q.    Isn't that the kind of thing that
21    you should try to figure out as part of your
22    reconnaissance?
23        A.    Again, we don't know what's behind
24    these doors.
```

Page 81

1    Q.    Okay.  But as part of the
2  reconnaissance, should you have tried to figure
3  out if the first floor was occupied?
4          MR. ZURBRIGGEN:  Object to form.
5          THE WITNESS:  Again, we don't know
6          what's behind these doors.  They give us
7          a location.  We recon the best we can.
8          You can't look inside windows and doors
9          and knock on doors and tell them we're
10         coming.  We breach these doors and
11         whatever is behind that door we figure
12         it out.
13  BY MR. WEST:
14    Q.    All right.  But could you please
15  answer the question I'm asking?  As part of the
16  reconnaissance, should you have tried to figure
17  out if the first floor was occupied?
18         I think that's a yes-or-no
19  question.
20         MR. ZURBRIGGEN:  And an objection
21         to form.
22         Sergeant, you can answer.
23         THE WITNESS:  Yes.
24  BY MR. WEST:

Page 82

1    Q.    Did you make any effort to figure
2  out if the first floor was occupied?
3          MR. ZURBRIGGEN:  Same objection.
4          THE WITNESS:  If you're asking me,
5          that would be a no.
6  BY MR. WEST:
7    Q.    At the staging area, did you --
8  strike the question.
9          As part of the briefing prior to
10  the execution of this warrant, did you discuss
11  whether or not there were any dogs on the
12  property?
13    A.    No, I don't believe so.  I don't
14  recall.
15    Q.    Did you review any Internet
16  information source as part of your reconnaissance
17  other than Google Maps?
18    A.    I don't recall.
19    Q.    Is there any reason why the
20  property owner or property manager was not
21  contacted as part of the reconnaissance to try to
22  obtain more information about the physical layout
23  of the property?
24         MR. ZURBRIGGEN:  Objection to the

Page 83

1          form.
2          Sergeant, if you understand it, you
3          can answer.
4          THE WITNESS:  Yeah, I understand.
5          Again, I have to see what time the job
6          came in.  Like, again, we get these jobs
7          and we're doing them like three, four
8          hours later.
9  BY MR. WEST:
10    Q.    As I think you said earlier, that
11  there was a physical surveillance done of the
12  property; is that right?
13    A.    Correct.
14    Q.    And that was done by you,
15  personally?
16    A.    Correct.
17    Q.    What time of day?
18    A.    I don't recall.
19    Q.    Do you remember if it was dark or
20  light out?
21    A.    It was probably light out because I
22  work last out, 11:00 p.m. to 7:00 a.m.
23    Q.    Okay.  Did you attempt to contact
24  anybody who had ever been inside of the 4664

Page 84

1  Torresdale property to obtain information about
2  which doors led to which apartments?
3    A.    No.
4    Q.    Did you contact any other source of
5  information to try to gain that knowledge?
6          MR. ZURBRIGGEN:  Objection to the
7          form.
8          Sergeant, to the extent you know.
9          THE WITNESS:  No.  That's usually
10         the detectives would handle that.
11  BY MR. WEST:
12    Q.    Okay.  You personally did not;
13  correct?
14    A.    No.
15    Q.    And when you ordered for the
16  Torresdale Avenue door to the building to be
17  breached --
18    A.    I didn't order that.
19    Q.    Okay.  When you designed the
20  operation for the SWAT unit to enter through the
21  Torresdale Avenue entry, did you believe that you
22  were going in blind?
23         MR. ZURBRIGGEN:  Object to the
24         form.

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 85

1          Sergeant, to the extent you
2    understand, you can answer.
3          THE WITNESS:  Every door we breach
4    is unknown.
5    BY MR. WEST:
6        Q.    Okay.  So when you designed this
7    operation, you did not know what was on the other
8    side of the Torresdale Avenue door; correct?
9        A.    Correct.
10       Q.    Did you do anything whatsoever to
11   try to learn whether or not the door led to the
12   first-floor apartment?
13         MR. ZURBRIGGEN:  Object to the
14   form.
15         Sergeant?
16         THE WITNESS:  Visually looking at
17   the property.
18   BY MR. WEST:
19       Q.    If a reconnaissance had been done
20   of the property you could have seen that people
21   were coming in and out of the front door; couldn't
22   you?
23       A.    Not at 3:00 in the morning.
24       Q.    But if you had done it at another

Page 86

1    time of day?
2        A.    I work 11:00 to 7:00.
3        Q.    Are you the only person at the SWAT
4    unit who can do reconnaissance or could someone
5    else have done it?
6          MR. ZURBRIGGEN:  Object to the
7    form.
8          Sergeant, again?
9          THE WITNESS:  No, I'm not the only
10   one.
11   BY MR. WEST:
12       Q.    Okay.  So even if you were only
13   working at 3:00 a.m., why didn't somebody else do
14   the reconnaissance to see if people were coming in
15   and out of the front door?
16         MR. ZURBRIGGEN:  Object to the
17   form.
18         THE WITNESS:  That would actually
19   be a detective unit.
20   BY MR. WEST:
21       Q.    Can you explain what you mean by
22   that would have been a detective unit?
23       A.    Normally detectives get locations.
24   Their procedure is they should go out and look at

Page 87

1    the location before they give us a call to go out
2    and do the warrant for the location.
3        Q.    Did the detective unit tell you if
4    you should go through the front door or the back
5    door?
6        A.    No.
7        Q.    I'm sorry, we're going through
8    stuff faster than I expected.  I'm actually
9    skipping over some questions.  That's why I'm
10   taking a minute.
11         Did you ever speak with Ms.
12   Alvarado?
13       A.    No.
14       Q.    All right.  So as part of your SWAT
15   unit training, did you receive any training as far
16   as how you should handle interactions with dogs
17   while trying to carry out warrant enforcement
18   operations?
19         MR. ZURBRIGGEN:  Object to the
20   form.
21         Sergeant, to the extent you know.
22         THE WITNESS:  No, that's not a --
23   that's you come out of the Academy, go
24   to these houses, you deal with dogs all

Page 88

1    the time.  And you deal with them
2    accordingly of what the dog is doing
3    towards you.
4    BY MR. WEST:
5        Q.    Okay.  But did you ever receive any
6    specific training from the Philadelphia Police
7    Department at any time as far as how you should
8    handle an action with dogs?
9        A.    No.
10         MR. ZURBRIGGEN:  Same objection,
11   for the record.
12         MR. WEST:  We're up to 11; right?
13         I'm going to mark something as
14   Mellody-11.  This is Bates Stamped
15   Defense 233 to 234.
16         ---
17         (Whereupon, Exhibit Mellody-11 was
18   marked for identification.)
19         ---
20   BY MR. WEST:
21       Q.    Sir, I'd ask you just to take a
22   moment to look at this document and let me know if
23   you think you've actually seen this before?
24       A.    I don't recall, to be honest with

Page 89

1  you.
2      Q.    All right.  You can put that down
3  then.
4      A.    (Witness complies.)
5      Q.    So we've done a lot of depositions
6  in this case already.  I can represent to you that
7  prior officers testified that they could hear the
8  dog barking before the property was breached.
9          Is that consistent with your memory
10 as well, could you -- actually, let me rephrase
11 the question.
12         Did you hear the dog barking before
13 the property was broached?
14     A.    Yes.
15     Q.    Okay.  So since you knew that there
16 was a dog inside of the property, were any
17 preparations made, to your knowledge, by anybody
18 as part of the SWAT unit to handle a likely dog
19 encounter?
20         MR. ZURBRIGGEN:  Object to the
21     form.
22         But, Sergeant, to the extent you
23     can answer.
24         THE WITNESS:  Not to my knowledge,

Page 90

1      no.
2  BY MR. WEST:
3      Q.    Okay.  For example, this document
4  here talks about alternative methods to handle a
5  dog encounter is like getting a dog noose, OC
6  spray.
7          Nobody had a dog noose or pulled
8  out an OC spray can prior to this operation;
9  right?
10         MR. ZURBRIGGEN:  Object to the
11     form.
12         Sergeant, you can answer; if you
13     know.
14         THE WITNESS:  Not to my knowledge,
15     no.
16 BY MR. WEST:
17     Q.    Now, I think you testified earlier
18 today that you didn't know what was on the other
19 side of the first-floor apartment when you planned
20 the operation; right?
21     A.    Correct.
22     Q.    Okay.  But before the door actually
23 got breached you could hear the dog barking on the
24 other side; right?  So did that give you any

Page 91

1  insight as to whether or not that property might
2  be occupied?
3          MR. ZURBRIGGEN:  Object to the form
4      of the question.
5          Sergeant, you can answer.
6          THE WITNESS:  Occupied means that
7      dog bark could be coming from the
8      second, first floor, basement.
9  BY MR. WEST:
10     Q.    Okay.  So that didn't cause you at
11 all to second guess maybe you guys might be going
12 into the first-floor apartment?
13     A.    No.
14     Q.    Did you ever receive any training
15 from the SWAT unit as far as how you should
16 conduct reconnaissance operations as part of the
17 SWAT unit?
18         MR. ZURBRIGGEN:  Objection as asked
19     and answered.
20         Go ahead, Sergeant, you can answer
21     again.
22         THE WITNESS:  Yes, sir.
23 BY MR. WEST:
24     Q.    Was all of that training oral or

Page 92

1  was any of that training in writing?
2          MR. ZURBRIGGEN:  Same objection.
3          THE WITNESS:  If you're saying if
4      there's something like some kind of
5      documentation, I believe so.
6  BY MR. WEST:
7      Q.    Okay.  You actually recall there
8  being any written documentation at this time?
9      A.    No, not to be honest with you.  It
10 was more of like hands on.
11     Q.    Okay.  So all of the training that
12 you received about how to do reconnaissance was
13 things you were told by other members of the SWAT
14 unit; right?
15         MR. ZURBRIGGEN:  Objection to the
16     form.
17         Sergeant, go ahead.
18         THE WITNESS:  No.  We have the Five
19     Squad trainers trained us.
20 BY MR. WEST:
21     Q.    Fire Squad trainers?
22     A.    Five Squad.
23     Q.    Okay.  What's the Five Squad?
24     A.    They're our trainers.  They handle

23 (Pages 89 to 92)

Page 93

1  all of the training to our unit and other units
2  that come in to train throughout the City.
3      Q.   And the training that you received
4  from those members of the Philadelphia Police
5  Department, that was all verbal training; correct?
6      A.   Hands on, too.
7      Q.   Hands on like they --
8      A.   Yeah, they gave us a location and
9  we go out and do it.
10      MR. WEST:  Okay.  So let's mark
11  Mellody-12.
12          ---
13      (Whereupon, Exhibit Mellody-12 was
14  marked for identification.)
15          ---
16  BY MR. WEST:
17      Q.   So you have in front of you a
18  document marked as SOP Number 31 SWAT Unit Warrant
19  Service.
20          Do you see that there?
21      A.   Yes.
22      Q.   Have you ever seen this document
23  before?
24      A.   Yes.

Page 94

1      Q.   When have you seen it?
2      A.   We train every once a week.  We go
3  over SOPs all the time.
4      Q.   Okay.  Sir, if you switch to the
5  second page of this document?
6      A.   (Witness complies.)
7      Q.   It describes the knock and announce
8  rule.
9          It says that it needs to be
10  followed under these circumstances; right?
11      A.   Correct.
12      Q.   And if we go down to 2b it says,
13  such officer shall await a response for a
14  reasonable period of time after their announcement
15  before gaining entry into the property.
16          Do you see that?
17      A.   Yes.
18      Q.   What does that -- what do those
19  words mean, to your understanding?
20      MR. ZURBRIGGEN:  Object to the
21  form.  Object as asked and answered.
22  Go ahead, Sergeant.
23      THE WITNESS:  I just have to make a
24  knock and announce, a reasonable amount

Page 95

1  of time for somebody to answer the door.
2  BY MR. WEST:
3      Q.   Okay.  And if you look down to the
4  note underneath that it actually says that 30
5  seconds should be the minimum.
6          Do you see that?
7      A.   Yes.
8      Q.   Prior to me showing that to you
9  right now, did anyone ever tell you that 30
10  seconds should be the minimum for a knock and
11  announce?
12      A.   I don't recall that.
13      MR. ZURBRIGGEN:  Object to form.
14  BY MR. WEST:
15      Q.   You don't recall ever being told
16  that before right now; right?
17      A.   No.  It's been five years.
18      Q.   In your experience, would the SWAT
19  unit always allow 30 seconds at a minimum between
20  knocking on a property and breaching it?
21      A.   You could say that, yes.
22      Q.   Is it true or not true?
23      A.   True.
24      Q.   And was at least a minimum of 30

Page 96

1  seconds allowed to pass between the front door of
2  the Torresdale Avenue door of the 4664 -- strike
3  the question.
4          Did at least 30 seconds pass
5  between the front door of Ms. Alvarado's apartment
6  -- I mis-worded that.  I'm sorry.  New question.
7          Did at least 30 seconds pass
8  between the front door to Ms. Alvarado's apartment
9  being knocked on and her apartment being breached?
10      MR. ZURBRIGGEN:  Objection to the
11  form.  And it's asked and answered.
12  Go ahead.
13      THE WITNESS:  I don't recall the
14  actual time, no.
15  BY MR. WEST:
16      Q.   Do you know if it was more or less
17  than 30 seconds?
18      MR. ZURBRIGGEN:  Same objection.
19  Go ahead.
20      THE WITNESS:  I don't recall.  I
21  couldn't tell you.
22  BY MR. WEST:
23      Q.   What, if any, method did the SWAT
24  unit follow as of June 2021, in your experience,

24 (Pages 93 to 96)

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 97

1  in order to ensure that at least 30 seconds passed
2  before a property was breached after a knock and
3  announce rule was first called?
4            MR. ZURBRIGGEN:  Object to the
5        form.
6            Sergeant, to the extent you
7        understand.
8            THE WITNESS:  So you're asking me
9        what kind of method, are you saying like
10       a watch or something?
11  BY MR. WEST:
12       Q.    Yes.  Let me make it a simpler
13  question.
14            So as of June 2021 when a member of
15  the SWAT unit would knock on the door of someone's
16  property to begin following the knock and announce
17  rule, what sort of method, if any, was in place to
18  ensure that at least 30 seconds passed before the
19  apartment was breached?
20            MR. ZURBRIGGEN:  Same objection to
21       the form.
22            Sergeant?
23            THE WITNESS:  Three knocks or more.
24  BY MR. WEST:

Page 98

1        Q.    Okay.  Can you show us what that
2  looks like?
3        A.    Actually, no.
4        Q.    Why not?
5        A.    Because it's going to have two
6  breachers, one with a ram, one with a Halligan.
7  The Halligan guy's knocking on the door.  I'm
8  usually the third person back.  And it's kind of
9  like visually it's just two other -- I don't
10  physically knock on the door.  Our breachers knock
11  on the door and they give three knocks or more.
12  And I make the decision to breach the door.
13       Q.    Okay.  So you physically have never
14  knocked on a door as part of a knock and announce
15  operation?
16       A.    Correct.
17       Q.    But, in your experience, the door
18  would be knocked on at least three times before
19  you break someone's door down; right?
20       A.    Three or more.
21            MR. WEST:  Okay.  Let's mark this
22       as Mellody-12 -- this is 13.
23            - - -
24            (Whereupon, Exhibit Mellody-13 was

Page 99

1        marked for identification.)
2            - - -
3  BY MR. WEST:
4        Q.    Have you ever seen this document
5  before right now?
6        A.    Yes.
7        Q.    When?
8        A.    I don't recall.  We go over our
9  SOPs.
10       Q.    All right.  So when you -- it says,
11  SWAT Unit Reconnaissance And Intelligence; right,
12  SOP 28?
13       A.    Correct.
14       Q.    When you conducted the
15  reconnaissance for the 4664 Torresdale Avenue
16  property, were you required to comply with the
17  terms of this SOP?
18            MR. ZURBRIGGEN:  Objection to the
19       form.
20            Sergeant; if you know.
21            THE WITNESS:  These are guidelines.
22       They're more of guidelines.
23  BY MR. WEST:
24       Q.    So you were not required to not

Page 100

1  follow these; am I correct?
2            MR. ZURBRIGGEN:  Same objection.
3            THE WITNESS:  I wouldn't say that;
4        but they're more guidelines to what we
5        do.
6  BY MR. WEST:
7        Q.    Okay.  So if we go down to Number
8  3, Survey Examples, it says, there can never be
9  too much tactical information.  Listed on this
10  documents are minimal examples of necessary
11  information.
12            Do you see that?
13       A.    Correct.
14       Q.    So would you ever send a team out
15  to breach a property without complying with this
16  list of -- strike the question.
17            Would you ever send a team out to
18  breach someone's front door without conducting
19  enough reconnaissance to ensure that you had at
20  least this minimum amount of information?
21       A.    Correct.  This is the standard.
22       Q.    Okay.  So if we go down, for
23  example, it says, how constructed.
24            What information, if any, did you

Page 101

1  have about how the property at 4664 Torresdale
2  Avenue was constructed before you broke down Ms.
3  Alvarado's front door?
4      A.    So looking at the picture knowing
5  that's an apartment building you have a door to
6  the right and windows to the left.  You've got two
7  mailboxes on the front door.  99.9 percent of the
8  time that door is going to lead to a hallway with
9  a stairwell in it, door to the right.
10     Q.    But you hadn't actually obtained
11 any information about the interior layout of the
12 property; correct?
13         MR. ZURBRIGGEN:  Sergeant, if you
14     can explain.
15         THE WITNESS:  Yeah, that's hard to
16     do.
17 BY MR. WEST:
18     Q.    I'm just saying in this particular
19 situation you hadn't actually obtained any
20 information about the interior of the property;
21 correct?
22         MR. ZURBRIGGEN:  Same objection.
23         THE WITNESS:  No.
24 BY MR. WEST:

Page 102

1      Q.    It is correct or not correct?
2      A.    It's correct.
3      Q.    It lists that you should figure out
4  if there's dogs; right?
5      A.    Correct.
6      Q.    Prior to the officers standing on
7  the steps leading to Ms. Alvarado's front door,
8  did you know if there were any dogs on the
9  property?
10     A.    No.
11     Q.    Had you made any effort to
12 determine if there were dogs on the property?
13     A.    Yeah.  Sometimes if you look at
14 like what's in the rear like a doghouse or like a
15 dog bowl sitting at the rear, stuff like that.
16     Q.    In this particular operation, did
17 you make any effort to determine if there were
18 dogs on the property?
19     A.    Yes.  That's like a normal thing to
20 do.
21     Q.    Okay.  What did you do?
22     A.    Basically, from the front of the
23 property there's nothing there, but the rear
24 there's no like fenced-in yard with a doghouse or

Page 103

1  a dog bowl or nothing like that.
2      Q.    Isn't it true at this property
3  there was actually a sign on the front door that
4  said beware of dog?
5          MR. ZURBRIGGEN:  Object to the
6      form, but to the extent you can recall.
7          THE WITNESS:  I don't recall that.
8  BY MR. WEST:
9      Q.    But if there was you didn't see it;
10 right?
11     A.    No.
12     Q.    Moving down to -- this document is
13 obviously mis-numbered, but Number 2 on the second
14 page, it says, Occupants; right?
15     A.    Okay.
16     Q.    What, if any, effort did you make
17 to determine who the other occupants of the
18 building were?
19     A.    Well, knowing it was an apartment,
20 the first floor -- the first floor was probably
21 out of play until you hit the door and then you
22 find out it's not an apartment.
23     Q.    Okay.  What, if any, effort did you
24 make to determine who occupied the first floor?

Page 104

1          MR. ZURBRIGGEN:  Object to the
2      form.
3          Sergeant, if you understand the
4      question.
5          THE WITNESS:  So you're asking me
6      if I called anybody to find out if
7      somebody occupies the first floor?
8  BY MR. WEST:
9      Q.    I'm just asking what, if any,
10 effort did you make as part of your reconnaissance
11 to determine who occupied the first floor?
12         MR. ZURBRIGGEN:  Same objection.
13         THE WITNESS:  None because at the
14     time we weren't dealing with the first
15     floor.
16 BY MR. WEST:
17     Q.    And if you look to the last section
18 on here it's marked Number 5 on Page 3, Method of
19 Reconnaissance.
20         What, if any of these, did you
21 follow as part of this operation?
22         MR. ZURBRIGGEN:  Object to the
23     form.
24         Sergeant; if you can.

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 105

1      THE WITNESS:  Marked vehicle,
2  uniformed personnel.
3  BY MR. WEST:
4      Q.    Okay.  So you used A, but not --
5  you did not use B, C, D or E; correct?
6      A.    We didn't use a police helicopter,
7  I'll tell you that.
8      Q.    Correct.  But just so we can kind
9  of move on, you used A, but you not use B, C, D or
10 E; correct?
11     A.    Yeah, so I went out in a marked
12 vehicle, I believe, in uniform.  That's what I
13 recall and that's usually how I do it.
14     MR. WEST:  All right.  Does anyone
15 want a quick break?  I want to show you
16 some video.  Yes, let's take a
17 five-minute break.
18     THE VIDEOTAPE OPERATOR:  Okay.
19 We're going to go off the record at
20 12:48 p.m.
21         - - -
22     (Whereupon, a discussion took place
23 off the video and stenographic records.)
24         - - -

Page 106

1      THE VIDEOTAPE OPERATOR:  Going back
2  on the record at 12:53 p.m.
3  BY MR. WEST:
4      Q.    All right.  Sergeant Mellody, so
5  just to make a clear record, we pulled up on the
6  screen something that would appear to be a
7  surveillance footage clip that's not being played
8  yet.  This was produced to us in Discovery by the
9  City of Philadelphia.  This particular angle is
10 marked Camera 10.
11     Can you see that?
12     A.    Yes.
13     Q.    And prior to right now you didn't
14 know that there was any camera footage of this
15 operation; correct?
16     MR. ZURBRIGGEN:  Objection to the
17 form.
18     But sergeant; if you know.
19     THE WITNESS:  No.
20 BY MR. WEST:
21     Q.    And nobody was wearing any body
22 cameras; right?
23     A.    No.
24     Q.    And you did or did not know that

Page 107

1  there was outside footage?
2      MR. ZURBRIGGEN:  Object to the
3  form.
4      Sergeant, again; if you know.
5      THE WITNESS:  Didn't know.
6  BY MR. WEST:
7      Q.    Okay.  Do you think that what we're
8  going to see here is consistent with your prior
9  testimony?
10     MR. ZURBRIGGEN:  Objection to the
11 form.
12     Sergeant, if you can predict the
13 future, go ahead and answer.
14     THE WITNESS:  We'll see, I guess.
15 I don't know.
16 BY MR. WEST:
17     Q.    So I'm going to start play at the
18 zero second mark.  Okay.  So I've started the
19 video at the 1.5 mark.
20     A.    Okay.
21     Q.    If you'd like me to pause it at any
22 time, let me know.
23     A.    Okay.
24     Q.    I paused it at the 2:17 mark.

Page 108

1      You can see there's an officer who
2  approached the property with a Halligan tool;
3  right?
4      A.    Correct.
5      Q.    And isn't part of the way you
6  breach someone's door, you have someone with a
7  Halligan tool will pull the door open a little bit
8  before the ram goes in?
9      A.    No.
10     Q.    What's the Halligan tool used for?
11     A.    So there's like a screen door.  You
12 put the Halligan in the screen door.  The ram hits
13 the Halligan.  And it puts it in the jam and it
14 rips it back to open the security door.
15     Q.    Okay.  And so if you have a locked
16 door, wouldn't you use the Halligan to create a
17 little bit of an opening before you have a ram go
18 in?
19     A.    No.
20     Q.    Okay.  What would the Halligan tool
21 be used for here?
22     A.    Probably knocking on the door.
23     Q.    Let's see.  Stopped the play at the
24 2:17 mark.  All right.

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 109

1           Now, at this point, 2:28 you can
2    see someone is ramming the door; correct?
3        A.    Correct.
4        Q.    And then you can see officers
5    entering; right?
6        A.    Correct.
7        Q.    Okay.  At any point in this video,
8    did you see a knock and announce?
9        A.    No, I did not.
10       Q.    Okay.  Is that consistent --
11       A.    Well, I should say, okay, I don't
12   know what he was saying.  Like I couldn't see if
13   he was tapping the door with the Halligan or what
14   he was saying.  I shouldn't have said that.
15       Q.    Okay.
16       A.    If he was up against that door, I
17   don't know what he was saying or what he was doing
18   with the Halligan from the video.
19       Q.    But even if the person with the
20   Halligan tool had knocked on the door, was that a
21   reasonable amount of time before the door got
22   breached with the ram?
23           MR. ZURBRIGGEN:  Object to the
24       form.

Page 110

1           Sergeant, you can answer; if you
2       can.
3           THE WITNESS:  So I didn't make that
4       call.  So Lieutenant Monk made that call
5       to breach that door.  So I can't answer
6       that.
7    BY MR. WEST:
8        Q.    Okay.  But based on your
9    understanding of the policies and procedures of
10   the City of Philadelphia, was this a correctly
11   done knock and announce?
12           MR. ZURBRIGGEN:  Same objection.
13       Sergeant, you can answer; if you
14       can.
15           THE WITNESS:  From the video, a
16       little quick from what I would do.
17   BY MR. WEST:
18       Q.    Okay.  It does not appear that a
19   reasonable amount of time passed; correct?
20           MR. ZURBRIGGEN:  Same objection.
21       Sergeant, you can answer.
22           THE WITNESS:  Again, a reasonable
23       amount of time, I don't know what the
24       time is.  I don't know when -- I don't

Page 111

1       know when -- I don't know when he
2       started to knock or announce from this
3       video.
4    BY MR. WEST:
5        Q.    Okay.  And, if you recall, we
6    previously looked at the statements of Lieutenant
7    Monk and Officer Murray; right?
8        A.    Correct.
9        Q.    And Officer Murray is the man with
10   the Halligan tool; right?
11           MR. ZURBRIGGEN:  To the extent you
12       know.
13           THE WITNESS:  From the video, I
14       guess.
15   BY MR. WEST:
16       Q.    Okay.
17       A.    Like I can't definitely say that's
18   him from the video because we're all dressed the
19   same.
20       Q.    And Officer Clark is the man with
21   the ram; right?
22           MR. ZURBRIGGEN:  Same objection.
23       Sergeant; if you can tell.
24           THE WITNESS:  I believe so.

Page 112

1    BY MR. WEST:
2        Q.    Okay.  Did you see Officer Clark
3    make any effort whatsoever to knock on that door
4    before he rammed it open?
5           MR. ZURBRIGGEN:  Same objection.
6           THE WITNESS:  A ram doesn't knock
7       on the door.
8    BY MR. WEST:
9        Q.    Okay.  So did you see Officer Clark
10   knock on that door before he rammed it open?
11           MR. ZURBRIGGEN:  Same objection.
12       Sergeant, to the extent you know.
13           THE WITNESS:  No, because he
14       wouldn't knock on the door.
15   BY MR. WEST:
16       Q.    Okay.
17       A.    That's not his job.
18       Q.    What you seen here in this video, is
19   this typical, in your experience as a member of
20   the SWAT unit in the City of Philadelphia, is this
21   typical of how a knock and announce is done?
22           MR. ZURBRIGGEN:  Object to the form
23       of the question.
24           Sergeant?

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 113

1          THE WITNESS: Can I see it real
2      time?
3    BY MR. WEST:
4      Q.     Do you mean you want me to start
5    over?
6      A.     Yes.
7      Q.     Okay.
8      A.     Because you stopped before anybody
9    went in.
10     Q.     Fair enough. So I'm going to go
11   back to the 1:35 mark. And I'm going to push
12   play. And I'll pause it whenever you tell me to.
13         Okay?
14     A.     Okay.
15     Q.     So pushing play from 1:35.
16     A.     Can you do me a favor?
17     Q.     Yes.
18     A.     Can you just review that up until
19   he walks up to the door for me for a second, can
20   you replay that?
21     Q.     Okay. So just to clear the record,
22   I paused the video at the 2:34 mark.
23         And do you want me to go back to
24   start where I was or from a different place?

Page 114

1      A.     Where they start walking up.
2          MR. WEST: Okay. Did I say 1:35
3      before?
4          THE COURT REPORTER: Yes.
5    By MR. WEST:
6      Q.     Just for the sake of a clear record
7    I'm going to go back to 1:35 and push the play
8    button. Again, I'll pause at any point you want
9    me to.
10     A.     Okay. You can pause it.
11     Q.     Okay. I'm pausing at 2:32.
12         So what did you see there?
13         MR. ZURBRIGGEN: Object to the
14     form.
15         Sergeant?
16         THE WITNESS: I saw a knock and
17     announce and breach of the door.
18   BY MR. WEST:
19     Q.     So you believe that what you saw
20   was a knock and announce consistent with the
21   policies and procedures of the Philadelphia Police
22   Department?
23         MR. ZURBRIGGEN: Object to the
24     form.

Page 115

1      Sergeant, you can answer.
2          THE WITNESS: So I'm going to say
3      visually looking at that video, no, but
4      I don't know what the circumstances were
5      and what the lieutenant was thinking at
6      that time.
7    BY MR. WEST:
8      Q.     Okay. Assuming there were no
9    exigent circumstances, was this consistent with
10   the knock and announce rule policies from the
11   Philadelphia Police Department?
12     A.     No.
13         MR. ZURBRIGGEN: Objection to the
14     form.
15         THE WITNESS: I'm going to say no.
16   BY MR. WEST:
17     Q.     Was this consistent with your
18   experience, as a member of the SWAT unit, as far
19   as how a warrant enforcement action would normally
20   be done?
21     A.     No.
22         MR. ZURBRIGGEN: Same objection.
23         THE WITNESS: No.
24   BY MR. WEST:

Page 116

1      Q.     How is this different than normal?
2      A.     From my liking --
3      Q.     No, I'm not asking --
4      A.     No. I'm saying like when I -- if
5    it was me ordering the breach --
6      Q.     Yes, let me clarify. I'm not
7    asking for your liking or preference right now.
8          Based on your experience as
9    somebody, I think you said, you've done thousands
10   of these, how is this different than your normal
11   experience, not your preference, your actual
12   experience?
13         MR. ZURBRIGGEN: And objection to
14     form.
15         Sergeant, you can answer based on
16     what you know.
17         THE WITNESS: How is it different?
18   BY MR. WEST:
19     Q.     Yes. Or is it the same, is this
20   normal?
21     A.     That is not normal.
22     Q.     Okay. So why is this not normal?
23     A.     Like I said, you have two people
24   ordering the breach, if I ordered the breach or if

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 117

1    the lieutenant ordered the breach. Like if I
2    ordered it, it would be different.
3        Q.    Okay. But I'm not asking for a
4    hypothetical question or I'm not asking for your
5    personal opinion.
6            In your experience as somebody
7    who's seen, by your prior testimony, hundreds or
8    thousands of warrant enforcement actions, why is
9    this not typical of how the SWAT unit would
10   normally do this, if it was not typical?
11           MR. ZURBRIGGEN: Same objection to
12       form.
13       Sergeant?
14           THE WITNESS: A little quick to my
15       liking.
16   BY MR. WEST:
17       Q.    Because they didn't wait a
18   reasonable amount of time?
19           MR. ZURBRIGGEN: Same objection.
20           THE WITNESS: Like, again, I don't
21       know what that time is. A reasonable
22       amount of time is, you know, a
23       reasonable amount of time.
24   BY MR. WEST:

Page 118

1        Q.    Did they not wait as long as you
2    normally expect?
3        A.    If I would have done it, no.
4        Q.    And, again, I'm not asking you how
5    you would have done it.
6            I'm just asking in your experience
7    based on how it's normally done, is this something
8    you've seen before or is this completely different
9    than any other time you've seen it?
10           MR. ZURBRIGGEN: Same objection,
11       for the record.
12       Sergeant, you can answer.
13           THE WITNESS: If there's exigent
14       circumstances, if there was like someone
15       jumped out a window or a gun comes out
16       the window, we're taking the door.
17   BY MR. WEST:
18       Q.    Okay. I can represent to you we've
19   had many people testify in this case previously
20   that there were no exigent circumstances.
21       A.    Okay.
22       Q.    So assuming that there were no
23   exigent circumstances, have you ever seen a SWAT
24   unit warrant enforcement operation that looked

Page 119

1    like this or is this unique?
2            MR. ZURBRIGGEN: Object to the
3        characterization of prior testimony and
4        object to the form.
5            Ahead, Sergeant, you can answer.
6            THE WITNESS: That was a first.
7    BY MR. WEST:
8        Q.    And what makes this a first?
9        A.    A little quick.
10       Q.    Because they didn't wait enough
11   time?
12           MR. ZURBRIGGEN: Same objection,
13       for the record.
14           THE WITNESS: You could say.
15   BY MR. WEST:
16       Q.    Okay. So when I asked you at the
17   beginning of this deposition if this was any
18   different than any other operation, why didn't you
19   tell me, yeah, we went in too quick?
20           MR. ZURBRIGGEN: Objection to the
21       form, particularly argumentative.
22           Go ahead, Sergeant, you can answer.
23           THE WITNESS: These warrants are
24       all different.

Page 120

1    BY MR. WEST:
2        Q.    Okay. But I'm just asking when I
3    asked you -- you knew what you were going to be
4    deposed about today; right?
5        A.    Right.
6            MR. ZURBRIGGEN: Objection to the
7        form.
8            Go ahead, Sergeant.
9    BY MR. WEST:
10       Q.    And you had a chance to review your
11   prior statement and you probably had a chance to
12   try to remember what happened that day; correct?
13           MR. ZURBRIGGEN: Same objection.
14           Go ahead, Sergeant.
15           THE WITNESS: Correct.
16   BY MR. WEST:
17       Q.    So at the beginning of this
18   deposition if I asked you if this operation was
19   typical or different, your testimony was typical.
20           Why have you changed your testimony
21   after seeing the video?
22           MR. ZURBRIGGEN: Objection as asked
23       and answered. Objection as
24       argumentative.

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 121

1        Go ahead, Sergeant, answer again.
2        THE WITNESS: That's not -- that's
3    not what you asked me. Just because you
4    showed me a video don't like change why
5    you asked that question and how I
6    answered it.
7    BY MR. WEST:
8        Q.    Isn't it true that if you hadn't
9    seen this video you would still say that this was
10   a typical operation and they followed the knock
11   and announce rule?
12       MR. ZURBRIGGEN: Objection to form.
13       Sergeant, you can answer; if you
14   can.
15       THE WITNESS: I can't answer. I
16   don't know. You're asking me if this is
17   typical, I'm telling you no. If you're
18   asking me in the beginning when the
19   interview started if there's anything
20   different, I can't recall that.
21       MR. WEST: Okay. That's all I
22   have.
23       MR. ZURBRIGGEN: I'll be very
24   brief.

Page 122

1        MR. WEST: Do you want me to leave
2    this up?
3        MR. ZURBRIGGEN: No. But I do have
4    a photo I'm going to show him I Bates
5    Stamped. I'm sorry, I didn't know I was
6    going to ask about it.
7        Can I just give you the Bates
8    Stamp?
9        I can put it on the TV, whatever
10   you want to do.
11       MR. WEST: Yes, you can show it to
12   me.
13       MR. ZURBRIGGEN: Sure. It's Number
14   98.
15       MR. WEST: Okay. Give me a second.
16   Let me see if I have that. Yes, they
17   didn't come through.
18       THE VIDEOTAPE OPERATOR: Our Bates
19   Stamp Numbers or yours?
20       MR. ZURBRIGGEN: Mine.
21       MR. WEST: Yes, they didn't come
22   through, but this is it.
23       MR. ZURBRIGGEN: No, it's Number
24   98.

Page 123

1        MR. WEST: Our Bates Stamps didn't
2    come through. But if you can show it to
3    me. It would be in here somewhere.
4    Okay, whatever. You can ask him.
5        - - -
6        EXAMINATION
7        - - -
8    BY MR. ZURBRIGGEN:
9        Q.    Sergeant --
10       MR. WEST: We'll mark that as an
11   exhibit; right?
12       MR. ZURBRIGGEN: We can mark that
13   as Exhibit if we're up to Mellody-15?
14       THE COURT REPORTER: 14.
15       MR. ZURBRIGGEN: 14. We'll mark
16   this. For the record, it's Bates
17   Stamped D 000098. And we'll mark it
18   Mellody-14 then.
19       - - -
20       (Whereupon, Exhibit Mellody-14 was
21   marked for identification.)
22       - - -
23   BY MR. WEST:
24       Q.    Sergeant, I'm going to show you

Page 124

1    this picture on my computer. Just take a look at
2    that.
3        A.    (Witness complies.)
4        Q.    Do you recognize any of the
5    properties on this photograph?
6        A.    Could be this one.
7    (Witness indicating.)
8        Q.    Are you indicating the one on the
9    far right of the picture?
10       A.    Yeah.
11       Q.    What is that property?
12       A.    That's the rear location.
13       Q.    Okay. And that's the rear entrance
14   to 4664 Torresdale?
15       A.    Yes.
16       Q.    And you observed that prior to the
17   warrant execution?
18       A.    Yes.
19       Q.    Okay. I believe you testified a
20   little bit earlier about a bump-out on the rear
21   property.
22       Can you, using this picture,
23   describe a little bit what you meant by a
24   bump-out?

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 125

1      A.    It's a probably a ten-by-ten square
2   box off the back of the house with a door and a
3   window on it.
4      Q.    So based on your observation of the
5   rear entrance in this property, does that lead you
6   to conclude that that was the entrance to the
7   second-floor rear apartment?
8              MR. WEST:  Objection to the form of
9      the question.
10             You can't lead your own witness.
11  BY MR. ZURBRIGGEN:
12     Q.    Go ahead, you can answer.
13     A.    No.
14     Q.    Okay.  Why not?
15     A.    It looks like a door from a kitchen
16  off a first floor.  Usually that's they are coming
17  off a bump-out like that, just come off a kitchen
18  on the first floor.
19     Q.    Was there -- can you see any
20  markings on that rear door from that photograph?
21     A.    No.
22     Q.    Do you recall any markings on that
23  rear door?
24     A.    No.

Page 126

1      Q.    If you don't mind, I'm going to
2   borrow that.  I'm going to show you what's been
3   previously marked as Mellody-10.
4              Is that the front of 4664
5   Torresdale Avenue?
6      A.    Yes.
7      Q.    Okay.  Is that how it appeared
8   based -- on the day of the incident in question,
9   based on your recollection?
10     A.    Yes.
11     Q.    Okay.  Did you -- do you observe in
12  this photograph any beware of dog sign?
13     A.    No.
14     Q.    Do you recall one, do you recall
15  observing one prior to the execution of the
16  warrant?
17     A.    No.
18     Q.    I just want to show you what's been
19  previously marked as Mellody-7.
20             Sergeant, just for the record, did
21  you create this photograph in Mellody-7?
22     A.    No.
23     Q.    Did you create the -- I'm sorry --
24  the pink arrow that's on that photograph?

Page 127

1      A.    No.
2              MR. ZURBRIGGEN:  That's all I have.
3              Keith might be some follow-up based
4      on that for you.
5                      - - -
6              EXAMINATION
7                      - - -
8   BY MR. WEST:
9      Q.    Yes.  Just you were asked some
10  questions about the pink arrow.
11             Is the pink arrow exactly the same
12  route that you would have recommended for the SWAT
13  unit to follow to enter this property if you had
14  had the information from the probation and parole
15  office or would you have recommended a different
16  route?
17             MR. ZURBRIGGEN:  Object to the
18     form.
19             Sergeant; you can answer.
20             THE WITNESS:  No.  We would have
21     went to the rear.
22  BY MR. WEST:
23     Q.    But is it the same as the yellow --
24  or strike.

Page 128

1              Is it the same route as the pink?
2      A.    I don't know because we can come
3   from up Margaret Street.  I don't know, because
4   our stage could be somewhere east of Torresdale.
5      Q.    I'm going to come around and look
6   at the photo.  I'm not going to make you
7   uncomfortable, not that I'm capable of making you
8   uncomfortable.
9      A.    It all depends on the stage.  If
10  the stage is somewhere back here --
11     Q.    Yes.
12     A.    -- we're coming up this way and
13  making a right in.  (Witness indicating.)
14     Q.    All right.
15     A.    It all depends where the stage is
16  at.
17     Q.    All right.  Fair enough.
18             But so if you're in the part of the
19  prop -- of the arrow that comes before Margaret
20  Street, if we started from Margaret Street to the
21  rear door, is that the route that you would have
22  recommended?
23     A.    Most likely.
24             MR. ZURBRIGGEN:  The same

03a074f7-07e5-43ee-aa33-9a62d33706df

Page 129

1    objection.
2        MR. WEST:  All right.  Okay.  I
3    have no more questions.
4        MR. ZURBRIGGEN:  None for me.  I
5    just need to designate on the record, I
6    think there was one mention of xxxxxxx
7    xxx.  So while the Confidentiality Order
8    is in place we'll designate that
9    confidential.
10        THE VIDEOTAPE OPERATOR:  We are
11    concluding this deposition at 1:12 p.m.
12            - - -
13        (Whereupon, the deposition
14    concluded at 1:12 p.m.)
15            - - -
16
17
18
19
20
21
22
23
24

Page 130

1
2
3        CERTIFICATION
4
5        I, DOUGLAS S. DIAMOND, hereby
6    certify that the foregoing is a true and correct
7    transcript transcribed from the stenographic notes
8    taken by me on Wednesday, October 11, 2023.
9
10
11
        DOUGLAS S. DIAMOND
12        Court Reporter - Notary Public
13        (This certification does not apply
14    to any reproduction of this transcript, unless
15    under the direct supervision of the certifying
16    reporter.)
17
18
19
20
21
22
23
24

33  (Pages 129 to 130)

**A**

**a.m** 1:16 4:24
40:3 83:22
86:13
**ability** 7:8 16:13
**able** 24:2 41:9
**Academy** 58:2
60:6 87:23
**accurate** 13:19
14:2 20:18
**action** 1:3 8:16
10:1,11 75:1
88:8 115:19
**actions** 117:8
**actual** 96:14
116:11
**Adam** 2:8 11:17
49:5
**adam.zurbrig...**
2:12
**additional** 31:23
**address** 4:20
31:21
**Adult** 42:19
**advised** 7:12
**aerial** 46:2,8,16
47:8,23 48:3
48:16
**affairs** 11:1
12:13,22
**ago** 6:10 10:22
**ahead** 19:4
34:22 35:7
61:11 65:10
78:24 79:18
91:20 92:17
94:22 96:12,19
107:13 119:5
119:22 120:8
120:14 121:1
125:12
**al** 1:6 4:15
**allegations** 6:19
6:21
**alleyway** 18:8,10
18:17 26:6,12
43:15 44:9
**alleyways** 45:4
**allow** 95:19

**allowed** 60:13
96:1
**alternative** 90:4
**Alvarado** 1:3
4:13 5:8,23
87:12
**Alvarado's**
41:24 65:4
96:5,8 101:3
102:7
**American** 1:13
2:3
**amount** 51:12
58:15,18 59:1
59:21 60:3,12
60:16,22 61:14
94:24 100:20
109:21 110:19
110:23 117:18
117:22,23
**angle** 67:10 70:7
106:9
**announce** 20:15
20:24 21:11,14
21:21 22:24
24:9 27:7 28:8
28:12,19 51:5
51:6,11 55:2
55:11,23 56:5
56:12,23 57:7
57:13,21 58:8
59:5,20 60:17
62:1,3 71:13
94:7,24 95:11
97:3,16 98:14
109:8 110:11
111:2 112:21
114:17,20
115:10 121:11
**announced**
22:21
**announcement**
94:14
**answer** 7:19 9:4
13:11,15 14:6
15:2 19:21
20:10,13 22:19
26:2 28:3
29:12 30:21

40:10 44:2,14
49:17 51:1
53:22 57:24
58:11,23 59:2
59:12,21 61:4
61:11 64:12
68:12 69:4,23
70:13 71:4
73:6 79:18
81:15,22 83:3
85:2 89:23
90:12 91:5,20
95:1 107:13
110:1,5,13,21
115:1 116:15
118:12 119:5
119:22 121:1
121:13,15
125:12 127:19
**answered** 79:17
91:19 94:21
96:11 120:23
121:6
**anticipation**
12:2
**anybody** 40:6
46:20 83:24
89:17 104:6
113:8
**apartment**
35:21 36:6,9
36:15 37:5,13
37:20 38:12
39:20 40:15
41:7 43:14
44:8 45:5
48:22 65:5,14
69:1 70:10
77:9,24 79:5
85:12 90:19
91:12 96:5,8,9
97:19 101:5
103:19,22
125:7
**apartments** 84:2
**appear** 63:24
106:6 110:18
**appeared** 126:7
**applied** 68:24

**apply** 130:13
**approached**
22:21 108:2
**approaching**
32:16,17
**approximately**
1:16
**approximation**
7:21,23 71:19
74:18,24
**ARCH** 2:9
**area** 15:18 29:13
29:17,24 30:23
31:4 68:2 75:6
82:7
**argumentative**
119:21 120:24
**arrest** 13:13,15
14:2,11,15,20
14:21 15:7
58:14
**arrival** 22:16,20
**arriving** 31:3
**arrow** 49:14
126:24 127:10
127:11 128:19
**aside** 50:19
62:24
**asked** 14:18
38:19 55:9
73:4 79:16
91:18 94:21
96:11 119:16
120:3,18,22
121:3,5 127:9
**asking** 16:23
17:1 40:11
56:18,20,22
60:23 65:11,13
65:16 68:13
72:20 81:15
82:4 97:8
104:5,9 116:3
116:7 117:3,4
118:4,6 120:2
121:16,18
**assigned** 52:15
52:24
**assume** 41:12

**apply** 130:13
**assuming** 115:8
118:22
**attached** 26:18
**attempt** 83:23
**attempting**
32:14
**attorney** 7:3,12
**attorneys** 5:22
**audio/video** 4:12
**available** 37:1
54:16 71:1
**Avenue** 8:17
10:1,11 13:14
15:8 16:3
17:17,24 18:12
20:16 21:1
22:17 23:23
25:23 32:22
33:23 48:3
62:5 68:7 69:8
78:20 84:16,21
85:8 96:2
99:15 101:2
126:5
**await** 94:13

**B**

**B** 105:5,9
**back** 17:10,11
19:15 27:6
46:7 58:4 67:8
87:4 98:8
106:1 108:14
113:11,23
114:7 125:2
128:10
**Badge** 4:11 5:4
**bark** 91:7
**barking** 89:8,12
90:23
**based** 7:13
110:8 116:8,15
118:7 125:4
126:8,9 127:3
**basement** 91:8
**basically** 15:17
16:17 17:7
19:5,14 102:22
**Bates** 13:9 19:19

22:4 88:14
122:4,7,18
123:1,16
beginning 1:16
119:17 120:17
121:18
behalf 5:7
believe 7:20 9:19
18:9 20:4
23:14 55:12
62:6 64:7
69:24 70:3
74:14 75:21
82:13 84:21
92:5 105:12
111:24 114:19
124:19
best 9:8,15
15:24 16:12
35:1 81:7
better 48:10,12
65:17 66:7,22
beware 103:4
126:12
big 64:21,24
bit 56:3 108:7
108:17 124:20
124:23
bitten 72:8,17
72:21
blind 84:22
blindly 80:12
blink 65:19
body 106:21
borrow 126:2
bowl 102:15
103:1
box 125:2
breach 33:6,11
33:12,24 61:24
81:10 85:3
98:12 100:15
100:18 108:6
110:5 114:17
116:5,24,24
117:1
breached 23:4
24:4 64:1 65:4
67:5 71:16

74:1,4,10
77:22 84:17
89:8 90:23
96:9 97:2,19
109:22
breachers 21:22
73:14 98:6,10
breaching 75:2
95:20
break 8:3 59:9
65:20,23 66:4
66:6 98:19
105:15,17
Brian 28:1
brief 75:9 78:9
121:24
briefing 75:16
75:20 77:12
78:21 79:12
82:9
broached 89:13
Broad 1:14 2:3
4:20
broke 41:23
101:2
building 1:14
2:3,9 68:8 77:9
77:10 78:21
80:14 84:16
101:5 103:18
buildings 36:16
bump-out 70:1
70:4 124:20,24
125:17
business 41:11
button 114:8

———————
**C**
C 2:1 105:5,9
call 30:14 31:20
40:5 42:7,9
47:1 87:1
110:4,4
called 42:15
51:5 54:19
73:11 97:3
104:6
camera 106:10
106:14

cameras 106:22
capable 128:7
car 6:12 18:4,19
19:6
carried 8:24
carry 87:17
case 6:11,14,20
41:16 43:6
46:19 47:10
48:5 64:2 89:6
118:19
cases 6:7
cause 91:10
Center 1:13 2:2
4:20
certain 32:20
42:21 56:18
certainly 28:23
certification 4:4
130:3,13
Certified 1:17
certify 130:6
certifying
130:15
chance 7:2
10:19 11:2
12:23 20:7
120:10,11
change 44:16
48:7 121:4
changed 44:9
120:20
characterizati...
44:1 119:3
check 12:11
circle 64:10 65:5
circled 63:19,23
circumstances
74:9 94:10
115:4,9 118:14
118:20,23
City 1:6 2:8 4:14
62:15,18 93:2
106:9 110:10
112:20
CIVIL 1:3
clarification
50:24
clarify 21:9

116:6
Clark 15:13
22:20 23:1,2,2
24:7,9 27:7,14
28:7,18 29:3,4
32:4,6,8 46:18
46:23 111:20
112:2,9
class 56:19
clear 33:20
50:22 106:5
113:21 114:6
clearly 45:4
67:13
clip 106:7
coffee 8:4
Color 3:15,17,18
3:22
colors 16:14
come 31:14
32:19 39:24
48:17 67:13
87:23 93:2
122:17,21
123:2 125:17
128:2,5
comes 118:15
128:19
coming 37:24
61:16,18 81:10
85:21 86:14
91:7 125:16
128:12
Common 4:15
Commonwealth
1:19
communicated
29:18
communicatio...
29:6 31:6
completed 54:21
completely
118:8
complies 11:24
12:10 20:1
22:13 50:21
63:1 89:4 94:6
124:3
comply 99:16

complying
100:15
comprehensive
49:18
computer 124:1
computers 47:1
conclude 125:6
concluded
129:14
concluding
129:11
conduct 8:24
15:5 70:19
91:16
conducted 13:21
28:8,19 31:2
32:7 75:18
99:14
conducting
100:18
confer 7:2
confidential
1:11 129:9
Confidentiality
129:7
confuse 8:8
consider 60:15
61:9
considered 60:2
consistent 13:5
67:13,14 89:9
107:8 109:10
114:20 115:9
115:17
Constitution
10:14
constructed
100:23 101:2
contact 43:19
83:23 84:4
contacted 82:21
contemporane...
19:12
context 58:19
continue 66:2
conversation
75:5
copy 11:18 12:5
48:10,12

**corner** 25:15
**correct** 7:4,5
  14:23 17:17,24
  18:1,12,13
  20:7 21:2,4,5
  21:14 23:20
  25:23 28:24
  29:11,16,16
  30:17 31:8,17
  32:9,10,23,24
  33:13,14 37:5
  38:7,23 39:15
  39:16 43:22
  50:9 53:3,4
  54:4,5,12,23
  55:2,13 57:7,9
  60:9 62:21
  67:6 69:19
  71:9 72:2,9,17
  72:19,19 73:19
  75:6 76:13
  77:18 83:13,16
  84:13 85:8,9
  90:21 93:5
  94:11 98:16
  99:13 100:1,13
  100:21 101:12
  101:21 102:1,1
  102:2,5 105:5
  105:8,10
  106:15 108:4
  109:2,3,6
  110:19 111:8
  120:12,15
  130:6
**correctly** 110:10
**counsel** 2:5,11
  4:3
**couple** 54:19
**course** 50:1
**Court** 1:1,17,21
  4:15 114:4
  123:14 130:12
**Courtney** 2:19
  4:18
**create** 33:20
  108:16 126:21
  126:23
**cross** 18:16,17

18:21 25:18
**crushing** 61:18
**cup** 8:4

**D**

**D** 3:1 105:5,9
  123:17
**dark** 83:19
**date** 1:16 4:23
**day** 9:18 73:21
  83:17 86:1
  120:12 126:8
**dcr.diamond...**
  1:23
**deal** 87:24 88:1
**dealing** 104:14
**December** 53:11
**decide** 53:18
**decision** 33:1,5,6
  33:8,11,11,15
  33:24 34:4,9
  34:17 98:12
**defendant** 6:14
**Defendants** 2:11
**Defense** 22:5
  88:15
**definitely**
  111:17
**Deli** 25:16
**Delight** 25:16
**Demetrius** 22:2
**Department** 2:8
  9:10,17 10:3
  51:18,24 52:7
  57:19 60:1
  88:7 93:5
  114:22 115:11
**depends** 30:13
  39:3 128:9,15
**deposed** 5:3 6:5
  43:5 120:4
**deposition** 1:11
  4:10,12 5:1,6
  5:10,24 6:1,23
  10:21 12:24
  119:17 120:18
  129:11,13
**depositions**
  63:22 89:5

**describe** 16:7,24
  17:1 124:23
**describes** 94:7
**description** 3:8
  3:16 35:9
**designate** 129:5
  129:8
**designed** 84:19
  85:6
**desk** 30:13 31:20
  31:24
**detail** 16:8
**detective** 29:7,7
  42:3 86:19,22
  87:3
**detectives** 29:13
  29:18,22 30:13
  30:16 31:7,14
  36:18,22 39:3
  39:5,14 41:10
  41:13,16 42:1
  42:2,15 75:8
  84:10 86:23
**detectives'** 41:11
  42:13
**determine** 24:2
  102:12,17
  103:17,24
  104:11
**determining**
  32:12
**Diamond** 1:17
  1:21 5:10
  130:5,11
**different** 27:5
  45:7 67:10
  76:5 113:24
  116:1,10,17
  117:2 118:8
  119:18,24
  120:19 121:20
  127:15
**differently** 56:3
**direct** 130:15
**direction** 27:5
  32:20
**directions** 46:17
**Discovery** 106:8
**discuss** 82:10

**discussion** 29:14
  66:9 105:22
**displayed** 50:1
  70:7
**distorted** 27:3
**district** 1:1,2
  52:15,16,17,17
  53:1
**districts** 52:16
**Docket** 4:16
**document** 11:12
  12:6,23 13:4,9
  22:15 23:4,23
  24:3,18,21
  27:17 28:18
  42:18,22 43:7
  43:10 44:4,7
  45:9,18,21
  48:9 62:8 63:2
  63:3,21 88:22
  90:3 93:18,22
  94:5 99:4
  103:12
**documentation**
  92:5,8
**documents**
  10:20 100:10
**dog** 3:19 72:1
  88:2 89:8,12
  89:16,18 90:5
  90:5,7,23 91:7
  102:15 103:1,4
  126:12
**doghouse**
  102:14,24
**dogs** 82:11
  87:16,24 88:8
  102:4,8,12,18
**doing** 41:5 47:6
  83:7 88:2
  109:17
**door** 16:17,19
  21:18 22:21,22
  24:4,18 26:19
  32:22,22 33:2
  33:3,6,11,13
  33:16 34:1,2,7
  34:10,10,18,19
  34:20 35:1,4,6

36:10,17,18,21
  36:23 37:3,13
  37:19,24 41:24
  45:3 51:12
  58:13,16 59:2
  59:9,21 61:17
  61:19,20 64:10
  64:14,20 65:2
  65:3,5,14 67:4
  69:7,18,24
  70:4,9 71:16
  71:16 76:9,13
  76:19 77:22
  78:6,8 79:4,6
  79:20 80:6,7,9
  80:12 81:11
  84:16 85:3,8
  85:11,21 86:15
  87:4,5 90:22
  95:1 96:1,2,5,8
  97:15 98:7,10
  98:11,12,14,17
  98:19 100:18
  101:3,5,7,8,9
  102:7 103:3,21
  108:6,7,11,12
  108:14,16,22
  109:2,13,16,20
  109:21 110:5
  112:3,7,10,14
  113:19 114:17
  118:16 125:2
  125:15,20,23
  128:21
**door's** 36:20
**doors** 15:19 19:7
  32:19 61:18
  79:2 80:11,24
  81:6,8,9,10
  84:2
**Doug** 11:11 23:6
**Douglas** 1:17
  5:10 130:5,11
**draw** 49:13
**dressed** 111:18
**drive** 17:10,19
**driveway** 26:11
  26:12,17
**driving** 25:22

**drove** 17:13,16
  17:23 18:11
**duly** 5:14
**duties** 52:23

**E**

**E** 2:1,1,18,18
  3:1 105:5,10
**e-mail** 1:23 2:6
  2:12
**earlier** 23:15
  38:19 55:10
  71:12 75:4
  83:10 90:17
  124:20
**early** 54:6
**east** 128:4
**EASTERN** 1:2
**effort** 82:1
  102:11,17
  103:16,23
  104:10 112:3
**either** 24:9 27:7
**elaborate** 73:8
**employed** 4:19
**encounter** 89:19
  90:5
**enforce** 39:2
  44:11
**enforced** 44:20
**enforcement**
  8:16 9:24
  10:10 13:23
  87:17 115:19
  117:8 118:24
**ensure** 97:1,18
  100:19
**enter** 29:23
  32:14 33:2
  34:9,18 40:23
  44:10 45:2
  84:20 127:13
**entering** 109:5
**entitled** 42:19
**entrance** 36:9
  43:14 44:8
  124:13 125:5,6
**entry** 47:17 50:1
  76:22,24 77:7

77:8,13 78:2
  84:21 94:15
**ESQUIRE** 2:2,8
**estate** 62:17
**estimate** 7:21,23
  71:18 74:18,23
**et** 1:6 4:14
**events** 13:5
**everybody** 47:22
**evidence** 72:8,21
**exactly** 23:3
  30:23 127:11
**Examination**
  3:4,5 5:17
  123:6 127:6
**examined** 5:15
**example** 32:21
  90:3 100:23
**examples** 100:8
  100:10
**exchange** 22:15
**execute** 48:22
**executed** 33:23
**executing** 13:12
  14:19 15:6
  46:9
**execution** 29:8
  29:19 30:7
  47:10 48:4
  82:10 124:17
  126:15
**exhibit** 11:14
  12:17 22:7
  23:10 27:19
  42:24 45:14
  48:12 50:2
  62:10 63:3,8
  66:15 88:17
  93:13 98:24
  123:11,13,20
**EXHIBITS** 3:8
**exigent** 74:8
  115:9 118:13
  118:20,23
**expect** 118:2
**expected** 87:8
**experience** 9:1
  60:11 95:18
  96:24 98:17

112:19 115:18
  116:8,11,12
  117:6 118:6
**explain** 18:23
  34:13 36:13
  37:16 44:23
  49:5,16 55:16
  58:12 60:20
  70:14 86:21
  101:14
**explained** 57:20
**explore** 18:2
**extent** 24:13
  25:2,11 26:9
  27:11 28:15
  41:1 44:3
  49:14,16 58:22
  64:5,13 65:9
  69:13 74:13
  76:16 78:15
  84:8 85:1
  87:21 89:22
  97:6 103:6
  111:11 112:12

**F**

**faces** 29:10
**fact** 68:7
**Fair** 65:18
  113:10 128:17
**far** 16:14 31:24
  33:8 54:15
  75:17 78:10
  87:15 88:7
  91:15 115:18
  124:9
**faster** 87:8
**favor** 113:16
**Felishatay** 1:3
  4:13 5:7
**fenced-in** 102:24
**Fifteen** 52:14
**figure** 41:6
  80:21 81:2,11
  81:16 82:1
  102:3
**file** 73:13
**filing** 4:4
**find** 40:6 103:22

104:6
**fine** 7:22 49:19
  50:19 66:1,3,3
**Fire** 92:21
**first** 20:14 22:18
  26:16 37:24
  43:13 44:7,19
  52:22 54:19
  70:10 73:5,15
  78:11,20 79:14
  79:20,23 80:8
  80:14 81:3,17
  82:2 91:8 97:3
  103:20,20,24
  104:7,11,14
  119:6,8 125:16
  125:18
**first-floor** 73:13
  76:21,24 77:7
  77:13 79:5
  85:12 90:19
  91:12
**first-story** 70:10
**five** 92:18,22,23
  95:17
**five-minute**
  105:17
**floor** 2:10 4:21
  36:6 37:24
  45:5 68:8 69:9
  70:2,10 73:15
  73:15 77:15,17
  77:21 78:11,20
  79:7,11,15,20
  79:23 80:8,14
  81:3,17 82:2
  91:8 103:20,20
  103:24 104:7
  104:11,15
  125:16,18
**floors** 15:20
**follow** 32:13
  50:1 96:24
  100:1 104:21
  127:13
**follow-up** 127:3
**followed** 9:18
  62:4 94:10
  121:10

**following** 61:24
  97:16
**follows** 5:15
  40:20
**foot** 18:3,20
  24:23 25:9
**footage** 106:7,14
  107:1
**foregoing** 130:6
**form** 4:6 9:3,21
  14:5 15:1
  16:11 17:5
  19:3 24:12
  25:1 26:1
  27:10 28:14
  30:3,19 31:11
  34:12 35:12
  36:12 37:7,15
  38:9 39:21
  41:19 44:13,21
  45:23 47:13
  49:2,15 50:11
  53:21 55:4,15
  56:14 57:22
  58:10,21 59:11
  60:19 64:4
  65:8 67:17
  68:11 69:3,12
  69:21 70:11
  71:3 72:11
  74:12 76:2,15
  78:14 80:16
  81:4,21 83:1
  84:7,24 85:14
  86:7,17 87:20
  89:21 90:11
  91:3 92:16
  94:21 95:13
  96:11 97:5,21
  99:19 103:6
  104:2,23
  106:17 107:3
  107:11 109:24
  112:22 114:14
  114:24 115:14
  116:14 117:12
  119:4,21 120:7
  121:12 125:8
  127:18

**Forty-nine** 52:4
52:5
**forward** 7:3
**foundation**
33:17 38:16
**four** 83:7
**front** 16:18 17:9
18:5 20:15
26:19 32:22
33:2,16 34:1
34:18,23 35:1
36:17,21,23
37:19 41:24
47:21 64:10,14
67:4 70:9
85:21 86:15
87:4 93:17
96:1,5,8
100:18 101:3,7
102:7,22 103:3
126:4
**front's** 17:15
**fruits** 14:3
**future** 107:13

**G**
**gain** 84:5
**gained** 14:22
**gaining** 94:15
**getting** 15:24
29:23 33:18
90:5
**give** 7:13,20
31:20,24 39:14
58:15 59:6,20
61:19 71:18
74:6,17,23
81:6 87:1
90:24 98:11
122:7,15
**given** 7:20 14:14
22:2 28:1
75:10,17
**gives** 79:11
**giving** 7:22
**go** 6:24 7:3
14:12 15:17
17:10 19:4
20:10 32:1

34:22 35:2,4
36:16 45:4
46:24 48:21
61:11 65:10,24
73:10 77:17,21
77:23 78:7,24
79:6,18 80:11
86:24 87:1,4
87:23 91:20
92:17 93:9
94:2,12,22
96:12,19 99:8
100:7,22
105:19 107:13
108:17 113:10
113:23 114:7
119:22 120:8
120:14 121:1
125:12
**goes** 80:8 108:8
**going** 7:14 20:13
27:4 32:3 34:7
34:11 36:17,21
37:14 44:12
47:2 60:21
66:6 72:22
75:18 77:11,14
77:14,17,20,23
78:2,11 80:6
84:22 87:7
88:13 91:11
98:5 101:8
105:19 106:1
107:8,17
113:10,11
114:7 115:2,15
120:3 122:4,6
123:24 126:1,2
128:5,6
**Good** 5:20
**Google** 26:20
46:3 47:8
48:16 82:17
**grab** 66:7
**Graf** 29:7
**green** 63:20,24
68:3,4,14
**guess** 7:15 64:15
65:1 91:11

107:14 111:14
**guessing** 59:15
62:17
**guidelines** 99:21
99:22 100:4
**gun** 118:15
**gunshot** 72:1
**guy** 21:17 30:13
31:20,24 36:19
**guy's** 98:7
**guys** 19:15 47:5
47:6 65:22,23
91:11

**H**
**half** 54:10
**Halligan** 98:6,7
108:2,7,10,12
108:13,16,20
109:13,18,20
111:10
**hallway** 79:4
101:8
**Hamoy-2** 63:4
**hand** 7:17 23:24
**handle** 80:10
84:10 87:16
88:8 89:18
90:4 92:24
**hands** 92:10
93:6,7
**happened** 54:6
75:5 120:12
**hard** 101:15
**hear** 51:9,14
61:15 72:1
73:24 89:7,12
90:23
**heard** 21:15
51:4
**helicopter** 105:6
**higher** 73:22
**highlighted** 28:2
42:21 43:12
**highlighter**
63:19,20
**hit** 79:6 80:5,9
103:21
**hits** 108:12

**home** 3:14 29:22
29:23 39:2
**honest** 6:18
88:24 92:9
**hospital** 15:21
**hospitals** 15:21
**hours** 83:8
**house** 32:16,17
35:3 66:24
67:2,10 125:2
**houses** 87:24
**hundred** 75:3
**hundreds** 117:7
**hypothetical**
117:4

**I**
**identification**
11:15 12:18
22:8 23:11
27:20 43:1
45:15 62:11
63:9 66:16
88:18 93:14
99:1 123:21
**illness** 7:7
**image** 46:3,9
**immediately**
74:10
**impair** 7:8
**inaccurate** 13:1
**incident** 8:19
20:12 126:8
**include** 14:20
**incomplete** 13:1
**inconsistent**
10:2,12
**inconspicuous**
17:8
**indicate** 72:17
**indicating** 10:23
21:20 50:17
64:22 124:7,8
128:13
**indication** 37:19
**indications**
34:24
**influence** 7:6
**information** 9:9

13:11 14:10,10
14:13,19,22
25:21 29:21
30:10 31:13,19
31:21,21,23
37:1 38:24
39:6,14 43:19
44:7,16,19
45:2,6 48:23
50:3 70:24
82:16,22 84:1
84:5 100:9,11
100:20,24
101:11,20
127:14
**informed** 31:7
38:6
**initial** 77:24
**inside** 47:1,6
64:10 65:5
77:6 81:8
83:24 89:16
**insight** 91:1
**inspect** 18:20
**inspected** 19:1
23:16,16
**inspection** 15:23
16:2,8 17:2
24:22 25:8
**Intelligence** 3:22
99:11
**intended** 8:1
**interactions**
87:16
**interior** 101:11
101:20
**internal** 11:1
12:13,21
**Internet** 82:15
**interpreting**
29:12
**interview** 3:9,11
3:13,14 11:1
20:2 27:24
121:19
**investigated**
70:8
**investigation** 3:9
3:11,13,14

12:4 22:4
**involved** 22:3
75:2
**involves** 8:16

**J**

**jam** 108:13
**Jersey** 1:20,22
**job** 32:3 34:6
83:5 112:17
**jobs** 47:18 83:6
**join** 52:6
**joined** 52:9
60:12
**jumped** 118:15
**June** 8:17 54:7
54:17,22 74:17
96:24 97:14

**K**

**Keith** 2:2 5:21
127:3
**keith@victim...**
2:6
**kept** 54:3
**Kevin** 1:12 3:3
4:10 5:4,13
**killed** 72:1
**kind** 6:24 8:21
62:17 70:3
80:20 92:4
97:9 98:8
105:8
**kitchen** 37:24
125:15,17
**Kitcherman**
2:19 4:18
**knew** 37:3,4
40:22 42:2
45:1 68:23
69:7,17 80:13
89:15 120:3
**knock** 20:15,23
21:11,13,21
22:24 24:8
27:6 28:8,12
28:19 51:5,6
51:11 55:1,11
55:23 56:5,12
56:23 57:6,12

57:20 58:7,13
59:5,19 60:17
61:24 62:3
71:12 81:9
94:7,24 95:10
97:2,15,16
98:10,10,14
109:8 110:11
111:2 112:3,6
112:10,14,21
114:16,20
115:10 121:10
**knocked** 22:21
71:16 96:9
98:14,18
109:20
**knocking** 95:20
98:7 108:22
**knocks** 97:23
98:11
**know** 7:18,18,22
8:5,11 15:10
20:11 21:6,7
21:10,22 24:14
25:12 27:12
28:3,16 30:5
33:18,19 35:13
35:17 38:10,17
38:21 39:1,22
40:4 41:1,20
47:14 50:17
54:15 58:7
59:16 61:21
62:14,22 65:3
67:18 69:23
72:12,22 74:3
74:13 77:6
78:6,7 79:2,10
79:19 80:12,17
80:23 81:5
84:8 85:7
87:21 88:22
90:13,18 96:16
99:20 102:8
106:14,18,24
107:4,5,15,22
109:12,17
110:23,24
111:1,1,12

112:12 115:4
116:16 117:21
117:22 121:16
122:5 128:2,3
**knowing** 101:4
103:19
**knowledge** 7:14
84:5 89:17,24
90:14
**known** 38:1,4,12
38:15 39:17
40:12
**knows** 47:22

**L**

**L** 2:18
**Lane** 1:22
**Law** 1:12,13 2:2
2:8 4:19
**lawsuit** 6:13
8:15
**lay** 33:16 38:16
**layout** 38:12
82:22 101:11
**lead** 101:8 125:5
125:10
**leading** 102:7
**learn** 85:11
**learned** 43:13
**leave** 122:1
**led** 37:13 39:18
40:13 65:4
69:8,18 70:9,9
79:20 84:2
85:11
█████ 44:8
**left** 26:16,17
35:6 79:5 80:7
101:6
**let's** 11:9 12:12
21:24 27:16
42:19 45:11
48:13 62:7
93:10 98:21
105:16 108:23
**level** 47:17
**lieutenant** 22:2
22:19 33:7,10
73:6,12,22,24

110:4 111:6
115:5 117:1
**light** 83:20,21
**likes** 63:14
**liking** 116:2,7
117:15
**line** 21:12 73:14
73:16
**list** 100:16
**Listed** 100:9
**lists** 102:3
**literally** 40:2
**little** 56:3 61:6
108:7,17
110:16 117:14
119:9 124:20
124:23
**lives** 36:19
**living** 35:20
**location** 14:12
15:18 16:1
32:3 34:24
81:7 87:1,2
93:8 124:12
**locations** 15:18
61:15 78:7
86:23
**locked** 108:15
**logically** 40:21
**logo** 62:16
**long** 52:12 53:5
61:6,8 118:1
**look** 13:8,10
14:13 15:17,18
15:19 17:8,11
18:15 19:17,20
20:9 21:23
22:14 28:2
37:17 67:8,22
68:1 81:8
86:24 88:22
95:3 102:13
104:17 124:1
128:5
**looked** 16:18
17:9 19:6
67:15 111:6
118:24
**looking** 47:22

67:7 68:2 70:6
85:16 101:4
115:3
**looks** 16:24
45:22 63:14
65:18 98:2
125:15
**lose** 42:20
**lot** 18:9,18 89:5
**louder** 8:10

**M**

**mailboxes** 101:7
**majority** 36:15
**making** 128:7,13
**man** 111:9,20
**manager** 42:7
42:10,16 82:20
**Mantua** 1:22
**map** 46:2 48:16
**maps** 26:20 46:4
46:17 47:8
82:17
**Margaret** 25:16
25:17 26:16
128:3,19,20
**mark** 11:12
12:14 21:24
23:6 27:16
42:20 45:11
62:7 63:5
66:12 88:13
93:10 98:21
107:18,19,24
108:24 113:11
113:22 123:10
123:12,15,17
**marked** 11:15
12:18,22 19:18
22:8 23:11,24
25:14 27:20
36:2 43:1
45:10,15 48:9
48:17 62:11
63:9,24 66:16
68:4 88:18
93:14,18 99:1
104:18 105:1
105:11 106:10

123:21 126:3
126:19
**marker** 48:18,20
50:2
**marking** 68:3,14
**markings** 63:20
125:20,22
**materials** 10:20
11:7
**matter** 4:13 5:23
76:24
**mean** 50:5 58:19
73:9 86:21
94:19 113:4
**means** 91:6
**meant** 124:23
**medication** 7:7
**Mellody** 1:12
3:3 4:11 5:4,13
5:21 19:23
23:14 106:4
**Mellody-1** 3:9
11:12,14 19:24
72:23
**Mellody-10** 3:18
66:13,15 67:20
126:3
**Mellody-11** 3:19
88:14,17
**Mellody-12** 3:20
93:11,13 98:22
**Mellody-13** 3:21
98:24
**Mellody-14** 3:22
123:18,20
**Mellody-15**
123:13
**Mellody-2** 3:10
12:15,17,22
19:18
**Mellody-3** 3:11
22:1,7
**Mellody-4** 3:12
23:7,10,24
36:3
**Mellody-5** 3:13
27:17,19
**Mellody-6** 3:14
42:20,24

**Mellody-7** 3:15
45:12,14 48:9
48:13 126:19
126:21
**Mellody-8** 3:16
62:8,10
**Mellody-9** 3:17
63:6,8 67:8,14
68:2,14 70:7
**member** 54:13
97:14 112:19
115:18
**members** 75:10
75:17 78:10
79:14 92:13
93:4
**memorializes**
43:10
**memory** 8:22
38:17 67:14
89:9
**mention** 129:6
**mentioned**
66:19
**method** 96:23
97:9,17 104:18
**methods** 90:4
**mind** 126:1
**Mine** 122:20
**minimal** 100:10
**minimum** 95:5
95:10,19,24
100:20
**minute** 87:10
**minutes** 10:22
**Mirela** 43:19
**mis-numbered**
103:13
**mis-worded**
96:6
**misunderstood**
16:23
**misused** 49:20
**moment** 11:23
16:16 27:23
88:22
**Monk** 22:2 33:7
73:7,12,22,24
110:4 111:7

**Monk's** 22:19
33:11
**months** 54:20
**morning** 5:20
23:5 40:7
85:23
**move** 105:9
**movement** 61:16
**Moving** 103:12
**Murray** 24:7,10
27:8,15 28:1,7
28:24 111:7,9
**Murray's** 28:3
29:3

---
**N**

**N** 2:1,18 3:1
**name** 4:18 5:21
43:7,18
**names** 24:6 29:9
29:10
**nature** 49:10
**necessary**
100:10
**need** 8:3,10
11:17 20:20
66:4,5 129:5
**needs** 94:9
**Neutralization**
3:19
**never** 77:6 78:6
78:7 98:13
100:8
**new** 1:19,22
75:15 96:6
**night** 39:24 40:1
**nighttime** 40:3
**noose** 90:5,7
**Nope** 45:20
**normal** 47:19,20
102:19 116:1
116:10,20,21
116:22
**normally** 30:10
30:12 35:3
39:1,11 46:8
60:13 62:20
79:3 86:23
115:19 117:10

118:2,7
**North** 1:13 2:3
**Notary** 1:18
130:12
**notation** 25:7
**note** 95:4
**notes** 19:13,14
130:7
**number** 4:11,16
5:4 19:22
31:22 93:18
100:7 103:13
104:18 122:13
122:23
**Numbers** 122:19

---
**O**

**O** 2:18
**object** 14:24
16:10 17:4
19:2 25:24
27:9 28:13
30:2,18 31:10
34:12 36:11
37:6,15 38:8
39:21 41:18
43:24 44:13,21
45:23 47:12
49:1,14 53:20
55:3 56:13
57:22 58:9,20
59:10,17 64:3
67:16 68:10
69:2,11 70:11
72:10 74:11
76:1,14 79:16
81:4 84:23
85:13 86:6,16
87:19 89:20
90:10 91:3
94:20,21 95:13
97:4 103:5
104:1,22 107:2
109:23 112:22
114:13,23
119:2,4 127:17
**objecting** 49:10
**objection** 9:2,20
10:5,16 14:4

24:11,24 25:10
26:8 29:1
34:21 35:11,23
40:18,24 49:6
50:10 55:14
57:2,8 59:18
60:4,18 61:3
61:10 64:11,19
65:7 69:20
71:2 78:13,23
79:24 80:15
81:20 82:3,24
84:6 88:10
91:18 92:2,15
96:10,18 97:20
99:18 100:2
101:22 104:12
106:16 107:10
110:12,20
111:22 112:5
112:11 115:13
115:22 116:13
117:11,19
118:10 119:12
119:20 120:6
120:13,22,23
121:12 125:8
129:1
**objections** 4:5
**obligated** 59:6
**obligation** 7:12
**obligations**
10:13
**observation**
125:4
**observe** 126:11
**observed** 9:24
10:10 124:16
**observing**
126:15
**obtain** 46:8
70:23 82:22
84:1
**obtained** 25:22
30:11 31:14
43:18 47:9
101:10,19
**obviously** 28:18
103:13

**OC** 90:5,8
**occupant** 59:6
**occupants** 20:17
21:4 103:14,17
**occupied** 80:14
81:3,17 82:2
91:2,6 103:24
104:11
**occupies** 104:7
**occur** 36:8
**occurred** 8:17
**October** 1:9
4:23 130:8
**odds** 40:3
**office** 19:15 38:6
43:6,11 48:24
65:21 70:24
127:15
**officer** 5:9 15:13
22:3,20,24
28:1,3,7,7,18
28:23 29:4
32:4,6,8 46:18
46:23 52:10,13
52:20 72:1,8
94:13 108:1
111:7,9,20
112:2,9
**officers** 24:3
32:1 33:12
46:14 53:3,6
89:7 102:6
109:4
**Offices** 1:12
**OISI** 27:24
**okay** 6:4,7,11,16
6:22 7:15,16
7:23,24 8:5,6
8:13,14 9:8,14
9:23 11:2 12:5
13:3 14:1
15:14,22 16:7
16:22 17:6,13
17:16,19 18:2
18:7,11,23
19:17 20:6,9
20:23 21:6,16
24:2,8,17
25:21 26:5

27:1,16 28:23
29:11,17 30:15
31:2,18 32:4
34:8 36:2 37:1
37:22 39:17
41:5,15 42:5
42:14 43:8,9
44:6,18 46:15
47:4 49:23
50:8 51:9,14
52:2,5,9,19
53:2,9 54:2
55:21 56:2,8
58:18 59:5,15
59:24 60:11
61:8,23 62:7
63:18 64:9
65:3,18 67:4
67:12 69:7
70:18 71:8
73:3,24 74:8
74:23 75:22
77:16 78:1
79:9 80:4 81:1
83:23 84:12,19
85:6 86:12
88:5 89:15
90:3,22 91:10
92:7,11,23
93:10 94:4
95:3 98:1,13
98:21 100:7,22
102:21 103:15
103:23 105:4
105:18 107:7
107:18,20,23
108:15,20
109:7,10,11,15
110:8,18 111:5
111:16 112:2,9
112:16 113:7
113:13,14,21
114:2,10,11
115:8 116:22
117:3 118:18
118:21 119:16
120:2 121:21
122:15 123:4
124:13,19

125:14 126:7
126:11 129:2
**old** 52:3
**once** 41:15 94:2
**one-floor** 68:15
**open** 22:22
61:20 108:7,14
112:4,10
**opening** 108:17
**operates** 32:12
**operation** 8:24
24:4 30:7,16
32:7 47:10
48:4 54:6 64:2
67:5 71:11
75:11,18 77:14
79:13 84:20
85:7 90:8,20
98:15 102:16
104:21 106:15
118:24 119:18
120:18 121:10
**operational**
33:24
**operations** 46:7
74:19 87:18
91:16
**operator** 2:19
4:9,17 105:18
106:1 122:18
129:10
**opinion** 117:5
**opportunity**
35:2 59:7
61:20
**oral** 91:24
**order** 48:21 74:1
84:18 97:1
129:7
**ordered** 74:3
84:15 116:24
117:1,2
**ordering** 116:5
116:24
**ordinary** 9:6
**outline** 6:24
**outside** 33:13
107:1
**overall** 73:20

**oversaw** 53:2
**owner** 43:20
82:20

**P**
**P** 2:1,1,18
**p.m** 83:22
105:20 106:2
129:11,14
**page** 3:2,8 13:9
19:19,22 22:12
28:2 43:13,22
44:7,20 94:5
103:14 104:18
**Pajo** 43:19
**park** 18:19
**parking** 18:9,18
**PARKWAY** 2:9
**parole** 30:6,24
38:2,5,6,11,20
39:7,8,18,20
40:13,15,22
41:2,8 43:5,11
48:23 50:4
52:18 70:24
127:14
**part** 9:24 24:4
30:9 32:11
37:2 46:7
47:11 62:20
64:1 67:5
68:20 70:22
80:21 81:1,15
82:9,16,21
87:14 89:18
91:16 98:14
104:10,21
108:5 128:18
**participated**
75:1
**particular** 39:6
63:3 76:4
101:18 102:16
106:9
**particularly**
119:21
**pass** 96:1,4,7
**passed** 71:15
97:1,18 110:19

**passing** 18:3
**patrol** 52:10,12
52:20 53:2,6
**pause** 107:21
113:12 114:8
114:10
**paused** 107:24
113:22
**pausing** 114:11
**Pennsylvania**
1:2,15,19 2:4
2:10 4:22
**people** 16:1 47:1
61:18 85:20
86:14 116:23
118:19
**percent** 7:19
36:20,22 79:3
101:7
**perfect** 38:18
**perfectly** 7:21
**performed** 5:1
**period** 94:14
**person** 5:2 21:12
39:6 86:3 98:8
109:19
**personal** 7:14
15:22 16:2
117:5
**personally** 46:13
75:1 83:15
84:12
**personnel** 105:2
**Philadelphia** 1:6
1:15 2:4,8,10
4:14,15,21
9:10,17 10:3
51:17,23 52:6
57:19 60:1
62:16 88:6
93:4 106:9
110:10 112:20
114:21 115:11
**Philly** 25:16
**photo** 47:18
122:4 128:6
**Photocopy** 3:15
3:17,18,22
**photograph**

3:15,17,18,22
26:18,19 49:11
63:13 124:5
125:20 126:12
126:21,24
**photographs**
11:6
**physical** 16:8
17:2 24:22
25:8 72:7
82:22 83:11
**physically** 17:8
19:1 21:13,15
28:20 98:10,13
**picture** 65:10,12
65:17 66:7,19
66:22 67:8
101:4 124:1,9
124:22
**pictures** 10:21
19:10 67:23
68:1
**piece** 44:19
**pink** 48:17,20
49:14 50:6
126:24 127:10
127:11 128:1
**place** 32:18 66:9
78:3 97:17
105:22 113:24
129:8
**plaintiff** 2:5 5:7
5:22
**plan** 77:24
**planned** 90:19
**plans** 44:10
**play** 103:21
107:17 108:23
113:12,15
114:7
**played** 106:7
**Pleas** 4:15
**please** 16:7
20:10 23:6
50:24 78:17
81:14
**plus** 14:21
**point** 18:14
26:22 33:22

54:8 75:9,16
78:1,4 109:1,7
114:8
**police** 9:10,17
10:3 22:22
51:17,23 52:7
57:19 60:1
88:6 93:4
105:6 114:21
115:11
**policies** 9:9,13
9:16 110:9
114:21 115:10
**Policy** 3:19
**portion** 28:3
68:4,8,17,19
69:8,18
**portions** 42:22
**position** 33:13
**possible** 16:8
**possibly** 8:10
37:12 47:6
**precisely** 29:15
**predict** 107:12
**preference**
116:7,11
**preliminary**
5:23 8:22
**preparation**
10:21
**preparations**
89:17
**prepared** 7:3
78:8
**present** 1:20
**presented** 49:12
**Pretrial** 42:19
**previous** 75:12
**previously** 45:10
111:6 118:19
126:3,19
**printer** 65:19
66:21
**prior** 6:5 12:23
13:12,22 14:9
14:19 15:6
20:7 29:7,14
29:17,23 31:3
33:22 39:1

47:9 48:4
54:22 63:21,22
71:23 82:9
89:7 90:8 95:8
102:6 106:13
107:8 117:7
119:3 120:11
124:16 126:15
**probably** 6:6,9
6:10,15 16:15
21:18 23:2
39:20 40:15,16
46:3 56:1 58:1
60:5 64:21
74:22 76:5
83:21 103:20
108:22 120:11
125:1
**probation** 30:6
38:5,6,20 39:8
39:18,19 40:5
40:6,13,14,21
41:8 42:19
43:5,11 48:23
50:4 70:24
127:14
**probationary**
54:13
**procedure** 86:24
**procedures** 9:10
9:17 110:9
114:21
**process** 8:2
**produced** 106:8
**prop** 128:19
**properties** 124:5
**property** 3:16
13:22 15:6,19
15:23 16:3,9
16:24 17:3,7
17:16,21 18:3
18:20 19:1,6
20:15,24 21:11
23:16,22 24:22
25:9,14,14,15
25:23 26:17,19
32:14,22 33:2
34:1,9,18
35:10 37:3,18

38:7 40:22
42:7,9,15
43:12,20 44:11
46:9 47:9,21
47:24 48:3
59:7,8 61:24
62:5,16 63:14
63:23 64:1
67:15 68:4,7
69:9,17,19
70:6,9 73:11
74:1,4,10 75:2
77:1,7 78:12
80:7 82:12,20
82:20,23 83:12
84:1 85:17,20
89:8,13,16
91:1 94:15
95:20 97:2,16
99:16 100:15
101:1,12,20
102:9,12,18,23
103:2 108:2
124:11,21
125:5 127:13
**provide** 23:7
**provided** 43:6
44:18
**Public** 1:18
130:12
**pull** 73:2 108:7
**pulled** 48:21
90:7 106:5
**pursuant** 10:13
60:16
**push** 113:11
114:7
**pushing** 113:15
**put** 29:10 47:3
53:16,16 62:24
89:2 108:12
122:9
**puts** 108:13

━━━━━ Q ━━━━━
**question** 4:6
7:19 8:11,12
8:22 13:11
14:5 16:23

19:20,22 20:10
25:4 32:5 33:9
34:12 38:3
39:10 40:10
42:1 44:22
45:24 49:8,15
50:12,23 56:3
57:23 60:14
67:24 69:21
70:12 73:1,4
75:12,14,15
81:15,19 82:8
89:11 91:4
96:3,6 97:13
100:16 104:4
112:23 117:4
121:5 125:9
126:8
**question-and-...**
22:15
**questions** 5:24
8:8,9 51:1 87:9
127:10 129:3
**quick** 48:8 50:13
65:22,23 73:1
105:15 110:16
117:14 119:9
119:19
**quote** 28:7

━━━━━ R ━━━━━
**R** 2:1,8,18
**ram** 98:6 108:8
108:12,17
109:22 111:21
112:6
**rammed** 112:4
112:10
**ramming** 109:2
**rank** 54:3 73:23
**reach** 41:7
**read** 10:22 11:2
20:14 22:18
**reads** 22:16
**ready** 65:23
**real** 48:8 50:13
62:17 65:22
113:1
**realized** 41:15

16:20 17:11
18:5,8,15,18
24:18 26:15
32:22 33:3
34:2,9,10,19
34:20 35:20
36:6,9,10,18
36:20,23 37:3
37:5,13,13,18
37:18,20,23
43:14 45:3,4
47:17,18 68:24
69:18 70:1,3
76:8,13,19
77:15,18,21
80:7 102:14,15
102:23 124:12
124:13,20
125:5,7,20,23
127:21 128:21
**reason** 49:7,24
82:19
**reasonable**
51:12 58:15,18
59:1,7,20 60:2
60:16,22 61:9
61:14 94:14,24
109:21 110:19
110:22 117:18
117:21,23
**recall** 6:21 26:23
26:23 29:12
30:8,22 35:15
35:16,19 48:6
55:17,22 56:9
56:15,16,17,24
57:1,5,11,15
60:8,10 65:16
71:5,6,10,17
71:20 72:13,16
76:3,17,18
78:15 82:14,18
83:18 88:24
92:7 95:12,15
96:13,20 99:8
103:6,7 105:13
111:5 121:20
125:22 126:14
126:14

**recalling** 70:2
**receive** 29:21
51:20 56:4,11
59:24 70:18
87:15 88:5
91:14
**received** 10:3
54:15 55:10
57:11,18 92:12
93:3
**receiving** 54:14
**recognize** 45:18
63:12 64:17
66:24 67:9,19
124:4
**recognized** 13:1
**recollection** 8:18
13:5 22:23
28:11 30:15
39:13 71:9
76:12 126:9
**recommended**
127:12,15
128:22
**recon** 14:12
19:16 23:8
36:3,5 47:3,6
47:11 81:7
**reconnaissance**
3:12,21 13:22
14:3,23 15:6
23:17,22 25:8
30:9 31:3,8,16
32:7,11 37:2
41:6 46:6,22
62:20 70:19
74:19 80:22
81:2,16 82:16
82:21 85:19
86:4,14 91:16
92:12 99:11,15
100:19 104:10
104:19
**reconned** 34:6
**Recons** 74:20,21
**record** 3:9,11,13
30:3 33:21
40:18 50:6,11
57:3 66:10

88:11 105:19
106:2,5 113:21
114:6 118:11
119:13 123:16
126:20 129:5
**recorded** 13:4
**records** 105:23
**Recovery** 1:13
2:2 4:19
**Redbud** 1:22
**reference** 24:17
24:20 26:5
55:1,7
**referred** 23:21
35:20
**referring** 71:22
72:23
**refresh** 22:23
28:11
**regards** 10:10
17:2 30:16
32:12 39:15
55:23 56:11
60:2 62:4
70:19
**relay** 19:15
**remain** 52:12
53:5
**remember** 6:17
18:24 26:22
29:14 68:6
72:12 75:23
83:19 120:12
**remembering**
28:20
**repeat** 25:4 31:9
34:15 78:16
**rephrase** 8:11
89:10
**replay** 113:20
**reporter** 1:18
114:4 123:14
130:12,16
**REPORTING**
1:21
**represent** 43:4
63:18 89:6
118:18
**representing**

5:22
**reproduction**
130:14
**request** 53:15,18
**required** 74:10
99:16,24
**reserved** 4:6
**resource** 41:8
**response** 20:16
21:3,8 94:13
**rest** 8:4 15:19
**review** 10:20
11:23 12:21,23
20:7,20 27:24
37:12 72:24
82:15 113:18
120:10
**reviewed** 12:2
**right** 5:20 6:22
7:11 8:15,21
10:19 11:9,11
11:22 12:12
13:8 14:18
15:14 21:19,24
25:15 26:15,20
36:6 37:9
38:22 40:9,20
40:23 45:9
46:19,23 47:11
48:15,18 49:23
50:4,14 54:11
58:5 62:24
64:10 65:2
67:7 68:17
69:1,10 71:13
72:5,23 73:18
75:4,6 80:13
80:14 81:14
83:12 87:14
88:12 89:2
90:9,20,24
92:14 94:10
95:9,16,16
98:19 99:5,10
99:11 101:6,9
102:4 103:10
103:14 105:14
106:4,13,22
108:3,24 109:5

111:7,10,21
116:7 120:4,5
123:11 124:9
128:13,14,17
129:2
**rips** 108:14
**rode** 17:7
**roll** 47:21
**room** 8:4
**route** 32:13,15
32:15 127:12
127:16 128:1
128:21
**routes** 15:21
**rowhome** 16:17
25:19
**rule** 51:5,6,11
55:2,11,23
56:5,12,23
57:7,13,21
58:8 59:6
60:17 62:1,3
94:8 97:3,17
115:10 121:11
**run** 65:21

**S**

**S** 1:17 2:1,18,18
130:5,11
**sake** 114:6
**satellite** 46:3,8
**satellites** 46:16
**saw** 9:24 10:9
21:13 74:9
114:16,19
**saying** 23:1
26:21 29:3,10
29:12 38:13
76:12 92:3
97:9 101:18
109:12,14,17
116:4
**says** 13:11 20:10
20:14 23:1
25:14 26:15
29:2 45:4
62:16 94:9,12
95:4 99:10
100:8,23

103:14
**Scally** 29:7
**scene** 73:5
**school** 54:19,22
  55:1 56:6,11
  57:7,13
**Scott-1** 63:4
**Scott-3** 45:10
**screen** 106:6
  108:11,12
**sealing** 4:3
**search** 13:12,12
  13:16 14:2,11
  14:15,20,21
  15:7 35:10,17
  35:19 37:4
  39:2 51:13
  58:14
**second** 13:9,10
  19:19,20,22
  20:9 22:11,14
  28:2 36:6
  43:21 45:5
  52:17 73:15
  77:15,17,21
  79:7,11 91:8
  91:11 94:5
  103:13 107:18
  113:19 122:15
**second-floor**
  37:20 68:24
  73:12,17 77:8
  77:16,20,23
  125:7
**seconds** 61:2
  66:6 95:5,10
  95:19 96:1,4,7
  96:17 97:1,18
**section** 19:21
  43:13 104:17
**security** 108:14
**see** 11:4,6 12:9
  13:17 19:7
  22:17 24:17,20
  25:7,13 26:5
  28:4,5,6,9
  37:12 43:12,16
  43:21 48:15
  61:16 64:9

65:1 67:23
68:3 72:2,4,7
72:20 83:5
86:14 93:20
94:16 95:6
100:12 103:9
106:11 107:8
107:14 108:1
108:23 109:2,4
109:8,12 112:2
112:9,18 113:1
114:12 122:16
125:19
**seeing** 72:16
  120:21
**seen** 45:21 61:23
  85:20 88:23
  93:22 94:1
  99:4 117:7
  118:8,9,23
  121:9
**send** 33:15
  100:14,17
**sentence** 22:18
**sentences** 20:14
**separate** 51:20
  78:2
**sergeant** 1:12
  3:3 4:10 5:4,13
  5:20 9:4 10:6
  14:6 15:2
  16:12 19:4
  20:19 23:14
  24:13 25:2,11
  26:2,9 27:11
  28:15 30:20
  34:13,22 35:13
  36:13 37:8,16
  38:10 39:22
  40:9 41:1,20
  44:2,14,23
  46:1 47:14
  49:3,16 50:15
  52:21,23 53:22
  54:4,9,17 55:5
  55:16 56:15
  57:24 58:11,22
  59:12 60:20
  61:4,11 64:5

64:12 65:9
67:18 68:12
69:4,13,22
70:13 71:4
72:12 74:13
76:16 78:15,24
79:18 80:1,17
81:22 83:2
84:8 85:1,15
86:8 87:21
89:22 90:12
91:5,20 92:17
94:22 97:6,22
99:20 101:13
104:3,24 106:4
106:18 107:4
107:12 110:1
110:13,21
111:23 112:12
112:24 114:15
115:1 116:15
117:13 118:12
119:5,22 120:8
120:14 121:1
121:13 123:9
123:24 126:20
127:19
**Sergeant's** 66:3
**Service** 3:20
  93:19
**Services** 42:19
**set** 50:19
**seven** 53:7
**sheet** 3:12 19:16
  23:18,22 25:8
  27:14 36:3,5
  47:3,11
**shooting** 12:3
  20:5 22:3 72:2
  72:5
**shot** 47:23 48:3
**show** 12:7,8
  48:20 98:1
  105:15 122:4
  122:11 123:2
  123:24 126:2
  126:18
**showed** 66:20
  121:4

**showing** 95:8
**side** 15:20 85:8
  90:19,24
**sign** 103:3
  126:12
**signing** 4:3
**Similarly** 8:7
**simpler** 97:12
**simply** 50:2
**single** 73:13
**sir** 11:22 12:21
  13:8 16:22
  19:17 22:11
  27:23 43:4
  48:15 71:11
  76:21 88:21
  91:22 94:4
**sitting** 21:19
  102:15
**situation** 37:12
  101:19
**six** 53:7 75:3
  76:5
**sixth** 21:12
**skipping** 87:9
**slower** 8:10
**somebody** 39:19
  40:14,21 48:16
  59:2 86:13
  95:1 104:7
  116:9 117:6
**someone's** 97:15
  98:19 100:18
  108:6
**Song** 72:1,8
**SOP** 93:18
  99:12,17
**SOPs** 94:3 99:9
**sorry** 19:23 38:3
  87:7 96:6
  122:5 126:23
**sort** 7:7 97:17
**sound** 54:11
**sounds** 6:22
**source** 82:16
  84:4
**South** 1:14 2:3
  4:20
**speak** 8:10 87:11

**speaking** 29:13
**specific** 30:16
  51:21 55:11,18
  55:22 56:10,17
  57:15 60:11
  71:8,11 76:12
  88:6
**specifically**
  15:16 17:1
  36:5 48:2 56:5
  57:6,12,20
  79:13
**specified** 37:5
**speculate** 7:15
**spray** 90:6,8
**Squad** 92:19,21
  92:22,23
**square** 125:1
**stack** 21:18
  73:11
**stage** 29:9 32:1
  128:4,9,10,15
**staging** 15:18
  29:13,17,24
  30:23 31:4
  75:6 82:7
**stairs** 79:7 80:7
**stairwell** 35:6
  101:9
**Stamp** 122:8,19
**Stamped** 13:10
  19:19 22:4
  88:14 122:5
  123:17
**Stamps** 123:1
**standard** 100:21
**standing** 102:6
**start** 11:9
  107:17 113:4
  113:24 114:1
**started** 107:18
  111:2 121:19
  128:20
**State** 1:19
**stated** 71:24
**statement** 3:10
  10:24 11:3,10
  12:1,13,22
  19:18 20:2,4

22:1 28:1
72:24 120:11
**statements** 13:3
111:6
**states** 1:1 10:14
36:6
**stenographic**
66:10 105:23
130:7
**steps** 102:7
**stickers** 63:3
**stipulated** 4:2
**stop** 6:12
**stopped** 52:19
108:23 113:8
**store** 25:16
**stories** 68:18
69:19
**story** 68:9,18,22
69:9
**straight** 35:7
**street** 1:14 2:3,9
4:21 17:14,20
18:16,17,21
25:17,18 26:16
26:16 46:24
47:5 128:3,20
128:20
**strike** 32:5 33:9
38:3,16 60:13
67:23 75:14
82:8 96:2
100:16 127:24
**structure** 68:15
68:18
**stuff** 16:15 19:7
31:22 47:7
87:8 102:15
**subsequently**
23:17
**substance** 7:7
**suggest** 24:21
**Suite** 1:14 2:4
**supervising** 32:8
**supervision**
130:15
**supervisor** 53:6
73:5,20
**supposedly**

28:12
**sure** 7:11,19
11:10 49:8,20
59:16 65:6
78:19 122:13
**surrender** 59:8
59:22
**surveillance**
83:11 106:7
**Survey** 100:8
**suspect** 13:13
30:6 35:20
38:1,4,16,20
39:1 40:12
43:7
**suspect's** 29:22
39:2
**SWAT** 3:12,20
3:21 8:23 9:1
9:18 10:13
15:5 32:12,13
33:12,16 46:7
48:21 51:21
53:10,13,19
54:4,9,14,16
54:19,22,24
55:11 56:6,11
57:7,13 60:12
61:23 70:20
73:21 74:18
75:10,17 78:10
79:14 84:20
86:3 87:14
89:18 91:15,17
92:13 93:18
95:18 96:23
97:15 99:11
112:20 115:18
117:9 118:23
127:12
**swear** 5:11
**switch** 19:19
48:11 94:4
**sworn** 5:14

——————
**T**
**T** 2:2,18
**tactical** 100:9
**take** 8:3 11:23

19:10,12,14
20:19 27:23
51:12 54:8
58:16 65:22
88:21 105:16
124:1
**taken** 1:12 5:6,9
26:20 130:8
**talked** 55:18
**talking** 33:19
**talks** 90:4
**tall** 68:9,18,19
69:9,19
**tan** 68:20
**tapping** 109:13
**team** 12:4 20:5
46:22 73:12,13
73:14,15,18
76:22,24 77:8
77:8,13,17,20
100:14,17
**teams** 77:10,23
78:2 79:6
**Tel** 2:5,11
**tell** 6:10 16:16
20:11 23:3,4
25:3 26:10
27:2 30:13,17
32:2 36:19
39:4 41:9 44:3
46:21 47:2
56:1 64:6,13
65:10 69:14
71:21 75:22
77:13 78:10
79:13,22 81:9
87:3 95:9
96:21 105:7
111:23 113:12
119:19
**telling** 121:17
**ten-by-ten** 125:1
**terms** 99:17
**testified** 5:15
23:15 38:21
71:12 89:7
90:17 124:19
**testify** 7:8
118:19

**testifying** 76:11
**testimony** 7:13
12:2 23:19
51:2 54:24
55:12 71:23
107:9 117:7
119:3 120:19
120:20
**Thank** 11:19
40:9
**thing** 47:19
62:17 80:20
102:19
**things** 92:13
**think** 12:6,11
38:17,19,20
48:10 53:7
55:9 66:20
70:1,7 71:12
71:24 75:4
81:18 83:10
88:23 90:17
107:7 116:9
129:6
**thinking** 80:6
115:5
**third** 52:17 98:8
**third-story**
77:10
**thousands** 116:9
117:8
**three** 77:10 83:7
97:23 98:11,18
98:20
**throw** 47:18
**time** 4:7 5:11 6:9
7:4 8:3,19
20:20 29:15
30:6 35:15,16
45:2 51:12
55:18 57:5
58:15,19,24
59:1,21 60:3
60:13,15,16,22
60:23,24 61:9
61:13,14,21
63:21 71:15
72:16,21 74:4
83:5,17 86:1

88:1,7 92:8
94:3,14 95:1
96:14 101:8
104:14 107:22
109:21 110:19
110:23,24
113:2 115:6
117:18,21,22
117:23 118:9
119:11
**times** 6:4 36:15
74:24 98:18
**tipping** 16:1
**today** 5:3 7:9,13
13:6 20:7
23:15 55:21
60:8 76:11
90:18 120:4
**today's** 4:23
10:21 12:2,24
**told** 30:23 38:2
42:3 56:23
92:13 95:15
**tool** 108:2,7,10
108:20 109:20
111:10
**Torresdale** 8:17
10:1,11 13:13
15:7 16:3
17:15,17,22,23
18:12 20:16,24
22:16 23:23
25:17,23 32:21
33:23 48:3
62:4 67:3,15
68:7 69:8
78:20 84:1,16
84:21 85:8
96:2 99:15
101:1 124:14
126:5 128:4
**track** 42:20
**train** 93:2 94:2
**trained** 92:19
**trainers** 92:19
92:21,24
**training** 10:2
51:16,21 54:15
54:16,20,22

55:10,19,22
56:4,10,17
57:12,16,18
59:24 70:18,22
87:15,15 88:6
91:14,24 92:1
92:11 93:1,3,5
**transcribed**
130:7
**transcript** 130:7
130:14
**transfer** 53:16
53:19
**transferred**
53:10,12 54:3
54:18
**trial** 4:7,12
**tried** 81:2,16
**trouble** 8:9
50:23
**true** 13:21 95:22
95:22,23 103:2
121:8 130:6
**truthful** 7:13
**truthfully** 7:9
**try** 8:12 33:20
37:12 80:21
82:21 84:5
85:11 120:12
**trying** 8:7 39:1
41:6 70:23
87:17
**turn** 22:11
**turned** 6:13
**TV** 122:9
**two** 6:6 10:22
20:14 47:5,6
65:1 68:18
69:19 70:2
78:2,4 98:5,9
101:6 116:23
**two-story** 25:19
77:9
**type** 35:5
**typical** 9:1
112:19,21
117:9,10
120:19,19
121:10,17

**U**
**Uh-huh** 28:10
**ultimately** 33:1
**uncomfortable**
8:2 128:7,8
**underneath** 95:4
**understand** 8:12
30:20 39:19
40:14 83:2,4
85:2 97:7
104:3
**understanding**
8:9 9:16 10:12
50:23 94:19
110:9
**uniform** 105:12
**uniformed** 105:2
**unique** 119:1
**unit** 3:12,20,21
8:24 9:1,18
10:13 15:5
22:4 32:12,13
33:12,16 46:7
48:21 51:21
53:10,13,19
54:4,9,14,17
55:11 60:12
61:24 70:20
73:21 74:18
75:10,17 78:10
79:14 84:20
86:4,19,22
87:3,15 89:18
91:15,17 92:14
93:1,18 95:19
96:24 97:15
99:11 112:20
115:18 117:9
118:24 127:13
**United** 1:1 10:14
**units** 93:1
**unknown** 85:4
**unnecessarily**
8:2
**unusual** 8:23
70:16
**upstairs** 80:8
**use** 4:12 8:3
62:20 105:5,6

105:9 108:16
**usually** 36:19
37:23 42:20
79:4 84:9 98:8
105:13 125:16

**V**
**vehicle** 18:5
32:15 105:1,12
**verbal** 93:5
**versus** 4:14
**Victim** 1:13 2:2
**Victims'** 4:19
**video** 4:17 10:20
11:4 105:16,23
107:19 109:7
109:18 110:15
111:3,13,18
112:18 113:22
115:3 120:21
121:4,9
**Videotape** 1:11
2:19 4:9
105:18 106:1
122:18 129:10
**view** 47:8 48:2
48:16
**viewed** 49:13
**visually** 85:16
98:9 115:3
**voluntarily** 59:8
**vs** 1:4

**W**
**wait** 61:17
117:17 118:1
119:10
**waived** 4:4
**walk** 17:10
47:24 73:10,13
**walking** 73:16
79:3 114:1
**walks** 113:19
**wall** 21:19
**want** 8:3,4 28:20
31:23 48:8,11
49:7 65:12,20
65:22 66:7
73:1 105:15,15
113:4,23 114:8

122:1,10
126:18
**wanted** 49:19
53:24
**warrant** 3:20
8:16 9:24
10:10 13:12,13
13:16 14:3,11
14:15,20,21
15:7 22:22
29:8,19 30:7
31:22 33:22
35:10,17,19
37:4 39:2
44:11,20 46:9
47:10 48:4,22
51:13 58:14,14
68:23 75:1
76:4 82:10
87:2,17 93:18
115:19 117:8
118:24 124:17
126:16
**warrants** 39:24
40:2 74:20
76:6 119:23
**wasn't** 16:23
28:23 33:24
77:20
**watch** 97:10
**way** 8:12,23
10:1,12 34:6
49:17 52:2
108:5 128:12
**we'll** 8:11 12:14
32:1 47:18
63:5 66:12
107:14 123:10
123:15,17
129:8
**we're** 7:14 8:7
27:4 33:19
36:17,21 42:6
47:2,22 61:17
79:2 81:9 83:7
87:7 88:12
105:19 107:7
111:18 118:16
123:13 128:12

**we've** 36:2 89:5
118:18
**wearing** 106:21
**website** 62:19,22
**Wednesday**
130:8
**week** 94:2
**weird** 47:17
**went** 18:15
57:13 105:11
113:9 119:19
127:21
**weren't** 104:14
**West** 2:2 3:4
5:19,21 9:7,22
10:8,18 11:11
11:17,21 12:14
12:20 14:17
15:4 16:21
17:12 19:9
20:22 21:24
22:10 23:6,13
24:16 25:6,20
26:4,13 27:16
27:22 28:22
29:5 30:4 31:1
31:12 34:16
35:8,14 36:1
36:24 37:10,21
38:14 40:8,19
41:4,22 43:3
44:5,17 45:8
45:11,17 46:5
48:1,7,14 49:5
49:19,22 50:7
50:18 54:1
55:8,20 56:21
57:4,10 58:3
58:17 59:4,14
59:23 60:7
61:1,7,22 62:7
62:13 63:5,11
64:8,16,23
65:15,20 66:5
66:12,18 67:21
68:16 69:6,16
70:5,17 71:7
72:14 74:16
76:7,20 78:18

79:8 80:3,19
81:13,24 82:6
83:9 84:11
85:5,18 86:11
86:20 88:4,12
88:20 90:2,16
91:9,23 92:6
92:20 93:10,16
95:2,14 96:15
96:22 97:11,24
98:21 99:3,23
100:6 101:17
101:24 103:8
104:8,16 105:3
105:14 106:3
106:20 107:6
107:16 110:7
110:17 111:4
111:15 112:1,8
112:15 113:3
114:2,5,18
115:7,16,24
116:18 117:16
117:24 118:17
119:7,15 120:1
120:9,16 121:7
121:21 122:1
122:11,15,21
123:1,10,23
125:8 127:8,22
129:2
**whatsoever**
85:10 112:3
**window** 118:15
118:16 125:3
**windows** 15:19
15:20 16:18,20
19:7 32:19
65:1 81:8
101:6
**witness** 3:2 5:3
5:11,14 9:5
10:7,17,23
11:24 12:10
14:8 15:3
16:14 17:6
19:5 20:1,21
21:20 22:13
23:8 24:15

25:4,13 26:3
26:11 27:13
28:17 29:2
30:22 34:14,23
35:24 36:14
37:9,17 38:11
39:23 41:2,21
44:15 45:1
46:2 47:15
49:4 50:9,12
50:16,17,21
53:23 55:6,17
56:16 57:9
58:1,13,24
59:13,19 60:5
60:21 61:5,13
63:1 64:7,14
64:20,22 65:11
66:1 67:19
68:13 69:5,15
69:24 70:15
71:6 72:13
74:14 76:3,18
78:16 79:1,19
80:2,18 81:5
81:23 82:4
83:4 84:9 85:3
85:16 86:9,18
87:22 89:4,24
90:14 91:6,22
92:3,18 94:6
94:23 96:13,20
97:8,23 99:21
100:3 101:15
101:23 103:7
104:5,13 105:1
106:19 107:5
107:14 110:3
110:15,22
111:13,24
112:6,13 113:1
114:16 115:2
115:15,23
116:17 117:14
117:20 118:13
119:6,14,23
120:15 121:2
121:15 124:3,7
125:10 127:20

128:13
**word** 9:12 35:17
35:17 49:20
**words** 20:11
94:19
**work** 42:4,13
46:14 83:22
86:2
**working** 86:13
**works** 7:1 31:19
**wouldn't** 14:1
39:18 40:13
41:7 100:3
108:16 112:14
**writing** 92:1
**written** 11:7
23:17 92:8

_____
**X**
**X** 3:1
**xxx** 43:8 129:7
**xxx's** 48:22
**xxxxxxx** 43:8
129:6

_____
**Y**
**Y** 57:4
**yard** 102:24
**yeah** 32:10
44:15 53:16
64:15 68:22
83:4 93:8
101:15 102:13
105:11 119:19
124:10
**year** 54:10
**years** 6:10 52:3
52:14 53:7,8
95:17
**yellow** 50:2
63:19,24 64:10
65:5 127:23
**Yep** 36:7
**yes-or-no** 81:18

_____
**Z**
**zero** 107:18
**Zurbriggen** 2:8
3:5 9:2,20 10:5
10:16 11:19

14:4,24 16:10
17:4 19:2
20:19 24:11,24
25:10,24 26:8
27:9 28:13
29:1 30:2,18
31:10 34:11,21
35:11,23 36:11
37:6,14 38:8
39:21 40:17,24
41:18 43:24
44:12,21 45:23
47:12 49:1,9
50:5,8,10,14
53:20 55:3,14
56:13 57:2,8
57:22 58:9,20
59:10,17 60:4
60:18 61:3,10
64:3,11,19
65:7 66:2
67:16 68:10
69:2,11,20
70:11 71:2
72:10 74:11
76:1,14 78:13
78:22 79:16,21
79:24 80:15
81:4,20 82:3
82:24 84:6,23
85:13 86:6,16
87:19 88:10
89:20 90:10
91:3,18 92:2
92:15 94:20
95:13 96:10,18
97:4,20 99:18
100:2 101:13
101:22 103:5
104:1,12,22
106:16 107:2
107:10 109:23
110:12,20
111:11,22
112:5,11,22
114:13,23
115:13,22
116:13 117:11
117:19 118:10

119:2,12,20
120:6,13,22
121:12,23
122:3,13,20,23
123:8,12,15
125:11 127:2
127:17 128:24
129:4

_____
**0**
**000098** 123:17
**08051** 1:22

_____
**1**
**1** 36:22
**1,000** 75:3
**1.5** 107:19
**1:12** 129:11,14
**1:35** 113:11,15
114:2,7
**10** 106:10
**100** 7:19 74:22
**11** 1:9 3:9 88:12
130:8
**11:00** 40:1 83:22
86:2
**11:05** 1:16
**11:06** 4:24
**11th** 4:23
**12** 3:10
**12:48** 105:20
**12:53** 106:2
**121** 1:14 2:3
4:20
**122** 3:5
**123** 3:22
**127** 3:4
**13** 98:22
**14** 123:14,15
**14TH** 2:10
**1515** 2:9
**1800** 1:14 2:4
**18th** 4:21
**19102** 2:10
**19107** 1:15 2:4
4:22
**1990s** 58:5
**1998** 52:8

_____
**2**

**2** 19:22 103:13
**2:17** 107:24
108:24
**2:28** 109:1
**2:32** 114:11
**2:34** 113:22
**20** 6:9
**2019** 53:11
**2021** 8:17 46:7
54:7,17,22
74:17 96:24
97:14
**2023** 1:9 4:24
130:8
**215** 2:5,11
**22** 3:11
**22-3763** 1:6
**220601633** 4:16
**23** 3:12
**233** 88:15
**234** 88:15
**26th** 52:24
**27** 3:13
**28** 99:12
**285** 4:11 5:5
**2b** 94:12

**3**

**3** 100:8 104:18
**3:00** 40:6 85:23
86:13
**30** 66:6 95:4,9
95:19,24 96:4
96:7,17 97:1
97:18
**31** 93:18
**36** 19:20

**4**

**4** 3:4
**406** 1:22
**42** 3:14
**43** 22:5
**45** 3:15 22:5
61:2
**46** 63:15
**4664** 10:1,11
13:13 15:7
16:3 20:16,24
22:16 23:22

32:21 33:23
48:3 62:4
63:17 67:3,15
68:7 78:20
83:24 96:2
99:15 101:1
124:14 126:4
**48** 52:3
**4th** 8:17

**5**

**5** 104:18
**5:00** 40:3
**50** 74:22
**546-1433** 2:5
**589-1107** 1:23

**6**

**62** 3:16 13:10
**63** 3:17
**64** 63:16
**66** 3:18
**683-5114** 2:11

**7**

**7:00** 83:22 86:2
**700** 76:5

**8**

**856** 1:23
**88** 3:19

**9**

**93** 3:20
**98** 3:21 122:14
122:24
**99.9** 36:20 79:3
101:7

# EXHIBIT "P"

Transcript of the Testimony of:
# Officer Edward Song

**Date:** May 15, 2023

**Case:** Alvarado v. City of Philadelphia

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

## Page 1

IN THE COURT OF COMMON PLEAS
PHILADELPHIA, PENNSYLVANIA
MAJOR JURY TRIAL DEMANDED

FELISHATAY ALVARADO,   :
      :
   Plaintiff (s)  :
      :
  -vs-    : JUNE TERM, 2022
      :
CITY OF PHILADELPHIA,   :
et al.    : NO.: 01633
      :
   Defendant (s)  :
- - -
Monday, May 15, 2023
- - -

    ORAL VIDEOTAPE DEPOSITION of OFFICER
EDWARD SONG, was taken, pursuant to notice,
held at the Victims' Recovery Law Center, 121
South Broad Street, 18th Floor, Philadelphia
Pennsylvania 19107, commencing at 10:02 a.m.,
before LISA HUGHES, Court Reporter and Notary
Public, there being present:

      DIAMOND COURT REPORTING
      406 REDBUD LANE
    MANTUA, NEW JERSEY  08051
      856-589-1107

## Page 2

1  APPEARANCES:
2
3  VICTIMS' RECOVERY LAW CENTER
   BY:  KEITH T. WEST, ESQUIRE
      121 South Broad Street
4      18th Floor
      Philadelphia, Pennsylvania 19107
5      Phone: (215) 546-1433
      keith@victimrecoverylaw.com.com
6      Representing the Plaintiff
7
8  CITY OF PHILADELPHIA LAW DEPARTMENT
   BY:  ADAM R. ZURBRIGGEN, ESQUIRE
9      One Parkway Building
      1515 Arch Street, 16th Floor
10    Philadelphia, Pennsylvania 19102
      Phone: (215) 683-5114
11    adam.zurbriggen@phila.gov
      Representing the Defendants
12
13
14
15 ALSO PRESENT:
16 SAMANTHA DIBONA, VIDEOGRAPHER
17
18
19
20
21
22
23
24

## Page 3

1      - - -
2    I N D E X
3      - - -
4
5  WITNESS     PAGE
6  OFFICER EDWARD SONG
7
8
9  EXAMINATION:
10 BY MR. WEST   4
11 BY MR. URBRIGGEN   95
12
13
14    - - -
15   E X H I B I T S
16    - - -
17
18 EXHIBIT NO.  DESCRIPTION   PAGE MARKED
19 Song-1   photocopy of photograph  27
20 Song-2   Philadelphia Police
21      Department Directive  88
22
23
24

## Page 4

1     - - -
2    (It is hereby stipulated and
3  agreed by and between counsel for
4  respective parties that reading,
5  signing, sealing, certification and
6  filing are waived and that all
7  objections, except as to the form of
8  questions, be reserved until the
9  time of trial and that any objection
10 by one defense counsel will inure to
11 the benefit of all other defense
12 counsel present.)
13    - - -
14   THE VIDEOGRAPHER:  This is
15 the audio video deposition for use
16 at trial in the matter of Felishatay
17 Alvarado v. City of Philadelphia, et
18 al.  GD #22-3763 and I'm the video
19 operator.  My name is Samantha
20 Dibona and I'm employed by the
21 Victims' Recovery Law Center.
22 My address is, 121 South Broad
23 Street, 18th Floor, Philadelphia,
24 Pennsylvania 19107.  Today's date is

Electronically signed by Lisa Hughes (601-318-489-3416)    c48b11e9-af99-4294-a672-0271409862db

Page 5

1    May 15, 2023 at 10:02 a.m.
2         This deposition is being
3    performed in person. The caption in
4    this case is Alverado v. City of
5    Philadelphia, et al., GD #22-3763.
6    The witness being deposed today is
7    Officer Edward Song. This
8    deposition is being taken on behalf
9    of the Plaintiff, Felishatay
10   Alvarado. The officer taking this
11   deposition today is Lisa Hughes and
12   she shall swear in the witness at
13   this time.
14        - - -
15        OFFICER EDWARD SONG,
16   having been first duly sworn, was
17   examined and testified as follows:
18        - - -
19        EXAMINATION
20        - - -
21   BY MR. WEST:
22   Q. Good morning, Officer Song. My name is
23   Keith West, I'm one of the attorneys
24   representing Ms. Alvarado in this lawsuit.

Page 6

1    How are you doing this morning?
2    A. Great. How are you doing?
3    Q. Good. And you've had a chance to
4    confer with your attorney, you're prepared to
5    testify today; is that correct?
6    A. Yes.
7    Q. Okay. Just a couple standard questions
8    I have to ask. Are you under the influence
9    of any sort of illness, medication,
10   substance, condition, anything that would
11   impair your ability to testify truthfully
12   today?
13   A. No.
14   Q. Okay. Have you ever been in a
15   deposition before?
16   A. No.
17   Q. This is your first deposition
18   experience?
19   A. Correct.
20   Q. All right. I'm sure your attorney gave
21   you a background, but let me just give you a
22   few ground rules just so you understand how
23   the process works. In many ways this may
24   feel like a normal conversation, but a big

Page 7

1    difference is everything we're saying has to
2    be written down by the court reporter. So
3    you're actually doing exactly what you're
4    supposed to do already, but unlike a normal
5    conversation, all of our responses have to be
6    spoken and we can't ever speak at the same
7    time. Okay?
8    A. Okay.
9    Q. So your attorney may have an objection
10   at some point. If your attorney begins
11   speaking, anyone else begins speaking, just
12   please pause and then we'll continue. Okay?
13   A. Okay.
14   Q. Your only obligation today is to give
15   truthful testimony based on your personal
16   knowledge, so at no point am I going to ask
17   you to guess or speculate, so please just
18   give us the information that's available to
19   you. Okay?
20   A. Okay.
21   Q. If you are able to give an estimate or
22   an approximation based on partial knowledge,
23   that's also very helpful, we'd ask for you to
24   give us your estimate or approximation, just

Page 8

1    let us know that's what you're doing. Okay?
2    A. Okay.
3    Q. Boring, but the example we always use
4    is if I asked you how many feet it is to the
5    wall, because you're not a robot you probably
6    can't tell me to the inch exactly how far it
7    is to the wall, but you probably could give
8    an estimate or an approximation, right? You
9    would do that in the course of your job?
10   A. Correct.
11   Q. But, you know, if you've grown up in
12   France and only knew the metric system, I'm
13   not asking you to guess or speculate what a
14   foot is. Do you understand the difference?
15   A. Yes.
16   Q. Also, this is not intended to be an
17   unnecessarily uncomfortable process, so if
18   you need a break at any time, a cup of
19   coffee, whatever, just let us know and we'll
20   try to be as accommodating as possible.
21   Okay?
22   A. Okay.
23   Q. Likewise, any question you're asked, if
24   you need me to speak louder, repeat the

Electronically signed by Lisa Hughes (601-318-489-3416)                    c48b11e9-af99-4294-a672-0271409862db

Page 9

1  question, if you have trouble understanding
2  the question, just let us know and we're
3  going to try to, if possible, restate or
4  rephrase the question.  Okay?
5       A. Okay.
6       Q. All right.  So Officer Song, what is
7  your current job?
8       A. Philadelphia Police Officer, assigned
9  to the SWAT unit.
10      Q. Okay.  What is your specific rank
11  within the Philadelphia Police Department?
12      A. Police officer.
13      Q. And what specific SWAT unit are you
14  assigned to?
15      A. Philadelphia Police.
16      Q. There's only one SWAT?
17      A. Correct.
18      Q. Okay.  How long have you been with
19  SWAT?
20      A. Fifteen years.
21      Q. And how long have you been with the
22  Philadelphia Police Department?
23      A. Twenty-three years.
24      Q. And just briefly, how did you join the

Page 10

1  SWAT unit?
2       A. After the allotted time that you're
3  allowed then you put in a transfer and you
4  get interviewed and if they accept you you go
5  on to the SWAT unit after training.
6       Q. Okay.  Did you apply to transfer to the
7  SWAT unit as early as you were eligible to do
8  so?
9       A. Yes.
10      Q. Regarding the incident with Ms.
11  Alvarado, I believe that there was an
12  investigation by the District Attorney's
13  Office, correct?
14          MR. ZURBRIGGEN:  Object to
15      form.  You can answer.
16          THE WITNESS:  I have no
17      knowledge of their investigation.
18  BY MR. WEST:
19      Q. Okay.  Were you interviewed or asked to
20  give any statement about the incident?
21      A. Yes.
22      Q. Okay.  And who were you interviewed by?
23      A. I believe Internal Affairs.
24      Q. Okay.  So there's an Internal Affairs

Page 11

1  investigation; is that fair to say?
2          MR. ZURBRIGGEN:  Object to
3      form, but, Officer, you can answer
4      if you can.
5          THE WITNESS:  I don't know.
6      Was there an investigation?  I was
7      interviewed by the Internal Affairs.
8  BY MR. WEST:
9       Q. Okay.  But you're not sure if there was
10  an Internal Affairs investigation?
11      A. I'm not privy to their investigations.
12      Q. Okay.  Since joining the Philadelphia
13  Police Department, how many times have you
14  been interviewed by Internal Affairs?
15      A. I can't tell you for sure.  I don't
16  know, maybe about ten times.
17      Q. Okay.  So approximately, ten times; is
18  that correct?
19      A. Roughly, around ten times, yes.
20      Q. How many of these ten times you've been
21  interviewed by Internal Affairs occurred
22  since you've joined the SWAT team?
23          MR. ZURBRIGGEN:  Object to
24      form, but, Officer, you can answer.

Page 12

1          THE WITNESS:  I don't know.
2      I don't know the number.  I can't
3      tell you.
4  BY MR. WEST:
5       Q. Chronologically, when was the first
6  time you were interviewed by the Internal
7  Affairs?
8       A. I don't know.  At some point when I was
9  in the 19th District, where I was first
10  assigned.
11      Q. Okay.  Prior to you joining the SWAT?
12      A. Correct.
13      Q. Can you give an estimate or an
14  approximation of how many times you've been
15  interviewed by Internal Affairs since joining
16  the SWAT.
17          MR. ZURBRIGGEN:  Object to
18      form, but, Officer, you can answer.
19          THE WITNESS:  I don't know.
20  BY MR. WEST:
21      Q. Of the approximately ten times that
22  you've been interviewed by Internal Affairs,
23  how many of these times involved a discharge
24  of a firearm?

Electronically signed by Lisa Hughes (601-318-489-3416)                    c48b11e9-af99-4294-a672-0271409862db

Page 13

1    MR. ZURBRIGGEN: Object to
2    form, but, Officer, you can answer.
3    THE WITNESS: Once.
4  BY MR. WEST:
5    Q. And what was that incident?
6    A. The dog shooting.
7    Q. The dog shooting involving Ms.
8  Alvarado?
9    A. Correct.
10    Q. Okay. So then the nine other
11  instances, none of those involved a firearm
12  being discharged in any way?
13    A. As far as I remember, no.
14    Q. Okay. In very general terms, can you
15  tell me what each of the prior instances
16  where you were interviewed by Internal
17  Affairs involved?
18    MR. ZURBRIGGEN: Object to
19    form, but, Officer, you can answer.
20    THE WITNESS: Truthfully, I
21    can't tell you.
22  BY MR. WEST:
23    Q. So your testimony right now is that you
24  cannot recall any details of any of the other

Page 14

1  approximately ten times you've been
2  interviewed?
3    MR. ZURBRIGGEN: Same
4    objection. Officer, you can answer.
5    THE WITNESS: No.
6  BY MR. WEST:
7    Q. That is your testimony or that's not
8  your testimony?
9    MR. ZURBRIGGEN: Same
10    objection. You can answer, Officer.
11    THE WITNESS: I remember
12    going to Internal Affairs, but what
13    I was interviewed for, I can't
14    remember. I don't know what
15    happened.
16  BY MR. WEST:
17    Q. So you have zero recollection of all
18  prior incidences, correct?
19    MR. ZURBRIGGEN: Same
20    objection. Officer, you can answer.
21    THE WITNESS: Yes.
22  BY MR. WEST:
23    Q. All right. What kind of training did
24  you receive as part of being on the SWAT team

Page 15

1  of the Philadelphia Police Department?
2    A. I attended a basic school for the SWAT
3  unit and as ongoing training throughout the
4  year at the SWAT unit.
5    Q. Okay. Did you receive any training
6  regarding any policies adopted by the
7  Philadelphia Police Department regarding when
8  it was appropriate or not appropriate to
9  discharge a firearm?
10    MR. ZURBRIGGEN: Object to
11    form, but, Officer, you can answer.
12    THE WITNESS: Can you say
13    the question again?
14  BY MR. WEST:
15    Q. Absolutely. Any time. Did you receive
16  any training with regards to what policies
17  have been adopted by the Philadelphia Police
18  Department with regards to when it was
19  appropriate or not appropriate to discharge a
20  firearm?
21    MR. ZURBRIGGEN: Object to
22    form. Officer, you can answer.
23    THE WITNESS: You fire your
24    weapon when you're in danger or you

Page 16

1    can get hurt.
2  BY MR. WEST:
3    Q. All right. That's your recollection of
4  the training you received, that you could
5  fire your firearm when you're in danger or if
6  you can get hurt; is that correct?
7    MR. ZURBRIGGEN: Object to
8    form, but, Officer, you can answer.
9    THE WITNESS: Yes.
10  BY MR. WEST:
11    Q. Do you recall anything additional
12  regarding that?
13    A. No.
14    Q. Okay. Did you receive, to your
15  recollection, any specific training with
16  regards to how to deal with dogs when
17  executing a warrant?
18    A. What kind of dog are you talking about?
19    Q. Any kind of dog.
20    A. Any kind of dog? If the dog is
21  friendly then the dog is friendly, you just
22  bypass the dog, but if the dog is going to
23  attack you then you do what you need to do to
24  prevent you from getting seriously injured.

4 (Pages 13 to 16)

Page 17

1    Q. Okay.  But let me make sure you
2  understand the question.  My question is, do
3  you recall any specific training?  I can ask
4  you more questions about the training, but
5  this, I think, is a yes or no question.
6    A. Okay.
7    Q. Do you recall receiving any specific
8  training from the Philadelphia Police
9  Department with regards to how you should
10  interact with dogs on the property when
11  executing a warrant?
12    A. No.
13    Q. Okay.  So your prior testimony about
14  dealing with friendly dogs or not friendly
15  dogs, is that just based on your own personal
16  opinion?
17        MR. ZURBRIGGEN:  Object to
18      form, but, Officer, you can answer.
19        THE WITNESS:  Yes.
20  BY MR. WEST:
21    Q. Okay.  Have you ever heard of anything
22  called the knock and announce rule?
23        MR. ZURBRIGGEN:  Object to
24      form, but, Officer, you can answer.

Page 18

1        THE WITNESS:  Yes.
2  BY MR. WEST:
3    Q. Please tell me to the best of your
4  understanding what the knock and announce
5  rule is?
6    A. You knock and announce the warrant
7  charges, you give ample amount of time for
8  the person to come answer the door, and if
9  they don't answer then the order is given to
10  breach the door.
11    Q. Okay.  And where did you learn about
12  the knock and announce rule?
13    A. It's part of the training during the
14  basic school during SWAT.
15    Q. Okay.  Now, when you referred to the
16  information that you obtained through your
17  training with the Philadelphia Police
18  Department a moment ago, were you referring
19  to information that you had received prior to
20  the date of our incident, which was June 4,
21  2021, or is this only information that you've
22  learned subsequent?
23        MR. ZURBRIGGEN:  Object to
24      form, but, Officer, you can answer.

Page 19

1        THE WITNESS:  Before.
2  BY MR. WEST:
3    Q. Okay.  All right.  So you've received
4  training that told you what the knock and
5  announce rule was prior to our incident on
6  June 4, 2021, correct?
7    A. Correct.
8    Q. All right.  And I believe your
9  testimony was that when executing a warrant
10  you should knock on the door and then provide
11  an ample amount of time before breaching the
12  door; is that correct?
13        MR. ZURBRIGGEN:  Object to
14      form.  Officer, you can answer.
15        THE WITNESS:  Yes.
16  BY MR. WEST:
17    Q. And I apologize if some of these
18  questions seem like lawyers are so annoying,
19  but it's just to create a clean record.
20  Okay?
21    A. Yes.
22    Q. This is going to sound like I'm asking
23  the same question, it's slightly different, I
24  promise, I'm not trying to reask.  Was the

Page 20

1  information that you're required to provide
2  an ample amount of time before breaching the
3  door when executing a warrant consistent with
4  the training that you received from the
5  Philadelphia Police Department?
6        MR. ZURBRIGGEN:  Object to
7      form, but, Officer, you can answer.
8        THE WITNESS:  Yes.
9  BY MR. WEST:
10    Q. All right.  So when you were provided
11  this training from the Philadelphia Police
12  Department, were you given any guidance as to
13  what an ample amount of time would mean?
14    A. Well, when we do the knock and
15  announce, we knock and announce and the door
16  isn't breached until the supervisor gives the
17  okay to breach the door, he gives the command
18  to breach the door and that's when the door
19  is breached.
20    Q. Okay.  I understand what you're saying,
21  but I'm just asking you to remember whatever
22  training you received from the Philadelphia
23  Police Department, that's my question.
24    A. Right.

Electronically signed by Lisa Hughes (601-318-489-3416)                                        c48b11e9-af99-4294-a672-0271409862db

Page 21

1   Q. So in any of the training that you
2   received from the Philadelphia Police
3   Department prior to June 4, 2021, did any of
4   that training give you any guidance as to
5   what was meant by an ample amount of time?
6          MR. ZURBRIGGEN: Object to
7       form, but, Officer, you can answer.
8          THE WITNESS: I really can't
9       tell you, no.
10  BY MR. WEST:
11  Q. Okay. For example, would it be a
12  minimum of five seconds, ten seconds,
13  anything like that?
14         MR. ZURBRIGGEN: Same
15      objection, but, Officer, you can
16      answer.
17         THE WITNESS: I will say at
18      least 30, 40 seconds.
19  BY MR. WEST:
20  Q. Okay. So it's your understanding that
21  between knocking on the door and breaching
22  the door, you should allow at least 30 to
23  40 seconds, correct?
24  A. Correct.

Page 22

1   Q. And with regards to the incident
2   involving Ms. Alvarado, do you have any
3   personal knowledge if at least 30 to 40
4   seconds passed between the knock on the door
5   and the door being breached?
6   A. I really can't tell you how long the
7   knock time was.
8   Q. Okay. Would you be surprised to learn
9   that it was less than that?
10         MR. ZURBRIGGEN: Object to
11      form.
12         THE WITNESS: I really can't
13      tell you how long the time was.
14  BY MR. WEST:
15  Q. Okay. Do you recall the incident
16  involving Ms. Alvarado well enough now that
17  you can recall who physically breached the
18  door?
19         MR. ZURBRIGGEN: Object to
20      form, but, Officer, you can answer.
21         THE WITNESS: I really can't
22      tell you who breached the door.
23  BY MR. WEST:
24  Q. Okay. Were you present when the door

Page 23

1   was breached?
2   A. Yes.
3   Q. Can you recall who else was there?
4   A. I know I was the first in line.
5   Officer Hamoy was behind me and I believe
6   Lieutenant Monk was behind him and I believe
7   behind Lieutenant Monk was Officer Saba and
8   behind Officer Saba was Officer Burkitt and
9   behind Officer Burkitt was Sergeant Mellody.
10  I believe. That's the best of my
11  recollection.
12  Q. Okay. And when you say behind, do you
13  mean like a line?
14  A. Yes.
15  Q. Okay. All right. So you were the
16  first person in line?
17  A. Correct.
18  Q. So does that mean you're the one who
19  actually breached the door?
20  A. No.
21  Q. Okay. And then the second person,
22  could you spell that name if you know?
23  A. H-A-M-O-Y.
24  Q. And then the third person?

Page 24

1   A. Lieutenant Monk.
2   Q. And then the fourth person?
3   A. Officer Saba.
4   Q. And then I think you said a fifth
5   person?
6   A. The fifth person is Officer Burkitt.
7   Q. All right. When conducting a warrant
8   enforcement on a house as part of the
9   Philadelphia SWAT team, would a person
10  normally be assigned as the point person?
11  Does that term mean anything to you in this
12  context?
13  A. It's whoever is assigned to the first
14  floor is going to be the first person in the
15  door.
16  Q. Okay. Let me take a step back. Is the
17  term point person, is that a term that in
18  your experience is normally used by the SWAT
19  team?
20  A. I don't think we use that term, it's
21  just whoever is the first in line, whoever is
22  first in.
23  Q. Okay. And I think you said it's
24  whoever is on the first floor?

Electronically signed by Lisa Hughes (601-318-489-3416)                    c48b11e9-af99-4294-a672-0271409862db

Page 25

1    A. So if you're assigned an entry team, if
2  you're assigned an entry team you're assigned
3  a floor to clear the property.  So if you're
4  the first person in -- if you're assigned to
5  the first floor and you're the first person
6  on the first floor then you're the first
7  person that's going in the door first.
8    Q. Okay.  So when you were executing the
9  warrant at Ms. Alvarado's house, was it your
10 understanding that you were specifically
11 assigned to enter the first floor apartment?
12   MR. ZURBRIGGEN: Object to
13   form.  Officer, you can answer.
14   THE WITNESS: I was assigned
15   to go in first, to the first floor,
16   yes.  Or if it's an apartment, then
17   I'll be the first person to go into
18   the second floor apartment.
19 BY MR. WEST:
20   Q. Okay.  So were you supposed to go in on
21 the first floor or the second door?
22   MR. ZURBRIGGEN: Same
23   objection.  Officer, you can answer.
24   THE WITNESS: So if it's an

Page 26

1    apartment and to say it's a -- just
2    say we're going into this law office
3    and there's no second floor and
4    we're hitting an apartment, I am
5    still first in, I'll be the lead
6    person on the first team so I'll be
7    the first one in the door still.
8  BY MR. WEST:
9    Q. Okay.  When you executed the warrant at
10 Ms. Alvarado's house, did you have any
11 information provided to you as to who lived
12 on the first floor of that building?
13   A. We were given information -- no.  We
14 were just given information that it was --
15 homicide gave us a warrant to serve on this
16 gentleman that was wanted for homicide, he
17 was supposed to be in the second floor rear
18 and that's who we were going after.
19   Q. Okay.  So you were aware before
20 entering the buildings that the warrant was
21 only valid for the second floor rear,
22 correct?
23   MR. ZURBRIGGEN: Object to
24   form, but, Officer, you can answer.

Page 27

1    THE WITNESS:  Yes.
2    MR. WEST:  We'll mark this
3  as Song-1.
4    - - -
5    (Whereupon, Song-1 was
6    marked for identification.)
7    - - -
8  BY MR. WEST:
9    Q. Mr. Song, if you wouldn't mind looking
10 at this for a moment and let me know if
11 you're able to identify what this is a
12 picture of?
13   A. This is a picture of Torresdale Avenue.
14   Q. And to your knowledge, have you ever
15 been to any of the houses in this picture?
16   A. Yes.
17   Q. Okay.  Can you tell me which ones?
18   A. The third house from the right.
19   Q. The one with kind of a tan exterior?
20   A. I believe so, yes.
21   Q. Again, this is a question that I don't
22 mean any offense by this, I just have to
23 create a clean record.  Because a lot of
24 people are color blind.  Are you color blind?

Page 28

1    A. I'm not colored blind.
2    Q. All right.  And to your recollection,
3  when have you been in the house that you just
4  identified?
5    A. The day in question.
6    Q. Okay.  So when you entered Ms.
7  Alvarado's house, this is the house then?  Do
8  you recognize it?
9    MR. ZURBRIGGEN: Object to
10   form, but, Officer, you can answer.
11   THE WITNESS:  Correct.
12 BY MR. WEST:
13   Q. Okay.  All right.  Sir, I will
14 represent to you that this is a Google Maps
15 picture that I printed out this morning.  In
16 the upper left corner it says 9:30 a.m.,
17 Monday, May 15th.  So I took this picture
18 from Google Maps this morning just to
19 represent to you where it came from.  And
20 does this appear to look the same as it did
21 the day that the dog got shot?
22   MR. ZURBRIGGEN:  Object to
23   form, but, Officer, you can answer.
24   THE WITNESS:  I can't tell

Electronically signed by Lisa Hughes (601-318-489-3416)                                    c48b11e9-af99-4294-a672-0271409862db

Page 29

1    you from this view, but I remember
2    walking up to the property in
3    question of the warrant service and
4    I remember the address of the
5    property on being at the house and I
6    don't think I remember actually
7    looking down the street from this
8    view so I can't tell you what
9    specifically you're talking about.
10   BY MR. WEST:
11        Q. Is there anything that you remember
12   about how the house looked that day is
13   different than what you see in the picture?
14            MR. ZURBRIGGEN:  Object to
15        form, but, Officer, you can answer.
16            THE WITNESS:  I really can't
17        tell you.
18   BY MR. WEST:
19        Q. Okay.  So, sir, if you look at the
20   picture you can see that there is a front
21   door there and there's two mailboxes,
22   correct?
23        A. Correct.
24        Q. Can you tell if there's any second

Page 30

1    floor above if you go through that door?
2            MR. ZURBRIGGEN:  Object to
3        form, but, Officer, you can answer.
4            THE WITNESS:  Can you repeat
5        the question?
6    BY MR. WEST:
7        Q. Right.  If you look at this picture, if
8    you go through that door, is there any second
9    floor above that door?
10            MR. ZURBRIGGEN:  Object to
11       form, but, Officer, you can answer.
12            THE WITNESS:  Can I tell if
13       there's a second floor from that
14       front door?  No, I can't tell.
15   BY MR. WEST:
16       Q. So based on all the training that
17   you've received from the Philadelphia Police
18   Department as part of being the SWAT team,
19   you can't look at this door and tell that you
20   can't get to the second floor through this
21   door, through this picture?
22            MR. ZURBRIGGEN:  Object to
23       form, but, Officer, you can answer.
24            THE WITNESS:  No.

Page 31

1    BY MR. WEST:
2        Q. For the record, I'm going to highlight
3    something.  So we're going to use the pink
4    highlighter.  If you look at the area where
5    there's a pink highlight, can tell if there's
6    a space there that is enterable through that
7    door where there is no second floor?  Can you
8    tell that or you're not able to tell?
9            MR. ZURBRIGGEN:  Object to
10       form, but, Officer, you can answer.
11            THE WITNESS:  Can you repeat
12       the question?
13   BY MR. WEST:
14       Q. Right.  So I've highlighted an area
15   with the pink highlighter.  Can you see that?
16       A. Yes.
17       Q. Okay.  The area with the pink
18   highlighter, is there any second floor there?
19            MR. ZURBRIGGEN:  Object to
20       form, but, Officer, you can answer.
21            THE WITNESS:  No.
22   BY MR. WEST:
23       Q. Okay.  So you can tell from this
24   picture that if you go through this door

Page 32

1    you're entering an area where there is no
2    second floor, correct?
3            MR. ZURBRIGGEN:  Object to
4        form, but, Officer, you can answer.
5            THE WITNESS:  What's the
6        specific question you're
7        asking?  There's no second floor
8        above the area that we went in, is
9        that what you're asking?
10   BY MR. WEST:
11       Q. Right.  I'll rephrase the question.  So
12   you can tell from this picture that if
13   somebody walks through that door they're
14   entering a room where there is no second
15   floor, correct?
16            MR. ZURBRIGGEN:  Object to
17       form.  Officer, you can answer.
18            THE WITNESS:  There is no
19       second floor above that area,
20       correct.
21   BY MR. WEST:
22       Q. All right.  On the day of the dog
23   shooting, who did you believe lived in this
24   area where there was no second floor?

Page 33

1    MR. ZURBRIGGEN: Object to
2 form. Officer, you can answer.
3    THE WITNESS: The building
4 does have a second floor.
5 BY MR. WEST:
6    Q. But you acknowledge that there's an
7 area were there is no second floor, correct?
8    MR. ZURBRIGGEN: Same
9 objection. Officer, you can answer.
10    THE WITNESS: There's no
11 second floor in that front room,
12 correct.
13 BY MR. WEST:
14    Q. On the day of the shooting, who did you
15 believe lived in that front room?
16    MR. ZURBRIGGEN: Same
17 objection. Officer, you can answer.
18    THE WITNESS: I didn't
19 believe any -- I don't know who
20 lived in the front room. We were
21 trying to get to the second floor.
22 Do you want me to explain why --
23    MR. ZURBRIGGEN: Officer,
24 there's no question pending.

Page 34

1    THE WITNESS: Okay.
2 BY MR. WEST:
3    Q. Did you end up shooting a dog on the
4 day that you executed the warrant at Ms.
5 Alvarado's house?
6    A. Yes.
7    Q. Did you know that the dog was in the
8 house before you entered the house?
9    A. No. I don't recall.
10    Q. Did you hear a dog barking before you
11 entered the house?
12    A. I don't recall.
13    Q. Do you recall if you had any
14 information available to you as to whether or
15 not there was a dog in that house before you
16 entered?
17    MR. ZURBRIGGEN: Object to
18 form, but, Officer, you can answer.
19    THE WITNESS: No, I don't
20 recall.
21 BY MR. WEST:
22    Q. If you had known there was a dog in the
23 house before you entered, would that have
24 changed how you went about executing the

Page 35

1 warrant in any way, whatsoever?
2    MR. ZURBRIGGEN: Object to
3 form, but, Officer, you can answer.
4    THE WITNESS: No.
5 BY MR. WEST:
6    Q. Officer Song, I'm going to mark this
7 with a yellow highlighter. So I've marked an
8 area with a yellow highlighter, is that the
9 door that you entered prior to shooting the
10 dog?
11    MR. ZURBRIGGEN: Object to
12 form, but, Officer, you can answer.
13    THE WITNESS: At this angle
14 I can't tell you for certain, I
15 just remember the front of the
16 property.
17 BY MR. WEST:
18    Q. Okay. The door that you entered, was
19 that in the front of the property?
20    A. Correct.
21    Q. Do you see any other door that you
22 consider to be the front of the property in
23 this picture?
24    MR. ZURBRIGGEN: Object to

Page 36

1 form, but, Officer, you can answer.
2    THE WITNESS: No.
3 BY MR. WEST:
4    Q. So how was the door breached?
5    A. I believe the door was breached with a
6 ram.
7    Q. And do you know why a ram was used to
8 breach the door?
9    MR. ZURBRIGGEN: Object to
10 form, but, Officer, you can answer.
11    THE WITNESS: Because the
12 door was locked.
13 BY MR. WEST:
14    Q. Did anyone knock on the door before it
15 was rammed?
16    A. Yes.
17    Q. Do you know who knocked on the door?
18    A. I do not.
19    Q. It wasn't you, correct?
20    A. Correct.
21    Q. Do you know how many times the door was
22 knocked on before it was rammed?
23    A. I do not.
24    Q. You have no recollection of that,

Electronically signed by Lisa Hughes (601-318-489-3416)    c48b11e9-af99-4294-a672-0271409862db

Page 37

1  correct?
2      A. I don't recall, no.
3      Q. Do you have any specific recollection
4  of seeing anyone knock on the door?
5          MR. ZURBRIGGEN: Object to
6      the form. You can answer.
7          THE WITNESS: Someone did
8      knock on the door, yes.
9  BY MR. WEST:
10     Q. How do you know that?
11     A. Because he was standing in front of me.
12     Q. But you can't recall who it was or how
13  long they knocked, correct?
14         MR. ZURBRIGGEN: Object to
15     form, but, Officer, you can answer.
16         THE WITNESS: Correct.
17  BY MR. WEST:
18     Q. Who was the first person to enter this
19  property after the door was breached?
20     A. I was.
21     Q. And who did you expect to find, if
22  anyone, on the other side of that door?
23         MR. ZURBRIGGEN: Object to
24     form, but, Officer, you can answer.

Page 38

1          THE WITNESS: Who did I
2      expect to find? The person who
3      we were looking for for the warrant
4      search.
5  BY MR. WEST:
6      Q. The murder suspect?
7      A. Correct.
8      Q. I think you testified earlier that you
9  were aware that the warrant was only good for
10  the second floor rear, correct?
11         MR. ZURBRIGGEN: Object to
12     form. You can answer.
13         THE WITNESS: Correct.
14  BY MR. WEST:
15     Q. When you entered that door, did you
16  believe you were entering the second floor
17  rear of the property?
18         MR. ZURBRIGGEN: Object to
19     form. Officer, you can answer.
20         THE WITNESS: No.
21  BY MR. WEST:
22     Q. Did it occur to you that you might be
23  entering the residence of someone else other
24  than the suspect?

Page 39

1          MR. ZURBRIGGEN: Object to
2      form. Officer, you can answer.
3          THE WITNESS: Can I have the
4      question again?
5  BY MR. WEST:
6      Q. Yes. When you walked through the door
7  that had been breached, did it occur to you
8  that you might be entering the residence of
9  someone other than the person named on the
10  warrant?
11         MR. ZURBRIGGEN: Same
12     objection. Officer, you can answer.
13         THE WITNESS: I believed I
14     was going to be entering a hallway.
15  BY MR. WEST:
16     Q. A hallway? And what was your basis for
17  believing that?
18         MR. ZURBRIGGEN: Object to
19     form, but, Officer, you can answer.
20         THE WITNESS: Ninety percent
21     or even more than that, if there's a
22     two-story apartment you can enter
23     the front door and it's like a foyer
24     area and it's a separation from

Page 40

1      going straight and going up to the
2      second floor and another door that
3      goes into the first floor.
4  BY MR. WEST:
5      Q. I don't mean any disrespect, Officer
6  Song, but are you saying it was just a guess
7  that there might be a hallway there?
8          MR. ZURBRIGGEN: Object to
9      form. Officer, you can answer.
10         THE WITNESS: Through my
11     experience in the SWAT unit, that I
12     would say over 99 percent of the
13     time that you go in that door if
14     there's no other entrances
15     available, that's a split. If it's
16     a second floor apartment then you go
17     in and there's a hallway there and
18     there's another doorway that leads
19     up to the second floor.
20  BY MR. WEST:
21     Q. Okay. And was that consistent with the
22  training you received from the Philadelphia
23  Police Department that this was a correct way
24  to execute a warrant in a multi-resident

Electronically signed by Lisa Hughes (601-318-489-3416)                    c48b11e9-af99-4294-a672-0271409862db

Page 41

1  building?
2          MR. ZURBRIGGEN:  Object to
3  form.  Officer, you can answer.
4          THE WITNESS:  I would say
5      it's just commonsense, you know,
6      and like through the thousands and
7      thousands of warrants I've done that
8      that's the case.
9  BY MR. WEST:
10     Q. But my question is, is that consistent
11 with the training you received from the
12 Philadelphia Police Department?
13         MR. ZURBRIGGEN:  Same
14     objection.  Officer, you can answer.
15         THE WITNESS:  Through my
16     training?  I can't answer that
17     question.  I don't know exactly what
18     you're trying to -- what kind of
19     answer you want.  Did they train me
20     on structures of a house?  I don't
21     know.  They didn't.
22 BY MR. WEST:
23     Q. All right.  You have no recollection of
24 ever receiving any training as to review the

Page 42

1  structure of a building; is that correct?
2          MR. ZURBRIGGEN:  Object to
3      form.  Officer, you can answer.
4          THE WITNESS:  No.
5  BY MR. WEST:
6      Q. And again, sir, I think you previously
7  acknowledged, you can just look at this
8  picture and you can see that there's no entry
9  to the second floor from this picture,
10 correct?
11         MR. ZURBRIGGEN:  Object to
12     form.  Officer, you can answer.
13         THE WITNESS:  There's no
14     entry to the second floor?
15 BY MR. WEST:
16     Q. There's a room on the other side of
17 that door, correct?
18         MR. ZURBRIGGEN:  Object to
19     form.
20         THE WITNESS:  There's no way
21     for me to know if there's a room or
22     if there's a hallway, but if there's
23     no other entrance then I would say
24     over 99 percent of the time that you

Page 43

1      enter the doorway there there's a
2      split.
3  BY MR. WEST:
4      Q. Okay.  Was there another entrance to
5  this building?
6          MR. ZURBRIGGEN:  Object to
7      form.  Officer, you can answer.
8          THE WITNESS:  Yes.
9  BY MR. WEST:
10     Q. Okay.  And that was a rear entrance,
11 correct?
12     A. Correct.
13     Q. And the warrant actually said rear on
14 it, correct?
15         MR. ZURBRIGGEN:  Object to
16     form.  Officer, you can answer.
17         THE WITNESS:  Correct.
18 BY MR. WEST:
19     Q. Did it occur to you that the rear
20 entrance might have been the entrance to the
21 rear apartment?
22         MR. ZURBRIGGEN:  Object to
23     form.  Officer, you can answer.
24         THE WITNESS:  Did it occur

Page 44

1      to me?  It could have been in the
2      rear.  But there are many times that
3      we serve warrants on houses that
4      said second floor rear, second floor
5      front, third floor rear, third floor
6      front, but all the entrances was
7      through the front door.
8  BY MR. WEST:
9      Q. Okay.  So when you've been in this
10 situation before, was there any effort made
11 to try to determine what the proper way would
12 be to enter the building before having to
13 make a forced entry?
14         MR. ZURBRIGGEN:  Object to
15     form.  Officer, you can answer.
16         THE WITNESS:  The job was
17     reconned, surveyed before we went
18     out and served the actual warrant,
19     and to the best of my knowledge,
20     there was no indication that there
21     was an entrance in the rear.
22 BY MR. WEST:
23     Q. So your understanding of this
24 particular warrant at the 4664 Torresdale

Electronically signed by Lisa Hughes (601-318-489-3416)                    c48b11e9-af99-4294-a672-0271409862db

Page 45

1  Avenue is that you believe that there had
2  been a recon done and there was no indication
3  that there was a rear entrance; is that
4  correct?
5       MR. ZURBRIGGEN:  Object to
6  form.  Officer you can answer.
7       THE WITNESS:  Correct.
8  BY MR. WEST:
9     Q. When you entered the front door of Ms.
10  Alvarado's home, at that time were you
11  unaware of the existence of a rear door?
12    A. No, I was not aware there was a rear
13  door.
14    Q. That was a bad question.  Let me reask
15  the question just because I think you may
16  have misheard me.  At the time that you
17  entered the front door of this property and
18  entered Ms. Alvarado's private residence,
19  were you unaware that there was a rear door
20  to that property?
21       MR. ZURBRIGGEN:  Object to
22  form.  Officer, you can answer.
23       THE WITNESS:  I have no
24  personal knowledge of the rear door.

Page 46

1  BY MR. WEST:
2     Q. You had no personal knowledge at that
3  time, correct?
4     A. Correct.
5     Q. Do you know one way or another whether
6  or not Lt. Monk was aware of the existence of
7  a rear door at that time?
8       MR. ZURBRIGGEN:  Object to
9  the form.  Officer, you can answer.
10       THE WITNESS:  I am not
11  aware.
12  BY MR. WEST:
13    Q. Have you had any conversations with Lt.
14  Monk at all about entering this property
15  before you guys entered the property?
16    A. Yes.
17    Q. And just tell me everything you can
18  remember as to what Lt. Monk said about
19  entering this property before you entered the
20  property?
21       MR. ZURBRIGGEN:  Object to
22  form, but, Officer, you can answer.
23       THE WITNESS:  As with a
24  warrant we have a briefing prior to

Page 47

1  the warrant service and we talked
2  about the -- well, he briefed us on
3  the warrant service and the location
4  of where we were going to enter the
5  property as per what was seen during
6  the recon of the property.
7  BY MR. WEST:
8     Q. Okay.  And do you remember what he
9  specifically said about that?
10       MR. ZURBRIGGEN:  Object to
11  form.  Go ahead.
12       THE WITNESS:  He said the
13  second floor.
14  BY MR. WEST:
15    Q. When briefings were done as part of the
16  SWAT at the Philadelphia Police Department,
17  would there normally be a written record of
18  that briefing that you're aware of?
19       MR. ZURBRIGGEN:  Object to
20  form, but, Officer, you can answer.
21       THE WITNESS:  Basically,
22  when there's a warrant service
23  there's paperwork that is completed
24  so the officers have the paperwork

Page 48

1  with the information on it for the
2  warrant service.
3  BY MR. WEST:
4     Q. Okay.  And do you recall what that kind
5  of paperwork is called, like does it have a
6  title on the page?
7       MR. ZURBRIGGEN:  Object to
8  form, but, Officer, you can answer.
9       THE WITNESS:  A recon sheet.
10  BY MR. WEST:
11    Q. A recon sheet.  Okay.  Is there
12  anything beyond that or is it just the recon
13  sheet?
14       MR. ZURBRIGGEN:  Same
15  objection, but, Officer, you can
16  answer.
17       THE WITNESS:  Prior to the
18  warrant we have recon sheets with
19  all the information that's needed
20  for the warrant service.
21  BY MR. WEST:
22    Q. Officer Song, in Philadelphia a lot of
23  people live in shared residences; is that
24  fair based on your experience or not?

12 (Pages 45 to 48)

Page 49

1  MR. ZURBRIGGEN: Object to
2  form. Officer, you can answer.
3  THE WITNESS: I can't attest
4  if they're shared properties or not.
5  BY MR. WEST:
6  Q. Fair enough. Did you ever, as part of
7  being a member of the Philadelphia Police
8  Department SWAT team, did you ever receive
9  any specific training about shared
10 residences?
11 MR. ZURBRIGGEN: Object to
12 the form, but, Officer, you can
13 answer.
14 THE WITNESS: No.
15 BY MR. WEST:
16 Q. For example, as we've already discussed
17 before, you were aware that the warrant was
18 only for the second floor of the property,
19 right?
20 MR. ZURBRIGGEN: Object to
21 form. Officer, you can answer.
22 THE WITNESS: Yes.
23 BY MR. WEST:
24 Q. Okay. And, obviously, you knew the

Page 50

1  property had a first floor, correct?
2  MR. ZURBRIGGEN: Object to
3  form, but, Officer, you can answer.
4  THE WITNESS: Correct.
5  BY MR. WEST:
6  Q. And I think your testimony is that you
7  didn't know who lived on the first floor,
8  right?
9  A. Correct.
10 Q. Now, as part of the reconnaissance
11 before executing a search warrant, in your
12 experience, would there normally be any
13 effort to ascertain who lived in the other
14 parts of the shared residence?
15 MR. ZURBRIGGEN: Object to
16 form, but, Officer, you can answer.
17 THE WITNESS: I would think
18 that's the detective's job.
19 BY MR. WEST:
20 Q. Okay. Is that something you'd normally
21 rely on the detectives to do in your
22 experience or not?
23 MR. ZURBRIGGEN: Same
24 objection. Officer, you can answer.

Page 51

1  THE WITNESS: Yes.
2  BY MR. WEST:
3  Q. Okay. Do you have any personal
4  knowledge if any detective in this situation
5  ascertained who lived on the first floor of
6  the property?
7  MR. ZURBRIGGEN: Object to
8  form. Officer, you can answer.
9  THE WITNESS: I do not.
10 BY MR. WEST:
11 Q. In your experience, before a search
12 warrant or an arrest warrant is executed in a
13 shared residence in the City of Philadelphia,
14 would it be normal to contact the property
15 owner to ascertain where people lived and who
16 lived there?
17 MR. ZURBRIGGEN: Object to
18 form. Officer, you can answer.
19 THE WITNESS: Again, I think
20 that's the responsibility of the
21 detective.
22 BY MR. WEST:
23 Q. Is that something in your personal
24 experience you would normally expect the

Page 52

1  detective to do?
2  MR. ZURBRIGGEN: Same
3  objection. Officer, you can answer.
4  THE WITNESS: Yes.
5  BY MR. WEST:
6  Q. Looking at Exhibit-1, if you could have
7  heard a dog barking on the other side of that
8  door, would that have given you any insight
9  as to whether or not that was an occupied
10 space or a hallway?
11 MR. ZURBRIGGEN: Object to
12 form. Officer, you can answer.
13 THE WITNESS: The dog
14 barking in the residence doesn't
15 mean that someone is inside.
16 BY MR. WEST:
17 Q. I'm not asking if the resident was
18 home, but would it indicate that it was an
19 occupied space?
20 MR. ZURBRIGGEN: Same
21 objection. Officer, you can answer.
22 THE WITNESS: Yes. If
23 there's a dog barking then I would
24 think that commonsense says that

13 (Pages 49 to 52)

Page 53

1    it's occupied, yes.
2    BY MR. WEST:
3    Q. Based on the policies and procedures of
4    the Philadelphia Police Department, to the
5    best of your knowledge based on your
6    training, if the only way to access the
7    second floor apartment was to go through
8    someone else's residence in the first floor,
9    would you have been authorized to go through
10   the other person's residence?
11       MR. ZURBRIGGEN: Object to
12       form. Officer, you can answer if
13       you can.
14       THE WITNESS: That will be a
15       call for the supervisor.
16   BY MR. WEST:
17   Q. And who would be the supervisor in this
18   situation?
19   A. Lt. Monk.
20   Q. Okay. Had you ever received any sort
21   of training from the Philadelphia Police
22   Department that told you that you should
23   never under any circumstances enter the
24   residence of a person for whom you did not

Page 54

1    have a warrant?
2        MR. ZURBRIGGEN: Object to
3        form. Officer, you can answer.
4        THE WITNESS: We only served
5        the warrants where the warrant is
6        specified to be at.
7    BY MR. WEST:
8    Q. Right. So, for example, if you have a
9    building where there is a first floor
10   apartment and a second floor apartment and
11   your warrant is only valid for the second
12   floor, would you be allowed under the
13   Philadelphia policies and procedures under
14   the best of your knowledge, under any
15   circumstances to enter the residence of the
16   first floor apartment occupant?
17       MR. ZURBRIGGEN: Object to
18       form. Officer, you can answer.
19       THE WITNESS: If it's only
20       for the second floor? Repeat the
21       question.
22   BY MR. WEST:
23   Q. Absolutely.
24       MR. WEST: Are you able to

Page 55

1    read back the last question?
2        - - -
3        (Whereupon, the reporter
4    read back the last question posed.)
5        - - -
6        MR. ZURBRIGGEN: Same
7    objection.
8    BY MR. WEST:
9    Q. Let me rephrase the question. Based on
10   your training under the policies and
11   procedures of the Philadelphia Police
12   Department, if there was a building that had
13   a first floor apartment and a second floor
14   apartment and you were attempting to execute
15   a warrant only for the second floor
16   apartment, under any circumstances would you
17   be allowed to enter the residence of the
18   first floor apartment?
19       MR. ZURBRIGGEN: Object to
20       form. Officer, you can answer.
21       THE WITNESS: So if it was
22       only for the second floor only, I
23       will say that if it's legally
24       sectioned off and there's hallways,

Page 56

1    then you go through a common door.
2    Now, there are plenty of apartments
3    in the City that they have, it's
4    like a rooming house and they have
5    rooms that are sectioned off on the
6    second floor and you go in through a
7    common door. So that's the best
8    answer that I can give you.
9    BY MR. WEST:
10   Q. Right. But my question is, would you
11   be allowed under any circumstances to enter
12   the residence, the occupied space of the
13   first floor apartment?
14       MR. ZURBRIGGEN: Object to
15       form. Officer, you can answer.
16       THE WITNESS: So you're
17       saying if I had to go through the
18       first floor apartment to get to the
19       second floor apartment? Is that the
20       question?
21   BY MR. WEST:
22   Q. So I think that's a different question,
23   but let me ask you that question. If you
24   felt that you had to go through the first

14 (Pages 53 to 56)

Electronically signed by Lisa Hughes (601-318-489-3416)                    c48b11e9-af99-4294-a672-0271409862db

Page 57

1 floor apartment to get to the second floor
2 apartment and your warrant was only valid for
3 the second floor apartment, would you be
4 allowed to go through the first floor
5 apartment?
6           MR. ZURBRIGGEN:  Object to
7     form.  Officer, you can answer.
8           THE WITNESS:  I would say
9     that it wouldn't be my decision, it
10    would be a decision made by the
11    supervisors.
12 BY MR. WEST:
13    Q. But do you know if the Philadelphia
14 Police Department has any policy or procedure
15 that would tell you the right answer in that
16 situation?
17           MR. ZURBRIGGEN:  Object to
18    form.  Officer, you can answer.
19           THE WITNESS:  I can't tell
20    you the answer to that.
21 BY MR. WEST:
22    Q. You don't know what the policy is,
23 correct?
24           MR. ZURBRIGGEN:  Objection.

Page 58

1           THE WITNESS:  I don't know.
2 BY MR. WEST:
3    Q. Okay.  If you went to a property that
4 had a first floor apartment and a second
5 floor apartment and you knew that the warrant
6 was only valid for the second floor apartment
7 and your supervisor told you to enter the
8 first floor apartment, would you do it?
9           MR. ZURBRIGGEN:  Object to
10    form.
11           THE WITNESS:  No.
12 BY MR. WEST:
13    Q. Why not?
14    A. Because the warrant is only for the
15 second floor.
16    Q. But I thought you said a moment ago
17 that it's a call that would be made by the
18 supervisor?
19           MR. ZURBRIGGEN:  Object to
20    form.
21           THE WITNESS:  I wouldn't
22    break in the door, but if it was
23    common space that you had to, if you
24    opened the door and that's the only

Page 59

1     place to go, then if there's no
2     other access then how else do you
3     get to the second floor?
4 BY MR. WEST:
5    Q. If you believed that it was necessary
6 to enter the apartment of a different person
7 who was not identified on the warrant to
8 enter a separate apartment belonging to the
9 person who was on the warrant, would you
10 believe that you were required to obtain a
11 new warrant before entering the property or
12 did you believe that you were allowed to
13 enter the property of the person who was not
14 identified on the warrant?
15           MR. ZURBRIGGEN:  Object to
16    form.  Officer, you can answer.
17           THE WITNESS:  So do we think
18    we need another warrant?  I don't
19    know, I can't tell you.
20 BY MR. WEST:
21    Q. Okay.  Now, you're not sure what the
22 Philadelphia Police Department policy and
23 procedure on that issue would be?
24           MR. ZURBRIGGEN:  Same

Page 60

1     objection.
2           THE WITNESS:  Correct.
3 BY MR. WEST:
4    Q. All right, sir, so after the door was
5 breached, what happened next to your best
6 recollection?
7    A. The door was breached and I entered the
8 property.
9    Q. And then what happened?
10    A. And then the dog came toward me and bit
11 me in the ankle area.
12    Q. Okay.  Did the dog bite you right away
13 or did anything happen first?
14    A. The dog bit me like pretty right away,
15 yes.
16    Q. Okay.  And where did the dog bite you
17 exactly?
18    A. The ankle area.
19    Q. Which ankle?
20    A. I don't remember.
21    Q. You don't recall.  Did you receive any
22 medical attention?
23    A. No.
24    Q. Did the dog bite rip your pants?

Electronically signed by Lisa Hughes (601-318-489-3416)                                    c48b11e9-af99-4294-a672-0271409862db

Page 61

1    A. No.
2    Q. Did the dog bite rip your socks?
3    A. No.
4    Q. Did the dog bite break your skin?
5    A. No.
6    Q. Is there any physical evidence of a dog
7  bite to the best of your knowledge?
8         MR. ZURBRIGGEN:  Object to
9       form.  Officer, you can answer.
10         THE WITNESS:  No.
11  BY MR. WEST:
12    Q. If you enter a residence and there's a
13  dog in the residence, in your experience, is
14  it normal for many dogs to respond after a
15  door is breached?
16         MR. ZURBRIGGEN:  Object to
17       form.
18         THE WITNESS:  Yes.
19  BY MR. WEST:
20    Q. And in your experience, what would be
21  normal ways for a dog to respond if the door
22  is suddenly breached?
23         MR. ZURBRIGGEN:  Object to
24       form, but, Officer, you can answer.

Page 62

1         THE WITNESS:  They either
2       run or they bark at you.
3  BY MR. WEST:
4    Q. Okay.  And if the dog is running, is it
5  normal for the dog to run towards the person
6  who had just broken into their house?
7         MR. ZURBRIGGEN:  Same
8       objection.
9         THE WITNESS:  No.  They run
10       away.
11  BY MR. WEST:
12    Q. Okay.  When the door to Ms. Alvarado's
13  home was breached, did the dog run?
14    A. It was -- I believe it was running
15  toward me.
16    Q. Okay.  Do you know if it actually ran
17  toward you or you don't recall?
18         MR. ZURBRIGGEN:  Object to
19       form.
20         THE WITNESS:  I don't
21       recall.
22  BY MR. WEST:
23    Q. Is it possible the dog was already
24  right near the door when the door was

Page 63

1  breached?
2         MR. ZURBRIGGEN:  Object to
3       form, but, Officer, you can answer.
4         THE WITNESS:  It could be.
5  BY MR. WEST:
6    Q. Do you believe the dog may have been
7  frightened because somebody had just broken
8  into the house?
9         MR. ZURBRIGGEN:  Object to
10       form.
11         THE WITNESS:  I have no clue
12       what the dog was feeling.
13  BY MR. WEST:
14    Q. Had you ever received any training from
15  the Philadelphia Police Department that a dog
16  might be frightened if someone broke into its
17  house?
18         MR. ZURBRIGGEN:  Object to
19       form.
20         THE WITNESS:  No.
21  BY MR. WEST:
22    Q. Prior to the front door of Ms.
23  Alvarado's house being breached, did you,
24  yourself, have any concern that her dog might

Page 64

1  be frightened?
2         MR. ZURBRIGGEN:  Object to
3       form.
4         THE WITNESS:  The dog was
5       what?  Afraid you said?
6  BY MR. WEST:
7    Q. Right.  So before that door was
8  breached, did you have any concern that that
9  might frighten a dog inside?
10         MR. ZURBRIGGEN:  Same
11       objection.
12         THE WITNESS:  I don't recall
13       knowing there was a dog behind the
14       door or not.
15  BY MR. WEST:
16    Q. Okay.  But if you had heard a dog
17  barking behind the door, would you be
18  concerned, oh, my gosh, if we bust down this
19  door and there's a dog right there barking,
20  that might frighten the dog?
21         MR. ZURBRIGGEN:  Same
22       objection.
23         THE WITNESS:  I have no clue
24       what the dog would be thinking.

16 (Pages 61 to 64)

Page 65

1   BY MR. WEST:
2      Q. Okay. But in just commonsense, in
3   normal experience, if you have a front door
4   and there's a dog barking and you smash the
5   door, don't you think that might startle the
6   dog?
7           MR. ZURBRIGGEN: Same
8       objection.
9           THE WITNESS: I don't know.
10      I can't tell you what the dog would
11      think.
12  BY MR. WEST:
13     Q. Okay. And you never received any
14  training from the Philadelphia Police
15  Department about how to deal with that
16  situation, correct?
17          MR. ZURBRIGGEN: Object to
18      form.
19          THE WITNESS: Correct.
20  BY MR. WEST:
21     Q. Based on your training from the
22  Philadelphia Police Department, do you
23  believe that enough ample time was provided
24  to Ms. Alvarado between the door being

Page 66

1   knocked on, for her to answer the door before
2   the door was breached?
3           MR. ZURBRIGGEN: Object to
4       form. Officer, you can answer.
5           THE WITNESS: I believe
6       there was.
7   BY MR. WEST:
8      Q. And how much time do you believe was
9   given?
10          MR. ZURBRIGGEN: Object to
11      form.
12          THE WITNESS: Like I said
13      before, 30 to 40 seconds at the
14      least.
15  BY MR. WEST:
16     Q. Okay. That would be your expectation,
17  correct?
18          MR. ZURBRIGGEN: Same
19      objection.
20          THE WITNESS: Correct.
21  BY MR. WEST:
22     Q. And less than that would be not enough
23  time, correct?
24          MR. ZURBRIGGEN: Same

Page 67

1       objection.
2           THE WITNESS: There are
3       exigent circumstances to jobs
4       with warrants, so there are times
5       that those are breached in less time
6       than that.
7   BY MR. WEST:
8      Q. Understood. But in this situation,
9   were there any exigent circumstances,
10  whatsoever, that you're aware of?
11          MR. ZURBRIGGEN: Object to
12      form. Officer, you can answer.
13          THE WITNESS: No, not that I
14      can recall.
15  BY MR. WEST:
16     Q. Did Lt. Monk give the order to breach
17  the door?
18          MR. ZURBRIGGEN: Object to
19      form. Officer, you can answer.
20          THE WITNESS: Yes.
21  BY MR. WEST:
22     Q. Do you have any personal knowledge as
23  to why Lt. Monk ordered the door to be
24  breached at the time that he ordered the door

Page 68

1   to be breached?
2           MR. ZURBRIGGEN: Object to
3       form, but, Officer, you can answer.
4           THE WITNESS: He gives the
5       command to breach the door whenever
6       he thinks the door needs to be
7       breached. I can't testify why he
8       told the person to breach the door.
9   BY MR. WEST:
10     Q. And to be clear, I'm not asking you to
11  guess or speculate or read his mind, I'm just
12  wondering maybe you had a conversation with
13  him, he gave you an explanation, you read a
14  report?
15     A. No.
16     Q. Did you receive any information as to
17  why he thought it was necessary to breach the
18  door at that time?
19          MR. ZURBRIGGEN: Object to
20      form. Officer, you can answer.
21          THE WITNESS: No.
22  BY MR. WEST:
23     Q. Did you say you were actually bit by
24  the dog or the dog came towards you?

17 (Pages 65 to 68)

Page 69

1    MR. ZURBRIGGEN: Object to
2  form.
3    THE WITNESS: I got bit by
4  the dog.
5  BY MR. WEST:
6    Q. Besides the dog bite, was there any
7  other reason that you felt it necessary to
8  fire your gun at the dog?
9    A. After the dog bit me he came back
10  around and it looked like he was going to
11  attempt to bite me again.
12    Q. Okay. How far away was the dog when
13  you shot it?
14    A. Roughly, about two feet away.
15    Q. Okay. And how did you position the gun
16  if you recall? Like what was the angle of
17  the gun at the time you fired it?
18    A. Downward angle.
19    Q. Do you recall at any point seeing Ms.
20  Alvarado on the date of the incident?
21    A. After the entry team passed me and was
22  coming back toward the front of the property,
23  that's the first time I seen Ms. Alvarado.
24    Q. Okay. Approximately, how long would

Page 70

1  that have been after the door being breached?
2    A. The time I saw her? Is that what
3  you're asking?
4    Q. Yeah. I'm asking, say the door is
5  breached, take that as zero hour, right, 0.0,
6  how long after that time was it that you
7  first saw Ms. Alvarado?
8    A. Like approximately, a minute or so.
9  Under a minute.
10    Q. Okay. And during that period of under
11  a minute, do you know physically where Ms.
12  Alvarado was?
13    A. During the entry time?
14    Q. Right. So the door is breached, less
15  than a minute passes, then you see Ms.
16  Alvarado, correct?
17    A. Yes.
18    Q. But in that period of time between the
19  door being breached until you saw Ms.
20  Alvarado, do you know where she was?
21    A. When the team was coming back toward
22  the front of the property I believe she was
23  behind the partition in front of me.
24    Q. Okay. And could you see where that

Page 71

1  partition led to?
2    A. I believe it was either the kitchen
3  area or dining room area.
4    Q. Okay. And could you tell what Ms.
5  Alvarado was doing back there?
6    A. I cannot.
7    Q. What was she wearing, if anything?
8    A. I cannot tell you what she was wearing.
9    Q. Do you have any recollection of if she
10  was naked?
11    A. I do not.
12    Q. Did you hear her say anything?
13    A. No.
14    Q. I'll represent to you that there's some
15  statements in the police file that she claims
16  to have asked for an opportunity to put her
17  dog in its cage before being shot. Do you
18  have any recollection if she may have said
19  anything like that?
20    A. I do not.
21    Q. Do you specifically recall that she did
22  not do it or you don't remember one way or
23  another?
24    A. I don't recall her saying anything.

Page 72

1    Q. Okay. So after the minute or so passes
2  and you see Ms. Alvarado near the partition,
3  did you hear her say anything after that?
4    A. No.
5    Q. Did you have any conversation with her?
6    A. No.
7    Q. At any point ever, have you ever
8  personally heard Ms. Alvarado say anything
9  that you can recall?
10    A. No.
11    Q. Did you see if any officer pointed a
12  gun at Ms. Alvarado?
13    A. I did not.
14    Q. Do you specifically recall that no one
15  did or you just can't remember whether or not
16  someone did or didn't?
17    A. I don't know whether anyone did or did
18  not.
19    Q. Okay. Have you ever been disciplined
20  since joining the Philadelphia Police
21  Department for any reason?
22    MR. ZURBRIGGEN: Object to
23  form, but, Officer, you can answer.
24    THE WITNESS: No, I don't

18 (Pages 69 to 72)

Page 73

1   think so.
2   BY MR. WEST:
3       Q. Have you ever been suspended for any
4   reason?
5           MR. ZURBRIGGEN: Same
6       objection. Officer, you can answer.
7           THE WITNESS: No.
8   BY MR. WEST:
9       Q. All right. I know we kind of got into
10  this before, but I don't think I closed the
11  book on it. As far as in your experience how
12  the SWAT team would normally operate back in
13  June, 2021, what was the role of the point
14  man, if any?
15          MR. ZURBRIGGEN: Object to
16      form. Officer, you can answer.
17          THE WITNESS: The role of
18      the first person is going into the
19      door first.
20  BY MR. WEST:
21      Q. And then do what?
22      A. And then you clear the room.
23      Q. Okay. When you say clear the property,
24  what does that mean?

Page 74

1       A. You clear the property of any dangers
2   that's in the property.
3       Q. In your opinion, was Ms. Alvarado's dog
4   a danger on the property?
5           MR. ZURBRIGGEN: Object to
6       form, but, Officer, you can answer.
7           THE WITNESS: What kind of
8       danger are you talking about?
9   BY MR. WEST:
10      Q. Sir, I'm just using the word you used.
11  When you said dangers on the property,
12  whatever you meant by that, would that have
13  included Ms. Alvarado's dog?
14          MR. ZURBRIGGEN: Same
15      objection. Officer, you can answer.
16          THE WITNESS: Well, the dog
17      bit me, so...
18  BY MR. WEST:
19      Q. Sorry, sir, is that a yes or a no?
20      A. The dog bit me. Was the dog a danger?
21  The dog was a danger to me, yes.
22      Q. Okay. Were there any other dangers in
23  Ms. Alvarado's residence that you had to
24  clear that day?

Page 75

1           MR. ZURBRIGGEN: Object to
2       form.
3           THE WITNESS: As far as I
4       know, no.
5   BY MR. WEST:
6       Q. To your knowledge, did the Philadelphia
7   Police Department have any reason to enter
8   Ms. Alvarado's home on the date of the
9   incident?
10          MR. ZURBRIGGEN: Object to
11      form. Officer, you can answer.
12          THE WITNESS: We were there
13      to serve the warrant on the homicide
14      suspect.
15  BY MR. WEST:
16      Q. Okay. Was there any other
17  circumstances, such as was there any
18  reasonable suspicion, did she commit a crime,
19  was she threatening anyone? Was there any
20  other basis to your knowledge to enter her
21  property?
22          MR. ZURBRIGGEN: Object to
23      form. Officer, you can answer.
24          THE WITNESS: No.

Page 76

1   BY MR. WEST:
2       Q. And when this particular warrant was
3   executed, were there any exigent
4   circumstances or unusual circumstances,
5   whatsoever, that you're aware of that
6   required the warrant to be executed in an
7   unusual manner?
8           MR. ZURBRIGGEN: Object to
9       form, but, Officer, you can answer.
10          THE WITNESS: No.
11  BY MR. WEST:
12      Q. On the date when the warrant was
13  executed, do you recall what time your shift
14  started?
15      A. 11 p.m. the day before.
16      Q. And how long would your shift normally
17  last?
18      A. Eight hours and fifteen minutes.
19      Q. Okay. So this warrant was executed
20  then at the end of your shift; is that
21  correct?
22      A. Correct.
23      Q. So if it had taken longer to execute
24  the warrant than it did, that would have

19 (Pages 73 to 76)

Page 77

1    required you to stay on overtime, correct?
2           MR. ZURBRIGGEN:  Object to
3    form.
4           THE WITNESS:  Correct.
5    BY MR. WEST:
6      Q. Do you believe that may have been any
7    motivation to try to get the job done
8    quickly?
9           MR. ZURBRIGGEN:  Object to
10    form.
11           THE WITNESS:  No.
12    BY MR. WEST:
13      Q. All right, sir, so I know that you
14    previously testified that you believed that
15    there was likely a hallway on the other side
16    of the front door, correct?
17           MR. ZURBRIGGEN:  Object to
18    form.
19           THE WITNESS:  Correct.
20    BY MR. WEST:
21      Q. To your knowledge, was any effort made
22    by anyone with the Philadelphia Police
23    Department to try to determine if the room
24    behind that front door was a common hallway

Page 78

1    or an individually occupied apartment?
2           MR. ZURBRIGGEN:  Object to
3    form.  Officer, you can answer.
4           THE WITNESS:  No.
5    BY MR. WEST:
6      Q. To your knowledge, no effort was made
7    to make that determination, correct?
8      A. Correct.
9           MR. ZURBRIGGEN:  Same
10    objection.
11    BY MR. WEST:
12      Q. And based on your understanding of the
13    policies and procedures of the Philadelphia
14    Police Department, who, if anyone, would have
15    had the responsibility of making that sort of
16    determination?
17           MR. ZURBRIGGEN:  Object to
18    form.  Officer, you can answer.
19           THE WITNESS:  I have no
20    clue.
21    BY MR. WEST:
22      Q. Okay.  Sir, it fair to say that in your
23    experience with the Philadelphia SWAT team,
24    making that sort of determination is not

Page 79

1    something that would normally be done?
2           MR. ZURBRIGGEN:  Object to
3    form, but, Officer, you can answer.
4           THE WITNESS:  Well, I would
5    say with the warrants that we do,
6    that if it's a split, second floor,
7    first floor, the common door is a
8    door you enter to get to the second
9    floor.
10    BY MR. WEST:
11      Q. I understand.  But in your experience
12    with the SWAT team now for a number of years,
13    is it your experience that a door of this
14    type would normally be breached without a
15    determination first being made whether or not
16    the room on the other side of the door was a
17    common area or a private residence?
18           MR. ZURBRIGGEN:  Object to
19    form.  Officer, you can answer.
20           THE WITNESS:  Well, I think
21    the two mailboxes showed that that
22    would be the main entrance for the
23    first floor and the second floor.
24    BY MR. WEST:

Page 80

1      Q. All right.  If you can just answer the
2    question I asked.
3           MR. WEST:  Can you read back
4    the last question?
5           - - -
6           (Whereupon, the reporter
7    read back the last question posed.)
8           - - -
9           MR. ZURBRIGGEN:  Same
10    objection.
11    BY MR. WEST:
12      Q. If you can just answer that specific
13    question?
14      A. To determine if it's a common area or
15    not.  I believe it's not an easy question to
16    answer.  Can you read it back to me again?
17           - - -
18           (Whereupon, the reporter
19    read back the last question posed.)
20           - - -
21           MR. ZURBRIGGEN:  Same
22    objection.  Officer, you can answer.
23           THE WITNESS:  The answer is
24    that there's no way you can know

20 (Pages 77 to 80)

Page 81

1    that if it's going into a common
2    area or going into a hallway.
3    BY MR. WEST:
4    Q. Okay.  And in your experience on the
5    Philadelphia Police Department, was there
6    normally any sort of process and procedure in
7    place to try to make that determination?
8        MR. ZURBRIGGEN:  Same
9    objection.  Officer, you can answer.
10       THE WITNESS:  I would say
11       through the experience of all the
12       warrants, I would say almost all the
13       time that door is the door for a
14       split for one to go up to the second
15       floor and one going to the first
16       floor.
17   BY MR. WEST:
18   Q. Okay.  So is it your experience with
19   the Philadelphia Police Department that the
20   presumption is that you can always enter
21   through a door on the first floor?
22       MR. ZURBRIGGEN:  Object to
23       form.  Officer, you can answer.
24       THE WITNESS:  There are -- I

Page 82

1        will say there are properties that
2        has two front doors and obviously,
3        one door is clearly marked saying
4        that this is the second floor then
5        we obviously go through that door,
6        but in this instance there's one
7        door and it seemed like it was the
8        only common door to go into the
9        property.  So do you want to ask the
10       same question?  I think that's the
11       best way I can answer it.
12   BY MR. WEST:
13   Q. Okay.  Sir, I believe you testified a
14   moment ago that when you see a door like
15   this, your expectation is that 90 percent of
16   the time normally it's a common area, right?
17       MR. ZURBRIGGEN:  Object to
18       form.
19       THE WITNESS:  Yes.
20   BY MR. WEST:
21   Q. And, of course, if you say it's
22   normally or 90 percent a common area, that
23   means sometimes it's not, right?
24       MR. ZURBRIGGEN:  Object to

Page 83

1    form.  Officer, you can answer.
2        THE WITNESS:  Well, I can't
3    say that every time, but in my
4    experience, every time that I've
5    done a warrant that's if there's no
6    other access if you breach that door
7    it's a split to the best of my
8    knowledge.
9    BY MR. WEST:
10   Q. Now, you're aware now that there
11   actually was a rear door to Ms. Alvarado's
12   house, correct?
13       MR. ZURBRIGGEN:  Object to
14       the form.
15       THE WITNESS:  Correct.
16   BY MR. WEST:
17   Q. So if you knew that there was a door
18   that led to the first floor and that the
19   warrant was only for the second floor rear
20   and you knew that there was a rear entrance,
21   if you had known all of that, would that have
22   been enough to lead you to believe that you
23   legally were not allowed to go through the
24   front door?

Page 84

1        MR. ZURBRIGGEN:  Object to
2    form.  Officer, you can answer.
3        THE WITNESS:  Well, all
4    houses have back doors, it's not
5    saying that just because it's a back
6    door it's going to lead to the
7    second floor, it could have led to
8    the back of the property of the
9    first floor.
10   BY MR. WEST:
11   Q. All right.  Based on all that we just
12   described, the fact that the warrant was for
13   the second floor rear, the fact that there
14   was a rear entrance, and the fact that the
15   warrant was not for the first floor, taking
16   all those factors into consideration that
17   you're aware of now, would that have been
18   enough to let you know on the date of the
19   incident that if you breached the first floor
20   door there was at least a possibility that
21   you would be entering the apartment of a
22   different person who was not identified on
23   the warrant who lived on the first floor
24   apartment?

21 (Pages 81 to 84)

Page 85

1   MR. ZURBRIGGEN: Object to
2   form. Officer, you can answer.
3   THE WITNESS: I will still
4   think that all houses have front
5   doors and back doors, right, I
6   will still think that if there's two
7   mailboxes on the property and
8   there's one door in the front, I
9   would think that door would lead to
10  the first floor and a hallway to
11  take me up to the second floor.
12  BY MR. WEST:
13  Q. And what would your confidence level
14  be, on a scale of one to ten, how confident
15  would you be that that first floor door
16  didn't lead to a first floor apartment?
17  MR. ZURBRIGGEN: Object to
18  form. Officer, you can answer if
19  you can.
20  THE WITNESS: If I was
21  running the job, I would say it
22  would be ten, that would be the door
23  that you would go into.
24  BY MR. WEST:

Page 86

1   Q. So you would say a ten out of ten a
2   zero percent chance that the door on the
3   first floor leads to the first floor
4   apartment?
5   MR. ZURBRIGGEN: Same
6   objection.
7   THE WITNESS: Nothing is a
8   hundred percent, but if it was my
9   decision, that would have been the
10  door that I went into.
11  BY MR. WEST:
12  Q. And not the rear door?
13  MR. ZURBRIGGEN: Same
14  objection.
15  THE WITNESS: Every house
16  has two doors, there's a door in the
17  back and there's a door in the
18  front.
19  BY MR. WEST:
20  Q. I understand, but why wouldn't you have
21  entered the rear door?
22  MR. ZURBRIGGEN: Same
23  objection. Officer, you can answer.
24  THE WITNESS: I would think

Page 87

1   that, as everybody else would think,
2   that the rear door would enter the
3   rear of the property of the first
4   floor.
5   BY MR. WEST:
6   Q. Okay. So do you believe that there
7   would have been any need in this situation to
8   maybe contact the property manager to try to
9   make sure that you're actually going into the
10  right apartment?
11  MR. ZURBRIGGEN: Object to
12  form. Officer, you can answer.
13  THE WITNESS: That's beyond
14  my responsibility.
15  BY MR. WEST:
16  Q. Okay. And did you ever receive any
17  training from the Philadelphia Police
18  Department under what circumstances that kind
19  of investigation should be made?
20  MR. ZURBRIGGEN: Object to
21  form.
22  THE WITNESS: What kind of
23  investigation are you talking about?
24  BY MR. WEST:

Page 88

1   Q. Sure. Did you ever receive any
2   training from the Philadelphia Police
3   Department with regards to how to execute a
4   search warrant?
5   A. Yes.
6   Q. Okay.
7   MR. WEST: I'd like to mark
8   this document as Song-2.
9   - - -
10  (Whereupon, Song-2 was
11  marked for identification.)
12  - - -
13  BY MR. WEST:
14  Q. I only have one printed copy, but can
15  you recognize it, it's Bates stamped? All
16  right. So, sir, I'd ask for you to review
17  that document real quick and then once you
18  had a chance to look it over briefly I'm
19  going to ask you some questions about it. So
20  these are Bates stamped as D000235 to 242.
21  And actually, it's just because these are
22  printed on two sides -- you know what, I'm
23  going to take this page out. So Exhibit 2 is
24  going to be 235 to 240. Sir, so as you're

22 (Pages 85 to 88)

Page 89

1  looking at that my question is going to be,
2  have you ever seen that document before that
3  you can recall?  You've had a couple minutes
4  to review the document now, sir, do you
5  recall if you've ever seen it before?
6      A. I have not finished reading it.
7          MR. ZURBRIGGEN:  Yeah, take
8      as much time as you need, Officer.
9  BY MR. WEST:
10     Q. All right.  Sir, so I think my prior
11 question was, have you ever seen that
12 document before?
13     A. I believe it's the directive of the
14 Philadelphia Police Department.
15     Q. Right.  And it says that right on the
16 document, right?  But what I'm asking you is,
17 prior to being shown it today, have you ever
18 seen that specific document before?
19     A. This document, no.
20     Q. Do you know whether or not the
21 Philadelphia Police Department has a
22 directive regarding how search warrants
23 should be executed?
24         MR. ZURBRIGGEN:  Object to

Page 90

1      form, but, Officer, you can answer
2      if you can.
3          THE WITNESS:  I believe
4      there is a directive.
5  BY MR. WEST:
6      Q. Have you ever personally read it?
7          MR. ZURBRIGGEN:  Object to
8      form but, Officer, you can answer.
9          THE WITNESS:  I believe I
10     have.
11 BY MR. WEST:
12     Q. Okay.  And when did you read that?
13     A. I do not recall.
14     Q. Do you have any specific recollection
15 of having read any such document?
16     A. I have read it, yes.
17     Q. All right.  So, sir, I believe you
18 testified earlier that you did give an
19 interview to the Internal Affairs after this
20 incident?
21     A. Correct.
22     Q. Can you tell me about when did that
23 take place?
24     A. The same day.

Page 91

1      Q. Okay.  The same day as the shooting?
2      A. I believe it was the same day, yes.
3      Q. Okay.  And did you give any other
4  interviews related to this?  Like were you
5  interviewed by any detectives outside of
6  Internal Affairs, did you write anything up
7  in the police report?
8          MR. ZURBRIGGEN:  Object to
9      form, but, Officer, you can answer
10     if you can.
11         THE WITNESS:  I believe it
12     was only Internal Affairs.
13 BY MR. WEST:
14     Q. Okay.  And how long was that interview
15 approximately?
16     A. About an hour maybe.
17     Q. Do you recall if anybody was present to
18 record that interview?
19     A. I do not recall.
20     Q. And who interviewed you?
21     A. I don't know.
22     Q. Sir, so I'm going to read from, for the
23 record this is a document that's been Bates
24 stamped by the defense as D000162, that's

Page 92

1  from directive 5.7 of the Philadelphia Police
2  Department that has been produced to us by
3  the defense, and it says, knock and announce
4  rule.  The purpose of the knock and announce
5  rule is to prevent violence and physical
6  injury to police and occupants, to protect an
7  occupant's expectation of privacy, to prevent
8  property damage resulting from entry, and to
9  give the occupants an opportunity to
10 surrender the premises.  Have you ever read
11 anything like that before?
12         MR. ZURBRIGGEN:  Object to
13     form.  Officer, you can answer if
14     you can.
15         THE WITNESS:  Not that I
16     recall, no.
17 BY MR. WEST:
18     Q. Okay.  In your opinion, having, you
19 know, whatever training you've received from
20 the Philadelphia Police Department and the
21 fact that you were there, do you believe that
22 Ms. Alvarado was given an opportunity to
23 surrender the premises before her front door
24 was breached?

Electronically signed by Lisa Hughes (601-318-489-3416)                                    c48b11e9-af99-4294-a672-0271409862db

Page 93

1    MR. ZURBRIGGEN: Object to
2    form. Officer, you can answer.
3    THE WITNESS: Yes.
4    BY MR. WEST:
5    Q. And what was that opportunity?
6    MR. ZURBRIGGEN: Object to
7    form. Officer, you can answer.
8    THE WITNESS: During the
9    knock and announce.
10   BY MR. WEST:
11   Q. Okay. And was she given any other
12   opportunity besides the knock and announce?
13   MR. ZURBRIGGEN: Object to
14   form. Officer, you can answer.
15   THE WITNESS: In what way
16   are you talking about?
17   BY MR. WEST:
18   Q. Well, I'm just trying to see. So it
19   says that she's supposed to get an
20   opportunity to surrender the premises, right?
21   So I'm trying to determine all opportunities
22   that were afforded to her based on your
23   personal knowledge. And I think you said
24   that there was a knock before the door was

Page 94

1    breached, correct?
2    A. Yes.
3    Q. All right. Now, I don't want to miss
4    anything. Was there any other opportunity
5    given to her to surrender the premises?
6    MR. ZURBRIGGEN: Object to
7    form.
8    THE WITNESS: No.
9    BY MR. WEST:
10   Q. Okay. So if this should turn out to be
11   shown by video surveillance that there was
12   only like two seconds that passed between the
13   officers getting to the door and the door
14   being breached, would it be fair to say that
15   she was not given any opportunity to
16   surrender the premises; is that fair?
17   MR. ZURBRIGGEN: Object to
18   form.
19   BY MR. WEST:
20   Q. Is that fair?
21   MR. ZURBRIGGEN: Object to
22   form. Officer, you can answer.
23   THE WITNESS: Repeat the
24   question.

Page 95

1    BY MR. WEST:
2    Q. Right. So if only two seconds passed
3    between the knock and the door being
4    breached, would it be fair to say that she
5    was not given an opportunity to surrender the
6    premises?
7    MR. ZURBRIGGEN: Object to
8    form.
9    THE WITNESS: Yes.
10   MR. WEST: Okay. I have no
11   further questions.
12   MR. ZURBRIGGEN: A quick
13   follow-up.
14   - - -
15   EXAMINATION
16   - - -
17   BY MR. ZURBRIGGEN:
18   Q. Officer, I want to direct your
19   attention back to what's been previously
20   marked Song-1. That's that picture there.
21   If you would take a look at that. Officer,
22   you testified earlier, I believe, that it was
23   the third building from the right that you
24   believe is the building in question; is that

Page 96

1    correct, sir?
2    A. Correct.
3    Q. Can you see from the picture that we're
4    looking at here the front door to that
5    property?
6    A. No.
7    Q. Do you recall what was on that front
8    door, if anything?
9    A. The address.
10   Q. How did it read, sir, if you can
11   recall?
12   A. I believe it read 4664.
13   Q. Do you recall any other markings that
14   would indicate that it was for the first
15   floor apartment?
16   A. No.
17   MR. ZURBRIGGEN: That's all
18   I have.
19   MR. WEST: Okay. Sir, I
20   wish we would have meant under other
21   circumstances. Thank you very much
22   for your time.
23   THE WITNESS: Thank you.
24   THE VIDEOGRAPHER: Finishing

Electronically signed by Lisa Hughes (601-318-489-3416)                    c48b11e9-af99-4294-a672-0271409862db

Page 97

1         the record at 11:34 a.m.
2                   - - -
3              (Whereupon, the videotape
4         deposition concluded at 11:34 a.m.)
5                   - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 98

1              - - -
2         C E R T I F I C A T E
3              - - -
4
5         I, hereby certify that the proceedings
6    and evidence noted are contained fully and
7    accurately in the stenographic notes taken by
8    me in the foregoing matter, and that this is
9    a correct transcript of the same.
10
11         _Lisa Hughes_____
12         Court Reporter - Notary Public
13
14         (The foregoing certification of this
15    transcript does not apply to any reproduction
16    of the same by any means, unless under the
17    direct control and/or supervision of the
18    certifying reporter.)
19
20
21
22
23
24

25 (Pages 97 to 98)

**A**

**a.m** 1:15 5:1
  28:16 97:1,4
**ability** 6:11
**able** 7:21 27:11
  31:8 54:24
**Absolutely**
  15:15 54:23
**accept** 10:4
**access** 53:6 59:2
  83:6
**accommodating**
  8:20
**accurately** 98:7
**acknowledge**
  33:6
**acknowledged**
  42:7
**actual** 44:18
**ADAM** 2:8
**adam.zurbrig...**
  2:11
**additional** 16:11
**address** 4:22
  29:4 96:9
**adopted** 15:6,17
**Affairs** 10:23,24
  11:7,10,14,21
  12:7,15,22
  13:17 14:12
  90:19 91:6,12
**afforded** 93:22
**Afraid** 64:5
**ago** 18:18 58:16
  82:14
**agreed** 4:3
**ahead** 47:11
**al** 1:7 4:18 5:5
**allotted** 10:2
**allow** 21:22
**allowed** 10:3
  54:12 55:17
  56:11 57:4
  59:12 83:23
**Alvarado** 1:3
  4:17 5:10,24
  10:11 13:8
  22:2,16 65:24
  69:20,23 70:7

70:12,16,20
71:5 72:2,8,12
92:22
**Alvarado's** 25:9
  26:10 28:7
  34:5 45:10,18
  62:12 63:23
  74:3,13,23
  75:8 83:11
**Alverado** 5:4
**amount** 18:7
  19:11 20:2,13
  21:5
**ample** 18:7
  19:11 20:2,13
  21:5 65:23
**and/or** 98:17
**angle** 35:13
  69:16,18
**ankle** 60:11,18
  60:19
**announce** 17:22
  18:4,6,12 19:5
  20:15,19 92:3
  92:4 93:9,12
**annoying** 19:18
**answer** 10:15
  11:3,24 12:18
  13:2,19 14:4
  14:10,20 15:11
  15:22 16:8
  17:18,24 18:8
  18:9,24 19:14
  20:7 21:7,16
  22:20 25:13,23
  26:24 28:10,23
  29:15 30:3,11
  30:23 31:10,20
  32:4,17 33:2,9
  33:17 34:18
  35:3,12 36:1
  36:10 37:6,15
  37:24 38:12,19
  39:2,12,19
  40:9 41:3,14
  41:16,19 42:3
  42:12 43:7,16
  43:23 44:15
  45:6,22 46:9

46:22 47:20
48:8,16 49:2
49:13,21 50:3
50:16,24 51:8
51:18 52:3,12
52:21 53:12
54:3,18 55:20
56:8,15 57:7
57:15,18,20
59:16 61:9,24
63:3 66:1,4
67:12,19 68:3
68:20 72:23
73:6,16 74:6
74:15 75:11,23
76:9 78:3,18
79:3,19 80:1
80:12,16,22,23
81:9,23 82:11
83:1 84:2 85:2
85:18 86:23
87:12 90:1,8
91:9 92:13
93:2,7,14
94:22
**anybody** 91:17
**apartment**
  25:11,16,18
  26:1,4 39:22
  40:16 43:21
  53:7 54:10,10
  54:16 55:13,14
  55:16,18 56:13
  56:18,19 57:1
  57:2,3,5 58:4,5
  58:6,8 59:6,8
  78:1 84:21,24
  85:16 86:4
  87:10 96:15
**apartments** 56:2
**apologize** 19:17
**appear** 28:20
**APPEARAN...**
  2:1
**apply** 10:6 98:15
**appropriate**
  15:8,8,19,19
**approximately**
  11:17 12:21

14:1 69:24
70:8 91:15
**approximation**
  7:22,24 8:8
  12:14
**Arch** 2:9
**area** 31:4,14,17
  32:1,8,19,24
  33:7 35:8
  39:24 60:11,18
  71:3,3 79:17
  80:14 81:2
  82:16,22
**arrest** 51:12
**ascertain** 50:13
  51:15
**ascertained** 51:5
**asked** 8:4,23
  10:19 71:16
  80:2
**asking** 8:13
  19:22 20:21
  32:7,9 52:17
  68:10 70:3,4
  89:16
**assigned** 9:8,14
  12:10 24:10,13
  25:1,2,2,4,11
  25:14
**attack** 16:23
**attempt** 69:11
**attempting**
  55:14
**attended** 15:2
**attention** 60:22
  95:19
**attest** 49:3
**attorney** 6:4,20
  7:9,10
**Attorney's**
  10:12
**attorneys** 5:23
**audio** 4:15
**authorized** 53:9
**available** 7:18
  34:14 40:15
**Avenue** 27:13
  45:1
**aware** 26:19

38:9 45:12
46:6,11 47:18
49:17 67:10
76:5 83:10
84:17

**B**

**B** 3:15
**back** 24:16 55:1
  55:4 69:9,22
  70:21 71:5
  73:12 80:3,7
  80:16,19 84:4
  84:5,8 85:5
  86:17 95:19
**background**
  6:21
**bad** 45:14
**bark** 62:2
**barking** 34:10
  52:7,14,23
  64:17,19 65:4
**based** 7:15,22
  17:15 30:16
  48:24 53:3,5
  55:9 65:21
  78:12 84:11
  93:22
**basic** 15:2 18:14
**Basically** 47:21
**basis** 39:16
  75:20
**Bates** 88:15,20
  91:23
**begins** 7:10,11
**behalf** 5:8
**believe** 10:11,23
  19:8 23:5,6,10
  27:20 32:23
  33:15,19 36:5
  38:16 45:11
  59:10,12 62:14
  63:6 65:23
  66:5,8 70:22
  71:2 77:6
  80:15 82:13
  83:22 87:6
  89:13 90:3,9
  90:17 91:2,11

**briefly** 9:24
88:18
**Broad** 1:14 2:3
4:22
**broke** 63:16
**broken** 62:6
63:7
**building** 2:9
26:12 33:3
41:1 42:1 43:5
44:12 54:9
55:12 95:23,24
**buildings** 26:20
**Burkitt** 23:8,9
24:6
**bust** 64:18
**bypass** 16:22

**C**

**C** 98:2,2
**cage** 71:17
**call** 53:15 58:17
**called** 17:22
48:5
**caption** 5:3
**case** 5:4 41:8
**Center** 1:13 2:2
4:21
**certain** 35:14
**certification** 4:5
98:14
**certify** 98:5
**certifying** 98:18
**chance** 6:3 86:2
88:18
**changed** 34:24
**charges** 18:7
**Chronologically**
12:5
**circumstances**
53:23 54:15
55:16 56:11
67:3,9 75:17
76:4,4 87:18
96:21
**City** 1:6 2:8 4:17
5:4 51:13 56:3
**claims** 71:15
**clean** 19:19

92:21 95:22,24
96:12
**believed** 39:13
59:5 77:14
**believing** 39:17
**belonging** 59:8
**benefit** 4:11
**best** 18:3 23:10
44:19 53:5
54:14 56:7
60:5 61:7
82:11 83:7
**beyond** 48:12
87:13
**big** 6:24
**bit** 60:10,14
68:23 69:3,9
74:17,20
**bite** 60:12,16,24
61:2,4,7 69:6
69:11
**blind** 27:24,24
28:1
**book** 73:11
**Boring** 8:3
**breach** 18:10
20:17,18 36:8
67:16 68:5,8
68:17 83:6
**breached** 20:16
20:19 22:5,17
22:22 23:1,19
36:4,5 37:19
39:7 60:5,7
61:15,22 62:13
63:1,23 64:8
66:2 67:5,24
68:1,7 70:1,5
70:14,19 79:14
84:19 92:24
94:1,14 95:4
**breaching** 19:11
20:2 21:21
**break** 8:18
58:22 61:4
**briefed** 47:2
**briefing** 46:24
47:18
**briefings** 47:15

27:23
**clear** 25:3 68:10
73:22,23 74:1
74:24
**clearly** 82:3
**closed** 73:10
**clue** 63:11 64:23
78:20
**coffee** 8:19
**color** 27:24,24
**colored** 28:1
**come** 18:8
**coming** 69:22
70:21
**command** 20:17
68:5
**commencing**
1:15
**commit** 75:18
**common** 1:1
56:1,7 58:23
77:24 79:7,17
80:14 81:1
82:8,16,22
**commonsense**
41:5 52:24
65:2
**completed** 47:23
**concern** 63:24
64:8
**concerned** 64:18
**concluded** 97:4
**condition** 6:10
**conducting** 24:7
**confer** 6:4
**confidence**
85:13
**confident** 85:14
**consider** 35:22
**consideration**
84:16
**consistent** 20:3
40:21 41:10
**contact** 51:14
87:8
**contained** 98:6
**context** 24:12
**continue** 7:12
**control** 98:17

**conversation**
6:24 7:5 68:12
72:5
**conversations**
46:13
**copy** 88:14
**corner** 28:16
**correct** 6:5,19
8:10 9:17
10:13 11:18
12:12 13:9
14:18 16:6
19:6,7,12
21:23,24 23:17
26:22 28:11
29:22,23 32:2
32:15,20 33:7
33:12 35:20
36:19,20 37:1
37:13,16 38:7
38:10,13 40:23
42:1,10,17
43:11,12,14,17
45:4,7 46:3,4
50:1,4,9 57:23
60:2 65:16,19
66:17,20,23
70:16 76:21,22
77:1,4,16,19
78:7,8 83:12
83:15 90:21
94:1 96:1,2
98:9
**counsel** 4:3,10
4:12
**couple** 6:7 89:3
**course** 8:9 82:21
**court** 1:1,16,22
7:2 98:12
**create** 19:19
27:23
**crime** 75:18
**cup** 8:18
**current** 9:7

**D**

**D** 3:2
**D000162** 91:24
**D000235** 88:20

**damage** 92:8
**danger** 15:24
16:5 74:4,8,20
74:21
**dangers** 74:1,11
74:22
**date** 4:24 18:20
69:20 75:8
76:12 84:18
**day** 28:5,21
29:12 32:22
33:14 34:4
74:24 76:15
90:24 91:1,2
**deal** 16:16 65:15
**dealing** 17:14
**decision** 57:9,10
86:9
**Defendant** 1:8
**Defendants** 2:11
**defense** 4:10,11
91:24 92:3
**DEMANDED**
1:2
**Department** 2:8
3:21 9:11,22
11:13 15:1,7
15:18 17:9
18:18 20:5,12
20:23 21:3
30:18 40:23
41:12 47:16
49:8 53:4,22
55:12 57:14
59:22 63:15
65:15,22 72:21
75:7 77:23
78:14 81:5,19
87:18 88:3
89:14,21 92:2
92:20
**deposed** 5:6
**deposition** 1:11
4:15 5:2,8,11
6:15,17 97:4
**described** 84:12
**DESCRIPTION**
3:18
**details** 13:24

**detective** 51:4
51:21 52:1
**detective's** 50:18
**detectives** 50:21
91:5
**determination**
78:7,16,24
79:15 81:7
**determine** 44:11
77:23 80:14
93:21
**DIAMOND**
1:22
**Dibona** 2:16
4:20
**difference** 7:1
8:14
**different** 19:23
29:13 56:22
59:6 84:22
**dining** 71:3
**direct** 95:18
98:17
**directive** 3:21
89:13,22 90:4
92:1
**discharge** 12:23
15:9,19
**discharged**
13:12
**disciplined**
72:19
**discussed** 49:16
**disrespect** 40:5
**District** 10:12
12:9
**document** 88:8
88:17 89:2,4
89:12,16,18,19
90:15 91:23
**dog** 13:6,7 16:18
16:19,20,20,21
16:22,22 28:21
32:22 34:3,7
34:10,15,22
35:10 52:7,13
52:23 60:10,12
60:14,16,24
61:2,4,6,13,21

62:4,5,13,23
63:6,12,15,24
64:4,9,13,16
64:19,20,24
65:4,6,10
68:24,24 69:4
69:6,8,9,12
71:17 74:3,13
74:16,20,20,21
**dogs** 16:16
17:10,14,15
61:14
**doing** 6:1,2 7:3
8:1 71:5
**door** 18:8,10
19:10,12 20:3
20:15,17,18,18
21:21,22 22:4
22:5,18,22,24
23:19 24:15
25:7,21 26:7
29:21 30:1,8,9
30:14,19,21
31:7,24 32:13
35:9,18,21
36:4,5,8,12,14
36:17,21 37:4
37:8,19,22
38:15 39:6,23
40:2,13 42:17
44:7 45:9,11
45:13,17,19,24
46:7 52:8 56:1
56:7 58:22,24
60:4,7 61:15
61:21 62:12,24
62:24 63:22
64:7,14,17,19
65:3,5,24 66:1
66:2 67:17,23
67:24 68:5,6,8
68:18 70:1,4
70:14,19 73:19
77:16,24 79:7
79:8,13,16
81:13,13,21
82:3,5,7,8,14
83:6,11,17,24
84:6,20 85:8,9

85:15,22 86:2
86:10,12,16,17
86:21 87:2
92:23 93:24
94:13,13 95:3
96:4,8
**doors** 82:2 84:4
85:5,5 86:16
**doorway** 40:18
43:1
**Downward**
69:18
**duly** 5:16

_____
**E**
**E** 3:2,15 98:2,2
**earlier** 38:8
90:18 95:22
**early** 10:7
**easy** 80:15
**Edward** 1:12 3:6
5:7,15
**effort** 44:10
50:13 77:21
78:6
**Eight** 76:18
**either** 62:1 71:2
**eligible** 10:7
**else's** 53:8
**employed** 4:20
**enforcement**
24:8
**enter** 25:11
37:18 39:22
43:1 44:12
47:4 53:23
54:15 55:17
56:11 58:7
59:6,8,13
61:12 75:7,20
79:8 81:20
87:2
**enterable** 31:6
**entered** 28:6
34:8,11,16,23
35:9,18 38:15
45:9,17,18
46:15,19 60:7
86:21

**entering** 26:20
32:1,14 38:16
38:23 39:8,14
46:14,19 59:11
84:21
**entrance** 42:23
43:4,10,20,20
44:21 45:3
79:22 83:20
84:14
**entrances** 40:14
44:6
**entry** 25:1,2
42:8,14 44:13
69:21 70:13
92:8
**ESQUIRE** 2:3,8
**estimate** 7:21,24
8:8 12:13
**et** 1:7 4:17 5:5
**everybody** 87:1
**evidence** 61:6
98:6
**exactly** 7:3 8:6
41:17 60:17
**EXAMINATI...**
3:9 5:19 95:15
**examined** 5:17
**example** 8:3
21:11 49:16
54:8
**execute** 40:24
55:14 76:23
88:3
**executed** 26:9
34:4 51:12
76:3,6,13,19
89:23
**executing** 16:17
17:11 19:9
20:3 25:8
34:24 50:11
**Exhibit** 3:18
88:23
**Exhibit-1** 52:6
**exigent** 67:3,9
76:3
**existence** 45:11
46:6

**expect** 37:21
38:2 51:24
**expectation**
66:16 82:15
92:7
**experience** 6:18
24:18 40:11
48:24 50:12,22
51:11,24 61:13
61:20 65:3
73:11 78:23
79:11,13 81:4
81:11,18 83:4
**explain** 33:22
**explanation**
68:13
**exterior** 27:19

_____
**F**
**F** 98:2
**fact** 84:12,13,14
92:21
**factors** 84:16
**fair** 11:1 48:24
49:6 78:22
94:14,16,20
95:4
**far** 8:6 13:13
69:12 73:11
75:3
**feel** 6:24
**feeling** 63:12
**feet** 8:4 69:14
**Felishatay** 1:3
4:16 5:9
**felt** 56:24 69:7
**fifteen** 9:20
76:18
**fifth** 24:4,6
**file** 71:15
**filing** 4:6
**find** 37:21 38:2
**finished** 89:6
**Finishing** 96:24
**fire** 15:23 16:5
69:8
**firearm** 12:24
13:11 15:9,20
16:5

**fired** 69:17
**first** 5:16 6:17
  12:5,9 23:4,16
  24:13,14,21,22
  24:24 25:4,5,5
  25:6,6,7,11,15
  25:15,17,21
  26:5,6,7,12
  37:18 40:3
  50:1,7 51:5
  53:8 54:9,16
  55:13,18 56:13
  56:18,24 57:4
  58:4,8 60:13
  69:23 70:7
  73:18,19 79:7
  79:15,23 81:15
  81:21 83:18
  84:9,15,19,23
  85:10,15,16
  86:3,3 87:3
  96:14
**five** 21:12
**floor** 1:14 2:4,9
  4:23 24:14,24
  25:3,5,6,11,15
  25:18,21 26:3
  26:12,17,21
  30:1,9,13,20
  31:7,18 32:2,7
  32:15,19,24
  33:4,7,11,21
  38:10,16 40:2
  40:3,16,19
  42:9,14 44:4,4
  44:5,5 47:13
  49:18 50:1,7
  51:5 53:7,8
  54:9,10,12,16
  54:20 55:13,13
  55:15,18,22
  56:6,13,18,19
  57:1,1,3,4 58:4
  58:5,6,8,15
  59:3 79:6,7,9
  79:23,23 81:15
  81:16,21 82:4
  83:18,19 84:7
  84:9,13,15,19

84:23 85:10,11
85:15,16 86:3
86:3 87:4
96:15
**follow-up** 95:13
**follows** 5:17
**foot** 8:14
**forced** 44:13
**foregoing** 98:8
  98:14
**form** 4:7 10:15
  11:3,24 12:18
  13:2,19 15:11
  15:22 16:8
  17:18,24 18:24
  19:14 20:7
  21:7 22:11,20
  25:13 26:24
  28:10,23 29:15
  30:3,11,23
  31:10,20 32:4
  32:17 33:2
  34:18 35:3,12
  36:1,10 37:6
  37:15,24 38:12
  38:19 39:2,19
  40:9 41:3 42:3
  42:12,19 43:7
  43:16,23 44:15
  45:6,22 46:9
  46:22 47:11,20
  48:8 49:2,12
  49:21 50:3,16
  51:8,18 52:12
  53:12 54:3,18
  55:20 56:15
  57:7,18 58:10
  58:20 59:16
  61:9,17,24
  62:19 63:3,10
  63:19 64:3
  65:18 66:4,11
  67:12,19 68:3
  68:20 69:2
  72:23 73:16
  74:6 75:2,11
  75:23 76:9
  77:3,10,18
  78:3,18 79:3

79:19 81:23
82:18 83:1,14
84:2 85:2,18
87:12,21 90:1
90:8 91:9
92:13 93:2,7
93:14 94:7,18
94:22 95:8
**fourth** 24:2
**foyer** 39:23
**France** 8:12
**friendly** 16:21
  16:21 17:14,14
**frighten** 64:9,20
**frightened** 63:7
  63:16 64:1
**front** 29:20
  30:14 33:11,15
  33:20 35:15,19
  35:22 37:11
  39:23 44:5,6,7
  45:9,17 63:22
  65:3 69:22
  70:22,23 77:16
  77:24 82:2
  83:24 85:4,8
  86:18 92:23
  96:4,7
**fully** 98:6
**further** 95:11

_____ G _____

**GD** 4:18 5:5
**general** 13:14
**gentleman** 26:16
**getting** 16:24
  94:13
**give** 6:21 7:14
  7:18,21,24 8:7
  10:20 12:13
  18:7 21:4 56:8
  67:16 90:18
  91:3 92:9
**given** 18:9 20:12
  26:13,14 52:8
  66:9 92:22
  93:11 94:5,15
  95:5
**gives** 20:16,17

68:4
**go** 10:4 25:15,17
  25:20 30:1,8
  31:24 40:13,16
  47:11 53:7,9
  56:1,6,17,24
  57:4 59:1
  81:14 82:5,8
  83:23 85:23
**goes** 40:3
**going** 7:16 9:3
  14:12 16:22
  19:22 24:14
  25:7 26:2,18
  31:2,3 35:6
  39:14 40:1,1
  47:4 69:10
  73:18 81:1,2
  81:15 84:6
  87:9 88:19,23
  88:24 89:1
  91:22
**good** 5:22 6:3
  38:9
**Google** 28:14,18
**gosh** 64:18
**Great** 6:2
**ground** 6:22
**grown** 8:11
**guess** 7:17 8:13
  40:6 68:11
**guidance** 20:12
  21:4
**gun** 69:8,15,17
  72:12
**guys** 46:15

_____ H _____

**H** 3:15
**H-A-M-O-Y**
  23:23
**hallway** 39:14
  39:16 40:7,17
  42:22 52:10
  77:15,24 81:2
  85:10
**hallways** 55:24
**Hamoy** 23:5
**happen** 60:13

**happened** 14:15
  60:5,9
**hear** 34:10 71:12
  72:3
**heard** 17:21
  52:7 64:16
  72:8
**held** 1:13
**helpful** 7:23
**highlight** 31:2,5
**highlighted**
  31:14
**highlighter** 31:4
  31:15,18 35:7
  35:8
**hitting** 26:4
**home** 45:10
  52:18 62:13
  75:8
**homicide** 26:15
  26:16 75:13
**hour** 70:5 91:16
**hours** 76:18
**house** 24:8 25:9
  26:10 27:18
  28:3,7,7 29:5
  29:12 34:5,8,8
  34:11,15,23
  41:20 56:4
  62:6 63:8,17
  63:23 83:12
  86:15
**houses** 27:15
  44:3 84:4 85:4
**Hughes** 1:16
  5:11
**hundred** 86:8
**hurt** 16:1,6

_____ I _____

**identification**
  27:6 88:11
**identified** 28:4
  59:7,14 84:22
**identify** 27:11
**illness** 6:9
**impair** 6:11
**inch** 8:6
**incidences** 14:18

**incident** 10:10
10:20 13:5
18:20 19:5
22:1,15 69:20
75:9 84:19
90:20
**included** 74:13
**indicate** 52:18
96:14
**indication** 44:20
45:2
**individually**
78:1
**influence** 6:8
**information**
7:18 18:16,19
18:21 20:1
26:11,13,14
34:14 48:1,19
68:16
**injured** 16:24
**injury** 92:6
**inside** 52:15
64:9
**insight** 52:8
**instance** 82:6
**instances** 13:11
13:15
**intended** 8:16
**interact** 17:10
**Internal** 10:23
10:24 11:7,10
11:14,21 12:6
12:15,22 13:16
14:12 90:19
91:6,12
**interview** 90:19
91:14,18
**interviewed**
10:4,19,22
11:7,14,21
12:6,15,22
13:16 14:2,13
91:5,20
**interviews** 91:4
**inure** 4:10
**investigation**
10:12,17 11:1
11:6,10 87:19

87:23
**investigations**
11:11
**involved** 12:23
13:11,17
**involving** 13:7
22:2,16
**issue** 59:23

**J**
**JERSEY** 1:23
**job** 8:9 9:7
44:16 50:18
77:7 85:21
**jobs** 67:3
**join** 9:24
**joined** 11:22
**joining** 11:12
12:11,15 72:20
**June** 1:5 18:20
19:6 21:3
73:13
**JURY** 1:2

**K**
**Keith** 2:3 5:23
keith@victim...
2:5
**kind** 14:23
16:18,19,20
27:19 41:18
48:4 73:9 74:7
87:18,22
**kitchen** 71:2
**knew** 8:12 49:24
58:5 83:17,20
**knock** 17:22
18:4,6,12 19:4
19:10 20:14,15
22:4,7 36:14
37:4,8 92:3,4
93:9,12,24
95:3
**knocked** 36:17
36:22 37:13
66:1
**knocking** 21:21
**know** 8:1,11,19
9:2 11:5,16
12:1,2,8,19

14:14 23:4,22
27:10 33:19
34:7 36:7,17
36:21 37:10
41:5,17,21
42:21 46:5
50:7 57:13,22
58:1 59:19
62:16 65:9
70:11,20 72:17
73:9 75:4
77:13 80:24
84:18 88:22
89:20 91:21
92:19
**knowing** 64:13
**knowledge** 7:16
7:22 10:17
22:3 27:14
44:19 45:24
46:2 51:4 53:5
54:14 61:7
67:22 75:6,20
77:21 78:6
83:8 93:23
**known** 34:22
83:21

**L**
**LANE** 1:23
**law** 1:13 2:2,8
4:21 26:2
**lawsuit** 5:24
**lawyers** 19:18
**lead** 26:5 83:22
84:6 85:9,16
**leads** 40:18 86:3
**learn** 18:11 22:8
**learned** 18:22
**led** 71:1 83:18
84:7
**left** 28:16
**legally** 55:23
83:23
**level** 85:13
**Lieutenant** 23:6
23:7 24:1
**Likewise** 8:23
**line** 23:4,13,16

24:21
**Lisa** 1:16 5:11
**live** 48:23
**lived** 26:11
32:23 33:15,20
50:7,13 51:5
51:15,16 84:23
**location** 47:3
**locked** 36:12
**long** 9:18,21
22:6,13 37:13
69:24 70:6
76:16 91:14
**longer** 76:23
**look** 28:20 29:19
30:7,19 31:4
42:7 88:18
95:21
**looked** 29:12
69:10
**looking** 27:9
29:7 38:3 52:6
89:1 96:4
**lot** 27:23 48:22
**louder** 8:24
**Lt** 46:6,13,18
53:19 67:16,23

**M**
**mailboxes** 29:21
79:21 85:7
**main** 79:22
**MAJOR** 1:2
**making** 78:15,24
**man** 73:14
**manager** 87:8
**manner** 76:7
**MANTUA** 1:23
**Maps** 28:14,18
**mark** 27:2 35:6
88:7
**marked** 3:18
27:6 35:7 82:3
88:11 95:20
**markings** 96:13
**matter** 4:16 98:8
**mean** 20:13
23:13,18 24:11
27:22 40:5

52:15 73:24
**means** 82:23
98:16
**meant** 21:5
74:12 96:20
**medical** 60:22
**medication** 6:9
**Mellody** 23:9
**member** 49:7
**metric** 8:12
**mind** 27:9 68:11
**minimum** 21:12
**minute** 70:8,9
70:11,15 72:1
**minutes** 76:18
89:3
**misheard** 45:16
**moment** 18:18
27:10 58:16
82:14
**Monday** 1:9
28:17
**Monk** 23:6,7
24:1 46:6,14
46:18 53:19
67:16,23
**morning** 5:22
6:1 28:15,18
**motivation** 77:7
**multi-resident**
40:24
**murder** 38:6

**N**
**N** 3:2
**naked** 71:10
**name** 4:19 5:22
23:22
**named** 39:9
**near** 62:24 72:2
**necessary** 59:5
68:17 69:7
**need** 8:18,24
16:23 59:18
87:7 89:8
**needed** 48:19
**needs** 68:6
**never** 53:23
65:13

**new** 1:23 59:11
**nine** 13:10
**Ninety** 39:20
**normal** 6:24 7:4
  51:14 61:14,21
  62:5 65:3
**normally** 24:10
  24:18 47:17
  50:12,20 51:24
  73:12 76:16
  79:1,14 81:6
  82:16,22
**Notary** 1:16
  98:12
**noted** 98:6
**notes** 98:7
**notice** 1:12
**number** 12:2
  79:12

**O**

**Object** 10:14
  11:2,23 12:17
  13:1,18 15:10
  15:21 16:7
  17:17,23 18:23
  19:13 20:6
  21:6 22:10,19
  25:12 26:23
  28:9,22 29:14
  30:2,10,22
  31:9,19 32:3
  32:16 33:1
  34:17 35:2,11
  35:24 36:9
  37:5,14,23
  38:11,18 39:1
  39:18 40:8
  41:2 42:2,11
  42:18 43:6,15
  43:22 44:14
  45:5,21 46:8
  46:21 47:10,19
  48:7 49:1,11
  49:20 50:2,15
  51:7,17 52:11
  53:11 54:2,17
  55:19 56:14
  57:6,17 58:9

58:19 59:15
61:8,16,23
62:18 63:2,9
63:18 64:2
65:17 66:3,10
67:11,18 68:2
68:19 69:1
72:22 73:15
74:5 75:1,10
75:22 76:8
77:2,9,17 78:2
78:17 79:2,18
81:22 82:17,24
83:13 84:1
85:1,17 87:11
87:20 89:24
90:7 91:8
92:12 93:1,6
93:13 94:6,17
94:21 95:7
**objection** 4:9
  7:9 14:4,10,20
  21:15 25:23
  33:9,17 39:12
  41:14 48:15
  50:24 52:3,21
  55:7 57:24
  60:1 62:8
  64:11,22 65:8
  66:19 67:1
  73:6 74:15
  78:10 80:10,22
  81:9 86:6,14
  86:23
**objections** 4:7
**obligation** 7:14
**obtain** 59:10
**obtained** 18:16
**obviously** 49:24
  82:2,5
**occupant** 54:16
**occupant's** 92:7
**occupants** 92:6
  92:9
**occupied** 52:9
  52:19 53:1
  56:12 78:1
**occur** 38:22 39:7
  43:19,24

**occurred** 11:21
**offense** 27:22
**office** 10:13 26:2
**officer** 1:11 3:6
  5:7,10,15,22
  9:6,8,12 11:3
  11:24 12:18
  13:2,19 14:4
  14:10,20 15:11
  15:22 16:8
  17:18,24 18:24
  19:14 20:7
  21:7,15 22:20
  23:5,7,8,8,9
  24:3,6 25:13
  25:23 26:24
  28:10,23 29:15
  30:3,11,23
  31:10,20 32:4
  32:17 33:2,9
  33:17,23 34:18
  35:3,6,12 36:1
  36:10 37:15,24
  38:19 39:2,12
  39:19 40:5,9
  41:3,14 42:3
  42:12 43:7,16
  43:23 44:15
  45:6,22 46:9
  46:22 47:20
  48:8,15,22
  49:2,12,21
  50:3,16,24
  51:8,18 52:3
  52:12,21 53:12
  54:3,18 55:20
  56:15 57:7,18
  59:16 61:9,24
  63:3 66:4
  67:12,19 68:3
  68:20 72:11,23
  73:6,16 74:6
  74:15 75:11,23
  76:9 78:3,18
  79:3,19 80:22
  81:9,23 83:1
  84:2 85:2,18
  86:23 87:12
  89:8 90:1,8

91:9 92:13
93:2,7,14
94:22 95:18,21
**officers** 47:24
  94:13
**oh** 64:18
**okay** 6:7,14 7:7
  7:8,12,13,19
  7:20 8:1,2,21
  8:22 9:4,5,10
  9:18 10:6,19
  10:22,24 11:9
  11:12,17 12:11
  13:10,14 15:5
  16:14 17:1,6
  17:13,21 18:11
  18:15 19:3,20
  20:17,20 21:11
  21:20 22:8,15
  22:24 23:12,15
  23:21 24:16,23
  25:8,20 26:9
  26:19 27:17
  28:6,13 29:19
  31:17,23 34:1
  35:18 40:21
  43:4,10 44:9
  47:8 48:4,11
  49:24 50:20
  51:3 53:20
  58:3 59:21
  60:12,16 62:4
  62:12,16 64:16
  65:2,13 66:16
  69:12,15,24
  70:10,24 71:4
  72:1,19 73:23
  74:22 75:16
  76:19 78:22
  81:4,18 82:13
  87:6,16 88:6
  90:12 91:1,3
  91:14 92:18
  93:11 94:10
  95:10 96:19
**once** 13:3 88:17
**ones** 27:17
**ongoing** 15:3
**opened** 58:24

**operate** 73:12
**operator** 4:19
**opinion** 17:16
  74:3 92:18
**opportunities**
  93:21
**opportunity**
  71:16 92:9,22
  93:5,12,20
  94:4,15 95:5
**ORAL** 1:11
**order** 1:19 67:16
**ordered** 67:23
  67:24
**outside** 91:5
**overtime** 77:1
**owner** 51:15

**P**

**p.m** 76:15
**page** 3:5,18 48:6
  88:23
**pants** 60:24
**paperwork**
  47:23,24 48:5
**Parkway** 2:9
**part** 14:24 18:13
  24:8 30:18
  47:15 49:6
  50:10
**partial** 7:22
**particular** 44:24
  76:2
**parties** 4:4
**partition** 70:23
  71:1 72:2
**parts** 50:14
**passed** 22:4
  69:21 94:12
  95:2
**passes** 70:15
  72:1
**pause** 7:12
**pending** 33:24
**Pennsylvania**
  1:1,15 2:4,10
  4:24
**people** 27:24
  48:23 51:15

percent 39:20
40:12 42:24
82:15,22 86:2
86:8
performed 5:3
period 70:10,18
person 5:3 18:8
23:16,21,24
24:2,5,6,9,10
24:14,17 25:4
25:5,7,17 26:6
37:18 38:2
39:9 53:24
59:6,9,13 62:5
68:8 73:18
84:22
person's 53:10
personal 7:15
17:15 22:3
45:24 46:2
51:3,23 67:22
93:23
personally 72:8
90:6
Philadelphia 1:1
1:6,14 2:4,8,10
3:20 4:17,23
5:5 9:8,11,15
9:22 11:12
15:1,7,17 17:8
18:17 20:5,11
20:22 21:2
24:9 30:17
40:22 41:12
47:16 48:22
49:7 51:13
53:4,21 54:13
55:11 57:13
59:22 63:15
65:14,22 72:20
75:6 77:22
78:13,23 81:5
81:19 87:17
88:2 89:14,21
92:1,20
Phone 2:5,10
photocopy 3:19
photograph
3:19

physical 61:6
92:5
physically 22:17
70:11
picture 27:12,13
27:15 28:15,17
29:13,20 30:7
30:21 31:24
32:12 35:23
42:8,9 95:20
96:3
pink 31:3,5,15
31:17
place 59:1 81:7
90:23
Plaintiff 1:4 2:6
5:9
PLEAS 1:1
please 7:12,17
18:3
plenty 56:2
point 7:10,16
12:8 24:10,17
69:19 72:7
73:13
pointed 72:11
police 3:20 9:8
9:11,12,15,22
11:13 15:1,7
15:17 17:8
18:17 20:5,11
20:23 21:2
30:17 40:23
41:12 47:16
49:7 53:4,21
55:11 57:14
59:22 63:15
65:14,22 71:15
72:20 75:7
77:22 78:14
81:5,19 87:17
88:2 89:14,21
91:7 92:1,6,20
policies 15:6,16
53:3 54:13
55:10 78:13
policy 57:14,22
59:22
posed 55:4 80:7

80:19
position 69:15
possibility 84:20
possible 8:20 9:3
62:23
premises 92:10
92:23 93:20
94:5,16 95:6
prepared 6:4
present 1:17
2:15 4:12
22:24 91:17
presumption
81:20
pretty 60:14
prevent 16:24
92:5,7
previously 42:6
77:14 95:19
printed 28:15
88:14,22
prior 12:11
13:15 14:18
17:13 18:19
19:5 21:3 35:9
46:24 48:17
63:22 89:10,17
privacy 92:7
private 45:18
79:17
privy 11:11
probably 8:5,7
procedure 57:14
59:23 81:6
procedures 53:3
54:13 55:11
78:13
proceedings
98:5
process 6:23
8:17 81:6
produced 92:2
promise 19:24
proper 44:11
properties 49:4
82:1
property 17:10
25:3 29:2,5
35:16,19,22

37:19 38:17
45:17,20 46:14
46:15,19,20
47:5,6 49:18
50:1 51:6,14
58:3 59:11,13
60:8 69:22
70:22 73:23
74:1,2,4,11
75:21 82:9
84:8 85:7 87:3
87:8 92:8 96:5
protect 92:6
provide 19:10
20:1
provided 20:10
26:11 65:23
Public 1:17
98:12
purpose 92:4
pursuant 1:12
put 10:3 71:16

—— Q ——
question 8:23
9:1,2,4 15:13
17:2,2,5 19:23
20:23 27:21
28:5 29:3 30:5
31:12 32:6,11
33:24 39:4
41:10,17 45:14
45:15 54:21
55:1,4,9 56:10
56:20,22,23
80:2,4,7,13,15
80:19 82:10
89:1,11 94:24
95:24
questions 4:8
6:7 17:4 19:18
88:19 95:11
quick 88:17
95:12
quickly 77:8

—— R ——
R 2:8 98:2
ram 36:6,7
rammed 36:15

36:22
ran 62:16
rank 9:10
read 55:1,4
68:11,13 80:3
80:7,16,19
90:6,12,15,16
91:22 92:10
96:10,12
reading 4:4 89:6
real 88:17
really 21:8 22:6
22:12,21 29:16
rear 26:17,21
38:10,17 43:10
43:13,19,21
44:2,4,5,21
45:3,11,12,19
45:24 46:7
83:11,19,20
84:13,14 86:12
86:21 87:2,3
reask 19:24
45:14
reason 69:7
72:21 73:4
75:7
reasonable
75:18
recall 13:24
16:11 17:3,7
22:15,17 23:3
34:9,12,13,20
37:2,12 48:4
60:21 62:17,21
64:12 67:14
69:16,19 71:21
71:24 72:9,14
76:13 89:3,5
90:13 91:17,19
92:16 96:7,11
96:13
receive 14:24
15:5,15 16:14
49:8 60:21
68:16 87:16
88:1
received 16:4
18:19 19:3

20:4,22 21:2
30:17 40:22
41:11 53:20
63:14 65:13
92:19
**receiving** 17:7
41:24
**recognize** 28:8
88:15
**recollection**
14:17 16:3,15
23:11 28:2
36:24 37:3
41:23 60:6
71:9,18 90:14
**recon** 45:2 47:6
48:9,11,12,18
**reconnaissance**
50:10
**reconned** 44:17
**record** 19:19
27:23 31:2
47:17 91:18,23
97:1
**Recovery** 1:13
2:2 4:21
**REDBUD** 1:23
**referred** 18:15
**referring** 18:18
**regarding** 10:10
15:6,7 16:12
89:22
**regards** 15:16
15:18 16:16
17:9 22:1 88:3
**related** 91:4
**rely** 50:21
**remember** 13:13
14:11,14 20:21
29:1,4,6,11
35:15 46:18
47:8 60:20
71:22 72:15
**repeat** 8:24 30:4
31:11 54:20
94:23
**rephrase** 9:4
32:11 55:9
**report** 68:14

91:7
**reporter** 1:16
7:2 55:3 80:6
80:18 98:12,18
**REPORTING**
1:22
**represent** 28:14
28:19 71:14
**representing** 2:6
2:11 5:24
**reproduction**
98:15
**required** 20:1
59:10 76:6
77:1
**reserved** 4:8
**residence** 38:23
39:8 45:18
50:14 51:13
52:14 53:8,10
53:24 54:15
55:17 56:12
61:12,13 74:23
79:17
**residences** 48:23
49:10
**resident** 52:17
**respective** 4:4
**respond** 61:14
61:21
**responses** 7:5
**responsibility**
51:20 78:15
87:14
**restate** 9:3
**resulting** 92:8
**review** 41:24
88:16 89:4
**right** 6:20 8:8
9:6 13:23
14:23 16:3
19:3,8 20:10
20:24 23:15
24:7 27:18
28:2,13 30:7
31:14 32:11,22
41:23 49:19
50:8 54:8
56:10 57:15

60:4,12,14
62:24 64:7,19
70:5,14 73:9
77:13 80:1
82:16,23 84:11
85:5 87:10
88:16 89:10,15
89:15,16 90:17
93:20 94:3
95:2,23
**rip** 60:24 61:2
**robot** 8:5
**role** 73:13,17
**room** 32:14
33:11,15,20
42:16,21 71:3
73:22 77:23
79:16
**rooming** 56:4
**rooms** 56:5
**Roughly** 11:19
69:14
**rule** 17:22 18:5
18:12 19:5
92:4,5
**rules** 6:22
**run** 62:2,5,9,13
**running** 62:4,14
85:21

_____

**S**

**s** 1:4,8 3:15
**Saba** 23:7,8 24:3
**Samantha** 2:16
4:19
**saw** 70:2,7,19
**saying** 7:1 20:20
40:6 56:17
71:24 82:3
84:5
**says** 28:16 52:24
89:15 92:3
93:19
**scale** 85:14
**school** 15:2
18:14
**sealing** 4:5
**search** 38:4
50:11 51:11

88:4 89:22
**second** 23:21
25:18,21 26:3
26:17,21 29:24
30:8,13,20
31:7,18 32:2,7
32:14,19,24
33:4,7,11,21
38:10,16 40:2
40:16,19 42:9
42:14 44:4,4
47:13 49:18
53:7 54:10,11
54:20 55:13,15
55:22 56:6,19
57:1,3 58:4,6
58:15 59:3
79:6,8,23
81:14 82:4
83:19 84:7,13
85:11
**seconds** 21:12
21:12,18,23
22:4 66:13
94:12 95:2
**sectioned** 55:24
56:5
**see** 29:13,20
31:15 35:21
42:8 70:15,24
72:2,11 82:14
93:18 96:3
**seeing** 37:4
69:19
**seen** 47:5 69:23
89:2,5,11,18
**separate** 59:8
**separation**
39:24
**Sergeant** 23:9
**seriously** 16:24
**serve** 26:15 44:3
75:13
**served** 44:18
54:4
**service** 29:3 47:1
47:3,22 48:2
48:20
**shared** 48:23

49:4,9 50:14
51:13
**sheet** 48:9,11,13
**sheets** 48:18
**shift** 76:13,16,20
**shooting** 13:6,7
32:23 33:14
34:3 35:9 91:1
**shot** 28:21 69:13
71:17
**showed** 79:21
**shown** 89:17
94:11
**side** 37:22 42:16
52:7 77:15
79:16
**sides** 88:22
**signing** 4:5
**sir** 28:13 29:19
42:6 60:4
74:10,19 77:13
78:22 82:13
88:16,24 89:4
89:10 90:17
91:22 96:1,10
96:19
**situation** 44:10
51:4 53:18
57:16 65:16
67:8 87:7
**skin** 61:4
**slightly** 19:23
**smash** 65:4
**socks** 61:2
**somebody** 32:13
63:7
**Song** 1:12 3:6
5:7,15,22 9:6
27:9 35:6 40:6
48:22
**Song-1** 3:19
27:3,5 95:20
**Song-2** 3:20
88:8,10
**Sorry** 74:19
**sort** 6:9 53:20
78:15,24 81:6
**sound** 19:22
**South** 1:14 2:3

4:22
**space** 31:6 52:10
52:19 56:12
58:23
**speak** 7:6 8:24
**speaking** 7:11
7:11
**specific** 9:10,13
16:15 17:3,7
32:6 37:3 49:9
80:12 89:18
90:14
**specifically**
25:10 29:9
47:9 71:21
72:14
**specified** 54:6
**speculate** 7:17
8:13 68:11
**spell** 23:22
**split** 40:15 43:2
79:6 81:14
83:7
**spoken** 7:6
**stamped** 88:15
88:20 91:24
**standard** 6:7
**standing** 37:11
**started** 76:14
**startle** 65:5
**statement** 10:20
**statements**
71:15
**stay** 77:1
**stenographic**
98:7
**step** 24:16
**stipulated** 4:2
**straight** 40:1
**street** 1:14 2:3,9
4:23 29:7
**structure** 42:1
**structures** 41:20
**subsequent**
18:22
**substance** 6:10
**suddenly** 61:22
**supervision**
98:17

**supervisor** 20:16
53:15,17 58:7
58:18
**supervisors**
57:11
**supposed** 7:4
25:20 26:17
93:19
**sure** 6:20 11:9
11:15 17:1
59:21 87:9
88:1
**surprised** 22:8
**surrender** 92:10
92:23 93:20
94:5,16 95:5
**surveillance**
94:11
**surveyed** 44:17
**suspect** 38:6,24
75:14
**suspended** 73:3
**suspicion** 75:18
**SWAT** 9:9,13,16
9:19 10:1,5,7
11:22 12:11,16
14:24 15:2,4
18:14 24:9,18
30:18 40:11
47:16 49:8
73:12 78:23
79:12
**swear** 5:12
**sworn** 5:16
**system** 8:12

———————
**T**
**T** 2:3 3:15 98:2
98:2
**take** 24:16 70:5
85:11 88:23
89:7 90:23
95:21
**taken** 1:12 5:8
76:23 98:7
**talked** 47:1
**talking** 16:18
29:9 74:8
87:23 93:16

**tan** 27:19
**team** 11:22
14:24 24:9,19
25:1,2 26:6
30:18 49:8
69:21 70:21
73:12 78:23
79:12
**tell** 8:6 11:15
12:3 13:15,21
18:3 21:9 22:6
22:13,22 27:17
28:24 29:8,17
29:24 30:12,14
30:19 31:5,8,8
31:23 32:12
35:14 46:17
57:15,19 59:19
65:10 71:4,8
90:22
**ten** 11:16,17,19
11:20 12:21
14:1 21:12
85:14,22 86:1
86:1
**term** 1:5 24:11
24:17,17,20
**terms** 13:14
**testified** 5:17
38:8 77:14
82:13 90:18
95:22
**testify** 6:5,11
68:7
**testimony** 7:15
13:23 14:7,8
17:13 19:9
50:6
**Thank** 96:21,23
**think** 17:5 24:4
24:20,23 29:6
38:8 42:6
45:15 50:6,17
51:19 52:24
56:22 59:17
65:5,11 73:1
73:10 79:20
82:10 85:4,6,9
86:24 87:1

89:10 93:23
**thinking** 64:24
**thinks** 68:6
**third** 23:24
27:18 44:5,5
95:23
**thought** 58:16
68:17
**thousands** 41:6
41:7
**threatening**
75:19
**time** 4:9 5:13 7:7
8:18 10:2 12:6
15:15 18:7
19:11 20:2,13
21:5 22:7,13
40:13 42:24
45:10,16 46:3
46:7 65:23
66:8,23 67:5
67:24 68:18
69:17,23 70:2
70:6,13,18
76:13 81:13
82:16 83:3,4
89:8 96:22
**times** 11:13,16
11:17,19,20
12:14,21,23
14:1 36:21
44:2 67:4
**title** 48:6
**today** 5:6,11 6:5
6:12 7:14
89:17
**Today's** 4:24
**told** 19:4 53:22
58:7 68:8
**Torresdale**
27:13 44:24
**train** 41:19
**training** 10:5
14:23 15:3,5
15:16 16:4,15
17:3,4,8 18:13
18:17 19:4
20:4,11,22
21:1,4 30:16

40:22 41:11,16
41:24 49:9
53:6,21 55:10
63:14 65:14,21
87:17 88:2
92:19
**transcript** 98:9
98:15
**transfer** 10:3,6
**trial** 1:2 4:9,16
**trouble** 9:1
**truthful** 7:15
**truthfully** 6:11
13:20
**try** 8:20 9:3
44:11 77:7,23
81:7 87:8
**trying** 19:24
33:21 41:18
93:18,21
**turn** 94:10
**Twenty-three**
9:23
**two** 29:21 69:14
79:21 82:2
85:6 86:16
88:22 94:12
95:2
**two-story** 39:22
**type** 79:14

———————
**U**
**unaware** 45:11
45:19
**uncomfortable**
8:17
**understand** 6:22
8:14 17:2
20:20 79:11
86:20
**understanding**
9:1 18:4 21:20
25:10 44:23
78:12
**Understood**
67:8
**unit** 9:9,13 10:1
10:5,7 15:3,4
40:11

**unnecessarily**
8:17
**unusual** 76:4,7
**upper** 28:16
**URBRIGGEN**
3:11
**use** 4:15 8:3
24:20 31:3

**V**

**v** 4:17 5:4
**valid** 26:21
54:11 57:2
58:6
**Victims'** 1:13
2:2 4:21
**video** 4:15,18
94:11
**VIDEOGRAP...**
2:16 4:14
96:24
**videotape** 1:11
97:3
**view** 29:1,8
**violence** 92:5
**vs-** 1:5

**W**

**waived** 4:6
**walked** 39:6
**walking** 29:2
**walks** 32:13
**wall** 8:5,7
**want** 33:22
41:19 82:9
94:3 95:18
**wanted** 26:16
**warrant** 16:17
17:11 18:6
19:9 20:3 24:7
25:9 26:9,15
26:20 29:3
34:4 35:1 38:3
38:9 39:10
40:24 43:13
44:18,24 46:24
47:1,3,22 48:2
48:18,20 49:17
50:11 51:12,12
54:1,5,11

55:15 57:2
58:5,14 59:7,9
59:11,14,18
75:13 76:2,6
76:12,19,24
83:5,19 84:12
84:15,23 88:4
**warrants** 41:7
44:3 54:5 67:4
79:5 81:12
89:22
**wasn't** 36:19
**way** 13:12 35:1
40:23 42:20
44:11 46:5
53:6 71:22
80:24 82:11
93:15
**ways** 6:23 61:21
**we'll** 7:12 8:19
27:2
**we're** 7:1 9:2
26:2,4 31:3
96:3
**we've** 49:16
**weapon** 15:24
**wearing** 71:7,8
**went** 32:8 34:24
44:17 58:3
86:10
**West** 2:3 3:10
5:21,23 10:18
11:8 12:4,20
13:4,22 14:6
14:16,22 15:14
16:2,10 17:20
18:2 19:2,16
20:9 21:10,19
22:14,23 25:19
26:8 27:2,8
28:12 29:10,18
30:6,15 31:1
31:13,22 32:10
32:21 33:5,13
34:2,21 35:5
35:17 36:3,13
37:9,17 38:5
38:14,21 39:5
39:15 40:4,20

41:9,22 42:5
42:15 43:3,9
43:18 44:8,22
45:8 46:1,12
47:7,14 48:3
48:10,21 49:5
49:15,23 50:5
50:19 51:2,10
51:22 52:5,16
53:2,16 54:7
54:22,24 55:8
56:9,21 57:12
57:21 58:2,12
59:4,20 60:3
61:11,19 62:3
62:11,22 63:5
63:13,21 64:6
64:15 65:1,12
65:20 66:7,15
66:21 67:7,15
67:21 68:9,22
69:5 73:2,8,20
74:9,18 75:5
75:15 76:1,11
77:5,12,20
78:5,11,21
79:10,24 80:3
80:11 81:3,17
82:12,20 83:9
83:16 84:10
85:12,24 86:11
86:19 87:5,15
87:24 88:7,13
89:9 90:5,11
91:13 92:17
93:4,10,17
94:9,19 95:1
95:10 96:19
**whatsoever** 35:1
67:10 76:5
**wish** 96:20
**witness** 3:5 5:6
5:12 10:16
11:5 12:1,19
13:3,20 14:5
14:11,21 15:12
15:23 16:9
17:19 18:1
19:1,15 20:8

21:8,17 22:12
22:21 25:14,24
27:1 28:11,24
29:16 30:4,12
30:24 31:11,21
32:5,18 33:3
33:10,18 34:1
34:19 35:4,13
36:2,11 37:7
37:16 38:1,13
38:20 39:3,13
39:20 40:10
41:4,15 42:4
42:13,20 43:8
43:17,24 44:16
45:7,23 46:10
46:23 47:12,21
48:9,17 49:3
49:14,22 50:4
50:17 51:1,9
51:19 52:4,13
52:22 53:14
54:4,19 55:21
56:16 57:8,19
58:1,11,21
59:17 60:2
61:10,18 62:1
62:9,20 63:4
63:11,20 64:4
64:12,23 65:9
65:19 66:5,12
66:20 67:2,13
67:20 68:4,21
69:3 72:24
73:7,17 74:7
74:16 75:3,12
75:24 76:10
77:4,11,19
78:4,19 79:4
79:20 80:23
81:10,24 82:19
83:2,15 84:3
85:3,20 86:7
86:15,24 87:13
87:22 90:3,9
91:11 92:15
93:3,8,15 94:8
94:23 95:9
96:23

**wondering**
68:12
**word** 74:10
**works** 6:23
**wouldn't** 27:9
57:9 58:21
86:20
**write** 91:6
**written** 7:2
47:17

**X**

**X** 3:2,15

**Y**

**Yeah** 70:4 89:7
**year** 15:4
**years** 9:20,23
79:12
**yellow** 35:7,8

**Z**

**zero** 14:17 70:5
86:2
**ZURBRIGGEN**
2:8 10:14 11:2
11:23 12:17
13:1,18 14:3,9
14:19 15:10,21
16:7 17:17,23
18:23 19:13
20:6 21:6,14
22:10,19 25:12
25:22 26:23
28:9,22 29:14
30:2,10,22
31:9,19 32:3
32:16 33:1,8
33:16,23 34:17
35:2,11,24
36:9 37:5,14
37:23 38:11,18
39:1,11,18
40:8 41:2,13
42:2,11,18
43:6,15,22
44:14 45:5,21
46:8,21 47:10
47:19 48:7,14
49:1,11,20

50:2,15,23
51:7,17 52:2
52:11,20 53:11
54:2,17 55:6
55:19 56:14
57:6,17,24
58:9,19 59:15
59:24 61:8,16
61:23 62:7,18
63:2,9,18 64:2
64:10,21 65:7
65:17 66:3,10
66:18,24 67:11
67:18 68:2,19
69:1 72:22
73:5,15 74:5
74:14 75:1,10
75:22 76:8
77:2,9,17 78:2
78:9,17 79:2
79:18 80:9,21
81:8,22 82:17
82:24 83:13
84:1 85:1,17
86:5,13,22
87:11,20 89:7
89:24 90:7
91:8 92:12
93:1,6,13 94:6
94:17,21 95:7
95:12,17 96:17

**0**

**0.0** 70:5
**01633** 1:7
**08051** 1:23

**1**

**10:02** 1:15 5:1
**11** 76:15
**11:34** 97:1,4
**121** 1:13 2:3
 4:22
**15** 1:9 5:1
**1515** 2:9
**15th** 28:17
**16th** 2:9
**18th** 1:14 2:4
 4:23
**19102** 2:10

**19107** 1:15 2:4
 4:24
**19th** 12:9

**2**

**2** 88:23
**2021** 18:21 19:6
 21:3 73:13
**2022** 1:5
**2023** 1:9 5:1
**215** 2:5,10
**22-3763** 4:18 5:5
**235** 88:24
**240** 88:24
**242** 88:20
**27** 3:19

**3**

**30** 21:18,22 22:3
 66:13

**4**

**4** 3:10 18:20
 19:6 21:3
**40** 21:18,23 22:3
 66:13
**406** 1:23
**4664** 44:24
 96:12

**5**

**5.7** 92:1
**546-1433** 2:5

**6**

**683-5114** 2:10

**7**

**8**

**856-589-1107**
 1:24
**88** 3:21

**9**

**9:30** 28:16
**90** 82:15,22
**95** 3:11
**99** 40:12 42:24

# EXHIBIT "Q"

# Transcript of the Testimony of:
# **Officer Joshua Burkitt**

**Date:** September 20, 2023

**Case:** Alvarado v. City of Philadelphia, et al

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

IN THE COURT OF COMMON PLEAS

PHILADELPHIA COUNTY, PENNSYLVANIA

- - -

FELISHATAY ALVARADO             :   JUNE TERM, 2022
                                :
       vs.                      :
                                :
CITY OF PHILADELPHIA, et al     :   NO. 1633


- - -

WEDNESDAY, SEPTEMBER 20, 2023

- - -


            Videotape Oral Deposition of OFFICER
JOSHUA BURKITT, taken at Victims' Recovery Law
Center, The North American Building, 121 South
Broad Street, 18th Floor, Philadelphia,
Pennsylvania, commencing at 10:10 a.m., before
Denise Weller, a Professional Shorthand Reporter
and Notary Public in and for the Commonwealth of
Pennsylvania.


- - -


            DIAMOND COURT REPORTING
              406 Redbud Lane
            Mantua, New Jersey 08051
               (856) 292-4292
            dcr.diamond@comcast.net

Page 2

1    A P P E A R A N C E S :
2
3    VICTIMS' RECOVERY LAW CENTER
      BY:  KEITH WEST, ESQUIRE
4    The North American Building
      121 South Broad Street
5    18th Floor
      Philadelphia, PA  19107
6    (215) 546-1433
      Keith@victimrecoverylaw.com
7    Attorney for the Plaintiff
8
      CITY OF PHILADELPHIA
9    LAW DEPARTMENT
      BY:  ADAM ZURBRIGGEN, ESQUIRE
10   1515 Arch Street
      14th Floor
11   Philadelphia, PA  19102
      (215) 683-5114
12   Adam.zurbriggen@phila.gov
      Attorney for the Defendants
13
14          - - -
15
16
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2
3    WITNESS                    PAGE
4
5    OFFICER JOSHUA BURKITT
6    (By Mr. West)                6
7
8
9
10
11          - - -
12
13          EXHIBITS
14   NO.        DESCRIPTION        PAGE
15
16   Burkitt-1    Interview Record      11
17   Burkitt-2    Search Warrant        20
18   Burkitt-3    Recon Sheet           22
19   Burkitt-4    Google Map            24
20   Burkitt-5    File Notes            26
21   Burkitt-6    Property Search       32
22   Burkitt-7    Google Map            39
23
24

Page 4

1          - - -
2          PROCEEDINGS
3          - - -
4         (It is hereby stipulated and agreed
5    by and between counsel that signing,
6    sealing, filing and certification are
7    waived; and that all objections, except as
8    to the form of the questions, are reserved
9    until the time of trial.)
10         - - -
11         MR. WEST:  By usual stipulations we
12   mean that all objections except for as to
13   the form of the question are reserved until
14   the time of trial.  Is that --
15         MR. ZURBRIGGEN:  That's fine here.
16         MR. WEST:  Okay.
17         THE VIDEOTAPE TECHNICIAN:
18   Deposition of Police Officer Joshua Burkitt.
19   This, the audio/video deposition for use at
20   trial in the matter of Alvarado versus City
21   of Philadelphia, et al; Philadelphia Court
22   of Common Pleas docket number 220601633 and
23   I am the video operator.
24         My name is Courtney Kitcherman.  And

Page 5

1    I am employed by the Victims' Recovery Law
2    Center.  My address 121 South Broad Street,
3    18th Floor, Philadelphia, Pennsylvania,
4    19107.
5         Today's date is September 20th at
6    10:13 a.m.  This deposition is being
7    performed in person.  The caption of this
8    case is Alvarado versus City of
9    Philadelphia, et al, Court of Common Pleas
10   docket number 220601633.  The witness being
11   deposed today is Officer Joshua Burkitt.
12   This deposition is being taken on behalf of
13   Plaintiff Felishatay Alvarado.
14         The officer taking this deposition
15   is Denise Weller.  And she shall swear the
16   witness in at this time.
17          - - -
18         OFFICER JOSHUA BURKITT, after having
19   been first duly sworn, was examined and
20   testified as follows:
21          - - -
22          EXAMINATION
23          - - -
24   BY MR. WEST:

2  (Pages 2 to 5)

Page 6

1    Q.  Good morning --
2    A.  Good morning.
3    Q.  -- Officer -- it's officer, right?
4    A.  Yeah.  Officer Burkitt.  You can call me
5    Josh, Officer Burkitt, whatever.
6    Q.  That's okay.  If you don't mind, I will
7    call you Officer Burkitt.
8    A.  It's okay with me.
9    Q.  All right.  And you're a member of the
10   SWAT team?
11   A.  Yes, sir.
12   Q.  In the City of Philadelphia.  All right.
13   Have you ever been in a deposition before?
14   A.  Negative.  No.
15   Q.  That's fine.  So just quickly I will go
16   over -- kind of explain the process to you.  Your
17   attorney might have done so as well.  But your
18   only obligation today is to give truthful
19   testimony based on what you personally know.  So
20   please answer the question you're asked truthfully
21   to the best of your ability.  But we are not
22   asking you at any time to guess or speculate,
23   okay?
24   A.  Okay.

Page 7

1    Q.  Like this is not the equivalent to like
2    multiple -- multiple option test where you are
3    supposed to answer every question.  Just let us
4    know what you do and do not know, okay?
5    A.  All right.
6    Q.  We do want to know everything you know,
7    though.  So if you are able to give an estimation
8    or approximation, please, you know, give us your
9    best estimate or approximation, if you have
10   partial knowledge of something.  Just let us know
11   that you're giving an estimate or approximation,
12   okay?
13   A.  Okay.
14   Q.  You're already following the format
15   perfectly.  But just to make sure you understand,
16   this is similar to a conversation in a lot of
17   ways.  But we do have a court reporter here.  She
18   has to write down everything that we say.  So we
19   have to be careful not to speak at the same time.
20   And hand gestures, you know, that kind of thing
21   that normally helps in a conversation, that won't
22   go on the written record.  So we have to be sure
23   that all of our responses are spoken, okay?
24   A.  Okay.

Page 8

1    Q.  That's it.  This is not intended to be an
2    unnecessarily uncomfortable process.  If you want
3    to take a break at any time, you want some water,
4    coffee, whatever, just let us know.  We will try
5    to be as accommodating as possible, okay?
6    A.  All right.
7    Q.  And similarly, you know, the questions
8    are -- I'm going to ask them to the best of my
9    ability in the hope that you understand them.
10   So if I ask you a question that you don't
11   understand for any reason, you know, please don't
12   answer it.  Just let me know that you would like
13   me to rephrase the question, speak louder,
14   quieter, rephrase the question, whatever, okay?
15   A.  Uh-huh.
16   Q.  I will be glad to reanswer any question
17   if you have any trouble understanding it, okay?
18   A.  Okay.
19   Q.  I will try to be considerate of your
20   time, because I know you've got a lot going on.
21   So you were on duty earlier today; is that
22   correct?
23   A.  Yes.
24   Q.  What time did your shift start?

Page 9

1    A.  My shift started at 11:00 p.m.
2    Q.  Okay.  And how long do the shifts you
3    normally work on, how long are they?
4    A.  They vary.  But no less than eight hours.
5    Q.  Okay.  And right now you're coming up
6    towards 12 hours, right?
7    A.  Coming up towards what?
8    Q.  It's almost 11:00 a.m., so you're almost
9    at 12 hours, right?
10   A.  Yes.
11   Q.  Okay.  How long have you been on the
12   night shift, if that is what you call it?
13   A.  I have been there since I got to SWAT, so
14   about four years now.
15   Q.  Okay.  And when did you begin on the --
16   you said about four hours.  Can you remember more
17   precisely when you joined the SWAT unit?
18   A.  I went to the SWAT unit I believe it
19   was -- I want to say January, February of 2020.
20   Q.  Okay.  What was your job prior to that?
21   A.  I was 24th District patrol.
22   Q.  And how long were you a patrol officer?
23   A.  I was patrol for two years.
24   Q.  And what did you do before that?

3 (Pages 6 to 9)

Page 10

1    A.   Before I was in patrol --
2    Q.   Uh-huh.
3    A.   -- as a police officer?  I worked down in
4  Kensington at a sheet fabricator shop.
5    Q.   Okay.
6    A.   Sheet metal fabrication.
7    Q.   So you -- just to make sure I understand
8  correctly.  Do you think that it was approximately
9  2018 when you first joined the Philadelphia Police
10  Department and that was your first job as a police
11  officer; is that right?
12    A.   I got hired in 2017.  I went to the
13  academy in 2017.
14    Q.   And that is the Philadelphia Police
15  Academy, correct?
16    A.   Yes.
17    Q.   Okay.  All right.  So our incident
18  occurred July -- June 4th, 2021 at a property with
19  the address of 4664 Torresdale Avenue.  I just
20  saw, because we are sitting here in the same room,
21  that prior to today's deposition, immediately
22  before, it looked like you read a statement that
23  you had given previously; is that correct?
24    A.   Correct.

Page 11

1    Q.   Have you reviewed any other documents,
2  pictures, video, anything else to prepare for
3  today's testimony?
4    A.   No.
5    Q.   Okay.  I will mark as Burkitt-1 a
6  document I believe is the record of your
7  interview.
8            - - -
9        (Whereupon, Exhibit Burkitt-1 was
10      marked for identification.)
11            - - -
12  BY MR. WEST:
13    Q.   All right.  So if you can just review
14  this real quick, does the document -- except for
15  the highlighting, is the document that I have
16  marked the same as the document that you reviewed?
17    A.   Yes.
18    Q.   Okay.  And I believe this document says
19  that you did not actually witness the dog getting
20  shot; is that correct?
21    A.   Correct.
22    Q.   And I actually highlighted -- from my own
23  purposes, I highlighted part of it.  It's my own
24  highlighting.

Page 12

1        But it says, "At that time I could hear a
2  large dog barking from inside.  The breacher was
3  given the order to initiate forcible entry into
4  the location."  So is that consistent with your
5  recollection that you could hear the dog barking
6  from inside the property prior to entry?
7    A.   Yes.
8    Q.   Okay.  Having a chance to review
9  Burkitt-1, is there anything in there that you
10  look at it now and you think that that is not
11  accurate?
12    A.   It seems accurate.
13    Q.   Okay.  Prior to June 4th, 2021, had you
14  ever done any reconnaissance for the SWAT unit?
15    A.   I have reconned jobs, yes.
16    Q.   When did you first start -- when did you
17  do your first recon job as part of the SWAT unit?
18    A.   During training you have to go out and do
19  like a mock-up, recon a property.
20    Q.   Okay.  So as part of the training that
21  you received when you first were joining the SWAT
22  unit, I guess before you were officially part of
23  the SWAT unit, part of that training was how to do
24  reconnaissance, correct?

Page 13

1    A.   Correct.
2    Q.   All right.  Did you -- and you have done
3  reconnaissance as part of the SWAT unit ever
4  since; is that correct?
5    A.   Yes.
6    Q.   Okay.  Do you have an estimate or
7  approximation of how many recon jobs you have
8  done?
9    A.   I couldn't tell you.  I couldn't say.
10    Q.   Dozens or more?
11    A.   Yes.
12    Q.   Okay.  Did you take -- did you play any
13  role in the recon of the 4664 Torresdale Avenue
14  property?
15    A.   No.
16    Q.   All right.  If you were -- strike the
17  question.
18        You were part of the entry team that
19  breached the front door of the 4664 Torresdale
20  property, correct?
21    A.   I was part of the entry team that went
22  in.  I had nothing to do with breaching.
23    Q.   Okay.  Physically, if you recall, how far
24  were you behind the breaching team?  So my --

4 (Pages 10 to 13)

Page 14

1  strike the question.
2      My understanding is that the breaching
3  team was two officers.  One who had a ram and one
4  who had a -- what do you guys call that, the
5  Handlin tool or something?
6      A.  Halligan.
7      Q.  Halligan.  So the breaching team was the
8  officer who had the ram and the officer who had
9  the Halligan tool, correct?
10     A.  Correct.
11     Q.  How far behind them were you?
12     A.  Maybe -- I couldn't really give you an
13 accurate -- maybe a car length away from them I
14 was, stacked up on the wall outside the house.
15     Q.  Right.
16     A.  So I was some distance from them.  I
17 believe I was the -- I was on the second entry
18 team.  And I was the second guy on that team.  And
19 I believe I was some distance away.
20     Q.  But prior to the dog getting shot, you
21 were one of the officers that had actually entered
22 the building, correct?
23     A.  Correct.  Yes.
24     Q.  It might sound like a basic question, but

Page 15

1  why did you go into the property?
2      MR. ZURBRIGGEN:  Object to form.
3  But Officer, you can.
4      THE WITNESS:  I believe we were
5  serving a warrant at location, a homicide
6  warrant.
7  BY MR. WEST:
8      Q.  Okay.  Had you ever seen the warrant --
9  strike the question.
10     Have you ever seen a warrant for that --
11     A.  Did I physically look at that warrant?
12     Q.  Uh-huh.
13     A.  No.
14     Q.  Did you know what the warrant actually
15 said?
16     A.  Like as in terms of a description of the
17 property or a description of the location as to
18 why we were hitting it?  No, I didn't look at the
19 warrant.
20     Q.  Okay.  So when you're enforcing a
21 warrant, it would usually give a physical
22 description, like an address, of the property that
23 you're allowed to enter, correct?
24     MR. ZURBRIGGEN:  Object to form.

Page 16

1  Officer, if you know.
2      THE WITNESS:  All I know is it
3  has -- that is supervisor, going over the
4  warrant.  That is what the supervisor does.
5  I have nothing to do with that.  So I'm not
6  exactly sure what the warrant entails.  I
7  know that it has to have specific things on
8  it such as an address.  But I don't know if
9  it has to have a physical description of the
10 property.  We -- that's all I know.
11 BY MR. WEST:
12     Q.  Okay.  So when you do reconnaissance jobs
13 as part of the SWAT unit, is that in order to
14 figure out how to enter a property that is
15 described in a warrant?
16     A.  So yeah.  It's the best and safest way to
17 not only make entry, but to approach a property.
18     Q.  Okay.  And in order to do that as part of
19 the reconnaissance, you have to look at the
20 warrant and figure out where the SWAT unit is
21 supposed to go, correct?
22     MR. ZURBRIGGEN:  Object to form.
23 But Officer, you can answer.
24     THE WITNESS:  Right.  A supervisor

Page 17

1  will observe the warrant.  And so my job in
2  terms of reconning a job, the supervisor, he
3  reads the warrant.  And I pull the job on
4  the computer, we verify the location on the
5  computer, the addresses on the computer and
6  then with what is on the warrant.  And then
7  someone -- and particularly two officers and
8  a supervisor have to go out and look at the
9  location themselves.
10 BY MR. WEST:
11     Q.  Okay.  Have you ever done reconnaissance
12 on a warrant for an apartment?  So to explain, the
13 warrant specifies entry into a certain apartment
14 in a building, multi-residence building.
15     A.  Yes.
16     Q.  And so as part of that reconnaissance, is
17 it your understanding that the SWAT unit has to
18 figure out how to enter that specific apartment
19 unit without entering anyone else's property,
20 since the other properties are not part of the
21 warrant?
22     MR. ZURBRIGGEN:  Object to form.
23 Officer, you can answer, if you can.
24     THE WITNESS:  So I am trying to

5 (Pages 14 to 17)

Page 18

1   think. When we are doing a recon for a
2   property like that, typically we try and
3   gather as much information as we can from
4   detectives and what we can gather on-line.
5   But sometimes it will be word of
6   mouth whether it's an apartment or not.
7   Like a lot of these homes are not even
8   supposed to be apartments. And they will
9   have them labeled as apartments. We do the
10  best that we can to obviously figure that
11  out before we make entry and go only where
12  we are supposed to go.
13  BY MR. WEST:
14      Q. All right. As part of your employment
15  with the Philadelphia Police Department, have you
16  ever received any training as far as how to
17  enforce a warrant at a multi-residence property?
18      A. I would say so, yes.
19      Q. Okay. Have you ever received any
20  training as part of your employment with the
21  Philadelphia Police Department as to how to read a
22  warrant?
23          MR. ZURBRIGGEN: Object to form.
24  But Officer, you can answer if you can.

Page 19

1          THE WITNESS: No.
2   BY MR. WEST:
3       Q. Okay.
4       A. I know -- I know like what a warrant is
5   supposed to entail, but I haven't had any formal
6   training on reading a warrant. Like I said, that
7   is first supervisor.
8       Q. All right. Prior to entering the
9   property at 4664 Torresdale Avenue, did you know
10  if the warrant specified that entry was supposed
11  to be in any particular apartment?
12      A. I can't recall.
13      Q. Okay.
14      A. I'd have to look at it.
15      Q. Okay.
16      A. I don't have it specified here, I don't
17  think, on this paperwork, so I don't really
18  remember.
19      Q. Let's see. Do you recall the name of the
20  suspect that you guys were trying to get?
21      A. No, I don't recall.
22      Q. Okay. I can represent to you his name is
23  ████████ Do you recall what he was suspected
24  of?

Page 20

1       A. I believe it was a homicide warrant.
2       Q. Okay. I will mark the search warrant as
3   Burkitt-2. And I will highlight for you the
4   address line.
5              - - -
6          (Whereupon, Exhibit Burkitt-2 was
7   marked for identification.)
8              - - -
9   BY MR. WEST:
10      Q. All right. Sir, just looking at the
11  search warrant for this job. You can see it says
12  second floor rear, correct?
13      A. Uh-huh.
14      Q. If you were doing the reconnaissance for
15  this job and you knew that ████████, the
16  suspect, lived, according to the warrant, on the
17  second floor rear apartment, and you knew that
18  ████████ was on probation, would you contact
19  his probation officer to try to get some guidance
20  as far as how to get to the second floor rear
21  apartment?
22          MR. ZURBRIGGEN: Object to form.
23  Officer, you can answer, if you can.
24          THE WITNESS: That is something that

Page 21

1   the detectives would handle. We have no
2   contact with parole or anything like that.
3   BY MR. WEST:
4       Q. Okay. So as part of the reconnaissance,
5   you wouldn't contact anyone?
6          MR. ZURBRIGGEN: Same objection.
7   But Officer, you can answer.
8          THE WITNESS: Like I said, I am just
9   a patrol officer in SWAT. I don't know what
10  fully entails a supervisor. But I've never
11  seen that done. And I don't believe that we
12  do that. The detectives would handle
13  something like that, contacting parole.
14  BY MR. WEST:
15      Q. That's fine. So what -- just normally in
16  your role in the recon, what would you do?
17      A. What would I do?
18      Q. Uh-huh.
19      A. So if I was reconning a property or a
20  job, I would pull as much information as I could
21  up of the property on the computer, pictures of
22  the property. And then I would make a sheet up, a
23  physical description of the property, how many
24  stories it was, where the windows are, how best to

Electronically signed by Denise Weller (401-411-238-5399)                    24e538e8-7293-44bb-9e29-d6fd979dfcbe

Page 22

1  approach it.  And then after I had done all of
2  that I would go out and look at the property, put
3  eyes on it.
4      Q.  And what would be the name of the
5  document that you would create, if that makes
6  sense?
7      A.  It would be called a recon sheet.
8      Q.  Okay.  So I have a document here that's
9  been previously marked as Exhibit 3.
10  Unfortunately, I don't recall off the top of my
11  head which deposition this was for.  But any case,
12  it's also Bates stamped as defense 72 and 73.  We
13  will mark this as Burkitt-3.  I think this was
14  from Saba's deposition.
15              - - -
16          (Whereupon, Exhibit Burkitt-3 was
17      marked for identification.)
18              - - -
19  BY MR. WEST:
20      Q.  Officer Burkitt, if you could just look
21  at that document real quick and let me know if you
22  recognize what it is.
23      A.  Uh-huh.  Yes.
24      Q.  What is that?

Page 23

1      A.  It's is recon sheet.
2      Q.  Had you ever seen this particular
3  document prior to the entry of the 4664 Torresdale
4  Avenue?
5      A.  Yes.
6      Q.  Okay.  Do you specifically recall seeing
7  this or do you believe that you normally would?
8      A.  We do before every job, everyone gets
9  one.
10      Q.  Okay.  And you can see at the top it says
11  location 4664 Torresdale Avenue, apartment second
12  floor rear, correct?
13      A.  Yes.
14      Q.  Now, do you see -- is this the whole
15  recon sheet?  Does this appear to be a complete
16  thing or do you think there should have been more?
17      A.  No.
18      Q.  In your practice, is there normally more
19  information?
20      A.  No, there's --
21          MR. ZURBRIGGEN:  Object to form.
22      But go ahead.
23          THE WITNESS:  Sorry.
24          MR. ZURBRIGGEN:  That's okay.

Page 24

1          THE WITNESS:  No.  There's typically
2      more information here.
3  BY MR. WEST:
4      Q.  Okay.
5      A.  This is -- this will be on the back of
6  this and there's a picture of the property, a map,
7  how to get to the property.  And so a couple more
8  bits.
9      Q.  Okay.  All right.  Would you normally --
10  would you normally look at Google Maps to see if
11  you could find a picture of the property?
12      A.  Yes.
13      Q.  Okay.  And I will mark this as Burkitt-4.
14              - - -
15          (Whereupon, Exhibit Burkitt-4 was
16      marked for identification.)
17              - - -
18  BY MR. WEST:
19      Q.  Is this the kind of Google Map that you
20  might normally use?
21      A.  No, not typically this.  Typically it
22  would be a picture of the front of the property.
23      Q.  Okay.  Why not use a picture from the top
24  of the property?

Page 25

1          MR. ZURBRIGGEN:  Object to form.
2      Officer, if you can.
3          THE WITNESS:  Sometimes these
4      numbers that are listed here, the address
5      markers on top of these buildings, aren't
6      exactly correct.  So we went by this.
7      Sometimes we could, you know, be off one or
8      two and have to adjust.  So we typically
9      have a frontal picture of the property so we
10      know we are all looking at the same house.
11  BY MR. WEST:
12      Q.  But if you look at the sky view, you can
13  see that there's a rear entrance to the property,
14  correct?
15          MR. ZURBRIGGEN:  Object to form, but
16      Officer, you can answer, if you can.
17          THE WITNESS:  It looks like a normal
18      row home to me.
19  BY MR. WEST:
20      Q.  And can you tell from this picture if
21  there is a rear entrance to these buildings?
22          MR. ZURBRIGGEN:  Same objection.
23      But Officer, you can answer.
24          THE WITNESS:  I can't tell from this

Electronically signed by Denise Weller (401-411-238-5399)                                    24e538e8-7293-44bb-9e29-d6fd979dfcbe

## Page 26

1    this photo if there is a door in the back of
2    that property.
3    BY MR. WEST:
4        Q.  Okay.  So I will represent to you that we
5    have had a deposition in this case of the
6    probation officer for ██████.  I have a
7    document.  It's been previously marked as Exhibit
8    Shannon-1.  Shannon was the name of the probation
9    officer.  We will mark this as Burkitt-5.
10           - - -
11           (Whereupon, Exhibit Burkitt-5 was
12       marked for identification.)
13           - - -
14   BY MR. WEST:
15       Q.  And sir, I am going to turn this document
16   to page 21.  I have a copy for you as well.  Page
17   21.  I have prehighlighted a portion of the entry
18   there for April 26th, 2019.  Actually, before you
19   look at that too much, I have a question.
20           In your experience, if someone is placed
21   on probation, will the probation officer normally
22   go out to the person's home to do an inspection?
23           MR. ZURBRIGGEN:  Object to form.
24       But Officer, if you know.

## Page 27

1        THE WITNESS:  I don't know what
2    probation officers do, no.
3    BY MR. WEST:
4        Q.  So in your training to do reconnaissance
5    as part of the SWAT unit, you don't know if a
6    probation officer would be a resource to explain
7    how to get into someone's home if that person is
8    on probation?
9        MR. ZURBRIGGEN:  Same objection.
10       But Officer, you can answer.
11       THE WITNESS:  So it's not -- these
12   things are something that a supervisor would
13   handle.  Typically detectives -- this is
14   information the detectives would -- are
15   supposed to garner and give to us.
16   BY MR. WEST:
17       Q.  So that is something --
18       A.  I can't say what a probation officer -- I
19   have no idea what they do.
20       Q.  I'm just trying to make sure -- I am not
21   trying to put words in your mouth.  I just want to
22   make sure I understand.
23           You have gone through the SWAT unit
24   training, you received reconnaissance training and

## Page 28

1    you don't personally know if a probation officer
2    normally would have information to provide you as
3    far as how to physically enter someone's home?
4        A.  No.
5        MR. ZURBRIGGEN:  Same objection.
6        THE WITNESS:  No.  I didn't say
7    anything like that.  I said I don't know
8    what the scope of their work -- does every
9    probation officer go out to every person's
10   house?  I don't know.  But I could see them,
11   yes, being a source in how to get into the
12   property.
13   BY MR. WEST:
14       Q.  Have you ever received any training as
15   part of the reconnaissance that you do for the
16   SWAT unit, if you have a suspect who is on
17   probation, whether or not you should contact the
18   probation officer to ask how to get into the
19   probation person's home?
20       MR. ZURBRIGGEN:  Same objection.
21       Officer, you can answer.
22       THE WITNESS:  That is something that
23   the detectives would do.
24       MR. WEST:  Okay.

## Page 29

1        THE WITNESS:  To my knowledge.  We
2    don't do that -- that is not what we do at
3    SWAT.
4    BY MR. WEST:
5        Q.  You've never received -- you personally
6    never received any such training, correct?
7        MR. ZURBRIGGEN:  Same objection.
8        THE WITNESS:  Yeah.  I never
9    received any training on getting in contact
10   with anyone, anyone's parole officer, no.
11   BY MR. WEST:
12       Q.  So just looking at the highlighted
13   section, you see on here that the probation and
14   parole office did an inspection of the property.
15   And specifically listed the location as second
16   floor apartment, rear entrance off of Margaret
17   Street, correct?
18       A.  Uh-huh.
19       Q.  You can see that?
20       A.  Yes.  I see what you highlighted, yes.
21       Q.  If we go back to the Google Map that we
22   marked as Burkitt-4.
23       A.  Yes.
24       Q.  So if you had this information in hand,

8 (Pages 26 to 29)

Page 30

1   second floor apartment, rear entrance off Margaret
2   Street and you looked at this map, would that give
3   you some sort of guidance as far as how to enter
4   this property?
5          MR. ZURBRIGGEN:  Object to form.
6   But Officer, you can answer, if you can.
7          THE WITNESS:  That would be a
8   supervisor's call to make.  But if I was
9   looking at the property, I mean, and I
10  had -- we had this information, we would
11  have to look back there and see.  Yes, we
12  have to check it out.  Or clarify with
13  detectives.  If I had that information, we
14  would probably be on the phone with
15  detectives verifying it.
16  BY MR. WEST:
17     Q.  Okay.  Right.  But looking at Burkitt-4,
18  you can see that -- you can see that it says
19  Margaret Street on this Google Map, correct?
20         MR. ZURBRIGGEN:  Object to form.
21  But Officer, you can answer.
22         THE WITNESS:  Yeah, I see that.
23  BY MR. WEST:
24     Q.  All right.  And you can see that Margaret

Page 31

1   Street leads to the rear -- the rear entrance of
2   these properties, correct?
3          MR. ZURBRIGGEN:  Same objection.
4   Officer, you can answer.
5          THE WITNESS:  Yes.  There's a
6   driveway off of Margaret Street that leads
7   to the back of these properties.
8   BY MR. WEST:
9      Q.  Okay.  So just using common sense, if the
10  information available to you was the search
11  warrant that says apartment two, second floor
12  rear, and you had the inspection records from the
13  probation parole office saying that you have to
14  enter the property through the rear entrance off
15  Margaret Street and you had this Google Map,
16  wouldn't you assume that the proper way to enter
17  ██████████ apartment is through the alleyway
18  off of Margaret Street?
19         MR. ZURBRIGGEN:  Same objection.
20  But officer, if you can answer it.
21         THE WITNESS:  If we had every single
22  piece of information that you have now, yes.
23  BY MR. WEST:
24     Q.  Okay.  As part of the reconnaissance

Page 32

1   training, did you ever receive any training as to
2   whether or not you should obtain property records
3   from the City of Philadelphia?
4          MR. ZURBRIGGEN:  Object to form.
5   But Officer, you can answer.
6          THE WITNESS:  No.
7   BY MR. WEST:
8      Q.  That is not part of the reconnaissance
9   that you guys do?
10         MR. ZURBRIGGEN:  Same objection.
11         THE WITNESS:  I never done that.
12         MR. WEST:  Okay.  Let's mark this as
13  Burkitt-6.
14                 - - -
15         (Whereupon, Exhibit Burkitt-6 was
16  marked for identification.)
17                 - - -
18  BY MR. WEST:
19     Q.  Sir, if you can take a moment to look at
20  this document that we marked as Burkitt-6 and let
21  me know if you can recognize what this is.
22     A.  I don't know.  I've never seen this
23  before.
24     Q.  You've never seen anything like this in

Page 33

1   your entire life?  You have no idea what this is
2   and you have no idea how to access it; is that
3   correct?
4          MR. ZURBRIGGEN:  Object to form.
5   But Officer, you can answer, if you can.
6          THE WITNESS:  I have no idea how to
7   access this and I don't know what this is.
8   BY MR. WEST:
9      Q.  All right.  So Officer Burkitt, I can
10  represent to you that this is publicly available
11  information from the City of Philadelphia website.
12  So the City of Philadelphia provides a website
13  where any member of the public can easily access
14  property records for every property in the City,
15  okay?
16     A.  Okay.
17         MR. ZURBRIGGEN:  Object to the
18  stating of the question.
19  BY MR. WEST:
20     Q.  And this is just a screen shot that we
21  took off the internet.  And you can see here that
22  the address is 4664 Torresdale Avenue, correct?
23         MR. ZURBRIGGEN:  Same objection.
24         THE WITNESS:  I can see that.

9 (Pages 30 to 33)

Page 34

BY MR. WEST:
1. Q. And you can see that the owner is listed
2. as Pajo Mirela. And I can represent to you that
3. there's plenty of records in this that indicate
4. that this SWAT unit was aware of the name of the
5. owner prior to the operation, okay?
6. A. Okay.
7. MR. ZURBRIGGEN: Same objection.
8. BY MR. WEST:
9. Q. And if you just look at this map on here,
10. you can see that according to this map from the
11. City of Philadelphia, the 4664 Torresdale Avenue
12. property has an entrance from Torresdale Avenue
13. and then also off Margaret Street, correct? You
14. can see that, correct?
15. MR. ZURBRIGGEN: Same objection.
16. THE WITNESS: I can't tell that from
17. this.
18. BY MR. WEST:
19. Q. Can you see Margaret Street?
20. MR. ZURBRIGGEN: Same objection.
21. THE WITNESS: I see Margaret Street,
22. yes. But there's nothing that indicates
23. that there's an entrance in the back of this

Page 35

1. property based off of this.
2. BY MR. WEST:
3. Q. Okay. Well, if you had the information
4. from the probation officer and you had this map in
5. hand, would you at least investigate to see if the
6. alleyway off of Margaret Street was an entrance
7. before -- before completing your reconnaissance?
8. MR. ZURBRIGGEN: Object to form.
9. Officer, go ahead.
10. THE WITNESS: So when we do a recon,
11. we do look at the back of the property. But
12. I remember this property looking like a
13. normal row home with a normal back door that
14. could have been just the back door to the
15. first floor apartment. And I don't know
16. anything about the owner, but people -- I
17. mean, the owner -- anyone can own a
18. building. Different people live in them.
19. BY MR. WEST:
20. Q. Uh-huh. Did you -- did you personally
21. see the rear door of the 4664 property?
22. A. Eventually, yes.
23. Q. Prior to entry.
24. A. I don't recall if it was on the recon

Page 36

1. sheet or not. It's possible that I did.
2. Q. Did you even know that the 4664
3. Torresdale Avenue property had a rear door prior
4. to entry?
5. A. It's possible that I did, yes.
6. Q. But you have no specific recollection of
7. that at this time, correct?
8. A. I would have to see the full recon sheet
9. that we made. I can't remember at the time if I
10. looked at that photo of the back door. I can't
11. say.
12. Q. But you have no specific recollection of
13. it right now, correct?
14. MR. ZURBRIGGEN: Objection. Go
15. ahead.
16. THE WITNESS: Right. The job was
17. some time ago. I don't know if -- when I
18. was flipping through my recon paper if I
19. looked at the back door of that property.
20. BY MR. WEST:
21. Q. Was there a briefing prior to the entry?
22. A. There was briefing.
23. Q. Who led the briefing?
24. A. I do not recall.

Page 37

1. Q. At the briefing, was anything said about
2. the rear door?
3. A. I can't recall.
4. Q. Not that you can recall today, correct?
5. A. Right.
6. Q. Do you recall if there was anything said
7. about -- at the briefing as to why the SWAT unit
8. was going to enter through the Torresdale Avenue
9. entrance, rather than the Margaret Street
10. entrance?
11. MR. ZURBRIGGEN: Object to form.
12. But Officer, if you know.
13. THE WITNESS: So -- so before
14. typically doing an apartment something
15. similar to this job, most of the time
16. there's a common entrance. And sometimes
17. we -- we are notified that it is a second
18. floor rear like this one does here.
19. And when you hit a door there's a
20. common entrance and there's an apartment to
21. the left. And there's stairs that lead up.
22. And there's a back bedroom which would be
23. the rear apartment. Or sometimes that is,
24. you know, one door. Or there's a front

10 (Pages 34 to 37)

Electronically signed by Denise Weller (401-411-238-5399)                                    24e538e8-7293-44bb-9e29-d6fd979dfcbe

Page 38

1   apartment on the second floor.
2         These things are just always
3   changing and always different.  Nothing is
4   consistent within the City.
5   BY MR. WEST:
6       Q.  Okay.  So why would that lead you to
7   enter through the Torresdale Avenue entrance
8   rather than the Margaret Street entrance?
9           MR. ZURBRIGGEN:  Object to form.
10      Officer?
11          THE WITNESS:  Typically people go in
12      through the front of the house.
13  BY MR. WEST:
14      Q.  Why?
15          MR. ZURBRIGGEN:  Same objection.
16          THE WITNESS:  I can't say why.  That
17      is just how we pretty much -- I mean, that's
18      how it's done most of the time.
19  BY MR. WEST:
20      Q.  Okay.
21      A.  I go in through my front door.
22      Q.  So you can see from the recon sheet and
23  the warrant that the property was specified as
24  being on the second floor of the building,

Page 39

1   correct?
2           MR. ZURBRIGGEN:  Object to form.
3       Officer?
4           THE WITNESS:  I can see that.
5   BY MR. WEST:
6       Q.  Okay.  And you said earlier that you
7   would rely upon Google Maps images of the front of
8   the building, correct?
9           MR. ZURBRIGGEN:  Objection.
10          THE WITNESS:  Uh-huh.
11          MR. WEST:  All right.  Let's mark
12      this as Exhibit 7.
13              - - -
14      (Whereupon, Exhibit Burkitt-7 was
15      marked for identification.)
16              - - -
17  BY MR. WEST:
18      Q.  Do you recognize what this is?
19      A.  Picture of the front of the property.
20      Q.  Of the 4664 Torresdale Avenue property,
21  right?
22      A.  Uh-huh.
23      Q.  And I can represent to you this was just
24  printed off Goggle Maps.  And the 4664 Torresdale

Page 40

1   Avenue property is the tan building in this
2   picture, correct?
3       A.  Yes.
4       Q.  Okay.  Sir, that tan -- you entered the
5   Torresdale Avenue entrance of this tan building,
6   correct, the front door that we can see in this
7   picture?
8       A.  Uh-huh.
9       Q.  Okay.  And you knew that the warrant was
10  only valid for the second floor property, correct?
11          MR. ZURBRIGGEN:  Object to form.
12      But officer?
13          THE WITNESS:  Correct.
14  BY MR. WEST:
15      Q.  Okay.  Sir, looking at this picture now,
16  can't you plainly see that that door led into a
17  room where there was no second floor?
18          MR. ZURBRIGGEN:  Object to form.
19      Officer, you can answer.
20          THE WITNESS:  No.  I can't tell that
21      from this photo.  I don't know what is
22      inside this property.
23          MR. WEST:  Okay.
24          THE WITNESS:  Looking at this photo.

Page 41

1   BY MR. WEST:
2       Q.  Can you see the tan building and the
3   front door?
4       A.  I see it, with the two mailboxes out
5   front.
6       Q.  Okay.
7       A.  The mailbox for both the floors out
8   front.
9       Q.  Right.  Now, the room behind that front
10  door, do you see any second floor above that?
11          MR. ZURBRIGGEN:  Object to form.
12      Officer?
13          THE WITNESS:  I do see the second
14      floor, yes.
15  BY MR. WEST:
16      Q.  Okay.  Can I see the exhibit?
17      A.  Sure.
18      Q.  I will use an orange highlighter.  All
19  right.  Officer Burkitt, can you see that I have
20  highlighted a portion of the building in orange?
21      A.  Uh-huh.
22      Q.  Do you want to see it?
23          MR. ZURBRIGGEN:  I see it.  I can
24      share it with the Officer.

11 (Pages 38 to 41)

Page 42

1    BY MR. WEST:
2        Q.  Just looking at this picture and using
3    common sense, can you see that if you enter
4    through that door you're going to enter the room
5    in the orange square?
6            MR. ZURBRIGGEN:  Object to form.
7        Officer, you can answer, if you can.
8            THE WITNESS:  So looking at this
9        photo, I don't know what's going to be
10       behind this door.  I don't know if it's
11       going to be a long hallway that leads to a
12       set of stairs with a wall separating me from
13       this apartment, that you're insinuating as
14       I'm supposed to know.
15           But no, I can't tell from this photo
16       what I am going to see when I hit this --
17       when we go into this door.
18   BY MR. WEST:
19       Q.  Right.  So if you can answer the question
20   that you're answered (sic).
21           Using common sense and looking at the
22   photograph, can you see that the area of the
23   property that you're going to enter, if you go
24   through that front door, is the area within the

Page 43

1    orange square?
2            MR. ZURBRIGGEN:  Object to form.
3        And asked and answered.
4    BY MR. WEST:
5        Q.  I'm not asking what is in there.  I'm
6    asking that's the area you're going to go through
7    the door, correct?
8            MR. ZURBRIGGEN:  Objection.
9        Officer, you can answer again.
10           THE WITNESS:  This is the front of
11       the property.  I know I am going to be
12       entering into the property if I go through
13       this door, yes.
14   BY MR. WEST:
15       Q.  Okay.  Is any portion of the property
16   within the orange square a two -- have two floors?
17           MR. ZURBRIGGEN:  Same objection.
18       Officer, you can answer.
19           THE WITNESS:  The property has two
20       floors.
21   BY MR. WEST:
22       Q.  Okay.  But the area within the orange
23   square is one floor, correct?
24           MR. ZURBRIGGEN:  Object as asked and

Page 44

1    answered.  And to the form.  Officer, you
2    can answer.
3            THE WITNESS:  I mean, it's the same
4        property.  To me looking at it, it looks
5        like it's -- I see what you are -- the point
6        you're trying to make.  But it's one
7        property.  There's two floors.
8    BY MR. WEST:
9        Q.  Okay.  So the other officers had no
10   trouble identifying this.  But just to make
11   sure -- I will ask a new question.
12           MR. ZURBRIGGEN:  Object to the
13       characterization of the officers' testimony.
14       But go ahead.
15   BY MR. WEST:
16       Q.  Your testimony is that you are a member
17   of the SWAT unit of the Philadelphia Police
18   Department, you received all of the training
19   available to you from the City of Philadelphia and
20   you're unable to tell if the area within the
21   orange square is one story?
22           MR. ZURBRIGGEN:  Object as asked and
23       answered, to the form.  Go ahead.  Officer,
24       answer again.

Page 45

1            THE WITNESS:  It's one property, two
2        stories.  That's how I see it.  It's not a
3        separate building.  I would consider it two
4        stories.
5    BY MR. WEST:
6        Q.  Did the property have multiple apartments
7    in it?
8            MR. ZURBRIGGEN:  Object to form.
9        Officer, if you understand you can answer.
10           THE WITNESS:  It was listed that it
11       had two -- a second apartment.
12   BY MR. WEST:
13       Q.  Okay.  So with the warrant that we have
14   identified in this deposition and marked as an
15   exhibit, were you allowed to enter any portion of
16   the 4664 Torresdale Avenue or were you only
17   allowed to enter a certain portion of the
18   property?
19           MR. ZURBRIGGEN:  Object to form.
20       Officer?
21           THE WITNESS:  We only had a ticket
22       for the second floor rear.
23   BY MR. WEST:
24       Q.  Okay.  So what, if any, precautions did

12 (Pages 42 to 45)

Page 46

1  you take to make sure that you only entered the
2  second floor rear apartment?
3            MR. ZURBRIGGEN:  Object to form.
4  Officer, you can answer.
5            THE WITNESS:  From my standpoint, we
6       reconned the job.  We looked at it.
7       Reconned the job, looked at it.  I mean, it
8       looks -- you never know what you're going to
9       get into.  Both mailboxes are out front.
10      That leads me to believe that this is a
11      stairwell that leads out to a hallway where
12      there would be -- someone would come and
13      collect their mail from the front of the
14      property.
15 BY MR. WEST:
16      Q.  Right.  So you have --
17      A.  I mean, we do the best we can.
18      Q.  Right.  So you have an actual inspection
19 of the property by the probation officer that says
20 you have to enter through the Margaret Street
21 entrance.  You have this picture from the
22 Torresdale Avenue --
23      A.  I didn't have that.
24            MR. ZURBRIGGEN:  Officer, let him --

Page 47

1            THE WITNESS:  I'm sorry.
2            MR. ZURBRIGGEN:  -- ask his
3       question.
4            THE WITNESS:  I'm sorry.
5            MR. ZURBRIGGEN:  I'm sorry.  I know
6       it's frustrating, but let him ask.
7            THE WITNESS:  No.  No.  I'm sorry
8       about that.
9            MR. WEST:  It's okay.
10 BY MR. WEST:
11      Q.  So you would agree that whoever did the
12 reconnaissance of this job had access to Google
13 Maps?
14      A.  I would agree with that.
15      Q.  And you would agree that whoever did
16 reconnaissance of this job, including detectives,
17 had the ability to call the probation officer and
18 ask if the apartment had been inspected, correct?
19            MR. ZURBRIGGEN:  Object to form.
20      Officer, you can answer.
21            THE WITNESS:  I don't know what
22      detectives do.  I mean, that is something
23      that we typically -- that's information that
24      we typically get from them in regards to if

Page 48

1  the suspect is on parole, if he has an ankle
2  monitor, if he has a parole officer.
3  BY MR. WEST:
4       Q.  All right, sir.  So if you had this
5  picture that we marked Burkitt-7 in hand --
6       A.  Uh-huh.
7       Q.  -- and this was the Torresdale entrance,
8  and you had the records from the probation officer
9  saying that the entrance to the second floor rear
10 apartment was in the Margaret Street entrance,
11 would you have sent the team in through the
12 Torresdale Avenue or the Margaret Street entrance?
13            MR. ZURBRIGGEN:  Object to form.
14      Officer, you can answer, if you can.
15            THE WITNESS:  I wouldn't send the
16      team anywhere, because I am not a
17      supervisor.
18 BY MR. WEST:
19      Q.  Okay.  Are you aware of any basis,
20 whatsoever, for the SWAT unit of which you are a
21 part, to have concluded that the Torresdale Avenue
22 entrance was the entrance into the second floor
23 rear apartment as opposed to the Margaret Street
24 entrance?

Page 49

1            MR. ZURBRIGGEN:  Object to form.
2       Officer, you can answer, if you can.
3            THE WITNESS:  So, on the recon sheet
4       it says apartment second floor.  To me, I
5       looked at this job when we -- I didn't go
6       and recon the job, but I looked at the
7       paperwork.
8            Like I said, we never know what we
9       are going to see behind the door.  Typically
10      in most common cases, there's a common
11      entryway.  So to me looking at this, the two
12      mailboxes out front just -- it's a two
13      story.  I would see it as, I mean, we were
14      going to go through the front door here.
15      This was going to be a common entryway and
16      we were going to proceed to either stairs or
17      another door that was going to lead us to
18      the property or to the second floor rear.
19 BY MR. WEST:
20      Q.  So you're saying even if you had known
21 that the probation officer specifically
22 memorialized that the entrance to the property was
23 through the Margaret Street entrance, you still
24 think it would have been reasonable to enter

Page 50

1    through Torresdale Avenue?
2         MR. ZURBRIGGEN:  Object to form.
3         THE WITNESS:  If we had this
4    information that you have now from the
5    probation officer, I am sure the supervisor
6    would have made the decision on how to
7    approach the property or gather more
8    information from detectives to better
9    specify the entrance to this location,
10   specifically the second floor rear.
11   BY MR. WEST:
12   Q.   So you're sure that if the supervisor had
13   known about the probation officer inspection
14   records, they would have considered if Margaret
15   Street was the proper entrance?
16        MR. ZURBRIGGEN:  Object to form.
17   Officer, you can answer.
18        THE WITNESS:  If -- I mean, yes, I
19   believe so if we had all of the information.
20   I don't know what information was privy to
21   the supervisors.  But I know it's typically
22   just a warrant that comes over.  And then we
23   go and do our own thing and we talk to
24   detectives and try to garner as much

Page 51

1    information as we can from them and
2    determine what is the best route to hit the
3    property, especially in a case like this
4    where there's a second floor.  But we are
5    pretty meticulous, but I do believe if he
6    had that information, yes, we would have
7    looked into going into the rear.
8    BY MR. WEST:
9    Q.   Okay.  Do you have any personal knowledge
10   as to why the supervisor on the 4664 Torresdale
11   Avenue job wouldn't have had that information?
12        MR. ZURBRIGGEN:  Object to form.
13   But Officer, you can answer, if you can.
14        THE WITNESS:  It would have to have
15   come from detectives.
16   BY MR. WEST:
17   Q.   Okay.
18   A.   All of the information that we get is
19   from detectives.
20   Q.   So assuming that the -- I just can
21   represent to you that the Torresdale entrance led
22   to apartment number one, which was a first floor
23   apartment.  And in fact, you're aware of that,
24   because you entered the property and you saw that

Page 52

1    someone lived there and it wasn't the suspect,
2    correct?
3    A.   Yes.
4    Q.   Were you legally allowed pursuant to that
5    warrant to enter the first floor apartment?
6         MR. ZURBRIGGEN:  Object to form.
7    Officer, you can answer if you can.
8         THE WITNESS:  Can you repeat the
9    question?
10   BY MR. WEST:
11   Q.   Sure.  You entered apartment number one
12   on the first floor, correct?
13   A.   Yes.
14   Q.   That was the apartment belonging to Ms.
15   Alvarado, correct?
16        MR. ZURBRIGGEN:  Object to form.
17   Officer, if you know.
18        THE WITNESS:  I mean, at the time I
19   didn't know whose it was.  And there was no
20   marking on the door that specified apartment
21   one or anything like that.  To me it looked
22   just like a normal door.  But yeah, we did
23   go into that -- into that door.
24   BY MR. WEST:

Page 53

1    Q.   Okay.  And you will agree that there were
2    no exigent circumstances for that entry, correct?
3         MR.ZURBRIGGEN:  Object to form.  But
4    Officer, if you know.
5         THE WITNESS:  Other than the fact
6    that we had a warrant for a homicide, no.
7    BY MR. WEST:
8    Q.   Right.  And the warrant was for the
9    second floor rear apartment, correct?
10        MR. ZURBRIGGEN:  Same objection.
11        THE WITNESS:  Yes.
12   BY MR. WEST:
13   Q.   Okay.  Legally, did you have any grounds
14   to enter apartment number one of 4664 Torresdale
15   Avenue, to your knowledge?
16        MR. ZURBRIGGEN:  Same objection.
17   But Officer, you can answer if you know.
18        THE WITNESS:  I mean, no.
19        MR. WEST:  Okay.  I have no further
20   questions.  Thank you very much.
21        MR. ZURBRIGGEN:  And I have no
22   questions.  So thank you, Officer.  I will
23   walk you out.
24        THE VIDEO OPERATOR:  We are going

Electronically signed by Denise Weller (401-411-238-5399)                                    24e538e8-7293-44bb-9e29-d6fd979dfcbe

Page 54

1  off the record at 10:57 a.m.
2       MR. ZURBRIGGEN:  Can we stay on the
3  record for one moment?  I'm sorry.
4       THE VIDEO OPERATOR:  Going back on
5  the record at 10:57 a.m.
6       MR. ZURBRIGGEN:  I do have to
7  designate.  I think the name ████████ was
8  mentioned during the deposition.  So I am
9  just designating for the record that portion
10 of the deposition is confidential under the
11 protective order.
12      MR. WEST:  Yeah.  No objection.
13      THE VIDEO OPERATOR:  We are going
14 off the record at 10:57 a.m.
15            - - -
16      (Whereupon, the videotaped
17 deposition concluded at 10:57 a.m.)
18            - - -
19
20
21
22
23
24

Page 56

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 55

1       C E R T I F I C A T I O N
        _ _ _ _ _ _ _ _ _ _ _ _ _
2
3
4       I hereby certify that the
5  proceedings and evidence noted are contained
6  fully and accurately in the notes taken by
7  me on the deposition of the above matter,
8  and that this is a correct transcript of the
9  same.
10
11
12
        DENISE WELLER
13      Shorthand Reporter
14
15            - - -
16
17
18      (The foregoing certification of this
19 transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24            - - -

15 (Pages 54 to 56)

**A**

**a.m** 1:16 5:6 9:8 54:1,5,14,17
**ability** 6:21 8:9 47:17
**able** 7:7
**academy** 10:13 10:15
**access** 33:2,7,13 47:12
**accommodating** 8:5
**accurate** 12:11 12:12 14:13
**accurately** 55:6
**actual** 46:18
**ADAM** 2:9
**Adam.zurbrig...** 2:12
**address** 5:2 10:19 15:22 16:8 20:4 25:4 33:22
**addresses** 17:5
**adjust** 25:8
**ago** 36:17
**agree** 47:11,14 47:15 53:1
**agreed** 4:4
**ahead** 23:22 35:9 36:15 44:14,23
**al** 1:6 4:21 5:9
**alleyway** 31:17 35:6
**allowed** 15:23 45:15,17 52:4
**Alvarado** 1:4 4:20 5:8,13 52:15
**American** 1:14 2:4
**and/or** 55:21
**ankle** 48:1
**answer** 6:20 7:3 8:12 16:23 17:23 18:24 20:23 21:7 25:16,23 27:10

28:21 30:6,21 31:4,20 32:5 33:5 40:19 42:7,19 43:9 43:18 44:2,24 45:9 46:4 47:20 48:14 49:2 50:17 51:13 52:7 53:17
**answered** 42:20 43:3 44:1,23
**anyone's** 29:10
**apartment** 17:12,13,18 18:6 19:11 20:17,21 23:11 29:16 30:1 31:11,17 35:15 37:14,20,23 38:1 42:13 45:11 46:2 47:18 48:10,23 49:4 51:22,23 52:5,11,14,20 53:9,14
**apartments** 18:8 18:9 45:6
**appear** 23:15
**apply** 55:19
**approach** 16:17 22:1 50:7
**approximately** 10:8
**approximation** 7:8,9,11 13:7
**April** 26:18
**Arch** 2:10
**area** 42:22,24 43:6,22 44:20
**asked** 6:20 43:3 43:24 44:22
**asking** 6:22 43:5 43:6
**assume** 31:16
**assuming** 51:20
**attorney** 2:7,12 6:17
**audio/video** 4:19

**available** 31:10 33:10 44:19
**Avenue** 10:19 13:13 19:9 23:4,11 33:22 34:12,13 36:3 37:8 38:7 39:20 40:1,5 45:16 46:22 48:12,21 50:1 51:11 53:15
**aware** 34:5 48:19 51:23

**B**

**back** 24:5 26:1 29:21 30:11 31:7 34:24 35:11,13,14 36:10,19 37:22 54:4
**barking** 12:2,5
**based** 6:19 35:1
**basic** 14:24
**basis** 48:19
**Bates** 22:12
**bedroom** 37:22
**behalf** 5:12
**believe** 9:18 11:6 11:18 14:17,19 15:4 20:1 21:11 23:7 46:10 50:19 51:5
**belonging** 52:14 ▉▉ 19:23 20:15,18 26:6 31:17 54:7
**best** 6:21 7:9 8:8 16:16 18:10 21:24 46:17 51:2
**better** 50:8
**bits** 24:8
**breached** 13:19
**breacher** 12:2
**breaching** 13:22 13:24 14:2,7
**break** 8:3

**briefing** 36:21 36:22,23 37:1 37:7
**Broad** 1:15 2:4 5:2
**building** 1:14 2:4 14:22 17:14,14 35:18 38:24 39:8 40:1,5 41:2,20 45:3
**buildings** 25:5 25:21
**Burkitt** 1:13 3:5 4:18 5:11,18 6:4,5,7 22:20 33:9 41:19
**Burkitt-1** 3:16 11:5,9 12:9
**Burkitt-2** 3:17 20:3,6
**Burkitt-3** 3:18 22:13,16
**Burkitt-4** 3:19 24:13,15 29:22 30:17
**Burkitt-5** 3:20 26:9,11
**Burkitt-6** 3:21 32:13,15,20
**Burkitt-7** 3:22 39:14 48:5

**C**

**C** 2:1 55:1,1
**call** 6:4,7 9:12 14:4 30:8 47:17
**called** 22:7
**caption** 5:7
**car** 14:13
**careful** 7:19
**case** 5:8 22:11 26:5 51:3
**cases** 49:10
**Center** 1:14 2:3 5:2
**certain** 17:13 45:17

**certification** 4:6 55:18
**certify** 55:4
**certifying** 55:22
**chance** 12:8
**changing** 38:3
**characterizati...** 44:13
**check** 30:12
**circumstances** 53:2
**City** 1:6 2:8 4:20 5:8 6:12 32:3 33:11,12,14 34:12 38:4 44:19
**clarify** 30:12
**coffee** 8:4
**collect** 46:13
**come** 46:12 51:15
**comes** 50:22
**coming** 9:5,7
**commencing** 1:16
**common** 1:1 4:22 5:9 31:9 37:16,20 42:3 42:21 49:10,10 49:15
**Commonwealth** 1:18
**complete** 23:15
**completing** 35:7
**computer** 17:4,5 17:5 21:21
**concluded** 48:21 54:17
**confidential** 54:10
**consider** 45:3
**considerate** 8:19
**considered** 50:14
**consistent** 12:4 38:4
**contact** 20:18 21:2,5 28:17 29:9

contacting 21:13
contained 55:5
control 55:21
conversation
  7:16,21
copy 26:16
correct 8:22
  10:15,23,24
  11:20,21 12:24
  13:1,4,20 14:9
  14:10,22,23
  15:23 16:21
  20:12 23:12
  25:6,14 29:6
  29:17 30:19
  31:2 33:3,22
  34:14,15 36:7
  36:13 37:4
  39:1,8 40:2,6
  40:10,13 43:7
  43:23 47:18
  52:2,12,15
  53:2,9 55:8
correctly 10:8
counsel 4:5
COUNTY 1:2
couple 24:7
court 1:1,22
  4:21 5:9 7:17
Courtney 4:24
create 22:5

D

D 3:1
date 5:5
dcr.diamond...
  1:24
decision 50:6
Defendants 2:12
defense 22:12
Denise 1:17 5:15
  55:12
Department 2:9
  10:10 18:15,21
  44:18
deposed 5:11
deposition 1:12
  4:18,19 5:6,12
  5:14 6:13

10:21 22:11,14
  26:5 45:14
  54:8,10,17
  55:7
described 16:15
description 3:14
  15:16,17,22
  16:9 21:23
designate 54:7
designating 54:9
detectives 18:4
  21:1,12 27:13
  27:14 28:23
  30:13,15 47:16
  47:22 50:8,24
  51:15,19
determine 51:2
DIAMOND
  1:22
different 35:18
  38:3
direct 55:21
distance 14:16
  14:19
District 9:21
docket 4:22 5:10
document 11:6
  11:14,15,16,18
  22:5,8,21 23:3
  26:7,15 32:20
documents 11:1
dog 11:19 12:2,5
  14:20
doing 18:1 20:14
  37:14
door 13:19 26:1
  35:13,14,21
  36:3,10,19
  37:2,19,24
  38:21 40:6,16
  41:3,10 42:4
  42:10,17,24
  43:7,13 49:9
  49:14,17 52:20
  52:22,23
Dozens 13:10
driveway 31:6
duly 5:19
duty 8:21

E

E 2:1,1 3:1 55:1
earlier 8:21 39:6
easily 33:13
eight 9:4
either 49:16
else's 17:19
employed 5:1
employment
  18:14,20
enforce 18:17
enforcing 15:20
entail 19:5
entails 16:6
  21:10
enter 15:23
  16:14 17:18
  28:3 30:3
  31:14,16 37:8
  38:7 42:3,4,23
  45:15,17 46:20
  49:24 52:5
  53:14
entered 14:21
  40:4 46:1
  51:24 52:11
entering 17:19
  19:8 43:12
entire 33:1
entrance 25:13
  25:21 29:16
  30:1 31:1,14
  34:13,24 35:6
  37:9,10,16,20
  38:7,8 40:5
  46:21 48:7,9
  48:10,12,22,22
  48:24 49:22,23
  50:9,15 51:21
entry 12:3,6
  13:18,21 14:17
  16:17 17:13
  18:11 19:10
  23:3 26:17
  35:23 36:4,21
  53:2
entryway 49:11
  49:15
equivalent 7:1

especially 51:3
ESQUIRE 2:3,9
estimate 7:9,11
  13:6
estimation 7:7
et 1:6 4:21 5:9
Eventually
  35:22
evidence 55:5
exactly 16:6
  25:6
EXAMINATI...
  5:22
examined 5:19
exhibit 11:9
  20:6 22:9,16
  24:15 26:7,11
  32:15 39:12,14
  41:16 45:15
EXHIBITS 3:13
exigent 53:2
experience
  26:20
explain 6:16
  17:12 27:6
eyes 22:3

F

F 55:1
fabrication 10:6
fabricator 10:4
fact 51:23 53:5
far 13:23 14:11
  18:16 20:20
  28:3 30:3
February 9:19
Felishatay 1:4
  5:13
figure 16:14,20
  17:18 18:10
File 3:20
filing 4:6
find 24:11
fine 4:15 6:15
  21:15
first 5:19 10:9
  10:10 12:16,17
  12:21 19:7
  35:15 51:22

52:5,12
flipping 36:18
floor 1:15 2:5,10
  5:3 20:12,17
  20:20 23:12
  29:16 30:1
  31:11 35:15
  37:18 38:1,24
  40:10,17 41:10
  41:14 43:23
  45:22 46:2
  48:9,22 49:4
  49:18 50:10
  51:4,22 52:5
  52:12 53:9
floors 41:7 43:16
  43:20 44:7
following 7:14
follows 5:20
forcible 12:3
foregoing 55:18
form 4:8,13 15:2
  15:24 16:22
  17:22 18:23
  20:22 23:21
  25:1,15 26:23
  30:5,20 32:4
  33:4 35:8
  37:11 38:9
  39:2 40:11,18
  41:11 42:6
  43:2 44:1,23
  45:8,19 46:3
  47:19 48:13
  49:1 50:2,16
  51:12 52:6,16
  53:3
formal 19:5
format 7:14
four 9:14,16
front 13:19
  24:22 37:24
  38:12,21 39:7
  39:19 40:6
  41:3,5,8,9
  42:24 43:10
  46:9,13 49:12
  49:14
frontal 25:9

**frustrating** 47:6
**full** 36:8
**fully** 21:10 55:6
**further** 53:19

**G**

**garner** 27:15
  50:24
**gather** 18:3,4
  50:7
**gestures** 7:20
**getting** 11:19
  14:20 29:9
**give** 6:18 7:7,8
  14:12 15:21
  27:15 30:2
**given** 10:23 12:3
**giving** 7:11
**glad** 8:16
**go** 6:15 7:22
  12:18 15:1
  16:21 17:8
  18:11,12 22:2
  23:22 26:22
  28:9 29:21
  35:9 36:14
  38:11,21 42:17
  42:23 43:6,12
  44:14,23 49:5
  49:14 50:23
  52:23
**Goggle** 39:24
**going** 8:8,20
  16:3 26:15
  37:8 42:4,9,11
  42:16,23 43:6
  43:11 46:8
  49:9,14,15,16
  49:17 51:7
  53:24 54:4,13
**Good** 6:1,2
**Google** 3:19,22
  24:10,19 29:21
  30:19 31:15
  39:7 47:12
**grounds** 53:13
**guess** 6:22 12:22
**guidance** 20:19
  30:3

**guy** 14:18
**guys** 14:4 19:20
  32:9

**H**

**Halligan** 14:6,7
  14:9
**hallway** 42:11
  46:11
**hand** 7:20 29:24
  35:5 48:5
**handle** 21:1,12
  27:13
**Handlin** 14:5
**head** 22:11
**hear** 12:1,5
**helps** 7:21
**highlight** 20:3
**highlighted**
  11:22,23 29:12
  29:20 41:20
**highlighter**
  41:18
**highlighting**
  11:15,24
**hired** 10:12
**hit** 37:19 42:16
  51:2
**hitting** 15:18
**home** 25:18
  26:22 27:7
  28:3,19 35:13
**homes** 18:7
**homicide** 15:5
  20:1 53:6
**hope** 8:9
**hours** 9:4,6,9,16
**house** 14:14
  25:10 28:10
  38:12

**I**

**idea** 27:19 33:1
  33:2,6
**identification**
  11:10 20:7
  22:17 24:16
  26:12 32:16
  39:15
**identified** 45:14

**identifying**
  44:10
**images** 39:7
**immediately**
  10:21
**incident** 10:17
**including** 47:16
**indicate** 34:4
**indicates** 34:23
**information**
  18:3 21:20
  23:19 24:2
  27:14 28:2
  29:24 30:10,13
  31:10,22 33:11
  35:3 47:23
  50:4,8,19,20
  51:1,6,11,18
**initiate** 12:3
**inside** 12:2,6
  40:22
**insinuating**
  42:13
**inspected** 47:18
**inspection** 26:22
  29:14 31:12
  46:18 50:13
**intended** 8:1
**internet** 33:21
**interview** 3:16
  11:7
**investigate** 35:5

**J**

**January** 9:19
**Jersey** 1:23
**job** 9:20 10:10
  12:17 17:1,2,3
  20:11,15 21:20
  23:8 36:16
  37:15 46:6,7
  47:12,16 49:5
  49:6 51:11
**jobs** 12:15 13:7
  16:12
**joined** 9:17 10:9
**joining** 12:21
**Josh** 6:5
**Joshua** 1:13 3:5

  4:18 5:11,18
**July** 10:18
**June** 1:4 10:18
  12:13

**K**

**KEITH** 2:3
**Keith@victim...**
  2:6
**Kensington** 10:4
**kind** 6:16 7:20
  24:19
**Kitcherman**
  4:24
**knew** 20:15,17
  40:9
**know** 6:19 7:4,4
  7:6,6,8,10,20
  8:4,7,11,12,20
  15:14 16:1,2,7
  16:8,10 19:4,4
  19:9 21:9
  22:21 25:7,10
  26:24 27:1,5
  28:1,7,10
  32:21,22 33:7
  35:15 36:2,17
  37:12,24 40:21
  42:9,10,14
  43:11 46:8
  47:5,21 49:8
  50:20,21 52:17
  52:19 53:4,17
**knowledge** 7:10
  29:1 51:9
  53:15
**known** 49:20
  50:13

**L**

**labeled** 18:9
**Lane** 1:22
**large** 12:2
**Law** 1:13 2:3,9
  5:1
**lead** 37:21 38:6
  49:17
**leads** 31:1,6
  42:11 46:10,11
**led** 36:23 40:16

  51:21
  ▮▮ 19:23 20:15
  20:18 26:6
  54:7
  ▮▮ 31:17
**left** 37:21
**legally** 52:4
  53:13
**length** 14:13
**Let's** 19:19
  32:12 39:11
**life** 33:1
**line** 20:4
**listed** 25:4 29:15
  34:2 45:10
**live** 35:18
**lived** 20:16 52:1
**location** 12:4
  15:5,17 17:4,9
  23:11 29:15
  50:9
**long** 9:2,3,11,22
  42:11
**look** 12:10 15:11
  15:18 16:19
  17:8 19:14
  22:2,20 24:10
  25:12 26:19
  30:11 32:19
  34:10 35:11
**looked** 10:22
  30:2 36:10,19
  46:6,7 49:5,6
  51:7 52:21
**looking** 20:10
  25:10 29:12
  30:9,17 35:12
  40:15,24 42:2
  42:8,21 44:4
  49:11
**looks** 25:17 44:4
  46:8
**lot** 7:16 8:20
  18:7
**louder** 8:13

**M**

**mail** 46:13
**mailbox** 41:7

**mailboxes** 41:4
46:9 49:12
**Mantua** 1:23
**map** 3:19,22
24:6,19 29:21
30:2,19 31:15
34:10,11 35:4
**Maps** 24:10 39:7
39:24 47:13
**Margaret** 29:16
30:1,19,24
31:6,15,18
34:14,20,22
35:6 37:9 38:8
46:20 48:10,12
48:23 49:23
50:14
**mark** 11:5 20:2
22:13 24:13
26:9 32:12
39:11
**marked** 11:10
11:16 20:7
22:9,17 24:16
26:7,12 29:22
32:16,20 39:15
45:14 48:5
**markers** 25:5
**marking** 52:20
**matter** 4:20 55:7
**mean** 4:12 30:9
35:17 38:17
44:3 46:7,17
47:22 49:13
50:18 52:18
53:18
**means** 55:20
**member** 6:9
33:13 44:16
**memorialized**
49:22
**mentioned** 54:8
**metal** 10:6
**meticulous** 51:5
**mind** 6:6
**Mirela** 34:3
**mock-up** 12:19
**moment** 32:19
54:3

**monitor** 48:2
**morning** 6:1,2
**mouth** 18:6
27:21
**MR.ZURBRI...**
53:3
**multi-residence**
17:14 18:17
**multiple** 7:2,2
45:6

————————
**N**
————————
**N** 2:1 3:1 55:1
**name** 4:24 19:19
19:22 22:4
26:8 34:5 54:7
**Negative** 6:14
**never** 21:10 29:5
29:6,8 32:11
32:22,24 46:8
49:8
**new** 1:23 44:11
**night** 9:12
**normal** 25:17
35:13,13 52:22
**normally** 7:21
9:3 21:15 23:7
23:18 24:9,10
24:20 26:21
28:2
**North** 1:14 2:4
**Notary** 1:18
**noted** 55:5
**notes** 3:20 55:6
**notified** 37:17
**number** 4:22
5:10 51:22
52:11 53:14
**numbers** 25:4

————————
**O**
————————
**O** 55:1
**Object** 15:2,24
16:22 17:22
18:23 20:22
23:21 25:1,15
26:23 30:5,20
32:4 33:4,17
35:8 37:11
38:9 39:2

40:11,18 41:11
42:6 43:2,24
44:12,22 45:8
45:19 46:3
47:19 48:13
49:1 50:2,16
51:12 52:6,16
53:3
**objection** 21:6
25:22 27:9
28:5,20 29:7
31:3,19 32:10
33:23 34:8,16
34:21 36:14
38:15 39:9
43:8,17 53:10
53:16 54:12
**objections** 4:7
4:12
**obligation** 6:18
**observe** 17:1
**obtain** 32:2
**obviously** 18:10
**occurred** 10:18
**office** 29:14
31:13
**officer** 1:12 3:5
4:18 5:11,14
5:18 6:3,3,4,5
6:7 9:22 10:3
10:11 14:8,8
15:3 16:1,23
17:23 18:24
20:19,23 21:7
21:9 22:20
25:2,16,23
26:6,9,21,24
27:6,10,18
28:1,9,18,21
29:10 30:6,21
31:4,20 32:5
33:5,9 35:4,9
37:12 38:10
39:3 40:12,19
41:12,19,24
42:7 43:9,18
44:1,23 45:9
45:20 46:4,19
46:24 47:17,20

48:2,8,14 49:2
49:21 50:5,13
50:17 51:13
52:7,17 53:4
53:17,22
**officers** 14:3,21
17:7 27:2 44:9
**officers'** 44:13
**officially** 12:22
**okay** 4:16 6:6,8
6:23,24 7:4,12
7:13,23,24 8:5
8:14,17,18 9:2
9:5,11,15,20
10:5,17 11:5
11:18 12:8,13
12:20 13:6,12
13:23 15:8,20
16:12,18 17:11
18:19 19:3,13
19:15,22 20:2
21:4 22:8 23:6
23:10,24 24:4
24:9,13,23
26:4 28:24
30:17 31:9,24
32:12 33:15,16
34:6,7 35:3
38:6,20 39:6
40:4,9,15,23
41:6,16 43:15
43:22 44:9
45:13,24 47:9
48:19 51:9,17
53:1,13,19
**on-line** 18:4
**operation** 34:6
**operator** 4:23
53:24 54:4,13
**opposed** 48:23
**option** 7:2
**Oral** 1:12
**orange** 41:18,20
42:5 43:1,16
43:22 44:21
**order** 12:3 16:13
16:18 54:11
**outside** 14:14
**owner** 34:2,6

35:16,17

————————
**P**
————————
**P** 2:1,1
**p.m** 9:1
**PA** 2:5,11
**page** 3:3,14
26:16,16
**Pajo** 34:3
**paper** 36:18
**paperwork**
19:17 49:7
**parole** 21:2,13
29:10,14 31:13
48:1,2
**part** 11:23 12:17
12:20,22,23
13:3,18,21
16:13,18 17:16
17:20 18:14,20
21:4 27:5
28:15 31:24
32:8 48:21
**partial** 7:10
**particular** 19:11
23:2
**particularly**
17:7
**patrol** 9:21,22
9:23 10:1 21:9
**Pennsylvania**
1:2,16,19 5:3
**people** 35:16,18
38:11
**perfectly** 7:15
**performed** 5:7
**person** 5:7 27:7
**person's** 26:22
28:9,19
**personal** 51:9
**personally** 6:19
28:1 29:5
35:20
**Philadelphia** 1:2
1:6,15 2:5,8,11
4:21,21 5:3,9
6:12 10:9,14
18:15,21 32:3
33:11,12 34:12

44:17,19
**phone** 30:14
**photo** 26:1
36:10 40:21,24
42:9,15
**photograph**
42:22
**physical** 15:21
16:9 21:23
**physically** 13:23
15:11 28:3
**picture** 24:6,11
24:22,23 25:9
25:20 39:19
40:2,7,15 42:2
46:21 48:5
**pictures** 11:2
21:21
**piece** 31:22
**placed** 26:20
**plainly** 40:16
**Plaintiff** 2:7
5:13
**play** 13:12
**Pleas** 1:1 4:22
5:9
**please** 6:20 7:8
8:11
**plenty** 34:4
**point** 44:5
**police** 4:18 10:3
10:9,10,14
18:15,21 44:17
**portion** 26:17
41:20 43:15
45:15,17 54:9
**possible** 8:5 36:1
36:5
**practice** 23:18
**precautions**
45:24
**precisely** 9:17
**prehighlighted**
26:17
**prepare** 11:2
**pretty** 38:17
51:5
**previously** 10:23
22:9 26:7

**printed** 39:24
**prior** 9:20 10:21
12:6,13 14:20
19:8 23:3 34:6
35:23 36:3,21
**privy** 50:20
**probably** 30:14
**probation** 20:18
20:19 26:6,8
26:21,21 27:2
27:6,8,18 28:1
28:9,17,18,19
29:13 31:13
35:4 46:19
47:17 48:8
49:21 50:5,13
**proceed** 49:16
**proceedings** 4:2
55:5
**process** 6:16 8:2
**Professional**
1:17
**proper** 31:16
50:15
**properties** 17:20
31:2,7
**property** 3:21
10:18 12:6,19
13:14,20 15:1
15:17,22 16:10
16:14,17 17:19
18:2,17 19:9
21:19,21,22,23
22:2 24:6,7,11
24:22,24 25:9
25:13 26:2
28:12 29:14
30:4,9 31:14
32:2 33:14,14
34:13 35:1,11
35:12,21 36:3
36:19 38:23
39:19,20 40:1
40:10,22 42:23
43:11,12,15,19
44:4,7 45:1,6
45:18 46:14,19
49:18,22 50:7
51:3,24

**protective** 54:11
**provide** 28:2
**provides** 33:12
**public** 1:18
33:13
**publicly** 33:10
**pull** 17:3 21:20
**purposes** 11:23
**pursuant** 52:4
**put** 22:2 27:21

———————
**Q**
**question** 4:13
6:20 7:3 8:10
8:13,14,16
13:17 14:1,24
15:9 26:19
33:18 42:19
44:11 47:3
52:9
**questions** 4:8
8:7 53:20,22
**quick** 11:14
22:21
**quickly** 6:15
**quieter** 8:14

———————
**R**
**R** 2:1 55:1
**ram** 14:3,8
**read** 10:22 18:21
**reading** 19:6
**reads** 17:3
**real** 11:14 22:21
**really** 14:12
19:17
**reanswer** 8:16
**rear** 20:12,17,20
23:12 25:13,21
29:16 30:1
31:1,1,12,14
35:21 36:3
37:2,18,23
45:22 46:2
48:9,23 49:18
50:10 51:7
53:9
**reason** 8:11
**reasonable**
49:24

**recall** 13:23
19:12,19,21,23
22:10 23:6
35:24 36:24
37:3,4,6
**receive** 32:1
**received** 12:21
18:16,19 27:24
28:14 29:5,6,9
44:18
**recognize** 22:22
32:21 39:18
**recollection** 12:5
36:6,12
**recon** 3:18 12:17
12:19 13:7,13
18:1 21:16
22:7 23:1,15
35:10,24 36:8
36:18 38:22
49:3,6
**reconnaissance**
12:14,24 13:3
16:12,19 17:11
17:16 20:14
21:4 27:4,24
28:15 31:24
32:8 35:7
47:12,16
**reconned** 12:15
46:6,7
**reconning** 17:2
21:19
**record** 3:16 7:22
11:6 54:1,3,5,9
54:14
**records** 31:12
32:2 33:14
34:4 48:8
50:14
**Recovery** 1:13
2:3 5:1
**Redbud** 1:22
**regards** 47:24
**rely** 39:7
**remember** 9:16
19:18 35:12
36:9
**repeat** 52:8

**rephrase** 8:13
8:14
**reporter** 1:17
7:17 55:13,22
**REPORTING**
1:22
**represent** 19:22
26:4 33:10
34:3 39:23
51:21
**reproduction**
55:20
**reserved** 4:8,13
**resource** 27:6
**responses** 7:23
**review** 11:13
12:8
**reviewed** 11:1
11:16
**right** 6:3,9,10,12
7:5 8:6 9:5,6,9
10:11,17 11:13
13:2,16 14:15
16:24 18:14
19:8 20:10
24:9 30:17,24
33:9 36:13,16
37:5 39:11,21
41:9,19 42:19
46:16,18 48:4
53:8
**role** 13:13 21:16
**room** 10:20
40:17 41:9
42:4
**route** 51:2
**row** 25:18 35:13

———————
**S**
**S** 2:1
**Saba's** 22:14
**safest** 16:16
**saw** 10:20 51:24
**saying** 31:13
48:9 49:20
**says** 11:18 12:1
20:11 23:10
30:18 31:11
46:19 49:4

**scope** 28:8
**screen** 33:20
**sealing** 4:6
**search** 3:17,21
  20:2,11 31:10
**second** 14:17,18
  20:12,17,20
  23:11 29:15
  30:1 31:11
  37:17 38:1,24
  40:10,17 41:10
  41:13 45:11,22
  46:2 48:9,22
  49:4,18 50:10
  51:4 53:9
**section** 29:13
**see** 19:19 20:11
  23:10,14 24:10
  25:13 28:10
  29:13,19,20
  30:11,18,18,22
  30:24 33:21,24
  34:2,11,15,20
  34:22 35:5,21
  36:8 38:22
  39:4 40:6,16
  41:2,4,10,13
  41:16,19,22,23
  42:3,16,22
  44:5 45:2 49:9
  49:13
**seeing** 23:6
**seen** 15:8,10
  21:11 23:2
  32:22,24
**send** 48:15
**sense** 22:6 31:9
  42:3,21
**sent** 48:11
**separate** 45:3
**separating**
  42:12
**September** 1:9
  5:5
**serving** 15:5
**set** 42:12
**Shannon** 26:8
**Shannon-1** 26:8
**share** 41:24

**sheet** 3:18 10:4,6
  21:22 22:7
  23:1,15 36:1,8
  38:22 49:3
**shift** 8:24 9:1,12
**shifts** 9:2
**shop** 10:4
**Shorthand** 1:17
  55:13
**shot** 11:20 14:20
  33:20
**sic** 42:20
**signing** 4:5
**similar** 7:16
  37:15
**similarly** 8:7
**single** 31:21
**sir** 6:11 20:10
  26:15 32:19
  40:4,15 48:4
**sitting** 10:20
**sky** 25:12
**someone's** 27:7
  28:3
**sorry** 23:23 47:1
  47:4,5,7 54:3
**sort** 30:3
**sound** 14:24
**source** 28:11
**South** 1:14 2:4
  5:2
**speak** 7:19 8:13
**specific** 16:7
  17:18 36:6,12
**specifically** 23:6
  29:15 49:21
  50:10
**specified** 19:10
  19:16 38:23
  52:20
**specifies** 17:13
**specify** 50:9
**speculate** 6:22
**spoken** 7:23
**square** 42:5 43:1
  43:16,23 44:21
**stacked** 14:14
**stairs** 37:21
  42:12 49:16

**stairwell** 46:11
**stamped** 22:12
**standpoint** 46:5
**start** 8:24 12:16
**started** 9:1
**statement** 10:22
**stating** 33:18
**stay** 54:2
**stipulated** 4:4
**stipulations** 4:11
**stories** 21:24
  45:2,4
**story** 44:21
  49:13
**Street** 1:15 2:4
  2:10 5:2 29:17
  30:2,19 31:1,6
  31:15,18 34:14
  34:20,22 35:6
  37:9 38:8
  46:20 48:10,12
  48:23 49:23
  50:15
**strike** 13:16 14:1
  15:9
**supervision**
  55:22
**supervisor** 16:3
  16:4,24 17:2,8
  19:7 21:10
  27:12 48:17
  50:5,12 51:10
**supervisor's**
  30:8
**supervisors**
  50:21
**supposed** 7:3
  16:21 18:8,12
  19:5,10 27:15
  42:14
**sure** 7:15,22
  10:7 16:6
  27:20,22 41:17
  44:11 46:1
  50:5,12 52:11
**suspect** 19:20
  20:16 28:16
  48:1 52:1
**suspected** 19:23

**SWAT** 6:10
  9:13,17,18
  12:14,17,21,23
  13:3 16:13,20
  17:17 21:9
  27:5,23 28:16
  29:3 34:5 37:7
  44:17 48:20
**swear** 5:15
**sworn** 5:19

─────────
**T**

**T** 55:1,1
**take** 8:3 13:12
  32:19 46:1
**taken** 1:13 5:12
  55:6
**talk** 50:23
**tan** 40:1,4,5 41:2
**team** 6:10 13:18
  13:21,24 14:3
  14:7,18,18
  48:11,16
**TECHNICIAN**
  4:17
**tell** 13:9 25:20
  25:24 34:17
  40:20 42:15
  44:20
**TERM** 1:4
**terms** 15:16 17:2
**test** 7:2
**testified** 5:20
**testimony** 6:19
  11:3 44:13,16
**thank** 53:20,22
**thing** 7:20 23:16
  50:23
**things** 16:7
  27:12 38:2
**think** 10:8 12:10
  18:1 19:17
  22:13 23:16
  49:24 54:7
**ticket** 45:21
**time** 4:9,14 5:16
  6:22 7:19 8:3
  8:20,24 12:1
  36:7,9,17

37:15 38:18
  52:18
**today** 5:11 6:18
  8:21 37:4
**today's** 5:5
  10:21 11:3
**tool** 14:5,9
**top** 22:10 23:10
  24:23 25:5
**Torresdale**
  10:19 13:13,19
  19:9 23:3,11
  33:22 34:12,13
  36:3 37:8 38:7
  39:20,24 40:5
  45:16 46:22
  48:7,12,21
  50:1 51:10,21
  53:14
**training** 12:18
  12:20,23 18:16
  18:20 19:6
  27:4,24,24
  28:14 29:6,9
  32:1,1 44:18
**transcript** 55:8
  55:19
**trial** 4:9,14,20
**trouble** 8:17
  44:10
**truthful** 6:18
**truthfully** 6:20
**try** 8:4,19 18:2
  20:19 50:24
**trying** 17:24
  19:20 27:20,21
  44:6
**turn** 26:15
**two** 9:23 14:3
  17:7 25:8
  31:11 41:4
  43:16,16,19
  44:7 45:1,3,11
  49:11,12
**typically** 18:2
  24:1,21,21
  25:8 27:13
  37:14 38:11
  47:23,24 49:9

50:21

**U**

**Uh-huh** 8:15
  10:2 15:12
  20:13 21:18
  22:23 29:18
  35:20 39:10,22
  40:8 41:21
  48:6
**unable** 44:20
**uncomfortable**
  8:2
**understand** 7:15
  8:9,11 10:7
  27:22 45:9
**understanding**
  8:17 14:2
  17:17
**Unfortunately**
  22:10
**unit** 9:17,18
  12:14,17,22,23
  13:3 16:13,20
  17:17,19 27:5
  27:23 28:16
  34:5 37:7
  44:17 48:20
**unnecessarily**
  8:2
**use** 4:19 24:20
  24:23 41:18
**usual** 4:11
**usually** 15:21

**V**

**valid** 40:10
**vary** 9:4
**verify** 17:4
**verifying** 30:15
**versus** 4:20 5:8
**Victims'** 1:13
  2:3 5:1
**video** 4:23 11:2
  53:24 54:4,13
**Videotape** 1:12
  4:17
**videotaped**
  54:16
**view** 25:12

**vs** 1:5

**W**

**waived** 4:7
**walk** 53:23
**wall** 14:14 42:12
**want** 7:6 8:2,3
  9:19 27:21
  41:22
**warrant** 3:17
  15:5,6,8,10,11
  15:14,19,21
  16:4,6,15,20
  17:1,3,6,12,13
  17:21 18:17,22
  19:4,6,10 20:1
  20:2,11,16
  31:11 38:23
  40:9 45:13
  50:22 52:5
  53:6,8
**wasn't** 52:1
**water** 8:3
**way** 16:16 31:16
**ways** 7:17
**website** 33:11,12
**WEDNESDAY**
  1:9
**Weller** 1:17 5:15
  55:12
**went** 9:18 10:12
  13:21 25:6
**West** 2:3 3:6
  4:11,16 5:24
  11:12 15:7
  16:11 17:10
  18:13 19:2
  20:9 21:3,14
  22:19 24:3,18
  25:11,19 26:3
  26:14 27:3,16
  28:13,24 29:4
  29:11 30:16,23
  31:8,23 32:7
  32:12,18 33:8
  33:19 34:1,9
  34:19 35:2,19
  36:20 38:5,13
  38:19 39:5,11

39:17 40:14,23
  41:1,15 42:1
  42:18 43:4,14
  43:21 44:8,15
  45:5,12,23
  46:15 47:9,10
  48:3,18 49:19
  50:11 51:8,16
  52:10,24 53:7
  53:12,19 54:12
**whatsoever**
  48:20
**windows** 21:24
**witness** 3:3 5:10
  5:16 11:19
  15:4 16:2,24
  17:24 19:1
  20:24 21:8
  23:23 24:1
  25:3,17,24
  27:1,11 28:6
  28:22 29:1,8
  30:7,22 31:5
  31:21 32:6,11
  33:6,24 34:17
  34:22 35:10
  36:16 37:13
  38:11,16 39:4
  39:10 40:13,20
  40:24 41:13
  42:8 43:10,19
  44:3 45:1,10
  45:21 46:5
  47:1,4,7,21
  48:15 49:3
  50:3,18 51:14
  52:8,18 53:5
  53:11,18
**word** 18:5
**words** 27:21
**work** 9:3 28:8
**worked** 10:3
**wouldn't** 21:5
  31:16 48:15
  51:11
**write** 7:18
**written** 7:22

**X**

**X** 3:1

**Y**

**yeah** 6:4 16:16
  29:8 30:22
  52:22 54:12
**years** 9:14,23

**Z**

**ZURBRIGGEN**
  2:9 4:15 15:2
  15:24 16:22
  17:22 18:23
  20:22 21:6
  23:21,24 25:1
  25:15,22 26:23
  27:9 28:5,20
  29:7 30:5,20
  31:3,19 32:4
  32:10 33:4,17
  33:23 34:8,16
  34:21 35:8
  36:14 37:11
  38:9,15 39:2,9
  40:11,18 41:11
  41:23 42:6
  43:2,8,17,24
  44:12,22 45:8
  45:19 46:3,24
  47:2,5,19
  48:13 49:1
  50:2,16 51:12
  52:6,16 53:10
  53:16,21 54:2
  54:6

**0**

**08051** 1:23

**1**

**10:10** 1:16
**10:13** 5:6
**10:57** 54:1,5,14
  54:17
**11** 3:16
**11:00** 9:1,8
**12** 9:6,9
**121** 1:14 2:4 5:2
**14th** 2:10
**1515** 2:10

**1633** 1:6
**18th** 1:15 2:5
  5:3
**19102** 2:11
**19107** 2:5 5:4

**2**

**20** 1:9 3:17
**2017** 10:12,13
**2018** 10:9
**2019** 26:18
**2020** 9:19
**2021** 10:18
  12:13
**2022** 1:4
**2023** 1:9
**20th** 5:5
**21** 26:16,17
**215** 2:6,11
**22** 3:18
**220601633** 4:22
  5:10
**24** 3:19
**24th** 9:21
**26** 3:20
**26th** 26:18
**292-4292** 1:23

**3**

**3** 22:9
**32** 3:21
**39** 3:22

**4**

**406** 1:22
**4664** 10:19
  13:13,19 19:9
  23:3,11 33:22
  34:12 35:21
  36:2 39:20,24
  45:16 51:10
  53:14
**4th** 10:18 12:13

**5**

**546-1433** 2:6

**6**

**6** 3:6
**683-5114** 2:11

**7**

**7** 39:12
**72** 22:12
**73** 22:12

**8**

**856** 1:23

# EXHIBIT "R"

# Transcript of the Testimony of:
# **Jose Hamoy**

**Date:** August 17, 2023

**Case:** FELISHATAY ALVARADO v. City of Philadelphia, et al.

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

## Page 1

IN THE COURT OF COMMON PLEAS
FOR PHILADELPHIA COUNTY, PENNSYLVANIA

- - -

FELISHATAY ALVARADO,   : JUNE TERM, 2022
                   :
     Plaintiff,   : NO. 01633
                   :
   vs.           :
                   :
CITY OF PHILADELPHIA,   :
et al.,           :
                   :
     Defendants.   :

- - -

August 17, 2023

- - -

Videotape deposition of OFFICER
JOSE HAMOY, taken pursuant to Notice at
VICTIMS' RECOVERY LAW CENTER, 121 South
Broad Street, 18th Floor, Philadelphia, PA
19107, beginning at 10:10 a.m., before
Candace Weindel, a Professional Reporter and
a Notary Public in and for the Commonwealth
of Pennsylvania.

- - -

DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 589-1107

## Page 2

```
 1   APPEARANCES:
 2
 3   VICTIMS' RECOVERY LAW CENTER
     BY:  KEITH WEST, ESQUIRE
 4   121 South Broad Street
     18th Floor
 5   Philadelphia, PA 19107
     (215) 546-1433
 6   Keith@victimrecoverylaw.com
     Representing the Plaintiff
 7
 8
 9   CITY OF PHILADELPHIA LAW DEPARTMENT
     BY:  ADAM R. ZURBRIGGEN, ESQUIRE
10   1515 Arch Street
     14th Floor
11   Philadelphia, PA 19102
     (352) 214-0377
12   Adam.Zurbriggen@phila.gov
     Representing the Defendants
13
14
            - - -
15
     ALSO PRESENT:
16
     Nimai Shukla, Videotape Operator
17
            - - -
18
19
20
21
22
23
24
```

## Page 3

```
 1              I N D E X
 2   WITNESS                      PAGE
 3   OFFICER JOSE HAMOY
 4   Examination By Mr. West          5
 5   Examination By Mr. Zurbriggen   69
 6
 7
 8           E X H I B I T S
 9   NO.        DESCRIPTION       PAGE
10
11   Hamoy-1    Search Warrant      49
12   Hamoy-2    Google Maps Image   64
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1        (It is agreed by and between
 2   counsel for the respective parties that
 3   reading, signing, sealing, certification
 4   and filing are waived; and that all
 5   objections, except as to the form of the
 6   question, are reserved until the time of
 7   trial.)
 8           - - -
 9        THE VIDEOTAPE OPERATOR:  This is
10   the audio/video deposition for use at
11   trial in the matter of Alvarado V. City
12   of Philadelphia, et al., Philadelphia
13   Court of Common Pleas, Docket Number
14   220601633.  And I am the video operator.
15        My name is Nimai Shukla, and I am
16   employed by the Victims' Recovery Law
17   Center.  My address is 121 South Broad
18   Street, 18th Floor, Philadelphia,
19   Pennsylvania 19107.
20        Today's date is August 17, 2023 at
21   10:10 a.m.  This deposition is being
22   performed in person.  The caption of
23   this case is Alvarado V. City of
24   Philadelphia, et al., Philadelphia Court
```

Electronically signed by Candace Weindel (601-298-573-1229)         2a62302a-8ff0-4b5f-afd8-b390790a1e34

Page 5

1    of Common Pleas, Docket Number
2    220601633.
3         The witness being deposed today is
4    Officer Jose Hamoy, Badge Number 2987.
5         THE WITNESS:  84.
6         THE VIDEOTAPE OPERATOR:  2984.
7    Sorry.
8         This deposition is being taken on
9    behalf of the plaintiff, Felishatay
10   Alvarado.  The officer taking this
11   deposition is Candace Weindel.  She
12   shall swear the witness in at this time:
13        - - -
14        OFFICER JOSE HAMOY, after having
15   been first duly sworn, was examined and
16   testified as follows:
17        - - -
18        EXAMINATION
19        - - -
20   BY MR. WEST:
21        Q.    All right.  Good morning, Officer.
22   It's officer currently; right?
23        A.    Yeah.  Good morning.  Yeah.
24        Q.    Good morning, Officer Hamoy.  My

Page 6

1    name is Keith West.  I'm one of the attorneys
2    representing the plaintiff in this case, Ms.
3    Alvarado.
4         Is this -- have you ever been in a
5    deposition before?
6         A.    No.  This is my first time
7    actually.
8         Q.    This is your first deposition.
9    Okay.
10        Did you have a chance to review any
11   documents in preparation for your testimony today?
12        A.    A few months ago, but I haven't
13   seen it since then.
14        Q.    Okay.  Can you just tell me what
15   you reviewed?
16        A.    Just the -- the service report that
17   we have at the headquarters as well as the -- the
18   reconnaissance sheets that we have.
19        Q.    The service report, reconnaissance.
20        Did you also review your prior
21   statement?
22        A.    Not -- no, not that I know.
23        Q.    You don't believe so?
24        A.    No.

Page 7

1         Q.    Okay.  And you're represented by
2    counsel today.  You're prepared to testify;
3    correct?
4         A.    Yup.
5         Q.    Okay.  These are just like standard
6    questions.  Don't read anything into it.
7         Are you under the influence any
8    sort of medication, substance, illness, anything
9    that would impair your ability to testify
10   truthfully today?
11        A.    No.
12        Q.    Just a few ground rules for how we
13   usually do depositions.  You are already doing
14   fine.  But it's in many ways like a normal
15   conversation except the court reporter needs to
16   write down everything we say.
17        A.    Okay.
18        Q.    So we have to be careful that we
19   don't speak at the same time.  Okay?
20        A.    Yeah.
21        Q.    And also, you kind of almost --
22        A.    Sorry about that.
23        Q.    Do you need more with that or are
24   you good?

Page 8

1         A.    No, I'm good.  Yeah.
2         Q.    All right.  Almost on cue, you
3    bring up the other issue, which is because it is
4    ultimately a written record, everything we say has
5    to be spoken.  So things we might say -- do in a
6    normal conversation, like hand gestures --
7         A.    Okay.
8         Q.    -- nods of the head, things like
9    that won't go on the record, so you have to be
10   sure that all of your responses are spoken.  Okay?
11        A.    Yes, sir.
12        Q.    If I ask you a question, please
13   only answer it if you believe that you understand
14   it.
15        A.    Okay.
16        Q.    So if you need me to repeat a
17   question, speak louder, explain the meaning of a
18   word or anything like that, just let us know.
19   Okay?
20        A.    Yes.
21        Q.    This is not intended to be an
22   unnecessarily uncomfortable process, so if you
23   need a break at any time, let us know.  You know,
24   if you would like water, coffee, anything like

2  (Pages 5 to 8)

Page 9

1  that, we'll try to be as accommodating as we can.
2  Okay?
3      A.    Okay.
4      Q.    All right.  So Officer Hamoy,
5  you're currently a member of the Philadelphia SWAT
6  Unit; correct?
7      A.    Yes.
8      Q.    Philadelphia Police Department SWAT
9  Unit?
10     A.    Yes, correct.
11     Q.    How long have you been a member of
12 the SWAT unit?
13     A.    Just a little over -- a little over
14 two years.
15     Q.    Okay.  Do you know what month you
16 started?
17     A.    December 2020.
18     Q.    Okay.  So two and a half years.
19          Our -- our incident, I can
20 represent to you, occurred on June 4, 2021.  So
21 you were a member of the SWAT unit at that time;
22 correct?
23     A.    Yes.
24     Q.    Prior to joining the SWAT unit,

Page 10

1  were you in some other capacity with the
2  Philadelphia Police Department?
3      A.    Yes.  I was a patrol officer at the
4  25th District for close to 10 years.
5      Q.    Okay.  And did you have any job
6  with the Philadelphia Police Department prior to
7  that?
8      A.    Yes.
9      Q.    What was that?
10     A.    I was -- I was in the Marines and
11 also was a federal police for the Department of
12 Defense.
13     Q.    Okay.  But not in a prior position
14 with the Philadelphia Police Department?
15     A.    No.
16     Q.    Okay.  So you were a patrol officer
17 for about 10 years?
18     A.    Yeah.
19     Q.    And then starting in December 2020,
20 you joined the SWAT unit; right?
21     A.    Yes.
22     Q.    Okay.  When you joined the SWAT
23 unit, did you receive any additional training
24 specific to the SWAT unit in addition to the

Page 11

1  training you received as a patrol officer?
2      A.    That's correct.
3      Q.    Okay.  What -- what additional
4  training did you receive as part of joining the
5  SWAT unit?
6      A.    You go to basic SWAT school for, to
7  the best of my recollection, close to nine weeks.
8      Q.    Okay.  Is that it?
9      A.    Yeah.  And then you have additional
10 in-service training from month to month.
11     Q.    Okay.  And how -- how -- like is
12 that one day per month, an hour per month?  What
13 is it?
14     A.    It depends, but we do train a whole
15 lot.
16     Q.    Okay.  What sort of topics were
17 covered at the SWAT school?
18          MR. ZURBRIGGEN:  Object to form.
19          But, Officer, you can answer.
20          THE WITNESS:  We get trained from
21          firearms proficiency,
22          building/room-clearing, a lot of special
23          equipment that we use during barricades
24          and warrant services and stuff like

Page 12

1          that.
2  BY MR. WEST:
3      Q.    Okay.  So all of the training that
4  you just specified would be useful as far as a
5  warrant enforcement at a home; correct?
6      A.    Yes.
7          MR. ZURBRIGGEN:  Object to form.
8          But, Officer, you can answer.
9  BY MR. WEST:
10     Q.    Okay.  Did -- and in your
11 experience, is that a normal job that the SWAT
12 unit at the Philadelphia Police Department do, to
13 enforce warrants at homes?
14     A.    Yes.
15     Q.    Okay.  Now, my understanding is
16 that the SWAT unit won't be used to enforce a
17 warrant at a home under -- under just any
18 circumstances.  Isn't it true that the SWAT unit
19 is usually reserved only for situations where
20 there's considered to be a risk of -- of
21 heightened danger?
22          MR. ZURBRIGGEN:  Object to form.
23          But, Officer, you can answer.
24          THE WITNESS:  High-risk.

Electronically signed by Candace Weindel (601-298-573-1229)                    2a62302a-8ff0-4b5f-afd8-b390790a1e34

Page 13

1    MR. WEST: High-risk.
2    THE WITNESS: High-risk warrant.
3    BY MR. WEST:
4        Q.    Okay. Could you explain what that
5    means to say high-risk warrant in this situation?
6        A.    Mostly violent offenders, that
7    there's a good chance that a normal patrol officer
8    would not be able to handle.
9        Q.    Okay. In your experience with the
10   SWAT unit, how much of -- of your normal time is
11   spent enforcing warrants at the homes of people
12   who are considered to be violent offenders or
13   likely to be violent offenders?
14       MR. ZURBRIGGEN: Officer, you can
15   answer if you can, if you can estimate.
16       THE WITNESS: Majority of the time,
17   yeah.
18   BY MR. WEST:
19       Q.    Okay. That's the main thing that
20   the SWAT unit does in your --
21       A.    Yeah. It's mostly high-risk
22   warrants and barricades.
23       Q.    Okay. So as part of the training
24   that you received on how to enforce warrants at

Page 14

1    homes, did you receive any training with regards
2    to what you're supposed to do if there is a dog on
3    the property?
4        A.    In terms of training?
5        Q.    Right. So I guess I can rephrase
6    the question. Let me give you some background.
7        So are you given any training from
8    the Philadelphia Police Department as part of
9    being a member of the SWAT unit with regards to
10   how you should approach various kinds of
11   residences when attempting to enforce warrants?
12       MR. ZURBRIGGEN: Object to form.
13       But, Officer, you can answer if you
14   can.
15       THE WITNESS: Yes.
16   BY MR. WEST:
17       Q.    Okay. And is any part of that
18   training, in your personal experience, in
19   reference to how you should interact with any dogs
20   that might be found on the property?
21       A.    During training, not necessarily
22   with the dog, but we are -- we do not -- if the
23   dog doesn't really try to bite any officer, we
24   would -- we would not harm any animal at all.

Page 15

1        Q.    Okay. But you never received any
2    specific training related to dog encounters;
3    correct?
4        MR. ZURBRIGGEN: Object to form.
5        Officer, you can answer.
6        THE WITNESS: I don't think you can
7    train to for a real dog, you know, to
8    attack you, yeah, so --
9    BY MR. WEST:
10       Q.    Okay. But if you can just ask --
11   answer the question you were asked.
12       You never received any training
13   specific to dog encounters; correct?
14       A.    No.
15       MR. ZURBRIGGEN: Same objection.
16       THE WITNESS: No.
17   BY MR. WEST:
18       Q.    That is correct; right?
19       A.    Yeah, that's correct.
20       Q.    Okay. And do you know whether or
21   not the Philadelphia Police Department has ever
22   issued any directives pertaining to how
23   Philadelphia Police Department officers should
24   handle encounters with dogs?

Page 16

1        MR. ZURBRIGGEN: Same objection.
2        Officer, you can answer.
3        THE WITNESS: Yes, I believe so.
4    BY MR. WEST:
5        Q.    Okay. And -- and what is your
6    understanding about that?
7        MR. ZURBRIGGEN: Same objection.
8        I'm sorry, Officer. Go ahead.
9        THE WITNESS: My understanding that
10   you try to avoid the best that you can
11   not to harm the dog unless -- unless it
12   endangers you or, you know, unless it
13   prevents -- your action would prevent
14   from the dog hurting somebody else or
15   yourself, yeah.
16   BY MR. WEST:
17       Q.    Okay. Where did you hear about the
18   directive?
19       A.    I believe somewhere in the
20   directive, but I just couldn't remember -- tell
21   you exactly when or -- when did I hear or read it
22   the last time.
23       Q.    Okay. Is it possible that you
24   first heard about that after June 4, 2021?

Page 17

1    MR. ZURBRIGGEN: Object to form.
2  Officer, you can answer.
3    THE WITNESS: No. I've been an --
4  I've been an officer for quite some
5  time.
6  BY MR. WEST:
7    Q.  Okay. When did -- when did the
8  directive that you're referring to go into effect?
9    MR. ZURBRIGGEN: Object to form.
10  Officer, you can answer if you can.
11    THE WITNESS: I -- I cannot recall
12  when.
13  BY MR. WEST:
14    Q.  Okay. Do you recall if the
15  directive gave any guidance as to what sort of
16  tools or weapons an officer should utilize when
17  encountering a dog?
18    A.  I would have to refer that. I just
19  couldn't remember it.
20    Q.  You have no recollection of that at
21  this time; correct?
22    A.  Yeah, not at this time.
23    Q.  Okay. And is it fair to infer that
24  you had no recollection of that on June 4, 2021?

Page 18

1    MR. ZURBRIGGEN: Object to form.
2  Officer, you can answer.
3    THE WITNESS: No. Word for word,
4  no, but for experience purposes, I
5  basically know what to do if the dog did
6  try to attack me.
7  BY MR. WEST:
8    Q.  Okay. But do you have any training
9  as to what specific tools or weapons you should
10  prepare to use if you expect to encounter a dog?
11    MR. ZURBRIGGEN: Object to form.
12  Officer, you can answer.
13    THE WITNESS: Yes, we do.
14  BY MR. WEST:
15    Q.  What are those?
16    A.  We have -- we have options from
17  pepper spray --
18    Q.  Anything else?
19    A.  Well, after that, because we were
20  on a -- it's different from patrol. So we're in a
21  high -- high-risk environment, so majority of the
22  time we do not have time to -- to deploy pepper
23  spray in high -- high-risk environment like that.
24  And -- and major -- as a SWAT operator, we do not

Page 19

1  use that because it -- it also contaminate the
2  rest of the officers serving the warrant if you do
3  deploy OC spray.
4    Q.  All right, sir. So I asked you
5  what tools or weapons you might use if you
6  anticipate an encounter with a dog. I believe you
7  testified that you could use pepper spray, but
8  that you wouldn't use that if you were doing a
9  warrant enforcement with the SWAT unit.
10    Are there any specific tools or
11  weapons that you would utilize if you anticipated
12  a dog encounter?
13    MR. ZURBRIGGEN: Object to form.
14  Officer, you can answer.
15    THE WITNESS: There's -- there's
16  other tools that you can use, but at
17  that moment, we are -- again, we are
18  serving a high-risk environment, so what
19  we have in our hand is, at that time, is
20  a rifle.
21  BY MR. WEST:
22    Q.  Okay. So is it -- so as of June
23  2021, if you were enforcing a warrant at a private
24  residence and you knew that you were likely to

Page 20

1  encounter a dog as part of that enforcement, is
2  the only tool or weapon that you would have at
3  hand a rifle?
4    MR. ZURBRIGGEN: Object to form.
5  Officer, you can answer.
6    THE WITNESS: When we're serving a
7  warrant, when we're making entry, what
8  we have in our -- what we have in both
9  of our hands is a rifle, sir.
10  BY MR. WEST:
11    Q.  Okay. And there would be no other
12  tool or weapon that you would have at hand to use
13  that might help with the dog encounter; correct?
14    A.  We do --
15    MR. ZURBRIGGEN: Same objection.
16  Officer...
17    THE WITNESS: We do have tools in
18  our belt, like OC spray and -- and
19  pistol and other stuff. But again, at
20  that time, as we're making entry, what
21  we have in both of our hands is -- is a
22  rifle, and at that very moment, we
23  haven't cleared the house yet and assume
24  that it's safe.

Electronically signed by Candace Weindel (601-298-573-1229)                    2a62302a-8ff0-4b5f-afd8-b390790a1e34

Page 21

BY MR. WEST:
1
2    Q.    As part of the SWAT unit training
3 that you received, did you receive any training
4 specific as to how warrant should be enforced at
5 multi-residence homes?
6            MR. ZURBRIGGEN:  Object to form.
7    Officer, you can answer.
8            MR. WEST:  Actually, strike the
9    question.  I'm going to rephrase that
10    question.
11 BY MR. WEST:
12    Q.    As part of the SWAT unit training
13 that you received from the Philadelphia Police
14 Department, did you receive any training specific
15 as to how you should enforce warrants at
16 multi-residence buildings?
17            MR. ZURBRIGGEN:  Same objection.
18    But, Officer, you can answer if you
19    can.
20            THE WITNESS:  Yes.
21 BY MR. WEST:
22    Q.    Okay.  And what was that training?
23    A.    You mean like step by step, like
24 when we receive the warrant, sir?

Page 22

1    Q.    Yeah.  If you could just answer
2 that as broadly as you can, anything you remember
3 that was specific to multi-residence buildings.
4            MR. ZURBRIGGEN:  Same objection.
5    But, Officer, you can answer if you
6    can.
7            THE WITNESS:  Yeah.  When we
8    receive the job from -- from the request
9    of the detectives, we verify the
10    warrant, make sure it's good.  The
11    supervisor would verify it and whether
12    they would deny it or not, if it does
13    meet the criteria, whatever that might
14    be from the supervisor's point of view.
15           And then, after that, we do -- we
16    do recon the house and look at the
17    property, what kind of door, how many
18    people that we might need the following
19    day.  And then once that's done, we call
20    everybody that we need.  And then we
21    serve the warrant at the time that was
22    requested by the detectives.
23 BY MR. WEST:
24    Q.    Okay.  Is that it?

Page 23

1    A.    Yeah.  There is more in-depth to
2 that, but, you know, that's basically --
3    Q.    Okay.  What's more in-depth than
4 that?
5            MR. ZURBRIGGEN:  Object to form.
6    But, Officer...
7            THE WITNESS:  You know, like the
8    tools, what kind of door -- what we're
9    going to need for the door, like the
10    positioning of the house because we
11    normally contain the house.  We put
12    rear, front, and if there is a side
13    window, we put personnel there, too,
14    before we actively make entry into the
15    house, how many teams that we need and
16    stuff like that.
17 BY MR. WEST:
18    Q.    All right, Officer.  I'm not sure
19 if you caught the question.  I asked anything
20 specific to multi-residence buildings.
21           Is there anything unique about what
22 you told me that would pertain only to
23 multi-residence buildings as opposed to any other
24 warrant?

Page 24

1            MR. ZURBRIGGEN:  Object to form.
2    But, Officer, if you can answer,
3    you can.
4            THE WITNESS:  We normally do the
5    same.  We normally do the same thing.
6            MR. WEST:  Okay.
7            THE WITNESS:  Yeah.
8 BY MR. WEST:
9    Q.    So as part of the training that you
10 received for being on the SWAT unit of the
11 Philadelphia Police Department, did you receive
12 any training specific to the enforcement of
13 warrants at multi-residence buildings?
14            MR. ZURBRIGGEN:  Object to form as
15    asked and answered.
16           But go ahead, Officer, answer.
17            THE WITNESS:  Yeah.  We are just --
18    we are just trained how to like recon
19    the property and how to make entry and
20    clear properties.  That's -- that's what
21    --
22            MR. WEST:  Okay.
23            THE WITNESS:  -- we were trained
24    for.

6  (Pages 21 to 24)

Page 25

1    MR. WEST:  So --
2        THE WITNESS:  I'm sorry if I kind
3    of misunderstood at first.
4    BY MR. WEST:
5        Q.    Is the important thing in reconning
6    the property ahead of time when you are dealing
7    with a multi-residence property to make sure that
8    if you enter a door, it's a door that only leads
9    to a residence which is subject to the warrant as
10   opposed to any other residence that might be in
11   the same multi-residence building?
12       MR. ZURBRIGGEN:  Object to form.
13   Officer, you can answer.
14       THE WITNESS:  Yeah.  We make sure
15       it's the right property, yeah.
16   BY MR. WEST:
17       Q.    Okay.  And not just the right
18   building, but you also have to make sure it's the
19   right residence.
20       Do you understand the question?
21       MR. ZURBRIGGEN:  Object to form.
22       But, Officer...
23       THE WITNESS:  Yeah.  To the best --
24       the best we can, yeah.

Page 26

1    BY MR. WEST:
2        Q.    For example, if you have a warrant
3    for a specific apartment number, are you allowed
4    to enter any apartment in the building as part of
5    your warrant enforcement or do you have to be more
6    specific than that?
7        MR. ZURBRIGGEN:  Object to form.
8        Officer...
9        THE WITNESS:  It depends what the
10       warrant service says that the detective
11       gave to us and then it's basically at
12       the supervisor's decision.
13   BY MR. WEST:
14       Q.    Okay.  Could you explain what you
15   mean as far as the warrant service given by the
16   detective?
17       A.    The warrant -- the -- the warrant
18   -- the copy of the affidavit that the detective
19   would give would normally indicate like second
20   floor only, third floor only if it's -- if it's
21   like a building.
22       Q.    Okay.
23       A.    Yeah.
24       Q.    So --

Page 27

1        A.    If it specifically says that, then
2    that's the only -- that's the only apartment, or
3    whatever the case may be, we would -- we would
4    execute the warrant for.
5        Q.    Now, when -- when you and the --
6    the other people in the SWAT unit are enforcing a
7    warrant at a private residence, the detective
8    wouldn't normally be on the scene, would he?
9        MR. ZURBRIGGEN:  Object to form.
10       But, Officer, you can answer if you
11   can.
12       THE WITNESS:  Yeah.  They meet us
13       in the staging area and they will follow
14       us.  And then once we -- we clear the
15       property, and then they go inside the
16       house and then we leave and go to the
17       next warrant, yeah.
18   BY MR. WEST:
19       Q.    Okay.  So do you normally have a
20   briefing before you enforce a warrant?
21       A.    Yes.
22       Q.    In your experience, would the
23   detective associated with the case normally attend
24   that briefing?

Page 28

1        A.    No, it's just us.
2        Q.    Okay.  And the briefing is when you
3    and the other members of the SWAT unit are given
4    specific instructions as to how the warrant is to
5    be enforced; correct?
6        A.    Yeah.  And our -- what our specific
7    jobs would be on that warrant.
8        Q.    Okay.  And is it at that briefing
9    when you are given specific instructions as to
10   what door you should enter through if you are
11   enforcing a warrant at a private residence?
12       MR. ZURBRIGGEN:  Object to form.
13       But, Officer, you can answer.
14       THE WITNESS:  Yes, that's correct.
15   BY MR. WEST:
16       Q.    Okay.  And so it follows naturally
17   then that the detective would not be part of that
18   briefing process; correct?
19       MR. ZURBRIGGEN:  Same objection.
20       But, Officer, you can answer.
21       THE WITNESS:  Yes, correct.
22   BY MR. WEST:
23       Q.    Okay.  So who would be the person
24   who would be giving the briefing that would

7 (Pages 25 to 28)

Page 29

1  include specific instructions as to what door or
2  doors you and the other members of the SWAT unit
3  should be entering through?
4      A.    That would be the supervisor in
5  charge.
6      Q.    Okay.  Is that usually a lieutenant
7  or a sergeant?
8      A.    It depends, but it's either a
9  sergeant or lieutenant.
10     Q.    Okay.  And with regards to the --
11 the warrant enforcement action that ended up
12 entering Ms. Alvarado's home in June 2021, who was
13 the supervisor that gave the briefing, if you
14 recall?
15          MR. ZURBRIGGEN:  Object to form.
16          But, Officer, you can answer if you
17          can recall.
18          THE WITNESS:  To the best of my
19          recollection, it was Lieutenant Monk.
20 BY MR. WEST:
21     Q.    Okay.  And do you know if Sergeant
22 Melody also gave briefing at that time or was it
23 only Lieutenant Monk?
24     A.    No.  We're going to be all in the

Page 30

1  briefing including Sergeant Melody.
2      Q.    Okay.  Do you recall anything that
3  Lieutenant Monk specifically said at that
4  briefing?
5      A.    It was just the normal -- the
6  normal brief, gave us our -- our responsibilities
7  during the warrant service and --
8      Q.    Do you specifically recall anything
9  he said at that briefing?
10          MR. ZURBRIGGEN:  Object to form.
11          Officer, you can answer if you can
12          recall.
13          THE WITNESS:  No, no, I can't.  No,
14          I don't.
15 BY MR. WEST:
16     Q.    Do you specifically recall anything
17 that Sergeant Melody said at that briefing?
18          MR. ZURBRIGGEN:  Same objection.
19          But, Officer, you can -- if you
20          recall --
21          THE WITNESS:  No.  Just a normal --
22          normal -- normal --
23 BY MR. WEST:
24     Q.    Okay.  Do you specifically recall

Page 31

1  anything that anyone said at that briefing at this
2  time?
3      A.    No.  It's been a while.
4      Q.    Okay.
5      A.    Not specifically, yeah.
6      Q.    So getting back to the issue of the
7  importance of reconnaissance, if you and the other
8  members of the SWAT unit are given a warrant to
9  enter a specific apartment number in an apartment
10 building, have you ever received any guidance as
11 to how to make sure that you only enter the
12 specific apartment and not any other part of the
13 apartment house or is that not important?
14          MR. ZURBRIGGEN:  Object to form.
15          Officer, you can answer if you can.
16          THE WITNESS:  Yes, it is important.
17          So we try to make sure that it is the
18          right property, yes.
19 BY MR. WEST:
20     Q.    Okay.  And how would you do that?
21          MR. ZURBRIGGEN:  Same objection.
22          Officer, you can --
23          THE WITNESS:  Normally, like when
24          we do reconnaissance on the house, you

Page 32

1  can see it from the front door, the
2  number of the property, the house is
3  marked or not.
4  BY MR. WEST:
5      Q.    In your -- in your experience in
6  the City of Philadelphia, do many people live in
7  multi-residence buildings?
8          MR. ZURBRIGGEN:  Object to form.
9          But, Officer, you can answer if you
10         can.
11          THE WITNESS:  Yes.  I would say a
12          good amount, yes.
13 BY MR. WEST:
14     Q.    Okay.  So that's a pretty normal
15 thing in your experience as a member of the SWAT
16 unit, that you have to enforce a warrant at a
17 multi-residence property; is that correct?
18          MR. ZURBRIGGEN:  Same objection.
19          Officer...
20          THE WITNESS:  Not all the time, but
21          yeah, we do end up serving warrants at a
22          multi-residence one.
23 BY MR. WEST:
24     Q.    Okay.  So did you ever receive any

8 (Pages 29 to 32)

Page 33

1    specific guidance as part of your training with
2    the Philadelphia Police Department as to what
3    parts of a building in a multi-residence property
4    that you could and could not enter if you had a
5    warrant that was specific to one apartment?
6            MR. ZURBRIGGEN:  Object to form as
7        asked and answered.
8            Go ahead, Officer, you can answer.
9            THE WITNESS:  Yes.
10   BY MR. WEST:
11       Q.    Okay.  And what was that specific
12   training?
13       A.    You know, you -- say the question
14   again, sir.  I'm sorry.
15           MR. WEST:  Is it possible that you
16       can read it back?
17           THE COURT REPORTER:  Yeah.
18               - - -
19           (Whereupon, the court reporter read
20       back the pertinent testimony.)
21               - - -
22           MR. ZURBRIGGEN:  Same objection.
23       Officer...
24           THE WITNESS:  Yeah.  The specific

Page 34

1            is that you are not going to serve the
2            warrant to -- to the wrong apartment.
3    BY MR. WEST:
4        Q.    Okay.  And where did you receive
5    that training?
6            MR. ZURBRIGGEN:  Object to form.
7        Officer...
8            THE WITNESS:  During basic school
9            and also during my on-the-job training.
10   BY MR. WEST:
11       Q.    Okay.  Now, if you are at a
12   multi-residence property and there's a front door
13   and you are not sure what's behind that front
14   door, do you have any -- any sort of training from
15   the SWAT unit or the Philadelphia Police
16   Department as to what you should do in that
17   situation?
18           MR. ZURBRIGGEN:  Object to form.
19       Officer, you can answer.
20           THE WITNESS:  That would be the
21       supervisor's decision, sir.
22   BY MR. WEST:
23       Q.    But you specifically, did you ever
24   receive any training --

Page 35

1            MR. ZURBRIGGEN:  Same --
2    BY MR. WEST:
3        Q.    -- in that situation?
4            MR. ZURBRIGGEN:  Same objection.
5            THE WITNESS:  That would be the
6        supervisor, sir.
7    BY MR. WEST:
8        Q.    Okay.  Have you ever done
9    reconnaissance?
10       A.    Yes, I do.
11       Q.    Okay.  So did you ever receive any
12   training on -- on what sort of reconnaissance
13   should be done in that situation?
14           MR. ZURBRIGGEN:  Same objection.
15       Officer...
16           THE WITNESS:  Yes.
17   BY MR. WEST:
18       Q.    Okay.  And what was that training
19   you received?
20       A.    Once we receive the warrant, we
21   verify the address and then we go to that address
22   and we look at what kind of doors so we know what
23   tools we need, how many windows so we know how
24   many officers, SWAT officers, we need to call and

Page 36

1    use to execute the warrant and how many teams and
2    stuff like that and if any -- we see anything, you
3    know, specific that -- that -- that we might think
4    that might -- that might be helpful to execute the
5    warrant safely.
6        Q.    When you would perform
7    reconnaissance at a multi-residence property,
8    would you do enough reconnaissance to make a
9    visual inspection of both the front and the rear
10   of the building?
11           MR. ZURBRIGGEN:  Object to form.
12       Officer, you can answer.
13           THE WITNESS:  Well, when you do
14       reconnaissance, sometimes you can only
15       do much because at the same time you
16       don't wanna -- you don't want them to
17       know that you are going to serve the
18       warrant.  You know, so if there's people
19       outside and stuff like that, you can
20       only sometimes do it from a distance.
21       So it depends upon the situation.
22   BY MR. WEST:
23       Q.    Did you play any role in the
24   reconnaissance for the warrant that was being

Electronically signed by Candace Weindel (601-298-573-1229)                    2a62302a-8ff0-4b5f-afd8-b390790a1e34

Page 37

1  enforced on the incident of June 4, 2021?
2      A.   I don't think so because we did a
3  lot of warrants in my last two and a half years.
4  I don't believe I did the reconnaissance on that
5  specific job, but you can refer it to the
6  paperwork because I honestly can't recall if I did
7  it or not.
8      Q.   Okay.  Do you know who did the
9  reconnaissance for this particular incident?
10     A.   No.
11          MR. ZURBRIGGEN:  Object to form.
12          But, Officer...
13          THE WITNESS:  No.
14 BY MR. WEST:
15     Q.   Okay.  As -- in your experience on
16 doing reconnaissance for a warrant enforcement on
17 a multi-residence property, have you ever
18 contacted the property manager?
19     A.   Yes.  Sometimes a supervisor or
20 detective will do that.
21     Q.   Why?
22          MR. ZURBRIGGEN:  Object to form.
23          Officer, if you know --
24          THE WITNESS:  If there's like -- if

Page 38

1          there's like -- like issues like, you
2          know, there's a gate or if it's like
3          there's -- if there's a key, sometimes
4          the detectives when they -- when they
5          send the warrant for us at the request
6          for us to serve, sometimes the detective
7          will say there that they spoke to the
8          property owner and they have the keys
9          that we can use so we don't have to
10         break the door.
11 BY MR. WEST:
12     Q.   Okay.  Did you ever receive any
13 specific guidance as part of your training with
14 the Philadelphia Police Department as to when you
15 should and shouldn't contact the property manager
16 with regards to enforcing a warrant at a
17 multi-residence property?
18         MR. ZURBRIGGEN:  Object to form.
19         Officer, you can answer.
20         THE WITNESS:  No.  But that's --
21         the one that normally does that would be
22         supervisors.  That's the supervisor.  We
23         don't -- as an operator, we normally
24         don't contact the -- the property owner.

Page 39

1  BY MR. WEST:
2      Q.   Okay.  Again, though, I thought you
3  said that you've actually done reconnaissance
4  yourself?
5      A.   Yes, I did.  But in terms of
6  speaking to like the owner of the house, majority
7  is done by the supervisor.
8      Q.   Okay.
9      A.   Or the detectives, majority of the
10 time, it's the detectives.
11     Q.   How about contacting L&I to get
12 property records; have you ever done anything like
13 that as part of a reconnaissance?
14     A.   No.
15     Q.   Do you know if that's something
16 that is ever done as part of the reconnaissance
17 for the SWAT unit?
18         MR. ZURBRIGGEN:  Object to form.
19         Officer...
20         THE WITNESS:  You would have to ask
21         the supervisor for that, sir.
22 BY MR. WEST:
23     Q.   Okay.  So have you not actually
24 been trained on how to do reconnaissance?

Page 40

1          MR. ZURBRIGGEN:  Object to form.
2          Officer...
3          THE WITNESS:  I was.
4  BY MR. WEST:
5      Q.   Okay.  Because it sounds like --
6  like for a lot of these questions related to how
7  to do reconnaissance you're saying that you have
8  to contact a supervisor.  So I'm confused if
9  you've received the training how to do it, why you
10 wouldn't know the answer to that.
11         MR. ZURBRIGGEN:  Object.
12         Officer...
13         THE WITNESS:  When you're talking
14         about speaking to the property owner,
15         sir, and stuff like that, that's mostly
16         done by the supervisor and detective.
17         The training that I received for
18         reconnaissance is basically to see like
19         how many windows in the property, what
20         kind of door, in order for us to know
21         how many SWAT operators we might need to
22         serve that warrant and also what tools
23         that we might need.
24         MR. WEST:  Okay.

10 (Pages 37 to 40)

Electronically signed by Candace Weindel (601-298-573-1229)                    2a62302a-8ff0-4b5f-afd8-b390790a1e34

Page 41

1    THE WITNESS: That's the training I
2    received, sir.
3  BY MR. WEST:
4    Q.    And the training you received also
5  said that in certain situations you wouldn't need
6  to check to see if there's a rear entrance to the
7  building; correct?
8    MR. ZURBRIGGEN: Object to form.
9    Officer, if you can --
10    THE WITNESS: If I do the
11    reconnaissance, I -- we normally -- to
12    the best that we could, depending on the
13    circumstance, we normally also check the
14    rear, of how to get to the rear of the
15    property. But that's not the case all
16    the time because sometimes there are
17    people standing outside, especially if
18    we're doing the reconnaissance during
19    the day.
20  BY MR. WEST:
21    Q.    Sir, with regards to the property
22  at 4664 Torresdale Avenue where the warrant was
23  enforced on June 4, 2021, isn't it true that prior
24  to entering Ms. Alvarado's apartment you

Page 42

1  personally were unaware of the existence of a rear
2  door?
3    MR. ZURBRIGGEN: Object to form.
4    Officer, if you recall, you can
5    answer.
6    THE WITNESS: No.
7  BY MR. WEST:
8    Q.    You did know there was a rear door?
9    A.    We know that there's a rear exit,
10  but we do not know that that's -- that's an
11  apartment or just plainly a back door of a normal
12  property.
13    Q.    So you did or did not know there
14  was a rear door?
15    MR. ZURBRIGGEN: Same objection.
16    Officer...
17    THE WITNESS: I assume that there's
18    a rear door, but I wasn't on the entry
19    team, sir. I wasn't the rear at that
20    time.
21  BY MR. WEST:
22    Q.    Well, sir, I'm not asking you if
23  you assumed that there would be a rear door. I'm
24  just asking did you specifically know whether or

Page 43

1  not there was or wasn't a rear door.
2    MR. ZURBRIGGEN: Same objection.
3    Officer, you can answer if you
4    recall.
5    THE WITNESS: Yes, I do, yeah.
6  BY MR. WEST:
7    Q.    You did know there was a rear door?
8    A.    Yeah.
9    Q.    How did you know there was a rear
10  door?
11    MR. ZURBRIGGEN: Same objection.
12    Officer...
13    THE WITNESS: Because we put --
14    during the brief, we put rear
15    containment at the back just in case the
16    suspect would run out the back door.
17  BY MR. WEST:
18    Q.    Okay. So tell me everything that
19  was said at the briefing with regards to the rear
20  door.
21    MR. ZURBRIGGEN: Object to form as
22    asked and answered.
23    Go ahead, Officer, you can answer.
24    THE WITNESS: I cannot specifically

Page 44

1  recall. All we did is we -- we put a
2  rear containment at the back door.
3  BY MR. WEST:
4    Q.    Do you specifically recall anything
5  about the rear door being said at the briefing
6  today?
7    MR. ZURBRIGGEN: Same objection.
8    Officer...
9    THE WITNESS: No.
10  BY MR. WEST:
11    Q.    The warrant in this case
12  specifically said that it applied to Apartment
13  Number 2 on the second floor rear; correct?
14    MR. ZURBRIGGEN: Object to form.
15    Officer, you can answer if you
16    recall.
17    THE WITNESS: No, I can't recall.
18  BY MR. WEST:
19    Q.    Okay. Do you recall what the
20  warrant at issue said?
21    A.    No. I have served many warrants
22  since then, so I have to refer you to the
23  paperwork there, sir.
24    Q.    Okay. Prior to entering Ms.

11 (Pages 41 to 44)

Electronically signed by Candace Weindel (601-298-573-1229)                    2a62302a-8ff0-4b5f-afd8-b390790a1e34

Page 45

1    Alvarado's apartment, were you given any
2    instructions as to what portions of the
3    multi-residence building you were and were not
4    allowed to enter?
5            MR. ZURBRIGGEN:  Object to form.
6        Officer, you can answer if you
7        know.
8            THE WITNESS:  I was in the first
9        entry team and my specific job at that
10       -- at that warrant is to enter through
11       the first door and clear the -- clear
12       the property from there.
13   BY MR. WEST:
14       Q.    Okay.  And where did you believe
15   that that door led to, if anywhere, or did you not
16   know?
17           MR. ZURBRIGGEN:  Object to form.
18       Officer, you can answer.
19           THE WITNESS:  Rephrase the question
20       again, sir.
21   BY MR. WEST:
22       Q.    Where did you think the door led?
23       A.    I would think it would lead to the
24   -- to the property that we -- that we -- that we

Page 46

1    are trying to serve the warrant for, sir.
2        Q.    Did you actually know where the
3    door led before you entered it?
4            MR. ZURBRIGGEN:  Object to form.
5            THE WITNESS:  That's -- you can't
6        tell that, sir.
7    BY MR. WEST:
8        Q.    So fair to say you didn't know
9    where the door led before you entered it?
10           MR. ZURBRIGGEN:  Same objection.
11       Officer...
12           THE WITNESS:  Yes.
13   BY MR. WEST:
14       Q.    Is that one of the things that the
15   reconnaissance team is supposed to figure out
16   before someone knocks down a front door to where
17   it leads?
18           MR. ZURBRIGGEN:  Object to form.
19       Officer, you can answer.
20           THE WITNESS:  We can only base
21       that, sir, to -- to what we observe from
22       the outside, sir.  So there's no way you
23       would be able to know what's behind that
24       door, sir.

Page 47

1    BY MR. WEST:
2        Q.    Sir, if you were aware of the
3    fact -- if you -- strike the question.
4            All right.  You entered the
5    property with Officer Song; correct?
6        A.    Yes.
7        Q.    Did you normally work with Officer
8    Song at that time or was -- were you kind of just
9    randomly assigned for this incident?
10           MR. ZURBRIGGEN:  Object to form.
11       But, Officer --
12           MR. WEST:  If you understand the
13       question.
14           THE WITNESS:  Yeah.  We're on the
15       same squad, but we -- we don't normally
16       have the same position and the same team
17       for every warrant every single day,
18       but --
19   BY MR. WEST:
20       Q.    Like was he possibly your partner
21   or anything like that or just someone you happened
22   to be next to at that time?
23       A.    No.  For that -- for that day, I
24   believe he was -- to the best of my recollection,

Page 48

1    he was my partner for that -- for that shift.
2        Q.    Okay.  That's what I was trying to
3    get at.
4            When -- it says somewhere in the
5    records that he was your partner.  Was that just
6    specific for the day or was he your partner more
7    than just that day?
8        A.    It's always specific for the day.
9    We -- we end up changing partners from time to
10   time because sometimes like we have different
11   operators that work on a shift.
12       Q.    Okay.  And in the context of how
13   the SWAT unit would operate at that time, in this
14   context, what does it mean to be a partner?
15       A.    You're on the same team.  What do
16   you mean?
17       Q.    I'm just wondering.  So it says in
18   the records that you and him were partners, and I
19   am just wondering what all that would -- that
20   would indicate.
21       A.    So --
22           MR. ZURBRIGGEN:  Object to form.
23       But, Officer, you can answer.
24           THE WITNESS:  So when we serve the

Electronically signed by Candace Weindel (601-298-573-1229)                                2a62302a-8ff0-4b5f-afd8-b390790a1e34

Page 49

1   warrant, normally partners would end up
2   on the same team, or if there's a
3   barricade, we're going to be together in
4   the same car, the same on the patrol log
5   and stuff like that.
6   BY MR. WEST:
7       Q.   Okay.  So sir, just for reference,
8   I will mark here as Hamoy-1 a copy of the search
9   warrant and affidavit.  This is Bates stamped as
10  Defense 151, and I have highlighted where it says
11  second floor rear, just for reference.
12              - - -
13          (Whereupon, the document was
14          marked, for identification purposes, as
15          Exhibit Number Hamoy-1.)
16              - - -
17  BY MR. WEST:
18      Q.   Sir, so you asked for a copy of the
19  warrant.  There's the warrant.
20          So sir, you can see that it
21  specifically says it only applies to the second
22  floor rear; correct?
23          MR. ZURBRIGGEN:  Object to form.
24          But, Officer, you can answer.

Page 50

1          THE WITNESS:  Yeah.  It says here,
2      sir.
3   BY MR. WEST:
4      Q.   Okay.  Now, when you entered --
5      A.   Do you want that back?
6      Q.   You can keep it.
7          When you entered the property at 46
8   -- 4664 Torresdale Avenue, did you enter the
9   second floor rear apartment?
10     A.   No, sir.  We entered the front.
11     Q.   Okay.  Now, if you had been aware
12  that there was a rear door to that building that
13  was on its own street with its own entrance, and
14  if you had been aware of the fact that the warrant
15  applied only to the rear of the building, do you
16  think that might have led you to believe that it
17  would have been more appropriate to enter through
18  the rear door rather than the front door in
19  executing this warrant?
20          MR. ZURBRIGGEN:  Object to form.
21          Officer, you can answer.
22          THE WITNESS:  That would be a
23      supervisor's call, sir.
24  BY MR. WEST:

Page 51

1      Q.   But based on your experience, what
2   would be your interpretation of that?
3          MR. ZURBRIGGEN:  Same objection.
4          Officer, you can answer.
5          THE WITNESS:  For me, if I've seen
6      this warrant, I would probably -- if I
7      was the supervisor, I would probably --
8      again, you know, it's the supervisor's
9      call, sir.
10  BY MR. WEST:
11     Q.   But if you had seen this warrant
12  and you knew there was a rear door, you probably
13  would have gone through the rear door; is that
14  correct?
15          MR. ZURBRIGGEN:  Object to form.
16          Officer, you can answer.
17          THE WITNESS:  Yes.
18  BY MR. WEST:
19     Q.   Okay.  Did you -- do you recall
20  hearing the dog in Ms. Alvarado's apartment
21  barking before the front door was breached?
22     A.   No, I could not recall.
23     Q.   Do you recall when you heard the
24  dog bark, if you heard the bark at all?

Page 52

1      A.   I couldn't recall when.
2      Q.   Okay.  No problem.
3          Do you know who ordered the door to
4   be breached, if anyone?
5      A.   That would be the supervisor behind
6   me.  I don't know specifically who.
7      Q.   All right, sir.  So let me give you
8   one more instruction.  Your only -- I mean,
9   subject to your attorney's instructions, your only
10  obligation today is to give truthful testimony
11  based on your personal knowledge.
12     A.   Oh.  Sorry about that.
13     Q.   So I'm not going -- I'm not going
14  to ask you to guess or speculate at any time.
15     A.   Okay.
16     Q.   Just let me -- I know sometimes,
17  like at school, we get multiple -- multiple-option
18  tests where you are supposed to answer every
19  question.  But if you don't know an answer, that's
20  perfectly fine.
21          So do you, today, recall who, if
22  anyone, ordered for Ms. Alvarado's front door to
23  be breached?
24     A.   I don't know specifically.

Page 53

1    Q.    Okay.  You don't recall it?
2    A.    I don't recall.
3    Q.    All right.  If I told you that it
4  may have been Lieutenant Monk who ordered the
5  breach, does that refresh your recollection at
6  all?
7         MR. ZURBRIGGEN:  Object to form.
8         But, Officer, if you recall --
9         THE WITNESS:  No, I would not.  I
10  wouldn't know.
11  BY MR. WEST:
12    Q.    Have you ever heard of something
13  called the knock-and-announce rule?
14    A.    Yes.
15    Q.    What is the knock-and-announce rule
16  in your experience?
17    A.    We always knock and announce at
18  least three times before we wait for an order from
19  a supervisor to breach.
20    Q.    Okay.  And did you ever receive any
21  training as to how much time you should allow to
22  pass between, pursuant to the knock-and-announce
23  rule, between knocking on someone's front door and
24  breaching their property?

Page 54

1    A.    To the best of my recollection,
2  reasonable time.
3    Q.    Okay.  And were you ever given any
4  guidance as to how much time should pass in order
5  for that be considered a reasonable amount of
6  time?
7    A.    To the best of my recollection, at
8  least three times minimum.
9    Q.    Okay.  And besides knocking at
10  least three times, is there any particular passage
11  of time that should be allowed to pass?
12    A.    I could not recall the specific
13  time, sir.
14    Q.    Okay.  Did you ever receive any
15  training that the knock-and-announce rule might
16  apply to certain kinds of doors at a
17  multi-property residence, but not other kinds of
18  doors?
19         MR. ZURBRIGGEN:  Object to form.
20         Officer, you can answer if you can.
21         THE WITNESS:  No.
22         MR. WEST:  Okay.
23         THE WITNESS:  We normally knock on
24    the front door.

Page 55

1  BY MR. WEST:
2    Q.    Right.  So any time -- and based on
3  your training, any door on the outside of the
4  knock-and-announce -- sorry, strike the question.
5         In your -- in your understanding of
6  the policies and procedures of the Philadelphia
7  Police Department, based on your training, any
8  door on the outside of a multi-residence property
9  is subject to the knock-and-announce rule before
10  the SWAT team is allowed to enter; correct?
11         MR. ZURBRIGGEN:  Object to form.
12         Officer, you can answer.
13         THE WITNESS:  Yes, that would be
14    correct.
15  BY MR. WEST:
16    Q.    Okay.  Can you recall at this time
17  how much time passed between, if any, between Ms.
18  Alvarado's front door being knocked on and her
19  door being knocked down with the SWAT unit ram?
20    A.    I cannot recall it specifically,
21  sir.
22    Q.    Do you recall whether or not it was
23  a reasonable amount of time?
24         MR. ZURBRIGGEN:  Object to form.

Page 56

1         But, Officer...
2         THE WITNESS:  Yeah.  It would be
3    reasonable, sir, to the best of my
4    recollection.
5  BY MR. WEST:
6    Q.    But do you have any specific
7  recollection of that amount of time that passed?
8         MR. ZURBRIGGEN:  Same objection.
9         THE WITNESS:  That, I do not.
10  BY MR. WEST:
11    Q.    Okay.  Sir, I can represent to you
12  that there actually is third-party video of that
13  incident.  It appears to show only a couple of
14  seconds passing.
15         Does that refresh your recollection
16  at all?
17         MR. ZURBRIGGEN:  Object to form.
18         THE WITNESS:  No.
19  BY MR. WEST:
20    Q.    Okay.  Were there any exigent
21  circumstances in effect in reference to the
22  warrant enforcement at the property of 4664
23  Torresdale Avenue, in your recollection?
24         MR. ZURBRIGGEN:  Object to form.

Electronically signed by Candace Weindel (601-298-573-1229)                                    2a62302a-8ff0-4b5f-afd8-b390790a1e34

Page 57

1    Officer, you can answer if you can.
2        THE WITNESS: Not that I recall
3    other than, to the best of my
4    recollection, we were serving a warrant
5    for -- for a homicide.
6        MR. WEST: Okay.
7        THE WITNESS: Yeah. I mean, to me,
8    that's -- you know, you are not -- you
9    are not serving a warrant on normal
10   human being.
11   BY MR. WEST:
12       Q.   Right. And in that situation,
13   because everyone is going to be on heightened
14   alert given the potential danger of the suspect,
15   it's all the more important for the reconnaissance
16   team to make sure they're sending you to the right
17   place; right?
18       MR. ZURBRIGGEN: Object to form.
19       Officer, you can answer.
20       THE WITNESS: Yes. That would make
21       sense.
22   BY MR. WEST:
23       Q.   Okay. Did -- before Ms. Alvarado's
24   front door was -- was rammed open, did you hear

Page 58

1    any person's voice from inside the apartment?
2        A.   Before?
3        Q.   Yeah.
4        A.   No.
5        Q.   Okay. So just tell me everything
6    you can remember, if anything, of what happened
7    once that front door was rammed open.
8        A.   To the -- to the best of my
9    recollection, the first that went in was Officer
10   Song and he made left and then I went straight to
11   the kitchen where I observed a female at -- way at
12   the back of the kitchen.
13       Q.   Okay. And isn't it true that at
14   some point Officer Song shot a dog in the
15   apartment, but that your back was turned to
16   Officer Song at the time and you did not see the
17   shooting?
18       A.   I did not see the shooting.
19       Q.   Okay. But you could see the -- the
20   female who is Ms. Alvarado; correct?
21       A.   Yes. She was at the -- at the
22   rear, at the back, at the kitchen.
23       Q.   Okay. Please tell me everything
24   you can recall about Ms. Alvarado at that time.

Page 59

1        A.   All I recall that when I was
2    approaching her to the kitchen, she raised her
3    hand. But that's the best of my recollection that
4    I can recall on that job.
5        Q.   Okay. So she raised her hand in a
6    non-threatening manner to indicate surrender; is
7    that correct?
8        MR. ZURBRIGGEN: Object to form.
9        But, Officer, you can answer if you
10       can.
11       THE WITNESS: Yeah,
12       non-threatening, yes.
13   BY MR. WEST:
14       Q.   Okay. And isn't it true that Ms.
15   Alvarado asked for an opportunity to put her dog
16   in its cage before it was shot?
17       MR. ZURBRIGGEN: Object to form.
18       But, Officer --
19       THE WITNESS: I do not recall that,
20       no.
21   BY MR. WEST:
22       Q.   Okay. You can't recall whether or
23   not she said that at this time?
24       A.   I don't think so.

Page 60

1        Q.   Okay. Do you recall anything
2    specifically that Ms. Alvarado said at that time?
3        A.   No.
4        Q.   But do you recall that Ms. Alvarado
5    was speaking at that time?
6        A.   I can't recall if -- what he said
7    -- she said.
8        Q.   Okay. So you can recall that she
9    was speaking. You just don't remember what she
10   said; is that correct?
11       A.   Yeah, that's correct.
12       Q.   Okay. Isn't it true that Ms.
13   Alvarado was partially nude at that time?
14       MR. ZURBRIGGEN: Object to form.
15       Officer, you can answer.
16       THE WITNESS: To the best of my
17       recollection, yes, but it's been a
18       while, yeah.
19   BY MR. WEST:
20       Q.   Okay. Did Ms. Alvarado in any way
21   act inappropriately or threateningly at any point
22   in any interaction you've ever had with her?
23       MR. ZURBRIGGEN: Object to form.
24       But, Officer, you can answer.

Electronically signed by Candace Weindel (601-298-573-1229)                    2a62302a-8ff0-4b5f-afd8-b390790a1e34

## Page 61

1  THE WITNESS: Not that I recall of.
2  BY MR. WEST:
3  Q.  Okay. To your understanding, was
4  Ms. Alvarado's apartment subject to the warrant
5  that we have shown you as Hamoy-1?
6  MR. ZURBRIGGEN: Object to form.
7  Officer, you can answer.
8  THE WITNESS: At that time, yeah, I
9  was -- I was -- that was my -- that's
10  what my -- that was my belief, yeah.
11  BY MR. WEST:
12  Q.  Based on the fact that the
13  supervisor told you to break the door down?
14  MR. ZURBRIGGEN: Object to form.
15  Officer...
16  THE WITNESS: Yes.
17  BY MR. WEST:
18  Q.  Did you have any other basis to
19  believe that Ms. Alvarado's apartment was subject
20  to this warrant?
21  MR. ZURBRIGGEN: Same objection.
22  THE WITNESS: No.
23  BY MR. WEST:
24  Q.  Okay. And Ms. Alvarado's apartment

## Page 62

1  was on the first floor; correct?
2  A.  Yes.
3  Q.  Okay. After the door was rammed
4  open, you could see inside of the apartment;
5  correct?
6  A.  Yes.
7  Q.  And you could see that it was an
8  occupied area; correct?
9  A.  Occupied, yes, by her.
10  Q.  Okay. And so you knew that there
11  was an occupied area on the first floor at that
12  time; correct?
13  A.  Yes.
14  Q.  So why did you enter that area even
15  though the warrant did not apply to the first
16  floor apartment?
17  MR. ZURBRIGGEN: Object to form.
18  Officer, you can answer.
19  THE WITNESS: That is the -- when
20  the door was breached, that's -- we went
21  inside and I didn't see any -- I didn't
22  see any -- like normally when you --
23  when you -- if it's like a multi -- you
24  know, multi-level house, normally

## Page 63

1  there's like stairs and doors left and
2  right, but that one, it was straight to
3  the living room into the kitchen.
4  BY MR. WEST:
5  Q.  Okay. So --
6  A.  So there's --
7  Q.  Wouldn't it have been reasonable
8  for you to understand at the moment the door was
9  breached that you had breached the door to the
10  wrong apartment?
11  MR. ZURBRIGGEN: Object to form.
12  THE WITNESS: No, not -- not after
13  we're inside the property.
14  BY MR. WEST:
15  Q.  What about the occupied area on the
16  first floor, if anything, led you to believe that
17  you had entered Apartment 2 on the second floor
18  rear?
19  MR. ZURBRIGGEN: Object to form.
20  Officer...
21  THE WITNESS: Once we -- once we
22  cleared that property, then I heard from
23  the supervisor that we need to go around
24  to the rear and I just followed

## Page 64

1  instructions.
2  BY MR. WEST:
3  Q.  Let me see if I have a photo. If
4  you can just give me a moment.
5  Did you hear Officer Song say
6  anything about the dog shooting?
7  A.  No.
8  Q.  Did you hear Officer Song say
9  anything prior to shooting the dog?
10  A.  No.
11  Q.  All right, sir. This is a photo.
12  It's actually dated here. It was taken from
13  Google Maps on May 15th of this year.
14  MR. WEST: We'll mark this as
15  Hamoy-2.
16  - - -
17  (Whereupon, the document was
18  marked, for identification purposes, as
19  Exhibit Number Hamoy-2.)
20  - - -
21  MR. WEST: And Adam, I didn't make
22  new copies.
23  MR. ZURBRIGGEN: That's fine.
24  MR. WEST: This is the same photo

Electronically signed by Candace Weindel (601-298-573-1229)            2a62302a-8ff0-4b5f-afd8-b390790a1e34

Page 65

1   we use all the time.
2        MR. ZURBRIGGEN:  I'll share -- I'll
3   share it with him.  That's fine.
4   BY MR. WEST:
5        Q.    Officer Hamoy, so if you could just
6   take a moment to orient yourself with that
7   photograph and let me know once you have had a
8   chance to look at it and proceed.
9        A.    Yup.
10       Q.    Okay.  Do you recognize what that's
11  a photograph of?
12       A.    Yeah, the property of 4658.
13       Q.    4664 Torresdale Avenue?
14       A.    Oh, sorry.  Yeah, 4664.
15       Q.    Could you mark with a yellow
16  highlighter the building that you believe was 4664
17  Torresdale?
18       A.    Just circle it?  (Witness complies)
19       Q.    Yes, just circle the building
20  because there's more than one in that picture.
21             Okay.  So the building that you've
22  circled with the yellow highlighter, is that the
23  building that was breached by the SWAT unit on
24  June 4, 2021?

Page 66

1        A.    To the best of my recollection,
2   yes.  But I think it's also on the recon sheet,
3   right, paperwork there.
4        Q.    But this is consistent with your
5   recollection of what it looked like; correct?
6        A.    Yes.
7        Q.    And there's a front door in this
8   yellow, highlighted, circled area; correct?
9        A.    Yes.
10       Q.    And that's the front door that --
11  that you and Officer Song and other SWAT unit
12  members breached; correct?
13       A.    Yes.
14       Q.    Sir, I want you to just carefully
15  look at that picture at this time, just carefully
16  review it.  And after you've had a chance to very
17  carefully look at it, would you let me know is
18  there a second floor above that door?
19             MR. ZURBRIGGEN:  Object to form.
20       Officer, you can answer.
21             THE WITNESS:  Yes.  It's clearly --
22       you can see it from there.
23  BY MR. WEST:
24       Q.    Immediately -- immediately above

Page 67

1   that front door, is there a second floor?
2             MR. ZURBRIGGEN:  Same objection.
3       Officer...
4             THE WITNESS:  Not immediately.
5       It's pushed back to the back.
6   BY MR. WEST:
7        Q.    Right.  So you can see that
8   somewhere in that building there is a second
9   floor, but that -- that door itself leads to an
10  area that's only one floor tall; correct?
11             MR. ZURBRIGGEN:  Same objection.
12       Officer...
13             THE WITNESS:  Yes.  Yup.  Yes.
14  BY MR. WEST:
15       Q.    Now, looking at that carefully at
16  this time, do you believe that it would be
17  reasonable for someone to believe that that door
18  led directly to the second floor rear apartment?
19             MR. ZURBRIGGEN:  Object to form.
20       Officer, you can answer.
21             THE WITNESS:  Yes.  To my
22       experience, there are -- there are --
23       there are times that it leads to the
24       second apartment, yeah.

Page 68

1   BY MR. WEST:
2        Q.    Okay.  But are there also times
3   where that door would have led to an occupied
4   first floor apartment?
5             MR. ZURBRIGGEN:  Object to form.
6       Officer, you can answer.
7             THE WITNESS:  Yes.
8   BY MR. WEST:
9        Q.    Okay.  And pursuant to this warrant
10  that we have already marked as Hamoy-1, would you
11  and the SWAT unit have been legally allowed to
12  enter the first floor apartment --
13             MR. ZURBRIGGEN:  Object to form.
14       Officer, you can answer.
15  BY MR. WEST:
16       Q.    -- in your -- in your understanding
17  of the Philadelphia policies and procedures?
18             MR. ZURBRIGGEN:  Same objection.
19       Officer...
20             THE WITNESS:  Based on what I have
21       seen here and what was highlighted in
22       that warrant, I would -- as I said
23       before, I would have went up to the
24       rear.  But that's me, though.

17 (Pages 65 to 68)

Page 69

1    BY MR. WEST:
2        Q.    You would not have done it if you
3    had --
4        A.    I would have went over to the rear,
5    yeah.
6        Q.    Okay.  All right, sir.  I don't
7    think I have any further questions for you at this
8    time.
9            MR. ZURBRIGGEN:  Just a couple
10           follow-up, Officer.
11               - - -
12           EXAMINATION
13               - - -
14   BY MR. ZURBRIGGEN:
15       Q.    Did you see the rear of the door at
16   any time that you were out serving the warrant,
17   the rear door?
18       A.    No because when we serve the
19   warrant, other than what we're told on the brief,
20   the rear normally goes the one to the rear.  So
21   they are the only ones that's going to have -- be
22   able to serve the rear or whoever reconned the
23   job.  So us as the entry team, we go straight to
24   where the supervisor wants us to be.

Page 70

1        Q.    And then, Officer Hamoy, I just
2    want to direct your attention back to Hamoy-2.
3            Can you see the markings on the
4    front door in this picture?
5        A.    No.
6        Q.    Do you recall the way the front
7    door was marked today?
8        A.    No.  The -- no.
9        Q.    Okay.  That's all I have, unless
10   Keith has any follow-up.
11           MR. WEST:  No, that's it.  Thank
12   you very much for your time, sir.
13           THE WITNESS:  Thank you.
14           MR. WEST:  I always hate having to
15   meet people for the first time like
16   this, so I hope you have a great day.
17   Okay.
18           THE WITNESS:  This is my first
19   time.
20           MR. ZURBRIGGEN:  I'll walk you out.
21               - - -
22           (Whereupon, the videotape
23   deposition concluded at 11:08 a.m.
24               - - -

Page 71

1            CERTIFICATION
2
3        I, CANDACE WEINDEL, hereby
4    certify that the foregoing is a true and
5    correct transcript transcribed from the
6    stenographic notes taken by me on Thursday,
7    August 17, 2023.
8
9
10
11
12       Candace C. Weindel
13           Candace Weindel,
             Court Reporter
14           Notary Public
15
16
17       (This certification does not apply
18   to any reproduction of this transcript,
     unless under the direct supervision of
19   the certifying reporter.)
20
21
22
23
24

Electronically signed by Candace Weindel (601-298-573-1229)                    2a62302a-8ff0-4b5f-afd8-b390790a1e34

**A**

**a.m** 1:17 4:21
  70:23
**ability** 7:9
**able** 13:8 46:23
  69:22
**accommodating**
  9:1
**act** 60:21
**action** 16:13
  29:11
**actively** 23:14
**Adam** 2:9 64:21
**Adam.Zurbri...**
  2:12
**addition** 10:24
**additional** 10:23
  11:3,9
**address** 4:17
  35:21,21
**affidavit** 26:18
  49:9
**ago** 6:12
**agreed** 4:1
**ahead** 16:8
  24:16 25:6
  33:8 43:23
**al** 1:8 4:12,24
**alert** 57:14
**allow** 53:21
**allowed** 26:3
  45:4 54:11
  55:10 68:11
**Alvarado** 1:5
  4:11,23 5:10
  6:3 58:20,24
  59:15 60:2,4
  60:13,20
**Alvarado's**
  29:12 41:24
  45:1 51:20
  52:22 55:18
  57:23 61:4,19
  61:24
**amount** 32:12
  54:5 55:23
  56:7
**animal** 14:24
**announce** 53:17

**answer** 8:13
  11:19 12:8,23
  13:15 14:13
  15:5,11 16:2
  17:2,10 18:2
  18:12 19:14
  20:5 21:7,18
  22:1,5 24:2,16
  25:13 27:10
  28:13,20 29:16
  30:11 31:15
  32:9 33:8
  34:19 36:12
  38:19 40:10
  42:5 43:3,23
  44:15 45:6,18
  46:19 48:23
  49:24 50:21
  51:4,16 52:18
  52:19 54:20
  55:12 57:1,19
  59:9 60:15,24
  61:7 62:18
  66:20 67:20
  68:6,14
**answered** 24:15
  33:7 43:22
**anticipate** 19:6
**anticipated**
  19:11
**apartment** 26:3
  26:4 27:2 31:9
  31:9,12,13
  33:5 34:2
  41:24 42:11
  44:12 45:1
  50:9 51:20
  58:1,15 61:4
  61:19,24 62:4
  62:16 63:10,17
  67:18,24 68:4
  68:12
**appears** 56:13
**applied** 44:12
  50:15
**applies** 49:21
**apply** 54:16
  62:15 71:16
**approach** 14:10

**approaching**
  59:2
**appropriate**
  50:17
**Arch** 2:10
**area** 27:13 62:8
  62:11,14 63:15
  66:8 67:10
**asked** 15:11 19:4
  23:19 24:15
  33:7 43:22
  49:18 59:15
**asking** 42:22,24
**assigned** 47:9
**associated** 27:23
**assume** 20:23
  42:17
**assumed** 42:23
**attack** 15:8 18:6
**attempting**
  14:11
**attend** 27:23
**attention** 70:2
**attorney's** 52:9
**attorneys** 6:1
**audio/video** 4:10
**August** 1:11
  4:20 71:7
**Avenue** 41:22
  50:8 56:23
  65:13
**avoid** 16:10
**aware** 47:2
  50:11,14

**B**

**B** 3:8
**back** 31:6 33:16
  33:20 42:11
  43:15,16 44:2
  50:5 58:12,15
  58:22 67:5,5
  70:2
**background**
  14:6
**Badge** 5:4
**bark** 51:24,24
**barking** 51:21
**barricade** 49:3

**barricades**
  11:23 13:22
**base** 46:20
**based** 51:1
  52:11 55:2,7
  61:12 68:20
**basic** 11:6 34:8
**basically** 18:5
  23:2 26:11
  40:18
**basis** 61:18
**Bates** 49:9
**beginning** 1:17
**behalf** 5:9
**belief** 61:10
**believe** 6:23 8:13
  16:3,19 19:6
  37:4 45:14
  47:24 50:16
  61:19 65:16
  65:16 67:16,17
**belt** 20:18
**best** 11:7 16:10
  25:23,24 29:18
  41:12 47:24
  54:1,7 56:3
  57:3 58:8 59:3
  60:16 66:1
**bite** 14:23
**breach** 53:5,19
**breached** 51:21
  52:4,23 62:20
  63:9,9 65:23
  66:12
**breaching** 53:24
**break** 8:23
  38:10 61:13
**brief** 30:6 43:14
  69:19
**briefing** 27:20
  27:24 28:2,8
  28:18,24 29:13
  29:22 30:1,4,9
  30:17 31:1
  43:19 44:5
**bring** 8:3
**Broad** 1:16 2:4
  4:17
**broadly** 22:2

**building** 25:11
  25:18 26:4,21
  31:10 33:3
  36:10 41:7
  45:3 50:12,15
  65:16,19,21,23
  67:8
**building/room...**
  11:22
**buildings** 21:16
  22:3 23:20,23
  24:13 32:7

**C**

**C** 2:1
**cage** 59:16
**call** 22:19 35:24
  50:23 51:9
**called** 53:13
**Candace** 1:18
  5:11 71:3,13
**capacity** 10:1
**caption** 4:22
**car** 49:4
**careful** 7:18
**carefully** 66:14
  66:15,17 67:15
**case** 4:23 6:2
  27:3,23 41:15
  43:15 44:11
**caught** 23:19
**Center** 1:15 2:3
  4:17
**certain** 41:5
  54:16
**certification** 4:3
  71:1,16
**certify** 71:4
**certifying** 71:18
**chance** 6:10
  13:7 65:8
  66:16
**changing** 48:9
**charge** 29:5
**check** 41:6,13
**circle** 65:18,19
**circled** 65:22
  66:8
**circumstance**

41:13
**circumstances**
12:18 56:21
**City** 1:8 2:9 4:11
4:23 32:6
**clear** 24:20
27:14 45:11,11
**cleared** 20:23
63:22
**clearly** 66:21
**close** 10:4 11:7
**coffee** 8:24
**Common** 1:1
4:13 5:1
**Commonwealth**
1:19
**complies** 65:18
**concluded** 70:23
**confused** 40:8
**considered**
12:20 13:12
54:5
**consistent** 66:4
**contact** 38:15,24
40:8
**contacted** 37:18
**contacting** 39:11
**contain** 23:11
**containment**
43:15 44:2
**contaminate**
19:1
**context** 48:12,14
**conversation**
7:15 8:6
**copies** 64:22
**copy** 26:18 49:8
49:18
**correct** 7:3 9:6
9:10,22 11:2
12:5 15:3,13
15:18,19 17:21
20:13 28:5,14
28:18,21 32:17
41:7 44:13
47:5 49:22
51:14 55:10,14
58:20 59:7
60:10,11 62:1

62:5,8,12 66:5
66:8,12 67:10
71:5
**counsel** 4:2 7:2
**COUNTY** 1:2
**couple** 56:13
69:9
**court** 1:1,22
4:13,24 7:15
33:17,19 71:13
**covered** 11:17
**criteria** 22:13
**cue** 8:2
**currently** 5:22
9:5
_____
**D**
**D** 3:1
**danger** 12:21
57:14
**date** 4:20
**dated** 64:12
**day** 11:12 22:19
41:19 47:17,23
48:6,7,8 70:16
**dealing** 25:6
**December** 9:17
10:19
**decision** 26:12
34:21
**Defendants** 1:9
2:12
**Defense** 10:12
49:10
**deny** 22:12
**Department** 2:9
9:8 10:2,6,11
10:14 12:12
14:8 15:21,23
21:14 24:11
33:2 34:16
38:14 55:7
**depending** 41:12
**depends** 11:14
26:9 29:8
36:21
**deploy** 18:22
19:3
**deposed** 5:3

**deposition** 1:13
4:10,21 5:8,11
6:5,8 70:23
**depositions** 7:13
**DESCRIPTION**
3:9
**detective** 26:10
26:16,18 27:7
27:23 28:17
37:20 38:6
40:16
**detectives** 22:9
22:22 38:4
39:9,10
**DIAMOND**
1:22
**different** 18:20
48:10
**direct** 70:2
71:17
**directive** 16:18
16:20 17:8,15
**directives** 15:22
**directly** 67:18
**distance** 36:20
**District** 10:4
**Docket** 4:13 5:1
**document** 49:13
64:17
**documents** 6:11
**dog** 14:2,22,23
15:2,7,13
16:11,14 17:17
18:5,10 19:6
19:12 20:1,13
51:20,24 58:14
59:15 64:6,9
**dogs** 14:19
15:24
**doing** 7:13 19:8
37:16 41:18
**door** 22:17 23:8
23:9 25:8,8
28:10 29:1
32:1 34:12,14
38:10 40:20
42:2,8,11,14
42:18,23 43:1
43:7,10,16,20

44:2,5 45:11
45:15,22 46:3
46:9,16,24
50:12,18,18
51:12,13,21
52:3,22 53:23
54:24 55:3,8
55:18,19 57:24
58:7 61:13
62:3,20 63:8,9
66:7,10,18
67:1,9,17 68:3
69:15,17 70:4
70:7
**doors** 29:2 35:22
54:16,18 63:1
**duly** 5:15
_____
**E**
**E** 2:1,1,15,15
3:1,8
**effect** 17:8 56:21
**either** 29:8
**employed** 4:16
**encounter** 18:10
19:6,12 20:1
20:13
**encountering**
17:17
**encounters** 15:2
15:13,24
**endangers** 16:12
**ended** 29:11
**enforce** 12:13,16
13:24 14:11
21:15 27:20
32:16
**enforced** 21:4
28:5 37:1
41:23
**enforcement**
12:5 19:9 20:1
24:12 26:5
29:11 37:16
56:22
**enforcing** 13:11
19:23 27:6
28:11 38:16
**enter** 25:8 26:4

28:10 31:9,11
33:4 45:4,10
50:8,17 55:10
62:14 68:12
**entered** 46:3,9
47:4 50:4,7,10
63:17
**entering** 29:3,12
41:24 44:24
**entrance** 41:6
50:13
**entry** 20:7,20
23:14 24:19
42:18 45:9
69:23
**environment**
18:21,23 19:18
**equipment**
11:23
**especially** 41:17
**ESQUIRE** 2:3,9
**estimate** 13:15
**et** 1:8 4:12,24
**everybody** 22:20
**exactly** 16:21
**Examination**
3:4,5 5:18
69:12
**examined** 5:15
**example** 26:2
**execute** 27:4
36:1,4
**executing** 50:19
**Exhibit** 49:15
64:19
**exigent** 56:20
**existence** 42:1
**exit** 42:9
**expect** 18:10
**experience**
12:11 13:9
14:18 18:4
27:22 32:5,15
37:15 51:1
53:16 67:22
**explain** 8:17
13:4 26:14
_____
**F**

61:12
**fair** 17:23 46:8
**far** 12:4 26:15
**federal** 10:11
**Felishatay** 1:5
  5:9
**female** 58:11,20
**figure** 46:15
**filing** 4:4
**fine** 7:14 52:20
  64:23 65:3
**firearms** 11:21
**first** 5:15 6:6,8
  16:24 25:3
  45:8,11 58:9
  62:1,11,15
  63:16 68:4,12
  70:15,18
**floor** 1:16 2:4,10
  4:18 26:20,20
  44:13 49:11,22
  50:9 62:1,11
  62:16 63:16,17
  66:18 67:1,9
  67:10,18 68:4
  68:12
**follow** 27:13
**follow-up** 69:10
  70:10
**followed** 63:24
**following** 22:18
**follows** 5:16
  28:16
**foregoing** 71:4
**form** 4:5 11:18
  12:7,22 14:12
  15:4 17:1,9
  18:1,11 19:13
  20:4 21:6 23:5
  24:1,14 25:12
  25:21 26:7
  27:9 28:12
  29:15 30:10
  31:14 32:8
  33:6 34:6,18
  36:11 37:11,22
  38:18 39:18
  40:1 41:8 42:3
  43:21 44:14

45:5,17 46:4
46:18 47:10
48:22 49:23
50:20 51:15
53:7 54:19
55:11,24 56:17
56:24 57:18
59:8,17 60:14
60:23 61:6,14
62:17 63:11,19
66:19 67:19
68:5,13
**found** 14:20
**front** 23:12 32:1
  34:12,13 36:9
  46:16 50:10,18
  51:21 52:22
  53:23 54:24
  55:18 57:24
  58:7 66:7,10
  67:1 70:4,6
**further** 69:7

**G**

**gate** 38:2
**gestures** 8:6
**getting** 31:6
**give** 14:6 26:19
  52:7,10 64:4
**given** 14:7 26:15
  28:3,9 31:8
  45:1 54:3
  57:14
**giving** 28:24
**go** 8:9 11:6 16:8
  17:8 24:16
  27:15,16 33:8
  35:21 43:23
  63:23 69:23
**goes** 69:20
**going** 21:9 23:9
  29:24 34:1
  36:17 49:3
  52:13,13 57:13
  69:21
**good** 5:21,23,24
  7:24 8:1 13:7
  22:10 32:12
**Google** 3:12

64:13
**great** 70:16
**ground** 7:12
**guess** 14:5 52:14
**guidance** 17:15
  31:10 33:1
  38:13 54:4

**H**

**H** 3:8
**half** 9:18 37:3
**Hamoy** 1:14 3:3
  5:4,14,24 9:4
  65:5 70:1
**Hamoy-1** 3:11
  49:8,15 61:5
  68:10
**Hamoy-2** 3:12
  64:15,19 70:2
**hand** 8:6 19:19
  20:3,12 59:3,5
**handle** 13:8
  15:24
**hands** 20:9,21
**happened** 47:21
  58:6
**harm** 14:24
  16:11
**hate** 70:14
**head** 8:8
**headquarters**
  6:17
**hear** 16:17,21
  57:24 64:5,8
**heard** 16:24
  51:23,24 53:12
  63:22
**hearing** 51:20
**heightened**
  12:21 57:13
**help** 20:13
**helpful** 36:4
**high** 18:21,23
**high-risk** 12:24
  13:1,2,5,21
  18:21,23 19:18
**highlighted**
  49:10 66:8
  68:21

**highlighter**
  65:16,22
**home** 12:5,17
  29:12
**homes** 12:13
  13:11 14:1
  21:5
**homicide** 57:5
**honestly** 37:6
**hope** 70:16
**hour** 11:12
**house** 20:23
  22:16 23:10,11
  23:15 27:16
  31:13,24 32:2
  39:6 62:24
**human** 57:10
**hurting** 16:14

**I**

**identification**
  49:14 64:18
**illness** 7:8
**Image** 3:12
**immediately**
  66:24,24 67:4
**impair** 7:9
**importance** 31:7
**important** 25:5
  31:13,16 57:15
**in-depth** 23:1,3
**in-service** 11:10
**inappropriately**
  60:21
**incident** 9:19
  37:1,9 47:9
  56:13
**include** 29:1
**including** 30:1
**indicate** 26:19
  48:20 59:6
**infer** 17:23
**influence** 7:7
**inside** 27:15
  58:1 62:4,21
  63:13
**inspection** 36:9
**instruction** 52:8
**instructions**

28:4,9 29:1
45:2 52:9 64:1
**intended** 8:21
**interact** 14:19
**interaction**
  60:22
**interpretation**
  51:2
**issue** 8:3 31:6
  44:20
**issued** 15:22
**issues** 38:1

**J**

**Jersey** 1:23
**job** 10:5 12:11
  22:8 37:5 45:9
  59:4 69:23
**jobs** 28:7
**joined** 10:20,22
**joining** 9:24
  11:4
**Jose** 1:14 3:3 5:4
  5:14
**June** 1:5 9:20
  16:24 17:24
  19:22 29:12
  37:1 41:23
  65:24

**K**

**keep** 50:6
**Keith** 2:3 6:1
  70:10
**Keith@victim...**
  2:6
**key** 38:3
**keys** 38:8
**kind** 7:21 22:17
  23:8 25:2
  35:22 40:20
  47:8
**kinds** 14:10
  54:16,17
**kitchen** 58:11,12
  58:22 59:2
  63:3
**knew** 19:24
  51:12 62:10
**knock** 53:17

54:23
**knock-and-an...**
53:13,15,22
54:15 55:4,9
**knocked** 55:18
55:19
**knocking** 53:23
54:9
**knocks** 46:16
**know** 6:22 8:18
8:23,23 9:15
15:7,20 16:12
18:5 23:2,7
29:21 33:13
35:22,23 36:3
36:17,18 37:8
37:23 38:2
39:15 40:10,20
42:8,9,10,13
42:24 43:7,9
45:7,16 46:2,8
46:23 51:8
52:3,6,16,19
52:24 53:10
57:8 62:24
65:7 66:17
**knowledge**
52:11

**L**
**L** 2:15
**L&I** 39:11
**Lane** 1:23
**Law** 1:15 2:3,9
4:16
**lead** 45:23
**leads** 25:8 46:17
67:9,23
**leave** 27:16
**led** 45:15,22
46:3,9 50:16
63:16 67:18
68:3
**left** 58:10 63:1
**legally** 68:11
**lieutenant** 29:6
29:9,19,23
30:3 53:4
**little** 9:13,13

**live** 32:6
**living** 63:3
**log** 49:4
**long** 9:11
**look** 22:16 35:22
65:8 66:15,17
**looked** 66:5
**looking** 67:15
**lot** 11:15,22 37:3
40:6
**louder** 8:17

**M**
**main** 13:19
**major** 18:24
**majority** 13:16
18:21 39:6,9
**making** 20:7,20
**manager** 37:18
38:15
**manner** 59:6
**Mantua** 1:23
**Maps** 3:12 64:13
**Marines** 10:10
**mark** 49:8 64:14
65:15
**marked** 32:3
49:14 64:18
68:10 70:7
**markings** 70:3
**matter** 4:11
**mean** 21:23
26:15 48:14,16
52:8 57:7
**meaning** 8:17
**means** 13:5
**medication** 7:8
**meet** 22:13
27:12 70:15
**Melody** 29:22
30:1,17
**member** 9:5,11
9:21 14:9
32:15
**members** 28:3
29:2 31:8
66:12
**minimum** 54:8
**misunderstood**

25:3
**moment** 19:17
20:22 63:8
64:4 65:6
**Monk** 29:19,23
30:3 53:4
**month** 9:15
11:10,10,12,12
**months** 6:12
**morning** 5:21,23
5:24
**multi** 62:23
**multi-level**
62:24
**multi-property**
54:17
**multi-residence**
21:5,16 22:3
23:20,23 24:13
25:7,11 32:7
32:17,22 33:3
34:12 36:7
37:17 38:17
45:3 55:8
**multiple** 52:17
**multiple-option**
52:17

**N**
**N** 2:1,15 3:1
**name** 4:15 6:1
**naturally** 28:16
**necessarily**
14:21
**need** 7:23 8:16
8:23 22:18,20
23:9,15 35:23
35:24 40:21,23
41:5 63:23
**needs** 7:15
**never** 15:1,12
**new** 1:23 64:22
**Nimai** 2:16 4:15
**nine** 11:7
**nods** 8:8
**non-threatening**
59:6,12
**normal** 7:14 8:6
12:11 13:7,10

30:5,6,21,22
30:22 32:14
42:11 57:9
**normally** 23:11
24:4,5 26:19
27:8,19,23
31:23 38:21,23
41:11,13 47:7
47:15 49:1
54:23 62:22,24
69:20
**Notary** 1:19
71:14
**notes** 71:6
**Notice** 1:14
**nude** 60:13
**number** 4:13 5:1
5:4 26:3 31:9
32:2 44:13
49:15 64:19

**O**
**O** 2:15
**Object** 11:18
12:7,22 14:12
15:4 17:1,9
18:1,11 19:13
20:4 21:6 23:5
24:1,14 25:12
25:21 26:7
27:9 28:12
29:15 30:10
31:14 32:8
33:6 34:6,18
36:11 37:11,22
38:18 39:18
40:1,11 41:8
42:3 43:21
44:14 45:5,17
46:4,18 47:10
48:22 49:23
50:20 51:15
53:7 54:19
55:11,24 56:17
56:24 57:18
59:8,17 60:14
60:23 61:6,14
62:17 63:11,19
66:19 67:19

68:5,13
**objection** 15:15
16:1,7 20:15
21:17 22:4
28:19 30:18
31:21 32:18
33:22 35:4,14
42:15 43:2,11
44:7 46:10
51:3 56:8
61:21 67:2,11
68:18
**objections** 4:5
**obligation** 52:10
**observe** 46:21
**observed** 58:11
**OC** 19:3 20:18
**occupied** 62:8,9
62:11 63:15
68:3
**occurred** 9:20
**offenders** 13:6
13:12,13
**officer** 1:13 3:3
5:4,10,14,21
5:22,24 9:4
10:3,16 11:1
11:19 12:8,23
13:7,14 14:13
14:23 15:5
16:2,8 17:2,4
17:10,16 18:2
18:12 19:14
20:5,16 21:7
21:18 22:5
23:6,18 24:2
24:16 25:13,22
26:8 27:10
28:13,20 29:16
30:11,19 31:15
31:22 32:9,19
33:8,23 34:7
34:19 35:15
36:12 37:12,23
38:19 39:19
40:2,12 41:9
42:4,16 43:3
43:12,23 44:8
44:15 45:6,18

46:11,19 47:5
47:7,11 48:23
49:24 50:21
51:4,16 53:8
54:20 55:12
56:1 57:1,19
58:9,14,16
59:9,18 60:15
60:24 61:7,15
62:18 63:20
64:5,8 65:5
66:11,20 67:3
67:12,20 68:6
68:14,19 69:10
70:1
**officers** 15:23
19:2 35:24,24
**Oh** 52:12 65:14
**Okay** 6:9,14 7:1
7:5,17,19 8:7
8:10,15,19 9:2
9:3,15,18 10:5
10:13,16,22
11:3,8,11,16
12:3,10,15
13:4,9,19,23
14:17 15:1,10
15:20 16:5,17
16:23 17:7,14
17:23 18:8
19:22 20:11
21:22 22:24
23:3 24:6,22
25:17 26:14,22
27:19 28:2,8
28:16,23 29:6
29:10,21 30:2
30:24 31:4,20
32:14,24 33:11
34:4,11 35:8
35:11,18 37:8
37:15 38:12
39:2,8,23 40:5
40:24 43:18
44:19,24 45:14
48:2,12 49:7
50:4,11 51:19
52:2,15 53:1
53:20 54:3,9

54:14,22 55:16
56:11,20 57:6
57:23 58:5,13
58:19,23 59:5
59:14,22 60:1
60:8,12,20
61:3,24 62:3
62:10 63:5
65:10,21 68:2
68:9 69:6 70:9
70:17
**on-the-job** 34:9
**once** 22:19
27:14 35:20
58:7 63:21,21
65:7
**ones** 69:21
**open** 57:24 58:7
62:4
**operate** 48:13
**operator** 2:16
4:9,14 5:6
18:24 38:23
**operators** 40:21
48:11
**opportunity**
59:15
**opposed** 23:23
25:10
**options** 18:16
**order** 40:20
53:18 54:4
**ordered** 52:3,22
53:4
**orient** 65:6
**outside** 36:19
41:17 46:22
55:3,8
**owner** 38:8,24
39:6 40:14

———————
**P**
**P** 2:1,1,15
**PA** 1:16 2:5,11
**PAGE** 3:2,9
**paperwork** 37:6
44:23 66:3
**part** 11:4 13:23
14:8,17 20:1

21:2,12 24:9
26:4 28:17
31:12 33:1
38:13 39:13,16
**partially** 60:13
**particular** 37:9
54:10
**parties** 4:2
**partner** 47:20
48:1,5,6,14
**partners** 48:9,18
49:1
**parts** 33:3
**pass** 53:22 54:4
54:11
**passage** 54:10
**passed** 55:17
56:7
**passing** 56:14
**patrol** 10:3,16
11:1 13:7
18:20 49:4
**Pennsylvania**
1:2,20 4:19
**people** 13:11
22:18 27:6
32:6 36:18
41:17 70:15
**pepper** 18:17,22
19:7
**perfectly** 52:20
**perform** 36:6
**performed** 4:22
**person** 4:22
28:23
**person's** 58:1
**personal** 14:18
52:11
**personally** 42:1
**personnel** 23:13
**pertain** 23:22
**pertaining** 15:22
**pertinent** 33:20
**Philadelphia** 1:2
1:8,16 2:5,9,11
4:12,12,18,24
4:24 9:5,8 10:2
10:6,14 12:12
14:8 15:21,23

21:13 24:11
32:6 33:2
34:15 38:14
55:6 68:17
**photo** 64:3,11
64:24
**photograph**
65:7,11
**picture** 65:20
66:15 70:4
**pistol** 20:19
**place** 57:17
**plainly** 42:11
**plaintiff** 1:6 2:6
5:9 6:2
**play** 36:23
**Pleas** 1:1 4:13
5:1
**please** 8:12
58:23
**point** 22:14
58:14 60:21
**police** 9:8 10:2,6
10:11,14 12:12
14:8 15:21,23
21:13 24:11
33:2 34:15
38:14 55:7
**policies** 55:6
68:17
**portions** 45:2
**position** 10:13
47:16
**positioning**
23:10
**possible** 16:23
33:15
**possibly** 47:20
**potential** 57:14
**preparation**
6:11
**prepare** 18:10
**prepared** 7:2
**pretty** 32:14
**prevent** 16:13
**prevents** 16:13
**prior** 6:20 9:24
10:6,13 41:23
44:24 64:9

**private** 19:23
27:7 28:11
**probably** 51:6,7
51:12
**problem** 52:2
**procedures** 55:6
68:17
**proceed** 65:8
**process** 8:22
28:18
**Professional**
1:18
**proficiency**
11:21
**properties** 24:20
**property** 14:3
14:20 22:17
24:19 25:6,7
25:15 27:15
31:18 32:2,17
33:3 34:12
36:7 37:17,18
38:8,15,17,24
39:12 40:14,19
41:15,21 42:12
45:12,24 47:5
50:7 53:24
55:8 56:22
63:13,22 65:12
**Public** 1:19
71:14
**purposes** 18:4
49:14 64:18
**pursuant** 1:14
53:22 68:9
**pushed** 67:5
**put** 23:11,13
43:13,14 44:1
59:15

———————
**Q**
**question** 4:6
8:12,17 14:6
15:11 21:9,10
23:19 25:20
33:13 45:19
47:3,13 52:19
55:4
**questions** 7:6

40:6 69:7
**quite** 17:4

---

**R**

**R** 2:1,9,15
**raised** 59:2,5
**ram** 55:19
**rammed** 57:24
58:7 62:3
**randomly** 47:9
**read** 7:6 16:21
33:16,19
**reading** 4:3
**real** 15:7
**really** 14:23
**rear** 23:12 36:9
41:6,14,14
42:1,8,9,14,18
42:19,23 43:1
43:7,9,14,19
44:2,5,13
49:11,22 50:9
50:12,15,18
51:12,13 58:22
63:18,24 67:18
68:24 69:4,15
69:17,20,20,22
**reasonable** 54:2
54:5 55:23
56:3 63:7
67:17
**recall** 17:11,14
29:14,17 30:2
30:8,12,16,20
30:24 37:6
42:4 43:4 44:1
44:4,16,17,19
51:19,22,23
52:1,21 53:1,2
53:8 54:12
55:16,20,22
57:2 58:24
59:1,4,19,22
60:1,4,6,8 61:1
70:6
**receive** 10:23
11:4 14:1 21:3
21:14,24 22:8
24:11 32:24

34:4,24 35:11
35:20 38:12
53:20 54:14
**received** 6:11
13:24 15:1,12
21:3,13 24:10
31:10 35:19
40:9,17 41:2,4
**recognize** 65:10
**recollection** 11:7
17:20,24 29:19
47:24 53:5
54:1,7 56:4,7
56:15,23 57:4
58:9 59:3
60:17 66:1,5
**recon** 22:16
24:18 66:2
**reconnaissance**
6:18,19 31:7
31:24 35:9,12
36:7,8,14,24
37:4,9,16 39:3
39:13,16,24
40:7,18 41:11
41:18 46:15
57:15
**reconned** 69:22
**reconning** 25:5
**record** 8:4,9
**records** 39:12
48:5,18
**Recovery** 1:15
2:3 4:16
**Redbud** 1:23
**refer** 17:18 37:5
44:22
**reference** 14:19
49:7,11 56:21
**referring** 17:8
**refresh** 53:5
56:15
**regards** 14:1,9
29:10 38:16
41:21 43:19
**related** 15:2
40:6
**remember** 16:20
17:19 22:2

58:6 60:9
**repeat** 8:16
**rephrase** 14:5
21:9 45:19
**report** 6:16,19
**reporter** 1:18
7:15 33:17,19
71:13,18
**REPORTING**
1:22
**represent** 9:20
56:11
**represented** 7:1
**representing** 2:6
2:12 6:2
**reproduction**
71:17
**request** 22:8
38:5
**requested** 22:22
**reserved** 4:6
12:19
**residence** 19:24
25:9,10,19
27:7 28:11
54:17
**residences** 14:11
**respective** 4:2
**responses** 8:10
**responsibilities**
30:6
**rest** 19:2
**review** 6:10,20
66:16
**reviewed** 6:15
**rifle** 19:20 20:3
20:9,22
**right** 5:21,22 8:2
9:4 10:20 14:5
15:18 19:4
23:18 25:15,17
25:19 31:18
47:4 52:7 53:3
55:2 57:12,16
57:17 63:2
64:11 66:3
67:7 69:6
**risk** 12:20
**role** 36:23

**room** 63:3
**rule** 53:13,15,23
54:15 55:9
**rules** 7:12
**run** 43:16

---

**S**

**S** 2:1,15,15 3:8
**safe** 20:24
**safely** 36:5
**saying** 40:7
**says** 26:10 27:1
48:4,17 49:10
49:21 50:1
**scene** 27:8
**school** 11:6,17
34:8 52:17
**sealing** 4:3
**search** 3:11 49:8
**second** 26:19
44:13 49:11,21
50:9 63:17
66:18 67:1,8
67:18,24
**seconds** 56:14
**see** 32:1 36:2
40:18 41:6
49:20 58:16,18
58:19 62:4,7
62:21,22 64:3
66:22 67:7
69:15 70:3
**seen** 6:13 51:5
51:11 68:21
**send** 38:5
**sending** 57:16
**sense** 57:21
**sergeant** 29:7,9
29:21 30:1,17
**serve** 22:21 34:1
36:17 38:6
40:22 46:1
48:24 69:18,22
**served** 44:21
**service** 6:16,19
26:10,15 30:7
**services** 11:24
**serving** 19:2,18
20:6 32:21

57:4,9 69:16
**share** 65:2,3
**sheet** 66:2
**sheets** 6:18
**shift** 48:1,11
**shooting** 58:17
58:18 64:6,9
**shot** 58:14 59:16
**show** 56:13
**shown** 61:5
**Shukla** 2:16
4:15
**side** 23:12
**signing** 4:3
**single** 47:17
**sir** 8:11 19:4
20:9 21:24
33:14 34:21
35:6 39:21
40:15 41:2,21
42:19,22 44:23
45:20 46:1,6
46:21,22,24
47:2 49:7,18
49:20 50:2,10
50:23 51:9
52:7 54:13
55:21 56:3,11
64:11 66:14
69:6 70:12
**situation** 13:5
34:17 35:3,13
36:21 57:12
**situations** 12:19
41:5
**somebody** 16:14
**someone's** 53:23
**Song** 47:5,8
58:10,14,16
64:5,8 66:11
**sorry** 5:7 7:22
16:8 25:2
33:14 52:12
55:4 65:14
**sort** 7:8 11:16
17:15 34:14
35:12
**sounds** 40:5
**South** 1:15 2:4

4:17
**speak** 7:19 8:17
**speaking** 39:6
40:14 60:5,9
**special** 11:22
**specific** 10:24
15:2,13 18:9
19:10 21:4,14
22:3 23:20
24:12 26:3,6
28:4,6,9 29:1
31:9,12 33:1,5
33:11,24 36:3
37:5 38:13
45:9 48:6,8
54:12 56:6
**specifically** 27:1
30:3,8,16,24
31:5 34:23
42:24 43:24
44:4,12 49:21
52:6,24 55:20
60:2
**specified** 12:4
**speculate** 52:14
**spent** 13:11
**spoke** 38:7
**spoken** 8:5,10
**spray** 18:17,23
19:3,7 20:18
**squad** 47:15
**staging** 27:13
**stairs** 63:1
**stamped** 49:9
**standard** 7:5
**standing** 41:17
**started** 9:16
**starting** 10:19
**statement** 6:21
**stenographic**
71:6
**step** 21:23,23
**straight** 58:10
63:2 69:23
**street** 1:16 2:4
2:10 4:18
50:13
**strike** 21:8 47:3
55:4

**stuff** 11:24 20:19
23:16 36:2,19
40:15 49:5
**subject** 25:9
52:9 55:9 61:4
61:19
**substance** 7:8
**supervision**
71:17
**supervisor** 22:11
29:4,13 35:6
37:19 38:22
39:7,21 40:8
40:16 51:7
52:5 53:19
61:13 63:23
69:24
**supervisor's**
22:14 26:12
34:21 50:23
51:8
**supervisors**
38:22
**supposed** 14:2
46:15 52:18
**sure** 8:10 22:10
23:18 25:7,14
25:18 31:11,17
34:13 57:16
**surrender** 59:6
**suspect** 43:16
57:14
**SWAT** 9:5,8,12
9:21,24 10:20
10:22,24 11:5
11:6,17 12:11
12:16,18 13:10
13:20 14:9
18:24 19:9
21:2,12 24:10
27:6 28:3 29:2
31:8 32:15
34:15 35:24
39:17 40:21
48:13 55:10,19
65:23 66:11
68:11
**swear** 5:12
**sworn** 5:15

**T**

**T** 2:15 3:8
**take** 65:6
**taken** 1:14 5:8
64:12 71:6
**talking** 40:13
**tall** 67:10
**team** 42:19 45:9
46:15 47:16
48:15 49:2
55:10 57:16
69:23
**teams** 23:15
36:1
**tell** 6:14 16:20
43:18 46:6
58:5,23
**TERM** 1:5
**terms** 14:4 39:5
**testified** 5:16
19:7
**testify** 7:2,9
**testimony** 6:11
33:20 52:10
**tests** 52:18
**Thank** 70:11,13
**thing** 13:19 24:5
25:5 32:15
**things** 8:5,8
46:14
**think** 15:6 36:3
37:2 45:22,23
50:16 59:24
66:2 69:7
**third** 26:20
**third-party**
56:12
**thought** 39:2
**threateningly**
60:21
**three** 53:18 54:8
54:10
**Thursday** 71:6
**time** 4:6 5:12 6:6
7:19 8:23 9:21
13:10,16 16:22
17:5,21,22
18:22,22 19:19
20:20 22:21

25:6 29:22
31:2 32:20
36:15 39:10
41:16 42:20
47:8,22 48:9
48:10,13 52:14
53:21 54:2,4,6
54:11,13 55:2
55:16,17,23
56:7 58:16,24
59:23 60:2,5
60:13 61:8
62:12 65:1
66:15 67:16
69:8,16 70:12
70:15,19
**times** 53:18 54:8
54:10 67:23
68:2
**today** 5:3 6:11
7:2,10 44:6
52:10,21 70:7
**Today's** 4:20
**told** 23:22 53:3
61:13 69:19
**tool** 20:2,12
**tools** 17:16 18:9
19:5,10,16
20:17 23:8
35:23 40:22
**topics** 11:16
**Torresdale**
41:22 50:8
56:23 65:13,17
**train** 11:14 15:7
**trained** 11:20
24:18,23 39:24
**training** 10:23
11:1,4,10 12:3
13:23 14:1,4,7
14:18,21 15:2
15:12 18:8
21:2,3,12,14
21:22 24:9,12
33:1,12 34:5,9
34:14,24 35:12
35:18 38:13
40:9,17 41:1,4
53:21 54:15

55:3,7
**transcribed** 71:5
**transcript** 71:5
71:17
**trial** 4:7,11
**true** 12:18 41:23
58:13 59:14
60:12 71:4
**truthful** 52:10
**truthfully** 7:10
**try** 9:1 14:23
16:10 18:6
31:17
**trying** 46:1 48:2
**turned** 58:15
**two** 9:14,18 37:3

**U**

**ultimately** 8:4
**unaware** 42:1
**uncomfortable**
8:22
**understand** 8:13
25:20 47:12
63:8
**understanding**
12:15 16:6,9
55:5 61:3
68:16
**unique** 23:21
**unit** 9:6,9,12,21
9:24 10:20,23
10:24 11:5
12:12,16,18
13:10,20 14:9
19:9 21:2,12
24:10 27:6
28:3 29:2 31:8
32:16 34:15
39:17 48:13
55:19 65:23
66:11 68:11
**unnecessarily**
8:22
**use** 4:10 11:23
18:10 19:1,5,7
19:8,16 20:12
36:1 38:9 65:1
**useful** 12:4

**usually** 7:13
  12:19 29:6
**utilize** 17:16
  19:11

**V**

**V** 4:11,23
**various** 14:10
**verify** 22:9,11
  35:21
**VICTIMS** 2:3
**Victims'** 1:15
  4:16
**video** 4:14 56:12
**videotape** 1:13
  2:16 4:9 5:6
  70:22
**view** 22:14
**violent** 13:6,12
  13:13
**visual** 36:9
**voice** 58:1
**vs** 1:7

**W**

**wait** 53:18
**waived** 4:4
**walk** 70:20
**wanna** 36:16
**want** 36:16 50:5
  66:14 70:2
**wants** 69:24
**warrant** 3:11
  11:24 12:5,17
  13:2,5 19:2,9
  19:23 20:7
  21:4,24 22:10
  22:21 23:24
  25:9 26:2,5,10
  26:15,17,17
  27:4,7,17,20
  28:4,7,11
  29:11 30:7
  31:8 32:16
  33:5 34:2
  35:20 36:1,5
  36:18,24 37:16
  38:5,16 40:22
  41:22 44:11,20
  45:10 46:1

47:17 49:1,9
  49:19,19 50:14
  50:19 51:6,11
  56:22 57:4,9
  61:4,20 62:15
  68:9,22 69:16
  69:19
**warrants** 12:13
  13:11,22,24
  14:11 21:15
  24:13 32:21
  37:3 44:21
**wasn't** 42:18,19
  43:1
**water** 8:24
**way** 46:22 58:11
  60:20 70:6
**ways** 7:14
**we'll** 9:1 64:14
**we're** 18:20 20:6
  20:7,20 23:8
  29:24 41:18
  47:14 49:3
  63:13 69:19
**weapon** 20:2,12
**weapons** 17:16
  18:9 19:5,11
**weeks** 11:7
**Weindel** 1:18
  5:11 71:3,13
**went** 58:9,10
  62:20 68:23
  69:4
**West** 2:3 3:4
  5:20 6:1 12:2,9
  13:1,3,18
  14:16 15:9,17
  16:4,16 17:6
  17:13 18:7,14
  19:21 20:10
  21:1,8,11,21
  22:23 23:17
  24:6,8,22 25:1
  25:4,16 26:1
  26:13 27:18
  28:15,22 29:20
  30:15,23 31:19
  32:4,13,23
  33:10,15 34:3

34:10,22 35:2
  35:7,17 36:22
  37:14 38:11
  39:1,22 40:4
  40:24 41:3,20
  42:7,21 43:6
  43:17 44:3,10
  44:18 45:13,21
  46:7,13 47:1
  47:12,19 49:6
  49:17 50:3,24
  51:10,18 53:11
  54:22 55:1,15
  56:5,10,19
  57:6,11,22
  59:13,21 60:19
  61:2,11,17,23
  63:4,14 64:2
  64:14,21,24
  65:4 66:23
  67:6,14 68:1,8
  68:15 69:1
  70:11,14
**window** 23:13
**windows** 35:23
  40:19
**witness** 3:2 5:3,5
  5:12 11:20
  12:24 13:2,16
  14:15 15:6,16
  16:3,9 17:3,11
  18:3,13 19:15
  20:6,17 21:20
  22:7 23:7 24:4
  24:7,17,23
  25:2,14,23
  26:9 27:12
  28:14,21 29:18
  30:13,21 31:16
  31:23 32:11,20
  33:9,24 34:8
  34:20 35:5,16
  36:13 37:13,24
  38:20 39:20
  40:3,13 41:1
  41:10 42:6,17
  43:5,13,24
  44:9,17 45:8
  45:19 46:5,12

46:20 47:14
  48:24 50:1,22
  51:5,17 53:9
  54:21,23 55:13
  56:2,9,18 57:2
  57:7,20 59:11
  59:19 60:16
  61:1,8,16,22
  62:19 63:12,21
  65:18 66:21
  67:4,13,21
  68:7,20 70:13
  70:18
**wondering**
  48:17,19
**word** 8:18 18:3
  18:3
**work** 47:7 48:11
**wouldn't** 19:8
  27:8 40:10
  41:5 53:10
  63:7
**write** 7:16
**written** 8:4
**wrong** 34:2
  63:10

**X**

**X** 3:1,8

**Y**

**yeah** 5:23,23
  7:20 8:1 10:18
  11:9 13:17,21
  15:8,19 16:15
  17:22 22:1,7
  23:1 24:7,17
  25:14,15,23,24
  26:23 27:12,17
  28:6 31:5
  32:21 33:17,24
  43:5,8 47:14
  50:1 56:2 57:7
  58:3 59:11
  60:11,18 61:8
  61:10 65:12,14
  67:24 69:5
**year** 64:13
**years** 9:14,18
  10:4,17 37:3

**yellow** 65:15,22
  66:8
**Yup** 7:4 65:9
  67:13

**Z**

**Zurbriggen** 2:9
  3:5 11:18 12:7
  12:22 13:14
  14:12 15:4,15
  16:1,7 17:1,9
  18:1,11 19:13
  20:4,15 21:6
  21:17 22:4
  23:5 24:1,14
  25:12,21 26:7
  27:9 28:12,19
  29:15 30:10,18
  31:14,21 32:8
  32:18 33:6,22
  34:6,18 35:1,4
  35:14 36:11
  37:11,22 38:18
  39:18 40:1,11
  41:8 42:3,15
  43:2,11,21
  44:7,14 45:5
  45:17 46:4,10
  46:18 47:10
  48:22 49:23
  50:20 51:3,15
  53:7 54:19
  55:11,24 56:8
  56:17,24 57:18
  59:8,17 60:14
  60:23 61:6,14
  61:21 62:17
  63:11,19 64:23
  65:2 66:19
  67:2,11,19
  68:5,13,18
  69:9,14 70:20

**0**

**01633** 1:6
**08051** 1:23

**1**

**10** 10:4,17
**10:10** 1:17 4:21

**11:08** 70:23
**121** 1:15 2:4
  4:17
**14th** 2:10
**151** 49:10
**1515** 2:10
**15th** 64:13
**17** 1:11 4:20
  71:7
**18th** 1:16 2:4
  4:18
**19102** 2:11
**19107** 1:17 2:5
  4:19

___
**2**
___
**2** 44:13 63:17
**2020** 9:17 10:19
**2021** 9:20 16:24
  17:24 19:23
  29:12 37:1
  41:23 65:24
**2022** 1:5
**2023** 1:11 4:20
  71:7
**214-0377** 2:11
**215** 2:5
**220601633** 4:14
  5:2
**25th** 10:4
**2984** 5:6
**2987** 5:4

___
**3**
___
**352** 2:11

___
**4**
___
**4** 9:20 16:24
  17:24 37:1
  41:23 65:24
**406** 1:23
**46** 50:7
**4658** 65:12
**4664** 41:22 50:8
  56:22 65:13,14
  65:16
**49** 3:11

___
**5**
___
**5** 3:4

**546-1433** 2:5
**589-1107** 1:24

___
**6**
___
**64** 3:12
**69** 3:5

___
**7**
___

___
**8**
___
**84** 5:5
**856** 1:24

# EXHIBIT "S"



Jun 4 2021 11:42am   P001
Fax                                                    Jun 4 2021 10:34am   P001/009

# Commonwealth of Pennsylvania  ss:
## CITY AND COUNTY OF PHILADELPHIA

APPLICATION FOR
## SEARCH WARRANT
AND AFFIDAVIT

WARRANT CONTROL NO.
**242513**

ISSUED TO DIST/UNIT

Det. Timothy Scully          791          Hom          Homicide

being duly sworn (or affirmed) before me according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at particular premises or in the possession of particular person as described below.

DATE OF APPLICATION
06-03-21

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible): Any and all firearms, ammunition or other ballistic evidence, clothing, including dark colored pants, dark belt, black, white and orange or red Puma sneakers, cellular phones and any and all other items deemed to be of evidentiary value to this investigation.

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSONS TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.):
4664 Torresdale Ave. Phila. Pa. 19124, 2nd floor rear.

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (If proper name is unknown, give alias and/or description):
Pedro Mirela, 20⁄4 Bleigh Ave. Phila. Pa.19152

VIOLATION OF (Describe conduct or specify statute)
Homicide

YEAR/DIST/COMPLAINT NO.
21-15-037016

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES (Sea specific instructions below):

See attached 75/52

ATTACH ADDITIONAL PAPER (75-51) IF NECESSARY          ☐ CHECK HERE IF ADDITIONAL PAPER IS USED.
## PLEASE SEE REVERSE SIDE OF THIS PAGE FOR INSTRUCTIONS

SIGNATURE OF AFFIANT          BADGE NO.          DIST/UNIT
Det. T. Scully # 791   Hom

Sworn to (or affirmed) and subscribed before me this 3 day of June 21

(SEAL)
(Signature of Issuing Authority)

COURT LOCATION

Date Commission Expires

RESULT OF SEARCH          DATE AND TIME OF SEARCH
☐ A.M.
☐ P.M.

ARREST
☐ Yes  ☐ No

JUDGE'S DISPOSITION
☐ Disc.  ☐ Held for Court  ☐ Further Hearing  ☐ Fined or Committed

PROPERTY SEIZED          (If "No" list inventory below)
☐ Yes  ☐ No

IF ADDITIONAL SPACES REQUIRED, USE REVERSE SIDE — INVENTORY MUST APPEAR ON ALL COPIES OF THE WARRANT.

I certify, subject to the penalties and provisions of 18 Pa. C.S. §4904(b) that this is a true and correct listing of all items seized.

OTHER OFFICERS PARTICIPATING IN SEARCH

Signature of Person Seizing Property          Badge No.

SIGNATURE OF WITNESS TO INVENTORY (Name and Address)

TO LAW ENFORCEMENT OFFICER: WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the above described premises or person, and to seize, secure, inventory, and make return according to the Pennsylvania Rules of Criminal Procedure, the above described items.

☑ This Warrant shall be served as practicable but in no event later than 950 ☑ A.M. ☐ June 5, 20 21

and shall be served only during daytime hours of 8 A.M. to 10 P.M.

Issued under my hand this ___ day of June,
20 21 at 900 P M o'clock. (Issue time must be stated)
(SEAL)
(Signature of Issuing Authority)

Court location
JBL

Court Commission Expires          9/21/14          Title of Issuing Authority   ACM

☐ This warrant shall be served as soon as practicable but in no event later than ___ ☐ A.M. ☐ P.M. ___, 20 ___.

and may be served anytime during day or night.

Issued under my hand this ___ day of ___
20 ___ at ___ M o'clock. (Issue time must be stated)
(SEAL)
(Signature of Issuing Authority)

* The issuing authority shall specify a date and time but no later than two (2) days after issuance (Pa. R. Crim. P. 205(b)).
** If the issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavit and wishes to issue a nighttime search warrant, only this section shall be completed. (Pa. R. Crim. P. 206(7)).

75-175 (Rev. 4/14)

CONFIDENTIAL



EXHIBIT
Scully
3
6-9-28-23

CONTINUATION OF APPLICATION FOR SEARCH WARRANT AND AFFIDAVIT #242513 .

On Saturday, May 22, 2021, at approximately 9:51pm, 15th District and SEPTA Police Officers responded to gunshots in the area of the Frankford Terminal, and observed the decedent, LH, 28/B/M suffering from multiple gunshot wounds to his body on the highway outside of 5223 Frankford Avenue. RPC 1526 transported the victim to Temple Hospital. At 10:10pm, the victim succumbed to his injuries and was pronounced dead by Dr. Santora.

Philadelphia Police Crime Scene Unit personnel measured, sketched, photographed and processed the scene. Investigators located ballistics, blood and a firearm as evidence. A total of twenty three (23) FCCs were located, nine (9) FC 9mm lugers and fourteen (14) OMPC 9mm. one (1) projectile, one (1) lead fragment and one (1) copper fragment.

On Sunday, May 23, 2021 Dr. Chu of the Office of the Medical Examiner conducted a post-mortem examination on the remains of the Decedent, and determined the cause of death to be multiple gunshot wounds and the manner of death Homicide.

Det. Anderson # 822 obtained video surveillance footage from the SEPTA Frankford Transportation Center that captured the shooting death of the Decedent. At approximately 9:49pm this footage depicts a light colored SUV traveling north on Frankford Avenue, and then making a right on Granite Street pulling over. Damage to the driver rear window of the SUV can be observed. The Decedent and another male (DP) are observed walking north on Frankford Avenue. As the males approach the corner of Frankford Avenue and Granite Street (in front of the Rainbow Shop at 5223 Frankford Avenue), the Offender exits the passenger side of the light colored SUV and shoots the Decedent, and the Decedent then collapses on the sidewalk. The Offender is a male with apparent braided hair, shirtless and wearing dark pants with light colored underwear or shorts above the waistband, and dark sneakers with a white logo.  The Offender then goes back onto Granite Street. DP initially backs away, but is then observed running to the corner of Frankford Avenue and Granite Street where he fires multiple gunshots (muzzle flashes are observed) east on Granite Street in the direction of the Offender. DP then runs east on Granite Street with SEPTA Police in foot pursuit. (DP was subsequently apprehended at 1600 Pratt Street out of view of the camera)

On Monday, May 24, 2021, the Real Time Crime Center (RTCC) contacted the Homicide Unit in reference to the shooting of LH at 5223 Frankford Avenue.  An anonymous tipster called the RTCC with the information that a male known to the tipster as ████████" committed the shooting.  The tipster elaborated that Philadelphia Police stopped ████ on the 5200 block of Marlowe Street recently, but that he was not arrested.  The tipster told RTCC that ████ drives a gold SUV and that, at the moment the tipster was on the phone with RTCC, that vehicle was on the 5200 block of Mulberry Street with several bullet holes in it.  The tipster provided a Pennsylvania license plate for that vehicle: LHW-2868.

A BMV check showed that PA Tag# LHW-2868 is registered to a 2004 Suzuki belonging to ████████, 4664 Torresdale Avenue, Philadelphia, PA 19124.

Detectives Domenic and Grace performed several checks and found that ███████████. PPN: 1005293 was stopped by Police on the 5200 block of Marlowe Street on April 5, 2021 (DC# 21-15-24065).

Detective Grace requested an ALPR (Automated License Plate Reader) check for Pennsylvania license plate LHW-2868.  The results showed multiple positive results in close proximity to 4664

A BMV check showed ███████ to have a PA ID listing the address of 4664 Torresdale Avenue, Philadelphia, PA 19124.

A check of Prison Release Data shows ████████ ██████ was last released on 6/18/2020 to 4664 Torresdale Avenue, 2nd Floor.

On June 2, 2021 the assigned spoke with Probation Officer Shannon who supervises ██████ PPN 1005293. Officer Shannon has not met with ████████ due to COVID protocols but last spoke to him on the telephone on May 5, 2021. Officer Shannon provided an address of 4664 Torresdale Avenue, 2nd Floor Rear for ██████.

The affiant is respectfully requesting that a search and seizure warrant be granted for the property at 4664 Torresdale Avenue, 2nd Floor Rear, Philadelphia, PA 19124 to recover any firearms, ammunition or other ballistic evidence, clothing including dark colored pants, dark belt, black, white and orange or red Puma sneakers, cellular telephones, and any other items deemed to be of evidentiary value to this investigation.

*I certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.*

| | | |
|---|---|---|
| Signature of Affiant | Badge | Unit |

Sworn to (or affirmed) and subscriber before me this _____ 3_____

Day of ____June_____ , 2021.

Signature of Issuing Authority

# EXHIBIT "T"

# Transcript of the Testimony of:
# **Detective Francis Graf**

**Date:** September 28, 2023

**Case:** Alvarado v. City of Philadelphia, et al

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

IN THE COURT OF COMMON PLEAS

PHILADELPHIA COUNTY, PENNSYLVANIA

- - -

FELISHATAY ALVARADO            :   JUNE TERM, 2022
                               :
      vs.                      :
                               :
CITY OF PHILADELPHIA, et al    :   NO. 1633

- - -

THURSDAY, SEPTEMBER 28, 2023

- - -

Videotaped Oral Deposition of
DETECTIVE FRANCIS GRAF, taken at Victims' Recovery
Law Center, The North American Building, 121 South
Broad Street, Philadelphia, Pennsylvania,
commencing at 10:15 a.m., before Denise Weller, a
Professional Shorthand Reporter and Notary Public
in and for the Commonwealth of Pennsylvania.

- - -

DIAMOND COURT REPORTING
406 Redbud Lane
Mantua, New Jersey 08051
(856) 292-4292
dcr.diamond@comcast.net

Page 2

```
 1   A P P E A R A N C E S :
 2
 3   VICTIMS' RECOVERY LAW CENTER
     BY:  KEITH WEST, ESQUIRE
 4   The North American Building
     121 South Broad Street
 5   18th Floor
     Philadelphia, PA  19107
 6   (215) 546-1433
     Keith@victimrecovery.com
 7   Attorney for the Plaintiff
 8
     CITY OF PHILADELPHIA
 9   LAW DIVISION
     BY:  ADAM R. ZURBRIGGEN, ESQUIRE
10   1515 Arch Street
     14th Floor
11   Philadelphia, PA  19102
     (215) 683-5114
12   Adam.zurbriggen@phila.gov
     Attorney for the Defendants
13
              - - -
14
     ALSO PRESENT:
15      Courtney Kitcherman, Video Operator
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1             I N D E X
 2
 3   WITNESS                    PAGE
 4
 5   DETECTIVE FRANCIS GRAF
 6     (By Mr. West)            6
 7
 8
 9
10              - - -
11
12            EXHIBITS
13   NO.        DESCRIPTION      PAGE
14
15   Graf-1       Statement       4
16   Graf-2     Property Search  36
17   Graf-3      Recon Sheet     39
18   Graf-4      Google Map      40
19   Graf-5       Interview      45
20   Graf-6       File Notes     48
21   Graf-7      Google Map      56
22   Graf-8     Arrest Warrant   65
23
24
```

Page 4

```
 1              - - -
 2           PROCEEDINGS
 3              - - -
 4       (Whereupon, Exhibit Graf-1 was
 5   premarked for identification.)
 6
 7       (It is hereby stipulated and agreed
 8   by and between counsel that signing,
 9   sealing, filing and certification are
10   waived; and that all objections, except as
11   to the form of the questions, are reserved
12   until the time of trial.)
13              - - -
14       MR. WEST:  So normally in this case
15   we agree to the normal stipulations by which
16   we mean that all objections except to the
17   form of the question are reserved to the
18   time of trial.
19       MR. ZURBRIGGEN:  Agreed.
20       THE VIDEOGRAPHER:  Deposition of
21   Police Detective Francis Graf, IV, badge
22   number 9066.  This, the audio/video
23   deposition for use at trial in the matter of
24   Alvarado vs. The City of Philadelphia, et
```

Page 5

```
 1   al; Philadelphia Court of Common Pleas
 2   docket number 220601633.
 3       And I am the video operator.  My
 4   name is Courtney Kitcherman.  And I am
 5   employed by the Victims' Recovery Law
 6   Center.  My address is 121 South Broad
 7   Street, 18th Floor, Philadelphia,
 8   Pennsylvania, 19107.  Today's date is
 9   September 28th at 10:16 a.m.
10       This deposition is being performed
11   in person.  The caption of this case is
12   Alvarado versus City of Philadelphia, et al,
13   Philadelphia Court of Common Pleas, docket
14   number 220601633.  The witness being deposed
15   today is Detective Francis Graf, IV, badge
16   number 9066.
17       This deposition is being taken on
18   behalf of Plaintiff, Felishatay Alvarado.
19   The officer taking this deposition is Denise
20   Weller.  And she shall swear the witness in
21   at this time.
22              - - -
23       DETECTIVE FRANCIS GRAF, after having
24   been first duly sworn, was examined and
```

Electronically signed by Denise Weller (401-411-238-5399)                    651df335-a17f-42a7-9b61-2015e189a2b8

Page 6

1  testified as follows:
2      - - -
3      EXAMINATION
4      - - -
5  BY MR. WEST:
6      Q.  Good morning, Detective Graf.  My name is
7  Keith West.  I am one of the attorneys
8  representing the plaintiff in this case, Ms.
9  Alvarado.  All right.  You have already had a
10 chance to speak with your attorney, you're
11 prepared to proceed today, correct?
12     A.  Correct.
13     Q.  Okay.  And don't take anything -- you
14 have probably been through a deposition before.
15 We have a couple of standard questions that we
16 have to ask everybody.  It's not anything
17 important to you.
18     Are you under the influence of any sort
19 of medication, illness, substance, anything that
20 would impair your ability to testify truthfully
21 today?
22     A.  No.
23     Q.  Okay.  All right.  Detective Graf, have
24 you ever been in a deposition before?

Page 7

1      A.  Yes.
2      Q.  How many times have you been deposed?
3      A.  I would say maybe three.
4      Q.  Okay.  All right.  So you have probably
5  heard the basic outline of how we do these before.
6  I will go through it quickly.  If you have any
7  additional questions or want any clarifications,
8  let me know.
9      A.  Okay.
10     Q.  As your attorney has told you, your only
11 obligation today is to give truthful testimony
12 based on your personal knowledge.
13     So we would ask for you not to guess or
14 speculate at any time.  But we want to know
15 everything you know.  So if you can estimate or
16 approximate or if you don't have complete
17 knowledge, that is good, just let us know that you
18 are giving an estimate or approximation, okay?
19     A.  Okay.
20     Q.  And we don't intend for this to be an
21 unnecessarily uncomfortable process, so if you
22 would like to take a break, you know, want some
23 more coffee or anything like that, just let us
24 know, okay?

Page 8

1      A.  Okay.
2      Q.  And please don't answer any questions
3  unless you understand them.  If you would like me
4  to speak louder, more slowly, you need me to
5  rephrase a question, anything like that, just let
6  us know and we will try to again, be as
7  accommodating as possible, okay?
8      A.  Okay.
9      Q.  All right.  So Detective Graf, you're
10 currently a homicide detective with the City of
11 Philadelphia, correct?
12     A.  Yes.
13     Q.  How long have you been a homicide
14 detective?
15     A.  11 and a half years.
16     Q.  All right.  So right now it is -- right
17 now it's 2023.  So do you think that you became a
18 homicide detective in about 200 -- what would that
19 be, about 2011?
20     A.  It was January of 2012.
21     Q.  All right.  And prior to that, what job
22 did you have?
23     A.  I was a detective at East Detective
24 Division in Philadelphia.

Page 9

1      Q.  Okay.  And what kind of cases would you
2  handle there?
3      A.  In the beginning when I first started
4  working there I would -- basically anything that
5  was not a homicide.
6      Q.  Okay.
7      A.  Or a sex offense.
8      Q.  Okay.
9      A.  But the last seven years there I was
10 assigned almost exclusively to non-fatal
11 shootings.
12     Q.  Okay.  And how long did you have that
13 job?
14     A.  At Detective East?
15     Q.  Yes.
16     A.  12 years.
17     Q.  Okay.  Approximately when did you join
18 the Philadelphia Police Department?
19     A.  1995.
20     Q.  When you joined, what was your -- what
21 was your original rank?
22     A.  Police recruit.  Actually, I worked for
23 the City as a civilian dispatcher for three
24 months.  Then I was a police recruit and then a

3 (Pages 6 to 9)

Page 10

1   police officer.
2      Q.  Were you -- basically what I am getting
3   at is did you start as a patrol officer?
4      A.  Yes.
5      Q.  Okay.  So you have kind of gone all of
6   the ranks up from patrol officer to homicide
7   detective, right?
8      A.  I was a patrol officer for three years, a
9   corporal for a year.  And then I have been a
10  detective since 1999.
11     Q.  Were you ever a sergeant or lieutenant?
12     A.  No.
13     Q.  Okay.  And have you ever been a member of
14  the SWAT Unit?
15     A.  No.
16     Q.  When you were deposed previously, what
17  were those three cases about?
18     A.  I just had one.  I am trying to think
19  what it was.  It was during COVID.  I am trying to
20  think what case that was.  I know one was
21  definitely an auto accident.
22     Q.  Okay.
23     A.  I think two were auto accidents,
24  actually.  And the last one -- I am trying to

Page 11

1   think what case that was.  It was from homicide.
2   It was a homicide case.  But I don't recall what
3   the -- oh, I'm sorry.  It was a person was killed
4   inside of an apartment building.  And the family
5   was suing the apartment complex.
6      Q.  Okay.  I am trying to think if that might
7   have actually been one of our cases.  Because we
8   handle a lot of crime victim cases.  Your name
9   comes up a lot just reading records.  I don't
10  remember if we ever --
11     A.  I am trying to think.  It was a woman
12  that got killed.  I can't think of her name.
13     Q.  It might have been with David
14  Thiruselvam.  It doesn't matter.  All right,
15  Detective.  So -- but you have never been a
16  defendant in a 1983 action?
17     A.  1983?
18        MR. ZURBRIGGEN:  Object to form.
19  Detective, if you know what that is.
20        THE WITNESS:  I don't know what that
21  is.
22  BY MR. WEST:
23     Q.  That's fine.  You have never been a
24  defendant in a lawsuit?

Page 12

1      A.  I have been a defendant in a lawsuit, but
2   that was eventually dropped when it went to trial.
3      Q.  Okay.  Were you deposed in that case?
4      A.  I don't recall being deposed.
5      Q.  Okay.  Could you tell me generally what
6   that case was about?
7      A.  It was an arrest made by the narcotics
8   drug force.
9      Q.  Okay.
10     A.  I handled the case.  I was the assigned
11  detective to the case.
12     Q.  Okay.  Just generally, was this related
13  to -- there's been kind of a series of cases in
14  Philadelphia about there was a narcotics unit back
15  in -- back of a number of years ago that has been
16  alleged --
17     A.  It had nothing to do with that.
18     Q.  Okay.  So this is a separate narcotics
19  issue?
20     A.  Yes.
21     Q.  Okay.  Fine.  All right.  Detective Graf,
22  this case involves a warrant informant --
23  enforcement action back in June 2021 at a property
24  located on Torresdale Avenue.

Page 13

1      Do you have any recollection of this case
2   at all today?
3      A.  Yes.
4      Q.  Okay.  And did you have a chance to
5   review any documents or materials in preparation
6   for today's testimony?
7      A.  I reviewed my statement to internal
8   affairs shooting.
9      Q.  Okay.  Did you review any video?
10     A.  No.
11     Q.  Did you -- are you aware if there is any
12  video of this enforcement action at all?
13     A.  Not that I am aware of.
14     Q.  Okay.  Did you -- did you review any
15  other documents besides your own statement?
16     A.  No.
17     Q.  All right.  I premarked your statement as
18  Graf-1.  It's right next to you.  You can take a
19  look.  Look at it real quick.  We will start off
20  going over that.
21     Do you recall today giving this statement
22  on June 17th of 2021?
23     A.  Yes.
24     Q.  Outside of reading the statement, do you

Electronically signed by Denise Weller (401-411-238-5399)                    651df335-a17f-42a7-9b61-2015e189a2b8

Page 14

1    have any recollection of being involved in a
2    warrant enforcement action for the address 4664
3    Torresdale Avenue?
4        A.  Can you repeat?
5        Q.  Yes, absolutely.  I am just wondering, do
6    you -- is your recollection limited to reviewing
7    this document or do you have any memory of this
8    incident separate from what you just read on the
9    paper?
10       A.  I recall being present.
11       Q.  Okay.  And in this statement, I will read
12   from the second page of the packet, Bates stamped
13   Defense 69.  "On June 2nd, 2021, I spoke to
14   Probation Officer Shannon of Philadelphia
15   Probation and Parole, who supervises" -- and it's
16   blocked off, but I can represent the name there is
17   ███████████.
18           Do you actually have any recollection of
19   that conversation today?
20       A.  Yes.
21       Q.  Okay.  Did you know that ███████ had
22   been on house arrest?
23       A.  I don't recall that.  I won't say yes or
24   no.  I don't remember.

Page 15

1        Q.  Okay.  Are you aware -- strike the
2    question.
3            In your experience if a suspect had been
4    placed on house arrest, would that mean that
5    someone from the Probation or Parole Office had,
6    by necessity, made a physical inspection of the
7    house?
8            MR. ZURBRIGGEN:  Object to form.
9    But Detective, if you know, you can answer.
10           THE WITNESS:  I don't know.  I don't
11   know their procedures.
12   BY MR. WEST:
13       Q.  Okay.  So in your many years of
14   experience with the Philadelphia Police
15   Department, you have never been educated as far as
16   what the procedures of the Philadelphia Probation
17   and Parole Office are?
18           MR. ZURBRIGGEN:  Same objection.
19   But Detective, you can answer.
20           THE WITNESS:  I don't know what
21   their procedures -- I can only assume.  I
22   don't know what their actual procedures are.
23   BY MR. WEST:
24       Q.  Okay.  Do you have any knowledge whether

Page 16

1    anybody from the Philadelphia Probation and Parole
2    Office had made an inspection of ███████████
3    residence?
4        A.  I do not.
5        Q.  Did you ever ask anyone if that had
6    happened?
7        A.  No, not that I recall.
8        Q.  Okay.  You obtained the address 4664
9    Torresdale Avenue, second floor rear, from Mr.
10   ███████ probation officer; is that correct?
11       A.  Correct.
12       Q.  All right.  And are you basing that just
13   on the statement you gave, the statement here or
14   do you have any specific recollection of doing
15   that?
16           MR. ZURBRIGGEN:  Object to form.
17   But go ahead, Detective.
18           THE WITNESS:  I mean, I remember the
19   conversation I had with the probation
20   officer.
21   BY MR. WEST:
22       Q.  Okay.
23       A.  I am sure I recorded this information
24   somewhere.  I mean, this was also the day prior to

Page 17

1    obtaining the warrant.
2        Q.  And you had that conversation in order to
3    gather information to prepare warrants to go to
4    Mr. ████ house, correct?
5        A.  Well, there -- I would -- I don't have an
6    independent recollection of this.  But I also --
7    we sometimes use probation officers or parole
8    agents to view video of people to possibly make an
9    identification.  In this case I don't know that
10   she had met with Mr. ████.  It was all based during
11   COVID.  So a lot of this was due to COVID
12   protocols.
13       Q.  Okay.  Did you ask parole officer --
14   probation -- strike the question.
15           Did you ask Probation Officer Shannon to
16   view any video related to this investigation?
17       A.  No.
18       Q.  Okay.  So what information did you ask
19   Probation Officer Shannon for related to this
20   investigation?
21       A.  We would ask for an address, possibly a
22   phone number.
23       Q.  Okay.
24       A.  I don't remember independently asking.

Page 18

1   Based on my experience, that is what I would
2   usually ask.
3       Q.   Okay.  And when you ask a probation
4   officer for a suspect's address, would you
5   normally also ask the probation officer how to
6   access the address?  How to enter the address?
7           MR. ZURBRIGGEN:  Objection to form.
8       Detective, if you know.
9           THE WITNESS:  I don't recall ever
10      asking that of a probation officer.  In this
11      case the probation officer had never been
12      there.
13  BY MR. WEST:
14      Q.   Okay.
15      A.   At least that's what I was told.
16      Q.   So why were you gathering this
17  information?  For what purpose?
18          MR. ZURBRIGGEN:  Object to the form.
19      But Detective, if you understand.
20          THE WITNESS:  Well, we were
21      eventually going to serve a warrant at the
22      property.  And he is also a suspect in a
23      homicide.  So we were going to talk -- if
24      the person is on probation or parole, we

Page 19

1       would usually speak to the person who was
2       supervising.  I mean, there's other things
3       that we did here also.
4   BY MR. WEST:
5       Q.   Was it your job to gather information to
6   give to the SWAT Unit so that they would know how
7   to enter Mr. ███ residence to enforce the
8   warrant?
9       A.   SWAT usually does their own
10  reconnaissance of a property.  If we do know, you
11  know, sometimes it's an apartment building or
12  something like that.  But I give them as much
13  information as I have.
14      Q.   Okay.  So in order to determine how to --
15  strike the question.  I will lay a foundation.
16          In order to enforce a warrant, is it true
17  that the SWAT Unit would need to know how to enter
18  the residence?
19          MR. ZURBRIGGEN:  Object to the form.
20      Detective, if you can say.
21          THE WITNESS:  I mean, how?  They
22      will determine how they will enter a
23      residence.  They are the ones that are
24      making the entry.  I will provide them with

Page 20

1       whatever information I have.  Which I did in
2       this case.
3   BY MR. WEST:
4       Q.   Uh-huh.  The question I am asking you
5   right now, Detective Graf is, in order to enforce
6   a warrant, does the SWAT Unit need to know how to
7   enter the residence described in the warrant?
8           MR. ZURBRIGGEN:  Same objection.
9       Detective, to the extent you know.
10          THE WITNESS:  Well, they would make
11      that determination.  I mean, we are going to
12      give them the information we have.  And in
13      this case they went through the front door.
14  BY MR. WEST:
15      Q.   Okay.  So --
16      A.   I had no knowledge that there was a rear
17  entry to this property.
18      Q.   Okay.  And you simply didn't know there
19  was a rear door, correct?
20      A.   Well, I didn't know there was a rear
21  door.  But there's a rear door that leads to the
22  second floor on the first floor.  The property had
23  a front door with two mailboxes.  In my
24  experience, almost always if there is a second

Page 21

1   floor apartment, you make the entry through the
2   front door.  There's usually a door that leads to
3   the first floor apartment and stairs that go to
4   the second floor.
5       I have never -- in my recollection, I
6   never encountered going in through the rear of the
7   property like that.
8       Q.   I understand.  But for the building
9   located at 4664 Torresdale Avenue, you didn't know
10  that there was a rear door, correct?
11      A.   I didn't know until the day of the
12  warrant.
13      Q.   Until after was --
14      A.   The warrant was served.
15      Q.   After the warrant was served, that is
16  when you first learned there was a rear door,
17  correct?
18      A.   Correct.
19      Q.   Okay.  Did you know that -- okay.  Strike
20  the question.
21      So 4664 Torresdale Avenue, you knew there
22  was a door on Torresdale Avenue; is that correct?
23      A.   Correct.
24      Q.   Did you know whether or not there was

6 (Pages 18 to 21)

Page 22

1   also an alleyway leading to the property?
2          MR. ZURBRIGGEN:  Object to the form.
3   Detective, if you understand.
4          THE WITNESS:  No.
5   BY MR. WEST:
6      Q.  You didn't know that, correct?
7      A.  I mean, I didn't check the alleyway --
8          MR. ZURBRIGGEN:  Same --
9          THE WITNESS:  -- but I didn't.
10         MR. ZURBRIGGEN:  Same objection.
11  BY MR. WEST:
12     Q.  So in your years of experience with the
13  Philadelphia Police Department, have you ever
14  received any training as far as how warrants
15  should be enforced at multi-residence properties?
16         MR. ZURBRIGGEN:  Object to the form.
17  But Detective, if you know, you can say.
18         THE WITNESS:  Not to my
19  recollection.
20  BY MR. WEST:
21     Q.  Okay.  And to make sure you understand
22  the point of the question -- well, let me ask this
23  question.
24         So was the warrant -- this is a new

Page 23

1   question.
2          Was the warrant at issue in this
3   operation valid for the entire building at 4664
4   Torresdale Avenue or for only a portion thereof?
5          MR. ZURBRIGGEN:  Object to the form.
6   Detective, you can answer.
7          THE WITNESS:  So in a warrant where
8   there is apartments, we are going to try to
9   be as specific as possible.  So various
10  things -- like, I believe Mr. ███ driver's
11  license was just for that residence.  And
12  then he had a prison release that was for
13  the second floor.
14         The most specific information we had
15  was from the probation officer that it was
16  second floor rear.  So my recollection is
17  that the search warrant was for second floor
18  rear.
19  BY MR. WEST:
20     Q.  Okay.  So if the search warrant
21  specifically said Apartment 2, second floor rear,
22  would that -- actually, strike the question.  Let
23  me lay a foundation.
24         So based on what you just said, Detective

Page 24

1   Graf, did the search warrant in this case permit
2   the police officers, members of the SWAT unit,
3   anyone else related to the Philadelphia Police
4   Department, to enter the entire building at 4664
5   Torresdale Avenue or only a portion thereof?
6          MR. ZURBRIGGEN:  Same objection.
7   But Detective, you can answer.
8          THE WITNESS:  Well, it gives
9   permission to enter the building.  And then
10  go to the specific, you know, apartment or
11  whatever that was outlined in the warrant.
12  BY MR. WEST:
13     Q.  Right.
14     A.  I mean --
15     Q.  And under that warrant, were the officers
16  allowed to enter other apartments that happened to
17  be in the same building?
18         MR. ZURBRIGGEN:  Same objection.
19  But Detective, you can answer.
20         THE WITNESS:  No.
21  BY MR. WEST:
22     Q.  Okay.  So as the Philadelphia Police
23  Department, including its SWAT Unit, were planning
24  this operation, was there any training that was

Page 25

1   made available by the police department that would
2   help the officers to make sure that they were
3   planning this operation in such a way that they
4   wouldn't enter the wrong apartment?
5          MR. ZURBRIGGEN:  Object to the form.
6   Detective, you can answer, if you can.
7          THE WITNESS:  I don't recall ever
8   any training in what you're --
9   BY MR. WEST:
10     Q.  Okay.
11     A.  But SWAT has different training.  I
12  don't -- I think a lot of what SWAT does is based
13  upon -- I don't want to speak for them.  They are
14  going to go -- we are going to provide the address
15  that we are going to go to.  They will verify that
16  we have that information.
17         You know, they will check our warrants
18  prior to going.  How they make their entry, I
19  don't -- you know, they have to do it the most
20  safe way.  I don't know what the training they
21  get.
22     Q.  Okay.  And if there were multiple doors
23  that entered into the 4664 Torresdale Avenue
24  property, was it exclusively the responsibility of

7 (Pages 22 to 25)

Page 26

1    the SWAT Unit to decide which door to enter
2    through or did you play some role in making that
3    decision?
4         MR. ZURBRIGGEN:  Objection to form.
5    Detective, if you know.
6         THE WITNESS:  Usually the SWAT
7    determines how they will make their entry,
8    because they are the ones going in.
9    BY MR. WEST:
10    Q.  Okay.  I can just represent to you that
11    many of the SWAT Unit members that we have deposed
12    in this case said that that was your
13    responsibility.  Is there any -- is there any
14    truth to that, in your experience?
15         MR. ZURBRIGGEN:  Object to the
16    representation of testimony.  But Detective,
17    you can answer.
18         THE WITNESS:  Well, if I'm going
19    with SWAT, I am going to provide them all of
20    the information that I have.  Now, if I know
21    that there's a specific -- if I did know
22    there was a specific way to enter a
23    property, then I will provide that to them.
24    But ultimately, they are the ones that go in

Page 27

1    first.  So they are going to make the
2    determination of how they go in.  We wait
3    while they make their entry.
4    BY MR. WEST:
5    Q.  Were you present at the staging area
6    prior to the execution of the warrant?
7    A.  Yes.
8    Q.  Was there a briefing given by the SWAT
9    Unit prior to this operation?
10    A.  We usually meet with the SWAT supervisor.
11    I know that I did speak to someone from SWAT.
12    They verified the warrant.  I believe there was a
13    question about the interior layout, which we had
14    no knowledge of.
15    Q.  Okay.  Who raised the question about the
16    interior layout?
17    A.  I believe SWAT asked that question.  I
18    don't know who it was.  I don't know the
19    specifics.  It's usually a supervisor that we
20    speak to.  Sometimes it's hard to tell who the
21    supervisor is, because they are all dressed in
22    tactical uniforms.
23    Q.  Okay.  And do you recall specifically who
24    raised that question?

Page 28

1         MR. ZURBRIGGEN:  Objection.  But
2    Detective?
3         THE WITNESS:  I don't know who.  I
4    don't know a name.
5    BY MR. WEST:
6    Q.  All right.  So I will read from the
7    bottom of Defense 70.  This is the second to last
8    page from the packet marked as Graf-1.
9         The question was asked, at least
10    according to this, "Was there any discussion about
11    how to access the second floor rear apartment of
12    4664 Torresdale Avenue at any time?"
13         Answer, "The SWAT officers asked if I
14    knew the layout of the property.  I told them I
15    did not know the interior layout."
16         Looking at that, do you believe that this
17    correctly states what you told the officer when
18    you gave this statement -- when you told the
19    detective when you gave this statement?
20         MR. ZURBRIGGEN:  Object to the form.
21    But Detective, to the best of your
22    recollection.
23         MR. WEST:  Yeah, I will reask the
24    question.

Page 29

1    BY MR. WEST:
2    Q.  So looking at this now, do you believe
3    that this statement correctly memorializes what
4    you told the detective when you gave this
5    statement to internal affairs?
6    A.  This is what -- what I said here is what
7    I said to --
8    Q.  Yes.
9    A.  -- at the interview?
10    Q.  Yes.
11    A.  Yes.
12    Q.  Okay.  And then just reading on was
13    there -- question, "Was there any discussion about
14    how to access the second floor rear apartment of
15    4664 Torresdale Avenue at any time?"  Answer,
16    "Just what I stated about the interior layout."
17    That's accurate?
18    A.  Yes.
19    Q.  All right.  So at the staging area,
20    members of the SWAT Unit stated prior to the
21    enforcement action, that they didn't know what the
22    interior of the property is; is that correct?
23    A.  We would have no way of knowing what the
24    interior is.

8 (Pages 26 to 29)

Page 30

1    Q.  But Detective, if you can answer the
2  question I asked.
3    A.  I only spoke to one person.
4    Q.  Okay.
5    A.  And if they are asking me that question,
6  I am assuming that they don't know the interior
7  layout, if they are asking me.
8    Q.  Okay.  And normally, would you speak with
9  the supervisor or a different member of the SWAT?
10    A.  Usually it's a supervisor.
11    Q.  Okay.  I believe I can represent to you
12  that so far all of the testimony we have had in
13  this case, the supervisors were Lieutenant Monk
14  and Sergeant Mellody.  Do you know -- does that
15  refresh your recollection whether you might have
16  spoke with Lieutenant Monk or Sergeant Mellody or
17  someone else?
18    A.  I don't -- it would have been -- we
19  usually talk to the supervisor.  I don't remember
20  who it was.
21    Q.  Okay.
22    A.  Usually it's the sergeant, but sometimes
23  it's the lieutenant.  They always -- it's twofold.
24  We will provide whatever information we have.  But

Page 31

1  they also want to verify their location that they
2  are -- that we have the proper location that they
3  are going to on the warrant.
4    Q.  All right.  In any case, it was your
5  personal experience that prior to the enforcement
6  operation, the SWAT Unit supervisor expressed to
7  you that they didn't know what the interior layout
8  of the building was and you said you didn't know
9  either, correct?
10    MR. ZURBRIGGEN:  Object to the form.
11  Go ahead.
12    THE WITNESS:  They asked me what the
13  interior -- I can't speak for what they knew
14  or what they didn't.  They asked me what the
15  interior layout was.
16  BY MR. WEST:
17    Q.  Was anything else discussed at the
18  staging area prior to executing the search
19  warrant?
20    A.  I don't recall, no.
21    Q.  All right.  And do you have any
22  recollection at all of who you spoke with at the
23  staging area?
24    A.  No.

Page 32

1    Q.  Did the suspect, Mr. ██ have a cell
2  phone?
3    A.  When?
4    Q.  At any point, to your knowledge.
5    A.  He's still at large.  So I don't --
6  when -- I don't -- when did he possess a cell
7  phone or?
8    Q.  All right.  I will ask a different
9  question.
10    At the time that you were gathering
11  information related to the warrant to enter Mr.
12  ██ believed residence, did you investigate
13  whether or not Mr. ██ had a cell phone?
14    A.  I'm sure I did.  But I don't recall if he
15  had a cell phone or if I had a cell phone number
16  for him.
17    Q.  You don't today recall making any effort
18  to obtain information with regards to whether or
19  not he had a cell phone; is that correct?
20    MR. ZURBRIGGEN:  Object to the form.
21  Detective, if you know.
22    THE WITNESS:  No.  I mean, as part
23  of the investigative process I am going to
24  try to attempt to see if he has a phone

Page 33

1    number.  I don't recall if we ever
2    accomplished that in this case.
3  BY MR. WEST:
4    Q.  Did you ever request a warrant to track
5  his cell phone number?
6    MR. ZURBRIGGEN:  Objection to the
7    form and relevance.  Go ahead, Detective.
8    THE WITNESS:  I don't know if we had
9    a cell phone number for him.  And no, I did
10    not.
11  BY MR. WEST:
12    Q.  Did you attempt to locate any social
13  media sites for Mr. ██?
14    MR. ZURBRIGGEN:  Same objection.
15    But, Detective?
16    THE WITNESS:  I don't recall.
17  BY MR. WEST:
18    Q.  Have you ever obtained any IP addresses
19  for computers used by Mr. ██?
20    MR. ZURBRIGGEN:  Same objection.
21    Detective, you can answer.
22    THE WITNESS:  No.
23  BY MR. WEST:
24    Q.  Did anyone conduct any physical

Electronically signed by Denise Weller (401-411-238-5399)                    651df335-a17f-42a7-9b61-2015ce189a2b8

Page 34

1    surveillance of the residence located at 4664
2    Torresdale Avenue?
3            MR. ZURBRIGGEN: Objection to the
4    form. Detective, if you understand.
5            THE WITNESS: No. Not to my
6    knowledge. No.
7    BY MR. WEST:
8    Q.   Okay. Did you personally ever visit the
9    property at 4664 Torresdale Avenue prior to
10   meeting at the staging area?
11   A.   So we obtained this warrant late the day
12   prior. It was late in the evening. On my way
13   home, I did drive by the residence -- the
14   residence.
15   Q.   Was that at nighttime?
16   A.   It could have been -- it was either
17   late -- I guess it was we served the warrant the
18   4th, I believe. So the night we got the warrant,
19   it could have been late like 11:00 p.m'ish or it
20   could have been early morning the next day. But
21   this was prior to the morning that we executed the
22   warrant.
23   Q.   And you only drove by on Torresdale
24   Avenue, correct?

Page 35

1    A.   Correct.
2    Q.   Did you ever look to Google Maps or any
3    other similar technology to try to find where the
4    property was physically located?
5    A.   Yes.
6    Q.   Okay.
7    A.   So the Google photo, my recollection it
8    was from 2019, which is one of the reasons why I
9    drove past to verify if it was still what the
10   Google Maps photo depicted.
11   Q.   Okay. Did you use any other technology
12   to try to find out physically what the property
13   looked like?
14           MR. ZURBRIGGEN: Object to the form.
15   But Detective --
16   BY MR. WEST:
17   Q.   Besides Google Maps.
18   A.   I mean, other than a real estate check, I
19   don't recall anything else.
20   Q.   Okay. When you say real estate check,
21   what do you mean?
22   A.   We do a check on Philadelphia Real Estate
23   website to see who the owner of the property is.
24   Q.   Okay. I have a document -- this has

Page 36

1    previously been marked as Scott-4. We will mark
2    this as Graf-2.
3            - - -
4            (Whereupon, Exhibit Graf-2 was
5    marked for identification.)
6            - - -
7    BY MR. WEST:
8    Q.   If you could look at that document, sir.
9    Is this -- is this a screen shot of the website
10   that you accessed or do you mean something else?
11   A.   So we have two ways to access. There's
12   the general public way to access, but we also have
13   our own real estate data base. So I don't recall
14   which one we used.
15   Q.   Okay. I can represent to you this is
16   publicly available.
17   A.   No. No. I'm saying we have two
18   different ways that we can use the public. We
19   have our own database too also, that is not public
20   through the police department, which basically
21   provides the same information. That is why I
22   don't know if this is the one we used or the
23   one --
24   Q.   Does the database that is available to

Page 37

1    you and not public have additional information
2    beyond what is available to the public?
3    A.   I don't think it -- if it does, it would
4    be minimal.
5    Q.   So this, as you can see here, lists the
6    owner of the property. Did you attempt to contact
7    the owner of the property and ask how the second
8    floor rear apartment could be accessed?
9    A.   No.
10   Q.   In your normal practice, would you ever
11   contact a property owner of a multi-residence
12   property to ask how an apartment could be accessed
13   in order to enforce a warrant?
14           MR. ZURBRIGGEN: Object to the form.
15   But Detective, you can say if you know.
16           THE WITNESS: I mean, it has been
17   done in a larger -- like an apartment
18   complex we may. Sometimes that is just to
19   obtain like keys, you know, if it's you
20   know, you know, like they have their own
21   special codes or whatever to enter the
22   property.
23           So it has been done, yes, but not in
24   a smaller -- I've never -- there's a few

10 (Pages 34 to 37)

Page 38

```
 1        reasons why.  Because we don't know what the
 2        relationship is of the owner with the
 3        tenant.  We don't want them to tip them off.
 4   BY MR. WEST:
 5        Q.  To your knowledge, does the City of
 6   Philadelphia have any policy or procedure about
 7   whether property managers or property owners
 8   should be contacted when you're preparing to
 9   enforce a warrant at a multi-residence property
10   and don't know the physical layout of the
11   property?
12             MR. ZURBRIGGEN:  Object to the form.
13        Detective, if you know.
14             THE WITNESS:  I have no knowledge of
15        that.
16             MR. WEST:  Okay.  If you guys would
17        give me a moment.  I have a document that I
18        need to provide you -- let's go off the
19        record for a second -- that I can't seem to
20        find here.
21             THE VIDEO OPERATOR:  Going off the
22        record at 10:50 a.m.
23             - - -
24             (Whereupon, a brief recess was
```

Page 39

```
 1        taken.)
 2             - - -
 3             THE VIDEO OPERATOR:  We are going
 4        back on the record at 10:53 a.m.
 5             - - -
 6             (Whereupon, Exhibit Graf-3 was
 7        marked for identification.)
 8             - - -
 9   BY MR. WEST:
10        Q.  All right, sir.  So I have handed you a
11   packet of documents marked as Graf-3.  If you take
12   a moment to review those.  And then let me know
13   when you have had a chance to look at them.
14        A.  Okay.
15        Q.  All right.  Detective Graf, could you
16   tell us what these documents are, if you know?
17        A.  I've never seen one before.  But it
18   states that it is a SWAT Unit recon sheet.
19        Q.  Okay.  But this is not something you
20   would normally see?
21        A.  No.  I never seen this before.
22        Q.  Okay.  So if we look in a couple of
23   pages, we have a map and a photograph that says
24   target on it, right?
```

Page 40

```
 1        A.  Yes.
 2        Q.  Are these the Google Map pictures that
 3   you got or are these different?
 4        A.  That's hard to tell.
 5        Q.  Okay.  And I have to tell you, the
 6   quality of the picture that says target is not
 7   very good.  But this is one that was produced to
 8   us.  Besides these types of pictures, so one that
 9   is an outside view from Torresdale Avenue and an
10   overview map, were there any other kinds of Google
11   Map pictures that you got related to this
12   investigation?
13             MR. ZURBRIGGEN:  Object to the form.
14        Detective, if you know.
15             THE WITNESS:  I don't remember.
16   BY MR. WEST:
17        Q.  Nothing that you can recall, correct?
18        A.  Right.
19        Q.  All right.  Let's mark this as Graf-4.
20             - - -
21             (Whereupon, Exhibit Graf-4 was
22        marked for identification.)
23             - - -
24   BY MR. WEST:
```

Page 41

```
 1        Q.  Do you know what this is -- do you know
 2   what this is?
 3        A.  It looks like it's an overview of the
 4   area of the target residence.
 5        Q.  Okay.  It looks like Google Maps overview
 6   photograph of 4664 Torresdale Avenue; is that
 7   correct?
 8        A.  I mean, not specifically just 46.  I
 9   mean, it's an area here.  Half the block.
10        Q.  Okay.  As of June 2021, when you're doing
11   investigations for warrant enforcement actions,
12   would you normally get a Google Maps overview
13   picture like this?
14        A.  I don't recall doing an overview of --
15   for this specific case.
16        Q.  Okay.  Is that something that you would
17   have normally done back then?
18        A.  I don't recall ever doing the overview.
19   I don't want to say that I didn't for a warrant.
20        Q.  Did you ever receive any training from
21   the Philadelphia Police Department with regards to
22   what the policies and procedures of the
23   Philadelphia Police Department were in conducting
24   an investigation preparatory to a warrant
```

11 (Pages 38 to 41)

Page 42

1    enforcement action at a private residence?
2         MR. ZURBRIGGEN:  Object to the form.
3    But Detective, if you know.
4         THE WITNESS:  I don't remember
5    specific training.  But we do have policies
6    in obtaining a warrant.
7    BY MR. WEST:
8    Q.  Okay.  Did any of those policies, to your
9    personal knowledge, involve obtaining information
10   with regards to the physical layout of a
11   residential property before an enforcement action?
12        MR. ZURBRIGGEN:  Object to the form.
13   Detective, you can answer.
14        THE WITNESS:  The interior are we
15   talking about?
16   BY MR. WEST:
17   Q.  I'm asking the question generally.
18   Anything related to the physical location and
19   nature of a property.
20        MR. ZURBRIGGEN:  Same objection.
21   But Detective, if you know.
22        THE WITNESS:  I don't recall
23   specifically what's in our policies.  But of
24   course we are going to want to know what we

Page 43

1    are -- what the property is.  I mean,
2    sometimes that is laid out even on the
3    search warrant what it is, if it's a two
4    story masonry home.  Or we, you know, you
5    try to make a physical check.  But when I
6    became a detective we didn't have Google
7    Maps either.  So now we have an option to
8    actually look on Google Maps and see
9    properties.
10   BY MR. WEST:
11   Q.  But as of June 2021 Google Maps had
12   existed for many years, correct?
13        MR. ZURBRIGGEN:  Object to form.
14   Detective, if you know.
15        THE WITNESS:  I am sure it has, was,
16   did.  I do remember that the photo from
17   Google Maps, though, was from 2019, if I am
18   not mistaken.
19   BY MR. WEST:
20   Q.  Okay.  Pursuant to the policies of the
21   City of Philadelphia Police Department, when
22   you're trying to obtain information about a
23   residential property, are you supposed to figure
24   out how many doors lead into the property?

Page 44

1         MR. ZURBRIGGEN:  Object to the form.
2    Detective, if you know.
3         THE WITNESS:  I don't know that that
4    is a specific policy.
5    BY MR. WEST:
6    Q.  Are you supposed to learn how many
7    streets have entrances to the property?
8         MR. ZURBRIGGEN:  Same objection.
9    But Detective, if you know.
10        THE WITNESS:  I don't know that to
11   be a specific policy.
12   BY MR. WEST:
13   Q.  Okay.  If you had seen this Google Maps
14   overview map, would that have led you to
15   understand that the building had access, not only
16   on Torresdale Avenue, but also from an alleyway
17   off of Margaret Street?
18        MR. ZURBRIGGEN:  Object to form.
19   Detective, to the extent you know.
20        THE WITNESS:  Does it show me that?
21   Yes.  But most buildings have access through
22   the rear.
23   BY MR. WEST:
24   Q.  I am just asking with regards to this

Page 45

1    specific property, if you had looked at his
2    specific map that we have marked as Graf-4, would
3    that have led you to understand that there was
4    rear access to this building from an alleyway off
5    of Margaret Street?
6         MR. ZURBRIGGEN:  Same objection.
7         THE WITNESS:  Well, that's what this
8    depicts, yes.
9    BY MR. WEST:
10   Q.  And you didn't know that prior to the
11   enforcement action, correct?
12        MR. ZURBRIGGEN:  Same objection.
13   Detective, you can answer.
14        THE WITNESS:  I didn't know what the
15   access was to the rear of this property.
16   But again, most properties have access to
17   the rear and doors in the rear, most.
18   BY MR. WEST:
19   Q.  All right.  All right, sir.  I will mark
20   some documents as Graf-5.
21        - - -
22        (Whereupon, Exhibit Graf-5 was
23   marked for identification.)
24        - - -

12 (Pages 42 to 45)

Page 46

BY MR. WEST:

1   Q.   Sir, so these documents are titled home
2   investigation interview.  And I can represent to
3   you that these were produced to us by a woman
4   named Jaclyn Matteo-Hand who works for the
5   Philadelphia Probation and Parole Office.
6          Have you ever spoken with Jaclyn
7   Matteo-Hand?
8   A.   No.
9   Q.   So a portion of this is highlighted,
10  actually was highlighted during her deposition.
11  And can you see that it says the address rear
12  apartment and then it actually specifically says
13  you have to go up the alleyway to knock on the
14  door.  Do you see that?
15  A.   Yes.
16  Q.   If you had known that when the Probation
17  and Parole Office had conducted an investigation
18  of Mr. ███ apartment they had learned that the
19  access was through the alleyway, and if you had
20  seen this Google Map overview that we have marked
21  as Graf-4, would that have led you to understand
22  that the proper entrance point to Mr. ███
23  apartment was through the alleyway off Margaret

Page 48

1   had never been there.  I don't have access
2   to the information that she has.  I spoke to
3   the person who was the supervisor, who said
4   she had never been to his residence, did not
5   supply this information.
6   BY MR. WEST:
7   Q.   However, you did not specifically ask if
8   there had been an inspection of this property
9   correct?
10         MR. ZURBRIGGEN:  Objection as asked
11  and answered and to the form.  Detective,
12  you can answer again.
13         THE WITNESS:  I asked her, yes.
14  Because she gave the answer that she hadn't
15  been there.
16         MR. WEST:  I believe that
17  contradicts your prior testimony.  If you
18  can mark this as Graf-6.
19         MR. ZURBRIGGEN:  And objection on
20  the record to the characterization of the
21  the Detective's testimony.
22         - - -
23         (Whereupon, Exhibit Graf-6 was
24  marked for identification.)

Page 47

1   Street?
2          MR. ZURBRIGGEN:  Object to the form
3   of the question.  Detective, if you
4   understand and you know, you can answer.
5          THE WITNESS:  So if I had access to
6   Google Maps and this information?
7   BY MR. WEST:
8   Q.   Yes.
9   A.   Yes.
10  Q.   Okay.  So if you had access to Google
11  Maps and had spoken with the probation officer,
12  you would have known how to do the job correctly?
13  A.   I did speak to his probation officer.
14         MR. ZURBRIGGEN:  Objection to the
15  form.
16         THE WITNESS:  I spoke to the
17  supervising probation officer who did not
18  supply this information to me.
19  BY MR. WEST:
20  Q.   Nor did you ask her if they had conducted
21  an investigation of the property, correct?
22         MR. ZURBRIGGEN:  Same objection.
23  Detective, you can answer.
24         THE WITNESS:  I did.  She said she

Page 49

1          - - -
2   BY MR. WEST:
3   Q.   Do you know what these records are?  Is
4   this something that you recognize?
5   A.   No.  I don't recognize this.
6   Q.   If the Philadelphia Police Department is
7   trying to enforce -- strike the question.
8          If the Philadelphia Police Department is
9   planning to enforce a warrant at the residence of
10  a person who is under probation or parole, in your
11  experience, will the Philadelphia Police
12  Department normally coordinate with the probation
13  and parole officer to try to learn as much
14  information as possible about the suspect's
15  physical residence?
16         MR. ZURBRIGGEN:  Objection to the
17  form of the question.  Detective, if you
18  understand, you can answer.
19         THE WITNESS:  Can you be more
20  specific?
21  BY MR. WEST:
22  Q.   Sure.  To your knowledge, does the
23  Philadelphia Police Department have any policy
24  with regards to whether a detective should contact

13 (Pages 46 to 49)

1    a suspect's probation officer to learn all of the
2    information available about a probation officer's
3    physical residence if the suspect is on probation?
4            MR. ZURBRIGGEN:  Objection to the
5        form of the question.  Detective, you can
6        answer, if you can.
7            THE WITNESS:  I don't know if
8        there's a policy on that.  In my experience,
9        that is what I do, which I did do in this
10       case, I contacted his probation officer.
11   BY MR. WEST:
12   Q.  Okay.  But to your knowledge --
13   A.  Do we coordinate with them, no.
14   Q.  Okay.  Is there any particular reason, to
15   your knowledge, that the City of Philadelphia
16   Police Department wouldn't coordinate with the
17   suspect's probation officer or parole officer?
18           MR. ZURBRIGGEN:  Object to the form.
19       Detective, you can answer, if you can.
20           THE WITNESS:  I don't know why we
21       don't have that policy.  But as time has
22       gone on, probation is less cooperative with
23       the police department with the information
24       that they provide.

1    BY MR. WEST:
2    Q.  Have you ever received any guidance from
3    anybody at the Philadelphia Police Department
4    whether it's an official policy or procedure or a
5    custom or something you have been told by anyone,
6    that you shouldn't coordinate with the Probation
7    and Parole Office?
8            MR. ZURBRIGGEN:  Objection to the
9        form of the question.  Detective, if you
10       understand, you can answer.
11           THE WITNESS:  So have I been told
12       not to --
13           MR. WEST:  Yes.
14           THE WITNESS:  -- coordinate?  Not
15       that I -- not that I recall.
16   BY MR. WEST:
17   Q.  Okay.  I think you said that sometimes
18   the Probation and Parole Office is not
19   cooperative; is that correct?
20   A.  I wouldn't say not cooperative.  The
21   information that they provide has decreased over
22   time.
23   Q.  Do you have -- can you elaborate on what
24   you mean by that?

1    A.  I believe it's -- my understanding is
2    it's the policy of the probation department now.
3    Q.  What is your understanding of the policy?
4    A.  I mean, when I first -- I don't know
5    their policy.  Like when I first started as a
6    detective, you know, we -- the probation officer
7    would come in, you know, if we had video or
8    whatever it is and try to make an identification.
9    That is not always the case now.  I think it all
10   depends upon who that probation officer's
11   supervisor is.  I don't know what the direct
12   policy of the probation department is, though.
13   They are a completely different independent
14   organization.
15   Q.  When you reached out to Probation Officer
16   Shannon with regards to the warrant for ███████
17   ███ was she non-cooperative in any way?
18           MR. ZURBRIGGEN:  Object to the form.
19       But Detective, you can answer?
20           THE WITNESS:  I don't recall her
21       being non-cooperative.
22   BY MR. WEST:
23   Q.  Was there any question that you asked her
24   to which she refused to give you an answer?

1            MR. ZURBRIGGEN:  Same objection.
2        Detective?
3            THE WITNESS:  I don't recall that.
4    BY MR. WEST:
5    Q.  You don't recall anything like that at
6    this time, correct?
7    A.  I don't recall whether that occurred or
8    not.  I don't remember the specific conversation
9    word for word, verbatim.
10   Q.  If you asked a homicide suspect's
11   probation officer for information about how to
12   capture the homicide suspect and the probation
13   officer refused to cooperate, would you contact
14   that probation officer's supervisor?
15           MR. ZURBRIGGEN:  Object to the form
16       of the question.  Detective, you can answer.
17           THE WITNESS:  I -- that would be --
18       I would make a decision at that time.
19   BY MR. WEST:
20   Q.  Did you --
21   A.  It depends on what non-cooperative is.  I
22   mean, I already knew where he lived.  I was just
23   looking for some basic, you know, more insight.
24   Q.  Did you have any reason to contact

Page 54

1    Probation Officer Shannon's supervisor?
2         MR. ZURBRIGGEN:  Object to the form.
3    Detective, if you know.
4         THE WITNESS:  No.  She gave me the
5    information that she had.  She never met him
6    and she had never been to his house of
7    record.
8    BY MR. WEST:
9    Q.   All right.  So the document I already
10   handed you, this is Graf-6, correct?  Sir, I can
11   represent to you that this is the client file
12   notes that was in the possession of the Probation
13   and Parole Office.  We have deposed Parole
14   Officer Shannon in this case, that is why this is
15   marked as Shannon-1.
16        If you can turn to page 21, you will find
17   an area that is highlighted in a prior deposition.
18   Do you see that area?  I am not trying to rush
19   you.  When you get a chance.
20   A.   I got it.  I have it.
21   Q.   All right.  So if you look at the
22   highlighted area it says April 26th, 2019,
23   correct?  4/26/2019?
24   A.   Yes.

Page 55

1    Q.   All right.  And this memorializes that
2    the probation office -- Parole and Probation
3    Office went to the second floor rear apartment at
4    4664 Torresdale Avenue and determined that the
5    entrance to Mr. ██ apartment was rear entrance
6    off Margaret Street, correct?
7         MR. ZURBRIGGEN:  Objection to the
8    form of the question.  Detective, to the
9    extent you know.
10        THE WITNESS:  That would -- this is
11   what it says?
12   BY MR. WEST:
13   Q.   Is that -- yeah.
14   A.   Yes.  That is what it says.
15   Q.   All right.  And I can represent to you
16   that this was provided to us by Ms. Shannon when
17   we deposed her, we asked her, if you had asked her
18   how to get to Mr. ██ apartment, you could --
19   she would have been able to answer that question.
20   And she pointed at this and said yes, she had
21   these records.  Did you know that prior to now?
22        MR. ZURBRIGGEN:  Objection to the
23   relevance and to the characterization of the
24   testimony.  Detective, you can answer.

Page 56

1         THE WITNESS:  Can you ask the
2    question again?
3    BY MR. WEST:
4    Q.   Sure.  Prior to June 4th, 2021, if you
5    had known that the probation office had previously
6    determined that the entrance to the second floor
7    rear apartment at 4664 Torresdale Avenue was
8    through the rear entrance off Margaret Street,
9    would that have affected in any way any guidance
10   that you gave to the SWAT Unit as far as how the
11   warrant with regards to Mr. ██ should be
12   enforced?
13        MR. ZURBRIGGEN:  Objection to the
14   form of the question and as asked and
15   answered.  Detective, go ahead.
16        THE WITNESS:  Well, yes.  If I had
17   been provided this information, I would have
18   supplied that information to SWAT.
19        MR. WEST:  Let's mark Graf-7.
20             - - -
21        (Whereupon, Exhibit Graf-7 was
22   marked for identification.)
23             - - -
24   BY MR. WEST:

Page 57

1    Q.   So sir, we have a document here.  It's
2    marked Scott-3 from a prior deposition.  If you
3    had had this information from the Probation and
4    Parole Office and if you had seen this Google Map,
5    would you have instructed the SWAT Unit to enforce
6    the warrant for Mr. ██ through the rear alleyway
7    entrance as indicated by the pink highlighting on
8    this picture?
9         MR. ZURBRIGGEN:  Objection to the
10   form of the question.  Objection as asked
11   and answered.  Detective, go ahead and
12   answer.
13        THE WITNESS:  If I had -- if I had
14   the information, I wouldn't tell them how to
15   enforce the warrant, but I would give them
16   the information as to how to make the best
17   entry to the house, yes.
18   BY MR. WEST:
19   Q.   Okay.  Would that have been consistent
20   with the path through the rear alleyway as shown
21   by the pink highlighting?
22   A.   I mean, that's one way, yes.
23   Q.   Okay.  But would you -- would you still
24   consider it appropriate to enter through the front

Electronically signed by Denise Weller (401-411-238-5399)                    651df335-a17f-42a7-9b61-2015e189a2b8

Page 58

1   of the building --
2        MR. ZURBRIGGEN:  Same -- same set of
3   objections for the record.  Detective?
4        THE WITNESS:  No.  If I had been
5   provided the information by probation, I
6   would have supplied that information to
7   SWAT.
8   BY MR. WEST:
9   Q.   All right.  And would it have been your
10  understanding that if you had had this information
11  from the Probation and Parole Office and you had
12  this Google Map, that the only proper entrance
13  point to enforce this warrant would have been
14  through the rear entrance of 4664 Torresdale
15  Avenue?
16       MR. ZURBRIGGEN:  Objection to the
17  form of the question, particularly with
18  regards to proper.  But Detective, to the
19  extent you can answer, answer.
20       THE WITNESS:  One more time.
21  BY MR. WEST:
22  Q.   Sure.  If you had had this information
23  from the Probation and Parole Office and you had
24  the Google Map overview of the building -- of the

Page 59

1   property, would you have understood that the only
2   legal way to enforce the warrant for Mr. ███
3   residence was to enter through the rear entrance
4   through the alleyway off Margaret Street?
5        MR. ZURBRIGGEN:  Same objection
6   particularly as to legal.  Detective, you
7   can answer.
8        THE WITNESS:  Yeah.  I am not sure
9   about the legal.  But I would have
10  instructed SWAT that the information we had
11  from Probation and Parole would be to go
12  through the rear.
13  BY MR. WEST:
14  Q.   Okay.
15  A.   If I had that information.
16  Q.   To your knowledge, did anyone conduct any
17  physical surveillance of the 4664 Torresdale
18  building prior to the enforcement action?
19       MR. ZURBRIGGEN:  Object as asked and
20  answered.  Detective, you can answer.
21       THE WITNESS:  To my knowledge, no.
22  I did not.
23  BY MR. WEST:
24  Q.   Sir, based on your personal observation,

Page 60

1   did the front door to the 4664 Torresdale Avenue
2   lead into a portion of the property that was two
3   stories tall or one story?
4        MR. ZURBRIGGEN:  Object to the form.
5   Detective, if you know, you can answer.
6        THE WITNESS:  I didn't go through
7   the front door.
8   BY MR. WEST:
9   Q.   But my question is, you did view the
10  front of the building, correct?
11  A.   Yes.
12  Q.   And so when you viewed the building in
13  your personal observation, did the door off
14  Torresdale Avenue lead into a portion of the
15  building that was one story tall or two stories
16  tall?
17       MR. ZURBRIGGEN:  Same objection.
18  But Detective, if you know.
19       THE WITNESS:  It looked like it was
20  built out one floor.
21  BY MR. WEST:
22  Q.   Okay.  So you could see in your own
23  observation that the front door on the Torresdale
24  Avenue side led into a portion of the building

Page 61

1   that was only one story tall, correct?
2        MR. ZURBRIGGEN:  Same objection to
3   the record.
4        THE WITNESS:  It appeared that way,
5   yes.
6   BY MR. WEST:
7   Q.   Okay.  Did it occur to you that that door
8   might lead into a first floor apartment?
9        MR. ZURBRIGGEN:  Objection to the
10  form.  Detective, if you understand you can
11  answer.
12       THE WITNESS:  The information I had,
13  it appeared to me based on my experience,
14  that there was one front door with two
15  mailboxes, which would indicate there's two
16  apartments that have access to that door.
17  Which traditionally in almost every
18  warrant -- I don't want to say every, but
19  almost every warrant we have ever done, it's
20  one doorway with usually like a hallway that
21  goes upstairs and a first floor apartment
22  access.
23       I've never seen it the way this
24  house was designed.  You have two mailboxes

Page 62

1    with one door.
2  BY MR. WEST:
3    Q.  So did you have any other information
4  available to you besides what you just said that
5  would have told you what was behind the Torresdale
6  Avenue door?
7         MR. ZURBRIGGEN:  Object to the form
8    of the question.  Detective, you can answer.
9         THE WITNESS:  I have no way of
10    knowing what is behind that door.
11  BY MR. WEST:
12    Q.  Okay.  If you had heard a dog barking on
13  the other side of that door, would that have led
14  you to believe that someone was living in that
15  portion of the building?
16         MR. ZURBRIGGEN:  Objection to form.
17         THE WITNESS:  That is too hard to
18    determine.
19  BY MR. WEST:
20    Q.  Is that information that would have
21  informed your understanding at all?
22         MR. ZURBRIGGEN:  Same objection.
23         THE WITNESS:  That doesn't say
24    anything.  That says there is a dog behind

Page 63

1    the door.
2  BY MR. WEST:
3    Q.  Are you familiar with Philadelphia Police
4  Department directive 5.7?
5         MR. ZURBRIGGEN:  Objection.
6    Detective, if you know.
7         THE WITNESS:  Which directive is
8    that?
9  BY MR. WEST:
10    Q.  I am asking like if I just say that
11  number, do you know what that is?
12    A.  No.  They have actually changed from --
13  there were directives that were all numbered and
14  now they are in this form, 5.7.  If you told me
15  what it was, maybe I would be familiar with it.
16    Q.  Okay.  To your knowledge, does the
17  Philadelphia Police Department have any official
18  directives with regard to search warrants?
19    A.  Yes.
20    Q.  Have you personally ever spoken with Ms.
21  Alvarado?
22    A.  I don't think so.
23    Q.  To your knowledge, was there any effort
24  to apprehend Mr. ▓ with regards to this homicide

Page 64

1  investigation prior to the enforcement action at
2  4664 Torresdale Avenue?
3    A.  In the six hours or seven hours we had
4  the warrant, no.
5    Q.  So what is all the information that you
6  provided to the SWAT Unit with regards to how they
7  should enforce this warrant enforcement action --
8  strike the question.
9         What is all of the information that you
10    provided to the SWAT Unit with regards to the
11  warrant to apprehend Mr. ▓ ?
12         MR. ZURBRIGGEN:  Objection to form.
13    Detective, to the extent that you recall.
14         THE WITNESS:  I am not sure exactly
15    what you're asking.  But we provided the
16    address.
17  BY MR. WEST:
18    Q.  Right.  And you specifically informed the
19  SWAT Unit that the address was the second floor
20  rear apartment, correct?
21         MR. ZURBRIGGEN:  Objection.
22    Objection as asked and answered.  Go ahead
23    and answer.
24         THE WITNESS:  We had three different

Page 65

1    addresses that I recall for Mr. ▓ .  His
2    identification from the state was just
3    listing that address on Torresdale Avenue.
4    His prison release was for that address
5    second floor.
6         The only information we had, the
7    second floor rear, was from probation.  So
8    that was the address that we used, because
9    that was the most specific address.  But his
10    ID doesn't indicate -- to my recollection,
11    did not indicate any apartment, just that
12    address.
13         MR. WEST:  All right.  Let's mark
14    this as Graf-8.
15              - - -
16         (Whereupon, Exhibit Graf-8 was
17    marked for identification.)
18              - - -
19  BY MR. WEST:
20    Q.  For the record, what we marked are the
21  records Bates stamped as Defense 146 to 153.
22         Sir, is it accurate to say that this
23  packet of documents contains the warrant of
24  address and the search warrant for Mr. ▓ ?

Page 66

1    A.   That's correct.
2    Q.   Have you ever heard of something called a
3  no knock warrant?
4    A.   I have.
5    Q.   What is a no knock warrant?
6    A.   I never used one.  But my understanding
7  is that you can not knock and just enter the
8  property.  But I don't know the specifics.
9    Q.   Okay.  So unless you have a no knock
10  warrant, are you required to follow something
11  known as the knock and announced rule?
12         MR. ZURBRIGGEN:  Object to the form.
13     But Detective, to the extent you know.
14         THE WITNESS:  That is my
15     understanding.
16  BY MR. WEST:
17    Q.   Okay.  As a veteran member of the
18  Philadelphia Police Department, do you know what
19  the knock and announce rule is?
20         MR. ZURBRIGGEN:  Same objection.
21     But Detective, you can answer to the extent
22     that you know.
23         THE WITNESS:  You have to knock,
24     announce and then wait a reasonable amount

Page 67

1  of time before entering.
2  BY MR. WEST:
3    Q.   Have you ever received any training from
4  the Philadelphia Police Department with regards to
5  what is considered a reasonable amount of time, in
6  that context?
7         MR. ZURBRIGGEN:  Same objection.
8     But Detective, you can answer.
9         THE WITNESS:  That, I don't
10     remember.  I mean, that is possible, but I
11     don't recall.
12  BY MR. WEST:
13    Q.   Okay.  In your personal experience, what
14  would you consider to be a reasonable amount of
15  time pursuant to the knock and announced rule?
16         MR. ZURBRIGGEN:  Objection to the
17     form.  But Detective, if you know, you can
18     answer.
19         THE WITNESS:  I don't have like a
20     specific time.  Maybe 15, 30 seconds.  That
21     is just off the --
22  BY MR. WEST:
23    Q.   What is the purpose of the knock and
24  announce rule, to your understanding?

Page 68

1         MR. ZURBRIGGEN:  Object to the form.
2     But Detective --
3         THE WITNESS:  I don't know.
4  BY MR. WEST:
5    Q.   Okay.  You have never received any
6  guidance from the Philadelphia Police Department?
7    A.   I don't recall.  I don't remember.
8    Q.   Okay.
9    A.   It may be in the police directive.  I'm
10  not sure.
11    Q.   Okay.  But just to make sure I am not
12  missing anything, these warrants required anybody
13  to -- who is enforcing them, to follow the knock
14  and announce rule, correct?
15         MR. ZURBRIGGEN:  Objection to the
16     form.  Detective, to the extent you know.
17         THE WITNESS:  I have never
18     participated in a no knock warrant.
19  BY MR. WEST:
20    Q.   Okay.  So you were -- you were the
21  affiant to obtain the warrant of arrest, correct?
22    A.   Correct.
23    Q.   Did you request a no knock warrant?
24    A.   No.

Page 69

1    Q.   Okay.  And given your decades of being a
2  detective with the Philadelphia Police Department,
3  do you have enough expertise to look at these
4  warrants and be able to say that these warrants
5  would require anyone enforcing them to follow a
6  knock and announce rule?
7         MR. ZURBRIGGEN:  Objection to the
8     form.  Detective, to the extent you know you
9     can answer.
10         THE WITNESS:  I mean, that is our
11     policy usually is to like -- general policy
12     is we knock and announce.
13  BY MR. WEST:
14    Q.   Okay.
15    A.   I haven't served a warrant without SWAT
16  in 12 years.  So -- but they always knock and
17  announce when I have been with them.
18    Q.   Is that consistent with your
19  understanding of the custom of the SWAT Unit that
20  they --
21    A.   I don't want to speak for the SWAT Unit.
22  But usually they knock and announce.
23    Q.   But not always, correct?
24         MR. ZURBRIGGEN:  Objection.

18 (Pages 66 to 69)

Page 70

1       THE WITNESS:  That, I can't answer.

2       MR. ZURBRIGGEN:  Object to the form.

3       THE WITNESS:  In my experience, yes,

4   they have.

5 BY MR. WEST:

6   Q.  Were you present when Ms. Alvarado's

7 apartment was entered?

8   A.  I was up the street.  Probably half a

9 block away maybe.

10   Q.  Did you personally witness Ms. Alvarado's

11 door being breached?

12   A.  No.

13   Q.  If the SWAT officers waited less than 10

14 seconds between arriving at the front door and

15 breaching the door, would that be consistent with

16 the knock and announce rule?

17   A.  I don't --

18   Q.  To your understanding?

19       MR. ZURBRIGGEN:  Objection to form.

20   Detective?

21       THE WITNESS:  I don't know.

22 BY MR. WEST:

23   Q.  You don't know.  Okay.

24       Besides what we have discussed so far

Page 71

1 today, did you make any additional efforts at all

2 to learn how a person could physically enter the

3 second floor rear apartment of 4664 Torresdale

4 Avenue?

5       MR. ZURBRIGGEN:  Objection to the

6   form.  But Detective, to the extent that you

7   know.

8       THE WITNESS:  Did I make any efforts

9   to find out how to get into the property?

10 BY MR. WEST:

11   Q.  Yes.

12   A.  No, I don't think so.

13   Q.  Okay.  Besides what we have discussed

14 today, did you make any additional efforts to

15 learn what was behind the door on the Torresdale

16 Avenue side of the 4664 Torresdale Avenue

17 building?

18       MR. ZURBRIGGEN:  Objection to the

19   form.  But Detective?

20       THE WITNESS:  I don't know how I

21   would have.  But no.

22 BY MR. WEST:

23   Q.  Okay.  Did you ever discuss with anybody

24 from the SWAT Unit what sort of reconnaissance

Page 72

1 they had conducted related to this operation?

2   A.  No.

3   Q.  All right.  I have no further questions.

4 Thank you.

5       MR. ZURBRIGGEN:  I have no questions

6 for the Detective.  But I would like to

7 designate on the record all mentions of

8 ██████ or anything else that was in the

9 confidential part of the warrant should be

10 designated confidential under the

11 confidentiality order.

12       MR. WEST:  No objection.

13       THE VIDEO OPERATOR:  At 11:30 p.m.

14 (sic) we are going off the record.

15       - - -

16     (Whereupon, the videotaped

17 deposition concluded at 11:30 a.m.)

18       - - -

19

20

21

22

23

24

Page 73

1       C E R T I F I C A T I O N

       - - - - - - - - - - - - -

2

3

4     I hereby certify that the

5 proceedings and evidence noted are contained

6 fully and accurately in the notes taken by

7 me on the deposition of the above matter,

8 and that this is a correct transcript of the

9 same.

10

11

12

   DENISE WELLER

13   Shorthand Reporter

14

15       - - -

16

17

18   (The foregoing certification of this

19 transcript does not apply to any

20 reproduction of the same by any means,

21 unless under the direct control and/or

22 supervision of the certifying reporter.)

23

24       - - -

19 (Pages 70 to 73)

Page 74

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Electronically signed by Denise Weller (401-411-238-5399)    651df335-a17f-42a7-9b61-2015e189a2b8

**A**

**a.m** 1:15 5:9
  38:22 39:4
  72:17
**ability** 6:20
**able** 55:19 69:4
**absolutely** 14:5
**access** 18:6
  28:11 29:14
  36:11,12 44:15
  44:21 45:4,15
  45:16 46:20
  47:5,10 48:1
  61:16,22
**accessed** 36:10
  37:8,12
**accident** 10:21
**accidents** 10:23
**accommodating**
  8:7
**accomplished**
  33:2
**accurate** 29:17
  65:22
**accurately** 73:6
**action** 11:16
  12:23 13:12
  14:2 29:21
  42:1,11 45:11
  59:18 64:1,7
**actions** 41:11
**actual** 15:22
**ADAM** 2:9
**Adam.zurbrig...**
  2:12
**additional** 7:7
  37:1 71:1,14
**address** 5:6 14:2
  16:8 17:21
  18:4,6,6 25:14
  46:12 64:16,19
  65:3,4,8,9,12
  65:24
**addresses** 33:18
  65:1
**affairs** 13:8 29:5
**affiant** 68:21
**agents** 17:8
**ago** 12:15

**agree** 4:15
**agreed** 4:7,19
**ahead** 16:17
  31:11 33:7
  56:15 57:11
  64:22
**al** 1:6 5:1,12
**alleged** 12:16
**alleyway** 22:1,7
  44:16 45:4
  46:14,20,24
  57:6,20 59:4
**allowed** 24:16
**Alvarado** 1:4
  4:24 5:12,18
  6:9 63:21
**Alvarado's** 70:6
  70:10
**American** 1:13
  2:4
**amount** 66:24
  67:5,14
**and/or** 73:21
**announce** 66:19
  66:24 67:24
  68:14 69:6,12
  69:17,22 70:16
**announced**
  66:11 67:15
**answer** 8:2 15:9
  15:19 23:6
  24:7,19 25:6
  26:17 28:13
  29:15 30:1
  33:21 42:13
  45:13 47:4,23
  48:12,14 49:18
  50:6,19 51:10
  52:19,24 53:16
  55:19,24 57:12
  58:19,19 59:7
  59:20 60:5
  61:11 62:8
  64:23 66:21
  67:8,18 69:9
  70:1
**answered** 48:11
  56:15 57:11
  59:20 64:22

**anybody** 16:1
  51:3 68:12
  71:23
**apartment** 11:4
  11:5 19:11
  21:1,3 23:21
  24:10 25:4
  28:11 29:14
  37:8,12,17
  46:13,19,24
  55:3,5,18 56:7
  61:8,21 64:20
  65:11 70:7
  71:3
**apartments** 23:8
  24:16 61:16
**appeared** 61:4
  61:13
**apply** 73:19
**apprehend**
  63:24 64:11
**appropriate**
  57:24
**approximate**
  7:16
**Approximately**
  9:17
**approximation**
  7:18
**April** 54:22
**Arch** 2:10
**area** 27:5 29:19
  31:18,23 34:10
  41:4,9 54:17
  54:18,22
**arrest** 3:22 12:7
  14:22 15:4
  68:21
**arriving** 70:14
**asked** 27:17 28:9
  28:13 30:2
  31:12,14 48:10
  48:13 52:23
  53:10 55:17,17
  56:14 57:10
  59:19 64:22
**asking** 17:24
  18:10 20:4
  30:5,7 42:17

  44:24 63:10
  64:15
**assigned** 9:10
  12:10
**assume** 15:21
**assuming** 30:6
**attempt** 32:24
  33:12 37:6
**attorney** 2:7,12
  6:10 7:10
**attorneys** 6:7
**audio/video** 4:22
**auto** 10:21,23
**available** 25:1
  36:16,24 37:2
  50:2 62:4
**Avenue** 12:24
  14:3 16:9 21:9
  21:21,22 23:4
  24:5 25:23
  28:12 29:15
  34:2,9,24 40:9
  41:6 44:16
  55:4 56:7
  58:15 60:1,14
  60:24 62:6
  64:2 65:3 71:4
  71:16,16
**aware** 13:11,13
  15:1

**B**

**back** 12:14,15
  12:23 39:4
  41:17
**badge** 4:21 5:15
**barking** 62:12
**base** 36:13
**based** 7:12
  17:10 18:1
  23:24 25:12
  59:24 61:13
**basic** 7:5 53:23
**basically** 9:4
  10:2 36:20
**basing** 16:12
**Bates** 14:12
  65:21
**beginning** 9:3

**behalf** 5:18
**believe** 23:10
  27:12,17 28:16
  29:2 30:11
  34:18 48:16
  52:1 62:14
**believed** 32:12
  ███████ 14:17
  14:21 16:2
  52:16 72:8
**best** 28:21 57:16
**beyond** 37:2
**block** 41:9 70:9
**blocked** 14:16
**bottom** 28:7
**breached** 70:11
**breaching** 70:15
**break** 7:22
**brief** 38:24
**briefing** 27:8
**Broad** 1:14 2:4
  5:6
**building** 1:13
  2:4 11:4 19:11
  21:8 23:3 24:4
  24:9,17 31:8
  44:15 45:4
  58:1,24 59:18
  60:10,12,15,24
  62:15 71:17
**buildings** 44:21
**built** 60:20

**C**

**C** 2:1 73:1,1
**called** 66:2
**caption** 5:11
**capture** 53:12
**case** 4:14 5:11
  6:8 10:20 11:1
  11:2 12:3,6,10
  12:11,22 13:1
  17:9 18:11
  20:2,13 24:1
  26:12 30:13
  31:4 33:2
  41:15 50:10
  52:9 54:14
**cases** 9:1 10:17

11:7,8 12:13
**cell** 32:1,6,13,15
32:15,19 33:5
33:9
**Center** 1:13 2:3
5:6
**certification** 4:9
73:18
**certify** 73:4
**certifying** 73:22
**chance** 6:10
13:4 39:13
54:19
**changed** 63:12
**characterizati...**
48:20 55:23
**check** 22:7 25:17
35:18,20,22
43:5
**City** 1:6 2:8 4:24
5:12 8:10 9:23
38:5 43:21
50:15
**civilian** 9:23
**clarifications**
7:7
**client** 54:11
**codes** 37:21
**coffee** 7:23
**come** 52:7
**comes** 11:9
**commencing**
1:15
**Common** 1:1 5:1
5:13
**Commonwealth**
1:17
**complete** 7:16
**completely**
52:13
**complex** 11:5
37:18
**computers** 33:19
**concluded** 72:17
**conduct** 33:24
59:16
**conducted** 46:18
47:20 72:1
**conducting**

41:23
**confidential**
72:9,10
**confidentiality**
72:11
**consider** 57:24
67:14
**considered** 67:5
**consistent** 57:19
69:18 70:15
**contact** 37:6,11
49:24 53:13,24
**contacted** 38:8
50:10
**contained** 73:5
**contains** 65:23
**context** 67:6
**contradicts**
48:17
**control** 73:21
**conversation**
14:19 16:19
17:2 53:8
**cooperate** 53:13
**cooperative**
50:22 51:19,20
**coordinate**
49:12 50:13,16
51:6,14
**corporal** 10:9
**correct** 6:11,12
8:11 16:10,11
17:4 20:19
21:10,17,18,22
21:23 22:6
29:22 31:9
32:19 34:24
35:1 40:17
41:7 43:12
45:11 47:21
48:9 51:19
53:6 54:10,23
55:6 60:10
61:1 64:20
66:1 68:14,21
68:22 69:23
73:8
**correctly** 28:17
29:3 47:12

**counsel** 4:8
**COUNTY** 1:2
**couple** 6:15
39:22
**course** 42:24
**Court** 1:1,22 5:1
5:13
**Courtney** 2:15
5:4
**COVID** 10:19
17:11,11
**crime** 11:8
**currently** 8:10
**custom** 51:5
69:19

___

**D**

**D** 3:1
**data** 36:13
**database** 36:19
36:24
**date** 5:8
**David** 11:13
**day** 16:24 21:11
34:11,20
**dcr.diamond...**
1:24
**decades** 69:1
**decide** 26:1
**decision** 26:3
53:18
**decreased** 51:21
**defendant** 11:16
11:24 12:1
**Defendants** 2:12
**Defense** 14:13
28:7 65:21
**definitely** 10:21
**Denise** 1:15 5:19
73:12
**department**
9:18 15:15
22:13 24:4,23
25:1 36:20
41:21,23 43:21
49:6,8,12,23
50:16,23 51:3
52:2,12 63:4
63:17 66:18

67:4 68:6 69:2
**depends** 52:10
53:21
**depicted** 35:10
**depicts** 45:8
**deposed** 5:14
7:2 10:16 12:3
12:4 26:11
54:13 55:17
**deposition** 1:11
4:20,23 5:10
5:17,19 6:14
6:24 46:11
54:17 57:2
72:17 73:7
**described** 20:7
**DESCRIPTION**
3:13
**designate** 72:7
**designated**
72:10
**designed** 61:24
**detective** 1:12
3:5 4:21 5:15
5:23 6:6,23 8:9
8:10,14,18,23
8:23 9:14 10:7
10:10 11:15,19
12:11,21 15:9
15:19 16:17
18:8,19 19:20
20:5,9 22:3,17
23:6,24 24:7
24:19 25:6
26:5,16 28:2
28:19,21 29:4
30:1 32:21
33:7,15,21
34:4 35:15
37:15 38:13
39:15 40:14
42:3,13,21
43:6,14 44:2,9
44:19 45:13
47:3,23 48:11
49:17,24 50:5
50:19 51:9
52:6,19 53:2
53:16 54:3

55:8,24 56:15
57:11 58:3,18
59:6,20 60:5
60:18 61:10
62:8 63:6
64:13 66:13,21
67:8,17 68:2
68:16 69:2,8
70:20 71:6,19
72:6
**Detective's**
48:21
**determination**
20:11 27:2
**determine** 19:14
19:22 62:18
**determined** 55:4
56:6
**determines** 26:7
**DIAMOND**
1:22
**different** 25:11
30:9 32:8
36:18 40:3
52:13 64:24
**direct** 52:11
73:21
**directive** 63:4,7
68:9
**directives** 63:13
63:18
**discuss** 71:23
**discussed** 31:17
70:24 71:13
**discussion** 28:10
29:13
**dispatcher** 9:23
**Division** 2:9
8:24
**docket** 5:2,13
**document** 14:7
35:24 36:8
38:17 54:9
57:1
**documents** 13:5
13:15 39:11,16
45:20 46:2
65:23
**dog** 62:12,24

**doing** 16:14
41:10,14,18
**door** 20:13,19
20:21,21,23
21:2,2,10,16
21:22 26:1
46:15 60:1,7
60:13,23 61:7
61:14,16 62:1
62:6,10,13
63:1 70:11,14
70:15 71:15
**doors** 25:22
43:24 45:17
**doorway** 61:20
**dressed** 27:21
**drive** 34:13
**driver's** 23:10
**dropped** 12:2
**drove** 34:23 35:9
**drug** 12:8
**due** 17:11
**duly** 5:24

**E**

**E** 2:1,1,14,14
3:1 73:1
**early** 34:20
**East** 8:23 9:14
**educated** 15:15
**effort** 32:17
63:23
**efforts** 71:1,8,14
**either** 31:9
34:16 43:7
**elaborate** 51:23
**employed** 5:5
**encountered**
21:6
**enforce** 19:7,16
20:5 37:13
38:9 49:7,9
57:5,15 58:13
59:2 64:7
**enforced** 22:15
56:12
**enforcement**
12:23 13:12
14:2 29:21

31:5 41:11
42:1,11 45:11
59:18 64:1,7
**enforcing** 68:13
69:5
**enter** 18:6 19:7
19:17,22 20:7
24:4,9,16 25:4
26:1,22 32:11
37:21 57:24
59:3 66:7 71:2
**entered** 25:23
70:7
**entering** 67:1
**entire** 23:3 24:4
**entrance** 46:23
55:5,5 56:6,8
57:7 58:12,14
59:3
**entrances** 44:7
**entry** 19:24
20:17 21:1
25:18 26:7
27:3 57:17
**ESQUIRE** 2:3,9
**estate** 35:18,20
35:22 36:13
**estimate** 7:15,18
**et** 1:6 4:24 5:12
**evening** 34:12
**eventually** 12:2
18:21
**everybody** 6:16
**evidence** 73:5
**exactly** 64:14
**EXAMINATI...**
6:3
**examined** 5:24
**exclusively** 9:10
25:24
**executed** 34:21
**executing** 31:18
**execution** 27:6
**Exhibit** 4:4 36:4
39:6 40:21
45:22 48:23
56:21 65:16
**EXHIBITS** 3:12
**existed** 43:12

**experience** 15:3
15:14 18:1
20:24 22:12
26:14 31:5
49:11 50:8
61:13 67:13
70:3
**expertise** 69:3
**expressed** 31:6
**extent** 20:9
44:19 55:9
58:19 64:13
66:13,21 68:16
69:8 71:6

**F**

**F** 73:1
**familiar** 63:3,15
**family** 11:4
**far** 15:15 22:14
30:12 56:10
70:24
**Felishatay** 1:4
5:18
**figure** 43:23
**file** 3:20 54:11
**filing** 4:9
**find** 35:3,12
38:20 54:16
71:9
**fine** 11:23 12:21
**first** 5:24 9:3
20:22 21:3,16
27:1 52:4,5
61:8,21
**floor** 2:5,10 5:7
16:9 20:22,22
21:1,3,4 23:13
23:16,17,21
28:11 29:14
37:8 55:3 56:6
60:20 61:8,21
64:19 65:5,7
71:3
**follow** 66:10
68:13 69:5
**follows** 6:1
**force** 12:8
**foregoing** 73:18

**form** 4:11,17
11:18 15:8
16:16 18:7,18
19:19 22:2,16
23:5 25:5 26:4
28:20 31:10
32:20 33:7
34:4 35:14
37:14 38:12
40:13 42:2,12
43:13 44:1,18
47:2,5 48:11
49:17 50:5,18
51:9 52:18
53:15 54:2
55:8 56:14
57:10 58:17
60:4 61:10
62:7,16 63:14
64:12 66:12
67:17 68:1,16
69:8 70:2,19
71:6,19
**foundation**
19:15 23:23
**Francis** 1:12 3:5
4:21 5:15,23
**front** 20:13,23
21:2 57:24
60:1,7,10,23
61:14 70:14
**fully** 73:6
**further** 72:3

**G**

**gather** 17:3 19:5
**gathering** 18:16
32:10
**general** 36:12
69:11
**generally** 12:5
12:12 42:17
**getting** 10:2
**give** 7:11 19:6
19:12 20:12
38:17 52:24
57:15
**given** 27:8 69:1
**gives** 24:8

**giving** 7:18
13:21
**go** 7:6 16:17
17:3 21:3
24:10 25:14,15
26:24 27:2
31:11 33:7
38:18 46:14
56:15 57:11
59:11 60:6
64:22
**goes** 61:21
**going** 13:20
18:21,23 20:11
21:6 23:8
25:14,14,15,18
26:8,18,19
27:1 31:3
32:23 38:21
39:3 42:24
72:14
**good** 6:6 7:17
40:7
**Google** 3:18,21
35:2,7,10,17
40:2,10 41:5
41:12 43:6,8
43:11,17 44:13
46:21 47:6,10
57:4 58:12,24
**Graf** 1:12 3:5
4:21 5:15,23
6:6,23 8:9
12:21 20:5
24:1 39:15
**Graf-1** 3:15 4:4
13:18 28:8
**Graf-2** 3:16 36:2
36:4
**Graf-3** 3:17 39:6
39:11
**Graf-4** 3:18
40:19,21 45:2
46:22
**Graf-5** 3:19
45:20,22
**Graf-6** 3:20
48:18,23 54:10
**Graf-7** 3:21

56:19,21
**Graf-8** 3:22
65:14,16
**guess** 7:13 34:17
**guidance** 51:2
56:9 68:6
**guys** 38:16

_____

**H**
**half** 8:15 41:9
70:8
**hallway** 61:20
**handed** 39:10
54:10
**handle** 9:2 11:8
**handled** 12:10
**happened** 16:6
24:16
**hard** 27:20 40:4
62:17
**heard** 7:5 62:12
66:2
**help** 25:2
**highlighted**
46:10,11 54:17
54:22
**highlighting**
57:7,21
**home** 34:13 43:4
46:2
**homicide** 8:10
8:13,18 9:5
10:6 11:1,2
18:23 53:10,12
63:24
**hours** 64:3,3
**house** 14:22
15:4,7 17:4
54:6 57:17
61:24

_____

**I**
**ID** 65:10
**identification**
4:5 17:9 36:5
39:7 40:22
45:23 48:24
52:8 56:22
65:2,17
**illness** 6:19

**impair** 6:20
**important** 6:17
**incident** 14:8
**including** 24:23
**independent**
17:6 52:13
**independently**
17:24
**indicate** 61:15
65:10,11
**indicated** 57:7
**influence** 6:18
**informant** 12:22
**information**
16:23 17:3,18
18:17 19:5,13
20:1,12 23:14
25:16 26:20
30:24 32:11,18
36:21 37:1
42:9 43:22
47:6,18 48:2,5
49:14 50:2,23
51:21 53:11
54:5 56:17,18
57:3,14,16
58:5,6,10,22
59:10,15 61:12
62:3,20 64:5,9
65:6
**informed** 62:21
64:18
**inside** 11:4
**insight** 53:23
**inspection** 15:6
16:2 48:8
**instructed** 57:5
59:10
**intend** 7:20
**interior** 27:13
27:16 28:15
29:16,22,24
30:6 31:7,13
31:15 42:14
**internal** 13:7
29:5
**interview** 3:19
29:9 46:3
**investigate**

32:12
**investigation**
17:16,20 40:12
41:24 46:3,18
47:21 64:1
**investigations**
41:11
**investigative**
32:23
**involve** 42:9
**involved** 14:1
**involves** 12:22
**IP** 33:18
**issue** 12:19 23:2
**IV** 4:21 5:15

_____

**J**
**Jaclyn** 46:5,7
**January** 8:20
**Jersey** 1:23
**job** 8:21 9:13
19:5 47:12
**join** 9:17
**joined** 9:20
**June** 1:4 12:23
13:22 14:13
41:10 43:11
56:4

_____

**K**
**Keith** 2:3 6:7
**Keith@victim...**
2:6
**keys** 37:19
**killed** 11:3,12
**kind** 9:1 10:5
12:13
**kinds** 40:10
**Kitcherman**
2:15 5:4
**knew** 21:21
28:14 31:13
53:22
**knock** 46:14
66:3,5,7,9,11
66:19,23 67:15
67:23 68:13,18
68:23 69:6,12
69:16,22 70:16
**know** 7:8,14,15

7:17,22,24 8:6
10:20 11:19,20
14:21 15:9,10
15:11,20,22
17:9 18:8 19:6
19:10,11,17
20:6,9,18,20
21:9,11,19,24
22:6,17 24:10
25:17,19,20
26:5,20,21
27:11,18,18
28:3,4,15
29:21 30:6,14
31:7,8 32:21
33:8 36:22
37:15,19,20,20
38:1,10,13
39:12,16 40:14
41:1,1 42:3,21
42:24 43:4,14
44:2,3,9,10,19
45:10,14 47:4
49:3 50:7,20
52:4,6,7,11
53:23 54:3
55:9,21 60:5
60:18 63:6,11
66:8,13,18,22
67:17 68:3,16
69:8 70:21,23
71:7,20
**knowing** 29:23
62:10
**knowledge** 7:12
7:17 15:24
20:16 27:14
32:4 34:6 38:5
38:14 42:9
49:22 50:12,15
59:16,21 63:16
63:23
**known** 46:17
47:12 56:5
66:11

_____

**L**
**L** 2:14
**laid** 43:2

**Lane** 1:22
**large** 32:5
**larger** 37:17
**late** 34:11,12,17
34:19
**Law** 1:13 2:3,9
5:5
**lawsuit** 11:24
12:1
**lay** 19:15 23:23
**layout** 27:13,16
28:14,15 29:16
30:7 31:7,15
38:10 42:10
**lead** 43:24 60:2
60:14 61:8
**leading** 22:1
**leads** 20:21 21:2
**learn** 44:6 49:13
50:1 71:2,15
**learned** 21:16
46:19
**led** 44:14 45:3
46:22 60:24
62:13
█████ 14:17,21
17:10 32:1,13
33:13,19 52:17
56:11 57:6
63:24 64:11
65:1,24 72:8
█████ 16:2,10
17:4 19:7
23:10 32:12
46:19,23 55:5
55:18 59:2
**legal** 59:2,6,9
**let's** 38:18 40:19
56:19 65:13
**license** 23:11
**lieutenant** 10:11
30:13,16,23
**limited** 14:6
**listing** 65:3
**lists** 37:5
**lived** 53:22
**living** 62:14
**locate** 33:12
**located** 12:24

21:9 34:1 35:4
**location** 31:1,2
  42:18
**long** 8:13 9:12
**look** 13:19,19
  35:2 36:8
  39:13,22 43:8
  54:21 69:3
**looked** 35:13
  45:1 60:19
**looking** 28:16
  29:2 53:23
**looks** 41:3,5
**lot** 11:8,9 17:11
  25:12
**louder** 8:4

——————
**M**
**mailboxes** 20:23
  61:15,24
**making** 19:24
  26:2 32:17
**managers** 38:7
**Mantua** 1:23
**map** 3:18,21
  39:23 40:2,10
  40:11 44:14
  45:2 46:21
  57:4 58:12,24
**Maps** 35:2,10,17
  41:5,12 43:7,8
  43:11,17 44:13
  47:6,11
**Margaret** 44:17
  45:5 46:24
  55:6 56:8 59:4
**mark** 36:1 40:19
  45:19 48:18
  56:19 65:13
**marked** 28:8
  36:1,5 39:7,11
  40:22 45:2,23
  46:21 48:24
  54:15 56:22
  57:2 65:17,20
**masonry** 43:4
**materials** 13:5
**Matteo-Hand**
  46:5,8

**matter** 4:23
  11:14 73:7
**mean** 4:16 15:4
  16:18,24 19:2
  19:21 20:11
  22:7 24:14
  32:22 35:18,21
  36:10 37:16
  41:8,9 43:1
  51:24 52:4
  53:22 57:22
  67:10 69:10
**means** 73:20
**media** 33:13
**medication** 6:19
**meet** 27:10
**meeting** 34:10
**Mellody** 30:14
  30:16
**member** 10:13
  30:9 66:17
**members** 24:2
  26:11 29:20
**memorializes**
  29:3 55:1
**memory** 14:7
**mentions** 72:7
**met** 17:10 54:5
**minimal** 37:4
**missing** 68:12
**mistaken** 43:18
**moment** 38:17
  39:12
**Monk** 30:13,16
**months** 9:24
**morning** 6:6
  34:20,21
**multi-residence**
  22:15 37:11
  38:9
**multiple** 25:22

——————
**N**
**N** 2:1,14 3:1
  73:1
**name** 5:4 6:6
  11:8,12 14:16
  28:4
**named** 46:5

**narcotics** 12:7
  12:14,18
**nature** 42:19
**necessity** 15:6
**need** 8:4 19:17
  20:6 38:18
**never** 11:15,23
  15:15 18:11
  21:5,6 37:24
  39:17,21 48:1
  48:4 54:5,6
  61:23 66:6
  68:5,17
**new** 1:23 22:24
**night** 34:18
**nighttime** 34:15
**non-cooperative**
  52:17,21 53:21
**non-fatal** 9:10
**normal** 4:15
  37:10
**normally** 4:14
  18:5 30:8
  39:20 41:12,17
  49:12
**North** 1:13 2:4
**Notary** 1:16
**noted** 73:5
**notes** 3:20 54:12
  73:6
**number** 4:22 5:2
  5:14,16 12:15
  17:22 32:15
  33:1,5,9 63:11
**numbered** 63:13

——————
**O**
**O** 2:14 73:1
**Object** 11:18
  15:8 16:16
  18:18 19:19
  22:2,16 23:5
  25:5 26:15
  28:20 31:10
  32:20 35:14
  37:14 38:12
  40:13 42:2,12
  43:13 44:1,18
  47:2 50:18

52:18 53:15
  54:2 59:19
  60:4 62:7
  66:12 68:1
  70:2
**objection** 15:18
  18:7 20:8
  22:10 24:6,18
  26:4 28:1 33:6
  33:14,20 34:3
  42:20 44:8
  45:6,12 47:14
  47:22 48:10,19
  49:16 50:4
  51:8 53:1 55:7
  55:22 56:13
  57:9,10 58:16
  59:5 60:17
  61:2,9 62:16
  62:22 63:5
  64:12,21,22
  66:20 67:7,16
  68:15 69:7,24
  70:19 71:5,18
  72:12
**objections** 4:10
  4:16 58:3
**obligation** 7:11
**observation**
  59:24 60:13,23
**obtain** 32:18
  37:19 43:22
  68:21
**obtained** 16:8
  33:18 34:11
**obtaining** 17:1
  42:6,9
**occur** 61:7
**occurred** 53:7
**offense** 9:7
**office** 15:5,17
  16:2 46:6,18
  51:7,18 54:13
  55:2,3 56:5
  57:4 58:11,23
**officer** 5:19 10:1
  10:3,6,8 14:14
  16:10,20 17:13
  17:15,19 18:4

18:5,10,11
  23:15 28:17
  47:11,13,17
  49:13 50:1,10
  50:17,17 52:6
  52:15 53:11,13
  54:1,14
**officer's** 50:2
  52:10 53:14
**officers** 17:7
  24:2,15 25:2
  28:13 70:13
**official** 51:4
  63:17
**oh** 11:3
**okay** 6:13,23 7:4
  7:9,18,19,24
  8:1,7,8 9:1,6,8
  9:12,17 10:5
  10:13,22 11:6
  12:3,5,9,12,18
  12:21 13:4,9
  13:14 14:11,21
  15:1,13,24
  16:8,22 17:13
  17:18,23 18:3
  18:14 19:14
  20:15,18 21:19
  21:19 22:21
  23:20 24:22
  25:10,22 26:10
  27:15,23 29:12
  30:4,8,11,21
  34:8 35:6,11
  35:20,24 36:15
  38:16 39:14,19
  39:22 40:5
  41:5,10,16
  42:8 43:20
  44:13 47:10
  50:12,14 51:17
  57:19,23 59:14
  60:22 61:7
  62:12 63:16
  66:9,17 67:13
  68:5,8,11,20
  69:1,14 70:23
  71:13,23
**ones** 19:23 26:8

26:24
**operation** 23:3
24:24 25:3
27:9 31:6 72:1
**operator** 2:15
5:3 38:21 39:3
72:13
**option** 43:7
**Oral** 1:11
**order** 17:2 19:14
19:16 20:5
37:13 72:11
**organization**
52:14
**original** 9:21
**outline** 7:5
**outlined** 24:11
**outside** 13:24
40:9
**overview** 40:10
41:3,5,12,14
41:18 44:14
46:21 58:24
**owner** 35:23
37:6,7,11 38:2
**owners** 38:7

―――――――
**P**
**P** 2:1,1,14
**p.m** 72:13
**p.m'ish** 34:19
**PA** 2:5,11
**packet** 14:12
28:8 39:11
65:23
**page** 3:3,13
14:12 28:8
54:16
**pages** 39:23
**paper** 14:9
**parole** 14:15
15:5,17 16:1
17:7,13 18:24
46:6,18 49:10
49:13 50:17
51:7,18 54:13
54:13 55:2
57:4 58:11,23
59:11

**part** 32:22 72:9
**participated**
68:18
**particular** 50:14
**particularly**
58:17 59:6
**path** 57:20
**patrol** 10:3,6,8
**Pennsylvania**
1:2,14,17 5:8
**people** 17:8
**performed** 5:10
**permission** 24:9
**permit** 24:1
**person** 5:11 11:3
18:24 19:1
30:3 48:3
49:10 71:2
**personal** 7:12
31:5 42:9
59:24 60:13
67:13
**personally** 34:8
63:20 70:10
**Philadelphia** 1:2
1:6,14 2:5,8,11
4:24 5:1,7,12
5:13 8:11,24
9:18 12:14
14:14 15:14,16
16:1 22:13
24:3,22 35:22
38:6 41:21,23
43:21 46:6
49:6,8,11,23
50:15 51:3
63:3,17 66:18
67:4 68:6 69:2
**phone** 17:22
32:2,7,13,15
32:15,19,24
33:5,9
**photo** 35:7,10
43:16
**photograph**
39:23 41:6
**physical** 15:6
33:24 38:10
42:10,18 43:5

49:15 50:3
59:17
**physically** 35:4
35:12 71:2
**picture** 40:6
41:13 57:8
**pictures** 40:2,8
40:11
**pink** 57:7,21
**placed** 15:4
**plaintiff** 2:7 5:18
6:8
**planning** 24:23
25:3 49:9
**play** 26:2
**Pleas** 1:1 5:1,13
**please** 8:2
**point** 22:22 32:4
46:23 58:13
**pointed** 55:20
**police** 4:21 9:18
9:22,24 10:1
15:14 22:13
24:2,3,22 25:1
36:20 41:21,23
43:21 49:6,8
49:11,23 50:16
50:23 51:3
63:3,17 66:18
67:4 68:6,9
69:2
**policies** 41:22
42:5,8,23
43:20
**policy** 38:6 44:4
44:11 49:23
50:8,21 51:4
52:2,3,5,12
69:11,11
**portion** 23:4
24:5 46:10
60:2,14,24
62:15
**possess** 32:6
**possession** 54:12
**possible** 8:7 23:9
49:14 67:10
**possibly** 17:8,21
**practice** 37:10

**premarked** 4:5
13:17
**preparation**
13:5
**preparatory**
41:24
**prepare** 17:3
**prepared** 6:11
**preparing** 38:8
**present** 14:10
27:5 70:6
**previously** 10:16
36:1 56:5
**prior** 8:21 16:24
25:18 27:6,9
29:20 31:5,18
34:9,12,21
45:10 48:17
54:17 55:21
56:4 57:2
59:18 64:1
**prison** 23:12
65:4
**private** 42:1
**probably** 6:14
7:4 70:8
**probation** 14:14
14:15 15:5,16
16:1,10,19
17:7,14,15,19
18:3,5,10,11
18:24 23:15
46:6,17 47:11
47:13,17 49:10
49:12 50:1,2,3
50:10,17,22
51:6,18 52:2,6
52:10,12,15
53:11,12,14
54:1,12 55:2,2
56:5 57:3 58:5
58:11,23 59:11
65:7
**procedure** 38:6
51:4
**procedures**
15:11,16,21,22
41:22
**proceed** 6:11

**proceedings** 4:2
73:5
**process** 7:21
32:23
**produced** 40:7
46:4
**Professional**
1:16
**proper** 31:2
46:23 58:12,18
**properties** 22:15
43:9 45:16
**property** 3:16
12:23 18:22
19:10 20:17,22
21:7 22:1
25:24 26:23
28:14 29:22
34:9 35:4,12
35:23 37:6,7
37:11,12,22
38:7,7,9,11
42:11,19 43:1
43:23,24 44:7
45:1,15 47:21
48:8 59:1 60:2
66:8 71:9
**protocols** 17:12
**provide** 19:24
25:14 26:19,23
30:24 38:18
50:24 51:21
**provided** 55:16
56:17 58:5
64:6,10,15
**provides** 36:21
**public** 1:16
36:12,18,19
37:1,2
**publicly** 36:16
**purpose** 18:17
67:23
**pursuant** 43:20
67:15

―――――――
**Q**
**quality** 40:6
**question** 4:17
8:5 15:2 17:14

19:15 20:4
21:20 22:22,23
23:1,22 27:13
27:15,17,24
28:9,24 29:13
30:2,5 32:9
42:17 47:3
49:7,17 50:5
51:9 52:23
53:16 55:8,19
56:2,14 57:10
58:17 60:9
62:8 64:8
**questions** 4:11
6:15 7:7 8:2
72:3,5
**quick** 13:19
**quickly** 7:6

————————

**R**
**R** 2:1,9,14 73:1
**raised** 27:15,24
**rank** 9:21
**ranks** 10:6
**reached** 52:15
**read** 14:8,11
28:6
**reading** 11:9
13:24 29:12
**real** 13:19 35:18
35:20,22 36:13
**rear** 16:9 20:16
20:19,20,21
21:6,10,16
23:16,18,21
28:11 29:14
37:8 44:22
45:4,15,17,17
46:12 55:3,5
56:7,8 57:6,20
58:14 59:3,12
64:20 65:7
71:3
**reask** 28:23
**reason** 50:14
53:24
**reasonable**
66:24 67:5,14
**reasons** 35:8

38:1
**recall** 11:2 12:4
13:21 14:10,23
16:7 18:9 25:7
27:23 31:20
32:14,17 33:1
33:16 35:19
36:13 40:17
41:14,18 42:22
51:15 52:20
53:3,5,7 64:13
65:1 67:11
68:7
**receive** 41:20
**received** 22:14
51:2 67:3 68:5
**recess** 38:24
**recognize** 49:4,5
**recollection** 13:1
14:1,6,18
16:14 17:6
21:5 22:19
23:16 28:22
30:15 31:22
35:7 65:10
**recon** 3:17 39:18
**reconnaissance**
19:10 71:24
**record** 38:19,22
39:4 48:20
54:7 58:3 61:3
65:20 72:7,14
**recorded** 16:23
**records** 11:9
49:3 55:21
65:21
**Recovery** 1:12
2:3 5:5
**recruit** 9:22,24
**Redbud** 1:22
**refresh** 30:15
**refused** 52:24
53:13
**regard** 63:18
**regards** 32:18
41:21 42:10
44:24 49:24
52:16 56:11
58:18 63:24

64:6,10 67:4
**related** 12:12
17:16,19 24:3
32:11 40:11
42:18 72:1
**relationship**
38:2
**release** 23:12
65:4
**relevance** 33:7
55:23
**remember** 11:10
14:24 16:18
17:24 30:19
40:15 42:4
43:16 53:8
67:10 68:7
**repeat** 14:4
**rephrase** 8:5
**reporter** 1:16
73:13,22
**REPORTING**
1:22
**represent** 14:16
26:10 30:11
36:15 46:3
54:11 55:15
**representation**
26:16
**representing** 6:8
**reproduction**
73:20
**request** 33:4
68:23
**require** 69:5
**required** 66:10
68:12
**reserved** 4:11,17
**residence** 16:3
19:7,18,23
20:7 23:11
32:12 34:1,13
34:14 41:4
42:1 48:4 49:9
49:15 50:3
59:3
**residential** 42:11
43:23
**responsibility**

25:24 26:13
**review** 13:5,9,14
39:12
**reviewed** 13:7
**reviewing** 14:6
**right** 6:9,23 7:4
8:9,16,16,16
8:21 10:7
11:14 12:21
13:17,18 16:12
20:5 24:13
28:6 29:19
31:4,21 32:8
39:10,15,24
40:18,19 45:19
45:19 54:9,21
55:1,15 58:9
64:18 65:13
72:3
**role** 26:2
**rule** 66:11,19
67:15,24 68:14
69:6 70:16
**rush** 54:18

————————

**S**
**S** 2:1,14,14
**safe** 25:20
**saying** 36:17
**says** 39:23 40:6
46:12,13 54:22
55:11,14 62:24
**Scott-3** 57:2
**Scott-4** 36:1
**screen** 36:9
**sealing** 4:9
**search** 3:16
23:17,20 24:1
31:18 43:3
63:18 65:24
**second** 14:12
16:9 20:22,24
21:4 23:13,16
23:17,21 28:7
28:11 29:14
37:7 38:19
55:3 56:6
64:19 65:5,7
71:3

**seconds** 67:20
70:14
**see** 32:24 35:23
37:5 39:20
43:8 46:12,15
54:18 60:22
**seen** 39:17,21
44:13 46:21
57:4 61:23
**separate** 12:18
14:8
**September** 1:8
5:9
**sergeant** 10:11
30:14,16,22
**series** 12:13
**serve** 18:21
**served** 21:14,15
34:17 69:15
**set** 58:2
**seven** 9:9 64:3
**sex** 9:7
**Shannon** 14:14
17:15,19 52:16
54:14 55:16
**Shannon's** 54:1
**Shannon-1**
54:15
**sheet** 3:17 39:18
**shooting** 13:8
**shootings** 9:11
**Shorthand** 1:16
73:13
**shot** 36:9
**show** 44:20
**shown** 57:20
**sic** 72:14
**side** 60:24 62:13
71:16
**signing** 4:8
**similar** 35:3
**simply** 20:18
**sir** 36:8 39:10
45:19 46:2
54:10 57:1
59:24 65:22
**sites** 33:13
**six** 64:3
**slowly** 8:4

**smaller** 37:24
**social** 33:12
**sorry** 11:3
**sort** 6:18 71:24
**South** 1:13 2:4
  5:6
**speak** 6:10 8:4
  19:1 25:13
  27:11,20 30:8
  31:13 47:13
  69:21
**special** 37:21
**specific** 16:14
  23:9,14 24:10
  26:21,22 41:15
  42:5 44:4,11
  45:1,2 49:20
  53:8 65:9
  67:20
**specifically**
  23:21 27:23
  41:8 42:23
  46:13 48:7
  64:18
**specifics** 27:19
  66:8
**speculate** 7:14
**spoke** 14:13 30:3
  30:16 31:22
  47:16 48:2
**spoken** 46:7
  47:11 63:20
**staging** 27:5
  29:19 31:18,23
  34:10
**stairs** 21:3
**stamped** 14:12
  65:21
**standard** 6:15
**start** 10:3 13:19
**started** 9:3 52:5
**state** 65:2
**stated** 29:16,20
**statement** 3:15
  13:7,15,17,21
  13:24 14:11
  16:13,13 28:18
  28:19 29:3,5
**states** 28:17

39:18
**stipulated** 4:7
**stipulations** 4:15
**stories** 60:3,15
**story** 43:4 60:3
  60:15 61:1
**street** 1:14 2:4
  2:10 5:7 44:17
  45:5 47:1 55:6
  56:8 59:4 70:8
**streets** 44:7
**strike** 15:1 17:14
  19:15 21:19
  23:22 49:7
  64:8
**substance** 6:19
**suing** 11:5
**supervises** 14:15
**supervising** 19:2
  47:17
**supervision**
  73:22
**supervisor** 27:10
  27:19,21 30:9
  30:10,19 31:6
  48:3 52:11
  53:14 54:1
**supervisors**
  30:13
**supplied** 56:18
  58:6
**supply** 47:18
  48:5
**supposed** 43:23
  44:6
**sure** 16:23 22:21
  25:2 32:14
  43:15 49:22
  56:4 58:22
  59:8 64:14
  68:10,11
**surveillance**
  34:1 59:17
**suspect** 15:3
  18:22 32:1
  50:3 53:12
**suspect's** 18:4
  49:14 50:1,17
  53:10

**SWAT** 10:14
  19:6,9,17 20:6
  24:2,23 25:11
  25:12 26:1,6
  26:11,19 27:8
  27:10,11,17
  28:13 29:20
  30:9 31:6
  39:18 56:10,18
  57:5 58:7
  59:10 64:6,10
  64:19 69:15,19
  69:21 70:13
  71:24
**swear** 5:20
**sworn** 5:24

—————

**T**
**T** 2:14 73:1,1
**tactical** 27:22
**take** 6:13 7:22
  13:18 39:11
**taken** 1:12 5:17
  39:1 73:6
**talk** 18:23 30:19
**talking** 42:15
**tall** 60:3,15,16
  61:1
**target** 39:24
  40:6 41:4
**technology** 35:3
  35:11
**tell** 12:5 27:20
  39:16 40:4,5
  57:14
**tenant** 38:3
**TERM** 1:4
**testified** 6:1
**testify** 6:20
**testimony** 7:11
  13:6 26:16
  30:12 48:17,21
  55:24
**Thank** 72:4
**thereof** 23:4
  24:5
**things** 19:2
  23:10
**think** 8:17 10:18

10:20,23 11:1
  11:6,11,12
  25:12 37:3
  51:17 52:9
  63:22 71:12
**Thiruselvam**
  11:14
**three** 7:3 9:23
  10:8,17 64:24
**THURSDAY**
  1:8
**time** 4:12,18
  5:21 7:14
  28:12 29:15
  32:10 50:21
  51:22 53:6,18
  58:20 67:1,5
  67:15,20
**times** 7:2
**tip** 38:3
**titled** 46:2
**today** 5:15 6:11
  6:21 7:11 13:2
  13:21 14:19
  32:17 71:1,14
**today's** 5:8 13:6
**told** 7:10 18:15
  28:14,17,18
  29:4 51:5,11
  62:5 63:14
**Torresdale**
  12:24 14:3
  16:9 21:9,21
  21:22 23:4
  24:5 25:23
  28:12 29:15
  34:2,9,23 40:9
  41:6 44:16
  55:4 56:7
  58:14 59:17
  60:1,14,23
  62:5 64:2 65:3
  71:3,15,16
**track** 33:4
**traditionally**
  61:17
**training** 22:14
  24:24 25:8,11
  25:20 41:20

42:5 67:3
**transcript** 73:8
  73:19
**trial** 4:12,18,23
  12:2
**true** 19:16
**truth** 26:14
**truthful** 7:11
**truthfully** 6:20
**try** 8:6 23:8
  32:24 35:3,12
  43:5 49:13
  52:8
**trying** 10:18,19
  10:24 11:6,11
  43:22 49:7
  54:18
**turn** 54:16
**two** 10:23 20:23
  36:11,17 43:3
  60:2,15 61:14
  61:15,24
**twofold** 30:23
**types** 40:8

—————

**U**
**Uh-huh** 20:4
**ultimately** 26:24
**uncomfortable**
  7:21
**understand** 8:3
  18:19 21:8
  22:3,21 34:4
  44:15 45:3
  46:22 47:4
  49:18 51:10
  61:10
**understanding**
  52:1,3 58:10
  62:21 66:6,15
  67:24 69:19
  70:18
**understood** 59:1
**uniforms** 27:22
**unit** 10:14 12:14
  19:6,17 20:6
  24:2,23 26:1
  26:11 27:9
  29:20 31:6

39:18 56:10
57:5 64:6,10
64:19 69:19,21
71:24
**unnecessarily**
7:21
**upstairs** 61:21
**use** 4:23 17:7
35:11 36:18
**usually** 18:2
19:1,9 21:2
26:6 27:10,19
30:10,19,22
61:20 69:11,22

### V
**valid** 23:3
**various** 23:9
**verbatim** 53:9
**verified** 27:12
**verify** 25:15
31:1 35:9
**versus** 5:12
**veteran** 66:17
**victim** 11:8
**Victims'** 1:12
2:3 5:5
**video** 2:15 5:3
13:9,12 17:8
17:16 38:21
39:3 52:7
72:13
**VIDEOGRAP...**
4:20
**videotaped** 1:11
72:16
**view** 17:8,16
40:9 60:9
**viewed** 60:12
**visit** 34:8
**vs** 1:5 4:24

### W
**wait** 27:2 66:24
**waited** 70:13
**waived** 4:10
**want** 7:7,14,22
25:13 31:1
38:3 41:19
42:24 61:18

69:21
**warrant** 3:22
12:22 14:2
17:1 18:21
19:8,16 20:6,7
21:12,14,15
22:24 23:2,7
23:17,20 24:1
24:11,15 27:6
27:12 31:3,19
32:11 33:4
34:11,17,18,22
37:13 38:9
41:11,19,24
42:6 43:3 49:9
52:16 56:11
57:6,15 58:13
59:2 61:18,19
64:4,7,11
65:23,24 66:3
66:5,10 68:18
68:21,23 69:15
72:9
**warrants** 17:3
22:14 25:17
63:18 68:12
69:4,4
**way** 25:3,20
26:22 29:23
34:12 36:12
52:17 56:9
57:22 59:2
61:4,23 62:9
**ways** 36:11,18
**website** 35:23
36:9
**Weller** 1:15 5:20
73:12
**went** 12:2 20:13
55:3
**West** 2:3 3:6
4:14 6:5,7
11:22 15:12,23
16:21 18:13
19:4 20:3,14
22:5,11,20
23:19 24:12,21
25:9 26:9 27:4
28:5,23 29:1

31:16 33:3,11
33:17,23 34:7
35:16 36:7
38:4,16 39:9
40:16,24 42:7
42:16 43:10,19
44:5,12,23
45:9,18 46:1
47:7,19 48:6
48:16 49:2,21
50:11 51:1,13
51:16 52:22
53:4,19 54:8
55:12 56:3,19
56:24 57:18
58:8,21 59:13
59:23 60:8,21
61:6 62:2,11
62:19 63:2,9
64:17 65:13,19
66:16 67:2,12
67:22 68:4,19
69:13 70:5,22
71:10,22 72:12
**witness** 3:3 5:14
5:20 11:20
15:10,20 16:18
18:9,20 19:21
20:10 22:4,9
22:18 23:7
24:8,20 25:7
26:6,18 28:3
31:12 32:22
33:8,16,22
34:5 37:16
38:14 40:15
42:4,14,22
43:15 44:3,10
44:20 45:7,14
47:5,16,24
48:13 49:19
50:7,20 51:11
51:14 52:20
53:3,17 54:4
55:10 56:1,16
57:13 58:4,20
59:8,21 60:6
60:19 61:4,12
62:9,17,23

63:7 64:14,24
66:14,23 67:9
67:19 68:3,17
69:10 70:1,3
70:10,21 71:8
71:20
**woman** 11:11
46:4
**wondering** 14:5
**word** 53:9,9
**worked** 9:22
**working** 9:4
**works** 46:5
**wouldn't** 25:4
50:16 51:20
57:14
**wrong** 25:4

### X
**X** 3:1

### Y
**yeah** 28:23
55:13 59:8
**year** 10:9
**years** 8:15 9:9
9:16 10:8
12:15 15:13
22:12 43:12
69:16

### Z
**ZURBRIGGEN**
2:9 4:19 11:18
15:8,18 16:16
18:7,18 19:19
20:8 22:2,8,10
22:16 23:5
24:6,18 25:5
26:4,15 28:1
28:20 31:10
32:20 33:6,14
33:20 34:3
35:14 37:14
38:12 40:13
42:2,12,20
43:13 44:1,8
44:18 45:6,12
47:2,14,22
48:10,19 49:16

50:4,18 51:8
52:18 53:1,15
54:2 55:7,22
56:13 57:9
58:2,16 59:5
59:19 60:4,17
61:2,9 62:7,16
62:22 63:5
64:12,21 66:12
66:20 67:7,16
68:1,15 69:7
69:24 70:2,19
71:5,18 72:5

### 0
**08051** 1:23

### 1
**10** 70:13
**10:15** 1:15
**10:16** 5:9
**10:50** 38:22
**10:53** 39:4
**11** 8:15
**11:00** 34:19
**11:30** 72:13,17
**12** 9:16 69:16
**121** 1:13 2:4 5:6
**146** 65:21
**14th** 2:10
**15** 67:20
**1515** 2:10
**153** 65:21
**1633** 1:6
**17th** 13:22
**18th** 2:5 5:7
**19102** 2:11
**19107** 2:5 5:8
**1983** 11:16,17
**1995** 9:19
**1999** 10:10

### 2
**2** 23:21
**200** 8:18
**2011** 8:19
**2012** 8:20
**2019** 35:8 43:17
54:22
**2021** 12:23

13:22 14:13
41:10 43:11
56:4
**2022** 1:4
**2023** 1:8 8:17
**21** 54:16
**215** 2:6,11
**220601633** 5:2
  5:14
**26th** 54:22
**28** 1:8
**28th** 5:9
**292-4292** 1:23
**2nd** 14:13

| **3** |
|---|
**30** 67:20
**36** 3:16
**39** 3:17

| **4** |
|---|
**4** 3:15
**4/26/2019** 54:23
**40** 3:18
**406** 1:22
**45** 3:19
**46** 41:8
**4664** 14:2 16:8
  21:9,21 23:3
  24:4 25:23
  28:12 29:15
  34:1,9 41:6
  55:4 56:7
  58:14 59:17
  60:1 64:2 71:3
  71:16
**48** 3:20
**4th** 34:18 56:4

| **5** |
|---|
**5.7** 63:4,14
**546-1433** 2:6
**56** 3:21

| **6** |
|---|
**6** 3:6
**65** 3:22
**683-5114** 2:11
**69** 14:13

| **7** |
|---|
**70** 28:7

| **8** |
|---|
**856** 1:23

| **9** |
|---|
**9066** 4:22 5:16

# EXHIBIT "U"

# Use of Force / Hospital Case Summary

- Click here to return to prior page
- Click here to return to the main menu.
- Click here for a hardcopy of this incident.
- This document is the property of the Philadelphia Police Department.

**Incident Entered By:** Lieut Mark Bugieda

*PS# 21-9005*

## Incident Details

| | | |
|---|---|---|
| **Received Dt/Tm** | **Date of Occurrence** | **Tm of Occurrence** |
| 6/4/2021  1:19 PM | 6/4/2021 | 5:55 AM |
| **DC #** | **Inv Unit** | **Control #** |
| 21-15-040680 | 6001 | PS #21-05 |
| **Hospital Case DC#** | **Hospital/Doctor** | |
| | | |
| **Susp/Def Went to Hospital** | **Susp/Def Injured** | **Susp/Def Arrested** |
| No | No | No |

**Charges Against Suspect/Defendant**

| | |
|---|---|
| **Officer Went to Hospital** | **Officer Injured** |
| No | No |

**Summary - Actions of Defendant and Officers**

Police Discharge PS #21-05 Lt. Bugieda #219 assigned.

## Use of Force Specific

| | |
|---|---|
| **Reason for Use of Force** | **Service Being Rendered** |
| Dog Shooting | Warrant |

**Incident Location**

- 4664 Torresdale Avenue, Suite/Apt: 1, Philadelphia, PA - : 1500

## Suspect/Defendant Information

**N/A N/A**
DOB:   Race: N/A   Gender: N/A

## Involved Officer(s) Information

**P/off Edward Song - Payroll #: 235933 - District: 4601 S.W.A.T. - In Uniform: Yes**

**Force Used Against Susp/Defendant**
- Firearm Discharge

D000001

**Commonwealth of Pennsylvania**
**Philadelphia Municipal Court**

# WARRANT OF ARREST



County of: Philadelphia
First Judicial District

*Copy*

**COMMONWEALTH OF PENNSYLVANIA**

v.

▬▬▬▬▬▬▬

**Issuing Authority**

**ACM LAUREN CONNOR**

Defendant's Address(s):

**4664 TORRESDALE AV Apt. 2 FLR Philadelphia, PA 19124**

Citation/Complaint No : COM-0002831-2021
Docket No :
Warrant Control No : **WAR-0002831-2021**
Date Citation/Complaint Filed : 06/03/2021

Charge(s):         **Shooting Victim**



| Code | Grade | Description | | Count |
|------|-------|-------------|--|-------|

*Additional charges, if any, are listed on separate page*

**DESCRIPTIVE INFORMATION:**

Social Security Number: ▬▬▬▬           Age: ▬        Race: ▬▬▬
Sex: ▬▬▬           Height: ▬▬ "        Eye Color: ▬▬▬
Date of Birth: ▬▬▬▬           Weight: ▬▬        Hair Color: ▬▬▬
Telephone Number: ▬▬▬▬

**Distinguishing features (scars, tattoos, facial hair, disability, etc):**

Alias(es):

TO POLICE OFFICER:

In the name of the Commonwealth of Pennsylvania, you are commanded to take ▬▬▬▬▬
the defendant, into custody for 111  Homicide ▬▬▬▬
Issued under my hand this **3**   day of **June , 2021**

Signature    Issuing Authority

PHILADELPHIA POLICE DEPARTMENT
OFFICER-INVOLVED SHOOTING INVESTIGATION UNIT
FINAL REPORT

OISI# PS21-05
Date: June 4th, 2021
Assigned: Detective Horn #881

**ORIGIN**
On 6-04-2021, at approximately 6:00AM, members of the SWAT Unit were executing a Homicide arrest warrant (#2021-2831 / M#21-201) /search warrant #242513 for the residence of 4664 Torresdale Avenue, 2nd floor rear, for a suspect named ███████. The murder occurred on ███████████████ at ███████████████. The SWAT unit was stacked at the front door residence and knocked and announced their presence with no response from inside of the home. SWAT subsequently used a ram to take down the front door and entered the residence. Upon entry, the interior of the scene was dark except for the light from the open front door. The SWAT team utilized their flashlights while clearing the first floor of the residence and encountered an aggressive Pit-Bull in the living room. The dog began biting the lower leg of SWAT Officer Song #3936 who was serving as the point man.  Officer Song discharged his Sig Sauer M400 rifle one time striking the dog in the head.

The property was cleared by SWAT, and the suspect was not on location.

**SCENE WALK THROUGH**
A scene walk through was conducted by Officer Song for the purposes of establishing the parameters of the crime scene.  Present for the walk through were Lieutenant Hendershot #148 of OISI, and Lieutenant Monk 279 and Sergeant Mellody #285 of SWAT

**WEATHER**

*70 degrees, overcast*

**SCENE**

The shooting scene was located in the 15th Police District (PSA 1), Northeast Police Division, a residential neighborhood consisting of two-story row homes, and businesses.  The scene was contained inside the private residence located at 4644 Torresdale Avenue, 1st Floor. 4600 Torresdale Avenue is a two-way residential street with vehicular traffic traveling north and southbound, regulated by a traffic light at the northern intersection; parking permitted on the east and west curb lines. The scene was bordered: Margaret Street to the north, Wilmot Street to the south, with Ditman Street to the west and Edmund Street to the east.

Two steps, followed by a small landing led to the front door clearly marked with the numbers "4664" in large black colored sticker-like icons. The white colored, front door was ajar, with minor frame damage, apparently due to SWAT breaching the residence.  Walking west through the threshold, a small couch was located along both the north and south walls with a small, oval glass table placed in the middle of the living room area between them.  A medium sized, dark brown, male, Pit-Bull dog was located just west of the glass table, with its head facing in a

PHILADELPHIA POLICE DEPARTMENT
OFFICER-INVOLVED SHOOTING INVESTIGATION UNIT
FINAL REPORT

OISI# PS21-05
Date: June 4th, 2021
Assigned: Detective Horn #881

southeastern direction; dog was deceased, with an apparent bullet wound in the forehead, with blood on the floor around the head, and upper body area.  A black dog crate, open, with a dog mat was located in the southwest corner of the room, with a television along the east wall, in front of the east wall window; closed curtains, and television blocked a clear view of the front of the property.  The television was on, as was a small lamp that was located in the northwest corner of the room.  (The resident, Felishatay Alvardo noted the television was on at the time of the incident but Police personnel turned on the light after the fact.) Continuing west through the residence, a small breakfast bar, with two chairs on the living room side of the room was noted, with a "Ring" Camera device sitting on top of the bar, facing the living room and front door; it was activated.  Continuing west past the breakfast bar, the kitchen area followed, leading to a small hallway that led to the bedroom and bathroom. The rear of the property is accessible through a common drive way located on Margaret Street.  A small gated, patio area led to a rear door that led to the second floor apartment; no access to the first floor from the rear of the property.  Also noted was a "Bling" Camera in the first floor, rear, right window, facing out to the rear patio and alleyway. This camera was also activated.


**BODY-WORN CAMERAS (BWC)**
Responding officers were not equipped with Body Worn Cameras

**OFFICER'S WEAPONS**
Sig Sauer M400 rifle serial number 21J045708 loaded with 29 live rounds

**POLICE INTERVIEWS**
**Sergeant Kevin MELLODY #285 / PR#233866- SWAT-** was interviewed by Detective Peter Marrero#648 at 2301 South 24th Street (OISI) and relayed the following information in summary:

On 6/4/2021 at approximately 6:00AM, Sergeant Mellody was on location with SWAT personnel executing a signed Homicide arrest/search warrant #242513 for the residence of 4664 Torresdale Avenue, for a suspect named ▮▮▮▮▮▮▮. Mellody was a part of the 2nd entry team with 2 additional officers. The SWAT unit was stacked at the front door residence and knocked and announced their presence with no response from inside of the home. SWAT subsequently used a ram to take down the front door and entered the residence. Upon entry, Sergeant Mellody noted that the interior of the scene was dark except for the light from the open front door. The SWAT team utilized their flashlights while clearing the first floor of the residence and encountered an aggressive Pitbull in the living room. Police Officer Edward Song - who was a part of the first entry team – separated himself from his unit's formation and stood with his Sig Sauer XM400 rifle at the low-ready position, pointing at the dog. At this point, Sergeant Mellody

D000004

PHILADELPHIA POLICE DEPARTMENT
OFFICER-INVOLVED SHOOTING INVESTIGATION UNIT
FINAL REPORT

OISI# PS21-05
Date: June 4th, 2021
Assigned: Detective Horn #881

resumed clearing the residence with the rest of the unit. When Sergeant Mellody entered the kitchen, he heard Police Officer Song discharge his rifle. Sergeant Mellody returned to the living room and saw Police Officer Song standing near the Pitbull which was deceased with an apparent gunshot wound through the bridge of its nose. Police Officer Song stated to Sergeant Mellody that the Pitbull had bit his lower right leg. Police Officer Song indicated to Sergeant Mellody that he had discharged at a downward angle to the floor. Sergeant Mellody did not observe any injuries but did observe what he believed to be dog saliva on Police Officer Song's right pants leg.

After the discharge, Sergeant Mellody made notifications and counted the remaining rounds in Police Officer Song's rifle. By his count, there were 28 rounds left in the weapon's magazine and one round in the chamber. The capacity of the magazine was 30 rounds.

Upon receiving relief at the crime scene, Sergeant Mellody transported Police Officer Song to OISI. At OISI gave a written interview and drew a diagram of the crime scene.

**Police Officer Patrick SABA #9823 / PR# 259421- SWAT-** was interviewed by Detective Toliver #9139 (SDD) inside South Detectives 2301 S 24th Street. He stated in summary that he was working with his partner Officer Burkitt #2091 assigned to S111. The officers were part of an entry team for 4664 Torresdale Avenue in reference to a search and arrest warrant. Officer Clark of SWAT knocked and announced. Officer Saba at this point could hear a dog barking inside. Officer Clark breached the door and the team entered. Once inside, Officer Saba observed a medium sized brown Pit-Bull aggressively biting at the back of Officer Song's leg. Officer Saba continued to the rear of the property on the first floor when he heard a single gunshot from the living room. The officers learned from the 1st floor resident that access to the second floor apartment can only be gained from the exterior rear. The officers then regrouped outside and made entry to the second floor from the rear. The suspect was not on location and the property was cleared without incident.

**Police Officer Jose HAMOY #2987 / PR# 274219- SWAT-** was interviewed by Detective Rush #820 (SDD) inside of South Detectives 2301 S 24th St. He stated in summary that he was assigned to S101 with Officer Song #3936. The officers were part of an entry team to serve a search and arrest warrant at 4664 Torresdale Avenue. Once the door was breached Officer Hamoy could hear a dog barking inside. Officer Song entered first with Officer Hamoy behind him. Officer Song went left while Officer Hamoy continued straight after observing a female in the kitchen. Officer Hamoy approached the female in the kitchen, and as he stood in front of her he heard a gunshot coming from behind him. Officer Hamoy assisted in clearing the property and realized there was no second floor access. The officers then went out the front door and around to the rear of the property. As he was leaving the first floor apartment, Officer Hamoy observed

PHILADELPHIA POLICE DEPARTMENT
OFFICER-INVOLVED SHOOTING INVESTIGATION UNIT
FINAL REPORT

OISI# PS21-05
Date: June 4th, 2021
Assigned: Detective Horn #881

a large dog laying on the floor.  The dog was bleeding.  The officers were able to gain access to the second floor apartment and cleared the property.

**Police Officer Matthew FITZPATRICK #148 / PR# 276655- SWAT-** was interviewed by Lieutenant Hendershot #148 inside of OISI headquarters 2301 S 24th Street.  Officer Fitzpatrick stated in summary that he was assigned to S115 and was responsible for front containment for the search and arrest warrant at 4664 Torresdale Avenue.  Officer Fitzpatrick was posted in the front of the property and heard the officers knock and announce at the front door.  The officers eventually breached the door and Officer Fitzpatrick could hear a dog barking.  About 10 seconds later, Officer Fitzpatrick heard a single gunshot from inside.  Officer Fitzpatrick did not witness the shooting and only learned after the incident was over who discharged.

**Police Officer Heriberto QUINTANA #2721 / PR# 214918- SWAT-** was interviewed by Detective Ferry #8134 (SDD) inside of South Detectives 2301 S 24th St.  He stated in summary that he was assigned to S101 and was responsible for rear containment behind 4664 Torresdale Avenue.  While in the rear of the property he heard a gunshot coming from the front of the house.  Officer Quintana did not witness the discharge.

**Police Officer Joshua BURKITT #2091 / PR# 292931- SWAT-** was interviewed by Detective Johnson #755 (SDD) inside of South Detectives 2301 S 24th Street.  He stated in summary that he was part of the entry team for a search and arrest warrant at 4664 Torresdale Avenue.  While lined up outside of the property, the breacher knocked and announced on the front door.  Officer Burkitt heard a dog barking inside.  The breecher then forced entry and the officers entered the property.  Upon their entry, Officer Burkitt noticed the dog barking, then charging at Officer Song who was the point man.  The dog was biting at Officer Song's calf, and Officer Song was forced to exit the stack.  As Officer Burkitt continued past Officer Song and the dog, the dog released from Officer Song's calf and cornered Officer Song in the living room.  The dog was snarling and acting aggressively towards Officer Song at this time.  Officer Burkitt was clearing the kitchen area of the apartment when he heard a single gunshot in the living room.  Once the kitchen was clear, Officer Burkitt observed the dog on the floor with a gunshot wound to the face/head area.  Officer Burkitt did not witness the discharge.

**Police Officer Cyprian SCOTT #6686 / PR# 206820 -SWAT-** was interviewed by Lieutenant Hendershot, OISI, and stated the following in summary. Officer Scott was assigned as front door containment during the arrest warrant service at 4664 Torresdale Avenue.  Fellow officers approached, and knocked and announced their presence; a dog immediately started barking.  A second knock and announce was given, and the dog continued to bark.  He said, after Lieutenant Monk gave the order, fellow officers breached the front door.  He heard the dog barking as fellow officers entered the residence, and 8 to 10 seconds later, he heard a single gunshot. Officer Scott maintained his front containment position for the entire operation. He did not see

D000006

PHILADELPHIA POLICE DEPARTMENT
OFFICER-INVOLVED SHOOTING INVESTIGATION UNIT
FINAL REPORT

OISI# PS21-05
Date: June 4th, 2021
Assigned: Detective Horn #881

the dog, the scene, nor did he speak with Officer Song about what took place inside the residence.

**Police Officer Brian MURRAY #6068 / PR# 271303- SWAT-** was interviewed by Lieutenant Hendershot, OISI, and stated the following in summary. He was assigned as breacher/hospital car for the arrest warrant service at 4664 Torresdale Avenue.  Once fellow SWAT Officers knocked and announced their presence, he heard a dog barking from inside the residence.  After breaching the front door, he entered, and saw a brown Pit-Bull dog inside; the dog continued to bark, and aggressively approach Officer Song.  He saw Officer Song discharge his weapon, striking the dog.  At that point, Officer Murray continued securing the room, until fellow officers realized there were no steps that led to the second floor apartment.  He remained inside the first floor residence with a female resident, securing the scene, while fellow officers made contact with a male in the second floor, through the rear entrance.

**Police Officer James ASHFORD #3802 PR# 230717-SWAT-** was interviewed by Detective Courtney #745, South Detectives Division, and stated the following in summary.  He was assigned to front containment during the arrest warrant service at 4664 Torresdale Avenue.  He heard a dog barking from inside the house after fellow SWAT Offices knocked and announced their presence. The barking continued during the second announcement, and breaching of the front door.  He heard one gunshot less than 8 seconds after the door was breached.  About 10 seconds after that, he saw the entry team exit the front door, and make their way to the rear of the property.  He found out after the fact that the discharge was from a fellow SWAT officer.

**Police Officer Phillip RIOTTO #3984 / PR# 277534- 15th District-** was interviewed by Detective Peter Marrero#648 at 2301 South 24th Street (OISI) and relayed the following information in summary:

On 6/4/2021, Police Officer Riotto was working the 11:30PM to 7:45AM when he was given a radio call to meet SWAT at the intersection of Wakeling Street and Torresdale Avenue to meet SWAT for the execution of a search warrant at 4664 Torresdale Ave for a homicide. Police Officer Riotto was told to take Orthodox Street and Torresdale Avenue to block northbound traffic on the 4600 block of Torresdale.  Officer David Smith #2016 informed Police Officer Riotto that his presence was requested at the residence. Upon arrival, he was informed that an officer had discharged their weapon, striking a dog. Sgt. Cerruti was on location and instructed Police Officer Riotto to hold the home as a crime scene. Inside of the home Officer Riotto saw a deceased dog with an apparent gunshot wound to its nose, a large pool of blood, and large caliber FCC in the living room of the residence. Officer Riotto encountered the female resident who was distraught. Officer Riotto noted that the front door to the residence was damaged and part of the door's wooden frame was on the floor. Police Officer Riotto also noted that the resident's sister

PHILADELPHIA POLICE DEPARTMENT
OFFICER-INVOLVED SHOOTING INVESTIGATION UNIT
FINAL REPORT

OISI# PS21-05
Date: June 4th, 2021
Assigned: Detective Horn #881

was present. The resident also informed Officer Riotto that an interior surveillance camera may have captured the shooting on video.

**Lieutenant Demetrius Monk #279 / PR# 206962- SWAT-** was interviewed by Detective Brian Newell #662 at OISI headquarters and relayed the following in summary. On June 4, 2021 Homicide requested the assistance of SWAT to execute a Search and Arrest Warrant for █████ ███████████████████. Upon arrival, Officer Clark approached the door, knocked and announced "Police, with a warrant, open the door". At that point, Lieutenant Monk could hear a dog barking and gave the order to breach. Upon entry, officers were met by a light brown colored pit-bull mix in the living room area. The dog immediately went after Officer Song biting his lower right leg. Lieutenant Monk continued past Officer Song where he encountered a white female in the kitchen area. She was on the floor behind a fence that separated the living room from the kitchen. He proceeded past her and cleared the property. Once Lieutenant Monk encountered the female, he heard a single gunshot from behind. The target was not located inside of the property and no additional observations were made.

**Police Officer Eric Clark #4453 / PR# 274907- SWAT-** was interviewed by Detective Brian Newell #662 at OISI headquarters and relayed the following in summary. On June 4, 2021, Homicide requested the assistance of SWAT to execute a Search and Arrest Warrant for █████ ███████████████████. Officer Clark was assigned as the "Breacher". Lieutenant Monk instructed Officer Clark to Knock and Announce. Upon doing so, a dog could be heard barking from inside as he breached the door. Officer Clark moved to the side as the entry teams entered the property. Officer Clark observed a dog barking at Officer Song as he checked the couches for weapons and heard a single rifle shot. After the property was secured, Officer Clark observed the dog deceased in the living room. No additional observations were made.

**Police Officer David Smith #2016 / PR# 250991- 15th District-** was interviewed by Detective Brian Newell #662 at OISI headquarters and relayed the following in summary. On June 4, 2021, he was assigned as 1531 and requested by SWAT to take the area of Torresdale Avenue and Margarette Street to block traffic. When SWAT made entry into 4664 Torresdale Avenue, Officer Smith heard a single gunshot. Moments later, he was advised by SWAT officers that an officer discharged at a dog inside of the property. Officer Smith prepared a Crime Scene Log for the incident. He observed a fawn colored pit-bull dead in the living room with blood by the head and (1) one Fired Cartridge Casing (F.C.C.). A woman was inside of the property but was not identified by Officer Smith. No additional observations were made.

**Police Officer Rivera #6797 / PR# 257944- SWAT-** was interviewed by Detective Anzideo #690 (SDD) at South Detectives and relayed the following in summary. On June 4, 2021, Homicide requested the assistance of SWAT to execute a Search and Arrest Warrant for █████ ███████████████████. Officers Rivera and Quintana #2721 were assigned as Rear

PHILADELPHIA POLICE DEPARTMENT
OFFICER-INVOLVED SHOOTING INVESTIGATION UNIT
FINAL REPORT

OISI# PS21-05
Date: June 4th, 2021
Assigned: Detective Horn #881

Containment. After entry was made through the front, Officer Rivera heard a single gunshot. He observed a black male and female exiting the rear of the property. After the property was secure, he learned that a dog was killed inside of the property. No additional observations were made.


## CIVILIAN INTERVIEWS

**Felishatay ALVARADO, 31/HF/ DOB, 12/01/1989, 4664 Torresdale Avenue** was interviewed by Lieutenant Jason Hendershot #148 on 6/4/2021 at 7:06 AM outside of 4666 Torresdale Avenue in the presence of her sister and legal guardian **Yara Alvarado, 34/H/F, D 4/18/1987, 4723 Torresdale Avenue / 4664 Torresdale Avenue**. In addition to giving Lieutenant Hendershot verbal consent to video tape their conversation, search their home for purposes of processing the crime scene and recover personal surveillance footage, Felishatay Alvarado stated the following in summary on an audio/video recorded conversation:

Felishatay Alvarado was inside of her home, in the shower when she heard SWAT personnel enter her home by breaking her door. She lives alone and according to her, no other persons were present at the home during the time of this incident. She further stated that she had all of the lights in her home turned off and she heard her dog barking.  Upon entry by SWAT, Felishatay Alvarado states that she made a request to SWAT to let her put her dog – an emotional support dog – away. She stated that SWAT denied her request and that later on, she heard one gunshot. Alvarado acknowledged that her dog was barking and that it did approach the officers.  She added that she believed that SWAT officers entered her property in error. Yara Alvarado interjected that the first and second floor of the building function as two separate apartments with two completely different entrances. Yara Alvarado further stated that the first and second floor do not have any shared access points; front entrances leads to the first flood and the rear entrances leads to the 2nd floor.

Yara Alvarado also provided a phone number for their property, Armin Maroli (215-982-0107)


## SURVEILLANCE VIDEOS

Surveillance video was recovered from Philly Deli Delight 4670 Torresdale (SW corner of Torresdale and Margaret).  The deli is 4 houses north of 4664 Torredale on the same side of the street.  Exterior cameras from both the front and rear were recovered and show SWAT lining up and entering the property.  The interior of 4664 Torresdale is not visible, and the discharge isnot captured on the video.

D000009

PHILADELPHIA POLICE DEPARTMENT
OFFICER-INVOLVED SHOOTING INVESTIGATION UNIT
FINAL REPORT

OISI# PS21-05
Date: June 4th, 2021
Assigned: Detective Horn #881

## ACTIONS TAKEN

- Officer Song's Sig Sauer M400 rifle with serial number 21J045708 was placed on Property Receipt 3465949 and submitted to the Firearms Identification Unit for analysis
- Twenty-Nine (29) live rounds from Officer Song's weapon were placed on Property Receipt 3165949 and submitted to the Firearms Identification Unit for analysis
- Police Officer interviews conducted
- Dog owner interviewed
- Consent to search was obtained by Detective O'Neill to process the crime scene
- The crime scene was processed by members of the Crime Scene Unit
- Radio tapes have been obtained
- Surveillance video from the corner store (Philly Deli 4670 Torresdale) was recovered
- Licenses and Inspections was contacted to determine if the property was legally turned into a duplex

## SUPPLEMENTAL REPORTS/ANALYSIS

The *Crime Scene Report* (CSU 21-0435) was received and reviewed. The assigned technician is P/O Campbell #9862. A total of 21 photographs were taken, and a rough sketch was prepared. One FC 223 REM fired cartridge casing was recovered from the living room floor. The casing was placed on Property Receipt 9030452 and submitted to the Firearms Identification Unit for analysis

The *Firearms Identification Unit Report* (OFS# 21-0009176) was received and reviewed. The examiner is Police Officer Cha. The report stated the Sig Sauer SIGM400 rifle with serial number 21J045708 was test fired and found to be operable with a trigger pull of 5 lbs +/- at a coverage probability of 95.45%. The fired cartridge casing recovered from the living room floor was microscopically compared to the rifle, however there is insufficient detail of the class and/or individual characteristics for an identification or elimination finding

## DAO FINDINGS

On 6/7/21 OISI received a facsimile transmission from ADA Clark Beljean of the District Attorney's Office SIU Unit stating that Officer Song had been "Cleared".

# EXHIBIT "V"



# PHILADELPHIA POLICE DEPARTMENT        DIRECTIVE 5.7

| Issued Date: 11-26-21 | Effective Date: 11-26-21 | Updated Date: |
|---|---|---|

**SUBJECT:   SEARCH WARRANTS**
**(PLEAC 1.2.3, 2.7.1, 2.7.2 a,b,c,d,e)**

## INDEX

| SECTION | TITLE | PAGE NUMBER |
|---|---|---|
| 1 | Policy | 1 |
| 2 | Purpose of a Search Warrant | 2 |
| 3 | Procedure for Obtaining a Search Warrant (75-175) | 2 |
| 4 | Particularity of the Search Warrant | 3 |
| 5 | Information Obtained from Informants or Third Parties | 6 |
| 6 | Procedure for Execution of the Search Warrant | 7 |
| 7 | Preparation of Complaint or Incident Report (75-48) | 10 |
| 8 | Distribution of Search Warrant (75-175) and Complaint or Incident Report (75-48) | 11 |
| 9 | Search Warrant Control Log (75-390) | 13 |
| 10 | Acquisition and Distribution of the 75-175 | 13 |
| 11 | Arrests in Private Residences | 13 |
| 12 | Consent to Search | 14 |
| 13 | Requirements for a Consent to Search | 15 |
| 14 | Scope of the Consent to Search | 16 |
| 15 | Procedure for Conducting a Consent to Search | 17 |
| 16 | Seizure of Property | 18 |
| 17 | No Seizure of Property | 18 |
| 18 | Search and Seizure of Luggage | 19 |
| 19 | PremierOne Records Management System (P1RMS) | 20 |
| 20 | English/Spanish Consent to Search Forms | 21 |
| 21 | Strip and Body Cavity Searches | 22 |
| 22 | Strip Search Guidelines | 24 |
| 23 | Body Cavity Search Guidelines | 25 |
| 24 | Strip/Body Cavity Search Procedures | 26 |
| 25 | Distribution of Search 75-48 (Strip/Body Cavity Searches) | 28 |
| 26 | Search Warrant Tracking | 29 |
| 27 | Obtaining Warrants from the Police Warehouse | 30 |
| 28 | Distributing Individual Warrants | 32 |
| 29 | Updating Search Warrants | 32 |
| 30 | Internal Affairs Responsibilities | 32 |
| 31 | Reports Control Responsibilities | 33 |
| 32 | Audits and Inspections Responsibilities | 33 |



**PHILADELPHIA POLICE DEPARTMENT       DIRECTIVE 5.7**

| Issued Date: 11-26-21 | Effective Date: 11-26-21 | Updated Date: |
| --- | --- | --- |

**SUBJECT:   SEARCH WARRANTS**
**(PLEAC 1.2.3, 2.7.1, 2.7.2 a,b,c,d,e)**

---

1.  **POLICY**

   A.  The determination concerning when a search warrant must be obtained will be based on pertinent legal guidelines and consultation with a supervisor.  The advice of an Assistant District Attorney (ADA) should be obtained and adhered to when any questions arise concerning the search warrant procedure.

   B.  All search warrants will be obtained and executed by police personnel in accordance with the procedures established in this directive and the applicable rules of Pennsylvania Criminal Procedure (Pa. R. Crim. P. 2001 to 2010) which can be found in the Pennsylvania Crimes Code.

   C.  The Application and Affidavit for Search Warrant (75-175) forms will ALWAYS be distributed in sequential order from the distribution point (Police Warehouse) through the issuance of a single warrant to an individual police officer/investigator.

   D.  All search warrant applications MUST be submitted to the District Attorney's Charging Unit (DACU) for review prior to submitting to a judge or bail commissioner.

   E.  The actual execution of the search warrant and related police actions during a search will be governed by this directive and pertinent legal guidelines, and barring exigent circumstances, will be strictly adhered to by all sworn personnel.

   F.  Misstatements, Omissions and Exculpatory Information

      1.  Under the Fourth Amendment, when applying for a warrant, police officers may not intentionally include misstatements or false statements; or recklessly omit any material facts from the accompanying affidavit of probable cause.  Because the Fourth Amendment prohibits this conduct, the Department also prohibits it.  Misstatements in or material omissions from a warrant application will damage the criminal case and could subject the investigator and the City to a §1983 federal civil rights claim.

2. Regarding omissions, investigators shall include in all warrant applications highly relevant facts within their knowledge that any reasonable officer knows that a magistrate would need to make an independent determination of probable cause. This includes all culpable information as well as exculpable information. Exculpable information includes, but is not limited to:

   a. any misidentification, inconsistency or failure to identify a suspect by a witness/victim.

   b. differences in height, clothing or other specifics of the offender from originally reported flash information.

   c. discrepancies in license tag or vehicle description information initially described by a witness/victim.

   d. information regarding any past interactions/relationships between the suspect and the victim that could affect a probable cause determination.

---

## 2.   PURPOSE OF A SEARCH WARRANT

A. A search warrant may be issued to search for and seize:

   1. contraband, the fruits of a crime, or things otherwise criminally possessed; or

   2. property which is or has been used as a means of committing a criminal offense; or

   3. property, which constitutes evidence of the commission of a criminal offense.

---

## 3.   PROCEDURE FOR OBTAINING A SEARCH WARRANT (75-175)

A. To obtain a search warrant, sworn personnel MUST:

   1. Have thoroughly investigated a complaint or gathered information as to convince a disinterested party (judge or bail commissioner) that probable cause exists to justify a search.

   2. Consult with their highest-ranking supervisor.

   3. Prepare a 75-175 as outlined in this directive.

   4. Fax a completed 75-175 to the DACU for approval.

a. The ADA will evaluate, note their approval or disapproval in the margin and return the fax.

5. Obtain a Record of Declination form from the ADA if the affidavit is disapproved or significantly modified.  A Record of Declination is not needed if the modifications amount to only handwritten notes on the 75-175 for the purpose of strengthening the probable cause aspect of the search warrant.

6. Write DACU's approval in the margin and include the ADA's name, date and time.

   **NOTE**:  The approved faxed copy returned from DACU will be maintained by the officer/investigator and remain as a part of the discovery package.

7. Present the original affidavit and a Continuation Report (75-51), if applicable to a judge or bail commissioner at the Bail Magistrate, Criminal Justice Center (CJC).  Testify to the truth and accuracy of the information contained in the affidavit.  Ensure that the approved copy is available for review by the judge or bail commissioner.

8. Make no corrections, additions, or deletions on any copy of the 75-175 once the judge or bail commissioner has possession of it.

   a. Search and seizure warrants that have been signed by a judge or bail commissioner will not be voided.

      **EXCEPTION**:  Search and seizure warrants that have not been served within the specified period of time, two days from the date of issuance, must be voided.

      **NOTE**: Supplementing a search warrant orally at the time it is signed by a judge or bail commissioner is not acceptable.  Under Rule 2003 (b), such oral additions will not be admissible at a subsequent suppression hearing.  If relevant facts arise or come to the attention of an officer after the warrant affidavit has already been completed, the new information must be included in the 75-175 or in a 75-51 and sworn to by the officer.

9. When the offense has been previously reported, use the original District Control number in the space provided.  Otherwise, obtain a DC number from the district where the search has occurred.

---

## 4.   PARTICULARITY OF THE SEARCH WARRANT

A. Sworn personnel shall complete all pertinent block headings on the 75-175, including their signature, badge number and district/unit.  (PLEAC 2.7.1)

B. THE PREMISES OR PERSON TO BE SEARCHED AND THE ITEMS TO BE SEIZED MUST BE SPECIFICALLY DESCRIBED IN THE WARRANT SO THAT THE JUDGE OR BAIL COMMISSIONER AND EXECUTING OFFICER HAVE NO DOUBT AS TO WHO OR WHAT CAN BE SEIZED AND WHERE THEY MAY BE FOUND.

1. Description of buildings should include:

   a. Street name and number (no intersections).  When possible, where search will take place (vehicle/building), use exact numerical location.
   b. Number or stories - apartment number.
   c. Type of construction (brick, wood, etc.).
   d. Type of property (single home, apartments, twin structure, etc.).
   e. Particular markings, color, or any additional information which serve to identify that particular premise.

---

**REDACTED – LAW ENFORCEMENT SENSITIVE**

---

C. The warrant MUST also include the following:

1. Name and/or description of owner, occupant(s), or possessor of the premise or property to be searched.
2. The particular crime that has been or is being committed.
3. What probable cause exists for a search.

   a. Probable cause is the existence of facts and circumstances that would justify a person of reasonable caution to believe:

      1) that an offense has been or is being committed;
      2) that the particular person or item to be seized is reasonably connected to the crime; and
      3) that the person can be found at a particular place or the item can be found in the possession of a particular person or at a particular place.

---

**REDACTED – LAW ENFORCEMENT SENSITIVE**

---

**DIRECTIVE 5.7 - 4**

2. Reasons for believing that the item(s) or person(s) are located at the premise specified and why they should be the subject of a seizure.

3. Facts known to the officer concerning:

   a. potential for destruction of evidence and
   b. potential for the removal of evidence, contraband, etc.
   c. threats of harm to police personnel should be clearly indicated on the warrant.

   **CAUTION**: The facts and information must be real and cannot be based on simple speculation or on a "hunch" by the officer applying for the warrant.

4. If a "night-time" search is requested (i.e., 10:01 PM to 5:59 AM), state why the search should be carried out in other than daytime hours (i.e., 6:00 AM to 10:00 PM). The judge or bail commissioner must specifically note on the warrant (bottom right corner of application) that they are authorizing such a search and sign their name to it.

   **NOTE**: There is a need for the officer to state additional probable cause to support such a search (e.g., evidence may be moved or destroyed, the threat of serious bodily injury or death, or other exigent circumstances exist).

5. The judge or bail commissioner MUST complete the "jurat" or the clause located directly under the probable cause (center right of 75-175) stating when, where and before whom such affidavit was sworn. (Exception: The "jurat" on the 75-175 need NOT be completed by the judge or bail commissioner if a 75-51 is used and its "jurat" is completed.)

   **NOTE**: As a result, the signature and seal of the issuing authority will appear a total of two (2) times. Once on the bottom section of the 75-175 and once on the "jurat" section of the 75-51 OR twice on the 75-175 ("jurat" and bottom section), if no 75-51 is used.

E. When additional space is required to complete the probable cause, use a Continuation Report (75-51) regardless of the amount of information supplied. The following steps will be carried out:

   1. Type in capital letters in the narrative section of the 75-51, CONTINUATION OF PROBABLE CAUSE FOR WARRANT # _____."

   2. Complete the necessary probable cause information.

   3. Directly under the last sentence of probable cause and at the bottom of the last page of the 75-51, type the following exactly as shown.

**DIRECTIVE 5.7 - 5**

_____

Signature of Affiant          Badge #          Dist/Unit

Sworn to (or affirmed) and subscribed before
me this _____day of _____20_____

_____(SEAL)
Signature of Issuing Authority

4. The officer (affiant) will affix their signature, badge number and district/unit on the line just completed in Step 3 above.

5. Attach the 75-51 to the 75-175.

6. Ensure the judge or bail commissioner signs and affixes their seal to the 75-51 on the line shown in Step 3 above.

   **NOTE**:  The first page (affidavit) of the 75-51 and 75-175 will be kept by the issuing authority.  A copy of the 75-51 will be attached to the corresponding copy of the 75-175, including the "owner-occupant-premises" copy.

_____

## 5.   INFORMATION OBTAINED FROM INFORMANTS OR THIRD PARTIES

A. Court decisions from both Federal and State Supreme Courts have established the test of the "totality of circumstances" as the standard of review by courts in assessing search warrant applications based upon information acquired through informants and third parties.

B. Affidavits will be reviewed in their entirety, and significance will be given to each relevant piece of information provided by the informant or third party and not exclusively on their credibility and reliability of the informant or third party.

C. Credibility and reliability are still significant factors in search warrant applications. Credibility, reliability, as well as all issues relating to the "totality" standard can all be enhanced with an officer's independent investigation and observation and additional corroboration of the informant's and third party's information.

   **NOTE:**  Thorough investigation and analysis is important since informants can intentionally give false and misleading information.  Officers can also consult with the on-duty ADA, where appropriate to evaluate these issues.

D. Sworn personnel must be prepared to verify the informant's past reliability at the suppression hearing and all information placed in the warrant must be accurate and appropriate to the best of the officer's knowledge.

**DIRECTIVE 5.7 - 6**

E.  When information has been obtained from another person (criminal or citizen informant, another police officer or anonymously), the officer completing the 75-175 must include specifically what information was received and how and when the information was obtained.

F.  Information obtained from informants, particularly criminal informants, must be thoroughly examined and documented in order to use in and successfully sustain the probable cause for the warrant and future court challenges.  Sworn personnel should strive to include as much information as possible in the probable cause section of the affidavit.  Information included should be:

**REDACTED – LAW ENFORCEMENT SENSITIVE**

**DIRECTIVE 5.7 - 7**

6. **PROCEDURE FOR THE EXECUTION OF THE SEARCH WARRANT**

A. Executing the Search Warrant

1. The search warrant must be served during the "daytime" hours (6:00 AM to 10:00 PM) unless a "night-time" search (10:01 PM to 5:59 AM) has been authorized, on the face of the warrant, by a judge or bail commissioner.  It must also be served within a specified period of time not to exceed two (2) days from the date of issuance.  A judge or bail commissioner may, however, designate a lesser period of time for its execution.

   a. Search and seizure warrants that have not been served within the specified period of time, (two (2) days from the date of issuance), must be voided.

2. Sworn personnel serving the warrant will thoroughly review it for accuracy, specifically concentrating on the exact location and description of property to be searched.

3. Sworn personnel are expected to perform the search in a highly professional manner.  Officers will not use abusive or derogatory language, threats, or intimidation while serving and executing a search warrant.  Weapons should not be displayed unnecessarily after the safety of the officers has been ensured and the premises secured as authorized by Directive 10.1, "Use of Force – Involving the Discharge of Firearms."  Officers engaging in improper or unprofessional conduct will be subject to disciplinary action.

4. Property should never be damaged or destroyed unless the search cannot be conducted without such action.  The unnecessary damage or destruction of personal property by police during a search is strictly prohibited and WILL result in severe disciplinary action as well as possible review by the courts.

5. When individuals are present while a residential search warrant is being served:

   a. Officers are required to complete a Vehicle or Pedestrian Investigation Report (75-48A) on all individuals in the immediate vicinity during a search of a residential location which is being conducted based upon a valid search warrant.

   b. According to the United States Supreme Court, the basis for the search warrant provides the necessary justification to lawfully detain the occupants in the immediate vicinity of a residential search, even if the officers have no reason to suspect criminal activity by the individuals.

c.  While the search warrant allows the individuals present to be detained during the search, it does not automatically authorize an officer to frisk the individuals. Officers must have additional reasonable suspicion to believe the individual present during a search warrant has a weapon that could harm the officer.  The additional reasonable suspicion must be articulated on the 75-48A when any frisk is conducted.

B.  Knock and Announce Rule

1.  The purpose of the "knock and announce" rule is to prevent violence and physical injury to police and occupants, to protect an occupant's expectation of privacy, to prevent property damage resulting from forced entry and to give the occupants an opportunity to surrender the premises.

2.  The manner of entry is provided in Rule 2007 of the Pennsylvania Rules of Criminal Procedure and is as follows:

a.  Without exception, a law enforcement officer executing a search warrant shall, before entry, give or make a reasonable effort to give notice of their identity, authority and purpose to any occupant of the premise specified in the warrant.

b.  Such officer shall await a response for a reasonable period of time after their announcement before gaining entry into the property.

c.  If the officer is not admitted after such a reasonable period of time, they may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search warrant.

**NOTE**:  The courts have not precisely and uniformly determined the exact period of time that can be considered "reasonable."  However, recent court decisions have shown that 30 seconds should be the minimum time police personnel should delay their entry into a property after announcing their presence and purpose.

C.  Exceptions to the Knock and Announce Rule

1.  While the courts recognize specific exceptions to the Knock and Announce rule, it shall be the policy of the Philadelphia Police Department to knock and announce prior to any warrant service.  If any investigator believes that their safety is at risk by knocking and announcing the warrant, the warrant service shall be referred to the SWAT Unit.

D.  Warrant Information Card (75-614)

1. On every occasion where a search warrant has been obtained, sworn personnel will give to the owner or occupant, a Warrant Information Card (75-614). If there is no one present at the home, leave the Warrant Information Card (75-614) AND the owner/occupant copy of the search warrant in a clearly visible area inside the property.

2. The Warrant Information Card (75-614) MUST contain the following information:

   a. Basic information about the search warrant process AND

      1. Name
      2. Rank
      3. Unit
      4. Office Phone Number
      5. District/Unit Address of the Commanding Officer of the district/unit that obtained the search warrant.

3. Questions or complaints concerning the warrant or search procedure can be directed to the pertinent commanding officer.

E. Seizure of Property

   1. Seizing officer will perform the following:

      a. Inventory and record the items seized on all copies of the search warrant. If necessary, reverse carbons and use the backside of the warrant to complete the inventory.
      b. Complete the warrant in the presence of the person from whom the items were seized or in the presence of at least one witness.
      c. Give the blue copy of the warrant, with listed items seized, to the person from whom taken or, if no one is present, leave the copy in a conspicuous location.
      d. If items are seized, request the signature of the person from whom taken or witnesses to the seizure. If they refuse to sign, indicate so on the warrant.
      e. Place their signature in the appropriate block.
      f. Prepare a Property Receipt (75-3) and distribute it in accordance with Directive 12.15, "Property Taken into Custody."

      **NOTE:** Even when there is no property seized, a copy of the warrant must still be given to the owner/occupant or left in a conspicuous location along with the Warrant Information Card.

---

## 7.   PREPARATION OF COMPLAINT OR INCIDENT REPORT (75-48)

A. A Complaint or Incident Report (75-48) will be prepared when a search is needed. Use the same DC number that was issued to the 75-175.

**DIRECTIVE 5.7 - 10**

B. In addition to the exigent circumstances information requested in Section 6-C-3 (where necessary), the 75-48 will also include: (PLEAC 2.7.2)

   1. Date and time service was executed/attempted.  (PLEAC 2.7.2 a)
   2. Name of officer(s) executing/attempting service.  (PLEAC 2.7.2 b)
   3. Name of person on whom the search warrant was served/executed. (PLEAC 2.7.2 c)

   4. Address of service/attempt.  (PLEAC 2.7.2 e)
   5. Warrant Number.
   6. Method of entry (consent, use of force, etc.).  (PLEAC 2.7.2 d)
   7. Results of search (arrest, seizure of items, negative results).  (PLEAC 2.7.2 d)
   8. Damage to property (describe in detail).
   9. Wrong location - when the warrant has been served on the "wrong location" state, "Warrant served on wrong location" and include both the correct and incorrect numerical locations and the name of the owner/occupant of the incorrect location.

      a. Damage to the property or service of warrants at a "wrong location" must be reported to Police Radio immediately.

   10. Whenever a search warrant has been served on a "wrong location," the Commanding Officer of the district/unit that obtained the warrant will be notified. They will notify the pertinent Chief Inspector and prepare a memorandum to the Police Commissioner, sent through the chain of command, describing the entire incident.  The Commanding Officer of the district of occurrence will be notified by the Commanding Officer of the district/unit that obtained the warrant.

      **NOTE:** A "wrong location" does not exist when all factors indicate correct warrant service at the premises described in the warrant was accomplished.  (i.e., simply because the search produced negative results, does not indicate a "wrong location").  However, negative search incidents should be carefully reviewed by the supervisor and by the Commanding Officer when they review the search warrant as per Section 9-B of this directive and take action when necessary.

---

## 8.   DISTRIBUTION OF SEARCH WARRANT (75-175) AND COMPLAINT OR INCIDENT REPORT (75-48)

A. Before the search warrant is broken down, photocopy the Reports Control (white) copy and note on the bottom "Commanding Officer Central File" and give to the district/unit Commanding Officer that obtained the warrant.  (If a 75-51 has been completed, also make a copy for the "Commanding Officer Central File").

| B. | | 75-175 | 75-48 |
|---|---|---|---|
| | White (Affidavit) | Retained by Affiant | N/A |
| | White | Reports Control | Reports Control (PLEAC 2.7.1) |
| | Canary | Property seized and Arrest Made or Only Arrest Made (Attach forward to Arraignment Court) | Dist/Unit case file |
| | | All Other Cases or Combinations (to Clerk of Quarter Sessions, 1301 Filbert Street | Dist/Unit case file |
| | Green | Property seized and Arrest Made or only Arrest Made (to District Attorney at Arraignment Court) | N/A |
| | | Property seized, No Arrest or No seizure, No Arrest (to District Attorney's Office – 3 South Penn Square) | N/A |
| | | Non-Service or No Search (To Reports Control) | N/A |
| | Pink | Retained by bail commissioner | N/A |
| | Blue | Owner/Occupant/Premise Copy | N/A |

C. Voided Warrants

1. Partially and completed 75-175s with no judge's or bail commissioner's signature are to be maintained by the district/unit Commanding Officer, except for the Reports Control copy.

   a. Mark the word "VOID" in large block letters across face of the warrant.
   b. Describe the reason for voidance in "Results of Search" block and include the supervisor's concurring signature.
   c. Record on the Internal Control Log (75-390) that the warrant is void.
   d. Send the "voided" white copy of the 75-175 to Reports Control.

**DIRECTIVE 5.7 - 12**

2.  Whenever a search warrant is voided, the immediate supervisor will prepare a memorandum to their Commanding Officer explaining why the warrant was voided.

   a.  This will include search and seizure warrants that have not been served within the specified period of time (two (2) days from the date of issuance).

---

## 9.   SEARCH WARRANT CONTROL LOG (75-390)

A.  The Search Warrant Control Log (75-390) shall be maintained by Commanding Officers to ensure internal control of search warrants issued by their command.

B.  Commanding Officers shall review this log periodically, and on a monthly basis review each search warrant issued to ensure all legal and departmental guidelines have been carried out.

---

## 10.   ACQUISITION AND DISTRIBUTION OF THE 75-175

A.  District/Unit Commanding Officers will always ensure that district/unit's DAR code number is placed on the memorandum to the Police Warehouse when requests for 75-175s are made.  No warrants will be distributed unless a memorandum with the proper DAR code number is re-sent to the warehouse supervisor.

B.  District/Unit Commanding Officers will always ensure, as per Section 1-C of this directive that the distribution of the search warrants to personnel are completed only in sequential order.

---

## 11.   ARRESTS IN PRIVATE RESIDENCES

A.  Absent exigent circumstances, the following warrant requirements must be met for a legal arrest in a private residence:

   1.  An arrest warrant is needed before an individual may be arrested in their place of residence regardless of the grade of the offense.

   2.  Both an arrest AND a search warrant are needed to enter a residence other than the defendant's in order to search for and arrest the defendant.

   3.  Both an arrest AND a search warrant are needed to enter any residence, whether owned by the defendant or not, if the purpose of the police entry is to arrest a suspect and search for evidence.

**DIRECTIVE 5.7 - 13**

B. Warrantless arrests and searches are permitted where exigent circumstances exist. However, courts generally review the reasonableness of police actions based upon exigent circumstances on a case-by-case basis and these issues are closely scrutinized. As a basic rule of procedure where time and circumstances permit, an arrest and/or search warrant must be obtained.  (PLEAC 1.2.3)

   1. Some factors, which courts consider in determining whether exigent circumstances existed, are:

      a. the reasonable belief that a threat of physical harm to police officers or others exists unless an arrest is made immediately.
      b. the seriousness of the offense.
      c. a strong reason to believe that the suspect is on the premises AND committed a crime.
      d. the likelihood that the suspect will escape.
      e. a "hot pursuit" of a suspect who flees into a building.
      f. the manner of entry (i.e., **REDACTED – LAW ENFORCEMENT SENSITIVE**).

   2. Officers will be required to document the fact that such exigent circumstances existed and may be required to articulate such details through court testimony.

   3. EXIGENT CIRCUMSTANCES DO NOT EXIST WHERE OFFICERS CREATE THEIR OWN EMERGENCY.  (E.G., IF AN OFFICER PLACES THEMSELVES IN A PLACE WHERE THEY ARE NOT LEGALLY PERMITTED TO BE AND THEY ARE FORCED TO TAKE POLICE ACTION. THE COURTS MAY NOT PROTECT THESE ACTIONS UNDER EXIGENT CIRCUMSTANCES.)

C. An arrest for any crime committed in the presence of police does not require a warrant regardless of the location in which the arrest is made, provided the arrest occurs immediately.

---

## 12.  CONSENT TO SEARCH

A. The consent to search is one of the few legally recognized exceptions, created by the U.S. Supreme Court, permitting law enforcement personnel to search a person or property without a search warrant.

B. Officers obtaining a consent to search must proceed carefully as a knowing, voluntary, and informed choice by the individual to be searched must be given.

C. Once consent is given, sworn personnel may seize:

   1. Contraband, the fruits of a crime, or other things criminally possessed.

      2.    Property which is or has been used as the means of committing a criminal offense.

      3.    Property, which constitutes evidence of the commission of a criminal offense.

D.  This section guides personnel in the use of the consent to search either a person, place or thing.

E.  Sworn personnel should only use the consent to search when there exists less than the requisite probable cause to conduct a warrantless search or to secure a search warrant.

F.  Consent to search will not be used as a substitute for a valid search warrant.  If the officer has probable cause and there are no exigent circumstances, which require an immediate search, they MUST obtain a search warrant.

G.  A supervisor will always be consulted before a consent to search and, unless there are extenuating circumstances, a supervisor (not necessarily from the officer's/investigator's district/unit that is requesting approval) should be physically on location and sign/endorse the Consent to Search Form (75-668).

      1.    Consent to a STRIP SEARCH MUST be approved, in writing, by the highest-ranking supervisor available in the district/unit.

      2.    Consent to a BODY CAVITY SEARCH MUST be approved, in writing, by a Lieutenant or higher-ranking supervisor.

            a.    A Consent to Search Form (75-668) and a Complaint or Incident Report (75-48) WILL be completed for these two types of consent searches.  Consent to perform strip or body cavity searches will be conducted as prescribed in Section 21.

H.  All consent searches should be in writing using a Consent to Search Form (75-668).

---

## 13.  REQUIREMENTS FOR A CONSENT TO SEARCH

A.  The courts will uphold a consent to search only when the following conditions have been met:

      1.    that a statement has been made consenting to the search;
      2.    that it has been given by the owner or possessor of the premise;
      3.    by a third party who possesses common authority over or other sufficient relationship to the property or effects to be searched,
      4.    and the consent is given voluntarily AND without being the result of duress or coercion, either expressed or implied.

B.  Factors, which may suggest to a court that consent was voluntarily given, include but are not limited to:

1.  the consenting party was not in police custody at the time of their consent;
2.  the consenting party's custodial status was voluntary when consent was given;
3.  the consenting party believed police would find no contraband;
4.  the consenting party was aware of their right to refuse;
5.  the consenting party was informed by police prior to the request for consent what the police were searching for;
6.  the consenting party signed a consent to search form prior to the search; and
7.  that the consenting party agreed to assist police in conducting the search.

C.  Factors, which may suggest to a court that consent was coerced, include but are not limited to:

1.  the presence of abusive or overbearing police actions and procedures;
2.  police use of deception or trickery to gain consent to search;
3.  statements or actions by police indicating the consenting party was not free to refuse the search;
4.  where consent is given by a person already in police custody;
5.  where police had blocked or impaired the consenting party's freedom of movement; and
6.  where consent was granted but only after it had been refused initially.

D.  In addition to the requirements described in Section 13-A above, officers will ensure they provide the consenting party with the following warnings:

1.  that the consenting party has the right to require the police to obtain a search warrant; and
2.  that they have the right to refuse to consent to a search.

E.  If the person is in police custody, three (3) additional warnings must be provided:

1.  that any items found can and will be confiscated and may be used against them in court;
2.  they have the right to consult with an attorney before making a decision to consent; and
3.  they have the right to withdraw their consent at any time.

**NOTE**:  In addition to the factors described in this section, officers should also take into consideration the mental competence of the person granting consent, whether they are under the influence of drugs or alcohol, and their age. The status of a minor alone does not prevent one from giving consent.

## 14.  SCOPE OF THE CONSENT TO SEARCH

A.  The following limitations are placed upon an officer who has been granted a consent to search:

    1.  An officer may NOT exceed the limits of the consent.

        a.  If consent has been granted to search for a particular object or person, the officer may only search those places where the person or object could be found.

    2.  Consent may be revoked at any time during the course of the search.

        a.  However, items found before the consent was revoked remain subject to seizure.

    3.  Sworn personnel should not open locked containers without specific permission from the consenting party.

        a.  This is permission above and beyond the initial consent.

        **NOTE**: A consent search may disclose the basis for an arrest or for the probable cause needed to acquire a search warrant.

## 15.  PROCEDURE FOR CONDUCTING A CONSENT TO SEARCH

A.  The procedures to be followed for conducting a consent to search:

    1.  A supervisor will always be consulted before a consent to search and, unless there are extenuating circumstances, a supervisor (not necessarily from the officer's/investigator's district/unit that is requesting approval) should be physically on location and sign/endorse the Consent to Search Form (75-668). Consent to a strip or body cavity search requires written approval of a supervisor.

    **NOTE**:  The procedures in Section 21 of this directive must be adhered to when conducting strip or body cavity searches.

    2.  Determine the consenting party's authority to truly give consent to search.

    3.  Provide the consenting party with all pertinent warnings as outlined in Section 13-D and E.

    4.  Prepare the Consent to Search Form (75-668) for each request ensuring as much information as possible is completed before presenting it to the consenting party.

**DIRECTIVE 5.7 - 17**

5.   Provide a detailed description of the person or property to be searched and the particular offense under investigation.

6.   Before the consenting party signs the form, the officer will read the statement they are signing and explain it to them.

7.   Obtain a witness (may be another officer) to serve the consenting party and to sign the document.  Witness must be competent and available to testify.

8.   Request a signature of the consenting party.  If the consent is granted, but the party refuses to sign, note the refusal on the consent form.

9.   Ensure the witness or another officer accompanies the searching officer throughout the premises.  REQUEST THAT THE CONSENTING PARTY ALSO ACCOMPANY THE SEARCHING OFFICER THROUGH THE PREMISES.

---

## 16.   SEIZURE OF PROPERTY

A.   When property is seized as a result of the search, police will:

1.   Strike out the word "nothing" in the Results of Search section of the Consent to Search Form.

2.   List the items seized on the Consent to Search Form.  Reverse the carbon of Consent to Search Form and use the back if additional space is required.

3.   Prepare a Property Receipt (75-3) listing all items seized.  If the consenting party refuses to return to the district/unit to complete the Property Receipt, note the refusal on the receipt.

4.   Note the Property Receipt number on the Consent to Search Form.

5.   Have the consenting party sign the Consent to Search Form on the bottom section below "Results of Search."  Explain that their signature indicates that police only seized those items listed.  If the party refuses to sign, note the refusal on the form. (This will amount to the consenting party's signature appearing twice on the Consent to Search Form and once on the Property Receipt).

6.   Have the witnesses sign the Consent to Search Form just below the consenting party's signature.  (This will also amount to the witnesses' signature appearing twice on the Consent to Search Form).

7.   Give the carbon copy of the Consent to Search Form to the consenting party, as well as the pertinent copy of the Property Receipt (75-3).

## 17.  NO SEIZURE OF PROPERTY

A.  When there is no property seized, police will:

1.  Strike out the words "only those items listed below" in the Results of Search section.

2.  Insert N/A in the spaces provided for inventory of items.

3.  Have the consenting party sign the Consent to Search Form on the bottom section below "Results of Search."  Explain that their signature indicates that the police seized nothing.  If the party refuses to sign, note the refusal on the form (This will amount to the consenting party's signature appearing twice on the Consent to Search Form).

4.  Have the witnesses sign the Consent to Search Form just below the consenting party's signature (This will amount to the witnesses' signature(s) appearing twice on the Consent to Search Form).

5.  Give the carbon copy of the Consent to Search Form to the consenting party.

## 18.  SEARCH AND SEIZURE OF LUGGAGE

A.  The scope of a search incident to a lawful arrest is limited to the person arrested and the area within their immediate control.

B.  The search of personal property immediately associated with the arrestee does not require a search warrant (e.g., wallets, purses).

C.  When an arrested individual is carrying a suitcase, briefcase, footlocker, etc., the luggage may be seized.  However, the contents of the luggage are generally not within the immediate control of the arrested individual and therefore, the luggage can only be opened/searched pursuant to the following guidelines:

1.  When the arresting officer has probable cause to believe that a suitcase, briefcase, footlocker, etc., may contain contraband or instruments of a crime, the luggage shall be seized, but NOT opened until a search warrant has been properly secured.

2.  In all cases where exigent circumstances exist, an immediate search may be made at the time of the arrest.  However, the exigent circumstances must be clearly articulated.  Exigent circumstances include, but are not limited to the following:

a.  Immediately dangerous instruments (e.g. explosives).

**DIRECTIVE 5.7 - 19**

      b.   Definite possibility that evidence may be destroyed or the evidence is perishable (e.g., blood).

D.  When the arresting officer has no reason to believe that the luggage contains contraband or evidence, the luggage shall be seized and:

    1.  Placed on a Property Receipt (75-3) in accordance with Directive 12.15, "Property Taken into Custody."

    2.  The luggage will be opened and inventoried in the presence of the person from whom it was seized.  Items will be listed on the pertinent property receipts.

      **<u>NOTE</u>:** Property of different categories inside the luggage must be placed on separate property receipts (e.g., prescription medicine, money, jewelry must be placed on separate receipts and stored separately from the luggage).

      a.  If the luggage, bag, etc., does not fit in the evidence drop box, it must be stored in the evidence holding room.

---

## 19.  PREMIERONE RECORDS MANAGEMENT SYSTEM (P1RMS)

A.  When an arrest is made or evidence is seized, ensure the Premier One Records Management System (P1RMS) contains the following:

    1.  Identity of the consenting party by name, age, race, sex, date of birth, and address.

    2.  Facts and circumstances indicating the consenting party owned or controlled the property searched or had common authority over it.  (e.g., Person had possession of item to be searched, they identified themselves as the owner, utility company or tax records reflect ownership, possession of the lease or deed, witnesses statements).

    3.  Facts and circumstances indicating the consent was given voluntarily (See Section 13-B).

    4.  Facts and circumstances of the search.

B.  <u>PRELIMINARY DISCOVERY</u> - In order for the District Attorney's Charging Unit (DACU) to have sufficient information to approve an arrest in PARS, investigators will ensure that the below information is entered and/or scanned into the P1RMS system <u>immediately upon completion</u> of the PARS report (and before the end of the investigator's tour of duty).

    1.  Required <u>PRELIMINARY DISCOVERY</u> needed for PARS Arrest approval:

    a.  75-48 – Complaint or Incident Report.

    b.  75-48A – Vehicle/Pedestrian Investigation Report (when applicable).

    c.  Victim(s)/Complainant(s) signed statement (75-483).

    d.  Witness(es) signed statement (75-483).

    e.  Defendant(s) signed statement (75-331) (when applicable).

    f.  Police Officer(s) signed statement (75-483).

    g.  Property Receipt(s) (75-3).

    h.  Description of suspect/defendant identification procedure (describe street identification).

    i.  Biographical Data Report (75-229).

    j.  Search and Seizure Warrants (75-175) if served.

    k.  Retail Theft Apprehension Form (75-635) (when applicable).

    l.  Ownership and Non-Permission Interview Sheet (75-636) (when applicable).

    m.  Auto Accident Reports (TrACS) (i.e., DUI arrest with auto accident).

    n.  Upload Photo Array.

    o.  75-43A Supplemental (if applicable).

    p.  Consent to Search (75-668) and/or Consent to Search DNA Form (75-625).

2.  It is important to note that <u>any and all</u> forms, reports, documents, and items used or seized in any investigation or arrest WILL be entered into the P1RMS.

    **<u>NOTE</u>:** The Commanding Officer of the Unit/Division assigned to the investigation/arrest will be responsible for ensuring that all police reports pertaining to the investigation/arrest are properly transmitted to the District Attorney's Office.

C.  When a consent to search was requested or conducted in an attempt to apprehend a wanted subject, document on the "Attempt to Apprehend Log" and in P1RMS Case File. Place a copy in the wanted person's folder.

---

## 20.  CONSENT TO SEARCH FORMS

A.  Depending on the circumstances, the following forms will be used:

1.  Use Form 75-668 when consenting party understands English and/or Spanish, whether or not in custody.

    **<u>NOTE</u>:** When available, a Spanish-speaking officer or witness/interpreter should be utilized to ensure that the consenting party fully understands the conditions of their consent.

2.  Distribution of the Consent to Search Form (75-668) will be as follows:

    a.  White Copy - will be maintained by the Commanding Officer, Reports Control Unit.

     b.  Yellow Copy - will be maintained by the Commanding Officer of the district/unit where the officer is assigned.

     c.  Pink Copy - will be given to the consenting party.

B.  Use the Consent to Search Form (DNA Sample) 75-625/Request for Expungement (Voluntary DNA Sample) 75-625A when:

  1.  The consenting party freely and voluntarily consents to give a biological sample (i.e., oral swab, blood) intended for DNA comparison whether or not the consenting party is in custody.  Ensure that all boxes are properly filled out prior to obtaining the sample.

     **NOTE:**  If the person does not understand English, an appropriate interpreter must be utilized to ensure that the consenting party fully understands the conditions of their consent (Refer to Directive 7.7, "Limited English Language Proficiency").

  2.  Acquisition of the 75-625/75-625A will be the same procedure as outlined in Section 10.

  3.  Distribution of the 75-625/75-625A will be as follows:

     a.  White Copy (75-625) will be attached to the Property Receipt (75-3) prepared for the sample submitted to the Office of Forensic Science.

     b.  Yellow Copy (75-625) will be maintained by the Detective Division and/or Investigative Unit collecting the sample.

     c.  Pink Copy (75-625) will be given to the consenting party.

     d.  Request for Expungement Form (75-625A) will be given to the consenting party.

  4.  Control of the forms should remain with each unit's Commanding Officer to ensure internal control and sequential issuing of the form by their command.

     **NOTE:**  No other forms will be used for collecting a consent DNA sample.  A sample of the 75-625/75-625A is contained at the end of this directive.

---

## 21.  STRIP AND BODY CAVITY SEARCHES

A.  Procedures outlined in this section are to guide members of the Philadelphia Police Department in the effective and proper use of strip and body cavity searches.

**DIRECTIVE 5.7 - 22**

B.  Sworn personnel of the Philadelphia Police Department shall conduct ALL searches in a legal, thorough and professional manner.

C.  Sworn personnel may conduct intrusive searches, such as a strip or body cavity search, ONLY under the limited circumstances described in this section.  POLICE PERSONNEL ARE NOT PERMITTED TO ROUTINELY CONDUCT OR AUTHORIZE STRIP/BODY CAVITY SEARCHES ON EVERY INDIVIDUAL TAKEN INTO POLICE CUSTODY.

D.  A strip search may only be conducted when an individual has been lawfully taken into custody AND sworn personnel can identify specific factors which establish a reasonable suspicion that the individual possesses a weapon or contraband, such as controlled substances, or evidence of a specific crime.

E.  A body cavity search may only be conducted when an individual has been lawfully taken into custody AND sworn personnel have obtained a search warrant thereby establishing probable cause to search for:

1.  contraband, the fruits of a crime, or things otherwise criminally possessed; or
2.  property which is or has been used as a means of committing a criminal offense; or
3.  property, which constitutes evidence of the commission of a criminal offense.

> **EXCEPTION**:  A search warrant is not required when an individual to be searched gives written consent to a search.

F.  Any strip search conducted must be approved, in writing, by the highest-ranking supervisor available in the district/unit.  Any body cavity search will only be approved, in writing, by a Lieutenant or higher-ranking officer.  They will also be present in the area of the search or designate a subordinate supervisor to do so (need not visually witness the search).

G.  All police districts, narcotics and detective units, as well as other units where persons may be brought for investigation, arrest or processing, will maintain a strip/body cavity search file (Homicide, PDU, etc.).  This file will be maintained alphabetically by the last name of the individual who was searched.  The yellow copy of the Complaint or Incident Report (75-48) will be maintained in the file.  District/Unit Commanding Officers will review and initial the report before it is placed in the file.  This file will be maintained for five (5) years.

H.  Definitions

1.  <u>Standard Search</u> - the thorough physical examination of an individual taken into custody pursuant to an arrest, a warrant, evidence of a specific crime, or where consent has been given by the individual.  This search is used to uncover a weapon or contraband such as controlled substances.

**DIRECTIVE 5.7 - 23**

**NOTE**:  The mouth (oral cavity) search is part of the standard search and should be completed when this type of search is to be utilized, if necessary.

a.  The search can consist of the removal of a person's OUTER GARMENTS (i.e., the coat, jacket, sweater, vest, wig, shoes, socks, hat, and handbag or wallet) as well as the grabbing, squeezing or sliding the hands over the remaining clothing to detect a weapon or contraband.

b.  A standard search does not preclude the touching of any part of the person's body, through their clothing, in an attempt to ensure that the person does not possess a weapon or contraband.

c.  Police personnel may also conduct a subsequent standard search on arrested individuals delivered to their custody as outlined in Directives 5.14, "Investigation and Charging Procedure" and Directive 7.8, "Adult Detainees in Police Custody."

2.  <u>Strip Search</u> - the removal or rearrangement of clothing to permit the VISUAL inspection of a person's undergarments, buttocks, anus, genitals or breasts to search for a weapon or contraband such as controlled substances.

3.  <u>Body Cavity Search</u> - the actual entering or touching, by instrument or appendage, a person's anal or vaginal area ONLY in an effort to search for a weapon, evidence or contraband such as controlled substances.

---

## 22.  STRIP SEARCH GUIDELINES

A.  STRIP SEARCHES

1.  Can only be conducted with:

a.  The existence of specific factors which establish a reasonable suspicion by the officer that the individual possesses a weapon or contraband, such as controlled substances, or evidence of a specific crime and that person has been lawfully taken into custody.

b.  These factors are taken into consideration:

1)  nature of the crime;
2)  circumstances of the arrest;
3)  acts of violence, if any
4)  discoveries from prior arrests and/or previous searches of the subject;
5)  subject's reputation or conduct.

**NOTE**:  The search must be authorized, in writing, by the highest-ranking supervisor available in the district/unit.  The supervisor, or a subordinate supervisor will be present in the area of the search (they need not visually witness the search).  Also, the mere fact that an arrest has occurred for a specific crime (e.g., Narcotics Offense) is not, by itself, reasonable suspicion to conduct a strip search.  All factors must be considered prior to requesting a strip search.

2.  **WILL** be conducted:

   a.  In a dignified and professional manner and the person to be searched will not be required to remain unclothed any longer than is necessary to complete the search.

   b.  In a police or medical facility or other secure building except under exigent circumstances.

   c.  In private and by an officer of the same sex as the person to be searched. (When practical, two officers of the same sex will be present).

   **NOTE:**  An officer may not touch the undergarments or the exposed breasts, genitals, vaginal or anal areas of the person being searched, unless it is to remove/recover a weapon, contraband, or evidence of a specific crime.  Use verbal commands to complete the search.

3.  **WILL NOT** be conducted for:

   a.  Traffic violations ONLY,
   b.  Investigatory stops ONLY,
   c.  Summary offenses requiring only the issuance of a Non-Traffic Summary Offense Citation (03-8) where the person is to be immediately released upon its completion.

---

## 23.  BODY CAVITY SEARCH GUIDELINES

A.  BODY CAVITY SEARCHES

1.  Can only be conducted if:

   a.  The person has been lawfully arrested AND a warrant outlining the probable cause to believe the person possesses:

   1)  contraband, the fruits of a crime, or things otherwise criminally possessed; or

    2)  property which is or has been used as a means of committing a criminal offense; or

    3)  property, which constitutes evidence of the commission of a criminal offense.

2. Person to be searched gives written consent.

    **NOTE**: Although a body cavity search is technically authorized by the authority issuing the search warrant, the request for such a warrant will still be approved and authorized, in writing, by a Lieutenant or higher-ranking supervisor.  That supervisor, or a subordinate supervisor, will be present in the area of the search (they need not visually witness the search).

3. **WILL** be conducted:

    a.  In a medical facility and ONLY by a licensed physician and their medical staff.

    b.  In private and in view of only the doctor, medical staff and an officer(s) of the same sex as the person to be searched.

    c.  In a dignified and professional manner and the person to be searched will not be required to remain unclothed any longer than the physician has deemed necessary.

4. **WILL NOT** be conducted for:

    a.  Traffic violations ONLY,
    b.  Investigatory stops ONLY,
    c.  Summary offenses requiring only the issuance of a Non-Traffic Summary Offense Citation (03-8) where the person is to be immediately released upon its completion.

---

## 24.  STRIP/BODY CAVITY SEARCH PROCEDURE

A. Sworn personnel requesting a search (strip/body cavity) will:

1. Ensure the person to be searched is properly secured until authorization is granted to search.

2. Request the presence of the highest-ranking supervisor available in the district/unit.

3. Request the assistance of an officer of the same sex as the person to be searched, if not present.

4.  State the facts, to the authorizing supervisor, which reveals their reasonable suspicion (strip search) or probable cause (body cavity search).

5.  If a strip search is approved, conduct as described in Section 22.

6.  If a body cavity search is approved, obtain a warrant as per Section 3.

B.  Supervisor authorizing (strip/body cavity search):

1.  Will evaluate the officer's request and ensure it meets the standard of reasonable suspicion (strip searches) or probable cause (body cavity searches) and take into consideration the totality of facts and circumstances including:

    a.  nature of the crime;
    b.  circumstances of the arrest;
    c.  acts of violence, if any
    d.  discoveries from prior arrests and/or previous searches of the suspect;
    e.  suspect's reputation of conduct.

    <u>NOTE</u>: The authorizing supervisor will not approve a strip search solely on the fact that an arrest has occurred for a specific crime (e.g., narcotics offense).

2.  Will approve or disapprove the request.

3.  Will ensure the search is conducted in the proper facility as indicated in Section 22 and 23 of this directive.

4.  Will ensure a strip search is conducted and viewed ONLY by an officer(s) of the same sex and that a cavity search is conducted and viewed ONLY by a licensed physician, medical staff and an officer(s) of the same sex as the person being searched.

5.  Will be, or have a designated supervisor, present in the area of the search as it occurs (need not visually witness the search).

6.  Will prepare, or designate a subordinate supervisor to prepare, a strip or body cavity search Complaint or Incident Report (75-48) for every individual search conducted.  ALWAYS use the District Control number of the original assignment or arrest.

    a.  A new District Control number will ONLY be obtained when there is no District Control number for the original assignment.

    <u>NOTE</u>:  A copy of the search 75-48 must be scanned into the Case File.

**DIRECTIVE 5.7 - 27**

       **EXCEPTION**: Where there is no Summary Citation.  (See Section 25-C).

   7.   Will ensure the 75-48 includes the following:

      a.   Name of the person searched (Complainant Block).
      b.   Name and badge number of the officer requesting the search.
      c.   Specific factors justifying the search.
      d.   Type of search conducted (strip or body cavity).
      e.   Whether the search was conducted under a warrant (include warrant number), consent, reasonable suspicion, or probable cause.
      f.   Signature and badge number of the officer or physician's signature that conducted search.
      g.   Name and badge number of the witnessing officer.
      h.   Date, time started, time finished and location where the search took place.
      i.   Any item(s) found during the search.
      j.   AUTHORIZING SUPERVISOR'S SIGNATURE AND BADGE NUMBER.

   8.   Will ensure that a strip/body cavity search was conducted and its details are noted on the district/unit S&R, noting the pertinent information including the District Control number.

C.  Sworn personnel conducting a search (strip search only) will:

   1.   Ensure the area where the search will take place is secure and cannot be used to escape custody.

   2.   Not touch the person's exposed breasts, anus, buttocks, genitals, or undergarments. Use verbal commands to ensure a thorough search.

   3.   Inform the authorizing supervisor of the items found.

   4.   Sign and include the badge number on the 75-48.

D.  ORS/Investigative Unit Supervisor will:

   1.   Ensure that a 75-48 is prepared, submitted, and, when an arrest is made and scanned into the Case File whenever a strip/body cavity search is conducted.

   2.   Code search 75-48 – Strip Search (no code number).

   3.   Ensure that an entry is made on the S&R with a brief description of the incident.

   4.   In addition, ensure that if a juvenile has undergone a strip/body cavity search, that it is noted in the remarks section of the computerized Juvenile Flow Chart.

**NOTE**:  Whenever there is a Summary Citation, the strip/body cavity search 75-48 will always be attached.

E.  Commanding Officers will periodically review 75-48s to ensure the guidelines in this directive are followed.

   1.  On a monthly basis, the district/unit Commanding Officer will send a memorandum through the chain of command to the Commanding Officer, Standards and Accountability, listing the number of strip/body cavity searches conducted by their personnel; include a DC number.

## 25. DISTRIBUTION OF SEARCH 75-48 (STRIP/BODY CAVITY SEARCHES)

A.  The strip/body cavity search 75-48 will be distributed as follows:

   1.  White copy – scanned into the P1RMS Case File.
   2.  Yellow copy - maintain alphabetically in district/unit strip search file of district/unit conducting the search.

B.  When only a Summary Citation (03-8) is required:

   1.  White copy - attach to yellow copy of citation (Reports Control).
   2.  Pink copy - attach to blue copy of citation (Police District).
   3.  Yellow copy- maintain alphabetically in district/unit strip search file of the district/ unit conducting the search.

C.  When the person searched is released and not charged: (no Summary Citation).

   1.  White and pink copy - hand delivered to the ORS of the district of apprehension who will distribute as per Directive 12.11, "Complaint or Incident Report (75-48)." The delivery must be completed within 24 hours of the search.

   2.  Yellow copy - maintain alphabetically in the district/unit strip search file of district/ unit conducting the search.

## 26. SEARCH WARRANT TRACKING

A.  It will be the overall responsibility of the Reports Control Unit to monitor and track the flow of all Department search warrants from their release by the Police Warehouse, to the individual districts/units, on through their service, post service, and filing stages. Individual Commanding Officers will have the ability to monitor their original affidavits on a regular basis to ensure total compliance with this directive.

B. The Integrity Control Office will be responsible for an additional level of oversight pertaining to the actual review of the search warrants. This review will help to identify any improprieties or corruption. A statistical report will be generated for the Police Commissioner as directed.

C. It will be the responsibility of the district/unit Commanding Officers, with the exception of Homicide and the Special Investigations Bureau's (SIB) units, to obtain, distribute, control, review and file all search warrants that have been assigned to their district/unit in accordance with this directive.

D. It will be the responsibility of the Homicide and SIB Unit commanders/supervisors (captain, lieutenants and sergeants) to obtain, distribute, control, review and file all search warrants that have been assigned for their unit's use. By delegating this responsibility to the supervisors instead of the commanders of the two units expected to use the greatest number of warrants, a more efficient method of tracking can be developed.

E. Only a supervisor will be able to obtain a package of warrants (packages contain 25) from the warehouse. No more than two packages (50 warrants) will be obtained per visit.

F. The procedures outlined in this directive and Computer Training Bulletin 95-1 must be strictly followed and commanders/supervisors will become thoroughly familiar with their contents. Supervisors WILL NOT give their personal computer sign-on code, or delegate after signing on, to a subordinate to perform any required entry to the Search Warrant Tracking System.

G. The contents of this section does not relieve the Commanding Officers of any district/unit, including Homicide and SIB, from maintaining the overall responsibility for any and all warrants issued to their personnel. The Commanding Officer's goldenrod copy of the 75-175, along with all required computer entry printouts, will be maintained in their file for compliance with departmental policies and procedures.

**NOTE**: All copies of a voided affidavit/warrant are to be sent to Reports Control, except the Commanding Officer's copy, which will be retained in their file.

H. Confidential warrants are those warrants, approved by the affiant's Chief Inspector that should remain confidential, however, the warrant numbers must still be maintained A memorandum will be sent by the affiant's Chief Inspector holding the confidential warrant to the Chief Inspector, Office of Professional Responsibility, listing all such warrants. The Chief Inspector, Office of Professional Responsibility, must approve these requests. When it has been determined by the requesting bureau's Chief Inspector that there is no longer a need for confidentiality, the necessary information concerning all aspects of these warrants must be immediately entered into the computer.

**DIRECTIVE 5.7 - 30**

I. Updating the search warrant by computer as required will be the responsibility of the affiant's supervisor/commander.  All questions asked on the computer MUST be answered (e.g., Is there a body warrant along with the search warrant?  What is the body warrant number?).

---

## 27.  OBTAINING WARRANTS FROM THE POLICE WAREHOUSE

A.  Warehouse personnel will:

1.  Only accept, from the printer of the warrants, the proper numerical, sequential 75-175's as per contract specifications.

2.  Continually rotate the stock of search warrants and distribute them in sequential order only.

3.  Release search warrants only to Police Department supervisors showing proper identification and presenting a memorandum, which MUST include the name and rank of the commander/supervisor of the requesting district/unit, payroll number and a six-digit DAR unit/platoon code number.  (Exception: Office of the District Attorney and Pennsylvania State Police)

   **NOTE**:  The first four digits of the DAR code refer to the district/unit, while the last two digits refer to the platoon (e.g., 1st Dist., 5 platoon = 010050).

4.  Ensure, alongside the receiving supervisor, that each package contains 25 sequentially numbered warrants.

5.  Immediately enter all pertinent information concerning the issuance of the warrant package into the computer in accordance with Computer Training Bulletin 95-1.

B.  District/Unit Commanding Officers will:

1.  Prepare a memorandum noting name, rank, payroll number and complete DAR unit/platoon code number addressed to the Supervisor, Police Warehouse, along with the 71-S-91, Materials Issue Slip.

2.  Send a supervisor (administrative lieutenant/sergeant) to obtain warrants.

3.  Inform the supervisor to accurately count the number of warrants in each package and ensure they are in sequential order.

4.  Log all warrants in sequential order in the Search Warrant Control Log (75-130).

C.  Homicide/SIU Units' Commander/Supervisor (captain/lieutenant/sergeant) will:

**DIRECTIVE 5.7 - 31**

1. Prepare a memorandum noting name, rank, payroll number, and complete six-digit DAR unit/platoon code number as shown below.

   **NOTE**:  The memorandum must be from the supervisor of the unit or platoon, not from the Commanding Officer.

**SAMPLE:**      TO:  Supervisor, Police Warehouse

FROM:  Lieutenant John Doe, Homicide Unit, 600320, Payroll #

SUBJ:  REQUEST FOR SEARCH WARRANTS

Obtain or send a subordinate supervisor to obtain the warrants.
Log all warrants in sequential order in the Search Warrant Control Log (75-130).

   **NOTE**:  All units/platoons in Homicide or SIB must have their own 75-130s.

---

## 28.  DISTRIBUTING INDIVIDUAL WARRANTS

A. Only a commander/supervisor may distribute a warrant to an officer/investigator (also known as the Affiant).  An issuing supervisor WILL NOT be the affiant.  Distribution must be done in sequential order.

   **NOTE**:  Officers from one district/unit in need of a warrant WILL NOT be denied a warrant because they are not assigned to the district/unit in possession of an available warrant.  A warrant will be made available to any officer or investigator in need of one (e.g., Narcotics officers working in Northeast Division will always be able to obtain a warrant from Northeast Detective Division).

B. Distributing Commander/Supervisor will:

   1. Follow the procedures outlined in Computer Training Bulletin 95-1, selecting menu screen number 2 and immediately enter all necessary information requested into the computer.

   2. Immediately complete the 75-130.

      **NOTE**:  Failure to immediately enter the information requested into the computer will be cause for follow-up review of the status of that warrant by the Reports Control Unit.

---

## 29.  UPDATING SEARCH WARRANTS

A.  Once a warrant has been issued and either served or voided, it is incumbent upon the receiving officer's/investigators' supervisor to update the warrant by following the procedures in Computer Training Bulletin 95-1, selecting menu number 2 and immediately enter all necessary information requested into the computer.

B.  All fields on the computer screen must be completed except when a warrant has been voided.  In these cases, follow the directions in Computer Training Bulletin 95-1 under "Void Procedure."

---

## 30.  INTERNAL AFFAIRS RESPONSIBILITIES

A.  Only authorized Internal Affairs personnel will have access to Menu Selection #4, "Modify Screen" through the WRNT command on the Police system.

B.  Authorized personnel will adhere to the procedures outlined in their copy of Computer Training Bulletin 95-1 and must answer the question concerning complaints.

---

## 31.  REPORTS CONTROL RESPONSIBILITIES

A.  Only authorized Reports Control personnel will have access to Menu Screen #5, "Reports Control Update Screen."

B.  Authorized personnel will adhere to the procedures outlined in their copy of Computer Training Bulletin 95-1 and must answer the question concerning the filing of the warrant.

C.  Copies of the warrants will be maintained in accordance with existing policy.

D.  Reports Control, on a weekly basis, will receive a register from the Data Processing Unit, which must be compared against the information available in the computer relating to completed or voided warrants.

E.  Strip/body cavity search 75-48s will be left attached to the copy of the Summary Citation.

> **EXCEPTION:**  When there is no Summary Citation, the strip/body cavity search 75-48 will arrive alone (See Section 25-C).  Since the DC number on the strip/body cavity search 75-48 should match the DC number of original assignment, both 75-48s will be placed together.

---

## 32.  AUDITS AND INSPECTIONS RESPONSIBILITES

A.  Will receive, on a weekly basis, a register from the Data Processing Unit relating to completed, voided and delinquent warrants.

B.  Will initiate a follow-up review on the status of the warrant when the district/unit fails to forward relevant copies of the Search Warrant (75-175) to the Reports Control Unit within seven (7) days of execution, being voided, or when there is non-service or no search.

---

## BY COMMAND OF THE POLICE COMMISSIONER

---

**RELATED PROCEDURES**:     Directive 5.14,     Investigation and Charging Procedure
                            Directive 7.8,      Adult Detainees in Police Custody
                            Directive 10.1,     Use of Force – Involving the Discharge of
                                                Firearms


                            Directive 12.11,    Complaint or Incident Report (75-48)
                            Directive 12.15,    Property Taken into Custody

---

VG #11-334486-B    W-436964



### CITY OF PHILADELPHIA

### PHILADELPHIA POLICE DEPARTMENT

# CONSENT TO SEARCH FORM

| DATE | TIME |
|---|---|
| LOCATION | DC NUMBER (if applicable) |

I,_____, hereby freely and voluntarily
provide consent to Philadelphia Police Officer _____
Badge#_____ to conduct a search of _____
for evidence of _____

I understand that the officer has no search warrant authorizing this search and that I have a
constitutional right to refuse permission for this search to be conducted.

Results of Search:
I certify that (nothing/only those items listed below) (was/were) removed from my custody by
the Philadelphia Police Department. (If property is seized, list items below and on Property
Receipt)

Property Receipt#_____

_____   _____
_____   _____
_____   _____

| SIGNATURE | DATE |
|---|---|
| SUPERVISOR (NAME AND BADGE #) | IDENTIFICATION VERIFICATION:<br>(EX. DRIVER'S LICENSE NUMBER) |
| WITNESS SIGNATURE | |

Reports Control

75-668

*WHITE COPY*



CITY OF PHILADELPHIA

PHILADELPHIA POLICE DEPARTMENT

# CONSENT TO SEARCH FORM

| DATE | TIME |
|---|---|
| LOCATION | DC NUMBER (if applicable) |

I,_____, hereby freely and voluntarily
provide consent to Philadelphia Police Officer_____
Badge#_____ to conduct a search of_____
for evidence of _____

I understand that the officer has no search warrant authorizing this search and that I have a
constitutional right to refuse permission for this search to be conducted.

Results of Search:
I certify that (nothing/only those items listed below) (was/were) removed from my custody by
the Philadelphia Police Department. (If property is seized, list items below and on Property
Receipt)

Property Receipt#_____

_____     _____

_____     _____

_____     _____

| SIGNATURE | DATE |
|---|---|
| SUPERVISOR (NAME AND BADGE #) | IDENTIFICATION VERIFICATION: (EX. DRIVER'S LICENSE NUMBER) |
| WITNESS SIGNATURE | |

75-668

District/Unit Commanding Officer

*YELLOW COPY*



CITY OF PHILADELPHIA

PHILADELPHIA POLICE DEPARTMENT

# CONSENT TO SEARCH FORM

| DATE | TIME |
|---|---|
| LOCATION | DC NUMBER (if applicable) |

I,_____, hereby freely and voluntarily provide consent to Philadelphia Police Officer _____
Badge#_____ to conduct a search of _____
for evidence of _____

I understand that the officer has **no** search warrant authorizing this search and that I have a constitutional right to refuse permission for this search to be conducted.

Results of Search:
I certify that (nothing/only those items listed below) (was/were) removed from my custody by the Philadelphia Police Department. (If property is seized, list items below and on Property Receipt)

Property Receipt#_____

_____   _____

_____   _____

_____   _____

| SIGNATURE | DATE |
|---|---|
| SUPERVISOR (NAME AND BADGE #) | IDENTIFICATION VERIFICATION: (EX. DRIVER'S LICENSE NUMBER) |
| WITNESS SIGNATURE | |

75-668

**Consenting Party**

*PINK COPY*

COPY



CITY OF PHILADELPHIA

**PHILADELPHIA POLICE DEPARTMENT**

# CONSENT TO SEARCH FORM
### (DNA SAMPLE)

| DATE | TIME |
|---|---|
| LOCATION | DC NUMBER (if applicable) |

I, _____, hereby freely and voluntarily provide consent to the Philadelphia Police Department (PPD) to collect an oral swab specimen from me. I fully understand that the DNA taken from the oral swab will be analyzed and can be introduced into evidence against me in any criminal proceedings.

I have also been fully informed that the DNA from this specimen will be entered into a DNA database and will be used for current and future criminal investigations. However, I understand that, despite providing my consent on this date, I retain the right to request the DNA profile developed from the oral swab to be expunged or deleted from the DNA database. I understand that the expungement process must be initiated by me and that I have been provided with instructions on the expungement procedures.

I understand that the PPD does not have a search warrant for my DNA and that I have the absolute right to refuse to provide the oral swab.

I certify that I am not under the influence of any drugs or alcohol to a degree that would hinder or otherwise diminish my ability to read and understand the consent being given. I further certify that I have, in fact, read the above statement and I am providing my consent willingly and without any threats or promises having been made to me by the PPD.

| SIGNATURE | DATE |
|---|---|
| WITNESS (NAME AND BADGE #) | IDENTIFICATION VERIFICATION: (EX. DRIVER'S LICENSE NUMBER) |
| WITNESS SIGNATURE | |

75-625

**White - OFS/DNA**



CITY OF PHILADELPHIA

**PHILADELPHIA POLICE DEPARTMENT**

# REQUEST FOR EXPUNGEMENT
### (VOLUNTARY DNA SAMPLE)

The Philadelphia Police Department will, upon request, expunge any DNA profile, from a voluntarily collected oral swab sample, from all DNA databases to which the profile was entered. Additionally, the physical specimen will also be destroyed.

The expungement and destruction only applies to the specimen and profile from the voluntary collection. Any other form of legally obtained samples/profiles, such as those collected as a result of a search warrant, court order, or as part of processing for a criminal conviction, will be maintained according to appropriate laws and procedures.

| NAME:  (LAST, FIRST, MIDDLE) | |
|---|---|
| DNA SEARCH FORM # (upper right corner of consent form) | DC NUMBER (if applicable) |
| DATE OF COLLECTION | LOCATION OF COLLECTION |
| IDENTIFICATION VERIFICATION USED DURING COLLECTION: (EX. DRIVER'S LICENSE NUMBER) | |
| SIGNATURE | DATE |

**Confirmation of expungement/destruction will be provided.  Please provide contact information for the confirmation below. Allow 90 days for processing of request.**

| STREET ADDRESS | |
|---|---|
| CITY, STATE, AND ZIP | PHONE # |
| EMAIL ADDRESS | FAX # |

75-625 A

# EXHIBIT "W"



EXHIBIT

| Instructor Cues and Performance Objectives | **DOG ENCOUNTERS** |
|---|---|

# DOG ENCOUNTERS

## I. Introduction

A. Fewer people die annually in the United States from dog bites than from lightning strikes.

B. Training Objectives:

- Identify and respond to indicators that a dog is present in a location.
    1. Failing to anticipate a dog on the premises is a frequent mistake that Officers make.
    2. Food/water bowls, leashes/chains, worn paths in lawn usually means a dog is present.
    3. Notify owner that you are there and tell them to contain their dog.
    4. Make noise, shake fence, call to dog to avoid surprises for you or the dog.

- List indications that a dog may attack.
    1. A dog's posture often signifies the dog's intent.
    2. Behavior does not always predict a threat.
    3. Barking does not always mean a dog is aggressive.
    4. Officer's movements may reduce likelihood of an attack.
    5. Dogs often react when they think their territory or owner are threatened.

- Identify tools and methods of avoiding or warding off a dog attack.
    1. Officers' body position, tone of voice, and other "tricks" can avoid their being perceived as a threat by the dog.
    2. Baton, night stick, ASP, pepper spray - tools readily at hand — can be used to counter a dog attack.

1

3. When all other means fail to stop the threat, lethal force is justified.

- Identify breed-specific characteristics of dogs commonly trained to fight and/or guard.
  1. Any dog can bite under certain conditions.
  2. Dogs' behavior depends on how they are trained and socialized.
  3. Despite common thinking, no breed is guaranteed to be a threat.
  4. Pit Bulls are valued as fighters, protectors and family pets.
  5. Rottweilers are known to be antisocial, stubborn and protective.
  6. Dobermans often do not growl or show aggression before attacking.

- Know resources available for back-up and/or continued training.
  1. Pennsylvania Humane Society
  2. American Society for the Prevention of Cruelty to Animals (ASPCA or PSPCA)
  3. National Animal Control Association (NACA)
  4. Philadelphia Animal Welfare Society (PAWS)
  5. Officers with special training in animal handling.

## II. DOG ENCOUNTERS

### A. The Approach

The failure to anticipate the presence of a dog in a location is the biggest mistake an Officer can make. 30% of all households in the United States have dogs.

Be alert to signs that dogs are present: Look for food and water bowls, dog toys, a worn path in the grass or a leash or chain attached to a tree or other anchor. If possible, try to know the property and pets in advance. Animal Behavior experts agree that simple do's and don't's can reduce the chances of a confrontation:

- Always assume that there is a least one dog on location and let it know you are there.
- Always insist the owner confine the animal.
- Don't approach a dog that seems afraid – you may unknowingly provoke an attack.
- Don't back a dog into a corner, or make it feel trapped.

Directive 3.20
Animal Control

2

- Do not exit your vehicle if there is an unfriendly dog in the area.

A dog's behavior does not always predict a threat. Barking does not always mean a dog is aggressive:

- If the dog is contained, barking tells you that it is protecting it's owner and wants you to know it.
- Most Officers who end up shooting a dog report that the dog was barking or growling, though again they are warning you that you are going to have to take control.
- Barking reflects the dog's territorial and protective instincts.
- Dogs react to movement. Try to keep actions slow and non-threatening.
- Touching the owner, or appearing to do so, can provoke hostility from the dog.

Most Dogs assume postures that may indicate their attitudes:

- BASELINE posture – the dog's head is held high, ears are up but not forward, the tail is down and the mouth is relaxed.
- ALERT posture – the head is held high, ears are forward, tail is out behind him, mouth is closed and is standing straight "on his toes".
- DEFENSIVE THREAT posture – he lowers his body, his hackles are up, the pupils are dilated, ears are back, corners of the mouth are pulled back (may bare teeth), the tail is tucked between legs and the nose is wrinkled.
- OFFENSIVE THREAT posture – hackles are up, ears are forward, corners of the mouth are forward, nose is wrinkled, his tail is up and stiff and he's standing tall on his toes.
- SUBMISSIVE posture – his tail is down, his body lowered, forehead is smooth, he licks at the mouth of the superior dog, he grovels and the corners of his mouth are back.

The hackles up near the tail, ears down, snarling and growling are good predictors of a dog's likely aggression. There are some do's and don'ts of facing a possibly hostile dog:

- Keep movement to a minimum
- Stand sideways – a person is a smaller threat in profile
- Don't extend your hand to a dog unless you have to, then keep your hand in a fist.
- Keep arms, hands near body
- Use a bite stick -- it can be put in a dog's mouth to distract

3

D000237

him
- Don't stare at dog
- Don't smile or show teeth.
- Back slowly away, eyes toward the dog – don't turnn and run
- Don't be afraid to make a tactical retreat or take cover
- Use your baton or asp as a bite stick, or "feed" it some other object.
- Call for backup – know your animal control resources.
- Use pepper spray if needed – it can usually at least slow the dog down.

## B. TOOLS

Having the right tools, or knowing how to use ordinary objects, can prevent an attack:
- Pepper spray
- Noose / snare
- Baton / ASP – bear in mind that the act of snapping open the ASP can startle and distract the dog.
- $CO_2$ fire extinguishers – spray smells and tastes bad, is cold and creates a disorienting cloud around the dog.

Directive 10.1
Discharge of
Firearms

Directive 10.2
Directive 10.3
Use of Force

The Force Continuum is the same when dealing with animals. Officers begin with the least physically harmful means of control then increase force as warranted:
- Calming behavior – talk quietly and move slowly
- Commands – familiar words firmly delivered may work.
- Isolation -- without backing the dog into a corner, wrangle it away from other people.
- Chemical (Pepper spray), Electronic (Taser), Sonic (sudden, loud noise), physical repellants (noose, baton)

When an attack is imminent or in progress, and these means have failed, lethal force is the last but only option.

## C. PIT BULLS AND LARGE DOGS

Every dog has the potential to bite. No breed is guaranteed to be more or less aggressive than other breeds, despite myths to the contrary. For example:
Pit Bulls:
- Are naturally people – friendly
- Will not challenge strangers unless they have not been

4

properly socialized.
- Are fiercely loyal, tenacious and intelligent.
- ideal characteristics for training to fight or as a guard dog
- are often great family pets
- must be trained to attack – it does not come naturally
- are often trained to protect people or property
- often wag their tails before, just before or after they attack
- certain postures in a pit bull (tail high, short movements) may signal dominance, not friendliness.

Rottweilers:
- are generally not very social
- don't like to take orders from strangers, or sometimes from their owners
- are to be taken seriously when they growl

Dobermans:
- often do not growl or show aggression before attack.

## D. PROTECTING YOURSELF

Dogs on their best behavior and well-trained are loving, loyal and protective. However, their instincts can not be ignored. **Officer Safety** is always the **FIRST PRIORITY**! Although dogs often attack without warning, as fighting dogs are trained to do, it is essential to recognize animal behaviors and respond appropriately. Just the presence of one or more dogs can intimidate an Officer so much that he or she may overreact. Some simple rules to remember:
- "Be a Tree" - Stand still
- Fight back if necessary
- Retreat if necessary
- Turn to your side, stand in profile
- Protect your face and throat
- Brace yourself against something solid if possible
- You are more vulnerable when on the ground, but protect yourself by curling up in the fetal position.
- Cover your throat and ears with fists.
- Do not expose fingers.

Be prepared:
- Know what you're walking in to and be prepared to respond accordingly.
- Know the history of that address and the animals that live there.

5

D000239

- Use lethal force only as last resort.

## III. REVIEW

- Use Caution
- Learn and read dog's body language
- Avoid eye contact
- Stand still
- Talk to the dog
- Use firm verbal commands
- Allow dog to retreat
- Be prepared
- Use lethal force as a last resort – Remember people treat animals like they are members of their family. How would you feel if someone shot your family member?

## IV. ADDITIONAL INFO

National Animal Control Association
PO Box 480851
Kansas City, Mo 64148
Phone # 913-768-1319
Email: naca@interserv.com

Pennsylvania SPCA
350 E. Erie Ave
Philadelphia PA
Phone# 215-426-6304
Email: Info@pspca.org

Philadelphia Animal Welfare Society (PAWS)
111 W. Hunting Park Ave
Philadelphia, PA 19140
Phone# 267-385-3800
www.acctphilly.org

6

D000240

# EXHIBIT "X"

Transcript of the Testimony of:
# Detective Timothy Scally

**Date:** September 28, 2023

**Case:** Alvarado v. City of Philadelphia, et al

Diamond Court Reporting
Phone:856-589-1107
Fax:856-589-4741
Email:dcr.diamond@comcast.net

IN THE COURT OF COMMON PLEAS

PHILADELPHIA COUNTY, PENNSYLVANIA

- - -

FELISHATAY ALVARADO          :   JUNE TERM, 2022
                             :
      vs.                    :
                             :
CITY OF PHILADELPHIA,  et al  :   NO. 1633

- - -

THURSDAY, SEPTEMBER 28, 2023

- - -


          Videotaped Oral Deposition of
DETECTIVE TIMOTHY SCALLY, taken at Victims'
Recovery Law Center, The North American Building,
121 South Broad Street, 18th Floor, Philadelphia,
Pennsylvania, commencing at 1:00 p.m., before
Denise Weller, a Professional Shorthand Reporter
and Notary Public in and for the Commonwealth of
Pennsylvania.


- - -


          DIAMOND COURT REPORTING
            406 Redbud Lane
          Mantua, New Jersey 08051
             (856) 292-4292
          dcr.diamond@comcast.net

Page 2

APPEARANCES:

VICTIMS' RECOVERY LAW CENTER
BY:  KEITH WEST, ESQUIRE
The North American Building
121 South Broad Street
18th Floor
Philadelphia, PA  19107
(215) 546-1433
Keith@victimrecoverylaw.com
Attorney for the Plaintiff

CITY OF PHILADELPHIA
LAW DIVISION
BY:  ADAM R. ZURBRIGGEN, ESQUIRE
1515 Arch Street
14th Floor
Philadelphia, PA  19102
(215) 683-5114
Adam.zurbriggen@phila.gov
Attorney for the Defendants

- - -

ALSO PRESENT:
     Courtney Kitcherman, Video Operator

---

Page 3

I N D E X

WITNESS                          PAGE

DETECTIVE TIMOTHY SCALLY
   (By Mr. West)              5, 80
   (By Mr. Zurbriggen)          80

- - -

EXHIBITS

NO.          DESCRIPTION          PAGE

Scally-1       Statement            4
Scally-2       Google Map          64
Scally-3       Search Warrant      64

---

Page 4

- - -

PROCEEDINGS

- - -

(Whereupon, Exhibit Scally-1 was premarked for identification.)

- - -

(It is hereby stipulated and agreed by and between counsel that signing, sealing, filing and certification are waived; and that all objections, except as to the form of the questions, are reserved until the time of trial.)

- - -

THE VIDEOGRAPHER:  Deposition of Police Detective Timothy Scally, badge number 791.

THE WITNESS:  Correct.

THE VIDEOGRAPHER:  This, the audio/video deposition for use at trial in the matter of Alvarado versus City of Philadelphia, et al, Philadelphia Court of Common Pleas, docket number 220601633.

And I'm the video operator.  My name is Courtney Kitcherman.  And I am employed

---

Page 5

by the Victims' Recovery Law Center.  My address is 121 South Broad Street, 18th Floor, Philadelphia, Pennsylvania, 19107. Today's date is September 28th, 2023 at 1:03 p.m.

This deposition is being performed in person.  The caption of this case is Alvarado versus City of Philadelphia, et al, Philadelphia Court of Common Pleas, docket number 220601633.  The witness being deposed today is Detective Timothy Scally, badge number 791.  This deposition is being taken on behalf of Plaintiff Felishatay Alvarado. The officer taking this deposition is Denise Weller.  And she shall swear the witness in at this time.

- - -

DETECTIVE TIMOTHY SCALLY, after having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. WEST:

Electronically signed by Denise Weller (401-411-238-5399)                    81fe29a0-2a3b-43e3-97e9-e32ccf7b98e9

Page 6

1    Q.  Good afternoon, Detective Scally.
2    A.  Good afternoon.
3    Q.  My name is Keith West.  I am one of the
4  attorneys representing plaintiff in this case, Ms.
5  Alvarado.  Have you ever been in a deposition
6  before?
7    A.  Yes.
8    Q.  How many times have you been deposed?
9    A.  I would say anywhere between three to
10  five times or more.
11    Q.  Okay.  Just really quickly, you're
12  probably familiar with the procedure.  We just
13  have a few standard instructions and questions we
14  put on every time.
15    A.  Yes.
16    Q.  Don't read anything into them.
17    Are you under the influence of any sort
18  of illness, medication, substance, anything that
19  would impair your ability to testify truthfully
20  today?
21    A.  No.
22    Q.  Okay.  And you have had a chance to
23  confer with your attorney and you're ready to
24  proceed, correct?

Page 7

1    A.  Yes.
2    Q.  Did you review any documents, videos,
3  photography, anything in anticipation of today's
4  testimony?
5    A.  Yes.
6    Q.  What did you review?
7    A.  I reviewed my statement to internal
8  affairs.
9    Q.  Is that it?
10    A.  I believe I also read Detective Graf's
11  interview with internal affairs.
12    Q.  Detective Grace?
13    A.  Graf.
14    Q.  Graf, G-R-A-F, right?
15    A.  Yes.
16    Q.  Is that it?
17    A.  That's it.
18    Q.  Okay.  I have premarked as Scally-1 as an
19  exhibit something that we have, an internal
20  affairs statement.  Is this what you reviewed?
21    A.  Yes.
22    Q.  All right.  When you reviewed it, was
23  there anything that you felt was inaccurate?  Did
24  you look at this and say that's not what I said or

Page 8

1  that's not what happened, anything like that?
2    A.  No.
3    Q.  Okay.  So besides Scally-1 and then
4  Detective Graf's statement, was there anything
5  else you reviewed?
6    A.  No.
7    Q.  Is there any video -- so strike the
8  question.
9    I can represent to you this lawsuit
10  arises from a warrant enforcement action that
11  occurred at 4664 Torresdale Avenue in early June
12  2021.
13    A.  Yes, I recall.
14    Q.  Is there any video of any part of that
15  operation?
16    MR. ZURBRIGGEN: Object to form.
17    Detective, to the extent you know.
18    THE WITNESS:  That we -- no.  No.
19    Are you referring to the homicide
20    investigation or when we hit the house with
21    the --
22  BY MR. WEST:
23    Q.  The warrant enforcement.
24    A.  I'm sorry.  You said warrant enforcement.

Page 9

1  No.  No video.
2    Q.  Did any video capture any part of that
3  like when the door got opened or anything like
4  that?
5    A.  I wasn't anywhere near there.
6    Q.  Okay.
7    A.  No.  I have no idea.
8    Q.  Is there any video that captures that?
9    A.  Not that I know of.
10    MR. ZURBRIGGEN:  Same objection.
11  BY MR. WEST:
12    Q.  Okay.  All right.  Were you at the
13  staging area prior to the executing of the search
14  warrant?
15    A.  Yes.
16    Q.  Okay.  And what time do you think you
17  arrived that day?
18    A.  I don't know exactly.  But normally we
19  meet at 5:30 a.m.  And we meet at like you said,
20  at a staging area.
21    Q.  Uh-huh.
22    A.  And then go as one to where we are going
23  to execute the search warrant.
24    Q.  Okay.  And somehow I got -- I jumped

Page 10

1 into -- just a few -- you're fine.  Just a few
2 other things I should tell you.
3      So we don't intend for this to be an
4 unnecessarily uncomfortable -- this isn't like at
5 least the police interrogations that you see in
6 the movies.  So if you want to take a break at any
7 time, you want a cup of coffee, anything, just let
8 us know, okay?
9      A.  Okay.  And I didn't take any offense to
10 those questions in the beginning, because I ask
11 the same ones.
12      Q.  Exactly.  Likewise, you know, if you get
13 asked any questions that you're having trouble
14 understanding, just don't answer them.  We will be
15 glad at any time to try to speak louder, slower,
16 rephrase questions if possible, anything like
17 that.
18      So if you have any trouble with a
19 question, just ask it to be repeated.  Otherwise,
20 if you do answer it, we assume that you understand
21 it, okay?
22      A.  Okay.
23      Q.  When did you join the Philadelphia Police
24 Department?

Page 11

1      A.  June 26th, 1995.
2      Q.  Okay.  And you're a homicide detective,
3 correct?
4      A.  Correct.
5      Q.  How long have you been a homicide
6 detective?
7      A.  18 years.
8      Q.  And that is not just a detective in
9 general, that is actually with the homicide unit?
10      A.  Yes.  So I did seven years in the 23rd
11 District as a patrol officer.  Three years at
12 Central Detectives as a detective assigned there.
13      Q.  Okay.
14      A.  And then the rest of my career has been
15 in the homicide unit going on 19 years.
16      Q.  Right.  So even as of June 2021, you had
17 a lot of experience with preparing arrest and
18 search warrants, correct?
19      A.  Correct.
20      Q.  All right.  Is it your -- is it your
21 belief that you're familiar with any policies or
22 procedures that exist at the Philadelphia Police
23 Department with regards to the preparation of
24 search and arrest warrants?

Page 12

1      MR. ZURBRIGGEN:  Object to the form.
2 But Detective, you can answer.
3      THE WITNESS:  Yes.
4 BY MR. WEST:
5      Q.  Okay.  Are you the most senior homicide
6 detective at this time?
7      A.  You would think I was, but I am not.
8      Q.  Okay.
9      A.  There's a few -- I am getting there,
10 though.  Yes.  There's three or four guys that
11 have been there a little bit longer than me.
12      Q.  All right.  So what did you guys discuss
13 at the staging area?
14      A.  I wasn't there.  Detective Graf talked to
15 the SWAT supervisor.  And then I was -- I believe
16 I was staying by the car.  And then when he was
17 done talking to the supervisor, we got in, you
18 know, the cars and then we left.
19      Q.  Okay.  At some point the property was
20 breached, correct?
21      A.  Correct.
22      Q.  Did you personally witness that?
23      A.  Yes.  In a sense I did, yes.  Can I
24 explain?

Page 13

1      Q.  Yes, please.
2      A.  We were -- we don't go with SWAT.  We
3 stayed behind a little bit, like a safe area so we
4 don't mess up with what they are doing and you
5 know, put ourselves in any type of danger.  So we
6 were literally -- forgive me, but I don't know the
7 street that cuts across.  But we were on the
8 corner.  So I did -- SWAT was already going into
9 the house when I walked up to the corner to where
10 we are going to stay in a safe place away.
11      I did see SWAT pull up on Torresdale
12 Avenue and then enter the house.
13      Q.  Okay.
14      A.  Like we were kind of off a little bit.  I
15 remember hearing them do their normal, you know,
16 search warrant, search warrant and then hear the
17 door get kicked in, I guess.  But --
18      Q.  Okay.  Did anybody knock on the door
19 prior to the door being breached?
20      A.  You do hear a bang, bang, bang a few
21 times and then you hear search warrant.
22      Q.  Specifically on June 4th, 2021 did you
23 hear -- sorry.  Strike the question.
24      Specifically on June 4th, 2021 did you

Page 14

1  see anyone knock on the door at the 4664
2  Torresdale Avenue property before the door was
3  breached?
4      A. I did not see them knock.
5      Q. Okay.
6      A. I heard them.
7      Q. Okay. So you specifically did hear
8  someone knock?
9      A. Yes.
10      Q. Okay. And you heard the door when it got
11  rammed open, correct?
12      A. Correct.
13      Q. How much time passed between the door
14  getting knocked on and the door getting breached?
15      A. I would have to say because they are
16  pretty meticulous about it, they really hit the
17  door hard. I would say from where we walked up,
18  they were already hitting it and announcing. So I
19  would say anywhere from 15 to 30 seconds.
20      Q. Okay. Is it possible it was less than
21  that?
22          MR. ZURBRIGGEN: Object to the form.
23      Detective, to the extent you know.
24          THE WITNESS: I don't think so, no.

Page 15

1  BY MR. WEST:
2      Q. Okay. Have you ever heard of anything
3  called the knock and announce rule?
4      A. Yes.
5      Q. What is it?
6      A. That is what I basically described, a
7  knock and announce what they are here for.
8  Usually it's a search warrant or arrest warrant.
9  And then they wait a certain amount of minutes or
10  not minutes, but time. And then they breach the
11  door.
12      Q. Okay. And how long are people supposed
13  to wait pursuant to the knock and announce rule?
14          MR. ZURBRIGGEN: Object to the form.
15      But Detective, if you know.
16          THE WITNESS: I don't believe there
17      is -- I don't actually do that. But I don't
18      believe there's a set amount of seconds you
19      have to count off. I think it is also
20      safety reasons as well. But it's an amount
21      of time that maybe somebody can get up and
22      open up the door before they put the door
23      in.
24  BY MR. WEST:

Page 16

1      Q. Okay. Under the training that you have
2  received from the Philadelphia Police Department,
3  do you have any understanding whether or not the
4  knock an announce rule is a constitutional
5  requirement?
6          MR. ZURBRIGGEN: Object to the form.
7      But Detective, again, if you know.
8          THE WITNESS: I don't believe it is.
9  BY MR. WEST:
10      Q. So your understanding is that there's no
11  constitutional requirement to knock and announce
12  before entering a property?
13          MR. ZURBRIGGEN: Same objection.
14      But Detective, to the extent that you know.
15          THE WITNESS: I don't know if it is
16      or not.
17  BY MR. WEST:
18      Q. Okay. Did you ever receive any training
19  from the Philadelphia Police Department with
20  regards to what the purpose of the knock and
21  announce rule is?
22          MR. ZURBRIGGEN: Same objection.
23      But Detective, you can answer.
24          THE WITNESS: I don't believe I

Page 17

1      received any specific training of why
2      there's a knock and announce rule.
3  BY MR. WEST:
4      Q. Did you ever receive any specific
5  training from the Philadelphia Police Department
6  with regards to the knock an announce rule in
7  general?
8          MR. ZURBRIGGEN: Same objection.
9      But Detective, you can answer.
10          THE WITNESS: I may have, but I
11      don't recall when.
12  BY MR. WEST:
13      Q. Okay. So as far as you're aware, is
14  there any -- is the knock and announce rule just
15  something that normally happens or is it a
16  requirement?
17          MR. ZURBRIGGEN: Object as asked and
18      answered. But Detective, you can answer.
19          THE WITNESS: I believe the
20      Philadelphia Police Department requires
21      that.
22  BY MR. WEST:
23      Q. Okay. What -- why didn't you meet with
24  the SWAT Unit?

5 (Pages 14 to 17)

Page 18

1      A.   For any -- Detective Graf's
2  investigation.  I am his partner.  And he had the
3  package to delivered to the SWAT supervisor.  Like
4  copies -- if they wanted any copies of the search
5  warrant or arrest warrant or pictures of who we
6  are looking for.
7      Q.   You said -- I'm sorry.  I am little
8  tired.  Did you say package?
9      A.   We always bring an envelope with us, just
10  in case.  How it works is we will fax over all --
11  like our search warrants and/or our arrest
12  warrants with the affidavit and everything.  And
13  sometimes they bring it with them, sometimes they
14  don't.  So we like to have a copy if they want it.
15      Q.   Yeah.  I want to make sure I'm using the
16  right word.  You said package, right?
17      A.   Yes.
18      Q.   Okay.  So when you referred to the
19  package, what all did that contain?
20      A.   It's a brown envelope filled with copies
21  of the search warrant and the -- if there's an
22  arrest warrant as well.  And what I like to bring
23  with me is a photo of the individual I have the
24  arrest warrant for.

Page 19

1      Q.   Okay.  Would there have been any sort of
2  like maps in that package?
3      A.   No.
4      Q.   Any sort of instructions as far as how
5  specifically to enter the 4664 Torresdale Avenue
6  property?
7      A.   No.
8      Q.   Okay.  Anything else in the brown
9  envelope besides what we covered?
10      A.   That's it.
11      Q.   Did you -- did you do any sort of
12  investigation to figure out -- strike the
13  question.  Let me lay a foundation.
14           My understanding is that the suspect was
15  named ███████  Is that your understanding?
16      A.   Yes.
17      Q.   Did you personally do any sort of
18  investigation to learn where ███████ might be
19  residing at that time?
20      A.   We would have done any type of BMV
21  checks, which is Bureau of Motor Vehicles, for
22  driver's license.  See if that driver's license
23  came back if he has been arrested in the past.  We
24  do a prison release to see where he was released

Page 20

1  to.  Detective Graf has an opportunity, I believe
2  he has a program he has access to called Clear.
3  And you put the name in there and see if it comes
4  back with any type of addresses, prior arrests,
5  any address.
6      Q.   Did you personally do any such search?
7      A.   I believe I did the BMV check.  That is
8  probably in here.  The license check, gun permit
9  checks, probationary, real estate.  Like I said,
10  any type of computer check that would give us
11  information where he was living.
12      Q.   Okay.  So you personally did the
13  probation check?
14      A.   Yes.
15      Q.   Okay.  And you knew that Mr. ███ had been
16  a house arrest, correct?
17           MR. ZURBRIGGEN:  Object to form, but
18  Detective, if you know.
19           THE WITNESS:  I didn't -- I don't
20  recall if I knew he was on house arrest or
21  not.  But I believe that the address came
22  back to that, the address that we eventually
23  got the search warrant for.
24  BY MR. WEST:

Page 21

1      Q.   All right.  If a suspect had been at any
2  point in the past on house arrest, that is
3  something that you would have been able to find in
4  your records, right?
5           MR. ZURBRIGGEN:  Same objection.
6  But Detective, you can answer.
7           THE WITNESS:  Yes.  We would look to
8  see if they were on any type of probation.
9  BY MR. WEST:
10      Q.   And you're aware that in the City of
11  Philadelphia, if someone is on house arrest that
12  means that somebody from the Probation and Parole
13  Office would have had to have done a physical
14  inspection of the house, correct?
15           MR. ZURBRIGGEN:  Object to the form.
16  Detective, if you know.
17           THE WITNESS:  I am not -- I don't
18  understand the policies of the probation
19  officers.  But in the past I've known
20  that -- even during because of COVID as
21  well, that they were not going out to
22  people's houses.  Everything was done via
23  cell phone.  Or they would do Zoom is what I
24  believe.

Electronically signed by Denise Weller (401-411-238-5399)                          81fe29a0-2a3b-43e3-97e9-e32ccf7b98e9

Page 22

BY MR. WEST:

Q. Okay. But prior to COVID.

A. Yes. Prior to COVID, my belief -- my understanding is that they were supposed to have a land line that they would have to be able to be contacted with probation. Other than that, I don't believe since then they have been doing that.

Q. Right.

A. They could have gone back to it now. I don't know.

Q. But prior to COVID -- strike the question.

You were aware of the fact that prior to COVID if someone was placed on house arrest, that would mean that somebody from the Probation and Parole Department would have to -- would go out and physically inspect the house, correct, where the person was going to be living?

MR. ZURBRIGGEN: Object to the form.

THE WITNESS: The only thing I know about that is they had to have a land line that probation can contact. I don't know if they actually do a physical check. But I do

Page 23

know they had to produce a land line.

BY MR. WEST:

Q. If you were looking for a suspect who was on probation, wouldn't contacting the Probation and Parole Office be a good source of information about how to find that suspect?

MR. ZURBRIGGEN: Object to form. Detective, you can answer.

THE WITNESS: Unfortunately, I have done this personally with my investigations. And the Philadelphia Probation Department in the past -- like I said, I have been there 18 years. In the beginning they would work with us. In the past probably 10 years or seven years they have been restricted on how much they can help us.

They don't want us coming over to their offices to wait for people to bring them in to be interviewed or being arrested. They requested if we do anything like that we do it outside. Some will and some won't. They won't call them in for us. So it's kind of an interesting -- like I think they have their own policies with dealing with

Page 24

us.

But the -- I have gone through the state and they have helped us as well. But it all depends on what their policies are with us. If I am looking for somebody, I would -- if they are on probation, I would find out how long their probation is, if they have an anklet, that kind of stuff.

BY MR. WEST:

Q. Have you ever contacted a homicide suspect's probation officer and asked for information about the physical layout of the house where the suspect had been residing?

A. No.

Q. No?

A. No. I have asked where they live, what their address is.

Q. Okay. You have never asked how to physically enter the property?

A. No.

Q. When you obtain a search warrant for a property, you understand that that means that at some point some police officer or member of the SWAT Unit is going to have to enter that property,

Page 25

correct?

MR. ZURBRIGGEN: Object to the form. Detective, you can answer.

THE WITNESS: Including myself, yes.

BY MR. ZURBRIGGEN:

Q. Okay. So as part of obtaining a search warrant, wouldn't you want to get all of the information available to you as far as how to physically access the property?

MR. ZURBRIGGEN: Object to the form. But Detective, you can answer.

THE WITNESS: When we fill out the search warrant itself prior to that we do what -- what the outside of the house, I guess, would look like. We look -- we do computer checks on like Google Maps or do physical drive by, to that sense.

But we never really go in any like -- I never got any type of diagrams about inside or asked or tried to, you know, if there was something interesting or something that was stand out on the facade of the house or you know, we would then make note of that.

Page 26

1  BY MR. WEST:
2      Q.  Okay.  But if you had access to some
3  person who could tell you how to physically enter
4  the property, wouldn't you like to ask that
5  person?
6          MR. ZURBRIGGEN:  Object to the form.
7      But Detective, you can answer.
8          THE WITNESS:  We would -- I don't
9      know if -- I don't understand the -- I
10     wouldn't ask a person how to get into a
11     place, because we are going to get into the
12     place.  Like we are going to use SWAT and we
13     are going to knock on the door via the
14     search warrant.
15 BY MR. WEST:
16     Q.  Okay.  What about in buildings where
17 there are multiple residences in the same
18 building, don't you have to use any caution to
19 avoid entering the residence of a person who is
20 not subject to the warrant?
21         MR. ZURBRIGGEN:  Object to the form.
22     Detective, you can answer.
23         THE WITNESS:  You want to use as
24     much caution as you can to limit everyone

Page 27

1      else -- to protect everyone as well.  But we
2      have had -- we have done -- I have done
3      search warrants in, you know, high rise
4      apartment buildings.  And we would contact
5      the security or we would try to gain entry
6      through the lobby and go up the elevator or
7      stairs so we would know exactly what
8      apartment we are going to.
9  BY MR. WEST:
10     Q.  Okay.  So as you're trying to use caution
11 in this kind of situation, if the suspect is on
12 probation, isn't it just obvious that you should
13 ask the probation officer how to enter the
14 property?
15         MR. ZURBRIGGEN:  Object to the form.
16     But Detective, you can answer.
17         THE WITNESS:  Not that specific
18     question.
19 BY MR. WEST:
20     Q.  Okay.  Did you use Google Maps?
21     A.  I did.
22     Q.  Did you -- did you know whether or not
23 this property had a rear door prior to the breach?
24     A.  I did not.

Page 28

1      Q.  When you used Google Maps, what view did
2  you look at?
3      A.  The view from Torresdale Avenue.
4      Q.  The street view?
5      A.  Yes.
6      Q.  Did you look at an overview?
7      A.  No.
8      Q.  Okay.  This is a picture we previously
9  marked as Exhibit Graf-4.  Let the record reflect
10 you're looking at Graf-4.
11     A.  That's fine.
12     Q.  You have never seen this before, right?
13     A.  No.
14     Q.  Is there any reason why you didn't look
15 at an overview Google Map of the property?
16         MR. ZURBRIGGEN:  Object to the form.
17     Detective, you can answer.
18         THE WITNESS:  No.
19 BY MR. WEST:
20     Q.  It was available to you and you could
21 have got it, correct?
22     A.  Correct.
23         MR. ZURBRIGGEN:  Same objection.
24 BY MR. WEST:

Page 29

1      Q.  And if you had looked from this Google
2  Map view you would have seen that the 4664
3  Torresdale Avenue property had entrances both on
4  Torresdale Avenue itself and then in the alleyway
5  off Margaret Street, correct?
6          MR. ZURBRIGGEN:  Object to the form.
7      But Detective, to the extent you can tell.
8          THE WITNESS:  Yes.
9  BY MR. WEST:
10     Q.  Actually, I think I am going to ask you
11 to mark this because previous -- previously I
12 think you testified that you were standing a safe
13 distance at the time of the breach, right?
14     A.  Correct.  I can show you exactly where I
15 was.
16     Q.  Yeah.  Can you mark with this blue pen
17 where you were physically located at the time the
18 door was breached?
19     A.  I just put an x right there.
20     Q.  Yes.  Let me see.  Check to see if this
21 is going to be big enough.
22     A.  I can make it bigger.
23     Q.  Yeah.  It's a little hard to see.  If you
24 can make it bigger.

8 (Pages 26 to 29)

Page 30

1    A.  Okay.
2    Q.  And then in between you and the 4664
3 Torresdale property, there was located the deli,
4 right?
5    A.  I wouldn't -- the mini deli -- the mini
6 mart is on the corner here.
7    Q.  Right.  That's the corner in between you
8 and 4664 Torresdale Avenue, right?
9    A.  Yes.
10   Q.  Sir, I can represent to you that we have
11 deposed the probation officer Shannon -- Mrs.
12 Shannon.  Strike the question.  Strike that.  I
13 think -- I am not sure if she is married.
14      I can represent to you that we have
15 deposed the probation officer Ms. Shannon.  And
16 she provided us with records showing that the
17 probation officer was aware that the entrance to
18 Mr. ███ apartment was through the alleyway off
19 Margaret Street.  Did you know that?
20      MR. ZURBRIGGEN:  Object to the
21      characterization.  And object to the form.
22      Detective, you can answer.
23      THE WITNESS:  I did not know that.
24 BY MR. WEST:

Page 31

1    Q.  Okay.  If you had known that, would you
2 believe it would have been more proper to breach
3 the rear door or the Torresdale Avenue door of
4 4664 in carrying out the warrants at issue in this
5 case?
6      MR. ZURBRIGGEN:  Same set of
7      objections, but Detective, you can answer,
8      if you can.
9      THE WITNESS:  If I know -- if I knew
10     what I know now, that the only entrance to
11     the second floor apartment is through the
12     rear, then that is where we would have made
13     our entry.
14 BY MR. WEST:
15   Q.  All right.  Detective Scally, if you can
16 just answer the question I am asking you.
17   A.  Oh, I'm sorry.
18   Q.  If you had obtained from the probation
19 officer the information known to the Probation and
20 Parole Office that the entrance to Mr. ███
21 apartment was through the rear entrance off
22 Margaret Street, would that have informed you to
23 know that the warrants at issue should have been
24 enforced only by entering through the rear door of

Page 32

1 the 4664 Torresdale Avenue property off Margaret
2 Street?
3      MR. ZURBRIGGEN:  Same set of
4      objections.  And object as asked and
5      answered.  Detective you can answer again.
6      THE WITNESS:  Yes.
7 BY MR. WEST:
8    Q.  Okay.  And I will show you, this has been
9 marked as Graf-6.  It's been marked as Shannon-1.
10 There's other exhibits to be marked as well.
11      I am pointing you to page 21.  It's a
12 highlighted portion.  It's highlighted at previous
13 depositions.
14      Sir, doesn't this indicate that in April
15 2019 when the Probation and Parole Office went out
16 and inspected the property, they learned that the
17 second floor apartment was accessible only from
18 the rear entrance off Margaret Street?
19      MR. ZURBRIGGEN:  Objection to the
20      form.  Detective, if you know.
21 BY MR. WEST:
22   Q.  If you can look at that.
23      MR. ZURBRIGGEN:  And take all of the
24      time you need.

Page 33

1 BY MR. WEST:
2    Q.  So Detective Scally, if you had obtained
3 that information --
4    A.  I'm not ready yet.
5    Q.  Okay.
6    A.  I am not familiar with this form or this
7 piece of paper.  So I am reading the whole thing.
8    Q.  Okay.
9    A.  Okay.
10   Q.  Sir, I think you said you're not familiar
11 with that form.  Have you ever looked at probation
12 records before?
13   A.  I have not seen probation records.  I
14 have seen juvenile probation records where the
15 probation officer has his or her notes.  But I
16 don't believe I ever got an extensive background
17 from a probation officer.
18   Q.  Okay.  And ███ is not the only
19 suspect that you had obtained a warrant for where
20 you got the address from a probation officer,
21 right?
22   A.  We didn't get -- we didn't get the
23 specific address from -- I mean, from the
24 probation officer himself.  We got it from

Electronically signed by Denise Weller (401-411-238-5399)                                    81fe29a0-2a3b-43e3-97e9-e32ccf7b98e9

Page 34

1  probation when we looked up on the computer check.
2      Q.  Sure.  Let me rephrase the question.  The
3  case of ███████ is not the first time that you
4  have obtained an address for a suspect from the
5  Probation and Parole Office, correct?
6          MR. ZURBRIGGEN:  Object to the form
7      of the question.
8          THE WITNESS:  That is correct, no.
9  BY MR. WEST:
10     Q.  Okay.  So that is something that happens
11  fairly frequently, correct?
12         MR. ZURBRIGGEN:  Same objection.
13     Detective, you can answer.
14         THE WITNESS:  Yeah, if you're on
15     probation -- you would do a computer check
16     on every person that you're going to be
17     involved in.  So you want to do a background
18     check.  That is part of it.  You
19     literally -- you contact the probation
20     officer themselves.  Not necessarily, all
21     depending on what the investigation is
22     bringing how quick it's moving.
23         But if we are out there trying to
24     find somebody, even a witness or anybody

Page 35

1      like that, then yeah, we would call the
2      probation officer and say does this person
3      come in or is there any problems, is there a
4      warrant for them from you guys or some way
5      to try to get that person to come in and
6      turn themselves in.
7          Because yes, so that is -- I think
8      it's a case by case basis.  But it is part
9      of trying to locate somebody's information.
10  BY MR. WEST:
11     Q.  Now, when you're preparing a warrant, are
12  you supposed to obtain all information available
13  to you that would describe the physical location
14  of where the person subject to the warrant is
15  located and how to access that location?
16         MR. ZURBRIGGEN:  Object to the form
17     of the question.
18         THE WITNESS:  There's no specific
19     policy.  But you want to be as thorough as
20     you can.
21  BY MR. WEST:
22     Q.  As thorough as you can?
23     A.  Yes.
24     Q.  All right.  So wouldn't being as thorough

Page 36

1      as you can include trying to get all of the
2      information available to the Probation and Parole
3      Office?
4          MR. ZURBRIGGEN:  Same objection.
5      Detective, you can answer.
6          THE WITNESS:  What we needed from
7      the probation officer is the address of
8      the -- you want the address to match all of
9      the other addresses.
10  BY MR. WEST:
11     Q.  Right.  But the Probation and Parole
12  Office also knew how to get into the apartment,
13  correct?
14         MR. ZURBRIGGEN:  Object to the
15     characterization.  Detective, if you know.
16         THE WITNESS:  I wouldn't know what
17     they know.
18  BY MR. WEST:
19     Q.  Isn't that at least a question you should
20  ask them?
21         MR. ZURBRIGGEN:  Object to form.
22     Detective, you can answer.
23         THE WITNESS:  I think in this
24     specific instance, no.  I wouldn't have

Page 37

1      asked them because we had an address and
2      there was nothing that would suggest any
3      other way from looking at the Google Maps or
4      anything else that there would be -- the
5      only access would be from the rear.
6  BY MR. WEST:
7      Q.  Okay.  So you knew that it was the rear
8  apartment?  That is actually on the warrant,
9  correct?
10         MR. ZURBRIGGEN:  Object to the form.
11     Detective?
12         THE WITNESS:  Second floor.  Second
13     floor rear I believe that is what it said.
14  BY MR. WEST:
15     Q.  Now, I know you have testified earlier
16  today that you personally were unaware that there
17  even was a rear door.
18         But if you had known that there was a
19  rear door, would that have made you at least
20  consider the possibility that the proper entrance
21  to the second floor rear apartment was through the
22  rear door?
23         MR. ZURBRIGGEN:  Object to the form.
24     Detective, you can answer.

10  (Pages 34 to 37)

Page 38

1   THE WITNESS: No.
2   BY MR. WEST:
3   Q.   Okay.  Another document, this has been
4   marked as Graf-5.  This is additional records
5   provided to us by the Probation and Parole Office.
6   This also memorializes that the Probation and
7   Parole Office knew from experience that the
8   entrance to Mr. ███ apartment was through that
9   alleyway.  Do you see that there?
10   MR. ZURBRIGGEN: Objection to the
11   characterization of the record.  But
12   Detective, you can --
13   THE WITNESS: Yes.
14   BY MR. WEST:
15   Q.   So if you had obtained from the Probation
16   and Parole Office that the entrance to Mr. ███
17   apartment was through the alleyway, and if you had
18   looked at a Google Maps overview like in Graf-4,
19   would you have concluded that the proper way to
20   get into Mr. ███ apartment was through the
21   alleyway off Margaret Street?
22   MR. ZURBRIGGEN: Objection to the
23   form.  Detective, you can answer if you can.
24   THE WITNESS: I don't agree with the

Page 39

1   basis of the photo.  But with this
2   information, this would have been the proper
3   way to execute that warrant.
4   BY MR. WEST:
5   Q.   The proper way to execute the warrant
6   would have been through the rear door, correct?
7   A.   Correct.
8   MR. ZURBRIGGEN: Same objection.
9   THE WITNESS: Yes.
10   BY MR. WEST:
11   Q.   You knew that there were other apartments
12   in the 4664 Torresdale Avenue building, correct?
13   MR. ZURBRIGGEN: Object to the form.
14   Detective, if you know.
15   THE WITNESS: What I knew was from
16   the front of the building there was two
17   mailboxes.  So I assume there were at least
18   two apartments.
19   BY MR. WEST:
20   Q.   Okay.  So what, if anything, did you do
21   to minimize the possibility that the SWAT Unit
22   would go into the wrong apartment?
23   MR. ZURBRIGGEN: Object to the form
24   of the question.  But Detective, you can

Page 40

1   answer.
2   THE WITNESS: I believe -- well,
3   Detective Graf drove by that apartment
4   himself.  And the mailboxes were still
5   there.  It was two mailboxes, one and two.
6   And that is the information that we used.
7   BY MR. WEST:
8   Q.   So the only thing that you did to try to
9   determine where the other apartment was located is
10   drive by on Torresdale Avenue?
11   A.   Correct.
12   MR. ZURBRIGGEN: Object to the form.
13   THE WITNESS: Yes.
14   BY MR. WEST:
15   Q.   Why didn't you contact the property
16   manager?
17   MR. ZURBRIGGEN: Object to the form.
18   But Detective, you can answer.
19   THE WITNESS: I didn't know who the
20   property manager was.
21   BY MR. WEST:
22   Q.   Do you know -- does the City of
23   Philadelphia have property records available
24   online?

Page 41

1   A.   We -- not that we would have -- I think
2   we have access to real estate files.  And it would
3   have the owner of the property on the real estate
4   file.
5   Q.   Okay.  This is a document that has been
6   marked at a lot of depositions.  The sticker here
7   is Exhibit Graf 2, Exhibit Graf -- Scott-4.  If
8   you can look at that.  Let me know, do you
9   recognize -- strike the question.
10   If you could look at this document which
11   has been marked as Graf-2, Exhibit Scott-4, and
12   let me know if you know what this is.
13   A.   I don't know.  I mean, it's obvious it's
14   from the City of Philadelphia, but I don't know
15   what program this is.
16   Q.   If this is a website, it's a website you
17   have never seen before, correct?
18   A.   Correct.
19   Q.   All right.  And you're not aware of any
20   other information that would have been available
21   to you to let you know who the owner of this
22   property was?
23   MR. ZURBRIGGEN: Object to the form
24   of the question.  But Detective, again, if

11 (Pages 38 to 41)

Page 42

1  you know.
2      THE WITNESS:  Not what I just
3  previously said, no.
4  BY MR. WEST:
5      Q.  If you had known who the property manager
6  was, would you have contacted that person?
7      A.  I probably would have not.
8      Q.  Why not?
9      A.  Because I didn't want to, for safety
10  reasons, I wouldn't have called ahead to say we
11  are going to be coming and hit one of your
12  apartments.
13      Q.  So it doesn't matter if the property
14  manager's identity was available to you, you
15  weren't going to call the property manager anyway,
16  correct?
17      MR. ZURBRIGGEN:  Object to form.
18  Detective, you can answer.
19      THE WITNESS:  I would have not.
20  BY MR. WEST:
21      Q.  Was it -- strike the question.
22      When you saw the entrance located on the
23  Torresdale Avenue side of the building, could you
24  tell whether or not that door led to a portion of

Page 43

1  the building located on the first floor?
2      MR. ZURBRIGGEN:  Object to the form.
3  Detective, if you understand you can answer.
4      THE WITNESS:  I believe there's only
5  one door to that residence.  And that was
6  the front door that was on Torresdale
7  Avenue.
8  BY MR. WEST:
9      Q.  Okay.  You're now aware of the fact that
10  there's a door in the rear of the building as
11  well, correct?
12      A.  Yes.
13      Q.  Okay.  My question is, could you tell
14  just visually looking at it, whether the door on
15  the Torresdale Avenue side of the building led to
16  the first floor?
17      MR. ZURBRIGGEN:  Objection to the
18  form of the question.  Again, Detective, if
19  you understand.
20      THE WITNESS:  I don't -- it led to
21  the inside of the building.  So I don't know
22  exactly what would be the first floor.  It's
23  on street level.  So I would say it would
24  lead you to the first floor, first level.

Page 44

1  BY MR. WEST:
2      Q.  All right.  Sir, I will show you a
3  document.  It's been previously marked as Exhibit
4  Scott-1 and Exhibit Hamoy-2.
5      Do you recognize what this is a picture
6  of?
7      A.  That is Torresdale Avenue.  And this is
8  the address, 4664 Torresdale.
9      Q.  Okay.  And is the door in the yellow
10  circle the Torresdale Avenue entrance to the 4664
11  Torresdale property?
12      A.  Yes.
13      MR. ZURBRIGGEN:  Objection to the
14  form.  Just for the record.
15      MR. WEST:  Can I ask why you
16  objected to that?
17      MR. ZURBRIGGEN:  Yeah.  Just to the
18  extent that that is clear on the exhibit.
19      THE WITNESS:  I mean, I see the
20  mailboxes.  And I know to the right of the
21  mailbox, that is where the door is.
22  BY MR. WEST:
23      Q.  You recognize it, right?
24      A.  Yes.

Page 45

1      Q.  The area that has been marked green, is
2  that area one story tall or two stories tall?
3      MR. ZURBRIGGEN:  Same objection for
4  the record.
5      THE WITNESS:  I would say one story
6  tall.
7  BY MR. ZURBRIGGEN:
8      Q.  Okay.  Did it ever occur to you that the
9  area marked in green might have been the first
10  floor apartment to this building?
11      MR. ZURBRIGGEN:  Object to the form.
12  Detective, you can answer.
13      THE WITNESS:  No.
14  BY MR. WEST:
15      Q.  Have you ever received any training from
16  the Philadelphia Police Department with regards to
17  how to make preparations to execute warrants at
18  multi-residence properties?
19      MR. ZURBRIGGEN:  Objection to the
20  form.  Detective, you can answer.
21      THE WITNESS:  No.
22  BY MR. WEST:
23      Q.  Was any surveillance done of this
24  property to determine if the area behind the

12 (Pages 42 to 45)

Page 46

1  windows visible in the yellow circle were
2  occupied?
3          MR. ZURBRIGGEN:  Objection to the
4      form of the question.  Detective, if you
5      know.
6          THE WITNESS:  I don't know.
7  BY MR. WEST:
8      Q.  Not to your knowledge, correct?
9      A.  Not to my knowledge.
10         MR. ZURBRIGGEN:  Same objection.
11  BY MR. WEST:
12     Q.  Okay.  Looking at this picture marked
13  Hamoy-2 and Scott-1, do you think it's reasonable
14  to believe that that door led to the second floor
15  of this building?
16         MR. ZURBRIGGEN:  Objection to the
17     form of the question.  Detective, if you
18     understand you can answer.
19         THE WITNESS:  It's been my
20     experience that it would, yes.
21  BY MR. WEST:
22     Q.  You don't believe that it led to this
23  area marked as green, which is one floor tall?
24         MR. ZURBRIGGEN:  Same objection.

Page 47

1      Detective, you can answer.
2          THE WITNESS:  I believe that -- my
3      belief was that door led to the building
4      itself.  And most likely the first floor
5      apartment was to the left.  And there were
6      stairs going straight up and the second
7      floor apartment would be up the stairs.
8  BY MR. WEST:
9      Q.  But you considered at least the
10  possibility that the door would lead into the
11  first floor apartment, didn't you?
12         MR. ZURBRIGGEN:  Objection as to
13     form and asked and answered.  Detective, you
14     can answer again.
15         THE WITNESS:  No.
16  BY MR. WEST:
17     Q.  If you had heard a dog on the other side
18  of that door, would that have made you consider
19  the possibility that the door led into an occupied
20  area?
21         MR. ZURBRIGGEN:  Objection to the
22     form.  Detective, you can answer.
23         THE WITNESS:  No.
24  BY MR. WEST:

Page 48

1      Q.  Is there anything in this world that
2  would have made you consider the possibility that
3  this door led into an occupied area?
4          MR. ZURBRIGGEN:  Same objection.
5      Detective, you can answer.
6          THE WITNESS:  During this
7      investigation I was surprised that the only
8      way to enter that second floor was through
9      the rear -- through the rear.
10         Through my experience, I truly
11     believed that that door would have led into
12     a vestibule area that led into the other
13     apartments.
14  BY MR. WEST:
15     Q.  Based on your understanding of the
16  policies and procedures of the Philadelphia Police
17  Department if the officers at any point had
18  learned that the area behind the door on the
19  Torresdale Avenue entrance was occupied pursuant
20  to the warrants that were obtained for the second
21  floor rear apartment, could they legally proceed
22  and enter the apartment?
23         MR. ZURBRIGGEN:  Objection to the
24     form.

Page 49

1          THE WITNESS:  I don't understand
2      what -- I don't understand the question.
3          MR. WEST:  That's fine.
4  BY MR. WEST:
5      Q.  Based on your understanding of the
6  policies and procedures of the Philadelphia Police
7  Department, if you or any other member of the
8  Philadelphia Police Department in any way gained
9  knowledge that the door on the Torresdale Avenue
10  entrance did lead directly into an occupied area,
11  pursuit to the warrants that had been obtained for
12  ███████, could you legally enter that occupied
13  first floor area?
14         MR. ZURBRIGGEN:  Same set of
15     objections.  Detective, to the extent that
16     you know, you can answer.
17         THE WITNESS:  If we had information
18     that there was access to the second floor
19     apartment, we would have to specifically say
20     that in our search warrant.  But if that is
21     an occupied -- if that is a different
22     dwelling, we would have to have a specific
23     search warrant for that dwelling.
24  BY MR. WEST:

13 (Pages 46 to 49)

Page 50

1    Q.  Right.  If you knew that the Torresdale
2  Avenue door led directly into an apartment on the
3  first floor, you would know that you cannot walk
4  through that door, correct?
5            MR. ZURBRIGGEN:  Same set of
6      objections.  Detective, you can answer.
7            THE WITNESS:  That's correct.
8  BY MR. WEST:
9    Q.  All right.  Do you have any idea why the
10  officers proceeded to enter this apartment even
11  after they had rammed the door open and could see
12  that there was a naked woman inside?
13            MR. ZURBRIGGEN:  Objection to the
14      form and the characterization.  Detective,
15      you can answer if you know.
16            THE WITNESS:  I don't know anything
17      about all of that.  But when they enter,
18      they have their own policies and they have
19      their own objectives.  So if they are going
20      into that, they are going to clear it.  I
21      can only assume that they were looking for
22      the second floor to go upstairs.
23  BY MR. WEST:
24    Q.  Okay.  But under the policies and

Page 51

1  procedures of the Philadelphia Police Department,
2  could they continue to enter the property if they
3  knew that the first floor was occupied?
4            MR. ZURBRIGGEN:  Same set of --
5  BY MR. WEST:
6    Q.  -- under the warrants that you obtained?
7            MR. ZURBRIGGEN:  Same set of
8      objections.  Detective, you can answer if
9      you can.
10            THE WITNESS:  Yes.
11  BY MR. WEST:
12    Q.  Okay.  And what is your basis of that
13  opinion?  Where did you learn that or where did
14  you gain that understanding?
15    A.  I'm gaining on officers safety -- not
16  just officer safety.  I can't put myself in the
17  mind of those SWAT officers.  But they are
18  following the first person who is in there.  And
19  as they are entering the property, it's their duty
20  to clear that property even before they leave it.
21  Just for the safety of others.
22            And I do believe that once they realized
23  that there was no second floor access -- and I can
24  only base this on what I saw.  I saw after they

Page 52

1  went into the building, at my vantage point they
2  did come around the corner and then go up through
3  the alley or the breezeway and entered the
4  apartment on the second floor.
5            MR. ZURBRIGGEN:  Same objection to
6      the last question.
7  BY MR. WEST:
8    Q.  Now, Officer Scally, when you saw with
9  your own eyes the SWAT Unit members enter Ms.
10  Alvarado's apartment and you saw the knock and
11  announce that they did, was that consistent in
12  your experience with what normally would be done
13  by the SWAT Unit?
14            MR. ZURBRIGGEN:  Objection to the
15      form of the question.  Detective, if you
16      understand, you can answer.
17            THE WITNESS:  Yes, it was
18      consistent.
19  BY MR. WEST:
20    Q.  What you saw with regard to knock and
21  announce was consistent with your understanding of
22  the policies and procedures of the Philadelphia
23  Police Department, correct?
24            MR. ZURBRIGGEN:  Same objection.

Page 53

1      Detective, you can answer.
2            THE WITNESS:  Yes.
3  BY MR. WEST:
4    Q.  Has ▮▮▮▮▮▮ been captured yet?
5    A.  I believe he has.
6    Q.  When was he captured?
7    A.  I don't recall.
8    Q.  Can you give an estimate or
9  approximation?
10    A.  I cannot.
11    Q.  Was it within the last two months?
12    A.  I don't recall.
13    Q.  Where is he currently?
14    A.  I don't know.
15    Q.  What is your basis for stating that you
16  believe he has been captured?
17    A.  I believe that -- I believe Detective
18  Graf was notified that he was arrested.  I wasn't
19  there for that.  But I believe I thought that
20  ▮▮▮▮▮▮ has been arrested.
21    Q.  Do you have any other basis for that --
22    A.  No.
23    Q.  -- understanding?
24    A.  No.

Electronically signed by Denise Weller (401-411-238-5399)                    81fe29a0-2a3b-43e3-97e9-e32ccf7b98e9

Page 54

1    Q.  Besides looking at a Google Maps street
2  view of the property from the Torresdale Avenue
3  entrance and driving by the property from
4  Torresdale Avenue, did you personally do any sort
5  of investigation to ascertain how the building
6  should be entered in order to gain access to the
7  second floor rear apartment?
8         MR. ZURBRIGGEN:  Objection to the
9     form of the question.  Detective, if you
10    understand, you can answer.
11        THE WITNESS:  I do understand.  Yes.
12  BY MR. WEST:
13    Q.  You did do anything additional --
14    A.  No.  No.  No.  Nothing additional from
15  what you stated.
16    Q.  Those two things are the only things you
17  did?  You looked at the street view Google Map
18  from Torresdale Avenue and you drove by on
19  Torresdale Avenue, correct?
20        MR. ZURBRIGGEN:  Same objection.
21    But Detective, you can answer.
22        THE WITNESS:  Yes.  Physically, yes.
23  BY MR. WEST:
24    Q.  Is there anything non-physically you did?

Page 55

1    A.  The computer checks.
2    Q.  Okay.  Can you tell me everything you did
3  with regards to computer checks?
4    A.  We did, like I said earlier, BMV check
5  and we would do -- the BMV check, gun permit
6  checks, probationary checks and our real estate
7  check.  Other computer searches would be through
8  Clear and any type of prison release.
9    Q.  Okay.
10    A.  And any other type of arrest for the
11  address he gave.
12    Q.  In any of these investigations that you
13  made, did any of this -- any source of information
14  looked at, did any of them involve anybody who had
15  actually entered the building?
16        MR. ZURBRIGGEN:  Object to the form.
17    Detective, if you understand, you can
18    answer.
19        THE WITNESS:  I did not enter the
20    first floor.
21  BY MR. WEST:
22    Q.  Okay.  Let me rephrase the question.  I
23  think you're misunderstanding what I mean.
24        So you have identified various sources of

Page 56

1  information that you looked into with regards to
2  this investigation.
3         Did any of the investigations, any of the
4  sources of information that you looked into,
5  include any person who had ever actually been
6  inside of the 4664 Torresdale Avenue property?
7         MR. ZURBRIGGEN:  Same objection.
8         THE WITNESS:  No.
9  BY MR. WEST:
10    Q.  Did you make any effort to obtain any
11  information from anyone who had ever actually been
12  inside of the building?
13    A.  No.
14        MR. ZURBRIGGEN:  Same objection.
15  BY MR. WEST:
16    Q.  Did you ever obtain a warrant for ███████
17  ███ cell phone?
18    A.  Me personally, no.
19    Q.  Do you believe anyone from the
20  Philadelphia Police Department did that?
21    A.  I don't know.
22    Q.  Is that something that normally should be
23  done?
24        MR. ZURBRIGGEN:  Object to the form.

Page 57

1  Detective, you can answer.
2        THE WITNESS:  If we had the
3    individual's cell phone number.  And we
4    would have it -- either we gained that
5    information, we would do a search warrant on
6    the cell phone or we would make sure that if
7    he wasn't arrested with the search warrant
8    or arrest warrant, excuse me, we would pass
9    that information on to the fugitive squad
10    unit and then they would most likely do a
11    search warrant on the cell phone.
12  BY MR. WEST:
13    Q.  Did you ever do any sort of search in
14  order to ascertain what IP addresses were used?
15        MR. ZURBRIGGEN:  Objection to the
16    form.  Detective, if you know you can
17    answer.
18        THE WITNESS:  I did not.
19  BY MR. WEST:
20    Q.  Is that something that normally would be
21  done looking for a homicide suspect?
22    A.  If we had his computer, I guess we would
23  do IP address checks.  But not familiar with his
24  computer.

15  (Pages 54 to 57)

Page 58

1    Q.   So, when you're working with the SWAT
2  Unit, what is the relationship between the
3  homicide detectives and the SWAT unit with regards
4  to who is supposed to come up reconnaissance to
5  figure out how to carry out a warrant?
6         MR. ZURBRIGGEN:  Objection to the
7    form.  Detective, if you know you can
8    explain.
9         THE WITNESS:  Well, I think the
10   homicide unit detectives we have our own,
11   you know, processes of identifying the
12   address to hit with SWAT.  And then we give
13   that information to SWAT.  Like I said
14   earlier, we give copies of everything.  And
15   then they do their own reconnaissance on how
16   they are going to operate and serve that
17   search warrant and arrest warrant.
18  BY MR. WEST:
19   Q.   Would you expect anyone from the SWAT
20  reconnaissance unit to contact the probation
21  officer if a suspect was on probation?
22        MR. ZURBRIGGEN:  Objection to the
23   form.  Detective, if you know.
24        THE WITNESS:  No.

Page 59

1  BY MR. WEST:
2    Q.   Why not?
3    A.   It was not part of their investigation.
4    Q.   All right.  So the only people who would
5  do that would be the detectives, correct?
6    A.   Correct.
7    Q.   All right.  So under the policies and
8  procedures of the Philadelphia Police Department,
9  to your understanding, please tell me everything
10  that you were supposed to do before Ms. Alvarado's
11  door was breached in order to determine if you
12  were at the right place.
13        MR. ZURBRIGGEN:  Objection to the
14   form of the question.  Detective, if you
15   understand you can answer.
16        THE WITNESS:  Well, it goes to -- we
17   go into the affidavit of probable cause for
18   the search warrant for that property.  So
19   all of the particulars that go into that
20   would be part of the process.  Then we go
21   through the District Attorney's Office, then
22   go through -- the magistrate would sign and
23   approve.  The process -- I'm sorry.  What
24   was the beginning of that question, again?

Page 60

1  BY MR. WEST:
2    Q.   Right.  So my question actually might be
3  a little different than you heard.  I want to know
4  under the policies and procedures of the
5  Philadelphia Police Department, tell me everything
6  that you are supposed to do as the assigned
7  detective to determine the physical location of
8  ████████      apartment.
9         MR. ZURBRIGGEN:  Same objection.  Go
10   ahead.
11        THE WITNESS:  So as before like I
12   said earlier, we go through very -- we go
13   through BMV checks, any type of license they
14   had, any of their arrest records with any
15   address that they have given.  We would --
16   like I said earlier, contact -- come up on
17   any type of probation, contact -- look on
18   their computer checks about what location
19   that they gave to the probation officer.
20        If you have opportunity to have that
21   other -- Clear computer check, you do that.
22   So it would be associated computer checks
23   with that.  Like prison release as well to
24   establish where the residency is.

Page 61

1  BY MR. WEST:
2    Q.   Right.  Now, what if you're contemplating
3  a SWAT Unit enforcement action at a
4  multi-residence property, what, if any, policies
5  and procedures exist in the Philadelphia Police
6  Department to try to make sure that you only go
7  into the right apartment?
8         MR. ZURBRIGGEN:  Objection to the
9    form of the question.  Detective, to the
10   extent you can answer and know.
11        THE WITNESS:  Of course.  So multi
12   dwellings, we would -- that would be on the
13   search warrant, the exact apartment that
14   would get us into that multi dwelling
15   residence.  So the same thing, same computer
16   checks and everything else would lead us to
17   that.
18  BY MR. WEST:
19   Q.   Right.
20   A.   That address.
21   Q.   More specifically, once you have the
22  apartment number and you have the address of the
23  building, what, if any, sort of investigation are
24  you supposed to do under the policies and

Page 62

1    procedures of the Philadelphia Police Department
2    to make sure that you only enter the right
3    apartment?
4          MR. ZURBRIGGEN:  Object to form.
5    Detective, you can answer, if you know.
6          THE WITNESS:  Well, that's your
7    goal, is to make sure you get into the right
8    apartment.  And you do those checks to make
9    sure you have the right apartment or the
10   right dwelling, right residence, to your
11   best ability.
12   BY MR. WEST:
13   Q.  Okay.  And what specific steps are you
14   supposed to follow under the Philadelphia Police
15   Department policies and procedures to achieve that
16   goal?
17         MR. ZURBRIGGEN:  Same objection.
18   Detective, again, if you know.
19         THE WITNESS:  You do any type of
20   background checks that individual's prior
21   and any time that he has given an address,
22   what address he has used in the past and
23   what address you have currently for that
24   person.

Page 63

1    BY MR. WEST:
2    Q.  Would you do any sort of investigation of
3    the physical layout of the building itself?
4          MR. ZURBRIGGEN:  Object to form.
5    Detective, to the extent you understand.
6          THE WITNESS:  It depends on the
7    investigation.
8    BY MR. WEST:
9    Q.  Why?
10         MR. ZURBRIGGEN:  Same objection.
11         THE WITNESS:  If you have an
12   apartment building that has a hundred
13   apartments, then you would have to -- I
14   don't particularly think I would go into
15   there.  But you would try to ascertain what
16   floor you're going to and then if there is a
17   lock on the lobby door, then you would
18   attempt to gain access via that way.
19   BY MR. WEST:
20   Q.  Okay.  How would you gain that kind of
21   information?
22   A.  You would contact -- in that reference
23   you would contact the building management.  And
24   you would request access.

Page 64

1    Q.  Okay.  So if you look at the search
2    warrant -- we will mark this as --
3          MR. WEST:  We have a document which
4    is previously marked as Graf-4, but you drew
5    on it.  So we will mark that as an exhibit.
6    That will be Scally-2.
7                - - -
8          (Whereupon, Exhibit Scally-2 was
9    marked for identification.)
10               - - -
11         MR. WEST:  And now I am going to
12   mark Scally-3, the search warrant.
13               - - -
14         (Whereupon, Exhibit Scally-3 was
15   marked for identification.)
16               - - -
17   BY MR. WEST:
18   Q.  Sir, you can take a moment to review
19   that, if you would like.  And let me know if you
20   are able to tell us what that is.
21   A.  First sheet is the copy of the search
22   warrant, number 242513.
23   Q.  And you were the affiant for this,
24   correct?

Page 65

1    A.  Correct.
2    Q.  What does it mean to be the affiant for a
3    search warrant?
4    A.  I am requesting either an affidavit to
5    become a search warrant, to be able to serve a
6    search warrant on a residence.
7    Q.  Okay.  And what kind of investigation, if
8    any, are you supposed to do pursuant to the
9    policies of the Philadelphia Police Department in
10   order to submit that sort of affidavit for a
11   search warrant?
12         MR. ZURBRIGGEN:  Objection to the
13   form.  Detective, if you understand, you can
14   answer.
15         THE WITNESS:  We would, through the
16   course of investigation, collect evidence
17   and interviews to make probable cause for
18   the affidavit and then submit it for
19   approval.
20   BY MR. WEST:
21   Q.  All right.  As I am reading this, it has
22   a specific description of the premises to be
23   searched.  That is a section in here, right?  It's
24   like -- I am looking at the search warrant --

17 (Pages 62 to 65)

Page 66

1    A.   Yeah, the front page.
2    Q.   Front page.  It's like the third box
3    down, right?
4    A.   Correct.
5    Q.   And you put on here second floor rear,
6    right?
7    A.   Correct.
8    Q.   Prior to putting that on the search
9    warrant, did you make any effort to figure out
10   what that meant?
11          MR. ZURBRIGGEN:  Objection to the
12       form.  Detective, if you understand, you can
13       answer.
14          THE WITNESS:  I put rear on there, I
15       recall, because the other address it just
16       said second floor.  And from -- I believe
17       the probation computer check said second
18       floor rear.  And so I wanted to be as
19       specific as possible, if there was any other
20       apartments on that second floor.  So second
21       floor rear we wanted to go that way
22       specifically.
23   BY MR. WEST:
24   Q.   Right.  Again, you got the address from

Page 67

1    the Probation and Parole Office, right, you just
2    said?
3    A.   Yeah, from the computer check.
4    Q.   Okay.  So why didn't you try to get all
5    of the information available to the Probation and
6    Parole Office as far as to what that meant, what
7    they meant by rear?
8           MR. ZURBRIGGEN:  Objection to the
9        form.  Detective, you can answer.
10          THE WITNESS:  I felt like I had the
11       information that I needed.
12   BY MR. WEST:
13   Q.   I mean, in retrospect, they obviously
14   were referring to the fact that the entrance was
15   through the rear door, right?
16          MR. ZURBRIGGEN:  Well, objection to
17       the characterization.  Detective, if you
18       know.
19          THE WITNESS:  I was surprised, but
20       yes.
21   BY MR. WEST:
22   Q.   Okay.  And had you gotten the information
23   available to you through the Probation and Parole
24   Office, you would not have been surprised, right?

Page 68

1           MR. ZURBRIGGEN:  Same objection.
2        Detective?
3           THE WITNESS:  I was -- if we
4        received that information originally, then
5        we would have put that -- that would have
6        been -- the search warrant would have read
7        that second -- you know, second floor
8        apartment in the rear.
9    BY MR. WEST:
10   Q.   But is there any other way that you could
11   have received the information other than just
12   asking for it?
13          MR. ZURBRIGGEN:  Objection to the
14       form.  Detective, if you understand it you
15       can answer.
16          THE WITNESS:  No.
17   BY MR. WEST:
18   Q.   I mean, there's no way that the probation
19   and parole officer could have given you that
20   information unless you asked for it, correct?
21          MR. ZURBRIGGEN:  Objection to the
22       form.  Detective, again, if you know.
23          THE WITNESS:  That's correct.
24   BY MR. WEST:

Page 69

1    Q.   And you knew the name of the owner of the
2    property, Pajo Mirela, because that's on the
3    document, right?
4    A.   Correct.
5    Q.   And you didn't make any effort to learn
6    from Pajo Mirela what rear meant, did you?
7           MR. ZURBRIGGEN:  Same objection.
8           THE WITNESS:  Correct.
9    BY MR. WEST:
10   Q.   Did you make any effort to learn what
11   rear meant in relation to this address?
12          MR. ZURBRIGGEN:  Objection; asked
13       and answered.  Detective, you can answer
14       again.
15          THE WITNESS:  I did not ask anybody
16       what rear meant.
17   BY MR. WEST:
18   Q.   And you didn't do a surveillance of the
19   property to figure out if it even had a rear door,
20   correct?
21   A.   I did not, no.
22   Q.   And did you rely on anyone else or ask
23   anyone else to do that kind of investigation?
24          MR. ZURBRIGGEN:  Objection to the

18  (Pages 66 to 69)

Page 70

1    form.  Detective, you can answer.
2         THE WITNESS:  No.
3    BY MR. WEST:
4         Q.   When the SWAT Unit enters someone's
5    apartment at six in the morning, is that
6    dangerous?
7         MR. ZURBRIGGEN:  Objection to the
8    form.  Detective, if you know and
9    understand, you can answer.
10        THE WITNESS:  Yes.
11   BY MR. WEST:
12        Q.   Why is that dangerous?
13        A.   Because you're going -- the officers are
14   going into the unknown.
15        Q.   And from the perspective of the resident
16   inside of the apartment, they also are dealing
17   with an unknown situation, aren't they?
18        MR. ZURBRIGGEN:  Same objection for
19   the record.  Detective, if you know.
20        THE WITNESS:  I don't think so as
21   much.  Because the way that our SWAT
22   officers do their knock and announce, it's
23   pretty aggressive.
24   BY MR. WEST:

Page 71

1         Q.   Okay.  Tell me all about that.
2         A.   They are very loud and they do a lot of
3    banging.
4         Q.   How much?
5         A.   They do at least three times.  I know
6    they bang -- it's been my experience on the same
7    street they bang at least three times.  Then they
8    scream what they are there for, search warrant or
9    arrest warrant.  They bang again and scream it
10   again.  And they bang it again and they scream it
11   again and then they hit.
12        Q.   All right.  And these bangs, these are
13   separated by time?  Like bang, bang, bang, wait;
14   bang, bang, bang, wait?
15        A.   Yes.  The knocking and they wait.  They
16   knock again, they are yelling search warrant or
17   arrest warrant and then they hit.
18        Q.   And that is the training that the
19   Philadelphia Police Department provides, so you
20   have to do that, right?
21        MR. ZURBRIGGEN:  Objection to the
22   form.  Detective, if you know.
23        THE WITNESS:  Yes.
24   BY MR. WEST:

Page 72

1         Q.   All right.  Could you -- based on your
2    training, could you simulate for me the whole
3    process?  Like bang, bang, bang, how long you're
4    supposed to wait, would you do that now?
5         MR. ZURBRIGGEN:  Objection to the
6    form.  Detective, again, if you know.
7         THE WITNESS:  Do you want me to bang
8    on the --
9    BY MR. WEST:
10        Q.   Yes.  Yes.  Pretend you're doing a --
11        A.   So -- --
12        Q.   You can just bang on the door.  However
13   you feel it would be best.  Pretend -- here is how
14   I will ask you to do it.  Pretend you're teaching,
15   based on your training, other members of the
16   Philadelphia Police Department how to do a knock
17   and announce.  Could you please demonstrate for
18   us?
19        MR. ZURBRIGGEN:  Objection.  But --
20        THE WITNESS:  That wouldn't be in my
21   purview.
22        MR. ZURBRIGGEN:  If you will indulge
23   us, Detective.
24        THE WITNESS:  That would never be in

Page 73

1    my purview.  I don't feel comfortable doing
2    that.  That is their safety as well.
3    BY MR. WEST:
4         Q.   Okay.  Yes.  Could you demonstrate for us
5    how you do a knock and announce?
6         MR. ZURBRIGGEN:  Objection for the
7    record.  Go ahead, Detective.
8         THE WITNESS:  Do you want me to
9    demonstrate on the wall or the door over
10   here or?
11   BY MR. WEST:
12        Q.   Anywhere you like.
13        A.   Okay.
14        Q.   Just give the camera a moment.  Okay.
15        A.   To my knowledge, it's you go up to the
16   door, they bang.  Search warrant, search warrant.
17   Bang, bang again, search warrant.  And bang, bang
18   again, search warrant.  And then they hit it.
19        Q.   Okay.  How much time do you think just
20   passed?
21        MR. ZURBRIGGEN:  Objection to the
22   form.  But go ahead.  If you can estimate,
23   Detective, how much time just passed?
24        THE WITNESS:  Five to seven seconds.

19 (Pages 70 to 73)

Page 74

BY MR. WEST:
1  Q.  Okay.  If it was six in the morning and
2  you were in bed, do you think five to six seconds
3  would be enough time for you to answer your door?
4     MR. ZURBRIGGEN:  Objection for the
5  record.  Detective, if you know, you can
6  answer.
7     THE WITNESS:  It would have woken me
8  up.  I have seen people answer the door in
9  the past prior to them going in.  But I
10 think it's all about where you're sleeping
11 in the house.  But the knock and announce is
12 really for that homeowner's safety as well.
13 But I think it does put our guys in
14 jeopardy.
15    But that being said, if you're on
16 the third floor in the bedroom, back rear
17 bedroom, you're not going to get down to the
18 front to be able to open the door.
19 BY MR. WEST:
20 Q.  Okay.  However, do you believe that five
21 to six seconds would give someone inside of the
22 house a reasonable opportunity to voluntarily open
23 the door and surrender the premises?

Page 75

1     MR. ZURBRIGGEN:  Objection to the
2  form of the question.  Detective, you can
3  answer.
4     THE WITNESS:  Yes, because I have
5  seen it in the past.
6  BY MR. WEST:
7  Q.  Okay.  Could you get out of your bed and
8  open the door within five to six seconds?
9     MR. ZURBRIGGEN:  Objection to the
10 form.  Detective, you can answer.
11    THE WITNESS:  Yes.
12 BY MR. WEST:
13 Q.  Okay.  You said it puts your guys in
14 danger, what do you mean by that?
15 A.  Well, when you're knocking on the door
16 and you're waking people up and you're telling
17 them that you're coming in with a search warrant.
18 And if you -- if you have a gun, you will be
19 able to have your gun ready.  If you have any
20 type of evidence, you will have an opportunity to
21 get rid of that evidence.  Especially for the
22 safety of the officers, because you're literally
23 telling them we have a search warrant and you
24 know, we are coming into that house.

Page 76

1     And that puts these guys in grave danger
2  where we have had in the past couple years -- in
3  fact, just a couple of months ago we had three
4  officers shot, SWAT officers were shot.  Luckily
5  none of them were killed.  But at least three of
6  the officers were shot.
7     A couple of years ago we had another
8  officer shot in the head and he was killed, SWAT
9  officer.  A year prior to that, six months prior
10 to that, my -- good friend of mine's brother was
11 shot in the head in his kevlar helmet.  He was
12 part of the SWAT Unit.  So every time you knock on
13 that door, you're telling somebody in there we are
14 coming.
15 Q.  Okay.  And in your experience, is that a
16 generally held view in the Philadelphia Police
17 Department that the knock and announce places
18 officers in danger?
19    MR. ZURBRIGGEN:  Objection to the
20 form of the question.  Detective, to the
21 extent that you know.
22    THE WITNESS:  No.
23    MR. WEST:  Okay.  It's about 2:20.
24 I'm not sure if I have more questions.  I

Page 77

1  would like a chance to review my notes.  Why
2  don't we take like a 10 minute break?
3     THE WITNESS:  That's fine.
4     THE VIDEO OPERATOR:  Going off the
5  record at 2:16 p.m.
6           - - -
7     (Whereupon, a brief recess was
8  taken.)
9           - - -
10    THE VIDEO OPERATOR:  Going back on
11 the record at 2:21 p.m.
12 BY MR. WEST:
13 Q.  Yeah, I just -- I don't have a lot more
14 questions for you, Detective.  But in the search
15 warrant that you obtained, it was specifically for
16 the second floor apartment, right?
17    MR. ZURBRIGGEN:  Objection to the
18 form.  Detective?
19    THE WITNESS:  Yes.
20 BY MR. WEST:
21 Q.  As you were doing your investigation in
22 anticipation of the SWAT Unit enforcing this
23 warrant, did you make any effort whatsoever to
24 learn who was living on the first floor?

20  (Pages 74 to 77)

Page 78

1    A.  I personally did not.
2    Q.  Did -- is there anyone else who would
3  have done that besides you?
4        MR. ZURBRIGGEN:  Objection to the
5  form.  Detective, if you know.
6        THE WITNESS:  Maybe Detective Graf.
7  He would have told me or we would have --
8  let me see how I would have found that out.
9  If they are registered -- we used to be able
10  to look at voter registration.  We are not
11  allowed to look at that, we don't have that
12  access anymore.  That is how we used to find
13  out.  That is another way we would have
14  found out who is living there.  But other
15  than that, no.
16  BY MR. WEST:
17    Q.  But so far as you're aware, prior to Ms.
18  Alvarado's front door being breached on June 4th,
19  2021, related to this warrant enforcement action,
20  no effort was made by the Philadelphia Police
21  Department to figure out who was living on the
22  first floor, correct?
23        MR. ZURBRIGGEN:  Objection to the
24  form.  Again, Detective, if you know.

Page 79

1        THE WITNESS:  That is -- from my
2  knowledge, that's correct.
3  BY MR. WEST:
4    Q.  Okay.  What, if any, effort did you make
5  to learn where the first floor apartment was
6  physically located?
7        MR. ZURBRIGGEN:  Objection to the
8  form.  Detective, if you know, understand,
9  answer.
10        THE WITNESS:  Just through my
11  experience that would have been on the first
12  floor.
13  BY MR. WEST:
14    Q.  Okay.  So because it's the first floor
15  apartment, you knew it was on the first floor,
16  right?
17    A.  Correct.
18    Q.  Besides that, did you make any effort to
19  try to learn where that apartment was physically
20  located?
21        MR. ZURBRIGGEN:  Same objection.
22  Detective, you can answer again.
23        THE WITNESS:  No.
24        MR. WEST:  Okay.  I don't believe

Page 80

1  that I have any further questions for you.
2        MR. ZURBRIGGEN:  Just one question
3  just for -- I think to make the record
4  absolutely clear.
5        - - -
6        EXAMINATION
7        - - -
8  BY MR. ZURBRIGGEN:
9    Q.  Detective, you were asked a question
10  about -- I think this was marked.  It's Graf-6,
11  these notes.  Had you seen these before the
12  warrant was executed on June 4th, 2021?
13    A.  No.
14        MR. ZURBRIGGEN:  Okay.  That's all I
15  have, Keith, unless you have any follow-up
16  on that.
17        - - -
18        EXAMINATION
19        - - -
20  BY MR. WEST:
21    Q.  Yeah.  I guess my follow-up would be, do
22  you think it would be a good idea if you guys
23  started coordinating with the Probation and Parole
24  Office to try to share information?

Page 81

1        MR. ZURBRIGGEN:  Objection to form.
2        THE WITNESS:  I would love to share
3  information with the probation department.
4  But they seem not to be very shareable with
5  us, in my opinion.
6  BY MR. WEST:
7    Q.  Okay.  Do you believe that if you had
8  asked information about ███████ at the time
9  that he was a homicide suspect from the Probation
10  and Parole Office, they would have refused to
11  provide you that information?
12        MR. ZURBRIGGEN:  Objection to the
13  form of the record -- question.  Detective,
14  if you know, you can answer.
15        THE WITNESS:  I believe if it came
16  to having them come into the office for us
17  to make an arrest there, for one of his
18  appointments, then yes, I think they would
19  deny us that ability.  Because that's been
20  done in the past.  But I also -- their
21  reasoning I understand.  But we are also --
22  we have a job to do as well.
23        But in my opinion, for us to gain
24  the information that is on this sheet, they

Page 82

1   would have to give us this.  And they -- I
2   don't believe they would give us this.  You
3   know, we would love to have all of the
4   information we possibly could from
5   everybody.  But there might be some type of
6   confidentiality issue with getting this type
7   of report given to us.  So that is something
8   that would have to be done with probation
9   and parole.
10  BY MR. WEST:
11      Q.   What --
12      A.   But I've never seen this.  I've only seen
13  this at the juvenile level.  But I've never seen
14  at the adult level.
15      Q.   What confidentiality would apply to the
16  probation records of a homicide suspect?
17          MR. ZURBRIGGEN:  Objection to the
18      form.  Detective, if you know the ins and
19      outs of confidentiality, go for it.
20  BY MR. WEST:
21      Q.   Are you aware -- let me rephrase the
22  question.
23          Are you aware of any confidentiality rule
24  that would prevent a homicide detective from

Page 83

1   gaining access to the probation records of a
2   homicide suspect?
3          MR. ZURBRIGGEN:  Same objection.
4      Detective, go for it.
5          THE WITNESS:  I have never been --
6      confidentiality, I believe that they
7      would -- I don't know what their policies
8      are.  So I can't comment on what their
9      policy is.  But if the information that we
10     requested in the past or I have never --
11     they never said here, I have this whole --
12     every contact with this person.  They never
13     offered this report or anything like this.
14          Normally our conversation is, you
15     know, does come to see you; is there any
16     warrants for him.  And what would -- you
17     know, I already know -- at that point I
18     already know what address they use, because
19     it's on their -- on the computer checks
20     through the probation department.  But these
21     are notes -- these are specific notes that
22     probably goes to the next probation officer
23     so they knew when to go -- how to go to the
24     house.

Page 84

1          But in all my time, many years, I've
2   never been offered something like this.  But
3   as a confidentiality, I just assume that is
4   why they don't want us to come to their
5   place and -- to make an arrest in their
6   building.
7   BY MR. WEST:
8      Q.   I wrote a note -- not to ask you the same
9   question, I just can't find my note.  Just remind
10  me again, how many years have you been a homicide
11  detective?
12     A.   18.
13     Q.   Okay.  In the 18 years that you have been
14  a homicide detective with the Philadelphia Police
15  Department, have you ever specifically requested
16  from the Probation and Parole Office the records
17  of the home inspection of a suspect who had been
18  on probation?
19          MR. ZURBRIGGEN:  Object to the form
20      of the question.  Detective, you can answer.
21          THE WITNESS:  Not all of our
22      homicide suspects are on probation.  But
23      those that have been, I never asked for
24      that.

Page 85

1          MR. WEST:  Okay.  No further
2   questions.
3          MR. ZURBRIGGEN:  And just while we
4   are on the record, just to designate, at
5   least until we can figure out what is going
6   on with Mr. ███  I will designate the
7   portions of the record as confidential under
8   the confidentiality order, unless and until
9   we modify that.
10          THE VIDEO OPERATOR:  Okay.  Going
11  off the record at 2:29 p.m.
12                  - - -
13          (Whereupon, the videotaped
14  deposition concluded at 2:29 p.m.)
15                  - - -
16
17
18
19
20
21
22
23
24

22 (Pages 82 to 85)

Page 86

1        C E R T I F I C A T I O N

         – – – – – – – – – – – –

2

3

4        I hereby certify that the

5    proceedings and evidence noted are contained

6    fully and accurately in the notes taken by

7    me on the deposition of the above matter,

8    and that this is a correct transcript of the

9    same.

10

11

12

     DENISE WELLER

13   Shorthand Reporter

14

15          - - -

16

17

18       (The foregoing certification of this

19   transcript does not apply to any

20   reproduction of the same by any means,

21   unless under the direct control and/or

22   supervision of the certifying reporter.)

23

24          - - -

Page 87

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

23 (Pages 86 to 87)

**A**

**a.m** 9:19
**ability** 6:19
  62:11 81:19
**able** 21:3 22:5
  64:20 65:5
  74:19 75:19
  78:9
**absolutely** 80:4
**access** 20:2 25:9
  26:2 35:15
  37:5 41:2
  49:18 51:23
  54:6 63:18,24
  78:12 83:1
**accessible** 32:17
**accurately** 86:6
**achieve** 62:15
**action** 8:10 61:3
  78:19
**ADAM** 2:9
**Adam.zurbrig...**
  2:12
**additional** 38:4
  54:13,14
**address** 5:2 20:5
  20:21,22 24:17
  33:20,23 34:4
  36:7,8 37:1
  44:8 55:11
  57:23 58:12
  60:15 61:20,22
  62:21,22,23
  66:15,24 69:11
  83:18
**addresses** 20:4
  36:9 57:14
**adult** 82:14
**affairs** 7:8,11,20
**affiant** 64:23
  65:2
**affidavit** 18:12
  59:17 65:4,10
  65:18
**afternoon** 6:1,2
**aggressive** 70:23
**ago** 76:3,7
**agree** 38:24
**agreed** 4:7

**ahead** 42:10
  60:10 73:7,22
**al** 1:6 4:21 5:8
**alley** 52:3
**alleyway** 29:4
  30:18 38:9,17
  38:21
**allowed** 78:11
**Alvarado** 1:4
  4:20 5:8,13 6:5
**Alvarado's**
  52:10 59:10
  78:18
**American** 1:13
  2:4
**amount** 15:9,18
  15:20
**and/or** 18:11
  86:21
**anklet** 24:8
**announce** 15:3,7
  15:13 16:4,11
  16:21 17:2,6
  17:14 52:11,21
  70:22 72:17
  73:5 74:12
  76:17
**announcing**
  14:18
**answer** 10:14,20
  12:2 16:23
  17:9,18 21:6
  23:8 25:3,11
  26:7,22 27:16
  28:17 30:22
  31:7,16 32:5
  34:13 36:5,22
  37:24 38:23
  40:1,18 42:18
  43:3 45:12,20
  46:18 47:1,14
  47:22 48:5
  49:16 50:6,15
  51:8 52:16
  53:1 54:10,21
  55:18 57:1,17
  59:15 61:10
  62:5 65:14
  66:13 67:9

**ahead** 68:15 69:13
  70:1,9 74:4,7,9
  75:3,10 79:9
  79:22 81:14
  84:20
**answered** 17:18
  32:5 47:13
  69:13
**anticipation** 7:3
  77:22
**anybody** 13:18
  34:24 55:14
  69:15
**anymore** 78:12
**anyway** 42:15
**apartment** 27:4
  27:8 30:18
  31:11,21 32:17
  36:12 37:8,21
  38:8,17,20
  39:22 40:3,9
  45:10 47:5,7
  47:11 48:21,22
  49:19 50:2,10
  52:4,10 54:7
  60:8 61:7,13
  61:22 62:3,8,9
  63:12 68:8
  70:5,16 77:16
  79:5,15,19
**apartments**
  39:11,18 42:12
  48:13 63:13
  66:20
**apply** 82:15
  86:19
**appointments**
  81:18
**approval** 65:19
**approve** 59:23
**approximation**
  53:9
**April** 32:14
**Arch** 2:10
**area** 9:13,20
  12:13 13:3
  45:1,2,9,24
  46:23 47:20
  48:3,12,18

  49:10,13
**arises** 8:10
**arrest** 11:17,24
  15:8 18:5,11
  18:22,24 20:16
  20:20 21:2,11
  22:15 55:10
  57:8 58:17
  60:14 71:9,17
  81:17 84:5
**arrested** 19:23
  23:19 53:18,20
  57:7
**arrests** 20:4
**arrived** 9:17
**ascertain** 54:5
  57:14 63:15
**asked** 10:13
  17:17 24:11,16
  24:18 25:20
  32:4 37:1
  47:13 68:20
  69:12 80:9
  81:8 84:23
**asking** 31:16
  68:12
**assigned** 11:12
  60:6
**associated** 60:22
**assume** 10:20
  39:17 50:21
  84:3
**attempt** 63:18
**attorney** 2:7,12
  6:23
**Attorney's**
  59:21
**attorneys** 6:4
**audio/video** 4:19
**available** 25:8
  28:20 35:12
  36:2 40:23
  41:20 42:14
  67:5,23
**Avenue** 8:11
  13:12 14:2
  19:5 28:3 29:3
  29:4 30:8 31:3
  32:1 39:12

  40:10 42:23
  43:7,15 44:7
  44:10 48:19
  49:9 50:2 54:2
  54:4,18,19
  56:6
**avoid** 26:19
**aware** 17:13
  21:10 22:14
  30:17 41:19
  43:9 78:17
  82:21,23

**B**

**back** 19:23 20:4
  20:22 22:10
  74:17 77:10
**background**
  33:16 34:17
  62:20
**badge** 4:15 5:11
**bang** 13:20,20
  13:20 71:6,7,9
  71:10,13,13,13
  71:14,14,14
  72:3,3,3,7,12
  73:16,17,17,17
  73:17
**banging** 71:3
**bangs** 71:12
**base** 51:24
**based** 48:15
  49:5 72:1,15
**basically** 15:6
**basis** 35:8 39:1
  51:12 53:15,21
**bed** 74:3 75:7
**bedroom** 74:17
  74:18
**beginning** 10:10
  23:13 59:24
**behalf** 5:13
**belief** 11:21 22:3
  47:3
**believe** 7:10
  12:15 15:16,18
  16:8,24 17:19
  20:1,7,21
  21:24 22:7

31:2 33:16
37:13 40:2
43:4 46:14,22
47:2 51:22
53:5,16,17,17
53:19 56:19
66:16 74:21
79:24 81:7,15
82:2 83:6
**believed** 48:11
▮▮▮▮ 19:15
19:18 33:18
34:3 49:12
53:4,20 56:16
60:8 81:8
**best** 62:11 72:13
**big** 29:21
**bigger** 29:22,24
**bit** 12:11 13:3
13:14
**blue** 29:16
**BMV** 19:20 20:7
55:4,5 60:13
**box** 66:2
**breach** 15:10
27:23 29:13
31:2
**breached** 12:20
13:19 14:3,14
29:18 59:11
78:18
**break** 10:6 77:2
**breezeway** 52:3
**brief** 77:7
**bring** 18:9,13,22
23:18
**bringing** 34:22
**Broad** 1:14 2:4
5:2
**brother** 76:10
**brown** 18:20
19:8
**building** 1:13
2:4 26:18
39:12,16 42:23
43:1,10,15,21
45:10 46:15
47:3 52:1 54:5
55:15 56:12

61:23 63:3,12
63:23 84:6
**buildings** 26:16
27:4
**Bureau** 19:21

———————
**C**
**C** 2:1 86:1,1
**call** 23:22 35:1
42:15
**called** 15:3 20:2
42:10
**camera** 73:14
**caption** 5:7
**capture** 9:2
**captured** 53:4,6
53:16
**captures** 9:8
**car** 12:16
**career** 11:14
**carry** 58:5
**carrying** 31:4
**cars** 12:18
**case** 5:7 6:4
18:10 31:5
34:3 35:8,8
**cause** 59:17
65:17
**caution** 26:18,24
27:10
**cell** 21:23 56:17
57:3,6,11
**Center** 1:13 2:3
5:1
**Central** 11:12
**certain** 15:9
**certification** 4:9
86:18
**certify** 86:4
**certifying** 86:22
**chance** 6:22
77:1
**characterizati...**
30:21 36:15
38:11 50:14
67:17
**check** 20:7,8,10
20:13 22:24
29:20 34:1,15

34:18 55:4,5,7
60:21 66:17
67:3
**checks** 19:21
20:9 25:16
55:1,3,6,6
57:23 60:13,18
60:22 61:16
62:8,20 83:19
**circle** 44:10 46:1
**City** 1:6 2:8 4:20
5:8 21:10
40:22 41:14
**clear** 20:2 44:18
50:20 51:20
55:8 60:21
80:4
**coffee** 10:7
**collect** 65:16
**come** 35:3,5
52:2 58:4
60:16 81:16
83:15 84:4
**comes** 20:3
**comfortable**
73:1
**coming** 23:17
42:11 75:17,24
76:14
**commencing**
1:15
**comment** 83:8
**Common** 1:1
4:22 5:9
**Commonwealth**
1:17
**computer** 20:10
25:16 34:1,15
55:1,3,7 57:22
57:24 60:18,21
60:22 61:15
66:17 67:3
83:19
**concluded** 38:19
85:14
**confer** 6:23
**confidential**
85:7
**confidentiality**

82:6,15,19,23
83:6 84:3 85:8
**consider** 37:20
47:18 48:2
**considered** 47:9
**consistent** 52:11
52:18,21
**constitutional**
16:4,11
**contact** 22:23
27:4 34:19
40:15 58:20
60:16,17 63:22
63:23 83:12
**contacted** 22:6
24:10 42:6
**contacting** 23:4
**contain** 18:19
**contained** 86:5
**contemplating**
61:2
**continue** 51:2
**control** 86:21
**conversation**
83:14
**coordinating**
80:23
**copies** 18:4,4,20
58:14
**copy** 18:14
64:21
**corner** 13:8,9
30:6,7 52:2
**correct** 4:17
6:24 11:3,4,18
11:19 12:20,21
14:11,12 20:16
21:14 22:18
25:1 28:21,22
29:5,14 34:5,8
34:11 36:13
37:9 39:6,7,12
40:11 41:17,18
42:16 43:11
46:8 50:4,7
52:23 54:19
59:5,6 64:24
65:1 66:4,7
68:20,23 69:4

69:8,20 78:22
79:2,17 86:8
**counsel** 4:8
**count** 15:19
**COUNTY** 1:2
**couple** 76:2,3,7
**course** 61:11
65:16
**Court** 1:1,22
4:21 5:9
**Courtney** 2:15
4:24
**covered** 19:9
**COVID** 21:20
22:2,3,12,15
**cup** 10:7
**currently** 53:13
62:23
**cuts** 13:7

———————
**D**
**D** 3:1
**danger** 13:5
75:14 76:1,18
**dangerous** 70:6
70:12
**date** 5:4
**day** 9:17
**dcr.diamond...**
1:24
**dealing** 23:24
70:16
**Defendants** 2:12
**deli** 30:3,5
**delivered** 18:3
**demonstrate**
72:17 73:4,9
**Denise** 1:16 5:14
86:12
**deny** 81:19
**department**
10:24 11:23
16:2,19 17:5
17:20 22:17
23:11 45:16
48:17 49:7,8
51:1 52:23
56:20 59:8
60:5 61:6 62:1

62:15 65:9
71:19 72:16
76:17 78:21
81:3 83:20
84:15
**depending** 34:21
**depends** 24:4
   63:6
**deposed** 5:10
   6:8 30:11,15
**deposition** 1:11
   4:14,19 5:6,12
   5:14 6:5 85:14
   86:7
**depositions**
   32:13 41:6
**describe** 35:13
**described** 15:6
**description** 3:14
   65:22
**designate** 85:4,6
**detective** 1:12
   3:5 4:15 5:11
   5:18 6:1 7:10
   7:12 8:4,17
   11:2,6,8,12
   12:2,6,14
   14:23 15:15
   16:7,14,23
   17:9,18 18:1
   20:1,18 21:6
   21:16 23:8
   25:3,11 26:7
   26:22 27:16
   28:17 29:7
   30:22 31:7,15
   32:5,20 33:2
   34:13 36:5,15
   36:22 37:11,24
   38:12,23 39:14
   39:24 40:3,18
   41:24 42:18
   43:3,18 45:12
   45:20 46:4,17
   47:1,13,22
   48:5 49:15
   50:6,14 51:8
   52:15 53:1,17
   54:9,21 55:17

57:1,16 58:7
58:23 59:14
60:7 61:9 62:5
62:18 63:5
65:13 66:12
67:9,17 68:2
68:14,22 69:13
70:1,8,19
71:22 72:6,23
73:7,23 74:6
75:2,10 76:20
77:14,18 78:5
78:6,24 79:8
79:22 80:9
81:13 82:18,24
83:4 84:11,14
84:20
**detectives** 11:12
   58:3,10 59:5
**determine** 40:9
   45:24 59:11
   60:7
**diagrams** 25:19
**DIAMOND**
   1:22
**different** 49:21
   60:3
**direct** 86:21
**directly** 49:10
   50:2
**discuss** 12:12
**distance** 29:13
**District** 11:11
   59:21
**DIVISION** 2:9
**docket** 4:22 5:9
**document** 38:3
   41:5,10 44:3
   64:3 69:3
**documents** 7:2
**dog** 47:17
**doing** 13:4 22:7
   72:10 73:1
   77:21
**door** 9:3 13:17
   13:18,19 14:1
   14:2,10,13,14
   14:17 15:11,22
   15:22 26:13

27:23 29:18
31:3,3,24
37:17,19,22
39:6 42:24
43:5,6,10,14
44:9,21 46:14
47:3,10,18,19
48:3,11,18
49:9 50:2,4,11
59:11 63:17
67:15 69:19
72:12 73:9,16
74:4,9,19,24
75:8,15 76:13
78:18
**drew** 64:4
**drive** 25:17
   40:10
**driver's** 19:22
   19:22
**driving** 54:3
**drove** 40:3 54:18
**duly** 5:19
**duty** 51:19
**dwelling** 49:22
   49:23 61:14
   62:10
**dwellings** 61:12

**E**
**E** 2:1,1,14,14
   3:1 86:1
**earlier** 37:15
   55:4 58:14
   60:12,16
**early** 8:11
**effort** 56:10 66:9
   69:5,10 77:23
   78:20 79:4,18
**either** 57:4 65:4
**elevator** 27:6
**employed** 4:24
**enforced** 31:24
**enforcement**
   8:10,23,24
   61:3 78:19
**enforcing** 77:22
**enter** 13:12 19:5
   24:19,24 26:3

27:13 48:8,22
49:12 50:10,17
51:2 52:9
55:19 62:2
**entered** 52:3
   54:6 55:15
**entering** 16:12
   26:19 31:24
   51:19
**enters** 70:4
**entrance** 30:17
   31:10,20,21
   32:18 37:20
   38:8,16 42:22
   44:10 48:19
   49:10 54:3
   67:14
**entrances** 29:3
**entry** 27:5 31:13
**envelope** 18:9,20
   19:9
**Especially** 75:21
**ESQUIRE** 2:3,9
**establish** 60:24
**estate** 20:9 41:2
   41:3 55:6
**estimate** 53:8
   73:22
**et** 1:6 4:21 5:8
**eventually** 20:22
**everybody** 82:5
**evidence** 65:16
   75:20,21 86:5
**exact** 61:13
**exactly** 9:18
   10:12 27:7
   29:14 43:22
**EXAMINATI...**
   5:22 80:6,18
**examined** 5:19
**excuse** 57:8
**execute** 9:23
   39:3,5 45:17
**executed** 80:12
**executing** 9:13
**exhibit** 4:4 7:19
   28:9 41:7,7,11
   44:3,4,18 64:5
   64:8,14

**exhibits** 3:13
   32:10
**exist** 11:22 61:5
**expect** 58:19
**experience**
   11:17 38:7
   46:20 48:10
   52:12 71:6
   76:15 79:11
**explain** 12:24
   58:8
**extensive** 33:16
**extent** 8:17
   14:23 16:14
   29:7 44:18
   49:15 61:10
   63:5 76:21
**eyes** 52:9

**F**
**F** 86:1
**facade** 25:22
**fact** 22:14 43:9
   67:14 76:3
**fairly** 34:11
**familiar** 6:12
   11:21 33:6,10
   57:23
**far** 17:13 19:4
   25:8 67:6
   78:17
**fax** 18:10
**feel** 72:13 73:1
**Felishatay** 1:4
   5:13
**felt** 7:23 67:10
**figure** 19:12
   58:5 66:9
   69:19 78:21
   85:5
**file** 41:4
**files** 41:2
**filing** 4:9
**fill** 25:12
**filled** 18:20
**find** 21:3 23:6
   24:7 34:24
   78:12 84:9
**fine** 10:1 28:11

49:3 77:3
**first** 5:19 34:3
43:1,16,22,24
43:24 45:9
47:4,11 49:13
50:3 51:3,18
55:20 64:21
77:24 78:22
79:5,11,14,15
**five** 6:10 73:24
74:3,21 75:8
**floor** 1:14 2:5,10
5:3 31:11
32:17 37:12,13
37:21 43:1,16
43:22,24 45:10
46:14,23 47:4
47:7,11 48:8
48:21 49:13,18
50:3,22 51:3
51:23 52:4
54:7 55:20
63:16 66:5,16
66:18,20,21
68:7 74:17
77:16,24 78:22
79:5,12,14,15
**follow** 62:14
**follow-up** 80:15
80:21
**following** 51:18
**follows** 5:20
**foregoing** 86:18
**forgive** 13:6
**form** 4:11 8:16
12:1 14:22
15:14 16:6
20:17 21:15
22:20 23:7
25:2,10 26:6
26:21 27:15
28:16 29:6
30:21 32:20
33:6,11 34:6
35:16 36:21
37:10,23 38:23
39:13,23 40:12
40:17 41:23
42:17 43:2,18

44:14 45:11,20
46:4,17 47:13
47:22 48:24
50:14 52:15
54:9 55:16
56:24 57:16
58:7,23 59:14
61:9 62:4 63:4
65:13 66:12
67:9 68:14,22
70:1,8 71:22
72:6 73:22
75:2,10 76:20
77:18 78:5,24
79:8 81:1,13
82:18 84:19
**found** 78:8,14
**foundation**
19:13
**four** 12:10
**frequently** 34:11
**friend** 76:10
**front** 39:16 43:6
66:1,2 74:19
78:18
**fugitive** 57:9
**fully** 86:6
**further** 80:1
85:1

**G**

**G-R-A-F** 7:14
**gain** 27:5 51:14
54:6 63:18,20
81:23
**gained** 49:8 57:4
**gaining** 51:15
83:1
**general** 11:9
17:7
**generally** 76:16
**getting** 12:9
14:14,14 82:6
**give** 20:10 53:8
58:12,14 73:14
74:22 82:1,2
**given** 60:15
62:21 68:19
82:7

**glad** 10:15
**go** 9:22 13:2
22:17 25:18
27:6 39:22
50:22 52:2
59:17,19,20,22
60:9,12,12
61:6 63:14
66:21 73:7,15
73:22 82:19
83:4,23,23
**goal** 62:7,16
**goes** 59:16 83:22
**going** 9:22 11:15
13:8,10 21:21
22:19 24:24
26:11,12,13
27:8 29:10,21
34:16 42:11,15
47:6 50:19,20
58:16 63:16
64:11 70:13,14
74:10,18 77:4
77:10 85:5,10
**good** 6:1,2 23:5
76:10 80:22
**Google** 3:17
25:16 27:20
28:1,15 29:1
37:3 38:18
54:1,17
**gotten** 67:22
**Grace** 7:12
**Graf** 7:13,14
12:14 20:1
40:3 41:7,7
53:18 78:6
**Graf's** 7:10 8:4
18:1
**Graf-2** 41:11
**Graf-4** 28:9,10
38:18 64:4
**Graf-5** 38:4
**Graf-6** 32:9
80:10
**grave** 76:1
**green** 45:1,9
46:23
**guess** 13:17

25:15 57:22
80:21
**gun** 20:8 55:5
75:18,19
**guys** 12:10,12
35:4 74:14
75:13 76:1
80:22

**H**

**Hamoy-2** 44:4
46:13
**happened** 8:1
**happens** 17:15
34:10
**hard** 14:17
29:23
**head** 76:8,11
**hear** 13:16,20,21
13:23 14:7
**heard** 14:6,10
15:2 47:17
60:3
**hearing** 13:15
**held** 76:16
**helmet** 76:11
**help** 23:16
**helped** 24:3
**high** 27:3
**highlighted**
32:12,12
**hit** 8:20 14:16
42:11 58:12
71:11,17 73:18
**hitting** 14:18
**home** 84:17
**homeowner's**
74:13
**homicide** 8:19
11:2,5,9,15
12:5 24:10
57:21 58:3,10
81:9 82:16,24
83:2 84:10,14
84:22
**house** 8:20 13:9
13:12 20:16,20
21:2,11,14
22:15,18 24:12

25:14,23 74:12
74:23 75:24
83:24
**houses** 21:22
**hundred** 63:12

**I**

**idea** 9:7 50:9
80:22
**identification**
4:5 64:9,15
**identified** 55:24
**identifying**
58:11
**identity** 42:14
**illness** 6:18
**impair** 6:19
**inaccurate** 7:23
**include** 36:1
56:5
**Including** 25:4
**indicate** 32:14
**individual** 18:23
**individual's**
57:3 62:20
**indulge** 72:22
**influence** 6:17
**information**
20:11 23:5
24:12 25:8
31:19 33:3
35:9,12 36:2
39:2 40:6
41:20 49:17
55:13 56:1,4
56:11 57:5,9
58:13 63:21
67:5,11,22
68:4,11,20
80:24 81:3,8
81:11,24 82:4
83:9
**informed** 31:22
**ins** 82:18
**inside** 25:20
43:21 50:12
56:6,12 70:16
74:22
**inspect** 22:18

**inspected** 32:16
**inspection** 21:14
  84:17
**instance** 36:24
**instructions**
  6:13 19:4
**intend** 10:3
**interesting**
  23:23 25:21
**internal** 7:7,11
  7:19
**interrogations**
  10:5
**interview** 7:11
**interviewed**
  23:19
**interviews** 65:17
**investigation**
  8:20 18:2
  19:12,18 34:21
  48:7 54:5 56:2
  59:3 61:23
  63:2,7 65:7,16
  69:23 77:21
**investigations**
  23:10 55:12
  56:3
**involve** 55:14
**involved** 34:17
**IP** 57:14,23
**issue** 31:4,23
  82:6

**J**

**jeopardy** 74:15
**Jersey** 1:23
**job** 81:22
**join** 10:23
**jumped** 9:24
**June** 1:4 8:11
  11:1,16 13:22
  13:24 78:18
  80:12
**juvenile** 33:14
  82:13

**K**

**Keith** 2:3 6:3
  80:15
**Keith@victim...**

2:6
**kevlar** 76:11
**kicked** 13:17
**killed** 76:5,8
**kind** 13:14
  23:23 24:8
  27:11 63:20
  65:7 69:23
**Kitcherman**
  2:15 4:24
**knew** 20:15,20
  31:9 36:12
  37:7 38:7
  39:11,15 50:1
  51:3 69:1
  79:15 83:23
**knock** 13:18
  14:1,4,8 15:3,7
  15:13 16:4,11
  16:20 17:2,6
  17:14 26:13
  52:10,20 70:22
  71:16 72:16
  73:5 74:12
  76:12,17
**knocked** 14:14
**knocking** 71:15
  75:15
**know** 8:17 9:9
  9:18 10:8,12
  12:18 13:5,6
  13:15 14:23
  15:15 16:7,14
  16:15 20:18
  21:16 22:11,21
  22:23 23:1
  25:20,23 26:9
  27:3,7,22
  30:19,23 31:9
  31:10,23 32:20
  36:15,16,17
  37:15 39:14
  40:19,22 41:8
  41:12,12,13,14
  41:21 42:1
  43:21 44:20
  46:5,6 49:16
  50:3,15,16
  53:14 56:21

57:16 58:7,11
  58:23 60:3
  61:10 62:5,18
  64:19 67:18
  68:7,22 70:8
  70:19 71:5,22
  72:6 74:6
  75:24 76:21
  78:5,24 79:8
  81:14 82:3,18
  83:7,15,17,17
  83:18
**knowledge** 46:8
  46:9 49:9
  73:15 79:2
**known** 21:19
  31:1,19 37:18
  42:5

**L**

**L** 2:14
**land** 22:5,22
  23:1
**Lane** 1:22
**Law** 1:13 2:3,9
  5:1
**lawsuit** 8:9
**lay** 19:13
**layout** 24:12
  63:3
**lead** 43:24 47:10
  49:10 61:16
**learn** 19:18
  51:13 69:5,10
  77:24 79:5,19
**learned** 32:16
  48:18
**leave** 51:20
**led** 42:24 43:15
  43:20 46:14,22
  47:3,19 48:3
  48:11,12 50:2
  ■ 19:15,18
  20:15 33:18
  34:3 49:12
  53:4,20 81:8
  85:6
  ■ 30:18
  31:20 38:8,16

38:20 56:17
  60:8
**left** 12:18 47:5
**legally** 48:21
  49:12
**level** 43:23,24
  82:13,14
**license** 19:22,22
  20:8 60:13
**Likewise** 10:12
**limit** 26:24
**line** 22:5,22 23:1
**literally** 13:6
  34:19 75:22
**little** 12:11 13:3
  13:14 18:7
  29:23 60:3
**live** 24:16
**living** 20:11
  22:19 77:24
  78:14,21
**lobby** 27:6 63:17
**locate** 35:9
**located** 29:17
  30:3 35:15
  40:9 42:22
  43:1 79:6,20
**location** 35:13
  35:15 60:7,18
**lock** 63:17
**long** 11:5 15:12
  24:7 72:3
**longer** 12:11
**look** 7:24 21:7
  25:15,15 28:2
  28:6,14 32:22
  41:8,10 60:17
  64:1 78:10,11
**looked** 29:1
  33:11 34:1
  38:18 54:17
  55:14 56:1,4
**looking** 18:6
  23:3 24:5
  28:10 37:3
  43:14 46:12
  50:21 54:1
  57:21 65:24
**lot** 11:17 41:6

71:2 77:13
**loud** 71:2
**louder** 10:15
**love** 81:2 82:3
**Luckily** 76:4

**M**

**magistrate**
  59:22
**mailbox** 44:21
**mailboxes** 39:17
  40:4,5 44:20
**management**
  63:23
**manager** 40:16
  40:20 42:5,15
**manager's** 42:14
**Mantua** 1:23
**Map** 3:17 28:15
  29:2 54:17
**maps** 19:2 25:16
  27:20 28:1
  37:3 38:18
  54:1
**Margaret** 29:5
  30:19 31:22
  32:1,18 38:21
**mark** 29:11,16
  64:2,5,12
**marked** 28:9
  32:9,9,10 38:4
  41:6,11 44:3
  45:1,9 46:12
  46:23 64:4,9
  64:15 80:10
**married** 30:13
**mart** 30:6
**match** 36:8
**matter** 4:20
  42:13 86:7
**mean** 22:16
  33:23 41:13
  44:19 55:23
  65:2 67:13
  68:18 75:14
**means** 21:12
  24:22 86:20
**meant** 66:10
  67:6,7 69:6,11

69:16
medication 6:18
meet 9:19,19
  17:23
member 24:23
  49:7
members 52:9
  72:15
memorializes
  38:6
mess 13:4
meticulous
  14:16
mind 51:17
mine's 76:10
mini 30:5,5
minimize 39:21
minute 77:2
minutes 15:9,10
Mirela 69:2,6
misunderstan...
  55:23
modify 85:9
moment 64:18
  73:14
months 53:11
  76:3,9
morning 70:5
  74:2
Motor 19:21
movies 10:6
moving 34:22
multi 61:11,14
multi-residence
  45:18 61:4
multiple 26:17

—————
N
—————
N 2:1,14 3:1
  86:1
naked 50:12
name 4:23 6:3
  20:3 69:1
named 19:15
near 9:5
necessarily
  34:20
need 32:24
needed 36:6

67:11
never 24:18
  25:18,19 28:12
  41:17 72:24
  82:12,13 83:5
  83:10,11,12
  84:2,23
New 1:23
non-physically
  54:24
normal 13:15
normally 9:18
  17:15 52:12
  56:22 57:20
  83:14
North 1:13 2:4
Notary 1:17
note 25:24 84:8
  84:9
noted 86:5
notes 33:15 77:1
  80:11 83:21,21
  86:6
notified 53:18
number 4:16,22
  5:10,12 57:3
  61:22 64:22

—————
O
—————
O 2:14 86:1
object 8:16 12:1
  14:22 15:14
  16:6 17:17
  20:17 21:15
  22:20 23:7
  25:2,10 26:6
  26:21 27:15
  28:16 29:6
  30:20,21 32:4
  34:6 35:16
  36:14,21 37:10
  37:23 39:13,23
  40:12,17 41:23
  42:17 43:2
  45:11 55:16
  56:24 62:4
  63:4 84:19
objected 44:16
objection 9:10

16:13,22 17:8
  21:5 28:23
  32:19 34:12
  36:4 38:10,22
  39:8 43:17
  44:13 45:3,19
  46:3,10,16,24
  47:12,21 48:4
  48:23 50:13
  52:5,14,24
  54:8,20 56:7
  56:14 57:15
  58:6,22 59:13
  60:9 61:8
  62:17 63:10
  65:12 66:11
  67:8,16 68:1
  68:13,21 69:7
  69:12,24 70:7
  70:18 71:21
  72:5,19 73:6
  73:21 74:5
  75:1,9 76:19
  77:17 78:4,23
  79:7,21 81:1
  81:12 82:17
  83:3
objections 4:10
  31:7 32:4
  49:15 50:6
  51:8
objectives 50:19
obtain 24:21
  35:12 56:10,16
obtained 31:18
  33:2,19 34:4
  38:15 48:20
  49:11 51:6
  77:15
obtaining 25:6
obvious 27:12
  41:13
obviously 67:13
occupied 46:2
  47:19 48:3,19
  49:10,12,21
  51:3
occur 45:8
occurred 8:11

offense 10:9
offered 83:13
  84:2
office 21:13 23:5
  31:20 32:15
  34:5 36:3,12
  38:5,7,16
  59:21 67:1,6
  67:24 80:24
  81:10,16 84:16
officer 5:14
  11:11 24:11,23
  27:13 30:11,15
  30:17 31:19
  33:15,17,20,24
  34:20 35:2
  36:7 51:16
  52:8 58:21
  60:19 68:19
  76:8,9 83:22
officers 21:19
  48:17 50:10
  51:15,17 70:13
  70:22 75:22
  76:4,4,6,18
offices 23:18
Oh 31:17
okay 6:11,22
  7:18 8:3 9:6,12
  9:16,24 10:8,9
  10:21,22 11:2
  11:13 12:5,8
  12:19 13:13,18
  14:5,7,10,20
  15:2,12 16:1
  16:18 17:13,23
  18:18 19:1,8
  20:12,15 22:2
  24:18 25:6
  26:2,16 27:10
  27:20 28:8
  30:1 31:1 32:8
  33:5,8,9,18
  34:10 37:7
  38:3 39:20
  41:5 43:9,13
  44:9 45:8
  46:12 50:24
  51:12 55:2,9

55:22 62:13
  63:20 64:1
  65:7 67:4,22
  71:1 73:4,13
  73:14,19 74:2
  74:21 75:7,13
  76:15,23 79:4
  79:14,24 80:14
  81:7 84:13
  85:1,10
once 51:22
  61:21
ones 10:11
online 40:24
open 14:11
  15:22 50:11
  74:19,23 75:8
opened 9:3
operate 58:16
operation 8:15
operator 2:15
  4:23 77:4,10
  85:10
opinion 51:13
  81:5,23
opportunity
  20:1 60:20
  74:23 75:20
Oral 1:11
order 54:6 57:14
  59:11 65:10
  85:8
originally 68:4
outs 82:19
outside 23:21
  25:14
overview 28:6
  28:15 38:18
owner 41:3,21
  69:1

—————
P
—————
P 2:1,14
p.m 1:15 5:5
  77:5,11 85:11
  85:14
PA 2:5,11
package 18:3,8
  18:16,19 19:2

**page** 3:3,14
32:11 66:1,2
**Pajo** 69:2,6
**paper** 33:7
**parole** 21:12
22:17 23:5
31:20 32:15
34:5 36:2,11
38:5,7,16 67:1
67:6,23 68:19
80:23 81:10
82:9 84:16
**part** 8:14 9:2
25:6 34:18
35:8 59:3,20
76:12
**particularly**
63:14
**particulars**
59:19
**partner** 18:2
**pass** 57:8
**passed** 14:13
73:20,23
**patrol** 11:11
**pen** 29:16
**Pennsylvania**
1:2,15,18 5:3
**people** 15:12
23:18 59:4
74:9 75:16
**people's** 21:22
**performed** 5:6
**permit** 20:8 55:5
**person** 5:7 22:19
26:3,5,10,19
34:16 35:2,5
35:14 42:6
51:18 56:5
62:24 83:12
**personally** 12:22
19:17 20:6,12
23:10 37:16
54:4 56:18
78:1
**perspective**
70:15
**Philadelphia** 1:2
1:6,14 2:5,8,11

4:21,21 5:3,8,9
10:23 11:22
16:2,19 17:5
17:20 21:11
23:11 40:23
41:14 45:16
48:16 49:6,8
51:1 52:22
56:20 59:8
60:5 61:5 62:1
62:14 65:9
71:19 72:16
76:16 78:20
84:14
**phone** 21:23
56:17 57:3,6
57:11
**photo** 18:23
39:1
**photography**
7:3
**physical** 21:13
22:24 24:12
25:17 35:13
60:7 63:3
**physically** 22:18
24:19 25:9
26:3 29:17
54:22 79:6,19
**picture** 28:8
44:5 46:12
**pictures** 18:5
**piece** 33:7
**place** 13:10
26:11,12 59:12
84:5
**placed** 22:15
**places** 76:17
**plaintiff** 2:7 5:13
6:4
**Pleas** 1:1 4:22
5:9
**please** 13:1 59:9
72:17
**point** 12:19 21:2
24:23 48:17
52:1 83:17
**pointing** 32:11
**police** 4:15 10:5

10:23 11:22
16:2,19 17:5
17:20 24:23
45:16 48:16
49:6,8 51:1
52:23 56:20
59:8 60:5 61:5
62:1,14 65:9
71:19 72:16
76:16 78:20
84:14
**policies** 11:21
21:18 23:24
24:4 48:16
49:6 50:18,24
52:22 59:7
60:4 61:4,24
62:15 65:9
83:7
**policy** 35:19
83:9
**portion** 32:12
42:24
**portions** 85:7
**possibility** 37:20
39:21 47:10,19
48:2
**possible** 10:16
14:20 66:19
**possibly** 82:4
**premarked** 4:5
7:18
**premises** 65:22
74:24
**preparation**
11:23
**preparations**
45:17
**preparing** 11:17
35:11
**Pretend** 72:10
72:13,14
**pretty** 14:16
70:23
**prevent** 82:24
**previous** 29:11
32:12
**previously** 28:8
29:11 42:3

44:3 64:4
**prior** 9:13 13:19
20:4 22:2,3,12
22:14 25:13
27:23 62:20
66:8 74:10
76:9,9 78:17
**prison** 19:24
55:8 60:23
**probable** 59:17
65:17
**probably** 6:12
20:8 23:14
42:7 83:22
**probation** 20:13
21:8,12,18
22:6,16,23
23:4,4,11 24:6
24:7,11 27:12
27:13 30:11,15
30:17 31:18,19
32:15 33:11,13
33:14,15,17,20
33:24 34:1,5
34:15,19 35:2
36:2,7,11 38:5
38:6,15 58:20
58:21 60:17,19
66:17 67:1,5
67:23 68:18
80:23 81:3,9
82:8,16 83:1
83:20,22 84:16
84:18,22
**probationary**
20:9 55:6
**problems** 35:3
**procedure** 6:12
**procedures**
11:22 48:16
49:6 51:1
52:22 59:8
60:4 61:5 62:1
62:15
**proceed** 6:24
48:21
**proceeded** 50:10
**proceedings** 4:2
86:5

**process** 59:20,23
72:3
**processes** 58:11
**produce** 23:1
**Professional**
1:16
**program** 20:2
41:15
**proper** 31:2
37:20 38:19
39:2,5
**properties** 45:18
**property** 12:19
14:2 16:12
19:6 24:19,22
24:24 25:9
26:4 27:14,23
28:15 29:3
30:3 32:1,16
40:15,20,23
41:3,22 42:5
42:13,15 44:11
45:24 51:2,19
51:20 54:2,3
56:6 59:18
61:4 69:2,19
**protect** 27:1
**provide** 81:11
**provided** 30:16
38:5
**provides** 71:19
**Public** 1:17
**pull** 13:11
**purpose** 16:20
**pursuant** 15:13
48:19 65:8
**pursuit** 49:11
**purview** 72:21
73:1
**put** 6:14 13:5
15:22 20:3
29:19 51:16
66:5,14 68:5
74:14
**puts** 75:13 76:1
**putting** 66:8

**Q**

**question** 8:8

10:19 13:23
19:13 22:13
27:18 30:12
31:16 34:2,7
35:17 36:19
39:24 41:9,24
42:21 43:13,18
46:4,17 49:2
52:6,15 54:9
55:22 59:14,24
60:2 61:9 75:2
76:20 80:2,9
81:13 82:22
84:9,20
**questions** 4:11
6:13 10:10,13
10:16 76:24
77:14 80:1
85:2
**quick** 34:22
**quickly** 6:11

**R**

**R** 2:1,9,14 86:1
**rammed** 14:11
50:11
**read** 6:16 7:10
68:6
**reading** 33:7
65:21
**ready** 6:23 33:4
75:19
**real** 20:9 41:2,3
55:6
**realized** 51:22
**really** 6:11 14:16
25:18 74:13
**rear** 27:23 31:3
31:12,21,24
32:18 37:5,7
37:13,17,19,21
37:22 39:6
43:10 48:9,9
48:21 54:7
66:5,14,18,21
67:7,15 68:8
69:6,11,16,19
74:17
**reason** 28:14

**reasonable**
46:13 74:23
**reasoning** 81:21
**reasons** 15:20
42:10
**recall** 8:13 17:11
20:20 53:7,12
66:15
**receive** 16:18
17:4
**received** 16:2
17:1 45:15
68:4,11
**recess** 77:7
**recognize** 41:9
44:5,23
**reconnaissance**
58:4,15,20
**record** 28:9
38:11 44:14
45:4 70:19
73:7 74:6 77:5
77:11 80:3
81:13 85:4,7
85:11
**records** 21:4
30:16 33:12,13
33:14 38:4
40:23 60:14
82:16 83:1
84:16
**Recovery** 1:13
2:3 5:1
**Redbud** 1:22
**reference** 63:22
**referred** 18:18
**referring** 8:19
67:14
**reflect** 28:9
**refused** 81:10
**regard** 52:20
**regards** 11:23
16:20 17:6
45:16 55:3
56:1 58:3
**registered** 78:9
**registration**
78:10
**related** 78:19

**relation** 69:11
**relationship**
58:2
**release** 19:24
55:8 60:23
**released** 19:24
**rely** 69:22
**remember** 13:15
**remind** 84:9
**repeated** 10:19
**rephrase** 10:16
34:2 55:22
82:21
**report** 82:7
83:13
**reporter** 1:16
86:13,22
**REPORTING**
1:22
**represent** 8:9
30:10,14
**representing** 6:4
**reproduction**
86:20
**request** 63:24
**requested** 23:20
83:10 84:15
**requesting** 65:4
**requirement**
16:5,11 17:16
**requires** 17:20
**reserved** 4:11
**residence** 26:19
43:5 61:15
62:10 65:6
**residences** 26:17
**residency** 60:24
**resident** 70:15
**residing** 19:19
24:13
**rest** 11:14
**restricted** 23:15
**retrospect** 67:13
**review** 7:2,6
64:18 77:1
**reviewed** 7:7,20
7:22 8:5
**rid** 75:21
**right** 7:14,22

9:12 11:16,20
12:12 18:16,16
21:1,4 22:9
28:12 29:13,19
30:4,7,8 31:15
33:21 35:24
36:11 41:19
44:2,20,23
50:1,9 59:4,7
59:12 60:2
61:2,7,19 62:2
62:7,9,10,10
65:21,23 66:3
66:6,24 67:1
67:15,24 69:3
71:12,20 72:1
77:16 79:16
**rise** 27:3
**rule** 15:3,13
16:4,21 17:2,6
17:14 82:23

**S**

**S** 2:1,14,14
**safe** 13:3,10
29:12
**safety** 15:20
42:9 51:15,16
51:21 73:2
74:13 75:22
**saw** 42:22 51:24
51:24 52:8,10
52:20
**Scally** 1:12 3:5
4:15 5:11,18
6:1 31:15 33:2
52:8
**Scally-1** 3:16 4:4
7:18 8:3
**Scally-2** 3:17
64:6,8
**Scally-3** 3:18
64:12,14
**Scott-1** 44:4
46:13
**Scott-4** 41:7,11
**scream** 71:8,9
71:10
**sealing** 4:9

**search** 3:18 9:13
9:23 11:18,24
13:16,16,21
15:8 18:4,11
18:21 20:6,23
24:21 25:6,13
26:14 27:3
49:20,23 57:5
57:7,11,13
58:17 59:18
61:13 64:1,12
64:21 65:3,5,6
65:11,24 66:8
68:6 71:8,16
73:16,16,17,18
75:17,23 77:14
**searched** 65:23
**searches** 55:7
**second** 31:11
32:17 37:12,12
37:21 46:14
47:6 48:8,20
49:18 50:22
51:23 52:4
54:7 66:5,16
66:17,20,20
68:7,7 77:16
**seconds** 14:19
15:18 73:24
74:3,22 75:8
**section** 65:23
**security** 27:5
**see** 10:5 13:11
14:1,4 19:22
19:24 20:3
21:8 29:20,20
29:23 38:9
44:19 50:11
78:8 83:15
**seen** 28:12 29:2
33:13,14 41:17
74:9 75:5
80:11 82:12,12
82:13
**senior** 12:5
**sense** 12:23
25:17
**separated** 71:13
**September** 1:8

5:4
**serve** 58:16 65:5
**set** 15:18 31:6
32:3 49:14
50:5 51:4,7
**seven** 11:10
23:15 73:24
**Shannon** 30:11
30:12,15
**Shannon-1** 32:9
**share** 80:24 81:2
**shareable** 81:4
**sheet** 64:21
81:24
**Shorthand** 1:16
86:13
**shot** 76:4,4,6,8
76:11
**show** 29:14 32:8
44:2
**showing** 30:16
**side** 42:23 43:15
47:17
**sign** 59:22
**signing** 4:8
**simulate** 72:2
**Sir** 30:10 32:14
33:10 44:2
64:18
**situation** 27:11
70:17
**six** 70:5 74:2,3
74:22 75:8
76:9
**sleeping** 74:11
**slower** 10:15
**somebody** 15:21
21:12 22:16
24:5 34:24
76:13
**somebody's** 35:9
**someone's** 70:4
**sorry** 8:24 13:23
18:7 31:17
59:23
**sort** 6:17 19:1,4
19:11,17 54:4
57:13 61:23
63:2 65:10

**source** 23:5
55:13
**sources** 55:24
56:4
**South** 1:14 2:4
5:2
**speak** 10:15
**specific** 17:1,4
27:17 33:23
35:18 36:24
49:22 62:13
65:22 66:19
83:21
**specifically**
13:22,24 14:7
19:5 49:19
61:21 66:22
77:15 84:15
**squad** 57:9
**staging** 9:13,20
12:13
**stairs** 27:7 47:6
47:7
**stand** 25:22
**standard** 6:13
**standing** 29:12
**started** 80:23
**state** 24:3
**stated** 54:15
**statement** 3:16
7:7,20 8:4
**stating** 53:15
**stay** 13:10
**stayed** 13:3
**staying** 12:16
**steps** 62:13
**sticker** 41:6
**stipulated** 4:7
**stories** 45:2
**story** 45:2,5
**straight** 47:6
**street** 1:14 2:4
2:10 5:2 13:7
28:4 29:5
30:19 31:22
32:2,18 38:21
43:23 54:1,17
71:7
**strike** 8:7 13:23

19:12 22:12
30:12,12 41:9
42:21
**stuff** 24:8
**subject** 26:20
35:14
**submit** 65:10,18
**substance** 6:18
**suggest** 37:2
**supervision**
86:22
**supervisor** 12:15
12:17 18:3
**supposed** 15:12
22:4 35:12
58:4 59:10
60:6 61:24
62:14 65:8
72:4
**sure** 18:15 30:13
34:2 57:6 61:6
62:2,7,9 76:24
**surprised** 48:7
67:19,24
**surrender** 74:24
**surveillance**
45:23 69:18
**suspect** 19:14
21:1 23:3,6
24:13 27:11
33:19 34:4
57:21 58:21
81:9 82:16
83:2 84:17
**suspect's** 24:11
**suspects** 84:22
**SWAT** 12:15
13:2,8,11
17:24 18:3
24:24 26:12
39:21 51:17
52:9,13 58:1,3
58:12,13,19
61:3 70:4,21
76:4,8,12
77:22
**swear** 5:15
**sworn** 5:19

|   | **T** |
| --- | --- |

**T** 2:14 86:1,1
**take** 10:6,9
32:23 64:18
77:2
**taken** 1:12 5:12
77:8 86:6
**talked** 12:14
**talking** 12:17
**tall** 45:2,2,6
46:23
**teaching** 72:14
**tell** 10:2 26:3
29:7 42:24
43:13 55:2
59:9 60:5
64:20 71:1
**telling** 75:16,23
76:13
**TERM** 1:4
**testified** 5:20
29:12 37:15
**testify** 6:19
**testimony** 7:4
**thing** 22:21 33:7
40:8 61:15
**things** 10:2
54:16,16
**think** 9:16 12:7
14:24 15:19
23:23 29:10,12
30:13 33:10
35:7 36:23
41:1 46:13
55:23 58:9
63:14 70:20
73:19 74:3,11
74:14 80:3,10
80:22 81:18
**third** 66:2 74:17
**thorough** 35:19
35:22,24
**thought** 53:19
**three** 6:9 11:11
12:10 71:5,7
76:3,5
**THURSDAY**
1:8
**time** 4:12 5:16

6:14 9:16 10:7
10:15 12:6
14:13 15:10,21
19:19 29:13,17
32:24 34:3
62:21 71:13
73:19,23 74:4
76:12 81:8
84:1
**times** 6:8,10
13:21 71:5,7
**Timothy** 1:12
3:5 4:15 5:11
5:18
**tired** 18:8
**today** 5:11 6:20
37:16
**today's** 5:4 7:3
**told** 78:7
**Torresdale** 8:11
13:11 14:2
19:5 28:3 29:3
29:4 30:3,8
31:3 32:1
39:12 40:10
42:23 43:6,15
44:7,8,10,11
48:19 49:9
50:1 54:2,4,18
54:19 56:6
**training** 16:1,18
17:1,5 45:15
71:18 72:2,15
**transcript** 86:8
86:19
**trial** 4:12,19
**tried** 25:20
**trouble** 10:13,18
**truly** 48:10
**truthfully** 6:19
**try** 10:15 27:5
35:5 40:8 61:6
63:15 67:4
79:19 80:24
**trying** 27:10
34:23 35:9
36:1
**turn** 35:6
**two** 39:16,18

40:5,5 45:2
53:11 54:16
**type** 13:5 19:20
20:4,10 21:8
25:19 55:8,10
60:13,17 62:19
75:20 82:5,6

---

**U**

**Uh-huh** 9:21
**unaware** 37:16
**uncomfortable**
10:4
**understand**
10:20 21:18
24:22 26:9
43:3,19 46:18
49:1,2 52:16
54:10,11 55:17
59:15 63:5
65:13 66:12
68:14 70:9
79:8 81:21
**understanding**
10:14 16:3,10
19:14,15 22:4
48:15 49:5
51:14 52:21
53:23 59:9
**Unfortunately**
23:9
**unit** 11:9,15
17:24 24:24
39:21 52:9,13
57:10 58:2,3
58:10,20 61:3
70:4 76:12
77:22
**unknown** 70:14
70:17
**unnecessarily**
10:4
**upstairs** 50:22
**use** 4:19 26:12
26:18,23 27:10
27:20 83:18
**Usually** 15:8

---

**V**

**vantage** 52:1

**various** 55:24
**Vehicles** 19:21
**versus** 4:20 5:8
**vestibule** 48:12
**Victims'** 1:12
2:3 5:1
**video** 2:15 4:23
8:7,14 9:1,2,8
77:4,10 85:10
**VIDEOGRAP...**
4:14,18
**videos** 7:2
**videotaped** 1:11
85:13
**view** 28:1,3,4
29:2 54:2,17
76:16
**visible** 46:1
**visually** 43:14
**voluntarily**
74:23
**voter** 78:10
**vs** 1:5

---

**W**

**wait** 15:9,13
23:18 71:13,14
71:15 72:4
**waived** 4:10
**waking** 75:16
**walk** 50:3
**walked** 13:9
14:17
**wall** 73:9
**want** 10:6,7
18:14,15 23:17
25:7 26:23
34:17 35:19
36:8 42:9 60:3
72:7 73:8 84:4
**wanted** 18:4
66:18,21
**warrant** 3:18
8:10,23,24
9:14,23 13:16
13:16,21 15:8
15:8 18:5,5,21
18:22,24 20:23
24:21 25:7,13

26:14,20 33:19
35:4,11,14
37:8 39:3,5
49:20,23 56:16
57:5,7,8,11
58:5,17,17
59:18 61:13
64:2,12,22
65:3,5,6,11,24
66:9 68:6 71:8
71:9,16,17
73:16,16,17,18
75:17,23 77:15
77:23 78:19
80:12
**warrants** 11:18
11:24 18:11,12
27:3 31:4,23
45:17 48:20
49:11 51:6
83:16
**wasn't** 9:5 12:14
53:18 57:7
**way** 35:4 37:3
38:19 39:3,5
48:8 49:8
63:18 66:21
68:10,18 70:21
78:13
**website** 41:16,16
**Weller** 1:16 5:15
86:12
**went** 32:15 52:1
**weren't** 42:15
**West** 2:3 3:6
5:24 6:3 8:22
9:11 12:4 15:1
15:24 16:9,17
17:3,12,22
20:24 21:9
22:1 23:2 24:9
26:1,15 27:9
27:19 28:19,24
29:9 30:24
31:14 32:7,21
33:1 34:9
35:10,21 36:10
36:18 37:6,14
38:2,14 39:4

39:10,19 40:7
40:14,21 42:4
42:20 43:8
44:1,15,22
45:14,22 46:7
46:11,21 47:8
47:16,24 48:14
49:3,4,24 50:8
50:23 51:5,11
52:7,19 53:3
54:12,23 55:21
56:9,15 57:12
57:19 58:18
59:1 60:1 61:1
61:18 62:12
63:1,8,19 64:3
64:11,17 65:20
66:23 67:12,21
68:9,17,24
69:9,17 70:3
70:11,24 71:24
72:9 73:3,11
74:1,20 75:6
75:12 76:23
77:12,20 78:16
79:3,13,24
80:20 81:6
82:10,20 84:7
85:1
**whatsoever**
77:23
**windows** 46:1
**witness** 3:3 4:17
5:10,15 8:18
12:3,22 14:24
15:16 16:8,15
16:24 17:10,19
20:19 21:7,17
22:21 23:9
25:4,12 26:8
26:23 27:17
28:18 29:8
30:23 31:9
32:6 34:8,14
34:24 35:18
36:6,16,23
37:12 38:1,13
38:24 39:9,15
40:2,13,19

42:2,19 43:4
43:20 44:19
45:5,13,21
46:6,19 47:2
47:15,23 48:6
49:1,17 50:7
50:16 51:10
52:17 53:2
54:11,22 55:19
56:8 57:2,18
58:9,24 59:16
60:11 61:11
62:6,19 63:6
63:11 65:15
66:14 67:10,19
68:3,16,23
69:8,15 70:2
70:10,20 71:23
72:7,20,24
73:8,24 74:8
75:4,11 76:22
77:3,19 78:6
79:1,10,23
81:2,15 83:5
84:21
**woken** 74:8
**woman** 50:12
**word** 18:16
**work** 23:13
**working** 58:1
**works** 18:10
**world** 48:1
**wouldn't** 23:4
25:7 26:4,10
30:5 35:24
36:16,24 42:10
72:20
**wrong** 39:22
**wrote** 84:8

---

**X**

**x** 3:1 29:19

---

**Y**

**yeah** 18:15
29:16,23 34:14
35:1 44:17
66:1 67:3
77:13 80:21
**year** 76:9

**years** 11:7,10,11
11:15 23:13,14
23:15 76:2,7
84:1,10,13
**yelling** 71:16
**yellow** 44:9 46:1

---
**Z**

**Zoom** 21:23
**Zurbriggen** 2:9
3:7 8:16 9:10
12:1 14:22
15:14 16:6,13
16:22 17:8,17
20:17 21:5,15
22:20 23:7
25:2,5,10 26:6
26:21 27:15
28:16,23 29:6
30:20 31:6
32:3,19,23
34:6,12 35:16
36:4,14,21
37:10,23 38:10
38:22 39:8,13
39:23 40:12,17
41:23 42:17
43:2,17 44:13
44:17 45:3,7
45:11,19 46:3
46:10,16,24
47:12,21 48:4
48:23 49:14
50:5,13 51:4,7
52:5,14,24
54:8,20 55:16
56:7,14,24
57:15 58:6,22
59:13 60:9
61:8 62:4,17
63:4,10 65:12
66:11 67:8,16
68:1,13,21
69:7,12,24
70:7,18 71:21
72:5,19,22
73:6,21 74:5
75:1,9 76:19
77:17 78:4,23

79:7,21 80:2,8
80:14 81:1,12
82:17 83:3
84:19 85:3

---
**0**

**08051** 1:23

---
**1**

**1:00** 1:15
**1:03** 5:4
**10** 23:14 77:2
**121** 1:14 2:4 5:2
**14th** 2:10
**15** 14:19
**1515** 2:10
**1633** 1:6
**18** 11:7 23:13
84:12,13
**18th** 1:14 2:5
5:2
**19** 11:15
**19102** 2:11
**19107** 2:5 5:3
**1995** 11:1

---
**2**

**2** 41:7
**2:16** 77:5
**2:20** 76:23
**2:21** 77:11
**2:29** 85:11,14
**2019** 32:15
**2021** 8:12 11:16
13:22,24 78:19
80:12
**2022** 1:4
**2023** 1:8 5:4
**21** 32:11
**215** 2:6,11
**220601633** 4:22
5:10
**23rd** 11:10
**242513** 64:22
**26th** 11:1
**28** 1:8
**28th** 5:4
**292-4292** 1:23

---
**3**

**30** 14:19

---
**4**

**4** 3:16
**406** 1:22
**4664** 8:11 14:1
19:5 29:2 30:2
30:8 31:4 32:1
39:12 44:8,10
56:6
**4th** 13:22,24
78:18 80:12

---
**5**

**5** 3:6
**5:30** 9:19
**546-1433** 2:6

---
**6**

**64** 3:17,18
**683-5114** 2:11

---
**7**

**791** 4:16 5:12

---
**8**

**80** 3:6,7
**856** 1:23