# VERONIQUE N. VALLIERE, PSY.D.
# VALLIERE & COUNSELING ASSOCIATES, Inc.

Forensic Treatment Services

P.O. Box 864
Fogelsville, PA  18051
Telephone: (610) 530-8392
Fax:  (610) 530-8940

## Clinical Evaluation

**Client:** Alvarado, Felishatay    **Clinician:** Veronique N. Valliere, Psy.D.
**DOB:** 12/1/89    **Date of Report:** 10/24/23
**Referral Source:**  Victims' Recovery Law Center    **Dates of Interviews:**  7/12/23; 8/4/23

===============================================================

### Reason for Referral

Ms. Alvarado was referred for an evaluation to assess the psychological, emotional, and social impact of an incident involving police officers who entered her home and shot her dog.  Officers were attempted to execute a warrant and entered Ms. Alvarado's home, the wrong address.  During the breach of Ms. Alvarado's apartment, officers killed Ms. Alvarado's dog and terrified Ms. Alvarado.  Ms. Alvarado is involved in a lawsuit against the City of Philadelphia and multiple co-defendants for their "collective gross negligence, careless, reckless, willful and wanton disregard for the rights and safety of" Ms. Alvarado.  The referral questions include:

- The nature of any psychological harm caused to the victim as a result of the alleged abuse;
- Whether the victim has recovered from the harm or continues to suffer from the harm;
- Her prognosis with respect to recovery, and how and for how long the harm will impact her life; and,
- Treatment recommendations if necessary, and if required, the nature, extent, and expected duration of the treatment.

Ms. Alvarado appeared as scheduled for her evaluation, which was performed on a secure video platform for a total of 3.0 hours, including testing.  Testing was administered via secure link.  Ms. Alvarado was coherent and oriented throughout her interview.  She demonstrated no overt signs of confusion, incoherence, or psychosis during the interview. The purpose of the interview and the limits to confidentiality were explained.  Ms. Alvarado understood that the disclosures she made, and the results of testing would be written into an evaluation for her attorney.  It appeared that her competence to participate in the interview was not compromised in any way. There was nothing to suggest that her ability to consent to the interview was significantly compromised.

This evaluation is limited to the information attained by history, records, interview, collateral contacts, and test results.  New or supplemental information potentially could impact the opinions offered in this report.  If new or contradictory information is obtained, this examiner would require review of the information to incorporate that information into the formulation of this report.  Any self-report can be impacted by bias.  However, Ms. Alvarado's reported history was entirely consistent with the provided information.  There is no reason to question the legitimacy of her self-report.

### Test & Techniques
Clinical Interview (total 3 hours)
Collateral Interviews
       Ms. Yara Alvarado – sister (25 minutes)

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

<h2 style="text-align:center;"><u>Confidential Evaluation</u></h2>

Review of Records:
- Body Cam Videos of Interviews of F. & Y. Alvarado on 6/4/21
- Deposition of F. Alvarado dated 8/11/23
- Deposition of Y. Alvarado dated 8/28/23
- Encounter Note – Greater Philadelphia Health Action, Inc. (GPHA) dated 3/8/23
- ESA Verification #ESA3691099894 by F. Welch, MD dated 4/24/21
- Ledger from Greater Philadelphia Health Action, Inc. (GPHA)
- Plaintiff's Amended Complaint with Exhibit
- Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production

Testing:
- Personality Assessment Inventory (PAI)
- Trauma Symptom Inventory – 2nd Edition (TSI-2)

## **Qualifications of Examiner**

I am a licensed clinical psychologist and have worked in the field of interpersonal violence for 30 years. I received my doctorate in Clinical Psychology from the Graduate School of Applied and Professional Psychology of Rutgers University in January 1993. I became licensed as a Psychologist in May 1995. I have gained my knowledge through my own studies and clinical work treating hundreds of victims of assault. Additionally, having evaluated, interviewed, and/or treated thousands of offenders, I have learned about the methods employed by sexual offenders and the dynamics of sexual abuse, along with the ways in which victims have responded to their assaults and the traumatic impact of sexual assault.

I am the owner/operator of two outpatient treatment centers, one for victims of violence and the other for offenders of violence. I provide treatment, evaluations, and consultation, as well as supervise the work of numerous other clinicians. I have served as an expert in courts across the country and internationally and with all branches of the military. I have served as a consultant and/or expert witness in over 150 courts martials and in many other trials as an expert in clinical psychology, forensic psychology, victim dynamics and response to violence/abuse, trauma, and offender risk, dynamics, and rehabilitation potential. I have also served as an evaluator in civil court in cases involving damages to victims related to abuse or assaults they have experienced at the hands of an individual or involving the neglect or failure to act by an agency or organization. I have served on the Pennsylvania Sexual Offender Assessment Board since 1997, performing thousands of offender evaluations.

