*Force Analysis LLC*

*PO Box 128*

*Linwood, New Jersey 08221*

*Glenn Garrels – Use of Force / Police Practices Consultant*

_____

FELISHATAY ALVARADO : Civil Action

Plaintiff, : No. 22-3763

v. :

City of Philadelphia, et al., :

Defendants :

*Expert Report of Glenn Garrels of Force Analysis LLC pertaining to the incident that occurred on June 4, 2021.*

October 27, 2023

Mr. David Keith

The Victim's Recovery Loss Center

121 South Broad Street

Philadelphia, Pennsylvania

Dear Mr. Keith,

I have reviewed the documents and submitted material provided to me concerning the incident that occurred on June 4, 2021. I have formulated seven opinions that I hold to a reasonable degree of probability and certainty in the field of police practices upon my training and experience:

1. **SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by illegally entering into her 1st floor, front apartment without having the legal authority to do so while executing a search warrant for a defendant believed to be located inside the 2nd floor, rear apartment which was also a violation of policies and procedures of the Philadelphia Police Department.**

2. **SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by executing the search warrant by forcibly ramming the door and not allowing her a reasonable amount of time to voluntarily surrender her residence which was also a violation of policies and procedures of the Philadelphia Police Department.**

3. **Lieutenant Monk and Sergeant Mellody failed to supervise the operation properly from the "recon" of the residence to the execution of the search warrant.**

4. **The Philadelphia Police Department improperly investigated this incident and provided inconsistent information about what had occurred pertaining to the execution of the search warrant and breach of the residence of Felishatay Alvarado.**

5. **The Philadelphia Police Department violated Felishatay Alvarado's 4th Amendment rights when Officer Song discharged his firearm mortally wounding the dog that was considered property**

of Felishatay Alvarado by not allowing her time to secure her dog which was also a violation of policies and procedures of the Philadelphia Police Department.

6. **The Philadelphia Police Department failed to follow nation standards in the planning and execution of this search warrant.**

7. **The Philadelphia Police Department failed to train its officers on policies and how to deal with dog encounters.**

I expand and support my opinions in the attached report.  If more materials are provided regarding this incident, I reserve the right to add, change, and delete any of my opinions based on any provision of additional information not reviewed at the time this report was completed.

Sincerely,

*Glenn Garrels*

Glenn Garrels

Force Analysis LLC

**Table of Contents**

Introduction                              5

Legal Guiding Principles                  7

Incident Summary                          8

Document Listing                          8

Method of Analysis                        12

Incident Analysis                         13

Opinions and Review                       13

    Opinion 1                         13

    Opinion 2                         32

    Opinion 3                         42

    Opinion 4                         44

    Opinion 5                         46

    Opinion 6                         48

    Opinion 7                         52

Conclusion                                56

## Introduction

I was a member of the New Jersey State Police for twenty-two years as a member of the 121St State Police Class which graduated on April 24, 2001. I last held the rank of Lieutenant and was assigned as the Unit Head of the Special Investigations Unit at the Casino Gaming Bureau. My experience included 4 years as a Road Duty Trooper assigned to the Field Operations Section in Troop "A" which encompassed southern New Jersey from 2001 through 2005. During that time, I was assigned to the Bellmawr, Port Norris, and Woodbine Stations before being transferred to the Tactical Patrol Unit. As a road duty Trooper, my duties and responsibilities included conducting motor vehicle accident investigations and enforcing motor vehicle laws under Title 39. I also conducted criminal investigations concerning property thefts, burglaries, sex assaults, assaults, robberies, weapon offenses, and narcotics under the New Jersey Criminal Code Title 2C. I prepared several narcotic search warrants that led to the recovery of narcotics and U.S. currency. I have a vast knowledge of identifying confidential informants and utilizing them to solve open criminal investigations.

While assigned to the Field Operations Section, I had temporary tenures in the Alcohol Beverage Control Unit where I investigated alcohol related crimes under Title 33 and licensed premise investigations under Title 13. These investigations also involved working in an undercover capacity concerning alcohol, narcotics, and gambling investigations. I also worked temporarily as a station detective in the Criminal Investigation Office in Troop "A" where I conducted extensive and complex criminal investigations.

In January of 2006, I was transferred to the Digital Technology Investigations Unit where I conducted criminal investigations into the possession and distribution of child pornography and other crimes against children. I received training in the recovery and analyzation of digital evidence.

In September of 2006, I was then transferred to the Major Crime South Unit where I was responsible for investigating suspicious deaths, homicides, in-custody deaths, and deadly force incidents which mainly consisted of officer involved shootings. It was here I honed my skills and expertise in force encounters. I was a member of the Major Crime South Unit for fourteen years and was a Detective, Detective Sergeant, Detective Sergeant First Class, and Lieutenant all within the unit. I was a case detective, case manager, and incident commander during these complex and high-profile investigations. During this time, I was also assigned to the New Jersey Attorney General's Shooting Response Team. I was involved in nearly one hundred Deadly Force / In-Custody Death Investigations. I have testified in Grand Juries, Motions, and Trials pertaining to these investigations.

I was temporarily assigned to the New Jersey State Police Academy for the 158th State Police Class in 2018. I instructed recruits on the New Jersey Criminal Code, Constitutional Law pertaining to search and seizure, and conducting criminal investigations. During my tenure as a detective over approximately eighteen years, I had extensive knowledge in preparing search warrants affidavits and their constitutional requirement pertaining to residences, vehicles, cell phone call detail records, clothing, and other evidence vital to investigations. I have also supervised countless search warrant preparations and executions during that time. I attended yearly training in search and seizure issues as part as being a New Jersey State Trooper.

I have attended training from around the country in the areas of how to conduct officer involved shooting investigations and deadly force incidents, and the different disciplines in those areas. I also became a use of force instructor through the Federal Law Enforcement Training Center (FLETC) and currently instruct Police and Correction recruits in the standard of force at the Atlantic County Police Academy. I have also instructed on how to conduct officer involved shooting investigations to different law enforcement agencies around the State of New Jersey. I have also attended several different trainings and certifications in the human performance in force encounters. Understanding these principles can greatly affect how an individual can perceive and respond to a force encounter.

Prior to becoming a New Jersey State Trooper, I was a Campus Police Officer with the Commonwealth of Massachusetts, Department of Mental Health. I was assigned to an out-patient Mental Health Facility where I provided police and security for the employees, visitors, and patients. This included interacting with patients daily and providing restraints on patients who were in crisis. I have attended training on dealing with mentally ill individuals by the Massachusetts Police Training Commission as well as training in non-violent self-defense by the Department of Mental Health. I have completed annual training for the New Jersey State Police that pertains to dealing with mentally ill. As a Road Duty Trooper, I assisted and handled dozens of cases dealing with individuals who were in crisis and needed a psychiatric evaluation.

## Instruction:

| | |
|---|---|
| Supervisor's Review of Use of Force – JA Mongomery Consulting - | 2023 - Present |
| Use of Force Instructor – Atlantic County Police Academy - | 2019 - Present |
| Investigating Officer Involved Shootings/Deadly Force - | 2014 - Present |

## Education:

**Master of Science Degree**, Criminal Justice Administration - Western New England College, 1998
**Bachelors of Art Degree**, Criminal Justice – Curry College, 1997
**Associate in Science Degree**, Massasoit Community College, 1995

## Commendations/Awards:

| | |
|---|---|
| New Jersey State Police / Letter of Recognition | March 2018 |
| 200 Club of Burlington County / Meritorious Service Award | February 2018 |
| New Jersey State Police / Unit Certificate of Commendation | September 2017 |
| New Jersey State Police / Letter of Commendation | July 2017 |
| New Jersey State Police / Unit Certificate of Commendation | March 2017 |
| New Jersey State Police / Unit Certificate of Commendation | March 2016 |
| **New Jersey State Police / Trooper of the Year** | **December 2015** |
| Burlington County / Pro Cops Award | August 2015 |
| New Jersey State Police / Unit Certificate of Commendation | April 2014 |
| New Jersey State Police / Unit Certificate of Commendation | October 2008 |

New Jersey Attorney General's Award                              December 2008

## Association Membership

New Jersey Homicide Investigator's Association
Association of Force Investigators
Human Factor & Ergonomics Society
International Association of Chiefs of Police
New Jersey Licensed Private Investigator's Association

**Legal Guiding Principles - This section contains foundational information for the basis of my opinions.**

**Fourth Amendment:**  The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[1]

**Pennsylvania Constitution; Article 1, Section 8: Security from Searches & Seizures:**  The people shall be secure in their person, houses, papers, and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath of affirmation subscribed to by the affiant.[2]

## Pennsylvania Rules of Criminal Code, Rule 207 which states;

"*Rule 207 - Manner of Entry into Premises*

*(A) A law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of the officer's identity, authority, and purpose to any occupant of the premises specified in the warrant, **unless exigent circumstances require the officer's immediate forcible entry**.*

*(B) **Such officer shall await a response for a reasonable period of time** after this announcement of identity, authority, and purpose, unless exigent circumstances require the officer's immediate forcible entry.*

*(C) If the officer is not admitted after such reasonable period, the officer may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search.*[3]

See generally *Commonwealth v. DeMichel*, 277 A.2d 159 (Pa. 1971) with regard to paragraphs (A) and (B). Concerning paragraph (C), see *Commonwealth v. Newman*, 240 A.2d 795 (Pa. 1968)."

---

[1] Fourth Amendment, United States Constitution
[2] Pennsylvania Constitution; Article 1, Section 8:
[3] Pennsylvania Rules of Criminal Code, Rule 207

## Pennsylvania Rules of Criminal Code, Rule 205, which states:

*"Rule 205, Contents of Search Warrant*

*(A) Each search warrant shall be signed by the issuing authority and shall:*

*(1) specify the date and time of issuance;*

*(2) identify specifically the property to be seized;*

*(3) name or describe with particularity the person or place to be searched;*

*(4) direct that the search be executed either;*

*(a) within a specified period of time, not to exceed 2 days from the time of issuance, or;*

*(b) when the warrant is issued for a prospective event, only after the specified event has occurred.[4]*

## Incident Summary

On June 4, 2021, officers from the Philadelphia Police Department executed a search warrant at the residence of Felishatay Alvarado located on the front, 1st floor apartment of 4664 Torresdale Street in Philadelphia, Pennsylvania. This search warrant was a continuing investigation into an arrest warrant for a suspect in a homicide case that did not include Felishatay Alvarado or her residence. The search warrant was authorized for the rear, 2nd floor apartment of 4664 Torresdale Avenue. When officers breached the front door of her apartment with a knock and announce search warrant after only a brief period, they encountered Felishatay Alvarado and her service door. One officer discharged his firearm at the service dog mortally wounding it while other officers cleared the remainder of the residence. When officers realized they had made a mistake, they exited the apartment and walked to the rear of the building and entered into the rear door which led to the 2nd floor, rear apartment. The suspect was not located at that time.

## Document Listing

The following were the documents I reviewed pertaining to this incident:

1. Axon_Capture_Video_2021-06-04_070917
2. Axon_Capture_Video_2021-06-04_071356
3. Axon_Capture_Video_2021-06-04_072135
4. Surveillance video A09_20210604053500_001.mp4
    (rear of building)
5. Surveillance video A10_20210604053500_002.mp4
    (Deli at front of building)
6. Use of Force / Hospital Case Summary                    D000001
7. Warrant of Arrest                                                    D000002
8. Philadelphia Police Department Officer Involved Shooting Investigation    D000003-D000010

---

[4] Pennsylvania Rules of Criminal Code, Rule 205

Unit Final Report prepared by Detective Horn, Report OIS# PS21-05

| | | |
|---|---|---|
| 9. | Officer Involved Shooting Investigation Unit Summary | D000011 |
| 10. | Complaint of Incident Report dated 6/4/21 | D000012 |
| 11. | Complaint or Incident Report prepared by Officer Hamoy dated 6/4/21 | D000013 |
| 12. | Warrant of Arrest / Affidavit | D000014-D000018 |
| 13. | Philadelphia Police Department Consent to Search dated 6/4/21 | D000019 |
| 14. | Crime Scene Log | D000020-D000021 |
| 15. | Statement of Officer Burkitt | D000022-D000023 |
| 16. | Statement of Officer Ashford | D000024-D000025 |
| 17. | Statement of Officer Scott | D000026-D000028 |
| 18. | Statement of Officer Murray | D000029-D000031 |
| 19. | Statement of Officer Riotto | D000032-D000034 |
| 20. | Statement of Sergeant Mellody | D000035-D000038 |
| 21. | Statement of Officer Smith | D000039-D000040 |
| 22. | Statement of Officer Clark | D000041-D000042 |
| 23. | Statement of Lieutenant Monk | D000043-D000045 |
| 24. | Civilian Interview Sheet OIS | D000046 |
| 25. | Statement of Officer Rivera | D000047-D000048 |
| 26. | Statement of Officer Saba | D000049-D000050 |
| 27. | Statement of Officer Hamoy | D000051 |
| 28. | Statement of Officer Fitzpatrick | D000052-D00054 |
| 29. | Statement of Officer Quintana | D000055 |
| 30. | Property Receipt | D000056-D000057 |
| 31. | Search Warrant | D000058-D000060 |
| 32. | Internal Affairs Statement of Sergeant Mellody | D000061-D000064 |
| 33. | Internal Affairs Statement of Detective Scully | D000065-D000067 |
| 34. | Internal Affairs Statement of Detective Graf | D000068-D000071 |
| 35. | SWAT Unit Recon Sheet | D000072-D000075 |
| 36. | PPD Mugshot Profile | D000076 |
| 37. | Firearms Identification Unit Lab Report | D000077-D000078 |
| 38. | Scene Photographs | D000079-D000100 |
| 39. | Complaint or Incident Report dated 6/4/21 prepared by Officer Vega | D000101 |
| 40. | Stray Contact Sheet from Animal Control | D000102-D000104 |
| 41. | Officer Involved Shooting Contact Sheet | D000105-D000109 |
| 42. | Memorandum from Commanding Officer of Internal Affairs | D000110-D000120 |
| 43. | OIS Investigation Unit Report prepared by Detective Horn | D000121-D000122 |
| 44. | PPD Case Report | D000123-D000124 |
| 45. | Internal Affairs Statement of Officer Song with Diagram | D000125-D000131 |
| 46. | Firearms Identification Unit Lab Report | D000132-D000133 |