I act as a consultant and trainer for many agencies and organizations. I have provided training nationally and internationally for such agencies as the Federal Bureau of Investigations, the Department of Defense, the Department of Justice, the Bureau of Indian Affairs, all branches of the military, and for agencies and institutions in other countries. I have testified regarding sexual assault in the military to the U.S. Congress and to the Pennsylvania General Assembly regarding a number of laws and issues involving sexual assault and violence. I have consulted with the Department of Defense and the U.S. Department of Justice in policy creation regarding sexual assault and understanding sexual offenders. I contributed to the Prison Rape Elimination Act (PREA). I have been consulted as an expert on sexual assault and domestic violence in media articles, and I have appeared on television and radio shows.

I have written three books published by Routledge Press, <u>Understanding Victims of Interpersonal Violence</u> (2019), <u>Unmasking the Sexual Offender</u> (2023), and <u>Successful Prosecution of Intimate Violence</u> (2023), regarding topics related to the substance of my Expert Report. The former is a guide for investigators and prosecutors designed to provide accessible information for personnel "in the trenches" with victims of violence to aid in understanding and explaining their behavior. The second provides information about the motivations, techniques, and dynamics of sexual offenders and their behaviors and outlines ways in which offenders manipulate and exploit others.

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA. This information cannot be copied or re-distributed without specific consent. Violators of these requirements may be subject to reporting and penalties under the law.

**Confidential Evaluation**

**Compensation**

Valliere & Counseling Associates, Inc. is being compensated for its time at hourly rates and, for its out-of-pocket expenses, at cost. My hourly rate is $350.00, up to $3500.00 per day. The compensation paid to Valliere & Counseling Associates, Inc. is not contingent upon the nature or substance of my findings or on the outcome of this matter.

**Offense/Incident Information**

Ms. Alvarado lived alone in Philadelphia, renting a first-floor apartment with her two dogs, three cats, and bird. Ms. Alvarado was living a quiet life, where she supported herself on Social Security Disability and occasional jobs she could hold when she felt well enough. Ms. Alvarado suffers from Von Willebrand disease, a bleeding disorder that prevents the individual's blood from clotting properly. She often felt poorly, with fatigue and pain from the disorder. Ms. Alvarado also suffered from anxiety and depression, lifelong issues that began in her early teen years, but worsening significantly since her mother's death in 2013.

After a period of depression and grief when her mother died, Ms. Alvarado adopted her Akuma, who provided emotional support and protection for her. He, along with Ms. Alvarado's smaller dog Penelope, became certified as emotional support animals in April 2021, to assist Ms. Alvarado with her "high stress levels." Her dog and other pets were her primary sources of solace and companionship. "My animals were the only thing I got out of bed for," she said, describing how her pets kept her going when she was severely depressed. Akuma, a pit bull, also helped Ms. Alvarado feel safe and protected as a single woman living alone in Philadelphia. She trained him well and he was "the love of [her] life."

On June 4, 2021, at approximately 5:00 in the morning, Ms. Alvarado was getting up and getting ready for work, preparing to get in the shower. She had on a tank top, wrapping her naked lower half with a towel. On the way to the shower, Ms. Alvarado heard her small parrot screaming "an alert," so went to her living room went to see what was happening. Suddenly, her door was smashed in, followed by numerous police officers. As Ms. Alvarado used multiple deadbolts on her door, the crash was significant. The officers began shouting and Ms. Alvarado's dogs began barking. She was ordered to sit on the floor, half-naked. Ms. Alvarado immediately called to her pit bull Akuma, telling him to "calm." He sat beside her and stopped barking. Ms. Alvarado asked the police to allow her to put the dogs in their kennel. However, the police "just shot Akuma." She said the dog was not barking or growling when he was shot.

Ms. Alvarado was immediately grief stricken when she heard the gunshot. Penelope, her small dog, ran to her, screaming and yelping loudly. Penelope was shaking and urinated on Ms. Alvarado, as Ms. Alvarado was sitting on the floor trying to calm the little dog. The police would not let her get up and would not tell Ms. Alvarado what had happened, simply commanding her to "be quiet, don't move." Ms. Alvarado felt panicky. She could not see Akuma but knew that he screamed when he was shot. Ms. Alvarado remained sitting on the floor for "a half hour." She saw one officer "kick" at the dog. After, Ms. Alvarado said that the police did not want to give her the dog's body. She had to advocate to get Akuma's body for cremation. When Ms. Alvarado did get her dog's body, she saw that he had been shot in the face.

The investigation revealed that officers falsely believed that Ms. Alvarado's apartment gave them access to a second-floor apartment where they were trying to serve the warrant. They ignored Ms. Alvarado when she tried to inform them that they could not reach the other apartment from her and had entered her home under problematic expectations. Ms. Alvarado had to remain on the floor on her knees, half-naked, without information and terrified, smelling her dog's blood for about a half hour. During the incident, Ms. Alvarado's sister came over, screaming for Ms. Alvarado because she heard the gunshot and did not know if Ms. Alvarado had been shot.

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA. This information cannot be copied or re-distributed without specific consent. Violators of these requirements may be subject to reporting and penalties under the law.