47. Property Report                                                          D000134
48. Crime Scene Report                                                       D000135-D000138
49. Complaint of Incident Report dated 6/4/21 prepared by SGT Williams        D000139
50. Incident History Report                                                  D000140-D000143
51. Email from LT Hendershot dated 6/4/21                                    D000144
52. Memo dated 6/11/21 Commanding Officer, Firearms Unit                     D000145
53. Defendant City of Philadelphia's Answers and Objections to Plaintiff Interrogatories and Requests for Production of Documents                     17 pages
54. Defendant Police Officer Edward Song's Answers and Objections to Plaintiff's Interrogatories and Requests for Production of Documents             16 pages
55. Civil Complaint                                                          25 pages
56. PPD Wanted Person Directive 5.17 dated 11/20/00
57. PPD Body Worn Camera (BWC) Directive 4.21 dated 5/20/19
58. PPD Arrest Warrant Directive 5.22 dated 9/1/20
59. PPD Use of Force Review Board Directive 10.4 dated 2/5/21
60. PPD Use of Force - Involving the Discharge of a Firearm Directive 10.1 dated 5/13/21
61. PPD Search Warrant Directive 5.7 dated 4/29/16                           D000154-D000193
62. PPD Disciplinary Procedures Directive 8.6 dated 5/1/10                   D000194-D000208
63. PPD Firearms Training Sheet for Officer Song dated 6/9/21                D000209
64. PPD Officer Involved Shooting Invest Unit (Repeated)                     D000210-D000211
65. PPD Training Bureau Firearms Training Unit                               D000212
66. Memo from Commanding Officer Firearms Training dated 6/11/21             D000213
67. Memo from Corporal Francis Rogalski dated 6/10/21                        D000214
68. Firearms Training Unit Policy #8                                         D000215-D000216
    PPD Directive 10.1                                                       D000217-D000219
69. PPD SOP #18 (Revised 2/24/20) SWAT Unit Room Clearing Techniques          D000220-D000222
70. PPD SOP #26 SWAT Unit Operational Planning                              D000223-D000225
71. PPD SOP #28 SWAT Unit Reconnaissance & Intelligence (Revised 4/11/19)    D000226-D000228
72. PPD SOP #30 SWAT Unit Warrant Threat Level Guidelines                    D000229
73. PPD SOP #31 SWAT Unit Warrant Service (Revised 10-20-22)                 D000230-D000232
74. PPD SOP #36 SWAT Unit Dog Neutralization Policy                          D000233-D000234
75. City of Philadelphia Response Letter dated 5/5/23
76. PPD Directive 8.2 Civil Suits dated 1/6/05
77. Dog Encounters Training                                                  D000235-D000241

78. Pennsylvania Law Enforcement Accreditation Commission          D000242-D000243
      Date October 28, 2021
79. Transcript deposition of Officer James Ashford dated 5/22/23
80. Transcript deposition of Officer Matthew Fitzpatrick dated 5/17/23
81. Transcript deposition of Lieutenant Demetrius Monk dated 5/19/23
82. Transcript deposition of Officer Heriberto Quintana dated 5/23/23
83. Transcript deposition of Officer Phillip Riotto dated 5/22/23
84. Transcript deposition of Officer Patrick Saba dated 5/16/23
85. Transcript deposition of Officer Edward Song dated 5/15/23
86. Ashford Exhibit 1 & Riotto Exhibit 1
87. SWAT Unit Recon Sheet                                        D000244-000249
      (Different than D000072-D000075 as 246-249 were added)
88. Police Internal Affairs Files                                D000250-000336
89. Video PS 21-05 4664 Torresdale Avenue (Inside Bing)
90. Riotto Exhibit 1
91. Saba Exhibits 1 (D000137), 2, 3 (D000172-173)
92. Songs Exhibits 1, 2                                          D000235-240
93. Training Records of officers involved                        D000337-644
94. Alvarado Exhibit 1 – Photograph of apartment front door
95. Alvarado Exhibit 1
96. Internal Affairs files for officers involved (unredacted)    D000645-731
97. Shannon Exhibit 1
98. Exhibits for Scott
99. Exhibits for Graff
100.    Hamoy Exhibits
101.    Home Investigation Interview Report
102.    Matteo Exhibits
103.    Rivera Exhibits
104.    Murray Exhibits 1
105.    Photo 1
106.    Photo 2
107.    Photo 3
108.    Photo 4
109.    Photo 5
110.    Plaintiff Photos 1-4
111.    Burkett Exhibits 1-7
112.    Scally Exhibits 1-3
113.    Sergeant Mellody Exhibits

114.    Transcript Deposition of Felishatay Alvarado dated 8/11/23
115.    Transcript Deposition of Yara Alvarado dated 8/28/23
116.    Transcript Deposition of Officer Joshua Burkitt dated 9/20/23
117.    Transcript Deposition of Officer Eric Clark dated 9/21/23
118.    Transcript Deposition of Detective Francis Graf dated 9/28/23
119.    Transcript Deposition of Officer Jose Hamoy dated 8/17/23
120.    Transcript Deposition of Jaclyn Matteo-Hand dated 9/27/23
121.    Transcript Deposition of Sergeant Kevin Mellody dated 10/11/23
122.    Transcript Deposition of Officer Brian Murray dated 8/11/23
123.    Transcript Deposition of Officer Miguel Rivera dated 8/18/23
124.    Transcript Deposition of Detective Timothy Scally dated 9/28/23
125.    Transcript Deposition of Officer Cypian Scott dated 9/21/23
126.    Transcript Deposition of Dana Shannon dated 9/15/23
127.    Transcript Deposition of Sergeant Michael Cerruti dated 10/16/23
128.    Cerruti exhibit 1
129.    Defendant Motion for Summary Judgement dated 10/17/23

## Method of Analysis

In March of 2023 I was contacted by Attorney Keith West of the Victim Loss Recovery Center.  He requested I review an incident that occurred in Philadelphia, Pennsylvania on June 4, 2021 when SWAT Officers from the Philadelphia Police Department executed a search warrant at 4664 Torresdale Avenue.  I requested he send me all the documents/video pertaining to this incident.  After I received all the pertinent information, I reviewed it in its entirety. I then formulated my opinions based on the totality of circumstances from the information provided in an impartial and objective manner.  In reviewing the evidence in this case and forming my opinions, I have relied upon the education, experience, and training that I have obtained in over two decades in law enforcement.  That methodology that I employed in this case was consistent with how I would have reviewed any similar use of force incident based on my training and experience as a supervisor in the field of law enforcement.

## Officers Involved

Officer James Ashford                    Badge Number 3802

Officer Joshua Burkitt                   Badge Number 2091

Officer Eric Clark                       Badge Number 4453

Officer Matthew Fitzpatrick              Badge Number 148

Officer Jose Hamoy                       Badge Number 2987

Officer Brian Murray                     Badge Number 6068

Officer Heriberto Quintana            Badge Number 2721

Officer Phillip Riotto                Badge Number 3984

Officer Rivera                        Badge Number 6797

Officer Patrick Saba                  Badge Number 9823

Officer Cyprian Scott                 Badge Number 3936

Officer Edward Song                   Badge Number 3936

Detective Francis Graf                Badge Number 9066

Detective Timothy Scully              Badge Number 791

Sergeant Kevin Mellody                Badge Number 285

Sergeant Michael Cerruti              Badge Number 8649

Lieutenant Demetrius Monk             Badge Number 279


## Involved Person

Felishatay Alvarado


## Incident Analysis

**Opinion 1: SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by illegally entering into her 1st floor, front apartment without having the legal authority to do so while executing a search warrant for a defendant believed to be located inside the 2nd floor, rear apartment which was also a violation of policies and procedures of the Philadelphia Police Department.**

The following fact patterns support my above opinion;

I reviewed the search warrant for 4664 Torresdale Avenue, Philadelphia, Pennsylvania which was signed and approved on June 3, 2021 where Detective Scally was listed as the affiant.  It clearly states on the first page that the search warrant was for the **2nd floor, rear** apartment. (D000058).  On the third page it again, clearly states on two occasions that the search warrant was for the **2nd floor, rear** apartment. (D000060)

I reviewed the typed statement of Detective Scally dated 6/17/21.  When asked, "Why did you list that the 2nd floor rear of 4664 Torresdale Avenue was the specific description of the premises that was to searched on the search warrant?"  He replied, "The information that was received from the probation officer was the most recent information.  Since the address was for the second floor, we wanted to be specific.  There could

have been a second-floor front that we did not know about." (D000066). (As I will demonstrate from Google Earth photographs, it clearly shows that there could not be a 2nd floor front as the 2nd floor is set back from the front of the building.) When Detective Scally was asked, "Did you have information on how the 2nd floor rear was to be accessed?" He replied, "No. I assumed it would be from the front." (D00066) Again, Google Earth photographs clearly show that no possible access could have been made to the 2nd floor rear from the 1st floor, front as the 2nd floor was set back from the front of the building.

I also reviewed the arrest warrant for the defendant whom the SWAT officers were attempting to locate which listed Detective Graf as the affiant. On page 1 the address listed was for the **2nd floor** of the building (D000002), and listed again as the 2nd floor on page 1 of the arrest affidavit (D000016).

I reviewed the typed statement provided by Detective Graf dated 6/17/21. Detective Graf advised database checks of BMV and prison release for the defendant involved in the murder both listed 4664 Torresdale Ave, **2nd floor** as an address (D000069). He also spoke with Probation Officer Shannon who advised the defendant's address as **2nd floor, rear** (D000069). She last spoke with the defendant on May 5, 2021, a month prior to the execution of the search warrant. Detective Graf advised he conducted no surveillance on the address (D000069) which would have confirmed the defendant was present at that location. He then advised he drove by the front of the property (D000069). He was asked if he "had any prior information that the 2nd floor apartment was in the rear of the property" which he answered, "I did not." (D000069). Prior to that question, Detective Graf provided the information above which came from database checks he conducted prior to obtaining the arrest warrant which clearly indicated the address as **2nd floor, rear.** He stated he looked at the property on Google maps which listed the property in 2019. He also advised he did not know there was a rear door until after the warrant service (D000070).

I reviewed the typed statement of Sergeant Mellody dated 7/12/21. When asked, "Did you have any information that the 2nd floor apartment was in the rear of the property?" He replied, "Yes." (D000062). When asked, "Was there any discussion about how to access the 2 floor, rear apartment of 4664 Torresdale Avenue at any time?" He replied, "Yes. I did a recon on the property and I observed a rear door at the location. When I reconed the property there was no signs of that door going to the second floor. There was a bump out on the left side. The door was on the right of the bump out when looking towards the rear of the property. I discussed this with the homicide personnel. The Homicide Unit personnel did not know where the rear door led to." (D000062).

Sergeant Mellody had first-hand information that the search warrant was for the 2nd floor rear. He had personally "reconed" the apartment. His observation that day provided him with access to the front and rear of the property. The photograph that was provided on the "SWAT Unit RECON Sheet" which showed a clear view of the front of the building (D000075). His observation should have informed him that the second floor was set back from the front of the building which would provide no access to the 2nd floor from the front of the 1st floor. He confirmed the search warrant and arrest warrant were for the 2nd floor rear (D000062). He confirmed he did not know where the rear door on the first floor led to (D000062). He then advised that he has obtained floor plans in the past for large apartment buildings through the internet

(D000063). He was then asked, "Were there any signs or indication on the front of the property leading you to believe the 2nd floor could be accessed from the front of the property? He replied, "No." (D000063). He indicated that he and Lieutenant Monk were the supervisors on scene (D000037). Even though there was no indication that the 2nd floor rear could not be accessed through the 1st floor front of the building, he still allowed the SWAT team to make entry into the front of the building. Because he had the knowledge and ability to obtain building plans, there was a possibility that he could of obtain them for this incident. D000073 showed the recon was conducted by "Clark/Sgt. Melody."

I reviewed PPD SOP 28 for SWAT Reconnaissance & Intelligence dated 4/11/19. It states;

> *"Purpose*
>
> *B. Intelligence is critical when planning a tactical operation and the first step to planning an operation."*
>
> *"Policy*
>
> *B. The reconnaissance will be performed by members of the SWAT Unit and a second separate reconnaissance will be performed by the Unit Supervisor unless there is an exigent circumstance why a supervisor cannot perform the operation or members of the SWAT Unit cannot be used."*
>
> *"3. Survey Examples*
>
> *A. There can never be too much tactical information available. Listed in this document are __minimum examples of necessary information__.*
>
> *1. Location or Site Intelligence - Address - __Number of floors - How constructed__ - Exits, how many, how constructed, where at on the property. - Number of windows, where at, size, fortifications.*
>
> *2 - Dogs, other deterrents to Police - Possible escape points, porch roofs, etc. - Overview of property in relationship to entire block. - Overview of block in relationship to neighborhood - Street types and direction in relationship to location."*

It appeared that Officer Clark and Sergeant Mellody conducted an incomplete "recon" of the property. Both officers, one being a supervisor, clearly observed the front of the residence prior to the execution of the search warrant. They did not take into consideration how the floors were constructed in relation to one another. SOP 28 also states;

> *"5. Method of Reconnaissance.*
>
> *a. Marked Vehicle, Uniformed personnel*
>
> *b. Unmarked vehicle, plainclothes personnel*
>
> *c. Police Helicopter*
>
> *d. Assistance from other members of the Police Department, accompanied by a SWAT Unit member*

> ***e. Any ruse or disguise that will enhance the accuracy of the reconnaissance****.*"

No methods were documented to ensure they were accurate on how and where they executed the search warrant.