# Confidential Evaluation

Ms. Alvarado's apartment was left in chaos and the floor covered in blood.  Ms. Alvarado could not bear to return nor to clean up the blood.  Her sister Yara had to clean the mess.  Ms. Alvarado moved to another apartment as soon as she could, staying with her sister for about a month until they could find another place.  Ms. ** had difficulty retrieving Akuma's body and then had to pay for his cremation.

## Relevant Historical Information

Ms. Alvarado is a 33-year-old, single Hispanic female.  She has an olive complexion, with brown eyes and black hair.  She wore glasses during her interview.  Ms. Alvarado is slender.

Ms. Alvarado was born and raised in North Philadelphia where she has lived her entire life.  She was raised by a single mother of seven.  Ms. Alvarado is the youngest.  Her mother had her later in life, when her mother was 40.  Ms. Alvarado has two siblings, a brother and a sister, with the same biological parents.  She has numerous half-siblings.  She grew up with her sister and two of her brothers.  Some of her siblings are much older than her.  Ms. Alvarado reported that her father "didn't want anything to do with" his children.  She looked for him at some point, but her father was never in her life, leaving when she was six months old.

Ms. Alvarado described her childhood as having its "ups and downs," especially financially.  Ms. Alvarado's mother is deceased, dying in 2013.  Ms. Alvarado was serving as her primary caretaker as her mother had COPD, arthritis, and diabetes.  Ms. Alvarado moved to Georgia after high school but returned after three years to care for her mother.  Her mother's death "hit" Ms. Alvarado "hard."  She became very depressed and withdrawn after her mother died, only "getting out of bed" to care for her mother's elderly dog.  Ms. Alvarado adopted Akuma after her mother's dog died within the same year or so.

Ms. Alvarado denied ever having been abused as child, physically, sexually, or emotionally.  She described school as "okay," but reported that she struggled with reading.  She "never got help," not receiving an IEP or special education.  She did not graduate high school and did not attain her GED.

Ms. Alvarado reported that she was "always sick" as a child.  She was on disability beginning as a child, which she supports herself now with, supplementing her SSD with part-time work.  She had German measles and has Von Willebrand's disease, a bleeding disorder characterized by blood-clotting issues that can lead to bleeding.  She can feel tired and ill at times.  Ms. Alvarado does work when she "feels okay," holding lower skilled retail and factory jobs.  Ms. Alvarado did not work since the "incident," dealing with depression, anxiety, and fatigue.  Ms. Alvarado may have recently gotten a part-time job as a companion for the elderly, which her sister pushed her to do to "get her out of the house."

Ms. Alvarado has never been married.  She has no children.  Ms. Alvarado has never been in a long-term relationship.  "I like to be by myself," she said.

<u>Treatment History/Substance Abuse History:</u>  As a child Ms. Alvarado suffered from depression.  Her mother put her into therapy, but "it didn't work."  Ms. Alvarado described herself as "quiet," saying she did not like to talk.  It was hard for her to open up about her feelings.  The therapists were unable to encourage her participation in treatment.  Ms. Alvarado is currently in treatment to learn to cope with her trauma.

Ms. Alvarado has no history of substance abuse.  She has never received substance abuse treatment.

<u>Criminal/Legal History:</u>  Ms. Alvarado has never had contact with the law prior to this incident.  She has no criminal history.

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

**Confidential Evaluation**

**Interview/Behavioral Observations**

Ms. Alvarado appeared as scheduled for her interview.  She was appropriately dressed and groomed.  Ms. Alvarado understood the purpose of the evaluation.  She was coherent and oriented.  Ms. Alvarado displayed not overt signs of severe depression, dysregulation, or difficulties with reality testing.  Ms. Alvarado was able to participate effectively in the interview.

Interpersonally, Ms. Alvarado was very pleasant and cooperative.  She spoke sadly much of the time, presenting with some depressed affect, though she tried very hard to be upbeat and optimistic.  When we discussed difficult topics, Ms. Alvarado became sad, though she tended to brush off the feelings so as not to trouble me or concern me with her well-being.  This was consistent with how Ms. Alvarado described herself and how her sister later described Ms. Alvarado, as not wanting to be a bother, not asking for help, and being reluctant to open up and be vulnerable about her feelings.

Ms. Alvarado was very simplistic and concrete.  She was not able to describe her thoughts and feelings well, using unsophisticated language and terms to express herself.  For example, when describing a severe level of depression that entailed not being able to get out of bed, not bathing, and not eating, she simply said she was "really sad."  When describing symptoms of panic attacks and terror, she used the simple terms of "nervous" and "anxious."  Ms. Alvarado does not have the language or insight to give a complex description of her inner life.  This is at least partially due to Ms. Alvarado's limitations and history of learning disabilities.  Her difficulties with reading and comprehension were recognizable and impacted her testing as well.  Ms. Alvarado seems to maintain simplistic ideas of herself and the world, living a quiet, peaceful, and uncomplicated life.  She was introverted and self-protective prior to this event, something that she has become even more so since she was violated.