I reviewed the typed statement of LT Monk dated 6/4/21. When asked to describe 4664 Torresdale Avenue, he replied, "It was a two-story row home with two mailboxes on the front. One for the 1st floor and one for the 2nd floor. There was no access to the second-floor apartment from inside of the first floor. The warrant was for the second floor. **We had no information on how to access the 2nd floor then through the main door**." LT Monk acknowledged the warrant was for the second floor, but had no information on how to access the 2nd floor.

I reviewed PPD SOP 31 "SWAT Unit Warrant Service" revised 10/20/22 which states:

> *"A thorough recon and brief will be conducted before warrant service is attempted…Both SWAT supervisors will obtain a copy of the warrant from the investigators and check it for accuracy and be guided by procedures outlined in SOP 28"*

The following photograph is a picture taken from Google Earth with an imagery date of 6/6/22. I then utilized the "snipping tool" to take a photograph of the image and saved it as a "PNG" file.



As the viewer can see, the 2nd floor is set back from the front of the building a considerable distance. If someone enters through the front door, it clearly shows there would be no entrance way to access the 2nd floor as the 2nd floor is set back. This photograph shows there could be no common foyer where a doorway

would exist to access the 1st and 2nd floor apartments from the front of the apartment. Sergeant Mellody conducted what he described as "recon" the morning the search warrant was executed. His observation of the front of the residence showed there would be no access to the 2nd floor from the front 1st floor.

I utilized the "snipping tool" and photographed the picture as provided in discovery of D000080 which depicts the front of the residence on the day of the incident. I then saved it as a "PNG" file. It clearly shows the 2nd floor is set back from the 1st floor front of the residence. Sergeant Mellody conducted "recon" on the day of the incident and this depicts his viewpoint.



I utilized the "snipping tool" and photographed the picture as provided in discovery of D000084 which depicts the front door of the residence that was struck with a ram by Officer Clark on the day of the incident. I then saved it as a "PNG" file.



I utilized the "snipping tool" and photographed the picture as provided in discovery of D000085 which depicts the front door frame of the residence that was struck with a ram by Officer Clark on the day of the incident. I then saved it as a "PNG" file.



I utilized "snipping tool" to take a photograph of the picture provided in discovery of D000087. This photograph depicts the view point from the front of the 1st floor apartment as entrance is made inside. I saved it as a "PNG" file. A stairway would have to be located by the kitchen entrance toward the rear of the residence to gain access to the 2nd floor because it is set back from the front of the building.



I utilized "snipping tool" to take a photograph of the picture provided in discovery of D000089.  This photograph depicts the view point from the front of the 1st floor apartment to the left front corner of the living room inward.  I saved it as a "PNG" file.



I utilized "snipping tool" to take a photograph of the picture provided in discovery of D000098.  This photograph depicts the rear of the residence and rear door into the 2nd floor apartment.  I saved it as a "PNG" file.



I also utilized Google Earth to take a photograph of the rear of the residence with "snipping tool." I then saved it as a "PNG" file.



I reviewed the typed stated of Sergeant Mellody to Internal Affairs dated 7/12/21. He was asked, "Was there any indication that a dog was present **before** the SWAT Unit entered 4664 Torresdale Avenue while you were outside the property?" He answered, "**Yes. A dog was barking**." I also reviewed the typed statement of Lieutenant Monk dated 6/4/21. He was asked, "Upon your arrival at 4664 Torresdale Avenue, what did you see and do?" He replied, "Upon arrival, Officer Clark approached the door, knocked and announced "Police, with a warrant, open the door". **At that point, I could hear a dog barking and I gave the order to breach**. Upon entry, we were met by a light brown colored pit-bull mix in the living room area. The dog immediately went after Officer Song biting his lower right leg. I continued past Officer Song where I encountered a white female in the kitchen area. She was on the floor behind a fence that separated the living from the kitchen. I proceeded past her and cleared the property. Once I encountered the female, I heard a single shot from behind me."

I reviewed the transcript deposition of Sergeant Brian Mellody dated October 11, 2023. At the beginning of the deposition, he stated he believed all policies and procedures were followed (Page 9). He advised there was nothing inconsistent from his training (Page 10). Sergeant Mellody confirmed he and Officer Clark did the "recon" (Page 15). He stated he inspected the front by riding past the residence then exited his vehicle and walked to the rear to observe that (Page 18). Sergeant Mellody confirmed he heard the

knock then Officer Clark and Murry performed the breach (Page 24).  He advised LT Monk made the decision to breach the door (Page 33), but he (Mellody) was the one who had made the decision to go to the front door to execute the warrant (Page 34).  He stated the search warrant stated rear while the "recon" sheet stated 2nd floor rear (Page 36).  When asked if he knew about the suspect being on parole, he stated he did not (Page 38).  He stated if he knew of the parole information it could have changed the plans (Page 44).  Sergeant Mellody advised the front of the residence is one story (Page 68).  He explained he heard LT Monk give the command to breach the door (Page 74).

I reviewed the deposition of Lieutenant Demetrius Monk dated 5/19/2023.  He was asked, "If you're attempting to enter an apartment for which you do have a valid warrant, as a member of the Philadelphia Police Department, pursuant to the policies and procedures of the Philadelphia Police Department, as you understand them based on your training, are you allowed to go into someone else's apartment that is not subject to the warrant?"  He replied, "Let me back up. ==At the time it was unknown whether the entrance was within the first-floor apartment or not.== So, I would go with we were legally -- we had legal bounds to be in that apartment." (Page 20).  He confirmed he knew the search warrant was for the second floor (Page 19).  (Again, PPD Directive 5.7 pertaining to search warrant states, "***the executing officer have no doubt as to who or what can be seized and where they may be found.)***  He was also asked, "So you believe that you were legally allowed to be in apartment one, first floor" which he responded, "Yes." (Page 20).

Lieutenant Monk was asked, "So prior to entering Ms. Alvarado's apartment, you understood that legally you are not allowed to go anywhere on the property, other than the second-floor rear apartment, correct?" He replied, "That's correct." (Page 25).  He was asked, "And did you believe that the breached private residence was the second-floor rear apartment?"  He replied, "At the time, we did not know the second floor was in the rear." (Page 27) (**As previously shown photographs of the residence, it clearly indicates that the 2nd floor could not be located at the front as the 2nd floor was set back from the front of the residence.**  When the door to the residence was breached, officers knew then as they entered into a residence and not a common hallway or foyer.  Yet, they continued through the 1st floor apartment clearing all rooms including the rear of the residence.)  Lieutenant Monk was asked, "However, assuming that it was true, if it was possible to access the second-floor rear apartment through Ms. Alvarado's first floor apartment, would you legally have been allowed to go through the first-floor apartment, in order to get there, without a warrant?"  He replied, "No." (Page 34).  Lieutenant Monk was asked, "Sir, what is the point of doing reconnaissance prior to a warrant enforcement job?"  He replied, "To identify the properties, the specific property, any difficulties we may have on approach, to get a layout of what the rear may look like and the general neighborhood." (Page 36).  (It was already established the Sergeant Mellody and Officer Clark conducted the "Recon" of the residence.  If done properly, a rear door would have been observed that could show how to access the 2nd floor rear, and also that the 2nd floor rear was set back from the front of the residence.)  Lieutenant Monk also confirmed he ordered the breach. (Page 37).

I again reviewed the search warrant which was approved on June 3, 2021. It stated the warrant shall be served only between the hours of 6AM and 6PM (D000058). I also reviewed the video surveillance (A10_20210604053500_002, Camera 10) provided from the corner Deli store which shows the SWAT Unit approaching the residence at 5:36:21 AM. (The time of the video surveillance was not confirmed with the actual time, but the video clearly shows it was daylight outside.) If "recon" by Sergeant Mellody was conducted when it was dark, it clearly now shows that any reasonable person could determine that the 2nd floor was set back from the front first floor of the building, therefore, no access could be made into a common foyer or area that would provide immediate access to the 2nd floor rear.

I reviewed the "Defendant Officer Edward Song's answers and objections to plaintiff's interrogatories and requests for production of documents." On page 8 he was asked, "If you believe that it was lawful for you to enter Plaintiff's home and/or kill her dog, please specify: A. Why you believe it was lawful for you to enter Plaintiff's home, and/or B. Why you believe it was lawful for you to kill Plaintiff's dog?" The answer provided was *Notwithstanding these objections, and without waiving the same, Defendant responds that he entered the front door to 4664 Torresdale Avenue in good faith and under the belief that it was the common entrance to both the first- and second-floor apartments; that this belief was reasonable given the appearance of the front door facing Torresdale Avenue, which read "4664," was situated immediately to the right of two mailboxes, and lacked any other markings on the door indicating it to be the entrance to the first floor apartment only.*

I reviewed the transcript deposition of Detective Timothy Scally dated 9/28/23. Detective Scally advised he conducted the probation check (Page 20) and did not know the defendant had been on house arrest (Page 21). He indicated he did not know the entrance to the apartment was on Margaret Street (Page 30). He advised if he had the information from probation, he would have known the entrance was at the rear (Page 31). Detective Scally stated there was no specific policy for preparing a warrant and obtaining all available information (Page 35). **\*\* PPD has Directive 5.22 for preparing arrest warrants and Directive 5.7 for preparing search warrants. \*\*** He advised he knew the search warrant was for the 2nd floor-rear (Page 37). Detective Scally explained that if he had the probation information and google maps view, the proper way to enter the residence would be through the rear.

Detective Scally stated the only way they determined the location of the apartment was they drove past the building (Page 40). He indicated he would not have contacted the property owner for safety reasons. He confirmed the area of the front door to the building is one story (Page 45). He believed the front door led to a vestibule area through his experience. He advised the SWAT Unit's knock and announce was consistent with what he observed from his experience (Page 51). He stated he obtained no search warrant for the suspect's cell phone or IP addresses (57). He believed that 5-7 seconds was a reasonable opportunity to surrender the premises (Page 75).

I reviewed the deposition of Officer Patrick Saba dated 5/16/23. He had been identified as a member of the PPD SWAT Unit since 2018. He was shown a photograph of the front of the residence located at 4664 Torresdale Avenue (Saba Exhibit 2). He was asked, "So do you think it would be reasonable for someone

to believe that this second -- that this door led to the second floor of a building?" He replied, "No. It wouldn't be reasonable." (Page 42). He also confirmed there were no exigent circumstances that required any sort of emergency. (Page 55 & 56).

I reviewed the deposition of Officer Matthew Fitzpatrick dated 5/17/23. He was asked, "When you have done reconnaissance at multi-residence properties as part of that, would you try to determine what apartment the warrant was valid for?" He replied, "So we do it on apartments, you have to make sure when you're doing reconnaissance you have to know the specific apartment. If it's unclear, then we will contact the detectives back and we will ask them, you know, if it's not in the warrant they will have to redo the warrant. And if it's not clear then we end up not doing it." (Page 29 & 30). He was then asked, "So if you did have a warrant and did specify a specific floor and apartment number, as part of your reconnaissance would you make sure that you understood how to get to that specific floor and apartment before you sent a team in there? He replied, "Yes. So, if it's a specific apartment, we will have to make sure when we are doing the reconnaissance that we are going to that specific apartment that the warrant is for. (Page 30). Officer Fitzpatrick was then asked, "And what kind of steps have you personally taken to try to figure that out in multi-residence properties?" He replied, "Usually it's unclear. So, if it's like, you know, apartment one and there's a one and a two and it's not marked, usually I will tell my supervisor usually that is -- I will tell them like hey, this isn't clear. He will end up contacting the detectives back. If it's unclear which house it is, then we usually will work with the detectives. But if they can't give us a specific answer, then we will just not do the warrant and we will say you didn't give us more information." (Page 31). He was then asked, "But what I want to ask you actually is if you were part of a reconnaissance team and you knew you had a warrant that was for a second-floor rear apartment and you knew that the apartment building had a rear door, would you investigate whether or not if the rear door was the proper access to the rear apartment?" He replied, "Yes. So, if I was on a reconnaissance and I saw that it said second floor rear door, then I would definitely tell my supervisor and say, hey, listen, there's a door in the rear that leads to the second floor. He would end up talking to the detectives and they would have to hash it out from there." (Page 32).

I reviewed the deposition of Officer Heriberto Quintana dated 5/23/23. He was asked, "Prior to arriving at the property, did you know whether or not there was a rear door?" He replied, "Yes." He was asked, "What were you told about the -- how did you know there was a rear door?" He replied, "Based on the description given during the reconnaissance and on the reconnaissance sheet." He was also asked, "And what were you told about the rear door prior to the operation?" He responded, "Not much. Just that it was accessible from the rear driveway, the view of the rear, including the rear door. Nothing else in particular about it." (Page 16). Officer Quintana was asked, "And during that briefing, did you learn one way or another whether or not the warrant specified a specific apartment number?" He replied, "It did not specify a specific apartment." (Page 27). (***This information is inconsistent with the signed search warrant for the residence.*** It states on at least three occasions that the search warrant specified the "2nd floor rear.")