Ms. Alvarado was cooperative.  She did not try to evade questions or intimidate the examiner.  She was not dramatic or exaggerating.  She spoke softly and clearly.  She did not display any problematic interpersonal behavior that would impact the interview.  Ms. Alvarado did not seem angry, hostile, or retaliatory.  She was very sad about her losses and conveyed a sense of fear and vulnerability.  Ms. Alvarado seemed to be struggling with disappointment over basic expectations of how she was treated.  For example, Ms. Alvarado said sadly when describing the officers shooting her dog, "They didn't even say sorry."

**Interview Information**

When Ms. Alvarado thinks about the raid she is "sad."  "It makes me want to cry," she said, "I relive it over and over again."  Ms. Alvarado is living across the street from her current apartment.  After the incident, she could not return to her home, living with her sister until they could find Ms. Alvarado a new apartment.  She "still smelled the blood" in her apartment, which triggered her and caused her to "relive" the killing of her dog and her fear.  She did not want to go home anymore.  Now, living across the street from her old home still reminds her and produces bad memories, but it is "not as bad."  Ms. Alvarado cried "all the time" after Akuma was killed.  She could not eat or sleep.  She became fearful of police.  She was "paranoid" all the time.

Ms. Alvarado suffers from significant fear and anxiety now.  "My sense of safety is gone," Ms. Alvarado said, explaining that she always feels on guard and vigilant, even in her new home.  "Every time someone knocks on the door," she said, "I am afraid.  Every noise startles me.  I am paranoid and afraid."  This was not a problem before, even when she struggled with depression.  "I feel unsafe all the time," Ms. Alvarado said sadly.

Ms. Alvarado has had severe sleeping issues since the raid.  The police entered her home when it was dark, very early in the morning.  Ms. Alvarado was vulnerable and unprepared.  Now, she feels very vulnerable when she sleeps.  She "always wakes up" during the night, "scared someone is coming in" her

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

home repeatedly during the night.  Ms. Alvarado also has difficulties falling asleep.  Often, she stays up to three or four in the morning.  Ms. Alvarado stated that she does not dream anymore.  She had frequent nightmares that were terrifying.  She would then wake up and "think about it" (the incident).  Then she cannot sleep.  Typically, Ms. Alvarado sleeps four hours, a disrupted sleep.  At times she sleeps during the day.  On good days, Ms. Alvarado will get "seven hours at the most" of sleep, but it is disrupted.  Overall, Ms. Alvarado reported she has "never really slept after the incident."  Ms. Alvarado eats less due to her anxiety.  Her weight has fluctuated.

Ms. Alvarado has flashbacks and intrusive thoughts.  She said she will be driving and "all of the sudden" she will begin to relive the event.  When she hears someone knock on the door, "it triggers and [she] will go back to that day."  "If I see a cop car parked near where I live," Ms. Alvarado immediately gets anxious.  "It is improving," Ms. Alvarado said, "but I try to avoid them."  Dogs that look like Akuma trigger sadness, anxiety, and grief for Ms. Alvarado.

The event has changed Ms. Alvarado's perception of police.   She does not feel safe.  This is a regrettable change for Ms. Alvarado.  Her older brother is a police officer.  She "used to have respect for" police.  Now she does not trust them.

Ms. Alvarado has struggled with a number of practical changes in her life.  Ms. Alvarado moved to another apartment about a month after the event.  Her new apartment is smaller.  It is also on the second floor.  Ms. Alvarado has to carry all her groceries and goods up a fire escape.  She must use the fire escape regardless of the weather to leave or enter her apartment.  She also has to use it to walk her dogs.  Penelope is fearful of the stairs, so Ms. Alvarado must carry her up and down.  Ms. Alvarado used to be on the first floor.  The move has caused some "inconvenience."  She has fallen on the fire escape twice, as it is slippery in the winter and rain.  It is also hot in the summer, as it is metal.

Ms. Alvarado has lived alone since her mother's death.  She was not afraid to live alone, especially because of Akuma.  Now, she feels afraid to live by herself.  She is aware of men on her "corner" who see her go in and out of her apartment without her big dog.  "I lost my sense of protection without my dog," she said.  Her new apartment is "more in the open" as well, more visible to strangers being close to a bus stop.  She does not walk the dogs as she used to because she does not feel safe.

Ms. Alvarado has a history of major depression, repeatedly triggered by loss and grief.  Ms. Alvarado said that her depression began when she was 13, after her grandmother, that she was close with, died of cancer.  Ms. Alvarado helped care for her grandmother.  After her grandmother died, it "left [Ms. Alvarado] feeling empty and sad."  She began having trouble sleeping.  She would not eat.  This became an issue quickly as Ms. Alvarado said she was "not a big eater ever – never really ate a lot."  She lost weight.  Her mother put her in treatment.  Ms. Alvarado described being seriously depressed after her mother died.  Ms. Alvarado was her caretaker for years and was devastated by her mother's death.