Officer Quintana was asked, "So with that background in mind and the personal experience you've already referred to, if you were tasked with doing a reconnaissance on a multi residence apartment building, where

the warrant specified that it only applied to the apartment number two, second floor rear, and you knew that there was a rear door and you knew that there was a front door to the building, would you at least consider the possibility that the front door did not provide entrance to the second floor rear apartment?" He replied, "Yes, I would consider that." (Page 32). He was also asked, "So would you try to get additional information, in that situation, prior to sending out the SWAT Unit to do a warrant enforcement operation?" He replied, "Yes." (Page 33). When he was asked what additional steps he would take, Officer Quintana replied, "If I have access to that information, I'd probably look up like a city database and find out exactly what type of dwelling it is. Ask the detectives to possibly set up a surveillance to see if they make a determination, based on the surveillance, what entrance to use specifically for something like that." (Page 33). When he was asked if reconnaissance was to sort out issues ahead of time, he agreed to that statement. (Page 37). When Officer Quintana was asked about what type of guidance he had received on training when it came to conducting reconnaissance, he replied, "In regards to recon, just basically what kind of things to look for when it came to that, how to access any particular, I guess you could say, additional entryways. For example, if we use -- if we were to serve a warrant in a multi-story dwelling, then we have to make a determination of how to get into the first door, how to get into a second door, if needed, and then how to access that particular floor that the apartment is on. That's something that all has to get taken into consideration." (Page 53).

I reviewed the deposition of Probation Officer Dana Shannon dated 9/15/23. She confirmed the "File Notes" pertaining to the suspect in this case stated that the field team went to the residence of the defendant on April 25, 2019. The location stated 2nd floor apartment (rear entrance off Margaret St.) (Page 18). She advised she never went to the residence (Page 20) and told Detective Graf she had never been to the residence (Page 22). She also told Detective Graf she personally never verified the address. Officer Shannon advised Detective Graf never requested the records (Page 25), but if asked, she would have told Detective Graf it was confirmed at that time (Page 26).

I then reviewed the "File Notes" pertaining to the suspect in this case. The following were notations of importance to this case and are summarized below:

1. 6/2/21     PP is suspect in a murder. PO told him we have only had contact with PP by phone. We could not confirm his address by a field visit.
2. 5/5/21     PP stated his address and phone number are the same.
3. 4/27/21     PP gave phone number 267-770-2861.
4. 7/31/20     PP gave email of blockzombie215@gmail.com.
5. 6/22/20     PP gave address 4664 Torresdale Ave, rear
6. 4/25/19     Field Team provided location of 2nd floor apartment (rear entrance off Margaret St.)

The "File Notes" provided a cell phone number for the defendant where suspects can be tracked to their location. He also provided an email address where IP addresses can be tracked to a location. Notations also provided information that the apartment was at the 2nd floor apartment (rear entrance off Margaret

Street.)  I found no documentation that Detective Graf followed any of these steps for the cell phone or IP addresses.

I reviewed the deposition of Felishatay Alvarado dated 8/11/23.  She advised she moved into the apartment in March of 2021.  She advised she added different numbers on the address that were bolder as the previous numbers were faded (Page 19).  Alvarado indicated the numbers on the mailboxes were the same (Page 20).  When asked if she ever had anyone knock on her door looking for people on the 2nd floor, she answered, "No." (Page 21).  She advised she was in her bathroom when she heard her bird scream (Page 43).  She advised here dog barked prior to the police officers breaching her door (Page 44).  She stated the "Beware of Dog" sign was up on the date of this incident (Page 87).

I reviewed the deposition of Officer Eric Clark dated 9/21/23.  He confirmed he and Sergeant Mellody conducted the reconnaissance for the execution of this search warrant (Page 38).   Officer Clark stated he knew there was a rear door to the residence (Page 46) and that they inspected the property (Page 47).  He also confirmed he knew the search warrant was for the rear of the residence (Page 49).  He advised he did not know about the Parole Office having records about the entrance in the rear (Page 53).  He advised if he knew Parole had information about the entrance being in the rear, it would have affected how they did the entry.  When asked, "Did you, as part of your reconnaissance, investigate whether there might be a door to enter the property off Margaret Street?"  He responded, "So I would say since I believe that in front of the property there's two mailboxes, so the properties, numerous properties that we had apartments set up like that and we see two mailboxes, you wouldn't think that, okay, that the entrance to the second-floor apartment is in the rear because the mailbox is not there, it's on the front of the property. So, we were expecting -- well, what I was expecting when I breached the door, that we go in, there was going to be probably a door to the right where there's the first-floor apartment and then a set of steps we had to go up to get to the second floor." (Page 58).  He was then asked, "Given that you knew that the 4664 Torresdale Avenue property had a front door and a rear door and had multiple apartments in it and that your warrant was only for the rear apartment, didn't it show reckless disregard for the residents of the apartments in that building that you did not investigate whether or not the proper entrance point was through the front door or the rear door."  He responded, "Because like I said, there's two mailboxes on the front of the property. Who gets their mail from the front of the property and has to walk all the way back to the rear of the property, like, I mean, that doesn't make sense. So, a reasonable person would believe, okay, to get to apartment 1, it's probably going to say Apartment 1 and 2 Apartment 2, they're going to go through the front door and go up some steps or go to the right, whatever the case may be, whatever the case may be. A reasonable person that sees two mailboxes -- like I'm pretty sure the mailman is not walking to the back of the property, he's putting the mail in the front mailbox.

Officer Clark was later asked, "Okay. So, under your understanding of the United States Constitution, would the warrant that was issued to enter Bernard Lee's residence, were you legally allowed to enter Ms. Alvarado's first floor apartment?"  He responded, "No. The warrant wasn't for the first floor, it was for the second floor." (Page 96)  He also confirmed he heard the dog barking prior to breaching the door (Page 98).

He advised he was not aware of any PPD SOP on dog encounters and has not received any training on dog encounters (99).

I reviewed the deposition of Officer Joshua Burkitt dated 9/20/23. He confirmed the search warrant indicated 2nd floor rear apartment (Page 23). He agreed if he had all the information that was available now, he would have assumed that the entrance to the apartment would be in the rear (Page 31). He advised there were no exigent circumstances to enter the apartment on the first floor and they had no legal grounds to enter (Page 53).

I reviewed the deposition of Jaclyn Matteo Hand, Probation/Parole Officer, dated 9/27/23. She indicated she would conduct the investigation of the defendant and provide the information to the field team (Page 5). She also stated the field team would inspect the residence (Page 6). Officer Matteo Hand advised she spoke with the mother of the defendant who advised the entrance to their apartment was in the alleyway (Page 8). She stated she completed the "Home Investigation Interview" with the mother in April of 2019. She advised the information would have been available to probation (Page 13). She indicated if someone asked where the defendant lived, they could have pulled the document and provided the information of the entrance off Margaret Street (Page 21).

I reviewed the "Home Investigation Interview" document which Officer Matteo Hand advised she completed for the field team. It stated the interview was completed with Shiela Washington who was the mother (Page 1). It also listed the address as:   **4664 Torresdale Ave. Rear apartment (2 floors) Phila PA 19124 (go up alleyway to knock on door).**  It also provided the legal owner of the property as: NAME: Mirela Pajo, Contact #: 267-303-2120 (Page 2). It also lists under household structure: rear apartment – 2 floors (Page 4). Where it asks where the defendant would sleep, it states:  2nd floor back bedroom (Page 4).

I reviewed the deposition of Officer Cyprian Scott dated 9/21/23. He stated he was informed of the search warrant the night prior when he came to work at 11pm (Page 12). He was aware they were going to a 2-story residence (Page 14). He believed the residence only had one door and he had no other information about another door (Page 21). He admitted the front portion of the residence was only one story (Page 26). When told that probation and inspection records specifically said that entry to this apartment was to the rear of the building on Margaret Street, he stated he was not aware of it (Page 31). Officer Scott stated he would have gone to the rear door if they had the information (Page 32). He indicated that the PPD has provided him with training on enforcing warrants on multi-residence properties (Page 35). He was asked, "And based on the training you've received from the Philadelphia Police Department in the SWAT Unit, would it be important for you and the rest of the SWAT team to avoid if at all possible, entering the wrong apartment number?" He replied, "Yes." (Page 39) Officer Scott also indicated it would be unconstitutional to go into another apartment (Page 39). He indicated that he has executed thousands of warrants and never has been to the rear of the residence to enter (Page 40). He advised he would not breach a door if it led into another apartment (Page 50).

I reviewed the deposition of Detective Francis Graf dated 9/28/03.  He explained he had no prior knowledge of the rear door to the residence (Page 20).  He advised he doesn't ever recall going through the rear entrance of a property like that (Page 21).  He indicated the warrant was for the 2nd-floor rear (Page 23).  When asked, "Were officers allowed to enter other apartments that happened to be in the same building?  He responded, "No." (Page 24)  He specifically stated that the SWAT Unit plans the entries (Page 25).  He did not recall if the suspect had a cell phone, but did not complete a phone warrant (Page 33).  Detective Graf indicated he did not recall any social media sites for the suspect (Page 33).  (If he did, it was not documented).  He advised he did not check IP addresses for the suspect and no one conducted physical surveillance (Page 33).  Detective Graf stated he did not contact the property owner.  He stated if he had the information from parole that the access was through the alleyway, it would have led to believe the entrance was off Margaret Street (Page 46).  He explained the "knock and announce rule" meant a reasonable amount of time (Page 67).

I reviewed the deposition of Officer Miguel Rivera dated 8/18/23.  Officer Rivera advised he was assigned to the rear of the apartment when he heard a single gunshot (Page 13).  He stated the entry team then came around the back of the residence (Page 13).  He stated the "recon" is to figure out what doors lead to which apartments (Page 25).  Officer Rivera stated at times they had contacted the property owners (Page 26).  When he was asked, "Can you enter any -- any portion of the building, even if the warrant applied only to Apartment 2, second floor rear?"  He responded, "No." (Page 30)  He confirmed that there was no 2nd-floor directly above the front door (Page 35).  Officer Rivera stated sometimes they monitor residences for when people are coming and going (Page 37).  When Officer Rivera was asked, "If it's not possible ahead of time to determine whether a front door leads into an occupied apartment or a common area, should you, if possible, delay the operation until reconnaissance is able to make that determination in order to avoid entering the apartment of someone who is not subject to a warrant?"  He responded, "Yes." (Page 43).  He indicated he has had no training on dog encounters.

I reviewed the deposition of Officer Jose Hamoy dated 8/17/23.  When asked if he knew whether or not the Philadelphia Police Department has ever issued any directives pertaining to how Philadelphia Police Department officers should handle encounters with dogs?"  He responded, "Yes, I believe so" and advised he has other tools to deal with dogs (Page 16).  He indicated he has received training from the PPD on how to enforce warrants on multi-residence buildings (Page 21).  He stated that sometimes the detective or supervisor would contact the property owner (Page 37).  He stated he knew there was a rear door (Page 43).  Officer Hamoy advised if he saw the warrant and knew there was a rear door, he would have gone to the rear door (Page 51).  When he was asked, "What is the knock-and-announce rule in your experience?"  He responded, "We always knock and announce at least three times before we wait for an order from a supervisor to breach."  **(That is not consistent what happened in this incident according to the video.)**  When asked, **"**And did you ever receive any training as to how much time you should allow to pass between, pursuant to the knock-and-announce rule, between knocking on someone's front door and breaching their property?  He responded, "To the best of my recollection, reasonable time."  (Page 54)  He was asked, "Okay. Can you recall at this time how much time passed between, if any, between Ms.

Alvarado's front door being knocked on and her door being knocked down with the SWAT unit ram?" He responded, "I cannot recall it specifically, sir." Then he was asked, "Do you recall whether or not it was a reasonable amount of time?" He responded, "Yeah. It would be reasonable, sir, to the best of my recollection." (Page 56) He explained that other than serving a warrant for a warrant for a homicide there was no exigent circumstances (Page 57). Officer Hamoy agreed that the 2nd-floor was pushed back from the front door (Page 67). He again advised on this warrant he would have gone to the rear of the residence (Page 68).

I reviewed the deposition of Officer Brian Murray dated 8/11/23. He identified himself as one of the breachers (page 9). He later stated that Officer Clark conducted the knock and announce and the breach of the door (Page 13). He advised he knew the search warrant was for the 2nd floor (Page 9). Officer Murray stated he was expecting to enter into a common entry point (Page). He indicated he was the last one to enter the residence (Page 10). He advised when he did enter into the residence, he knew it was not a common entry (10). He stated that he believed that LT Monk gave the order to breach the door (Page 15).

When Officer Murray was asked, "And why was that, why would you allow a period of time before the breach?" He responded, "We give enough time to try and get someone to comply and open the door. Ideally someone will open the door as opposed to us having to breach the door." (Page 18) He could not recall any exigent circumstances (Page 20) and indicated that a reasonable amount of time would be 30 seconds (Page 20). He stated he had no knowledge of a video of the incident (Page 20). He explained a dog was barking prior to breaching the door (Page 24). He advised he is trained to utilize OC spray on dogs to avoid a lethal encounter and they keep a dog noose in the truck (Page 27). Officer Murray advised he had no knowledge of the dog policy (Page 34). He explained he has never contacted a property owner and was unaware the suspect was on parole (Page 55). When he was asked, "Based on your experience and training with the Philadelphia Police Department, if you heard a dog barking inside of a property, would that be any reason to cut short the amount of time under the knock and announce rule between knocking on the property and breaching the door?" He responded, "No." (Page 60).