After Ms. Alvarado's mother's death, Ms. Alvarado got Akuma, the dog that was killed by police.  Akuma served as her emotional support dog, helping her with her depression and anxiety.  He was very well-trained.  He was nine years old when he was killed, spending almost all his life with Ms. Alvarado.  Ms. Alvarado said that she and Akuma had a "very deep bond."  He helped her begin to function again after she lost her mother.  "My animals were the only reason I got up in the morning," she explained, saying her depression and grief were severe at the time.  She was having trouble getting out of bed, caring for herself, and leaving her house.  Her pets' needs were her motivation.  Ms. Alvarado got another small dog, Penelope, after she got Akuma.  They kept each other company as well.

Penelope has been traumatized by being present for the raid and killing of Akuma.  Ms. Alvarado stated that Penelope is now anxious, scared of loud noises, and afraid of strangers.  Ms. Alvarado also has a small parrot, a conure, that has been impacted by the raid.  Ms. Alvarado described how her bird was "screaming" throughout the event, adding to Ms. Alvarado's fear and the chaos that ensued.  The bird

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

now screams at loud noises, is more anxious, and reacts with fear if Ms. Alvarado picks up her broom or a stick. The bird is a bit more aggressive as well, prone to bite if it is nervous.

Ms. Alvarado is currently in therapy to address her trauma symptoms. She reported that this is "sometimes in zoom, sometimes in person." She said that her therapist gave her useful "breathing exercises." She attends every two weeks. Ms. Alvarado will not take medication for her anxiety and depression. She is fearful of becoming "addicted," so relies on prayer, natural remedies, and herbs. Ms. Alvarado is exerting effort in to feeling better and dealing with her symptoms. "I try to control the way I feel," she said, "I use treatment and coping. I try to clear my mind when I am overwhelmed."

Ms. Alvarado's primary coping is to rely on God. "I leave it up to God," she said, "It helps me a lot – prayer." Ms. Alvarado has returned to church after the incident. She said her mother always "talked about God," so Ms. Alvarado finds solace in leaning on God.

*Collateral Interviews – Yara Alvarado (sister)*

This examiner interviewed Ms. Yara Alvarado over the phone for approximately 25 minutes. Ms. Alvarado identified her sister as someone she was close to and who had observed the impact of the incident on Ms. Alvarado. Ms. Yara Alvarado speaks to her sister on an almost daily basis. They were close before the incident. Ms. Alvarado lived with Yara for about a month after the incident, until she was able to help Ms. Alvarado get another apartment. Ms. Alvarado did not feel safe in the apartment that was breached.

Directly after the incident, Yara was fearful for Ms. Alvarado's mental health. For instance, she explained what Ms. Alvarado did in her new apartment, which concerned Yara. "It was like the movie *A Beautiful Mind*," she said, "There were papers pasted all over the walls." These "papers" were inspirational and coping quotes that Ms. Alvarado had put up all over to help her deal with her anxiety and grief. According to her sister, Ms. Alvarado has a "very hard time expressing herself" and sharing her feelings. "She is trying to prove she is so strong," Yara explained. Yara encourages Ms. Alvarado to go to therapy. Yara added, "Going to Church helps her." Yara explained that Ms. Alvarado has gotten more involved in church, which has been the "most helpful." "the Church is pulling her out of depression some," Yara stated.

Yara has noticed numerous changes in her sister. Ms. Alvarado has gone into a "very bad depression" since Akuma was killed, according to Yara. She also has become reactive and hypervigilant. "If someone knocks, she is paranoid," Yara explained. Yara must give Ms. Alvarado plenty of notice when she is coming to visit, something that was not previously necessary. When she hears sirens, Ms. Alvarado "tenses up and looks around." Ms. Alvarado's "nerves are really bad." "She is very jumpy," said Yara. The most upsetting thing for Yara to witness is that Ms. Alvarado "has lost her sense of safety – she doesn't feel safe."

Ms. Alvarado has withdrawn from relationships with friends and family. The only family Ms. Alvarado associates with is Yara. She is not engaged with nephews she was once close to since the incident. Ms. Alvarado cannot have children, so her "animals are her children."

Ms. Alvarado has changed in other ways. "She was always dolled up all the time," Yara said, "Now, she doesn't wear makeup. She wears pajama bottoms, baggy clothes. She doesn't comb or do up her hair." Ms. Alvarado has "dropped a lot of weight." Ms. Alvarado has always been vegan, but now only eats "rice and potatoes." "I have to get on her to eat properly," Yara said. For a while after the incident, Ms. Alvarado was not leaving the house "for days and days." Yara recently helped get Ms. Alvarado a part-time job being a companion for the elderly. Ms. Alvarado will now go out, and enjoys her job, but takes two of her dogs "everywhere she goes."

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA. This information cannot be copied or re-distributed without specific consent. Violators of these requirements may be subject to reporting and penalties under the law.