I reviewed the PPD Directive 5.7 pertaining to "search warrants" which states:

> *"B. All search warrants will be obtained and executed by police personnel in accordance with the procedures established in this directive and the applicable **rules of Pennsylvania Criminal Procedure (Pa. R. Crim. P. 2001 to 2010)** which can be found in the Pennsylvania Crimes Code. (D000155).*

*4.       Particularity of the Search Warrant*

> *B.       The premises or person to be seized and the items to be seized must be specifically described in the warrant so that the judge if bail commissioner and the ==executing officer have no doubt as to who or what can be seized and where they may be found.==*

> > *1.       Descriptions of buildings should include:*

> a.    street name and number of (no intersections.)  When possible, where search will take place (vehicle/building), use exact numerical location.
>
> b.    number of stories – apartment number
>
> C.    type of construction (brick, wood, etc.)
>
> d.    type of property (single home, apartments, twin structure, etc.)
>
> e.    particular markings, color, or any additional information which serve to identify the particular premise.

I reviewed the Pennsylvania Rules of Criminal Code, Rule 205, Contents of Search Warrant which states:

*(A)  Each search warrant shall be signed by the issuing authority and shall:*

*(1)  specify the date and time of issuance;*

*(2)  identify specifically the property to be seized;*

*(3)  **name or describe with particularity the person or place to be searched;***

*(4)  direct that the search be executed either;*

*(a)   within a specified period of time, **not to exceed 2 days from the time of issuance**, or;*

*(b)   when the warrant is issued for a prospective event, only after the specified event has occurred.*[5]

The search warrant described the exact place to be searched which was described in the search warrant on three occasions listed as 4664 Torresdale Ave, ***2nd floor, rear***.  It was unreasonable for the officers to believe that they could obtained entry into the 2nd floor rear from the 1st floor front of the building as the photos of the front of the residence indicate.  As stated in Directive 5.7, "*the executing officer **have no doubt as to who or what can be seized and where they may be found.**"*

From reviewing the statements of the officers involved, specifically LT Monk, who advised, "At the time it was unknown whether the entrance was within the first-floor apartment or not," there was at least ambiguity on the part of the officers of how to gain access to the 2nd floor, rear.  This is not consistent with the policy of PPD which states:

"*the executing officer **have no doubt as to who or what can be seized and where they may be found.**"*

As part of their policy, the officers had the ability to obtain more background information prior to executing the search warrant.  There appeared to be ambiguity on their part, but still executed the search warrant.  No physical surveillance was conducted as Sergeant Mellody and Officer Clark only drove by the front of the residence and Detective Graf also only drove past the front of the residence.  No officers

---

[5] Pennsylvania Rules of Criminal Code, Rule 205, Contents of Search Warrants

advised they conducted surveillance. It is understandable that they did not want to contact the property owner the night prior and risk notifying the suspect of the warrant, but also attempted no other "***ruse or disguise that will enhance the accuracy of the reconnaissance***" as stated in the policy.

As specified in Rule 205, the search warrant was valid for 2 days. The detectives who obtained the warrants, the officers who conducted the reconnaissance, and the officers who executed the search warrant, specifically LT Monk and Sergeant Mellody, had ample time to further their investigation and obtain more thorough and complete information.

A reasonable and thorough investigation by Detective Scally would have included asking the parole officer how to enter into the residence. His own statement confirmed if he had the now known information, he would have known entry was in the rear of the residence. By not doing to was a violation of the PPD policy which also led to an unconstitutional entry into the residence of Ms. Alvarado.


**Opinion #2   SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by executing the search warrant by forcibly ramming the door and not allowing her a reasonable amount of time to voluntarily surrender her residence which was also a violation of policies and procedures of the Philadelphia Police Department.**

The following is a timing sequence of the events as captured by the video surveillance, A10_20210604053500_002, Camera 10. All times are approximations.

**TIMING SEQUENCE**

| Camera Time | Time Counter | Description |
|---|---|---|
| 5:36:19 | 1:18 | Philadelphia SWAT arrive at residence |
| 5:37:13 | 2:12 | SWAT is in a stack in front of residence |
| 5:37:19 | 2:18 | Officer knocks and announces |
| 5:37:21 | 2:20 | Officer Clark begins to move toward the front door to utilize the ram after order given to breach by LT Monk |
| 5:37:27 | 2:26 | 1st ram of the door |
| 5:37:29 | 2:28 | 2nd ram of the door |
| 5:37:33 | 2:32 | Officers begin to enter residence |
| 5:39:11 | 4:10 | Officers begin to exit residence |
| | | |

Although I did not observe it written on the search warrant, SWAT officers were conducting a "knock and announce" search warrant for 4664 Torresdale Ave, 2nd floor, rear as stated in the Officer Involved Shooting Investigation Report. (D000003). Officers knocked and announced at 5:37:19AM. Officer Clark began to walk toward the front door with the ram after the order was given to breach it. He then rammed

the door the first time at 5:37:27AM.  They only gave the resident 2 seconds before the order was given to breach the door and 8 seconds before they began to strike the door with the ram.  It is unreasonable to think the resident could answer the door that quickly, specifically that time of the morning, and more importantly, no exigent circumstances existed.

In a review of the typed statement of LT Monk (D000044), he advised, "At that point, I could hear a dog barking and I gave the order to breach."  A review of the typed statement of Sergeant Mellody (D000063), he advised he knew a dog was present when he was outside the property when he heard it barking.  Due to the fact that this was a "knock and announce" search warrant, the resident must be given a reasonable amount of time to answer the door.  The dog barking did not give away any tactical disadvantage and jeopardize the lives of the officers as they were already knocking and announcing their presence.  Although attempting to apprehend a murder suspect is in itself dangerous, the situation did not become more dangerous by the dog barking whereby no exigent circumstances existed.

I again reviewed the transcript deposition of Sergeant Mellody.  He confirmed from his previous interview to the shoot team that when they conducted the knock and announce there was no response (Page 20).  When he was asked to explain the knock and announce rule, he stated, "Well, knock and announce rule is like a reasonable amount of time to take a door in a search warrant." (Page 51)  Sergeant Mellody explained he obtained that information from training with the PPD.  He explained he received training about knock and announce warrants while at SWAT school (Page 56).  He stated knock and announce is no specific time just reasonable time to answer the door (Page 59).  When he was asked, "Under the knock and announce rule, are you obligated to give the occupant of the property a reasonable opportunity to voluntarily surrender the property before you break down the door?"  He responded, "Yes." (Page 59).  Sergeant Mellody also stated, "When we do knock and announce, we give them a reasonable amount of time to answer the door to surrender to us." (Page 59).  He advised he never saw SWAT not follow the knock and announce rule (61) and believed it was followed that day (Page 62).  **(He had not observed the video at that time).**   He advised there were no exigent circumstances (Page 74).  He explained he has had no dog encounter training and does not remember the dog policy (Page 88).  He stated he had no other tools like a dog noose or OC spray to utilize (Page 90).  He confirmed the SWAT SOP for knock and announce stated 30 seconds to wait (Page 95).  Sergeant Mellody did not remember if 30 seconds was utilized before the breach (Page 96).   He was asked, "In your experience, the door would be knocked on at least three times before you break someone's door down; right?"  He responded, "Three or more." (Page 98)

Sergeant Mellody explained he did not know about the video of the search warrant until the deposition (Page 106).  When he was shown the video, he expressed "Little quick from what I would do." (Page 110)  When asked, "Assuming there were no exigent circumstances, was this consistent with the knock and announce rule policies from the Philadelphia Police Department?"  He responded, "No." (Page 115).  He was asked, "Was this consistent with your experience, as a member of the SWAT unit, as far as how a warrant enforcement action would normally be done?" He responded, "No." (Page 115)  Sergeant Mellody was asked, "So you believe that what you saw was a knock and announce consistent with the policies and procedures of the Philadelphia Police Department?" He responded, "So I'm going to say visually looking at

that video, no, but I don't know what the circumstances were and what the Lieutenant was thinking at that time." (Page 115)

A review of the memorandum prepared by Lieutenant Kevin Hall (Commanding Officer of Internal Affairs) dated 1/3/23, he advised Lieutenant Jason Hendershot of the OISI contacted the property owner, identified as Armin Maroli, (D000117). Maroli stated he purchased the property 2-3 years ago (2018-2019) as a duplex and no modifications had been made indicating that there was never any access between the two (2) apartments. As stated by Sergeant Mellody, he has obtained building plans in the past for apartment buildings. If plans were obtained for this residence or contact made with the property owner, information would have been obtained that showed no access to the 2nd floor rear could have been obtained from the 1st floor front.

I reviewed the PPD Directive 5.17 related to "Wanted Persons." It clearly states, "Make every effort to determine the location of the wanted subject, **prior to obtaining the warrant**."[6] Although Detective Graf stated in the arrest warrant that he conducted database checks with BMV, prison release records, and a conversation with probation officer, he did not make every effort to determine the fugitive's location as outlined in the directive. Being a former homicide detective for 14 years, it is common knowledge that suspects are often apprehended utilizing the cellphone records to provide their locations with cell site tower information, cell phone "pings", and call detail records which was not documented by detectives. The search warrant specifically stated the officers were attempting to locate a **"cellular phone"** along with other evidence. This insinuates they were aware that the suspect had a cell phone and may be utilized to track his location. It is often common knowledge that suspects are often tracked utilizing their social media accounts that provide who they are communicating with and IP addresses utilized by their accounts that can be tracked to an address. A neighborhood canvass was not documented to determine of any persons observed the suspect at that 2nd floor, rear apartment. Certainly, no physical surveillance was conducted to determine if the suspect was seen entering or exiting the 2nd floor rear apartment. Further, any reasonable investigation of the suspect's whereabouts would have included, at bare minimum, obtaining all information from the Probation / Parole Office with regards to how the suspect's apartment could be entered. It is blatantly indifferent to the 4th Amendment for the City of Philadelphia to have failed to have required its detectives to obtain such basic information in conducting reconnaissance under the circumstances presented here.

I reviewed the PPD Directive 5.22 related to "Arrest Warrants." It clearly reads, "Regarding omissions, investigators shall include in all warrant applications highly relevant facts within his or her knowledge that any reasonable officer knows that a magistrate would need to make an independent determination of probable cause. **This included all culpable information as well as exculpable information**."[7] Again, it is not known whether the suspect had a cellphone, social media accounts, neighbors who saw him at the

---

[6] Philadelphia Police Department Directive, 5.17, Wanted Persons dated 11/20/00
[7] Philadelphia Police Department Directive 5.22, Arrest Warrants dated 9/1/20

residence, or physical surveillance that was conducted to place the suspect at the 2nd floor rear apartment. I am merely stating that these procedures, if done, were not documented.

Also in the Directive 5.22, it states;

*"PRIOR TO OBTAINING THE ARREST WARRANT*

*A. Sworn personnel will ensure that a complete and timely investigation has taken place. The information concerning the suspect and his/her location, as well as any information noted on the 75-572 and 75-51 must be accurate, reliable and contemporary.*

*B. Areas of investigation should **include but are not limited to:***

*1. Motor vehicle checks*

*2. Voter registration checks*

*3. Welfare files*

*4. School records*

*5. Employment records*

*6. Utility bills*

***7. Interviews with family, friends, co-workers, etc.***

***8. Informants***

***9. Surveillance***

*10. Jailtrak system*

*11. Coles Directory*

*12. Fiche File*

***13. Intelligence check (associates, areas frequented)***

*14. Criminal record check - photos, extracts*

*15. Driver's license*

*16. Firearms checks*

***17. Probation/Parole***

*NOTE: These types of investigations should also be used to supplement an officer's efforts concerning "due diligence" requirements after the warrant has been obtained."*

Although some of these steps were taken, many others were not such as interviews with family, friends, and co-workers, surveillance, informants, intelligence checks, and probation/parole notes which goes toward "make every effort to determine the location of the wanted subject, **prior to obtaining the warrant."[8]**

I reviewed PPD Directive 5.7 related to "Search Warrants" dated 4/29/16.  The directive states;

*"B.   Knock and Announce*

**1.**   *The purpose of the Knock and announce" rule is to prevent the violence and physical injury to police and occupants, **to protect the occupant's expectation of privacy, to prevent property damage resulting from a forced entry and to give the occupants an opportunity to surrender the premises.***

2.   *The manner of the entry is provided from in Rule 207 of the Pennsylvania Rules of Criminal Procedure and is as follows:*

   a.   *A law enforcement officer executing a search warrant shall, before entry give or make reasonable effort to give, notice of their identity, authority and purpose to any occupant of the premises specified in the arrant, **UNLESS exigent circumstances require immediate forcible entry.***

   b.   ***Such officer shall wait a response for a reasonable period of time after their announcement before gaining entry into the property.***

   c.   *If the officer is not admitted after such a reasonable period of time, they may forcibly enter the premises and may use such physical force to effect entry therein as is necessary to execute the search warrant.*

   ***NOTE:  The courts have not precisely and uniformly determined the exact period of time that can be considered "reasonable."***

I reviewed the Pennsylvania Rules of Criminal Code, Rule 207 which states;

*"Rule 207 - Manner of Entry into Premises*

*(A) A law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of the officer's identity, authority, and purpose to any occupant of the premises specified in the warrant, unless exigent circumstances require the officer's immediate forcible entry.*