Another new and compulsive behavior Yara has noticed is that Ms. Alvarado has been "collecting pets" ever since Akuma was killed. She said Ms. Alvarado has adopted two more dogs since she was interviewed for her evaluation. Ms. Alvarado now has four dogs, four cats, and a bird. Yara had to force Ms. Alvarado to give up an opossum baby she found on the street and was trying to raise. "She is trying to fill the void," Yara explained. Ms. Alvarado is now demonstrating what Yara described as "attachment issues." "She wants to rescue everything she sees," Yara said. Ms. Alvarado allowed a strange homeless man into her shared basement and almost inviting a homeless couple to stay with her. "She tries to be everyone's superman because she can't be her own," Yara said.

Yara tries to offer Ms. Alvarado as much support and encouragement as she can. She helped Ms. Alvarado get a job, encourages her to go to church, and supports her involvement in therapy. However, she remains worried about Ms. Alvarado, especially because it is difficult for Ms. Alvarado to ask for help. "I just want her to feel safe again," Yara said.

**Review of Records**

*Encounter Note – GPHA (3/8/23)*

Ms. Alvarado appeared at the clinic to seek a letter to excuse her from jury duty. At the time she presented for care, she had the diagnoses of Anxiety Disorder, unspecified, Major Depressive Disorder, recurrent, and Post-traumatic Stress Disorder, chronic.

*Ledger – GPHA*

A ledger sheet from GPHA indicated that Ms. Alvarado had a psychiatric evaluation performed in July 2022. She participated in three mental health telehealth visits for a total of one hour and 15 minutes.

**Testing Summary**

Ms. Alvarado took the testing through a link to her cell phone. She was monitored via video and instructed to let this examiner know if she had trouble reading or comprehending any item. Ms. Alvarado did not report any specific difficulties during her testing. However, she informed this examiner that she had a history of reading difficulties and learning disabilities, something I told her might affect her comprehension, reiterating that she needed to inform me if she had problems. While Ms. Alvarado did not identify any problems while taking her tests, the test results both indicate some random and atypical response patterns.

*Trauma Symptom Inventory – 2nd ed. (TSI-2)* - The TSI is a self-report instrument measuring symptoms of Post-Traumatic Stress Disorder and other symptoms of trauma. It was designed as a broad-spectrum assessment of trauma related symptoms and behaviors. The scale assesses a wide array of psychological arenas including: anger/irritability; depression; intrusive experiences; anxious arousal; avoidance; dissociation; suicidality; somatic preoccupation; impaired self-reference; insecure attachment; and other trauma related symptoms and behaviors. There are two validity scales – one assessing defensiveness or avoidance, the other assessing atypical responding.

Ms. Alvarado produced a valid profile. Her score on atypical responding was elevated. This scale can assess over-reporting of symptoms, a cry for help, or the presence of symptoms that not all individuals with trauma experience. In elevated scales, the manual advises examining the individual items to see if the items are consistent with observations and self-report. In Ms. Alvarado's case, her score was elevated by an item regarding frequent flashbacks for several weeks and loss of memory for traumatic events. Ms. Alvarado did report intense, frequent flashbacks for weeks after the event, corroborated by her sister.

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA. This information cannot be copied or re-distributed without specific consent. Violators of these requirements may be subject to reporting and penalties under the law.

**Confidential Evaluation**

Ms. Alvarado showed elevations on scales consistent with her self-report. Her scores involving anxiety were clinically significant. The scales represent the experiences of hyperarousal, "jumpiness," fear, and panic associated with trauma. Ms. Alvarado continues to have clinically significant levels of intrusive experiences – unwanted and sudden memories, thoughts, or feelings associated with the traumatic event. Testing reiterates that Ms. Alvarado way of coping is to avoid thoughts, feelings, reminders, and triggers of the trauma, something she readily described. Ms. Alvarado's test scores also reflect her somatic or physical concerns, indicating that she worries about her health and symptoms that may be related to the depression and anxiety she had, but also likely reflects her chronic health issues. Finally, Ms. Alvarado indicated that she avoids intimacy and attachment. While Ms. Alvarado and her sister reported she has further withdrawn for social interactions, Ms. Alvarado described this as a pre-existing issue for her. Overall, Ms. Alvarado's score on the Posttraumatic Stress scale was clinically significant.

*Personality Assessment Inventory* (PAI) – The PAI is a 344 item, self-administered personality inventory that assesses numerous domains in the individual's personality functioning, including self-concept, clinical syndromes and symptoms, and interpersonal issues. It has four validity scales, including measurements of inconsistent responding, positive and negative impression management, and unusual responding. It is also useful in assessing exaggeration and potential malingering, important areas for examination in a forensic evaluation.

Ms. Alvarado produced a valid profile. However, she demonstrated some elevation on the scale for unusual responses, potentially related to confusion, reading difficulties, or unique interpretations of items. Given this score, her profile should be interpreted with caution. Ms. Alvarado's profile indicated some level of defensiveness as well, a reluctance to admit even common issues. Ms. Alvarado's score indicate that she may attempt to present as functioning better than she actually is, something she demonstrated in her interview and corroborated by her sister.