*(B) Such officer shall await a response for a reasonable period of time after this announcement of identity, authority, and purpose, unless exigent circumstances require the officer's immediate forcible entry.*

---

[8] Philadelphia Police Department Directive 5.17, Wanted Persons dated 11/20/00

*(C) If the officer is not admitted after such reasonable period, the officer may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search.[9]*

 *See generally Commonwealth v. DeMichel, 277 A.2d 159 (Pa. 1971) with regard to paragraphs (A) and (B). Concerning paragraph (C), see Commonwealth v. Newman, 240 A.2d 795 (Pa. 1968)."*

\*\* Although these court cases are older cases, these are the ones noted under the Pennsylvania Criminal Code for Rule 207 \*\*

I reviewed PPD SOP 31 "SWAT UNIT WARRANT SERVICE" which states:

*Knock and Announce Rule Directive 5.7 6 B*

*1. The purpose of the "knock and announce" rule is to prevent violence and physical injury to police and occupants, to protect an occupant's expectation of privacy, to prevent property damage resulting from forced entry and to give the occupants an opportunity to surrender the premises.*

*2. The manner of entry is provided for in Rule 207 of the Pennsylvania Rules of Criminal Procedure and is as follows:*

*a. A law enforcement officer executing a search warrant shall, before entry, give or make reasonable effort to give, notice of their identity, authority and purpose to any occupant of the premises specified in the warrant, UNLESS exigent circumstances require immediate forcible entry.*

*b. Such officer shall await a response for a reasonable period of time after their announcement before gaining entry into the property.*

*c. If the officer is not admitted after such a reasonable period of time, they may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search warrant.*

*NOTE: The courts have not precisely and uniformly determined the exact period of time that can be considered "reasonable". However, recent court decisions have shown that 30 seconds should be the minimum time police personnel should delay their entry into a property after announcing their presence and purpose.*

A review of the Lieutenant Monk's deposition revealed he was asked, "What is the knock and announce rule?"  He replied, "the knock and announce rule is when you knock on the door to give the occupant sufficient time to open the door." (Page 37).  He was also asked, "Based on the training that you've received with regards to the policies and procedures of the Philadelphia Police Department, what is the purpose of the knock and announce rule?" He responded, "Again, we perform a knock and announce,

---

[9] Pennsylvania Rules of Criminal Code, Rule 207

again, to make the occupant aware that the police are on their -- at their door and allow them time, sufficient time, typically 25, 30 seconds, to open the door." (Page 38)  He was asked, "How long -- how much time passed between that knock and the front door being breached?"  He replied, "If I was to guess, 15, 20 seconds perhaps" (Page 39) **(This information is inconsistent with the timing sequence I conducted utilizing the video obtained.)**  Lieutenant Monk was asked, "But regardless, the point being that you knew that you were giving less time than you would have if it had been a front door that you knew was occupied, correct?"  He replied, "Yes." (Page 42).  He also stated, "I followed my training, but no, I did not allow the 30 seconds."  (Page 44)  This clearly shows that Lieutenant Monk was aware of providing sufficient time to surrender the residence, but purposely did not allow that time.  He later revealed that there were no exigent circumstances to breach the door earlier. (Page 44).

Lieutenant Monk also agreed that Sergeant Mellody could have figured out whether or not it was necessary to go through the first-floor apartment to get to the second floor (Page 51) and could have called the property management (Page 52).  He indicated he was not aware of a rear door prior to breaching Ms. Alvarado's door.  (Page 53).  Later, Lieutenant Monk was asked, "That door that was breached, prior to breaching that door, you were not concerned with allowing enough time for anyone who might be behind that door an opportunity to voluntarily surrender the premises, correct?"  He replied, "Incorrect, because again, we performed a knock and announce. Though it may have been shorter, we did perform a knock and announce." (Page 83).  When asked, "So is it your testimony that you ordered the breach of Ms. Alvarado's front door sooner than you might have otherwise because you heard dogs barking?"  He replied, "That combined with the fact that ==typically== it's an exterior door and there are apartment doors behind it." (Page 86).  **(This again shows that there were no exigent circumstances in this situation.  Also, he is suggesting that he has not reached the "No doubt" threshold as per PPD policy.)**  Also, if the exterior opened into a common hallway or foyer, the allotted time must still be given to answer and surrender the residence.  It was also to his knowledge that no one under his command made any effort to ascertain who resided on the first floor. (Page 93).  He was later asked, "Was there any higher requirement implemented by the Philadelphia Police Department, to your knowledge, for breaching someone's front door, other than mere possibility that that door might lead to a residence where you were legally allowed to be?"  He replied, "Not that I am aware of."  Again, PPD directive 5.7 related to search warrants states the "executing officer have ==***no doubt***== as to who or what can be seized and where they may be found."

I reviewed the deposition of Officer Edward Song dated 5/15/23.  Officer Song was identified as the individual who discharged his firearm mortally wounding Ms. Alvarado's dog during this incident.  He was also the first individual who entered the residence to execute the search warrant. He was asked, "Please tell me to the best of your understanding what the knock and announce rule is?"  He replied, "You knock and announce the warrant charges, you give ample amount of time for the person to come answer the door, and if they don't answer then the order is given to breach the door." (Page 18)  He also indicated that between knocking and breaching, you should allow at least 30-40 seconds. (Page 21).  When asked, "When you executed the warrant at Ms. Alvarado's house, did you have any information provided to you as to who lived on the first floor of that building?"  He replied, "We were given information -- no. We were just given

information that it was -homicide gave us a warrant to serve on this gentleman that was wanted for homicide, he was supposed to be in the second-floor rear and that's who we were going after."  Officer Song later confirmed the area they entered into the residence by looking at the picture (Song Exhibit 1) that there was no second floor above it. (Page 32) and also "that there is no second floor in that front room." (Page 33)



When Officer Song was asked, "When you walked through the door that had been breached, did it occur to you that you might be entering the residence of someone other than the person named on the warrant?" He replied, "Ninety percent or even more than that, if there's a two-story apartment you can enter the front door and it's like a foyer area and it's a separation from going straight and going up to the second floor and another door that goes into the first floor." (Page 40).  As previously stated, Officer Song acknowledged there was no second floor at the front of the residence, therefore, it would have been unreasonable to gain access to the 2nd floor from the front first floor.  Officer Song advised the residence had a rear door and the warrant actually stated "rear" on it.  (Page 43).  He was asked, "Based on your training from the Philadelphia Police Department, do you believe that enough ample time was provided to Ms. Alvarado between the door being knocked on, for her to answer the door before the door was breached?"  He replied, "I believe there was" and "Like I said before, 30 to 40 seconds at the least. (Page 65 & 66).  Officer Song later stated there were no exigent circumstances during the execution of the warrant. (Page 67 & 76).  He later advised when shown PPD Directive 5.7 related to search warrants, that he could not recall seeing that document prior.  (Page 92).  When asked, "In your opinion, having, you know, whatever training you've received from the Philadelphia Police Department and the fact that you were there, do you believe that Ms. Alvarado was given an opportunity to surrender the premises before her front door was breached?"  He replied, "Yes."  (Page 93).   Officer Song was then asked, "Right. So, if only two seconds passed between

the knock and the door being breached, would it be fair to say that she was not given an opportunity to surrender the premises?" He replied, "Yes." (Page 95).

I reviewed the deposition of Officer Ashford dated 5/22/23. He was asked, "So based on the training that you've received as a member of the Philadelphia Police Department, how much time should you let pass between knocking on someone's front door to -- to enforce a warrant and before you actually breach the front door? He replied, "I would say 20 to 30 seconds." (Page 40). He was also asked, "My question is do you personally know -- just a yes or no question. Do you personally know what the policies and procedures are of the Philadelphia Police Department with regards to the knock-and-announce rule?" He replied, "No." (Page 44).

I again reviewed the deposition of Detective Scally. Detective Scally advised he had a lot of experience with search and arrests warrants (Page 11) and is familiar with the policies and procedures of them (Page 12). He advised he heard the knocks on the door then heard the door rammed (Page 14). He believed officers waited 15-30 seconds after the knock and announce prior to entry (Page 14). **(That was inconsistent with what was viewed in the video.)** When asked to explain the meaning of knock and announce, he stated, "That is what I basically described, a knock and announce what they are here for. Usually, it's a search warrant or arrest warrant. And then they wait a certain amount of minutes or not minutes, but time. And then they breach the door." (Page 15)

I reviewed the deposition of Officer Quintana dated 5/23/23. He was asked, "Are you familiar with something called the knock and announce rule? He replied, "Yes." He was asked, "What is the knock and announce rule? He replied, "When you announce that you're serving a warrant, you're supposed to give about 30 seconds to a minute before you breach the property." (Page 17). When asked about training for the "knock and announce rule," he was asked, "So it's your testimony that at least once a year you and the other members of the SWAT Unit are informed that there's something called the knock and announce rule that requires you to allow at least 30 to 60 seconds between knocking on a front door and attempting to breach the property, correct?" He replied, "Yes." (Page 19). He was also asked, "So from your position in the rear of the building, you could actually hear someone yell breach?" He replied, "No. I could hear when they knock and announce and then I could hear the actual breach, like a ram hitting a door." (Page 16). Officer Quintana was asked, "So when the ram hit the door, that was loud enough that you could actually hear it hit the door from the rear of the building?" He replied, "Yes." (Page 16). He was asked, "How much time passed between the knock and the door being breached?" He replied, "I don't recall. Anywhere from 30 seconds to a minute." (Page 16). "When you say anywhere between 30 seconds and a minute, what's your basis for that?" He replied, "Based on what I remember between the knock and announce, the screams, you know, the officer screaming they were serving a warrant, and then based on the time that I could hear the door get breached and then more or less the time between that and the one gunshot, that was maybe a minute, minute and a half." (Page 16). He was asked, "Do you think it's possible that your experience that officers should allow at least 30 to 60 seconds under the knock and announce rule has been so routine in your experience, something you've experienced so many times, that you may remember this incident as a time where that rule was followed because you've seen it followed so many times?" He

replied, "I was going by my memory from being in the rear and listening to radio communication as to when they arrived. It's just based on my memory." (Page 21).

I reviewed the deposition of Officer Eric Clark dated 9/21/23.  He confirmed he has received training on the "knock and announce rule" as being a member of the PPD.  When asked, "Is your only knowledge as to what the knock and announce rule training that you've received from the Philadelphia Police Department?" He responded, "Yes. I would say that's basically we're told to knock and announce, give a reasonable amount of time depending on the circumstances and breach the door." (Page 19).  He indicated when the SWAT Unit is executing a search warrant, the supervisor says when to breach the door (Page 24).  He was asked if he could wait as little as 10 seconds, he advised, "Yeah, if exigent circumstances or something to that nature, yeah, possibly." (Page 26)  He later indicated he was not aware of any exigent circumstances (Page 67).  Officer Clark was asked, "Under the knock and announce rule, when you knock and announce your presence, are you required to give the occupants of the structure enough time to voluntarily surrender the structure?"  He responded, "Yes." (Page 33)  When asked, "And you definitely never received any training from the Philadelphia Police Department about providing a certain amount of time or anything like that, correct?"  He responded, "Like I said, not that I'm aware of." (Page 34)  Officer Clark confirmed he had the ram and breached the door because he was told to by the supervisor (Page 64).  He also advised there was only a few seconds before the door was breached after the knock (Page 70).  After being shown the video and confirming it was only approximately seven seconds until the door was breached after the knock, he was asked, "So at most we've got about seven seconds. Does that comply with the requirements of the knock and announce rule under your understanding pursuant to whatever training you've received from the Philadelphia Police Department, including the SWAT unit?"  He responded, "Yea, I guess." (Page 80)  Officer Clark later advised it was a reasonable amount of time (Page 82).

I reviewed the deposition of Officer Cyprian Scott dated 9/21/23.  When he was asked why was the building breached, he responded, "There was no answer at the door after numerous times knocking and announcing police." (Page 16)  When he was asked how much time passed between the first knock until the door was breached, he responded, "I would say a good minute to a minute -- about a minute, minute 15 seconds maybe." (Page 16) *** These two answers are inconsistent with what is seen on the video of the breach as my timing sequence indicates. ***  He indicated he heard the officer knocking on the door (Page 16).  When asked if he had ever heard of something called the knock and announce rule, he advised, "I believe you knock and announce and you wait at least 45 seconds, if I'm not mistaken, before a door has to be breached." (Page 16)  Officer Scott stated that is how he was trained by the PPD. (Page 17).  He advised it was a violation of the constitution to enter a private citizen's residence without knocking and announcing first (Page 19)  When asked as of June 4, 2021 that if you hadn't waited at least 45 seconds before entering Ms. Alvarado's property, that was a violation of the constitution, correct?"  He responded, "Yes." (Page 19).

I believe the officers did not wait a **reasonable amount of time** prior to entering into the residence.  The only explanation Lieutenant Monk and Sergeant Mellody provided was a dog began barking.  This was not a "no knock" search warrant.  It was a "knock and announce" warrant, therefore, the dog barking did not

provide exigent circumstances for the officers to enter almost immediately after announcing themselves and did not place the officers at a tactical disadvantage or increase safety issues. ***"The dignity and privacy protected by the fourth amendment demand a certain propriety on the part of policemen even after they have been authorized to invade an individual's privacy. Regardless of how great the probable cause to believe a man guilty of a crime, he must be given a reasonable opportunity to surrender his privacy voluntarily."***[10]

Again, the timing sequence depicts a very short amount of time the officers allowed for Ms. Alvarado to answer the door, just because a dog began to bark. ***"Accordingly, even where the police duly announce their identity and purpose, forcible entry is still unreasonable and hence violative of the Fourth Amendment if the occupants of the premises sought to be entered and searched are not first given an opportunity to surrender the premises voluntarily."***[11] In the search warrant it states the following items of evidence that the police were looking for:

> *"Any and all firearms, ammunition, or other ballistic evidence, clothing including dark colored pants, dark belt, black, white, and orange or red Puma sneakers, cellular phone, and any and all other items deemed to be of evidentiary value to this investigation."* (D000058)

I don't believe the officers were in fear of the suspect escaping as officers were in the front and rear of the residence, and they were attempting to locate the suspect on the 2nd floor rear. I also don't believe officers were in fear of the suspect destroying evidence.