Ms. Alvarado's testing did not reveal any serious clinical pathology indicative of a severe mental illness or personality pathology. However, her scale scores reveal her suspiciousness, anxiety, depression, fears, and unhappiness. Ms. Alvarado's results reflect her distrust in her environment, hypervigilance to harm, and distrust of other people's motives. Ms. Alvarado has somatic complaints, consistent with her chronic illness and the somatic symptoms of her anxiety and depression. Ms. Alvarado reported ineffective efforts in coping with her fears and anxieties at times, choosing to avoid reminders or situations that evoke her fear versus being able to cope with those fears. She may struggle with agoraphobia. Ms. Alvarado's profile indicates that she experiences the physiological symptoms associated with depression, like sleep disturbances, fatigue, and eating issues, as well as symptoms related to anxiety, like pounding heart, trembling, and sweaty hands.

Ms. Alvarado's profile reiterated her social isolation. She maintains detachment from others; intimacy may be uncomfortable or threatening. Others may perceive her as aloof and unemotional. She tends to keep her environment predictable but has few reliable social supports. She is unlikely to be willing to be vulnerable and open to discussing her problems. Ms. Alvarado's strength lies in her stable sense of self. She believes she is goal-driven and has a sense of purpose.

Ms. Alvarado's profile is consistent with her interview presentation, self-report, and history. She has limited supports, has lived an introverted life with few relationships, and has a chronic disease that worries her. She is fearful of leaving her home, hypervigilant about her environment, and mistrustful of others. She has described losing any sense of safety, something that has magnified her shy and introverted behavior. Ms. Alvarado is fearful of leaving the home and struggles with anxiety about the unknown and unpredictable since the event.

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA. This information cannot be copied or re-distributed without specific consent. Violators of these requirements may be subject to reporting and penalties under the law.

**Diagnostic Summary/Offense Impact Analysis**

Ms. Alvarado is a peace-loving, introverted, simple individual who made a life for herself with a chronic disorder and difficulties with learning. Ms. Alvarado has a history of depression and anxiety beginning in her early adolescence that was triggered by loss and death. An episode of Major Depression recurred following the death of her mother. She found a means to cope with her issues and rise out of her depression with the love and companionship of her pets, especially Akuma, who she used for protection and emotional support.

Ms. Alvarado suffered a tragedy, in both the violation of her home and sanctuary and the killing of her dog Akuma. This event triggered a recurrence of her Major Depression because she suffered a significant loss and experienced the related grief. Historically, loss has been a serious challenge for Ms. Alvarado. It was again, resulting in daily crying, loss of eating, sleep disturbances, dysphoria, and loss of self-care. Ms. Alvarado experienced a Major Depressive episode following the death of her dog, characterized by depressed mood, loss of interest, sleep disturbances, fatigue, problems concentrating and coping, and appetite problems. Ms. Alvarado reported a history of Major Depressive Disorder. However, she was managing her depression and the related anxiety prior to the event with police.

Additionally, since the raid and killing of her dog, Ms. Alvarado has developed a trauma-related disorder, suffering symptoms related specifically to the traumatic event, in addition to the depression. Ms. Alvarado can be diagnosed with Posttraumatic Stress Disorder. In diagnosis of trauma disorders, the traumatic experience has to be experienced or witnessed and must involve an actual or serious threat of death or significant injury to the physical integrity of oneself or others. Subsequent to the event(s), the individual must develop symptoms characteristic of trauma that persist for more than 30 days.

It is evident that Ms. Alvarado meets the diagnostic criteria of Posttraumatic Stress Disorder and developed symptoms specifically following and related to the raid of her apartment. Ms. Alvarado demonstrates the following symptoms, meeting the full diagnostic criteria for PTSD:

- Intrusive Symptoms
    - Recurrent and intrusive thoughts and memories of the assault;
    - Recurrent distressing dreams/nightmares;
    - Flashbacks, or a sense of reliving the event;
    - Intense distress at exposure to stimuli evoking or triggering recall of the event;
    - Physiological reactivity to stimuli evoking the event;
- Avoidance of Stimuli Associated with the Trauma
    - Efforts to avoid any thoughts or feelings of the event;
    - Efforts to avoid situations, reminders, or triggers of the event;
- Negative Alterations in Cognitions and Mood related to the trauma
    - Persistent negative beliefs and expectations (lack of trust, fear of recurrence);
    - Persistent negative emotional state (chronic anxiety, fear);
    - Feelings of detachment and estrangement from others (betrayal, "paranoid," isolated);
    - Marked diminishment of pleasure or interest in significant activities;
- Marked Alterations in Arousal and Reactivity
    - Difficulty falling asleep and/or staying asleep;
    - Difficulty concentrating;
    - Hypervigilance and exaggerated startle response.

Ms. Alvarado described the symptoms above throughout her interview. Her reports were confirmed by collateral contacts, records, and testing results.

Ms. Alvarado is attending therapy, despite her pre-existing issues with describing and sharing her issues with others. She is using the skills she is learning to cope with her anxiety. Additionally, Ms. Alvarado is

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA. This information cannot be copied or re-distributed without specific consent. Violators of these requirements may be subject to reporting and penalties under the law.

seeking solace and comfort in her faith and her optimism.  She is challenging herself by working and broadening her range of activities, like walking her dogs.  Ms. Alvarado continues to rely on avoidance as a major part of her survival with her symptoms.  It is clear that Ms. Alvarado is not invested in suffering and is making efforts to improve.