According to Rule 207, I don't believe there were any **exigent circumstances** that would allow the forcible entry into the residence without allowing reasonable amount of time to surrender the premises. As previously stated, there was no added safety issue from the barking dog or tactical disadvantage to enter for safety reasons. No officers provided an exigent circumstance during their depositions.

Both Officer Clark and Officer Murray gave conflicting information in their depositions of who performed the knock and announce on the date of this incident. It is clear one person conducted the knock and announce while a separate person conducted the breach of the door with the ram. The video has no audio and the person who conducted the knock and announce goes out of view for a few seconds when they approach the door. Regardless of who conducted the knock and announce, there was insufficient time between that and when the door was breached to allow a person reasonable amount of time to voluntarily surrender their residence, and in this case, also secure the dog who was mortally wounded.

**Opinion 3: Lieutenant Monk and Sergeant Mellody failed to supervise the operation properly from the "recon" of the residence to the execution of the search warrant.**

From the documentation provided for this case, it appeared that Lieutenant Monk was the highest-ranking officer for this operation. According to SOP, he would be the individual who approved this operation. He

---

[10] Commonwealth v. Demichel 442 Pa. 553 (Pa. 1971) • 277 A.2d 159
[11] Abid

ordered the execution of the search warrant at the wrong address as listed in the search warrant, and also ordered officers to execute the search warrant prior to allowing a reasonable amount of time for the resident to allow SWAT entry into the building to voluntarily surrender the residence.

A review of PPD Directive 5.7 Search Warrants also states;

C.      *Exceptions to the Knock and Announce Rule*

*1.   The only exceptions to the "knock and announce" rule which will permit an officer to disregard its provisions are:*

*a. When occupants remain silence after repeated knocking and identification by officers and continued compliance with the Rule would be fruitless;*

*b.  When the police are virtually certain that the occupants of the premises already know their purpose;*

*c.   When the police have reason to believe that an announcement prior to their entry would imperil their safety; and*

*d.   The police have reason to believe that evidence is about to be destroyed.*

***2.   Sworn personnel should be prepared to clearly articulate to the courts why the "knock and announce" rule was violated and produce any evidence to support their decision to do so.***

*3.   In addition, where exigent circumstances have occurred during the servicer of the warrant, they will be noted on the Complaint or Incident Report (75-48).  The assigned investigator will also describe on the Investigation Report (75-49), in detail, the exigent circumstances and explain why the "knock and announce" rule was violated."*

I have received no documentation that explains why the officers violated the "knock and announce" rule by not providing a reasonable amount of time for the occupant to answer the door and voluntarily surrender her residence.  Lieutenant Monk stated in his typed statement (D000044) that he gave the order to breach after hearing the dog bark.  As stated in the timing sequence, Officer Clark began to walk to the door to utilize the ram approximately 2 seconds after the knock and announce and 8 seconds before the first time the ram was utilized.  This was not only a clear violation of the Pennsylvania Rules of Criminal Code 207, but also PPD Directive 5.7.

I reviewed PPD SOP 26 SWAT Unit Operational Planning.  It states:

*"2. Responsibility*

*A. The supervisor, who will brief the Operation, will be responsible to establish the Operational Plan unless exigent circumstances exist.*

B. *The Operational Plan will be approved by the* ==**highest-ranking SWAT Supervisor**== *available, through the chain of Command."*

During the deposition of Lieutenant Monk, he was asked, "the warrant specifically says second floor rear, does it not?" He replied, "I have not seen the warrant." (Page 27).

Sergeant Mellody was the supervisor who was responsible for the reconnaissance of the residence. He conducted no surveillance and did not take into account of how the second-story was set back from the first floor. In his deposition he advised he was responsible for where they would make entry into the residence. He stated he was notified of the warrant when he arrived at work the night before. He had 2 days to execute the warrant. More time was available to do a more though and complete reconnaissance in order for the correct apartment to be searched.

I reviewed the discipline history of Lt Monk. If I am reading it properly, it states that LT Monk was found guilty of an administrative charge of "Neglect of Duty" for failing to supervise on 5/2/03. He again, was found guilty on a separate administrative charge for "Neglect of Duty" for failing to supervise on 7/17/09.

**Opinion 4: The Philadelphia Police Department improperly investigated this incident and provided inconsistent information about what had occurred pertaining to the execution of the search warrant and breach of the residence of Felishatay Alvarado.**

I reviewed the following three documents:

1. Officer Involved Shooting (OIS) Investigation Unit Preliminary Report (D000121-D000122) prepared by Detective Horn dated 6/4/21. The OIS investigation Unit Preliminary Report states on page 1 (D000121);

   *"Sergeant Mellody was a part of the entry team with additional officers; the SWAT Unit was positioned (in a stack formation) at the front door: <u>they knocked and announced their presence with no response from inside of the home. At that point, members of the SWAT Unit heard a dog barking from inside. A second knock and announce was performed with negative results and the dog continued to bark. Lieutenant Monk ordered the front door entry team to breach the front door, utilizing a ram.</u>"*

2. Officer Involved Shooting Investigation Unit Final Report (D000003-D000010) prepared by Detective Horn. The Final Report states on page 1 (D00003);

   *<u>"The SWAT Unit was stacked at the front door residence and knocked and announced their presence with no response from inside of the home. SWAT subsequently used a ram to take down the front door and entered the residence.</u>"*

3. Memorandum to the Police Commissioner from the Commanding Officer of Internal Affairs Division prepared by Lieutenant Mark Bugieda dated 1/3/23. The memorandum states on page 1;

*"Upon their arrival, the SWAT officers positioned themselves in a stacked formation at the front door of the residence, <u>knocked and announced their presence. The officers received no response from inside the residence.</u> SWAT officers then heard a dog barking inside the residence. Lieutenant Monk gave an order to breach the front door, utilizing a ram. Officer Clark then struck the entrance door with a ram, breaching the door."* (D000110)

On page 10 the memorandum states;

*"Upon their arrival, the SWAT officers positioned themselves in a stacked formation at the front door of the residence. <u>Officer Clark knocked and announced their presence. The officers received no response from inside the residence,</u> but the officers could hear a dog barking from inside the residence. Lieutenant Monk gave an order to breach the front door, utilizing a ram."* (D000119)

As I showed with the timing sequence, I obtained from viewing the video surveillance from the Deli three doors down (Surveillance video A10_20210604053500_002.mp4), the video clearly shows the officers provided approximately 2 seconds before giving the order to breach the door after they "knocked and announced," and approximately 8 seconds when the door was first struck with the ram. The OIS Preliminary Report states a second knock and announce was performed which clearly did not happen. It is understandable that the Preliminary Report may have inaccurate information as all the facts of the case may not have been collected when the report was prepared. The Final Report also states that "no response" was obtained. In the Final Report Detective Horn wrote that the video surveillance was collected from the front and rear of the residence, therefore, he must have viewed it as he wrote, "Exterior cameras from both the front and rear were recovered and show SWAT lining up and entering the property." (D000009). The video and timing sequence shows that statement to be inaccurate as no reasonable amount of time was allowed for Ms. Alvarado to answer the door.

The report prepared by Lieutenant Bugieda also states that "no response" was obtained when officers "knocked and announced." He wrote in his report on page 8 the timed events as they occurred on video (D000117) as shown below:

*"Title: A10_20210604053500.MP4, Camera 10*

*Length: Thirty-four (34) minutes and fifty-nine (59) seconds.*

*• At 5:37:04 AM, SWAT officers line up on the sidewalk, while front containment and breach officers are positioned in front of 4664 Torresdale Avenue.*

*• At 5:37:27 AM, a SWAT officer strikes the front door of 4664 Torresdale A venue with a ram. SWAT officers in a stacked position enter 4664 Torresdale Avenue. Approximately two (2) minutes later, the*

> *SWAT officers exit the property through the front door, and walk around the block to the rear of the property."*

I agree with his time that the SWAT officer strikes the door at 5:37:27 which is indicated on my timing sequence, but Lieutenant Bugieda failed to document when the officer "knocked and announced" and when the officer began to approach the door to strike it with the ram, therefore, he did not understand that no reasonable amount of time was provided to Ms. Alvarado to surrender her residence to officers. These investigation reports failed to indicate that officers violated Directive 5.7 pertaining to "Search Warrants" as well as the Pennsylvania Rules of Criminal Code, Rule 207, and SOP 31 "SWAT Unit Warrant Service."


**Opinion 5:  The Philadelphia Police Department violated Felishatay Alvarado's 4th Amendment rights when Officer Song discharged his firearm mortally wounding the dog that was considered property of Felishatay Alvarado by not allowing her time to secure her dog which was also a violation of policies and procedures of the Philadelphia Police Department.**

As previously stated in this report, the PPD did not wait a reasonable amount of time before breaching the 1st floor front apartment of Felishatay Alvarado.  Again, this was a "knock and announce" search warrant where Pennsylvania Rule 207 and PPD Directive 5.7 clearly indicate that police must wait a "reasonable amount of time" prior to entering into a premises to execute a search warrant.  As shown by the video surveillance and timing sequence I constructed, Officer Clark began walking to the front door with the breaching tool approximately 2 seconds after the "knock and announce" was conducted.  Lieutenant Monk advised "I could hear a dog barking and I gave the order to breach." (Monk typed statement Page 2, D000044). Due to the fact that a reasonable amount of time was not provided for Felishatay Alvarado to voluntarily surrender her residence prior to the breach of the front door, it also did not allow for her to secure her dog.  "A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property."[12]  The dog was clearly property of Felishatay Alvarado while she was inside her home.  Again, there was no exigent circumstances to immediately enter the residence while executing a "knock and announce" search warrant.  Officer Song later discharged his firearm one time mortally wounding the dog in the living room of the residence.  "Destroying property meaningfully interferes with an individual's possessory interest in that property."[13]  In Pennsylvania, by statute, "All dogs are declared to be personal property and subjects of theft."[14]  I understand that this search warrant was pertaining to a homicide investigation where an individual was shot, but again, this was a "knock and announce" search warrant.

I reviewed PPD Directive 10.1 "Use of Force-Involving the Discharge of Firearms."  It states:

> B.    *Discharging Involving Other Animals*

---

[12] United States v. Jacobsen, 466 U.S. 109, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984).
[13] Abid
[14] 3 Pa. Stat. Ann. § 459-601(a).

*1.      Police Officers shall not discharge their firearm at a dog or other animal except to protect themselves or another person from physical injury **and there is no other reasonable means to eliminate the threat,** or when acting consistently with existing Department guidelines authorizing the human destruction of a deer."*

As previously stated, there was no exigent circumstances to enter the residence to violate the "knock and announce" rule. The officers heard the dog barking when they were outside the front 1st floor residence and attempt no other means to control or secure the dog prior to breaching the door.

I also reviewed the "Dog Encounters" training block that was provided to Officer Song after the incident occurred (D000235-D000241). It states on page 1:

*B.      Training Objectives*

- *Identify and respond to indicators that a dog is present in a location.*
1. *Failing to anticipate a dog on the premises is a frequent mistake that officers make.*
2. *Food/water bowls, leashed/chains, worn paths in lawn usually mean the presence of a dog.*
3. ***Notify owner that you are there and tell them to contain their dog.***
4. *Make noise, shake fence, call to dog to avoid surprises for you or the dog.*

- *Identify tools and methods of avoiding or warding off a dog attack.*

1. *Officers' body position, tone of voice, and other "tricks" can avoid their being perceived as a threat by the dog.*
2. *Baton, night stick, ASP. Pepper spray – tools readily at hand-can be used to counter a dog attack.*
3. *When all other means fail to stop the threat, lethal force is justified."*

Officer Songs and all the other officers on scene including Lieutenant Monk clearly knew a dog was present and failed to have a contingency plan to deal with it or utilize any other reasonable means to secure the dog. Officer Song or any other officer on scene made no attempt to utilize other tools at their disposal. According to Officer Song's Internal Affairs Typed Statement (D000125-000131), he turned to the left as he entered the residence to clear the corner of the room (D000126). He then advised "the rest of the team was heading back toward the back of the first floor" (D000127). This clearly shows that while Officer Song was dealing with the dog, it did not stop the remainder of the SWAT Unit from performing their job, therefore, no further danger or exigent circumstances existed.

I reviewed the deposition of Lieutenant Monk. When asked, "As of June 2021, to your knowledge, did the Philadelphia Police Department have any sort of policy or procedure in place as to how members of the

SWAT Unit should deal with dogs at private residences, if they encounter them?"  He replied, "I can't state that there is a policy in regards to that, no." (Page 78).