One of the more momentous changes in Ms. Alvarado's life as a result of this traumatic event, is her loss of a sense of safety.  Ms. Alvarado lived a protected and relatively modest, uncomplicated life prior to the assault on her home.  She was comfortable and felt protected, where she lived and with her dog.  Now, she fears that people will know she lives alone.  She does not trust police.  Ms. Alvarado has had to adjust to a new apartment with all the factors involved, like being closer to a bus stop.  She did not leave her home for a time.  Ms. Alvarado has a distorted and disrupted sense of trust, something that a traumatic event can create.  Ms. Alvarado does not know what to trust so she vacillates between distrust and no regard for trust, like taking in a stranger.  Individuals who are traumatized in situations presumed safe and protected, by people they were supposed to trust (like parents or police), can become ineffective and inaccurate at assessing risk and evaluating trustworthiness.  She has withdrawn from some relationships in the course of her trauma.

## Conclusions and Recommendations

It is my opinion, to a reasonable degree of psychological certainty, that Ms. Alvarado has suffered from a diagnosable condition, namely **Post-traumatic Stress Disorder**, in the past and currently that has profoundly altered her life.  This condition is a direct result of the violations she experienced during the raid on June 4, 2021.  Ms. Alvarado also experienced an episode of **Major Depressive Disorder**, triggered by the loss of her dog and safety, creating additional psychological hurdles for her to navigate.  Ms. Alvarado has a history of Major Depressive Disorder and Generalized Anxiety Disorder, which were exacerbated by the traumatic event.  Ms. Alvarado was managing her pre-existing mental health issues with the assistance of Akuma prior to police killing him.  She suffers impairment in all arenas of her life: psychological; interpersonal/social; and functional.

My conclusions are as follows:

1. Ms. Alvarado can be diagnosed with Post-traumatic Stress Disorder, which has persisted and is still very prominent in her experience.  She is engaged in efforts to cope with her trauma the best she can with limited skills, primarily relying on avoidance as a means to cope.

2. Ms. Alvarado requires therapeutic interventions.  Her treatment needs to be specialized to address her trauma and related depressive and anxiety symptoms.  Treatment of trauma is a specialized treatment that may require a variety of techniques and interventions, including exposure therapy, EMDR, biofeedback, or other avenues to improvement.  Alternative interventions may be particularly necessary for Ms. Alvarado, who is reluctant to or less adept at sharing and introspecting than other clients.  Ms. Alvarado requires strategies and skills that a concrete and accessible to her, presented at a level she can best utilize.  Her learning issues may make reading, journaling, or other more typical interventions less useful.

3. Ms. Alvarado's current treatment is inadequate.  She is unable to have regular appointments, dictated by insurance and clinic scheduling issues.  She should be afforded private therapy that is regular, available, and preferably in person.  Effective therapeutic interventions as described above are not easy or doable via telehealth.  Therapy sessions with a specialized therapist can cost between $150 - $250 per session.  A year of therapy will cost between $7500 - $12,500 per year.  Ms. Alvarado will likely require at least two

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.

      years of therapy with decreasing sessions if she progresses.  She may require a course of EMDR or exposure therapy, which may require more fees.

4. Adequate treatment of trauma can take years and require consistent participation by the client.  If her symptoms increase, she might require a higher level of care, like inpatient or intensive outpatient care.  As Ms. Alvarado is involved in her faith and uses her relationship with God as source of her strength, faith-based therapy may be useful for Ms. Alvarado.

5. Ms. Alvarado's treatment should also address her coping skills.  She has few if any skills to process and manage her anxiety, fear, and depression, as well as her intrusive thoughts and memories related to the abuse.

6. Ms. Alvarado will struggle with her trauma for a significant period in the future, if not for the remainder of her life.  She will experience permanent harm in the form of recurrent intrusive memories, fear and hypervigilance, grief, and anxiety.  While she might learn to better manage these issues, it is unlikely they will fully resolve, especially given her pre-existing vulnerabilities.

7. As Ms. Alvarado finds solace and relief from animals, she may benefit from a service animal for her trauma and anxiety to assist her in becoming more independent.  A service animal differs from an emotional support animal in that a service animal is specially trained to detect and intervene in mental health symptoms, like those that accompany serious PTSD.  A trained service dog that can accompany her in public may assist in broadening her circle and allow her to seek new and different opportunities for socialization and education.  An animal that additionally offers her a feeling of protection, like a larger trained dog, will be beneficial.

*All the opinions contained in this report are given with a reasonable degree of psychological certainty.*

Veronique N. Valliere, Psy.D.
Licensed Psychologist

Information contained in this document may be confidential and protected health information protected by State and Federal laws regarding confidentiality and HIPAA.  This information cannot be copied or re-distributed without specific consent.  Violators of these requirements may be subject to reporting and penalties under the law.