**OPINION 6:  The Philadelphia Police Department failed to follow nation standards in the planning and execution of this search warrant.**

I reviewed the letter from the Pennsylvania Law Enforcement Accreditation Commission (P.L.E.A.C.) dated October 28, 2021.  It stated that the Commission unanimously voted to ***re-accredit*** the Philadelphia Police Department.  This insinuates that the PPD was accredited prior to this and would predate the date of this incident which was June 4, 2021.  The PPD Directive 5.7 pertaining to search warrants dated 4/29/16 lists PLEAC standards 1.2.3, 2.7.1, 2.7.2 a,b,c,d,e as referred to in their directive.  These standards only state that the police department should have a directive on how legal processes (such as search warrants) should be documented for records purposes.  The standards are listed below are updated from 4/22:

*LEGAL PROCESS*

***Records***

***2.7.1*** *– A written directive that includes information regarding each item of legal process, civil and/or criminal, shall be recorded and include, at minimum, the following elements:* ***(04/19)***
      *a. date received;*
      *b. type of legal process, civil or criminal;*
      *c. nature of document;*
      *d. source of document;*
      *e. name of plaintiff/complainant or name of defendant/respondent;*
      *f. officer assigned for service;*
      *g. date of assignment;*
      *h. court docket number, warrant number, or other identifying number; and*
      *i. date service is due or date of service.*

***Narrative:*** *This system of records should allow entries to be retrieved by docket number, name or unique number assigned to allow cross-reference.*

***2.7.2*** *– A written directive that provides ~~for~~ procedures for and documenting of a record of the execution or attempted service of legal process documents shall be maintained and include at minimum, the following elements:* ***~~(04/19)~~*** ***(04/22)***
      *a. date and time service was executed/attempted;*
      *b. name of sworn law enforcement officer(s) executing/attempting service;* ***(04/22)***
      *c. name of person on whom legal process was served/executed;*
      *d. method of service/reason for non-service; ~~and~~* ***(04/22)***
      *e. address of service/attempt~~.~~; and* ***(04/22)***

f. *execution of criminal arrest warrants, civil arrest warrants, or writs requiring the seizure of real or personal property are to be performed by a sworn law enforcement officer. (04/22)*

**Narrative:** *Basic information must be maintained for each execution or attempted execution of legal process documents.*

I located the International Association of Chiefs of Police (IACP) Model Policy pertaining to executing search warrants dated February 2005. The IACP is the world's largest and most influential professional association for police leaders. With more than 33,000 members in over 170 countries, the IACP is a recognized leader in global policing, committed to advancing safer communities through thoughtful, progressive police leadership. Since 1893, the association has been serving communities by speaking out on behalf of law enforcement and advancing leadership and professionalism in policing worldwide. The policy states:

*B. Preparation for Executing the Warrant*

*1. The case agent and tactical coordinator, where required, work cooperatively to ensure proper preparation, planning, and service of the warrant. They shall detail procedures for executing the warrant to all team members in a warrant service briefing. The plan briefing shall be conducted by both the case agent and tactical coordinator and will include but not necessarily be limited to the following:*

*a. The specific items subject to the search as defined in the warrant and any available information on their location.*

*b. Information concerning the structure to be search and surroundings, **to include floor plans where available**, mockups, photos, and diagrams of the location identifying entrances, exits, obstructions, fortifications, garages, outlying buildings, suspect vehicles, and all other points of concern.*

*c. Suspects and other occupants who may be present at the location—incorporating photos or sketches whenever possible—with emphasis on suspect threat potential, as well as the presence of children, the elderly or others who may not be involved with suspects.*

*d. A complete review of the tactical plan to include the staging area, route of approach; individual assignments for entry, search, management of evidence, custody and handling of seized vehicles, custody of prisoners, and post-execution duties such as securing the location and conducting surveillance on the site for additional suspects.*

*e. Personnel, resources, or armament necessary for gaining entry, safety and security of officers, or for conducting the search.*

*f. If a joint agency task force operation, all officers participating in the warrant service shall be present and identified as members of the warrant service team.*

*g. Contingency plans for encountering hazardous materials, __canines__, booby traps, fortifications or related hazards; measures to take in case of injury or accident, to include the nearest location of trauma or emergency care facilities*

*h. Procedures for exiting the location under emergency conditions.*

## C. Entry Procedures

*1. If an advance surveillance team is at the target site, radio contact shall be made to ensure that the warrant can be served according to plan.*

*2. The search personnel shall position themselves in accordance with the execution plan.*

*3. Notification*

*a. An easily identifiable police officer shall knock and notify persons inside the search site, in a voice loud enough to be heard inside the premises, that he/she is a police officer and has a warrant to search the premises, and that he/she demands entry to the premises at once.*

*b. Following the knock and announce, officers shall delay entry for an appropriate period of time based on the size and nature of the target site and time of day to provide a reasonable opportunity for an occupant to respond (__normally between 15 and 20 seconds__). If there is reasonable suspicion to believe that the delay would create unreasonable risks to the officers or others, inhibit the effectiveness of the investigation, or would permit the destruction of evidence, entry may be made as soon as practicable.*

## APPENDIX A: PRE-SEARCH PLANNING CHECKLIST

## A. Target Location Considerations

*1. Can the site be penetrated by gunfire?*

*2. Does the target site pose a fire hazard?*

*3. Are there underground parking facilities, attached garages, or additional buildings on the curtilage?*

*4. Where are the access points, on upper and lower levels, approach issues related to access points, and points of cover at approach point(s)?*

*5. Which way do doors and windows open?*

*6. Does the target site have an alarm system or warning device?*

> *7. Is there evidence of reinforced entrances or fortifications?*
>
> *8. Barred windows or doors*
>
> *9. Backing mesh*
>
> *10. Appearance of double locks on doors?*
>
> *11. Are there any lookouts, and if so, where, how many, warning devices used, signals?*
>
> *12. Evidence of children, such as bicycles or swings?*
>
> *13. Evidence of elderly, disabled, handicapped or other uninvolved persons?*
>
> *14. Unusual obstacles to entrance?*
>
> *15. Can a reasonably accurate floor plan be obtained or constructed?*
>
> *16. Attitude of neighbors: hostile or friendly?*
>
> *17. Evidence of dogs? If so, how can they best be controlled?*
>
> *18. Where is the electrical box and is it accessible?*

I also reviewed the IACP "Concepts and Issues" pertaining to the execution of search warrants dated February 2006 which states:

> *Whenever possible, photographs should be taken of the location and the immediate surroundings. If available, a helicopter is ideal for taking photographs. Photographs can identify safe approach routes and provide views of areas obstructed by vegetation, fencing, walls, or other natural or manmade obstacles that could affect the approach or entry. Other useful photographs can be easily obtained from a surveillance location, or stationary or moving vehicle. For example, if it is a detached home, the officer should note the proximity of adjoining homes and should attempt to determine who occupies these locations. If occupants of those locations are sympathetic to or in conspiracy with suspects at the target site, they may serve to alert the suspects to either police surveillance or their approach to the location. On the other hand, if neighbors or others occupying locations in the immediate area are cooperative and trustworthy, they may allow authorities to utilize their locations briefly for purposes of surveillance. Video cameras are also very useful in this regard as they may cover more area in a shorter time frame and add greater continuity to photographic coverage.*
>
> *The same type of information should be established for multiple family units with added emphasis on safety should it be necessary to use firearms. The volume and nature of pedestrian and vehicular traffic in the immediate area should be established at the time of day in which the warrant will be executed. This information will have obvious safety implications for the operation, dictate whether*

*special consideration should be given to traffic control, and will also help to establish whether there is a need to deal with lookouts or other accomplices that may be operating in the area.*

I reviewed the PPD Directive 10.4; Use of Force Review Board (UFRB). It states that "all police involved shootings shall be reviewed." (Page 1) Although this incident did not involve deadly force toward a citizen, it did involve the discharge of an officer's duty weapon during the course of their duties. The directive also states, "No Use of Force Violations, but Other Departmental Violation Discovered: The actions of the officer were in accordance with Departmental Use of Force policy or objectively reasonable under extraordinary circumstances, ==but other Departmental violations not related to the use of force are discovered==. The review will be marked "Justified - Use of Force within Departmental Policy – Other Departmental Violations Discovered - Not within Departmental Policy."

NOTE: The Chairperson will notify the Police Commissioner in writing and forward the case to the charging unit for the appropriate disciplinary charges to be filed against the officer." (Page 3)

I opine that several departmental violations occurred during the course of this incident as previously stated which include the executing the search warrant at the wrong location, and not following the knock and announce rule which also led to the shooting of the dog. I requested, but did not receive, the complete IAB investigation which would have documented any department violations if they occurred. I also requested the Use of Force Review Board documentation and recordings which were not provided to me. The UFRB would also have department violations documented if they occurred. On Page 11 of Lt Bugieda's memorandum to the Police Commissioner, it states:

"This investigation Report should be forwarded to the Use of Force Review Board (UFRB) to review the totality of the circumstances and issue a final determination regarding the Philadelphia Police Department's policy Directive #10.1, pertaining to the use of deadly force."

**Opinion 7: The Philadelphia Police Department failed to train its officers on policies and how to deal with dog encounters.**

A review of the officers' depositions showed that a large majority of the them stated they have had no training on dog encounters, specifically Lt Monk and Sergeant Mellody (Supervisors on scene) as well as Officer Song (Officer who mortally wounded the dog belonging to Ms. Alvarado.) A review of PPD SOP #36 – SWAT Unit Dog Neutralization Policy states:

1. Policy.

   **A. SWAT personnel will use every means available to have vicious animals secured.**

      **1. Have owner secure the animal**.

      **2. Ensnare the animal.**

      3. Remove or confine the animal.

      4. Request the assistance of the PACCA.

**B. SWAT personnel will not place themselves or allow others to place themselves in unnecessary or unreasonable danger of serious bodily injury by vicious animals.**

C. When there are no reasonable means of securing the animal, deadly force is justifiable against viscous animals. All guidelines of PD # 10 shall apply.

D. If the animal is secured or contained and no one is claiming ownership PACCA will be notified

      2. SWAT Unit Supervisor Responsibility

      **A. Ensure alternative methods are <u>considered</u> when viscous animals may be present.**

      1. High volume OC spray

      2. Dog Noose

A review of the "Dog Encounters" training states the following:

      *B.*    *Training Objectives*

- *Identify and respond to indicators that a dog is present in a location.*
  1. *Failing to anticipate a dog on the premises is a frequent mistake that officers make.*
  2. *Food/water bowls, leashed/chains, worn paths in lawn usually mean the presence of a dog.*
  3. *Notify owner that you are there and tell them to contain their dog.*
  4. *Make noise, shake fence, call to dog to avoid surprises for you or the dog.*

- *Identify tools and methods of avoiding or warding off a dog attack.*

  1. *Officers' body position, tone of voice, and other "tricks" can avoid their being perceived as a threat by the dog.*
  2. *Baton, night stick, ASP. Pepper spray – tools readily at hand-can be used to counter a dog attack.*
  3. *When all other means fail to stop the threat, lethal force is justified."*

I opine that the officers were not prepared to handle a dog encounter during this incident and did not even consider other alternatives prior to entering the residence. I have seen conflicting photographs regarding the "Beware of Dog" sign that was placed in the left front window of the Ms. Alvarado's residence. The

following is a Crime Scene photograph of taken after the incident occurred by Crime Scene detectives on the day of the incident.  It shows no "Beware of Dog" sign in the window (D000080).



The following photograph was exhibited and shown as plaintiff 4 which clearly shows the "Beware of Dog" sign in the left window:



If the sign was present in the hours leading up to the execution of the search warrant, it would have been displayed when Detectives drove past the residence and when officers conducted their reconnaissance.

Again, referring to the timing sequence I conducted, Officer Clark began to move toward the door within approximately 2 seconds of the knock and announce after LT Monk gave the order to breach the door after hearing the dog barking. No consideration for other alternatives were considered to handle the dog. Also, by not allowing Ms. Alvarado reasonable time to voluntarily surrender the residence and secure her dog,

offices placed themselves in a situation to have to use deadly force on the
dog.

## Conclusion:

As previously stated, I have formulated ??? opinions that I hold to a reasonable degree of probability and certainty in the field of use of force based upon my training and experience:

1. **SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by illegally entering into her 1st floor, front apartment without having the legal authority to do so while executing a search warrant for a defendant believed to be located inside the 2nd floor, rear apartment which was also a violation of policies and procedures of the Philadelphia Police Department.**

2. SWAT officers from the Philadelphia Police Department violated the 4th Amendment rights of Felishatay Alvarado by executing the search warrant by forcibly ramming the door and not allowing her a reasonable amount of time to voluntarily surrender her residence which was also a violation of policies and procedures of the Philadelphia Police Department.

3. **Lieutenant Monk and Sergeant Mellody failed to supervise the operation properly from the "recon" of the residence to the execution of the search warrant.**

4. **The Philadelphia Police Department improperly investigated this incident and provided inconsistent information about what had occurred pertaining to the execution of the search warrant and breach of the residence of Felishatay Alvarado.**

5. **The Philadelphia Police Department violated Felishatay Alvarado's 4th Amendment rights when Officer Song discharged his firearm mortally wounding the dog that was considered property of Felishatay Alvarado by not allowing her time to secure her dog which was also a violation of policies and procedures of the Philadelphia Police Department.**

6. **The Philadelphia Police Department failed to follow nation standards in the planning and execution of this search warrant.**

7.  **The Philadelphia Police Department failed to train its officers on policies and how to deal with dog encounters.**

I expand and support my opinions in the attached report.  If more materials are provided regarding this incident, I reserve the right to add, change, and delete any of my opinions based on any provision of additional information not reviewed at the time this report was completed.

Sincerely,

*Glenn Garrels*

Glenn Garrels

Force Analysis LLC